**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. et al.,<br><br>Appellees. | Case No. 3:26-cv-02315-X |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S MOTION TO CERTIFY <u>PENDING APPEAL TO THE FIFTH CIRCUIT UNDER 28 U.S.C. § 158(D)(2)(A)</u>**

3:26-cv-02315-X

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1
QUESTIONS PRESENTED FOR DIRECT REVIEW ........ 2
BACKGROUND ........ 3
LEGAL STANDARD ........ 10
ARGUMENT ........ 11
I. The Extent to Which Bankruptcy Courts are Tasked with Examining Settlements is an Issue of Significant Importance to the Public ........ 11
A. Preventing Fraud and Misconduct is a Central Function of Bankruptcy Courts ........ 13
B. Limited Review of Court-Appointed Professionals is Contrary to the Bankruptcy Court's Function ........ 17
II. Certification to the Fifth Circuit is Warranted to Materially Advance the Progress of the Case ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adkins*,
517 B.R. 698 (Bankr. N.D. Tex. 2014)....10

*In re Aerogroup Int'l, Inc.*,
No. BR 17-11962 (CSS), 2020 WL 757892 (D. Del. Feb. 14, 2020)....11

*In re Age Refining, Inc.*,
801 F.3d 530 (5th Cir. 2015)....14

*Arenas v. U.S. Trustee*,
535 B.R. 845 (10th Cir. BAP 2015)....15

*Estate of Brown v. 1 Glen Hill Road Ops., LLC*,
No. 3:25-cv-2855-E, 2026 WL 1602714 (N.D. Tex. June 3, 2026)....12, 17

*In re CNC Payroll, Inc.*,
491 B.R. 454 (Bankr. S.D. Tex. 2013)....18

*Commodity Futures Trading Comm'n v. Weintraub*,
471 U.S. 343 (1985)....18

*In re Covington Properties, Inc.*,
255 B.R. 77 (Bankr. N.D. Fla. 2000)....15

*In re CWNevada LLC*,
602 B.R. 717 (Bankr. D. Nev. 2019)....14, 16

*In re Foster Mortg. Corp.*,
68 F.3d 914 (5th Cir. 1995)....14

*Matter of Garfinkle*,
672 F.2d 1340 (11th Cir. 1982)....15

*In re GenOn Energy, Inc.*,
2018 WL 9708912 (Bankr. S.D. Tex. Jun. 19, 2018)....20

*In re Highland Capital Management, L.P. (Highland II)*,
132 F.4th 353 (5th Cir. 2025)....7, 8

*In re Highland Capital Mgmt., L.P.*,
No. 19-34054-sgj....3

*In re Highland Capital Mgmt., L.P.*,
No. 3:19-34054-sgj, Dkt. 4333 (Bankr. N.D. Tex. July 21, 2025) ....................12

*In re Highland Capital Mgmt., L.P.*,
No. 3:19-34054-sgj, Dkt. 4678 (Bankr. N.D. Tex. June 15, 2026) ....................13

*In re Int'l Mgmt. Assocs., LLC*,
2009 WL 6498191 (Bankr. N.D. Ga. Dec. 1, 2009) ....................20

*In re Kallstrom*,
298 B.R. 753 (10th Cir. BAP 2003) ....................16

*Kirschner v. Dondero*,
Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021) ....................7, 8, 16, 20

*Local Loan Co. v. Hunt*,
292 U.S. 234 (1934) ....................15

*Louisiana World Exposition v. Fed. Ins. Co.*,
858 F.2d 233 (5th Cir. 1988) ....................18

*In re Mirant Corp.*,
354 B.R. 113 (Bankr. N.D. Tex. 2006) ....................18

*In re MPF Holding U.S. LLC*,
444 B.R. 719 (Bankr. S.D. Tex. 2011) ....................11, 12

*In re New Valley Corp.*,
181 F.3d 517 (3d Cir. 1999) ....................15

*Northbay Wellness Grp., Inc. v. Beyries*,
789 F.3d 956 (9th Cir. 2015) ....................15

*In re Pac. Lumber Co.*,
584 F.3d 229 (5th Cir. 2009) ....................10

*In re Pac. Lumber Co.*,
584 F.3d at 241–42 ....................11

*In re Pearl Res. LLC*,
No. 20-31585, 2025 WL 2081580 (Bankr. S.D. Tex. July 22, 2025) ....................11, 12

*Pepper v. Litton*,
308 U.S. 295 (1939) ....................14, 15

*In re Performance Nutrition, Inc.*,
239 B.R. 93 (Bankr. N.D. Tex. 1999) ....................17, 18

*In re Southmark Corp.*,
163 F.3d 925 (5th Cir. 1999) ....................18, 19

*U.S. v. Energy Res. Co., Inc.*,
495 U.S. 545, (1990) ....................14

*In re Vega*,
102 B.R. 552 (Bankr. N.D. Tex. 1989) ....................19

*Wolf v. Weinstein*,
372 U.S. 633 (1963) ....................17

*In re Yacovi*,
411 Fed. App'x. 342 (1st Cir. 2011) ....................14

*In re Yazoo Pipeline Co., L.P.*,
459 B.R. 636 (Bankr. S.D. Tex. 2011) ....................19

**Statutes**

28 U.S.C. § 158(d)(2) ....................10, 11

28 U.S.C. § 158(d)(2)(A) ....................21

28 U.S.C. § 158(d)(2)(A)(i) ....................11

28 U.S.C. §§ 158(d)(2)(A)(i)–(iii) ....................10

28 U.S.C. § 158(d)(2)(A)(iii) ....................19

**Other Authorities**

Fed. R. Bankr. P. 8006(f)(2)(B) ....................2

Fed. R. Bankr. P. 9019 ....................2

Fed. R. Civ. P. 59(e) ....................10

Fed. R. Civ. P. 60 ....................8, 10

Fed. R. Civ. P. 60(b) ....................9, 10

The Dugaboy Investment Trust ("Dugaboy" or "Appellant") respectfully moves this Court for entry of an order certifying the above-captioned Bankruptcy Court appeal for direct review in the Fifth Circuit.

## INTRODUCTION

This appeal concerns the extent to which a bankruptcy court must scrutinize a proposed settlement with the debtor, where there is evidence that the settlement counterparty has engaged in misconduct and that the proposed settlement, if approved, would facilitate and advance that misconduct. Two bankruptcy judges, both before and after the first judge's recusal, held that fraud and misconduct by a bankruptcy settlement counterparty is none of the Bankruptcy Court's business. But that tunnel view of a bankruptcy court's responsibilities cannot be squared with the bankruptcy courts' role as conduits of equity or their mandate to do justice.

The fraud and misconduct at issue here was outrageous. Mark Patrick was entrusted with running two corporate structures for the benefit of established charities in Dallas and throughout the country. He stole hundreds of millions in assets from those charities dedicated to doing good works, siphoned off tens of millions of dollars in compensation for himself and his co-conspirators, and put the stolen assets under the control of a sham "charity" run from his basement. From there, he entered into a settlement with the debtor, Highland Capital Management, L.P. ("Highland"), for pennies on the dollar, all so he could obtain offensive weapons against the donors to these charitable structures who would naturally be inclined to hold him accountable for his fraud. In approving the settlement and denying a motion for reconsideration, the Bankruptcy Court determined that it need not concern itself with the theft and misconduct because it was perpetrated by a counterparty to the debtor rather than the debtor itself. The Bankruptcy Court explained that, in evaluating any settlement, its review should take the lightest of touches, trusting the business

judgment of a debtor-in-possession to do what is best for itself.

The Bankruptcy Court's approach is wrong, and the legal questions it raises constitute matters of sufficient public importance to warrant direct appeal to the United States Court of Appeals for the Fifth Circuit. The standard of review that a bankruptcy court applies to approving settlements that may be tainted by fraud or misconduct directly affects the core functions of a bankruptcy court, especially when a bankruptcy court serves as a court of equity whose primary function is to promote fairness and good faith. This is especially so when the Bankruptcy Court had arranged for the equity owners of the debtor to be displaced from managing it during the bankruptcy. Under those circumstances, where a *de facto* trustee is in place, the court has a special responsibility that what is effectively an arm of the court does not involve itself with misconduct and taint the judicial system.

Direct appeal of this matter to the Fifth Circuit will also accelerate the final resolution of a long-running dispute between the parties. The original settlement under Federal Rule of Bankruptcy Procedure 9019 was first presented to the Bankruptcy Court in May 2025, and multiple appeals from that settlement remain pending before this Court. Allowing the Fifth Circuit to quickly determine the extent to which bankruptcy courts must review proposed settlements for fraud and misconduct will facilitate a quicker conclusion of the review of the settlement under the correct legal standard.

**<u>QUESTIONS PRESENTED FOR DIRECT REVIEW</u>**

Pursuant to Federal Rule of Bankruptcy Procedure 8006(f)(2)(B), Dugaboy presents the following questions warranting direct review by the United States Court of Appeals for the Fifth Circuit.

1. To what extent should a bankruptcy court evaluate the fraud or misconduct of a counterparty to a settlement with a bankruptcy debtor and whether a settlement would advance of facilitate any such fraud or misconduct? More specifically,

whether the Bankruptcy Court erred by disregarding the misconduct of Mark Patrick as unrelated to the 9019 Settlement, furthering such misconduct by approving a settlement benefiting Mr. Patrick?

2. Whether the Bankruptcy Court should apply closer scrutiny to settlements proposed by court-appointed bankruptcy professionals?

## BACKGROUND

This appeal arises out of a years-long bankruptcy which is proceeding in the Northern District of Texas. *See In re Highland Capital Mgmt., L.P.*, No. 19-34054-sgj (Bankr. N.D. Tex. (Oct. 16, 2019). James Dondero—a pioneer in the hedge fund industry—founded Highland Capital Management, L.P. and built it into one of the Nation's leading funds. In 2019, Highland took an unanticipated judgment and sought Chapter 11 bankruptcy protection to liquidate a handful of assets and satisfy the judgment. Highland initially filed in the District of Delaware and, in early hearings there, appeared headed toward an orderly and prompt exit, as intended. But then an alleged creditor who had been involved in a prior bankruptcy proceeding with a Dondero- affiliated entity moved to transfer the bankruptcy to the Northern District of Texas under the supervision of Chief Judge Stacey Jernigan, because of the negative perceptions of Mr. Dondero she had expressed in a prior bankruptcy.

When transferred, the case took a turn. In the first hearing, Chief Judge Jernigan immediately threatened to remove Mr. Dondero from management of Highland. Faced with these threats, Mr. Dondero agreed to a three-person management committee—two of which were picked by a creditors committee historically hostile to Highland—to run it during the Bankruptcy. She then blessed a structure that effectively replaced that committee with a singular figurehead appointed by the creditors committee, James P. Seery, who served as the chief restructuring officer of Highland.

Mr. Seery and the army of law firms and advisors servicing him had one goal: Stretch this bankruptcy into an effective liquidation of Highland and maximize their professional fees. What

followed was an epic abuse of the bankruptcy process. Highland was facing a judgment that was slightly more than $100 million. But Mr. Seery and his colleagues began portraying Highland as somehow insolvent, assembling an inflated batch of more than $400 million in creditor claims. So inflated were the claims and so desperate was the misleadingly portrayed financial situation of Highland that two hedge funds with historical connections to Mr. Seery rode in to buy almost all creditor claims for approximately $160 million. But Highland was never insolvent and was always able to pay off the judgment and get back to work. The history of the bankruptcy so demonstrates. The estate ended up paying more than $412 million to those two hedge funds, nearly all of the nominal value of the bloated batch of creditor claims. Stretching this bankruptcy out with a false sense of insolvency, the estate has paid Mr. Seery and his cohort of bankruptcy professionals more than $260 million that can be determined from bankruptcy documents that are nearly a year old, and likely much more since then or hidden from view. $140 million more made its way into various litigation and indemnity trusts. Dugaboy management estimates that, added together, the estate produced more than $860 million. And with the actual creditors being exited early on false claims of insolvency for $160 million, that means more than $700 million has been misallocated into the pockets Mr. Seery, his legions of bankruptcy professionals, and two hedge funds historically affiliated with Mr. Seery.

And despite all of this money flocking into the hands of those who do not deserve it, Mr. Seery refused to pay dozens of Highland employees what they were legitimately owed for their work before and during the bankruptcy. So profoundly unfair was that move that Mr. Dondero made these employees whole from his own pocket. Along the way, Mr. Seery vilified all who would question him, including the prior leadership of Highland and Mr. Dondero. His current plan is to cast the remaining Highland carcass aside and never return it to its previous leaders.

This bankruptcy case is out of control. It was drawn out and turned into an unnecessary and unjustified liquidation at the behest and in service of the inadequately supervised bankruptcy professionals that took over Highland. It should have been a months-long bankruptcy that paid the unanticipated judgment and got Highland back to business.

Before the bankruptcy began, Mr. Dondero and his co-founder Mark Okada had given their equity stake in Highland to the Hunter Mountain Investment Trust, part of a structure designed to benefit The Dallas Foundation. The Dallas Foundation is a century-old charity dedicated to improving the lives of Texans.

The Hunter Mountain Investment Trust ("Hunter Mountain") had a long-time administrator, but when he stepped aside, tax lawyer Mark Patrick volunteered to take that role. The administrator's role was to allow Messrs. Dondero and Okada and The Dallas Foundation to maximize the impact of those assets for charitable causes. And as any equity holder in Highland would have, Hunter Mountain initially, objected time and again to Seery and his service providers' hijacking of what was supposed to be its straightforward restructuring.

At roughly the same time, Mark Patrick replaced another retiring trustee of one of Mr. Dondero's other charitable structures—known as the Charitable DAF—that managed more than $270 million in assets seeded with a substantial donation from Mr. Dondero. The Charitable DAF was designed to be for the benefit of four established charities, including The Dallas Foundation, the Greater Kansas City Foundation, and the Santa Barbara Foundation, with Mr. Dondero working together with those charities to decide on the good causes its assets would support.

In late 2023, Mr. Patrick began a wide-ranging scheme to use these positions of trust to line his own pockets. In doing so, Mr. Patrick papered over and concealed his fraud from the very entities and individuals from which he was stealing, including the established charities. As of

November 2023, Mr. Patrick and Shields Legal Group, P.C. began planning to remove valuable assets from both structures for little to no consideration. *See*, *e.g.*, Shields Work Plan Memorandum, Dkt. 4617-7 at § I.(a.)(6.). These plans included creating a new general partner of the DAF structure that was "hard to find or track, or trace" such that it was difficult to "find owners" and provide "strong litigation protection." Email from M. Patrick to B. Schaller dated Feb 5, 2024, Dkt. 4623-2.

In late 2024 and early 2025, Mr. Patrick executed the plan. He formed a series of alphabet soup entities to jam into the Charitable DAF structure so he could use them to steal the Charitable DAF's assets. At the top was his new so-called "DFW Charitable Foundation," a sham charity run from Patrick's home address with almost no philanthropic activities. He then used the newly created entities to separate the established charities from their assets. He procured a sham valuation from a co-conspirator accounting firm to somehow determine that the charities' $270 million in assets (a large portion of which was in cash and other marketable securities) was worth only $1.6 million and then exited the charities from the structure for that amount. All the while, he concealed these transactions from the charities, while lulling them into believing that the structure "was all remaining the same" and that financial transparency would be forthcoming.

Mr. Patrick made Hunter Mountain part of this mess by selling it into the Charitable DAF structure before he stole all the Charitable DAF's assets in February 2025. *See* Membership Interest Purchase Agreement, Dkt. 4617-15 at 1. That was not a real arm's length sale. Mr. Patrick controlled the purchaser and seller entities. Examination of M. Patrick, May 12, 2026 Hr'g Tr. at 70:4–8.

All along the way, Mr. Patrick was pouring the charities' assets into his own pockets. For what was always a part-time job (except when you are busy restructuring the entities to steal all

the assets), Mr. Patrick paid himself and his co-director more than $18 million from the last quarter of 2024 to the second quarter of 2025. In another line of work, that sum would have turned him into the Nation's highest paid college football coach. Of course, he did not disclose this grotesque compensation to anyone, much less the charities.

With the equity position of Highland stripped from the charities, Mr. Patrick approached Highland's bankruptcy-court-appointed management to negotiate a settlement. Now believing he was unburdened with the responsibility for managing the Highland equity asset to maximize value for the charities, Mr. Patrick was prepared to capitulate to Highland's managers and to bless their stripping down of the company for their own benefit so long as he could obtain something to advance his own fraud. That is what the proposed settlement, presented to the Bankruptcy Court for approval on May 19, 2025, represented. Thereunder, Hunter Mountain gave up all its valuable claims against the estate. In return, Hunter Mountain received an immediate payment of $500,000, promises for future payments, and a claim over the residual bankruptcy estate Hunter Mountain already had. Most importantly, Mr. Patrick and Hunter Mountain received claims against Mr. Dondero and former management of Highland that the debtor had long since effectively abandoned. *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021). Mr. Patrick knew when his theft of the charitable assets came to light, Messrs. Dondero and Okada would start asking hard questions. Having the ability to prosecute claims against Messrs. Dondero and Okada would provide a weapon in that fight and deter scrutiny.

A further reason why the proposed 9019 Settlement demanded closer scrutiny is the fact that it arose swiftly on the heels of the Fifth Circuit's decision in *Highland II*. *See In re Highland Capital Management, L.P. (Highland II)*, 132 F.4th 353 (5th Cir. 2025). Therein, the Fifth Circuit held the gatekeeper provision, a prefiling injunction designed to prevent valid claims by Hunter

Mountain and others against Highland and its management from reaching the courtroom, must be narrowed coextensively with the exculpation provision narrowed in *Highland I*. *Id.* at 358. Rehearing was denied on April 28, 2025, and mere weeks later, Highland purported to settle some of the very claims that would be otherwise enjoined by the formerly broad gatekeeper provision with Hunter Mountain. The 9019 Settlement required Hunter Mountain and its related entities to stay all pending litigation against Highland, dismiss those claims with prejudice within five business days, and release all remaining claims it may have. Dkt. 4217-1 at 9, 12–15. Taking advantage of Hunter Mountain's management that had gone rogue, Highland exchanged money to get the same claims dismissed that would have been covered by the gatekeeper provision. Hunter Mountain and Mr. Patrick eagerly accepted, receiving money—the ultimate goal of Mr. Patrick's theft—and the *Kirschner* claims to dissuade investigation into Mr. Patrick's misconduct.

Dugaboy objected to the settlement. However, the subsequent proceedings reviewing the settlement occurred quickly, and discovery was limited. In the little discovery that did occur, Mr. Patrick actively concealed his misconduct. In his deposition, Mr. Patrick claimed not to be familiar with CDMCFAD, LLC, an entity he had recently formed and used to divest hundreds of millions of dollars of assets from charitable beneficiaries. Mr. Patrick's misconduct continued at the hearing on the proposed 9019 settlement before the Bankruptcy Court, when he feigned ignorance about his role in the transaction when CDMCFAD, LLC obtained 100% interest in Charitable DAF Fund. Examination of M. Patrick, June 25, 2025 Hr'g Tr. at 182:4–16.

Chief Judge Jernigan approved the settlement. In denying Dugaboy's motion to stay the 9019 order—in a passage that the replacement bankruptcy judge also quoted in rejecting the Rule 60 relief at issue in this appeal—Chief Judge Jernigan determined: "Whatever the misdeeds may or may not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy

estate (or the Settlement Agreement) to justify a stay." Dkts. 4333 at 4 and 4678 at 11 (emphasis removed).

Dugaboy and the Texas Attorney General asked Chief Judge Jernigan to wait on the results of regulatory inquiries and the proceedings in the Cayman Islands regarding how Mr. Patrick handled these charitable entities. On July 15, 2025, in liquidation proceedings for the Charitable DAF Structure in the Cayman Islands, a court-appointed receiver published allegations of Mr. Patrick's fraudulent restructuring activities. Specifically, the Cayman liquidators' allegations described the misconduct Mr. Patrick had engaged in, creating generic and hard-to-track-or-trace companies to divest over $270 million of assets from charity to feather his own nest. In light of these more specific allegations of Mr. Patrick's misconduct, Dugaboy requested a stay of the 9019 Settlement on July 17, 2025. Chief Judge Jernigan denied that request four days later.

What followed between August and December 2025 was the release of hard evidence from the Cayman liquidation proceedings, bringing to light Mr. Patrick's fraudulent restructuring of the charitable entities detailed above. Dugaboy—based on the release of this new admissible evidence—moved for relief from the settlement approval order under Rule 60(b), contending among other things that the settlement was the product of fraud, collusion, and bad faith and against the interest of justice. After fully briefing the motion, the Bankruptcy Court held a three-day evidentiary hearing in May 2026, ultimately denying relief on June 15, 2026.

The Bankruptcy Court determined that even the full evidence of Mr. Patrick's misconduct did not warrant vacating the settlement order's approval, holding that the entire exercise of probing a counterparty's misconduct or whether the settlement would facilitate it was legally immaterial to approval of a settlement. Dkt. 4678 at 11. In doing so, he held that a counterparty's misconduct was just simply "not sufficiently intertwined" with the bankruptcy to deserve the court's attention

in approving a settlement with a bankruptcy debtor. *Id.* It is the debtor's conduct, and only the debtor's, that matters. *Id.*

The Bankruptcy Court also held that the evidence revealed from the Cayman liquidation was not "newly discovered" for purposes of Rule 60. Dkt. 4678 at 10–11. The Bankruptcy Court pointed to an affidavit Mr. Dondero filed in the Cayman Islands in April 2025 detailing a history of other lesser Mr. Patrick compliance lapses. *Id.* at 10. Because Mr. Patrick had made mistakes of a different type and a lesser magnitude in the past, the court appeared to reason, Dugaboy should have pressed those as a reason to disapprove the settlement in June 2025, even if there was later evidence that Mr. Patrick fraudulently reorganized two charitable structures to steal more than a quarter million in assets, including the equity interests on whose behalf he was purporting to act when effecting the settlement. *Id.*

Dugaboy promptly filed a Rule 59(e) motion to reconsider or otherwise amend on June 29, 2026, asking the Court to reconsider, amend, or otherwise alter its denial of the Rule 60(b) motion and its earlier approval of the settlement itself.

## LEGAL STANDARD

28 U.S.C. § 158(d)(2) provides for direct review of bankruptcy appeals by federal courts of appeals under certain circumstances. *In re Pac. Lumber Co.*, 584 F.3d 229, 241–42 (5th Cir. 2009). Appeals courts "shall" certify direct appeal if any one of the following four conditions exists:

> "[T]he order or judgment subject of the appeal involves: (i) a question of law on which there is no controlling decision by the circuit court or the Supreme Court; (ii) a matter of public importance; (iii) an issue where there are conflicting decisions; or (iv) a circumstance for which an immediate appeal may materially advance the progress of the case or proceeding in which the appeal is taken.

*In re Adkins*, 517 B.R. 698, 699 (Bankr. N.D. Tex. 2014); *see* 28 U.S.C. §§ 158(d)(2)(A)(i)–(iii).

Congress created 28 U.S.C. § 158(d)(2) with twin aims to "expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose caselaw has been plagued by indeterminacy." *In re Pac. Lumber Co.*, 584 F.3d at 241–42.

To qualify as a matter of "public importance" under Section 158(d)(2), "the issue on appeal must transcend the litigants and involve a legal question, the resolution of which will advance the cause of jurisprudence to a degree that is usually not the case." *In re Aerogroup Int'l, Inc.*, No. BR 17-11962 (CSS), 2020 WL 757892, at *5 (D. Del. Feb. 14, 2020). Examples include "constitutionality of a provision of title 11, the applicability of nonbankruptcy law to matters arising in bankruptcy case," or issues involving "any one of the important provisions governing consumer bankruptcies." *In re MPF Holding U.S. LLC*, 444 B.R. 719, 726 (Bankr. S.D. Tex. 2011) (quoting 1 Collier on Bankr. P. 5.06[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010)). "A case involving a matter of public importance might exist even if there is controlling court of appeals or Supreme Court precedent[.]" 1 Collier on Bankr. P. 5.06[5][b].

Under the fourth prong, the "material advancement" bar can be met when, "due to the amount in controversy . . . any decision by the District Court in this matter is very likely to be appealed to the Fifth Circuit." *MPF Holding*, 444 B.R. at 727. Cases involving delays that would otherwise "result in potential significant cost" to the parties are also instructive. *In re Pearl Res. LLC*, No. 20-31585, 2025 WL 2081580, at *3 (Bankr. S.D. Tex. July 22, 2025).

## ARGUMENT

### I. The Extent to Which Bankruptcy Courts are Tasked with Examining Settlements is an Issue of Significant Importance to the Public

Certification of an issue directly to the court of appeals is warranted when the "judgment, order, or decree . . . involves a matter of public importance." 28 U.S.C. § 158(d)(2)(A)(i). Such matters of public importance go beyond "trivial matter[s] of bankruptcy law" or "statutory

interpretation and common law analysis," but instead must "affect the public as a whole." *In re MPF Holding U.S. LLC*, 444 B.R. 719, 726 (S.D. Tex. 2011). Matters of public importance include "complex constitutional issues" and the standards and "important provisions governing consumer bankruptcies." *Id.* (citing Collier on Bankr. P. 5.06[5][b], Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2010). When a matter arising from the bankruptcy court "transcends the litigants" and deciding that legal question would "advance the cause of jurisprudence," then it has sufficient public importance to warrant direct review by the court of appeals. *Estate of Brown v. 1 Glen Hill Road Ops., LLC*, No. 3:25-cv-2855-E, 2026 WL 1602714, at *8 (N.D. Tex. June 3, 2026); *see In re Pearl Res. LLC*, No. 20-31585, 2025 WL 2081580, at *3 (Bankr. S.D. Tex. June 22, 2025) (finding issue of the applicability of state sovereign immunity and a potential burden on Texas taxpayers sufficient to certify direct appeal).

Whether and to what extent a bankruptcy court should concern itself with misconduct and fraud in proceedings before it "transcends the litigants" here, because it cuts to the very core of a bankruptcy court as a court of equity. The Bankruptcy Court acknowledged that the Statement of Claim had raised serious allegations about Mr. Patrick's misconduct but declined to engage with those allegations. Order Denying Motion to Stay, *In re Highland Capital Mgmt., L.P.*, No. 3:19-34054-sgj, Dkt. 4333 at 4 (Bankr. N.D. Tex. July 21, 2025). The Bankruptcy Court found that because Mr. Patrick was "merely a signatory for a counter-party to a settlement agreement," the extent of his authority to enter into that agreement and the assets which he exchanged in the 9019 Settlement was not before the court. *Id.* In fact, the Bankruptcy Court stated, "[w]hatever the misdeeds may or may not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) to justify a stay." *Id.* Dugaboy argued that the allegations in the Statement of Claim justified at least a temporary pause to allow evidence

of the substance of such claims to be revealed. The assertion that indications of the misconduct of a counter-party is some sort of category error—and not relevant to—whether to approve a settlement with a debtor is a legally incorrect understatement of the Bankruptcy Court's duty when evaluating such proposal.

In denying the later motion from relief from the settlement approval when hard evidence of Mr. Patrick's misconduct arrived, the replacement bankruptcy judge repeated the error, claiming again that Mr. Patrick's misdeeds were not properly before it. *See* Memorandum Opinion, *In re Highland Capital Mgmt., L.P.*, No. 3:19-34054-sgj, Dkt. 4678 at 11 (Bankr. N.D. Tex. June 15, 2026). The Bankruptcy Court held that its review is limited to circumstances where the debtor itself is steeped in a scheme of fraud or misconduct, regardless of whether its counterparties are trading to the debtor stolen goods or whether the settlement might advance the misconduct.

The extent to which a bankruptcy court should review whether a bankruptcy settlement counterparty comes to the court through misconduct or fraud is a matter of public importance for two distinct reasons. First, the duty of a court of equity to prevent fraud amongst and between litigants and third parties before it is a central function of any court, including a bankruptcy court. Second, the degree to which this duty extends to a bankruptcy that does not involve either debtors-in-possession or a Chapter 11 trustee but instead implicates professionals appointed by a bankruptcy court to run the debtor is a significant matter with ramifications far beyond the litigants in the Highland bankruptcy alone.

### A. Preventing Fraud and Misconduct is a Central Function of Bankruptcy Courts

Both bankruptcy judges' decisions suffer from the same central flaw: each implicitly approved misconduct before them in the courtroom and infecting the circumstances of the 9019 Settlement in the name of preserving a deferential review of a deal reached between the debtor and another party. This misconstrues the Bankruptcy Court's role.

As courts of equity, bankruptcy courts have a duty to ensure justice is done and their powers are not used to facilitate fraud or misconduct. *U.S. v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990). This duty to prevent fraud or misconduct also extends to refusing to bless or otherwise support the occurrence of such fraud and misconduct in proceedings before it rather than acting as a rubber stamp on such settlements. *In re Yacovi*, 411 Fed. App'x. 342, 347 (1st Cir. 2011). While settlements in the bankruptcy process provide the possibility of simplification and peaceful resolution of claims between parties, they also present the opportunities for collusion or bad faith that could harm not only the litigants before the court but also the public perception of the court's proceedings. *See In re CWNevada LLC*, 602 B.R. 717, 737 n. 44 (Bankr. D. Nev. 2019) (stating a bankruptcy court's role in rooting out fraud by litigants before it "is designed to preserve public confidence in, as well as the integrity of the court, by preventing it from becoming a participant in inequitable conduct.") (citing *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15 (1945)). Bankruptcy courts ought not and do not approve settlements when one of the parties or the settlement itself arrives at the court through fraud, collusion, or bad faith. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015); *see also In re Foster Mortg. Corp.*, 68 F.3d 914, 918 (5th Cir. 1995). In fact, when presented with evidence of a fraudulent scheme or misconduct infecting a settlement, it becomes "the duty of the bankruptcy court in the exercise of its equity jurisdiction to undo" the fraudulent scheme. *Pepper v. Litton*, 308 U.S. 295, 312 (1939).

The reasons for requiring a non-deferential review of proposed settlements amidst indicia of fraud or misconduct, where substantive rights and significant value are exchanged, are many. First is to ensure the settlement before the Bankruptcy Court was reached in good faith and between parties with the authority to bind themselves to the covenants in the settlement agreement.

Bankruptcy courts routinely apply the doctrine of unclean hands during the bankruptcy process, barring from the bankruptcy court individuals that are not "honest but unfortunate debtor[s.]" *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *see also Arenas v. U.S. Trustee*, 535 B.R. 845 (10th Cir. BAP 2015) (dismissing case for debtor engaged in marijuana business lawful under Colorado but not federal law as not coming to the court with clean hands). This requirement for litigants to come to the court with clean hands extends to non-debtors as well. *See, e.g.*, *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956 (9th Cir. 2015) (reversing a bankruptcy court's decision to dismiss adversary action against debtor because the plaintiff had unclean hands, requiring bankruptcy court to weigh the relative unclean hands of the debtor and the non-debtor); *Matter of Garfinkle*, 672 F.2d 1340 (11th Cir. 1982) (affirming bankruptcy court's dismissal of third party's claims against the bankruptcy estate for unclean hands after it sought to circumvent unfavorable contract it entered into with bankrupt entity); *In re New Valley Corp.*, 181 F.3d 517 (3d Cir. 1999) (applying unclean hands to non-debtor but ultimately reversing dismissal of non-debtor's claims as insufficiently related to the issue before the bankruptcy court). Bankruptcy courts further have an obligation to unwind fraudulent schemes, even when perpetrated by a non-debtor. *Pepper*, 308 U.S. at 312. Mark Patrick came to the Court with neither good faith nor the ability to bind Hunter Mountain. Mr. Patrick sought to exchange valuable assets for claims he could use to defend his misconduct from Dugaboy or Mr. Dondero's investigative efforts. But he lacked authority even to enter into the settlement agreement on Hunter Mountain's behalf.

Bankruptcy courts apply this same standard of vigilance to settlements presented before them, notwithstanding the fact that the Bankruptcy Court below declined to follow such standards. Settlements that prejudice non-debtors under an unfair or inequitable exchange must be disapproved. *See In re Covington Properties, Inc.*, 255 B.R. 77 (Bankr. N.D. Fla. 2000). Collusive

settlements that are designed not to fairly and equitably resolve claims between the debtor and another party must be prevented because they also impinge the "legitimacy and integrity of the bankruptcy process." *In re Kallstrom*, 298 B.R. 753, 758–59 (10th Cir. BAP 2003) (affirming disapproval of settlement that was for the purpose of using a discharge to negotiate the value of a creditor's claim as *quid pro quo*).

An aspect of the settlement that the Bankruptcy Court did not reach was the true, underlying purpose of the settlement, which was to exchange the valuable claims of Hunter Mountain against the estate for the *Kirschner* claims. Mark Patrick sought to use the *Kirschner* claims as a cudgel to dissuade investigation into his misconduct. Possessing sizable claims against Mr. Dondero and other parties that would seek to examine Mr. Patrick's misbehavior could deter or prevent examination of his scheme. The Bankruptcy Court never reached this issue, deciding it was not obliged to scrutinize a settlement counterparty's actions in the first place.

This issue is of public importance because it affects public perceptions of fairness in the bankruptcy process. *See In re CWNevada*, 602 B.R. at 737 n.44. The Bankruptcy Court declined to pause the settlement when allegations of Mr. Patrick's misconduct emerged in July 2025, and perhaps parties can debate whether declining to do so negatively affected the public perception of judicial integrity when admissible evidence of that misconduct was not yet available. But the harm to public confidence in the courts fully ripened when the Bankruptcy Court was presented with detailed evidence of Mr. Patrick's fraud and misconduct and held that it, categorically, was not the type of thing that should concern the court. This is particularly so as the evidence showed the relation between Mr. Patrick's misconduct and the 9019 Settlement and establishing that he was trading in stolen assets and without authority. Correcting the applicable legal standard—and making clear that and to what extent counterparty misconduct should be evaluated—will correct

potential errors in reviewing the many settlements that come before the bankruptcy courts of this circuit and will ensure that the integrity of the judicial system is not infected with the misconduct of others even for short periods of time.

Certification of this appeal directly to the Fifth Circuit is warranted to permit the Court of Appeals to provide guidance about the depth of review a bankruptcy court must undertake to approve a settlement agreement. Courts of equity are meant to be closed to those with unclean hands, regardless of whether they are the debtor themselves or other litigants to third parties seeking to use a bankruptcy court to perpetrate or protect their fraud. The extent to which bankruptcy courts in the Fifth Circuit satisfy their role as courts of justice, fairness, and equity by identifying and preventing fraud amongst the parties before them is a question that would "advance the cause of jurisprudence" sufficiently to constitute a matter of public importance. *Estate of Brown*, 2026 WL 1602714, at *8.

### B. Limited Review of Court-Appointed Professionals is Contrary to the Bankruptcy Court's Function

Applying a deferential standard of review may make sense for proposed settlement agreements where trustees or debtors have fiduciary duties to all parties but applying that same limited review to bankruptcies where court-appointed professionals are in charge is nonsensical.

Only in extremely difficult circumstances do debtor-in-possession bankruptcies require a third party to step in and run the debtor entity throughout the proceeding. As the historical management of the entity, debtors-in-possession have familiarity with the entity's assets and procedures such that they are "capable of carrying on the business during the proceeding" and may make coherent determinations about the relative value of those assets. *Wolf v. Weinstein*, 372 U.S. 633, 649 (1963). Debtors-in-possession have an interest in both the entity's continued health and existence and a fiduciary duty to "act in the best interest of the estate." *In re Performance*

*Nutrition, Inc.*, 239 B.R. 93, 112 (Bankr. N.D. Tex. 1999). It follows that a bankruptcy court, in its surveillance of the proceeding, has assurances of fairness in the form of these fiduciary obligations to creditors.

Courts do not defer to the judgment of a Chapter 11 trustee. While a trustee may make recommendations or seek approval on actions to take, the trustee may not act without the approval of the bankruptcy court. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352–53 (1985). Trustees are subject to ethical and fiduciary duties and are appointed to provide independent oversight and ensure access to fairness for all individuals coming to the court with clean hands. *See id.*; *In re CNC Payroll, Inc.*, 491 B.R. 454, 460 (Bankr. S.D. Tex. 2013) ("The Court must assure both the integrity of [trustees], and their ability to operate independently."). These obligations extend to individuals with financial interest in the debtor itself. *See Performance Nutrition*, 239 B.R. at 111.

These procedural protections are not firmly in place when, as here, court-appointed non-trustee bankruptcy professionals take control of a debtor. *In re Southmark Corp.*, 163 F.3d 925, 931 (5th Cir. 1999) (acknowledging that "standards for the conduct of court-appointed professionals . . . are not comprehensively expressed in the statute."). Professionals and committees selected by creditors do not owe fiduciary duties to maximize the estate, nor to protect the estate at all—their duty is solely to creditors. *See generally Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233 (5th Cir. 1988) (recognizing the differing interests between a fiduciary trustee and a creditors' committee); *In re Mirant Corp.*, 354 B.R. 113, 143 n.80 (Bankr. N.D. Tex. 2006) (recognizing that "the interests of [a committee's] constituents, to which it owes its primary duties, may not always be perfectly congruent with what is best for the estate."). The need for judicial oversight is much higher in these bankruptcies. Absent sufficient scrutiny, these

professionals may not act in the best interest of the estate and may be influenced by factors outside the best interests of the debtor, other creditors, and the economic owners of the debtor.

Most importantly, court-appointed bankruptcy professionals are just as much an arm of a bankruptcy court as a trustee would be. The bankruptcy court has a special responsibility to ensure that they have not been wrapped into wrongdoing. *See Southmark*, 163 F.3d at 931 ("Supervising the court-appointed professionals also bears directly on the distribution of the debtor's estate. If the estate is not marshaled and liquidated or reorganized expeditiously, there will be far less money available to pay creditors' claims."). But the lower court's approach eschewed this obligation, reserving its intervention for only the most extraordinary of circumstances. This is contrary to the role of a bankruptcy judge and to the body of case law acknowledging the importance of non-debtor fraud. *See, e.g.*, *In re Vega*, 102 B.R. 552 (Bankr. N.D. Tex. 1989) (removing and sanctioning Chapter 7 trustee for misleading and misrepresentative fund management); *In re Yazoo Pipeline Co., L.P.*, 459 B.R. 636, 648 (Bankr. S.D. Tex. 2011) (permitting post-petition fraud claims against third parties for injuries on behalf of the estate). This is a matter of public importance that transcends the parties before this Court and thus requires determination from the Fifth Circuit of the proper level of review necessary in cases of court-appointed management of debtors.

## II. Certification to the Fifth Circuit is Warranted to Materially Advance the Progress of the Case

A Court may certify appeals directly to the Fifth Circuit if an immediate appeal "may materially advance the progress of the case or proceeding in which the appeal is taken." 28 U.S.C. § 158(d)(2)(A)(iii). Certification to the Fifth Circuit will materially advance the progress of the Highland bankruptcy towards finality.

First, direct appeal is warranted because it will accelerate the final resolution of the issues

presented by bringing them directly to the Fifth Circuit, avoiding delay and conserving judicial resources in a dispute that is all but certain to be appealed to the Fifth Circuit anyway. *See, e.g.*, *In re GenOn Energy, Inc.*, 2018 WL 9708912, at *3 (Bankr. S.D. Tex. Jun. 19, 2018) (certification for direct appeal is warranted when it "will conserve judicial resources"); *In re Int'l Mgmt. Assocs., LLC,* 2009 WL 6498191, at *4 (Bankr. N.D. Ga. Dec. 1, 2009) (certifying direct appeal to "avoid substantial litigation and the prospect of numerous appeals").

Second, if the lower courts need to review the settlement with greater scrutiny than the legal standard adopted by the bankruptcy judges below, that review should occur sooner rather than later. If the Circuit Court were to clarify the standard and remand to this Court or the Bankruptcy Court a year or two from now, substantial debtor and other party resources might be spent implementing or organizing affairs around an invalid settlement. Certification of the above legal issue to the Circuit Court now would avoid that wasteful outcome.

Third, the settlement with Hunter Mountain has been pending since Chief Judge Jernigan's approval in June 2025, and debtors and creditors alike have been awaiting resolution of these issues for over a year. Importantly, the settlement has collateral effects on creditors and equity holders other than those directly involved in the settlement. Indeed, Mr. Patrick is attempting to revive the so-called *Kirschner* litigation now, promising to consume the resources of the parties and another judge of this District through the next year, even though it is not clear that he should have the authority to pursue it. In this way, direct circuit review could relieve the consumption of resources before two Article III judges in this District. Resolving these issues directly at the Circuit Court level will result in a final decision sooner, thus enabling the Bankruptcy Court to move forward and allowing the debtors and creditors to reach finality. This potential to materially advance the progress of the case and avoid delay while the instant appeal moves through the

District Court benefits all parties involved: the debtors and creditors, who wish to understand their rights and obligations after nearly a year of waiting and the judicial branch, which will conserve judicial resources.

* * *

For the foregoing reasons, Dugaboy respectfully requests that this Court certify the above-captioned appeal to the Fifth Circuit pursuant to 28 U.S.C. § 158(d)(2)(A).

Dated: August 14, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
King & Spalding LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

/s/ *John Ashcroft*
John Ashcroft (*pro hac vice* pending)
Johnny Sutton
ASHCROFT SUTTON
P.O. Box 160368
Austin, Texas 78716
T. (512) 370-1800
F. (703) 247-5446
jsutton@ashcroftlawfirm.com

/s/ *Michael Burrage*
Michael Burrage, OBA No. 1350
WHITTEN BURRAGE
512 N. Broadway Ave., Ste. 300
Oklahoma City, OK 73102
T. (405) 516-7800
F. (405) 516-7859
mburrage@whittenburragelaw.com

***Counsel for The Dugaboy Investment Trust***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 14, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J Edney*
Michael J. Edney

**CERTIFICATE OF CONFERENCE**

I hereby certify that, on August 14, 2026, Michael J. Edney, lead counsel for The Dugaboy Investment Trust, communicated with John A. Morris, counsel for Highland Capital Management, L.P. regarding the substance of this Motion to Certify. Later that day, Mr. Morris requested additional time to consider the issues raised by Dugaboy, asking Dugaboy not to file its Motion to Certify. Mr. Edney responded regarding the timeliness of the Motion, namely that the deadline to file is today, so Dugaboy planned to file to maintain its right to request certification. Mr. Edney offered to discuss the relief requested herein and, if appropriate, augment the filing following Mr. Morris's further consideration.

/s/ *Michael J Edney*
Michael J. Edney