**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02315-X

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4679] Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026.**

**APPELLANT RECORD**

**VOLUME 3**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02315-X<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to the Clerk of Court's correspondence [Docket No. 4700] and Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4685] on June 29, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4513] and a *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4699] now files this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and Hunter Mountain Investment Trust among other entities?

2. Did the Bankruptcy Court err in making evidentiary and trial conduct rulings during the course of evidentiary hearings held on Dugaboy's motion to vacate in May 2026?

3. Did the Bankruptcy Court err in making rulings on the availability of discovery, including the production of documents or depositions, in proceedings leading to its denial of the motion to vacate or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and the Hunter Mountain Investment Trust, among other entities?

4. Did the Bankruptcy Court err in not treating the Hunter Mountain Investment Trust, Mark Patrick, and other entities associated with him as parties in the 9019 settlement approval proceedings or the proceedings considering whether to vacate or reconsider that settlement approval?

5. Did the Bankruptcy Court err by misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(2) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by determining that the evidence presented of Mark Patrick's misconduct was not newly discovered or otherwise cognizable under Rule 60(b)(2)?

6. Did the Bankruptcy Court err in determining that James Dondero's knowledge could be imputed to Dugaboy, regardless of the capacity in which he was acting at the time he gained that knowledge?

7. Did the Bankruptcy Court err in determining that previously known instances of Mr. Patrick's

compliance lapses in other areas needed to have been acted upon in order to preserve the right to remove him from his position at the Hunter Mountain Investment Trust for later discovered and more significant misconduct related to misappropriating much of the asset value of two charitable structures, including the Charitable DAF?

8. Did the Bankruptcy Court err in misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(3) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by, among other things, determining that there is no evidence that Highland withheld or otherwise obscured evidence of Mark Patrick's misconduct and resulting lack of authority to negotiate the 9019 settlement agreement from Dugaboy in the proceedings that led to the Bankruptcy Court's entry of the original Federal Rule of Bankruptcy Procedure 9019 Order on June 30, 2025?

9. Did the Bankruptcy Court err in not considering under Federal Rule of Civil Procedure 60(b)(3) or otherwise the evidence Mark Patrick and/or his associates withheld or otherwise obscured from the Court through omissions and misrepresentations during discovery and before the Court at the hearing on the proposed settlement under Federal Rule of Bankruptcy Procedure 9019?

10. Did the Bankruptcy Court err by misconceiving the applicable legal standard and/or in not considering the fraud and misconduct of Mark Patrick and his associates in misappropriating most or all of the assets of two charitable structures and obscuring or making it more difficult to detect that conduct when determining whether to vacate the settlement approval order under Federal Rule of Evidence 60(b)(3)?

11. Under all aspects of Federal Rule of Civil Procedure 60(b) and the Court's inherent powers to vacate or modify judgments that are against the interest of justice and affected by wrongdoing, did the Bankruptcy Court err in suggesting that the fraud and misconduct of Mark Patrick was not directly pertinent to whether a bankruptcy settlement with entities he purported to control should be approved?

12. Did the Bankruptcy Court misapply the Federal Rule of Civil Procedure 60(b)(6) standard in denying Dugaboy's Motion for Relief from Order and Motion to Vacate in determining that Dugaboy "failed to articulate a 'mutually exclusive' reason for vacating the 9019 Order?"

13. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when he came to the Court having engaged in fraud and/or misconduct, or with unclean hands, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

14. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when that judgment may have assisted Mr. Patrick in furthering his misconduct or in deterring others from contesting it, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

15. Whether the 9019 settlement order, in light of the presented evidence of Patrick's misconduct, was an inappropriate circumvention of the Fifth Circuit's decision to permit suits against certain parties without seeking bankruptcy court permission and constituted a invalid non- consensual release of claims?

16. Did the Bankruptcy Court err in denying relief under Federal Rule of Civil Procedure 60(b) or the Court's other authorities to reconsider, amend, or vacate orders on Dugaboy's independently asserted ground that Chief Judge Stacey G. Jernigan lacked authority to enter the Rule 9019 Settlement Order because she should have recused herself and was disqualified from presiding in this matter earlier in the proceedings?

17. Did the Bankruptcy Court err in denying prior motions to recuse Judge Jernigan based on her manifestations of bias against James Dondero and others associated with him, including through her extrajudicial statements in novels and elsewhere?

18. Did the Bankruptcy Court err in finding that Dugaboy had abandoned its argument regarding whether Judge Jernigan was disqualified or should have been recused for not introducing additional testimonial evidence at the hearing on the matter, despite having fully briefed the issue in its Federal Rule of Civil Procedure 60(b) Motion and Reply thereto and having place the fully published versions of the judge's novels before the Court?

19. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of Mark Patrick's personal benefit in the decision to sell the Hunter Mountain Investment Trust?

20. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of the attendance of Supporting Organizations at the instant proceedings?

21. Did the Bankruptcy Court err when it determined that the deposition transcript of Mark Patrick (Highland hearing exhibit 55) was admissible and not an exception to hearsay?

22. Did the Bankruptcy Court err when it admitted Highland's hearing exhibits 43-45 as relevant?

23. Did the Bankruptcy Court err when it did not permit James Dondero to testify in Dugaboy's case-in-chief, including while permitting Highland to sponsor his testimony for other purposes by admitting his deposition?

24. Did the Bankruptcy Court err when it excluded Dugaboy's exhibits 292-297 as improper rebuttal evidence?

25. Did the Bankruptcy Court err when it granted Highland's request to admit the deposition testimony of James Dondero, despite Highland's decision not to call him as a witness for live testimony in the case, even though he was available in the courtroom throughout the proceedings?

26. Did the Bankruptcy Court err in protecting Highland, Hunter Mountain, Mark Patrick, and others from having to produce documents created earlier than May 19, 2025?

27. Did the Bankruptcy Court err in granting any part of Highland and other participants' requests for a protective order and/or to quash subpoenas?

28. Did the Bankruptcy Court err when it delayed Highland, Mark Patrick, Hunter Mountain, and other entities' obligations to respond to discovery until a couple of weeks before trial, only to require them to produce documents, sit for depositions, and commence trial—all within a 10-day period?

29. Whether a bankruptcy court may deny relief under Federal Rule of Civil Procedure Rule 60(b) or otherwise because vacatur would not itself unwind antecedent transactions or restore a separate pre-settlement structure?

30. Whether Federal Rule of Civil Procedure 60(b)(3) requires proof that concealed or misrepresented information would have changed the outcome, or instead clear and convincing evidence that adverse-party misconduct prevented a full and fair presentation?

31. Whether the District Court should conduct additional hearings and/or review of some or all findings *de novo* given that the decision below was entered by an Article I judge, who may exercise authority only through plenary supervision by a judge contemplated by Article III of the Constitution?

32. Are rulings by Article I bankruptcy judges on matters ancillary to the bankruptcy process due a similar amount of deference as rulings on core bankruptcy matters, or should the District Court act as an Article III backstop to judges not nominated by the President or confirmed by the Senate?

33. Is any amount of deferential review of a Bankruptcy Court's findings consistent with the Supreme Court's recent decisions that principal and inferior officers of the United States must be subject to plenary supervision by the President or some other office expressly listed in the Constitution, such as an Article III judge?

34. Whether the District Court should conduct additional hearings and/or review of some or all of the Bankruptcy Court's findings *de novo* given the Bankruptcy Court found it lacked jurisdiction to rule on the motion under Federal Rule of Civil Procedure 60(b), and the appealed Order denying relief under Rule 60(b) was only to the extent the Court was permitted to issue a ruling concerning the matter?

35. Whether the Bankruptcy Court erred in finding this matter a core proceeding pursuant to 28 U.S.C. § 157(b)(2)?

36. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1
000001
1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4685] filed by Appellant;

000008
2. The Bankruptcy Court's June 15, 2026 *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4679];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000009
4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 2 000642 Thru Vol. 3 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001837 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| 001839 Thru Vol 6 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* ~~filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513~~ Motion to Reconsider (related documents 4297 Order on motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| VOl. 7 02/27/2026 003628 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 03/02/2026 003641 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 03/02/2026 003644 & 003645 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 03/02/2026 003646 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 03/03/2026 003657 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 03/04/2026 003661 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 04/01/2026 003664 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |
| 04/01/2026 003703 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 7 | | Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 04/03/2026 004727 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol 8 04/03/2026 004784 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol. 9 04/03/2026 005201 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 04/06/2026 005203 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 04/06/2026 005211 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 9 | | *Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005216 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005219 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005221 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005223 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005227 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| Vol 9 04/17/2026 005324 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol. 10 04/21/2026 005584 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005588 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005609 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005676 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| Vol. 10 04/22/2026 005686 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005698 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005720 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005721 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005723 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005731 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/28/2026 005740 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 10 | | *Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005749 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005761 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005770 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005777 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |
| 04/29/2026 005779 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

vol. 10

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005781 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005788 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005790 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005792 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005795 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005878 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005896 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005899 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005901 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005907 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005914 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005921 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005923 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005930 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005933 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005936 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005939 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol 12 006097 thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| V01:22 05/08/2026 008150 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 008166 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 05/09/2026 008182 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 22 008250 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008287 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008423 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008459 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008466 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008910 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 28 | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 010658 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010730 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol. 30 011119 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol. 31 011703 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol. 32 013172 thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014857 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol. 35<br>05/11/2026<br>015318 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026<br>015474 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026<br>015475 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026<br>015507 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026<br>015534 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026<br>015535 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36<br>05/18/2026<br>015538 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| 701.37<br>05/18/2026<br>015965 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026<br>015977 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026<br>016048 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026<br>016051 –<br>016053 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026<br>016054 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026<br>016103 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| Vol. 37 016104 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016202 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016459 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016473 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| 016474 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court; and

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J");

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No. 4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: July 31, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Dated: January 16, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*<u>/s/ Zachery Z. Annable</u>*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

**CERTIFICATE OF CONFERENCE**

I hereby certify that, on January 14, 2024, John A. Morris, counsel for Highland Capital Management, L.P., wrote to HMIT's counsel and requested that counsel let Mr. Morris know by January 16, 2024 at 2:00 p.m. Central Time whether HMIT was opposed or unopposed to the relief requested in the foregoing Motion. HMIT is **OPPOSED** to the relief requested in the Motion.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

# Exhibit 18

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

**NOTICE OF APPEAL OF "ORDER EXTENDING STAY OF CONTESTED MATTER [DOCKET NO. 4000]" [DKT 4104] BY RIGHT**

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

Hunter Mountain Investment Trust

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:
□ Plaintiff
□ Defendant
□ Other (describe)

For appeals in a bankruptcy case and not in an adversary proceeding:
□ Debtor
X Creditor
□ Trustee
□ Other (describe)

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

**DKT 4104** - ORDER EXTENDING STAY OF CONTESTED MATTER [DOCKET NO. 4000][1]

A true and correct copy of the Order is attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: signed June 22, 2024 and filed June 24, 2024 [Dkt. No. 4104]

3. **Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1. *Party/Appellee:* Highland Capital Management, L.P.

Attorney:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

2. *Party/Appellee:* James P. Seery, Jr.

Attorneys:

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, D.C. 20006

[1] Given the lack of clarity in the law about the appropriate mechanism for obtaining review, Hunter Mountain is filing a Notice of Appeal by Right and a Notice of Appeal by Leave (along with a motion for leave to file an interlocutory appeal) and a petition for writ of mandamus (which will be filed shortly thereafter).

(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

and

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

2. *Party/Appellant:* Hunter Mountain Investment Trust

Attorney:

STINSON LLP

Deborah Deitsch-Perez
TX Bar No. 24036072
Michael P. Aigen
TX Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
T: 214.560.2201
F: 214.560.2203
Email: deborah.detschperez@stinson.com
Email: michael.aigen@stinson.com

**Dated: July 8, 2024**

**STINSON LLP**

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 8, 2024, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# Exhibit 19

# Current – DAF Holdco



# Exhibit 20

**Subject:** Re: Rand PE Fund I, L.P.

It is a side pocket investment payment.

---

**From:** Chris Rice <CRice@nexpointservices.com>
**Sent:** Monday, February 24, 2025 10:45 AM
**To:** Shawn Raver <SRaver@randadvisors.com>
**Cc:** Mark Patrick <MPatrick@randadvisors.com>
**Subject:** RE: Rand PE Fund I, L.P.

How does this need to be booked from an accounting perspective?

Chris Rice CPA
Senior Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
crice@nexpointservices.com | www.nexpoint.com

---

**From:** Shawn Raver <SRaver@randadvisors.com>
**Sent:** Monday, February 24, 2025 10:05 AM
**To:** Chris Rice <CRice@nexpointservices.com>
**Cc:** Mark Patrick <MPatrick@randadvisors.com>
**Subject:** Re: Rand PE Fund I, L.P.

I did find wiring instructions for Dolimiti from its subscription documents.

NexBank
1620996
311973208

Can you wire $7,500 from Rand PE Fund's PNC account to that Dolimiti account.

Thank you.

Shawn

---

**From:** Chris Rice <CRice@nexpointservices.com>
**Sent:** Thursday, February 20, 2025 1:35 PM
**To:** Shawn Raver <SRaver@randadvisors.com>
**Subject:** RE: Rand PE Fund I, L.P.

Not that I am aware. Cash has always moved via ACH/Wire at PNC or BBVA (previously).

Chris Rice CPA
Senior Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
crice@nexpointservices.com | www.nexpoint.com

---

**From:** Shawn Raver <SRaver@randadvisors.com>
**Sent:** Thursday, February 20, 2025 1:19 PM
**To:** Chris Rice <CRice@nexpointservices.com>
**Subject:** Re: Rand PE Fund I, L.P.

And I assume we don't have a checkbook for Rand PE Fund?

---

**From:** Chris Rice <CRice@nexpointservices.com>
**Sent:** Thursday, February 20, 2025 12:42 PM
**To:** Shawn Raver <SRaver@randadvisors.com>; Chris Rice <CRice@skyviewgroup.com>
**Subject:** RE: Rand PE Fund I, L.P.

I do not. For Dolomiti, we can get those from Ashley. For Hakusan, I think that we can get those from Dawn Munson.

Do you want me to reach out, or do you want to handle?

Chris Rice CPA
Senior Manager – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
crice@nexpointservices.com | www.nexpoint.com

---

**From:** Shawn Raver <SRaver@randadvisors.com>
**Sent:** Thursday, February 20, 2025 9:28 AM
**To:** Chris Rice <CRice@skyviewgroup.com>
**Subject:** Rand PE Fund I, L.P.

Chris -

Do you want wire instructions for Dolomiti, LLC and Hakusan, LLC?

Thanks,
Shawn
DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or

reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

# Exhibit 21

**From:** Isaac Leventon
**To:** JP Sevilla; DC Sauter
**Cc:** Deitsch-Perez, Deborah R.
**Subject:** FW: Rand PE Fund I, L.P.
**Date:** Wednesday, March 12, 2025 8:21:00 AM
**Attachments:** image001.jpg
image002.png

---

Any guess who bought Hunter Mountain?

---

**From:** Chris Rice <CRice@nexpointservices.com>
**Sent:** Wednesday, March 12, 2025 8:10 AM
**To:** Legal Confidentiality <LegalConfidentiality@skyviewgroup.com>
**Cc:** Frank Waterhouse <fwaterhouse@skyviewgroup.com>; JP Sevilla <JSevilla@SkyViewGroup.com>; Ashley Gunther <AGunther@nexpoint.com>
**Subject:** RE: Rand PE Fund I, L.P.

Received confirmation that Rand PE Fund I LP's interest in Beacon Mountain/HMIT was liquidated for $1mm. Not details on who the purchaser was and exactly what date the transaction closed.

Any additional information needed? Am I cleared to process the request to wire $7k for a side pocket payment to Dolomiti?

Thanks

Chris Rice CPA
Director – Fund Analysis

O: (214) 550-4549 | C: (801) 669-1297
crice@nexpointservices.com | www.nexpoint.com

---

**From:** Chris Rice
**Sent:** Thursday, March 6, 2025 8:06 AM
**To:** Legal Confidentiality <LegalConfidentiality@skyviewgroup.com>
**Cc:** Frank Waterhouse <fwaterhouse@skyviewgroup.com>; JP Sevilla <JSevilla@SkyViewGroup.com>; Ashley Gunther <AGunther@nexpoint.com>
**Subject:** RE: Rand PE Fund I, L.P.

All –

I wanted to follow-up/provide an update on this item.

Rand Advisors is still requesting that the distribution be made to Dolomiti, and the distribution is

# Exhibit 22

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of The Highland Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

# MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Sub-Trust" and together with Highland and the Claimant Trust, the "Movants") file this Motion (the "Motion") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), substantially in the form attached hereto as **Exhibit A**, approving a settlement agreement (the "Settlement Agreement")[2] between Highland, the Claimant Trust, the Litigation Sub-Trust, and the Highland Indemnity Trust (the "Indemnity Trust", and together with Highland, the Claimant Trust, and the Litigation Sub-Trust, the "Highland Entities"), on the one hand, and Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"), on the other hand. A copy of the Settlement Agreement is attached as **Exhibit 1** to the *Declaration of Gregory V. Demo in Support of the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* (the "Demo Declaration"), filed concurrently herewith. In support of this Motion, the Movants respectfully state as follows:

## INTRODUCTION

1. Following extensive, arm's-length, good faith negotiations, the Highland Entities and the HMIT Entities, acting through their duly authorized representatives, executed the Settlement Agreement that will result in, among other things: (a) the dismissal with prejudice of all pending litigation between and among them; (b) the disposition of Estate Claims asserted against certain of the HMIT Entities by the Litigation Trustee of the Litigation Sub-Trust and the

---

[2] Capitalized terms used herein, but not defined, have the meanings ascribed to them in the Settlement Agreement or elsewhere in this Motion, as applicable.

assignment of the balance of the remaining Estate Claims (as defined in the Plan) to the HMIT Entities; (c) the allowance of the HMIT Class 10 Interest in the Claimant Trust in a fixed amount; (d) distributions to HMIT on account of its Class 10 interest, including the assignment of the Dugaboy Note, a long-term note with no ready market, at times and in amounts, and subject to the conditions, set forth in the Settlement Agreement; and (e) the exchange of mutual general and broad releases and other protections consistent with the parties' intent to end all current, and avoid all future litigation, between and among them (except for any alleged breach of the Settlement Agreement).

2. The parties' entry into the Settlement Agreement is one of the most significant developments in the long-running Highland Bankruptcy Case. As this Court is aware, until now, HMIT has used its position as a holder of an unallowed, unvested, contingent interest in Class 10 of the Claimant Trust to commence litigation demanding books and records, seeking judicial declarations as to its claimed status as a beneficiary of the Claimant Trust, and asserting various other claims against the Highland Entities and their Court-appointed fiduciaries. The HMIT Entities have been made subject to a motion filed by Highland in the District Court seeking an adjudication that they or some of them are vexatious litigants. While that motion was denied by the District Court, Highland could bring the same type of motion before this Court. Also certain of the HMIT Entities have been named as defendants by the Liquidation Sub-Trust in the Amended Kirschner Complaint.

3. No more. The parties' willingness to resolve all disputes and settle all claims among them will finally end that portion of the protracted and value-destructive litigation that has impeded the Highland Entities' ability to distribute their assets to their constituents and fully implement the Plan. The Settlement Agreement will also remove substantial hurdles to the

eventual windup of the Highland Entities.[3] Indeed, among the many benefits that will accrue to the Highland Entities from the Settlement Agreement are: (a) the cessation of costly, time-consuming, and disruptive litigation; (b) the disposition of two significant Estate assets—the Estate Claims and another illiquid asset, the Dugaboy Note—via distribution, assignment, and sale in furtherance of the ultimate winding up of the Claimant Trust's affairs; (c) the resolution of all disputes in connection with the HMIT Class 10 interest in the Claimant Trust, which was not previously allowed; and (d) the protection against future value-destructive litigation.

4. The proposed Settlement Agreement is clearly in the best interests of the Highland Entities and their stakeholders and results from a sound exercise of their business judgment. The Motion should be granted.

## RELEVANT BACKGROUND

### I. HMIT's Partnership Interest in Highland

5. In December 2015, HMIT acquired 100% of Highland's Class B and Class C limited partnership interests (the "Class B/C Interests") from James Dondero, Mark Okada, and certain entities affiliated with them. Mr. Dondero—through the Dugaboy Investment Trust ("Dugaboy") and Strand Advisors, Inc. ("Strand")—and Mr. Okada, directly and indirectly, retained Highland's Class A limited partnership interests (the "Class A Interests").

6. The Class B/C Interests represented 99.50% of the Debtor's prepetition total equity. The Class A Interests, in aggregate, represented the remaining 0.50%.

7. Concurrently with its acquisition of the Class B/C Interests, HMIT executed that certain *Secured Promissory Note* dated December 21, 2015, in the original face amount of

[3] Assuming the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be Patrick Daugherty's claim (Adv. Proc. No. 25-03055-sgj, Docket No. 1 (Bankr. N.D. Tex. May 2, 2025) (the "Daugherty Claim")), and the disputed, out-of-the-money, *de minimis* Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand.

$63,000,000 in favor of Highland (the "HMIT Note"), which, as of the Petition Date, had an outstanding principal balance of $57,690,640.95 (the "HMIT Note Balance").

8. On December 24, 2015, the Debtor and its limited partners, including HMIT, entered into that certain *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as subsequently amended, the "LPA"). Pursuant to the LPA, each limited partner had a capital account at the Debtor on account of its limited partnership interests.

9. As of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "HMIT Capital Account Balance"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.[4]

## II. The Bankruptcy Case

10. The Debtor commenced the Bankruptcy Case in the District of Delaware on October 16, 2019, by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Bankruptcy Case was subsequently transferred to this Court.

11. On February 22, 2021, the Bankruptcy Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "Plan"). The Plan went effective on August 11, 2021 [Docket No. 2700] (the "Effective Date").

12. On the Effective Date, in accordance with the Plan: (a) the Claimant Trust and Litigation Sub-Trust were created; (b) the Class B/C Interests and the Class A Interests were extinguished; (c) holders of allowed Class 10 interests, consisting of Class B/C Interests, would receive contingent and unvested Class 10 Interests if and when their claims or interests were

[4] As of the Petition Date, Dugaboy's capital account was $740,081.61; Strand's capital account was $994,707.76; and Mr. Okada's and his affiliates entities' capital accounts, in aggregate, was $248,280.33.

allowed in amounts determined under the Plan; (d) holders of allowed Class 11 interests, consisting of the Class A Interests, would receive contingent and unvested Class 11 Interests if and when their claims or interests were allowed in amounts under the Plan; (e) James P. Seery, Jr., was appointed the Claimant Trustee of the Claimant Trust; and (f) Marc Kirschner was appointed the Litigation Trustee of the Litigation Sub-Trust.

13. Presently, neither the HMIT Class 10 Interest nor any of the Class 11 Interests have been Allowed (as such term is defined in the Plan).

## III. The Kirschner Litigation

14. On October 15, 2021, the Litigation Trustee filed his *Complaint and Objection to Claims* (Adv. Proc. No. 21-03076-sgj, Docket No. 1 (Bankr. N.D. Tex. Oct. 15, 2021)) (the "Kirschner Complaint") which asserted, among other things, various claims against (a) Rand PE Fund and (b) HMIT, including a cause of action to collect amounts owed to Highland by HMIT pursuant to the HMIT Note.

15. On May 19, 2022, the Litigation Trustee amended the Kirschner Complaint (Adv. Proc. No. 21-03076-sgj, Docket No. 158 (Bankr. N.D. Tex. May 19, 2022)) (the "Amended Kirschner Complaint"). The Amended Kirschner Complaint asserted substantially similar claims against HMIT and Rand PE Fund, including claims to collect the amounts owed under the HMIT Note.

16. On April 4, 2023, upon the motion of the Litigation Trustee, this Court stayed prosecution of the Amended Kirschner Complaint, among other proceedings. Adv. Proc. No. 21-03076-sgj, Docket No. 338 (Bankr. N.D. Tex. April 4, 2023). As of the issuance of the stay, none of the HMIT Entities named a defendant had filed answers and therefore had not been required to file any counterclaims.

## IV. <u>The Pending HMIT Litigation</u>

17. On March 28, 2023, HMIT filed *Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket Nos. 3699, 3760, 3815, 3816] (as amended and supplemented, the "<u>First Motion for Leave</u>") in which HMIT asserted, *inter alia*, claims for breach of fiduciary duty, conspiracy, and unjust enrichment against Highland, the Claimant Trust, and Mr. Seery, among others. On August 25, 2023, this Court denied the First Motion for Leave. *In re Highland Cap. Mgmt., L.P.*, 2023 Bankr. LEXIS 2104 (Bankr. S.D. Tex Aug. 25, 2023). HMIT appealed to the District Court for the Northern District of Texas (the "<u>District Court</u>"), and, on March 21, 2025, the District Court remanded to this Court for further proceedings. *Hunter Mountain Inv. Tr. v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E, Docket No. 44 (N.D. Tex. Mar. 21, 2025).

18. On May 10, 2023, Dugaboy Investment Trust ("<u>Dugaboy</u>") and HMIT filed that certain *Complaint to (i) Compel Disclosures About the Assets of Highland Claimant Trust and (ii) Determine (a) Relative Value of Those Assets, and (b) Nature of Plaintiffs' Interests in the Claimant Trust*, Adv. Proc. No. 23-03038-sgj, Docket No. 1 (the "<u>Valuation Complaint</u>"), seeking an order (a) compelling the Claimant Trust to provide information about its assets, (b) valuing those assets, and (c) deeming Dugaboy and HMIT "Claimant Trust Beneficiaries." On May 24, 2024, this Court dismissed the Valuation Complaint with prejudice [Docket No. 27]. Dugaboy and HMIT appealed to the District Court (Case No. 3:24-cv-01531-X (N.D. Tex.)), and the appeal is fully briefed and *sub judice*.

19. On January 1, 2024, HMIT filed its *Motion for Leave to File a Delaware Complaint* [Docket. No. 4000] (the "<u>Second Motion for Leave</u>," and together with the First Motion for Leave and the Valuation Complaint, the "<u>Pending HMIT Litigation</u>"). On January 16, 2024, Highland and the Claimant Trust moved to stay the Second Motion for Leave pending

appellate review of the dismissal of the Valuation Complaint [Docket No. 4013] (the "Stay Motion"). On June 22, 2024, this Court granted the Stay Motion [Docket No. 4104]. HMIT subsequently appealed to the District Court (Case No. 3:24-cv-01786-L (N.D. Tex.)), and the appeal is fully briefed and *sub judice*.

## V. Summary of the Salient Terms of the Settlement Agreement

20. To resolve the disputes between the Highland Entities and the HMIT Entities, including the Pending HMIT Litigation, the parties and their counsel engaged in extensive arm's-length, good faith negotiations over the last several months. These negotiations resulted in the Settlement Agreement, which provides for, *inter alia*, the sale and transfer of certain Estate Claims and other Estate assets to the HMIT Entities, the dismissal of the Pending HMIT Litigation, and the exchange of broad mutual releases.

21. Subject to the terms of the Settlement Agreement, the principal terms of the Settlement Agreement are set forth below:[5]

- Within five (5) business days after the Court issues an order approving the allowance of HMIT Class 10 Interest (the "Bankruptcy Court Approval Date"), the HMIT Entities will dismiss the Pending HMIT Litigation with prejudice;[6]
- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will dismiss HMIT and Rand PE Fund from Counts I, II, III, and XXIV (which relates to the HMIT Note) of the Amended Kirschner Complaint with prejudice;
- Within five (5) business days after the Bankruptcy Court Approval Date, Highland will pay $500,000 to HMIT;
- Subject to the Court's approval and the terms and conditions set forth in the Settlement Agreement, the HMIT's Class 10 Interests will be allowed in the amount of

[5] In the event of any inconsistency between this Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control.

[6] The Valuation Complaint will only be dismissed as to HMIT; Dugaboy's claims in the Valuation Complaint will not be impaired.

$336,940,230.58, which represents the HMIT Capital Account Balance, less the HMIT Note Balance;[7]

- Within five (5) business days after the Bankruptcy Court Approval Date, (a) the Indemnity Trust will distribute $10 million Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests and (b)(i) the Highland Entities will cause the portion of that certain *Promissory Note*, dated May 31, 2017, in the original face amount of $24,268,621.69, from Dugaboy, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee (the "Dugaboy Note") held by the Highland Entities to be distributed in-kind to HMIT and (ii) the Indemnity Trust will distribute to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the date of the Settlement Agreement to the date of such assignment of the Dugaboy Note;[8]

- Subject to certain conditions precedent, the Indemnity Trust will make subsequent distributions Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests with a final distribution date estimated to be on or about April 1, 2029;

- Within five (5) business days after the Bankruptcy Court Approval Date, the Litigation Trustee will, solely to the extent permitted by the Plan, the Litigation Sub-Trust Agreement, and applicable law, transfer, sell and assign to the HMIT Entities all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee in the Amended Kirschner Complaint (the "Transferred Claims"); and

- On the Bankruptcy Court Approval Date, the HMIT Releasors will provide broad, general releases to the Highland Released Parties and the Highland Releasors will provide broad, general releases to the HMIT Released Parties.

If the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million.

[7] Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable, statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in the Settlement Agreement.

[8] Pursuant to the Settlement Agreement, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than 50% of the current balance owed under the Dugaboy Note. Contemporaneously with the assignment of the Dugaboy Note, the Indemnity Trust will make a *pro rata* cash distribution to any other Holder of an Allowed Class 10 Claim or Equity Interest based on such valuation.

## RELIEF REQUESTED

22. Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b), the Movants request entry of an order substantially in the form attached hereto as **Exhibit A**, granting the Motion, approving the Settlement Agreement, and authorizing the Highland Entities and their agents to take all actions necessary or desirable to implement the Settlement Agreement without the need for further notice or approval by the Court.

## BASIS FOR RELIEF REQUESTED

23. Bankruptcy Rule 9019 provides that "[o]n motion … and after notice and a hearing, the court may approve a compromise or settlement." FED. R. BANKR. P. 9019(a). Settlements are favored in the bankruptcy context to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). The approval of a settlement is within the "sound discretion" of the Court. *In re Jackson Brewing Co.*, 624 F.2d 599, 603 (5th Cir. 1980).

24. Pursuant to Bankruptcy Rule 9019(a), the Court may approve a settlement if it is fair, reasonable, and in the best interests of the estate. *See, e.g., Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). A settlement should be approved unless it falls below the lowest point in the range of reasonableness, based on a comparison between the terms of the settlement and the costs and benefits of further litigation. *See, e.g., Jackson Brewing Co.*, 624 F.2d at 602 (court must compare the "terms of the compromise with the likely rewards of litigation"); *Cook v. Waldron*, 2006 U.S. Dist. LEXIS 31411, at *10 (S.D. Tex. April 18, 2006) (court should "canvass the issues" to decide if settlement falls "below the lowest point in the range of reasonableness").

25. In evaluating a proposed settlement, courts consider (i) the "probability of success in the litigation, with due consideration for the uncertainty in fact and law," (ii) the "complexity

and likely duration of the litigation and any attendant expense, inconvenience and delay," and (iii) "[a]ll other factors bearing on the wisdom of the compromise." *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (quoting *Jackson Brewing Co.*, 624 F.2d at 602). Assessing the first factor—success on the merits—does not require a "mini-trial" on the merits. *Cajun Elec. Power Coop.*, 119 F.3d at 356. The "other factors" include "the best interests of the creditors, 'with proper deference to their reasonable views,'" as well as "'the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.'" *Id.* (quoting *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995)).

26. A trustee also "is permitted to settle lawsuits pursuant to section 363(b)" of the Bankruptcy Code. *Id*. at 354. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. 363(b)(1). A settlement involving a transaction outside the ordinary course of business "'must be supported by an articulated business justification, good business judgment, or sound business reasons.'" *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.)*, 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore)*, 608 F.3d 253, 263 (5th Cir. 2010)).

27. As discussed in detail below, the factors to be considered pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 363(b) weigh in favor of approving the Settlement Agreement in this case.

28. First, although the Highland Entities believe they have strong and meritorious defenses to all of the Pending HMIT Litigation, history has shown that defending the Pending HMIT Litigation, including the appeals that could result therefrom, will be costly, time-consuming and value-destructive to the estate and creditor recoveries. Further, there is no guarantee that the

Highland Entities would continue to be successful in defending the Pending HMIT Litigation—or that the HMIT Entities will not file additional litigation against the Highland Entities and their indemnified parties.

29. The second factor—complexity, duration, and costs of litigation—also weighs heavily in favor of approval of the Settlement Agreement. As this Court is aware, the cost of defending against the litigation in this case, including the Pending HMIT Litigation, has been significant. The litigation and its attendant costs have also significantly delayed and reduced distributions to the Debtor's constituents. The Pending HMIT Litigation began in 2023 and, although HMIT has lost in this Court, the Pending HMIT Litigation is subject to at least two pending appeals and has no signs of resolving absent this settlement. If the Settlement Agreement is not approved, the Highland Entities will be faced with significant appellate litigation and potentially additional litigation in this Court and other courts to resolve the Pending HMIT Litigation as well as any other litigation that may be brought by the HMIT Entities if the Settlement Agreement—and the Litigation Protections, including the releases—are not approved.

30. Third, approval of the Settlement Agreement is justified by the paramount interest of Highland's creditors and constituents. The Settlement Agreement resolves the Pending HMIT Litigation, resolves all disputes in connection with the HMIT Class 10 claim; sells, transfers, and assigns the Estate Claims asserted in the Amended Kirschner Complaint—which has been pending since 2021 at significant cost to the estate—to the HMIT Entities; and provides for broad mutual releases and a cessation of the litigation and acrimony that has delayed consummation of the Plan. In exchange the Highland Entities are paying $500,000 and the Indemnity Trust is agreeing to scheduled distributions from the Indemnity Trust to the Holders of Allowed Class 10 Claims and Equity Interests. The Settlement Agreement is clearly a rational exercise of the Highland Entities' business judgment.

31. Finally, the Settlement Agreement was unquestionably negotiated in good faith and at arm's length. The Highland Entities' and HMIT Entities' relationship to date has been defined by hostility. Notwithstanding that history, the Highland Entities and HMIT Entities, with their advisors, negotiated the Settlement Agreement over the last several months, which, although not perfect for any party, finally resolves the years of active litigation and acrimony between the Highland Entities and HMIT Entities.

32. While this Motion is the motion of the Highland Entities, undersigned counsel for the HMIT Entities appears below to evidence the approval by the HMIT Entities of the form and content of this Motion.

## NO PRIOR REQUEST

33. No previous request for the relief sought herein has been made to this Court or any other court.

## PRAYER

**WHEREFORE**, the Movants respectfully request entry of an order, substantially in the form attached hereto as **Exhibit A**, granting the Motion and the relief requested herein, and granting them such other and further relief as the Court deems just and proper.

[remainder of page intentionally blank]

May 19, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

Appearing to Evidence Approval of Form and Content:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

*Counsel for the HMIT Entities*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

# Exhibit 23

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11**<br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Dallas, Texas<br>June 25, 2025<br>9:30 a.m. Docket<br><br>- MOTION TO EXTEND DURATION OF TRUSTS (4213)<br>- MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

the 9019 motion?

THE COURT: You may.

MR. MORRIS: Okay. With respect to the 9019 motion, there were originally three Objecting Parties: the Dugaboy Investment Trust, Patrick Daugherty, and The Dallas Foundation and an entity called Crown Global.

I'm pleased to report, and I think Your Honor may already be aware, that a settlement has been reached to dispose of The Dallas Foundation and the Crown Global objection. There is a written agreement to that effect that effectuates that. And I'd like to just turn the podium over to Mr. Phillips. Louis Phillips represents the HMIT Entities. I know Mr. Curry is here on behalf of the objecting parties, The Dallas Foundation, but I think -- I think I'll let Mr. Phillips address, you know, the specific terms of the resolution of that objection.

THE COURT: All right. Thank you. And I will say that my staff reached out yesterday to -- I don't know if it was Mr. Curry or someone in your office -- wanting to know have you delivered exhibit notebooks. And it was at that point my staff heard, well, we've resolved.

MR. CURRY: We had just finished.

THE COURT: Okay. All right. So I'm happy to hear what the resolution is.

MR. PHILLIPS: Good morning, Your Honor. Louis M.

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A Yes, I have.

Q And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q Did you help prepare this chart?

A No.

Q No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A Yes.

Q And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't

# Exhibit 24

EXECUTION VERSION

# SETTLEMENT A REEMENT & ENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**A r**") is entered into as of May 19, 2025 (the "**A r D**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**H d**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**C Tr**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**L S Tr**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**I d Tr**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**H d E**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**B M**"), Rand Advisors, LLC, a Delaware limited liability company ("**R d Ad r**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**R d PE F d**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**R d P**"), Atlas IDF, LP, a Delaware limited partnership ("**A IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**A P**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT E**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**P r**," and each individually, as a "**P r**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**M**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**A**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**A**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**A d d C**" means the *ended Co plaint and b ection to Clai s*, filed as docket number 158 in *Kirschner v. ondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT C I r**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT N**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT N C**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT R d P r**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT P r**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT C r d P r**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *ot ithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**I d Tr Ad r r**" has the meaning given to it in the Indemnity Trust Agreement.

"**I d Tr A r**" means that certain *Second ended and estated nde nit Trust gree ent of the nde nit Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of April 28 , 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity

**NO THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**A REEMENT**

1. Stay and Dismissal of Pending Litigation With Prejudice.

(a) Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

(b) Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2. Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint.

(a) The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3. Cash Payment to HMIT. Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**P**") by wire transfer:

Hunter Mountain Investment Trust
C o CLO Holdco, LLC
Hancock Whitney
Account # - 071173413
Routing # - 113000968
(469) 604-0955

4. HMIT Class 10 Interest.

(a) Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58 100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance.

(b) Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable,

statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement. Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c) Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**<u>C A</u>**"), and any attempted Class 10 Assignment shall be null and void.

(d) For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5. <u>Initial Interim Distributions on the Allowed Class 10 Interests</u>.

(a) Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**<u>I I r D r D</u>**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**<u>I I r C D r A</u>**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**<u>r Tr r</u>**").

(b) Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**<u>N A D</u>**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date. Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6. <u>Subsequent Distribution(s) on the Allowed Class 10 Interests.</u>

(a) On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**<u>F r S D r</u>**", and the date on which such Subsequent Distribution is made, the "**<u>F r S D r D</u>**") Pro Rata to the

Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b) On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**S d S D r**", and the date on which such Subsequent Distribution is made, the "**S d S D r D**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c) Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7. Final Distribution on the Allowed Class 10 Interests.

(a) On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b) The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c) Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8. Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a) Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-

form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**K r r Tr r**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b) THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c) As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**K r r Pr**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d) Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9. General Release By The HMIT Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants,

administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT R r**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT E R d C**").

10. General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**H d R r**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**H d R d C**").

11. Further Provisions Concerning The General Releases.

(a) **FOR THE AVOIDANCE OF DOUBT THE FORE OIN RELEASES ARE INTENDED TO BE ENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS HETHER KNO N OR UNKNO N SUSPECTED OR UNSUSPECTED ARISIN OR EXISTIN FROM THE BE INNIN OF TIME THROU H AND INCLUDIN THE A REEMENT DATE**

(b) To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c) Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A ENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASIN PARTY DOES NOT KNO OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTIN THE RELEASE AND THAT IF KNO N BY HIM OR HER OULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT ITH THE DEBTOR OR RELEASED PARTY**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNO IN LY AND VOLUNTARILY AIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HI HLAND ENTITIES, ON THEIR O N BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HI HLAND RELEASORS RESPECTIVELY** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d) As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i) any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**<u>HMIT A d C</u>**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**<u>H d A d C</u>**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12. <u>Covenant Not To Sue; Limitation on Standing</u>. Upon the Agreement Date:

(a) Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b) Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c) For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13. <u>Representations and Warranties</u>.

(a) Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. 101(54)), by any HMIT Releasor.

(b) The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the

# Exhibit 25

Gregory G. Hesse, Esq.
State Bar No. 09549419
HUNTON ANDREWS KURTH, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | § | Case No. 19-34054-sgj-11 |
| | § | |
| Reorganized Debtor. | § | |

**PRELIMINARY OBJECTION OF THE DUGABOY INVESTMENT TRUST TO THE MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES**

**COMES NOW**, the Dugaboy Investment Trust ("Dugaboy") and submits this Preliminary Objection (the "Objection") to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "Settlement Motion"), and in support thereof, respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Settlement Motion seeks approval of a settlement agreement between Highland Capital Management, L.P. ("Highland"), the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust (collectively, the "Highland Entities"), on the one hand, and Hunter Mountain Investment Trust ("HMIT") and related entities (the "HMIT Entities")

on the other (the "Settlement Agreement"). On June 6, 2025, Dugaboy retained the undersigned counsel to represent it with respect to the Settlement Motion. The undersigned promptly requested a brief two-week extension of the Settlement Motion's objection deadline. Counsel for the Highland Entities declined any extension. As such, Dugaboy files this Objection to preserve its rights, and expressly reserves the right to supplement this Objection after conducting discovery of the issues relevant to the Settlement Motion.

2. If the Court grants the Settlement Motion, it will approve a wide-ranging compromise that would significantly alter the confirmed Plan (as defined below). Specifically, the Settlement Motion attempts to elevate distributions to certain equity interests (Class 10) above the remaining creditors and provides for accelerated distributions *ahead* of those creditor[s].[1] Such a distribution is a clear violation of the terms of the Plan and its implementation documents, including the Claimant Trust Agreement. For this reason alone, the Court should deny the Settlement Motion.

3. Additionally, the Settlement Motion is devoid of information sufficient to allow the Court or other parties in interest to determine whether the proposed Settlement Agreement meets the standards for approval, including evidence to support the distribution of any assets to the holders of any equity interests, including the HMIT Entities, and evidence to support the allowance of HMIT's Class 10 interest in the amount of $336,940,230.58. As a result, Dugaboy intends to serve discovery upon the Highland Entities to obtain the evidence relating to these and other issues set forth in the Settlement Motion.

---

[1] It is not clear from the Settlement Motion the total number of remaining, unpaid claimants. In footnote 3 of the Settlement Motion, the Highland Entities represent that if the Settlement Motion is granted, the only "unresolved claim" is the claim of Patrick Daugherty. Since the Settlement Motion proposes making distributions to only the holder of a Class 10 Equity Interest, it implies that the only "unresolved claim" (maybe the only unpaid claim) is held by Mr. Daugherty.

4. Finally, the Settlement Agreement's currently drafted mutual release provisions are vague and overly broad. Out of an abundance of caution, Dugaboy objects to any language that explicitly or implicitly attempts to impose a release of any of its claims or the claims of any affiliates, including James Dondero ("Dondero"), against any Highland Entity (as that term is defined in the Settlement Agreement) or any HMIT Entity (as that term is defined in the Settlement Agreement). For these reasons, as further detailed below, the Settlement Motion should be denied.

**PROCEDURAL HISTORY**

5. The Debtor commenced the above-captioned case (the "Bankruptcy Case") in the District of Delaware on October 16, 2019. The Bankruptcy Case was subsequently transferred to this Court. On February 22, 2021, this Court entered the *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "Plan"). The Plan went effective on August 11, 2021 [Docket No. 2700] (the "Effective Date").

6. On the Effective Date, in accordance with the Plan: (a) Highland established the Claimant Trust for the benefit of the Claimant Trust Beneficiaries; (b) Highland established Litigation Sub-Trust for the benefit of the Claimant Trust as the "Litigation Sub-Trust Beneficiary"; (c) the Class B/C Interests and the Class A Interests in Highland were extinguished; (d) holders of allowed Class 10 interests, consisting of Class B/C Interests, would receive contingent and unvested Class 10 Interests if and when their claims or interests were allowed in amounts determined under the Plan; (e) holders of allowed Class 11 interests, consisting of the Class A Interests, would receive contingent and unvested Class 11 Interests if and when their claims or interests were allowed in amounts under the Plan; (f) James P. Seery, Jr., was appointed

the Claimant Trustee of the Claimant Trust; and (g) Marc Kirschner was appointed the Litigation Trustee of the Litigation Sub-Trust.

7. Subsequently, on or about August 16, 2021, the Claimant Trust, as grantor through the Claimant Trustee (Mr. Seery), established the Indemnity Trust for the benefit of the "Trust Indemnified Parties."[2] In general terms the "Trust Indemnified Parties" and "Beneficiaries" of the Indemnity Trust are (a) the "Indemnified Parties" identified in Sec. 8.2 of the Claimant Trust Agreement, (b) the "Indemnified Parties" identified in Sec. 8.2 of the Litigation Sub-Trust and (c) the "Covered Persons" under Sec. 10 of the Reorganized Limited Partnership Agreement of Highland. Mr. Seery appointed himself the Indemnity Trust Administrator for the Indemnity Trust and is generally responsible for managing the Indemnity Trust.[3]

8. Prior to the filing of the Settlement Motion, neither the Class 10 Interests held by HMIT nor any of the Class 11 Interests, including those held by Dugaboy, have been Allowed (as defined in the Plan). The Settlement Motion, however, proposes to alter this state of affairs with an agreement to allow HMIT's Class 10 Interests and to authorize distribution of funds and assets to HMIT by the Claimant Trust or by other entities for the benefit of the Claimant Trust. The proposed distributions being made by the Claimant Trust, or for the benefit of the Claimant Trust, are being effectuated, apparently, prior to payment in full of all holders of claims.

---

[2] According to the Settlement Agreement, the Indemnity Trust Agreement has been amended at least two times, most recently "effective as of [April 28], 2025." See, Settlement Agreement, p.5 (definition of "Indemnity Trust Agreement"). Upon information and belief, the Second Amendments to the Indemnity Trust Agreement have not been provided to Dugaboy.

[3] The Settlement Agreement was signed for the Highland Entities by Mr. Kirschner as the Litigation Trustee for the Litigation Sub-Trust and Mr. Seery as (a) the Chief Executive Officer of Highland, (b) the Claimant Trustee for the Claimant Trust and (c) the Indemnity Trust Administrator for the Indemnity Trust.

## INITIAL OBJECTIONS

### A. The Settlement Agreement Violates the Terms of the Plan and the Claimant Trust Agreement

9. The Claimant Trust Agreement has explicit requirements that must be met prior to the distribution of funds or assets to any Equity Trust Certificate holders. Sec. 5.1(c) of the Claimant Trust Agreement provides:

> (c) Contingent Trust Interests. On the date hereof, or on the date such Interest becomes Allowed under the Plan, the Claimant Trust shall issue Contingent Interests to Holders of Allowed Class 10 Class B/C Limited Partnership Interests and Holders of Allowed Class 11 Class A Limited Partnership Interests (collectively, the "Equity Holders"). The Claimant Trustee shall allocate to each Holder of Allowed Class 10 Class B/C Limited Partnership Interests and each Holder of Allowed Class 11 Class A Limited Partnership Interests a Contingent Trust Interest equal to the ratio that the amount of each Holder's Allowed Class 10 or Class 11 Interest bears to the total amount of the Allowed Class 10 or Class 11 Interests, as applicable, under the Plan. Contingent Trust Interests shall not vest, and the Equity Holders shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the "GUC Payment Certification"). Equity Holders will only be deemed "Beneficiaries" under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court, at which time the Contingent Trust Interests will vest and be deemed "Equity Trust Interests." The Equity Trust Interests shall be subordinated in right and priority to Subordinated Trust Interests, and distributions on account thereof shall only be made if and when Subordinated Beneficiaries have been repaid in full on account of such Subordinated Beneficiary's Allowed Subordinated Claim, in accordance with the terms of the Plan, the Confirmation Order, and this Agreement. The Equity Trust Interests distributed to Allowed Holders of Class A Limited Partnership Interests shall be subordinated to the Equity Trust Interests distributed to Allowed Holders of Class B/C Limited Partnership Interests.

10. Before the Holders of Class 10 or Class 11 Interests are entitled to receive any distribution of property, the Claimant Trustee is required to file with the Court the "GUC Payment Certification" (as defined in Section 5.1(c) of the Claimant Trust Agreement). As of the filing of the Settlement Motion, the GUC Payment Certification had not been filed. So, based on the

express terms of the Claimant Trust Agreement, no distribution can be made to the HMIT Entities based on its Class 10 Interests.

11. The Settlement Agreement, however, includes an agreement between the Highland Entities and the HMIT Entities as to the allowed amount of HMIT's Class 10 Interest: $336,940,230.58. And Section 4(b) of the Settlement Agreement provides that, notwithstanding the allowance of HMIT's Class 10 Interest, it shall not be a "Claimant Trust Beneficiary" or a "Beneficiary" under the Claimant Trust Agreement.

12. In an apparent attempt to subvert the prohibition against making distributions to the HMIT Entities, the Settlement Agreement proposes to have distributions made by entities under the control of the Claimant Trust or the Claimant Trustee to the HMIT Entities. For example:

- Highland, which is wholly owned, directly and indirectly, by the Claimant Trust, is making a $500,000 payment to the HMIT Entities;[4]

- the Indemnity Trust, which was created by the Claimant Trust for the benefit of the Indemnified Parties identified in the Claimant Trust, the Litigation Trust and the Highland limited partnership agreement is making a series of payments in an amount not less than $23 million (and could be more if any funds remain in the Indemnity Trust on April 1, 2029) to be applied to HMIT's allowed Class 10 Equity Interest;

- the Litigation Trust, the sole beneficiary of which is the Claimant Trust, is transferring to the HMIT Entities the "Kirschner Claims";[5] and

- "The Highland Entities" (the specific Highland Entity is not disclosed in the Settlement Motion or Settlement Agreement) is transferring to HMIT the Dugaboy Note. After the Dugaboy Note is valued, the value is to be applied to HMIT's Class 10 Interest.

13. All, or substantially all, of the payments and transfers of property are being made by *or for the benefit of* the Claimant Trust to reduce the HMIT Entities' Class 10 Equity Interests

---

[4] The Settlement Agreement is silent as to how this payment is to be applied by HMIT. Will it be applied to HMIT's Class 10 Interest?

[5] The Settlement Agreement is silent as to the value of the "Kirschner Claims" or how such value it to be applied by HMIT. Once again, will the value attributed to the "Kirschner Claims" be applied to HMIT's Class 10 Interest?

in violation of the express terms of the Claimant Trust Agreement and Plan. As such, the Settlement Motion should be denied.

**B. There is Insufficient Evidence to Support Approval of the Settlement Agreement**

14. The Highland Entities are proposing a settlement with the HMIT Entities that violates the Plan, the Claimant Trust Agreement and the Confirmation Order. As a result, Dugaboy requires discovery relating to a number of relevant issues, including but not limited to:

- Has the Claimant Trust paid all the creditors, including the Class 9 subordinated creditors, in full?
- Is the Debtor solvent and capable of paying all the creditors, including the Class 9 subordinated creditors, in full?
- If the Debtor has not paid all creditors in full, does it have adequate funds and resources to pay all creditors in full?
- What is the basis of the Claimant Trustee's agreement to allow the Class 10 Equity Interest of HMIT in the amount of $336,940,230.58?
- What is the basis of the Claimant Trustee's assertion in Footnote 3 as to the amount of the Class 11 Equity Interests?
- What value is being attributed to the Kirschner Claims, and will such value be applied to HMIT's Class 10 Equity Interest?

15. The forgoing factual issues are not exhaustive but illustrate a sampling of the types of open factual issues left unaddressed by the Settlement Motion. Dugaboy intends to serve discovery on the Highland Entities with regard to the Settlement Motion. Because the Highland Entities have failed to provide sufficient evidence to support approval of the Settlement Agreement, the Court should deny the Settlement Motion.

**C. The Releases Contained in the Settlement Agreement are Vague and Overly Broad**

16. Finally, the Settlement Motion contains vague and overly broad mutual release provisions. Out of an abundance of caution, Dugaboy objects to any language that explicitly or implicitly attempts to impose a release of any of its claims or the claims of any affiliate, including

Mr. Dondero, of any Highland Entity (as that term is defined in the Settlement Agreement) or any HMIT Entity (as that term is defined in the Settlement Agreement).

**RESERVATION OF RIGHTS**

17. In the event the Court grants Dugaboy's motion to extend the response deadline to the Settlement Motion, Dugaboy reserves its rights to supplement this Objection. Further, Dugaboy reserves its rights to supplement this Objection as a result of evidence that will be obtained in discovery.

**WHEREFORE, PREMISES CONSIDERED**, Dugaboy prays that the Court enter an order (a) denying the Settlement Motion, and (b) granting Dugaboy such other and further relief to which it is entitled.

Respectfully submitted,

**HUNTON ANDREWS KURTH LLP**

By: /s/ *Gregory G. Hesse*
Gregory G. Hesse (Texas Bar No.09549419)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
GHesse@hunton.com

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 9th day of June, 2025, a true and correct copy of the foregoing was served on ECF participants, electronically through the Court's ECF System.

/s/ *Gregory G. Hesse*
Gregory G. Hesse

# Exhibit 26

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.

**U.S. Bankruptcy Court**

**Northern District of Texas**

Notice of Electronic Filing

The following transaction was received from emi entered on 6/30/2025 at 10:43 AM CDT and filed on 6/25/2025

**Case Name:** Highland Capital Management, L.P.
**Case Number:** 19-34054-sgj11
**Document Number:** 4295

**Docket Text:**
Hearing held on 6/25/2025. (RE: related document(s) [4216] Motion to compromise controversy with the HMIT Entities. (Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust, Interested Party Highland Litigation Sub-Trust (Appearances: J. Morris and Pachulski team for Reorganized Debtor; R. Loigman for Post-Confirmation Trusts; L. Phillips for HMIT Entities; M. Lang for Dugaboy; D. Curry for Dallas Foundation; L. Young for UST. Evidentiary hearing. Motion granted. Counsel to upload order.) (Edmond, Michael)

The following document(s) are associated with this transaction:

**19-34054-sgj11 Notice will be electronically mailed to:**

David G. Adams on behalf of Creditor United States (IRS)
david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;brooke.lewis@usdoj.gov;CaseView.ECF@usdoj.gov

Joseph Y. Ahmad on behalf of Creditor Acis Capital Management GP, LLC
joeahmad@azalaw.com, sbates@azalaw.com;ahernandez@azalaw.com

Joseph Y. Ahmad on behalf of Creditor Acis Capital Management, L.P.
joeahmad@azalaw.com, sbates@azalaw.com;ahernandez@azalaw.com

Michael P. Aigen on behalf of Creditor Hunter Mountain Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Creditor The Dugaboy Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant Highland Capital Management Fund Advisors, L.P.
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant Highland Capital Management Services, Inc.
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant NexPoint Advisors, L.P.
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant James Dondero
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant Nancy Dondero
michael.aigen@stinson.com

Michael P. Aigen on behalf of Interested Party Highland CLO Management Ltd
michael.aigen@stinson.com

Michael P. Aigen on behalf of Partner Dugaboy Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Plaintiff Dugaboy Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Plaintiff Hunter Mountain Investment Trust
michael.aigen@stinson.com

Christopher J. Akin on behalf of Defendant Isaac Leventon
cakin@lynnllp.com, vkropp@lynnllp.com

Christopher J. Akin on behalf of Defendant Scott Ellington
cakin@lynnllp.com, vkropp@lynnllp.com

Omar Jesus Alaniz on behalf of Creditor Farallon Capital Management, LLC
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Creditor Jessup Holdings LLC
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Creditor Muck Holdings LLC
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Creditor Stonehill Capital Management LLC
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Creditor James P. Seery, Jr.
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Debtor Highland Capital Management, L.P.
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Other Professional Highland Claimant Trust
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Omar Jesus Alaniz on behalf of Other Professional James P. Seery, Jr.
oalaniz@reedsmith.com, omar-alaniz-2648@ecf.pacerpro.com;gsaenz@reedsmith.com

Jerry C. Alexander on behalf of Attorney Scott M. Seidel
alexanderj@passmanjones.com, chandlers@passmanjones.com

Amy K. Anderson on behalf of Creditor Issuer Group
aanderson@joneswalker.com, tfontenot@joneswalker.com;amy-anderson-9331@ecf.pacerpro.com

Zachery Z. Annable on behalf of Debtor Highland Capital Management, L.P.

# <u>Exhibit 27</u>

# Attachment 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

## BINDING TERM SHEET

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

[signature]

Julie Diaz, Chief Executive Officer

The HMIT Entities

______________________________

Mark Patrick

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

______________________________

Julie Diaz, Chief Executive Officer

The HMIT Entities

______________________________

Mark Patrick

# Exhibit 28

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

**July 9, 2025**

Honorable Stacey G.C. Jernigan
United States Bankruptcy Court
Northern District of Texas
1100 Commerce Street, Room 1254
Dallas, Texas 75242

Re: Request for a Stay; Case No. 19-34054-sgj11

Dear Judge Jernigan:

The Office of the Texas Attorney General (the "OAG") respectfully ask that the Court enter a brief stay of this bankruptcy proceeding.

The OAG, as the representative of the public's interest in charity, is charged under Texas law with the power and duty to protect and enforce the public interest in nonprofit organizations, foundations and charitable trusts. See Tex. Prop. Code § 123.002 (authorizing the Attorney General to intervene in a "proceeding involving a charitable trust."). Federal courts have recognized this principle. *See, e.g., Tex. v. Veterans Support Org.*, 166 F. Supp. 3d 816, 820-21 (W.D. Tex. 2015).

The OAG is further charged with protecting the public interest as it relates to unlawful acts or practices in trade or commerce under the Texas Deceptive Trade Practices-Consumer Protection Act. Tex. Bus. & Com. Code § 17.41 *et seq*. (the "DPTA"). The OAG reviews charitable, nonprofit, and for-profit entities to determine whether they are compliant with Texas laws including, *inter alia*, the DTPA, the Business Organizations Code, the Property Code, the Texas Health & Safety Code, and the Uniform Unincorporated Nonprofit Association Act. The OAG can also investigate and enforce breaches of the common law fiduciary duties of trustees of charitable trusts and officers, directors, and employees of nonprofit organizations to protect the public interest.

The OAG has issued Civil Investigative Demands to persons and entities, some of whom are involved in this bankruptcy proceeding, in response to complaints. *See* Tex. Bus. & Com. Code § 17.61. One of the complaints under investigation involves conduct allegedly taken by persons or entities during this bankruptcy proceeding.

A brief stay of the bankruptcy proceedings will assist the OAG in its investigation and permit it time to determine whether any further action, as it relates to this bankruptcy, is necessary to ensure protection of the public interest.

Please contact the undersigned if the Court requires additional information.

Case 19-34054-sgj11 Doc 4330-1 Filed 07/09/26 Entered 07/09/26 14:16:50 Desc Main Exhibit 28 Page 2 of 2

Respectfully submitted,

*/s/ Johnathan Stone*

**JOHNATHAN STONE**
Chief, Consumer Protection Division
Texas State Bar No. 24071779

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**
Consumer Protection Division
P.O. Box 12548
Austin, Texas 78711
Telephone: (512) 936-2613
Fax: (512) 473-8301
Johnathan.Stone@oag.texas.gov

**ATTORNEYS FOR THE STATE OF TEXAS**

# Exhibit 29

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

**<u>NOTICE OF APPEAL OF ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH</u>**

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

The Dugaboy Investment Trust

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:
□ Plaintiff
□ Defendant
□ Other (describe)

For appeals in a bankruptcy case and not in an adversary proceeding:
□ Debtor
X Creditor
□ Trustee
□ Other (describe)

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

> **ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**
>
> A true and correct copy of the Order is attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: signed June 30, 2025 [Dkt. No. 4297]

3. **Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1. *Party/Appellee:* Highland Capital Management, L.P.

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

2. *Party/Appellee:* Highland Claimant Trust

Attorneys:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

3. *Party/Appellee:* The Highland Litigation Sub-Trust

Attorneys:

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor New York, NY 10010
T: (212) 849-7000

And

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
T: (214) 981-3300

4. Party/Appellee: Hunter Mountain Investment Trust

KELLY HART PITRE
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
T: (225) 381-9643
F: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
T: (504) 522-1812
F: (504) 522-1813
Email: amelia.hurt@kellyhart.com

Dated: July 14, 2025,

Respectfully submitted,

**CRAWFORD, WISHNEW & LANG PLLC**

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

***Counsel for Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 14, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Lang*
Michael J. Lang

# EXHIBIT A

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1. The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2. Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3. The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4. The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5. The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6. The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7. The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8. The Motion is **GRANTED**.

9. As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10. All other Objections to the Motion are overruled.

11. The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12. HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13. The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14. The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15. Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors." For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**### END OF ORDER ###**

# Exhibit 30

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)

jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |
| | § | |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO STAY 9019 ORDER**

The Dugaboy Investment Trust ("Dugaboy") hereby files this Motion to Stay 9019 Order and would respectfully show the court the following:

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").

## I. SUMMARY OF MOTION

1. On June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297]. Dugaboy files this motion seeking a 90-day stay of the 9019 Order so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco")filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme.

2. According to the JOL Petition, Mark Patrick manipulated the ownership of the HMIT entities to convert $270 million of assets and pay himself and co-conspiring professionals millions that were supposed to be used for the benefit of the long-established charities, including assets Dugaboy and its beneficiary, James Dondero, contributed to the Charitable DAF for the benefit of the charities supported by Dugaboy. The Dallas Foundation, The Greater Kansas City Foundation, The Santa Barbara Foundation, and the Community Foundation of North Texas (the "Charities" or the "Participating Shareholders") were left with nothing in favor of a new entity with no track record or professional staff run out of Mr. Patrick's house.[2] This Court should stay any transfers of assets to the control of Mr. Patrick, given that his express instructions to create a web of new entities that were: "*Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*" JOL Petition ¶ 82. A clearer indication of an intention to abscond with assets could hardly be found.

[2] The interests of the charities are affected through supporting organizations who for ease of reference are included in the definition of "Charities" and "Participating Shareholders" for the purposes of this Motion.

3. The relief sought in this Motion is necessary to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the 9019 Order (and all resulting orders, such as the dismissals effected as a result of the 9019 Order) in light of evidence suggesting that the settlement approved by this Court was a key element of the alleged fraudulent scheme. Transfers of assets to companies controlled by Mr. Patrick must be halted, lest those assets are moved to companies "hard to find or track."

## II. ARGUMENT

### A. The Court Enters the 9019 Order Over the Objection of Dugaboy

4. On May 19, 2025, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith [Docket No. 4216] (the "Motion") was filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust").

5. Over the objection of several parties, including Dugaboy, on June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297].

6. At the hearing Dugaboy presented the Court with the letter request of the JOLs to stay the proceeding for 45 days pending their investigation, but the Court entered the 9019 Order. Transcript of Hearing on June 25, 2025 on 9019 Motion ("9019 Tr.") at 189:22-191:1.

### B. The JOL Files a Complaint Alleging Illegal Acts by Mr. Patrick

7. The JOL Petition makes serious allegations against Mr. Patrick.

8. Specifically, the Complaint alleges that Mr. Patrick, a director and sole Management Shareholder of HoldCo, unbeknownst to the Charities (holders of the Participating Shares of HoldCo)

: (1) caused HoldCo to assign its interest in certain assets to a Delaware limited liability company formed and controlled by Mr. Patrick; (2) caused HoldCo to issue Participating Shares to a Delaware company incorporated and controlled by Mr. Patrick; (3) caused the Delaware limited liability company to redeem HoldCo's membership interest; and (4) caused HoldCo to be placed into voluntary liquidation after making a final distribution to the Participating Shareholders in HoldCo. JOL Petition at ¶¶ 6-6.4. These machinations are referred to in the JOL Petition and herein as the "restructuring."

9. As the Complaint states, the restructuring was undertaken specifically to bring ownership of these assets, with a net value of $270 million (as of September 30, 2024), under Mr. Patrick's effective control, with the express purpose of leaving the Charities, as the original, and rightful, ultimate beneficiaries of the fund, with nothing. JOL Petition at ¶ 7. Mr. Patrick testified that the "entity in liquidation [Holdco] owns nothing," confirming the conversion at the hearing on the 9019 Motion. 9019 Tr. 185:18-24) (Dkt. No. 4296).

10. In short, the JOL Petition details how Mr. Patrick caused HoldCo, originally the sole limited partner of Charitable DAF Fund, LP (the "Fund"), to sell off the Fund, with its $270 million in assets for $1.6 million, using manipulated and fraudulent valuations. JOL Petition ¶¶ 136-150.

11. Showing just how difficult it was to achieve his false valuation, Mr. Patrick initially sought to have PwC, which had historically conducted valuations of the HoldCo's assets and which had as recently as late 2024 confirmed the $270 million valuation, conduct a post "restructuring" valuation that would discount the value of the assets sufficiently to justify the sale of the Fund for $1.6 million. JOL Petition ¶¶ 123-125. PwC refused, saying it did not see a basis for the proposed discount. JOL Petition ¶125.

12. Undeterred, Mr. Patrick and the professionals assisting him sought a valuation from FTI Consulting in London ("FTI"). Using the fact that the charities could not force distributions, FTI

authored a memo presuming one could assert a very small discount on the value of the Fund if the Charities were aligned with the Fund's mission, but a 95% discount if they were not. JOL Petition ¶¶ 126-128. Thus, if Mr. Patrick could arbitrarily say that the Funds were no longer aligned with the charities' missions (notwithstanding the fact that nothing had changed in the charities' missions) he could apparently say devalue the Fund. *Id.*

13. Indeed, the question Mr. Patrick's counsel posed to FTI was "would Mark still be able to shareholder structure to ensure the existing participating shareholders [the charities] got nothing?" JOL Petition ¶134. Ultimately, recognizing Mr. Patrick's clearly improper machinations, FTI refused to lift limits it had placed on use of its memo, cautioning Walkers, that its memo was "not a valuation" and could "not be used to support a transaction." JOL Petition ¶¶ 133, 135.

14. Thwarted by FTI, one of Mr. Patrick's United States counsel, Shields Legal, then asked a Dallas-based firm, Valuscope, to value the Fund, using a discounted cash flow ("DCF") analysis with a 99.2% discount for lack of control and an additional 20% discount for lack of marketability, with no justification for the use of a DCF analysis or either, let alone both, discounts. JOL Petition ¶¶ 139-45. This resulted in an astonishing purported 99.29% drop in the value of the assets in just a six-month period. On its face, this manipulation is fraudulent, but this is what was used to justify selling the Fund to an entity controlled by Mr. Patrick and owned by a new charity he owned and controlled for $1.6 million. That $1.6 million was distributed to the Charities, and then Mr. Patrick attempted to cover his tracks with an expedited voluntary liquidation process, controlled by Mr. Patrick's counsel with Kroll as the proposed liquidator, to sweep all of the wrongdoing under the rug. JOL Petition ¶ 151.

15. This effort was halted only because the Charities, not knowing of the pending liquidation effort, brought their own official liquidation proceeding in the Cayman Court. That

proceeding resulted in the JOL being appointed and Kroll and Walkers resigning as proposed liquidators and counsel. JOL Petition ¶ 152-54.

16. The JOL's investigation revealed that Mr. Patrick:

a. increased the Directors' fees from $40,000 per annum in 2022 to $600,000 in 2023 and to $2.25 million for just the first half of 2024. JOL Petition ¶ 85;

b. added a salary for himself of $850,000 a year in September 2024; and

c. added a provision for a "long term incentive" ("LTI") tied to the Funds returns (when he is not a registered investment advisor, or any sort of financial advisor, for that matter, but simply a tax lawyer). JOL Petition ¶ 86. The LTI was 7.5% of the Funds returns over 10%, with a provision allowing for a greater bonus the more he spent on legal fees. JOL Petition ¶ 86.3.

What's troubling is that the LTI created an incentive to increase legal spending through the proliferation of lawyers and lawsuits, thereby increasing legal expenses and Mr. Patrick's personal bonuses.

17. Less than a month later, Mr. Patrick also gave himself an LTI payment of $975,000 and an annual discretionary bonus for 2023 of 2.5 times his annual salary. JOL Petition ¶¶ 87.1-87.2. He also gave himself a retroactive LTI payment for the period March 2023 to March 2024 of $4.8 million and authorized additional annual and discretionary bonuses at his sole and absolute discretion. *Id*. By contrast, the prior the prior controlling shareholder and director of Holdco and the Fund, Grant Scott, during his entire tenure was paid $60,000 a year. JOL Petition ¶ 88.

18. As a result, the JOL Petition alleges that Mr. Patrick's acts constitute breaches of fiduciary duty and seek to have a receiver appointed. JOL Petition ¶¶ 160-81.

**C. The 9019 Order Should Be Reevaluated in Light of the Allegations in the JOL Complaint**

19. These allegations are essential to evaluating or re-evaluating the 9019 Order for three primary reasons. ***First***, a change in control of HoldCo will affect not just HoldCo, but all the

companies owned and controlled by HoldCo, including Hunter Mountain and the entities that entered into the settlement agreement that is the subject of the 9019 Order.

20. The JOL, if they are able to rescind all of the restructuring, and on these facts it certainly appears that they will be able to do so, will be able to appoint new controlling persons in all the former subsidiaries. Then, under honest management, seeking the best for the Charities, the subsidiaries will determine what transactions to ratify and which to rescind or reform. This Court should stay the effectiveness of the 9019 Order to minimize what must be reformed or rescinded.

21. *Second*, the allegations in the JOL Petition set forth a pattern of behavior by Mr. Patrick with respect to these entities and his self-dealing that unquestionably leads to the conclusion that the same illegal behavior could well have taken place with respect to the 9019 Order and the related settlement agreement. The newly discovered communications detailed throughout the JOL Petition show the steps that Mr. Patrick engaged in to effectuate his scheme. The HMIT Settlement occurred over the same time period, making it a part of that scheme.

22. *Third*, showing a real danger of manufactured evidence being used to justify the ends desired, Mr. Patrick purported to justify his actions by contending that Mr. Dondero was imperiling the charities' 501(c)(3) status (JOL Petition ¶ 146.1), using an opinion of counsel that post-dated all of the planning for the restructuring (JOL Petition ¶ 146.5). Creating an echo chamber of evidence, he himself made false reports to the IRS to attempt to imperil the charities' tax-exempt status. JOL Petition ¶¶ 113, 146.4. These acts demonstrate that Mr. Patrick's actions and testimony with respect to the 9019 Order must be examined and evaluated.

**D. The Highland Entities Allowed These Illegal Acts to Proceed Uninvestigated**

23. It is also important to note the Highland Entities' role in allowing their 9019 Motion to proceed and the 9019 Order to be entered in light of the above. While the Highland Entities claim they performed due diligence with respect to the transactions at issue in the 9019 Order, including the

authority of Mr. Patrick, to agree to the settlement agreement (9019 Tr. 97:12-17) (Dkt. No. 4296), they did not know of the alleged improprieties raised above. Instead, they elected to look only at the organizational documents (9019 Tr. 98:6-23) and ignored the Cayman proceeding, Mr. Seery was "hesitant" to even say he was "generally" aware of the Cayman proceeding (9019 Tr. 98:24-99:1). Moreover, with respect to Mr. Dondero's complaints about what Mr. Patrick was doing to the Charities, counsel for the Highland Entities stated: "Mr. Patrick, I don't know what happened between him and Mr. Dondero. I don't care. I have no knowledge of that." (9019 61:25-62:1) (Dkt. No. 4296). The transcript evidences that the HCMLP entities ignored the Cayman proceeding to rush through the 9019 Settlement before evidence of the fraud could be presented to this Court.

**E. The Texas Attorney General Requests Additional Time to Investigate These Allegations**

24. On July 9, 2009, the Office of the Texas Attorney General wrote a letter to the Court asking the Court to enter a stay of this bankruptcy proceeding because it was investigating conduct allegedly taken by persons or entities in this bankruptcy proceeding. Dkt. No. 4308. Upon information and belief, Mr. Patrick and the entities he controls, as well as the 9019 Order, are the subject of this investigation. This request of the Texas Attorney General is consistent with what Dugaboy seeks by way of this motion and therefore Dugaboy urges the Court to follow this recommendation so that the Texas Attorney General will have an adequate opportunity to address the illegal and inequitable conduct by Mr. Patrick and his entities that are being investigated by the JOL.

25. These allegations rise to the level of a basis for a Federal Rule of Civil Procedure 60 motion seeking reconsideration of the 9019 Order based on newly discovered evidence. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005) ("Rule 60(b)(2) provides that a court may relieve a party from a final judgment based on 'newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b). Rule 60(b)(3) provides for relief based on 'fraud . . . misrepresentation, or other misconduct of an adverse party,' and Rule

60(b)(6) further provides for relief based on 'any other reason justifying relief from the operation of the judgment.' The purpose of Rule 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of the facts.”). Entering a stay will preserve the status quo so that interested parties may conduct a sufficient investigation.

**F. The Court Has the Power to Stay the 9019 Order for 90 Days.**

26. Pursuant to Bankruptcy Code § 105(a), the Court “may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].” 11 U.S.C. § 105(a). Moreover, the Supreme Court has held: [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936).

27. This Court possesses broad discretion to grant stays, particularly where doing so is unlikely to cause harm to any other party. *See, e.g., Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 483 (N.D. Tex. 2016) (“Courts have ‘broad’ discretion to grant stay[s] . . . especially when there is not a ‘fair possibility’ that the stay ‘will work damage to someone else.’”); *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) (“The stay of a pending matter is ordinarily within the trial court’s wide discretion to control the course of litigation . . . . This authority has been held to provide the court the ‘general discretionary power to stay proceedings before it in control of its docket and in the interests of justice.’” (internal citations omitted)).

28. While stays should “not be immoderate or of an indefinite duration,” *Fishman*, 180 F. Supp. 3d at 483, courts routinely grant stays of six months where doing so promotes judicial efficiency. *See, e.g.*, *14th St. Props., LLC v. S. Fid. Ins. Co.*, No. CV 22-1593, 2023 WL 416317, at *1 (E.D. La. Jan. 26, 2023) (granting stay and administratively closing matter for six months due to

state insolvency proceedings); *Integrated Claims Sys., LLC v. Old Glory Ins. Co.*, No. 2:15CV-00412-JRG, 2020 WL 1027771, at *1 (E.D. Tex. Mar. 3, 2020) (granting motion to stay for six months); *Cleveland Air Serv., Inc. v. Pratt & Whitney Canada*, No. 4:13-CV-161-DMB-DAS, 2016 WL 4179987, at *2 n.3 (N.D. Miss. Aug. 5, 2016) (staying discovery for six months); *Maples v. Donzinger*, No. CIV.A. 13-223, 2014 WL 688965, at *2 (E.D. La. Feb. 21, 2014) (granting a six month stay).

29. Courts have also granted stays which may only be lifted by the parties after a determined time. *See, e.g., Scarborough v. Integricert, LLC*, No. 6-12-CV-00396, 2014 WL 12662272, at *3 (W.D. La. Apr. 4, 2014) ("Lastly, this Court's intention is not to stay the case for an indefinite period. To the contrary, the Court will issue a stay for a period of one-hundred and twenty days, at the end of which, either party may move to lift the stay upon a showing of good cause. Thus, the stay will not last for an 'indefinite' period such as Scarborough fears.").

30. Consistent with these authorities, the implementation of the 9019 Order should be stayed for 90 days in the interests of judicial economy and efficiency in order to allow Dugaboy and other interested parties sufficient time to investigate the allegations in the JOL Petition. A grant of the requested stay will enable the Court to fairly evaluate the putative settlement between the Highland Entities and the HMIT Entities.

31. Additionally, a stay will benefit the Highland Entities, the HMIT Entities, and estate stakeholders, not harm them. All parties undoubtedly want certainty regarding the legitimacy and future enforceability of their actions and bargains. For example, if the Cayman Proceeding determines that Mr. Patrick may retain his control position in the DAF and its subsidiaries, then such a decision would likely remove any additional obstacles to the HMIT settlement. By contrast, if the Cayman Proceeding subsequently determines that Mr. Patrick engaged in ultra vires acts or acted without

appropriate authority, that decision could throw the settlement, and all subsequent actions taken in furtherance of the settlement, into question.

32. In sum, the Court has broad discretion to enter a stay of not more than six months (and the requested 90 days is half of what other courts have allowed) - which is neither "immoderate" nor "of an indefinite duration.." *Fishman*, 180 F. Supp. 3d at 483; *see also McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982) (vacating indefinite stay that could last for seven years or longer where trial court "gave no reason for such a protracted stay"). The requested stay serves the interests of judicial economy, ensures efficient management of this bankruptcy proceeding, and is in the best interests of the parties to the putative settlement and all remaining stakeholders.

33. Therefore, Dugaboy requests that the Court adhere to the request by the Texas Attorney General and stay the 9019 Order for 90 days so that these newly discovered allegations can be investigated by Dugaboy and other stakeholders and a determination can be made as to whether a FRCP 60 motion is necessary.

## III. CONCLUSION

For the foregoing reasons, Dugaboy requests that the Court stay the 9019 Order for 90 days.

Respectfully submitted,

By: /s/Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)
jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 17, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Michael J. Lang*
Michael J. Lang

# EXHIBIT A

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (       )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**WRIT OF SUMMONS**

---

TO: (1) **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2) **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3) **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4) **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6) **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1 The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2 The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3 The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4 The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5 In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6 By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1 the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**THE PARTIES**

The Company

9 The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10 The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11 The Company has been governed by the following memorandum and articles of association from time to time:

11.1 The memorandum and articles of association dated 27 October 2011; and

11.2 The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12 Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13 Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

[1] Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

20 On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21 On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22 The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23 Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24 As a result of the Impugned Transactions, the Company now has no material assets.

<u>DFW</u>

25 DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26 DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

The Fund

27 The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28 The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29 Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30 Until 18 December 2024, the Company was the sole limited partner of the Fund.

31 On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32 The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33 On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34 The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35 The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36 The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37 Mr Patrick is the New GP's sole director and sole shareholder.

38 The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39 CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40 CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41 Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42 The sole manager of CDM is Mark Patrick.

43 From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund’s main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1 a director of the Company;

50.2 a director of CLO HoldCo (the Fifth Defendant); and

50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

54.1 The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2 Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3 Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4 "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5 Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6 The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55 The Charities are the following four US charitable or non-profit foundations:

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as “Type I”, “Type II” and “Type III”. S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each “Type”, respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

67.1 the Supporting Organisation:

(a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

(a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

(a) the Institutional Member is entitled to two votes; and

(b) the Individual Member is entitled to one vote.

68.3 Institutional membership is not transferable or assignable.

68.4 Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5 Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6 There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69 The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1 the Supported Organisation will provide certain services to the Supporting Organisation;

69.2 the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3 in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70 Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71 The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1 the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2 the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3 the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4 while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72 The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73 The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

<u>The LPA</u>

73.1 Clause 1.12

(i) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2 Clause 1.6

*(i) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

*(ii) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

The Articles

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

thereby assuming the Control Position from that date.

74.2 In or around 24 March 2021, Mr Scott:

(a) assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b) transferred to Mr Patrick the 100 Management Shares in the Company; and

(c) resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3 On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4 Mr Patrick therefore assumed the Control Position from that date.

74.5 On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6 On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7 Mr Patrick is the sole shareholder and director of the New GP.

74.8 Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

76.10 where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11 where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12 in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

Plan to defeat the interests of the Original Participating Shareholders

77 On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78 It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79 The Work Plan stated that (amongst other things):

79.1 the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2 "…*we may need to rely on opinions and memoranda in potential future disputes*..."

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82 In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection*."

83 On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84 On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85 In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1 directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2 expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86 On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1 to increase Mr Patrick's salary to US$850,000 per annum;

86.2 include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3 the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87 On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1 the Directors resolved (amongst other things) that Mr Patrick would receive:

(a) an LTI payment of US$975,000; and

(b) an ‘annual discretionary bonus’ for 2023 at an amount of 2.5 times his base salary.

87.2 Previously, in or around October 2021, Mr Patrick had signed an ‘employment agreement’ for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the ‘sole and absolute discretion of the Directors’.

88 Comparatively, Mr Scott’s salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors’ fees, remuneration and/or benefits.

89 In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund. Mr Patrick did not do so.

90 On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

91 On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93 On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94 On 7 February 2025, 318 Participating Shares were issued to DFW.

95 On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1 Amended the Memorandum at paragraph 3 to give the Company charitable objects;

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 "*…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined* by *the Manager in its sole discretion."*

102 The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103 The effect of these transactions was that:

103.1 CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2 The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104 The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1 The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2 The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

105 On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1 refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a) how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the *"assets"* of the Company;

(b) the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c) how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2 considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106 On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107 Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108 On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1 had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2 are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109 On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: *"[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110 On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111 On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112 On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113 On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114 On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115 Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1 four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2 two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

115.3 one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4 one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116 In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117 On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118 On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1 Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3 it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4 the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120 In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121 At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122 The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123 On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124 On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> *"... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently."*

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127 On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128 On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129 On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130 On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131 On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> *"Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner."*

132 The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133 On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things*:*

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134 On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135 On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136 Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1 100% Membership Interest in CDM; and

136.2 Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137 The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138 A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139 The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously]. When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity. However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

140 ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141 For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> *'Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality*'.

142 Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1 applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2 determined the FMV of 100 Participating Shares to be US$536,784;

142.3 applied a discount of 99.2% for DLOC; and

142.4 applied a discount of 20.00% for DLOM.

143 The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

144 Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145 Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified “total equity” of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146 On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1 The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations’) non-profit and tax-exempt status:

> *“… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)*"

146.2 The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a) there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

(b) the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c) such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5 Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a) asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b) suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c) concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6 Exhibit E contained two valuation reports:

(a) The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Voluntary Liquidation and Supervision Order

151 On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152 However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153 On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition. Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154 On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155 At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1 A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2 A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

## ATTRIBUTION OF KNOWLEDGE AND INTENTION

158 As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1 As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2 As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3 As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159 Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

## CLAIMS AGAINST THE DEFENDANTS

<u>Breaches of fiduciary and other duty</u>

160 The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Restructuring, including the CDM Assignment

161 The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1 The Plaintiff relies on paragraphs 77 to 105 above.

161.2 With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4 The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b) knew or ought to have known that:

(i) the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii) the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii) other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv) even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(v) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c) knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162 By reason of the foregoing breaches of duty or any of them:

162.1 The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2 CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3 CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Share Issuance

163 The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1 The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

164.4 The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165 The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1 The Plaintiff relies on paragraphs 120 to 150 above.

165.2 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that:

(i) proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii) proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv) proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v) the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b) knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166 By reason of the foregoing breaches of duty or any of them:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Further claims against Mr Murphy

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

<u>Directors' Fees, Remuneration and Expenses</u>

168 The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169 As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170 Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171 Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172 The Company claims:

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

173.6 The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7 Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8 As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

<u>Proprietary claim and/or unconscionable receipt</u>

174 The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1 CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2 The knowledge of CDM was and is that of Mr Patrick.

174.3 The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4 CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5 By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Unjust Enrichment

175 In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1 The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2 That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176 In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177 If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1 CDM is the "alter ego" of Mr Patrick.

177.2 DFW is the "alter ego" of Mr Patrick.

177.3 In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4 In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

PARTICULARS

(a) In relation to CDM:

(i) Mr Patrick was and is the Manager. There are no other officers or managers.

(ii) Mr Patrick was and is the managing member.

(iii) CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv) CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v) CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b) In relation to DFW:

(i) Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii) Mr Patrick was and is the sole member.

(iii) Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(iv) DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v) DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi) DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

Loss and Damage

178 As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1 Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1) Damages or equitable compensation.

(2) Orders for restitution or disgorgement.

(3) Orders for the restoration of property to the Company.

(4) Interlocutory or final injunctions as may be necessary or appropriate.

(5) Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6) Orders for the provision of documents or information at an early interlocutory stage.

(7) Orders for the cancellation of the Share Issuance, as appropriate.

(8) Rectification of the register of the Company, as appropriate.

(9) Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10) An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11) An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(12) All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13) All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14) All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15) Interest as above.

(16) Further or other relief.

(17) Costs.

DATED this 15th day of July 2025



**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182 The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183 A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184 A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**Notes for Guidance**

1 Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2 For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3 Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4 Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (......................................)" after that Partner's name.

5 Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6 Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7 Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8 A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important. Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)

| | | |
|---|---|---|
| | ☐ yes | ☐ no |
| 3. | If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)<br><br>☐yes ☐ no | |

Service of the Writ is acknowledged accordingly

(Signed)......................................................

Attorney for

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

| |
|---|
| Maples and Calder (Cayman) LLP<br>PO Box 309 Ugland House<br>Grand Cayman KY1-1104<br><br>Cayman Islands: CJM/JRN/LRA/TQR/858403-01 |

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

| |
|---|
| |

# Exhibit 31

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 21, 2025**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**MEMORANDUM OPINION AND ORDER RE ARDIN STAY REQUESTS ADDRESSIN DE &**

## I INTRODUCTION

This Order addresses the "Motion to Stay 9019 Order" filed July 17, 2025, by the Dugaboy Investment Trust (the "Dugaboy Stay Motion"). DE # 4326. This Order also addresses a letter sent to this court by Texas Attorney General Ken Paxton, which letter was dated July 9, 2025, and was docketed on July 10, 2025, at DE # 4308 (the "Texas AG Letter"). This court will sometimes refer to the Dugaboy Stay Motion and the Texas AG Letter jointly as the "Stay Requests."

Settlement Agreement (on behalf of the Hunter Mountain entities). ***To be sure, the Hunter Mountain entities are not themselves charitable organi ations***. Mark Patrick just happens to be a representative of both Hunter Mountain and the Cayman Islands charitable entities that are the subject of the Cayman Islands Action. Note that Dugaboy appealed this bankruptcy court's Rule 9019 Settlement Order on July 14, 2025. The Dugaboy Stay Motion is not a standard request for a stay pending appeal, pursuant to Fed. R. Bankr. Proc. 8007. Rather, a stay is sought, pursuant to Bankruptcy Code section 105, "to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the Rule 9019 Settlement Order."[1]

<u>The Texas AG Letter</u>. The Texas AG Letter is not a properly filed motion. *See* Fed. R. Bankr. Proc. 5005. In any event, the court has considered it. It has a similar theme, only it asks for ***a stay of the entire bankruptcy proceedings*** (which are now more than four years post-confirmation). The Texas AG notes in his letter that, as the representative of the public's interest in charity, he is charged under Texas law with the power and duty to protect and enforce the public interest in nonprofit organizations, foundations, and charitable trusts.[2] The Texas AG Letter states that the Texas AG Office is investigating "persons and entities, some of whom are involved in this bankruptcy proceeding, in response to complaints"[3] and that " o ne of the complaints under investigation involves conduct allegedly taken by persons or entities during this bankruptcy proceeding."[4] The timing and statements in the Texas AG Letter suggest that the person being investigated is the same Mark Patrick addressed in the Dugaboy Stay Motion.

---

[1] Dugaboy Stay Motion,   3.
[2] Texas AG Letter, 1 (citing Tex. Prop. Code   123.002 (authorizing the Attorney General to intervene in a "proceeding involving a charitable trust.") and *Tex. v. Veterans Support Org.*, 166 F. Supp. 3d 816, 820-21 (W.D. Tex. 2015)).
[3] Texas AG Letter, 1 (citing Tex. Bus. & Com. Code   17.61).
[4] Texas AG Letter, 1.

Summary of Ruling. For the reasons set forth below, this bankruptcy court will not grant a stay. ***hatever the misdeeds may or may not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy estate (or the ettlement Agreement) to justify a stay***. Neither this bankruptcy case, nor the contested matter involving the Settlement Agreement, is a "proceeding involving a charitable trust." As further described herein, there happens to be a "proceeding involving a charitable trust" ongoing in the Cayman Islands. Mark Patrick is apparently accused of misdeeds therein. But, in the bankruptcy case, Mark Patrick is merely a signatory for a counter-party to a settlement agreement with the bankruptcy estate (that counter-party being the former 99.5% equity owner of Highland, namely Hunter Mountain). This court evaluated the Settlement Agreement in the manner that jurisprudence requires[5] (and weighed the evidence presented, including witness testimony from four witnesses). As noted, this court's Rule 9019 Settlement Order is now subject to appeal. This court determined that the Settlement Agreement was fair and equitable, within the range of reasonableness, and in the best interest of the Highland bankruptcy estate being administered under a confirmed plan with disinterested fiduciaries. The Stay Requests do not articulate a bona fide reason to stay the Rule 9019 Settlement Order or, for that matter, a bankruptcy case that is now more than four years past confirmation. Importantly, it would appear that the parties have other avenues to address any malfeasance of Mark Patrick *vis-à-vis* the liquidation proceedings involving the Cayman Islands Charitable Foundation Structure.

[5] *In re Jackson Brewing Co.*, 624 F.2d 599, 603 (5th Cir. 1980); *Official Comm. of Unsecured Creditors v. Moeller (In re Age Ref., Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.),* 119 F.3d 349, 356 (5th Cir. 1997); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917-18 (5th Cir. 1995); *Gluckstadt Holdings, L.L.C. v. VCR I, L.L.C. (In re VCR I, L.L.C.),* 922 F.3d 323, 327 (5th Cir. 2019) (quoting *Cadle Co. v. Mims (In re Moore),* 608 F.3d 253, 263 (5th Cir. 2010)).

The court signed the Rule 9019 Settlement Order on June 30, 2025 DE # 4297 .

Then, on July 17, 2025, Dugaboy filed the Dugaboy Stay Motion. This was preceded by the filing of the Texas AG Letter on July 10, 2025. As earlier noted, both of these Stay Requests urge that this court should halt things while they or others investigate matters that should be hashed out in the Cayman Islands Action. The Dugaboy Stay Motion says this

> is necessary to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the 9019 Order (and all resulting orders, such as the dismissals effected as a result of the 9019 Order) in light of evidence suggesting that the settlement approved by this Court was a key element of Mark Patrick's alleged fraudulent scheme. Transfers of assets to companies controlled by Mr. Patrick must be halted, lest those assets are moved to companies "hard to find or track."[23]

## VI DENIAL OF STAY REQUESTS

As noted earlier, the Dugaboy Stay Motion and the Texas AG Letter are not motions for stay pending appeal pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure. Dugaboy requests some sort of discretionary stay, for 90 days, while proceedings in the Cayman Islands Action go forward and, perhaps, reach a conclusion that improprieties by Mark Patrick occurred with regard to the Cayman Islands Charitable Foundation Structure. To be clear, the request is made by Dugaboy, whose party-in-interest status in the Highland estate is quite *de minimis*. The Texas AG apparently is of the impression (as a result of whomever filed a complaint with him) that this bankruptcy case, or the contested matter involving the Settlement Agreement, is a "proceeding involving a charitable trust." But that simply is not the case. While the assets of Hunter Mountain remember, the former 99.5% equity owner of Highland may ultimately be part of a *res* that indirectly benefits (or was intended to benefit) the Charitable Entities such as Dallas Foundation (as a result of the manner in which the Cayman Islands Charitable Foundation

[23] Dugaboy Stay Motion, 3.

Structure was designed), this does not mean that the Highland bankruptcy case is a proceeding involving a charitable trust. This court believes it applied the correct analysis required for a bankruptcy settlement. Nothing about the bankruptcy court's ruling impacts the Cayman Islands Action or the Texas AG actions it might seek to take on behalf of the Charitable Entities such as the Dallas Foundation. Accordingly,

**IT IS ORDERED** that the Stay Requests by Dugaboy and the Texas attorney general be, and hereby are, **DENIED**

**END OF MEMORANDUM OPINION AND ORDER**

# Exhibit 32

# Judicial Council for the Fifth Circuit

Complaint Number: 05-26-90042

IN RE COMPLAINT OF JUDICIAL MISCONDUCT UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

## ORDER

Complainant, former in-house counsel for a company, has filed a complaint alleging misconduct by a United States Bankruptcy Judge in the company's Chapter 11 bankruptcy case and related adversary proceedings.

Noting that he did not testify in the company's bankruptcy case and appeared as a witness before the judge only once in a prior bankruptcy proceeding of a different company, Complainant contends that the judge "has developed a bias against [him] and the hedge fund industry which employs him," and that bias "has manifested in abusive and harassing behavior and discrimination towards [him]." Complainant's specific allegations are addressed below.

*Comments Regarding Stalking Lawsuit*

Complainant states that he filed a lawsuit in state court in which he made claims that a former employee of the company was liable for stalking him. Complainant takes issue with comments made by the judge during a hearing regarding whether men could be subject to stalking. Complainant also alleges that the judge referred to his stalking lawsuit in "scare-quotes" in an order on a motion to recuse filed in the bankruptcy case and cited the

lawsuit as an example of how things had gotten "contentious" and "seemingly personal" among different parties involved in the bankruptcy.

Complainant claims that the foregoing comments and actions are "harassing and discriminatory" and violate Rules 4(a)(2) and (3) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules").

JC&D Rule 4(a) defines cognizable misconduct as "conduct prejudicial to the effective and expeditious administration of the business of the courts." Under Rule 4(a)(2)(B),[1] cognizable misconduct includes "treating litigants . . . or others in a demonstrably egregious and hostile manner." Under Rule 4(a)(3), cognizable misconduct "includes intentional discrimination on the basis of race, color, sex, gender, gender identity, pregnancy, sexual orientation, religion, national origin, age, or disability."

Pursuant to JC&D Rule 11(b), I requested a written response to the complaint from the judge. In her response, the judge admitted to making the comments cited in the complaint and explained her view as to why they had not been unreasonable or improper. She also pointed to the fact that Complainant had not sought any relief associated with the alleged stalking.

In subsequent communications with me regarding this complaint, the judge acknowledged that comments based on stereotypes about who can or cannot suffer harassment are not appropriate and agreed to refrain from making such comments in the future. I find that this action constitutes appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* Rule 11(d).

This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2) (a chief judge may "conclude the proceeding if the chief judge finds that appropriate corrective action has been taken or that

---

[1] Though Complainant references Rule 4(a)(2) generally, only subsection B of that rule is potentially applicable.

action on the complaint is no longer necessary because of intervening events").

*Comments and Opinions Regarding Complainant's Integrity and Character*

Complainant also takes issue with negative comments made about his character and credibility and actions against him taken by the judge during hearings. Complainant states that at one hearing, the judge enjoined him and his subordinate from sharing confidential information they received as in-house attorneys for the company without permission, even though they were not parties to the adversary proceeding and they were not present at the hearing.

Complainant states that the judge's "willingness to make credibility assessments about [him] without hearing from him is evidence of her repeated animus, and has otherwise caused a loss of public confidence in the Court as an instrument of justice" in violation of Rule 4(a)(2)(B) of the JC&D Rules. Though Complainant frames the judge's statements as "mak[ing] credibility assessments about [him] without hearing from him," Complainant appears to be alleging that the judge formed a negative view or bias against him based on her prior dealings with him in a prior bankruptcy proceeding. The Supreme Court has long recognized that "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings*, do not constitute a basis for a bias or partiality motion . . . ." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (emphasis added). Further, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* This includes "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men

and women, even after having been confirmed as federal judges, sometimes display." *Id.* at 555-56.[2]

The judge's alleged opinions of Complainant and her related comments are consistent with the types of comments and efforts at judicial administration described in *Liteky* that do not constitute evidence of improper judicial bias. For the same reasons, the comments are not demonstrably egregious or hostile under JC&D Rule 4(a)(2)(B) or "prejudicial to the effective and expeditious administration of the business of the courts" under 28 U.S.C. § 351(a).

These allegations are therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred." To the extent these allegations are "directly related to the merits of a decision or procedural ruling," they are subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(ii).

*The Judge's Novels*

Complainant contends that the judge has "expressed overtly hostile views toward the hedge fund industry" in two fictional novels she authored, and that there are many parallels between the judge and the novels' protagonist. Complainant states that the company's bankruptcy proceeding and the bankruptcy proceeding of another company "have many parallels to these books, such that [the judge] appears to be making negative and hostile commentary through her books concerning the litigants in her court." He therefore accuses her of bias against the hedge fund industry and the litigants in these proceedings that is "reasonably likely to lower public confidence in

[2] In a similar vein, the Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 66, June 2009, provides: "Strongly stated judicial views rooted in the record, a stern and short-tempered judge's efforts at court administration, expressions of impatience, dissatisfaction, annoyance and even anger directed to an attorney or a party should not be confused with judicial bias." Guide to Judiciary Policy, Vol. 2B, Ch. 2, at 95.

her ability to fairly adjudicate, and in turn, have a prejudicial effect on the administration of the court," in violation of Rule 4(a)(7) of the JC&D Rules.

JC&D Rule 4(a)(7) states that "[c]ognizable misconduct includes conduct occurring outside the performance of official duties if the conduct is reasonably likely to have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

In her response to my request to address the allegations in this complaint, the judge advised that: her novels are not about the company or anything that happened in the company's bankruptcy case; the references in her novels to hedge funds are "relatively infrequent"; such references are not "gleaned from knowledge or information from" the company's bankruptcy case; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, the company's former CEO and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were

not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related to the company's bankruptcy case that are currently pending before her.[3]

[3] Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

# Exhibit 33

# Judicial Council for the Fifth Circuit

Complaint Number: 05-26-90044

IN RE COMPLAINT OF JUDICIAL MISCONDUCT UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

## ORDER

Complainant, the President of a religious organization, has filed a complaint on behalf of the organization alleging misconduct by a United States Bankruptcy Judge in two corporate bankruptcy cases and an adversary case.

While the organization is not a litigant in any of the foregoing proceedings, Complainant states that the organization is concerned that one of the corporate bankruptcy debtors, which indirectly provides financial support to the organization, is subject to biased treatment by the judge in the adversary proceeding because she maintains negative views of the debtor's former chief executive officer, those associated with him, and "the hedge fund industry in general." Complainant bases this claim on the contents of two fictional novels authored by the judge. Complainant also takes issue with the judge's marketing of her novels.

*Alleged bias against participants in the bankruptcy and related proceedings*

Complainant alleges that one of the judge's novels contains negative depictions of hedge funds and a hedge fund manager character, and that the judge used information obtained in the bankruptcy proceedings in her novels. He notes that there are substantial similarities between the novels and the

bankruptcy proceedings, including the fact that both feature hedge funds with the same types of asset holdings and the similarities between the judge and the novels' main character. Complainant contends the novels are evidence that the judge is biased against the corporate-debtor's CEO and the hedge fund industry.

Pursuant to Rule 11(b) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules"), I requested a written response to the complaint from the judge. In her response, the judge advised that: her novels are not about anyone or anything that happened in any litigation before her; the references in her novels to hedge funds are "relatively infrequent"; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, the former CEO of one of the corporate debtors and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related to the company's bankruptcy case that are currently pending before her.[1]

I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that

---

[1] Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

*Alleged use of position as a federal bankruptcy judge to market novels*

Complainant alleges that the judge used her position as a federal bankruptcy judge to promote the sale of her novels. Complainant notes that the back covers of the novels, as well as the "Author's Note" in one novel, indicate that she is a bankruptcy judge. Complainant further states that the judge "hosted a book club" for that novel at an event held by group of women bankruptcy professionals.

The Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 114, November 2014, addresses promotional activity associated with extrajudicial writings and publications and provides in pertinent part: "A judge may mention his or her position, length of service, and court in a book jacket or in other similar straightforward author summaries, provided that the identification is without embellishment and appears in the context of other biographical information." The judge's references to herself as a federal bankruptcy judge on the back covers of her novels and in the "Author's Note" of one novel falls within this permissible activity. This allegation is therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

Whether the judge's participation in the book club event amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies any problem raised by this allegation. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: agreed that future promotional activity related to her extrajudicial writings will be consistent with the Code of Conduct for United States Judges and other relevant ethical guidance, including refraining from marketing current

or future books at a law firm or other similar venue or using the prestige of judicial office to advance the sale or marketing of her books; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting the resources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

I find that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

# Exhibit 34

# Judicial Council for the Fifth Circuit

Complaint Number: 05-26-90045

IN RE COMPLAINT OF JUDICIAL MISCONDUCT UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

## ORDER

Complainant, who is involved in the hedge fund industry, has filed a complaint alleging misconduct by a United States Bankruptcy Judge regarding two novels she authored and alleged activity concerning the marketing of those novels.

*The Judge's Novels*

Complainant alleges that the judge is biased against the hedge fund industry and its participants as evidenced by her novels, which he alleges contain "sweeping negative commentary" about the hedge fund industry. Complainant claims that the novels were written while the judge presided over bankruptcy proceedings involving hedge funds and that substantial similarities exist between her and the novels' protagonist. Complainant asserts that the anti-hedge fund commentary in the novels "denigrates public confidence in the judiciary's integrity and impartiality" and is "prejudicial to the effective and expeditious administration of the business of the courts."

Pursuant to Rule 11(b) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules"), I requested a written response to the complaint from the judge. In her response, the judge advised that: her novels are not about anyone or anything that happened in any litigation before

her; the references in her novels to hedge funds are "relatively infrequent"; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, a company's former CEO and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings based on the novels. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person

could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related to the company's bankruptcy case that are currently pending before her.[1]

I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

*The Judge's Promotion of Her Novels*

Complainant also claims that the judge has improperly promoted her novels by stating in the biography section of her social media accounts that she is a federal bankruptcy judge and promoting the sale of her books on her social media accounts through purchase links and references to certain book reviews. In addition, Complainant contends that the judge improperly

[1] Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

promoted one of the novels at an event hosted by a group of women bankruptcy professionals at a law firm.

The Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 114, November 2014, addresses promotional activity associated with extrajudicial writings and publications and provides in pertinent part: "A judge may mention his or her position, length of service, and court in a book jacket or in other similar straightforward author summaries, provided that the identification is without embellishment and appears in the context of other biographical information." To the extent that the judge references herself as a federal bankruptcy judge in the biography section of her social media accounts, this falls within the permissible activity discussed in Advisory Opinion 114. This allegation is therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

Whether the book reviews on the judge's social media accounts or her participation in the book club event amount to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies any problem raised by these allegations. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge advised me that she removed any book reviews from her social media account that were in question. The judge also: agreed that future promotional activity related to her extrajudicial writings will be consistent with the Code of Conduct for United States Judges and other relevant ethical guidance, including refraining from marketing current or future books at a law firm or other similar venue or using the prestige of judicial office to advance the sale or marketing of her books; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and,

if questions remain after consulting the resources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

I find that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

# Exhibit 35




Excerpts from *Hedging Death*
By Stacey Jernigan
Copyright (c) 2022 by Stacey Jernigan

Excerpt 1:
Pages 18–23
(emphasis added in **bold**)

Faked deaths. Also known as "staged deaths." Evanescing without a trace.

"Yes, feigning one's own death is a 'thing,'" Avery was explaining to Julia one Saturday afternoon while the two of them rinsed and diced vegetables for a salad. Avery was apprising Julia as to why her father would be away from home for an indeterminate length of time, while next coaching Julia through preparation of Baba Jo's favorite recipe for meaty, cheesy manicotti.

"No, silly, your dad is not faking his own death! Oh my gosh, Julia!"

Julia looked back at her mother with a kittenish half smile.

Max Lassiter was taking an extended trip down to Mexico to investigate what was believed to be a pretend death of a man named Cade Graham, a well-known wealthy playboy and high-flying, Dallas hedge fund manager. Graham was the founder and CEO of Dallas-based Ranger Capital, a multibillion-dollar conglomerate, which managed not just hedge funds but private equity funds, CDOs, CLOs, REITs, life settlements, and all manner of complicated financial products. This investigation was part of Max's new post-retirement gig—working as an investigator for Premier Mutual Life Insurance Company.

Max had "escaped the confinement of the police department" and retired a couple of years ago—not long after the July 2016 police massacre. He had started this "strange new endeavor," as Avery called it, last January. He now referred to himself as a professional "finder." And he was referring to this Mexico assignment of his as "Operation Hedge Hog." His investigative assignments always had some catchy code name. Just like with the

corporate transactional lawyers Avery used to work with at her old law firm. It appears one could not ever use actual names for their projects—whether there were legitimate confidentiality concerns or not. "Project Orion," "Juno," "Calypso"—there was never any rhyme or reason to them. At least "Operation Hedge Hog" had a meaningful tie to Cade Graham's profession.

"Why do people fake their own deaths, Mom?"

"Well, it happens often enough that there is even an official term for it: 'pseudocide.'"

"I have never heard of that word."

"I hadn't either until your dad started this. Anyway, why, you ask, would a person execute such a hoax? Honey, I could spend all day answering that question. There have been plenty of reasons people have orchestrated their own deaths throughout history. **People who engage in this come from all walks of life—from ordinary, everyday people, to egomaniacs, eccentrics, to well-known authors, to women escaping domestic abuse (a donna fugata, as they say in Italian), to corporate titans, to hedge fund managers, to former Nazis. Most often, though, they are middle class, middle aged, heterosexual white males with families."**

"You've just described Dad!"

"Yes, I suppose I have."

"But why, Mom? Why do people do something so weird?"

"It's usually about escaping some undesirable situation, sweetie. But I would say it is most often about money—such as someone falling into financial distress and trying to escape the consequences. Conversely, sometimes someone has had the good fortune of coming into a lot of money—like an inheritance or winning the lot-

tery—and is trying to escape a spouse or family or friends seeking a share. This is sad, but I have even heard of young people with significant amounts of student loan debt faking their deaths to get out of the burden of having to pay it."

"You mean like if Heath did it, because he chose to attend such an expensive private college and has such huge student loans now, Mom?"

"Not funny, Julia!"

"Can you get arrested for faking your own death?"

"Well, faking your death—just basically going missing off the gridis not by itself a crime. Technically, a person can go missing if he or she chooses. You know, just check out of life, so to speak. But most of the time, a fraud is going to be committed somehow in the process, or the person is going to end up committing some other crime as part of faking his death."

"Like how?"

"Well, a 'pseudocide' usually starts with a person leaving random evidence to mislead people into thinking that he or she is dead, but there is usually no corpse (for obvious reasons). Sometimes, the evidence that they leave to mislead people ends up being fraudulently created and so that fraudulent evidence can be a crime. Sometimes, the death-faker will next assume the identity of an actual dead person with similar vital statistics and age. That would also be a crime."

"Oh yeah, I've seen that in a TV show before."

"Ha! I bet you have. And insurance fraud is very high on the list of reasons that people are known to fake their deaths—that is, as part of an attempt to fraudulently collect life insurance policy proceeds. And that's why

your father is getting involved in the alleged death of this fellow, Cade Graham."

"I'm not sure I get what you mean, Mom."

"Let's see. I assume you know what life insurance is, or no?"

Julia raised her right eyebrow and shrugged her shoulders. Julia had never been very childlike—always an old soul—so much so that sometimes Avery forgot that she was a child and didn't already know some basic things that adults know.

"Okay, I'll explain. I pay premiums every month for a life insurance policy, so that if I die before you are grown up, a pot of money will be paid out by the insurance company that will support you, since if I am dead, I am not around making money anymore to support you. Just like car insurance is for the situation when you are in a car wreck, life insurance is for when someone dies—there will be money to pay out to people who depended upon that person."

"You're being so morbid, Mom."

"No, not really. The concept of life insurance came into existence a couple of hundred years ago. It's generally quite a good thing that can give parents peace of mind for their families. But, like any other commercial enterprise in life, there are always going to be dishonest people who figure out a way to exploit the system. There are many documented cases, from the very beginning of the industry, of schemes where people have faked their deaths, or the deaths of friends and loved ones, to receive life insurance money."

"How do people do it usually?"

"Well people are sometimes good at it and people are often terrible at it. According to your father, people most

often fake a water accidenta drowning or falling off a boat far out in the ocean from the shore. Presumably, the perpetrators believe that drowning out at sea provides a plausible reason for the absence of a body. These cases are almost always suspicious, especially if the person has been in legal or financial trouble. In a drowning, a body will typically wash up, usually in the first few days. So, if there's a drowning and no corpse ever appears, it's very suspicious in the eyes of law enforcement. Of course, sometimes people just leave a suicide note and disappear—causing suspicion about whether foul play was involved."

"The character Juliet from Romeo and Juliet faked her death, Mom!"

"Yes, Julia. At least, initially. That didn't work out very well, did it? And some people think Elvis and Michael Jackson might have faked their own deaths."

"Huh?"

"Oh, never mind. Before your time, sweetie. Anyway, it is really very hard to get away with faking your death. People think they are geniuses at staying hidden, but they leave breadcrumbs everywhere. Digital footprints. Technology has been an absolute gamechanger when it comes to ferreting out missing people—well, at least missing adults. A person really must completely do away with all technology and go completely off the grid. That's why the U.S. Marshals almost always find their fugitives because people can't stay off their phones or computers or avoid ATMs or credit cards or video cameras."

"I bet I could disappear, Mom."

"Oh please. You can't stay off your phone for five minutes."

In fact, Julia had just put down her vegetable peeler and was doing internet searches on her phone. **She had just Googled Cade Graham's name and saw plenty of pictures of him — mostly standing with beautiful and extremely young women in exotic locations. He looked fifty-something and had slicked back, collar-length, silver hair, a tanned complexion, sparkling green eyes, and fluorescently glowing white teeth.**

"I found pictures of Cade Graham, Mom. He apparently wears nothing but black turtlenecks. And only hangs out with girls who look barely older than me."

"Lovely. Anyway, there is a creepy, underground market out there with resources to help a person orchestrate a fake death. For example, you can obtain a fake death certificate through these underground markets. Mexico is one place where people have been known to easily get a fake death certificate. It's usually accomplished through people who work for the government providing the documents that people need. It might cost you $150 to get a fake death certificate. Then the person just arranges for it to be filed with the U.S. Embassy down there. 'John Doe was killed in a car wreck while vacationing in Mexico.' There are also certain countries where there are corrupt morgues, where the operators take in dead homeless people and keep them on ice until someone comes around and wants to buy a body to pass it off as himself."

"That's so disgusting!"

"Yep, it is all right."

"So, what's the deal with Cade Graham? Why do Dad and the insurance company think that he faked his own death?"

**"Oh, Mr. Graham is, or was, a real piece of work. A real hedonistic, narcissistic playboy.** He has—or had—fashion model or actress girlfriends on almost every continent, it seems. As you noticed from your internet search, they all look disturbingly young. **And he seems, over time, to have developed a reputation as being a hustler working the bottom rungs of Wall Street. A ton of people hate him, don't trust him, and can't figure out how on earth he manages to make so much money in both good times and bad times. Other people think he's magic and will write him a blank check to invest money with him any time he asks.** He supposedly went vacationing in Mexico recently and died in a fiery, single-car crash. But the facts just don't all add up."

"How so?"

"Well, not only is Mexico not Cade Graham's type of vacation hot spot—he is more the French Riviera, Marbella, or Amalfi Coast type—but **there was recently a lot of strange activity in some of his hedge funds—a lot of money disappearing. People were suing him, and the Feds were investigating him for all sorts of things. His world was crumbling around him. All kinds of problems were mounting up."**

Excerpt 2:
Pages 79
(emphasis added in **bold**)

"Baxter Squared" was Max's nickname for the two new Cavalier King Charles Spaniel puppies that Avery recently adopted, Jake and Finley. Sadly, sweet old Baxter, the family's previous Cavalier King Charles Spaniel, died last year of congestive heart failure, close to the same time that Max had his heart attack. Sad coincidence.

Excerpt 3:
Pages 81 to 82
(emphasis added in **bold**)

"Hey, you started this discussion, Max, by saying you wanted me to answer some questions about life insurance. I'm just answering your questions. I think your words were that you wanted me to 'fill in some gaps in your knowledge.'"

"Okay. You're right. Back to AIDS."

**"Anyway, this is really creepy, but the 1980s, when AIDS was a new disease and practically always a death sentence, is really when the practice started up of selling—or settling—life insurance policies. Terminally ill AIDS victims would sell their life insurance policies to get cash to pay for their medicine.** Sadly, these policies were quick payoffs in that situation, because the policy owner would usually die in a couple of years or less, after selling the policy. These are referred to as viatical settlements where the policy holder is terminally ill. But the more common situation is where the policy holder is a senior—over age sixty-five—and not terminally ill."

**"Again, I just can't believe this shit is legal.** Some greedy, tie-wearing weasel lawyer probably invented this."

"Why does everyone keep referring to lawyers as tie-wearing weasels today?"

"What?"

Excerpt 4:
Pages 82 to 86
(emphasis added in **bold**)

"Oh nothing. Max, I doubt a lawyer invented the life insurance settlement business. Actually, I have no idea. Maybe a lawyer did create the whole idea. But I do know that law makers, both in Washington and at the state level, have certainly investigated this industry on occasion. And truthfully, the insurance policy holders typically end up getting a lot more cash than they otherwise would from the cash surrender value that the insurance company itself would pay. So, again, I guess it's not unreasonable to think of this as a win-win type of transaction. And there is some regulation of the industry. I am by no means an expert at all, but I recall that there are some restrictions on what you can and can't do."

"Okay, stop there. I want to hear about the restrictions."

"Well, let's see. There's a concept that you must have an 'insurable interest' in the subject matter of any insurance policy. So, for example, you cannot be the original purchaser of a life insurance policy on a stranger or some other random person with whom you don't have any kind of a relationship."

'Like, I could not go out and take out an original life insurance policy on my next-door neighbor."

"Exactly. Also, you cannot enter one of these life settlement transactions at the very same time that a policy is issued. In other words, you can generally only purchase another person's life insurance policy after it has legitimately been in place for several years."

"Aha! So, there is a line you can cross where it's not legal! Told you, Dave."

"Sure. But, again Max, I am not an expert on this. Max, what in the world is going on with Cade Graham and life insurance settlements? Why all these odd ques-

tions? I thought you were going down to Mexico just to investigate his apparent pseudocide."

**"Well, as I understand it, Cade Graham, Mr. Hedge Fund Genius, created a specific hedge fund at his company, Ranger Capital, that was purchasing life insurance policies.** He drummed up dozens of investors to contribute money for his 'life settlements hedge fund,' and, through a broker, the fund acquired more than 5,000 policies having over one billion dollars of face value."

"Okay. I understand. I have certainly heard of hedge funds getting involved in the life insurance settlements business. It is not in and of itself problematic, Max."

"Well, as it turns out, Graham, in connection with buying up these life insurance policies, was using a supposed 'expert' who was inputting life expectancy data that suggested that the people selling the policies would die much sooner than they were, based on actuarial tables. The result was the hedge fund was not collecting funds on the policies as expected. It was a frigging disaster. The Wall Street Journal wrote an expose on it and reported policy holders were living two and three times beyond projections."

"Oh, how terrible. People were living longer than expected," Avery said sarcastically.

"I'm telling you. I don't know how in the world this is legal. It certainly doesn't feel legal—or at least not moral or ethical."

"Okay. Well, go on. I've got to hear the rest of this."

"Anyway, for a couple of years, the hedge fund was paying about $1 million per month just on the premiums on these 5,000 life insurance policies and collecting nothing, zippo, because basically no one was dying. **The hedge fund eventually ran out of cash. Graham was**

**losing his shirt on this business—or rather his investors were. People were getting really pissed off at Graham. The SEC was investigating him. The situation was becoming untenable. Cade was having to cover the cost of maintaining this fund from other resources. He was robbing from Peter to pay Paul in his hedge fund empire—by borrowing from unrelated hedge funds in the Ranger Capital empire, he managed to pay the premiums on the life insurance policies."**

"Okay. Well, you and everyone else in Dallas knew that Graham was on the financial precipice. This was just one of many reasons that he was, I guess. Right? Oh, wait, don't tell me. Do you think Cade Graham started putting hits out on people that had the life insurance policies owned by his hedge fund, so that some of these policies would start paying off? He's hiding out in Mexico and playing dead while ordering hits on people? Good God, I feel guilty just suggesting something so terrible. I'm going to be struck by lightning any moment."

"It's actually not a bad guess, Avery. But no. For some reason, Premier—which was the issuer on a lot of these policies—started noticing that Graham's hedge fund had recently started buying up a lot of policies on people who were American citizens now living in Mexico. These were middle class folks who had retired in Mexico. Mostly on the Yucatan Peninsula near Cancun, Cozumel, and Playa del Carmen. Nice weather. Low cost of living. And there is a nice senior living community down there called *Isla Valladolid* where many of these ex-pats retired. *Isla Valladolid* has extremely nice, posh independent living condos, assisted living facilities, and a nursing home for the residents when they start to eventually

need that type of care. All high-rises overlooking the ocean."

"Sounds like a place I might like to live someday."

"Uh, better hold that thought. I don't think you'll feel that way when I'm finished with my story."

Dave Carrillo chimed in from across the table. "Tell her the part about the REIT. Ask her what the hell a REIT is." Dave had now abandoned any reservations he might have had about eavesdropping. Realizing this, Max put his phone on speaker.

"Oh yeah, Dave wants me to tell you that a REIT—which I understand means a 'real estate investment trust'—happens to own this bougie *Isla Valladolid* property, and the REIT is minority-owned by Graham and majority-owned by some Mexican nationals who have close ties to one of the big drug cartels. The *Oscuro* Cartel. And then this Mexican-cartel controlled REIT leases the property to another entity—an operator/tenant—that Graham mostly owns and controls through offshore companies."

**"Welcome to the world of structured corporate finance, Max—well except for the drug cartel part. Lots of interconnecting relationships and frequently offshore companies.** That's interesting, but let's get to the really good stuff, Max. I feel you're building to a punch line here."

Excerpt 5:
Pages 105 to 106
(emphasis added in **bold**)

Despite its history of standing its ground and keeping people out, **Malta is now a place where a person can rather easily worm himself in and disappear forever.** Malta is part of the Schengen Treaty of countries and, thus, if one flies there from anywhere in the European Union or other Schengen Treaty countries (which one nearly must), no one checks for a passport upon one's arrival. It is also an easy, short boat ride from the porous borders of places such as Tunisia and Libya.

**Malta, while beautiful, exotic, and an all-around lovely place, is a haven for a variety of criminal financial activity and other at least questionable practices (the government has considered officially backing Bitcoin in recent times). Gambling (there are casinos there) and the mafia are now ubiquitous.**

Richard Braden (n.k.a. Rasmus Aavik) had arrived in Malta before Matthew and Marcus Braden had ever stepped foot in Texas. He had read books, as a child living in a Catholic orphanage, about the Knights of St. John and the Great Siege at Malta, and the place had captivated his imagination. He moved to a spot called St. Julian's Bay, overlooking the tranquil blue Mediterranean. He moved there shortly after the State of New Jersey reported him as having died, in the year 2002, from a Staph infection—this had been a report fictitiously created by the young Richard Braden, who very early became a skillful cyber-criminal. Still somewhat young when he arrived, Richard managed to endear himself to the staff at a beautiful gothic style church facing the bay there—The Parish Church of Our Lady of Mount Carmel—with an imposing bell tower that chimed portions of Nearer My God to Thee every fifteen minutes. There was a feral cat colony right by the church along the pro-

menade on the beach which Richard helped maintain for many years. There was an easily accessible ferry in St. Julian's Bay that could take one to the historic capital of Malta, Valletta.

Valletta fascinated the young Richard Braden when he first arrived, with its narrow, cobblestone streets and amazing high views of the island's cities and fortresses. He eventually bought a Vespa so that he could ride around the island and explore. As a young man, he eventually left the Church that had taken him in and took on the identity of Rasmus Aavik. He was able to get a job at the Bank of Valletta, rising from clerk to teller to account manager in time. He managed to pose well as an Estonian ex-pat and learned the Maltese way of life quite well.

Everyone speaks both English and Maltese in Malta. Maltese is difficult (it is a Semitic language written in Latin script, derived from an Arabic dialect that first appeared during the Ninth Century Muslim conquest of Sicily), but Richard, like his two brothers, was highly intelligent so he had no problem mastering the language. Eventually, Richard purchased a quaint small sidewalk café which he named Deheb Qumar, serving mostly Italian and Sicilian cuisine, but also a few local specialties like rabbit and garlic octopus. He adorned the walls of his café with posters and memorabilia from movies like The Godfather, Good Fellas, and Scarface. Frank Sinatra tunes were always playing softly in the background. There were cigarette vending machines and a small bar in the front of the café, and several video cameras hidden in random spots around the café. Richard (Rasmus) drove a cobalt blue Land Rover Defender that, every day, he parked in front of the cafe. Most days, Richard (Rasmus) sat at the bar, taking notes, with a pencil in an

old-style ledger pad with carbon paper, seemingly adding up figures and occasionally handing pieces of paper to men who would randomly walk in. He led a discreet but interesting life. Restauranteur. Bookie. Money launderer. Financier. Investor. And, of course, former Estonian sailor.

Excerpt 6:
Pages 107 to 111
(emphasis added in **bold**)

Cade Graham had led a rather charmed life for his fifty-plus years, until his troubles of the past two years. He grew up in the exclusive Highland Park enclave in Dallas, Texas. He was the only child of a workaholic heart surgeon and an alcoholic mother, and the grandson of a storied East Texas oil wildcatter—the latter of whom had mostly raised him. He was tall, well-built, and handsome, with a confident Texas swagger. He still looked rather boyish in middle age. He went to Princeton for undergraduate studies, played football for the Tigers, and was president of the exclusive Cottage Eating Club, as had been his father and grandfather before him. After graduation, he worked several years at the New York Stock Exchange, then earned an MBA from Wharton, and went from there to Bear Stearns on Madison Avenue. **He eventually came home to his native Dallas after the Bear Stearns implosion. Once back in Dallas, he started working in private equity and, ultimately, the largely unregulated hedge fund industry. Both private equity and hedge funds thrived in the freewheeling business culture of Big D—a perfect fit for Graham. He also liked that it was still a male dominated world. He liked the gambling and risk-taking that are inherent with hedging and distressed investing. Perhaps it was something in his DNA or a learned trait from his wildcatter grandfather.**

**After a few years of feeling like he was working round-the-clock, making other people fabulously wealthy (Graham was a mere millionaire while his bosses were billionaires), he decided to form his own company—Ranger Capital. Graham had weathered the capital markets crash of 2008 quite well, despite losing big in mortgage securitization at Bear Stearns.**

**He almost always came out on top in his life. It astounded everyone who knew him. Even as his colleagues were licking their wounds in 2008 and ratcheting themselves down to a more pedestrian lifestyle, Graham had acquired a mansion on Strait Lane in Dallas with a sixteen-car garage full of Lamborghinis, Ferraris, McLarens, and Aston Martins.** He also owned a villa overlooking Lake Como in Italy, an apartment in Paris in the Eight District, on the Right Bank (a.k.a. "VIII arrondissement" or huitieme), and a small, moated Norman country home near Lisieux, where he enjoyed boar hunting. **He played golf with celebrities and politicians. He gave to all the right charities.** He had young girlfriends everywhere and allegedly had a couple of illegitimate children whose existence and identity were closely guarded secrets. But he was mostly a loner. A prosperous and hedonistic—and hardworking—loner. Tabloids and internet gossip blogs described him as a Gatsby-like enigma. He had sensibly and cannily never given an interview to any of the usual high-finance media outlets. Among other things, it was impossible to accurately approximate the fortune he had amassed.

**But times had, for once, finally turned hard for the ordinarily Teflon-coated Cade Graham a few years back. His boyish brown hair had turned silver, and his sun-kissed smooth skin had grown weathered. In recent years, Graham's Ranger Capital had specialized in the "SPAC" and "de-SPACing" segment of the capital markets, where investors essentially give an investment manager a blank check to create a special purpose acquisition company ("SPAC"), that will then go out and find a company with which to merge**

**(“de-SPAC”).** Among the vehicles that Ranger Capital ended up using these blank checks for were: (1) a fund that invested in life insurance policy settlements; (2) REITs that owned real estate on which hospitals, medical buildings, senior living communities, and rehab facilities were built—which were then leased at lucrative prices to tenant operators; (3) funds that lent money for medical research and development projects; and (4) funds that invested in pharmaceutical companies. In other words, Graham essentially just used the SPAC blank checks for whatever he wanted and whenever he wanted, until he found good companies with which to de-SPAC. In any event, the REITS and the pharmaceutical companies had performed fabulously well. But the life insurance settlement fund was an unmitigated disaster, as was the fund that had been investing in medical R&D.

The medical R&D fund was especially bothersome to Graham. One of Graham’s illegitimate sons had gone to Emory University (on his dime) and majored in Biology before going to Harvard for an MBA to follow in his father’s footsteps in the world of high finance. While at Emory, he had worked as a research assistant for a grad student there named Dmitry Basayev. Basayev was supposedly a genius who was now on the verge of coming out with revolutionary break throughs in the areas of infectious diseases and state-of-the-art protocols to destroy super bugs. Graham’s son introduced him to Basayev. While Graham had long ago learned that great ideas were a dime a dozen, Basayev’s extravagant claims about revolutionizing the medical care world in general seemed to have legs. The young, handsome Chechen immigrant had the kind of hubris and charisma that Graham liked.

Graham, at the urging of his illegitimate son, invested several million dollars in early 2015 in a project of Basayev's known as DB Biocontainment, LLC. Graham not only made large loans to DB Biocontainment, LLC, but he also created an offshore company that would buy the aforementioned land in Ellis County, Texas and lease the land to DB Biocontainment, LLC, as tenant. The land would be used as an unconventional, state-of-the-art, underground research facility. Graham made this investment not only at the encouragement of his illegitimate son, but also at the encouragement of another hedge fund, Toro Capital (which had been formed by several of Graham's old buddies from Bear Stearns). Toro Capital had invested heavily in another one of Basayev's companies called BASA, Inc., which was supposedly working on the ultraviolet and air purification disinfectant system that would effectively destroy super germs in medical facilities and public spaces like no other product on the market. Toro Capital had a track record of investing its clients' money extremely well. So, Graham felt optimistic about Dmitry Basayev. Of course, by late March 2017, BASA, Inc. was in a Chapter 11 case and, thereafter, was accused of orchestrating a massive Ponzi scheme. And Toro Capital was later sued for its role in funding the alleged Ponzi scheme.

Luckily, at least for Graham, he did not buy much debt in BASAand what little debt he did purchase he had hedged by buying credit default swaps. A credit default swap, or "CDS," is similar to insurance for people who loan money or invest in debt. A debt holder who buys a CDS is guaranteed by the CDS issuer that if the CDS-covered debt goes into default, the CDS issuer will buy the debt from the debt holder for the full amount (face

value) of the debt. **Thus, the CDS issuer was left "holding the bag," so to speak, on the BASA, Inc. debt that Graham had owned. It had become a very common thing, over the last few years, for Cade Graham to leave others holding the bag.**

Excerpt 7:
Pages 120 to 127
(emphasis added in **bold**)

For a few months, in 2016 and into early 2017, Cade Graham's life generally—and specifically, arrangements at *Isla Valladolid*—seemed to be going quite well. Graham's financial missteps seemed to have been curbed a bit. His beautiful, bougie, Yucatan retirement community was ninety percent occupied with residents who all timely paid their rent. Thus, the tenant-operator of *Isla Valladolid* (which was, of course, a company owned and controlled by Cade Graham) was able to timely pay its monthly rent to the REIT (the landlord/trust that owned the underlying property). Cade Graham's majority co-owners in the REIT (the *Oscuro* Mexican crime cartel) were partially pleased. However, it is never good enough to only partially please a Mexican crime cartel.

How in the world did a Dallas, Highland Park-bred, Ivy League educated, white privileged male—with all of his enormous wealth, beautiful girlfriends, and continental panache—ever get entangled with a Mexican crime cartel? How did *Oscuro* become the majority owners of the *Isla Valladolid* REIT?

It started innocently enough. **Cade Graham had become entangled in some nasty litigation with some major players in the credit default swap (CDS) industry. Graham had been accused of misrepresentations, bad faith, and outright fraud in some cases. After a couple of years of this, no one in the CDS industry would deal with Graham or his various hedge funds anymore. He had become persona non grata. Radioactive. Fallen from grace.** None of the usual CDS issuers would touch any of Graham's deals. This was problematic. It is difficult to operate hedge funds without the ability to acquire credit default swaps or have similar

products in place, now and then. Graham's illegitimate son once again entered the picture.

The illegitimate son went by the name of Ethan Alves. Cade Graham had a contractual arrangement with Ethan and his mother, Marisol Alves, such that Graham would provide generous monetary support to Ethan and Ethan's mother, a former Brazilian model, but Ethan could never use Graham's last name. As it turned out, Ethan had a friend from Harvard Business School from an affluent family in Mexico City that had an investment firm that catered to wealthy Mexican nationals. According to Ethan, that friend owed Ethan some favors, as a result of past trading tips that Ethan had sent his way. Ethan bet Cade that he could arrange for some of his friend's cash-rich Mexican clients to enter into a credit default swap transaction with Cade *in connection with buying the BASA debt*. In fact, young Ethan had made it happen. Thus, Cade Graham originally got involved with Dmitry Basayev (and DB Biocontainment, LLC and BASA, Inc.) at the urging of Ethan—first, due to Ethan's connection to Dmitry Basayev from their days at Emory University together and, second, because Ethan sweetened the deal by finding some wealthy Mexican investors to provide credit default swaps in connection with his father's loans to BASA.

The problem now was that those wealthy Mexican investors—primarily friends and associates of Senor Mateo Guerrero, the leader of the *Oscuro* crime cartel—had lost their shirts on the BASA credit default swaps. And now Senor Mateo Guerrero and all his investing *amigos* from the cartel were out for blood from Graham—literally and figuratively. Under immense pressure, Graham satisfied his blood debt to the *Oscuro* car-

tel by giving them a majority interest in the REIT that owned and served as the landlord of *Isla Valladolid*.

Graham could always trust himself to come up with clever solutions, but, this time, his usually quick mind was barren of ideas. One day, when sitting in an airport bar, he remembered a story he had heard a while back about another hedge fund manager, Sam Israel, who faked his own death, when he was facing criminal fraud charges. Israel did not get away with the hoax. As Graham recalled, Israel had a girlfriend assisting him in the hoax—he figured the girlfriend probably screwed things up for him. **Graham was of the general view that women always screwed things up. Misogyny was among Graham's many qualities.** Graham also vaguely recalled another guy who faked his own death in a plane crash but was later captured. The more bourbon that Graham drank, the more he began to like this macabre idea of faking his own death. He figured he was smarter than those other fools and could successfully pull it off. He had enough money stashed away in Cayman and Isle of Man bank accounts that he could easily start a new life. Maybe it was time to exit stage left and live anonymously in some new place. Perhaps the Cook Islands.

Graham carefully did his research. He learned that there were consultants who would, for about $30,000, make you disappear. These were known as invisibility or disappearance services. One could also essentially buy do-it-yourself death kits, where you could order fake death certificates and make arrangements with black market morgues, and even funeral parlors who would do a fake wake for you if you wanted. The Philippines seemed to be the epicenter for pseudocide services like this. But Graham had no appetite for going to the Philip-

pines. Besides, that would not make any sense. He had no reason to be in the Philippines. On the other hand, people knew he had investments in Mexico—at least the people that he wanted to believe he was dead—and, thus, there would be no reason for folks to be suspicious if he suddenly died in Mexico.

After a few weeks of more research and soul-searching, Graham decided to go with a disappearance service in Mexico. In his research, Graham learned about certain disappearance services that could be found on the Dark Web with all communications occurring through ProtonMail (an encrypted email program). Graham had a personal laptop that was loaded with "TOR" anonymity software and which, thus far, he had dedicated solely to his occasional Dark Web and ProtonMail communications that were necessitated with the *Oscuro* cartel folks. Graham had learned of a site on the Dark Web called Enos.onion. **It looked like whomever was behind Enos.onion was into every black market imaginable: hit men for hire; hackers for hire; blackmail through "deep fakes"; bitcoin exchanges; offshore shell company formation; laundering funds through management of offshore accounts; shady investment opportunities; insider trading tips; sex trafficking; and disappearance services.** Basically, any illicit thing that one could think of could be arranged through Enos.onion. And the site looked surprisingly sophisticated, unlike a lot of the other options out there. No misspellings; no propaganda concerning government-insurrection or end-of-the-world; and none of the other tell-tale signs of so many of the bush-league fraudsters on the Dark Web.

Case 3:26-cv-02315-K Document 19-3 Filed 03/18/26 Page 261 of 620 PageID 1891



Excerpt 8:
Pages 136
(emphasis added in **bold**)

Marcus returned to his villa outside Rosarito, Mexico and began his nightly trolling of the internet. On this night, he did searches for Cade Graham. He knew that was who "St. Jude" was. He figured it out soon into their long meeting. His internet searches confirmed it. He found countless pictures of him. The paparazzi loved Graham. Moreover, Braden found some articles in the financial press about Graham's forays into the healthcare sector and the recent troubles he was confronting with angry investors, the SEC, and his disputes with rating agencies regarding various comments and positions they had taken regarding companies in Graham's vast business empire. Nowhere could Marcus find any reference to Graham's investments in the DB Biocontainment underground facility or in *Isla Valladolid*—and certainly no hint of an association with *Oscuro*. **Marcus grinned thinking about how Graham had kept all this information secret with his byzantine web of offshore companies.** And now Marcus had insider information, so to speak, about Graham's widespread endeavors. He liked having insider information. That was his *modus operandi* in life. His stock in trade.

# Exhibit 36

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>*Plaintiff*<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET | Adv. Pro. No. 21-03076-sgj |

RECOVERY, LTD.,

*Defendants.*

**MEMORANDUM OF LAW IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.'S MOTION TO RECUSE**

left Movant and its counsel with the perception that they cannot succeed on any motion or objection filed with this Court. Worse still, Movants and its counsel must proceed with extreme caution out of legitimate concern that the Court will sanction them for attempting to protect their legal rights and positions.[9] That is precisely the type of problem that recusal is designed to prevent. No litigant should perceive that justice is impossible because of the predilections of the presiding judge.

**C. Judge Jernigan Authors A Book Mirroring Her Perception of Highland And Mr. Dondero**

Compounding matters, Movant recently became aware that Judge Jernigan wrote and published two novels while she was presiding over the Acis and HCMLP Bankruptcies.

Judge Jernigan's first novel, *He Watches All My Paths*, was released on January 3, 2019, just weeks before Judge Jernigan confirmed the joint bankruptcy plan of Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Acis")—companies for which Mr. Dondero served as CEO and for which HCMLP performed certain management services prior to Acis's bankruptcy. Against that backdrop, Judge Jernigan describes the financial industry as being dominated by "[h]igh flying hedge fund managers" that "suck up money like an i-robot vacuum" and seem to "make money no matter what" and who routinely show "outrageous amounts of hubris" as part of their "bro culture." Given that description, it is no wonder that the novel's central protagonist, a Dallas federal bankruptcy judge, wonders whether the death threats she is receiving come from a hedge fund manager that has previously appeared in her court.

Judge Jernigan's second novel, *Hedging Death*, was released in March 2022, less than a

---

[9] Debtor sought to have Movant and Nexpoint sanctioned and held in contempt for making a proffer of evidence to preserve the record for appeal in the Notes cases. *See* Adv. Pro. No. 21-3004, Dkt. 130 at 10-14. Although it was the Debtor's motions that were out of line (given that a making a proffer was the only means of preserving the record), and while Judge Jernigan denied the Debtor's motions, she still chastised Movant and Nexpoint for protecting their rights, calling the Debtor's motion "a close call." Ex. O, April 20, 2022 Hr'g Tr. at 51:14-21.

year after HCMLP's Plan was approved and while these bankruptcy proceedings were still ongoing.[10] In *Hedging Death*, Judge Jernigan repeatedly invokes detail from the ACIS and Highland Bankruptcies. Again, the central protagonist of the novel is a Dallas bankruptcy judge, along with her husband, a retired police officer (like Judge Jernigan's husband) and private investigator. The story involves a "high-flying, Dallas hedge fund manager" who, like Mr. Dondero, Judge Jernigan characterizes as a reckless investment manager and vexatious litigant. *Id.* at 10, 16. The investment firm in the novel is called Ranger Capital and is experiencing economic distress largely because of extensive litigation stemming from bad investments. *Id.* at 11, 74. This alone is astonishing: HCMLP's original name was Ranger Asset Management, as is prominently disclosed on the website of Mr. Dondero's investment firm NexPoint, and which has been mentioned in other filings in Judge Jernigan's court. And HCMLP, like the supposedly fictitious Ranger, initially sought chapter 11 protection because of investor litigation. The similarities do not stop there.

In the novel, Ranger, like HCMLP, is a "multi-billion dollar conglomerate, which manage[s] not just hedge funds but private equity funds, CLOs, REITs, life settlements, and all manner of complicated financial products." *Id.* at 11. In the novel, Judge Jernigan describes the life settlement industry—which she knows was an industry in which HCMLP and Mr. Dondero invested—as "creepy," "immoral," "unethical," and "should be illegal." *Id.* at 71-74. As Judge Jernigan is well aware, HCMLP and its affiliates managed hedge funds, private equity funds, CDOs, CLOs, REITs, life settlement portfolios, and private investment accounts for institutions around the world—exactly the same unusual mix of investments at issue in Judge Jernigan's second "fictional" novel.

[10] Stacey Jernigan, Hedging Death (2022).

# Exhibit 37

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
**ENTERED**
THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 5, 2023**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**IN RE**

**HI HLAND CAPITAL MANA EMENT L P** **CASE NO S**
**C r**
**R r d D r**

**<u>MEMORANDUM OPINION AND ORDER DENYIN AMENDED RENE ED MOTION TO RECUSE PURSUANT TO U S C</u>**

**r r r d r**
*see* **DE &**

There have been multiple motions to recuse the presiding bankruptcy judge ("Presiding Judge") in the main bankruptcy case of Highland Capital Management, L.P. ("Highland," "Reorganized Debtor," or sometimes "Debtor"). Each one has been filed by James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f k a HCRE

exclusion

A We were not.[29]

In any event, Movants' statement that this court found the Movants to be "vexatious litigants" is not consistent with the record. This court did not specifically find or conclude that Movants are "vexatious litigants." Rather, this court determined that Mr. Dondero's litigation history supported the inclusion of a gatekeeper provision in the Plan. *See* Confirmation Order, at 80-81 DE # 1943 . All of the above-quoted testimony was in connection with the bankruptcy court considering whether gatekeeper provisions proposed in the Plan were necessary and appropriate. Significantly, the Fifth Circuit affirmed this court's findings and concluded that the gatekeeper provision was justified and "sound."[30]

The fact that the Presiding Judge commented on litigiousness (often by the way in the context of yearning for settlement) should not be interpreted as "bias" or "prejudice" toward Movants or any other party, for that matter. Not only was there significant credible evidence of this, but it is simply about rule enforcement and managing a docket consistent with this court's duty to the public.

<u>The Presiding Judge's Fiction Novels.</u> As noted early on, there is now a Fourth Motion to Recuse filed February 27, 2023, in Adversary Proceeding No. # 21-3076 which is styled *Kirschner v. Dondero. et al*. The Presiding Judge intends to rule on that Fourth Motion to Recuse after all parties in that adversary proceeding have had the opportunity to respond.

[29] DE # 1905, at pp. 31-32 (Transcript from 2 3 21 Confirmation Hearing, Testimony of Marc Tauber of Aon Financial).
[30] *NexPoint v. Highland Capital Management*, 48 F.4th 419, 435 (5th Cir. 2022).

While the Presiding Judge had intended to remain silent on this subject until such time as the time had run for parties in the Adversary Proceeding to respond, the court observed that on March 3, 2023, Movants filed a new pleading entitled *Supplemental Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455*, in which Movants supplement their Third Motion to Recuse "with information regarding two books published by Judge Jernigan, which Movants recently learned about and read." DE # 3673. Movants state in this new pleading that the Presiding Judge's fiction novels "contain derisive commentary about financial industry executives, the financial industry generally, and the financial instruments specifically at issue in HCMLP's bankruptcy" and that the second novel in particular "appears based on Judge Jernigan's experiences with HCMLP and Mr. Dondero in the Bankruptcy Proceedings." The Movants conclude that "any reasonable person would agree appear that the Presiding Judge's novels are patterned after Mr. Dondero, are additional evidence that the Court harbors exceedingly negative views about hedge fund managers and the hedge fund industry, generally, as well as Mr. Dondero specifically." *Id.*, at 4.

The Presiding Judge's novels again entirely fiction are not about Mr. Dondero or the hedge fund industry in general. The first novel (*He Watches All My Paths*) is entirely about a federal judge who receives death threats and the impact of that on her family, as well as the U.S. Marshals who provide protection. The ultimate perpetrator of the threats in the novel is not a person in the hedge fund industry but, rather, a young, former tort victim who feels wronged by the American justice system. The second novel (*Hedging Death*) is partly a sequel to the first in that it involves a manhunt for a criminal from the first book and it also happens to involve a bio-medical research firm in a Chapter 11 case in the protagonist judge's court, whose president

is a Chechen immigrant to the U.S. and received funding from a hedge fund manager named Cade Graham. Cade Graham is the book character that Movants believe is "patterned" after Mr. Dondero. The character Cade Graham is an individual who fakes his own death in Mexico ("pseudocide") after linking up with Mexican drug cartels. He is described as a Dallas native, raised by an oil man, who graduated from Princeton. He has a Brazilian girlfriend with whom he has a son, Ethan, with whom he engages in business. The book mentions a "Ranger Capital" exactly seven times (on six pages in more than 300 pages) as a company of Cade Graham's. There is another hedge fund mentioned in the book called Toro Capital. Movants state now that Highland once did business under the name of "Ranger." This was never mentioned in the bankruptcy case. It is not in the Highland disclosure statement. The Presiding Judge cannot find the name in any of the numerous organizational charts that were presented to her in the last three years. The Presiding Judge has never once heard this.

The Presiding Judge regrets this sideshow. Many sitting judges write books  albeit it is more common for them to write legal nonfiction books than fiction books. Ironically, the former can be much more fraught with peril  creating the possibility that someone is going to infer a legal viewpoint that might signal how the judge might rule in a future case. The Presiding Judge made clear that everything in the two books should be viewed as fiction. For example, on the copyright information page of *Hedging Death*:

> Hedging Death is a work of fiction. Names, characters, places, and incidents are the products of the author's imagination or are used fictitiously. Any resemblance to actual events, locales, or persons, living or dead, is entirely coincidental.

Then, again on the Author's Page before the Prologue:

> Because I am a sitting United States judge, and I am also married to a police officer, I feel compelled, at the outset, to clarify certain points regarding this novel. First, with the exception of the Prologue herein (which describes real-life events that happened July 7, 2016, in Dallas, Texas) the following is a work of fiction. While some of the characters and events beyond the Prologue may be loosely based on actual persons and events, and some of the places (in my home state of Texas and in various other faraway spots) are certainly very real, the human characters in this novel are absolutely fictional. Judge Avery Lassiter, the main character in this novel, is not me. Second, one should not assume that any statement or opinion expressed or implied by any characters in this novel are necessarily mine or are somehow a reflection on how I might rule on any particular issue in any case in the future.

The author Oscar Wilde once wrote: "Life imitates art far more than art imitates life."[31] That being true, many fiction authors do, indeed, write about "what they know." Many fiction authors write stories where characters are loosely based on real life people or weave plots that are loosely based on real life events. The examples are countless. Agatha Christie wrote a story line about a kidnapping of a child from a wealthy American family (based on the Lindberg child kidnapping) in *Murder on the Orient Express*. Practically, everything Ernest Hemingway ever wrote was a highly fictionalized story from his past: *A Farewell to Arms* (story of an American expatriate working as an ambulance driver in the Italian Army who is wounded and falls in love with an Italian nurse  Hemingway was wounded as an ambulance driver working for the Italian Army in World War I); *The Sun Also Rises* (story of a group of young American and British expatriates who become friends living in Paris and go to the bull fights in Pamplona  once again, Hemingway spent years in Paris, hanging out with the likes of F Scott Fitzgerald, Pablo Picasso, and Gertrude Stein, occasionally going to see the bull fights in Spain); *The Old Man and the Sea*

[31] Oscar Wilde, The Decay of Lying  An Observation (essay in his collection of essays titled *Intentions* in THE NINETEENTH CENTURY periodical (Jan. 1889)).

(story about an old fisherman in Cuba again, Hemingway spent several years of his life fishing, writing, and drinking in Cuba on a boat called the *Pillar*). The Presiding Judge is somewhat embarrassed to discuss these literary greats in the same paragraph in which she is mentioning her own fiction works it is merely to make a point. While the Presiding Judge's protagonist characters in her books (Judge Avery Lassiter and Max Lassiter) may resemble herself and her spouse, and while certain judges, lawyers, and U.S. Marshal characters in her books may resemble real life persons (i.e., heroes) that she has been honored to see or know during her lifetime, there are no characters or entities in her books that have been inspired by or modeled after the Movants.

**VI CONCLUSION**

The Presiding Judge has not specifically addressed herein every single ground asserted by the Movants as a manifestation of her alleged bias or animus. The submissions on this issue are enormous (as mentioned, thousands of pages have been filed). Distilled to its essence, the Third Motion to Recuse has failed to present any objective manifestations of bias or prejudice.

The court does not believe any of the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality. This court does not believe that any objective person would find that the Movants are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

WHEREFORE, it is hereby

ORDERED that the Third Motion to Recuse is denied.

It is so ORDERED.

**END OF MEMORANDUM OPINION AND ORDER**

# Exhibit 38

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 5, 2023**

**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **CASE NO. 19-34054-SGJ-11** |
| | § | **(Chapter 11)** |
| **Reorganized Debtor.** | § | |

**MEMORANDUM OPINION AND ORDER DENYING "AMENDED RENEWED MOTION TO RECUSE, PURSUANT TO 28 U.S.C. § 455"**

**(ruling on the most recent motion to recuse filed in the main bankruptcy case, *see* DE ## 3570 & 3571)**

There have been multiple motions to recuse the presiding bankruptcy judge ("Presiding Judge") in the main bankruptcy case of Highland Capital Management, L.P. ("Highland," "Reorganized Debtor," or sometimes "Debtor"). Each one has been filed by James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE

Partners, LLC, a Delaware limited liability company (collectively, the "Movants").[1] This Memorandum and Order relates to the one entitled *Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* (with supporting Brief), filed October 17, 2022 [DE ## 3570 & 3571]—which is either the second or third such motion filed in the main bankruptcy case, depending upon how one counts. For ease of reference, the court will refer to this motion and brief at DE ## 3570 & 3571 as the "Third Motion to Recuse." This Memorandum Opinion and Order denies the Third Motion to Recuse.

## I. FOR CLARIFICATION, THE FOUR MOTIONS TO RECUSE FILED BY MOVANTS.

First Motion to Recuse. Movants filed the first *Motion to Recuse Pursuant to 28 U.S.C. § 455* on March 18, 2021, along with a supporting Brief and an Appendix [DE ## 2060, 2061, & 2062] (hereinafter, the "First Motion to Recuse"). This was collectively 2,763 pages in length. This was approximately one month after the bankruptcy court confirmed a Chapter 11 plan in this case—specifically, the court confirmed a plan (the "Plan") on February 22, 2021. This was also approximately 17 months after the bankruptcy case was filed in October 2019. The First Motion to Recuse was also filed just two business days before the bankruptcy court was scheduled to hear a motion of Highland to hold Mr. Dondero in contempt of a TRO. The court denied the First Motion to Recuse in an order dated March 23, 2021 ("First Order Denying Recusal") [DE # 2083]. The Movants appealed the First Order Denying Recusal, and that appeal was dismissed for lack of jurisdiction on February 9, 2022 ("District Judge Kinkeade's Order") (reported at 2022 WL

---

[1] An entirely separate, fourth Motion to Recuse the Presiding Bankruptcy Judge was filed February 27, 2023, by one of the Movants—Highland Capital Management Fund Advisors, L.P.—in related Adversary Proceeding # 21-3076 styled *Kirschner v. Dondero, et al.* [DE # 309]. This Memorandum Opinion and Order is not intended to address that motion.

394760). District Judge Kinkeade's Order held that: (a) an order denying a motion to recuse is an interlocutory order; (b) it is not subject to the collateral order doctrine; (c) it is not an appealable interlocutory order under 28 U.S.C. § 1292(a); (d) Movants were not entitled to leave to appeal under 28 U.S.C. § 1292(b); (e) Movants were not entitled to withdrawal of the reference on the First Motion to Recuse; and (f) Movants were not entitled to have their appeal construed as a petition for writ of mandamus.

Second Motion to Recuse. A new motion was filed on August 25, 2022, five months after District Judge Kinkeade's Order. It was entitled "Amended Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in Support" [DE ## 3470 & 3471] ("Second Motion to Recuse"). This was six days after the Fifth Circuit ruled on the appeal of the Highland Plan confirmation order, affirming it in substantial part. The Second Motion to Recuse, which, with Appendix, was 162 pages in length, expressed Movants' interpretation of District Judge Kinkeade's Order: that the only reason the First Order Denying Recusal was not final and appealable was because of one sentence at the end of the order, wherein the bankruptcy court ***reserved the right to supplement or amend the order***. The bankruptcy court promptly set a status conference (six days later—on August 31, 2022) regarding the Second Motion to Recuse to clarify Movants' basis for its new motion. For one thing, the bankruptcy court questioned Movants' interpretation that this one sentence in the First Order Denying Recusal was the actual basis for District Judge Kinkeade's Order,[2] since he cited a litany of authority for the proposition that a recusal order does not become final until a final judgment has been entered

[2] The bankruptcy court put that sentence in the First Order Denying Recusal because it expected the Movants might file a Rule 59 motion requesting a hearing or seeking more findings.

in the overall proceeding. District Judge Kinkeade's Order, penultimate paragraph ("Appellants must await final judgment, or other final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order."). In other words, could the bankruptcy court truly "fix" the lack of finality problem by simply deleting that one sentence in the First Order Denying Recusal? Moreover, the court questioned the procedural propriety of Movants' request to "supplement" the record on the First Motion to Recuse with approximately 154 pages of extra evidence. This request appeared to the court to be either a very untimely Rule 59 motion or, in essence, a new motion to recuse—urging consideration of new grounds/evidence that arose subsequent to the First Motion to Recuse. After a status conference, on September 1, 2022, the court issued an order denying the Second Motion to Recuse [DE # 3479] ("Second Order Denying Recusal") for ***procedural defects***, but ruled that the order was:

> without prejudice to the Movants' right to file (1) a simple motion (without an appendix or attached proposed supplements to the record) under the appropriate procedural rule(s), seeking only a revised and amended Recusal Order that removes the following language contained at the end of the Recusal Order, but otherwise leaves the Recusal Order unchanged: "The court reserves the right to supplement or amend this ruling;" and/or (2) a new motion to recuse this bankruptcy judge based on any alleged new evidence or grounds for recusal that were not considered by this bankruptcy judge at the time of its consideration of the original Recusal Order.

Third Motion to Recuse. The Movants chose the latter option. Specifically, approximately six weeks later, on October 17, 2022, the Movants filed the current motion before the court entitled *Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455* and supporting brief [DE ## 3570 & 3571] (the "Third Motion to Recuse"). This was 10 days after the Fifth Circuit had issued, on October 7, 2022, a denial of a request for a stay in connection with its ruling on the Plan and confirmation order. The court is aware that there is a petition for *writ of certiorari* pending at the

U.S. Supreme Court regarding the Plan and confirmation order. In any event, the Third Motion to Recuse is 280 pages in length (the motion, brief and appendix combined)—with the additional appendix intended to supplement the 2,763 pages of materials filed with the First Motion to Recuse. The Reorganized Debtor filed a Response and Brief objecting to the Third Motion to Recuse (56 pages in length) and filed an appendix in support (4,035 pages in length), both on October 31, 2022. DE # 3595 & 3596. Movants then filed a motion to file a reply brief in excess of the page limit and a Reply [DE ## 3618 & 3623] on November 10, and November 14, 2022, respectively. These documents were collectively 58 pages. ***Because more than 7,000 pages of material were submitted***, and also because this court has other court business (including typically at least three Highland contested matters or adversary rulings under advisement at any given point in time), this court has had the Third Motion to Recuse under advisement (that is the subject of this Order).

Fourth Motion to Recuse. Meanwhile a fourth motion to recuse the Presiding Judge was filed on February 27, 2023 in the separate Adversary Proceeding #21-3076 by one of the same Movants that is a defendant therein.[3] It appears that some of the same arguments are made in the Fourth Motion to Recuse with one significant new argument: Movant believes that a character in one of the fiction legal thriller novels written by the Presiding Judge is based on Mr. James

[3] *See HCMFA's Motion to Recuse pursuant to [2]8 U.S.C. §§ 144 and 455* and brief in support [Adv. Pro. No. 21-3076 DE ## 309, 310]. The court notes anecdotally that this Fourth Motion to Recuse was filed several hours after the bankruptcy court issued an opinion and order conforming the Highland Plan to the ruling of the Fifth Circuit. It may very well be coincidental, but the various motions to recuse have each followed on the heels of a significant case development that Movants may perceive to be adverse to their interests —*i.e.*, the Plan confirmation order; affirmance by the Fifth Circuit of the Plan confirmation order; denial of a stay by the Fifth Circuit of its ruling on the confirmation order; a ruling of the bankruptcy court conforming the Plan to the Fifth Circuit's ruling. Again, this may be purely coincidental.

Dondero and, thus, shows the Presiding Judge has a bias towards him or the hedge fund industry generally. This court will separately rule on the Fourth Motion to Recuse in due course, after the parties have had the chance to respond.

## II. THE SPECIFIC GROUNDS URGED IN THE CURRENT MOTION.

Movants are requesting that the Presiding Judge recuse herself from presiding over the Chapter 11 case of Highland (all of it). With regard to the specific grounds urged by Movants, they state that they perceive the Presiding Judge has animus towards Mr. Dondero and parties connected with him or deemed under his control (the "Affected Entities"). Mr. Dondero and the Affected Entities argue that the Presiding Judge's impartiality can be reasonably questioned. Specifically, they express concerns that the Presiding Judge formed negative opinions of Mr. Dondero in a prior bankruptcy case over which the Presiding Judge presided (*In re Acis Capital Management, L.P.,* Case No. 18-30264);[4] that those opinions have supposedly carried over to the Highland case; that the Presiding Judge has been unable to extricate those opinions from her mind; and that this has resulted in an actual bias against Mr. Dondero that has prejudiced or is prejudicing him and the Affected Entities.

Accordingly, the Movants ask that the Presiding Judge recuse herself from any future contested matters and adversary proceedings arising in the Highland case.

## III. RELEVANT CASE BACKGROUND.

By way of further background, the Highland case has been pending since October 16, 2019. It was filed in the Bankruptcy Court for the District of Delaware. Venue was transferred to the Bankruptcy Court for

[4] Acis Capital Management, L.P. ("Acis") was formerly a company in the Highland corporate organizational structure.

the Northern District of Texas, Dallas Division, on motion of the Official Unsecured Creditors Committee ("UCC") on December 4, 2019. The UCC in this case consisted of non-insider creditors asserting more than $1 billion worth of claims against the Debtor.

On January 9, 2020, a significant corporate governance settlement between Highland and the UCC was reached and presented to this court. It was approximately one month after the Highland case was transferred to the Presiding Judge. The settlement involved the removal of Mr. Dondero as CEO and from all decision making at Highland, ***at the insistence of the UCC***, and an entirely new corporate governance structure was imposed on the Debtor, with extensive oversight by the UCC. This new corporate governance structure was negotiated by the Debtor under pressure from both the UCC and the United States Trustee—both of whom expressed positions that a Chapter 11 Trustee should be appointed in this case due to Mr. Dondero's alleged conflicts of interest, inability to act as a fiduciary, and purported mismanagement. Mr. Dondero signed off on the corporate governance settlement and this court approved it. A new three-member independent board controlled the Debtor for the remainder of the bankruptcy case until the Plan went effective in August 2021. That board consisted of a retired bankruptcy judge (Russell Nelms); a second individual with extensive experience serving as an independent board member of companies undergoing bankruptcy or restructuring (John Dubel); and a third individual (later appointed CEO) with broad experience managing distressed debt investments and other products similar to what Highland managed (James P. Seery). Mr. Dondero stayed on with Highland during the entire first year of the bankruptcy case (through October 2020), as an unpaid portfolio manager, but with no governance role, at the request of the Debtor. The UCC acquiesced to that arrangement (although they had not negotiated this and expressed reservations about Mr. Dondero's role—albeit limited). The United States Trustee was opposed to the new corporate government structure and preferred a Chapter 11 Trustee instead. This court overruled the United States Trustee's objection and determined that the corporate

governance structure negotiated by the UCC was more likely to preserve value and foster reorganization efforts than the more drastic step of appointing a Chapter 11 Trustee.

After more than a year, under direction of the new board, Highland obtained confirmation of a Chapter 11 Plan on February 22, 2021. The Plan was proposed after many months of contentiousness with several large creditors and the UCC. In fact, in August 2020, the bankruptcy court required the key parties to stand down and engage in mediation before two respected co-mediators (Retired Bankruptcy Judge Allan Gropper, S.D.N.Y. and Attorney/Mediator Sylvia Mayer, Houston). Highland (either during or after mediation) reached key settlements with the largest creditors in this case (including Acis, which asserted more than a $70 million disputed claim; the Redeemer Committee for the Crusader Fund, which asserted more than a $250 million claim and had been in litigation in multiple fora with Highland and affiliates for approximately a decade; and UBS Securities, which asserted more than a $1 billion claim and had also been in litigation with Highland and certain affiliates for more than a decade). Mr. Dondero participated in the mediation, but settlements were not reached with him. The independent board members asked for Mr. Dondero's resignation from Highland in October 2020 (i.e., from his role as a portfolio manager). At this point, things became very contentious among the Movants and the Debtor; dozens of contested motions and objections were filed among the Movants and Debtor. Accusations were made by the Debtor that Mr. Dondero was interfering with Highland business, employees, and had even destroyed a company phone to hide evidence. TROs were sought and obtained. Finally, the court confirmed the Plan in February 2021. The Plan was supported by the UCC and overwhelmingly (99%+) by non-insider creditors. Other large, non-insider creditors that supported the Plan, besides those mentioned above, were Patrick Daugherty (a former executive of Highland who has been in litigation with Highland and Mr. Dondero for more than a decade) and HarbourVest—each of whom asserted multi-million dollar claims in this case. In any event, the Movants appealed the confirmation order, and it was

affirmed in substantial part by the Fifth Circuit. The plan has been in effect since August 2021.

## IV. LEGAL STANDARD APPLICABLE TO THE MOTION TO RECUSE.

Before addressing the substance of the Third Motion to Recuse, the court will address the governing legal authority: 28 U.S.C. § 455, Fed. R. Bankr. P. 5004(a), and certain case law interpreting same. The relevant portions of 28 U.S.C. § 455 provide that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

28 U.S.C. § 455(a) & (b)(1).

Bankruptcy Rule 5004(a) further provides that, "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstance arises or, if appropriate, shall be disqualified from presiding over the case."

*A. Timeliness?*

The court first notes that the applicable statute and rule do not address the concept of timeliness of a motion to recuse. However, several courts have taken timeliness into account.

The Fifth Circuit has noted, in *Delesdernier v. Porterie*, 666 F.2d 116 (5th Cir. 1982), that, while there were arguments in favor of not reading a timeliness requirement into the statute,

"the lack of a timeliness rule has its own problems."[5] The Fifth Circuit, in concluding that it was "convinced that timeliness may not be disregarded in all cases regarding disqualification under § 455(a)," stated,[6]

> Lack of a timeliness requirement encourages speculation and converts the serious and laudatory business of insuring judicial fairness into a mere litigation stratagem. Congress did not enact § 455 to allow counsel to make a game of the federal judiciary's ethical obligations; we should seek to preserve the integrity of the statute by discouraging bad faith manipulation of its rules for litigious advantage.

Regarding the specific motion for disqualification of a district court judge in that case, the Fifth Circuit notes "that the motion raised for the first time on appeal, and after two full trials on the merits, is too tardily made for us to consider it now."[7]

*B. Hearing Needed? If So, Who Presides?*

The court next notes that the applicable statute and rule do not expressly state whether the presiding judge or some other judge should decide a motion to recuse/disqualify or whether a hearing—evidentiary or otherwise—is required.

Case authority has interpreted the provisions set forth above to give the targeted judge authority (at least initially) to decide a motion to disqualify. *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999) (a motion to recuse is committed to the discretion of the targeted judge, and the denial of such motion will only be reversed upon the showing of an abuse of discretion); *Wilborn v. Wells Fargo Bank, N.A. (In re Wilborn)*, 401 B.R. 848, 851 (Bankr. S.D.Tex. 2009) (citing *United States v. Mizell*, 88 F.3d 288, 299 (5th Cir. 1996) (the targeted judge has broad

---

[5] *Delesdernier*, 666 F.2d at 121.
[6] *Id.*
[7] *Id.* at 122-23. The Ninth Circuit and Tenth Circuit have also taken timeliness into account when considering a § 455 motion for recusal. *See Davies v. C.I.R*, 68 F.3d 1129, 1130-31 (9th Cir. 1995)(a motion for recusal filed "one year after a ruling was considered untimely."); *Willner v. Univ. of Kansas*, 848 F.2d 1023 (10th Cir. 1988).

discretion in determining whether disqualification is appropriate)).[8]

Additionally, the court notes that the applicable statute and rule do not expressly state what type of hearing is required, if any. Case authority has interpreted that a motion for disqualification does not necessarily confer upon a movant a right to make a record in open court, nor does it confer upon them a right to an evidentiary hearing. *Lieb v. Tillman (In re Lieb)*, 112 B.R. 830, 835-36 (Bankr. W.D. Tex. 1990). *See generally* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3550, at 629 (a section 455 motion can be supported by an affidavit, a verified memorandum, or a statement of facts in some form). The procedure for a targeted judge to follow, as set forth in *Levitt v. University of Texas*, 847 F.2d 221, 226 (5th Cir. 1988), and as more specifically articulated in *Lieb v. Tillman*, 112 B.R. at 836, is: (a) first, the targeted judge should decide whether the "claim asserted" by the movants "rises to the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality; (b) if not, then the judge should not recuse himself; and (c) if so, another judge should "decide what the facts are," *i.e.,* hold an evidentiary hearing, and presumably then this other judge would decide whether disqualification is appropriate. If a movant appeals a decision not to disqualify or recuse and the district court finds the record and documents submitted to be inadequate for a determination, it may remand and direct another judge to conduct an evidentiary hearing to enlarge the record. Such procedure is consistent with *Levitt. See Lieb v.Tillman*, 112 B.R. at 836.

---

[8] The Fifth Circuit discourages transfer of a disqualification motion because "[t]he challenged judge is most familiar with the alleged bias or conflict of interest" and "is in the best position to protect the nonmoving parties from dilatory tactics." *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1162 (5th Cir. 1982).

*C. Motions to Recuse are Very Fact-Specific.*

Next, with regard to evaluating a motion to recuse, the Fifth Circuit has recognized thatsection 455(a) claims are fact-driven, and as a result, the analysis of a particular section 455(a) claim must be guided, not by a comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue. *United States v. Jordan,* 49 F.3d 152, 157 (5th Cir. 1995). Disqualification is appropriate if a reasonable person, knowing all of the relevant circumstances, would harbor doubts about the impartiality of the judge. *Chitimacha Tribe*, 690 F.2d at 1165.

*D. On the Topic of Bias or Animus.*

As a matter of law, the existence of clashes between the court and counsel for a party is an insufficient basis for disqualification, and "Circuit Courts have refused to base disqualification under section 455 upon apparent animosity towards counsel." *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975)(holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel."))(other citations omitted); *see also, Focus Media, Inc. v. NBC (In re Focus Media),* 378 F.3d 916, 929-31 (9th Cir. 2004) (adverse rulings and negative remarks ordinarily do not support a bias challenge). More significant, the U.S. Supreme Court has stated that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish bias or partiality" and that[9]

> judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias

[9] *Liteky v. United States*, 510 U.S. 540, 555-556 (1994).

> or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

What might amount to a "high degree of favoritism or antagonism"? The example given by the *Liteky* Court was a 1921, WWI-espionage case where the District Court Judge allegedly said of the German American defendants: "'One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans' because their 'hearts are reeking with disloyalty.'" A very recent Fifth Circuit case echoes these principles as well. In *Brocato*, the court noted that "a judge is not generally required to recuse for bias, even if the judge is 'exceedingly ill disposed towards the defendant,' when the judge's 'knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings[.]'"[10]

## V. THE UNIQUE FACTS AND CIRCUMSTANCES APPLICABLE HERE.

First, the court determines that the Third Motion to Recuse and the previous motions to recuse have not been timely. Again, the original one was filed more than 15 months after the Presiding Judge was transferred the Highland case from Delaware. It was the 2060th pleading on the docket maintained in the bankruptcy case (this does not count the docket entries in the nine, separate adversary proceedings related to the Highland case), and it was filed after many dozens of orders had been issued by the court, including the confirmation order that was subsequently affirmed on appeal. The current Third Motion to Recuse was the 3570th pleading on the docket of the bankruptcy case and was filed exactly three years after the bankruptcy case was filed. The timing does not seem to pass muster—if, indeed, timeliness is a factor, as Circuit-level authority has suggested.

[10] *United States v. Brocato*, 4 F.4th 296, 302-03 (5th Cir. 2021).

But, since the Third Motion to Recuse—and all of them for that matter—raise serious issues, the court will nevertheless analyze the pending motion as though it is timely. The court will address whether the overall circumstances might cause a reasonable observer to question or harbor doubts about the bankruptcy court's impartiality. Would the claims asserted in the Third Motion to Recuse rise to the threshold standard of raising a doubt in the mind of a reasonable observer as to the court's impartiality?

*A. The Acis Case.*

The Third Motion to Recuse revisits the Acis bankruptcy case and suggests that the Presiding Judge gained extrajudicial knowledge and developed opinions of Mr. Dondero and the Affected Entities during that case and that this has created animus or bias towards them in the Highland bankruptcy case and related adversary proceedings. Evaluating this contention requires some examination of just what the bankruptcy court heard and adjudicated in the Acis case.

Acis Capital Management, L.P. ("Acis LP"), a Delaware limited partnership, and Acis Capital Management GP, L.L.C. ("Acis GP/LLC"), a Delaware limited liability company—were two entities within the approximately 2,000-entity organizational structure of Highland that were forced into an involuntary bankruptcy case in January 2018 (for convenience, the court will collectively refer to them as "Acis"). The Presiding Judge presided over the Acis case. Mr. Dondero was the president of the two Acis debtors, as well as the CEO of Highland at the time. The Presiding Judge's recollection is that Mr. Dondero testified ***only once*** during the lengthy Acis proceedings (during the trial on the involuntary petitions in the Spring of 2018) and, at all other times, various inhouse counsel at Highland (Scott Ellington, Isaac Leventon, and J.P. Sevilla) served as the witnesses for Acis and Highland.

As far as "extrajudicial knowledge," what the Presiding Judge learned from the Acis case was largely regarding the "CLO Industry." The court learned that Highland was a pioneer, among registered investment advisors, in the securitization investment product known as a "CLO" (collateralized loan obligations) and Acis, for many years, was the vehicle through which Highland's CLO business was managed. The court learned about the typical structure of these CLOs (the various tranches of debt and the rights they enjoyed), the typical governing documents for and life cycle of a CLO, the typical portfolio management agreements, the shared services agreements, and the sub-advisory agreements that undergirded the whole operation. The court learned about Highland's role in these and the role of Acis, historically, and the role of an entity known as Highland CLO Funding "("HCLOF"). If the Presiding Judge made any specific rulings with regard to Mr. Dondero or the Affected Entities during the Acis case, she cannot recall. The court certainly does recall accusations made by Acis against ***Highland*** and ***HCLOF*** with regard to alleged fraudulent transfers and alleged denuding of Acis assets to thwart a judgment creditor, Josh Terry. The court has never ruled on the actual fraudulent transfer claims and, the claims (at least among Acis and Highland) have been settled.

In summary, the extrajudicial knowledge—if it should be considered that—the Presiding Judge gained from the Acis case, that is now suggested to have created bias or animus, was knowledge about the highly complex CLO products industry, knowledge about the forms of agreements that typically set forth parties' rights and obligations, and some knowledge about the Highland business structure and the shared services and sub-advisory services model it typically used. The Presiding Judge, at all times, has been aware that Mr. Dondero was a founder of Highland and was the President of Acis and CEO of Highland at relevant times. To be clear, a

Chapter 11 Trustee was appointed in the Acis case soon after an order for relief was entered, and the Presiding Judge only recalls Mr. Dondero testifying once in court during the Acis case. The Presiding Judge has a vague recollection that deposition testimony may have been presented at another time. The court cannot recall any of the other Affected Entities ever being parties appearing in the Acis case or providing testimony.

Assuming, *arguendo*, that the Presiding Judge gained some knowledge about Highland and at least one of the Movants (i.e., Mr. Dondero) from the Acis case, the governing case law suggests that this sort of awareness would not qualify as extrajudicial knowledge.[11] In *Tejero*, for example, the Fifth Circuit made it clear that a judge's knowledge of a party gained from previous cases involving that party does not qualify as extrajudicial knowledge.[12] There, the judge relied on knowledge gained from presiding over three previous cases involving the party that moved for the judge's recusal.[13]

The court notes, anecdotally, that 28 U.S.C. § 1408(2) contemplates that venue is proper over a case "in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership." Thus, it is not *per se* improper (in fact, it is generally proper) for a presiding judge to preside over cases of affiliated business entities of a party. It happens all the time.

Without showing that the Presiding Judge relied on extrajudicial knowledge to form her opinion, the Movants bear the burden of showing that the Presiding Judge 'display[ed] a deep-

---

[11] *See, e.g.*, *Liteky*, 510 U.S. at 555-556; *Tejero v. Portfolio Recovery Assocs., L.L.C.*, 955 F.3d 453, 463-64 (5th Cir. 2020).
[12] *See Tejero*, 955 F.3d at 463 (citing *United States v. Reagan* 725 F.3d 471, 491 (5th Cir. 2013)).
[13] *See id.*

seated favoritism or antagonism that would make fair judgment impossible.[14]

*B. Bias or Animus, More Generally?*

More generally, the court does not believe that the provisions of 28 U.S.C. § 455 are implicated here. The Presiding Judge does not believe she harbors, or has shown, any personal bias or prejudice against the Movants. She does not believe she has displayed deep-seated favoritism or antagonism.

As earlier mentioned, case law has held that clashes between a court and counsel for a party is an insufficient basis for disqualification, and courts "have refused to base disqualification under section 455 upon apparent animosity towards counsel." *In re Lieb*, 112 B.R. at 835 (citing *Davis v. Board of School Comm'rs*, 517 F.2d 1044, 1050-52 (5th Cir. 1975)(holding that disqualification should be determined "on the basis of conduct which shows a bias or prejudice or lack of impartiality by focusing on a party rather than counsel."))(other citations omitted). Not only has this court shown proper respect for Mr. Dondero's and each of the Affected Entities' counsel, but the court has no disrespect or animus toward Mr. Dondero on a personal level or any of the Movants. This court desperately wants to believe (and has, and always will, keep its mind open to the belief) that the foremost goal of the Movants is to preserve their economic and proprietary rights—even though, over time, things have gotten more and more contentious and even seemingly personal among certain parties (the court is reminded of when the former general counsel of Highland sued another prior general counsel of Highland for "stalking" him, and the suit was removed from the state court to the bankruptcy court; the bankruptcy court swiftly remanded it

[14] *Liteky*, 510 U.S. at 555.

back to state court—believing it had no place in a business reorganization). In any event, the Presiding Judge has commented several times that she believes Mr. Dondero, more than anything else, just wanted to get the company he built back. The Presiding Judge has said this, in spite of hearing sworn testimony that Mr. Dondero has threatened out of court to "burn the place down" if he cannot get what he believes he should get from the bankruptcy process.

This court has merely addressed motions, objections, and other pleadings as they have been presented. It has issued and enforced orders when requested and warranted. This court has provided Movants with a full and fair opportunity to present and pursue their objections and motions. In many situations, the court has issued very lengthy findings of fact and conclusions of law, opinions, or reports and recommendations to the District Court. Sometimes Movants have appealed (in fact, more than two dozen times) and many times they did not. This court's rulings have mostly been affirmed or otherwise undisturbed in the appeals that have been resolved so far.

*C. Misstatements, Partial Descriptions, or Misunderstandings of Various Case Events.*

Regrettably, the brief in support of the Third Motion to Recuse (filed by counsel who never appeared during the bankruptcy case until filing the First Motion to Recuse) contains several misstatements or partial descriptions of events during the case, in several places, that create misimpressions. Some of the more problematic examples of this are set forth below (in no particular order).

<u>The Bankruptcy Court's Orders Requiring Mr. Dondero's (and Allegedly His Sister's?) Attendance at Bankruptcy Court Hearings</u>. In the brief in support of the Third Motion to Recuse, Movants assert as one example of the Presiding Judge's alleged bias, certain of her orders—entered in January 2021, May 2021, and June 2021—"target[ing] Mr. Dondero (as well as his sister Nancy

Dondero) by requiring their presence at all hearings, regardless of whether their presence is needed." Third Motion to Recuse (brief in support), at p. 16 [DE # 3542]. This entirely misstates what happened.

First, almost 100% of the dozens of Highland hearings over the last 3+ years have been conducted virtually through WebEx (due to COVID and the large number of out-of-town participants). The court does not believe Nancy Dondero has ever physically been in the bankruptcy court, and Mr. Dondero rarely has. Certainly, they have never been penalized for that.

More importantly, what Movants omit was that, during a January 8, 2021 hearing to determine whether the court should grant a requested preliminary injunction against Mr. Dondero (regarding his alleged interference with the Debtor's business and certain employees of the Debtor), Mr. Dondero testified that he had not attended an earlier TRO hearing regarding this alleged conduct, nor read the transcript from the hearing, nor read the TRO itself to know what conduct it addressed.[15] The bankruptcy court was concerned that Mr. Dondero's failure to attend or participate in bankruptcy court hearings that impacted him or might result in obligations imposed upon him would create an opportunity for "plausible deniability." Thus, this court ordered Mr. Dondero to appear at all hearings to ensure both awareness of and compliance with this court's orders. Again, these were almost always video hearings. Mr. Dondero subsequently failed to appear at a hearing, thereby validating the court's concerns. Consequently, this court entered an order on May 24, 2021, clarifying that Mr. Dondero was required to appear at all hearings in the bankruptcy case [DE # 2362]. Notably, Mr. Dondero did not appeal the preliminary injunction or

[15] See DE # 3596, Ex. 31, Appx. 3755 ("Q … At least as of today, you never bothered to read the TRO that was entered against you, correct? A Correct.").

the May 24, 2021 order.

More generally, it is not atypical for this bankruptcy court to order principals of a party to appear at hearings when there are concerns regarding: (a) the contentiousness of a case, or (b) whether clients and lawyers are completely in sync and in communication with each other.

As for Nancy Dondero, the bankruptcy court has never ordered Nancy Dondero to appear at any hearings. Instead, on June 17, 2021, the court ordered the trustee of the Dugaboy and Get Good Trusts (i.e., Mr. Dondero's family trusts) to appear at all hearings and proceedings but only "where either of the Trusts are a party or take a position" [DE # 2458]. The trusts (Dugaboy, in particular) have been very active during the bankruptcy case and the court believed their standing was very tenuous. The court provided a detailed rationale for its order and it was never appealed. Nevertheless, Movants now disturbingly assert that Nancy Dondero was required to appear at all hearings "regardless of whether [her] presence [was] needed."

<u>August 4, 2021 Order Finding Mr. Dondero in Contempt of Court</u>. In the brief in support of the Third Motion to Recuse, Movants cite an order entered by the bankruptcy court on August 4, 2021, holding Mr. Dondero in civil contempt of court [DE # 2660] (the "Contempt Order"), as "[p]erhaps one of the most telling" examples of the Presiding Judge's bias. Third Motion to Recuse (brief in support), at p. 14-15 [DE # 3571]. Movants do not accurately or fully describe the facts leading up to entry of this Contempt Order (which was appealed and affirmed in all material respects).[16]

First, the Contempt Order stemmed from an April 12, 2021 complaint (the "HarbourVest

---

[16] *Charitable DAF Fund L.P. v. Highland Cap. Mgmt.*, L.P., 2022 U.S. Dist. LEXIS 175778 (N.D. Tex. Sept. 28, 2022). The only finding not affirmed was the payment of $100,000 if an unsuccessful appeal was filed.

Complaint") filed against Highland in the District Court, by an entity known as CLO Holdco and its parent company that is referred to as the "DAF"—both believed to be under the control of Mr. Dondero (more on that below). The HarbourVest Complaint was filed less than two months after Highland's Plan was confirmed and before it went effective. Movants allege that the HarbourVest Complaint addressed Highland's "brokering [during the bankruptcy case] the sale of CLO interests held by HarbourVest … without prior notice to other CLO investors and without respecting those investors' right of first refusal" in violation of some alleged duty. Third Motion to Recuse (brief in support), at 14. This is an inaccurate description of the events in the bankruptcy case that are the subject of the HarbourVest Complaint, and it also does not make clear why the bankruptcy court was motivated to enter the Contempt Order regarding the filing of the HarbourVest Complaint.

The facts were that, prior to Highland's bankruptcy case, a third-party unrelated to Highland called HarbourVest purchased a 49.98% equity interest in a non-Debtor entity called HCLOF for approximately $80 million. Highland and the entity CLO Holdco also owned equity interests in HCLOF. After Highland's bankruptcy, HarbourVest filed claims against Highland in excess of $300 million and sought rescission of its investment in HCLOF, alleging it was fraudulently induced by factual misrepresentations and omissions made by Mr. Dondero and certain of Highland's employees prior to the bankruptcy case. Highland and HarbourVest settled HarbourVest's claims, and Highland filed a Rule 9019 motion seeking court approval of the settlement. DE # 1625. The motion for approval of the settlement went out on normal notice to creditors and parties-in-interest in the bankruptcy case. Under the settlement, HarbourVest received allowed claims in the bankruptcy case totaling $80 million in the aggregate and

transferred its interests in HCLOF to a Highland subsidiary, effectively rescinding HarbourVest's investment in HCLOF. All aspects of the settlement were publicly disclosed in Highland's motion. DE # 1625. Mr. Dondero, his family trusts, and CLO Holdco (the same entity that later filed the HarbourVest Complaint) all objected to the settlement with HarbourVest. CLO Holdco argued it had a right of first refusal to HarbourVest's 49.98% interest in HCLOF. However, after reviewing Highland's pleadings, HCLOF's governing documents, and applicable law, CLO Holdco announced through counsel at a bankruptcy court hearing on the settlement that it had determined it had no such right and withdrew its objection. The bankruptcy court approved the settlement, including the transfer of HarbourVest's 49.98% interest in HCLOF to Highland and/or its designee.

Then, three months later, CLO Holdco and its parent company DAF filed the HarbourVest Complaint seeking, among other things, to enforce CLO Holdco's alleged right of first refusal—a right CLO Holdco had conceded did not exist in open bankruptcy court. The HarbourVest Complaint raises claims against Highland for breaches of fiduciary duty under the Investment Advisers Act[17] and/or state law, breach of contract, negligence, violations of the Racketeer Influenced and Corrupt Organizations statute (15 U.S.C. § 1961, et seq. ("RICO")), and tortious interference—all relating to the settlement that the bankruptcy court had approved on notice to creditors and after an evidentiary hearing. With regard to the RICO count, CLO Holdco and DAF

[17] While specific statutory references to the federal Investment Advisers Act are sparse in the HarbourVest Complaint, subsequent pleadings of the Plaintiffs made clear they are referring to at least 15 U.S.C. § 80b-6 and 80b-15(a) (which they cite as imposing both a duty of care and a duty of loyalty, each unwaivable, on investment advisors, in favor of funds and its investors, citing *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008)); 15 U.S.C. § 206(2) (which they cite as requiring investment advisers to seek "best execution" for all their clients' transactions, citing *SEC v. Ambassador Advisors, LLC,* 576 F. Supp. 3d 286, 300 (E.D. Pa. 2021)); and 15 U.S.C. § 215 (which they cite as recognizing "a limited private right of action for equitable relief including disgorgement, wherein one may seek to void the rights of a violator who performs a contract in violation of the Advisers Act").

alleged that Highland and certain co-Defendants it named were an "association-in-fact" engaged in a pattern of racketeering activity for failing to disclose the valuation of the 49.98% equity interest and ultimately effectuating the HarbourVest Settlement. Shortly thereafter, CLO Holdco sought to add Mr. James Seery (Highland's CEO) as a defendant in clear violation of various bankruptcy court orders [e.g., DE # 854]. Accordingly, the bankruptcy court, after an evidentiary hearing, issued the Contempt Order finding Mr. Dondero and others in contempt. To be clear, not only were the Plaintiffs seeking to sue Mr. Seery in violation of bankruptcy court orders, but this had the appearance of an end-run around the bankruptcy court—i.e., suing a Debtor (Highland was still a Debtor, with a confirmed plan that had not reached its effective date) for post-petition conduct that had been approved by the bankruptcy court after notice to creditors, and, all the while, one of the plaintiffs had objected to the post-petition conduct, by objecting to the HarbourVest Settlement, and then withdrew such objection. Moreover, even if there was a legal theory to pursue claims against Highland regarding the whole HarbourVest Settlement, there was a process for pursuing administrative claims in the confirmation order and Plan, and this process had not been followed.

Movants state in their brief in support of their Third Motion to Recuse, at p. 15, that Mr. Dondero credibly testified "he was not involved at all in authorizing or preparing the motion to add Mr. Seery" to the HarbourVest Complaint and that there was no evidence to the contrary. This is directly contradicted by the actual record. As the District Court explained when affirming the bankruptcy court's Contempt Order:

> Ample evidence supports the bankruptcy court's factual findings. Dondero has had a significant role in DAF for over a decade. DAF's assets come in part from Dondero and his "family trusts." Dondero "was DAF's managing member

until 2012," and he remains "DAF's informal investment advisor." After Dondero stepped down as managing member, that role went to Grant Scott, "Dondero's long-time friend, college housemate, and best man at his wedding." Scott ultimately resigned due to "disagreements with … Dondero."

[Mark] Patrick replaced Scott as "DAF's general manager on March 24, 2021"—19 days before the Seery Motion. Patrick initially had "no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction." Only once "Dondero told [him] that an investment opportunity was essentially usurped" did Patrick "engage[] the Sbaiti firm to launch an investigation" and ask "Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts." After that, Dondero "communicated directly with the Sbaiti firm"—Patrick did not. Dondero "saw versions of the complaint before it was filed" and had "conversations with attorneys" about the complaint pre-filing. That complaint focused on "Seery's allegedly deceitful conduct" and "mention[ed] Mr. Seery 50 times." Further, when listing the parties, the complaint listed each party named in the caption along with "[p]otential party James P. Seery, Jr.," providing his citizenship and domicile.

Further, although Dondero averred that he did not direct the Sbaiti firm to add Seery to the complaint, Dondero also contradicted himself, first claiming that he did not know that "the Sbaiti firm intended to file a motion for leave to amend their complaint to add Mr. Seery," but then agreeing during the hearing that he "[p]robably" was "aware that that motion was going to be filed prior to the time that it actually was filed." He also testified to conversations about the Seery Motion, noting that it involved a "very complicated legal preservation" issue.

Based on all that evidence, the Court is not left with a definite and firm conviction that the bankruptcy court erred. After being stymied in the bankruptcy court, Dondero manufactured the exigency for the lawsuit that challenged Seery's conduct. Dondero's claim that he "did not suggest that Mr. Seery should be added as a defendant" is not credible. Dondero gave Patrick the idea of challenging Seery's conduct, and he worked with the Sbaiti firm to bring that idea to fruition in the complaint—a complaint that clearly contemplated adding Seery to the lawsuit. Likewise, his plea that he "had no involvement with the Seery Motion" is not credible. Dondero himself testified to the contents of attorney communications concerning the Seery Motion, eventually admitting that he "probably" had knowledge of the Motion before it was filed. In short, the bankruptcy court did not err, after considering the "totality of the evidence," in finding that Dondero had "the idea of" suing to "challenge Mr. Seery's … conduct," that he "encouraged Mr. Patrick to do something wrong," and that Patrick "abdicated responsibility to Mr. Dondero with regard to . . . executing the litigation strategy."[18]

---

[18] *Charitable DAF Fund, L.P.*, 2022 U.S. Dist. LEXIS 175778, at **18-21.

The District Court, like the bankruptcy court, included ample citations to the record, including the direct testimony of both Mr. Dondero and Mr. Mark Patrick, to support its factual findings concerning Mr. Dondero's direct involvement in violating the bankruptcy court's orders and processes.

Finally, Movants allegations about the lack of support for the amount of bankruptcy court's sanctions is incorrect. Movants alleged that Highland submitted invoices showing it had incurred just $38,796.50 defending against Mr. Dondero's contempt in connection with the HarbourVest Complaint. But, in fact, Highland submitted invoices for $187,795. [DE # 2421-1, 2421-2; Ex. 34, Appx. 4048-4102]. The bankruptcy court added to that amount to compensate for additional costs, and the bankruptcy court's sanction of $239,655 was affirmed by the District Court.[19]

Hearing on Debtor's Application to Employ Foley Gardere as Special Counsel on February 19, 2020. The bankruptcy court held a hearing early in the bankruptcy case on Debtor's application to retain the law firm Foley Gardere to pursue appeals of the Acis involuntary petition and the Acis confirmation order (the "Application to Employ") on behalf of ***Neutra Ltd. (which is or was a company owned by Mr. Dondero***). During this hearing, retired Bankruptcy Judge Russell Nelms, one of the three independent directors appointed to Debtor's new board, testified that, as to the board's business judgment, the Application to Employ was considered by the independent directors, and they concluded that it was in the ***Debtor's*** best interest for Foley Gardere to perform this legal work. Movants assert that, despite this testimony, the bankruptcy court displayed a predisposition to contest positions that could possibly benefit Mr. Dondero on the pre-determined

[19] *Id.* at **13-17.

basis that any person sharing an opinion with Mr. Dondero (including, apparently, a member of the independent board) was somehow being unduly influenced by him).

Movants are less-than-clear regarding the bankruptcy court's comments and concerns regarding the Foley Gardere Application. To be clear, through the Foley Gardere Application, Highland sought to retain Foley Gardere on behalf of ***both*** Highland and the non-Debtor entity, Neutra Ltd., in the appeal of the Acis confirmation order and related matters (the "Acis Appeal"). In support of the Foley Gardere Application, Highland disclosed that: (a) Neutra Ltd. was owned by Mr. Dondero and his partner, Mark Okada, and (b) ***Highland*** intended to pay for Foley Gardere's representation of Neutra Ltd. in the Acis Appeal. The UCC and Acis objected to the Foley Gardere Application on the ground that ***Highland*** should not be permitted to use estate assets to support Neutra, a Dondero-controlled entity. [DE # 120]

Mr. Nelms testified in support of the Foley Gardere Application and was subject to a lengthy cross-examination.[20] The bankruptcy court approved Highland's retention of Foley Gardere but determined that the evidence was insufficient to justify expending estate assets to pay ***Neutra, Ltd.'s*** legal fees, a non-Debtor entity in which Highland held no interest.[21] The bankruptcy court's ruling on the Foley Gardere Application was based on its determination that Highland failed to prove that the estate would benefit by paying a non-Debtor's (Neutra Ltd.'s) legal fees. The bankruptcy court stated: "I cannot believe there is a chance in the world there is economic benefit to Highland if these things get reversed. Economic benefit to Neutra: Yeah, maybe. . . . But benefit to Highland? I just don't think the evidence has been there to convince me

[20] DE # 3596, Ex. 24, Appx. 3086-3142.
[21] *Id*. Appx. 3204-3209.

it's reasonable business judgment for Highland to pay the legal fees associated with the appeal."[22]

The bankruptcy court is at a loss to understand how its comments on the Foley Gardere Application constitute a manifestation of bias towards Mr. Dondero or Movants.

The January 2021 Examiner Motion. On January 14, 2021, Mr. Dondero's family trusts, requested the bankruptcy court exercise its discretion to direct the appointment of a neutral third-party examiner pursuant to 11 U.S.C. § 1104(c) as an allegedly less costly means to resolve various issues that had arisen in the Highland bankruptcy (the "Examiner Motion"). The Examiner Motion was made 15 months after the case was filed, after months of global mediation had occurred, where most of the significant claims against the estate had been settled, and less than three weeks before the scheduled confirmation hearing, which the court had been told was likely to have support of the major creditor constituencies. Despite the family trusts' request, the bankruptcy court declined to set that motion for an emergency hearing, meaning it was set for hearing in the ordinary course, after the date of the confirmation hearing. It became moot after confirmation of the Plan—although it would not have been moot if confirmation had been denied. Movants assert that the court's failure to set the Examiner Motion on an emergency basis shows bias. No creditor supported the Examiner Motion. When the court ultimately denied the Examiner Motion, nobody appealed.

Questioning of Highland About Possibility of PPP Loans at the July 2020 Exclusivity Hearing. Movants contend that certain questions of the bankruptcy court regarding COVID-related "PPP loans" at a July 8, 2020 exclusivity hearing were evidence of bias against Mr.

---

[22] *Id.* Appx. 3205-3206.

Dondero. As fully disclosed by this court, the inquiries were prompted by an extrajudicial source (a newspaper article) that the Presiding Judge happened to read one day, which noted that "Mr. Dondero or affiliates" received PPP loans. Because of the vagueness of the article, the bankruptcy court sought information from Highland—not Movants—and ordered Highland to disclose any PPP loans it had received post-petition. Highland responded to the court at a subsequent hearing that Highland had not obtained any PPP loans. Neither Mr. Dondero nor any of his affiliated entities were directed to provide any information, no action was taken against them, and the issue was never raised again by the bankruptcy court. Movants' suggestion that this somehow showed biased towards them is hard to understand. The court was merely inquiring about the possibility of Highland having obtained a post-petition COVID loan. Mr. Dondero was not even in control of Highland at this time.[23]

Court's Usage of Terms Such as "Litigious" or "Vexatious." This court and all courts sometimes use strong words as part of managing complex and contentious cases. Did the Presiding Judge ever refer to Mr. Dondero or Movants as "litigious"? Yes. This was based on evidence. This was a view formed against the backdrop of having heard about more than a decade of litigation with UCC members and certain other creditors in courts in Texas, Delaware, New York, the Cayman Islands, Bermuda, and Guernsey.[24] For example, one of the new, independent directors of the Debtor, John Dubel—a man with decades of experience working on some of the

[23] In mid-2020, it was very unclear whether Chapter 11 debtors were eligible for PPP loans. The Presiding Judge was hearing different things in different court hearings and in the press. The Presiding Judge was partly simply curious as to whether Highland had been able to get one—in addition to being concerned it should be disclosed to creditors if it did.

[24] An overview of prepetition litigation involving Highland and other Dondero-related parties is set forth in the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., DE # 1473 at 20-24.

largest, most complex Chapter 11s around the country—credibly testified as follows:

> Q Did you form a view as to the causes of the bankruptcy filing?
>
> A Litigation. That was my clear view. This company had been in litigation with multiple parties, various different parties, since around 2008. Generally, you would see litigation like the types that were, you know, that were here, you know, you'd litigate for a while, then you'd try and settle it. It did not appear to me that there was any intention on the—the Debtor to settle these litigations, but would rather just continue the process and proceed forward on the litigation until the very last minute. And so it was obvious that this was going to—that the Debtor was a, as I said, a highly-litigious shop, and that was one of the causes, obviously, the cause of the filing, along with the fact that judgments were about to be entered against the Debtor.[25]

Continuing on, Mr. Dubel elaborated:

> Q And can you elaborate a little bit on I think you said you had done some diligence and you had formed a view as to the causes of the bankruptcy filing, but did this case present any specific concerns or issues that you and the board members had to address perhaps above and beyond what you experienced in some of the other cases you described?
>
> A Well, as I said earlier, the fact that the litigation -- the various litigations with the creditors have been going on for what I viewed as an inordinate amount of years, and that it was clear from my diligence that I had done that this had been directed by Mr. Dondero, to keep this moving forward in the litigation, and to, in essence, just, you know, never give up on the litigation.
>
> It was important that the types of protections that we were afforded in the January 9th order were put in place, because we—none of us—none of the three of us, and myself in particular, did not want to be in a position where we would be sued and harassed through lawsuits for the next, you know, ten years or so. That's not something anybody would want to sign up for.[26]

Did the Presiding Judge ever use the term "vexatious"? Yes. This was as a result of learning of the decade of unresolved litigation in the multiple fora set forth above. But it was also

[25] DE # 1894, pp. 271-272 (Transcript of Confirmation Hearing, 2/2/21, Testimony of Independent Director John Dubel).
[26] *Id.* at 274.

a perception formed after witnessing Movants and other Dondero-affiliates file over 50 proofs of claim (most of which were later withdrawn). It was also a view that any reasonable person might develop after reading the many dozens of motions; the many dozens of objections; and the many dozens of appeals that were pursued by Movants in the bankruptcy case. It was also borne out when multiple witnesses testified that there was a phenomenon in the insurance industry colloquially referred to as ***the "Dondero Exclusion"***—meaning that cost-effective liability insurance could not be obtained for the officers of Highland because of the company's historical inclination toward litigation.

For example, the new Highland CEO, Mr. James Seery, credibly testified on direct examination by Debtor's counsel as follows:

> Q Did you have any involvement in the Debtor's efforts to obtain D&O insurance for the independent board?
>
> A I did.
>
> Q Can you just describe for the Court what role you played and what issues came up as the Debtor sought to obtain that insurance?
>
> A Sure. The Debtors had been looking to get an insurance policy in place. They were not able to do that. I happen to have worked with an insurance broker on D&O situations in some very difficult situations over the years and brought them into the mix. They were able to go out to the market and find a policy that would cover us, the—kind of the key components of that policy, though, were, number one, the guaranty that HCMLP would give--I'm sorry, the guaranty that HCMLP would give to Strand's obligations, and also the--I'll call it the gatekeeper provision was very important because these parties did not want to have—they wanted to have what was referred to, commonly referred to as the Dondero Exclusion.
>
> So while we were—we purchased a policy that covered us, it did have an exclusion, unless there were no assets left, and then the what I'll call—we refer to as kind of a Side A policy would kick in.
>
> Q OK. What do you mean by the Dondero Exclusion?

A The insurers did not want to cover the—any litigation that Mr. Dondero would bring against directors. It was pretty commonly known in the marketplace that Mr. Dondero was very litigious, and insurers were not willing to write the insurance without the protections that this order afforded because they did not want to be hit with frivolous—hit with claims on the policy for frivolous litigation that might be brought.[27]

Q And do you recall at confirmation what impediments were described to the Court in terms of obtaining D&O insurance at that time?

A Yes. I think the main impediment which was discussed by Mr. Tauber is what they colloquially refer to in insurance markets as the Dondero Exclusion. Basically, getting coverage to cover Mr. Dondero's actions is very difficult because of his litigious nature. And so one of the keys was to build in and continue the gatekeeper function.[28]

And then, again, more testimony about the "Dondero Exclusion" came on direct examination of Debtor's counsel from an executive in the insurance industry, Marc Tauber, of Aon Financial:

Q Okay. And, finally, you mentioned Mr. Dondero. What role did he play in your ability to obtain insurance for the Strand board?

A Well, that's a very significant role. As, you know, as mentioned, the underwriters are very risk-averse, so the litigiousness of Mr. Dondero is a very strong red flag prohibiting a number of people from writing the insurance at all. And the ones that were writing, that were willing to provide options, were looking for protections from Mr. Dondero.

Q And what kind of protections were they looking for?

A Well, the gatekeeper function was a key factor. That was really the only way we could even start a conversation with any of the people that we were able to engage. And in addition, they wanted a, you know, sort of a belts and suspenders additional protection of having an exclusion preventing any litigation brought by or on behalf of Mr. Dondero.

Q Were you able to identify any carrier who was prepared to underwrite D&O insurance for Strand without the gatekeeper provision or without a Dondero

---

[27] *Id.* at 276-277.
[28] DE # 2598, Transcript from 7/21/21 hearing (direct examination of James P. Seery).

exclusion?

A We were not.[29]

In any event, Movants' statement that this court found the Movants to be "vexatious litigants" is not consistent with the record. This court did not specifically find or conclude that Movants are "vexatious litigants." Rather, this court determined that Mr. Dondero's litigation history supported the inclusion of a gatekeeper provision in the Plan. *See* Confirmation Order, at ¶¶ 80-81 [DE # 1943]. All of the above-quoted testimony was in connection with the bankruptcy court considering whether gatekeeper provisions proposed in the Plan were necessary and appropriate. Significantly, the Fifth Circuit affirmed this court's findings and concluded that the gatekeeper provision was justified and "sound."[30]

The fact that the Presiding Judge commented on litigiousness (often—by the way—in the context of yearning for settlement) should not be interpreted as "bias" or "prejudice" toward Movants or any other party, for that matter. Not only was there significant credible evidence of this, but it is simply about rule enforcement and managing a docket consistent with this court's duty to the public.

<u>The Presiding Judge's Fiction Novels.</u> As noted early on, there is now a Fourth Motion to Recuse filed February 27, 2023, in Adversary Proceeding No. # 21-3076 which is styled *Kirschner v. Dondero. et al*. The Presiding Judge intends to rule on that Fourth Motion to Recuse after all parties in that adversary proceeding have had the opportunity to respond.

---

[29] DE # 1905, at pp. 31-32 (Transcript from 2/3/21 Confirmation Hearing, Testimony of Marc Tauber of Aon Financial).

[30] *NexPoint v. Highland Capital Management*, 48 F.4th 419, 435 (5th Cir. 2022).

While the Presiding Judge had intended to remain silent on this subject until such time as the time had run for parties in the Adversary Proceeding to respond, the court observed that on March 3, 2023, Movants filed a new pleading entitled *Supplemental Memorandum of Law in Support of Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455*, in which Movants supplement their Third Motion to Recuse "with information regarding two books published by Judge Jernigan, which Movants recently learned about and read." DE # 3673. Movants state in this new pleading that the Presiding Judge's fiction novels "contain derisive commentary about financial industry executives, the financial industry generally, and the financial instruments specifically at issue in HCMLP's bankruptcy" and that the second novel in particular "appears based on Judge Jernigan's experiences with HCMLP and Mr. Dondero in the Bankruptcy Proceedings." The Movants conclude that "any reasonable person would agree appear [that the Presiding Judge's novels are] patterned after Mr. Dondero, are additional evidence that the Court harbors exceedingly negative views about hedge fund managers and the hedge fund industry, generally, as well as Mr. Dondero specifically." *Id.*, at 4.

The Presiding Judge's novels—again entirely fiction—are not about Mr. Dondero or the hedge fund industry in general. The first novel (*He Watches All My Paths*) is entirely about a federal judge who receives death threats and the impact of that on her family, as well as the U.S. Marshals who provide protection. The ultimate perpetrator of the threats in the novel is not a person in the hedge fund industry but, rather, a young, former tort victim who feels wronged by the American justice system. The second novel (*Hedging Death*) is partly a sequel to the first—in that it involves a manhunt for a criminal from the first book—and it also happens to involve a bio-medical research firm in a Chapter 11 case in the protagonist judge's court, whose president

is a Chechen immigrant to the U.S. and received funding from a hedge fund manager named Cade Graham. Cade Graham is the book character that Movants believe is "patterned" after Mr. Dondero. The character Cade Graham is an individual who fakes his own death in Mexico ("pseudocide") after linking up with Mexican drug cartels. He is described as a Dallas native, raised by an oil man, who graduated from Princeton. He has a Brazilian girlfriend with whom he has a son, Ethan, with whom he engages in business. The book mentions a "Ranger Capital" exactly seven times (on six pages in more than 300 pages) as a company of Cade Graham's. There is another hedge fund mentioned in the book called Toro Capital. Movants state now that Highland once did business under the name of "Ranger." This was never mentioned in the bankruptcy case. It is not in the Highland disclosure statement. The Presiding Judge cannot find the name in any of the numerous organizational charts that were presented to her in the last three years. The Presiding Judge has never once heard this.

The Presiding Judge regrets this sideshow. Many sitting judges write books—albeit it is more common for them to write legal nonfiction books than fiction books. Ironically, the former can be much more fraught with peril—creating the possibility that someone is going to infer a legal viewpoint that might signal how the judge might rule in a future case. The Presiding Judge made clear that everything in the two books should be viewed as fiction. For example, on the copyright information page of *Hedging Death*:

> Hedging Death is a work of fiction. Names, characters, places, and incidents are the products of the author's imagination or are used fictitiously. Any resemblance to actual events, locales, or persons, living or dead, is entirely coincidental.

Then, again on the Author's Page before the Prologue:

> Because I am a sitting United States judge, and I am also married to a police officer, I feel compelled, at the outset, to clarify certain points regarding this novel. First, with the exception of the Prologue herein (which describes real-life events that happened July 7, 2016, in Dallas, Texas) the following is a work of fiction. While some of the characters and events beyond the Prologue may be loosely based on actual persons and events, and some of the places (in my home state of Texas and in various other faraway spots) are certainly very real, the human characters in this novel are absolutely fictional. Judge Avery Lassiter, the main character in this novel, is not me. Second, one should not assume that any statement or opinion expressed or implied by any characters in this novel are necessarily mine or are somehow a reflection on how I might rule on any particular issue in any case in the future.

The author Oscar Wilde once wrote: "Life imitates art far more than art imitates life."[31] That being true, many fiction authors do, indeed, write about "what they know." Many fiction authors write stories where characters are loosely based on real life people or weave plots that are loosely based on real life events. The examples are countless. Agatha Christie wrote a story line about a kidnapping of a child from a wealthy American family (based on the Lindberg child kidnapping) in *Murder on the Orient Express*. Practically, everything Ernest Hemingway ever wrote was a highly fictionalized story from his past: *A Farewell to Arms* (story of an American expatriate working as an ambulance driver in the Italian Army who is wounded and falls in love with an Italian nurse—Hemingway was wounded as an ambulance driver working for the Italian Army in World War I); *The Sun Also Rises* (story of a group of young American and British expatriates who become friends living in Paris and go to the bull fights in Pamplona—once again, Hemingway spent years in Paris, hanging out with the likes of F Scott Fitzgerald, Pablo Picasso, and Gertrude Stein, occasionally going to see the bull fights in Spain); *The Old Man and the Sea*

---

[31] Oscar Wilde, The Decay of Lying—An Observation (essay in his collection of essays titled *Intentions* in THE NINETEENTH CENTURY periodical (Jan. 1889)).

(story about an old fisherman in Cuba—again, Hemingway spent several years of his life fishing, writing, and drinking in Cuba on a boat called the *Pillar*). The Presiding Judge is somewhat embarrassed to discuss these literary greats in the same paragraph in which she is mentioning her own fiction works—it is merely to make a point. While the Presiding Judge's protagonist characters in her books (Judge Avery Lassiter and Max Lassiter) may resemble herself and her spouse, and while certain judges, lawyers, and U.S. Marshal characters in her books may resemble real life persons (i.e., heroes) that she has been honored to see or know during her lifetime, there are no characters or entities in her books that have been inspired by or modeled after the Movants.

**VI. CONCLUSION.**

The Presiding Judge has not specifically addressed herein every single ground asserted by the Movants as a manifestation of her alleged bias or animus. The submissions on this issue are enormous (as mentioned, thousands of pages have been filed). Distilled to its essence, the Third Motion to Recuse has failed to present any objective manifestations of bias or prejudice.

The court does not believe any of the assertions of the Movants rise to "the threshold standard of raising a doubt in the mind of a reasonable observer" as to the judge's impartiality. This court does not believe that any objective person would find that the Movants are the victims of improper judicial conduct rising to the extraordinary remedy of recusal.

WHEREFORE, it is hereby

ORDERED that the Third Motion to Recuse is denied.

It is so ORDERED.

**### END OF MEMORANDUM OPINION AND ORDER ###**

# Exhibit 39

# United States District Court
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC | § § § § § § § | CIVIL ACTION NO. 3:23-CV-0726-S |

**ORDER**

Before the Court is the Petition for Writ of Mandamus ("Petition") [ECF No. 1], the Appendix to the Petition for Writ of Mandamus ("Appendix") [ECF Nos. 1-1 through 1-5], the Joint Supplemental Appendix ("Supplemental Appendix") [ECF No. 8], Highland Capital Management, L.P.'s Response to Petition for Writ of Mandamus ("Response") [ECF No. 17], and the Reply in Support of Petition for Writ of Mandamus ("Reply") [ECF No. 23]. Petitioners James Dondero, Highland Capital Management Fund Advisors, L.P., The Dugaboy Investment Trust, Get Good Trust, and NexPoint Real Estate Partners, LLC, seek a writ of mandamus ordering the recusal of Bankruptcy Judge Stacey G. Jernigan ("Judge Jernigan") from the Chapter 11 bankruptcy proceedings concerning Highland Capital Management, L.P. ("Debtor"). For the reasons articulated in the Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse, Pursuant to 28 U.S.C. § 455" ("Third Order Denying Recusal"), the Court finds that Petitioners failed to present any objective manifestations of bias or prejudice that would constitute grounds for Judge Jernigan's recusal. *See* App. 2-37. Accordingly, the Court finds that Petitioners have not shown that the extraordinary remedy of a writ of mandamus is warranted. For the following reasons, the Petition is **DENIED**.

## I. BACKGROUND

On October 16, 2019, Debtor filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Case"), and that court transferred venue to the United States Bankruptcy Court for the Northern District of Texas. *Charitable DAF Fund, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt. L.P.*), No. 19-34054-SGJ-11, 2022 WL 780991, at *1 (Bankr. N.D. Tex. Mar. 11, 2022). Fifteen months after the case was transferred, Petitioners filed a motion to recuse under 28 U.S.C. § 455 ("First Recusal Motion"). App. 39-75. Judge Jernigan denied the First Recusal Motion, Suppl. App. 3593-603, and Petitioners appealed ("First Appeal"), *id.* at 3732-64. Concluding that Judge Jernigan's order was interlocutory and not immediately appealable as a matter of right, the district court dismissed the First Appeal for lack of jurisdiction. *Id.* at 5777-90.

Five months later, Petitioners filed their Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455, which they later amended ("Second Recusal Motion"). *Id.* at 5793-801 (original motion); *id.* at 6523-30 (amended motion). In the Second Recusal Motion, Petitioners asked Judge Jernigan to reconsider the First Recusal Motion along with Petitioners' supplemental evidence and arguments and to "enter a final, appealable order on th[e] issue." *Id.* at 6530. Judge Jernigan held a status conference on August 31, 2022, regarding the Second Recusal Motion. *Id.* at 14659-85. At the hearing and in a written order, Judge Jernigan denied the Second Recusal Motion as procedurally improper. *Id.* at 14656-58, 14681-84. The order was entered "without prejudice to the Movants' right to file (1) a simple motion . . . seeking only a revised and amended Recusal Order . . . and/or (2) a new motion to recuse this bankruptcy judge based on any alleged new evidence or grounds for recusal" that were not included in the First Recusal Motion. *Id.* at 14658. Petitioners chose the second option.

On October 17, 2022, Petitioners filed their Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Third Recusal Motion"). App. 2800-28. Judge Jernigan issued the Third Order Denying Recusal on March 6, 2023. *Id.* at 2-37. On April 4, 2023, Petitioners filed a Petition for Writ of Mandamus in the First Appeal, but District Judge Ed Kinkeade ("Judge Kinkeade") unfiled it because the First Appeal was dismissed, and the Petition for Writ of Mandamus was not "in any way . . . a continuation of the bankruptcy appeal that was before the Court." Suppl. App. 5791-92. Judge Kinkeade directed Petitioners to file a new action if they wished to seek relief as to the Third Order Denying Recusal. *Id.* This action before yet another district court ensued.

## II. ANALYSIS

A writ of mandamus is an "extraordinary remedy" justified only by "exceptional circumstances." *In re Gordon*, No. 18-60869, 2019 WL 11816606, at *1 (5th Cir. 2019) (citation omitted). As such, the Supreme Court has established three requirements that must be met before a writ may issue. "First, the party seeking issuance of the writ must have no other adequate means to attain the relief he desires. . . . Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." *In re LeBlanc*, 559 F. App'x. 389, 392 (5th Cir. 2014) (citation omitted). And third, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.* For the reasons set forth in the Response, the Court finds these three requirements have not been met. Resp. 16-20.

To meet the first requirement, Petitioners must show that the alleged error is "*irremediable on ordinary appeal*, thereby justifying emergency relief in the form of mandamus." *In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 (5th Cir. 2000) (footnote and citation omitted). "That is a high bar: The appeals process provides an adequate remedy in almost all cases, even where defendants face the prospect of an expensive trial." *In re Depuy Orthopaedics, Inc.*, 870

F.3d 345, 352 (5th Cir. 2017) (citation omitted). Petitioners fail to make the required showing. As examples of Judge Jernigan's alleged bias, Petitioners cite comments made by Judge Jernigan throughout the course of the Bankruptcy Case, *see* Pet. 5-7; however, the Court finds that these statements, when taken in context, provide no basis for reasonably questioning Judge Jernigan's impartiality or finding personal bias or prejudice. As further evidence of Judge Jernigan's alleged bias, Petitioners also cite rulings they never appealed and rulings that were appealed and affirmed in all material aspects. *See, e.g.*, App. 20-28; Resp. 7-8. If anything, Judge Jernigan's rulings could arguably constitute grounds for appeal, not for recusal.

As to the second requirement, because Petitioners have not shown that recusal was warranted, Petitioners do not demonstrate a "clear and indisputable" right to mandamus. *In re LeBlanc*, 559 F. App'x. at 392 (citation omitted). 28 U.S.C. § 455, which applies to bankruptcy courts through Federal Rule of Bankruptcy Procedure 5004(a), provides in relevant part that any judge "shall disqualify [her]self in any proceeding in which [her] impartiality might reasonably be questioned" or "[w]here [s]he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(a), (b)(1). A party seeking recusal must clear the following hurdles: "They must (1) demonstrate that the alleged comment, action, or circumstance was of 'extrajudicial' origin, (2) place the offending event into the context of the entire trial, and (3) do so by an 'objective' observer's standard." *Andrade v. Chojnacki*, 338 F.3d 448, 455 (5th Cir. 2003). The Court finds that Petitioners have not cleared the required hurdles.

Petitioners allege that Judge Jernigan displayed personal bias and animus toward Dondero and his affiliates based on rulings and statements made by Judge Jernigan throughout the Bankruptcy Case, Pet. 3-9, but none of the grounds Petitioners assert merit disqualification.

Petitioners do not place the contested rulings and statements in the appropriate context within the Bankruptcy Case. As set forth in the Third Order Denying Recusal, the Third Recusal Motion "contains several misstatements or partial descriptions of events during the case, in several places, that create misimpressions." App. 19. Further, these challenges arise from "intrajudicial sources." *Andrade*, 338 F.3d at 460. To lead to disqualification, events in court must "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* at 462 (citation omitted). Petitioners fail to identify any action or statement revealing a sufficient degree of antagonism.

Petitioners also contend that two *fiction* novels authored by Judge Jernigan are "the most revealing evidence of [her] bias." Pet. 1. The Court is not persuaded by Petitioners' far-reaching comparison between the books and the parties to the Bankruptcy Case. Petitioners fail to show how any portion of the crime novels could raise a doubt in the mind of a reasonable observer as to Judge Jernigan's impartiality.

As to the third requirement, Petitioners have not shown that a writ of mandamus is appropriate under the circumstances. After a careful review of the record, the Court concludes that a reasonable and objective observer, aware of all the facts and circumstances, would not harbor doubts about Judge Jernigan's impartiality in the Bankruptcy Case. The Court agrees with Judge Jernigan in finding that Petitioners' allegations are wholly conclusory and baseless and do not establish Judge Jernigan's personal bias or prejudice for or against any party, or any other basis upon which Judge Jernigan's impartiality might reasonably be questioned. *See* 28 U.S.C § 455(a)-(b); FED. R. BANKR. P. 5004(a).

### III. CONCLUSION

The Court finds that Petitioners have not proved "exceptional circumstances" sufficient to justify the extraordinary remedy of a writ of mandamus. *In re Gordon*, 2019 WL 11816606, at *1. For the foregoing reasons, the Petition for Writ of Mandamus [ECF No. 1] is **DENIED**.

**SO ORDERED.**

SIGNED March 8, 2024.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**

# Exhibit 40

**Rand Structure Chart –**
*(effective as of 4/27/2023)*



Updated 4.27.2023

**DAF/Rand Structure Chart**
*(effective as of 4/27/2023)*



**Rand Structure Chart**
*(8/1/22 – Feb. 2025)*






**Rand Structure Chart –**
*(Feb. 2025)*

**DAF/Rand Structure Chart**
*(Feb. 2025)*




001540

*DFW Charitable Foundation completed it acquisition of 100% of CDMCFAD between December 2024 and March 2025. The final result of this transaction is shown here for simplicity's sake.


DAF/Rand Structure Chart
(May 2025)
Mark Patrick
Director
Manager
100%
DFW Charitable Foundation
(Delaware)
(Director: Mark Patrick)
100%
CDMCFAD, LLC
(Delaware)
(Manager: Mark Patrick)
CDH GP, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
99% LP
1% GP
Charitable DAF Fund, LP
(Cayman Islands)
(General Partner Managed)
100%
CLO HoldCo, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
100%
CLO Holdco, LLC
(Delaware)
100%
Beacon Mountain, LLC
(Delaware)
(Managed solely by its single member)
100% Beneficiary
Hunter Mountain Investment Trust
(Delaware statutory trust)
(Administrator: Mark Patrick)
(DE Trustee: Wilmington Trust)
100%
Liberty CLO Holdco, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
100%
Charitable DAF Holdings Corp.
(Delaware)
(Director: Mark Patrick)


Mark Patrick
DFW Charitable Foundation
(Delaware)
(Director: Mark Patrick)
Dallas Foundation
Sole known economic beneficiary
Fiduciary Control
$1 million cash
$23.5 million cash + “valuable” litigation claims

**DAF Structure Chart**
*(as of 3/6/2024)*



**DAF Structure Chart**
*(3/7/24 – 12/17/24)*



**DAF Structure Chart**
*(3/7/24 – 12/17/24)*



**DAF Structure Chart**
*(12/18/24 – 2/6/25)*




DAF Structure Chart
(2/7/25 – 3/26/25)
Key
Control/ Fiduciary
Assets
Economic Benefit
The Community Foundation of North Texas (CFNT) (nonprofit charity)
Santa Barbara Foundation (nonprofit charity)
Greater Kansas City Community Foundation (nonprofit charity)
The Dallas Foundation (nonprofit charity
Supporting Organization
HCMLP Charitable Fund
Highland Santa Barbara Foundation, Inc. (nonprofit nonstock DE corp.)
Highland Kansas City Foundation, Inc. (nonprofit nonstock DE corp.)
Highland Dallas Foundation, Inc. (nonprofit nonstock DE corp.)
0.80% Participation Shares
16.05% Participation Shares
51.04% Participation Shares
DFW Charitable Foundation (Delaware) (Director: Mark Patrick)
Charitable DAF HoldCo, Ltd. (Cayman Islands) (Directors: Mark Patrick, Paul Murphy)
100% member
CDMCFAD, LLC (Delaware) (Manager: Mark Patrick)
100% LP
Charitable DAF Fund, LP (Cayman Islands) (General Partner Managed)
100%
CLO HoldCo, Ltd. (Cayman Islands) (Directors: Mark Patrick, Paul Murphy)
[Additional subsidiaries for holding specific assets]
Liberty CLO Holdco, Ltd. (Cayman Islands) (Directors: Mark Patrick, Paul Murphy)
President
Sole Director
Sole Member
Sole known economic beneficiary
Mark Patrick (Managing Member)
100% Management Shares
Manager
GP
CDH GP, Ltd. (Cayman Islands) (Directors: Mark Patrick, Paul Murphy)

**DAF Structure Chart**
*(as of 3/27/2025)*




*The Charitable Foundations received $1.61 m in cash based on a 99.4% discount on their $270 million in assets

**DAF Structure Chart**
*(as of 3/27/2025)*




DAF Structure Chart
(as of 3/27/2025)
Key
Control/ Fiduciary
Assets
Economic Benefit
Mark Patrick
President
Sole Director
Sole Member
Sole known economic beneficiary
DFW Charitable Foundation
(Delaware)
(Director: Mark Patrick)
100%
Manager
CDMCFAD, LLC
(Delaware)
(Manager: Mark Patrick)
100%
CDH GP, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
100% LP
GP
Charitable DAF Fund, LP
(Cayman Islands)
(General Partner Managed)
100%
CLO HoldCo, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
100%
[Additional subsidiaries for holding specific assets]
100%
Liberty CLO Holdco, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
$270 million in assets


Net effect of DAF Transactions
(12/18/24 - 3/27/2025)
Mark Patrick
Sole known economic beneficiary
DFW Charitable Foundation
(Delaware)
(Director: Mark Patrick)
$1.61 million cash
$270 million in cash and assets
Fiduciary Control
The Dallas Foundation
Greater Kansas City Foundation
Santa Barbara Foundation
The Community Foundation of North Texas


Rand Structure Chart
(8/1/22 – Feb. 2025)
Dallas Foundation
Supported Organization
100% support
100% support
Okada Family Trust
Empower Dallas
30%
70%
Annuity Policy
Crown Global
Insurance Company
100% LP
Other investors
4% LP
Charitable DAF Holdings Corp.
(Director: Mark Patrick)
Sole Member
Atlas IDF GP, LLC
(Manager: Mark Patrick)
GP
Atlas IDF, LP
96% LP
Sole Member
Rand PE Fund Management, LLC
(Manager: Mark Patrick)
GP
Sole Member
Rand Advisors, LLC
(registered investment advisor)
(Manager: Mark Patrick)
IMA
Rand PE Fund I, L.P.
Sole Member
Beacon Mountain, LLC
Sole Beneficiary
Hunter Mountain Investment Trust
(Delaware statutory trust)
99.5% LP
Highland Capital Management, L.P.
$23.5 m (at least)


Rand Structure Chart
(May 2025)
Dallas Foundation
Supported Organizations
100% support
100% support
Okada Family Trust
Empower Dallas
30%
70%
Annuity Policy
Crown Global
Insurance Company
100% LP
Other investors
4% LP
Charitable DAF Holdings Corp.
(Director: Mark Patrick)
Sole Member
Atlas IDF GP, LLC
(Manager: Mark Patrick)
GP
Atlas IDF, LP
96% LP
Sole Member
Rand PE Fund Management, LLC
(Manager: Mark Patrick)
GP
Rand PE Fund I, L.P.
$1 million cash
Sole Member
Rand Advisors, LLC
(registered investment advisor)
(Manager: Mark Patrick)
IMA


DAF Structure Chart
(May 2025)
Mark Patrick
Director
Manager
100%
DFW Charitable Foundation
(Director: Mark Patrick)
100%
CDMCFAD, LLC
(Delaware)
(Manager: Mark Patrick)
CDH GP, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
99% LP
1% GP
Charitable DAF Fund, LP
100%
CLO HoldCo, Ltd.
100%
CLO Holdco, LLC
100%
Liberty CLO Holdco, Ltd.
100%
Charitable DAF Holdings Corp.
(Director: Mark Patrick)
100%
Beacon Mountain, LLC
Sole Beneficiary
Hunter Mountain Investment Trust
(Delaware statutory trust)
99.5% LP
Highland Capital Management, L.P.
$23.5 m (at least)

**Rand Structure Chart**
*(effective as of 12/2015 – 8/2022)*



# Exhibit 41

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

**ORDER I CONFIRMIN THE FIFTH AMENDED
PLAN OF REOR ANI ATION OF HI HLAND CAPITAL
MANA EMENT L P AS MODIFIED AND II RANTIN RELATED RELIEF**

The Bankruptcy Court[2] having:

a. entered, on November 24, 2020, the *Order A Approving the Ade uacy of the Disclosure Statement Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorgani ation C Esta lishing Deadline for Filing O ections to Confirmation of Plan D Approving Form of allots oting Deadline and Solicitation Procedures and E Approving Form and Manner of Notice* Docket No. 1476 (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and or control numerous non-debtor entities in the complex Highland enterprise.

5. **T D r**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

6. **T H d E r r** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

**DEBTOR S CHAPTER PLAN OF REOR ANI ATION**

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I
## RULES OF INTERPRETATION COMPUTATION OF TIME OVERNIN LA AND DEFINED TERMS

**A R I r r C T d r L**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

**B D d T r**

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims ar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims O ection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided however* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided however* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or E uity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Availa le Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. " *allot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. " *an ruptcy Code*" means title 11 of the United States Code, 11 U.S.C. 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. " *an ruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. " *an ruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. " *ar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. " *ar Date Order*" means the *Order I Esta lishing ar Dates for Filing Proofs of Claim and II Approving the Form and Manner of Notice Thereof* D.I. 488 .

17. " *usiness Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims O ection Deadline*" means the date that is 180 days after the Confirmation Date; *provided however* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust eneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class  Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class  C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C.  1102(a)(1) on October 29, 2019 D.I. 65 , consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. *Convenience Claim* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests* means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B C Limited Partnership Interests.

45. "*De tor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. *Delaware an ruptcy Court* means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for De tor s Fifth Amended Chapter Plan of Reorgani ation*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distri ution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distri ution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distri ution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*En oined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*E uity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*E uity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* D.I. 354 .

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided however* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhi it*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal udgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69. " *eneral Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. " *eneral Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. " *overnmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. " *UC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distri ution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. " *efferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81. "*Litigation Su Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Su Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New P LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New P LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 5 a 2 28 and of the an ruptcy Code Authori ing the De tor to Retain Employ and Compensate Certain Professionals Utili ed y the De tor in the Ordinary Course* D.I. 176 .

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. *Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "Petition *Date*" means October 16, 2019.

92. "*Plan*" means this *De tor s Fifth Amended Chapter Plan of Reorgani ation*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distri ution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims ar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims O ection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided however* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Re ection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorgani ed De tor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorgani ed De tor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorgani ed Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court D.I. 247 .

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Su Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Su Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Su ordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Su ordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distri ution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*U S*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. " *oting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. " *oting Record Date*" means November 23, 2020.

## ARTICLE II
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**A Ad r E C**

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided however* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A S r**

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**B S r C d Tr C d C d E I r**

| C | C | S | V R |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C E V C**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D I r d V C**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E U r d N V C**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F I r d N V C**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**Cr d**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H C d Tr C d E I r**

1. *Class efferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and oting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. *Class 2 Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and oting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. *Class Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and oting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 Priority Non Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.
- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.
- *Impairment and oting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. *Class 5 Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.
- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.
- *Impairment and oting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.
- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.
- *Impairment and oting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. <u>*Class Convenience Claims*</u>

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and oting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. <u>*Class 8 eneral Unsecured Claims*</u>

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and oting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. <u>*Class Su ordinated Claims*</u>

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and oting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. <u>*Class Class C Limited Partnership Interests*</u>

- *Classification*: Class 10 consists of the Class B C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B C Limited Partnership Interest Claim, except with respect to any Class B C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and oting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. <u>*Class Class A Limited Partnership Interests*</u>

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and oting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I S Pr r U r d C**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**S rd d C**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV
## MEANS FOR IMPLEMENTATION OF THIS PLAN

**A S r**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

**B** **T C Tr**[2]

1. *Creation and overnance of the Claimant Trust and Litigation Su Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

4. *Management of the Reorgani ed De tor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *esting of Assets in the Reorgani ed De tor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. 3713(b) and 26 U.S.C. 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorgani ed De tor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distri ution of Proceeds from the Reorgani ed De tor Assets Transfer of Reorgani ed De tor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D C A**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

**E R L C d E I r**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**F C N C r d I r**

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

**C E I r r S r I r**

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

**H C r Pr**

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

**I Tr V C**

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

**P D**

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 D.I. 912 .

**K H d C M L P R r P d Tr**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. 412, 430, and 29 U.S.C. 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

**D A C d E I r**

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHER ISE PROVIDED HEREIN OR AS A REED TO BY THE DEBTOR REOR ANI ED DEBTOR OR CLAIMANT TRUSTEE AS APPLICABLE**

# Exhibit 42

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj** |
| | § | |
| **Reorganized Debtor.** | § | |
| | § | |

**NOTICE OF APPEAL OF "ORDER EXTENDING STAY OF CONTESTED MATTER [DOCKET NO. 4000]" [DKT 4104] BY RIGHT**

**Part 1: Identify the appellant(s)**

1. Name(s) of appellant(s):

Hunter Mountain Investment Trust

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding:
□ Plaintiff
□ Defendant
□ Other (describe)

For appeals in a bankruptcy case and not in an adversary proceeding:
□ Debtor
X Creditor
□ Trustee
□ Other (describe)

**Part 2: Identify the subject of this appeal**

1. Describe the judgment, order, or decree appealed from:

**DKT 4104** - ORDER EXTENDING STAY OF CONTESTED MATTER [DOCKET NO. 4000][1]

A true and correct copy of the Order is attached hereto as Exhibit A.

2. State the date on which the judgment, order, or decree was entered: signed June 22, 2024 and filed June 24, 2024 [Dkt. No. 4104]

3. **Part 3: Identify the other parties to the appeal**

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys:

1. *Party/Appellee:* Highland Capital Management, L.P.

Attorney:

PACHULSKI STANG ZIEHL & JONES LLP
Jeffery N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
T: (310) 277-6910
F: (212) 561-7777

And

Hayward & Associates PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy. Ste. 106
Dallas, TX 75231
T: (972) 755-7100
F: (972) 755-7110

2. *Party/Appellee:* James P. Seery, Jr.

Attorneys:

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil
Joshua S. Levy
1875 K Street, N.W.
Washington, D.C. 20006

[1] Given the lack of clarity in the law about the appropriate mechanism for obtaining review, Hunter Mountain is filing a Notice of Appeal by Right and a Notice of Appeal by Leave (along with a motion for leave to file an interlocutory appeal) and a petition for writ of mandamus (which will be filed shortly thereafter).

(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

and

REED SMITH LLP
Omar J. Alaniz
Texas Bar No. 24040402
Lindsey L. Robin
Texas Bar No. 24091422
2850 N. Harwood St., Ste. 1500
Dallas, Texas 75201
(469) 680-4292

2. *Party/Appellant:* Hunter Mountain Investment Trust

Attorney:

STINSON LLP

Deborah Deitsch-Perez
TX Bar No. 24036072
Michael P. Aigen
TX Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, TX 75201
T: 214.560.2201
F: 214.560.2203
Email: deborah.detschperez@stinson.com
Email: michael.aigen@stinson.com

**Dated: July 8, 2024**

**STINSON LLP**

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 8, 2024, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

# Exhibit 43

**Fill in this information to identify your case:**

United States Bankruptcy Court for the:

DISTRICT OF DELAWARE

Case number *(If known)* ________ Chapter 11

☐ Check if this an amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy

4/19

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known). For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| | | | |
|---|---|---|---|
| 1. | **Debtor's name** | Highland Capital Management, L.P. | |
| 2. | **All other names debtor used in the last 8 years**<br>Include any assumed names, trade names and *doing business as* names | | |
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 75-2716725 | |
| 4. | **Debtor's address** | **Principal place of business**<br><br>300 Crescent Court<br>Suite 700<br>Dallas, TX 75201<br>Number, Street, City, State & ZIP Code<br><br>Dallas<br>County | **Mailing address, if different from principal place of business**<br><br>P.O. Box, Number, Street, City, State & ZIP Code<br><br>**Location of principal assets, if different from principal place of business**<br><br>Number, Street, City, State & ZIP Code |
| 5. | **Debtor's website** (URL) | www.highlandcapital.com | |
| 6. | **Type of debtor** | ☐ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))<br>■ Partnership (excluding LLP)<br>☐ Other. Specify: ________ | |

Debtor **Highland Capital Management, L.P.**
Name

Case number (*if known*) ______________________

**7. Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

■ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes.

**5259**

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

- ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,725,625 (amount subject to adjustment on 4/01/22 and every 3 years after that).
- ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
- ☐ A plan is being filed with this petition.
- ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
- ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
- ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.
☐ Yes.

District ____________ When ____________ Case number ____________
District ____________ When ____________ Case number ____________

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

■ No
☐ Yes.

Debtor ____________ Relationship ____________
District ____________ When ____________ Case number, if known ____________

Debtor **Highland Capital Management, L.P.** Case number (*if known*) ______________
Name

**11. Why is the case filed in *this district?***

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? ______________

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other ______________

**Where is the property?** ______________

Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency ______________

Contact name ______________

Phone ______________

**Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

■ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ■ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ■ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ■ $100,000,001 - $500 million | ☐ More than $50 billion |

Debtor **Highland Capital Management, L.P.**
Name

Case number (*if known*)

**Request for Relief, Declaration, and Signatures**

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 10/16/2019
MM / DD / YYYY

X [signature]
Signature of authorized representative of debtor

Strand Advisors, Inc., General Partner
by: James D. Dondero, President
Printed name

Title

**18. Signature of attorney**

X [signature]
Signature of attorney for debtor

Date 10/16/2019
MM / DD / YYYY

**James E. O'Neill**
Printed name

**Pachulski Stang Ziehl & Jones LLP**
Firm name

**919 N. Market Street**
**17th Floor**
**Wilmington, DE 19899**
Number, Street, City, State & ZIP Code

Contact phone **302-652-4100** Email address **joneill@pszjlaw.com**

**4042 DE**
Bar number and State

**ACTION BY WRITTEN CONSENT OF**
**THE SOLE GENERAL PARTNER**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**
**(a Delaware limited partnership)**

The undersigned, being the sole general partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Company**"), hereby takes the following actions and adopts the following resolutions:

WHEREAS, the General Partner, acting pursuant to the laws of the State of Delaware, has considered the financial and operational aspects of the Company's business;

WHEREAS, the General Partner has reviewed the historical performance of the Company, the outlook for the Company's assets and overall performance, and the current and long-term liabilities of the Company;

WHEREAS, the General Partner has carefully reviewed and considered the materials presented to it by the management of and the advisors to the Company regarding the possible need to undertake a financial and operational restructuring of the Company; and

WHEREAS, the General Partner has analyzed each of the financial and strategic alternatives available to the Company, including those available on a consensual basis with the principal stakeholders of the Company, and the impact of the foregoing on the Company's business and its stakeholders.

NOW, THEREFORE, BE IT RESOLVED, that in the judgment of the General Partner, it is desirable and in the best interests of the Company, its creditors, partners, and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware;

RESOLVED, that the officers of the General Partner (each, an "**Authorized Officer**") be, and each of them hereby is, authorized, empowered and directed on behalf of the Company to execute, verify and file all petitions, schedules, lists, and other papers or documents, and to take and perform any and all further actions and steps that any such Authorized Officer deems necessary, desirable and proper in connection with the Company's chapter 11 case, with a view to the successful prosecution of such case, including all actions and steps deemed by any such Authorized Officer to be necessary or desirable to the develop, file and prosecute to confirmation a chapter 11 plan and related disclosure statement;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to retain the law firm of Pachulski Stang Ziehl & Jones LLP (**"PSZ&J"**) as bankruptcy counsel to represent and assist the Company in carrying out its duties under chapter 11 of the Bankruptcy Code, and to take any and all actions to advance the Company's rights in connection therewith, and the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the bankruptcy, and to cause to be filed an appropriate application for authority to retain the services of PSZ&J;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to retain and employ Development Specialists, Inc. (***"DSI"***) to provide the Company with Bradley D. Sharp as chief restructuring officer (***"CRO"***) and additional personnel to assist in the execution of the day to day duties as CRO. The CRO, subject to oversight of the General Partner will lead the Company's restructuring efforts along with the Company's advisors, and to take any and all actions to advance the Company's rights in connection therewith, and the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the bankruptcy petition, and to cause to be filed an appropriate application for authority to hire the CRO and his affiliated firm, DSI;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to employ any other professionals necessary to assist the Company in carrying out its duties under the Bankruptcy Code; and in connection therewith, the Authorized Officers are hereby authorized and directed to execute appropriate retention agreements, pay appropriate retainers prior to or immediately upon the filing of the chapter 11 case and cause to be filed appropriate applications with the bankruptcy court for authority to retain the services of any other professionals, as necessary, and on such terms as are deemed necessary, desirable and proper;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to obtain post-petition financing and obtain permission to use existing cash collateral according to terms which may be negotiated by or on behalf of the Company, and to enter into any guaranties and to pledge and grant liens on its assets as may be contemplated by or required under the terms of such post-petition financing or cash collateral arrangement; and in connection therewith, the Authorized Officers shall be, and each of them hereby is, hereby authorized, empowered and directed, on behalf of the Company, to execute appropriate loan agreements, cash collateral agreements and related ancillary documents;

RESOLVED, that the Authorized Officers be, and each of them hereby is, authorized, empowered and directed, on behalf of the Company, to take any and all actions, to execute, deliver, certify, file and/or record and perform any and all

documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities or certificates and to take any and all actions and steps deemed by any such Authorized Officer to be necessary or desirable to carry out the purpose and intent of each of the foregoing resolutions and to effectuate a successful chapter 11 case;

RESOLVED, that any and all actions heretofore taken by any Authorized Officer in the name and on behalf of the Company in furtherance of the purpose and intent of any or all of the foregoing resolutions be, and hereby are, ratified, confirmed, and approved in all respects.

*[Signature pages follow]*

Case 19-34054-sgj11 Doc 339 Filed 12/04/19 Entered 12/04/19 Page 8 of 16
Exhibit 43 Page 18 of 217

IN WITNESS WHEREOF, the undersigned have duly executed this Written Consent as of October 7, 2019.

STRAND ADVISORS, INC.
Sole General Partner of Highland Capital Management, L.P.

By: ______________________________
James D. Dondero
President

*SIGNATURE PAGE TO THE ACTION BY WRITTEN CONSENT OF THE SOLE GENERAL PARTNER OF HIGHLAND CAPITAL MANAGEMENT, L.P.*

**Fill in this information to identify the case:**

Debtor name HIGHLAND CAPITAL MANAGEMENT, L.P.

United States Bankruptcy Court for the: District of Delaware (State)

Case number (If known): 19-

☐ Check if this is an amended filing

Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim: If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1. | Redeemer Committee of the Highland Crusader Fund<br>c/o Terri Mascherin, Esq.<br>Jenner & Block<br>353 N. Clark Street<br>Chicago, IL 60654-3456 | Terri Mascherin<br>Tel: 312.923.2799<br>Email:<br>tmascherin@jenner.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | $189,314,946.00 |
| 2. | Patrick Daugherty<br>c/o Thomas A. Uebler, Esq.<br>McCollom D'Emilio Smith Uebler LLC<br>2751 Centerville Rd #401<br>Wilmington, DE 19808 | Thomas A. Uebler<br>Tel: 302.468.5963<br>Email:<br>tuebler@mdsulaw.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | $11,700,000.00 |
| 3. | CLO Holdco, Ltd.<br>Grant Scott, Esq.<br>Myers Bigel Sibley & Sajovec, P.A.<br>4140 Park Lake Ave, Ste 600<br>Raleigh, NC 27612 | Grant Scott<br>Tel: 919.854.1407<br>Email:<br>gscott@myersbigel.com | Contractual Obligation | | | | $11,511,346.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4. | McKool Smith, P.C.<br>Gary Cruciani, Esq.<br>McKool Smith<br>300 Crescent Court, Suite 1500<br>Dallas, TX 75201 | Gary Cruciani<br>Tel: 214.978.4009<br>Email: gcruciani@mckoolsmith.com | Professional Services | Contingent<br>Unliquidated<br>Disputed | | | $2,163,976.00 |
| 5. | Meta-e Discovery LLC<br>Paul McVoy<br>Six Landmark Square, 4th Floor<br>Stamford, CT 6901 | Paul McVoy<br>Tel: 203.544.8323<br>Email: pmcvoy@metaediscovery.com | Professional Services | | | | $1,852,348.54 |
| 6. | Foley Gardere<br>Holly O'Neil, Esq.<br>Foley & Lardner LLP<br>2021 McKinney Avenue<br>Suite 1600<br>Dallas, TX 75201 | Holly O'Neil<br>Tel: 214.999.4961<br>Email: honeil@foley.com | Professional Services | | | | $1,398,432.44 |
| 7. | DLA Piper LLP (US)<br>Marc D. Katz, Esq.<br>1900 N Pearl St, Suite 2200<br>Dallas, TX 75201 | Marc D. Katz<br>Tel: 214.743.4534<br>Email: marc.katz@dlapiper.com | Professional Services | | | | $994,239.53 |
| 8. | Reid Collins & Tsai LLP<br>William T. Reid, Esq.<br>810 Seventh Avenue, Ste 410<br>New York, NY 10019 | William T. Reid<br>Tel: 512.647.6105<br>Email: wreid@rctlegal.com | Professional Services | | | | $625,845.28 |
| 9. | Joshua & Jennifer Terry<br>c/o Brian P. Shaw, Esq.<br>Rogge Dunn Group, PC<br>500 N. Akard Street, Suite 1900<br>Dallas, TX 75201 | Brian Shaw<br>Tel: 214. 239.2707<br>email: shaw@roggedunngroup.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | $425,000.00 |
| 10. | NWCC, LLC<br>c/o of Michael A. Battle, Esq.<br>Barnes & Thornburg, LLP<br>1717 Pennsylvania Ave N.W. Ste 500<br>Washington, DC 20006-4623 | Michael A. Battle<br>Tel: 202.371.6350<br>Email: mbattle@btlaw.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | $375,000.00 |
| 11. | Duff & Phelps, LLC<br>c/o David Landman<br>Benesch, Friedlander, Coplan & Aronoff LLP<br>200 Public Square, Suite 2300<br>Cleveland, OH 44114-2378 | David Landman<br>Tel: 216.363.4593<br>Email: dlandman@beneschlaw.com | Professional Services | | | | $350,000.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 12. American Arbitration Association<br>120 Broadway, 21st Floor,<br>New York, NY 10271 | Elizabeth Robertson, Director<br>Tel: 212.484.3299<br>Email: robertsone@adr.org | Professional Services | | | | $292,125.00 |
| 13. Lackey Hershman LLP<br>Paul Lackey, Esq.<br>Stinson LLP<br>3102 Oak Lawn Avenue, Ste 777<br>Dallas, TX 75219 | Paul Lackey<br>Tel: 214.560.2206<br>Email: paul.lackey@stinson.com | Professional Services | | | | $246,802.54 |
| 14. Bates White, LLC<br>Karen Goldberg, Esq.<br>2001 K Street NW, North Bldg Suite 500<br>Washington, DC 20006 | Karen Goldberg<br>Tel: 202.747.2093<br>Email: karen.goldberg@bateswhite.com | Professional Services | | | | $235,422.04 |
| 15. Debevoise & Plimpton LLP<br>c/o Accounting Dept 28th Floor<br>919 Third Avenue<br>New York, NY 10022 | Michael Harrell<br>Tel: 212-909-6349<br>Email: mpharrell@debevoise.com | Professional Services | | | | $179,966.98 |
| 16. Andrews Kurth LLP<br>Scott A. Brister, Esq.<br>111 Congress Avenue, Ste 1700<br>Austin, TX 78701 | Scott A. Brister<br>Tel: 512.320.9220<br>Email: ScottBrister@andrewskurth.com | Professional Services | | | | $137,637.81 |
| 17. Connolly Gallagher LLP<br>1201 N. Market Street<br>20th Floor<br>Wilmington, DE 19801 | Ryan P. Newell<br>Tel: 302.888.6434<br>Email: rnewell@connollygallagher.com | Professional Services | | | | $118,831.25 |
| 18. Boies, Schiller & Flexner LLP<br>5301 Wisconsin Ave NW<br>Washington, DC 20015-2015 | Scott E. Gant<br>Tel: 202.237.2727<br>Email: sgant@bsfllp.com | Professional Services | | | | $115,714.80 |
| 19. UBS AG, London Branch and UBS Securities LLC<br>c/o Andrew Clubock, Esq.<br>Latham & Watkins LLP<br>555 Eleventh Street NW<br>Suite 1000<br>Washington, DC 20004-130 | Andrew Clubock<br>Tel: 202.637.3323<br>email: Andrew.Clubok@lw.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | Unliquidated |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 20. | Acis Capital Management, L.P. and Acis Capital Management GP, LLC<br>c/o Brian P. Shaw, Esq.<br>Rogge Dunn Group, PC<br>500 N. Akard Street, Suite 1900<br>Dallas, TX 75201 | Brian Shaw<br>Tel: 214. 239.2707<br>email:<br>shaw@roggedunngroup.com | Litigation | Contingent<br>Unliquidated<br>Disputed | | | Unliquidated |

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-_____ (___) |
| Debtor. | ) | |

**CORPORATE OWNERSHIP STATEMENT (RULE 7007.1)**

Pursuant to Federal Rule of Bankruptcy Procedure 7007.1 and to enable the Judges to evaluate possible disqualification or recusal, the Debtor, certifies that the following is a corporation other than the Debtor, or a governmental unit, that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or states that there are no entities to report under FRBP 7007.1.

☑ None [*check if applicable*]

Name:
Address:

DOCS_SF:101987.5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-_____ (___) |
| | ) | |
| Debtor. | ) | |

**LIST OF EQUITY SECURITY HOLDERS**

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case:

Name: Strand Advisors, Inc.
Address: 300 Crescent Court
Suite 700
Dallas, TX 75201

Name: The Dugaboy Investment Trust
Address: 300 Crescent Court
Suite 700
Dallas, TX 75201

Name: Mark K. Okada
Address: 300 Crescent Court
Suite 700
Dallas, TX 75201

Name: The Mark and Pamela Okada Family Trust – Exempt Trust #1
Address: 300 Crescent Court
Suite 700
Dallas, TX 75201

Name: The Mark and Pamela Okada Family Trust – Exempt Trust #2
Address: 300 Crescent Court
Suite 700
Dallas, TX 75201

Name: Hunter Mountain Investment Trust
Address: c/o Rand Advisors LLC
John Honis
87 Railroad Place Ste 403
Saratoga Springs, NY 12866

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-_____ (___) |
| Debtor. | ) | |

**CERTIFICATION OF CREDITOR MATRIX**

Pursuant to Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware, the above captioned debtor (the "Debtor") hereby certifies that the *Creditor Matrix* submitted herewith contains the names and addresses of the Debtor's creditors. To the best of the Debtor's knowledge, the *Creditor Matrix* is complete, correct, and consistent with the Debtor's books and records.

The information contained herein is based upon a review of the Debtor's books and records as of the petition date. However, no comprehensive legal and/or factual investigations with regard to possible defenses to any claims set forth in the *Creditor Matrix* have been completed. Therefore, the listing does not, and should not, be deemed to constitute: (1) a waiver of any defense to any listed claims; (2) an acknowledgement of the allowability of any listed claims; and/or (3) a waiver of any other right or legal position of the Debtor.

**Fill in this information to identify the case:**

Debtor name Highland Capital Management, L.P.

United States Bankruptcy Court for the: DISTRICT OF DELAWARE

Case number (if known) __________

☐ Check if this is an amended filing

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors

12/15

**An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.**

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

**Declaration and signature**

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

- ☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
- ☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
- ☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
- ☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
- ☐ *Schedule H: Codebtors* (Official Form 206H)
- ☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
- ☐ Amended *Schedule* __________
- ■ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
- ■ Other document that requires a declaration **Corporate Ownership Statement, List of Equity Holders, Creditor Matrix Certification**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 10/16/2019 X [signature]
Signature of individual signing on behalf of debtor

Frank Waterhouse
Printed name

Treasurer of Strand Advisors, Inc., General Partner
Position or relationship to debtor



Software Copyright (c) 1996-2019 Best Case, LLC - www.bestcase.com Best Case Bankruptcy

# Exhibit 44

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

**MOTION OF THE DEBTOR FOR APPROVAL OF SETTLEMENT WITH THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

The above-captioned debtor and debtor in possession (the "Debtor") files this motion (the "Motion") for the entry of an order (the "Order") approving the terms of a settlement

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

between the Debtor and the Committee (as defined below) regarding governance of the Debtor and procedures for operations in the ordinary course of business, as embodied in the term sheet attached hereto as **Exhibit A** (the "Term Sheet"). In support of this Motion, the Debtor respectfully represents as follows:

## Preliminary Statement

1. Following weeks of negotiations, the Debtor and the Committee have reached a proposed settlement, which contemplates the creation of a new independent board of directors (the "Independent Directors") at Strand Advisors, Inc. ("Strand"), the Debtor's general partner and ultimate party in control, and the implementation of certain protocols governing the operation of the Debtor's business in the ordinary course. The Independent Directors will consist of the following three highly qualified and independent individuals: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee.[2] Two of the Independent Directors were chosen by the Committee and the third Independent Director will be selected by or otherwise acceptable to the Committee. Background information for each of the Independent Directors is attached hereto as **Exhibit B**.

2. Pursuant to the Term Sheet, and effective upon entry of the Order, James Dondero will no longer be a director, officer, managing member, or employee of the Debtor or Strand and will have no authority, directly or indirectly, to act on the Debtor's behalf. Going forward, the Independent Directors, through Strand, will have sole and exclusive management and control of the Debtor. The Independent Directors will have the discretion to appoint an interim

[2] The Committee's agreement to the Term Sheet in its entirety is contingent upon the selection of a third Independent Director acceptable to the Committee. In the event the Committee and the Debtor cannot reach an agreement on an acceptable Independent Director to fill the third seat of the Board of Directors, the Term Sheet shall be null and void.

Chief Executive Officer (the "CEO") who will manage the Debtor's day-to-day business operations. Subject to Court approval, the Debtor still intends to retain Development Specialists, Inc. ("DSI") to provide a Chief Restructuring Officer (the "CRO") that will serve at the direction of the Independent Directors (or CEO, if appointed).

3. It bears emphasis that the Independent Directors will not be mere figureheads. The Debtor and the Committee envision that the Independent Directors will be actively involved and intimately familiar with all material aspects of the Debtor's business and restructuring efforts. Moreover, with guidance of the CRO and CEO (if appointed), the Independent Directors will endeavor to prevent any negative influence Mr. Dondero or any of his affiliates or agents may have on the Debtor and its employees. Further, as part of the Term Sheet, the Committee will be granted standing to pursue estate claims against Mr. Dondero and other former insiders of the Debtor who were not employed by the Debtor as of the execution of the Term Sheet. The Committee will also retain the right to move for a chapter 11 trustee.

4. In sum, the Term Sheet resolves months of litigation between the Debtor and the Committee over the Debtor's governance structure and operating protocols, allowing all parties to refocus on a path forward for this chapter 11 case. With the Independent Directors in place, the Debtor can move forward expeditiously, efficiently, and effectively with the substantive aspects of this case and consider any available restructuring options that will maximize value for all constituents. The Debtor therefore urges the Court to approve the Term Sheet and allow the key economic interest holders to proceed with a productive restructuring effort.

**Jurisdiction and Venue**

5. The United States Bankruptcy Court for the District of Northern District of Texas, Dallas Division (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory bases for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

8. On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

9. To assist and coordinate the restructuring process, the Debtor retained DSI and Bradley D. Sharp to serve as the CRO on October 7, 2019. On October 29, 2019, the Debtor filed the *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring Related Services, Nunc Pro Tunc as of the Petition Date* [Docket No. 74] (the "CRO Motion") seeking to formally retain the CRO. The CRO Motion remains pending, and the Debtor is filing a supplement to the CRO Motion concurrently herewith.

10. On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court. On November 12, 2019, the Committee filed an omnibus objection to the CRO Motion, cash management motion, and

motion for approval of ordinary course protocols [Docket No. 130] (the "Committee Objection"), raising various concerns regarding the Debtor's governance and business practices.

11. On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's bankruptcy case to this Court [Docket No. 186].[3] The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

12. On December 23, 2019, the U.S. Trustee filed a motion in this Court to appoint a chapter 11 trustee for the Debtor [Docket No. 271] (the "Trustee Motion"). Although the Debtor will be filing a separate response to the Trustee Motion, it suffices to say that the Trustee Motion (filed without even considering the proposed Term Sheet) completely lacks merit given the governance changes and other resolutions encompassed in the Term Sheet agreed to by the Committee, as the representative of the primary economic stakeholders here.

**Terms of the Proposed Settlement**

13. Pursuant to the Term Sheet, the Debtor and the Committee have agreed to: (a) implement certain changes to the Debtor's governance, including the appointment of the Independent Directors; (b) provide the Committee with additional transparency into the operation of the Debtor's business; (c) retain the CRO on updated terms; and (d) implement certain protocols governing the ordinary course business operations of the Debtor. The terms of this agreement are contained in the Term Sheet.[4] A summary of the Term Sheet is as follows:

---

[3] All docket numbers refer to the docket maintained by this Court.

[4] In the event of any inconsistency between the summary of the Term Sheet contained herein and the Term Sheet, the Term Sheet will govern.

| | |
|---|---|
| **Independent Directors** | The Debtor's general partner, Strand will appoint the following three (3) Independent Directors: James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee. The Independent Directors will be granted exclusive control over the Debtor and its operations. Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees. The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached to the Term Sheet (the "Governing Documents"), which documents shall be satisfactory to the Committee. Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).<br><br>The Independent Directors shall be compensated in a manner to be determined, with an understanding that the source of funding, whether directly or via reimbursement, will be the Debtor.<br><br>As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether a CEO should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court.<br><br>The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also |

| | |
|---|---|
| | participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of the Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as an employee of the Debtor. |
| **CRO** | Bradley Sharp and DSI shall, subject to approval of the Court, be retained as the CRO to the Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. Mr. Sharp's and DSI's retention is subject to this Court's approval. The Debtor has filed the CRO Motion, as supplemented as of the date hereof, which requests authority to retain Mr. Sharp and DSI.[5]<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Mark Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "<u>Estate Claims</u>"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached to the Term Sheet, which requirements cannot be modified without the consent of the Committee or Court order (the "<u>Document Production Protocol</u>").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are |

[5] For the avoidance of doubt, the Debtor is not seeking retention of the CRO pursuant to this Motion. The Debtor is seeking such relief pursuant to the CRO Motion (as supplemented).

| | |
|---|---|
| | within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached to the Term Sheet, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "Reporting Requirements"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols attached to the Term Sheet, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order (the "Operating Protocols" and, together with the Reporting Requirements, the "Protocols"). |

14. By this Motion, the Debtor is seeking the Court's approval of the Term Sheet, the terms contained therein, and the exhibits attached thereto. For the avoidance of doubt, approval of the Term Sheet includes the approval of the following:

- Independent Directors: The appointment of James Seery, John Dubel, and a third director to be selected by or otherwise acceptable to the Committee as the Independent Directors of Strand, the Debtor's general partner, with power to oversee the operations of the Debtor as set forth in the Term Sheet. Mr. Seery and Mr. Dubel were selected by the Committee, and the Debtor agreed to their appointment as Independent Directors. The Debtor is also seeking approval of the Governing Documents appointing the Independent Directors, to the extent required, and the authority to compensate the Independent Directors either directly from the assets of the Debtor or via the reimbursement of Strand of any compensation paid to the Independent Directors.

- Document Management and Preservation: The implementation of the Document Production Protocol, which will govern how the Debtor retains and produces documents and information to the Committee during the pendency of its bankruptcy case. The Debtor is also agreeing to the allow the Committee to access certain documents that are otherwise subject to the Shared Privilege to assist the Debtor in investigating the Estate Claims.

- Estate Claims. The Debtor has agreed to grant the Committee standing to pursue any Estate Claims. Estate Claims do not include claims or causes of action against any current employees of the Debtor; however, if any employee ceases to be employed by the Debtor, the Committee will have standing to pursue claims against such former employee.

- Reporting Requirements and Operating Protocols: The Debtor has agreed to provide certain reporting to the Committee and to operate under certain protocols, which set forth the parameters of how the Debtor can conduct its business without the requirement of Court approval. The Protocols provide, in certain circumstances, how the CRO and the Independent Directors will oversee the Debtor's operations. The purpose of the Protocols is to allow the Debtor to function in the ordinary course of its business while providing transparency to the Committee.

15. The Debtor believes that appointing the Independent Directors and otherwise effectuating the terms of the Term Sheet is in the best interests of the Debtor, its estate, and its creditors. The Term Sheet will allow the Debtor to proceed with a productive reorganization effort that will maximize value for all constituents. Accordingly, the Debtor seeks approval of the Term Sheet.

## **Relief Requested**

16. By this Motion, the Debtor seeks entry of an order pursuant to sections 105(a), 363(b)(1), and 363(c)(1) of the Bankruptcy Code and Bankruptcy Rule 9019: (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b)

authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; (c) granting the Committee standing to pursue the Estate Claims; and (d) granting related relief.

**<u>Authority for the Relief Requested</u>**

**A. Section 363(c)(1) of the Bankruptcy Code Authorizes the Debtor to Enter <u>Into Certain Aspects of the Term Sheet in the Ordinary Course</u>**

17. Because the Debtor is not settling any claims or causes of action through the Term Sheet or otherwise expending estate resources, the Debtor believes that it has the authority to effectuate the majority of the transactions and compromises set forth in the Term Sheet without Court approval under section 363(c)(1) of the Bankruptcy Code. Specifically, section 363(c)(1) provides:

> [i]f the business of the debtor is authorized to be operated under section. . . 1108. . . of this title. . . the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). As such, a debtor may engage in postpetition actions if the debtor is authorized to operate its business under section 1108 and such transactions are "in the ordinary course of business."

18. An activity is "ordinary course" if it satisfies both the "horizontal test" and the "vertical test." *See, e.g., Denton Cty. Elec. Coop. v. Eldorado Ranch, Ltd.* (*In re Denton Cty. Elec. Coop.*), 281 B.R. 876, 882 n.12 (Bankr. N.D. Tex. 2002); *see also In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992). The vertical test looks to "whether the transaction subjects a

hypothetical creditor to a different economic risk than existed when the creditor originally extended credit." *In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013). The horizontal test considers "whether the transaction was of the sort commonly undertaken by companies in the industry." *Id.* Here, both the vertical test and horizontal test are satisfied.

19. Under the Term Sheet, the Debtor is seeking authority to (a) appoint the Independent Directors at Strand (a non-debtor entity), (b) have Mr. Dondero removed from his role at the Debtor and Strand; (c) agree to seek the retention of the CRO under a revised engagement letter that provides that the CRO will report to the Independent Directors; (d) grant the Committee standing to pursue the Estate Claims; (e) enter into and implement the Document Production Protocols; (f) grant the Independent Directors the exclusive right to determine whether to waive exclusivity; and (g) enter into and implement the Protocols. Only the compensation of the Independent Directors, the entrance into the Protocols (which provide the Committee with certain right to object to the Debtor engaging in a "Transaction" (as defined in the Protocols) and allow the Debtor to seek a hearing before this Court on an expedited basis), and the grant of standing to the Committee to pursue Estate Claims could be construed as outside of the ordinary course of business. The balance of the terms of the Term Sheet either involve non-debtors[6] or will be the subject of separate motions seeking Court approval at the appropriate time.

**B. The Court Should Approve the Term Sheet Under <u>Rule 9019 of the Bankruptcy Code</u>**

20. Although the Debtor believes that it has authority to implement the majority of the Term Sheet in the ordinary course of its business under section 363(c), the Debtor is seeking

[6] With respect to the Independent Directors, they are being appointed to a new independent board of Strand, the Debtor's general partner, and Strand is not a debtor in this case or subject to this Court's jurisdiction.

this Court's approval of the Term Sheet under section 105 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules out of an abundance of caution. Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc); *see also Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1116 (5th Cir. 1995) (stating that section 105(a) of the Bankruptcy Code "authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code").

21. Bankruptcy Rule 9019 governs the procedural prerequisites to approval of a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

22. Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *see also Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980). Pursuant to Bankruptcy Rule 9019(a), a bankruptcy court may, after appropriate notice and a hearing, approve

a compromise or settlement so long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). Ultimately, "approval of a compromise is within the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

23. In making this determination, the United States Court of Appeals for the Fifth Circuit applies a three-party test, "with a focus on comparing 'the terms of the compromise with the rewards of litigation.'" *Official Committee of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F. 3d 349, 356 (5th Cir. 1997) (citing *Jackson Brewing*, 624 F.2d at 602). The Fifth Circuit has instructed courts to consider the following factors: "(1) The probability of success in the litigation, with due consideration for the uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.*

24. Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.; Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; Foster Mortg. Corp., 68 F.3d at 918 (citations omitted).

25. Here, the Debtor submits that effectuating the transactions set forth in the Term Sheet satisfies the Fifth Circuit's three-part test. The settlement embodied in the Term Sheet was driven in large part by the Debtor's creditors and has the support of the Committee, which consists of the Debtor's principal creditors. The Term Sheet was negotiated at arm's length, and there was no fraud or collusion in its negotiation. The settlement is also fair and reasonable and in the best interests of the Debtor's estate and also resolves the open disputes regarding the CRO Motion, the *Motion of Debtor for Interim and Final Orders Authorizing (A) Continuance of Existing Cash Management System, (B) Continued Use of the Prime Account, (C) Limited Waiver*, as supplemented [Docket Nos. 51 & 259], and *Precautionary Motion of the Debtor for Order Approving Protocols for the Debtor to Implement Certain Transactions in the Ordinary Course of Business* [Docket No. 76].

26. The Debtor and members of the Committee have been entangled in highly contentious litigation that has spanned many years and multiple venues. As evidenced by the brief history of the Debtor's bankruptcy case,[7] that contention and mistrust has carried over into this proceeding and could derail any chance that the Debtor has to successfully reorganize and structure a plan to pay its creditors. The governance and operational changes set forth in the Term Sheet, will provide greater transparency to the Committee and start the process of rebuilding the trust necessary to negotiate a successful resolution of this case. Without the Term Sheet, the Debtor

[7] *See, e.g., Declaration of Frank Waterhouse in Support of First Day Motions* [Docket No. 11], *Motion of the Official Committee of Unsecured Creditors for an Order Transferring Venue of this Case to the United States Bankruptcy Court for the Northern District of Texas* [Docket No. 85], *Omnibus Objection of the Official Committee of Unsecured Creditors to the Debtor's (I) Motion for Final Order Authorizing Continuance of the Existing Cash Management System, (II) Motion to Employ and Retain Development Specialists, Inc. to Provide a Chief Restructuring Officers, and (III) Precautionary Motion for Approval of Protocol for "Ordinary Course" Transactions* [Docket No. 130], and *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Docket No. 271].

anticipates that the Committee would move to appoint a chapter 11 trustee and the U.S. Trustee has already done so (without even seeing the Term Sheet). The Debtor will contest such motions because the appointment of a chapter 11 trustee could gravely harm the Debtor's business. The implementation of the Term Sheet will head off any potential issues that could arise, eliminate costly, time consuming and uncertain litigation, and give the Debtor sufficient breathing room to work towards rebuilding trust with its creditor body and allow the Debtor to exit bankruptcy and preserve the value of its business. The Debtor's bankruptcy case has been pending for over two and a half months, and it is time for the parties to put the acrimony that marked the initial stages of this case behind them and to move forward in a productive manner – precisely what the Term Sheet seeks to accomplish.

## C. Consummating the Settlement Agreement is a Sound Exercise of the Debtors' Business Judgment.

27. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor in possession to "use, sell, or lease, other than in the ordinary course of business, property of the estate," after notice and a hearing. It is well established in this jurisdiction that a debtor may use property of the estate outside the ordinary course of business under this provision if there is a good business reason for doing so. *See, e.g., ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors, and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.") (*quoting In re Cont'l Air Lines, Inc.*, 780 F.3d 1223, 1226 (5th Cir. 1986)); 441 B.R. 813, 830 (Bankr. S.D. Tex.

2010); *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd. (In re State Park Bldg. Grp., Ltd.)*, 331 B.R. 251, 254 (Bankr. N.D. Tex. 2005).

28. The transactions contemplated by the Term Sheet are within the sound business judgment of the Debtor. The Term Sheet resolves potentially costly and protracted litigation with the Committee over the Debtor's corporate governance and will give the Debtor the breathing room necessary to negotiate and effectuate the terms of a plan acceptable to the Debtor's creditors. Further, providing standing to the Committee to investigate Estate Claims and the payment of the Independent Directors from the assets of the estate are each necessary components of the Term Sheet. The Committee would not have agreed to the Term Sheet without the grant of standing to investigate Estate Claims. Moreover, Strand, a non-debtor, is unable to cover the costs of the Independent Directors. As such, there is a good business reason for the Debtor's payment of the Independent Directors' compensation: the Term Sheet and the appointment of the Independent Directors would not have been agreed to or possible without that condition.[8] The foregoing is sufficient grounds to approve the Term Sheet and authorize the Debtor to effectuate the terms of the Term Sheet under Section 363(b)(1).

## **No Prior Request**

29. No previous request for the relief sought herein has been made to this, or any other, Court.

[8] Further, although the Debtor seeks to reimburse Strand for the cost of the Independent Directors, the Debtor is otherwise obligated to reimburse Strand for any costs or expenses incurred by Strand in its management of the Debtor. *See* Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., § 3.10(b).

**Notice**

30. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee; (b) the Office of the United States Attorney for the Northern District of Texas; (c) the Debtor's principal secured parties; (d) counsel to the Committee; and (e) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter an Order, substantially in the form attached hereto as **Exhibit C**, (a) approving the Debtor's settlement with the Committee as set forth in the Term Sheet and outlined herein; (b) authorizing the Debtor to take any action as may be reasonably required to effectuate the terms of the Term Sheet, including entering into the Governing Documents and compensating – either directly or through reimbursement – the Independent Directors; and (c) granting related relief.

Dated: December 27, 2019

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Maxim B. Litvak (Texas Bar No. 24002482)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: jpomerantz@pszjlaw.com
ikharasch@pcszjlaw.com
mlitvak@pszjlaw.com
gdemo@pszjlaw.com

-and-

*/s/ Melissa S. Hayward*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachary Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel and Proposed Counsel for the Debtor and Debtor in Possession*

# Exhibit 45

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**MOTION TO COMPEL COMPLIANCE WITH BANKRUPTCY RULE 2015.3**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, RM. 1254, DALLAS, TEXAS 75242-1496 BEFORE CLOSE OF BUSINESS ON MAY 20, 2021, WHICH IS AT LEAST 21 DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE SHALL BE IN WRITING AND FILED WITH THE CLERK, AND A COPY SHALL BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN. IF A RESPONSE IS FILED A HEARING MAY BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

Now into Court, through undersigned counsel, come The Dugaboy Investment Trust and Get Good Trust ("Movers"), who file this motion to compel Highland Capital Management, L.P. ("Debtor") to comply with Bankruptcy Rule 2015.3 ("Motion"). In support of the Motion, Movers aver as follows:

**CASE BACKGROUND**

1. The Debtor filed for relief under Chapter 11 of the United States Bankruptcy Code on October 16, 2019 in the United States Bankruptcy Court for the District of Delaware.
2. The case was subsequently transferred to this Court on the 4th day of December, 2019 [Dkt. #1].
3. On November 24, 2020, the Debtor filed its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* ("Fifth Amended Plan of Reorganization") [Dkt. #1472].
4. The Fifth Amended Plan of Reorganization was confirmed by this Court's *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Order") on the 22nd day of February, 2021 [Dkt. #1943].
5. The Court's Order confirming the Debtor's Fifth Amended Plan of Reorganization has been appealed by Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1957].
6. In connection with the appeal, Motions for Stay Pending Appeal have been filed by (i) Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. [Dkt. #1955] (the "Advisors"); (ii) Highland Income Fund, NexPoint Strategic Opportunities Fund, Highland Global Allocation Fund, and NexPoint Capital, Inc. [Dkt. #1967] (the

"Funds"); (iii) The Dugaboy Investment Trust and Get Good Trust [Dkt. 1971] (the "Movers"); and (iv) James Dondero [Dkt. 1973] ("Dondero").

7. This Court entered an *Order on Motions for Stay Pending Appeal* on March 23, 2021, denying the requests for a stay pending appeal ("Order Denying Requests") [Dkt. #2084].

8. Advisors, Funds, Movers and Dondero have appealed this Court's Order Denying Requests for a stay pending appeal.

9. The appeal of this Court's Order Denying Requests for stay pending appeal is presently before Judge Godbey, United States District Judge for the Northern District of Texas.

10. The Debtor has not filed any reports required by Bankruptcy Rule 2015.3 over the approximately thirty (30) months in which this case has been pending.

11. The Effective Date for the Fifth Amended Plan confirmed by this Court has yet to occur.

**OVERVIEW OF BANKRUPTCY RULE 2015.3**

Rule 2015.3 requires "periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or debtor . . . in which the estate holds a substantial or controlling interest." Fed. R. Bankr. P. 2015.3(a). The purpose of Rule 2015.3 is "to assist parties in interest taking steps to ensure that the debtor's interest in any entity . . . is used for payment of allowed claims against the debtor." Pub. L. No. 109-8 § 419(b) (2005).

The term "substantial or controlling interest" is not defined, nor does it appear elsewhere in the Bankruptcy Code or Bankruptcy Rules. 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020). In the absence of other guidance, Collier suggests that a court may turn to the definition of an "affiliate"[1] or "insider"[2] in the Bankruptcy Code, or even state law on the definition of a

[1] Bankruptcy Code § 102(2) defines an affiliate:
(2) The term "affiliate" means—
(A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

controlling or substantial interest. See 9 Collier on Bankruptcy § 2015.3.07 (16th ed. 2020) ("case law regarding the definition of 'insider' or 'affiliate' may be helpful. Additionally, there is a substantial body of corporate case law regarding controlling interests that could be consulted.")

Under Rule 2015.3, there is a rebuttable presumption that the estate has a "substantial or controlling interest" of an entity in which it "controls or owns at least a 20 percent interest." Fed. R. Bankr. P. 2015.3(c).

The Court may, after notice and a hearing, vary the reporting requirement established by subdivision (a) of this rule for cause, including that the trustee or debtor in possession is not able, after a good faith effort, to comply with those reporting requirements, or that the information

---

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

[2] The Bankruptcy Code included a non-exclusive list of insiders:

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor;

(C) if the debtor is a partnership—

(i) general partner in the debtor;

(ii) relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv) general partner of the debtor; or

(v) person in control of the debtor[.]

required by subdivision (a) is publicly available. The examples given for waiving cause are not exclusive. 9 Collier on Bankruptcy §2015.3.08 (16th ed. 2020).

When questioned at the confirmation hearing in connection with Bankruptcy Rule 2015.3, James Seery, on behalf of the Debtor, testified as to the following:

a) He was familiar with BR 2015.3 [Dkt. #1905, pg. 48, lines 12-15];

b) No report in compliance with BR 2015.3 has been filed by the Debtor [Dkt. #1905, pg. 48, lines 15-17]; and

c) "There was no reason for it (failure to file the 2015.3) other than we did not get it done initially and it fell through the cracks" [Dkt. #1905, pg. 49, lines 18-21].

**EXISTING CASE LAW ON BANKRUPTCY RULE 2015.3**

Little case law exists on the requirements of Bankruptcy Rule 2015.3. In general, cases where parties have sought and received a waiver fall into two categories: (1) cases where the subsidiary is in the process of being sold; and (2) prepacked bankruptcies if the plan is not confirmed by a certain date. See e.g., *In re RCS Capital Corp*., Case No. 16-102233 (Bankr. D. Del. Mar. 4, 2016) [Dkt. 714 ¶17] ("The Purchase Agreement has already been approved by the Court . . . . Therefore, within a relatively short period of time . . . , the Debtor will no longer have a substantial or controlling interest in [the subsidiary"); *In re HCR Manorcare*, Case No. 18-10467 (Bankr. D. Del. Oct. 3, 2018) [Dkt. 8 ¶ 47] (Seeking waiver of reporting requirements if a pre-packed bankruptcy plan is not confirmed within a set period of time).

The case law as it exists does not support a waiver of Bankruptcy Rule 2015.3 and especially for the "it slipped through the cracks excuse." It has been three (3) months since the issue of Debtor's failure to comply with Bankruptcy Rule 2015.3 was raised to the Debtor and

Debtor has not sought to remedy the failure and file the requisite 2015.3 reports for the applicable periods or seek leave of Court. The Debtor must believe the issue will simply go away and not be brought to the attention of the Court and, therefore, the Debtor will not have to disclose the financial condition of the assets in which it possesses a controlling or substantial interest. The Debtor's typical excuse in this case is the creditors committee has seen the information, however, Bankruptcy Rule 2015.3 requires a public filing and not a disclosure limited to a select few.

The Seery attempted excuse that "we were told we didn't have separate consolidating statements for every entity and it would be difficult" [Seery testimony Dkt. #1905, page 49, lines 14-20] is not credible in light of the fact that the majority of entities in which Debtor has a controlling or substantial interest are investment funds. Most of the entities listed below in which the Debtor has a substantial or controlling interest are either regulated or have third party investors and, as such, separate accounting and statements on an entity by entity basis are required. In addition, the fact that the Debtor lacked a "consolidated statement" on one entity is not a legitimate excuse for not filing a 2015.3 report for the other entities in which the Debtor has a controlling or substantial interest.

**ENTITIES IN WHICH THE DEBTOR OWNS OR MAY OWN A CONTROLLING INTEREST**

There is no complete listing in any one place that identifies the entities in which the Debtor possesses a substantial or controlling interest. To assemble the list, Mover has had to parse through various documents and filings. The entities include, but are not limited, to the following:

a) Highland Select Equity Fund [See ftn. 8, Debtor's Motion for Exit Loan Dkt. #2229]. The Exit Loan Motion identifies Highland Select Entity Fund, L.P., Highland

Restoration Capital Partners, L.P. Highland CLO Funding, Ltd., Highland Multi Strategy Credit Fund L.P., Highland Capital Management Korea Limited, Cornerstone Healthcare and Trussway Industries and Trussway Holdings, LLC.[3]

b) The Exit Financing Motion [Dkt. #2229, pg. 7, ftn. 9] indicates that the Debtor owns additional assets that, by the literal reading of ftn. 9, are not listed in the section of the motion that identifies the collateral for the loan. These entities should be specifically identified and reports should be filed for these entities that are not listed in the collateral section of the motion.

c) In the Deposition of James Seery taken on January 29, 2021, in addition to the entities listed above, James Seery generically identifies CCS Medical Inc., Targa International, PetroCap and JHT as entities controlled by Debtor or controlled through funds that are controlled by Debtor. It is believed the corporate names are PetroCap LLC, PetroCap Partners II LP, PetroCap Incentive Partners II LP , Targa Resources Partners LP, Targa S.A and JHT Holding Inc.

d) SSP Holdings Inc. and Omni Max, which were sold by the Debtor without Court approval based upon the Debtor's belief that Court approval was not required, should also have been the subject of a 2015.3 report for the period between the filing and the date of the sale.

## CONCLUSION

Throughout this case the Debtor has taken the position that it does not have to seek court approval for sales of assets or report to anyone relative to assets owned by entities in which it has

[3] a) On information and belief, the Debtor asserted ownership of one hundred percent (100%) of Highland Select Entity Fund LP is incorrect and Mark Okata and PCMG Trading partners XXIII L.P. own an interest.

either control or a substantial interest. See Dondero *Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Dkt. #1439] and the Debtor's Objection thereto [Dkt. #1546]. In its Objection, the Debtor states in PP 9 that the sales at issue (Highland Multi Strategy Credit Fund L.P, Highland Restoration Capital Partners L.P and SSI Holdings Inc.) were not subject to Court approval and 11 USC §363. It appears, however, that this restricted view of Bankruptcy Court jurisdiction no longer suits the Debtor's new narrative and now it is seeking court authority to secure an exit loan and to use the assets of a controlled non-debtor entity (See Debtor's Motion for an Exit Loan, Dkt. # 2229) in order that the Debtor can pay its professionals and, in a second Motion, settle the UBS claim using the assets of a different non-debtor controlled entity [Dkt. #2199].

Had the Debtor followed Bankruptcy Rule 2015.3, both this Court and the creditors, large and small, of the Estate along with the creditors and minority owners of the controlled entities would have had some insight over the Debtor's actions with respect to these entities over the course of the Chapter 11. Bankruptcy Rule 2015.3 was designed to provide transparency and it should be enforced as a matter of public policy.

April 29, 2021

Respectfully submitted,

/s/Douglas S. Draper.
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

# Exhibit 46

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 6, 2021**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | **Re: Docket Nos. 2256, 2341 2343, 2424, and 2442** |

**ORDER DENYING MOTION TO COMPEL COMPLIANCE WITH BANKRUPTCY RULE 2015.3**

On April 29, 2021, The Dugaboy Investment Trust and Get Good Trust (collectively, the "Movant") filed its *Motion to Compel Compliance with Bankruptcy Rule 2015.3* (the "Motion") [Docket No. 2256]. On May 20, 2021, the above-captioned reorganized debtor (the "Reorganized Debtor") filed its opposition to the Motion (the "Opposition") [Docket No. 2341] and the official committee of unsecured creditors appointed in this chapter 11 case (the "Committee") filed its

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

DOCS_SF:105924.1 36027/003

joinder to the Opposition on May 20, 2021 (the "Joinder") [Docket No. 2343]. Movant filed a reply to the Opposition on June 8, 2021 (the "Reply") [Docket No. 2424]. The Court conducted a hearing on the Motion on June 20, 2021 (the "Hearing") and, following this Hearing, issued its minute order on June 20, 2021 (the "Minute Order") [Docket No. 2442]. The Minute Order provided that (i) the Motion would be continued to another hearing in early September; (ii) if the effective date of the Debtor's Plan[2] (the "Effective Date") occurs before such hearing, the matter would be moot; and (iii) if the Effective Date had not occurred by then, the Court would consider the Motion further. The Effective Date of the Plan occurred on August 11, 2021.[3] The Court finds and concludes that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). After due deliberation and based on the Motion, the Opposition, the Joinder, the Reply, the record of the Hearing, and the Minute Order; it is hereby

**ORDERED** that the Motion is **DENIED AS MOOT;** and it is further

**ORDERED** that the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

**### END OF ORDER ###**

---

[2] *See Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1808] and *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943].

[3] *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on August 11, 2021 [Docket No. 2700].

# Exhibit 47

CROWNGLOBAL
INSURANCE

Deferred Variable Annuity Policy

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen, [signature]

12/16/15 Janita Burke, [signature]

**THIS IS A LEGAL CONTRACT.**
**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

*continued on next page*

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

CROWN GLOBAL
INSURANCE

Deferred Variable Annuity Policy

Crown Global Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

**THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.**

**NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.**

CROWNGLOBAL INSURANCE

# Policy Data Page

## General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | | |
|---|---|---|
| Proposed Policyholder: | Proposed Annuitant: | |
| Empower Dallas Foundation, Inc | Grant Scott | |
| Proposed Annuitant's Date of Birth: | Gender: | |
| 29 May, 1962 | Male | |
| Policy Effective Date: 10 Dec, 2015 | Issue Date: 10 Dec, 2015 | |
| Annuity Starting Date: Deferred until Annuitant's 85th birthday at the latest | | |
| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218

**Premium Amounts**

| | |
|---|---|
| Initial Premium: | $ 15,903,108.54 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

CROWN GLOBAL INSURANCE

# Policy Data Page

## Initial Allocation of Payments to Investment Options

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank: n/a

Investment Manager: n/a

CROWNGLOBAL INSURANCE

# Policy Data Page

## Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a $10mm of Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

CROWNGLOBAL INSURANCE

## Table of Contents


General Policy Data .... 3
Initial Allocation of Payments to Investment Options .... 4
Policy Fees and Charges .... 5

**Article I General Provisions .... 15**
Section 1.1 Consideration .... 15
Section 1.2 Entire Policy .... 15
Section 1.3 Survival of Representations, Warrants, Covenants .... 15
Section 1.4 Amendment or Modification .... 15
Section 1.5 Misstatement of Age .... 15
Section 1.6 Non-Participating Policy .... 16
Section 1.7 Ownership of Assets .... 16
Section 1.8 Rule of Construction .... 16
Section 1.9 Governing Law .... 16
Section 1.10 Effective Date of Coverage .... 16

**Article II Premium Provisions .... 17**
Section 2.1 Premiums .... 17
Section 2.2 Insurer's Right to Refuse Premiums .... 17
Section 2.3 Nonpayment of Premium .... 18

**Article III Termination Provisions .... 19**
Section 3.1 Insurer's Cancellation Rights .... 19
Section 3.2 Reinstatement .... 20

**Article IV Premium Investment; Policy Account Values .... 21**
Section 4.1 The Separate Account .... 21
Section 4.2 Premiums .... 21
Section 4.3 Allocations to Investment Options .... 21
Section 4.4 Compliance with Investor Control Rules .... 22
Section 4.5 Changes in Allocations to Investment Options .... 23
Section 4.6 Responsibility for Selecting Investment Options .... 23
Section 4.7 Appointment of Investment Manager and Custodian Bank .... 24
Section 4.8 Timing of Allocations .... 24
Section 4.9 Investment of Separate Account Assets .... 24
Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification .... 26
Section 4.11 Changes in Investment Options .... 26

CROWNGLOBAL INSURANCE


Section 4.12 Policy Account Value ... 27

**Article V Transfers Among Investment Options ... 28**

Section 5.1 General ... 28
Section 5.2 Conditions on Transfer ... 28
Section 5.3 Liability ... 29
Section 5.4 Limits on Right of Transfer ... 29

**Article VI Annuity Provisions ... 30**

Section 6.1 Annuity Payments ... 30
Section 6.2 Annuity Percentage ... 30
Section 6.3 No Guaranteed Payments ... 30
Section 6.4 Annuity Starting Date ... 31
Section 6.5 Change of Annuity Starting Date ... 31
Section 6.6 Annuity Income Options ... 31
Section 6.7 Maturity Payment ... 32

**Article VII Loan Provisions ... 33**

Section 7.1 Policy Loans ... 33

**Article VIII Surrender Provisions ... 34**

Section 8.1 General ... 34
Section 8.2 Full Surrender ... 34
Section 8.3 Partial Surrender ... 34

**Article IX Policy Fees and Charges ... 36**

Section 9.1 Policy Administration Fee ... 36
Section 9.2 DAC Charges ... 36
Section 9.3 Management & Expense Fee ... 36
Section 9.4 Policy Set-Up Deposit ... 36
Section 9.5 Acceptance Fee ... 36
Section 9.6 Surrender Charge ... 37
Section 9.7 Taxes ... 37
Section 9.8 Agreed Upon Procedures Fee ... 37
Section 9.9 Deductions for Fees and Charges ... 37
Section 9.10 Custodian Bank and Investment Manager Fees ... 37

**Article X Death Benefit Provisions ... 39**

Section 10.1 Death Benefit ... 39
Section 10.2 Due Proof of Death ... 40

CROWNGLOBAL INSURANCE

**Article XI Owner, Beneficiary, Assignment .....41**
Section 11.1 Proposed Policyholder ..... 41
Section 11.2 Change of Proposed Policyholder ..... 41
Section 11.3 Proposed Annuitant ..... 41
Section 11.4 Change of Proposed Annuitant ..... 41
Section 11.5 Beneficiary ..... 42
Section 11.6 Change of Beneficiary ..... 42
Section 11.7 Assignment ..... 42

**Article XII Other General Provisions .....44**
Section 12.1 Periodic Reports ..... 44
Section 12.2 Currency and Place of Payment ..... 44
Section 12.3 Notices, Requests and Elections ..... 44
Section 12.4 Policy Settlement ..... 45
Section 12.5 Deferment ..... 45
Section 12.6 Incontestability ..... 45
Section 12.7 Policyholder Information ..... 46
Section 12.8 Tax Matters ..... 46
Section 12.9 Limitation on Liability of Insurer ..... 47

CROWNGLOBAL INSURANCE

## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** – A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,

exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

CROWN GLOBAL INSURANCE

(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.

CROWNGLOBAL INSURANCE

**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.

CROWNGLOBAL INSURANCE

**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.

CROWNGLOBAL INSURANCE

# Article I General Provisions

## Section 1.1 Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

## Section 1.2 Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

## Section 1.3 Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

## Section 1.4 Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

## Section 1.5 Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on

CROWNGLOBAL INSURANCE

whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

**Section 1.6 Non-Participating Policy**

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

**Section 1.7 Ownership of Assets**

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

**Section 1.8 Rule of Construction**

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

**Section 1.9 Governing Law**

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

**Section 1.10 Effective Date of Coverage**

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.

## Article II Premium Provisions

### Section 2.1 Premiums

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder’s financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer’s Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

### Section 2.2 Insurer’s Right to Refuse Premiums

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.

The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3 Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.

CROWNGLOBAL INSURANCE

## Article III Termination Provisions

### Section 3.1 Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4. Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination. The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.

**Section 3.2 Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.

CROWNGLOBAL INSURANCE

## Article IV Premium Investment; Policy Account Values

### Section 4.1 The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2 Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3 Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the

Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories: IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

### Section 4.4 Compliance with Investor Control Rules

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.

CROWNGLOBAL INSURANCE

### Section 4.5 Changes in Allocations to Investment Options

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in “Initial Allocation of Payment to Investment Options” on the Policy Data Page will continue to apply to any additional Premium payments.

### Section 4.6 Responsibility for Selecting Investment Options

The Insurer does not and will not make any recommendation as to the Proposed Policyholder’s selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the

CROWNGLOBAL INSURANCE

performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7 Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager). A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8 Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9 Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1. Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes

of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2. The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3. No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4. The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5. In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

CROWNGLOBAL INSURANCE

**Section 4.10** **Request for Extension of Investment Rights With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11** **Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any

such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12 Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.

# Article V Transfers Among Investment Options

## Section 5.1 General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

## Section 5.2 Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1. Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.
2. Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.
3. Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.
4. Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).
5. The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.
6. No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.
7. In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.

**Section 5.3 Liability**

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

**Section 5.4 Limits on Right of Transfer**

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested. For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.

CROWNGLOBAL INSURANCE

# Article VI Annuity Provisions

## Section 6.1 Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

## Section 6.2 Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

## Section 6.3 No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.

CROWNGLOBAL INSURANCE

**Section 6.4** **Annuity Starting Date**

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

**Section 6.5** **Change of Annuity Starting Date**

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

**Section 6.6** **Annuity Income Options**

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's

actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7 Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

## Article VII Loan Provisions

### Section 7.1 Policy Loans

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.

CROWNGLOBAL INSURANCE

## Article VIII Surrender Provisions

### Section 8.1 General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2 Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3 Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than

CROWNGLOBAL
INSURANCE

$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

CROWNGLOBAL INSURANCE

## Article IX Policy Fees and Charges

### Section 9.1 Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2 DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate. The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3 Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4 Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer. Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee. If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5 Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

CROWNGLOBAL INSURANCE

**Section 9.6** **Surrender Charge**

Surrender charges will not apply to this Policy.

**Section 9.7** **Taxes**

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account. These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

**Section 9.8** **Agreed Upon Procedures Fee**

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

**Section 9.9** **Deductions for Fees and Charges**

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

**Section 9.10** **Custodian Bank and Investment Manager Fees**

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the

CROWNGLOBAL INSURANCE

custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

CROWNGLOBAL INSURANCE

# Article X Death Benefit Provisions

## Section 10.1 Death Benefit

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2 Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1. A certified copy of a death certificate;
2. A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or
3. Any other proof of death satisfactory to the Insurer.

CROWNGLOBAL INSURANCE

## Article XI Owner, Beneficiary, Assignment

### Section 11.1 Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2 Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3 Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4 Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.

**Section 11.5 Beneficiary**

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

**Section 11.6 Change of Beneficiary**

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

**Section 11.7 Assignment**

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

CROWNGLOBAL INSURANCE

The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a “1035” exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier. Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder’s rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder. For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein. The Proposed Policyholder (x) acknowledges that the Insurer’s ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy and (y) agrees that following the Insurer’s 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.

CROWNGLOBAL INSURANCE

## Article XII Other General Provisions

### Section 12.1 Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2 Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3 Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4 Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5 Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible. The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6 Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

CROWNGLOBAL INSURANCE

**Section 12.7 Policyholder Information**

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) “handling of Life insurance with separately managed accounts/portfolios” dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer’s domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an “FBAR”, with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

**Section 12.8 Tax Matters**

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.

CROWNGLOBAL INSURANCE

**Section 12.9** **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

CROWNGLOBAL
INSURANCE

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

# Exhibit 48

# RAND PE FUND I, L.P.

(A DELAWARE “SERIES” LIMITED PARTNERSHIP)

## FINANCIAL STATEMENTS

### INDEPENDENT AUDITOR’S REPORT

FOR THE YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)

# RAND PE FUND I, L.P.

TABLE OF CONTENTS

DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 |
| **Financial Statements** | |
| Statements of Assets, Liabilities and Partners' Capital | 3 |
| Schedule of Investments | 4 |
| Statements of Operations | 5 |
| Statements of Changes in Partners' Capital | 6 |
| Statements of Cash Flows | 7 |
| Notes to Financial Statements | 8 |

Cohen & Co®

Independent Auditor's Report

To the Partners of
Rand PE Fund I, L.P.

***Opinion***

We have audited the accompanying financial statements and financial statements in liquidation of Rand PE Fund I, L.P., which comprise the statement of asset and liabilities, including the schedule of investments, as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the related statements of operations, changes in partners' capital and cash flows for the year and period then ended, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Rand PE Fund I, L.P. as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the results of its operations, changes in its partners' capital and cash flows for the year and period then ended in accordance with accounting principles generally accepted in the United States of America.

***Basis for Opinion***

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Rand PE Fund I, L.P. and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

***Partnership Liquidation***

As discussed in Note 1 to the financial statements, in February 2025, in accordance with the Partnership's operating agreement, the Manager approved a plan for the orderly liquidation of the Partnership and notified the partners of their intentions to liquidate the partnership effective February 24, 2025 (liquidation date). Our opinion is not modified with respect to this matter.

***Responsibilities of Management for the Financial Statements***

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

***Auditor's Responsibilities for the Audit of the Financial Statements***

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Rand PE Fund I, L.P.'s internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

Cohen & Company, Ltd.

Cleveland, Ohio
June 26, 2025

# RAND PE FUND I, L.P.

## STATEMENTS OF ASSETS, LIABILITIES AND PARTNERS' CAPITAL

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Assets** | | |
| Investment, at fair value (cost $15,986,892 and $0, respectively) | $ 1,000,000 | $ - |
| Cash and cash equivalents | 19,891 | 1,019,678 |
| Total assets | $ 1,019,891 | $ 1,019,678 |
| **Liabilities** | | |
| Accrued expenses | $ 43,900 | $ 69,965 |
| Distributions payable | - | 949,713 |
| Total liabilities | 43,900 | 1,019,678 |
| **Partners' capital** | 975,991 | - |
| Total liabilities and partners' capital | $ 1,019,891 | $ 1,019,678 |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## SCHEDULE OF INVESTMENTS

YEAR ENDED DECEMBER 31, 2024

| Ownership Percentage | Description | Fair Value | % of Partners' Capital |
|---|---|---|---|
| | **Investment in LLC interests** | | |
| | United States | | |
| | Financial | | |
| 100% | *Beacon Mountain, LLC (cost $15,986,892)* | $ 1,000,000 | 102.46% |
| | **Total Investment (cost $15,986,892)** | $ 1,000,000 | 102.46% |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF OPERATIONS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | Year ended December 31, 2024 | Period ended February 24, 2025 (liquidation date) |
|---|---|---|
| **Investment income and expenses** | | |
| **Income** | | |
| Investment income | $ - | $ - |
| **Expenses** | | |
| Professional fees | 43,900 | 25,000 |
| Custodian fees | 2,650 | 1,278 |
| Other expense | - | - |
| Total expenses | 46,550 | 26,278 |
| Net investment loss | (46,550) | (26,278) |
| **Realized gain** | | |
| Net realized loss from settlement income | (52,242) | - |
| Net realized loss on investments | - | (14,986,892) |
| Net change in unrealized depreciation on investments | 1,000,000 | 14,986,892 |
| | 947,758 | - |
| **Net increase (decrease) in partners' capital resulting from operations** | $ 901,208 | $ (26,278) |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF CHANGES IN PARTNERS' CAPITAL

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2023** | $ - | $ 74,783 | $ 74,783 |
| **Operating activities** | | | |
| Net investment loss | - | (46,550) | (46,550) |
| Net realized loss from settlement income | - | (52,242) | (52,242) |
| Net change in unrealized depreciation on investments | - | 1,000,000 | 1,000,000 |
| Net increase in partners' capital resulting from operations | - | 901,208 | 901,208 |
| **Partners' capital at December 31, 2024** | **$ -** | **$ 975,991** | **$ 975,991** |

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2024** | $ - | $ 975,991 | $ 975,991 |
| **Operating activities** | | | |
| Net investment loss | - | (26,278) | (26,278) |
| Net realized loss on investments | - | (14,986,892) | (14,986,892) |
| Net change in unrealized depreciation on investments | - | 14,986,892 | 14,986,892 |
| Net decrease in partners' capital resulting from operations | - | (26,278) | (26,278) |
| **Capital activities** | | | |
| Capital distributions* | - | (949,713) | (949,713) |
| Net change in partners' capital resulting from capital activities | - | (949,713) | (949,713) |
| **Partners' capital at February 24, 2025 (liquidation date)** | **$ -** | **$ -** | **$ -** |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF CASH FLOWS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net increase (decrease) in partners' capital resulting from operations | $ 901,208 | $ (26,278) |
| Adjustments to reconcile net increase (decrease) in partners' capital resulting from operations to net cash provided by (used in) operating activities: | | |
| Proceeds from the disposition of investments | - | 1,000,000 |
| Net realized loss on investment transactions | - | (14,986,892) |
| Net change in unrealized depreciation on investments | (1,000,000) | 14,986,892 |
| Net changes in operating assets and liabilities | | |
| Increase in other assets | 62,242 | - |
| Increase in accrued expenses | (5,100) | 26,065 |
| Net cash provided by (used in) operating activities | (41,650) | 999,787 |
| **Cash flows from financing activities** | | |
| Capital distributions, net of payable* | - | - |
| Net cash provided by financing activities | - | - |
| Net increase (decrease) in cash | (41,650) | 999,787 |
| Cash and cash equivalents, beginning of year | 61,541 | 19,891 |
| Cash and cash equivalents, end of year | $ 19,891 | $ 1,019,678 |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.

## 1. Organization

Rand PE Fund I, L.P. (the "Partnership") was organized as a "series" limited partnership under the laws of Delaware Revised Uniform Limited Partnership Act on October 29, 2015, and commenced operations on December 17, 2015. The Partnership offered partner interests in the Partnership ("Interests") in a private placement pursuant to section 4(a)(2) of the Securities Act of 1933, as amended ("Securities Act"), and Regulation D promulgated thereunder.

Rand PE Fund Management, LLC, a Delaware limited liability company (the "General Partner"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs. Rand Advisors, LLC, a Delaware limited liability company (the "Investment Manager"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC"). The Investment Manager has a shared services agreement with Skyview Group ("Skyview") to provide certain limited back office services including, but not limited to, bookkeeping, financial reporting, tax preparation, operations, and IT support. Neither the Investment Manager nor Skyview receives any compensation from the Partnership for these services.

The Partnership was formed to pool investment funds of its investors (each, a "Limited Partner" and, collectively, "Limited Partners"; and, together with the General Partner (as defined above), "Partners") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

The Partnership is governed by the Agreement of Limited Partnership (the "Partnership Agreement") dated October 29, 2015. Interests in the Partnership will be offered in separate series of interests ("Series"). All current Limited Partners have been enrolled in "Series 1 Interests". Each Series will have separate rights and obligations. In addition, each Series may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined in the Partnership Agreement) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.

On June 21, 2022, the Partnership entered into a confidential settlement agreement with certain third-parties who agreed to pay all legal, audit, and custody expenses incurred by Hunter Mountain Investment Trust ("HMIT"), an entity which the Partnership had owned indirectly through its investment in Beacon Mountain, LLC, and the Partnership for the duration of the Highland Capital Management, L.P. ("HCMLP") bankruptcy. As of December 31, 2024 this agreement is not expected to result in any further actual reimbursement to the Partnership and all related income and receivables have been written off.

On August 1, 2022, Rand Advisors, LLC was acquired by Rand Advisors Holding Corp, effecting a change in control of the Investment Manager.

On February 6, 2025, the General Partner redeemed certain limited partners in the Partnership for their Capital Account value of $0. Following the sale of the Partnership's sole investment thereafter, the Partnership caused distributions to be made to such limited partners for their respective share of such sale proceeds pursuant to the "side pocket" status of such investment.

On February 12, 2025, the Partnership's sole investment was sold and thereafter on February 24, 2025, the Investment Manager decided to dissolve the Partnership at which point liquidation became imminent. Under the plan of liquidation, the Partnership plans to settle all outstanding liabilities and pay out distributions to the partners. The adoption of the liquidation basis of accounting did not have a material effect on the carrying value of the Partnership's assets and liabilities and was therefore not adopted.

## 2. Significant Accounting Policies

The following is a summary of the significant accounting policies followed by the Partnership in the preparation of its financial statements.

**Basis of Accounting**
The Partnership's financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and are stated in United States dollars. The Partnership is an investment company in conformity with U.S. GAAP and as such follows the accounting and reporting guidance under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 946, *Financial Services – Investment Companies*.

**Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in partners' capital from operations during the period. The Partnership's significant estimates include the fair value of its investments and derivative contracts. Actual results could differ from those estimates.

**Investment Transactions**
Investment transactions are recorded on a trade-date basis. Realized gains and losses on investment transactions are determined based on specific identification using the first-in, first-out method.

Investments are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Statements of operations.

See Note 6 for the Partnership's fair value hierarchy disclosures.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. banks or brokers and deposits with original maturities of less than 90 days. Cash equivalents are carried at cost, which approximates fair value. At December 31, 2025, the Partnership held cash balances at certain financial institutions within the federally insured limit of $250,000. At February 24, 2025 the Partnership held cash balances at certain financial institutions which exceeded the federally insured limit of $250,000 by approximately $770,000. The Investment Manager regularly monitors the credit quality of these institutions.

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums are accreted or amortized to interest income except for deeply discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis. Amendment fees are recognized when received. Operating expenses are recorded on the accrual basis as incurred.

**Allocation of Gains and Losses**
Net capital change as a result of operations is generally allocated to the capital accounts of each limited partner in proportion to their respective ownership percentages as determined at the beginning of each accounting period adjusted for any additional contributions or withdrawals.

## 3. Taxes

The Partnership is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of the Partnership's net taxable income. Interest, dividends and other income realized by the Partnership from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Partnership applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2024.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2024, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from December 31, 2021 forward.

The Partnership recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the Statements of operations. During the year ended December 31, 2024 and period ended February 24, 2025 (liquidation date), the Partnership did not incur any interest or penalties.

## 4. Limited Partnership Agreement

**Capital Contributions and Withdrawals**
The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Generally, new Limited Partners will be admitted on the first day of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days’ prior written notice and subject to certain other restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).

There is no public market for the limited partner interests in the Partnership ("Interests") nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner.

Each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion, upon at least 91 days' prior written notice. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000. Generally, not less than 90% of the withdrawal proceeds (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable withdrawal date. The balance of the amount payable upon such withdrawal will be paid without interest, within 90 days after the completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

**Limitations on Withdrawals**
The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; (iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; or (iv) for such other reasons or for such other periods as the General Partner may in good faith determine.

**Side Pocket Accounts**
A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an illiquid investment held in a Side Pocket Account until such time that such illiquid investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account. At the sole discretion of the Investment Manager, an illiquid investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in the Partnership Agreement). At December 31, 2024, the Partnership's investment was held in a side pocket account. At February 24, 2025 (liquidation date), the investment had been sold.

**Management Fees**
The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "Investment Management Agreement") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("Management Fee"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |

| | |
|---|---|
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A pro rata Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No management fees were paid to the Investment Manager during the year or period presented, as the Investment Manager elected to waive its management fees. The Investment Manager can, at its discretion, waive or reduce the management fee.

**Allocation of Net Increase/(Decrease) in Partners' Capital Resulting from Operations**
The Partnership Agreement specifies the allocation of net income or loss (increases and decreases in net worth, as defined in the Limited Partnership Agreement) to each partner's capital account. Net income or loss includes all gains and losses, whether realized or unrealized, plus all other items of income (such as interest) and less all expenses. Generally, net income and loss for each month (or other period, as the case may be) will be allocated to the partners in proportion to their capital account balances at the start of such month (or such other period). Capital account balances will reflect capital contributions, previous allocations of increases and decreases in net worth and withdrawals.

**5. Financial Instruments with Concentration of Credit Risk and Other Risks**

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership due to a change in the market value of its investments. The Partnership's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership's investments. Volatility or illiquidity could impair the Partnership's performance or result in losses. The Partnership may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

**Liquidity Risk**
The Partnership's limited partner interests have not been registered under the Securities Act or any other applicable securities laws. There is no public market for the interests and neither the Partnership nor the Investment Manager expects such a market to develop.

**Market Concentration**
The Partnership was formed to invest in small to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. All of the assets attributable to Series I have been invested in LLC interests of Beacon Mountain, LLC. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole.

**Litigation Risk**
The Partnership is periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in material losses to the Partnership.

**Limited Diversification**
The Partnership's portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of risk may increase the losses suffered by the Partnership. In addition, it is possible that the Investment Manager may select investments that

are concentrated in certain classes of financial instruments. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole. As of December 31, 2024, the Partnership's portfolio consisted of one investment in the LLC interests of Beacon Mountain, LLC. At February 24, 2025 (liquidation date), the investment had been sold.

**Custody Risk**
The clearing operations for the Partnership's investments are provided by major financial institutions. In addition, all of the Partnership's cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of major securities exchanges. The Partnership may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership might be unable to recover the full value of its assets or incur losses due to its assets being unavailable for a period of time.

**Concentration of Investor Risk**
One affiliated entity, Atlas IDF, L.P., held approximately 96.5% of the Partnership's capital balance as of December 31, 2024.

**6. Fair Value Hierarchy of Financial Instruments**

In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Partnership discloses the fair value of its investments in a hierarchy that prioritizes the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on unadjusted prices in active markets for identical assets and liabilities that the Partnership has the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership uses prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's nonperformance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available or are determined to be unreliable, the Partnership develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Investment Manager has established policies, as described above, processes and procedures intended to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent.

As of December 31, 2024, the Partnership's investment consisted of an LLC interest. As of February 24, 2025 (liquidation date), the investment had been sold.

**LLC interests**
As of December 31, 2024, the Partnership's investment was comprised entirely of a membership interest in a nonpublic limited liability company that was valued using commonly accepted valuation methodologies due to not having a readily determinable fair value. The LLC's sole investment is an indirect non-voting limited partner interest in 99.5% of a private investment management firm. This private investment management firm owns equity in a company that is in bankruptcy. The LLC interest is classified as level 3 as it is priced using inputs that are not readily observable.

The following table provides a summary of the investment recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2024. As of February 24,2025, no investments were held by the partnership.

| | Level 1 | Level 2 | Level 3 | Total fair value at December 31, 2024 |
|---|---|---|---|---|
| LLC interests | $ - | $ - | $ 1,000,000 | $ 1,000,000 |

The following table provides a roll forward of the amounts for the year ended December 31, 2024 and February 24, 2025 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.

| | LLC interests |
|---|---|
| Fair value as of December 31, 2023 | $ - |
| Purchases | - |
| Sales and maturities | - |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | - |
| Net change in unrealized gains/(losses) | 1,000,000 |
| Fair value as of December 31, 2024 | $ 1,000,000 |

| | LLC interests |
|---|---|
| Fair value as of December 31, 2024 | $ 1,000,000 |
| Purchases | - |
| Sales and maturities | (1,000,000) |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | (14,986,892) |
| Net change in unrealized gains/(losses) | 14,986,892 |
| Fair value as of February 24, 2025 (liquidation date) * | $ - |

*The values in the preceding table are equal to zero.

No transfers between levels occurred during the year ended December 31, 2024, or period ended February 24, 2025.

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy as of December 31, 2024. As of February 24, 2025 no investments were held by the Partnership.

| Category | Fair Value at December 31, 2024 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| LLC interests | $ 1,000,000 | Transaction Indication of Value | Sales Price | $ 1,000,000 |

## 7. Commitments and Contingencies

In the normal course of business, the Partnership may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Partnership to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

## 8. Related Party Transactions

**Management Fees**
For its services to the Partnership, the Investment Manager is entitled to management fees as described in Note 4. For the year ended December 31, 2024 and period ended February 24, 2025 (liquidation

date), the Investment Manager did not earn management fees. The Investment Manager does not charge a management fee on investments in related funds.

## 9. Financial Highlights

Financial highlights for the year ended December 31, 2024 and February 24, 2025 are as follows:

| | Year ended December 31, 2024 **Series I** | Period ended February 24, 2025 (liquidation date) **Series I** |
|---|---|---|
| Total return [1] | 1205.10 % | (17.87)% |
| Ratios to average limited partners' capital [2] | | |
| Investment income | 0.0 % | 0.0 % |
| Operating expenses | (37.18)% | (17.87)% |
| Net investment loss | (37.18)% | (17.87)% |

[1] Total return is determined using a time-weighted rate of return methodology in which rates of return are geometrically linked. Total return is reflected after all investment related and operating expenses. An individual investor's return may vary from these returns based on timing of capital transactions.

[2] Expense ratios are determined by dividing the total investment related and operating expenses by the average limited partners' capital. The ratio of net investment income/(loss) is determined by dividing the net investment income/(loss) by the average limited partners' capital.

## 10. Subsequent Events

The General Partner has evaluated subsequent events through June 26, 2025, which is the date the financial statements were available for issuance and has determined no subsequent event disclosure is necessary.

# Exhibit 49

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
In re § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor. §
§

-----------------------------------------------

ORAL DEPOSITION OF
MARK PATRICK
JUNE 23, 2025
(Reported remotely)

-----------------------------------------------

ORAL DEPOSITION OF MARK PATRICK, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 23RD day of June, 2025, from 12:05 p.m. to 1:14 p.m., via Zoom videoconference before Ida Alcala, Certified Shorthand Reporter No. 12565, in and for the State of Texas, reported by oral stenographic means, pursuant to the Texas Rules of Civil Procedure, and the provisions stated on the record or attached hereto.

Page 2

APPEARANCES

Mr. Sawnie A. Mcentire (Via Videoconference)
PARSONS MCENTIRE MCCLEARY PLLC
1700 Pacific Ave Ste 4400
Dallas, Texas 75201-7324
214-237-4300

Mr. Michael Lang (Videoconference)
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave Ste 2390
Dallas, Texas 75201
214-817-4500

Mr. Louis M. Phillips (Via Videoconference)
KELLY HART ATTORNEYS AT LAW (LOUISIANA)
Baton Rouge Office
301 N. Main Street Ste. 1600
Baton Rouge, LA 70801
225-381-9643

Mr. John R. Morris (Via Videoconference)
ATTORNEY AT LAW
P.O. Box 470472
Fort Worth, Texas 76147-0472
817-262-7762

Ms. Deborah A. 'Deborah' Newman (Via Videoconference)
NEWMAN LAW FIRM
245 W. 18th Street
Houston, Texas 77008-4005
713-942-2501

Mr. Matthew Okin (Via Videoconference)
OKIN ADAMS LLP
1113 Vine St Ste 240
Houston, Texas 77002-1044
713-228-4100

(CONTINUED ON NEXT PAGE)

Page 3

(CONTINUED)

Mr. Andrew Kohl 'Drew' York (Via Videoconference)
GRAY REED & MCGRAW
1601 Elm St. Ste 4600
Dallas, Texas 75201-7212
469-320-6114

Ms. Kathryn George (Via Videoconference)
LATHAM AND WATKINS LLP
Chicago Office
330 North Wabash Avenue Ste 2800
Chicago, IL 60611
312-876-7700

ALSO PRESENT:
Ms. Amelia Hurt (Videoconference)
Mr. Jeff Pomerantz (Videoconference)
Mr. Gregory Demo (Videoconference)

Page 4

I N D E X


| | PAGE |
|---|---|
| WITNESS: MARK PATRICK | |
| Appearances | 2 |
| Examination by Mr. Lang | 5 |
| Examination by Mr. York | 24 |
| Further Examination by Mr. Lang | 42 |
| Changes and Signature | 44 |
| Reporter's Certification | 46 |


INFORMATION REQUESTED TO BE FURNISHED
(None)

EXHIBITS INDEX

COUNSEL FOR DUGABOY INVESTMENT TRUST


| EXHIBITS | DESCRIPTION | PAGE IDENTIFIED |
|---|---|---|
| 1 | Charitable DAF/CLO HoldCo Structure Chart | 8 |
| 2 | Rand Structure Chart | 8 |
| 3 | Proposed settlement agreement | 16 |

Page 5

PROCEEDINGS

MARK PATRICK,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.
A. Mark Patrick.
Q. And, Mr. Patrick, how are you currently employed?
A. I -- what do you mean by --
Q. Who's your -- who do you work for?
A. I work for DAF entities.
Q. And when you say the DAF entities, can you be more specific into which entities that are?
A. You know, there -- it's just a group of entities that hold investment assets for charitable purposes.
Q. Specifically, do you have the names of these entities?
A. Some -- some of them such as CLO HoldCO.
Q. Anybody else?
A. Liberty, I think. Charitable DAF HoldCo Inc, US entity, Charitable DAF Fund LP. I'm probably missing several others. It's a sophisticated structure, but that's generally the gist of when I refer to DAF entities.
Q. And what about Hunter Mountain? Are you employed by Hunter Mountain?

Page 6

A. Well, no -- I know -- I appreciate that. I'm -- like, when I think of employment, I'm also the preferred manager for Wind Advisers, which is an investment adviser that advises investment funds -- and then -- so then I have roles and that's why when you ask about employment, you know, there's -- it's kind of a different question than roles.
Q. That's fair. Tell you what. Why don't I put up a work chart and we'll talk through it. Will that work?
A. Yeah, I'll take a look anything.
Q. Okay. Do you see this chart?
A. Yes, I do.
Q. Okay. So this is the charitable DAFs, you know, the whole structure comp chart. Do you see that at the top?
A. Yes.
Q. Okay. Is this how the DAF CLO HoldCo structure currently looks today?
A. No, it does not.
Q. Okay. What is different?
A. Well, there's a lot of differences. I'd have to kind of see the specific documentation to be exact.
Q. Well, can you generally describe the -- the changes that have been made to this flowchart?
MR. MCENTIRE: I'll object as to form and relevance.

Page 7

A. Yeah. I mean, I -- I think I have already, you know, with respect to the listing of entities. You'd have to show me some documents with respect to these entities and I can, you know, walk you through it.
Q. Would charitable DAF GP LLC still the GP for charitable DAF CLO Co?
A. I don't -- I don't recall precisely and I, you know, I want -- I want to be -- when I give you an answer, a hundred percent accurate.
Q. Okay. Does charitable DAF Fund LP still own a hundred percent of CLO Hold Co?
A. Yes, that is my understanding.
Q. And this charitable DAF CLO CO limited still own a hundred percent of charitable DAF Fund LP?
MR. MCENTIRE: Objection, form.
A. No.
Q. (By Mr. Lang) Okay. Charitable DAF FUND LP, is that owned by CDM CFAD LLP?
MR. MCENTIRE: Objection, form.
A. That's my general -- that's my general understanding.
Q. (By Mr. Lang) Okay. And who owns CDM CFAD LLC?
A. Yeah, again, without corporate documents that you can present to me, I -- you know -- I -- I just don't want to be inaccurate.

Page 8

Q. Does DFW Charities own CDM CFAD LLC?
MR. MCENTIRE: Objection, form. Relevant.
A. Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I -- I just don't want to go beyond what I have a hundred percent knowledge of.
Q. I'm sharing this charitable DAF CLO CO structure chart as Exhibit 1, to be fair. And this is a RAND structured chart, which I'm marking as Exhibit 2. Do you recognize this document?
MR. MCENTIRE: Mark, at this time he's only asking whether you recognize it.
A. Yeah, I haven't made it to the bottom, I apologize.
MR. MCENTIRE: Okay.
A. What is the question now?
Q. (By Mr. Lang) Well, do you recognize this organizational structure? Let me change the question.
A. Do I recognize this structure. Generally -- very generally.
Q. Okay. And starting at the top, charitable DAF Holdings Corp, do you see that box?
A. Yes, I do.
Q. Is that owned by CLO HOLD CO?
MR. MCENTIRE: Objection, form.
A. I don't know -- I don't know. I can't recall

Page 9

precisely if there's other entities in -- in between that, you know, whether that links up to CLO Hold Co.
Q. (By Mr. Lang) Does CLO Hold Co indirectly own charitable -- charitable DAF holdings Corp.?
MR. MCENTIRE: Objection, form.
A. Yeah, again, I can't answer with accuracy here unless you showed me a corporate -- some actual corporate filings or something like that.
Q. (By Mr. Lang) Is this generally the structure for the RAND -- structure -- is it generally a structure it looks like today?
MR. MCENTIRE: Objection, form.
A. What part of the structure are you referring to, Mr. Lang?
Q. (By Mr. Lang) Well, the whole thing. Charitable DAF Holdings Corp?
A. No.
Q. Does it own Rand Advises LLC?
A. Yeah, can you restate that question, again?
Q. Does charitable DAF Holdings Corp, top box, the sole member of Rand Advisers LLC? The green box to the left.
A. Yes, that is -- that is my understanding.
Q. Okay. Does charitable DAF holdings Corp, the box at the top, is it still the sole member of Rand PD fund

Page 10

management LLC?
A. I would -- I would believe so.
Q. Okay. And is RAND PE fund management LLP still the general partner for RAND PE Fund One LP? See it just below it?
A. Yes, I would believe so.
Q. And then charitable DAF Holdings Corp, the box at the top, is it still the sole member for Atlas IDF GP PLLC?
MR. MCENTIRE: Objection, form.
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF GP LLC still the general corporate for Atlas IDF LP?
MR. MCENTIRE: Objection, form?
A. Yes, I would believe so.
Q. (By Mr. Lang) Okay. And is Atlas IDF LP still the 99 percent limited partner for RAND PE FUND I LP?
MR. MCENTIRE: Objection, form.
A. I'm trying to recall because I have RAND PE FUND in a wind down situation. So I -- I don't know if that is accurate or not offhand.
Q. (By Mr. Lang) And does RAND PE FUND ONE LP still the sole member of Beacon LLC?
MR. MCENTIRE: Objection, form.
A. No.
Q. (By Mr. Lang) Okay. Who -- who owns Beacon

Page 11

Mountain LLC?
A. An entity called CLO HOLD CO LLC.
Q. And that's different than CLO HOLD CO limited?
A. Yes.
Q. Who owns CLO HOLD CO LLP?
A. I believe it's CLO HOLD CO limited, from my understanding.
Q. And the CLO HOLD CO LLC owned Hunter Mountain?
A. No.
Q. Who owns Hunter Mountain?
A. Beacon Mountain LLC. And I would clarify one thing. I -- it's beneficial -- it's a beneficial ownership. Hunter Mountain investment trust is a trust.
Q. Okay. I appreciate that.
A. Can you do -- if you don't mind, do a summary? I just want to make sure that we're sort of accurate here?
Q. Okay. From what I understand --
A. Yeah, from Beacon Mountain ownership. I just want to make sure you are understanding is --
Q. Beacon Mountain LLC is owned by CLO HOLD CO LLC?
A. Yes.
Q. Beacon Mountain LLC owns Hunter or -- Hunter Mountain Investment Trust is owned by Beacon Mountain LLP?
A. Yes.
MR. MCENTIRE: Objection.

Page 12

A. (inaudible) beneficial.
MR. MCENTIRE: Yeah, I would object to mischaracterizing his testimony.
MR. LANG: Nobody's mischaracterizing.
Q. (By Mr. Lang) The beneficial owner of Hunter Mountain Investment Trust.
A. Yeah, this is all a current state.
Q. Current state.
And what is your role with Hunter Mountain Investment Trust?
A. My understanding is I'm the -- an administrator which is a -- the control person for that trust.
Q. Are you the control person for Beacon Mountain LLP?
A. Yes.
Q. Are you the control person for CLO HOLD CO LLC?
A. Yes.
Q. Are you the control person for RAND Advisers LLC?
A. Yes.
Q. Are you the control person for RAND PE FUND Management LLC?
A. Yes.
Q. Are you the control person for Atlas IDF GP LLC?
A. Yes.
Q. Are you the control person for the Charitable DAF Holdings Corp?

Page 13

A. Yes.
Q. And you're the control person for Charitable DAF Fund LP?
I'll -- I'll go back here.
MR. MCENTIRE: Objection, form.
Q. (By Mr. Lang) Are you the control person for Charitable DAF Fund LP?
MR. MCENTIRE: Objection, form.
A. It's -- no, but you should ask me a follow-up question.
Q. What's your role at Charitable DAF Fund LP?
A. Yeah, I'm the control person for the general partner of that limited partnership.
Q. And who's the general partner of the limited partnership?
A. Yeah, and then this is where my memory is -- is -- I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer.
MR. MCENTIRE: Yeah, Mark, let's don't -- let's don't speculate unless he has a document, okay?
A. Yes.
Q. (By Mr. Lang) Are you the control person for CDMCFAD LLC?
MR. MCENTIRE: Can you repeat the question, I didn't hear it, Mr. Lang.

Page 14

Q. (By Mr. Lang) Mr. Patrick, are you the control person for CDMCFAD LLC?
A. I believe I am.
Q. Does that stand for anything out of curiosity?
A. I don't remember.
Q. All right.
MR. PHILLIPS: Objection, formatting.
Q. (By Mr. Lang) Did you -- you negotiated the settlement agreement that is the subject of (inaudible) correct?
A. Correct.
Q. Did you initiate settlement discussion with about events?
A. What do you mean by initiate.
Q. Well, did you approach them about settlement or did they approach you?
A. I'm sorry, you were slightly muffled there.
Q. I said did they approach you about settling or did you approach them about a potential settlement?
MR. PHILLIPS: Objection to the form of the question?
A. I can't -- I can't recall offhand. Who approached who or -- yeah.
Q. Under the settlement agreement, Hunter Mountain is to receive among other things the Dugaboy note and the

Page 15

Kirschner claims. Do you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims?
A. I -- I would appreciate it if you could pull up the -- the Dugaboy note document that you are referring to. There's an awful lot of Dugaboy notes out there, and -- and as a starter and I'd also appreciate if you could pull up for me the -- what you're referring to as the Kirschner Litigation complaint.
Q. I'm referring to what's in the settlement agreement. It refers to the Dugaboy note --
A. Well, then the document speaks for itself, sir. If you want to show me the document, I'll definitely testify to the accuracy of what I signed.
Q. I'm asking if you know what I'm referring to when I refer to the Dugaboy note and the Kirschner claims as re restricted at that point out from Patricia claims as referenced in the settlement agreement.
A. Yeah, and I'm asking you to show me the settlement agreement with the lines and then I -- and I'll verify that for you if you don't mind.
There's a lot of Dugaboy notes out there you have to appreciate that, Mr. Lang.
Q. Which one have you bargained to receive in the settlement agreement?
A. And -- and there's a lot of Kirschner litigation as

Page 16

well.
Q. Well, the Kirschner litigation is that -- Styled Kirschner versus Dondero Adversary Proceeding 2103076.
Are you familiar with that one?
A. I'm not familiar with that caption. If you could just show me the document that you're -- the complaint that you're referring to, then I will say that is -- that is the litigation that -- that we negotiated for.
Q. Okay.
A. You can bring up the settlement agreement, I'll happily verify that whatever is referenced in there is what I negotiated for, but I'm not gonna broad brush generically say that I negotiated for some Dugaboy note without a little more precision, if you don't mind.
Q. Can you see my screen?
A. Here we go. Yes.
Q. Okay. When I refer to the Dugaboy note, that's the note that I'm referring to. Does that help you?
MR. MCENTIRE: Well, for the record, Mr. Lang, can we just identify that you have put up the actual settlement agreement, is that correct?
MR. LANG: Yes. Sorry. Exhibit 3 will be the settlement agreement. The proposed settlement agreement.
A. Yes, so you're having me refer to the Dugaboy note dated May 31st, 2017, with a face amount of roughly

Page 17

24 million as the maker and with Highland Capital Management collectively as the payee. That's what -- that's what you're referring me to.
Q. That's what I'm referring you to.
A. And what is your question?
Q. I'm -- I was just asking if you understand what I'm referring to when I say the Dugaboy note?
A. Okay. I understand now what you're referring to.
Q. And then the Kirchner claims are -- means all claims and causes of action that were asserted or could've been asserted by litigation trustee or the litigation subtrust in the capital amended. Do you see that?
A. Yes, I do.
Q. Okay. Let's go up and see the amenities claims. The amended complaint means the Amended Complaint and objection to claims Docket number 158 in Kirschner versus Dondero adversary proceeding 21-03076, do you see that?
A. Yes, I do.
Q. Okay. So if I refer to the Kirchner claims, you know what I'm referring to now?
A. Yes, I do. Thank you.
Q. Okay. How does Hunter Mountain value the Kirchner claims?
MR. MORRIS: Objection to the form of the question.

Page 18

A. Hunter Mountain is a non-living entity. It's a trust.
Q. (By Mr. Lang) Have you valued the Kirchner claims?
A. I have not had an appraised evaluation. I'm not qualified to appraise value.
Q. Do you have an estimated value of the Kirchner claims?
A. Estimate. Estimate. Who? Are you asking if I've estimated the value?
Q. Yes.
A. Of the Kirchner claim?
Q. Yes.
A. No.
Q. Have you done anything to determine the value of the Kirchner claims?
A. No.
Q. What does Hunter Mountain plan to do with the Kirchner claims after the settlement agreement if it's approved?
MR. MCENTIRE: Objection to the form of the question.
MR. PHILLIPS: Objection, form.
A. So you're asking me to speculate about my future actions --
Q. (By Mr. Lang) I'm not asking you --

Page 19

A. -- with respect that claim?
Q. What does Hunter Mountain plan to do with the Kirschner claims if the settlement agreement is pursued or --
A. What do you mean by plan?
Q. What is it's intention to do with the Kirschner claims if the settlement agreement is approved?
MR. PHILLIPS: Objection, form.
A. And again, what do you mean by to do?
Q. (By Mr. Lang) What -- are you going to dismiss the claims?
A. I don't -- I won't be the owner of the claim so I couldn't dismiss it.
Q. Is Hunter Mountain going to dismiss the claim?
A. I wouldn't want to -- want to speculate.
Q. Do you have any plans whatsoever sitting here today on what you're going to do -- what Hunter Mountain is going to do with the Kirchner claim if the settlement agreement is approved?
MR. PHILLIPS: Objection, form.
MR. MCENTIRE: Joined objection.
A. And again, help me understand better what you mean by plan because, you know, I have a -- it's -- I have a lot of plans for the weekend, but whether I do it or not, you know, is fairly speculative. You just got to help me kind

Page 20

of understand what you mean by that.
Q. (By Mr. Lang) I mean, what is your intent? What do you plan to do with the Kirchner claims if the settlement agreement is approved. Why is it such a hard question to answer? It seems very basic?
MR. PHILLIPS: Objection, form.
A. To be fair, Mr. Lang, if the agreement -- the settlement agreement is approved, then Hunter Mountain will have ownership over that claim, and -- one thing -- I guess one thing that is certain that I can tell you as far as a plan is to evaluate and decide what we are going to do.
Q. (By Mr. Lang) And that means pursuing the claims?
MR. MCENTIRE: Objection, form.
A. Wait. I'm sorry. Say that, again.
Q. (By Mr. Lang) I said, and does that include potentially pursuing the claims?
A. By whom?
Q. Hunter Mountain.
A. Oh, pursuing the claim. Well, yes, I would imagine it -- it involves a range of options.
Q. And what -- what is within that range of options that you can think of sitting here right now?
MR. PHILLIPS: Objection, form.
A. I don't know because I'll reach out to my legal advisors and they'll give me a range of options, but, you

Page 21

know, I would say either move forward or not or whatnot, but I'll let the legal advisors tell me.

MR. MCENTIRE: Yeah, Mark, let me jump in here. You can try to answer the question if you can to the extent you're not relying upon legal advice, okay? And so feel free to do that. If you have to rely upon legal advice, then I instruct you not to answer.

A. At some point in the future, I'll rely upon legal advice to determine what my range of options are.

Q. Has Hunter Mountain performed any analysis of the Dugaboy note?

A. Has Hunter Mountain performed any analysis regarding the Dugaboy note?

Q. Like the valve of the Dugaboy note.

A. Oh, has Hunter Mountain itself determined the --

Q. Yes.

A. -- the -- the value of it. We'll, again, it's an entity and it doesn't, you know, think for itself so I would say, no.

Q. Has anybody with Hunter Mountain analyzed the value of the Dugaboy note?

A. Anybody with? Again, what you are -- I'm the administrator but -- are you talking about people with a role?

Q. Have you? Have you performed any analysis of the

Page 22

value of the Dugaboy note?

A. No, again, because I'm not a qualified appraiser.

Q. Have you requested anyone to provide an analysis of the valve of the Dugaboy note?

A. Yes.

Q. Who have you requested the value of Dugaboy note?

A. A qualified appraisal company.

Q. Who is that qualified appraisal company?

A. It's a company called Weaver.

Q. Okay. Have they provided you with an opinion on the value of the Dugaboy note?

A. No.

Q. When do expect them -- let me ask this, have they told you when they may be able to provide the opinion of a value of the Dugaboy note?

MR. PHILLIPS: Objection to form?

A. I can't -- I can't recall offhand when they'll provide me an evaluation on that Dugaboy note?

Q. (By Mr. Lang) Okay.

MR. LANG: I'll pass the witness.

MR. MCENTIRE: I'm sorry, Mr. Lang, I couldn't hear you. I apologize.

MR. LANG: I said -- I said I'll pass the witness.

I think David or there are other attorneys

Page 23

that have questions.

MR. MCENTIRE: Okay.

Is there anyone else who wants to ask Mr. Patrick any questions?

MR. PHILLIPS: Michael could you take down a document?

MR. LANG: Yup, sorry. Thank you.

MR. PHILLIPS: I read it seven times now.

MR. LANG: I got it. I forgot it was up.

MR. MCENTIRE: Anybody else have any questions for Mr. Patrick?

MR. YORK: Go ahead, Matthew.

MR. OKIN: Can everybody hear me okay?

MR. PHILLIPS: Yes.

MR. OKIN: I think, Louis, you and I have an agreement that we were going to postpone our asking questions til tomorrow, is that correct?

MR. PHILLIPS: Correct, at 2:00 o'clock, right? 2:00 o'clock, right?

MR. OKIN: 2:00 o'clock tomorrow. So we'll defer our questions. We are going to take Mr. Patrick's deposition when we recommence at 2:00 o'clock tomorrow.

MR. MCENTIRE: Okay. Anyone else have any questions of Mr. Patrick.

MR. YORK: So -- this is Drew York, I do.

Page 24

Mr. Phillips, are you okay with me going forward now.

MR. PHILLIPS: I think we -- I forgot, I didn't get a chance to tell you, Mr. York, that I think Mr. Patrick --

Mr. Patrick you want to -- we don't want to wait til 2:00, so --

THE WITNESS: Yeah, let's just keep going.

MR. PHILLIPS: We can keep going. We can move straight on to you. I just didn't know if he wanted a five minute break.

MR. YORK: Let's take five minutes. Let's do that. Let's go off the record, take a five-minute break and come back, how's that?

MR. PHILLIPS: Okay.

(Recess at 12:33 p.m.)

(Resume at 12:41 p.m.)

MR. YORK: Let's go on the record.

EXAMINATION

BY MR. YORK:

Q. Mr. Patrick, good afternoon, my name is Drew York and I represent Patrick Daugherty in this matter. Are you familiar with Mr. Daugherty?

A. Yes.

Q. And how do you know Mr. Daugherty?

Page 25

A. I knew him from Highland.
Q. Were you also employed at Highland at one point in time?
A. Yes.
Q. What position?
A. I was in the tax department.
Q. Okay. Did you have a title?
A. I was a tax professional.
Q. How long were you employed at Highland?
A. Oh, from 2008 to 2021.
Q. And were you always employed in the position as a taxpayer professional at Highland during that time?
A. Yes.
Q. You mentioned earlier in response to some questions from Mr. Lang that you're currently the administrator or control person for Hunter Mountain, is that correct?
A. Yes.
Q. Okay. When did you take on that role?
A. I believe in 2022.
Q. Did you have -- do you remember when in 2022?
A. I think the latter part of the summer.
Q. Did you have any role at Hunter Mountain trust prior to that time in 2022 when you became the administrator?
A. Can you ask that question one more time?

Page 26

Q. Sure. Did you have any role at the Hunter Mountain trust prior to the time you became the administrator in 2022?
(Zoom call froze)
THE COURT REPORTER: Is everyone still there?
A. -- recall specifically, you know, so I, you know, I had no formal role.
Q. Okay. When you say you would speak to Mr. Hanus from time to time when he was the administrator, can you describe for me what it was that you would be conferring with him about?
A. Probably would have to be -- involved taxes.
Q. And why was he conferring with you on that based on your -- I assume role at Highland at the time, right?
MR. MCENTIRE: Objection, form.
Q. (By Mr. York) Actually, that's fair. I'll back up and let me ask this question. Did Mr. Hanus reach out to you in his role as the administrator for the Hunter Mountain trust while you were still in the tax department at Highland?
A. I can't recall specifically, but I'm confident that he and I spoke on occasion.
Q. And what do you recall the two of you speaking about?
A. It had to involve tax -- some sort of tax related

Page 27

type questions.
Q. Did you have any other involvement with the Hunter Mountain Trust at all? Not even in a formal role, but any involvement with the Hunter Mountain Trust at all prior to your becoming the administrator in 2022?
A. No.
Q. Were you ever counsel for the Hunter Mountain Trust?
A. No.
Q. Were you ever counsel to the Hunter Mountain Trust in any fashion?
A. No.
Q. Did you ever conduct any tax analysis with regard to the Hunter Mountain Trust when you were at Highland?
A. I can't recall, specifically.
Q. Can you recall even if you did, when?
A. Well, it'd probably be around -- I mean, it would be when that trust was, you know, created and after it was created.
Q. When was the trust created?
A. I don't recall, specifically.
Q. Do you recall who came up with the idea to create the trust?
A. The idea to create the trust. You know what, I actually do.

Page 28

Q. Who was that?
A. It was Thomas Surgeon. That's what I seem to recall. He -- he wanted that trust created.
Q. Why?
A. Well, I can't recall specifically, but he was in the compliance department at Highland.
Q. Earlier today Mr. Lang showed you those organizational structure charts that we looked at. I think Exhibit 1 which was the charitable DAF structure chart. And I -- as I understood from your testimony the chart that he put up is no longer accurate. Do you know why it's changed?
MR. PHILLIPS: Objection, form.
MR. MCENTIRE: Following the objection. He's already asked and answered this question too.
A. I'm trying to remember when that exhibit was put in to place, but -- any variably kind of complex sophisticated corporate structures, you know, they're generally -- just don't -- a lot of different reasons for -- for structures to kind of shift throughout the years.
Q. (By Mr. York) And you don't recall specifically when those changes were made to the structure?
A. Well, I think there's -- I guess I'm trying to expresses this -- it's rather fluid. A lot of these kind of structures, you know, just for an example, sometimes you make an investment of certain types and so then you want to

Page 29

have a special purpose vehicle formed for that investment, and, you know, to hold it, and it can be for a variety of reasons and purposes and whatnot. So that's what I'm kind of saying that, that these structures are always sort of fluid when you have a variety of investment holdings as one reason, and as, you know, tax law changes can influence development of structures, legal -- corporate legal changes. That's why it's -- it's a very complex structure that has a lot of different things, and so you really have to see it and snapshot it in time, you know, but -- but it's always evolving in light of different considerations.
Q. Let's switch gears. Did you have any involvement in the creation and development of the charitable DAF?
MR. MCENTIRE: Objection, form.
MR. PHILLIPS: Objection, form.
A. If you don't mind, could you be a little more specific to what you're referring to charitable DAF?
Q. (By Mr. York) Sure.
Mr. Lang, can you put up the chart for me please, Exhibit 1.
MR. PHILLIPS: I'm having a hard time -- I know there's not a question pending, but what does this have to do with the Daugherty objection?
MR. MCENTIRE: I don't think it has anything to do with the objection.

Page 30

So, Mr. Lang -- I mean, Mr. York, I don't know how we go here.
MR. PHILLIPS: We're not going to allow any kind of amendment to pleadings or by additional evidence and that sort of thing. I'm just having a hard time with this folderol about -- Daugherty has an objection, but this is not part of it.
MR. YORK: Take down the exhibit for now, I'll go a different route.
Mr. Patrick, have you read Mr. Daugherty objection to the proposed settlement between Highland and the HMIT entities?
A. Yes.
Q. Are you aware that Highland has separately filed an adversary proceeding against Mr. Daugherty?
A. I have an awareness, yes.
Q. Okay. Have you ever read the settlement agreement between Highland and Mr. Daugherty?
A. No.
Q. In the course of the negotiations of the proposed settlement between Highland and the HMIT entities, was there ever any discussions about Mr. Daugherty unresolved class a claim?
MR. PHILLIPS: Objection to form.
A. Yes.

Page 31

Q. (By Mr. York) When did those take place?
A. I believe during the period of the -- the discussions around the settlement.
Q. Before or after the settlement agreement -- I'm sorry, strike that. Before or after the motion for entry for approval of settlement was filed with the Bankruptcy Court?
A. Oh, I can't recall with that sort of precision.
Q. Did it come up before the parties, that is Highland and HMIT entities reached an agreement in principle to the proposed settlement?
A. Yes, I --
Q. Who brought it up?
A. Not me, is what I can say because it's nothing that was really in my radar screen.
Q. Was it brought up by anybody else on the HMIT entities side?
MR. PHILLIPS: Objection, form.
MR. MCENTIRE: Let me jump in here. I would object to the extent that he's asking you to talk about discussions you've had with Mr. Lewis or other attorneys representing Hunter Mountain. If you can answer that without making reference to any such privileged discussions, you can do so. Otherwise, I will instruct you not to answer.

Page 32

A. Yeah, no -- I mean, we had substantial all legal involvement and so I think a lot of those discussions -- I mean, it wasn't necessarily me, but is lawyers to lawyers.
Q. (By Mr. York) Did you ever have any communications yourself with anyone on the Highland side regarding Mr. Daugherty unresolved Class A claim in the bankruptcy?
A. I just remember generally speaking -- and it coming up in the settlement negotiations.
Q. I understand that. So is your answer then, no, you did not have any direct conversations with anyone from Highland regarding Mr. Daugherty Class A claim?
A. I wish I could be that precise. I just don't recall. Maybe.
Q. Well, if you did, who would those conversations have been with?
A. Yeah, I don't want to speculate.
MR. MORRIS: Objection form.
Q. (By Mr. York) Are you aware that Highland is engaged in a dispute with the IRS regarding its tax filings from 2008 to 2010?
A. Yes.
Q. Okay. And have you been aware of that since, you know, since the time that you became the administrator at Hunter Mountain Trust?
A. Yes.

Page 33

Q. And before that?
A. Yes.
Q. All right. What is your understanding of that dispute?
MR. PHILLIPS: Objection, form.
A. That there's a proposed adjustment with respect to the Highland tax return for 2007 and 2008.
Q. Have you had any discussions with anyone from Highland regarding that dispute?
A. When?
Q. At any point in time.
A. Oh, yeah, when I was employed by Highland, yes.
Q. Okay. What about since?
A. When I was employed by Skyview.
Q. When you were employed by Skyview?
A. Yeah.
Q. Okay. Who owns Skyview?
A. My understanding is a Scott Ellington.
Q. Okay. And who did you have those conversations with?
A. Oh, outside counsel.
Q. Other than counsel, have you had discussions with anyone else about the IRS audit dispute?
A. Oh, I'm sure I have.
Q. Do you recall who?

Page 34

A. Not really, specifically.
Q. Do you recall the last time you did?
A. No.
Q. Do you recall what was said?
A. No.
Q. Are you familiar with what's known an FPAA, F-P-A-A?
A. Yes, I am.
Q. What does that stand for?
A. Final partnership administrator adjustment.
Q. And is that a document or form, I guess, that is issued by the IRS with respect to an audit?
A. Yes, it is.
Q. All right. Do you know whether an FPAA has been issued with regard to Highlands tax filings for 2007-2008?
A. I may have known, but I may have forgotten. That's -- so I don't want to say, I don't know because I just can't -- I can't recall, but I may have known.
Q. I'm not sure -- so you just don't know as you sit here?
A. Well, I'm saying I guess I can't remember, but it's within a realm of possibility that I may have known at some point.
Q. Have you seen it?
A. It's been many years, and that's why my memory

Page 35

isn't precise enough to give you kind of an affirmative.
MR. MCENTIRE: Mark, don't speculate if you don't remember.
A. Yeah.
Q. (By Mr. York) Have you ever had any discussions with anyone concerning the FPAA if one has actually been issued for either Highland's 2007 at 2008 tax returns?
MR. PHILLIPS: Objection, form.
A. Can you state that again?
Q. (By Mr. York) Sure. Have you ever had any discussions with anyone to the best of your recollection about an FPAA if one has actually been issued concerning Highland's either 2007 or 2008 tax returns?
A. Yeah, I don't recall. If I have or have not, I just don't remember.
Q. You were asked earlier by Mr. Lang about who reached out first on the settlement discussions. Am I correct the settlement discussions between Highland and Hunter Mountain began sometime in, I think, March of this year? Is that right?
A. I -- I don't know with absolute precision, like, I was thinking April.
Q. Did you personally have any direct negotiations with anyone on the Highland side?
MR. MORRIS: Objection.

Page 36

A. Yes.
Q. (By Mr. York) Who was that?
A. Wait, so restate your question again.
Q. Yeah, my question was did you -- did you have any direct negotiations with anyone on Highland side relating to the proposed settlement?
A. Yes, I did.
Q. And my question then was, who --
MR. MCENTIRE: Objection.
A. The professionals at Highland.
Q. (By Mr. York) So you spoke just with the professionals at Highland? Nobody else?
A. No, I spoke to a lot of, you know, like, my team.
Q. Sure. I'm asking on the Highland side, who did you speak with?
A. Oh, the professionals there at Highland.
Q. Okay, which ones?
A. You know, Mr. Starey, and I guess when you say spoke with, I mean, do you, like, general discussions within a group typesetting. You know, Dave Clause and Tim Corinoir. Those are the names that come to mind.
Q. And you can't recall who initiated the settlement discussions -- the discussions about potentially settling the dispute between Highland and the Hunter Mountain entities, correct?

Page 37

A. Yeah, I can't, specifically.
Q. You consider yourself to have had a close relationship with Jim Dondero in the past?
MR. MCENTIRE: Objection, form.
MR. PHILLIPS: Objection, form.
A. No.
MR. YORK: So you know that Highland at one point did characterize you as having a close relationship with Mr. Dondero over a more than decade period of time that you worked at Highland.
MR. PHILLIPS: Objection, form.
MR. MCENTIRE: Joined in the objection.
A. I didn't have that awareness.
Q. (By Mr. York) Do you still communicate with Mr. Dondero?
MR. PHILLIPS: Objection, form.
A. No.
Q. (By Mr. York) When was the last time you recall communicating with him?
MR. MCENTIRE: Objection, form.
A. I can't recall precisely.
Q. (By Mr. York) Was it some time within this calendar year?
MR. MCENTIRE: Same objection.
A. No.

Page 38

Q. (By Mr. York) Last year?
A. Yes.
Q. Do you recall when last year?
A. No.
Q. Can you tell me -- was it, you know, spring, summer, fall 2024? Any idea?
MR. PHILLIPS: Objection, form.
A. Well, I'm pretty confident it was in the summer.
Q. Okay.
A. But it may have been later, but at least the summer.
Q. All right. What do you recall the two of you discussing in the last conversation?
MR. MCENTIRE: Objection, form.
MR. PHILLIPS: Objection, form.
MR. MCENTIRE: Can we have an agreement that one attorney objects, it's good for all?
MR. YORK: Sure.
MR. PHILLIPS: It's fine with me. I can't speak for Mr. Lang or Okin.
MR. LANG: That's fine.
A. I just don't specifically remember.
Q. (By Mr. York) Has Highland capital ever had an ownership interest in Hunter Mountain Trust?
A. Highland Capital Management having an ownership in

Page 39

Hunter Mountain?
Q. Yeah.
A. To my understanding, no.
Q. Okay. Do you know how Hunter Mountain came to own Class B and Class C limited partnership interest in Highland Capital Management?
A. Yes.
Q. How?
A. Purchase and contribution.
Q. So are you saying that Hunter Mountain purchased Class B Limited partnership interest in Highland Capital?
MR. PHILLIPS: I'm going to object to form.
And counsel, where are we headed here?
MR. YORK: Just trying to make sure we have a full understanding when we go into this hearing. Hunter Mountain interest is as set forth in the -- in the proposed settlement relating to the capital account balance, that's all.
A. What was the question?
Q. Yeah, so did -- I was trying to understand when you said purchase and contribution, what do you mean by that? What's -- what's that number?
A. Yeah, yeah, my understanding is that Hunter Mountain had purchased the -- some interest in Highland Capital Management LP. I don't recall precisely the class

Page 40

and then it had also acquired interest in Highland Capital Management LP via a contribution contributing a note or an asset into it. Is what I -- is my general understanding.
Q. And is that note, that you're referring to, is that what Coakley has been called the Hunter Mountain Investment Trust note?
MR. PHILLIPS: Objection to form.
A. Yeah, I don't know what you're referring to. I'm just -- my general -- my general knowledge is that -- that there was a note contributed by Hunter Mountain into Highland in exchange for an interest.
Q. (By Mr. York) When did that occur to your knowledge?
MR. PHILLIPS: Objection, form.
A. I can't remember the years gone by.
Q. (By Mr. York) Was it while you were employed with Highland?
A. Yes.
Q. The last couple of questions here, I think, is Hunter Mountain paying the legal expenses for Mr. Phillips and his firm? Relating to the proposed settlement and, I guess, the defense of the proposed settlement at the upcoming hearing?
A. I believe so.
Q. Okay. Is there --

Page 41

MR. PHILLIPS: I'll answer that, yes.
MR. YORK: Mr. Phillips, if you want to go under oath we can put you under oath as a witness too, but --
MR. PHILLIPS: Let me rephrase. I hope so.
A. Yeah.
Q. (By Mr. York) Is there anyone that's making any payment or contribution to Hunter Mountain in relation to those legal expenses? In other words, is any third party paid Hunter Mountain or reimbursed Hunter Mountain for any legal expenses associated with the proposed settlement?
A. No, but -- except for the current ownership, you know, is probably funding it that way. So CLO HoldCo LLC would be making a contribution into Hunter Mountain to pay legal bills.
Q. All right.
A. And probably -- I'm kinda jumping -- probably go to Beacon Mountain first and then it would go to Hunter Mountain like that.
Q. On up the chain, so to speak?
A. Yeah. Well, I don't know how -- on up the chain -- yeah, until there's cash which would be CLO HoldCo.
Q. Okay. Are there any indemnifications agreements that Hunter Mountain has entered into where it is being indemnified by any parties relating to -- relating to the

Page 42

settlement at all?
MR. PHILLIPS: Objection, form.
A. Not to my -- not to my knowledge.
Q. Okay. All right.
MR. PHILLIPS: I would qualify that. If you're asking about the settlement agreement, could you put the settlement agreement up because there may be indemnification provisions in the settlement agreement. If you're asking for outside the settlement agreement, that's a different story.
MR. YORK: You took care of that for me Lewis.
A. Yeah, yeah, and no, I appreciate that clarification because I guess I should have asked you either or because I was getting confused thinking that maybe it also includes the settlement agreement. No, my answer is with respect to anything outside of a settlement agreement. There are no indignities to my general understanding.
Q. All right.
With that, I think, at this point, I'll pass the witness back to Mr. Lang, if he's got any further questions.

FURTHER EXAMINATION

BY MR. LANG:
Q. I have one question. You said that Rand PE Fund I, LP was in liquidation, do you recall that?

Page 43

A. Yeah, yeah, well, I call it a windup.
Q. Windup, okay.
A. Yeah, yeah. It's a windup.
Q. And then I could be wrong, but I think I recall that Mr. Raver testified that Atlas IDF LP was in liquidation, does that sound right?
MR. MCENTIRE: Objection, form.
A. Yeah, windup.
Q. (By Mr. Lang) You said windup also?
A. Yeah, but, but loosely termed they're one and the same.
MR. LANG: Okay. That's all I've got.
MR. MCENTIRE: Anybody else?
MR. OKIN: Well, we'll be back at 2:00 tomorrow.
MR. MCENTIRE: Yeah. Okay. I think that adjourns the deposition Ms. Court Reporter.
(End of Proceedings.)

Page 44

CHANGES AND SIGNATURE

| PAGE | LINE | CHANGE | REASON |
|---|---|---|---|

Page 45

I, MARK PATRICK, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

___________________
MARK PATRICK

THE STATE OF TEXAS
COUNTY OF ________

Before me, _____________________, on this day personally appeared MARK PATRICK, known to me (or proved to me under oath or through ____________________)(description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _______ day of _______________, 20___.

_________________________
Notary Public in and for
the State of Texas

Page 46

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

§
In re § Chapter 11
HIGHLAND CAPITAL MANAGEMENT, L.P, § Case No. 19-34054-sgj11
Reorganized Debtor. §
§

REPORTER'S CERTIFICATION
DEPOSITION OF MARK PATRICK
JUNE 23, 2025

I, IDA ALCALA, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARK PATRICK, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on __________________, 2025, to the witness or to the attorney for the witness for examination, signature and return to me by _________________, 2025;

That the amount of time used by each party at the deposition is as follows:

Mr. Lang : (00:28)
Mr. York : (00:27)

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Michael Lang, Attorney for Dugaboy Investment Trust.
Mr. Sawnie Mcentire, Attorney for Mark Patrick.
Mr. Drew York, Attorney for Patrick Daugherty.

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action

Page 47

in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of the Texas Rules of Civil Procedure will be certified to after they have occurred.

Certified to by me this 23rd day of June, 2025.

_________________________
Ida Alcala, CSR#12565
CSR Expiration Date: 12/31/26
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on ___________, 2025.

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Mr. Mcentire, Custodial Attorney;

That $____________ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3 and that a copy of this certificate was served on all parties shown herein and filed with the Clerk.

Certified to by me this ______ day of _____________, 2025.

_________________________
Ida Alcala, CSR#12565
Firm Registration No. CRF-3
1235 North Loop West
Suite 510
Houston, Texas 77008
CSR Expiration Date: 12/31/26

# Exhibit 50

SadisGoldberg LLP

# Amended and Restated Limited Partnership Agreement of Atlas IDF, LP

A DELAWARE "SERIES" LIMITED PARTNERSHIP

**As of November 30, 2015**

## Exhibit A

Neither Atlas IDF, LP nor the limited partner interests therein ("**Interests**") have been or will be registered under the Securities Act of 1933, as amended ("**Securities Act**"), the Investment Company Act of 1940, as amended, or the securities laws of any of the States of the United States. The offering of the Interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, may not be transferred or resold, except: (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Amended and Restated Limited Partnership Agreement.

This Amended and Restated Limited Partnership Agreement of Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), is entered into as of November 30, 2015 ("**Agreement**") by and among: (i) Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), with an address at 87 Railroad Place, Suite 403, Saratoga Springs, New York, 12866; (ii) such persons and entities who are or may become limited partners in accordance with the terms hereof ("**Limited Partners**"; and, together with the General Partner, shall collectively be referred to as the "**Partners**"); (iii) John Honis, as the initial Limited Partner ("**Initial Limited Partner**"); and (iv) such other persons who may become parties to this Agreement from time to time.

**WITNESSETH:**

**WHEREAS**, the General Partner and the Initial Limited Partner entered into a Limited Partnership Agreement, dated and effective as of October 29, 2015 ("**Current Agreement**"); and

**WHEREAS**, the General Partner desires to amend and restate the Current Agreement in its entirety pursuant to, and in accordance with the terms of, **Section 28** thereof, including to reflect the conversion of the Partnership into a "series" limited partnership.

**NOW THEREFORE**, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree to amend and restate the Current Agreement in its entirety with the following terms and conditions:

## ARTICLE I
## GENERAL PROVISIONS

**Section 1.01** **Formation of Partnership**. The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (as in effect on the date hereof and as amended from time to time, the "**Act**") by the filing of its Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware (the "**Delaware Secretary**") on October 29, 2015. On November 19, 2015, an amended Certificate was filed with the Delaware Secretary to convert the Partnership into a "series" limited partnership under Section 17-218 of the Act. The General Partner, for itself and as agent for the Limited Partners, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the formation and operation of the Partnership as a limited partnership under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the General Partner determines that the Partnership may conduct business. Each Limited Partner admitted to the Partnership by the General Partner shall promptly execute all relevant certificates and other documents, as the General Partner shall request.

**Section 1.02** **Partnership Name**. The name of the Partnership is Atlas IDF, LP.

**Section 1.03** **Purpose**. The Partnership was organized for the purpose of investing and trading in a wide variety of securities and financial instruments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including but not limited to, common and preferred stocks, bonds and other debt securities, convertible securities, limited partner interests, mutual fund shares, options, warrants, commodities, futures, derivatives (including swaps, forward contracts and structured instruments), currencies, monetary instruments, and cash and cash equivalents. In furtherance of the foregoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be formed under the Act, and any and all activities necessary or incidental thereto, including any other business activities described in the Partnership's confidential private placement memorandum (as amended and supplemented from time to time, the "**Memorandum**"). In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager (as defined in **Section 3.01**). Portfolio Funds may allocate their assets to Illiquid Investments (as defined in **Section 9.07(a)**).

**Section 1.04** **Place of Business**. The Partnership shall have offices located at 87 Railroad Place, Suite

403, Saratoga Springs, New York, 12866, or elsewhere as the General Partner may from time to time determine. The Partnership may have more than one (1) office as may from time to time be determined by the General Partner.

**Section 1.05** **Fiscal Year**. The fiscal year of the Partnership (the "**Fiscal Year**") shall end on December 31 of each year, except that it may be changed at any time by the General Partner in its sole discretion. In the event that the General Partner changes the Partnership's Fiscal Year, the dates and time periods referred to in this Agreement shall be appropriately adjusted.

**Section 1.06** **Term of Partnership**. The term of the Partnership commenced upon filing of the Partnership's Certificate with the Delaware Secretary and shall continue indefinitely; *provided, however*, that the Partnership shall be dissolved forthwith upon the occurrence of any one of the events set forth in **Section 13.01**.

## ARTICLE II
## COMPOSITION; ADMISSIONS

**Section 2.01** **Names of the Partners**. Atlas IDF GP, LLC, a Delaware limited liability company, is the sole general partner of the Partnership as of the date hereof. The names and addresses of the General Partner and of each of the Limited Partners shall be set forth in the records of the Partnership to be kept on file at all times at the principal place of business of the Partnership.

**Section 2.02** **Admission of Partners**. Additional Limited Partners (as defined in **Section 8.01**) may be admitted to the Partnership at such times as provided in **Article VIII**. In connection with the admission of a Limited Partner to the Partnership, such Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement or an agreement to become bound by the provisions of this Agreement and such other subscription materials as shall be determined by the General Partner. Upon the admission of a Limited Partner, the Initial Limited Partner listed on the signature page hereof shall automatically be deemed to have withdrawn from the Partnership. For the avoidance of doubt, the General Partner shall be permitted to make an investment in the Partnership and be issued Partnership Interests hereunder, and such Interests of the General Partner shall be treated as a Limited Partner's Partnership Interests hereunder. A substitute general partner and additional general partners may be admitted to the Partnership as provided in **Article IV**.

**Section 2.03** **Partnership Interests**.

(a) For purposes of this Agreement, the term "**Partnership Interest**" shall mean the quotient resulting from dividing (i) the amount in a Partner's Capital Account (as defined in **Section 9.01**), including the fair value of such Partner's interests in any Side Pocket Accounts (as defined in **Section 9.07**) or New Issues Accounts (as defined in **Section 9.08(a)**) and other memorandum accounts, by (ii) the aggregate amount in the Capital Accounts of all Partners, including the fair value of any Side Pocket Accounts, New Issues Accounts and other memorandum accounts. "**Partnership Interests**" shall mean the sum of all amounts in the Capital Accounts of all Partners (including all Side Pocket Accounts, New Issues Accounts and other memorandum accounts).

(b) The Partnership is an "insurance-dedicated" fund. The Partnership Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state or local government pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet certain suitability standards, as further set forth in the Memorandum. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.

Each life insurance company Limited Partner will be deemed to hold a Partnership Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Partnership Interest.

**Section 2.04** **Issuance of Interests in Series**.

(a) Pursuant to Section 17-218 of the Act, the Partnership Interests will be offered in separate series ("**Series**"). The Partnership is currently offering one Series of Partnership Interests: "**Series 1 Partnership Interests**". Each Series of Partnership Interests will have separate rights and obligations.

(b) In addition, each Series of Partnership Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series of Partnership Interests in the future, which may have rights and obligations that differ from those of the Series 1 Partnership Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined) and other rights and terms. The terms of such additional Series shall be determined by the General Partner, in its sole discretion.

(c) Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership shall maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series. The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.

(d) Pursuant to Section 17-218 of the Act, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

(e) As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined in **Section 2.04(f)**). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(f) As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined in the Memorandum), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal (as defined in the Memorandum) is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series, as further set forth in the Memorandum.

(g) Unless the context otherwise requires, Series 1 Partnership Interests and any other Series of Partnership Interests shall be collectively referred to throughout this Agreement as the "**Partnership Interests**." As the context may require, the holders of Series 1 Partnership Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Agreement the "**Limited Partners**".

(h) References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Agreement and/or in a separate supplement thereto.

## ARTICLE III
## MANAGEMENT

**Section 3.01** **Management of Partnership**

(a) The business and affairs of the Partnership shall be managed exclusively by the General Partner. The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership. The General Partner shall have sole discretion and authority to select investments, shall invest the funds of the Partnership from time to time as the General Partner deems appropriate in accordance with the purposes set forth in **Section 1.03**, and shall have (without limitation) the powers set forth in **Section 3.02**. The General Partner may select an investment manager ("**Investment Manager**") to provide all or any portion of the portfolio management services required by the Partnership, including the valuation of assets of the Partnership. The Investment Manager may be changed from time to time by the General Partner in its sole and absolute discretion. The initial Investment Manager shall be Rand Advisors, LLC, a Delaware limited liability company and an affiliate of the General Partner. If at any time there is no Investment Manager, then the General Partner shall provide such portfolio management services, and be subject to the provisions of this Agreement applicable to the Investment Manager.

(b) Each of the General Partner and the Investment Manager shall not be required to devote its full time to the business of the Partnership, but shall devote so much of its time and efforts to the affairs of the Partnership as may in its judgment be necessary to accomplish the purposes of the Partnership. Nothing herein contained shall prevent the General Partner or the Investment Manager from conducting any other business, including any business with respect to securities (and/or other investments), whether or not such business ventures are in direct or indirect competition with the Partnership. Each of the General Partner and the Investment Manager is not prohibited from buying or selling securities for its own account, including the same securities (and/or other investments) as are purchased, sold or held by the Partnership, but none of the General Partner, the Investment Manager or any of their respective affiliates (which shall not include, for purposes of this paragraph, advisory clients or managed funds) shall buy securities (and/or other investments) from or sell securities (and/or other investments) to the Partnership without the written consent of either all Limited Partners or a committee of independent Limited Partners.

**Section 3.02** **Powers of the General Partner**. Without in any way intending to limit the powers of the General Partner, the General Partner shall have the right, power and authority on behalf of the Partnership (or to delegate any portion of such rights, power and authority):

(a) As provided in **Section 3.01**, to allocate all of the assets of the Partnership among securities (and/or other investments) to be selected by the General Partner in its sole and absolute discretion, including, but not limited to the right to:

(i) purchase, hold and sell securities (and/or other investments) and rights therein of any kind or nature;

(ii) allocate any and all of the assets of the Partnership among a number of Portfolio Funds;

(iii) purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind;

(iv) maintain margin accounts with brokers, pledge securities for loans and, in connection with any such pledge, effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v) transact business through brokers and dealers and other persons selected by the General Partner in its sole discretion, and in selecting such brokers, dealers and other persons, and determining the compensation payable to such persons, it shall seek to obtain the best execution for the Partnership taking into account the value of any research and brokerage services or products provided by such persons to the General Partner or the Partnership even though other persons may be able to provide transactional services (without any accompanying research or brokerage services or products) at lower rates of compensation;

(b) To acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership and the General Partner or for any purpose convenient or beneficial to the Partnership;

(c) To engage in any transaction with affiliates of the General Partner, including entering into and amending and restating an investment management agreement with the Investment Manager (any such agreement, in effect from time to time, "**Investment Management Agreement**"), subject to the restrictions in **Section 3.01(b)**;

(d) To employ persons, whether full-time or part-time, in the operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner shall determine, regardless of whether or not such persons also may be employed by the General Partner or its affiliates;

(e) To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings or any claims, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(f) To open brokerage, bank and other accounts and, to the extent that funds are not invested, to deposit and maintain such funds in the name of the Partnership in such accounts and to temporarily invest such funds in short term United States and/or foreign government securities, money market accounts and/or other short term interest-bearing instruments; *provided, however*, that the Partnership's funds shall not be commingled with the funds of any other person or entity;

(g) To cause the Partnership to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended ("**Code**"), or any similar provision enacted in lieu thereof;

(h) To act as the "tax matters partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code;

(i) To select as its accounting year the annual period ending December 31 or any other Fiscal Year as is permitted by the Internal Revenue Service ("**IRS**");

(j) To engage independent accountants, attorneys, investment managers, sub-advisers, broker-dealers, administrators, custodians, consultants and such other persons as the General Partner may deem necessary or advisable;

(k) To establish and maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part time or full time, and do such other acts and incur such expenses as the General Partner may deem necessary or advisable in connection with the maintenance or administration of such office;

(l) To require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the person or entity contracting with the

Partnership is to look solely to the Partnership and its assets for satisfaction;

(m) To purchase and sell Partnership assets at such price or amount for cash, securities or other property and upon such terms as are deemed in the General Partner's absolute discretion to be in the best interests of the Partnership;

(n) To prepare (or cause to be prepared), execute, acknowledge and/or deliver any and all instruments to effectuate the business of the Partnership, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Partner, as provided in **Sections 3.06(b) and 13.05**;

(o) To effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the U.S. Investment Advisers Act of 1940, as amended ("**Advisers Act**")) through the General Partner or any of its affiliates that is registered as a broker or dealer; *provided* that the authority granted in this subsection may be revoked at any time by the General Partner or by vote or consent of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners;

(p) To "cross" any transaction for the purchase or sale of securities between two or more advisory clients or managed funds, including the Partnership (as contemplated in Rule 206(3) under the Advisers Act and interpretations thereunder) ("**Cross Trading**"); *provided* that the General Partner receives no additional compensation in connection with such Cross Trading activities, and subject to the restrictions in **Section 3.01(b)**;

(q) To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions (as defined in **Section 8.01**), withdrawals of capital, any fee, any payment to the General Partner and/or any requirement imposed on a Limited Partner by this Agreement, regardless of whether such notice period, minimum amount, limitation, restriction, withdrawal provision, fee, payment or other requirement of this Agreement, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(r) To establish such reserves for the Partnership as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with U.S. generally accepted accounting principles ("**GAAP**"));

(s) To value the assets and liabilities of the Partnership;

(t) To create special purpose vehicles to make or pursue investments either alone or as a joint-venture with other persons or entities;

(u) To establish and offer multiple Series of Partnership Interests with such rights and privileges as the General Partner shall determine, and to amend this Agreement in connection therewith to reflect such multi-Series structure;

(v) To convert the Partnership from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, and to amend this Agreement pursuant thereto to reflect such master-feeder structure;

(w) To create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets; and

(x) To do any act, engage in any activity or execute any agreement of any nature, necessary or incidental to the accomplishment of the purposes of the Partnership in accordance with the provisions of this Agreement, the Memorandum and all applicable federal, state and local laws and regulations.

**Section 3.03** **Actions of General Partner**. The General Partner is authorized, directed and empowered to act individually on behalf of the Partnership, and in accordance therewith, to execute all documents and instruments on behalf of the Partnership. Third parties may rely on the execution of any documents on behalf of the Partnership by the General Partner.

**Section 3.04** **Liability and Indemnification**

(a) None of the General Partner, the Investment Manager or any of the Investment Manager Affiliates (as defined in **Section 6.02(a)**) shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. It shall be conclusively presumed and established that the General Partner, the Investment Manager and such persons acted in good faith if any action is taken, or not taken, by any of them on the advice of legal counsel or other independent outside consultants; *provided* that the General Partner, the Investment Manager and such persons did not act with gross negligence or willful misconduct in the selection of such counsel or consultants. Any exculpation under this **Section 3.04(a)** shall apply only to the extent that such exculpation does not violate applicable federal and state laws.

(b) The Partnership shall indemnify and hold harmless the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this **Section 3.04(b)**, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 3.04(b)** shall be paid from and to the extent of Partnership assets only, and shall apply only to the extent that such indemnity does not violate applicable federal and state laws. The Partnership shall, in the sole discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis.

(c) If, to the extent, and at such times as, any assets of the Partnership are deemed to be "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), of any Limited Partner that is an employee benefit plan governed by ERISA, the General Partner shall be, and hereby acknowledges that it shall be considered to be, a fiduciary within the meaning of Section 3(21) of ERISA as to that Limited Partner. In such an event, or if any manager, member, officer, employee, agent or affiliate of the General Partner, is ever held to be a fiduciary of any Limited Partner, then, in accordance with Sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Partnership, and the person shall not be responsible for any other duties to such Limited Partner, specifically including evaluating the initial or continued appropriateness of this investment in the Partnership under Section 404(a)(1) of ERISA.

**Section 3.05** **No Prohibition Against Other Business Ventures**. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage and hold interests in other business ventures of every kind and description for its own account, including, without limitation, other investment entities similar to the Partnership, whether or not such

business ventures are in direct or indirect competition with the Partnership, and whether or not the Partnership or any of the Partners also has an interest therein, without having to account to the Partnership or any Partner for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Partnership or any Partner.

**Section 3.06** **Duty to Keep Books, Financial and Tax Reports**

(a) At all times during the existence of the Partnership, the General Partner shall keep true and complete records and books of account, in which each transaction of the Partnership shall be entered fully and accurately. The General Partner has the power, in its sole and absolute discretion, to delegate some or all of the administrative bookkeeping functions relating to the Partnership to an administrator or other agent, which may be the Partnership's accountants.

(b) The General Partner shall cause to be prepared and distributed to each Partner as soon as practicable following each Fiscal Year the Partnership's annual financial statements prepared in accordance with GAAP (except to the extent that the Memorandum or this Agreement states or contemplates that such statements may be inconsistent with GAAP) and audited by an independent certified public accounting firm. The General Partner shall also have prepared and filed all federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Partnership is obligated to file. Subject to the limitations set forth in **Section 5.04**, copies of all Partnership tax returns, information returns or reports shall be available to all Partners as soon as possible after the close of the Partnership's Fiscal Year at the principal office of the Partnership. Copies of each Partner's Schedule K-1 of the Partnership's Tax Return (Form 1065) shall be distributed to such Partner as soon as practicable after the close of the Partnership's Fiscal Year. The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

(c) The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**IFRS**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## ARTICLE IV
## GENERAL PARTNER RESIGNATION; TRANSFER OF GENERAL PARTNER INTEREST; CONTINUATION OF PARTNERSHIP; SUBSTITUTION OF GENERAL PARTNER

**Section 4.01** **General Partner Resignation and Involuntary Withdrawal; Admission of Additional General Partners and Transfer by General Partner**

(a) The General Partner shall not be permitted to voluntarily withdraw or resign as the general partner of the Partnership, except upon no less than thirty (30) days' prior written notice to all Limited Partners. In the event of dissolution of the General Partner, or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the General Partner, or the General Partner shall make any assignment for the benefit of its creditors (any of the foregoing, an "**Involuntary Withdrawal**"), the General Partner or the General Partner's trustee, receiver or assignee shall have none of the rights and powers of a general partner hereunder, and shall have no authority to act on behalf of the Partnership or have any voice in the management and operation of the Partnership, except as provided in **Section 13.02**.

(b) The General Partner may admit additional general partners to the Partnership at such times as the General Partner shall determine, without the consent of the Limited Partners. Notwithstanding anything herein to the contrary, the General Partner shall have the right to transfer its interest, as the general partner of the Partnership, to any affiliate of the General Partner, including any person or entity controlled by the

General Partner, controlling the General Partner or under common control with the General Partner, without the consent of the Limited Partners. In the event of such transfer by the General Partner to an affiliate, the General Partner shall not be deemed to have resigned or withdrawn from the Partnership for purposes of **Section 13.01(a)**. Any affiliate transferee of the General Partner under this **Section 4.01(b)** shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to such transfer. The General Partner shall not assign, transfer, sell, mortgage or otherwise encumber or transfer its interest as the general partner of the Partnership, except as set forth herein. Any additional general partner or transferee of the General Partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. For the avoidance of doubt, should the General Partner transfer its interest, as the general partner of the Partnership, to any non-affiliate of the General Partner, the Limited Partners shall have the right to revoke such appointment within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners.

**Section 4.02** **Continuation of Partnership; Appointment of Substitute General Partner by Limited Partners**. If an event as set forth in **Section 13.01(a)** occurs, the Limited Partners shall have the right, within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, to appoint a substitute general partner, in which event the Partnership shall not dissolve and shall continue its existence.

**Section 4.03** **Substitute General Partner Requirements**. Any substitute general partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. Any successor to such office of general partner shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to its withdrawal, resignation or Involuntary Withdrawal from the Partnership.

## ARTICLE V
## STATUS, RIGHTS, POWERS AND VOTING RIGHTS OF LIMITED PARTNERS

**Section 5.01** **Limited Liability**. No Limited Partner, Substitute Limited Partner (as defined in **Section 10.02**) or Additional Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Partner's Capital Account in the relevant Series, from time to time, including any amounts thereof attributable to Capital Contributions, except that such Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership (x) in an amount up to its aggregate Capital Contributions in the relevant Series (including any income or gains thereon) to the Partnership in order to pay such Partner's *pro rata* share of any Partnership liabilities that arose while such Partner held Partnership Interests, and (y) as required under **Section 5.02(b)**.

**Section 5.02** **Capital Contributions**

(a) No Limited Partner shall be entitled to a return of such Limited Partner's Capital Contribution or any portion thereof, except as set forth in **Section 7.01**, and no time has been agreed upon for the return of any Partner's Capital Contribution, except as herein provided.

(b) Each Limited Partner, if such Limited Partner receives a return of all or any part of such Limited Partner's Capital Contribution, may, to the extent provided for in the Act, be liable to the Partnership or the relevant Series for an amount equal to such distribution, if at the time of such distribution, the Limited Partner knew the

Partnership or the relevant Series was prohibited from making such distribution under the Act.

**Section 5.03** **<u>Liability of Limited Partner for Additional Contributions and Loans</u>**. No Limited Partner shall be obligated to provide any contributions to the Partnership, other than the Original Capital Contribution (as defined in **<u>Section 9.02</u>**) of such Limited Partner. No Limited Partner shall be obligated to make any loan to the Partnership.

**Section 5.04** **<u>Rights of Limited Partners to Inspect Books, Records, and Partnership Documents</u>**. Upon reasonable advance written notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained pursuant to Section 17-305 of the Act and any financial statements maintained by the Partnership. Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner. Notwithstanding the foregoing, the General Partner in its discretion may limit the information that a Limited Partner may obtain pursuant to this **<u>Section 5.04</u>** to the extent that such information shall allow a Limited Partner to identify any other Limited Partner. As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner. Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

**Section 5.05** **<u>No Restriction on Other Activities</u>**. Limited Partners may engage and hold interests in business ventures of every kind and description for their own accounts, including, without limitation, business ventures which are, directly or indirectly, in competition with the Partnership and whether or not the Partnership or any of the Partners also has an interest therein. Neither the Partnership nor any of the Partners shall have any rights in such independent business ventures by virtue of this Agreement.

**Section 5.06** **<u>Voting Rights</u>**. In addition to the rights to vote conferred upon the Limited Partners in **<u>Sections 3.01(b), 3.02, 4.02 and 13.02</u>** or otherwise specifically set forth herein, Limited Partners shall have the right to vote on amendments to this Agreement to the extent provided in **<u>Section 14.08</u>**.

**Section 5.07** **<u>Constructive Consent by Limited Partners</u>**. In the event that the General Partner requires the consent of the Limited Partners in order to take action (including approving amendments to this Agreement), and written notice of such action is sent to any such Limited Partners by (i) certified mail, return receipt requested, (ii) electronic mail, or (iii) overnight delivery by a reputable private carrier or by the postal service, those Limited Partners not affirmatively objecting in writing within thirty (30) days after such notice is deemed to have been mailed or sent (under **<u>Section 14.01</u>**) be deemed to have consented to the proposed action set forth in the General Partner's notice.

**Section 5.08** **<u>Rights as to Dissolution</u>**. The Limited Partners shall have no right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement. No Limited Partner shall have the right to bring an action for partition against the Partnership, and each Partner hereby waives any right to partition of the Partnership's property.

**Section 5.09** **<u>Consent by Partners in Lieu of Meeting</u>**. Any action required by this Agreement or the Act to be taken at any regular or special meeting of the Partners, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Partners (or shall be deemed signed by the Partners pursuant to **<u>Section 5.07</u>**) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Partners entitled to vote thereon were present and voted.

**Section 5.10** **<u>Non-Voting Interests of BHC Limited Partners; Other Non-Voting Interests</u>**

(a) The portion of any Partnership Interest held for its own account by a BHC Limited Partner (as defined in this **Section 5.10(a)**) whose interests in the Partnership are determined, at any time, to be in excess of 4.99% (or such greater or lesser percentage as may be permitted or required from time to time under Section 4(c)(6) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) of the aggregate outstanding Partnership Interests of all Limited Partners, excluding any other Partnership Interests that are non-voting Partnership Interests pursuant to this **Section 5.10**, shall be deemed to be non-voting Partnership Interests to the extent of such excess above 4.99% (whether or not subsequently transferred, in whole or in part, to any other person or entity) (collectively, "**Non-Voting Interests**"); *provided* that such Non-Voting Interests shall be permitted to participate in any vote by the Limited Partners on (i) any proposal to dissolve or continue the business of the Partnership under this Agreement, (ii) any vote pursuant to **Section 4.02**, and (iii) matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to this Agreement or modifications of the terms of its Partnership Interest). Except as provided in **Section 13.01(a)**, a BHC Limited Partner shall not be permitted to vote on the selection of any successor general partner of the Partnership, and each BHC Limited Partner irrevocably waives its right to vote its Non-Voting Interest on the selection of a successor general partner of the Partnership under Section 17-801 of the Act, which waiver shall be binding upon such BHC Limited Partner or any person or entity that succeeds to its Partnership Interest. A "**BHC Limited Partner**" shall mean any Limited Partner that is, or is an affiliate of, a bank holding company (as defined in Section 2(a) of the BHCA) that is subject to the provisions of Regulation Y issued by the Board of Governors of the Federal Reserve System.

(b) To the extent permitted by the BHCA, and except as otherwise provided in this **Section 5.10**, Non-Voting Interests shall not be counted as Partnership Interests held by any Limited Partner for purposes of determining whether any vote or consent required by this Agreement has been approved or given by the requisite percentage of the Limited Partners.

(c) Notwithstanding the foregoing, any BHC Limited Partner may elect to no longer be treated as a BHC Limited Partner for the purposes of this Agreement by delivering written notice of such election to the General Partner. Any such election made by a BHC Limited Partner may be rescinded at any time by providing written notice thereof to the General Partner.

(d) The General Partner may, for legal, regulatory or other reasons, designate any other Partnership Interests as non-voting, in whole or in part. Except as provided in this **Section 5.10**, a Partnership Interest held by a Limited Partner as a non-voting Partnership Interest shall be identical in all regards to all other Partnership Interests held by Limited Partners.

(e) For the avoidance of doubt, the provisions of this **Section 5.10** shall apply on a Series-by-Series basis.

## ARTICLE VI
## FEES AND EXPENSES; BROKERAGE PRACTICES

**Section 6.01** **Management Fee**.

(a) In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager shall receive a quarterly management fee ("**Management Fee**") equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined in **Section 9.04**), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|

| | |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each Capital Account will be charged a blended Management Fee based on the above schedule.

The Management Fee shall be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee shall be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee shall be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's Capital Account during any calendar quarter. Management Fees shall be payable with respect to the Partnership Interests of a Limited Partner in any Side Pocket Account.

(b) For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (each as defined in **Section 9.07**) shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

(c) With respect to any Limited Partner who has requested to withdraw all of its Partnership Interests from the Partnership, with the exception of any Partnership Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Partnership Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account shall remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve shall be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, shall be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

(d) The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined in the Memorandum), including the PE Portfolio Fund (as defined in the Memorandum). Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Section 6.02** **Expenses**

(a) **Organizational and Initial Offering Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their respective managers, members, shareholders, directors, officers, partners, employees, agents and/or affiliates (collectively, "**Investment Manager Affiliates**") for all organizational

and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to sixty (60) months from the date the Partnership commences operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in Fiscal Year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of this Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within sixty (60) months of its commencement, any unamortized expenses shall be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

(b) **Operating Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Partnership Interests, including, but not limited to, printing of the Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Partnership's administrator ("**Administrator**"), costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership. Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

(c) **Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

(d) **General Partner and Investment Manager Expenses**. The General Partner and the Investment Manager shall pay for their own general operating and overhead expenses associated with providing the management and investment management services required under this Agreement and the Investment Management Agreement, respectively. These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended, as set forth in the Memorandum.

**Section 6.03** **Marketing Fees and Sales Charges**. The General Partner and/or the Investment Manager may sell Partnership Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the Capital Contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer shall be disclosed to, and acknowledged by, such Limited Partner.

**Section 6.04** **Directed Brokerage**. The Investment Manager is authorized to direct Partnership brokerage transactions to brokers or other persons who refer prospective Limited Partners to the Partnership. The Investment Manager is authorized to pay finders' fees or other compensation at its own expense to such persons.

**Section 6.05** **Allocation of Investment Opportunities**. The Investment Manager may at times determine that certain investments shall be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, the Investment Manager's own accounts or accounts of an affiliate. If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager shall endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable. The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

**Section 6.06** **Aggregation of Orders**. The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership shall be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors. In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities. Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold. In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

## ARTICLE VII
## WITHDRAWALS FROM CAPITAL ACCOUNT; DISTRIBUTIONS

**Section 7.01** **Permissible Withdrawals**. A Limited Partner may withdraw all or any of the value in such Limited Partner's Capital Account in any Series in the manner and to the extent provided in **Section 7.02**. Each of the General Partner and its principals and affiliates may withdraw all or any of the value in its respective Capital Account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.

**Section 7.02** **Withdrawal Procedures**

(a) Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date shall be referred to herein as a "**Withdrawal Date**"), upon at least ninety-one (91) days' prior written notice to the Administrator, with a copy to the General Partner. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's Capital Account balance below $500,000. All withdrawals shall be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

(b) The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Partnership Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal. In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(c) A Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's Capital Account. At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in **Section 9.07**). **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

(d) The following provision shall apply to withdrawals, on a Series-by-Series basis:

(i) A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, less than ninety percent (90%) of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts) shall be paid within ninety (90) days after the applicable Withdrawal Date.

(ii) In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, ninety percent (90%) or more of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such Fiscal Year ninety percent (90%) of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within ninety (90)

days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal shall be paid, without interest, within ninety (90) days after completion of the audited financial statements for the Fiscal Year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full Capital Account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within ninety (90) days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

(e) The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's Capital Accounts on at least five (5) days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

(f) The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's Capital Account under this **Article VII**.

(g) All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

(h) All notices of withdrawal must specify the dollar amount or percentage of value of a Limited Partner's Capital Account to be withdrawn. The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

(i) If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee shall be payable to the relevant Series of the Partnership and shall be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

(j) Upon withdrawal of all of the capital in its Capital Account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner shall be deemed to have withdrawn from the Partnership or the relevant Series and, upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under this Agreement.

(k) In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable. For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

**Section 7.03 Limitations on Withdrawals**

(a) The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from Capital Accounts:

(i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners;

(ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds;

(iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications;

(iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account;

(v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or

(vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

(b) All Limited Partners shall be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

**Section 7.04** **<u>Distributions</u>**

(a) The Partnership (or any Series) is not required, and generally does not intend, to make any distributions of cash or other property. However, the Partnership (or any Series) may make such distributions at such times and in such amounts as the General Partner shall determine in its sole discretion.

(b) All distributions hereunder (other than those made related to withdrawals from Capital Accounts) shall be made *pro rata* to all Partners in accordance with their relative Capital Accounts (or Side Pocket Accounts, New Issues Accounts or other memorandum accounts, as applicable) at the time of any such distribution. The General Partner may set up such reserves as it shall determine shall be appropriate or necessary to accomplish the purposes of the Partnership (even if such reserves are not in accordance with GAAP). If the Partnership (or a Series) shall distribute property other than cash pursuant to this **<u>Section 7.04</u>**, the Capital Accounts of the Partners shall be adjusted as if such property were sold at the value of such property as determined under **<u>Section 9.04</u>**, and the cash proceeds of such sale were distributed.

(c) Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

## ARTICLE VIII
## ADDITIONAL LIMITED PARTNERS

**Section 8.01** **<u>Future Issuance of Partnership Interests</u>**. The General Partner may admit as of the first day

of each month (each such date, a "**Contribution Date**"), or at any other time that the General Partner determines in its sole and absolute discretion, as additional Limited Partners ("**Additional Limited Partners**"), persons who contribute cash or, in the General Partner's sole discretion, persons who contribute securities (and/or other investments), for Partnership Interests ("**Capital Contributions**"). If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including, but not limited to, the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments), and legal, accounting and administration costs. Such special charge shall be assessed as of such dates deemed appropriate by the General Partner. Any securities (and/or other investments) accepted as a Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

## ARTICLE IX
## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS; NET ASSET VALUE ADJUSTMENTS; TAXABLE INCOME AND LOSS AND DISTRIBUTIONS

**Section 9.01** **Capital Accounts**. A Partner's "**Capital Account**" as of a particular date shall consist of the following:

(a) an amount equal to the Partner's Original Capital Contribution;

(b) the increases, if any, to such account by reason of Additional Capital Contributions (as defined in **Section 9.03(a)**);

(c) the decreases, if any, to such account by reason of withdrawals (and distributions) from such Capital Account; and

(d) the increases or decreases, if any, to such Capital Account in accordance with the provisions of this **Article IX**.

Capital Accounts shall be maintained in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2), or any successor provisions thereto.

**Section 9.02** **Original Capital Contributions**. A Partner's "**Original Capital Contribution**" shall be the amount of the cash, or in the sole discretion of the General Partner, securities (and/or other investments), contributed by such party upon such Partner's admission as a Partner. The General Partner may establish such minimum Original Capital Contribution as the General Partner deems appropriate and that minimum may thereafter be waived or changed by the General Partner. In the event an Original Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that a Partner is admitted, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Original Capital Contribution, and commence a new accounting period on the date of such admission, and upon such admission, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.

**Section 9.03** **Additional Capital Contributions**

(a) A Partner shall be permitted, with the consent of the General Partner, to make additional Capital Contributions in an amount deemed appropriate by the General Partner in cash or, in the sole discretion of the General Partner, securities (and/or other investments) ("**Additional Capital Contributions**") to the capital of the Partnership as of any Contribution Date, or at any other time that the General Partner determines in its sole and absolute discretion. In the event an Additional Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that Additional

Capital Contributions are accepted pursuant to this **Section 9.03**, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Additional Capital Contributions, and commence a new accounting period on the date of such acceptance, and upon such acceptance, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners. Any securities accepted as an Additional Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

(b) In connection with an Additional Capital Contribution by an existing Limited Partner, the General Partner shall (i) treat such Additional Capital Contribution as a Capital Contribution with respect to one of such Limited Partner's existing Capital Accounts or (ii) establish a new Capital Account to which such Capital Contribution shall be credited and which shall be maintained for the benefit of such Limited Partner separately from any existing Capital Account of such Limited Partner. Such separate Capital Account may be maintained for any purpose, in the discretion of the General Partner. If a Limited Partner has more than one Capital Account, any withdrawals by or distributions to such Limited Partner shall be applied to such Capital Accounts in such manner and proportion as the General Partner shall determine in its sole discretion.

**Section 9.04** **Determination of Net Asset Value**

(a) The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, shall be determined on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to sixty (60) months from the date the Partnership commences operations and (y) reserves may be taken that are inconsistent with GAAP), the Memorandum and the following:

(1) No value shall be assigned to goodwill;

(2) All accrued debts and liabilities shall be treated as liabilities, including, but not limited to, all compensation payable to the Investment Manager that has been earned but not yet paid (e.g., Management Fees), any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are required;

(3) Securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, shall be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date;

(4) Options that are listed on a securities or commodities exchange shall be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; provided that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options shall be valued at the midpoint between the last "bid" and "ask" prices for such options on such date;

(5) Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, shall be valued based upon quotations obtained from market makers, dealers or pricing services;

(6) Securities (and/or other investments) contributed to the Partnership as subscription proceeds shall be treated as if purchased by the Partnership at market value on the date of contribution, and securities (and/or other

investments) distributed from the Partnership as withdrawal proceeds shall be treated as if sold by the Partnership at market value on the date of distribution;

(7) Net profits and net losses from New Issues (as defined in **Section 9.08(a)**) shall only be credited or debited to the Net Asset Value of the New Issues Accounts, except to the extent permitted by the applicable rules of the FINRA (as defined in **Section 9.08(a)**), in which case a portion of the net profits and net losses from New Issues may be credited or debited to the Net Asset Value of the Capital Accounts of Limited Partners who are Restricted Persons (as defined in **Section 9.08(a)**) up to an amount permitted by applicable FINRA rules;

(8) Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, shall be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value; and

(9) In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

(b) If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument does not fairly represent its market value, the Investment Manager shall value such security, commodity, option or other financial instrument as it reasonably determines.

(c) In connection with the determination of the Net Asset Value of the Partnership, the Investment Manager may consult with and is entitled to rely upon the advice of the Partnership's brokers and any other third parties deemed appropriate by the Investment Manager. In no event and under no circumstances shall the Investment Manager, the Partnership's brokers or such other third parties incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

(d) Absent bad faith or manifest error, all Net Asset Value determinations pursuant to this Agreement are conclusive and binding as to all Partners.

(e) After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Partnership during the month (or other time period, as the case may be) just ended. The term "**increase in Net Asset Value**" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the Net Asset Value of the Partnership as of the end of the preceding period, after adjusting for Capital Contributions, distributions and withdrawals. The term "**decrease in Net Asset Value**" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Partnership as of the end of the preceding period, after making the adjustments specified above.

**Section 9.05** **Allocation of Increases and Decreases in Net Asset Value**

(a) Any net increase or decrease in Net Asset Value during any month (or such other period, as the case may be) shall be allocated as of the end of such month (or such other period, as the case may be) to the Capital Account of each Partner in the proportion which such Partner's Capital Account bore to the sum of the Capital Accounts of all the Partners as of the beginning of such month (or such other period, as the case may be); *provided* that net increases or decreases in Side Pocket Accounts, New Issues Accounts and other memorandum accounts shall be allocated as provided in **Sections 9.07 and 9.08**, respectively.

(b) Notwithstanding the provisions set forth above, if the Partnership has a material item of income or loss in any fiscal period which relates to a matter or transaction occurring during a prior fiscal period (e.g., if the Partnership wins a cash settlement in a case it began in a prior period) the item of income or loss may, at the sole discretion of the General Partner, be shared among the Partners (including persons who ceased to be Partners) in accordance with each such Partner's Partnership Interest in the Partnership during the prior period.

**Section 9.06** **Allocations for Tax Purposes; General Partner Discretion on Allocations; Withholding**

(a) Ordinary income, gains, losses and deductions of the Partnership for each Fiscal Year shall accrue to, and be borne by, the Partners in proportion to their sharing of net increases or decreases in Net Asset Value, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate.

(b) All allocations under this **Section 9.06** shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury regulations promulgated thereunder ("**Regulations**"), or the successor provisions to such Code Section and Regulations.

(c) All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion, and the General Partner is expressly permitted to use the aggregate method of apportioning taxable gain and loss under Treasury Regulation Section 704(b). The General Partner is expressly authorized to make special allocations to the Partners of such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d). The General Partner's determination of the foregoing matters shall be final and conclusive as to all parties.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event a Partner withdraws all of the capital in its Capital Account from the Partnership (excluding any amounts held in Side Pocket Accounts), the General Partner shall have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's Capital Account exceeds, or is less than, its federal income tax basis in its Partnership Interest.

(e) Any taxes, fees or other charges that the Partnership is required to withhold under applicable law with respect to any Partner shall be withheld by the Partnership (and paid to the appropriate government authority) and shall be deducted from the Capital Account of such Partner as of the last day of the Fiscal Year (or earlier if the Partner withdraws) with respect to which amounts are required to be withheld.

(f) For the avoidance of doubt, the provisions of this **Section 9.06** shall apply on a Series-by-Series basis.

**Section 9.07** **Side Pocket Accounts**

(a) The Investment Manager may designate that certain investments held by a Series of

the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in a Side Pocket Account, and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely**. Illiquid Investments held in a Side Pocket Account shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

(b) At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) shall be reallocated, *pro rata*, from the Side Pocket Account to the Capital Accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account shall receive an amount equal to its interest in such Side Pocket Account (net of any accrued Management Fees and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve), with respect thereto) within ninety (90) days after such reallocation. A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

(c) Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Notwithstanding any provisions of this Agreement to the contrary, any expenses relating specifically to a Side Pocket Account shall be charged to the Partners participating in such account in proportion to their respective interests therein, as of the commencement of such Side Pocket Account.

(d) If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment (each, a "**Follow-On Investment**"), only the Partners participating in such original investment shall participate in such Follow-

On Investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that if a Partner shall have withdrawn from the Partnership, the General Partner shall equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the Follow-On Investment. In its discretion, the Investment Manager need not designate as a "Follow-On Investment" an additional investment in the same or similar opportunity as the investment for which a Side Pocket Account has been established, but instead may designate such investment as a new investment with a separate Side Pocket Account. Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment.

**Section 9.08** **New Issues; Other Memorandum Accounts for Restricted Transactions**.

(a) From time to time, the Partnership may invest in initial public offerings of equity securities ("**New Issues**"). Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in New Issues, each subject to a de minimis exemption ("**De Minimis Limit**"). To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular Capital Accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts shall be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed the De Minimis Limit.

(b) In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds shall be transferred from the Partnership to the New Issues Account. Securities held in the New Issues Account shall be held there until they are eventually sold or transferred. Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the Capital Accounts of all of the Partners after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period shall be credited or debited to the Capital Accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. In the event that the Partnership establishes one or more New Issues Accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that Limited Partners that are not Restricted Persons were receiving profits based in part on the capital of Limited Partners that are Restricted Persons. Such adjustment may, in the sole and absolute discretion of the General Partner, and to the extent not prohibited by rules of FINRA, consist of: (i) assessing an interest charge to the Capital Accounts of Limited Partners that are not Restricted Persons, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by Limited Partners that are not Restricted Persons in connection with New Issue trades; or (ii) such other adjustment as the General Partner considers equitable and is not inconsistent with the rules of FINRA.

(c) In addition to the foregoing provisions with respect to New Issues Accounts and Side Pocket Accounts, to the extent that certain Limited Partners are restricted from participating in any transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such non-participating Limited Partners. Only those Limited Partners who the General Partner determines are eligible shall participate in such accounts. In the event that the Partnership establishes one or more memorandum accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that participating

Limited Partners were receiving profits based in part on the capital of non-participating Limited Partners. Such adjustment may, in the sole and absolute discretion of the General Partner, consist of: (i) assessing an interest charge to the Capital Accounts of participating Limited Partners, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by participating Limited Partners in connection with such trades; or (ii) such other adjustment as the General Partner considers equitable.

# ARTICLE X
# RESTRICTIONS ON TRANSFERS OF PARTNERSHIP INTERESTS OF LIMITED PARTNERS; ADMISSION OF SUBSTITUTE LIMITED PARTNERS; OTHER MATTERS AFFECTING PARTNERSHIP INTERESTS

**Section 10.01** **Restrictions on Transfer of Partnership Interests of Limited Partners**

(a) Except for transfers by will or intestate succession or by operation of law, no Limited Partner may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "**Transfer**" or "**Transferred**"), in whole or in part, such Limited Partner's Partnership Interest without the consent of the General Partner, which may be given or withheld in the sole and absolute discretion of the General Partner.

(b) No Limited Partner may Transfer, in whole or in part, such Limited Partner's Partnership Interest if, in the General Partner's discretion, such Transfer could result in the termination of the Partnership for federal income tax purposes, and any purported Transfer that could result in the termination of the Partnership for federal income tax purposes shall be void *ab initio*. In its sole and absolute discretion, the General Partner may request a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) as to whether any contemplated Transfer could result in the termination of the Partnership for federal income tax purposes, and the General Partner shall be entitled to rely conclusively upon such opinion in determining whether such Transfer could result in the termination of the Partnership and whether consent to such disposition should be given.

(c) The Partnership Interests may not be transferred without documentation acceptable to the General Partner, which may include a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) that such proposed Transfer may be effected without:

(i) registration of the Partnership Interest being made under the Securities Act of 1933, as amended;

(ii) violating any applicable state securities or "blue sky" law (including investment suitability standards) or the laws of any other jurisdiction;

(iii) the Partnership becoming subject to the Investment Company Act of 1940, as amended ("**1940 Act**"); or

(iv) violating the Act.

(d) In no event shall the Partnership Interest of a Limited Partner or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

**Section 10.02** **Admission of Substitute Limited Partner**

(a) Subject to the provisions of this **Article X**, an assignee of the Partnership Interest of a Limited Partner (which shall include any purchaser, transferee, donee or other recipient of any disposition of such Partnership Interest) shall be deemed admitted to the Partnership as a Limited Partner (a "**Substitute Limited Partner**") only upon the satisfactory completion of the following:

(i) consent of the General Partner shall have been given, which may be given or withheld in the sole and absolute discretion of the General Partner and which shall be evidenced by a written document executed by the General Partner;

(ii) the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and such assignee shall have expressly assumed all of the rights and obligations of the assignor Limited Partner hereunder, and shall have executed such other documents or instruments as the General Partner may require in its sole and absolute discretion in order to effect the admission of such person as a Limited Partner;

(iii) an amendment to the Certificate, if required by the Act (in the opinion of the General Partner), evidencing the admission of such person as a Limited Partner shall have been filed;

(iv) the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the Partnership Interest is made as a principal, for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such Partnership Interest, and that the assignee will not Transfer such Partnership Interest or any fraction thereof to anyone in violation of this Agreement;

(v) if the assignee is a corporation, partnership, limited liability company, trust or other entity, the assignee shall have provided to the General Partner evidence satisfactory to the General Partner of its authority to become a Limited Partner under the terms and provisions of this Agreement;

(vi) the assignee shall have complied with all applicable governmental rules and regulations, if any;

(vii) the assignee meets the suitability requirements for investing in the Partnership and the assignee completes the subscription documents ("**Subscription Documents**") provided by the General Partner; and

(viii) all costs and expenses incurred by the Partnership and the General Partner in connection with this **Section 10.02** shall be paid by the person or entity seeking to become a Substitute Limited Partner (or the transferor Limited Partner).

**Section 10.03** **Rights of Assignee of Partnership Interest**

(a) Subject to **Section 10.01(b)**, if a Limited Partner Transfers all or a portion of such Limited Partner's Partnership Interest, involuntarily, by operation of law or voluntarily, without the consent required by this **Article X**, the transferee or assignee shall: (i) be entitled only to receive that proportion of profit and loss, and any distribution of Partnership assets, attributable to the Partnership Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon written notification of same to the General Partner consistent with **Section 10.03(b)**; and (ii) have no other rights as a Limited Partner unless admitted as a Substitute Limited Partner in accordance with the terms of this Agreement.

(b) Subject to the provisions of **Section 10.01**, and except as required by operation of law, the Partnership shall not be obligated for any purposes whatsoever to recognize the assignment by any Limited Partner of such Limited Partner's Partnership Interest until the General Partner has received notice thereof.

(c) Any person or entity who is the assignee of all or any portion of the Partnership Interest of a Limited Partner, but who has not become a Substitute Limited Partner, and desires to make a further disposition of such Partnership Interest, shall be subject to all the provisions of this **Article X** to the same extent and in the same manner as

any Limited Partner desiring to make a disposition of such Limited Partner's Partnership Interest.

**Section 10.04** **<u>Effect of Bankruptcy, Death or Incompetence of a Limited Partner</u>**. The bankruptcy, dissolution or winding up of a Limited Partner, the death of a Limited Partner or an adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity), shall not cause the termination, wind-down or dissolution of the Partnership and the business of the Partnership shall continue. If a Limited Partner becomes bankrupt, dissolved or wound up, the trustee or receiver of such Limited Partner's estate or, if a Limited Partner dies, such Limited Partner's executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent, such Limited Partner's committee, guardian or conservator, shall have the rights of such Limited Partner for the purposes of settling or managing such Limited Partner's estate or property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to dispose of all or any part of such Limited Partner's Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Limited Partner.

**Section 10.05** **<u>Attachment by Creditors</u>**. If a Partnership Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the Partnership Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Substitute Limited Partner or an Additional Limited Partner.

## ARTICLE XI
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 11.01** **<u>Limited Partners</u>**. Each Limited Partner represents, warrants and covenants to the Partnership and to every other Partner as follows:

(a) Such Limited Partner shall provide promptly, upon request by the General Partner, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Partnership to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Partnership.

(b) There is no misrepresentation contained in the Subscription Documents and the forms attached thereto completed by such Limited Partner.

(c) If such Limited Partner is a corporation, partnership, limited liability company, trust or other entity, that the officer (or other signatory) signing on its behalf has been duly authorized to execute and deliver this Agreement and, to the extent requested by the General Partner, the Certificate.

(d) Such Limited Partner that is an entity that would be an "investment company" under the 1940 Act, but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) thereof, has advised the General Partner of the number of persons that constitute "beneficial owners of such Limited Partner's outstanding securities (other than short-term paper)" within the meaning of Section 3(c)(1)(A) of the 1940 Act, and shall advise the General Partner promptly upon any change in that number.

## ARTICLE XII
## SPECIAL POWER OF ATTORNEY

**Section 12.01** **<u>Execution and Consent</u>**. Each Limited Partner hereby irrevocably constitutes and appoints the General Partner and its respective successors (hereinafter referred to as "**<u>Special Attorney</u>**") as the attorney-in-fact for such Limited Partner with power and authority to act in the Limited Partner's name and on the Limited Partner's behalf to execute, acknowledge, swear to and file documents and instruments necessary or appropriate to the conduct of the Partnership's business, which shall include, but not be limited to, the following:

(a) the Certificate and this Agreement, as well as amendments thereto as required by the

laws of any state, or any other jurisdiction, or as otherwise permitted under the terms of this Agreement;

(b) any other certificates, instruments and documents, including fictitious name certificates, as may be required by, or may be appropriate under, the laws of any state;

(c) the amendment and/or restatement of this Agreement in accordance with **Section 14.08**; and

(d) any documents that may be required to effect the continuation of the Partnership, the admission of an Additional Limited Partner or a Substitute Limited Partner, the withdrawal of a Limited Partner, or the dissolution and termination of the Partnership, *provided* that such continuation, admission, withdrawal or dissolution and termination are in accordance with the terms of the Certificate and this Agreement.

**Section 12.02** **Procedural Aspects**. The power of attorney granted by each Limited Partner to the Special Attorney:

(a) is a special power of attorney, coupled with an interest, and is accordingly irrevocable;

(b) may be exercised by the Special Attorney for each Limited Partner either by signing separately as attorney-in-fact for each Limited Partner or, by executing any instrument with the single signature of such Special Attorney acting as attorney-in-fact for all of the Limited Partners; and

(c) shall survive the assignment by a Limited Partner of the whole or any portion of such Limited Partner's Partnership Interest; *provided* that where the assignee has been approved in accordance with the provisions of this Agreement for admission to the Partnership as a Substitute Limited Partner, the Power of Attorney shall survive such assignment for the sole purpose of enabling the Special Attorney to execute, acknowledge and file any instrument necessary to effect such substitution.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

**Section 13.01** **Dissolution**. The Partnership shall be dissolved upon the earliest to occur of:

(a) the withdrawal, resignation or Involuntary Withdrawal of the General Partner, or any other event that results in such entity ceasing to be a general partner, unless the remaining Limited Partners agree, within ninety (90) days after such event, to continue the Partnership with a new and qualified substitute general partner pursuant to and in accordance with the terms and conditions set forth in **Article IV**;

(b) an election to dissolve the Partnership made by the General Partner, in its discretion, upon thirty (30) days' prior written notice to the Limited Partners; or

(c) the happening of any other event, including the entry of a decree of judicial dissolution under Section 17-802 of the Act, that under the law of the State of Delaware, mandatorily requires the dissolution of the Partnership.

For the avoidance of doubt, the termination of the Partnership shall constitute the termination of all Series. For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

**Section 13.02** **Liquidation**. Upon the dissolution of the Partnership, the "**Liquidators**", namely: (i) the General Partner or, if there is no general partner at the time, or if the principal(s) of the General Partner are unable to act on its behalf, (ii) (A) the person or persons previously designated in writing by the General Partner and notified to the Partnership's auditors, or (B) if the General Partner has not made such a designation, the person or persons designated by Limited

Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, shall cause the cancellation of the Certificate, liquidate (or distribute) the assets of the Partnership, and apply and distribute the balance of the proceeds of such liquidation in accordance with the following order of priority: (1) pay off known liabilities; (2) establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP); and (3) distribute the remainder to the Partners in proportion to the Capital Account balances maintained in accordance with the provisions of **Section 9.01** and the Act. The Liquidators shall take all other steps necessary to wind up the affairs of the Partnership as promptly as practicable. To the extent reasonable, the business of the Partnership may continue to be conducted until liquidation is complete. For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Partnership.

**Section 13.03** **Notice of Dissolution**

(a) Upon the dissolution of the Partnership or the relevant Series, the Liquidators shall promptly notify the Partners of such dissolution as well as known creditors and claimants whose addresses appear on the Partnership's or the relevant Series' records.

(b) The General Partner shall give at least fifteen (15) days' prior written notice to each Limited Partner that is a BHC Limited Partner (as defined in **Section 5.10**) of any proposal to distribute property in-kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in-kind to the extent that such Limited Partner advises the General Partner at least five (5) days prior to the date set forth in such notice for such distribution that such distribution in-kind could reasonably be expected to cause it to violate the BHCA. In the event that a BHC Limited Partner notifies the General Partner to such effect, the General Partner shall be authorized to make such arrangements for the property that it would have otherwise distributed in-kind as the General Partner shall determine in its reasonable discretion.

**Section 13.04** **Deferred Liquidation; Distribution In-Kind of Joint Interests in Property**. For the avoidance of doubt, the following provisions of this **Section 13.04** shall apply on a Series-by-Series basis. Notwithstanding the provisions of **Section 13.02**, if on dissolution of the Partnership the Liquidators shall determine that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets, except those necessary to satisfy liabilities of the Partnership (other than those to Partners), or distribute to the Partners, in lieu of cash, as tenants in common and in proportion to their respective interests in the Partnership, undivided interests in such Partnership assets as the Liquidators deem not suitable for liquidation. To the extent that the General Partner exercises its right, power and authority under **Section 3.02(w)**, this Section shall be construed by the Liquidators in their reasonable discretion to give effect thereto.

**Section 13.05** **Final Statement**. As soon as practicable after the dissolution of the Partnership or the relevant Series, a final statement of its assets and liabilities shall be prepared by the General Partner and/or the internal accountants for the Partnership or the relevant Series and furnished to the Partners.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 14.01** **Address and Notices**. The address of each Partner (other than the General Partner) for all purposes shall be the address set forth on the signature page to this Agreement or such other address of which the General Partner has received written notice in accordance with this **Section 14.01**. The address of the General Partner for all purposes shall be the address set forth in **Section 1.04** or such other address of which the General Partner has provided written notice to the Partners in accordance with this **Section 14.01**. Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made (i) when delivered in person, (ii) when sent to such Partner at such address by

registered or certified mail, return receipt requested, or by electronic mail, or (iii) when delivered by overnight delivery by a reputable private carrier or by the postal service.

**Section 14.02** **<u>Titles and Captions</u>**. All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

**Section 14.03** **<u>Pronouns and Plurals</u>**. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**Section 14.04** **<u>Further Action</u>**. The Limited Partners shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate, in the discretion of the General Partner, to achieve the purposes set forth in this Agreement.

**Section 14.05** **<u>Governing Law, Personal Jurisdiction and Venue</u>**. **EACH LIMITED PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIM, CONTROVERSY, DISPUTE OR ACTION RELATING IN ANY WAY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES. EACH LIMITED PARTNER UNDERSTANDS AND AGREES THAT IT IS WAIVING THE PROTECTION OF STATUTES IN ITS STATE OF RESIDENCE THAT PROVIDE IT WITH CERTAIN RIGHTS, REMEDIES AND PROTECTIONS IN THE CASE OF FRAUD OR MISREPRESENTATION AND AGREES TO RELY SOLELY UPON THE LAWS OF THE STATE OF DELAWARE AND ANY APPLICABLE FEDERAL LAWS. EACH LIMITED PARTNER MAKES THIS WAIVER KNOWINGLY AND REPRESENTS THAT IT HAS CONSULTED INDEPENDENT COUNSEL, OR THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH SUCH INDEPENDENT COUNSEL BUT HAS ELECTED NOT TO DO SO, AND AGREES THAT THE ONLY STATE LAWS THAT WILL APPLY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT AND ITS INVESTMENT IN THE PARTNERSHIP ARE THE LAWS OF THE STATE OF DELAWARE.**

**EACH OF THE LIMITED PARTNERS, FUND COUNSEL AND ANY OTHER PARTY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR ANY OTHER AGREEMENT REGARDING SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP (COLLECTIVELY, FOR PURPOSES OF THIS CLAUSE, THE "PARTIES") IRREVOCABLY CONSENTS TO BEING SERVED WITH LEGAL PROCESS ISSUED FROM THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITUATED IN THE STATE OF NEW YORK. THE PARTIES IRREVOCABLY WAIVE ANY OBJECTIONS TO THE PERSONAL JURISDICTION OF THESE COURTS. SAID COURTS SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES AND ACTIONS, OF ANY KIND OR MANNER, WHICH IN ANY WAY RELATE TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP. THE PARTIES ALSO IRREVOCABLY WAIVE ANY OBJECTIONS THAT THESE COURTS CONSTITUTE AN OPPRESSIVE, UNFAIR, OR INCONVENIENT FORUM AND AGREE NOT TO SEEK TO CHANGE VENUE ON THESE GROUNDS OR ANY OTHER GROUNDS. THE PARTIES FURTHER AGREE THAT THEY WILL NOT FILE SUIT IN A JURISDICTION OTHER THAN NEW YORK AND THAT, SHOULD THEY DO SO, THEY SHALL BE LIABLE FOR ALL DAMAGES AS A RESULT OF MAKING SUCH A FILING AND SHALL PAY ALL ATTORNEYS' FEES INCURRED BY ANY PARTY IN CONNECTION WITH MOVING TO DISMISS THE SUIT FOR FAILURE TO COMPLY WITH THIS PROVISION.**

In the event that (i) any current or prior Limited Partner ("**<u>Claiming Party</u>**") initiates or asserts any litigation, arbitration or similar claim or counterclaim, or joins, offers substantial assistance to or has a direct financial interest in any claim ("**<u>Claim</u>**") against the Partnership, the General Partner, the Investment Manager or any Investment Manager Affiliates, including any Claim purportedly filed on behalf of the Partnership or any Limited Partner, and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose

Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Partnership and/or the General Partner, the Investment Manager or any such Investment Manager Affiliate for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the parties may incur in connection with such Claim.

**Section 14.06** **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns; *provided*, however, that fund counsel shall be a party to this Agreement solely with respect to **Sections 3.04(b) and 14.05** hereof in order to benefit from and enforce such Sections, and a conformed signature page for fund counsel is included as a counterpart to this Agreement.

**Section 14.07** **Entire Agreement**. This Agreement, together with the related Subscription Documents and any other written agreement between the General Partner, on behalf of the Partnership (acting severally in the name of and for the account of any individual Series), and any Limited Partner of that Series, shall constitute the entire agreement and understanding among all the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including, without limitation, the Current Agreement. The parties hereto acknowledge that, notwithstanding any other provision of this Agreement or the Subscription Documents, the General Partner, on its own behalf or on behalf of the Partnership, without any act, consent or approval of any other Partner, may enter into side letters or other writings to or with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or the Subscription Documents ("**Side Letters**"). The parties agree that any rights established, or any terms of this Agreement or the Subscription Documents altered or supplemented, in a Side Letter to or with one or more Limited Partners shall govern with respect to such Limited Partner(s) notwithstanding any other provision of this Agreement or the Subscription Documents. No covenant, representation or condition not expressed in this Agreement or such Subscription Documents (and, if applicable, any Side Letter) shall affect or be deemed to interpret, change or restrict the express provisions hereof and thereof.

**Section 14.08** **Amendment**. This Agreement may be modified or amended only by the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of all of the outstanding Partnership Interests of each Series; *provided* that the General Partner may amend this Agreement from time to time (x) only with the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners of a specific Series of Partnership Interests, if such amendment, in the opinion of the General Partner, only has a material effect on such Series of Partnership Interests, and (y) without the consent, approval or other authorization of, or notice to, any of the Limited Partners (including pursuant to **Sections 3.02(u)** and **(v)**) if, in the opinion of the General Partner, the amendment does not have a material adverse effect on any Limited Partner. Notwithstanding the foregoing, no amendment may: (i) convert a Limited Partner's interest to that of a general partner or, modify the limited liability of any Limited Partner, without the consent of each affected Partner or (ii) amend any provision hereof which requires the consent or approval of a specified percentage in interest of the Limited Partners without the consent of such specified percentage in interest of the Limited Partners.

**Section 14.09** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or the relevant Series.

**Section 14.10** **Waiver by Partner**

(a) Any Partner by notice to the General Partner may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other Partner to such first mentioned Partner.

(b) No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and

effect with respect to any other existing or subsequent breach.

**Section 14.11** **Rights and Remedies**

(a) The rights and remedies of any of the Partners hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

(b) Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Partner aggrieved as against the other Partners for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Partners hereunder shall be enforceable in equity as well as at law or otherwise, except as provided in **Section 5.08**.

**Section 14.12** **Counterparts**. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing his, her or its signature hereto, independently of the signature of any other party.

**Section 14.13** **Certain Tax Matters**

(a) *Tax Matters Partner*

(i) The Tax Matters Partner (as such term is defined in Section 6231(a)(7) of the Code) of the Partnership shall be the General Partner. The General Partner shall have all powers necessary to perform fully in its capacity as Tax Matters Partner and, in such capacity, the General Partner shall use its reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including the Regulations) and shall have any powers necessary to perform fully in such capacity.

(ii) In furtherance of the foregoing, the General Partner is authorized to represent the Partnership before taxing authorities and courts in tax matters affecting the Partnership and the Partners in their capacity as such and shall keep the Partners informed of any such administrative and judicial proceedings. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any action brought against it in connection with any judgment in or settlement of any such proceeding, except in the case of the General Partner's own fraud, gross negligence, willful misconduct or conduct that is the subject of a criminal proceeding (where the General Partner has a reasonable cause to believe that such conduct was unlawful).

(iii) Any Partner that is in dispute with any tax authority in relation to any Partnership matter shall notify the General Partner within thirty (30) calendar days, and if the General Partner reasonably determines that the matter is of material relevance to the tax position of the Partnership, such Partner shall consult with the General Partner (or any advisor appointed by the General Partner for the purpose) as to how that dispute shall be handled. Any Partner who enters into a settlement agreement with respect to any Partnership item shall notify the Tax Matters Partner of such settlement agreement and its terms within thirty (30) calendar days after the date of settlement.

(iv) The provisions of this **Section 14.13(a)** shall survive any termination of this Agreement.

(b) *Tax Elections*. Each Partner agrees to provide the Partnership with such information which may be necessary or desirable in order for the General Partner to carry out its powers under this **Section 14.13** and **Section 3.02(g)**, including, without limitation, to facilitate compliance with Section 743 of the Code and elections permitted thereunder.

(c) *Classification as a Partnership*. The parties hereto intend that the Partnership be classified as a partnership for federal income tax purposes. The General Partner shall not elect to have the Partnership classified as an association taxable as a corporation for federal income tax purposes pursuant to Regulation Section 301.7701–3. The General Partner shall, for and on behalf of the Partnership, take all steps as it may deem reasonably necessary to maintain the Partnership's classification as a partnership for federal income tax purposes.

(d) *Tax Audits*. Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership or any existing or former investment.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, this Amended and Restated Limited Partnership Agreement has been duly executed as of the day and year first above written.

**Atlas IDF GP, LLC**, as General Partner
(acting severally in the name of and for the account of each individual Series)

By: ______________________
Name: John Honis
Title: Managing Member

INITIAL LIMITED PARTNER:

/s/ John Honis
John Honis

[SIGNATURES OF ADDITIONAL LIMITED PARTNERS AND OTHER PARTIES ARE SET FORTH ON SEPARATE SIGNATURE PAGES]

# Exhibit 51




Excerpts from He Watches All My Paths
By Stacey Jernigan
Copyright (c) 2019 by Stacey Jernigan

Excerpt 1:
Author's Note
(emphasis added in **bold**)

AUTHOR'S NOTE

Because I am a sitting United States judge, and I am also married to a police officer, I feel compelled, at the outset, to clarify certain points regarding this novel.

First, the following is a work of fiction. **Some of the characters and events herein are based loosely on actual persons and events,** and some of the places (in my home state of Texas and in various other faraway spots) are certainly very real. Moreover, in my capacity as a judge, I have been the recipient of death threats that ultimately required United States Marshal Service protection, like the main character in this novel. But, the human characters in this novel are absolutely fictional. Judge Avery Lassiter, the main character in this novel, is not me and my own situation with threats did not transpire in the same manner as hers.

Second, one should not assume that any statement or opinion expressed or implied by any characters in this novel are necessarily mine or are somehow a reflection on how I might rule on any particular issue in any case in the future.

Third — and perhaps most importantly — the references herein to certain federal judges, public officials, and lawyers (and families) who have been assassinated in this country in the past are, sadly, true — as are certain facts presented regarding the United States Marshals Service. As mentioned earlier, these honorable souls are among those to whom this novel is dedicated.

The author, Stacey G. C. Jernigan, has served as a federal bankruptcy judge, since the year 2006, in Dallas, Texas. Before that, she practiced law many years at a large international law firm, Haynes and Boone, LLP, based in Texas. **She is married to a police officer and**

**has a son and a daughter who are both young adults now.** She writes and travels extensively in her spare time.

Excerpt 2:
Pages 26–27
(emphasis added in **bold**)

Thanksgiving—while strange and unrelaxed—was relatively uneventful for the most part. But Judge Lassiter's extended family was, without a doubt, somewhat traumatized and had never realized that Avery's job had risks like this attached to it. Officer Max's job—sure. He definitely experienced his share of dangerous encounters (practically daily, serving on his covert undercover special task force). Officer Max's and his colleagues' catch phrase was "every day we play the deadly game." But now Avery's and the kids' lives seemed vulnerable to a possibly dangerous predator. This was unsettling and unexpected. Until recently, Avery had been a corporate attorney representing Fortune 500 companies and other wealthy institutional clients for her entire legal career, at a prestigious international law firm. **Now she presided over civil and bankruptcy matters in her court. She had no criminal law background or docket whatsoever. She handled financial disputes and ruled in money matters—not murder and mayhem. The most exciting legal matter that she ever encountered was a financial super-web that needed unraveling.** Avery's Southern Belle mother, in her pearls and navy, knit St. John suit, and perfectly hair-sprayed bob, kept wringing her hands that Thanksgiving Day and saying, "I thought you didn't handle criminal matters, Honey? Why would somebody want to kill you over money? It's just money! It's only money!" Avery always said that her mother could be incredibly naïve about such things. Strange, considering Avery's mother's appreciation for all things Biblical—and money being "the root of all evil" and such.

Excerpt 3:
Pages 60–62
(emphasis added in **bold**)

The man's thoughts were suddenly distracted when the clerk told the jury panel to listen and turn their attention to the overhead monitors where they would be shown a 15-minute video about the importance of jury service. After that, folks would be told where to go next. The man shifted in his chair uncomfortably and glared up at the nearest screen. Good God. The video featured some of the pillars of the Dallas community, telling him how special jury duty was and how important they all were. He'd go through the motions today. But what a joke.

About an hour later, the clerk finally started calling people for jury panels. The man had a low number, so he suspected his chances were pretty high of being put on a jury panel. He was right. He was in the second group called. He was told to report to a courtroom on the 5th floor. He followed the line of people moving like sheep toward the outrageously slow elevators. He avoided eye contact and speaking with the masses. He didn't want to be there with them.

Finally, about thirty minutes after being forced to sit shoulder-to-shoulder with strangers on the cold, hard pews in the courtroom of the Honorable Wayne T. Barnes, there was some activity. Approximately a half-dozen lawyers came into the front of the courtroom, exiting from the chamber doors of Judge Barnes, and started settling into places at the counsel table. There were dozens of banker boxes piled up around the walls of the courtroom, and lawyers began pulling files and notepads and laptop computers out of them. **It was obvious that one group of lawyers (four of them) represented a deep pocket corporation, and the other two lawyers were likely representing a humbler client. One group**

**of lawyers (all men) wore slicked back perfect hair and expensive dark wool suits with tailor made shirts, silk red ties, cufflinks, and Italian loafers. They each had a polished, fraternal, athletic look. They had similarly well-dressed clients who were sipping Starbucks lattes, constantly checking cell phones, and looking incensed about being in a courtroom. They no doubt had billion-dollar companies that they needed to be running, or a golf game or three-martini lunch at the Dallas Country Club that they would be missing. Or maybe they were hedge fund managers—they had that air of hubris about them that was so characteristic of those Wall Street assholes.** The two other lawyers had bad haircuts and cheap, ill-fitting suits (one wearing Seersucker in January), with brown, smudged loafers, and looked as though they had been up all night. They had an elderly man and three blue collar looking adults in their 30's or 40's sitting next to them. A courtroom deputy suddenly jerked to attention and yelled "all rise; the 199th Judicial District Court of Dallas County, Texas is now in session. The Honorable Wayne T. Barnes presiding." A tall, lanky African American, bald man in a black robe said hello and kindly smiled, telling the jury panel members and lawyers to take a seat.

The man found the next thirty minutes to be absolutely excruciating. During this phase of jury duty, the lawyers informed the jury panel a bit about the trial for which they were seeking jurors. The lawyer in the Seersucker suit starting things off, standing up and wandering toward the jury panel with a lumbering gait and an exposed large girth. He began speaking in a velvety Baritone voice with a very Southern drawl: "May it please

the court. And ladies and gentlemen. Let me share with you fine citizens of Dallas County some of the salient facts of the case at bar."

"Why did fucking lawyers have to talk that way?" the man thought. "Salient facts. Why can't they just say 'hey, here's what happened."

The lawyer soon shared that the plaintiffs were the surviving widower (age 74) and three adult offspring of Mrs. Dottie Wilson. The plaintiffs alleged that they had suffered damages due to the death of Mrs. Wilson, on August 6, 2015, allegedly caused by Mrs. Wilson's exposure to asbestos dust and fibers when she handled and laundered the allegedly asbestos-laden clothing of her husband, Myron Wilson. Mr. Wilson had been employed for 30 years at a large natural gas field and processing facility in East Texas, known as the Chandler Lake Refinery. In the course of performing his work, Mr. Wilson allegedly was occupationally exposed to large quantities of asbestos-containing insulation products that were utilized and/or handled by, or in the close proximity of, Mr. Wilson. Mr. Wilson's initial job for Chandler was a switcher. When he was a switcher, he worked with steam coils on certain flow lines and each of them was covered with insulation containing asbestos. Also, certain heaters within the work area had insulation in them. Mr. Wilson later became a compressor operator and then a chief operator. When he was a compressor operator, he worked with turbochargers, engines, and compressors that had insulation on them. Mr. Wilson later became a member of a maintenance crew (fixing anything that broke throughout the plant). Mr. Wilson also believed that he was exposed to asbestos at the Chandler Lake Refinery through certain pipe insulation—specifically "hot oil pip-

ing" used in the process of "drying" natural gas—that is, getting propane and pentanes out of the hydrocarbon gas. Mr. Wilson believed, in particular, that he may have been exposed to asbestos dust in the compressor building at the Chandler Lake Refinery where, once a year or so, he would have to pull out, repair, or rip off pipe insulation. Upon completion of Mr. Wilson's daily work, he would leave the worksite and return home with asbestos dust and fibers on his clothing and person. Mrs. Dottie Wilson was allegedly then exposed to the asbestos dust and fibers when she gathered, handled, and laundered Mr. Wilson's dust-laden clothing and ultimately sustained a very serious injury to her body. In 2015, Mrs. Wilson suddenly developed pain and trouble breathing. Shortly thereafter, Mrs. Wilson was diagnosed with the asbestos-related lung cancer known as mesothelioma. Mrs. Wilson's contraction of mesothelioma resulted in immediate disability, physical pain and suffering, and severe mental stress, and she soon passed away, on August 6, 2015.

The plaintiffs soon filed their petition for survival and wrongful death damages in Dallas County, Texas, where the behemoth Chandler Corporation was headquartered. Chandler Corporation somehow had avoided mass tort litigation from the plaintiffs' bar until the Wilson lawsuit, and they were not going to go down without a fight. If they lost this suit, it would be the tip of the iceberg and they would soon be fighting hundreds or thousands of copycat lawsuits just like this one. They had to stop the floodgates.

Excerpt 4:
Pages 78
(emphasis added in **bold**)

She was dealing with a nasty dispute involving two feuding hedge fund managers. There were several SMU law students in her courtroom observing the court proceedings. The students had wanted to learn something about what hedge funds were and how they made their money. **Avery had been explaining to the students before court about how hedge funds work—describing how they are a less-regulated side of capital finance.** Avery had further lectured to the students that hedge funders raise money from wealthy "accredited" individuals and institutions, such as government pension funds or university endowments, and the hedge funders deploy (that is, invest) that money as they see fit. **These high-flying hedge fund managers essentially suck up money ("fresh powder" they call it) like an iRobot vacuum cleaner from every corner of the universe and invest it, generally earning compensation of 20% of the assets they invest and another 2% of the profits that the assets earn. They make money no matter what—whether their investments are successful or not—because of their 20% cut.** Avery explained, to the law students' surprise, that lawyers, physicians, and investment bankers were now yesteryear's rich, esteemed professions. The law students were probably starting to rethink their decision to attend law school (that had not been Avery's intention). **Avery had been quietly daydreaming about whether one of these hedge fund manager guys (they are mostly men—in a stereotypically competitive "bro culture") could somehow have been connected to her death threats—she was recalling the comment in the second threat letter about the "rich who rule the universe."** Hedge fund managers were certainly worthy of that description. The hedge

fund managers in her courtroom right now were rich alright—they were centimillionaires. They probably thought of anyone making $1–$5 million per year as middle class. Some of these managers were intelligent with impressive academic credentials. **They all were bombastic talkers imbued with an outrageous amount of hubris.** They vacationed in places like Lake Como and Bora Bora and consulted meditation gurus in places like the Bay of Bengal. They sailed catamarans around the world and bought airplanes and race horses like it was candy. **Everything in their life was about winning. In the current lawsuit Avery had before her, the hedgies were accusing each other of being greedy sociopaths.** As Avery's mind drifted deeper toward wondering if perhaps someone in her court involving one of these hedgies had perhaps sent her the death threats, Annalise quietly slipped into the courtroom and handed her a note, telling her that she needed to take a recess. That was never a good sign. Avery had a call holding from one of Mad Max's police department colleagues, saying that Officer Max was at a local hospital emergency room, because he had been injured in a mishap while on duty, but it appeared that he was going to be alright. Avery would probably want to come to the hospital—but he thought Mad Max would be fine.

Excerpt 5:
Pages 165 to 168
(emphasis added in **bold**)

Avery was packing up a bag in her bedroom at home on an especially nice warm Wednesday in November. She would be driving down to Austin with Ward Scott and the Deputy Marshals midmorning. She and Ward were going to be making a presentation at a bankruptcy law conference in Austin. She and Ward would be speaking to 300 or so lawyers and other professionals in the restructuring and insolvency community regarding oil and gas law issues. "A riveting subject, to be sure," Avery joked.

The Deputy Marshals hated it when Avery engaged in public speaking, but she didn't really care. She did a lot of it—it is expected of judges. Avery went down to this particular law conference in Austin every November. She had an old law professor from her University of Texas Law School days that she always enjoyed seeing. She also always took the opportunity to visit with some of her former law clerks, interns, and externs who were still in the Austin area or who otherwise traveled to the conference for continuing legal education. And, best of all, she seized the opportunity to stay a couple of days at the Four Seasons Hotel and Spa on Lady Bird Lake and visit some of her old law school haunts on nearby Sixth Street in downtown Austin.

As Avery packed, she stopped to listen to the latest daily cable news coverage about Karl Lee. There was still no proof of his death, and the legal and family drama engulfing the Lee empire had now reached an absolute crisis level. The quarreling among Lee's wife and his grown children was more rancorous than ever. They had all taken to Twitter on an almost hourly basis, publicly airing their disputes in a very distasteful and embarrassing way. The boards of directors at all of Lee's corporations were bickering as well. **Meanwhile, certain ex-**

**tremely aggressive hedge funds were starting to buy up blocking positions in the shares of his companies, as well as debt all over the capital structure of the Lee empire—an obvious sign that they smelled opportunity. Hedge funds are drawn to distressed companies like sharks are drawn to blood.** The Regent Hotel & Casino was particularly hard hit. Bondholders of the casino were starting to form ad hoc committees consisting of the largest holders of the debt and would soon be conducting "beauty contests"—that is, interviewing legal counsel and financial advisors for a possible out-of-court restructuring and likely Chapter 11 bankruptcy case. It barely made any sense to Avery. Lee disappeared three months ago, and it was as though all of his companies fell off of a financial cliff. How could one man be so indispensable to his companies? Avery guessed it was really true, that companies needed to have succession plans for this type of thing and Lee's companies—as well run as they were—did not have any. Avery wondered how Judges Lupinaci and Murphy would feel if one of their most high profile and successful corporate restructuring cases ended up being a "Chapter 22" (lawyer-lexicon for a second Chapter 11 case; 11 times 2).

Avery imagined that the lawyers at the conference in Austin would be gossiping nonstop about the possibility of another Regent bankruptcy case and other possible Lee companies that might need to be run through the cleansing bath of bankruptcy. Lawyers in the corporate restructuring field can be like vultures, waiting to swoop onto the carcass of a dying company. A variation of "barbarians at the gate," as some have called it. They are in the misery business for sure. Ward sometimes grumpily called them "the lowest common denominator" in the

lawyer food chain. Avery always chastised him that this was not entirely fair. Actually, the lawyers in the corporate restructuring field tended to be creative problem solvers who were great at cleaning up financial messes. They were the "fixers." They were often brilliant—having chosen an area of law practice that was far more complex than something like tort law or criminal law. One had to be both a financial wizard and legal wizard to be successful in the field. Still, Avery hated how the lawyers in this field loved to gossip about tragedy. The only thing that this group of lawyers loved to do more than gossip about corporate calamity was talk about how busy they were and how many billable hours they racked up in the preceding month. Toxic chest pounding. It was Avery's personal belief that lawyers tended to lie spectacularly to one another about how many hours they billed. Just like the cliché of the fisherman who lies about the size of the fish he catches daily.

# Exhibit 52

No. 25-355

# In the Supreme Court of the United States

JAMES DONDERO; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; THE DUGABOY INVESTMENT TRUST; NEXPOINT REAL ESTATE PARTNERS, LLC; AND GET GOOD TRUST, PETITIONERS

*v.*

STACEY G. JERNIGAN; HIGHLAND CAPITAL MANAGEMENT, L.P., RESPONDENTS

*ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

## PETITION FOR REHEARING

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue
Suite 400
Austin, Texas 78701
(512) 686-3940
jonathan@mitchell.law

MICHAEL J. EDNEY
*Counsel of Record*
J. PIERCE LAMBERSON
MARK C. INGRAM
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 955-1500
medney@hunton.com

*Counsel for Petitioners*

## TABLE OF CONTENTS


Table of contents ..... i
Table of authorities ..... iii
Grounds for rehearing ..... 1
- I. Procedural summary ..... 4
- II. The intervening Fifth Circuit Judicial Council "corrective action" of recusal warrants rehearing ..... 7
- III. In the alternative, the Court should call for the views of the Solicitor General or grant, vacate, and remand ..... 11

Conclusion ..... 13
Certificate of counsel ..... 14
Appendix .....


## APPENDIX


Order of the Judicial Council for the Fifth Circuit, *In re Complaint of James D. Dondero Against Chief United States Bankruptcy Judge Stacey G.C. Jernigan*, No. 05-26-90041 (Dec. 29, 2025) ..... 1a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025) ..... 6a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90043 (Dec. 29, 2025) ..... 14a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90044 (Dec. 29, 2025) ........ 19a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90045 (Dec. 29, 2025) ........ 25a

## TABLE OF AUTHORITIES

**Cases**

*Demodulation, Inc. v. United States*,
114 Fed. Cl. 655 (Fed. Cl. 2014) .....................................13
*Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, No. 25-119 .............................................11
*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988).........................................................10

**Statutes**

28 U.S.C. § 455...................................................................3, 8
28 U.S.C. § 455(a) ..................................................................3

**Rules**

Fifth Circuit Comment to Jud. Cond. & Jud. Disab. Proc. R. 4.2. .........................................................................12
Jud. Cond. & Jud. Disab. Proc. R. 11(g)(2)........................5
Jud. Cond. & Jud. Disab. Proc. R. 24(1)............................5
Jud. Cond. & Jud. Disab. Proc. R. 24(5)............................5
Sup. Ct. R. 44.2 .................................................................2, 7

# In the Supreme Court of the United States

No. 25-355

JAMES DONDERO; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; THE DUGABOY INVESTMENT TRUST; NEXPOINT REAL ESTATE PARTNERS, LLC; AND GET GOOD TRUST, PETITIONERS

*v.*

STACEY G. JERNIGAN; HIGHLAND CAPITAL MANAGEMENT, L.P., RESPONDENTS

*ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT*

## PETITION FOR REHEARING

Petitioners James Dondero; Highland Capital Management Fund Advisors, L.P.; The Dugaboy Investment Trust; NexPoint Real Estate Partners, LLC; and Get Good Trust respectfully petition for rehearing of this Court's order of January 12, 2026, denying their petition for writ of certiorari.

### GROUNDS FOR REHEARING

The question presented is whether a trial judge's decision not to recuse should be reviewed for abuse of discretion when presented on direct review (and a clear and

indisputable abuse of discretion when presented on mandamus) or *de novo*. Nearly every circuit had weighed in on this fully mature split of authority, with the Fifth Circuit and some others taking the former position, the Seventh Circuit the latter, and still others reviewing recusal declinations solely for an abuse of discretion even on mandamus.

The split of circuit authority was squarely presented by the decision of the Fifth Circuit declining mandamus relief against a bankruptcy judge's failure to recuse on grounds of having written novels denigrating the hedge-fund industry and a character similar to a hedge-fund manager party before her. The Fifth Circuit held that "due to similarities between the parties and the characters in her novels, a strong argument could be made that [the bankruptcy judge] had a duty to recuse," but that strong argument did not amount to the clear and indisputable abuse of discretion required for mandamus relief. Pet. App. 17a.

"[I]ntervening circumstances of a substantial or controlling effect" warrant rehearing of the petition's denial. Sup. Ct. R. 44.2. Since the Court's decision, Petitioners received Fifth Circuit Judicial Council resolutions of judicial complaints regarding the bankruptcy judge's novels. In those resolutions, the Fifth Circuit Chief Judge arranged for extensive corrective action and required the judge to recuse herself from any issues in the Highland bankruptcy going forward.

So the judge's novels have now given rise both to a "strong argument . . . that she had a duty to recuse" and to "corrective action" addressing "conduct occurring

outside the performance of official duties" leading to a "substantial and widespread lowering in public confidence in the courts among reasonable people." Pet. App. 17a; App. 10a. The former led the Fifth Circuit merits panel to deny mandamus relief. Yet the latter led the Fifth Circuit Chief Judge to effectuate the bankruptcy judge's recusal—but only from future proceedings in the bankruptcy while leaving her tainted past rulings in place.

These intersecting and conflicting standards and outcomes would send Franz Kafka to his typewriter. It is now apparent that the judge should have recused from the get-go due to her novels, because her "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Only the standard of review is preventing the Fifth Circuit from reversing the judge's refusal to recuse now and vacating her decisions made while acting outside the limits Congress set.

This intervening event also highlights the anomalies wrought by the circuit split on the standard of review for recusal decisions. The judge's decision not to recuse would have been reversed through mandamus if this case were in Chicago. It stands for the time being because this case was in Dallas. This Court should grant rehearing and set the case for argument to resolve this split of circuit authority.

In the alternative, the Court should grant rehearing and call for the views of the Solicitor General, or (at the very least) grant the petition for certiorari and vacate and remand so the Fifth Circuit may reconcile its decision with the intervening judicial conduct resolution entered by its Chief Judge.

## I. PROCEDURAL SUMMARY

Until a few weeks ago, Judge Stacey Jernigan had been presiding over bankruptcy cases involving hedge-fund entities associated with James Dondero. While doing so, she wrote two novels with a protagonist bankruptcy judge pitted against a negatively portrayed character similar to Mr. Dondero. Pet. at 6–12.

In the pending case, Mr. Dondero sought temporary bankruptcy protection for one of his hedge funds — Highland Capital Management — to have time to sell assets to satisfy an unanticipated judgment. The case was transferred to Judge Jernigan because she was familiar with Mr. Dondero's businesses. On the first day, Judge Jernigan urged Mr. Dondero's removal from management. She later converted the restructuring into an unnecessary, multi-year liquidation.

When they became aware of the novels, Mr. Dondero and others unsuccessfully asked Judge Jernigan to recuse from the Highland bankruptcy. Mr. Dondero then sought mandamus from the district court and appealed the district court's denial to the Fifth Circuit.

The Fifth Circuit acknowledged that "a strong argument could be made that [Judge Jernigan] had a duty to recuse" on account of the novels. Pet. App. 17a. But that strong argument was not enough to warrant mandamus given the Fifth Circuit's decision to apply deferential rather than de novo review. *Id.* at 8a.

Petitioners sought review in this Court, but the Court denied certiorari on January 12, 2026.

Since the completion of briefing, there were material developments from the Fifth Circuit Judicial Council of

which the Petitioners and this Court were not aware. Mr. Dondero, various former Highland managers, and others negatively affected by the bankruptcy had previously filed five judicial conduct complaints with the Fifth Circuit Judicial Council. The Judicial Council took no action on them for more than two years. In papers dated December 29, 2025, the Chief Judge of the Fifth Circuit resolved the complaints, while fully aware of the pending petition in this Court. App. 12a n.3.

Judicial conduct complaints are handled with some confidentiality. After resolution, the Fifth Circuit mails an unredacted version to the complainant. Then it posts on its website a redacted resolution that anonymizes the complainant and judge. Jud. Cond. & Jud. Disab. Proc. R. 11(g)(2), 24(1), 24(5). A former Highland manager received one resolution in the mail during the week of January 5, 2026, and brought it to Petitioners' counsel. That resolution concerned, not Judge Jernigan's novels, but her public statements about the recusal controversy. Petitioners alerted the Court to this development on January 8, 2026, the day before the conference on the certiorari petition.

On January 13, Petitioners' counsel learned that the Fifth Circuit had, at some point, posted on its website four other resolutions that, although anonymized, appeared to involve Judge Jernigan. Three of them addressed the judge's novels. Mr. Dondero and a former in-house counsel for Highland were complainants in two of the four and requested unredacted resolutions, one of which was received during the week February 2, 2026, and appears in the appendix. App. 1a–5a. The other concerns the

redacted resolution at App. 6a–13a and will be lodged with the Court when it arrives.

The books-related resolutions applied Federal Judicial-Conduct and Judicial-Disability Discipline Proceedings Rule 4(a)(7) , which regulates "conduct occurring outside the performance of judicial duties" that "is reasonably likely to have a prejudicial effect on the administration of the courts, including a substantial and widespread lowering in public confidence in the courts among reasonable people." App. 10a. The Chief Judge concluded that the complaints should be resolved through "corrective action" worked out with subject judge, rather than referral to a special committee to impose sanctions. That corrective action included assurances that Judge Jernigan would never again publish "extrajudicial writings . . . that a reasonable person could assume are based on matters before her or characters that a reasonable person could assume are based on parties or witnesses in matters before her[.]" App. 11a. The resolution also mandated "three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety[.]" *Id.* at 27a.

Finally, the corrective action resulted in Judge Jernigan "recus[ing] herself from all matters related to [Highland Capital's] bankruptcy case that are currently pending before her." *Id.* at 27a–28a. With respect to this last remedy, the Chief Judge noted that it "should not be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse . . . or on the validity of any decision, ruling, or order she has issued in any judicial proceeding," because those issues are pending

before or would be addressed by this Court or in other judicial proceedings. *Id.* at 28a n.1.

This resolution was unusually serious. Only three other of the more than 400 Fifth Circuit judicial complaints resolved since December 2019 have been resolved by the Chief Judge through corrective action, rather than a finding of insubstantiality. The Fifth Circuit's Chief Judge has not referred a complaint to a special committee for imposition of sanctions since 2015.

## II. THE INTERVENING FIFTH CIRCUIT JUDICIAL COUNCIL "CORRECTIVE ACTION" OF RECUSAL WARRANTS REHEARING

The Fifth Circuit Judicial Council's "corrective action" providing for Judge Jernigan's recusal due to her novels is a "intervening circumstance[ ] of a substantial or controlling effect" that merits rehearing. Sup. Ct. R. 44.2. Granting rehearing comes with three options: (1) granting the petition and setting the case for merits briefing and oral argument; (2) granting rehearing and calling for the views of the Solicitor General on whether merits review should be granted; or (3) granting the petition, vacating the order below, and remanding for consideration in light of the Fifth Circuit Judicial Council's action. The Court should grant merits review (either now or after seeking the Solicitor General's views), as this intervening event highlights the inefficient chaos of the Fifth Circuit's deferential standards for reviewing refusals to recuse. At a minimum, however, the decision below should vacated and remanded so that the Fifth Circuit can reconcile it with the Chief Judge's corrective action.

The current state of affairs has produced an intolerably contradictory set of legal standards governing recusal, depending on the setting. First, there is the standard when a party asks a judge to recuse, or when a judge discovers grounds for her own recusal. There, Congress requires a judge to recuse in a series of circumstances, including where her "impartiality might reasonably be questioned." 28 U.S.C. § 455. That was not an invitation to exercise judgment. It was a statutory mandate, underscored by Congress's use of the command "shall disqualify himself." *Id.*

Second, there is what to do when the judge rejects a request for recusal. In a lengthy case, that means either (i) years of rulings by an officer who Congress said could not act as a judge; or (ii) seeking review of the decision on mandamus. Because of the inefficiency of years of litigation and scores of likely void rulings by an unfit judicial officer, the circuits have universally held that recusals are the type of rulings for which mandamus is appropriate. The Fifth Circuit will intervene on mandamus, but only when a refusal to recuse was an "abuse of discretion" that was "clear and indisputable." Pet. App. 8a. The Third Circuit does not add another layer of deference on mandamus, reversing recusal denials if they were an "abuse of discretion." And the Seventh Circuit reviews the decisions *de novo*, noting that Congress made recusal mandatory in certain circumstances, that judges are particularly ill-suited to evaluate their own conduct providing grounds for recusal, and the inefficiency of letting non-recusal errors linger until the end of the case. *See* Pet. at 17–19.

Third, there is review of decisions not to recuse at the end of the case, after final judgment. The First, Second, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Eleventh, D.C., and Federal Circuits review those for an abuse of discretion. The Seventh Circuit reviews those *de novo*. *See* Pet. at 19–23.

Fourth is where a party has filed a judicial conduct complaint. That goes to a circuit's judicial council and, for most every case, is resolved by the circuit's chief judge. Jud. Cond. & Jud. Disab. Proc. R. 11. Judicial conduct complaints are supposed to be failsafe supplements to remedies for structural issues in a case—including problems with judicial impartiality—by motion practice, contested by the parties, in that case. *Id.* at R. 3(h). For that reason, judicial conduct complaints cannot be used to overturn or directly affect the validity of decisions made in a case. But when "extrajudicial conduct" leads to a decrease of "public confidence" in the courts, the Chief Judge can arrange for "corrective action" that recuses the subject judge from the case going forward. As here, the effect can only be prospective, with the reversal or invalidation of a historical recusal declination or decisions left to requests for relief in the case in question. App. 28a n.1.

These four strands are tied into an ugly knot that is bad for judicial economy and public confidence in the judiciary. The same set of facts should not lead to such disparate outcomes depending on the standard of review. The quickest route to the partial relief of a prospective recusal should not be a judicial conduct complaint, which gets resolved at the pleasure of a circuit's judicial council. Here, the Chief Judge took *three years*. And it is unlikely

a coincidence that the resolutions occurred days before the Court's conference in this case. App. 1a.

But the knot is not Gordian, to be untied only by a future ruler who does not exist.[1] This Court, today, has the power to untangle it. And it can do so by granting the petition, ordering merits briefing, and clarifying how the judiciary polices itself under a standard of appellate review tailored to the situation. Doing so would resolve a fully developed split of circuit authority that is leading to unsightly outcomes.

This is not just a cosmetic issue. It goes directly to the public confidence in the judiciary, a value this Court repeatedly has granted merits review to preserve. *E.g.*, *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988).

Unlike federal courts outside the Seventh Circuit, the Judicial Council does not apply deferential review when deciding whether a judge has violated the canons or rules governing judicial conduct. Nor could it, as the Judicial Council decides complaints against judges in the first instance, rather than formally reviewing decisions by the judge against whom the accusations are made. It makes no sense for federal appellate courts deferentially to review for an abuse-of-discretion a judge's decision not to recuse and its consequences inside a case, when the

---

1. In Greek mythology, the Gordian knot was tied to an oxcart and could only be unwound by the future ruler of Asia. Alexander the Great solved the problem by slicing through it with a sword. Oxford Advanced American Dictionary, *Gordian Knot*, 2026, https://www.oxfordlearnersdictionaries.com/definition/american_english/gordian-knot (last accessed Jan. 30, 2026).

judge's same conduct is reviewed de novo by the Judicial Council.

## III. IN THE ALTERNATIVE, THE COURT SHOULD CALL FOR THE VIEWS OF THE SOLICITOR GENERAL OR GRANT, VACATE, AND REMAND

If the Court is disinclined to resolve the questions presented at this time, then it should either grant rehearing and call for the views of the Solicitor General, or it should grant the petition for certiorari, vacate the decision below, and remand so the Fifth Circuit can reconcile the merits panel decision with the Judicial Council's resolution.

The Court has already called for the views of the Solicitor General in a petition arising from the same case— *Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, No. 25-119. There, the petitioners are asking this Court to rule on the legality and scope of the "gatekeeper" and "exculpation" provisions in the bankruptcy court's confirmation plan entered by the same judge in question.[2] It is similarly appropriate for the Solicitor General to weigh in on the certworthiness of the recusal issues, which are intertwined with the provisions in the confirmation plan that the petitioners in *Highland* are asking this Court to review. The "gatekeeper" and "exculpation" provisions were initially adopted by the now-recused Judge Jernigan, and her forced recusal has implications not only for Mr. Dondero's petition but for the petition in

2. An "exculpation provision" shield entities from liability for actions taken in connection with the bankruptcy. A "gatekeeper provision" requires bankruptcy-court approval before any legal action can proceed against protected entities, even when that legal action is initiated in other courts.

*Highland* as well. Indeed, the Fifth Circuit Judicial Council's corrective action of recusal will present a vehicle problem for this Court's review of any Jernigan-approved order or decision in the Highland bankruptcy, as the parties argue about the consequences of recusal on the validity of her prior rulings. The Solicitor General should weigh in on—and this Court should have benefit of a full view of—the intertwined effect of the issues presented in the two petitions arising from the Highland case.

Importantly, the recusal issue is not just some run-of-the-mill other issue in the case below. It presents a fully mature split of circuit authority.

At the very least, the Court should grant certiorari and vacate and remand for the Fifth Circuit to reconsider its ruling in the wake of the Judicial Council resolutions.

How the Fifth Circuit's standards for review of recusal decisions and their application in this case interact with the Circuit's own judicial conduct process is a relevant judicial policy question. Indeed, a principal reason the Chief Judge did not arrange for retrospective relief due to the book, reversing the non-recusal decision and addressing the validity of prior decisions entered by the judge, is because the judicial conduct complaint process does not permit it. Fifth Circuit Comment to Jud. Cond. & Jud. Disab. Proc. R. 4.2. The Fifth Circuit sitting as court of review should have an opportunity to reconcile its ruling with the Chief Judge's remedy in resolving the judicial conduct complaint. After all, "if the orders of the now-recused judge were allowed to stand," parties and the public "could one day wonder whether the outcome of the case was influenced by a judge who later recused herself from

the case." *Demodulation, Inc. v. United States*, 114 Fed. Cl. 655, 657 (Fed. Cl. 2014).

## CONCLUSION

The petition for rehearing should be granted.

Respectfully submitted.

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue
Suite 400
Austin, Texas 78701
(512) 686-3940
jonathan@mitchell.law

MICHAEL J. EDNEY
*Counsel of Record*
J. PIERCE LAMBERSON
MARK C. INGRAM
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue NW
Washington, D.C. 20037
(202) 955-1500
medney@hunton.com

February 6, 2026

## CERTIFICATE OF COUNSEL

I certify that this petition for rehearing is presented in good faith and not for delay, and that it is restricted to the grounds specified in Supreme Court Rule 44.2.

/s Michael J. Edney
MICHAEL J. EDNEY

**APPENDIX**

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of James D. Dondero Against Chief United States Bankruptcy Judge Stacey G.C. Jernigan*, No. 05-26-90041 (Dec. 29, 2025) .............................. 1a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025) .............................. 6a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90043 (Dec. 29, 2025) .............................. 14a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90044 (Dec. 29, 2025) .............................. 19a

Order of the Judicial Council for the Fifth Circuit, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90045 (Dec. 29, 2025) .............................. 25a

United States Court of Appeals
Fifth Circuit
**FILED**
**December 29, 2025**

**Lyle W. Cayce**
**Clerk**

**JUDICIAL COUNCIL**
**FOR THE FIFTH CIRCUIT**

---

Complaint No. 05-26-90041

---

IN RE COMPLAINT OF JAMES D. DONDERO AGAINST
CHIEF UNITED STATES BANKRUPTCY JUDGE
STACEY G.C. JERNIGAN,
NORTHER DISTRICT OF TEXAS
UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

---

ORDER

James D. Dondero ("Dondero") has filed a complaint alleging misconduct by Chief United States Bankruptcy Judge Stacey G. C. Jernigan, Northern District of Texas, in *In re Highland Capital Management) L.P.*, No. 19-BK-34054 (Bankr. N.D. Tex.) *("In re Highland"),* a Chapter 11 bankruptcy proceeding. *In re Highland* was filed by Highland Capital Management, L.P. ("Highland"), an investment firm that managed billion-dollar, publicly-traded investment portfolios for nearly three decades. *See Dondero v. Jernigan,* No. 24-10287, 2025 WL 1122466, at *1 (5th Cir. Apr.16, 2025). Dondero is the former chief executive officer of Highland. *See id.*

In his complaint, Dondero contends that prior to presiding over *In re Highland,* Chief Judge Jernigan presided over a bankruptcy proceeding filed by Acis Capital Management, L.P.[1] ("Acis"), in which Highland participated. *See In re Acis Cap. Mgmt.) LP,* No. 18-BK-30264 (Bankr. N.D. Tex.) *("In re Acis").* Dondero alleges that Chief Judge Jernigan formed negative impressions of and bias against Dondero and his affiliates while presiding over *In re Acis.* As evidence of the alleged bias, Dondero references Chief Judge Jernigan's post-trial "Findings of Fact and Conclusions of Law" issued in *In re Acis,* which discredited certain testimony of Dondero and generally questioned the credibility of Dondero and former in-house Highland attorneys Scott Ellington and Isaac Leventon, all of whom testified on behalf of Acis. Dondero further alleges that Chief Judge Jernigan referred to a lawsuit that she improperly attributed to Dondero as "vexatious" during *In re Acis.*

According to Dondero, the bias formed by Chief Judge Jernigan during *In re Acis,* along with her reliance on information that she learned in *In re Acis,* has resulted in consistent adverse rulings against him and his affiliates in *In re Highland.* Dondero alleges that Chief Judge Jernigan made *sua sponte* rulings that "targeted" him; "ignored corporate formalities to punish" entities perceived to be affiliated with Dondero; "single[d] out Dondero for negative treatment" during hearings and in rulings; intentionally disregarded rules and law to rule against Dondero; and "manipulate[d]" the Rules of Procedure to Dondero's detriment. In support, Dondero's complaint sets forth numerous examples of Chief Judge Jernigan's

1. Dondero formed Acis Capital Management, L.P., an SEC-registered investment advisor, along with two other individuals.

adverse rulings and critical comments made during judicial proceedings in *In re Highland.*

Many of Dondero's allegations call into question the correctness of Chief Judge Jernigan's decisions and rulings. To the extent the allegations relate directly to the merits of decisions or procedural rulings, they are subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(ii). The remaining allegations do not constitute "sufficient evidence to raise an inference that misconduct has occurred." *See* 28 U.S.C. § 352(b)(1)(A)(iii).[2]

As the Supreme Court has recognized, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the *current proceedings, or of prior proceedings,* do not constitute bias, unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."[3] *See Liteky v. United States,* 510 U.S. 540, 555 (1994) (emphasis added). Though "[a] judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards [a party,] . . . the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes . . . necessary to completion of the judge's task." *Id.* at 550–51.

---

2. While the allegations in Dondero's complaint alone do not raise an inference of bias, other individuals have submitted separate complaints with additional allegations against Chief Judge Jernigan regarding alleged bias against Dondero and his affiliates. Those allegations are addressed in the orders disposing of their respective complaints.

3. "[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings." *Liteky,* 510 U.S. at 551.

In addition, remarks "that are critical or disapproving of" individuals involved in a lawsuit, even when "hostile," have been expressly found by the Supreme Court to be excluded from the characterization of "bias." *See id.* at 555. This includes "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," as well as "[a] judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration." *Id.*[4]

The critical comments made by Chief Judge Jernigan during judicial proceedings and cited by Dondero, without more, fall squarely within the confines of *Liteky* and do not, on their face, display "deep-seated favoritism or antagonism that would make fair judgment impossible." *See id* at 555.

Regarding Dondero's suggestion that Chief Judge Jernigan's pattern of adverse rulings against him constitutes evidence of improper bias, Dondero fails to state a viable claim of misconduct because "[a]dverse decisions alone do not constitute evidence of bias." *Id.*

For these reasons, the complaint is subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

---

4. In a similar vein, the Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 66, June 2009, provides: "Strongly stated judicial views rooted in the record, a stern and short-tempered judge's efforts at court administration, expressions of impatience, dissatisfaction, annoyance and even anger directed to an attorney or a party should not be confused with judicial bias." Guide to Judiciary Policy, Vol. 2B, Ch. 2, at 95.

The complaint is DISMISSED.

JENNIFER WALKER ELROD
*Chief Judge*

United States Court of Appeals
Fifth Circuit
**FILED**
**December 29, 2025**
**Lyle W. Cayce**
**Clerk**

**JUDICIAL COUNCIL**
**FOR THE FIFTH CIRCUIT**

---

Complaint No. 05-26-90042

---

IN RE COMPLAINT OF JUDICIAL MISCONDUCT UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

---

ORDER

Complainant, former in-house counsel for a company, has filed a complaint alleging misconduct by a United States Bankruptcy Judge in the company's Chapter 11 bankruptcy case and related adversary proceedings.

Noting that he did not testify in the company's bankruptcy case and appeared as a witness before the judge only once in a prior bankruptcy proceeding of a different company, Complainant contends that the judge "has developed a bias against [him] and the hedge fund industry which employs him," and that bias "has manifested in abusive and harassing behavior and discrimination towards [him]." Complainant's specific allegations are addressed below.

*Comments Regarding Stalking Lawsuit*

Complainant states that he filed a lawsuit in state court in which he made claims that a former employee of

the company was liable for stalking him. Complainant takes issue with comments made by the judge during a hearing regarding whether men could be subject to stalking. Complainant also alleges that the judge referred to his stalking lawsuit in "scare-quotes" in an order on a motion to recuse filed in the bankruptcy case and cited the lawsuit as an example of how things had gotten "contentious" and "seemingly personal" among different parties involved in the bankruptcy.

Complainant claims that the foregoing comments and actions are "harassing and discriminatory" and violate Rules 4(a)(2) and (3) of the Rules for Judicial-Conduct and Judicial-Disability Proceedings ("JC&D Rules").

JC&D Rule 4(a) defines cognizable misconduct as "conduct prejudicial to the effective and expeditious administration of the business of the courts." Under Rule 4(a)(2)(B),[1] cognizable misconduct includes "treating litigants . . . or others in a demonstrably egregious and hostile manner." Under Rule 4(a)(3), cognizable misconduct "includes intentional discrimination on the basis of race, color, sex, gender, gender identity, pregnancy, sexual orientation, religion, national origin, age, or disability."

Pursuant to JC&D Rule 11(b), I requested a written response to the complaint from the judge. In her response, the judge admitted to making the comments cited in the complaint and explained her view as to why they had not been unreasonable or improper. She also pointed to the fact that Complainant had not sought any relief associated with the alleged stalking.

In subsequent communications with me regarding this complaint, the judge acknowledged that comments based

1. Though Complainant references Rule 4(a)(2) generally, only subsection B of that rule is potentially applicable.

on stereotypes about who can or cannot suffer harassment are not appropriate and agreed to refrain from making such comments in the future. I find that this action constitutes appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* Rule 11(d).

This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2) (a chief judge may "conclude the proceeding if the chief judge finds that appropriate corrective action has been taken or that action on the complaint 1s no longer necessary because of intervening events").

*Comments and Opinions Regarding Complainant's Integrity and Character*

Complainant also takes issue with negative comments made about his character and credibility and actions against him taken by the judge during hearings. Complainant states that at one hearing, the judge enjoined him and his subordinate from sharing confidential information they received as inhouse attorneys for the company without permission, even though they were not parties to the adversary proceeding and they were not present at the hearing.

Complainant states that the judge's "willingness to make credibility assessments about [him] without hearing from him is evidence of her repeated animus, and has otherwise caused a loss of public confidence in the Court as an instrument of justice" in violation of Rule 4(a)(2)(B) of the JC&D Rules. Though Complainant frames the judge's statements as "mak[ing] credibility assessments about [him] without hearing from him," Complainant appears to be alleging that the judge formed a negative view or bias against him based on her prior dealings with him in a prior

bankruptcy proceeding. The Supreme Court has long recognized that "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of the current proceedings, *or of prior proceedings,* do not constitute a basis for a bias or partiality motion . . . ." *Liteky v. United States,* 510 U.S. 540, 555 (1994) (emphasis added). Further, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* This includes "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.* at 555–56.[2]

The judge's alleged opinions of Complainant and her related comments are consistent with the types of comments and efforts at judicial administration described in *Liteky* that do not constitute evidence of improper judicial bias. For the same reasons, the comments are not demonstrably egregious or hostile under JC&D Rule 4(a)(2)(B) or "prejudicial to the effective and expeditious administration of the business of the courts" under 28 U.S.C. § 351(a).

These allegations are therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occur-

---

2. In a similar vein, the Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 66, June 2009, provides: "Strongly stated judicial views rooted in the record, a stern and short-tempered judge's efforts at court administration, expressions of impatience, dissatisfaction, annoyance and even anger directed to an attorney or a party should not be confused with judicial bias." Guide to Judiciary Policy, Vol. 2B, Ch. 2, at 95.

red." To the extent these allegations are "directly related to the merits of a decision or procedural ruling," they are subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(ii).

*The Judge's Novels*

Complainant contends that the judge has "expressed overtly hostile views toward the hedge fund industry" in two fictional novels she authored, and that there are many parallels between the judge and the novels' protagonist. Complainant states that the company's bankruptcy proceeding and the bankruptcy proceeding of another company "have many parallels to these books, such that [the judge] appears to be making negative and hostile commentary through her books concerning the litigants in her court." He therefore accuses her of bias against the hedge fund industry and the litigants in these proceedings that is "reasonably likely to lower public confidence in her ability to fairly adjudicate, and in turn, have a prejudicial effect on the administration of the court," in violation of Rule 4(a)(7) of the JC&D Rules. JC&D Rule 4(a)(7) states that "[c]ognizable misconduct includes conduct occurring outside the performance of official duties if the conduct is reasonably likely to have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

In her response to my request to address the allegations in this complaint, the judge advised that: her novels are not about the company or anything that happened in the company's bankruptcy case; the references in her novels to hedge funds are "relatively infrequent"; such references are not "gleaned from knowledge or information from" the company's bankruptcy case; and that in the beginning of her novels she states that the opinions express-

ed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, the company's former CEO and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work

as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related to the company's bankruptcy case that are currently pending before her.[3]

I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

---

3. Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

United States Court of Appeals
Fifth Circuit
**FILED**
**December 29, 2025**

**Lyle W. Cayce**
**Clerk**

**JUDICIAL COUNCIL**
**FOR THE FIFTH CIRCUIT**

Complaint No. 05-26-90043

IN RE COMPLAINT OF JUDICIAL MISCONDUCT
UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

ORDER

Complainant, former in-house counsel for a company, has filed a complaint alleging misconduct by a United States Bankruptcy Judge involving two cases that both relate to a Chapter 11 bankruptcy proceeding filed by the company.

Complainant alleges that the judge made public comments about the merits of contested matters raised in the two pending cases in violation of Canons 3(A)(6) and 4 of the Code of Conduct for United States Judges and Rules 4(a)(1)[1] and 4(a)(7) of the Rules for Judicial-Conduct and Judicial Disability Proceedings ("JC&D Rules").[2]

1. Complainant cites JC&D Rule 4(a)(1) in his complaint. However, that rule's examples of cognizable misconduct are not relevant to the allegations in this complaint.
2. Canon 3(A)(6) provides that "[a] judge should not make public comment on the merits of a matter pending or impending in any
(continued…)

Specifically, Complainant contends that the judge made comments to an online news organization addressing allegations that a character in her fictional novel was modeled after the former CEO of the company and a frequent participant in the legal proceedings related to the company bankruptcy. These comments were made while the two cases were pending-a motion to recuse and a petition for writ of mandamus filed in the two cases-that raised, in part, the issue of whether the judge should have recused from the bankruptcy due to the appearance of bias against the CEO created through her extrajudicial writings.

Pursuant to JC&D Rule 11(b), I invited the judge to respond to the complaint in writing. In her response, the judge stated that she had received many media requests asking her to comment about whether a character in her novel was based on the CEO and she responded to one e-mail from her personal e-mail account. She submitted a copy of the e-mail with her response.

This e-mail reflects that the judge expressly declined to comment on any pending case, denied that the novel

---

court." Canon 4, in relevant part, provides: "[A) judge should not participate in extra judicial activities that detract from the dignity of the judge's office, interfere with the performance of the judge's official duties, reflect adversely on the judge's impartiality, lead to frequent disqualification, or violate the limitations set forth below." *See* Guide to Judiciary Policy, Vol. 2A, Ch. 2. JC&D Rule 4(a) provides that "[m)isconduct is conduct prejudicial to the effective and expeditious administration of the business of the courts." JC&D Rule 4(a)(7) provides that "[c)ognizable misconduct includes conduct occurring outside the performance of official duties if the conduct is reasonably likely to have a prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people."

was about a pending case or litigant, and explained generally the plot of the novel. While the article states that the judge addressed the [then-pending] recusal motion, the judge's e-mail did not reference the recusal motion or any filing in any case.

The judge stated that, at the time she made the comments to the news organization, she did not perceive her comments as being related to the merits of a pending judicial matter. Rather she intended her comments to stop further media inquiries about her extrajudicial writings. Lastly, the judge expressed sincere sorrow that anyone would construe these comments as improper under the circumstances.

In a later correspondence with me regarding this complaint, the judge agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

Canon 3(A)(6) provides in pertinent part that "[a] judge should not make public comment on the merits of a matter pending or impending in any court." The Commentary on Canon 3(A)(6) adds:

> The admonition against public comment about the merits of a pending or impending matter continues until the appellate process is complete. If the public comment involves a case from the judge's own court, the judge should take particular care so that the comment does

> not denigrate public confidence in the judiciary's integrity and impartiality, which would violate Canon 2A. A judge may comment publicly on proceedings in which the judge is a litigant in a personal capacity, but not on mandamus proceedings when the judge is a litigant in an official capacity.

While the Code's Canons are instructive, 28 U.S.C. § 351 ("the Act") and the JC&D Rules are the governing authority for determining what constitutes cognizable misconduct. *See* Commentary to JC&D Rule 4. Those authorities define misconduct as conduct "prejudicial to the effective and expeditious administration of the business of the courts." 28 U.S.C. § 351. An inadvertent, minor violation of the Code's specific rules, promptly remedied when brought to the attention of the judge, might be a violation of the Code, but might not rise to the level of misconduct contemplated by the Act. *See* Commentary to JC&D Rule 4.

While there was overlapping subject matter between the judge's comments to the news organization and the issues pending in litigation, it is debatable whether her comments constitute "comment[s] on the merits" of a pending matter. Regardless, any potential violation of Canon 3(A)(6) under these particular facts was unintended and minor and does not rise to the level of "conduct prejudicial to the effective and expeditious administration of the business of the courts." The complaint is therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

In addition, the judge expressed remorse that her statements could be construed as commenting on pending

cases when she had made efforts to indicate that she could not comment on pending cases, and she promised to consult with available ethics resources when ethical dilemmas such as this arise in the future. This action constitutes appropriate corrective action. *See* Rule 11(d) (defining appropriate corrective action as voluntary action that acknowledges and remedies the problems raised by the complaint).

The complaint can therefore alternatively be concluded under 28 U.S.C. § 352(b)(2) (a chief judge may "conclude the proceeding if the chief judge finds that appropriate corrective action has been taken or that action on the complaint is no longer necessary because of intervening events").

The complaint is DISMISSED. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

United States Court of Appeals
Fifth Circuit

**FILED**
**December 29, 2025**

**Lyle W. Cayce**
**Clerk**

**JUDICIAL COUNCIL**
**FOR THE FIFTH CIRCUIT**

Complaint No. 05-26-90044

IN RE COMPLAINT OF JUDICIAL MISCONDUCT
UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

ORDER

Complainant, the President of a religious organization, has filed a complaint on behalf of the organization alleging misconduct by a United States Bankruptcy Judge in two corporate bankruptcy cases and an adversary case.

While the organization is not a litigant in any of the foregoing proceedings, Complainant states that the organization is concerned that one of the corporate bankruptcy debtors, which indirectly provides financial support to the organization, is subject to biased treatment by the judge in the adversary proceeding because she maintains negative views of the debtor's former chief executive officer, those associated with him, and "the hedge fund industry in general." Complainant bases this claim on the contents of two fictional novels authored by the judge. Complainant also takes issue with the judge's marketing of her novels.

*Alleged bias against participants in the bankruptcy and related proceedings*

Complainant alleges that one of the judge's novels contains negative depictions of hedge funds and a hedge fund manager character) and that the judge used information obtained in the bankruptcy proceedings in her novels. He notes that there are substantial similarities between the novels and the bankruptcy proceedings, including the fact that both feature hedge funds with the same types of asset holdings and the similarities between the judge and the novels' main character. Complainant contends the novels are evidence that the judge is biased against the corporate-debtor's CEO and the hedge fund industry.

Pursuant to Rule 11(b) of the Rules for Judicial-Conduct and Judicial Disability Proceedings ("JC&D Rules"), I requested a written response to the complaint from the judge. In her response, the judge advised that: her novels are not about anyone or anything that happened in any litigation before her; the references in her novels to hedge funds are "relatively infrequent"; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, the former CEO of one of the corporate debtors and others challenged the judge's decision not to re-

cuse in the company's bankruptcy proceedings. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance

in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related to the company's bankruptcy case that are currently pending before her.[1] I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

*Alleged use of position as a federal bankruptcy judge to market novels*

Complainant alleges that the judge used her position as a federal bankruptcy judge to promote the sale of her novels. Complainant notes that the back covers of the novels, as well as the "Author's Note" in one novel, indicate that she is a bankruptcy judge. Complainant further states that the judge "hosted a book club" for that novel at an event held by group of women bankruptcy professionals.

The Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 114,

1. Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

November 2014, addresses promotional activity associated with extrajudicial writings and publications and provides in pertinent part: "A judge may mention his or her position, length of service, and court in a book jacket or in other similar straightforward author summaries, provided that the identification is without embellishment and appears in the context of other biographical information." The judge's references to herself as a federal bankruptcy judge on the back covers of her novels and in the "Author's Note" of one novel falls within this permissible activity. This allegation is therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

Whether the judge's participation in the book club event amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies any problem raised by this allegation. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: agreed that future promotional activity related to her extrajudicial writings will be consistent with the Code of Conduct for United States Judges and other relevant ethical guidance, including refraining from marketing current or future books at a law firm or other similar venue or using the prestige of judicial office to advance the sale or marketing of her books; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting the resources, to seek particularized guidance in the form of either informal guidance from the Fifth Cir-

cuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

I find that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

United States Court of Appeals
Fifth Circuit
**FILED**
**December 29, 2025**
**Lyle W. Cayce**
**Clerk**

**JUDICIAL COUNCIL**
**FOR THE FIFTH CIRCUIT**

---

Complaint No. 05-26-90045

---

IN RE COMPLAINT OF JUDICIAL MISCONDUCT
UNDER THE JUDICIAL IMPROVEMENTS ACT OF 2002.

---

ORDER

Complainant, who is involved in the hedge fund industry, has filed a complaint alleging misconduct by a United States Bankruptcy Judge regarding two novels she authored and alleged activity concerning the marketing of those novels.

*The Judge's Novels*

Complainant alleges that the judge is biased against the hedge fund industry and its participants as evidenced by her novels, which he alleges contain "sweeping negative commentary" about the hedge fund industry. Complainant claims that the novels were written while the judge presided over bankruptcy proceedings involving hedge funds and that substantial similarities exist between her and the novels' protagonist. Complainant asserts that the anti-hedge fund commentary in the novels "denigrates public confidence in the judiciary's integrity

and impartiality" and is "prejudicial to the effective and expeditious administration of the business of the courts."

Pursuant to Rule 11(b) of the Rules for Judicial-Conduct and Judicial Disability Proceedings ("JC&D Rules"), I requested a written response to the complaint from the judge. In her response, the judge advised that: her novels are not about anyone or anything that happened in any litigation before her; the references in her novels to hedge funds are "relatively infrequent"; and that in the beginning of her novels she states that the opinions expressed or implied by the characters in her novels are not necessarily her opinions. The judge further states that she has presided "over countless cases in [her] lifetime and worked on even more, before becoming a judge, involving hedge funds, private equity funds, and exotic financial products" and that "[u]ntil now, [she] is not aware of anyone suggesting that [she] ha[s] shown any biases or animus where they are concerned."

The Fifth Circuit has also addressed the matter. In an appeal of a district court order denying their petition for mandamus, a company's former CEO and others challenged the judge's decision not to recuse in the company's bankruptcy proceedings based on the novels. The Fifth Circuit opined that whether a reasonable reader and observer of these proceedings could question the judge's impartiality is debatable, and due to the similarities between the characters in the judge's novel and the litigants currently before her court, a strong argument could be made that she had a duty to recuse. Nonetheless, while noting that some similarities between the books and the cases before the judge may raise cause for concern, the court held that the similarities were not close enough to find that the district court abused its discretion in denying the petition.

Regardless of the merits of these allegations, the issue of whether the judge's conduct amounts to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies the problems raised by the complaint. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge: assured me that her forthcoming novel does not involve subject matter that could reasonably be perceived as being based on matters pending before her or her work as a bankruptcy judge; agreed that any future extrajudicial writings will not include scenarios or subject matter that a reasonable person could assume are based on matters pending before her, or include characters that a reasonable person could assume are based on parties or witnesses in matters before her; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting those sources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

While the judge remains steadfast that she has no bias or animus against any party in any matter pending before her, she has also recused herself from all matters related

to the company's bankruptcy case that are currently pending before her.[1]

I find, without regard to the veracity of the allegations in the complaint, that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

*The Judge's Promotion of Her Novels*

Complainant also claims that the judge has improperly promoted her novels by stating in the biography section of her social media accounts that she is a federal bankruptcy judge and promoting the sale of her books on her social media accounts through purchase links and references to certain book reviews. In addition, Complainant contends that the judge improperly promoted one of the novels at an event hosted by a group of women bankruptcy professionals at a law firm.

The Committee on Codes of Conduct of the Judicial Conference of the United States, Advisory Opinion 114, November 2014, addresses promotional activity associated with extrajudicial writings and publications and provides in pertinent part: "A judge may mention his or her position, length of service, and court in a book jacket or in other similar straightforward author summaries, provided that the identification is without embellishment and appears in the context of other biographical information."

1. Neither the judge's recusal nor anything in this order should be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit and is currently pending before the Supreme Court, or the validity of any decision, ruling, or order that she has issued in any judicial proceeding.

To the extent that the judge references herself as a federal bankruptcy judge in the biography section of her social media accounts, this falls within the permissible activity discussed in Advisory Opinion 114. This allegation is therefore subject to dismissal under 28 U.S.C. § 352(b)(1)(A)(iii) as "lacking sufficient evidence to raise an inference that misconduct has occurred."

Whether the book reviews on the judge's social media accounts or her participation in the book club event amount to misconduct under 28 U.S.C. § 351(a) need not be decided because she has taken appropriate corrective action that acknowledges and remedies any problem raised by these allegations. *See* JC&D Rule 11(d).

In communications with me regarding this complaint, the judge advised me that she removed any book reviews from her social media account that were in question. The judge also: agreed that future promotional activity related to her extrajudicial writings will be consistent with the Code of Conduct for United States Judges and other relevant ethical guidance, including refraining from marketing current or future books at a law firm or other similar venue or using the prestige of judicial office to advance the sale or marketing of her books; agreed to complete three hours of ethics training, with a particular focus on avoiding conduct that might lead to the appearance of impropriety; and agreed to consult available ethics resources (e.g., codes of conduct, commentary, etc.) when ethical dilemmas arise in the future and, if questions remain after consulting the resources, to seek particularized guidance in the form of either informal guidance from the Fifth Circuit's representative on the Committee on Codes of Conduct of the Judicial Conference of the United States

or from Committee counsel, or in the form of a confidential advisory opinion from the Committee.

I find that these actions constitute appropriate corrective action that acknowledges and remedies the problems raised by the complaint. This aspect of the complaint is therefore subject to conclusion under 28 U.S.C. § 352(b)(2).

The complaint is CONCLUDED in part and DISMISSED in part, and this matter is hereby closed. An unredacted private order is entered simultaneously herewith.

Pursuant to JC&D Rules 23(b)(1) and (8), IT IS ORDERED that a copy of this order be published on the court's website forthwith.

JENNIFER WALKER ELROD
*Chief Judge*

# Exhibit 53

Hard copy to be delivered to the Court

# Exhibit 54

Hard copy to be delivered to the Court

Case 3:26-cv-02315-K Document 19-3 Filed 03/18/26 Page 613 of 620 PageID 2243

# Exhibit A

# Exhibit B

# Exhibit C

# Exhibit D

# Exhibit E

Case 3:26-cv-02315-K Document 19-3 Filed 03/18/26 Page 618 of 620 PageID 2248

# Exhibit F

# Exhibit G

# Exhibit H