**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02315-X

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4679] Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026.**

**APPELLANT RECORD**

**VOLUME 8**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02315-X<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to the Clerk of Court's correspondence [Docket No. 4700] and Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4685] on June 29, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4513] and a *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4699] now files this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and Hunter Mountain Investment Trust among other entities?

2. Did the Bankruptcy Court err in making evidentiary and trial conduct rulings during the course of evidentiary hearings held on Dugaboy's motion to vacate in May 2026?

3. Did the Bankruptcy Court err in making rulings on the availability of discovery, including the production of documents or depositions, in proceedings leading to its denial of the motion to vacate or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and the Hunter Mountain Investment Trust, among other entities?

4. Did the Bankruptcy Court err in not treating the Hunter Mountain Investment Trust, Mark Patrick, and other entities associated with him as parties in the 9019 settlement approval proceedings or the proceedings considering whether to vacate or reconsider that settlement approval?

5. Did the Bankruptcy Court err by misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(2) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by determining that the evidence presented of Mark Patrick's misconduct was not newly discovered or otherwise cognizable under Rule 60(b)(2)?

6. Did the Bankruptcy Court err in determining that James Dondero's knowledge could be imputed to Dugaboy, regardless of the capacity in which he was acting at the time he gained that knowledge?

7. Did the Bankruptcy Court err in determining that previously known instances of Mr. Patrick's

compliance lapses in other areas needed to have been acted upon in order to preserve the right to remove him from his position at the Hunter Mountain Investment Trust for later discovered and more significant misconduct related to misappropriating much of the asset value of two charitable structures, including the Charitable DAF?

8. Did the Bankruptcy Court err in misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(3) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by, among other things, determining that there is no evidence that Highland withheld or otherwise obscured evidence of Mark Patrick's misconduct and resulting lack of authority to negotiate the 9019 settlement agreement from Dugaboy in the proceedings that led to the Bankruptcy Court's entry of the original Federal Rule of Bankruptcy Procedure 9019 Order on June 30, 2025?

9. Did the Bankruptcy Court err in not considering under Federal Rule of Civil Procedure 60(b)(3) or otherwise the evidence Mark Patrick and/or his associates withheld or otherwise obscured from the Court through omissions and misrepresentations during discovery and before the Court at the hearing on the proposed settlement under Federal Rule of Bankruptcy Procedure 9019?

10. Did the Bankruptcy Court err by misconceiving the applicable legal standard and/or in not considering the fraud and misconduct of Mark Patrick and his associates in misappropriating most or all of the assets of two charitable structures and obscuring or making it more difficult to detect that conduct when determining whether to vacate the settlement approval order under Federal Rule of Evidence 60(b)(3)?

11. Under all aspects of Federal Rule of Civil Procedure 60(b) and the Court's inherent powers to vacate or modify judgments that are against the interest of justice and affected by wrongdoing, did the Bankruptcy Court err in suggesting that the fraud and misconduct of Mark Patrick was not directly pertinent to whether a bankruptcy settlement with entities he purported to control should be approved?

12. Did the Bankruptcy Court misapply the Federal Rule of Civil Procedure 60(b)(6) standard in denying Dugaboy's Motion for Relief from Order and Motion to Vacate in determining that Dugaboy "failed to articulate a 'mutually exclusive' reason for vacating the 9019 Order?"

13. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when he came to the Court having engaged in fraud and/or misconduct, or with unclean hands, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

14. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when that judgment may have assisted Mr. Patrick in furthering his misconduct or in deterring others from contesting it, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

15. Whether the 9019 settlement order, in light of the presented evidence of Patrick's misconduct, was an inappropriate circumvention of the Fifth Circuit's decision to permit suits against certain parties without seeking bankruptcy court permission and constituted a invalid non- consensual release of claims?

16. Did the Bankruptcy Court err in denying relief under Federal Rule of Civil Procedure 60(b) or the Court's other authorities to reconsider, amend, or vacate orders on Dugaboy's independently asserted ground that Chief Judge Stacey G. Jernigan lacked authority to enter the Rule 9019 Settlement Order because she should have recused herself and was disqualified from presiding in this matter earlier in the proceedings?

17. Did the Bankruptcy Court err in denying prior motions to recuse Judge Jernigan based on her manifestations of bias against James Dondero and others associated with him, including through her extrajudicial statements in novels and elsewhere?

18. Did the Bankruptcy Court err in finding that Dugaboy had abandoned its argument regarding whether Judge Jernigan was disqualified or should have been recused for not introducing additional testimonial evidence at the hearing on the matter, despite having fully briefed the issue in its Federal Rule of Civil Procedure 60(b) Motion and Reply thereto and having place the fully published versions of the judge's novels before the Court?

19. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of Mark Patrick's personal benefit in the decision to sell the Hunter Mountain Investment Trust?

20. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of the attendance of Supporting Organizations at the instant proceedings?

21. Did the Bankruptcy Court err when it determined that the deposition transcript of Mark Patrick (Highland hearing exhibit 55) was admissible and not an exception to hearsay?

22. Did the Bankruptcy Court err when it admitted Highland's hearing exhibits 43-45 as relevant?

23. Did the Bankruptcy Court err when it did not permit James Dondero to testify in Dugaboy's case-in-chief, including while permitting Highland to sponsor his testimony for other purposes by admitting his deposition?

24. Did the Bankruptcy Court err when it excluded Dugaboy's exhibits 292-297 as improper rebuttal evidence?

25. Did the Bankruptcy Court err when it granted Highland's request to admit the deposition testimony of James Dondero, despite Highland's decision not to call him as a witness for live testimony in the case, even though he was available in the courtroom throughout the proceedings?

26. Did the Bankruptcy Court err in protecting Highland, Hunter Mountain, Mark Patrick, and others from having to produce documents created earlier than May 19, 2025?

27. Did the Bankruptcy Court err in granting any part of Highland and other participants' requests for a protective order and/or to quash subpoenas?

28. Did the Bankruptcy Court err when it delayed Highland, Mark Patrick, Hunter Mountain, and other entities' obligations to respond to discovery until a couple of weeks before trial, only to require them to produce documents, sit for depositions, and commence trial—all within a 10-day period?

29. Whether a bankruptcy court may deny relief under Federal Rule of Civil Procedure Rule 60(b) or otherwise because vacatur would not itself unwind antecedent transactions or restore a separate pre-settlement structure?

30. Whether Federal Rule of Civil Procedure 60(b)(3) requires proof that concealed or misrepresented information would have changed the outcome, or instead clear and convincing evidence that adverse-party misconduct prevented a full and fair presentation?

31. Whether the District Court should conduct additional hearings and/or review of some or all findings *de novo* given that the decision below was entered by an Article I judge, who may exercise authority only through plenary supervision by a judge contemplated by Article III of the Constitution?

32. Are rulings by Article I bankruptcy judges on matters ancillary to the bankruptcy process due a similar amount of deference as rulings on core bankruptcy matters, or should the District Court act as an Article III backstop to judges not nominated by the President or confirmed by the Senate?

33. Is any amount of deferential review of a Bankruptcy Court's findings consistent with the Supreme Court's recent decisions that principal and inferior officers of the United States must be subject to plenary supervision by the President or some other office expressly listed in the Constitution, such as an Article III judge?

34. Whether the District Court should conduct additional hearings and/or review of some or all of the Bankruptcy Court's findings *de novo* given the Bankruptcy Court found it lacked jurisdiction to rule on the motion under Federal Rule of Civil Procedure 60(b), and the appealed Order denying relief under Rule 60(b) was only to the extent the Court was permitted to issue a ruling concerning the matter?

35. Whether the Bankruptcy Court erred in finding this matter a core proceeding pursuant to 28 U.S.C. § 157(b)(2)?

36. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1
000001

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4685] filed by Appellant;

000008

2. The Bankruptcy Court's June 15, 2026 *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4679];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000009

4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2 — 000642 — Thru Vol. 3

Vol. 4 — 001837

001839 Thru Vol 6

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol. 7 02/27/2026 003628 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 03/02/2026 003641 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 03/02/2026 003644 & 003645 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 03/02/2026 003646 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 03/03/2026 003657 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 03/04/2026 003661 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 04/01/2026 003664 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |
| 04/01/2026 003703 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 | | | Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004727 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol 8 004784 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol. 9 005201 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005203 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005211 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order* |

Vol. 9

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005216 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005219 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005221 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005223 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005227 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| Vol 9<br>04/17/2026<br>005324 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol. 10<br>04/21/2026<br>005584 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026<br>005588 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026<br>005609 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026<br>005676 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| Vol. 10 005686 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005698 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005720 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005721 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005723 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005731 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005740 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held) *Discovery Deadlines and Hearing on The Dugaboy Investment* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 10 | | *Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005749 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005761 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005770 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005777 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |
| 04/29/2026 005779 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 10 005781 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005788 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005790 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005792 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005795 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005878 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005896 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005899 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005901 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005907 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005914 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005921 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005923 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005930 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005933 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005936 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005939 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol 12 006094 thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| VOl:22 008150 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008166 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008182 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 22 008250 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008287 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008423 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008459 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008466 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008910 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| vol. 25 009548 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| vol. 26 009862 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| vol. 27 010223 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| vol. 28 010532 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol. 35 05/11/2026 015318 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015474 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015475 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015507 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015534 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015535 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015538 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol. 37 015965 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 015977 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016048 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016051 – 016053 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016054 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016103 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| Vol. 37 016104 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016202 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016459 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016473 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| 016474 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court; and

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J");

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No. 4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: July 31, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

**DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P. AND THE HIGHLAND CLAIMANT TRUST'S OBJECTION TO DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE [DOCKET NO. 4513]**

I, John A. Morris, pursuant to 28 U.S.C. § 1746, under penalty of perjury, declare as follows:

[1] Highland's last four digits of its taxpayer identification number are (8357). The service address for Highland is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

1 I am a partner in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. ("HCMLP"), the reorganized debtor in the above-referenced bankruptcy case and the Highland Claimant Trust (the "Claimant Trust", and together with HCMLP, "Highland"), and I submit this Declaration in support of *Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate [Docket No. 4513]* (the "Objection").[2] Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2 Attached as **Exhibit A** is a true and correct copy of Dugaboy's Index (compiled from all documents Dugaboy filed at Docket Nos. 4513 and 4521), a document prepared by professionals employed by my firm at my direction.

3 Attached as **Exhibit B** is a true and correct copy of the *JOL Writ of Summons and Statement of Claim*, filed in the Cayman Proceeding on July 15, 2025.

4 Attached as **Exhibit C** is a true and correct copy of a Judgment entered in the Charitable DAF HoldCo Ltd.'s Cayman Proceeding, dated February 10, 2026.

5 Attached as **Exhibit D** is a true and correct copy of the First Affidavit of Mark Eric Patrick filed in the Cayman Proceeding, dated June 4, 2025.

6 Attached as **Exhibit E** is a true and correct copy of a *Remittance Agreement* between the NexPoint Small Bay and Charitable DAF and Liberty CLO Holdco, Ltd. (as those terms are defined), dated January 10, 2025.

7 Attached as **Exhibit F** is a true and correct copy of a Rule 11 Agreement between the Dondero Foundation and Patrick and certain entities controlled by him, dated July 11, 2025.

8 Attached as **Exhibit G** is a true and correct copy of an amendment to a loan agreement executed by, among others, certain Dondero-controlled entities and CLO Holdco, Ltd., dated September 30, 2025.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Objection.

9 Attached as **Exhibit H** is a true and correct copy of a *Stipulation [Proposed] Order of Dismissal With Prejudice* between Liberty CLO HoldCo, Ltd. and Dugaboy and others aligned with or controlled by Dondero, dated December 3, 2025.

10 Attached as **Exhibit I** is a true and correct copy of an *Agreed Final Judgment* between Atlas IDF, LP (an HMIT affiliate) and certain Dondero-controlled entities, dated December 8, 2025.

11 Attached as **Exhibit J** is a true and correct copy of the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Court, filed in the United States District Court for the District of Delaware*, dated July 21, 2025.

12 Attached as **Exhibit K** is a true and correct copy of the deposition transcript of Shawn Raver dated June 20, 2025.

13 Attached as **Exhibit L** is a true and correct copy of the Highland Rule 9019 Presentation.

14 Attached as **Exhibit M** is a true and correct copy of the CWR Form No. 15 filed in the Cayman Proceeding and dated July 21, 2025.

Dated: April 3, 2026

*/s/ John A. Morris*
John A. Morris

# EXHIBIT A

| Exhibit No. | Document |
|---|---|
| **Dugaboy Memo of Law in Support of Motion to Vacate – Exhibits – Dkt No. 4513** | |
| 1 | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297 (Bankr. N.D. Tex. **June 30, 2025**) ("Rule 9019 Settlement Order") (pdf pages 70-74) |
| 2 | Transcript of Status and Scheduling Conference Hearing Held **December 6, 2019** at 23:2–15, Dkt. 207 (pdf pages 75-102) |
| 3 | Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Dkt 4231("Charities' Obj.") (dated **June 9, 2025**) (pdf pages 103-111) |
| 4 | DAF's original organizational chart ("DAF Org Chart") (undated) (pdf pages 112-113) |
| 5 | Rand Advisors, LLC Form ADV Part 2A (**March 17, 2025**) (pdf pages 114-144) |
| 6 | *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158 - Complaint (page 10 only) (dated **May 19, 2022**) (pdf pages 145-148) |
| 7 | Notice of Occurrence of Effective Date of Confirmed Plan of Reorganization, Dkt. 2700 (dated **August 11, 2021**) (pdf pages 149-153) |
| 8 | *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 1 (dated **May 19, 2022**) (pdf pages 154-300) |
| 9 | Order Pursuant to Plan "**Gatekeeper Provision**" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3904 (certain pages only) (dated **August 25, 2024**) (pdf pages 301-326) |
| 10 | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding ("Motion for Leave"), Dkt. 3699 (dated **March 28, 2024**) (pdf pages 327-364) |
| 11 | Order, *Hunter Mountain Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:23-cv-02071-E (N.D. Tex. **Mar. 21, 2025**), Dkt. 44 (pdf pages 365-370) |
| 12 | Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland Cap. Mgmt., L.P.*, No. 23-03038-sgj (Bankr. N.D. Tex. **May 10, 2023**), Dkt. 1 ("Valuation Litigation") [DUGABOY MISTAKENLY ATTACHED THE WRONG COMPLAINT—THE COMPLAINT ATTACHED IS KIRSCHNER V. DONDERO, OKADA, ET AL., DATED OCTOBER 15, 2021] (pdf pages 371-505)] |

| Exhibit No. | Document |
|---|---|
| 13 | Memorandum Opinion and Order Granting Motion to Dismiss Adversary Proceeding in Which Contingent Interest Holders in Chapter 11 Plan Trust Seek a Post-Confirmation Valuation of Trust Assets, Adv., Dkt. 27, No. 23-03038 (dated **May 24, 2024**) (pdf pages 506-542) |
| 14 | Notice of Appeal, *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:24-cv-01531-X (N.D. Tex. **Aug. 29, 2025**), Dkt. 32 (pdf pages 543-548) [DUGABOY MISTAKENLY ATTACHED A DUPLICATE OF EXHIBIT 15 RATHER THAN THE NOTICE OF APPEAL] |
| 15 | *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 25-10999 (5th Cir. **October 1, 2025**), Dkt. 32 [USCA letter to Dugaboy's counsel] (pdf pages 549-554) |
| 16 | Motion for Leave to File a Delaware Complaint ("Delaware Motion for Leave"), Dkt. 4000 (dated **January 1, 2024**) (pdf pages 555-593) |
| 17 | Highland's Motion to Stay Contested Matter or for Alternative Relief, Dkt. 4013 (dated **January 14, 2024**) (pdf pages 594-602) |
| 18 | Order Extending Stay of Contested Matter, Dkt. 4104 (dated **July 8, 2024**) (pdf pages 603-607) [DUGABOY MISTAKENLY ATTACHED THE NOTICE OF APPEAL, NOT THE ORDER] |
| 19 | Organizational chart reflecting the DAF Restructuring (undated but filed on **July 21, 2025**) (pdf pages 608-609) |
| 20 | Email from Shawn Raver to Chris Rice (dated Feb. 20, 2025) (pdf pages 610-613) |
| 21 | Email from Chris Rice to Skyview Group (dated Mar. 12, 2025) (pdf pages 614-615) |
| 22 | Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Motion"), Dkt. 4216 (dated **May 19, 2025**) (pdf pages 616-630) |
| 23 | Transcript of Hearing dated **June 25, 2025** ("9019 Hr'g Tr.") (certain pages only) (pdf pages 631-637) |
| 24 | Settlement Agreement & General Release, Dkt. 4217-1 (certain pages only) (dated **May 19, 2025**) (pdf pages 638-647) |
| 25 | Preliminary Objection of The Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities, Dkt. 4230 (dated **June 9, 2025**) (pdf pages 648-656) |

| Exhibit No. | Document |
|---|---|
| 26 | Notice of Hearing Held June 25, 2025 [**June 25, 2025**], Dkt. 4295 (pdf pages 657-658) |
| 27 | Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Dkt. 4291 (**June 27, 2025**) [DUGABOY MISTAKENLY ATTACHED THE JUNE 24, 2025 BINDING TERM SHEET BETWEEN HMIT AND THE DALLAS FOUNDATION RATHER THAN THE STIPULATION] (dated June 24, 2025) ("Withdrawal Stip.") (pdf pages 659-665) |
| 28 | Letter from Ken Paxton re: Request for a Stay; Dkt. 4308 (dated **July 9, 2025**) (pdf pages 666-668) |
| 29 | Notice of Appeal, Dkt. 4311; Ex. 30, The Dugaboy Investment Trust's Motion to Stay 9019 Order, Dkt. 4326 ("Dugaboy Motion to Stay") (**July 14, 2025**) |
| 30 | The Dugaboy Investment Trust's Motion to Stay 9019 Order, Dkt. 4326 (dated **July 17, 2025**) (pdf pages 679-775) |
| 31 | Memorandum Order and Opinion Regarding Stay Requests, Dkt. 4333 ("Stay Order") (dated **July 21, 2025**) (pdf pages 776-781) |
| 32 | Order 05-26-90042 (**December 29, 2025**) (pdf pages 782-789) |
| 33 | Order 05-26-90044 (**December 29, 2025**) (pdf pages 790-795) |
| 34 | Order 05-26-90045 (**December 29, 2025**) (pdf pages 796-801) |
| 35 | Stacey G. Jernigan, *Hedging Death*, White Bird Publications (**March 22, 2022**) (excerpt) (pdf pages 802-837) |
| 36 | Memorandum of Law in Support of Highland Capital Management Fund Advisors, L.P.'s Motion to Recuse at 16–17, *Highland Cap. Mgmt. L.P. v. Kirschner*, Adv. Proc. No. 21-03076, Dkt. 310 (Bankr. N.D. Tex. **Feb. 27, 2023**) ("Motion to Recuse") (excerpt) (pdf pages 838-842) |
| 37 | Movant's Supplemental Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455, No. 19-34054, Dkt. 3673 (Bankr. N.D. Tex. **Mar. 3, 2023**) (pdf pages 843-849) (excerpt) |
| 38 | Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455," No. 19-34054, Dkt. 3676 at 32–36 (Bankr. N.D. Tex. **Mar. 6, 2023**) (pdf pages 850-886) |

| Exhibit No. | Document |
|---|---|
| 39 | Order re: Writ of Mandamus at 3, No. 3:23-cv-00726-S, Dkt. 25 (N.D. Tex. **Mar. 8, 2024**) (pdf pages 887-893) |
| 40 | Original organizational chart for Hunter Mountain ("Hunter Mountain Org Chart") (pdf pages 894-914) |
| 41 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief, Dkt. 1943 ("Confirmation Order") (dated **February 22, 2021**) (pdf pages 915-946) |
| 42 | Notice of Appeal [ORDER EXTENDING STAY OF CONTESTED MATTER [DOCKET NO. 4000]], Dkt. 4111 (dated **July 8, 2024**) (pdf pages 947-951) |
| 43 | Voluntary Petition, Dkt. 3 (dated **October 16, 2019**) (pdf pages 952-968) |
| 44 | Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 281 (dated **December 27, 2019**) (pdf pages 969-987) |
| 45 | Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2256 (dated **April 29, 2021**) (pdf pages 988-997) |
| 46 | Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2812 (dated **September 6, 2021**) (pdf pages 998-1000) |
| 47 | Deferred Variable Annuity Policy No. 30218 dated as of **December 10, 2015**, issued to Empower Dallas as Policyholder and Beneficiary (pdf pages 1001-1049) |
| 48 | Rand Fund 2024 Audit (dated **June 26, 2025**) (pdf pages 1050-1068) |
| 49 | Transcript of Deposition of Mark Patrick (**June 23, 2025**) (pdf pages 1069-1081) |
| 50 | Amended and Restated Limited Partnership Agreement of Atlas Fund as of **November 30, 2015** at § 3.01 (pdf pages 1082-1116) |
| 51 | Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (**January 16, 2019**) (excerpt) (pdf pages 1117-1135) |
| 52 | Petition for Rehearing in the Supreme Court (dated **February 26, 2026**) (pdf pages 1136-1185) |

| Exhibit No. | Document |
|---|---|
| 53 | Stacey G. Jernigan, *Hedging Death*, White Bird Publications (**Mar. 22, 2022**) (full text) (pdf page 1186) |
| 54 | Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (**Jan. 16, 2019**) (full text) (pdf page 1187) |
| | pdf pages 1188 – 1195 are slip sheets only for Ex A - H |
| **Dkt 4521 – Dugaboy's Supplemental Exhibits** | |
| A | First Affidavit of Mark Eric Patrick Cayman proceedings (Marked Ex 47) (dated **June 4, 2025**) (pdf pages 1-9) |
| B | Writ of Summons Cayman proceedings (dated July 15, 2025) (pdf pages 10 -93) [a copy was attached as Exhibit A to Dugaboy's Motion for a Stay filed July 17, 2025; see Ex. 30 above)] |
| C | "Exhibit 125" Deposition Transcript of Torrey Littleton, (dated **June 22, 2025**) (pdf pages 94-194) |
| D | Chapter 15 Petition for Recognition of a Foreign Proceeding for Charitable DAF Holdco, Ltd. (dated **July 21, 2025**) (pdf pages 195– 198) |
| E | Winding Up Petition for Charitable DAF Holdco, Ltd. (dated **April 23, 2025**) (pdf pages 199-211) |
| F | "Exhibit 124" – Deposition Transcript of Julie Diaz (dated **June 22, 2025**) (pdf pages 212-314) |
| G (Part 1) | Declaration of Margo Macinnis in Support of Chapter 15 Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code (dated **July 21, 2025**) (pdf pages 1-46) |
| G – Exhibits Part 1 | "Exhibit 1" Supervision Order Cayman Island proceedings (dated May 6, 2025) (pdf pages 47-50)<br><br>"Exhibit 2" Margot MacInnis, Partner, Practice Leader – Cayman Islands Curriculum Vitae (pdf pages 51-52)<br><br>"Exhibit 3" Certificate of Incorporation Charitable DAF HoldCo, Ltd (dated October 2011) (pdf pages 53-56)<br><br>"Exhibit 4" Charitable DAF Holdco, Ltd Memorandum and Articles of Association (dated October 27, 2011) (pdf pages 57-124) |

| Exhibit No. | Document |
|---|---|
| | "Exhibit 5" Charitable DAF Holdco, Ltd Amended and Restated Memorandum and Articles of Association (dated February 20, 2025) (pdf pages 125-162)<br><br>"Exhibit 6" Register of Members of Charitable DAF HoldCo, Ltd. (printed April 25, 2025) (pdf pages 163-167)<br><br>"Exhibit 7" Charitable DAF Holdco, Ltd Written Resolutions of the Sole Director of the Company (dated March 25, 2021) (pdf pages 168-170)<br><br>"Exhibit 8" Charitable DAF Holdco, Ltd. Share Transfer Form (dated March 24, 2021) (pdf pages 171-172)<br><br>"Exhibit 9" Written Resolutions of the Sole Director of Each Company (dated April 22, 2021) (pdf pages 173-176)<br><br>"Exhibit 10" Charitable DAF Holdco, Ltd., Director Details Mark Patrick, Paul Murphy (no date) (pdf pages 177-178)<br><br>"Exhibit 11" Internal Revenue Service letter to Highland Dallas Foundation Inc. (dated January 19, 2013) (pdf pages 179-181)<br><br>"Exhibit 12" Charitable DAF Holdco, Ltd Written Resolutions of the Sole Director of the Company (dated November 30, 2011) (pdf pages 182-183)<br><br>"Exhibit 13" Share Transfer Form Charitable DAF Holdco, Ltd. (dated November 30, 2011) (pdf pages 184-185)<br><br>"Exhibit 14" Internal Revenue Service letter to Highland Kansas City Foundation Inc. (dated March 21, 2013) (pdf pages 186-188)<br><br>"Exhibit 15" Share Transfer Form Charitable DAF Holdco, Ltd (dated November 30, 2011) (pdf pages 189-190)<br><br>"Exhibit 16" Internal Revenue Service letter to Highland Santa Barbara Foundation Inc. (dated February 12, 2013) (pdf pages 191-194)<br><br>"Exhibit 17" Share Transfer Form Charitable DAF Holdco, Ltd (dated November 30, 2011) (pdf pages 195-196)<br><br>"Exhibit 18" Internal Revenue Service letter to Community Foundation of Metropolitan Tarrant Count Inc. (dated May 19, 1994)<br>Internal Revenue Service letter to Community Foundation of North Texas (dated March 2, 2006) (pdf pages 197-199) |

| Exhibit No. | Document |
|---|---|
| | "Exhibit 19" Charitable DAF Holdco, Ltd Written Resolutions of the Sole Director of the Company (dated August 12, 2015) (pdf pages 200-203)<br><br>"Exhibit 20" Letter from DFW Foundation to Charitable DAF Holdco, Ltd (dated February 7, 2025) (pdf pages 204-205)<br><br>"Exhibit 21" Charitable DAF Holdco, Ltd Written Resolutions of the Board of Directors of the Company (dated February 7, 2025) (pdf pages 206-231)<br><br>"Exhibit 22" Register of Directors for Charitable DAF Holdco, Ltd. (dated December 18, 2023) (pdf pages 232-233)<br><br>"Exhibit 23" The Dallas Foundation Supporting Organization Operating Agreement (dated November 30, 2011) (pdf pages 234-242)<br><br>"Exhibit 24" Highland Kansas City Foundation Agreement and Acknowledgment of Legal Relationship (dated November 30, 2011) (pdf pages 243-246)<br><br>"Exhibit 25" Santa Barbara Foundation Supporting Organization Operating Agreement (dated November 30, 2011) (pdf pages 247-254)<br><br>"Exhibit 26" Highland Dallas Foundation Certificate of Incorporation (dated November 22, 2011) (pdf pages 255-258)<br><br>"Exhibit 27" Highland Kansas City Foundation, Inc. Certificate of Incorporation (dated November 23, 2011) (pdf pages 259-262)<br><br>"Exhibit 28" Highland Santa Barbara Foundation, Inc., Certificate of Incorporation (dated November 22, 2011) (pdf pages 263-266)<br><br>"Exhibit 29" Bylaws of Highland Dallas Foundation Inc. (undated) (pdf pages 267-282)<br><br>"Exhibit 30" Highland Kansas City Foundation, Inc., Unanimous Written Consent of Directors in Lieu of Organizational Meeting and Bylaws (dated November 30, 2011) (pdf pages 283-302)<br><br>"Exhibit 31" Bylaws of Highland Santa Barbara Foundation, Inc., (undated) (pdf pages 303-318)<br><br>"Exhibit 32" Organizational Chart Titled "Before" (Undated) (pdf pages 319-320)<br><br>"Exhibit 33" Organizational Chart Current-DAF Holdco (Undated) (pdf pages 321-322) |

| Exhibit No. | Document |
|---|---|
| | "Exhibit 34" Certificate of Registration of Exempted limited partnership Charitable DAF Fund, LP (dated October 28, 2011) (pdf pages 323-324)<br><br>"Exhibit 35" Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP (dated November 7, 2011) (pdf pages 325-346) |
| G | "Exhibit 36" Second Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP (dated March 11, 2024) (pdf pages 1-20)<br><br>"Exhibit 37" Written Consent of the Managing Member of Charitable DAF GP, LLC (dated March 7, 2024) (pdf pages 21-24)<br><br>"Exhibit 38" Statement of Terms of Section 10 of the Exempted LP Act (As Amended) (dated March 7, 2024) (pdf pages 25-26)<br><br>"Exhibit 39" Register of Members for CDH GP, LTD (dated February 27, 2024) (pdf pages 27-31)<br><br>"Exhibit 40" Register of Member for CLO Holdco, Ltd. (date of incorporation December 13, 2010) (pdf pages 32-35)<br><br>"Exhibit 41" Grand Cayman Search Report for CLO HoldCo, Ltd. (dated December 13, 2010) (pdf pages 36-37)<br><br>"Exhibit 42" The Companies Law (as Amended) Company Limited by Shares Memorandum and Articles of Association of CLO Holdco, Ltd.(dated December 13, 2010) (pdf pages 38-96)<br><br>"Exhibit 43" Certificate of Incorporation of CLO Holdco, Ltd. (dated January 24, 2024) (pdf pages 97-98)<br><br>"Exhibit 44" Unanimous Written Resolutions of all of the Directors of the Company for Charitable DAF Holdco, Ltd. (dated December 18, 2024) (pdf pages 99-106)<br><br>"Exhibit 45" Deed of Assignment and Assumption between CDH GP, Ltd and Charitable DAF Holdco, Ltd and CDMCFAD, LLC (December 18, 2024) (pdf pages 107-113)<br><br>"Exhibit 46" Charitable DAF Holdco, Ltd. Written Resolutions (dated April 2, 2025) (pdf pages 114-117)<br><br>"Exhibit 47" CDMCFAD, LLC Delaware formation documents (December 12, 2024) (pdf pages 118-120) |

| Exhibit No. | Document |
|---|---|
| | "Exhibit 48" LLC Agreement of CDMCFAD, LLC (dated December 18, 2024) (pdf pages 121-149)<br><br>"Exhibit 49" DFW Charitable Foundation Delaware formation documents (December 9, 2024) (pdf pages 150-154)<br><br>"Exhibit 50" Charitable DAF Holdco, Ltd Valuation Analysis of Certain Participation Shares (dated March 25, 2025) (pdf pages 155-230)<br><br>"Exhibit 51" Charitable DAF Holdco, Ltd. Valuation Analysis of 100 Participation Shares (dated September 30, 2024) (pdf pages 231-286)<br><br>"Exhibit 52" Letter Agreement re; Assignment of Undertakings (dated March 27, 2025) (pdf pages 287-292)<br><br>"Exhibit 53" Admission and Amendment No. 1 Agreement (March 27, 2025) (pdf pages 293-297)<br><br>"Exhibit 54" Redemption and Amendment No. 2 Agreement (March 27, 2025) (pdf pages 298-302)<br><br>"Exhibit 55" Written Consent of the Manager of CDMCFAD, LLC (March 27, 2025) (pdf pages 303-306)<br><br>"Exhibit 56" Total Annual Expenses (undated) (pdf pages 307-308)<br><br>"Exhibit 57" Charitable DAF Holdco, Ltd. Written Resolutions of the Directors of the Company (September 13, 2024) (pdf pages 309-311)<br><br>"Exhibit 58" Charitable DAF Holdco, Ltd. Written Resolutions of the Directors of the Company (dated October 1, 2024) (pdf pages 312-320)<br><br>"Exhibit 59" Writ of Summons (dated July 15, 2025) (pdf pages 321-404)<br><br>"Exhibit 60" Letter from Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation to Paul Murphy, Director of Charitable DAF Holdings Corp. (dated November 11, 2024 ) (pdf pages 405-407)<br><br>"Exhibit 61" Email from Paul Murphy to Brandon R. Schaller, et al. (dated November 26, 2024) (pdf pages 408-414)<br><br>"Exhibit 62" Email from Barnaby Gowrie to Mark Patrick and Paul Murphy (dated November 27, 2024) (pdf pages 414-420)<br><br>"Exhibit 63" Participating Shareholder Rights Charitable DAF Holdco Ltd. |

| Exhibit No. | Document |
|---|---|
| | (undated) (pdf pages 421-441)<br><br>"Exhibit 64" Email from Michael Stockham to Paul Murphy (dated February 7, 2025) (pdf pages 442-456)<br><br>"Exhibit 65" Charitable DAF Holdco, Ltd. Written Resolutions (dated April 2, 2025) (pdf pages 457-459)<br><br>"Exhibit 66" Letter from Charitable DAF Holdco's Cayman counsel to Johnstone Law (dated April 25, 2025) (pdf pages 460-462)<br><br>"Exhibit 67" Petition for Court Supervision of a Voluntary Liquidation (May 2, 2025) (pdf pages 463-473)<br><br>"Exhibit 68" Notice of Appointment of Official Liquidators (May 7, 2025) (pdf pages 474-475)<br><br>"Exhibit 69" Publication Notice of Notice of First Meeting of Contributories (June 2, 2025) (pdf pages 476-477)<br><br>"Exhibit 70" Letter from Douglas Mancino to Michael Stockham (dated February 14, 2025) (pdf pages 478-480)<br><br>"Exhibit 71" Letter from Michael Stockham to Douglas Mancino (dated February 27, 2025) (pdf pages 481-482)<br><br>"Exhibit 72" Letter from Douglas Mancino to TEGE Referrals Group, Internal Revenue Service (dated March 20, 2025) (pdf pages 483-501)<br><br>"Exhibit 73" Charitable DAF Holdco Written Resolutions (dated April 2, 2025) (pdf pages 502-504)<br><br>"Exhibit 74" Charitable DAF Holdco Written Resolutions (dated April 2, 2025) (pdf pages 505-50)<br><br>"Exhibit 75" Email from David Rosenber to Douglas Mancino (dated March 18, 2025) (pdf pages 507-508)<br><br>"Exhibit 76" Email from David Rosenber to Douglas Mancino (dated April 3, 2025) (pdf pages 509-511)<br><br>"Exhibit 77" The H M Le Petitio (April 23, 2025) (pdf pages 512-524)<br><br>"Exhibit 78" Cayman Islands Companies Act (January 28, 2025) (pdf pages 525- |

| Exhibit No. | Document |
|---|---|
| | 576)<br><br>"Exhibit 79" Cayman Islands Companies Winding Up Rules) (January 12, 2023) (pdf pages 577-584)<br><br>"Exhibit 80" Charitable DAF holdco Ltd, Written Resolutions of the Joint Official Liquidators of the Company (July 1, 2025) (pdf pages 585-586)<br><br>"Exhibit 81" Letter from M Goodman to Johnstone Law (dated May 30, 2025) with several attachments (pdf pages 587-649)<br><br>"Exhibit 82" Summons in Cayman proceedings (July 15, 2025) (pdf pages 650-666)<br><br>"Exhibit 83" one page transcript excerpt from Patrick deposition transcript (undated) (pdf pages 667-668)<br><br>"Exhibit 84" Register of Members for Charitable DAF Fund, LP (dated October 28, 2011) (pdf pages 669-670)<br><br>"Exhibit 85" Plaintiffs Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver (July 1, 2025) (pdf pages 671-708)<br><br>"Exhibit 86" Presentation: Paul Murphy Independent Director Charitable DAF Holdco Ltd. (dated December 4, 2024) (pdf pages 709-718)<br><br>"Exhibit 87" Email from David Corkern to Brandon R. Schaller (dated December 18, 2024) (pdf pages 719-721)<br><br>"Exhibit 88" Temporary Restraining Order and Order Setting Hearing for Temporary Injunction (undated) (pdf pages 722-726)<br><br>"Exhibit 89" Letter from Joesph M. Cox to Brian Shaw (dated July 11, 2025) (pdf pages 727-730)<br><br>"Exhibit 90" Defendants' Motion to Dismiss and Please to the Jurisdiction (July 14, 2025) (pdf pages 731-777)<br><br>"Exhibit 91" Memorandum from Haynes and Boone, Kenneth Bezozo to Mark Patrick (dated July 9, 2021) (pdf pages 778-783)<br><br>"Exhibit 92" Executive Employment Agreement (dated March 24, 2021) (pdf pages 784-802) |

| Exhibit No. | Document |
|---|---|
| | "Exhibit 93" Valuation Analysis of 100% Membership Interest in CDMCFAD, LLC (dated March 25, 2025) (pdf pages 803-877)<br><br>"Exhibit 94" CDH GP, Ltd Certificate of Incorporation (February 27, 2024) (pdf pages 878-881) |

| Exhibit No. | Document |
|---|---|
| H | Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver (July 1, 2025) (pdf pages 1-38)<br><br>Exhibit 1-A DFW Charitable Foundation Formation Documents (dated December 9, /2024) (pdf pages 41-43)<br><br>Exhibit 1-B CDMCFAD, LLC Formation Documents (dated December 12, 2024) (pdf pages 44)<br><br>Exhibit 1-C CDH GP, Ltd. Formation Documents (dated February 10, 2025) (pdf pages 45-46)<br><br>Exhibit 2-A Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement (November 7, 2011) (pdf pages 47-67)<br><br>Exhibit 2-B Amended and Restated Memorandum and Articles of Association (dated Jan. 19, 2025) (pdf pages 68-97)<br><br>Exhibit 3 Sykes Affidavit Exhibit GS-I (April 27, 2025) (pdf pages 98-162)<br><br>Exhibit 4-A No Confidence Letter (dated Nov. 11, 2024) (pdf pages 163-164)<br><br>Exhibit 4-B Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham (dated Jan. 23-Feb. 7, 2025) (pdf pages 165-178)<br><br>Exhibit 4-C Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino ( dated Feb 14-April 3, 2025) (pdf pages 179-183)<br><br>Exhibit 5 Hearing Transcript (Patrick Testimony) (dated June 25, 2025) (pdf pages 184-210)<br><br>Exhibit 6 Dondero Declaration (dated July 1, 2025) (pdf pages 211-222)<br><br>Exhibit 7 Diaz Declaration (dated July 1, 2025) (pdf pages 223-244)<br><br>Exhibit 8 Supervision Order (dated May 6, 2025) (pdf pages 245-248) |
| **Exhibits Filed Under Seal** | |
| I | Third Affidavit of Margo Macinnis filed in the Cayman Proceedings |

| Exhibit No. | Document |
|---|---|
| J | Exhibit MM-3 to Third Affidavit of Margo Macinnis filed in the Cayman Proceedings |

**EXHIBIT B**

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 (      )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

<u>Plaintiff</u>

AND

(1) MARK ERIC PATRICK

(2) PAUL MURPHY

(3) CDMCFAD, LLC

(4) DFW CHARITABLE FOUNDATION

(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6) CLO HOLDCO, LTD.

<u>Defendants</u>

---

**WRIT OF SUMMONS**

---

TO: (1) **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2) **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3) **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4) **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6) **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 201 OF 2025 ( )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1) MARK ERIC PATRICK

(2) PAUL MURPHY

(3) CDMCFAD, LLC

(4) DFW CHARITABLE FOUNDATION

(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6) CLO HOLDCO, LTD.

Defendants

---

STATEMENT OF CLAIM

---

INTRODUCTION

1 The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2 The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3 The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4 The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5 In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6 By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1 the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the **"Impugned Transactions"**.

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

## THE PARTIES

The Company

9 The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10 The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11 The Company has been governed by the following memorandum and articles of association from time to time:

11.1 The memorandum and articles of association dated 27 October 2011; and

11.2 The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the **"Articles"**) save that the Company reserves the right to challenge the validity of the Articles.

12 Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13 Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20 On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21 On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22 The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23 Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24 As a result of the Impugned Transactions, the Company now has no material assets.

<u>DFW</u>

25 DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26 DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

The Fund

27 The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28 The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29 Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30 Until 18 December 2024, the Company was the sole limited partner of the Fund.

31 On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32 The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33 On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34 The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35 The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36 The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37 Mr Patrick is the New GP's sole director and sole shareholder.

38 The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39 CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40 CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41 Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42 The sole manager of CDM is Mark Patrick.

43 From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. (**"Highland"**) from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1 a director of the Company;

50.2 a director of CLO HoldCo (the Fifth Defendant); and

50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54.1 The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners…*".

54.2 Clause 1.3 of the LPA provides that "*… the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3 Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4 "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5 Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses…*".

54.6 The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55 The Charities are the following four US charitable or non-profit foundations:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as "Type I", "Type II" and "Type III". S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each "Type", respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

67.1 the Supporting Organisation:

(a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

(a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

(a) the Institutional Member is entitled to two votes; and

(b) the Individual Member is entitled to one vote.

68.3 Institutional membership is not transferable or assignable.

68.4 Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5 Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6 There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69 The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1 the Supported Organisation will provide certain services to the Supporting Organisation;

69.2 the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3 in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

70 Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71 The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1 the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2 the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3 the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4 while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72 The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73 The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

The LPA

73.1 Clause 1.12

(i) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2 Clause 1.6

*(i) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

*(ii) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

The Articles

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

*The office of Director shall be vacated if the Director...is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

thereby assuming the Control Position from that date.

74.2 In or around 24 March 2021, Mr Scott:

(a) assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b) transferred to Mr Patrick the 100 Management Shares in the Company; and

(c) resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3 On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4 Mr Patrick therefore assumed the Control Position from that date.

74.5 On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6 On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7 Mr Patrick is the sole shareholder and director of the New GP.

74.8 Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

76.10 where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11 where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12 in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

Plan to defeat the interests of the Original Participating Shareholders

77 On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78 It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79 The Work Plan stated that (amongst other things):

79.1 the advice required related to "*...potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc...*"; and

79.2 "*...we may need to rely on opinions and memoranda in potential future disputes...*"

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP (**"Walkers"**) (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things):

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82 In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*"

83 On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84 On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85 In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1 directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2 expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86 On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1 to increase Mr Patrick's salary to US$850,000 per annum;

86.2 include a long-term incentive (**"LTI"**) tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3 the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87 On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1 the Directors resolved (amongst other things) that Mr Patrick would receive:

(a) an LTI payment of US$975,000; and

(b) an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2 Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88 Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89 In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund. Mr Patrick did not do so.

90 On 11 November 2024, Holland and Knight (**"H&K"**), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the **"No Confidence Letter"**).

91 On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> *"Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…"*

92 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93 On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94 On 7 February 2025, 318 Participating Shares were issued to DFW.

95 On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1 Amended the Memorandum at paragraph 3 to give the Company charitable objects;

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 "*...would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

98.3 As a Delaware limited liability company (CDM): "*…as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

…

*The initial Manager shall be Mark Patrick.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

102 The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103 The effect of these transactions was that:

103.1 CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2 The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104 The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things):

104.1 The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2 The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

105 On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1 refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a) how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the "*assets*" of the Company;

(b) the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c) how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2 considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

Persistent and continual lack of information for the Supporting Organisations

106 On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107 Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108 On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1 had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2 are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109 On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: *"[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions."*

110 On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111 On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112 On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113 On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114 On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115 Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1 four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2 two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

115.3 one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4 one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116 In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117 On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118 On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1 Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "*...deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3 it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4 the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120 In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121 At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122 The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123 On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124 On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> *"... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently."*

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127 On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128 On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129 On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130 On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131 On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> *"Agree we need to finalise the [FTI valuation] reports ...We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions ...*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner."*

132 The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133 On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things:

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> ...
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> ...

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

...

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134 On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135 On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction."*

*March 2025 ValueScope Valuation*

136 Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1 100% Membership Interest in CDM; and

136.2 Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137 The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138 A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| Valuation Date | DLOC* | DLOM** | Valuation Basis | FMV (100 Shares) |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139 The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously]. When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity. However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

140 ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141 For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> *'Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality'*.

142 Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1 applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2 determined the FMV of 100 Participating Shares to be US$536,784;

142.3 applied a discount of 99.2% for DLOC; and

142.4 applied a discount of 20.00% for DLOM.

143 The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

144 Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145 Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified "total equity" of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146 On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1 The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations') non-profit and tax-exempt status:

> *"... the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)*"

146.2 The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a) there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. (**"HDF"**) due to the undue influence and control exercised over HDF by Mr Dondero.

(b) the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c) such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5 Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a) asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b) suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c) concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6 Exhibit E contained two valuation reports:

(a) The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Voluntary Liquidation and Supervision Order

151 On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152 However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153 On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition. Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154 On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155 At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1 A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2 A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

## ATTRIBUTION OF KNOWLEDGE AND INTENTION

158 As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1 As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2 As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3 As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159 Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

## CLAIMS AGAINST THE DEFENDANTS

Breaches of fiduciary and other duty

160 The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Restructuring, including the CDM Assignment

161 The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1 The Plaintiff relies on paragraphs 77 to 105 above.

161.2 With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4 The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b) knew or ought to have known that:

(i) the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii) the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii) other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv) even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(v) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c) knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162 By reason of the foregoing breaches of duty or any of them:

162.1 The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2 CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3 CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Share Issuance</u>

163 The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1 The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

164.4 The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165 The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1 The Plaintiff relies on paragraphs 120 to 150 above.

165.2 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that:

(i) proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii) proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv) proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v) the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b) knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166 By reason of the foregoing breaches of duty or any of them:

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Further claims against Mr Murphy

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Directors' Fees, Remuneration and Expenses

168 The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169 As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170 Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171 Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172 The Company claims:

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

173.6 The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7 Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8 As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

<u>Proprietary claim and/or unconscionable receipt</u>

174 The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1 CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2 The knowledge of CDM was and is that of Mr Patrick.

174.3 The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4 CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5 By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Unjust Enrichment

175 In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1 The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2 That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176 In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177 If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1 CDM is the "alter ego" of Mr Patrick.

177.2 DFW is the "alter ego" of Mr Patrick.

177.3 In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4 In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

PARTICULARS

(a) In relation to CDM:

(i) Mr Patrick was and is the Manager. There are no other officers or managers.

(ii) Mr Patrick was and is the managing member.

(iii) CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv) CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v) CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b) In relation to DFW:

(i) Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii) Mr Patrick was and is the sole member.

(iii) Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(iv) DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v) DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi) DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

Loss and Damage

178 As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1 Its Partnership Interest in the Fund.

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1) Damages or equitable compensation.

(2) Orders for restitution or disgorgement.

(3) Orders for the restoration of property to the Company.

(4) Interlocutory or final injunctions as may be necessary or appropriate.

(5) Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6) Orders for the provision of documents or information at an early interlocutory stage.

(7) Orders for the cancellation of the Share Issuance, as appropriate.

(8) Rectification of the register of the Company, as appropriate.

(9) Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10) An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11) An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(12) All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13) All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14) All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15) Interest as above.

(16) Further or other relief.

(17) Costs.

DATED this 15th day of July 2025

Maples and Calder (Cayman) LLP

______________________________

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182 The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183 A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184 A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**Notes for Guidance**

1 Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2 For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3 Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4 Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (......................................)" after that Partner's name.

5 Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6 Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7 Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8 A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD OF 2025 ( )

BETWEEN:

CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

Plaintiff

AND

(1) MARK ERIC PATRICK

(2) PAUL MURPHY

(3) CDMCFAD, LLC

(4) DFW CHARITABLE FOUNDATION

(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER

(6) CLO HOLDCO, LTD.

Defendants

ACKNOWLEDGMENT OF SERVICE

OF WRIT OF SUMMONS

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important. Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐ yes ☐ no

3. If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐ yes ☐ no

Service of the Writ is acknowledged accordingly

(Signed).......................................................

Attorney for

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

| |
|---|
| Maples and Calder (Cayman) LLP<br>PO Box 309 Ugland House<br>Grand Cayman KY1-1104<br>Cayman Islands: CJM/JRN/LRA/TQR/858403-01 |

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

| |
|---|
| |

# EXHIBIT C

NEUTRAL CITATION NUMBER: [2026] CIGC (FSD) 9

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

**Plaintiff/Applicant**

**- AND -**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD**

**Defendants/Respondents**

| | |
|---|---|
| **Before:** | The Hon. Raj Parker |
| **Heard:** | 15 and 16 December 2025 |
| **Appearances:** | Andrew Ayres KC with Caroline Moran, Luke Armitage and Alasdair Munro of Maples and Calder (Cayman) LLP on behalf of the Company |
| | Andrew Scott KC with Mark Goodman, Ronan O'Doherty and George Connolly of Campbells LLP on behalf of the 1st, 3rd, 5th and 6th Defendants |
| | David Quest KC with Peter Tyers-Smith and Daniel Mills of Kobre & Kim (Cayman) on behalf of the 2nd Defendant |
| | Jennifer Colegate with Fleur O'Driscoll and Nia Statham of Baker & Partners (Cayman) Limited on behalf of the 4th Defendant |

**Draft judgment circulated:** 28 January 2026

**Judgment delivered:** 10 February 2026

*Proprietary injunction - jurisdiction - s.11 of the Grand Court Act (2015 Revision) - O.29, r.1 and r.2 of the Grand Court Rules - test for grant of injunction - serious issue to be tried - nature of proprietary interest - discretion - cross undertaking in damages - fortification - charitable fund structure - Cayman Islands exempted limited company in structure to make charitable distributions for US tax reasons to US charities - reorganisation by directors of fund structure - transference of limited partnership interest without notification to supporting organisations - claims of improper purpose to gain control - claims of excessive remuneration against directors - alleged transactions at undervalue.*

*Introduction*

1. Charitable DAF HoldCo. Ltd (in Official Liquidation) (the "Company") is a Cayman Islands exempted company. It applies[1] for a proprietary injunction restraining the disposal of and dealing with assets over which the Company asserts a proprietary claim.

2. The application arises from transactions procured by the First and Second Defendants (Mr Mark Patrick and Mr Paul Murphy, collectively "the Directors" and D1 and D2) in alleged breach of fiduciary duties owed to the Company.

3. Four parties addressed the Court over a two-day hearing. Mr Andrew Ayres KC represented the Company, Mr Andrew Scott KC represented D1, D3, D5 and D6 (the "CDM Defendants" or "CDM Entities"), Mr David Quest KC represented D2 ("Mr Murphy"), and Ms Jennifer Colegate represented D4 ("DFW").

4. All of the Defendants contested the application on various grounds. The affidavits and exhibits submitted on the application are voluminous.[2]

5. In a nutshell the Company's claim alleges that unlawful steps were taken by the Directors to divest the Company of its sole asset, which is a limited partnership interest (the "Partnership

[1] By summons dated 15 July 2025 as amended on 4 December 2025.

[2] Including: First Affidavit of Margot MacInnis; Third Affidavit of Margot MacInnis; Second Affidavit of Mark Eric Patrick; Third Affidavit of Mark Eric Patrick; First Affidavit of Paul Murphy; First Affidavit of Alexander L. Reid; First Affidavit of Douglas Mancino; First Affidavit of Marvin Bradford Bedingfield.

Interest") in a Cayman Islands exempted limited partnership, Charitable DAF Fund, LP (the "Fund").

6. The Company alleges that control of the Partnership Interest of the Company was transferred to D3 and/or D4, entities under Mr Patrick's sole control and ownership, for a gross undervalue of c.US$ 1.6 million in March 2025.

7. The Company points to the fact that the Fund's net asset value was estimated at c.US$ 270 million in September 2024.

8. The joint official liquidators ("JOLs")[3], who bring the claim on behalf of the Company, are concerned that the Directors remain in control of the relevant assets and that the Company has been divested of its control of the Fund. They are concerned that value has been lost and will continue to be lost while the Directors enrich themselves by paying themselves what the JOLs say are 'vast and unjustifiable' fees and by the expenditure of large sums under the guise of 'ordinary business expenses'.

*Factual Background*

*The Fund*

9. The factual background to the Fund's establishment and the transfer of the Partnership Interest is explained in the First Affidavit of Margot MacInnis sworn 15 July 2025 ("MacInnis 1"). The following is a summary of the relevant structures and transactions which show how this worked.

10. The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the US.

11. The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "ARLPA").

12. The Fund was formed in 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland Capital Management, L.P. ("Highland"), to enable certain assets to be donated to those registered charitable organisations.

[3] *Appointed on 6 May 2025.*

13. The Fund's sole asset is or was its single share, comprising 100% of the issued share capital in CLO HoldCo, Ltd (D6).

*The Company*

14. The Company, until recently the Fund's sole limited partner, and owner of the 99% Partnership Interest, was incorporated in the Cayman Islands on 7 November 2011.

15. The Company's share capital is divided into Participating Shares and Management Shares[4]:

(1) The entirety of the Participating Shares were, from 2011 to 2024, held by four non-profit U.S. companies[5] (the "Original Participating Shareholders") that act as "Supporting Organisations" to US charities (the "Charities").[6] Each is a charitable entity exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code of 1986 (the "IR Code"). Mr Dondero was (and remains) involved at board level with these Supporting Organisations, but according to Ms MacInnis he does not control them. The Defendants say that he does own and in effect controls them.

(2) The Management Shares were initially held by a Mr Grant Scott, but were transferred to Mr Patrick on 25 March 2021, on which date Mr Patrick was also appointed to replace Mr Scott as sole director of the Company.

16. On 22 April 2021, Mr Patrick, as Management Shareholder, appointed Mr Murphy as a director of the Company. Mr Murphy is resident in the Cayman Islands.

17. The Company's Memorandum and Articles of Association[7] provide that Management Shareholders had the right to receive notice of, and to attend, to speak at and to vote at, any general meeting of the Company, but no right to participate in the profits or assets of the Company (Article 11).

---

[4] *Authorised share capital of US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.*
[5] *Highland Dallas Foundation, Inc, Highland Santa Barbara Foundation Inc, Highland Kansas City Foundation Inc (together the "Highland Foundations"), and subsequently Community Foundation of North Texas ("CFNT").*
[6] *Save that CFNT an underlying charity, has no "Supporting Organisation" and holds its shares in the Company directly.*
[7] *The memorandum and articles of association dated 27 October 2011; and the amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.*

18. The Participating Shareholders have no right to vote at Company meetings, but did have rights in a winding up or repayment of capital and the right to participate in the profits or assets of the Company by way of dividend in accordance with Article 12.

19. The Participating Shareholders therefore have the economic interest in the Company, whereas the Management Shareholders have the control rights.

20. The Company was placed into voluntary liquidation by directors' resolution on 2 April 2025.

*The General Partner of the Fund*

21. Under the ARLPA, sole control over the management and distribution of the Fund's assets was granted to the Fund's general partner. From its formation until 7 March 2024, the Fund's General Partner was Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands (the "Original GP"). On 25 March 2021, the same date he appointed Mr Patrick sole director of the Company, and transferred his 100 Management Shares to him, Mr Scott also transferred to Mr Patrick the entire issued share capital in the Original GP. On 7 March 2024, the Original GP was replaced by CDH GP, Ltd, a Cayman Islands incorporated company (D5 and the "New GP"), of which Mr Patrick is sole shareholder and director.

*Charitable Purpose and Tax Considerations*

*The Fund's Purpose*

22. The purpose of the Fund was to make investments for the ultimate benefit of the Charities which the Supporting Organisations supported.

23. The Charities are the following four U.S. charitable or non-profit organisations:

(1) *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over US$1 billion in grants and manages over US$500 million in assets.

(2) *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over US$7 billion in grants and manages over US$6 billion held in charitable funds.

(3) *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over US$800 million.

(4) *North Texas Community Foundation*: which manages assets totalling US$513 million and donated US$38.9 million to local non-profits in 2023.

*The Tax Structure*[8]

24. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company.

25. Section 501(c)(3) of the IR Code provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that they receive income classified as unrelated business taxable income ("UBTI").

26. Section 509 of the IR Code defines the term "supporting organisation" as a tax-exempt entity that must be organised and then operate exclusively either (i) for the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of, one or more supported organisations (the Charities). The supported organisations must also be s501(c)(3) entities.

27. Both the Charities and the Supporting Organisations apparently meet the criteria of s501(c)(3), and are therefore exempt from US state and federal taxes save to the extent that they receive UBTI.

28. Apparently as a matter of US tax law, some income received directly from the Fund by the Charities would likely be considered UBTI.

29. In order to 'insulate' the Charities from UBTI, instead of holding their interest in the Fund directly, the Supporting Organisations hold their interest through an 'offshore corporate blocker' structure, i.e. the Company.

30. The purpose of inserting the Company into the structure was that any tax that was due from these investments would be paid at the Company level, and the proceeds would then be distributed to the Supporting Organisations and then to the Charities free of any tax liability.

[8] *See affidavit of Marvin Bradford Bedingfield.*

*Company Submission on this Structure*

31. The Company argues that:

(1) The Supporting Organisations (the four non-profit US companies who were the original Participating Shareholders) and the Charities hold or ultimately hold the real economic interest in the Fund;

(2) They are not merely discretionary beneficiaries whom the Fund may or may not choose to confer a benefit on, but the ultimate owners of the Fund, albeit through the Company as a tax filter, and with the Fund having its own discretion as to how to manage its investments; and

(3) The fact that the GP had a discretion as to whether to make any distribution to any of the Participating Shareholders does not change this analysis.

*Relationship between Supporting Organisations and the Charities*

32. As to the relationship between the Supporting Organisations and the Charities:

(1) The Supported Organisations (Charities) are said to control the Supporting Organisations (Participating Shareholders) through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations (Participating Shareholders):

(2) The Supporting Organisations (Participating Shareholders) support the Supported Organisations (Charities) by way of paying fees (i.e. making grants) to them from time to time from their assets, including any dividends received from the Company;

(3) The Supporting Organisations (Participating Shareholders) have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to their relevant Charity in furtherance of their charitable purposes; and

(4) Whilst Mr Dondero sits on the board of the Supporting Organisations (Participating Shareholders), he does not control them, as a supermajority of the votes are always held by the respective Charity.

33. As described above, the structure was set up to make discretionary distributions to qualifying tax exempt organisations under Section 501(c)(3) of the IR Code. US tax rules apparently require donors to cede 'dominion and control' over contributed assets and for donees to be genuinely independent from donor influence.[9]

*Mr Patrick's Role*

34. Mr Patrick is a US attorney and was employed as tax counsel by Highland from 2008 to 2021, and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. Highland is a group of companies set up by Mr Dondero. Mr Patrick was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

35. From March 2021, Mr Patrick was the sole director of the Company, and holder of the 100 Management Shares in it, and the sole director and shareholder in the Fund's general partner (as at March 2021, the Original GP). Mr Patrick occupied a position informally termed "the Control Position", the effect of which was that Mr Patrick was in effective sole control of the limited partner (i.e. the Company), the general partner (the Original GP), and was therefore in effective sole control of the Fund and all its assets, albeit, according to the Company, with no economic, residual, beneficial or winding up interest in either the Company or the Original GP.

*Directors' Fees and Expenditure*

36. The Company says that the Fund's annual expenses showed increases in expenditure which show:

(1) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 and increased further to around US$2.25 million in the first half of 2024; and

(2) Expenses overall for the first half of 2024 were around US$18.3 million, almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

[9] *Patrick 2 section D, Reid 1 and Mancino 1.*

37. As is explained in MacInnis 1,[10] in October 2024, Mr Patrick executed an employment agreement, under which he was entitled to receive a base salary of US$850,000; a long-term incentive plan payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and is eligible for both annual and discretionary bonuses as determined at the sole and absolute discretion of the Directors.

38. The Company points to Mr Grant Scott's salary during his previous tenure which, by contrast, was approximately US$60,000 per annum, and says Mr Patrick's remuneration and benefits are 'grossly excessive'.

*The Divestiture of the Company's Limited Partnership Interest in the Fund*

*Supporting Organisations' Concerns*

39. In late October 2024, as a result of concerns arising from the expenditure by the Directors on fees and expenses, the Supporting Organisations asked for financial information from Mr Patrick.

40. On 11 November 2024, Holland and Knight, U.S. attorneys for the Supporting Organisations, sent a letter to Mr Murphy advising that they no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations.

41. On 26 November 2024, Mr Patrick sought advice from Walkers (Cayman) LLP ("Walkers"), then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding up petition brought by the Supporting Organisations on just and equitable grounds.

42. On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help any efforts Mr Patrick might make to resist such a winding up.

---

[10] *At §49.*

*The Reorganisation*

43. The Company relies on the following steps taken by the Defendants, each without informing the Supporting Organisations or the Charities.

*CDM*

44. On 18 December 2024, the Directors passed a resolution (the "18 December Resolution"), under which:

> *"In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "Transferee"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "Partnership") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liability company interests in the Transferee (the "Transfer").*

45. The 18 December Resolution also provided that (based apparently on US tax advice) the proposed assignment of the Partnership Interest to D3, CDM (the "CDM Assignment"):

> *"... would help insulate the DAF from exposure to [Dondero] and his entities ... who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF"*; and that

> *"The IRS would look favorably upon any and all attempts for DAF to maintain its influence from 'what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement'".*

46. This resolution was given effect by way of a Deed of Assignment and Assumption of the same date which was executed by Mr Patrick on behalf of each of: (i) the Company, in his capacity as Director; (ii) CDM, in his capacity as Manager; and (iii) the New GP, in his capacity as Director (a position which the Company says gives rise to an irreconcilable conflict of interest).

47. CDM is a Delaware limited liability company. Its Certificate of Formation, dated 12 December 2024, is signed by Mr Patrick, who is CDM's sole member.

48. Also on 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "LLC Agreement").

49. The LLC Agreement provides that:

> *"Fair Market Value shall have the meaning set forth in Section 6.9(b).*
>
> *...*
>
> *The initial Manager shall be Mark Patrick.*
>
> *...*
>
> *6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*
>
> *...*
>
> *6.9 Valuation of Company Assets.*
>
> *(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*
>
> *(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*
>
> *...*
>
> *7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal*

*amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

50. The Company says the effect of these changes was that:

(1) CDM was inserted into the corporate structure and as a subsidiary of the Company and would hold the Partnership Interest (previously held by the Company);

(2) The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been the Partnership Interest, was exchanged for its membership of CDM (the "Company's CDM Membership"); and

(3) The Company's CDM Membership was inherently fragile as it was held in a company that (by a combination of Delaware law and the LLC Agreement) was owed no fiduciary duties by its manager, Mr Patrick; and subject to redemption at any time of Mr Patrick's choosing, and for any price of Mr Patrick's choosing, subject to the 'good faith' proviso at paragraph 6.9(a) of the LLC Agreement.

*New Shares to DFW*

51. In February 2025, the Directors again sought advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders, *"in light of a possible just and equitable winding up petition"* being filed by one of the Supporting Organisations.

52. On 7 February 2025, the Company's board passed a resolution (the "Share Issuance Resolution") approving a proposed share issue of 318 Participating Shares, of a nominal or par value of US$0.01 each as fully paid up, to D4, DFW. Paragraph 5.2 of the Share Issuance Resolution noted that *"following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company."*

53. DFW is, according to its Certificate of Incorporation, a Delaware non-profit non-stock corporation. It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes, incorporated on 9 December 2024, and was incorporated by Mr Douglas Mancino, then a partner at Seyfarth Shaw, a U.S. law firm apparently engaged by the Fund. The sole member of DFW is Mr Patrick.

54. The Share Issuance Resolution stated that the Directors believed the issuance of shares to DFW was justified as a means of protecting the Company, because:

(1) There was a heightened risk that the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company;

(2) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(3) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

55. The Company says the effect of the Share Issuance Resolution was to remove the majority that was held by the Original Participating Shareholders, and to dilute their shareholding into a minority stake. DFW (D4) now holds 51% of the Participating Shares.

*The Admission and Redemption*

56. On 27 March 2025, the Company entered into a letter agreement with CDM, pursuant to which it was agreed that CDM would redeem the Company's CDM Membership, and CDM would admit DFW to membership of CDM, with DFW obtaining membership in it.

57. On 27 March 2025, Mr Patrick executed:

(1) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(2) Admission and Amendment No.2 Agreement under which CDM redeemed (the "Redemption") the Company's CDM Membership for the same sum of US$1,637,192 (the "Redemption Sum").

58. On the same day, Mr Patrick executed a written consent (the "Manager Consent") to the Admission and Redemption, on behalf of CDM, under which the Admission and Redemption was justified by reference to Participating Shareholders allegedly posing a material risk to the Company, due to:

*"among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)."*

59. The Company says that the substantive financial effect of the Redemption, under which DFW paid the Redemption Sum to CDM, and the Company's CDM Membership was redeemed for the Redemption Sum, was that the Company's CDM Membership was purchased by or otherwise transferred to DFW for the Redemption Sum.

*Effect of the Reorganisation*

60. The Company says that the result of these transactions, all done 'in secret', is that:

(1) The Company realised its interest in the Fund, which it says had a Net Asset Value ("NAV") of c.US$269.1m, for only US$1.6m;

(2) The Company made a distribution to Participating Shareholders (c.US$1.6m);

(3) The Supporting Organisations and the Charities were divested of their indirect interest in the Fund, and the assets underlying the Fund; and

(4) The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

*The Issue of Control*

61. The Company argues that:

(1) the Company, in its role as tax blocker and which formerly held a very valuable interest in the Fund, no longer has that interest or anything like proper value in exchange for it;

(2) the Charities have been completely disconnected from the Fund and structure which was set up to produce capital and income for their activities; and

(3) Mr Patrick remains in control of the Fund and its assets but in a way and pursuant to a structure which has no supervision by the Charities or the Supporting Organisations, and nor do they have any economic interest in it.[11]

62. The Defendants in answer broadly say that:

(1) It is because of Mr Dondero's historic intermeddling and wrongdoing that the Control Person for the DAF structure, D1 (Mr Patrick), acted to reorganise the DAF structure to protect it from Mr Dondero's predations and the risks these posed to its assets and charitable mission, in the sole service of which the Company existed;

(2) Mr Patrick took this protective restructuring action together with the other director of the Company, D2 (Mr Murphy), in good faith, believing it to be in the best interest of the Company, and acting with the benefit of legal and tax advice from an array of respected advisors in this jurisdiction and in the US;[12] and

(3) CDM redeemed the Company's membership interest for fair market value, and the Company paid dividends with the proceeds to its Participating Shareholders.

63. Mr Patrick and Mr Murphy vehemently deny, for the reasons set out in detail in their affidavit evidence, that the restructuring was done in breach of their fiduciary duties to the Company or that they are in any other way in breach as alleged by the Company.

64. Mr Ayres KC for the Company described the reason given for the restructuring as a bogus reason. It has never been properly explained how the assets of the Fund might be imperilled by Mr Dondero.

---

[11] *The claims are pleaded in the Statement of Claim dated 15 July 2025 and amended on 15 October 2025.*
[12] *Including Walkers (Cayman) LLP ("Walkers"), Maples & Calder (Cayman) LLP ("Maples") and Campbells LLP in the Cayman Islands, Shields Legal Group, Carrington Coleman & Sloman & Blumenthal, L.L.P, Dorsey & Whitney and others in the US, and Tony Beswetherick KC in the UK.*

*The Interim Undertakings and Disclosure*

65. The JOLs originally requested urgent injunctive relief last year and the application was listed for 31 July 2025, the last day of term. In the event there was a compromise, the hearing was adjourned and a series of undertakings (the "Interim Undertakings") were given by the Defendants pending the determination of this application.

66. In outline, the effect of the Interim Undertakings was as follows:

(1) Pending the determination of this application, the Defendants and the CDM Entities undertook not to deal with or dispose of any assets of the CDM Entities other than in the ordinary course of business;

(2) The Defendants undertook not to dispose of or diminish the value of their, or any, interest in the Fund other than in the ordinary course of business;

(3) The Defendants and the CDM Entities were not prohibited from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF HoldCo, Ltd (in Official Liquidation) FSD 116 of 2025 (JAJ) (the "Liquidation Proceedings"), or the related Chapter 15 recognition application commenced by the JOLs; and

(4) The Defendants were to provide a retrospective notification of transactions below US$50,000, and agreed to give 7 days' notice of any transactions above US$50,000.

*The JOLs' Continuing Concerns about the Interim Undertakings*

67. The JOLs say that the Interim Undertakings, although not adequate for the long-term because there is no ability to prevent any inappropriate or suspicious transactions, were agreed out of a desire for a pragmatic compromise to adjourn a hearing on the last day of the summer term.

68. They say that the Interim Undertakings were expressed to apply only until the determination of the present application (as opposed to through to trial), and the Defendants expressly agreed as part of the Interim Undertakings that the issue of whether they are permitted to use funds that

derive directly or indirectly from the Partnership Interest to pay their legal fees and other service providers will be determined as part of this application.

69. The JOLs are also concerned that the 'ordinary course of business' exception to the prohibition contained in the Interim Undertakings is susceptible to exploitation by Mr Patrick and Mr Murphy because they are likely to say that their 'exorbitant' fees are paid in the ordinary course of business, and are also concerned that the legal fees that have been incurred by the Defendants so far are excessive.[13]

*JOLs' Legal Fees - Funding Agreement*

70. In July 2025, the JOLs filed an *ex parte* sanction application in the Liquidation Proceedings seeking approval to enter a funding agreement (the "Funding Agreement") with an entity named Crossvine Litigation Funding LLC ("Crossvine"), a special purpose vehicle whose managers are Mr Scott Ellington and Mr Michael McDonald. Mr Ellington is apparently a longtime business associate of Mr Dondero.

71. On 5 September 2025, the JOLs notified DFW (D4) (but apparently none of the other Defendants) that they had exhausted the litigation funding provided by Crossvine.

72. Crossvine is apparently:

> "*incorporated for the purpose of ultimately Mr Dondero ... funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*"[14]

73. As to the arrangements with Crossvine, the CDM Defendants maintain that through the Company, the JOLs are asserting proprietary claims over assets of the CDM Entities that include causes of action and litigation receivables which would inure to the benefit of the liquidation estate, and those causes of action and litigation receivables are, in many cases, directly adverse to the interests of Messrs Dondero and Ellington.

74. The CDM Defendants believe this constitutes an unacceptable conflict of interest, as does the profit Mr Dondero stands to make on any sums advanced under the Funding Agreement.

*Disclosure*

---

[13] *Amounting to, as far as the JOLs are aware, at least US$4,256,882 (MacInnis 3, §111).*
[14] *MacInnis 6, §11.*

75. The JOLs also complain that the disclosure provided by the Defendants under the Interim Undertakings has been deficient. The disclosure deficiencies are described in the detailed chronology referred to at §106 of MacInnis 3. It is not necessary to set them out. They are denied by the Defendants.

76. The JOLs are of the view that no exercise has been undertaken to determine where the assets of the Fund and each of its subsidiaries are held, which raises a wider question about how Mr Patrick has performed his duties to manage the Fund, receiving large fees for doing so, without proper information concerning the Fund's assets. This again is denied by the Defendants, particularly the CDM Defendants.

77. The JOLs say Mr Patrick's attempt to justify his approach at Patrick 2 §151, is cursory and unconvincing.[15]

78. The JOLs argue that the objection is not that consolidated balance sheets were provided, but that there was a failure to provide more detailed, entity-by-entity disclosure that would provide the JOLs with proper visibility into the Fund's asset position.

79. The CDM Defendants respond that the DAF structure historically produced consolidated balance sheets and accompanying quarterly valuation materials. That was always what was provided to the Supporting Organisations and was given to the JOLs immediately following entry into the Interim Undertakings on 31 July 2025.[16]

*The Relevant Law*

*Proprietary Injunction*

80. It is important to emphasise that this is an application for a proprietary injunction. It is not an application for *Mareva* style relief which would require a risk of dissipation and which would normally include an ordinary course of business exception. A proprietary injunction would not usually provide such an exception.

---

[15] *"...as the DAF Structure prepares consolidated financial materials in the ordinary course, I believe that these allegations are incorrect".*

[16] *They add that once the JOLs requested entity specific financials (which go beyond the existing consolidated records), the CDM Defendants engaged an external accounting firm, Armanino LLC, to prepare entity-level financial information at year-end 31 December 2024, and subsequently as at 30 June 2025.*

*Jurisdiction*

81. The Court's power to grant such relief arises under s.11 of the Grand Court Act (2015 Revision) in conjunction with O.29, r.1 and r.2 of the Grand Court Rules (2023 Revision) ("GCR").

*"Section 11.*

*(1) The Court shall be a superior court of record and, in addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time being in force in the Islands, shall possess and exercise, subject to this and any other law, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by-*

*(a) Her Majesty's High Court of Justice; and*
*(b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981, and any Act of the Parliament of the United Kingdom amending or replacing that Act.*

*Application for injunction (O.29, r.1)*

*1. (1) An application for the grant of an injunction may be made by any party to a cause or matter before or after the trial of the cause or matter, whether or not a claim for the injunction was included in that party's writ, originating summons, counterclaim or third party notice, as the case may be.*

*(2) Where the applicant is the plaintiff and the case is one of urgency such application may be ex parte on affidavit but, except as aforesaid, such application must be made by motion or summons."*

82. A key feature of the jurisdiction is that a proprietary injunction is only available where the plaintiff can maintain a *prima facie* proprietary claim to the assets which are the subject of the injunction.

§28-199 of Grant and Mumford on Civil Fraud (1st ed) ("Civil Fraud") states:

*"Accordingly, where a claimant asserts a claim in specie to relevant property that claimant can apply to the court for an interim injunction aimed at preserving in the hands of the defendant that property on the basis that at trial the claimant will seek a*

*remedy which involves the return of that property to the claimant. The term "proprietary injunction" is used to describe the type of injunction issued by the court in response to such a claim."*

*Test*

83. In deciding whether to grant a proprietary injunction, the Court applies the principles of *American Cyanamid v Ethicon Ltd [1975] AC 396.*[17]

84. In applying those principles, the applicant must establish three general matters:

(1) There is a serious issue to be tried on the merits;

(2) The balance of convenience is in favour of the grant of an injunction; and

(3) It is just and convenient to grant the injunction.

85. This Court, in *In Frabran Holdings Limited and Ors. -v- Daventree Trustees Limited and Ors,*[18] ("*Daventree Trustees*") confirmed the application of the *American Cyanamid* principles to proprietary injunctions, and stated at §154:

*"In applications for proprietary injunctions, the matter is one for the discretion of the court. On ordinary principles, a plaintiff beneficiary would have to show:*

*a) a prima facie case the property is his,*

*b) a serious issue to be tried that the trust property is in danger pending the hearing of his claim,*

*c) that damages would not be an adequate remedy,*

*d) that the balance of convenience favours the grant of an injunction,*

[17] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G-H.; In Ascentra Holdings Inc (in OL) v Yoshida [2024 (1) CILR 409] at §96 (Parker J).*
[18] *Parker J (Unreported, 17 January 2024).*

e) *and that it is just and convenient to order an injunction."*[19]

86. In a recent case Ramsay-Hale CJ helpfully set out the scope of the Court's power to order proprietary injunctions[20] at §29:

> *"The scope of the Court's power to make property preservation orders pursuant to GCR O.29, r.2(1) is usefully summarized in the White Book:*
>
> i. *the source of the Court's power is the inherent jurisdiction of the Court to secure by orders the just and proper trial of the issues: see White Book note 29/8A/2;*
>
> ii. *the Court may only make an order in relation to property "which is the subject-matter of the cause or matter or as to which any question may arise therein." The property must be bona fide the subject-matter of the action: see note 29/8A/7;*
>
> iii. *the order may be granted even where the party against whom it is sought has a proprietary interest in it. An order should not be refused merely because the defendant claims that he has a discretionary power to determine whether or not the property should be preserved and how it should be preserved, when one of the issues in the case is whether or not the power is untrammelled by a duty to the plaintiff to preserve the property: Johnson v Tobacco Leaf Marketing Board [1967] VR 427."*

*Serious Issue to be Tried*

87. The Company must show a serious issue to be tried that it has a specific proprietary interest in the asset under consideration i.e. the Partnership Interest. The test is whether the claim has a real (as opposed to a fanciful) prospect of success which would withstand a reverse summary judgment application.

88. As the Court said in *Ascentra*:[21]

---

[19] *See also Smellie CJ in Classroom Investments Inc v China Hospitals Inc [2015] (1) CILR 451 at §§50-57.*
[20] *Lakeshore Biopharma Co Ltd [2025] CIGC (FSD) 24 ("Lakeshore") Ramsay-Hale CJ.*
[21] *Ascentra Holdings, Inc (in official liquidation) v Yoshida [2024 (1) CILR 409] Parker J.*

> "97. *The company must show a serious issue to be tried, i.e., that there is a "real, as opposed to a fanciful, prospect of success on the claim." This is lower than the "good arguable case" threshold that applies in freezing injunction cases. A serious issue to be tried has to be shown on the evidence, not by mere assertion or allegation.*
>
> 98. *Further, it follows from the nature of a proprietary injunction that the serious issue to be tried should be in respect of facts which, if proven, would afford the claimant a proprietary remedy."*

*Balance of Convenience*

89. If a properly arguable claim to a proprietary interest is established, it may well be the case that damages will not be an adequate remedy if the property is dealt with pending trial, and so the balance of convenience will generally be in favour of the applicant.[22]

90. As Flaux J said in *Madoff Securities v Raven [2011] EHWC 3102 (Comm)* at §140, once a sufficiently arguable proprietary case has been established, arguments by respondents that '"*it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it" when, on this hypothesis [the respondent] should not have had the money in the first place, do not cut much ice"*.

91. Whilst the Court will not enquire too closely into the merits at this stage, where the scales are evenly balanced in relation to the balance of convenience, the Court can take into account the relative strengths of the parties' cases.[23]

92. As to the exercise of discretion, the court said in *Ascentra* at §124:

> *"The question in relation to this issue is which course is likely to involve the least risk of injustice or irremediable prejudice to one party or the other. The analysis will include the prejudice to the company if no injunction is granted, or to the defendants if it is, the likelihood of such prejudice actually occurring, the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking, the likelihood of either party being able to satisfy such an award, and the likelihood that the injunction will turn out to have been wrongly granted or withheld."*

[22] *Grant and Mumford (eds), Civil Fraud: Law, Practice, & Procedure ("Civil Fraud") at 28-206.*
[23] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G–784H.*

93. For the Court to exercise its discretion in all the circumstances of the case, the effect of the injunction must be examined to ensure that it is in the interests of justice overall and does not work unfairly, oppressively or is granted without good cause. The court must assess whether granting or refusing to grant an injunction is more likely to produce a just result.

94. As Lord Hoffmann said as to the purpose and effect of interim injunctions:

> *"It is often said that the purpose of an interlocutory injunction is to preserve the status quo, but it is of course impossible to stop the world pending trial. The court may order a defendant to do something or not to do something else, but such restrictions on the defendant's freedom of action will have consequences, for him and for others, which a court has to take into account. The purpose of such an injunction is to improve the chances of the court being able to do justice after a determination of the merits at the trial. At the interlocutory stage, the court must therefore assess whether granting or withholding an injunction is more likely to produce a just result...that means that if damages will be an adequate remedy for the plaintiff, there are no grounds for interference with the defendant's freedom of action by the grant of an injunction..."*[24]

*Just and Convenient*

95. Generally speaking where the Court finds that the balance of convenience favours the grant of the injunction, it would be unlikely that the Court found that it was not just and convenient to grant the injunction.[25]

*Use of Funds for Ordinary Course Business Purposes*

96. In *Polly Peck International plc v Nadir*, Scott LJ commented that a proprietary injunction "*would not be subject to provisos enabling the use of the money for normal business purposes, or for the payment of legal fees, or the like*".[26]

97. The rationale for this is that the applicant has established that the particular asset in question arguably belongs to him and so the question is whether the respondent should be permitted to use assets which may turn out to be the applicant's for any of those purposes.

[24] *National Commercial Bank of Jamaica v Olint Corp Ltd [2009] UKPC 16, at §16.*
[25] *Ascentra ibid, §150.*
[26] *Page 784.*

98. Therefore, in the case of a proprietary injunction, if ordered, whilst there is no presumption in favour of the exceptions for such payments being included in a proprietary order, the defendants may show (and the burden is on them) that it is nonetheless appropriate for any expenditure from the injuncted assets to be permitted.[27]

99. This issue was further examined in *Marino v FM Capital Partners [2016] EWCA Civ 1301* per Sales LJ at §23:

> *"Lewison J (as he then was) in Independent Trustee Services Ltd v GP Noble Trustees Ltd [2009] EWHC 161 (Ch) helpfully summarised the proper approach at para. [6] by setting out the four questions which should be addressed: (1) does the claimant have an arguable proprietary claim to the funds in issue? (2) if yes, does the defendant have arguable grounds for denying that claim? (3) if yes, has the defendant demonstrated that without the release of the funds in issue he cannot effectively defend the proceedings (or, it may be added, meet his legitimate living expenses)? (4) if yes, where does the balance of justice lie as between, on the one hand, permitting the defendant to expend funds which might belong to the claimant and, on the other hand, refusing to allow the defendant to expend funds which might belong to it?"*

*Legal Expenses*

100. Similarly, if there is an argument that provision for legal expenses is to be carved out from the injunction, the defendants will need to satisfy the court that they have no other source of funding available apart from the disputed funds, and that the balance of prejudice comes down in their favour.[28]

101. Further, Miles J in *AB v CD [2023] EWHC 2419 (Ch)* at §43 noted that the balancing exercise must be carried out in relation to "*all relevant circumstances*", and that *'[t]he court will "act cautiously so as to ensure that the funds are not wasted", which may be achieved by "limiting the amount ...even if that may cause a defendant to reassess how to pursue her case or to consider alternative funding models*"'.

[27] *Civil Fraud ibid at 32-059 to 32-060.*
[28] *Ascentra ibid, §151.*

*Ancillary Disclosure*

102. Ancillary to freezing and proprietary jurisdiction, it is well established that the Court has jurisdiction to require respondents to provide disclosure.

103. In the context of proprietary injunctions, it is legitimate for such disclosure orders to be aimed at establishing the whereabouts of missing funds, as opposed to merely policing the terms of the order.

104. As the editors of Civil Fraud point out at 29-028 to 29-029:

> *"The court's approach is epitomised in the famous dictum of Templeman LJ in Mediterranea Raffineria Siciliana Petroli SpA v Mabanaft GmbH:*
>
> > *"A court of equity has never hesitated to use the strongest powers to protect and preserve a trust fund in interlocutory proceedings on the basis that, if the trust fund disappears by the time the action comes to trial, equity will have been invoked in vain."*
>
> *The disclosure typically ordered in such a case is categorically different to a normal asset disclosure order. What the court is here doing is requiring the respondent to identify the current location and status of assets, or their proceeds, to which the claimant lays claim, even if they are no longer in the possession of the respondent and regardless of whether the respondent himself claims ownership of the assets..."*

*Cross-Undertakings and Fortification*

105. The court will normally require a cross undertaking in damages as the price for interfering with the defendant's freedom before they have been found liable for anything and to indemnify the defendants for any damage found wrongfully to have been caused to them by the injunction, if they ultimately prevailed at trial.[29]

[29] *Kelly v Fujigmo Limited [2012] (2) CILR 222 Smellie CJ at §13; JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA 139 at §68.*

106. This would be the usual order to achieve justice at the trial.[30] There are rare exceptions where the court has waived or limited the size of the cross undertaking required, but there would have to be a good reason not to make the usual order, for example where the applicant's inability to provide the undertaking has been caused by the wrongful conduct of the defendants or where there is no practical possibility of damage being suffered. The mere fact that the claim is being brought by liquidators of an insolvent company does not lead to the conclusion that a cross undertaking should be capped.[31]

*Fortification*

107. Assuming that the defendants can show:

(1) on a good arguable case basis, that the injunction will cause them loss; and

(2) that the party offering the cross undertaking will not be good for the money absent fortification,[32]

the approach is for the Court to make an intelligent estimate of the likely amount of any loss which might be suffered by the applicant for fortification by reason of making the interim order, and assess whether the making of the interim order is or was a cause without which the relevant loss would not be or would not have been suffered.[33]

*D1, D3, D5 and D6 (CDM Defendants) Arguments in Outline*

108. The following represents a summary of the points Mr Andrew Scott KC made on behalf of the CDM Defendants:

(1) Mr Patrick and Mr Murphy vehemently deny that there has been any breach of their fiduciary duties to the Company for the reasons set out in their affidavit evidence;

---

[30] *Hoffmann-La Roche & Co. A.G. v Trade & Indus. [1975] AC 295 at §361 (Lord Diplock), cited by the Cayman Islands Court of Appeal in Ennismore Fund Management Ltd v Fenris Consulting Limited [2020] (2) CILR 147 at §37.*
[31] *Re IAHP Group Holdings Limited; Bucknall v Rizvi [2025] EWHC 2069 (Ch) per Mellor J at §87.*
[32] *Omni Bridgeway (Fund 5) Cayman Invt Limited v Bugsby Property LLC & Anor [2024] Costs LR 405 per Jacobs J at §9.*
[33] *Daventree Trustees at §162.*

(2) The proprietary injunction sought, in respect of the limited partnership interest (the Partnership Interest) held by CDM is too wide and would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim;

(3) There is no legal basis for such a claim under the Exempted Limited Partnership Act (as amended) ("ELP Act") or the ARLPA;[34]

(4) The relevant assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner;

(5) Even if there were a proprietary interest in the limited partnership, it is of no economic value to the Company, being a right to be considered by the general partner for discretionary charitable distributions for the benefit of qualifying Indirect Charitable Owners, and so any loss would fall on those owners, not the Company, and being financial in nature it could be adequately compensated in damages;

(6) The effect of the relief sought would be to 'lock down' the Fund and the CDM Entities and place their operations under the control of the JOLs, which is not justified. It would restrain the CDM Defendants from conducting their lawful business operations in the ordinary course, impairing their ability to make distributions to charitable causes;

(7) The Company's only rights as the former limited partner of the Fund were to be considered for discretionary distributions at the sole discretion of the general partner[35], and there is no justification for the JOLs taking such control;

(8) The Company's purpose and role within the DAF structure was to facilitate charitable distributions to qualifying non-profit organisations. It did not exist to operate or transact business as a commercial entity or to benefit its Participating Shareholders;[36]

---

[34] *The limited partnership interest is a bundle of contractual and /or statutory rights not a proprietary interest in the Fund's assets.*

[35] *See Article 4.2 of the ARLPA. The ARLPA also confirms that: (i) the General Partner has full, exclusive and complete discretion to manage the DAF's affairs and assets (Article 1.6(a)); (ii) Limited Partners do not participate in management and have no power to bind the DAF (Article 1.6(b)); (iii) distributions are at the General Partner's discretion (Article 4.2(a)); and (iv) partners renounce any right to partition partnership property (Article 6.14).*

[36] *See Asif J's comments at the June 2024 sanction hearing in the Liquidation Proceedings: "this structure is unlike the majority of funds in that there is no right to receive dividends. So it's purely discretionary, it's almost like a discretionary trust" and "could, for example, be set up as a foundation company."*

(9) The JOLs are being funded by Mr Dondero (who allegedly has a history of dishonesty and vexatious litigation) through a funding vehicle, Crossvine, established for his benefit, which has opaque financial standing;

(10) The reason Mr Patrick acted in late 2024 and 2025 to restructure was to protect the Fund from Mr Dondero's predations and the risks[37] that these posed to its assets and charitable mission;

(11) Both Mr Patrick and Mr Murphy carried out the restructuring in good faith believing it to be in the best interests of the Company having taken legal and tax advice from respected advisers in this jurisdiction and in the US;[38]

(12) When Mr Patrick and Mr Murphy caused the Company to assign the Partnership Interest as part of the DAF restructuring, they did so in good faith, in the best interests of the Company, and for valuable consideration in the form of the Company's CDM Membership. They likewise acted when the Company's CDM Membership was redeemed. The Company was paid US$1,637,192 upon redemption, a fair market valuation supported at the time by two independent valuation exercises (by ValueScope and FTI) and subsequently confirmed by a third independent firm, Weaver & Tidwell LLP ("Weaver").[39] Having received the fair market value of its CDM membership interest, the Company immediately distributed those proceeds to the Original Participating Shareholders;

(13) Having carried out the restructuring, there is no realistic risk that CDM will dispose of or diminish the value of the Partnership Interest now that it has been put beyond Mr Dondero's reach;

---

[37] *An illustration of that exposure is, according to the CDM Defendants, the litigation that UBS pursued in the US Courts against Mr Dondero and entities with which he was affiliated or controlled (the "UBS Litigation"). On 8 February 2023, UBS filed a Special Turnover Petition whereby, apparently, it sought to challenge as fraudulent certain transactions by which attempts were made to put assets beyond UBS's reach and to affix liability to the entities involved on the basis that they were the "alter egos" of Mr Dondero. One such transaction involved D6 ("CLO HoldCo"), one of the holding companies within the DAF Structure, which was joined as a defendant to the petition. UBS alleged that "CLO HoldCo is a wholly owned subsidiary of [the DAF] which Dondero indirectly controls and has funded from personal assets, his family trusts, and HCM". Mr Patrick and Mr Murphy were able to settle UBS's claims and secure broad releases for the benefit of CLO HoldCo and other CDM Entities. The CDM Defendants say that UBS were willing to settle and provide releases as they were satisfied that CLO HoldCo and the CDM Entities were no longer aligned with Mr Dondero.*

[38] *The decision-making is recorded in the Company board resolutions dated 18 December 2024, 7 February 2025 and 2 April 2025.*

[39] *See Patrick 2 at §81.*

(14) The relief sought would risk causing irremediable harm to the Fund, the CDM Entities, and their ongoing businesses, impairing the charitable mission they support by US$126.7 million[40]. The JOLs are unwilling or unable to offer a properly fortified cross undertaking in damages in respect of this risk and so the balance of convenience weighs decisively against granting the injunctive relief;

(15) The imposition of an injunction stands to benefit Mr Dondero, and Mr Ellington personally. For example, it would prevent the CDM Entities from pursuing valuable litigation claims which are adverse to their interests (claims which, taking the JOLs' pleaded case at its height, would otherwise inure to the benefit of the liquidation estate); and

(16) There is no basis for a proprietary injunction against Mr Patrick in respect of his properly incurred, approved and documented salary and bonus payments or the two pieces of US real estate referred to in the pleaded case, as he was paid by other entities within the structure, not the Company, and it has no pleaded proprietary claim to those assets or any *prima facie* case that they belong to it.[41]

*Constructive Trust*

109. The CDM Defendants also argue that there is also no arguable proprietary case available to the JOLs that:

(1) CDM holds its limited partnership interest in the Fund on constructive trust for the Company; or

(2) DFW holds the Participating Shares issued to it on constructive trust for the Company; or

(3) DFW holds its membership interest in CDM on constructive trust for the Company.

[40] *As set out in the Damages Report from ValueScope.*
[41] *Mr Patrick is a US citizen who lawfully purchased these assets with remuneration received from his employment by US entities.*

*No Assets at Risk*

110. The CDM Defendants argue that even if any of the proprietary claims were sustainable, they would not support the extraordinary relief sought, where the JOLs have had the benefit of the Interim Undertakings, which have 'held the ring' in a manner that is just and convenient and which has allowed the Fund and the CDM Entities to further their charitable mission in the ordinary course of their business.

111. The CDM Defendants say that the criticisms the JOLs advance[42] are not a fair reflection of how they have worked in practice and that there has been no exploitation of the ordinary course of business exception as alleged. The CDM Defendants also say the JOLs have had ample opportunity to police and if required prevent suspicious transactions of which there have been none.

*Remuneration*

112. They strongly refute the criticisms regarding the alleged excessive remuneration received by Mr Patrick and Mr Murphy[43] and rely, in respect of Mr Patrick's remuneration, on the compensation benchmarking work done by Mercer, a global consulting firm, and by the remuneration/compensation committee.

113. They also rely on the fact that the JOLs have not filed expert evidence which challenges Mercer's recommendations. They point out that the comparisons the JOLs make with Mr Grant Scott's historical remuneration are inappropriate for a number of reasons, not least that Mr Scott's role was fundamentally different in scope, complexity and exposure to Mr Patrick's. They say that Mr Scott only passively managed the structure, outsourcing management of the assets and investment decisions to entities owned or controlled by Mr Dondero, who then charged significant investment management and advisory fees.[44]

*Modified Undertakings*

114. The CDM Defendants refer to the modified set of undertakings that they offered on 24 November 2025, to last until the determination of the trial, subject to the provision of appropriate fortification of the cross undertaking, which the JOLs refused.

---

[42] *See MacInnis 3.*
[43] *See in detail Patrick 2 and Murphy 1.*
[44] *Estimated at approximately US$30 million between 2014 and 2020, Patrick 2 at §137.*

115. As to the modified undertakings offered, Mr Ayres KC explained the objection taken by the JOLs, in particular to the suggestions which now said that the CDM Entities would only be obliged to give 7 days' notice of transactions above US$100,000 (as opposed to US$50,000) and that no disclosure was required of payments made by the CDM Entities to Mr Patrick and Mr Murphy above US$50,000 where the payments were contractual salary or bonus entitlements accrued in the ordinary course.

116. Mr Andrew Scott KC argued that if the Court were minded to grant some form of injunctive relief, it should be the minimum necessary to maintain the *status quo* pending trial and any order should be modelled on these undertakings.

117. He argued that the JOLs' criticisms regarding the Interim Undertakings' apparent 'inadequacies' and lack of protection are overblown. He submitted that the JOLs have not shown any irreparable harm to the Company or that there is any real risk that the assets would be adversely dealt with.

*Texas Proceedings*

118. Reference was made to Texas proceedings which it is necessary to briefly describe.

119. The Highland Foundations applied in July 2025 to obtain a Temporary Restraining Order that would have 'locked down' the DAF structure.

120. In the Texas Petition, the Highland Foundations sought (among other things) the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the Fund. The Highland Foundations alleged that Mr Patrick owed them fiduciary duties which were breached in the restructuring that he organised.

121. The CDM Defendants point out that the Judge in the Texas proceedings observed to the Highland Foundations at the hearing that:

> *"I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that".*

122. The matter was settled (by the Rule 11 Agreement) upon the CDM Entities giving undertakings on 11 July 2025.

123. Mr Scott KC invited the Court to endorse the Texas court's recognition that there was no risk of irremediable harm. Particularly in the light of the Rule 11 Agreement in Texas where undertakings were given not to make payments other than in the ordinary course of business, for investments and monies to be kept in the entities which they currently resided in, and for there to be no further change in the corporate structure. Subject to that the Fund and its assets could be operated in the ordinary course.

124. Mr Ayres KC pointed out that these proceedings did not concern the Company, the relief sought was not refused and the agreement made was outside the JOLs' control.

125. Mr Scott KC urged the Court to have regard to the effect of an injunction which would:

(1) cause serious and irreversible prejudice to the CDM Defendants by restraining them from conducting their lawful business operations and impairing their ability to make distributions to charitable causes; and

(2) benefit Mr Dondero and Mr Ellington personally. It would, he said, prevent the CDM Entities from pursuing valuable litigation claims which were adverse to their personal interests which would be otherwise for the benefit of the liquidation estate, and it would also benefit them personally as they would gain from any uplift of sums advanced under the funding agreement.

*Legal Fees*

126. The CDM Defendants argue that the JOLs' criticism of the amount of legal fees expended was misplaced because such fees were caused by the JOLs' litigation tactics in the U.S. and Cayman, for example their conduct of the sanction application in June 2025 which resulted in indemnity costs of *circa* US$1m being awarded against them in favour of DFW and Mr Patrick.

*D2 Submissions in Outline*

127. Mr David Quest KC's submissions included the following points on behalf of Mr Murphy:

(1) There is no adequately pleaded case or serious issue to be tried on the evidence that the payment of remuneration to Mr Murphy amounted to a breach of fiduciary duty;

(2) There is no tracing claim that money paid to him by way of remuneration would justify a proprietary, as opposed to a personal, claim against him;

(3) If there were any such case, the proper plaintiff would be the corporate entity that made the payment and the Company did not make any payment. The Company does not have and never has had its own source of liquidity given its purpose as a blocker for UBTI;[45]

(4) The Company has no proprietary claim to the assets of the Fund and less so to the assets held by subsidiaries of the Fund because its limited partnership interest only gave it an entitlement to be considered for discretionary charitable distributions, not for its own account but for the account of the appropriately qualified charities;

(5) The Terms of the ARLPA[46] made clear that the Company had no entitlement to remain an object of the charitable purposes of the Fund and, unlike a shareholder, never had any right to exercise managerial control over the Fund assets;

(6) Pursuant to section 16(1) of the ELP Act, the general partner of the Fund held its sole asset (the shares in CLO HoldCo) on trust for the Fund in accordance with the ARLPA;[47]

(7) Damages would be an adequate remedy if liability were established at trial and so the balance of convenience is against any proprietary injunctive relief;

(8) If an injunction were granted against Mr Murphy, the assets in question would have a maximum value of US$900,000[48] which is insignificant compared to the value of the overall claim (c.US$270m); and

---

[45] *Patrick 1, §30-31.*
[46] *LPA 2011 cl.4.3 and LPA 2024 cl.16.*
[47] *Section 16: "(1) Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement".*
[48] *Although he has been spending money on outgoings: Murphy 1, §§84-87.*

(9) An injunction would be highly invasive and prejudicial to Mr Murphy as it would freeze most of his liquid assets and the bank accounts into which his salary and bonus were paid.

*DFW (being the majority Participating Shareholder of the Company) (D4) Submissions in Outline*

128. The only liquid assets which DFW holds are the discretionary distributions it receives through its limited partnership membership in CDM (the "CDM Interest"). It also has 51% of the Participating Shares of DFW in the Company.

129. Ms Jennifer Colegate's submissions included the following points:

(1) The property in the hands of DFW was not property which could be followed or traced from the Company to DFW, and as such cannot be the subject of a constructive trust;

(2) There is no basis for restitution as between DFW and the Company in respect of the CDM Interest because the interest conferred on DFW has not been done so at the expense of the Company - it was redeemed for value;

(3) Damages would be an adequate remedy if the redemption was found at trial to be for insufficient consideration;

(4) There is no serious issue to be tried as to the Company having a proprietary interest under Cayman law in the CDM Interest and it is not pleaded how agreements governed by the laws of Delaware would support the imposition of a proprietary injunction;

(5) The Company does not and cannot as a matter of law hold title to its own shares and cannot assert a constructive trust over shares it has issued;

(6) There is no risk of DFW disposing of any assets and DFW has no intention to do so;

(7) An injunction would prevent DFW from making charitable distributions to charities in accordance with the Fund's charitable purposes; and

(8) DFW should be allowed to defray necessary legal costs from funds available to it via CDM.

***Decision***

*Is there a serious issue to be tried that the Company has a proprietary interest in the asset(s) over which an injunction is sought to be imposed?*

130. The Court has carefully considered whether the Company, as a limited partner in the Fund, has a proprietary interest as a limited partner which would entitle it to be protected by way of the injunction sought and/or an indirect beneficial interest in the underlying assets of the Fund.

131. The Court answers both of these questions in the negative.

132. Taking a step back, wide interim proprietary injunctive relief with similarly broad orders for asset disclosure are sought by the Company which would require (among other things) each Defendant to:

> *"preserve and… not in any way dispose of, deal with, encumber, transfer or diminish the value of… any interest… in Charitable DAF Fund, LP… the Fund Entities… and/or any assets of the Fund",*

with no exceptions for ordinary course dealings.

133. The Court accepts the Defendants' submissions that it would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim which may be because, under Cayman law, the assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner.

134. An Exempted Limited Partnership ("ELP") under Cayman law is different from an ordinary partnership and a registered company. It has no legal personality.

135. The property and rights of an ELP are held on trust by the general partner as an asset of the partnership in accordance with the terms of the partnership agreement.[49]

136. The limited partners do not own those assets, whether legally or beneficially. They instead have contractual rights under the ARLPA and statutory rights under the ELP Act. Those rights do not in the Court's view found a seriously arguable proprietary claim to partnership assets.

[49] *Section 16(1) of the ELP Act.*

137. Notwithstanding this, a limited partner may be said to have a 'proprietary interest' in the partnership assets,[50] a concept which Mr Ayres KC relied upon.

138. However, in the same way beneficiaries under a discretionary trust may have a 'proprietary interest' in the trust assets and their interests are to be considered.

139. The limited partnership interest in this case is not a proprietary interest in the assets themselves but the right to be considered for potential distributions[51] which the Company then passes on to the Charities.

140. The Court is not satisfied in this case that there is a real prospect of showing that the Company has a legitimate proprietary claim to legal or beneficial ownership of the assets it seeks to injunct.

141. The Court has examined the particular features of the legal structure of the ELP and the terms of the relevant partnership agreement to ascertain the extent and nature of any proprietary claim and entitlement of the limited partner.[52]

142. The recitals to the ARLPA provide that the purpose of the Fund was to:

> "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code ... for the economic benefit of* ***the Limited Partner and its Indirect Charitable Owners...***". (emphasis added)

143. Clause 1.3 of the ARLPA provides that:

> "*... the Partnership may make investments in other types of securities, investment vehicles and instruments* ***in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners***". (emphasis added)

---

*[50] Aquapoint LP (in Official Liquidation) v Fan [2025] UKPC 56 per Lord Richards at §48: this view was expressed in the context of a winding up petition appeal, not a proprietary injunction case.*
*[51] Y v R [2018] 1 CILR 1 Mangatal J at §59 and §§66-68 and JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA) [2016] 1 WLR 160.*
*[52] The legal interest of the limited partner is expressed in the partnership agreement to be an ownership interest equal to each limited partner's opening capital account: clause 4.1 of the ARLPA.*

144. "*Indirect Charitable Owners*" is defined in clause 1.12 of the ARLPA as:

> "***the indirect equity owners of the Limited Partners**, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" (emphasis added)

145. Clause 4.2(a) of the ARLPA provides that:

> "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash **and the needs of the Indirect Charitable Owners of the Limited Partner** for funds to cover their administrative and operating expenses…*". (emphasis added)

146. The particular position and purpose of the Company in the structure gives it no proprietary claim to the assets of the Fund or the assets held by the subsidiaries of the Fund.

147. The Company's limited partnership interest only gave it an entitlement to be considered for discretionary distributions, not for its own account, but for the account of the appropriately qualified charities.

148. It is true that the Original Participating Shareholders had the right to be considered for a dividend from the Company (Article 12), but the purpose of the Fund was to make charitable distributions to the relevant Charities through the Company which was given no ownership rights and, in the Court's view, was not entitled to be an object of the charitable purposes of the Fund.

149. Mr Ayres KC submitted that clause 4.2 of the ARLPA is expressed in mandatory terms with regard to distributions, but reading the clause as a whole, together with the ARLPA, it is clear that discretion was left to the general partner after first taking into consideration available cash and the needs of the Indirect Charitable Owners.

150. It also appears from Mr Patrick's evidence[53] that the distributions which the Company made to each of the Supporting Organisations were not linked to the number of Participating Shares

[53] *Patrick 2, §§66-67.*

held by each organisation, but on a predetermined formula primarily linked to the Company's NAV. This is set out by Mr Patrick in an excel spreadsheet.

151. The Participating Shareholders did not receive a *pro rata* distribution or dividend from the Company and instead their annual distribution was dependent on the contractual terms which governed the relationship between each of these Supporting Organisations and their underlying Charities which are, as an average, set out in Mr Patrick's evidence:

> "§68 *These distributions were, on average, c.US$160,000 per annum for Highland Kansas City, c.US$280,000 per annum for Highland Dallas, and c.US$60,000 per annum for Highland Santa Barbara. In addition, CFNT was paid $100,000 per year annually in the fourth quarter of each year."*

152. This is further support for the Court's view, on a proper analysis, that the Company has no legal or beneficial claim to own assets of the Fund or the CDM Entities.

153. This also accords with the Mission Statement adopted by the Company and its objects.

154. The Mission Statement, adopted by the Company by way of written resolution of the Directors on 3 December 2024, stated:

> *'1. ADOPTION OF COMPANY MISSION STATEMENT.*
>
> *1.1 NOTED THAT:*
>
> *(a) The Company wishes to adopt a mission statement to clearly outline the purpose and objectives of the Company.*
>
> *(b) Based on the Company's operating history (which includes significant donations to various charities) and the reason for establishing the Company, the Company wishes to adopt the following mission statement:*
>
> *"Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference." ("Mission Statement")'*

155. The Court finds that this accords with the purpose of the Fund structure, which is to support the Fund's charitable mission, and that the assets are assets of the Fund which are held by the general partner on statutory trust in accordance with the ELP Act and the ARLPA.

156. Moreover, by clause 4.3 of the ARLPA, the general partner can terminate the limited partner's interest in its sole discretion and apparently at will. The limited partner has no entrenched rights.

157. Clause 4.3 of the ARLPA provides that:

> *"The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code."*

158. The following clauses also make clear that the Company is to be considered for distributions at the general partner's sole discretion, not for its own account, but for the benefit of the Supporting Organisations insofar as they qualified as Indirect Charitable Owners.

159. As the Court has found, that is not a proprietary right to the Fund's assets, but is a limited right consistent with the role of the Company to act as a tax blocker and conduit for charitable distributions.

160. Clause 1.6 (GP powers) of the ARLPA provides that:

> *(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs* ***and fulfill the purposes of the Partnership;***[54] *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner. (emphasis added)*

[54] *i.e. principally to benefit the Indirect Charitable Owners.*

(b) *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement."*

161. In addition, in keeping with the limited rights afforded, Clause 6.14 of the ARLPA provides that all Partners:

> "*renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek to bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held*".

*Koza*[55]*, Gill and Kaur, and Bourlakova*

162. Mr Ayres KC sought to rely on the English Court of Appeal's decision in *Koza* and the subsequent decisions which considered *Koza* to persuade the Court that a proprietary claim was justified in this case. The Court has carefully considered these decisions and the helpful submissions of both Mr Ayres KC and Mr Scott KC.

163. The Court has concluded that there is good reason not to follow each of these decisions in the way that Mr Ayres KC suggested the Court should. To explain why the court has decided not to follow them in the way Mr Ayres KC suggested, it is necessary to give short explanations and analysis.

164. The *Koza* case was principally concerned with the *Mareva* jurisdiction (freezing orders) of the English court, not the proprietary injunction jurisdiction.

165. One of the issues considered by the Court of Appeal was whether the court had jurisdiction to make the injunction regardless of whether there had been a breach of an undertaking given to

[55] *[2020] EWCA Civ 1018.*

the court. The Court of Appeal decided that there was such jurisdiction and Lord Justice Popplewell gave the leading judgment:

> "67 *Although at first sight it might seem surprising that the jurisdiction to make ancillary orders to enforce or render effective undertakings can be invoked when it is not, and never will be, definitively established that the threatened conduct is a breach of the undertaking, and there is no decided case revealed by counsel's researches in which it has been exercised in such circumstances, it seems to me that it is consistent with established principle and practice that such jurisdiction exists and can be exercised in such circumstances.*
>
> 68 *The starting point is that where the court has by injunction restrained conduct in general terms, the ancillary jurisdiction permits the grant of a further injunction to restrain something specific which is within the scope of the general restraint.* ***This is a common feature of freezing orders.***"(emphasis added)

166. Popplewell LJ made the distinction between the freezing order jurisdiction and a proprietary claim to assets which he described as founding a principled basis for preserving those assets pending trial:[56]

> "82 *I would also accept the existence of this alternative jurisdictional basis for the injunction granted by the judge. Where there is a dispute over control of a company the court may make interim orders,* ***including freezing orders, whose purpose is to preserve the value of the company in favour of a party who has a legitimate interest in preserving its value.*** *(emphasis added)*
>
> 83 *Section 37(1) of the Senior Courts Act 1981 is in very wide terms. ... Where a claimant has a proprietary claim to assets, there is obviously a principled basis for preserving those assets pending trial, and a proprietary freezing order is commonly granted in such circumstances.* ***In the present case Koza Altin has no proprietary claim as such to the assets in question: the funding will be from assets owned by its subsidiary, Koza Ltd. However, a parent company does have an interest in the use by its subsidiary of the latter's assets because such use affects the value of its shareholding in the subsidiary, and such***

[56] *§§82-83.*

> ***interest is proprietary in nature because the shareholding is a species of property.*** *It is, therefore, in accordance with principle that the court's wide jurisdiction under section 37 should be exercisable to protect such a proprietary interest in appropriate circumstances.* ***Koza Altin's proprietary interest in preserving the value of Koza Ltd's assets, and the consequent value of its own shareholding, is a legitimate interest which is capable of justifying protection by the grant of a freezing order.*** *It is a separate question whether the circumstances justify the grant of such an injunction in any particular case; but the existence of a power to grant it is consistent with principle."* (emphasis added)

167. As to the freezing order jurisdiction, the court needed to determine whether there was a real risk that the alleged expenditure at issue in breach of undertaking would be an unjustified dissipation of assets otherwise than in the ordinary and proper course of Koza Ltd's business.

168. In the Court's view, the *Koza* decision does not assist Mr Ayres KC in relation to the jurisdiction to grant the proprietary injunction in this case, where the facts are very different.

*Gill and Kaur*[57]

169. In this case the respondents to the injunctions did not appear and were unrepresented. Bryan J had heard no opposition to the injunctions and said, purporting to apply *Koza,* at § 40:

> *"In order to obtain a proprietary injunction, it is not necessary for the applicant to have a direct proprietary claim to the assets themselves."*

170. The Court finds this to be unpersuasive authority in the circumstances in which the Judge made that comment, against the jurisprudence to the contrary which requires a proprietary claim to the assets themselves.

---

[57] *[2025] EWHC 156 (Comm).*

*Bourlakova*[58]

171. This, unlike *Koza* and *Gill and Kaur*, was a proprietary injunction case where the claimant sought injunctions to restrain dealings with the company's assets pending trial. The claimants claimed to be shareholders of the relevant companies.

172. However, the judge in that case, Smith J, was not being asked to order an injunction which would prevent the companies from continuing in the ordinary course of their business. That is unusual for a proprietary injunction case, which unlike the freezing order jurisdiction, does not require a real risk of dissipation of assets and would normally not allow an ordinary course of business exception because the assets themselves are claimed to be owned by the applicant.

173. Smith J took *Koza* to establish that a proprietary injunction could be made to restrain the company from dealing with assets without the need for any proprietary claim and without the need to show any risk of unjustified dissipation.[59]

174. With respect to the Judge, this Court does not accept that the analysis he makes of Popplewell LJ's judgment in *Koza* is correct.

175. Popplewell LJ found on the particular facts of that case that the parent had an interest in the use by its subsidiary of the subsidiary's assets, even though it did not have a proprietary claim to those assets, because he found that such use affected the value of its shareholding in the subsidiary, and such an interest is proprietary in nature because the shareholding was a species of property.

176. Popplewell LJ, however, was dealing with a freezing order which could still be made provided its requirements were met in relation to a real risk of dissipation.

177. In any event, *Bourlakova* can also be distinguished on the facts.

178. An ordinary course exception is applied for in this case which concerns a limited partner interest in a Fund, not a shareholder's interest in a Company.

---

[58] *[2025] EWHC 1792 (Ch).*
[59] *§§140-144.*

*Lakeshore*[60]

179. Even if it could be said that the rights of the Company in this case, as a limited partner in the Fund, are somehow analogous to a shareholder's rights in the above three cases (which the Court doubts), the Court could not grant a proprietary injunction if there is no *prima facie* ownership interest in the relevant assets sought to be injuncted.

180. This issue was considered by the Chief Justice in *Lakeshore*. In that case a displaced shareholder sought a proprietary injunction against a company in respect of the company's assets. This was refused on the basis that there was no good claim to beneficial ownership of those assets and the shareholder rights asserted in that case did not found a basis for proprietary injunctive relief.

181. The Court held that a proprietary claim is one where the claimant asserts a legal or beneficial interest in an asset and that the asset must be specific and ascertained, citing Gee Commercial Injunctions (7th Ed.) at 2-026.[61]

182. The Court noted that a company's shareholders have no proprietary interest in its assets.

183. This Court accepts the reasoning in that case and applies it to this application.

*Valuation Issues*

184. The Court has also reviewed the detailed advice of Mr Beswetherick KC who advised the Company that the Company's objects, revised in line with the Mission Statement, could not realistically be challenged by the Participating Shareholders.[62]

185. The Court has concluded that the Fund structure in this case gave the Company and its Participating Shareholders no rights of legal or beneficial ownership or indeed control with regard to the Fund and its assets.

186. There is evidence that other charitable entities were unwilling to accept 'a gift of Participating Shares' on this basis:

---

[60] *[2025] CIGC (FSD) 24.*
[61] *§61 and see §§62-69.*
[62] *See §§56-60.*

> *"[t]hese charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point".*[63]

187. As borne out by the valuations conducted in this case, this outcome was of more limited economic value to the Company as a limited partner in the Fund than an asset valuation of the Fund's assets.

188. Having considered the Company's arguments and evidence, the Court takes the view that there is no good reason to impugn ValueScope's assessments of the CDM Interest,[64] or to second guess the FTI report[65] (which considered appropriate discounts in relation to the Participating Shares), and/or the Weaver fairness opinion.

189. The Court is unpersuaded on this application that the transactions undertaken were at an undervalue. The JOLs have adduced no valuation evidence.

*What Rights did the Company have as a Limited Partner in the Fund?*

190. The Court accepts Mr Scott KC's submissions that the Company's rights as a limited partner in this structure were not typical of those in a commercial Cayman investment fund. The Fund was not an investment vehicle for limited partners on commercial terms as is usually the case.[66]

191. Unlike a limited partnership agreement used for commercial investment purposes, the ARLPA did not have the usual provisions relating to, for example: the limited partners' capital commitments; investment objectives; carried interest and distributions; and investment periods. The Fund did not solicit capital from investors. There are no subscription agreements through which interests are taken up as the Supporting Organisations did not make any capital commitments. The Fund was not able to make capital calls against the Supporting Organisations or against the Company.[67]

[63] *Patrick Liquidation 1 at §96.*
[64] *7 January and 26 March 2025.*
[65] *27 March 2025.*
[66] *Patrick 1, §§89-99.*
[67] *Patrick 2, §63(d).*

192. Rather, the ARLPA reflects the charitable purpose of the Fund which was to benefit a defined class of qualifying beneficiaries, namely the Indirect Charitable Owners.[68]

193. As stated above, the Court agrees with the Defendants' submissions that the Company only had the right to be considered for discretionary distributions by the general partner at the partnership level and by the Directors at the Company level (by way of dividend).[69]

194. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company. The Company was constituted in a form to facilitate the surrender of ownership and control.

195. It did not hold any assets or cash reserves.[70]

196. It is clear having reviewed the Memorandum and Articles of the Company that the Participating Shareholders (who paid no money for their shares) had no control or ownership rights in the Fund's assets.

197. The Court accepts Mr Scott KC's submission that any economic rights that the Company may have had[71] were satisfied when the Company was voluntarily wound up after the restructuring had taken place.

*The Company's Pleaded Proprietary Claims against CDM and DFW*

198. The claims are in respect of:

(1) the limited partnership interest held by CDM;

(2) the participating shares held by DFW; and

(3) the membership interest in CDM also held by DFW.

199. They are all pleaded to arise from the restructuring on the basis of a constructive trust.

---

[68] *Murphy 1, §28.*
[69] *That is the basis on which ValueScope, FTI and Weaver produced the US$1.6 million valuation.*
[70] *Patrick 1, §31.*
[71] *Under Article 12 "The participating shares shall confer upon the shareholders rights in a winding up of repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles."*

200. The Court, consistent with its findings in relation to the proprietary injunction analysis, finds that those claims raise no serious issue to be tried. The Court finds that there is no seriously arguable case that the Participating Shares held by DFW and the CDM Interest also held by DFW were assets owned legally or beneficially by the Company. No constructive trust arises absent a proprietary interest.[72]

201. The Court is also unpersuaded that there is a real risk that those assets will be diminished or otherwise unlawfully dealt with (see below).

*The Injunction against Mr Patrick*

*The Corporate Entity which made the Remuneration Payments*

202. The Court has reviewed the relevant evidence and the pleadings. The Court takes the provisional view that the sums paid to Mr Patrick as remuneration for his work did not come from Company funds or assets.

203. Whilst there are Company board resolutions in respect of the payments, other companies in the structure actually paid Mr Patrick on behalf of the Company.[73] This may give rise to a proprietary tracing claim by the Company, but there is no seriously arguable case that the payments represent assets which belong to the Company.

*Excessive Remuneration*

204. The Company says in contrast to Mr Scott, who was paid US$60,000 per annum, Mr Patrick awarded himself sums comprising a base salary of US$850,000, a bonus of 2.5 times that base salary, and a long-term incentive ("LTI") payment of US$975,000. For the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000.

205. From disclosure provided pursuant to the Interim Undertakings, the JOLs say that Mr Patrick received, by way of director's fees, a total of US$10,548,778 in 2024 and US$3,325,000 in the first six months of 2025.[74]

---

[72] *Foskett v McKeown [2001] 1 AC 102.*
[73] *They seem to have been paid by Liberty CLO HoldCo, Ltd, CLO HoldCo Ltd, and Charitable DAF Holdings Corp.*
[74] *MacInnis 3, §52.*

206. Having reviewed the affidavit evidence on this question including the detailed report dated 26 August 2024 from Mercer, the Court finds that there is no serious issue to be tried that this remuneration was excessive and in breach of his duty to the Company.

207. If there were any such irregularity in Mr Patrick's remuneration, the Articles contain an indemnity for officers for conduct short of bad faith.

208. The remuneration levels were the subject of professional advice. Mercer undertook benchmarking and market research which considered the complexity of Mr Patrick's role and the value of the Fund's assets and holdings.

209. The JOLs and the Company have not provided any expert evidence to gainsay Mercer's view.

210. In addition, the remuneration was structured in accordance with legal advice including the establishment of a remuneration committee.

211. Mr Patrick's second affidavit and Mr Murphy's first affidavit set out in some detail the demands of the role of being a Director, their own expertise, and the level of risk involved, particularly in relation to the extensive litigation involving the Fund. Apparently, Mr Murphy was unable to obtain directors and officers insurance given the history of claims made by Mr Dondero.

212. It may be said that as a matter of common sense the Court should objectively assess whether the amounts paid were excessive.

213. Even if there was a seriously arguable case that these amounts were excessive from that point of view and Mr Patrick acted in breach of duty (in bad faith) in relation to his remuneration, the Court finds that this is not a proprietary claim of the Company and is a claim for which damages would be an adequate remedy.

214. The court finds that there is no serious issue to be tried that a proprietary claim lies against the Texas and Missouri properties such that would justify a proprietary injunction restraining the disposition of these properties. The Court accepts Mr Scott KC's submission that there is no pleaded proprietary claim to these specific properties and there is no *prima facie* case that the Company owns those properties or that they are the traceable proceeds of anything belonging to it.

215. There is insufficient evidence that the alleged excess remuneration was used to purchase these properties.

*The Injunction against Mr Murphy*

216. Mr Ayres KC made clear that as Mr Murphy still plays a role in the Fund and the Company, the JOLs apply to injunct him in respect of all the Fund entities.

217. However, it is undisputed, on the evidence before the court, that Mr Murphy does not hold any interest in the Fund or in its limited or general partner and has no shareholding or any other interest in any of the companies connected with the Fund.

218. The Company's proprietary claim concerns only money that was paid to him as remuneration under his director's service agreements.

219. The Court takes the view that the damages and compensation claimed based on his participation in the restructuring are not proprietary claims in nature.

220. Having reviewed Mr Murphy's affidavit evidence,[75] the levels of remuneration he received (which is not contradicted) do not seem to the Court to be excessive in the circumstances. They are within the margin of appreciation in respect of commercial decisions such as risk and reward relating to remuneration.

221. In 2024, Mr Murphy was paid a total of US$466,667[76] including a bonus of US$250,000 in recognition of his:

> "*contribution to the increased independence of the Company*" and "*input in responding to the Supporting Organisations' behaviour in November/December*".

222. The Company says that this appears to be a reward for Mr Murphy's actions in supporting the restructuring and therefore the Company claims to recover this sum.

223. Mr Murphy was also paid US$500,000[77] in fees payable in monthly instalments and backdated to 1 January 2025, to be paid in advance:

[75] *Murphy 1, §§48-78.*
[76] *MacInnis 3, §§64-66, §74.*
[77] *On or after 12 May 2025: Murphy 1, §72.*

> *"in circumstances where the Companies may have an inability to discharge their financial obligations to [Mr Murphy], for example, where freezing injunctions or temporary restraining orders may be sought against the Companies".*

224. The Court accepts that the comparison made by the Company with the salary paid to Mr Grant Scott is not apposite given the complex and contentious issues that Mr Murphy had to deal with and the professional services he provided.

225. Moreover Mr Patrick, and not Mr Murphy, replaced Mr Scott. Mr Scott had been the sole Management Shareholder of the Company. Mr Murphy's role was newly created.

226. A second director was appointed because entities in the Fund had become involved in US Chapter 11 proceedings (including proceedings for contempt of court) and proceedings brought by UBS in respect of a judgment exceeding US$1 billion. It was considered that there was an urgent need to appoint a robust independent director with litigation experience.[78]

227. Mr Grant Scott was a close personal friend of Mr Dondero, and was:

> *"a patent lawyer with no experience in finance or running charitable organisations, who was Mr. Dondero's long-time friend, college housemate and best man at his wedding".*[79]

228. Mr Dondero's deposition evidence in the Highland Capital Chapter 11 bankruptcy proceedings (in Texas) given on 1 June 2021 shows that Mr Scott was not fulfilling a serious role and reveals the difficulties in identifying anyone prepared to take on his position without sufficient protections.

229. Mr Quest KC emphasised that Mr Murphy is a professional independent director with (by 2021) 17 years of relevant legal, financial services, and asset-management experience.

230. The Court is not persuaded that the payment of his remuneration gave rise to an actionable breach of fiduciary duty.

231. Moreover, there is no pleaded case of fraud or wilful default against him or any deliberate decision by him to act in breach of his fiduciary duty. There is also no evidence that would

[78] *Murphy 1, §35.6.*
[79] *As noted by Judge Jernigan in the US civil contempt proceedings.*

support an allegation of fraud or wilful default against Mr Murphy, or which would support any allegation of relevant actual knowledge.

232. The Court does not however agree with Mr Quest KC that there is no evidence to support the suggestion that Mr Murphy was paid in return for his agreement to the course of action that Mr Patrick took in relation to the restructuring.[80] The timing of the payment of US$250.000 and the reason given for it, raise a plausible inference.

233. However, the Court is of the view that in the light of the *'Directors liability and indemnity'* provisions of his service agreement,[81] there is no serious issue to be tried.

234. The Court accepts Mr Ayres KC's point that he does not need in his pleading to anticipate defences which may or may not be run. However, the evidence does not show a serious issue to be tried against the liability and indemnity protection.

235. In addition, the Company did not pay Mr Murphy. The Court is not persuaded that the Company owned the funds that were paid to Mr Murphy or that it had a proprietary interest in the remuneration paid by CLO HoldCo (D6) to Mr Murphy. The Company as a limited partner had no control over CLO HoldCo (D6).

236. The balance of convenience is firmly against granting a proprietary injunction against Mr Murphy. The injunction sought against him is not against any identifiable fund over which any proprietary claim by the Company could be made. Even if there were such an identifiable fund, if the injunction were to be granted, it would give Mr Murphy a difficult task to comply with.

237. The remuneration was paid into Mr Murphy's bank accounts. If an order was made against him, he would be left having to work out which monies he still had (and from a proportion of his remuneration said to be excessive over 4 ½ years) or which may be received from any assets of the Fund, at the risk of committal for breach. No tracing claim is pleaded. This ambiguity would be a reason as a matter of discretion to refuse to make the injunction against him.[82]

238. The Court accepts Mr Quest KC's cogent submissions that it is hard to see any benefit to the Company and the JOLs in the injunction application against Mr Murphy not to diminish assets, and there is real potential oppression to Mr Murphy in seeking to comply with the injunction sought.

---

[80] *Company written argument, §128.*
[81] *See clause 6 of the April 2021 Directors Services Agreement.*
[82] *Vestey Foods UK Ltd v Cox [2018] EWHC 3466 (Ch).*

*The Balance of Convenience Generally*

*Assets in Danger*

239. Had the Court been persuaded that there was a serious issue to be tried in relation to the proprietary interest of the Company and there was a legitimate juridical basis to grant a proprietary injunction, it would not have granted the injunction against any of the Defendants because it is not persuaded that there is a real risk that the assets are in danger.

240. There is no good reason to believe that the relevant assets will be adversely dealt with given the evidence that the Court has considered on this application, and following the undertakings in July 2025 and suggested in November 2025, as well as the Texas Rule 11 Agreement.

241. Having considered the affidavit evidence and submissions made, the Court is unpersuaded that the ordinary course of business exception poses any real risk to the Fund or to the Company.

242. The Court has concluded that the course which is likely to involve the least risk of injustice is not to grant the injunction.

*Lock Down and Transference of Control to JOLs*

243. The balance of convenience would also come down firmly in favour of the Defendants because the effect of the relief if granted would be to lock down the charitable activities of the Fund and place it under the control of the JOLs, which the Court regards as unjustified at this interlocutory stage.

244. The Court is not persuaded that the carve outs for specific projects proposed by the JOLs remedy the issue.

245. There is on the other hand no real risk of irremediable prejudice to the Company and the JOLs if the injunction is refused.

*Serious Issue to be Tried on the Restructuring*

246. The question whether the allegations made against the Directors are true or not will be properly investigated at trial. The principal allegation is a serious one, namely that they have stripped

the Company of its only asset so as to seize control and enrich themselves without the scrutiny of the Supporting Organisations.

247. They each vehemently deny these allegations and give reasons for the reorganisation which will need to be investigated at trial. There is a mass of contemporaneous documentary material to consider including legal and professional advice provided at the time. The Defendants say that it is inherently improbable that all of these advisers were wrong and that the restructuring was invalid or illegal and that the Directors knew this to be the case at the time.

248. No doubt the allegations the Defendants make that the Highland Foundations, which Mr Dondero controlled as Participating Shareholders, were used as vehicles to exert influence over the assets and operations of the Fund, inconsistently with its purpose and exposing it and its assets to litigation in which he was personally involved, will also be examined in detail at trial.[83]

249. All of the evidence will be properly tested at trial against the contemporaneous material so that a conclusion may be drawn as to whether the Directors took the decisions they did because they believed them to be in the best interests of the Company, as they say, or whether they are in breach of fiduciary duty as the JOLs and the Company say.

250. It is clear that Mr Dondero and his affiliates have a long history of contention with Mr Patrick and the Fund. The Court also notes that the Defendants say that Mr Dondero is the primary stakeholder in the liquidation, is funding it, and has a considerable personal stake in the claims being advanced by the Company, as well as the standing to benefit from any recoveries made pursuant to the funding agreement with Crossvine.

251. The Court has carefully considered the actions taken by the Directors, the advice sought and given, and the justifications put forward for the actions that were undertaken. The time when these actions were undertaken coincides with when the Supporting Organisations (Participating Shareholders) were getting increasingly concerned about the conduct of the Directors.

252. The Court has also taken into account the Company's point that these complex transactions were undertaken in secret without notifying the Original Participating Shareholders (Supporting Organisations) and in effect presented them with a *fait accompli*.

[83] *Patrick 1 Liquidation, §§101-164 and Patrick 2, §§26-43*

253. The Court has been persuaded that the Company and JOLs have a case which the Directors need to answer in relation to the divestiture of the Company's limited partner interest in the Fund which does withstand a reverse summary judgment application.

254. Weighing all of these points at this stage with a necessarily incomplete picture, the Court is persuaded that there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring.

255. The Court expresses no view as to whether that case is likely to succeed or not at this stage, merely that it has cleared the relatively low bar of having a real, as opposed to a fanciful, prospect of success at trial.

256. That finding does not change the analysis or outcome on this application and in particular does not affect the Court's view on the balance of convenience and the exercise of its discretion generally.

257. The Company's interest at stake is not proprietary, is of no economic value to the Company which has not already been reimbursed, and was a right to be considered by the general partner for discretionary charitable distributions for the Indirect Charitable Owners. Any loss would be felt by those owners and could be compensated by an award of damages which could be met from the Fund's assets.

*Cross Undertaking*

258. There is a further important reason why the Court, even had it been persuaded that there was a juridical basis to grant a proprietary injunction, would not have done so.

259. Given the wide nature of the injunction applied for and the significant costs which the Defendants would need to spend to comply with it, the absence of a secure cross undertaking is a good reason to not grant the injunction.

260. The default position is that an applicant for an interim injunction is required to give a cross undertaking in damages. This is not a case where it would be right to waive the cross undertaking required.

261. The Court has concluded that if the injunction were granted, significant loss would be likely to be caused to the Fund and its charitable recipients. There might also be business related and reputational impacts on individuals, including most obviously the Directors, which may be hard to quantify.

*Fortification*

262. The Court has also concluded in its discretion that this is a proper case for fortification. The JOLs themselves are not offering a cross undertaking and yet ask for wide ranging relief and further disclosure orders.

263. The Court is not persuaded that Crossvine, which is put forward to provide a cross undertaking, would be good to make up the likely loss sustained if it was to be found that the injunction had been wrongly granted.

264. The Defendants say Crossvine is controlled by Messrs Dondero and Ellington, both of whom are involved in the UBS Litigation in the US where it is alleged that Mr Dondero has an outstanding judgment against him of more than US$1.2 billion.

265. There is scant material on this application as to the nature, extent and location of Crossvine's assets. Apparently, the original funding Crossvine agreed has been exhausted.

266. The Defendants point out that an indemnity costs order[84] that was made against the Company as part of a June sanction application in the Liquidation Proceedings has not been complied with.

267. The Defendants have a good arguable case that there is a real risk that Crossvine, on the present evidence available, will not be good for the money.

268. Mr Ayres KC argued that the evidence from ValueScope suggesting potential damage to the Fund of c.US$127m if the injunction is granted is flawed because they had been involved in justifying the redemption of the Company's interest in CDM and so were not able to provide objective and independent evidence to the Court by way of the Damages Report. The Court does not agree.

---

[84] *Said to be circa US$1 million.*

269. An intelligent estimate of the loss is, in the Court's view, in the region of the ValueScope Damages Report. There is a real need for fortification in this case and none is offered. That in itself is a powerful factor against the granting of the proprietary injunction sought on the balance of convenience.

*Conclusion*

270. For these reasons, the Court refuses to make an order in the terms of the amended injunction summons filed on 4 December 2025.

**THE HON. JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**

# EXHIBIT D

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK,** of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4. I am duly authorized to provide this affidavit for and on behalf of DFW to:

   (a) Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

   (b) Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

   (c) Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5. In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7. There is now produced and shown to me a paginated bundle of documents marked **"MP1"**. References in this affidavit are to pages in MP1 are in the form [**MP1/page number**]. The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment. As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs. To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8. I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed. I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025. To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9. There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10. In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11. In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

    (a) Objections to the JOLs' Summons

    (b) Professional background and dealings with Holdco / DAF

    (c) Function of Holdco and DAF Structure

    (d) DAF as alter ego of Mr Dondero

    (e) Responses to First Affidavit of Ms Diaz

    (f) Responses to First Affidavit of Mr Dondero

### A. OBJECTION TO JOLS' SUMMONS

15. In summary, DFW:

(a) Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

(b) Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

(c) Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

   (a) The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

   (b) On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

   (c) On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring**.

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent. As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

*(i)* *<u>Objections to Johnstone Law on the basis of a conflict of interest</u>*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7 (14 May Letter)**, the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators, Johnstone Law addressed the proposition that *"There is no hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court. In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**). Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation" "...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**). Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

(a) Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

(b) After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

(c) I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

(d) Mr Johnstone asserts that he *"no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients"* (**Johnstone 1, paragraph 39**) and that there is no *"suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs"* (**Johnstone 1, paragraph 40**).

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure. Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*. This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations. Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

(a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1** suggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing. I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys. I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May. It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs. However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton. There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco. In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting. That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**). As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero. DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW. I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction. The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50. I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*. At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW. I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51. I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested. Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52. Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed. Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53. Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54. As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55. Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56. Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57. I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58. Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59. In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

**B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF**

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66. Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67. I was employed by Skyview from March 2021 to October 2024.

68. I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69. Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18,** at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1,** Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 (**"Trust #2"**), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

### C. FUNCTION OF HOLDCO AND DAF STRUCTURE

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1] In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control". These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure. I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations. If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust). At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81. For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made. Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure. A copy of this email exchange is exhibited at **MP1/ page 84 - 85.**

82. In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83. My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84. In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation. Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

(a) Did not solicit capital from investors;

(b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

(c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

(d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

(e) Does not have a registered investment advisor;

(f) There are no investment hurdles or reporting requirements;

(g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

(h) The economic substance filing lists business of Holdco; and

(i) There is no wind down date or term within which shareholders are entitled as of right to distributions.

90. Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect. Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91. The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same. In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 **(2015 Articles) (Diaz 1, paragraph 15)**. The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**). It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92. Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified. Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93. Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco. As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco. Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94. In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95. The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

(a) it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve. The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

(b) Participating Shares do not confer the right to remove or appoint directors to Holdco. The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

(c) The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]...issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

(d) Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96. At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas. These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97. In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares. Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights. The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98. The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

**D. DAF AS ALTER EGO OF JAMES DONDERO**

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that "*The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed*". Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, *"And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee."* Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170.**

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b) As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c) When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116. With respect to point (ii) above:

(a) I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests. On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**). It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b) Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation. As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%. Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c) I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities. Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person. As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**). With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**). The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline. Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate. From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF. In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

**(a) The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**). By way of background:

(a) In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b) NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c) TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d) I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e) Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f) However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a) In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b) I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c) The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a) In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full. In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354**).

**(d) Polo Glen DST**

(a) DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b) As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c) As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120. In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations. The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted. DAF is further at risk of being found to be the alter ego of Mr Dondero's alter ego given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero. Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities. Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties. DAF must vigorously defend itself and its assets, which can be costly and time-consuming".* The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support. Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

***Turnover Proceedings - New York County Supreme Court (Index No 650744/23)***

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

***Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)***

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

***Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)***

130. This action was brought by Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

2 Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

***Derivative Action - Royal Court of Guernsey (Civil Number 2479)***

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank, **National Association.**

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)***

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)***

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (19-34054)***

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

***General Litigation - District Court, Northern District of Texas (24-00498)***

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

***The Business Court of Texas First Division (25-BC01B-0004)***

138. Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

***United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)***

141. I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (Mr

**McCabe)**, who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals. DAF and I were frequently referred to as:

(a) as an alter ego of Dondero,

(b) part of Dondero's web of entities, and

(c) under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374 (Seyfarth Letter)**, which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation **(HDF)**, which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over".*

(c) DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d) We adopted institutional grade investment committee guidelines.

(e) We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f) By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148. I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149. However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150. Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151. It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury""*, with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*". To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above). In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

**E. RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ**

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero. In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been. Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses. These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III). DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement. As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose. On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**. DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185. As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024. It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations. I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186. For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187. Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (DAF 2)."* . I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188. The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

## F. RESPONSES TO FIRST AFFIDAVIT OF MR DONERO

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*
>
> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

"*The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy.*"

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

(a) Investment committee

(b) Investment advisors

(c) Investment houses and banks with investment functions

(d) Real estate advisors

(e) Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.

**SWORN** to at Wise Texas )
on this 4th day of June 2025 )
) **MARK ERIC PATRICK**

**BEFORE ME:** 132662714 08/27/2028

**NOTARY PUBLIC**

NOTARY PUBLIC STATE OF TEXAS
Shannara Franzel
ID NUMBER 132662714
COMMISSION EXPIRES August 27, 2028

Electronically signed and notarized online using the Proof platform.

**EXHIBIT E**

# REMITTANCE AGREEMENT

This Remittance Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO"). NexPoint Small Bay, Charitable DAF, and Liberty CLO are each referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Charitable DAF and Liberty CLO jointly previously provided temporary bridge funding and equity to NexPoint Small Bay, with repayment required in accordance with the Limited Liability Company Agreement of NexPoint Small Bay (the "DAF Bridge Equity"); and

WHEREAS, NexPoint Small Bay currently owes $8,265,050.74 to Charitable DAF and Liberty CLO, jointly, as repayment for the DAF Bridge Equity;

THEREFORE, for and in consideration of the payment, promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Payment to DAF.** On or before January 14, 2025, NexPoint Small Bay shall pay to Charitable DAF and Liberty CLO, jointly, the amount of $8,265,050.74 (the "DAF Bridge Equity Payment").

2. **Satisfaction and Release of Claims.** Charitable DAF and Liberty CLO each stipulates and agrees that the DAF Bridge Equity Payment will fully and completely satisfy all obligations arising out of or relating to the DAF Bridge Equity, that they each, upon receipt of the DAF Bridge Equity Payment, automatically and forever release and discharge NexPoint Small Bay and its affiliates, members, successors, and assigns, of and from all claims, demands, damages, liability, and responsibility, of any type or kind arising from or relating to the DAF Bridge Equity and/or their membership in NexPoint Small Bay, and Charitable DAF and Liberty CLO shall cease to be Members of NexPoint Small Bay and cease to have any rights under the Limited Liability Company Agreement of NexPoint Small Bay. Charitable DAF and Liberty CLO hereby provide any consent that is required by them under the Limited Liability Company Agreement of NexPoint Small Bay.

3. **Choice of Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

4. **Amendments; Waivers.** No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

5. **Binding Effect.** Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

6. **Entire Agreement.** The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the Parties acknowledge have been merged into this Agreement.

7. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Remittance Agreement as of the Effective Date set forth above and in the capacities set forth below.

**NREA SB II Holdings, LLC,**
a Delaware limited liability company

By: ______________________
Name: Anthony Scavo
Title: Authorized Signatory

CHARITABLE DAF HOLDINGS CORP.

By:______________________
Name:______________________
Title:______________________

LIBERTY CLO HOLDCO, LTD.

By:______________________
Name:______________________
Title:______________________

# REMITTANCE AGREEMENT

This Remittance Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO"). NexPoint Small Bay, Charitable DAF, and Liberty CLO are each referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, the Charitable DAF and Liberty CLO jointly previously provided temporary bridge funding and equity to NexPoint Small Bay, with repayment required in accordance with the Limited Liability Company Agreement of NexPoint Small Bay (the "DAF Bridge Equity"); and

WHEREAS, NexPoint Small Bay currently owes $8,265,050.74 to Charitable DAF and Liberty CLO, jointly, as repayment for the DAF Bridge Equity;

THEREFORE, for and in consideration of the payment, promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Payment to DAF.** On or before January 14, 2025, NexPoint Small Bay shall pay to Charitable DAF and Liberty CLO, jointly, the amount of $8,265,050.74 (the "DAF Bridge Equity Payment").

2. **Satisfaction and Release of Claims.** Charitable DAF and Liberty CLO each stipulates and agrees that the DAF Bridge Equity Payment will fully and completely satisfy all obligations arising out of or relating to the DAF Bridge Equity, that they each, upon receipt of the DAF Bridge Equity Payment, automatically and forever release and discharge NexPoint Small Bay and its affiliates, members, successors, and assigns, of and from all claims, demands, damages, liability, and responsibility, of any type or kind arising from or relating to the DAF Bridge Equity and/or their membership in NexPoint Small Bay, and Charitable DAF and Liberty CLO shall cease to be Members of NexPoint Small Bay and cease to have any rights under the Limited Liability Company Agreement of NexPoint Small Bay. Charitable DAF and Liberty CLO hereby provide any consent that is required by them under the Limited Liability Company Agreement of NexPoint Small Bay.

3. **Choice of Law; Jurisdiction; Venue.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

4. **Amendments; Waivers.** No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

5. **Binding Effect.** Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

6. **Entire Agreement.** The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the Parties acknowledge have been merged into this Agreement.

7. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Remittance Agreement as of the Effective Date set forth above and in the capacities set forth below.

NREA SB II Holdings, LLC

By:________________________
Name:______________________
Title:_______________________

CHARITABLE DAF HOLDINGS CORP.

By: [signature]
Name:______________________
Title:_______________________

LIBERTY CLO HOLDCO, LTD.

By: [signature]
Name:______________________
Title:_______________________

# EXHIBIT F

E-filed in the Office of the Clerk
for the Business Court of Texas
7/13/2025 5:09 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

Duane Morris®

*FIRM and AFFILIATE OFFICES*

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX +1 214 853 9480
*E-MAIL:* JMCox@duanemorris.com

*www.duanemorris.com*

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

July 11, 2025

Mr. Brian Shaw
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

*Sent via email*

**Re: The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
**Cause No. 25-BC01B-0027**
**Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

b. not take any action to increase the compensation paid to any employee of the Covered Entities;

c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide



Copy from re:SearchTX

purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

f. not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards,

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

Brian Shaw, Counsel for Defendants

JMC/kr
cc: (all via email)
Darren McCarty, Esq.
Craig Warner, Esq.
Clients



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Craig Warner on behalf of Craig Warner
Bar No. 24084158
CMWarner@duanemorris.com
Envelope ID: 103064824
Filing Code Description: Notice
Filing Description: Rule 11 Agreement
Status as of 7/14/2025 9:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/13/2025 5:09:31 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/13/2025 5:09:31 PM | SENT |



Copy from re:SearchTX

# EXHIBIT G

*Execution Version*

# THIRTEENTH AMENDMENT TO SENIOR SECURED TERM LOAN CREDIT AGREEMENT

THIRTEENTH AMENDMENT TO SENIOR SECURED TERM LOAN CREDIT AGREEMENT, dated September 30, 2025 (this "Amendment"), is by and among MIDWAVE WIRELESS, INC. (f/k/a TERRESTAR CORPORATION) (the "Borrower"), MIDWAVE WIRELESS COMMUNICATIONS, LLC (F/K/A MOTIENT COMMUNICATIONS LLC), MIDWAVE WIRELESS HOLDINGS, INC. (F/K/A MOTIENT HOLDINGS INC.), MIDWAVE WIRELESS HOLDINGS I, INC. (F/K/A MVH HOLDINGS I INC.), 2014 AWS SPECTRUM PARTNERSHIP, LP, 2014 AWS SPECTRUM BIDCO CORPORATION, as guarantors (each a "Guarantor" and, collectively, the "Guarantors" and together with the Borrower, the "Loan Parties"), the Lenders party hereto (in such capacity, the "Consenting Lenders"), and NEXBANK, FKA NEXBANK SSB, as agent for the Lenders (in such capacity, the "Administrative Agent").

## WITNESSETH:

WHEREAS, the Loan Parties, Administrative Agent and the Lenders have entered into that certain Senior Secured Term Loan Credit Agreement, dated as of February 27, 2015, as amended and restated pursuant to that certain First Amendment, dated as of October 25, 2017, and as amended and restated pursuant to that certain Second Amendment, dated as of March 19, 2018, and as amended by that certain Third Amendment, dated as of August 1, 2018, that certain Fourth Amendment, dated May 15, 2019, that certain Fifth Amendment, dated as of May 15, 2020, that certain Sixth Amendment, dated as of December 29, 2020, that certain Seventh Amendment, dated as of July 6, 2021, that certain Eighth Amendment, dated as of August 5, 2021, that certain Ninth Amendment, dated as of June 30, 2023, that certain Tenth Amendment, dated as of November 7, 2024, that certain Eleventh Amendment, dated as of January 31, 2025, and that certain Twelfth Amendment, dated as of May 14, 2025 (as further amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement" and as amended by this Amendment, the "Credit Agreement"), pursuant to which the Lenders have made and may make loans and advances and provide other financial accommodations to the Borrower as set forth in the (x) Existing Credit Agreement and (y) other Loan Documents;

WHEREAS, pursuant to the Existing Credit Agreement, the Financing Fee Effective Date is October 1, 2025;

WHEREAS, pursuant to the Existing Credit Agreement, the Borrower agreed to pay to each Tenth Amendment Consenting Lender (other than the Specified Lender) a financing fee equal to 9.0% of the principal amount of the Loans held by such Tenth Amendment Consenting Lender on such Financing Fee Effective Date, which shall be payable in kind, capitalized, compounded and added to the unpaid principal amount of the Tranche J Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date (the "Existing Financing Fee Requirement");

WHEREAS, the Borrower has requested that the Consenting Lenders agree to amend the timing and mechanics of the Existing Financing Fee Requirement with respect to the Loans held by such Consenting Lender on the terms and subject to the conditions set forth herein and in the Credit Agreement;

WHEREAS, the Consenting Lenders are willing to agree to such amendments to the Existing Credit Agreement on the terms and subject to the conditions set forth herein; and

WHEREAS, by this Amendment, the undersigned parties desire and intend to evidence such amendments;

NOW THEREFORE, in consideration of the foregoing and the mutual agreements and covenants contained herein and in the Credit Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Consents; etc. Each of the Consenting Lenders and the Loan Parties consents to and approves this Amendment, the amendments to the Existing Credit Agreement effected hereby, and the Credit Agreement as amended by this Amendment.

2. Amendment to Existing Credit Agreement.

(a) Section 1.1 of the Existing Credit Agreement is hereby amended to add thereto, in alphabetical order, the following definitions which shall read in full as follows:

"*Financing Fee PIK Interest*" means PIK Interest applicable to 9.0% of the principal amount of the Loans held by a Tenth Amendment Consenting Lender for the period beginning on October 1, 2025, and ending on the Financing Fee Effective Date.

(b) Section 1.1 of the Existing Credit Agreement is hereby amended by amending and restating the definition of "Financing Fee Effective Date" in its entirety as follows:

"*Financing Fee Effective Date*" means December 15, 2025.

(c) Section 2.9(c) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"(c) *Financing Fee.* The Borrower agrees to pay to each Tenth Amendment Consenting Lender (other than the Specified Lender) on the Financing Fee Effective Date a financing fee equal to (i) 9.0% of the principal amount of the Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date (after adding Financing Fee PIK Interest to the principal amount of the Loans held by such Tenth Amendment Consenting Lender) *plus* (ii) Financing Fee PIK Interest (collectively, the "*Financing Fee*"), which shall be payable in kind, capitalized, compounded and added to the unpaid principal amount of the Tranche J Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date; provided, that any assignment of Loans by any Tenth Amendment Consenting Lender effected following the Tenth Amendment Effective Date shall be deemed to include an assignment of the right to receive any Financing Fee on account of such Loans."

3. Interpretation. For purposes of this Amendment, all terms used herein which are not otherwise defined herein, including but not limited to, those terms used in the recitals hereto, shall have the respective meanings assigned thereto in the Existing Credit Agreement as amended

by this Amendment.

4. Representations and Warranties by Loan Parties. The Borrower and the Guarantors, jointly and severally, represent and warrant to the Administrative Agent and the Lenders as follows, which representations and warranties shall survive the execution and delivery hereof:

(a) no Default or Event of Default has occurred and is continuing as of the date hereof before and after giving effect to this Amendment;

(b) the Borrower and each Guarantor has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Amendment, and this Amendment has been duly executed and delivered by the Borrower and each Guarantor, and constitutes a legal, valid and binding obligation of the Borrower and each Guarantor, enforceable against such Borrower or Guarantor in accordance with its terms, except as enforceability may be limited by applicable domestic or foreign bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(c) the execution, delivery and performance of this Amendment by the Borrower or any Guarantor will not violate any Requirement of Law or Contractual Obligation of such Borrower or Guarantor in any respect that has or could reasonably be expected to have a Material Adverse Effect; and

(d) all of the representations and warranties set forth in the Existing Credit Agreement and the other Loan Documents, as amended hereby, are true and correct in all material respects (or, with respect to any representation or warranty that is itself modified or qualified by materiality or "Material Adverse Effect" standard, such representation or warranty shall be true and correct in all respects) on and as of the date hereof, as if made on the date hereof, except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

5. Conditions Precedent. The amendments contained herein shall only be effective on the date on which each of the following conditions precedent are satisfied or waived (the "Thirteenth Amendment Effective Date"):

(a) the Administrative Agent shall have received counterparts of this Amendment, duly authorized, executed and delivered by each of the Loan Parties;

(b) the Administrative Agent shall have received counterparts of this Amendment, duly authorized, executed and delivered by the Consenting Lenders constituting each of the Lenders;

(c) no Default or Event of Default shall exist or have occurred and be continuing (after giving effect to the provisions of this Amendment); and

(d) the representations and warranties of each of the Loan Parties contained in this Amendment and each other Loan Document shall be true and correct in all material respects

(or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) on and as of the Thirteenth Amendment Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) as of such earlier date.

6. Reaffirmation of the Guaranty and Collateral Documents.

(a) Each Loan Party (i) confirms, ratifies and reaffirms its respective obligations under the guaranty described in Article XI of the Credit Agreement (the "Guaranty"), (ii) agrees that the Guaranty remains valid, binding and enforceable in all respects against such Loan Party and that the Guaranty shall continue to be in full force and effect, with the same force, effect and priority in effect immediately prior to the Thirteenth Amendment Effective Date, and (iii) agrees to continue to comply with, and be subject to, all of the terms, provisions, conditions, covenants, agreements and obligations applicable to it as set forth in the Guaranty;

(b) Each Loan Party confirms, ratifies and reaffirms (i) its respective obligations under the Collateral Documents to which it is a party and (ii) the security interest granted in all of its right, title and interest in, to and under the Collateral under each Collateral Document to which it is a party;

(c) Each Loan Party agrees that each Collateral Document to which it is a party remains valid, binding and enforceable in all respects against such Loan Party and the security interests granted by it therein shall continue to be in full force and effect, with the same force, effect and priority in effect immediately prior to the Thirteenth Amendment Effective Date; and

(d) Each Loan Party agrees, acknowledges and reaffirms all the covenants and agreements contained in each Collateral Document to which it is a party.

All of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Credit Agreement and the other Loan Documents, in each case, as amended by this Amendment.

7. Effect of this Amendment; No Novation. Except as expressly set forth herein, no other amendments, changes or modifications to the Loan Documents are intended or implied, and in all other respects the Loan Documents are hereby specifically ratified, reaffirmed and confirmed by each Loan Party as of the Thirteenth Amendment Effective Date and the Loan Parties shall not be entitled to any other or further amendment by virtue of the provisions of this Amendment or with respect to the subject matter of this Amendment. To the extent of conflict between the terms of this Amendment and the other Loan Documents, the terms of this Amendment shall control. The Credit Agreement and this Amendment shall be read and construed as one agreement. On and after the Thirteenth Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import, and each reference in the other Loan Documents to the Credit Agreement, shall mean and be a reference to the Credit Agreement as amended by this Amendment. The parties hereto acknowledge and agree that this Amendment and the other Loan Documents, whether executed and delivered in connection

herewith or otherwise, do not constitute a novation, satisfaction, payment, re-borrowing or termination of the "Obligations" under the Existing Credit Agreement or the other Loan Documents, and that all such "Obligations" under the Existing Credit Agreement or the other Loan Documents are in all respects continued and outstanding as "Obligations" under the Credit Agreement, except to the extent such obligations are modified from and after the Thirteenth Amendment Effective Date as provided in this Amendment or otherwise paid in full on the Thirteenth Amendment Effective Date.

8. Governing Law. This Amendment and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York without giving effect to any provision thereof that would require the application of the law of another jurisdiction.

9. Binding Effect. This Amendment shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

10. Further Assurances. The Borrower and the Guarantors shall execute and deliver such additional documents and take such additional action as may be reasonably requested by the Administrative Agent to effectuate the provisions and purposes of this Amendment.

11. Entire Agreement. This Amendment represents the entire agreement and understanding concerning the subject matter hereof among the parties hereto, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.

12. Headings. The headings listed herein are for convenience only and do not constitute matters to be construed in interpreting this Amendment.

13. Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Amendment by facsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Amendment. Any party delivering an executed counterpart of this Amendment by facsimile or other electronic method of transmission shall also deliver an original executed counterpart of this Amendment, but the failure to do so shall not affect the validity, enforceability, and binding effect of this Amendment.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Limited Waiver to be duly executed and delivered by their authorized officers as of the day and year first above written.

**MIDWAVE WIRELESS, INC.,** as the Borrower

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS COMMUNICATIONS LLC,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS HOLDINGS INC.,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS HOLDINGS I INC.,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

*[Signature Page to Thirteenth Amendment]*

**2014 AWS SPECTRUM BIDCO CORPORATION,** as a Guarantor

By: ______________________________
Name: John Dooley
Title: President and Chief Executive Officer

**2014 AWS SPECTRUM PARTNERSHIP, LP,** as a Guarantor

By: Jarvinian AWS3 LLC, its General Partner

By: ______________________________
Name: John Dooley
Title: Manager

[*Signature Page to Thirteenth Amendment*]

**NEXBANK, FKA NEXBANK SSB,** as Administrative Agent

By: ______________________________
Name: Rhett Miller
Title: EVP - Chief Banking Officer

**CONSENTING LENDERS:**

CEDARVIEW OPPORTUNITIES MASTER FUND, LP, as Consenting Lender

By: [signature]
Name: Burton Weinstein
Title: Managing Partner

*[Signature Page to Thirteenth Amendment]*

**CONSENTING LENDERS:**

JAMES PALLOTTA, as Consenting Lender

By: /s/ Pallotta
Name: James J. Pallotta
Title:

**CONSENTING LENDERS**:

L-BAND FUND II, LP, as Consenting Lender

By: ______________________________
Name: Thomas P. Eddy
Title: Member of L-Band Fund II GP LLC, the General Partner of L-Band Fund II, LP

L-BAND TARGET FUND, LP, as Consenting Lender

By: ______________________________
Name: Thomas P. Eddy
Title: Member of L-Band Target Fund GP, LLC, the General Partner of L-Band Target Fund, LP

**CONSENTING LENDERS:**

SIC I LLC FKA SOLUS INVESTMENT CO LLC, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLA LTD, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS ADVISORS LLC, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS LONG-TERM OPPORTUNITIES FUND MASTER LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 1 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 4 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 5 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES IDF SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, L.P., as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS CORE OPPORTUNITIES LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

ULTRA MASTER LTD., as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

ULTRA NB LLC, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

**CONSENTING LENDERS**:

**CLO HOLDCO, LTD.**, as Consenting Lender

By: ______________________________
Name: Mark Patrick
Title: Director

**CONSENTING LENDERS:**

TRUST UNDER THE KODAK RETIREMENT PLAN
TRUST, as Consenting Lender

By: ______________________________
Name: Chris Klapinsky
Title: Partner, NEPC, LLC

[*Signature Page to Thirteenth Amendment*]

Case 1:26-cv-01652-JPB Document 14-1 Filed 02/27/26 Page 18 of 20

**CONSENTING LENDERS:**

THE IBS OPPORTUNITY FUND, LTD., as Consenting Lender

By: ______________________________
Name: JAMES S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS INVESTMENT MANAGER

THE IBS TURNAROUND FUND (QP) (A LIMITED PARTNERSHIP), as Consenting Lender

By: ______________________________
Name: JAMES S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS GENERAL PARTNER

THE IBS TURNAROUND FUND, L.P., as Consenting Lender

By: ______________________________
Name: JAMES. S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS GENERAL PARTNER

*[Signature Page to Thirteenth Amendment]*

**CONSENTING LENDERS**:

**OCM TRSTR Holdings, LLC** as Consenting Lender

By: Oaktree Fund GP, LLC
Its: Manager

By: Oaktree Fund GP I, L.P.
Its: Managing Member

Signed by:
By: Sherman Lau
905F9317BF544D7...
Name: Sherman Lau
Title: Authorized Signatory

DocuSigned by:
By: David Nicoll
80EF4EE2BE4F41F...
Name: David Nicoll
Title: Authorized Signatory

**CONSENTING LENDERS**:

WARANA SP USA VI-A LLC, as Consenting Lender

By: Grant Gillespie (Sep 26, 2025 10:31:46 EDT)
Name: Grant Gillespie
Title: Authorized Signatory

**EXHIBIT H**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **LIBERTY CLO HOLDCO, LTD.**<br><br>*Plaintiff*,<br><br>**v.**<br><br>**NANCY DONDERO, as Trustee of The Dugaboy Investment Trust, GRANT JAMES SCOTT as Trustee of The SLHC Trust, NEXPOINT ADVISORS, L.P., NEXPOINT ADVISORS GP, LLC, NEXPOINT REAL ESTATE ADVISORS IV, L.P. and NEXPOINT REAL ESTATE ADVISORS GP, LLC,**<br><br>*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 1:25-cv-00236-JLH** |

**STIPULATION AND [PROPOSED]**
**ORDER OF DISMISSAL WITH PREJUDICE**

WHEREAS, on February 28, 2025, Plaintiff Liberty CLO HoldCo, Ltd. ("Plaintiff") commenced the above-captioned action and filed its Complaint and supporting documents (D.I. 1); and

WHEREAS, on March 25, 2025, Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant Scott, as Truste of the SLHC Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estate Advisors IV, L.P., and NexPoint Real Estate Advisors GP, LLC (collectively, "Defendants") filed their Answers (D.I. 19-23);

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their undersigned counsel and subject to approval of the Court, that:

1. The Complaint in the above-captioned action is dismissed with prejudice.

2. Upon the Court's approval of this Stipulation and [Proposed] Order of Dismissal with Prejudice, the above-captioned action shall hereby be closed.

Dated: December 3, 2025

DORSEY & WHITNEY (DELAWARE) LLP

By: */s/ Eric Lopez Schnabel*
Eric Lopez Schnabel (DE Bar No. 3672)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail: *schnabel.eric@dorsey.com*

-and-

Brian Shaw (*admitted pro hac vice*)
Texas Bar No. 24053473
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3003
E-mail: bshaw@ccsb.com

Monica Gaudioso (*admitted pro hac vice*)
Texas Bar No. 24084570
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3088
E-mail: mgaudioso@ccsb.com

**ATTORNEYS FOR PLAINTIFF LIBERTY CLO HOLDCO, LTD.**

**HOGAN MCDANIEL**

By: */s/ Daniel K. Hogan*
Daniel K. Hogan
DE Bar No. 2814
1311 Delaware Avenue, Ste. 1
Wilmington, Delaware 19806
Telephone: (302) 656-7540
Facsimile: (302) 656-7599
Email: dkhogan@dkhogan.com

**STINSON LLP**

Deborah Deitsch-Perez
Texas Bar No. 24036072
deborah.deitschperez@stinson.com
(*admitted pro hac vice*)

Jeffrey T. Prudhomme
Texas Bar No. 24053696
jeff.prudhomme@stinson.com
(*admitted pro hac vice*)

2200 Ross Ave, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Telecopier: (214) 560-2203

**ATTORNEYS FOR DEFENDANTS**

IT IS SO ORDERED THIS __ day of _____________, 2025

_______________________________
The Honorable Jennifer L. Hall

**EXHIBIT I**

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
12/8/2025

| | | |
|---|---|---|
| ATLAS IDF, LP,<br><br>Plaintiff,<br><br>v.<br><br>NEXPOINT REAL ESTATE PARTNERS, LLC f/k/a HCRE PARTNERS, LLC, and NANCY DONDERO, as Trustee of The Dugaboy Investment Trust,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | THE BUSINESS COURT OF TEXAS<br>FIRST DIVISION<br><br>Cause No. 25-BC01B-0004 |

## AGREED FINAL JUDGMENT

The Court considered the Traditional Motion for Summary Judgment (the "Motion")[1] filed by Plaintiff Atlas IDF, LP ("Atlas") on September 29, 2025, the response and reply, the admitted summary-judgment evidence, the pleadings in this case, and the agreement of the parties reflected by this Agreed Final Judgment.

The Court concludes that the Motion should be granted and the parties' agreement honored, such that Atlas is entitled to final judgment against Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NexPoint") as set forth below.

[1] All defined terms in the Motion are incorporated herein.



Copy from re:SearchTX

Accordingly, the Court therefore RENDERS final judgment in favor of Atlas on its claims for breach (1) of the $2.3M Note, and (2) the $5M Note against NexPoint.

It is ORDERED, Adjudged, and Decreed that Atlas shall recover the following amounts from NexPoint:

1. Damages on the $2.3M Note, calculated as follows: $4,583,477.85 in accrued but unpaid principal and interest due as of October 27, 2025; with pre-judgment interest on that amount at the rate of 8.00% annually, accruing at $967.71 per day beginning on October 27, 2025, until the day before the date of this Agreed Final Judgment;

2. Damages on the $5M Note, calculated as follows: $9,955,549.91 in accrued but unpaid principal and interest due as of October 27, 2025; with pre-judgment interest on that amount at the rate of 8.00% annually, accruing at $2,105.25 per day beginning on October 27, 2025, until the day before the date of this Agreed Final Judgment;

3. Atlas's reasonable and necessary pre-judgment attorneys' fees in the amount of $136,834.50;



Copy from re:SearchTX

4. Conditional post-judgment and appellate fees as follows:

a. $19,791.75 if NexPoint files an unsuccessful motion for new trial;

b. $118,750.50 if NexPoint files an unsuccessful appeal to the Court of Appeals;

c. $59,375.25 if NexPoint files an unsuccessful petition for review to the Supreme Court of Texas if a response to the petition for review is filed;

d. $118,750.50 if NexPoint files an unsuccessful petition for review to the Supreme Court of Texas if a brief on the merits is also filed; and

e. $79,167.00 if NexPoint files an unsuccessful appeal to the Supreme Court of Texas if the petition for review is granted and oral argument is presented;

5. Costs of court; and

6. Post-judgment interest on all amounts due under this Agreed Final Judgment at the contractual rate of 8.00% pursuant to Texas Finance Code § 304.002, beginning on the date this Agreed Final Judgment is rendered.



Copy from re:SearchTX

It is ORDERED, Adjudged, and Decreed that NexPoint shall pay to Atlas the net proceeds due to NexPoint from the sale of any of its assets to satisfy this Agreed Final Judgment until paid in full.

It is ORDERED, Adjudged, and Decreed that Atlas shall have all writs of process and orders necessary to execute on and enforce this Agreed Final Judgment.

This Agreed Final Judgment finally disposes of all claims, all causes of action, and all parties before the Court in this case. To the extent not addressed herein or in a prior order of the Court, all other relief requested by the parties is denied. This final judgment is appealable.

NexPoint waives all rights to appeal this Agreed Final Judgment.

It is SO ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: December 8, 2025



Copy from re:SearchTX

**AGREED AS TO FORM, ENTRY, AND AS A CONSENT/AGREED JUDGMENT:**

By: *\/s/ Brian P. Shaw*
Brian P. Shaw, counsel for
Plaintiff Atlas IDF, LP

By: *\/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez, counsel
for Defendant NexPoint Real
Estate Partners f/k/a HCRE
Partners, LLC



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108824009
Filing Code Description: No Fee Documents
Filing Description: Agreed Final Judgment
Status as of 12/8/2025 10:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Deborah Deitsch-Perez | | deborah.deitschperez@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Deborah Deitsch-Perez | | deborah.deitschperez@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jeff Prudhomme | | jeff.prudhomme@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jeff Prudhomme | | jeff.prudhomme@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Monica E.Gaudioso | | mgaudioso@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Andrea C.Reed | | areed@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 12/8/2025 10:43:10 AM | SENT |
| Team Email | | DAL.LSSTeam2@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jacob Gaslin | | jacob.gaslin@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 12/8/2025 10:43:10 AM | SENT |

Copy from re:SearchTX

**EXHIBIT J**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 15 |
| CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1] | Case No. 25-11376 (___) |
| Debtor in a foreign proceeding. | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 2

BACKGROUND ..... 5

A. Overview of HoldCo and its Stakeholders ..... 5

i. The Charitable Structure ..... 7

B. Overview of the Fund ..... 9

C. Key Transactions Precipitating the Debtor's Liquidation ..... 10

i. The Relevant Transactions ..... 10

(A) The LP/LLC Exchange ..... 11

(B) DFW Share Issuance ..... 12

(C) Redemption ..... 13

ii. The Remuneration Transactions ..... 15

D. Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations ..... 16

E. The Cayman Proceeding ..... 20

i. Conduct of the Cayman Proceeding ..... 21

ii. Commencement of the Cayman Litigation ..... 23

iii. Injunction Application ..... 27

1. Serious Issues to be Tried ..... 29

2. Balance of convenience ..... 29

3. Disclosure of assets ..... 32

4. Cross undertaking in damages ..... 33

F. The Texas Proceeding ..... 33

G. This Chapter 15 Case ..... 35

JURISDICTION AND VENUE ..... 36

RELIEF REQUESTED .......... 38

BASIS FOR RELIEF REQUESTED .......... 39

A. HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code .......... 39

B. The Cayman Proceeding is a Foreign Main Proceeding .......... 41

i. The Cayman Proceeding Constitutes a "Foreign Proceeding" .......... 42

ii. The Cayman Proceeding is a "Foreign Main Proceeding" .......... 45

C. In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding .......... 49

D. The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code .......... 50

E. The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code .......... 51

F. The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code .......... 52

G. The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code .......... 53

i. The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7) .......... 53

ii. Injunctive Relief is Appropriate .......... 54

iii. Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action .......... 56

H. The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity .......... 59

I. Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code .......... 63

i. Legal Standard for Relief Under Sections 1521(a)(7) and 1507 .......... 63

ii. Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code .......... 66

J. Granting the Relief Requested herein, Including Recognition of the Cayman

Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S. Public Policy ........ 68

NOTICE ........ 69

CONCLUSION ........ 1

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re ABC Learning Ctr's, Ltd.*,
445 B.R. 318 (Bankr. D. Del. 2010) ....... 43, 57, 62

*Ackerman v. Levine*,
788 F.2d 830 (2d Cir. 1986) ....... 62

*Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*,
701 F.3d 1031,1057 (5th Cir. 2012) ....... 64

*In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*,
303 B.R. 1 (Bankr. S.D.N.Y. 2003) ....... 40

*In re Agrokor*,
591 B.R. 163 (Bankr. S.D.N.Y. 2018) ....... 60, 64

*In re Air Berlin PLC & Co. Luftverkehrs KG*,
No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017) ....... 54

*In re AJW Offshore Ltd.*,
488 B.R. 551 (Bankr. E.D.N.Y. 2013) ....... 57

*American Film Technologies v. Taritero (In re American Film Technologies)*,
175 B.R. 847 (Bankr. D. Del. 1994) ....... 66

*Amezcua v. Cortez*,
No. 3D20- 1649 (Fla. 3d DCA Jan. 13, 2021) ....... 65

*In re Ascot Fund Ltd.*,
603 B.R. 271 (Bankr. S.D.N.Y. 2019) ....... 46

*In re Ashapura Minechem Ltd.*,
480 B.R. 129 (S.D.N.Y. 2012) ....... 62

*In re Atlas Shipping A/S*,
404 B.R. 726 (Bankr. S.D.N.Y. 2009) ....... 59, 60

*In re Avanti Comms. Grp. PLC*,
582 B.R. 603 (Bankr. S.D.N.Y. 2018) ....... 65

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007) ....... 45, 49, 59

*In re Bemarmara Consulting A.S.*,
Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013) ....39, 40

*In re Berau Capital Res. PTE*,
540 B.R. 80 (Bankr. S.D.N.Y. 2015) ....37, 40

*In re Betcorp Ltd.*,
400 B.R. 266 (Bankr. D. Nev. 2009) ....42, 43

*In re British American*,
488 B.R. 205 (Bankr. S.D. Fla 2013) ....60

*In re Cell C Proprietary Ltd.*,
571 B.R. 542 (Bankr. S.D.N.Y. 2017) ....63, 65

*Cermesoni v. Maneiro*,
144 So. 3d 627 (Fla. 3d DCA 2014) ....65

*Clarkson v. Coughlin*,
898 F. Supp. 1019 (S.D.N.Y. 1995) ....54

*CohnReznick LLP v. Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*,
2018 U.S. LEXIS 109684 (S.D.N.Y. 2018) ....58

*In re Comair Ltd.*,
No. 21-10298(JLG), 2021 Bankr. LEXIS 3137 (Bankr. S.D.N.Y. Nov. 14, 2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS 6146 (S.D.N.Y. Jan. 12, 2023) ....56

*In re Countrywide Home Loans, Inc.*,
384 B.R. 373 (Bankr. W.D. Pa. 2008) ....57

*In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*,
2025 Bankr.LEXIS 751 (Bankr. D. Del. April 1, 2025) ....59

*CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*,
482 B.R. 96 (Bankr. S.D.N.Y. 2012) ....60

*In re Daebo Int'l Shipping Co., Ltd.*,
543 B.R. 47 (Bankr. S.D.N.Y. 2015) ....63

*Daewoo Motor America, Inc. v. General Motors Corp.*,
459 F.3d 1249 (11th Cir. 2006) ....61

*Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*,
737 F.3d 238 (2d Cir. 2013) ....40

*In re Farfetch Limited (in Official Liquidation)*,
Case No. 24-11519 (CTG) (Bankr. D. Del. 2024)....................37, 45

*Flynn v. Wallace (In re Irish Bank Resolution Corp. (In Special Liquidation))*,
538 B.R. 692 (D. Del. 2015)....................46

*In re Foreign Econ. Indus. Bank*,
607 B.R. 160 (Bankr. S.D.N.Y. 2019)....................41

*In re Frontera Resources Caucasus Corp. and David Griffin*,
No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019)....................53

*In re Garcia Avila*,
296 B.R. 95 (Bankr. S.D.N.Y. 2003)....................54

*In re Global Ocean Carriers Ltd.*,
251 B.R. 31 (Bankr. D. Del. 2000)....................37

*Gorsoan Ltd. v. Bullock*,
No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021)....................65

*In re Hughes*,
281 B.R. 224 (Bankr. S.D.N.Y. 2002)....................56, 57

*In re IIG Glob. Trade Fin. Fund Ltd.*,
No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27, 2023)....................45

*In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 (Bankr. S.D.N.Y. Aug. 19, 2011)....................56, 57

*In re Ir. Bank Resolution Corp. (In Special Liquidation)*,
2014 Bankr. LEXIS 1990 (D. Del. April 30, 2014)....................42, 47

*In re Kane*,
628 F.3d 631 (3d Cir. 2000)....................56

*Markus v. Rozhkov*,
615 B.R. 679 (S.D.N.Y. 2020)....................56

*In re Markus*,
607 B.R. 379 (Bankr. S.D.N.Y. 2019)....................56, 63

*In re Metcalfe & Mansfield Alternative Investments*,
421 B.R. 685 (Bankr. S.D.N.Y.2010)....................60, 62

*In re Millard*,
501 B.R. 644 (Bankr. S.D.N.Y. 2013)....................44

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
471 B.R. 342 (Bankr. S.D.N.Y. 2012) .....56

*In re MMG LLC*,
256 B.R. 544 (Bankr. S.D.N.Y. 2000) .....54

*In re Modern Land (China) Co.*,
641 B.R. 768 (Bankr. S.D.N.Y. 2022) .....45

*Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*,
714 F.3d 127 (2d Cir. 2013) .....46, 48

*Nahar v.Nahar*,
656 So. 2d 225 .....65

*In re Neves*,
570 B.R. 420 (Bankr. S.D. Fla. 2017) .....61

*In re Northshore Mainland Servs., Inc.*,
537 B.R. 192 (Bankr. D. Del. 2015) .....40

*In re Ocean Rig UDW Inc.*,
570 B.R. 687 (Bankr. S.D.N.Y. 2017) .....43, 46

*In re Octaviar Admin Pty.*,
511 B.R. 361 (Bankr. S.D.N.Y. 2014) .....37

*In re Oi S.A.*,
587 B.R. 253 (Bankr. S.D.N.Y. 2018) .....60, 61, 63

*In re Olinda Star, Ltd.*,
614 B.R. 28 (Bankr. S.D.N.Y. 2020) .....64, 65

*In re Orion Healthcorp, Inc.*,
596 B.R. 228 (Bankr. E.D.N.Y. 2019) .....57

*In re Overnight and Control Comm'n of Avánzit, S.A.*,
385 B.R. 525 (Bankr. S.D.N.Y. 2008) .....42, 45

*In re Platinum Partners Value Arbitrage Fund L.P.*,
583 B.R. 803 (Bankr. S.D.N.Y. 2018) .....56, 57, 58

*Principal Growth Strategies, LLC v. AGH Parent LLC*,
615 B.R. 529 (D. Del. 2020) .....44

*In re Recoton Corp.*,
307 B.R. 751 (Bankr. S.D.N.Y. 2004) .....57

*In re Rede Energia, S.A.*,
515 B.R. 69 (Bankr. S.D.N.Y. 2014)....59, 60, 62, 65

*In re Silicon Valley Bank (Cayman Islands Branch)*,
658 B.R. 75 (Bankr. S.D.N.Y. 2024)....43

*In re SphinX, Ltd.*,
351 B.R. 103 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007)....50, 59

*In re Suntech Power Holdings Co.*,
520 B.R. 399 (Bankr. S.D.N.Y. 2014)....37, 45, 46, 48

*Swartzwelder v. McNeilly*,
297 F.3d 228 (3d Cir. 2002)....66

*In re Symington*,
209 B.R. 678 (Bankr. D. Md. 1997)....57

*Tahan v. Hodgson*,
662 F.2d 862 (D.C. Cir. 1981)....61

*In re Talal Qais Abdulmunem Al Zawawi*,
634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024)....39

*In re U.S. Steel Canada Inc.*,
571 B.R. 600 (Bankr. S.D.N.Y. 2017)....63

*Ungaro-Benages v. Dresdner Bank AG*,
379 F.3d 1227 (11th Cir. 2004)....61

*In re Wilson*,
413 B.R. 330 (Bankr. E.D. La. 2009)....57

*In re Zais Inv. Grade Ltd. VII*,
455 B.R. 839 (Bankr. D.N.J. 2011)....40

**Statutes**

11 U.S.C. § 101(15)....39

11 U.S.C. § 101(24)....50

11 U.S.C. § 105(a)....59, 66

11 U.S.C. § 109(a)....40

11 U.S.C. § 542(e)....56

11 U.S.C. § 1501 .....39, 60

11 U.S.C. § 1501(a) .....45, 69

11 U.S.C. § 1501(b)(1) .....45

11 U.S.C. § 1502(1) .....39

11 U.S.C. § 1502(2) .....49

11 U.S.C. § 1502(4) .....46

11 U.S.C. § 1502(5) .....49, 50

11 U.S.C. § 1506 .....62

11 U.S.C. § 1507 .....59

11 U.S.C. § 1507(a) .....64

11 U.S.C. § 1509(b)(3) .....60

11 U.S.C. § 1517(a)(2) .....50

11 U.S.C. § 1517(b)(1) .....41, 46

11 U.S.C. § 1517(b)(2) .....49

11 U.S.C. § 1520(a) .....52, 53

11 U.S.C. § 1521 .....52

11 U.S.C. § 1521(a)(7) .....58, 59, 63, 66

11 U.S.C. § 1521(e) .....54

11 U.S.C. § 1522 .....52, 63

**Regulations**

*In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10, 2020) .....44

**Other Authorities**

H.R. Rep. No. 109-31(I), (2005) .....62

H.R. Rep. No. 109-31, pt. 1 ....................61

H.R. Rep. No. 109-31, pt. 1 (2005)....................64

Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq., *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis* ....................41

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators (the "JOLs") of Charitable DAF HoldCo, Ltd (In Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"),[2] which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith"), respectfully submit the *Official Form 401 Chapter 15 Petition for Recognition of a Foreign Proceeding* (ECF No. 1) and this *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (together, the "Petition"), the accompanying Declaration of Caroline Moran executed on July 21, 2025 (the "Moran Decl."), and the Declaration of Margot MacInnis executed on July 21, 2025 (the "MacInnis Decl." and, together with the Moran Decl., the "Declarations"), for entry of an order (the "Proposed Order"), substantially in the form attached hereto as Exhibit A, pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"): (a) recognizing the Cayman Proceeding as a foreign main proceeding under sections 1515 and 1517 of the Bankruptcy Code; (b) recognizing the Petitioners as the Debtor's foreign representatives under sections 101(24), 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

[2] Entitled *In the matter of section 131 of the Companies Act (2025 Revision) and in the matter of Charitable DAF HoldCo Ltd* FSD 116 of 20256 (JAJ).

## PRELIMINARY STATEMENT[3]

1. On May 6, 2025, the Cayman Court appointed the JOLs, in their capacity as independent fiduciaries and court officers, to liquidate HoldCo under its supervision. Under Cayman law, the JOLs' duties include the collection, realization and distribution of the assets of HoldCo to its creditors and, if there is a surplus, to equity holders. Cayman law affords the JOLs authority to investigate HoldCo's business and affairs in furtherance of their duties.

2. HoldCo is a Cayman Islands exempted company, formed in 2011 to serve as the sole limited partner of the Charitable DAF Fund, LP (the "Fund"), a Cayman Islands exempted limited partnership established to manage investments for the benefit of certain U.S. tax-exempt charitable organizations. For more than a decade, HoldCo facilitated significant charitable activity in the United States by distributing profits realized from the Fund's investment portfolio, which maintained a net asset value of approximately $270 million, to its ultimate, beneficial interest holders: four large, well established charities serving communities in need in the United States.

3. Beginning in 2024, HoldCo's directors, Mr. Mark Patrick and Mr. Paul Murphy, executed a series of complex, interrelated transactions—without the knowledge of HoldCo's beneficial interest holders—that resulted in the dilution of HoldCo's beneficial interest holders' stake in HoldCo from 100% to under 50% and the divestment of HoldCo's interest in the Fund in exchange for a membership interest in a Delaware limited liability company that was purported to be redeemed for the sum of approximately $1.6 million. These transactions occurred not long after Mr. Patrick had approved significant increases in his remuneration package.

[3] Capitalized terms used in this section but not otherwise defined shall have the meanings ascribed to them elsewhere in this Petition.

4. Since their appointment on May 6, 2025, the JOLs have conducted an extensive investigation, which is ongoing, into the facts and circumstances regarding these transactions. Based on the evidence amassed by the JOLs to date, on July 14, 2025, the Cayman Court granted leave to the JOLs to bring claims on behalf of HoldCo against Mr. Patrick, Mr. Murphy and certain other defendants for breaches of fiduciary and other duties, unlawful means conspiracy, unjust enrichment, restitution and other equitable relief and damages by way of filing a "Writ and Statement of Claim" (the "Statement of Claim"). On July 15, 2025, HoldCo proceeded to file the Statement of Claim with the Cayman Court, commencing litigation. At the same time, HoldCo filed an application for (a) a proprietary injunction to prevent the defendants from dealing with HoldCo's assets that are now held or controlled by the defendants together with disclosure orders (the "Injunction Application") and (b) leave to serve US-based defendants the Statement of Claim and the Injunctive Relief Application (the "Leave to Serve Application" and, together with the Injunctive Relief Application, the "Applications"). The Applications have been listed for hearing on July 31, 2025.

5. The Petitioners now commence this case under chapter 15 of the Bankruptcy Code (this "Chapter 15 Case") to obtain recognition of the Cayman Proceeding as a foreign main proceeding under chapter 15 of the Bankruptcy Code. The basis for recognition is straightforward. HoldCo is subject to official liquidation in the Cayman Islands, its jurisdiction of organization, which is being administered, since May 6, 2025, in accordance with Part V of the Cayman Islands Companies Act (2025 Revision) (the "Companies Act"), a law relating to, among other things, insolvency or the adjustment of debt, by JOLs appointed by the Cayman Court and under the supervision of the Cayman Court.

6. Chapter 15 of the Bankruptcy Code was enacted to provide effective mechanisms for dealing with cases of cross-border insolvency such as this one. Its express objectives include fostering: (a) cooperation between United States courts, trustees, examiners, debtors and debtors in possession, and the courts and other competent authorities of foreign countries; (b) greater legal certainty for trade and investment; (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor; and (d) protection and maximization of the value of the debtor's estate. These goals will be furthered by the granting of chapter 15 recognition here.

7. Recognition of the Cayman Proceeding as a foreign main proceeding is crucial for several reasons, including: (a) to assist the JOLs in fulfilling their duty under the relevant provisions of the Companies Act to investigate the assets, affairs, rights, liabilities, and obligations of the Debtor, including, if necessary, by compelling parties in interest to provide information requested by the JOLs; and (b) to prevent the further dissipation of assets that comprise the group of entities and affiliates that were formerly owned, directly or indirectly, by HoldCo and the Fund, including by recognizing and enforcing orders for injunctive relief with respect to persons or entities formerly affiliated with HoldCo as may be entered by the Cayman Court. Each of these reasons is squarely within and consistent with the broader goals underpinning the purpose of chapter 15 recognition. The Petitioners anticipate that the Chapter 15 Case will complement the Debtor's Cayman Proceeding to ensure the effective and economic administration of the Debtor's liquidation efforts.

## BACKGROUND

8. The following is an overview of the Debtor's business, capital structure, events leading to the Cayman Proceeding and this Chapter 15 Case as of the date of the filing of the Petition (the "Petition Date").

### A. Overview of HoldCo and its Stakeholders

9. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011. Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[4] (MacInnis Decl. ⁋ 8, Ex. 3)

10. HoldCo's share capital is divided into participating shares (the "Participating Shares"), which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and management shares (the "Management Shares"), which have voting rights but confer no other right to participate in HoldCo's profits or assets. Accordingly, holders of Participating Shares (the "Participating Shareholders") have the entirety of the economic interest in HoldCo, whereas the holder of Management Shares (the "Management Shareholder") has the control rights. (MacInnis Decl. ⁋ 9, Ex. 5)

11. Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Inc. (the "Highland Dallas Foundation"), Highland Kansas City Foundation, Inc. (the "Highland Kansas City Foundation"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation" and, together with Highland Dallas Foundation and Highland Kansas City Foundation, the "Supporting Organizations") and

[4] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

The Community Foundation of North Texas ("CFNT," and, together with the Supporting Organizations, the "Original Participating Shareholders"). (MacInnis Decl. ⁋ 10, Ex. 6)

12. As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders. The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo. Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott. HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident. (MacInnis Decl. ⁋ 11, Exs. 6-10)

13. As of the date hereof, the Participating Shareholders are:

(a) Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the Internal Revenue Code of 1986 (the "IRC") incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(b) Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(c) Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;

(d) CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015; and

(e) DFW Charitable Foundation ("DFW"), a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025 ("DFW Share Issuance"). Mr. Patrick is its registered director, president and sole member.[5]

(MacInnis Decl. ⁋ 12, Exs. 11-21)

**i. The Charitable Structure**

14. Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly. They are:

(a) The Dallas Foundation ("TDF") (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

(b) Greater Kansas City Community Foundation ("GKCCF") (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

(c) Santa Barbara Foundation ("SBF" and, together with TDF and GKCCF, the "Charities," and each, a "Charity") (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

(d) CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023. CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization). Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.

(MacInnis Decl. ⁋ 13, Ex. 19)

15. Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.). (MacInnis Decl. ⁋ 14, Exs. 23-25)

[5] HoldCo contests the validity of the DFW Share Issuance in the Cayman Litigation (defined below).

16. The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo. (MacInnis Decl. ⁋ 15, Exs. 26-28)

17. Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity. For US tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity. Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee. (MacInnis Decl. ⁋ 16, Exs. 23-28, 29-31)

18. HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for "unrelated business taxable income" ("UBTI") with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held. (MacInnis Decl. ⁋17, Ex. 92)

19. HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned a larger group of entities (collectively, the "DAF Structure"). (MacInnis Decl. ⁋ 18)

20. The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure. (MacInnis Decl. ⁋ 19, Exs. 32-33, 35-36)

## B. Overview of the Fund

21. The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024 (the "Fund LPA"). Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund. (MacInnis Decl. ⁋ 20. Exs. 34-36)

22. The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners." (MacInnis Decl. ⁋ 21, Ex. 5)

23. Charitable DAF GP, LLC (the "Original GP"), a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD (the "New GP" or "CDH"), a Cayman Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders. (MacInnis Decl. ⁋ 22, Exs. 37-39, 94)

24. The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd ("CLO HoldCo"). CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. (MacInnis Decl. ⁋ 23 Exs. 32-33, 40-43)

25. Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the

proposed order accompanying the Injunction Application (defined below), the "Fund Entities") are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint[6] entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates. (MacInnis Decl. ⁋ 24, Ex. 82)

26. At all relevant times, the Fund had a net asset value of approximately $270 million. (MacInnis Decl. ⁋ 25, Ex. 51)

## C. Key Transactions Precipitating the Debtor's Liquidation

### i. The Relevant Transactions

27. Beginning in 2024, HoldCo's directors, Mr. Patrick and Mr. Murphy (together, the "Directors") executed a series of complex, interrelated transactions without the knowledge or consent of the Original Participating Shareholders. These transactions consisted of (a) HoldCo's contribution of its interest in the Fund to a newly formed entity organized in Delaware, CDMCFAD, LLC ("CDM"), controlled by Mr. Patrick, in exchange for membership interests in CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were redeemable and afforded HoldCo no fiduciary safeguards (the "LP/LLC Exchange"); (b) the DFW Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025, sufficient to make it, rather than the Original Participating Shareholders, the majority owner of HoldCo's participating shares; and (c) the purported redemption of HoldCo's interest in CDM in exchange for approximately $1.6 million on March 27, 2025 (the "Redemption" and, together with

[6] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

the LP/LLC Exchange and the DFW Share Issuance, the "Relevant Transactions"). (MacInnis Decl. ⁋ 26, Exs 20-21, 44-46)

(A) The LP/LLC Exchange

28. On December 12, 2024, CDM was incorporated as a limited liability company in Delaware. Mr. Patrick was the sole member of CDM. (MacInnis Decl. ⁋ 27 Exs 47-48)

29. On December 18, 2024, without informing the Supporting Organizations or the Charities, (i) the Directors passed resolutions to transfer HoldCo's entire limited partnership interest in the Fund (the "Fund Partnership Interest") to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the issued and outstanding membership interests in CDM; and (ii) HoldCo, CDM, and the New GP entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities: on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director, pursuant to which (a) HoldCo assigned its entire interest in the Fund to CDM (the "CDM Assignment"), (b) the New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with the Fund LPA, and (c) CDM agreed to exercise its reasonable best endeavors to ensure that 100% of the membership interest in CDM (the "CDM Membership Interest") would be transferred to HoldCo. (MacInnis Decl. ⁋ 28, Exs. 44-45)

30. The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire interest in the Fund previously held by HoldCo; and (b) HoldCo became the sole membership interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest

in the Fund—being exchanged for the CDM Membership Interest. (MacInnis Decl. ⁋ 29, Exs. 42, 45-46)

31. The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership Interest was less valuable than the Fund Partnership Interest because, among other reasons, whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick, did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value." (MacInnis Decl. ⁋ 30, Ex. 48)

(B) DFW Share Issuance

32. On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes. (MacInnis Decl. ⁋ 31, Ex. 49)

33. On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%. (MacInnis Decl. ⁋ 32, Exs. 20-21)

(C) Redemption

34. Following the LP/LLC Exchange, ValueScope, Inc. ("ValueScope") was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the 100% membership interest in CDM; and (b) certain Participating Shares of HoldCo as of March 25, 2025 (the "March 2025 ValueScope Valuations"). Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a net asset value ("NAV") basis at HoldCo's request to determine their fair market value ("FMV"). The final NAV-based valuation prepared by ValueScope prior to the Relevant Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370. (MacInnis Decl. ⁋ 33, Exs. 50-51, 93)

35. The March 2025 ValueScope Valuations, however: (a) applied a discounted cash flow ("DCF") methodology to estimate the present value of expected future distributions, rather than the asset-based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% discount for lack of control ("DLOC"); and (d) applied a 20.00% discount for lack of marketability ("DLOM"). The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick. (MacInnis Decl. ⁋ 34, Exs. 50, 93)

36. Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF. Although the March 2025 ValueScope Valuations

reports identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analyses did not address who benefited from the residual value of roughly $267.4 million. (MacInnis Decl. ⁋ 35, Ex. 50)

37. On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into a letter agreement with CDM (the "Letter Agreement"), pursuant to which HoldCo assigned to CDM various contracts and agreements to which it was a party. On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192; and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192 (the "Redemption Sum") (together, the "Admission and Redemption"). (MacInnis Decl. ⁋ 36, Exs, 52-54)

38. Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed a written consent (the "Manager Consent") approving the Admission and Redemption. The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status. (MacInnis Decl. ⁋ 37, Ex. 55)

39. On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01 (the "Redemption Distributions"). (MacInnis Decl. ⁋ 38, Ex. 46)

40. The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount—effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the Original Participating Shareholders, being the Supporting Organizations and CFNT were actually or effectively divested of their indirect interest—subject to the discretion of the person holding the Control Position—in the Fund and its underlying assets; and (d) the Original Participating Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their proportionate share of distributions in the amount of 48.96% of the Redemption Sum. As such, HoldCo had no assets at that time. (MacInnis Decl. ⁋ 39)

**ii. <u>The Remuneration Transactions</u>**

41. Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick resolved to dramatically increase his remuneration (collectively, the "<u>Renumeration Transactions</u>"). Specifically (and among other things):

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.

(b) On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve a long-term incentive ("<u>LTI</u>") of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(c) On or around October 1, 2024:

(i) The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(ii) Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.

(MacInnis Decl. ⁋ 40. Exs. 56-58, 93)

42. By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum. (MacInnis Decl. ⁋ 41, Ex. 83)

43. As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million). (MacInnis Decl. ⁋ 42, Ex. 56)

**D. <u>Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations</u>**

44. As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests. (MacInnis Decl. ⁋ 43, Ex. 59)

45. In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders. (MacInnis Decl. ⁋ 44)

46. In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses. (MacInnis Decl. ⁋ 45, Ex. 56)

47. In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund. Mr. Patrick did not do so. (MacInnis Decl. ⁋ 46)

48. On November 11, 2024, Holland and Knight, LLP ("H&K"), U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations (the "No Confidence Letter"). (MacInnis Decl. ⁋ 47, Ex. 60)

49. On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds. On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help. Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024. (MacInnis Decl. ⁋ 48, Exs. 49, 61-62)

50. On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various assurances regarding governance matters being addressed by the Directors. The meeting was, by all accounts, positively regarded. The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations. (MacInnis Decl. ⁋ 49, Ex. 63)

51. Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations. (MacInnis Decl. ⁋ 50)

52. On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. (MacInnis Decl. ⁋ 51, Ex. 64)

53. Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded, and (ii) about the ongoing lack of transparency on the party of the Directors. (MacInnis Decl. ⁋ 52, Ex. 64)

54. On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you." (MacInnis Decl. ⁋ 53, Ex. 64)

55. On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious

antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions." (MacInnis Decl. ⁋ 54, Ex. 64)

56. On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position. (MacInnis Decl. ⁋ 55, Ex. 64)

57. On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees." (MacInnis Decl. ⁋ 56, Ex. 64)

58. On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance. (MacInnis Decl. ⁋ 57, Ex. 21)

59. On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure. On February 27, 2025, H&K responded that his clients were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations. H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond. (MacInnis Decl. ⁋ 58, Exs. 21, 70-71, 75)

60. On March 20, 2025, Mr. Mancio sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations. The letter makes serious and unsubstantiated allegations about the Supporting Organizations,

absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ." (MacInnis Decl. ⁋ 59, Ex. 72)

61. Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations. On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators. (MacInnis Decl. ⁋ 60, Exs. 46, 55, 65, 73-74)

62. Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried about the apparent source of confusion. (MacInnis Decl. ⁋ 61, Ex. 76)

## E. <u>The Cayman Proceeding</u>

63. Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act (the "<u>J&E Petition</u>"). It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025. (MacInnis Decl. ⁋ 62, Exs. 66, 77)

64. On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act (the "<u>Supervision Petition</u>").

Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order. Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Companies Winding Up Rules (2023 Consolidation) (the "Winding Up Rules"). (MacInnis Decl. ⁋ 63, Exs. 1, 67, 78-79)

65. Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled. Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order. (MacInnis Decl. ⁋ 64, Ex. 78)

**i. Conduct of the Cayman Proceeding**

66. The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment. The JOLs have taken steps to fulfil their statutory obligations by: filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper; determining HoldCo should be treated as solvent for

the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025, and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025. (MacInnis Decl. ⁋ 65, Exs. 68-69, 78-80)

67. Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo. (MacInnis Decl. ⁋ 66)

68. The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and US counsel.[7] In addition, the JOLs, through counsel, have engaged with representatives of CDM, the New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation. The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol. (MacInnis Decl. ⁋ 67, Ex. 81)

[7] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and US counsel by the JOLs.

69. Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain US-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs' investigation has progressed sufficiently to enable them to identify significant areas of concern. (MacInnis Decl. ⁋ 68)

**ii. <u>Commencement of the Cayman Litigation</u>**

70. On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing a Writ and Statement of Claim (the "<u>Statement of Claim</u>") against the following defendants (collectively, the "<u>Named Defendants</u>"): (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4)

DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP; and (6) CLO HoldCo (the "Cayman Litigation").[8] (MacInnis Decl. ⁋ 69, Ex. 59)

71. A further description of each of the Named Defendants is as follows:

(a) **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo. As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo. Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b) **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021. Mr. Murphy is also a director of CLO HoldCo.

(c) **CDM**. A limited liability company incorporated in Delaware on December 12, 2024. Mr. Patrick is the Manager of CDM. DFW has been the sole member of CDM since March 27, 2025.

(d) **DFW**. A nonprofit, non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth Shaw LLP ("Seyfarth"), a U.S. law firm apparently engaged by the Fund. DFW is

[8] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e) **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024. It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection*."

(f) **CLO HoldCo**. A Cayman Islands exempted limited company. CLO HoldCo is the Fund's only direct subsidiary. The Fund held all of CLO HoldCo's issued shares.

(MacInnis Decl. ⁋ 70)

72. HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of (a) the Relevant Transactions and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally. In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution. (MacInnis Decl. ⁋ 71, Ex. 59)

73. At the hearing of the sanction application on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Litigation, the JOLs were required to satisfy the Cayman Court in the Cayman Proceeding that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best served by the JOLs commencing the Cayman Litigation.[9] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation. (MacInnis Decl. ⁋ 72, Ex. 85)

74. On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)). At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now held or controlled by the Named Defendant together with disclosure orders ("Injunction Application"); and (b) leave to serve the U.S.-based defendants with the Statement of Claim and Injunction Application ("Leave to Serve Application" and together with the Injunction Application, the "Applications"). (MacInnis Decl. ⁋ 73, Exs. 59, 82-83)

75. Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO HoldCo, Ltd. The Applications have been listed for hearing on July 31, 2025 (the "Injunction Hearing Date"). (MacInnis Decl. ⁋ 74)

76. The Named Defendants are entitled to participate and be heard on that date. In the event the Named Defendants do not participate, the Cayman Court will hear the Injunction

[9] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter partes* hearing for a later date. (MacInnis Decl. ⁋ 75. Exs. 82-83)

77. Should the Cayman Court grant the Injunctive Relief Application following the scheduled hearing on the Injunction Hearing date, and issue an order consistent with draft order for relief sought therein (the "Injunctive Relief Order"), the JOLs expect to seek recognition and enforcement of the Injunctive Relief Order against the Named Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the recognition of the Cayman Proceeding, at which time the JOLs also seek recognition of the Injunctive Relief Order in this Chapter 15 Case as set forth herein pursuant to sections 1507(a) and 1521(a) of the Bankruptcy Code. (MacInnis Decl. ⁋ 76, Ex. 82)

**iii. Injunction Application**

78. The Injunction Application seeks orders that:

(a) the Named Defendants will (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

(b) the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

(c) the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

(d) the Named Defendants shall make ancillary asset disclosures.

(MacInnis Decl. ¶ 77. Ex. 82)

79. The basis for the injunctive relief sought is that the Named Defendants each own and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously arguable case that it does):

(a) Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).

(b) After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo. Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner. Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.

(MacInnis Decl. ¶ 78, Exs. 6, 40, 44-49. 52-55, 84)

80. Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property. (MacInnis Decl. ¶ 79, Moran Decl. ¶¶ 40, 42-45)

81. Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment), (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so. (MacInnis Decl. ¶ 80, Moran Decl. ¶¶ 42-45)

**1. Serious Issues to be Tried**

82. On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators (which is higher than the 'serious issue to be tried' threshold for a proprietary injunction). (MacInnis Decl. ¶ 81, Ex. 85)

83. The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny. (MacInnis Decl. ¶ 82. Exs. 44, 70, 72, 86-87)

**2. Balance of convenience**

84. The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way. The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis. (MacInnis Decl. ¶ 83, Ex. 82)

85. Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations. (MacInnis Decl. ¶ 84)

86. Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective. (MacInnis Decl. ⁋ 85)

87. Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a) The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b) The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.

(MacInnis Decl. ⁋ 86. Ex. 82)

88. The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order

to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made. (MacInnis Decl. ¶ 87, Ex. 82)

89. The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce. (MacInnis Decl. ¶ 88)

90. As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim. (MacInnis Decl. ¶ 89)

91. Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for: (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT. Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other

assets or investments, and the Charities and Supporting Organizations would effectively be back to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status. (MacInnis Decl. ¶ 90)

### 3. Disclosure of assets

92. The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date. (MacInnis Decl. ¶ 91)

93. In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest). (MacInnis Decl. ¶ 92)

94. In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a) All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.

(b) All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(c) All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO

HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.

(MacInnis Decl. ⁋ 93, Ex. 82)

**4. Cross undertaking in damages**

95. The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances. (MacInnis Decl. ⁋ 94)

**F. The Texas Proceeding**

96. On July 1, 2025, the Supporting Organizations commenced an action (the "TRO Action") against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP (collectively, the "TRO Defendants") by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* (the "TRO Application") in the Texas Business Court, 1st Division (the "Texas Court"). Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly. (MacInnis Decl. ⁋ 95. Ex. 85)

97. On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a Rule 11 Agreement under the Texas Rules of Civil Procedure (the "Rule 11 Agreement"), which the JOLs understand is a binding contract among the parties. The key points of the Rule 11

Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants. The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025. (MacInnis Decl. ⁋ 96, Ex. 88)

98. Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement (the "Final Rule 11 Agreement") to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction (the "Plea") pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea. On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action. (MacInnis Decl. ⁋ 97, Ex. 89-90)

99. The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case. The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong

to HoldCo as asserted in the Cayman Litigation. The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case. (MacInnis Decl. ⁋ 98, Exs. 59, 89)

## G. <u>This Chapter 15 Case</u>

100. On the Petition Date, the Petitioners commenced this Chapter 15 Case. (MacInnis Decl. ⁋ 99)

101. Consistent with the purpose of official liquidation under Part V of the Companies Act, the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo. *See* Companies Act, section 110(2). (MacInnis Decl. ⁋ 100, Ex. 78)

102. Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose. This automatic stay mirrors the stay imposed in United States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively. (MacInnis Decl. ⁋ 101, Ex. 78)

103. A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[10] *See* Companies Act, section 140. (MacInnis Decl. ⁋ 102, Ex. 78)

[10] For example, see sections 140 and 141 of the Companies Act.

104. Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled. (MacInnis Decl. ¶ 103)

## JURISDICTION AND VENUE

105. The United States Bankruptcy Court for the District of Delaware (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.

106. Recognition of a foreign proceeding and other matters under chapter 15 of the Bankruptcy Code are core matters under 28 U.S.C. § 157(b)(2)(P).

107. This Chapter 15 Case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of the Petition in accordance with section 1515 of the Bankruptcy Code.

108. The Petitioners confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules and rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of final orders or judgments by the Court to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

109. Venue in this district is proper under 28 U.S.C. § 1410(1) because the Debtor has its principal assets in the United States located in Delaware, and 28 U.S.C. §1410(3) because it is

consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the Petitioners.

110. With regard to section 1410(1), the Debtor has an ownership interest in a $150,000 advance security retainer deposited with and held by Reed Smith in a trust account located in Wilmington, Delaware with M&T Bank (the "Reed Smith Retainer") in accordance with Delaware Rule of Professional Responsibility 1.5. *See, e.g.*, *In re Farfetch Limited (in Official Liquidation),* Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (establishing venue in Delaware where Debtor held a retainer in the jurisdiction); *In re Berau Capital Res. PTE*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (finding that an attorney retainer was sufficient to establish venue); *In re Octaviar Admin Pty.*, 511 B.R. 361, 372-74 (Bankr. S.D.N.Y. 2014) (finding that an attorney retainer is sufficient to confer jurisdiction in the United States); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (holding that establishing a deposit account in New York "had the effect of establishing a basis for venue in [the Southern District of New York] under 28 U.S.C. § 1410(1)"); *In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 39 (Bankr. D. Del. 2000) (retainers held in escrow by counsel for a debtor in the United States is "property" in the United States).

111. With regard to section 1410(3): (i) the Debtor's economic stakeholders, the Supporting Organizations, are Delaware nonprofit corporations exempt from taxation under section 501(c)(3) of the Internal Revenue Code, (ii) the Debtor has past direct ownership of CDM, which is organized in Delaware, and (iii) prior to the commencement of the Cayman Proceeding, the Debtor and the Directors engaged Delaware counsel in connection with the Relevant Transactions.

112. The statutory predicates for the relief requested in this Petition are sections 101(23)-(24), 105(a), 306, 542(e), 1502, 1504, 1507, 1509, 1510, 1512, 1515, 1516, 1517, 1520, 1521, 1522, and 1524 of the Bankruptcy Code and Bankruptcy Rule 2004.

**RELIEF REQUESTED**

113. The Petitioners have commenced this Chapter 15 Case as an ancillary proceeding to the Cayman Proceeding and respectfully file this Petition contemporaneously with the accompanying documentation required by sections 1504 and 1515 of the Bankruptcy Code.

114. The Petitioners respectfully request that this Court enter an order, substantially in the form of the Proposed Order attached hereto as Exhibit A, pursuant to sections 105(a), 542(e), 1504, 1507, 1509, 1510, 1515, 1517, 1520 and 1521 of the Bankruptcy Code that:

(a) recognizes the Cayman Proceeding as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, or, in the alternative, as a foreign nonmain proceeding pursuant to section 1517(b)(2) of the Bankruptcy Code;

(b) recognizes the Petitioners as the "foreign representatives" as defined in section 101(24) of the Bankruptcy Code;

(c) recognizes and gives full force and effect in the United States to the Supervision Order and the Injunctive Relief Order, including any and all extensions or amendments thereof authorized by the Cayman Court and extending the protection of such orders;

(d) grants the Debtor all of the relief afforded pursuant to section 1520 of the Bankruptcy Code, including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States;

(e) authorizes the Debtor to conduct the examination of witnesses, the taking of evidence or the delivery of information concerning the Debtors' assets, affairs, rights, obligations or liabilities in accordance with section 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules;

(f) authorizes the Debtor to compel all persons that hold recorded information, including books, documents, records, and papers relating to the Debtor's

property or financial affairs to turnover or disclose such recorded information in accordance with section 542(e), 1521(a)(4) and 1521(a)(7) of the Bankruptcy Code; and

(g) provides such other and further relief as the Court deems just and proper.

**BASIS FOR RELIEF REQUESTED**

115. Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between United States courts and foreign courts, to afford greater legal certainty for trade and investment, to protect and maximize the value of debtors' assets, and to facilitate the fair and efficient administration of cross-border insolvencies in a manner that protects the interests of all creditors and other interested parties, including the debtor. 11 U.S.C. § 1501.

116. Consistent with these principles, the Petitioners commence this action under chapter 15 of the Bankruptcy Code to obtain recognition of the Cayman Proceeding and certain related relief. This Chapter 15 Case seeks to complement the Cayman Proceeding to: (i) investigate, the assets, affairs, and liabilities of the Debtor that are within the territorial jurisdiction of the United States; (ii) ensure the effective and economical administration of the Debtor's liquidation; and (iii) protect against asset dissipation pending the outcome of the Petitioners' continuing investigations and the Cayman Litigation.

**A. HoldCo Is an Eligible "Debtor" Under Chapter 15 of the Bankruptcy Code**

117. HoldCo qualifies as a "debtor" as such term is defined in section 1502(1), which provides that a debtor is "an entity that is the subject of a foreign proceeding." *See* 11 U.S.C. 1502(1). Here, HoldCo is an "entity," which includes a corporation. *See* 11 U.S.C. §§ 101(15) (definition of "entity," which includes a "person") and 101(41) (definition of "person," which includes a "partnership" and a "corporation"). HoldCo is: (1) a corporate entity organized under the laws of the Cayman Islands; and (2) is the subject of the Cayman Proceeding.

118. Accordingly, as courts, including courts in the Third Circuit have held, no further showing is required for HoldCo to qualify as a "debtor" eligible for relief under chapter 15 of the Bankruptcy Code. *See, e.g.*, Transcript of Hearing at 9, 3–18, *In re Bemarmara Consulting A.S.*, Case No. 13-13037(KG) (Bankr. D. Del. Dec. 17, 2013) [D.I. 38] (finding section 109(a) of the Bankruptcy Code to be inapplicable to Chapter 15 because section 109(a) "provides for [debtors]" under the Bankruptcy Code, and it is the foreign representative, and not the debtor in the foreign proceeding, who petitions the court in chapter 15 cases); *see also In re Talal Qais Abdulmunem Al Zawawi*, 634 B.R. 11 (Bankr. M.D. Fla. 2021); 637 B.R. 663 (M.D. Fla. 2022); appeal No. 22-11024, Doc 53-1 (11th Cir. April 3, 2024). Further, "[s]ection 1502 defines [d]ebtor as an entity that is the subject of a foreign proceeding. And there was nothing in that definition in Section 1502 which reflects upon a requirement that [d]ebtor have assets." *Bemarmara Consulting,* at pp. 9. Therefore, section 109(a) of the Bankruptcy Code does not apply and HoldCo qualifies as a debtor under chapter 15.

119. However, even if, as some courts in other circuits have held, section 109(a) applies to determine whether a foreign debtor is eligible to be a debtor in a chapter 15 case, HoldCo is an eligible debtor. *See, e.g.*, *Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 241 (2d Cir. 2013) (holding that section 109(a) applies to chapter 15 debtors). Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title." *See* 11 U.S.C. § 109(a). Accordingly, a foreign debtor can satisfy the section 109 requirement by possessing even a nominal amount of property in the United States. *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 200 (Bankr. D. Del. 2015) (stating that courts have determined that the property requirement of section 109(a) is satisfied by foreign debtors with "even a minimal amount of property located in the

United States") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 8 (Bankr. S.D.N.Y. 2003)); *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. at 82 (holding that section 109(a) neither requires a specific quantum of property in the United States, nor states when or for how long that property must be located within the United States); *In re Zais Inv. Grade Ltd. VII*, 455 B.R. 839, 842 (Bankr. D.N.J. 2011) (finding that securities and cash pledged as collateral and held by a trustee are nominally the property of a Cayman Island corporation, and that the corporation is therefore an eligible debtor under section 109).

120. HoldCo is eligible to be a debtor under section 109(a) of the Bankruptcy Code because it has property located in the United States consisting of the Reed Smith Retainer. For these reasons, HoldCo satisfies the requirements to be deemed a debtor under chapter 15 of the Bankruptcy Code whether or not section 109(a) of the Bankruptcy Code applies.

**B. <u>The Cayman Proceeding is a Foreign Main Proceeding</u>**

121. The Cayman Proceeding is entitled to recognition as a foreign main proceeding under chapter 15 of the Bankruptcy Code. Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if: (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517; *see also* Hon. Burton R. Lifland, Una O'Boyle, Esq. and Erin Healy Mautner, Esq., *Chapter 15 of the United States Bankruptcy Code: An Annotated Section-By-Section Analysis* ("The decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings . . . [t]he requirements of this section . . . are all that must be fulfilled to attain recognition"); *see also In re Foreign Econ. Indus. Bank*, 607 B.R. 160, 168 (Bankr. S.D.N.Y. 2019) (internal citations omitted) ("The language of this section makes

clear that the decision whether to grant recognition is not dependent upon any findings about the nature of the foreign proceeding . . . [i]nstead, if the three requirements of this section are met, the court is obligated to grant recognition."). Section 1517(b) of the Bankruptcy Code provides that a foreign proceeding "shall be recognized . . . (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1517(b)(1). Here, as explained below, all requirements for recognition of the Cayman Proceeding, the Petitioners, and this Petition are satisfied.

**i. <u>The Cayman Proceeding Constitutes a "Foreign Proceeding"</u>**

122. The Cayman Proceeding qualifies as a "foreign proceeding" under chapter 15 of the Bankruptcy Code. Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

123. Based on this definition, courts have held that a "foreign proceeding" is:

(a) a proceeding;

(b) that is either judicial or administrative;

(c) that is collective in nature;

(d) that is in a foreign country;

(e) that is authorized or conducted under a law related to insolvency or the adjustment of debts;

(f) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and

(g) which proceeding is for the purpose of reorganization or liquidation.

*See In re Ir. Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at *40 (D. Del. April 30, 2014) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also*

*In re Overnight and Control Comm'n of Avénzit, S.A.*, 385 B.R. 525, 532-33 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Declarations, the Cayman Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

124. *First*, the Cayman Proceeding was brought pursuant to section 131 of the Companies Act. *See* Companies Act § 131. For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the Cayman Proceeding operates under such a statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

125. *Second*, the Cayman Proceeding is judicial in character. A liquidation proceeding is deemed judicial in character when it involves a court "exercis[ing] its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). Here, the Cayman Proceeding is subject to the control and supervision of the Cayman Court. Specifically, in the Cayman Proceeding, the Debtor's assets and affairs are subject to the control and supervision of the Cayman Court for the purpose of the liquidation, pursuant to the Supervision Order, which, *inter alia*, (i) appoints the JOLs as joint official liquidators, (ii) authorizes the Petitioners to commence legal proceedings in the name and on the behalf of the Debtor to obtain information or pursue a stay in the Cayman Islands or in the United States, and (iii) permits the Petitioners to present a petition for the winding up of the Fund. *See* Supervision Order ¶¶ 2-6; MacInnis Decl. ¶¶ 63-64.

126. *Third*, the Cayman Proceeding is collective in nature in that it considers the rights of all of the Debtor's creditors and interest holders. *See* Moran Decl. at ¶ 57. A collective

proceeding is one in which all creditors' interests are adequately and fairly addressed. *See Betcorp Ltd.*, 400 B.R. at 281 (stating that a proceeding is collective where such proceeding "considers the rights and obligations of all creditors" in contrast to a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor"). United States bankruptcy courts have recognized that Cayman liquidation proceedings qualify as collective judicial proceedings for the purposes of chapter 15 recognition. *See In re Silicon Valley Bank (Cayman Islands Branch)*, 658 B.R. 75, 92 (Bankr. S.D.N.Y. 2024) (citing *In re Ocean Rig UDW Inc.,* 570 B.R. 687, 701-02 02 (Bankr. S.D.N.Y. 2017)) ("concluding, among other things, that the Cayman liquidation proceedings commenced under Part V of the Companies Law are unquestionably collective judicial proceedings"); *see also In re Millard*, 501 B.R. 644, 650 (Bankr. S.D.N.Y. 2013) (recognizing a Cayman Liquidation as a collective judicial proceeding irrespective of whether the debtor was solvent or insolvent). The Supervision Order was entered pursuant to Companies Act section 131, which sits within Part V. Therefore, the Court should find that the Cayman Proceeding is a collective one.

127. *Fourth*, the Cayman Proceeding and the Cayman Court are located in the foreign territory of the Cayman Islands. United States courts have found that a proceeding in the Cayman Islands satisfies the foreign country requirement for the purposes of establishing a foreign proceeding. *See, e.g., Principal Growth Strategies, LLC v. AGH Parent LLC*, 615 B.R. 529 (D. Del. 2020); *In re Receivers Hugh Dickson & John Royle for an Ex Parte Order Pursuant to 28 U.S.C. § 1782 for Discovery in Aid of Foreign Proceedings*, Civil Action No. 20-940 (ES) (MAH), 2020 U.S. Dist. LEXIS 71828 (D.N.J. Mar. 10, 2020).

128. *Fifth*, as described above, the Companies Act, which governs the Cayman Proceeding, relates to insolvency and the adjustment of debt. *See* Moran Decl, at ¶ 56. Specifically,

the Cayman Proceeding is governed by Part V of the Companies Act (which is the Cayman Islands statute applicable to corporate insolvencies and liquidations), in which the Debtor's assets and affairs are subject to the supervision of the Cayman Court, for the purpose of liquidation, pursuant to the Supervision Order made by the Cayman Court. *See* Supervision Order, ¶¶ 2-6.

129. *Sixth*, the Cayman Proceeding subjects the Debtor's assets and affairs to the supervision of the Cayman Court during the pendency of the proceedings. *See* Supervision Order, generally; Moran Decl., at ¶¶ 58-59.

130. *Finally*, the objective of the Cayman Proceeding is the liquidation of the Debtor. The Petitioners submit that the Supporting Organizations commenced the Cayman Proceeding for the purpose of liquidation, as required by section 101(23) of the Bankruptcy Code. *See* Moran Decl., at ¶¶ 58-59.

131. As described above, the Cayman Proceeding satisfies all elements required for recognition as a foreign proceeding under section 101(23) of the Bankruptcy Code and applicable case law. United States courts have recognized collective proceedings similar to the Cayman Proceeding as "foreign proceedings" on numerous occasions. *See, e.g., In re Farfetch Limited (in Official Liquidation)*, Case No. 24-11519 (CTG) [D.I. 46] (Bankr. D. Del. 2024) (recognizing a Cayman liquidation proceeding as a "foreign proceeding"); *In re IIG Glob. Trade Fin. Fund Ltd.*, No. 20-10132 (MEW), 2023 Bankr. LEXIS 1145 (Bankr. S.D.N.Y. April 27, 2023) (same); *In re Modern Land (China) Co.*, 641 B.R. 768 (Bankr. S.D.N.Y. 2022) (same); *In re Suntech Power Holdings Co.*, 520 B.R. at 399 (same).

**ii. <u>The Cayman Proceeding is a "Foreign Main Proceeding"</u>**

132. Chapter 15 of the Bankruptcy Code applies where a foreign representative seeks assistance in a United States Court. 11 U.S.C. § 1501(b)(1). The stated objectives of chapter 15

include: (i) cooperation between domestic courts and foreign courts in cross-border insolvency cases, (ii) "legal certainty for trade and investment," (iii) protection of all interested parties in a cross-border insolvency, and (iv) "maximization of the value of the debtor's assets." 11 U.S.C. § 1501(a); *see In re Oversight & Control Comm'n. of Avánzit*, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)). The Petitioners respectfully submit that each of these goals would be best achieved by recognizing that the Cayman Islands are the Debtor's COMI (defined and described below and that the Cayman Proceeding is therefore a "foreign main proceeding").

133. In addition to qualifying as a "foreign proceeding" under section 101(23) of the Bankruptcy Code, the Cayman Proceeding also qualifies as a "foreign main proceeding," which is defined in the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. § 1502(4); *see also* 11 U.S.C. § 1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered if the foreign proceeding that is subject to the petition "is pending in the country where the debtor has the center of its main interests"). The relevant time period for determining the location of a debtor's COMI is at or around the date on which the chapter 15 petition is filed. *See Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013); *Flynn v. Wallace (In re Irish Bank Resolution Corp. (In Special Liquidation))*, 538 B.R. 692, 697 (D. Del. 2015); *Ocean Rig UDW Inc.*, 570 B.R. at 705-06; *In re Ascot Fund Ltd.*, 603 B.R. 271, 279 (Bankr. S.D.N.Y. 2019); *In re Suntech Power Holdings Co.*, 520 B.R. at 416.

134. While the term COMI is not expressly defined in the Bankruptcy Code, bankruptcy courts have enumerated factors relevant to the determination of a debtor's COMI.

135. Delaware courts consider specific factors when assessing a Debtor's COMI. As an initial matter, section 1516 of the Bankruptcy Code provides that "[i]n the absence of evidence to the contrary, the debtor's registered office … is presumed to be the center of the debtor's main interests." Here, the Debtor's registered office is located in the Cayman Islands. Accordingly, the Debtor is entitled to the statutory presumption that its COMI is located in the Cayman Islands.

136. A court will also consider the following factors relevant to determining COMI:

(a) the location of the debtor's headquarters;

(b) the location of those who actually manage the debtor;

(c) the location of the debtor's primary assets;

(d) the location of the majority of the debtor's creditors or a majority of the creditors who would be affected by the case; and/or

(e) the jurisdiction whose law would apply to most disputes.

*See In re Ir. Bank Resolution Corp. (In Special Liquidation)*, 2014 Bankr. LEXIS 1990, at *138. Considering these factors, and for the reasons provided below, the Debtor's COMI is located in the Cayman Islands.

137. The Debtor was incorporated in 2011 in the Cayman Islands under the laws of the Companies Act. The Debtor has its registered office, and is headquartered, at HSM Corporate Service Ltd., 68 Fort Street, George Town, PO Box 31726, Grand Cayman KY1-1207, Cayman Islands.

138. Since the entry of the Supervision Order in the Cayman Proceeding on May 6, 2025, the Petitioners have assumed sole authority, subject to the supervision of the Cayman Court, to manage the Debtor's assets and administer its estate. *See* MacInnis Decl. ¶¶ 62-64. In connection therewith, the Petitioners have fulfilled their statutory obligations to publish and disseminate notices of HoldCo's winding up and their appointment, obtained sanction from the Cayman Court

to engage Cayman Islands and U.S. counsel, published a Report to Contributories on July 2, 2025, and, on July 3, 2025, convened the first meeting of contributories held on July 9, 2025, issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, requesting books and records, held discussions with various parties regarding HoldCo's history and financial affairs, and commenced the Cayman Litigation and the Applications. In connection therewith, the Petitioners have made decisions regarding the Cayman Proceeding, retained U.S. counsel to advise the Petitioners on U.S. law matters, and maintained control over the Debtor. *Id.* at ¶¶ 62-68.

139. The Petitioners have conducted these activities from their office in the Cayman Islands. Moreover, the actions of the Petitioners in connection with the Debtor's estate are subject to supervision by a Cayman Islands judge in the Cayman Court. *See id.*; *see also Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d at 137 ("[A]ny relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis."); *In re Suntech Power Holdings Co*., 520 B.R. at 416 (A "court may consider the location of the debtor's 'nerve center,' including from where the debtor's activities are directed and controlled, in determining a debtor's COMI."). Accordingly, the facts support a finding that those who actually manage the Debtor are located in the Cayman Islands.

140. The Debtor's registered office, current management, accounting, planning, budgeting, and human resources materials are located in the Cayman Islands. As discussed below, discovery is necessary to determine additional information regarding the Debtor's assets other than the Reed Smith Retainer.

141. Based on the facts and circumstances set forth herein, there are no facts sufficient to rebut the presumption that the Debtor's COMI is in the Cayman Islands. Therefore, the Cayman Proceeding should be recognized as a foreign main proceeding.

142. Certain other factors also support a finding that the Debtor's COMI is located in the Cayman Islands. For instance, the outward appearance of the Debtor's COMI is an important consideration. All of the Debtor's recent activities have been conducted and ascertainable as being in the Cayman Islands. Accordingly, the Cayman Islands can be reasonably ascertainable by the Debtor's creditors and other stakeholders as the Debtor's COMI.

143. Additionally, having commenced the Cayman Litigation, the Debtor certainly holds causes of action in the Cayman Islands. While the Debtor may also hold claims in other jurisdictions, the location of causes of action in the Cayman Islands makes this factor at least neutral.

144. Based on these facts, the totality of the circumstances—particularly, the fact that the Debtor's nerve center has been the Cayman Islands since the appointment of the Petitioners as joint official liquidators—strongly weighs in favor of the conclusion that the Debtor's COMI is located in the Cayman Islands. Because the Cayman Proceeding is pending in the location of the Debtor's COMI, the Cayman Proceeding should be recognized as a foreign main proceeding.

**C. <u>In the Alternative, the Cayman Proceeding Should be Recognized as a Foreign Nonmain Proceeding</u>**

145. In the event that this Court determines that the Cayman Proceeding will not be deemed a "foreign main proceeding," it should instead recognize the Cayman Proceeding as a "foreign nonmain proceeding" as defined in section 1502(5) of the Bankruptcy Code. 11 U.S.C. § 1502(5). Under section 1517(b) of the Bankruptcy Code, a foreign proceeding shall be recognized as a foreign nonmain proceeding if it is pending in a country where the debtor has an

"establishment." *See* 11 U.S.C. § 1517(b)(2). Section 1502 of the Bankruptcy Code defines an "establishment" as "any place of operations where the debtor carries out a non-transitory economic activity." *See* 11 U.S.C. § 1502(2). The "establishment" requirement is satisfied by conducting business locally. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 130-31, *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

146. The Debtor conducts pertinent economic activity in the Cayman Islands. As noted above, its headquarters is located in the Cayman Islands. Accordingly, the Petitioners submit that at a minimum, the Debtor maintains an establishment in the Cayman Islands where non-transitory economic activity takes place. Moreover, prior to the commencement of the Cayman Proceeding, and while the Debtor was approving the Relevant Transactions, one of the Directors, Mr. Murphy, was resident in the Cayman Islands. As explained above, the Petitioners have been continuing the operation of the Debtor during the winding up of its affairs pursuant to the Cayman Proceeding.

147. For these reasons, to the extent that this Court finds that the Cayman Proceeding is not a "foreign main proceeding," there are sufficient grounds for this Court to find that the Debtor has an "establishment" in the Cayman Islands and to recognize the Cayman Proceeding as a "foreign nonmain proceeding" per the definition provided in section 1502(5) of the Bankruptcy Code. See *In re SphinX, Ltd.*, 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006) *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (finding that "no negative consequences would appear to result from recognizing the [foreign] proceedings as nonmain proceedings, that is the better choice.").

### D. <u>The Petitioners Satisfy the Requirements of a "Foreign Representative" Under Section 101(24) of the Bankruptcy Code</u>

148. For recognition under chapter 15, a foreign proceeding must also have a foreign representative. *See* 11 U.S.C. § 1517(a)(2) (providing that a foreign representative shall apply for recognition of the foreign proceeding). The Petitioners submit that this Chapter 15 Case was

commenced by a duly authorized "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code, which provides as follows:

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C. § 101(24).

149. Pursuant to the Supervision Order, the Cayman Court authorized the appointment of Margot MacInnis and Sandipan Bhowmik as the JOLs, authorized and empowered them to act jointly and severally as the foreign representatives in connection with the Cayman Proceeding. *See* Supervision Order, ¶¶ 2-3. The Cayman Court, by way of the Supervision Order, further granted the JOLs the power to, among other things: (i) commence legal proceedings in the name and on behalf of the Debtor to obtain the information, documents, or examine individuals in the United States; (ii) apply for the preservation, freezing or attachment of assets to which the Debtor is or may be entitled; and (iii) seek registration or recognition of themselves and/or the Cayman Proceeding in any state in the United States for either of the reasons referenced in (i) or (ii). *See Id.* at ¶¶ 5-6. As a result of the authority granted by the Cayman Court and under United States law, the Petitioners are entitled to file this Chapter 15 Case in the United States for the purpose of having themselves, the Cayman Proceeding, the Supervision Order, and other orders of the Cayman Court recognized and enforced in the United States. *See Id.* ¶¶ 2-6.

## E. <u>The Petition Was Properly Filed and Satisfies the Requirements under Section 1515 of the Bankruptcy Code</u>

150. The Petitioners duly and properly commenced this Chapter 15 Case by filing the Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code, Bankruptcy Rules and Local Rules, including: (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses

of all persons or bodies authorized to administer foreign proceedings of the Debtor, (ii) all parties to litigation pending in the United States in which the Debtor is a party at the time of the commencement of the Chapter 15 Case, and (iii) all entities against whom at relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtor's foreign proceedings that are known to the Petitioners; and (d) a certified copy of the Supervision Order.

151. Accordingly, because the Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the Cayman Proceeding in this Chapter 15 Case. Granting such recognition will promote the United States public policy of respecting foreign proceedings as articulated in sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code. For these reasons, the conditions for recognition of the Cayman Proceeding are satisfied under section 1517 of the Bankruptcy Code.

**F. The Petitioners are Entitled to Automatic Relief Under Section 1520 of the Bankruptcy Code**

152. Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, *see* 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to HoldCo and to its property that is located within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioners respectfully submit that no further showing is required to the extent the Court recognizes the Cayman Proceeding as a foreign main proceeding.

## G. The Petitioners are Entitled to Additional Relief Under Section 1521 of the Bankruptcy Code

153. Upon recognition of a foreign proceeding, section 1521 of the Bankruptcy Code provides specific grounds for additional relief. Specifically, section 1521 authorizes the Court to grant "any appropriate relief," including "any relief that may be available to a trustee" subject to certain limitations and provided that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. §§ 1521, 1522. Here, the Petitioners respectfully request that this Court grant relief under sections 1521(a)(1), (2), (3), (4), (5), (6) and (7) of the Bankruptcy Code.

### i. The Foreign Representative is Entitled to Appropriate Relief Under Sections 1521 (a)(1), (2), (3), (4), (5), (6) and (7)

154. As stated below, the Petitioners seek further relief upon recognition in the form of availing themselves of discovery rights under the Bankruptcy Code to assist them in their investigation of the assets and affairs of the Debtor, to identify the location of property over which the Debtor has or may assert a proprietary interest, and in their efforts to recover books and records of the Debtor in the possession of third parties to investigate the location of the Fund and other assets of the Debtor. This will help avoid the potential loss of critical evidence relating to the Debtor's assets and liabilities, as well as causes of action against third parties.

155. First, pursuant to sections 1521(a)(1), (2), and (3), the Petitioners request: (1) that this Court stay the commencement, continuation, or execution of any individual action or proceeding concerning the Debtor's assets, rights, obligations, or liabilities to the extent they have not already been stayed by section 1520(a); and (2) the Court suspend the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a). These provisions are necessary to ensure the Debtor's assets or interests in the United States are not dissipated during the course of the Cayman Proceeding.

156. Second, to enable them to identify, protect, and preserve the Debtor's estate for the benefit of all its creditors, the Petitioners request that this Court entrust them with the administration or realization of all or part of the Debtor's assets within the territorial jurisdiction of the United States pursuant to section 1521(a)(5). *See IIG Global Trade Finance Fund Ltd., No. 20-10132 (MEW) (Bankr. S.D.N.Y Jan. 17, 2020)* ECF No. 9 (ordering that the administration or realization of all or parts of the assets of [the debtor] within the territorial jurisdiction of the U.S. is entrusted to its liquidators); *In re Frontera Resources Caucasus Corp. and David Griffin*, No. 19-13418 (MEW) (Bankr. S.D.N.Y Oct. 25, 2019) ECF No. 19 (ordering that the liquidators are entrusted with the administration and realization of [the debtor's] assets within the territorial jurisdiction of the United States); *In re Air Berlin PLC & Co. Luftverkehrs KG*, No. 17-12282 (MEW) (Bankr. S.D.N.Y Aug. 18, 2017) ECF. No. 24 (granting 1521(a)(5) relief). This authority would be consistent with the Petitioners' authority to administer the Debtor's assets under Cayman law.

157. Finally, as discussed below, the Petitioners request that this Court provide discovery relief pursuant to sections 542(e), 1519(a)(3), 1521(a)(4), 1521(a)(7) of the Bankruptcy Code and Bankruptcy Rule 2004.

**ii. <u>Injunctive Relief is Appropriate</u>**

158. The standards, procedures, and limitations applicable to an injunction also apply to relief sought under sections 1521(a)(1), (2), (3), and (6) of the Bankruptcy Code. *See* 11 U.S.C. § 1521(e). Generally, to obtain an injunction, a movant must demonstrate the likelihood of irreparable harm. *See Clarkson v. Coughlin*, 898 F. Supp. 1019, 1035 (S.D.N.Y. 1995). Irreparable harm in the chapter 15 context exists if there is a risk of disruption to the orderly and fair distribution of assets through dissenting creditor actions to the detriment of other creditors. *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present

when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum.") (*quoting* Collier on Bankruptcy ¶ 304.05 (15th ed. Rev. 2003)); *In re MMG LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors").

159. The risk of irreparable harm exists here, particularly in light of the consummation of the Relevant Transactions, which dispossessed the Debtor of its direct and indirect interests in the DAF Structure, and the risk that the Debtor's proprietary interests asserted in the Cayman Litigation could be further dissipated pending the outcome of the Cayman Litigation and the JOLs continuing investigation of the Relevant Transactions and the Remuneration Transactions. It is imperative that the Debtor's assets are protected while the JOLs' investigations are ongoing—recognition of the Injunctive Relief Order (discussed below) is therefore critical.

160. Absent injunctive relief, the Debtor's efforts to orderly liquidate through the Cayman Proceeding and to maximize value for all stakeholders could be thwarted by the actions of the Named Defendants or other parties in interest, a result that is inconsistent with the Bankruptcy Code. The interests of affected parties under the Cayman Proceeding are sufficiently protected under section 1522(a) of the Bankruptcy Code because all similarly situated parties will be treated equally and fairly during the pendency of the Cayman Proceeding. Moreover, all parties will have the opportunity to be heard in the Cayman Proceeding and the Cayman Litigation. The injunction also will not cause undue hardship or prejudice to the rights of any U.S.-based creditors or other parties in interest and is consistent with principles of comity. Accordingly, the injunction should be granted.

161. The ultimate goal of the Petitioners is to protect the Debtor and to preserve and maximize realization on the assets of the Debtor for the benefit of its creditors and other stakeholders. The additional relief requested by the Petitioners under sections 1521, 362, and 105 of the Bankruptcy Code will assist the Petitioners in carrying out their duties as joint official liquidators to achieve this goal and will promote the effective administration of the Cayman Proceeding.

**iii. <u>Discovery Relief is Both Necessary and Appropriate to Uncover Assets and Determine Causes of Action</u>**

162. It is crucial that the Petitioners be permitted to take discovery pursuant to sections 1519(a)(3), 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code. The Petitioners seek discovery to: (i) locate the Fund and uncover related frauds and potential assets of the Debtor; and (ii) determine causes of action against and defenses to third parties. These rules indicate Congress's recognition of the need for foreign debtors to conduct discovery with respect to their assets, liabilities and affairs, including the investigation of potential causes of actions. *See, e.g., In re Comair Ltd.*, No. 21-10298(JLG), 2021 Bankr. LEXIS 3137, at *28 (Bankr. S.D.N.Y. Nov. 14, 2021), appeal dismissed, No. 21 CIV. 10146 (AT), 2023 U.S. Dist. LEXIS 6146 (S.D.N.Y. Jan. 12, 2023); *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012); *In re Glitnir banki hf.*, No. 08-14757 SMB, 2011 Bankr. LEXIS 3296 at *19 (Bankr. S.D.N.Y. Aug. 19, 2011); *In re Hughes*, 281 B.R. 224, 229 (Bankr. S.D.N.Y. 2002).

163. Specifically, the discovery of third party causes of action could uncover "contingent property interests" of the Debtor. *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012) (citing *In re Kane*, 628 F.3d 631, 641 n.7 (3d Cir. 2000) (noting that property of the estate "encompasses contingent property interests such as causes of action")). The Petitioners are seeking discovery to promote a significant chapter 15 objective by

permitting the Petitioners to fulfill their roles. *See In re Markus*, 607 B.R. 379, 390 (Bankr. S.D.N.Y. 2019), *aff'd in part*, vacated in part on other grounds, remanded sub nom. *Markus v. Rozhkov*, 615 B.R. 679 (S.D.N.Y. 2020) (quoting *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 821 (Bankr. S.D.N.Y. 2018)).

164. Additionally, section 542(e) provides "[s]ubject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee." 11 U.S.C. § 542(e). Foreign representatives in chapter 15 cases seeking court-ordered discovery at times seek relief pursuant to section 542(e), which is either directly applicable to chapter 15 cases or, in the alternative, delineate relief which can be granted by the court pursuant to section 1521(a)(4). *See In re Platinum Partners Value Arbitrage Fund, LP*, 583 B.R. 803 (Bankr. S.D.N.Y. 2018); *see also In re AJW Offshore Ltd.*, 488 B.R. 551, 564 (Bankr. E.D.N.Y. 2013) (finding that a foreign representative may seek disclosure pursuant to section 542(e)); *In re ABC Learning Ctr.'s, Ltd.*, 445 B.R. 318, 341 (Bankr. D. Del. 2010) (allowing the right to seek turnover under section 542).

165. Following sections 542(e) and 1521(a)(4), Bankruptcy Rule 2004 provides an additional ground for a court to authorize discovery in a chapter 15 case, with the stated purpose of determining the nature and extent of the bankruptcy estate. *See In re Glitnir banki hf.*, No. 08-14757 (SMB), 2011 Bankr. LEXIS 3296, at *20 (Bankr. S.D.N.Y. Aug. 19, 2011). "The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (citation omitted).

In particular, discovery under Rule 2004 can be used to "facilitate[s] . . . the unearthing of frauds." *In re Orion Healthcorp, Inc.*, 596 B.R. 228, 235 (Bankr. E.D.N.Y. 2019) (citation omitted). Thus, Rule 2004 can be used as a "pre-litigation discovery device." *In re Wilson*, 413 B.R. 330, 336 (Bankr. E.D. La. 2009). Likewise, a Rule 2004 motion "need not be tied to specific factual allegations between parties." *See In re Symington*, 209 B.R. 678, 684 (Bankr. D. Md. 1997). Rather, Rule 2004 examinations may be "broad, unfettered and in the nature of a 'fishing expedition.'" *See In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 400 (Bankr. W.D. Pa. 2008); *see also In re Hughes*, 281 B.R. at 226 (same).

166. Finally, courts have found that a foreign representative may be authorized to take discovery in accordance with section 542(e) and Bankruptcy Rule 2004 pursuant to sections 1507 and 1521(a)(7). *See CohnReznick LLP v. Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (In re Platinum Partners Value Arbitrage Fund L.P.)*, 2018 U.S. LEXIS 109684, at *11 (S.D.N.Y. 2018); *Platinum Partners Value Arbitrage Fund*, 583 B.R. at 810. If recognition is granted, section 1507 of the Bankruptcy Code grants the bankruptcy court authority to "provide additional assistance to a foreign representative under this title or under other laws of the United States" provided that such assistance is "consistent with the principles of comity" and satisfies the fairness considerations set forth in section 1507(b). Thus, chapter 15 provides courts with broad, flexible, and pragmatic rules to fashion relief that is "largely discretionary and turns on subjective factors that embody principals of comity." *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. at 810 (Bankr. S.D.N.Y. 2018) (citation omitted). And, section 1521(a)(7) broadly affords a foreign representative "any additional relief that may be available to a trustee . . ." 11 U.S.C. § 1521(a)(7).

167. Here, the Petitioners must be afforded broad discovery rights in the United States to facilitate their investigations. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

**H. <u>The Injunctive Relief Order, As Entered by the Cayman Court, Should Be Fully Enforced Within the Territorial Jurisdiction of the United States Under Sections 105(a), 1507 and 1521(a)(7) of the Bankruptcy Code and Under Principles of Comity</u>**

168. Upon recognition of the Cayman Proceeding as a foreign proceeding—whether main or nonmain—the Court has the authority to provide additional assistance to the JOLs pursuant to the Bankruptcy Code or other applicable laws of the United States, so long as such relief is consistent with principles of comity. *See* 11 U.S.C. §§ 1507 and 1521(a)(7). Indeed, "[t]he plain language of Bankruptcy Code sections 1521(a) and 1507 give this Court a broad grant of discretion to aid foreign courts in accordance with principles of comity." *See In re Credito Real, S.A.B. de C.V., SOFOM, E.N.R.*, 2025 Bankr.LEXIS 751, at *39 (Bankr. D. Del. April 1, 2025). Additionally, section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

169. Chapter 15 specifically contemplates that the court should be guided by principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief. *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009); *see also, In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333 ("relief [post-recognition] is largely discretionary and turns on subjective factors that embody principles of comity." (citing §§ 1507, 1521, and 1525).). Chapter

15 of the Bankruptcy Code empowers "courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R. at 333-34; *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) ("chapter 15 maintains—and in some respects enhances—the 'maximum flexibility' . . . that section 304 provided bankruptcy courts in handling ancillary cases in light of principles of international comity and respect for the laws and judgments of other nations.") (internal citations omitted). These principles are embedded in the relief available under Chapter 15, which "provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives in the chapter in accordance with comity." *In re Rede Energia, S.A.*, 515 B.R. at 91.

170. Accordingly, "[a]fter recognition, chapter 15 specifically contemplates that the court will exercise its discretion consistent with principles of comity." *In re British American*, 488 B.R. 205, 239 (Bankr. S.D. Fla 2013) (quoting *In re Atlas Shipping A/S*, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009)). Courts are "guided by the principles of comity and cooperation with foreign courts in deciding whether to grant the foreign representative additional post-recognition relief." *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685, 696 (Bankr. S.D.N.Y.2010) (citing *In re Atlas Shipping*, 404 B.R. at 738); *see also CT Inv. Mgmt v. Cozumel Caribe (In re Cozumel Caribe S.A. de C.V.)*, 482 B.R. 96, 113 (Bankr. S.D.N.Y. 2012) (noting that comity is a "central tenet" in chapter 15 proceedings); 11 U.S.C. § 1501 (stating that the purpose of chapter 15 is to provide mechanisms for cooperation and comity between courts dealing with cross-border insolvency cases); *see also In re Agrokor*, 591 B.R. 163, 186 (Bankr. S.D.N.Y. 2018) ("Once a case is recognized as a foreign main proceeding, as has already occurred here, Chapter 15

specifically contemplates that the court will exercise its discretion consistent with principles of comity."); *In re Oi S.A.*, 587 B.R. 253, 264 (Bankr. S.D.N.Y. 2018) ("Chapter 15 … provides courts with broad, flexible rules to fashion relief that is appropriate to effectuate the objectives of the chapter in accordance with comity.") (internal quotations and citations omitted).

171. Indeed, section 1509(b)(3) expressly states that upon the foreign representative's recognition, the Court "must grant comity or cooperation to the foreign representative." 11 U.S.C. § 1509(b)(3). Chapter 15's legislative history evidences this principle. Congress has stated that "comity is raised in the introductory language [of Chapter 15] to make clear that it is the central concept to be addressed." *In re Oi*, 587 B.R. at 264 (quoting H.R. Rep. No. 109-31, pt. 1, at 109 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 172).

172. In *Hilton v. Guyot*, the United States Supreme Court defined comity as follows:

> Comity in the legal sense, is neither a matter of absolute obligation, on the one hand, nor mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

159 U.S. 113, at 141. "Comity is a common law rule by which courts in the United States give deference to foreign judgments." *In re Neves*, 570 B.R. 420, 426 (Bankr. S.D. Fla. 2017).

173. The proponent of comity bears the initial burden to satisfy the comity considerations set forth in *Hilton v. Guyot*, which considers the following:

> (a) whether the foreign court was competent and used proceedings consistent with civilized jurisprudence; (b) whether the judgment was rendered by fraud; and (c) whether the foreign judgment was prejudicial because it violated American public policy notions of what is decent and just.

*Daewoo Motor America, Inc. v. General Motors Corp.*, 459 F.3d 1249, 1258 (11th Cir. 2006) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)).

174. The first factor requires the proponent of comity to "describe the process by which the [foreign order] was obtained, why that process is not unfair, and why it does not offend the United States' notions of justice." *In re Neves*, 570 B.R. at 426. Once the proponent of comity satisfies this burden, the burden shifts to the party opposing comity to show that the foreign order "violates American public policy notions of what is decent and just." *Id.* at 427; see also *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (a foreign judgment may not be recognized on comity if its recognition would be "repugnant to fundamental notices of what is decent and just"). This burden is "high and unfrequently met" and is applicable only in "clear-cut cases." *Ackerman v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (citations omitted).

175. Further, all relief under Chapter 15 is subject to the public policy exception set forth in section 1506. Under section 1506, the Court may refuse "to take an action governed by [Chapter 15] if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. This public policy exception is "narrowly construed, because the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States.'" *In re ABC Learning Ctrs.*, 728 F.3d at 309 (quoting H.R. Rep. No. 109-31(I), at 109 (2005) reprinted in U.S.C.C.A.N. 88, 172); *see also In re Ashapura Minechem Ltd.*, 480 B.R. 129, 139 n.60 (S.D.N.Y. 2012) (internal quotations omitted) (citation omitted) (explaining that courts have "uniformly" interpreted the public policy exception "narrowly and applied it sparingly")

176. In considering comity, the relief granted in the foreign proceeding need not be identical to the relief that is available in the United States to be entitled to comity. *See In re Rede Energia*, 515 B.R. at 69. Indeed, the Restatement (Second) of Conflict of Laws states that the

principle of international comity should not be limited to monetary awards as foreign orders for equitable relief have been afforded comity in the United States. Restatement § 102.

177. In that regard, under principles of comity, courts have recognized injunctions issued by foreign courts, even if such injunctions may not be enforceable in the United States. *See In re Metcalfe & Mansfield Alternative Invs.*, 421 B.R. at 700 (noting "[p]rinciples of comity in chapter 15 cases support enforcement of the [foreign order] in the United States whether or not the same relief could be ordered in a plenary case under chapter 11.").

**I. Recognition of the Injunctive Relief Order is Warranted under Sections 1521(a)(7) and 1507 of the Bankruptcy Code**

**i. Legal Standard for Relief Under Sections 1521(a)(7) and 1507**

178. The Court has authority under sections 1521(a)(7) and 1507 to recognize and enforce the Injunctive Relief Order.

179. Upon recognition of a foreign proceeding, section 1521(a)(7) authorizes the Court to grant "any appropriate relief" at the request of the foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including any relief that may be available to a trustee or debtor-in-possession, subject to certain exceptions that do not apply here. 11 U.S.C. § 1521(a)(7); *see In re Cell C Proprietary Ltd.*, 571 B.R. 542, 554 (Bankr. S.D.N.Y. 2017) (noting that the list of "appropriate relief" under section 1521(a) is "non-exhaustive"); *In re Daebo Int'l Shipping Co., Ltd.*, 543 B.R. 47, 52–53 (Bankr. S.D.N.Y. 2015).

180. The Court has "exceedingly broad" discretion to grant relief under section 1521(a). *In re Markus*, 610 B.R. at 76; *In re U.S. Steel Canada Inc*., 571 B.R. 600, 609 (Bankr. S.D.N.Y. 2017) (citation omitted). However, such relief may be granted "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). An analysis under section 1522 requires a balancing test of the respective interests. *See In re Oi*, 587 B.R. at 265 (citing various cases).

181. Furthermore, Section 1507 of the Bankruptcy Code also permits the Court to grant the requested relief as "additional assistance." 11 U.S.C. § 1507(a). *Ad Hoc Group of Vitro Noteholders v. Vitro S.A.B. de CV (In re Vitro S.A.B. de CV)*, 701 F.3d 1031,1057 (5th Cir. 2012) (explaining that section 1507's "broad grant of assistance is intended to be a catchall"); *see also* H.R. Rep. No. 109-31, pt. 1, at 109 (2005) (noting that section 1507 authorizes "additional relief" beyond that available under section 1521 of the Bankruptcy Code). Though the "interplay between the relief available under sections 1507 and 1521 is far from clear," some courts analyze relief under these sections in a two-step approach: first considering relief under section 1521 and, if such relief is not available, then the Court may consider the relief requested under section 1507. *In re Olinda Star, Ltd*., 614 B.R. 28, 47 (Bankr. S.D.N.Y. 2020) (citing various cases).

182. To grant "additional assistance" under section 1507, the Court shall consider whether the additional assistance is consistent with principles of comity and whether it satisfies the following fairness considerations set forth in section 1507(b):

> (1) just treatment of all holders of claims against or interests in the debtor's property;
>
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3) prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

> (5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b); *In re Agrokor*, 591 B.R. at 188-89

183. Courts have recognized and enforced foreign orders under sections 1521 and 1507 to give effect and ensure compliance with the foreign order. Such is the case with foreign confirmation orders or orders to facilitate their implementation. *In re Olinda Star, Ltd.*, 614 B.R. at 47-48 (recognizing BVI scheme of arrangement and entering a permanent injunction against acts that would interference with the scheme); *In re Avanti Comms. Grp. PLC*, 582 B.R. 603 (Bankr. S.D.N.Y. 2018) (recognizing and enforcing UK schemes of arrangement which, among other things, granted third party releases); *In re Cell C Proprietary Ltd.*, 571 B.R. at 551 (recognizing South African arrangement sanctioned by South African court); *In re Rede Energia S.A.*, 515 B.R. at 93-94 (recognizing Brazilian reorganization and confirmation decision and enjoining actions in the United States in contravention of the decision

184. American courts have also afforded comity to *ex parte* interim injunctions. For instance, in *Gorsoan Ltd. v. Bullock*, No. 2020-020803-CA-01 (Fla. 11th Cir. Ct. Feb. 17, 2021), the court recognized an *ex parte* interim injunction order issued by a Cypriot court freezing Bullock's assets worldwide. In so doing, the court noted its rich history of affording comity to foreign interim injunctions. *Id.* at p. 3; *see also Amezcua v. Cortez*, No. 3D20- 1649, at 6 (Fla. 3d DCA Jan. 13, 2021) (recognizing Mexican embargo order prohibiting transfer of condominium unit); *Cermesoni v. Maneiro*, 144 So. 3d 627, 629 (Fla. 3d DCA 2014); *Nahar v.Nahar*, 656 So. 2d 225, 229 (Fla. 3d DCA 1995.

**ii. Recognition of the Injunctive Relief Order is Appropriate under Sections 1521 and 1507 of the Bankruptcy Code**

185. Section 1521(a)(7) of the Bankruptcy Code provides the granting of any additional relief – in this case, the recognition of the Injunctive Relief Order – that may otherwise be available to a trustee in bankruptcy. Here, such an Injunctive Relief Order may be enforceable in the United States under section 105(a). *See American Film Technologies v. Taritero (In re American Film Technologies)*, 175 B.R. 847, 855 (Bankr. D. Del. 1994) (utilizing section 105 to issue a preliminary injunction). Additionally, the standard for an injunction in the Cayman Islands is similar to that in the Third Circuit. *See* Moran Decl., at ¶ 42 (discussing the standard for injunctive relief in the Cayman Islands).[11] Indeed, as set forth in the Moran Declaration, the Cayman Court has already determined that (a) the Cayman Litigation had a reasonable prospect of success and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation. *See* Moran Decl., at ¶ 32.

[11] To determine whether to issue a preliminary injunction, a court must consider: (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party, and (4) whether the relief is in the public interest. *See Swartzwelder v. McNeilly*, 297 F.3d 228, 234 (3d Cir. 2002).

186. Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court. *See* Moran Decl., at ¶ 35. Moreover, the nature of the relief being sought is similar to the relief that has been raised among the parties in protocol discussions in the Cayman Proceeding and is, in substance, akin to the restrictions that the Named Defendants agreed to assume in the Rule 11 Agreement in the Texas Proceeding. *See* MacInnis Decl., at ¶¶ 68, 97. Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, it should be recognized by this Court in the interests of comity.

187. In addition, recognition of the Injunctive Relief Order satisfies the relevant equitable and practical considerations outlined in section 1507(b) of the Bankruptcy Code. First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group. Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation. Finally, the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution. These considerations, grounded in the principles of comity and cross-border cooperation, strongly support recognition

of the Injunctive Relief Order, which represents the Cayman Court's necessary and proportionate response to the JOLs' and the Named Defendants' failure to reach agreement on a protocol to mitigate the risk of asset dissipation pending completion of the JOLs' investigation and the Cayman Litigation.

188. Accordingly, the JOLs seek, should the Cayman Court issue the Injunctive Relief Order, full enforcement of the Injunctive Relief Order within the territorial jurisdiction of the United States to ensure that the mitigation of any risk of asset dissipation—including asset dissipation of funds for the benefit of U.S. charities—pending completion of the JOLs' investigation and the Cayman Litigation is applied consistently across the two relevant jurisdictions, furthering the very goals of international cooperation and assistance to foreign courts and principles of comity.

**J. Granting the Relief Requested herein, Including Recognition of the Cayman Proceeding and Injunctive Relief Order, Are Not Manifestly Contrary to U.S. Public Policy**

189. The requested relief herein advances the public policy objectives of chapter 15 of the Bankruptcy Code, including cooperation, fairness, and efficiency, and the protection and maximization of asset value. As set forth in the Moran Declaration, Cayman law provides a structured process for the liquidation of a debtor's assets, involving judicial oversight and opportunity for creditor participation, which is aligned with U.S. principles of due process and fair treatment of creditors. *See* Moran Decl. ¶¶ 29, 64. To aid an orderly liquidation, it is imperative that the Petitioners be afforded the necessary relief to both protect the Debtor's assets and conduct ongoing investigations—this includes recognition of the Cayman Proceeding and Injunctive Relief Order. Absent this Court granting the relief requested herein, there is a significant risk of further asset dissipation—particularly related to the Fund. Therefore, such relief promotes the fair and efficient administration of cross-border insolvency, protects the interests of all creditors and other

parties in interest, including the Debtor, and maximizes the value of the Debtor's assets. *See* 11 U.S.C. § 1501(a).

**NOTICE**

190. Notice of this Petition has been provided in accordance with the terms set forth in the *Motion of Petitioners for Entry of an Order Scheduling a Hearing on Chapter 15 Petition for Recognition and Related Relief and Specifying Form and Manner of Service of Notice*. The Petitioners submit that such notice is proper, and that no other or further notice need be provided.

## CONCLUSION

WHEREFORE, the Petitioners respectfully request the Court to enter an order, substantially in the form attached as **Exhibit A**, granting the requested relief and such other and further relief as may be just and proper.

Dated: July 21, 2025
Wilmington, Delaware

Respectfully submitted,

**REED SMITH LLP**

By: */s/ Jason D. Angelo*
Jason D. Angelo (No. 6009)
1201 North Market Street, Suite 1500
Wilmington, DE 19801
Telephone: +1.302.778.7500
Facsimile: +1.302.778.7575
E-mail: jangelo@reedsmith.com

-and-

Casey Laffey, Esq. (*pro hac vice* forthcoming)
Aaron Javian, Esq. (*pro hac vice* forthcoming)
Ian M. Turetsky, Esq. (*pro hac vice* forthcoming)
Richard C. Solow, Esq. (*pro hac vice* forthcoming)
**REED SMITH LLP**
599 Lexington Avenue
New York, NY 100220
Telephone: +1.212.521.5400
Facsimile: +1.713.521.5450
E-mail: claffey@reedsmith.com
ajavian@reedsmith.com
ituretsky@reedsmith.com
rsolow@reedsmith.com

*Counsel to Margot MacInnis and Sandipan Bhowmik as Joint Official Liquidators of Chapter 15 Debtor*

**VERIFICATION OF PETITION**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America, as follows:

My colleague, Sandipan Bhowmik, and I are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands, which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ). As such, I have full authority to verify the foregoing Petition on behalf of the Debtor.

I have read the foregoing Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information, and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
Cayman Islands

/s/ Margot MacInnis
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (___) |

**ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND DISCRETIONARY RELIEF**

Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited (the "Petitioners"), the duly appointed joint official liquidators of Charitable DAF HoldCo, Ltd ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025) (JAJ) (the "Supervision Order"), by its undersigned United States counsel, Reed Smith LLP ("Reed Smith") having filed in their capacity as the authorized foreign representatives of HoldCo the Official Form Petition and the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition")[2] and the accompanying Moran Decl. and MacInnis Decl., seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Verified Petition, Moran Decl., MacInnis Decl., together with all exhibits thereto, in support of the Verified

[1] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 170388. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

Petition, as well as any objections thereto; and a hearing having been held on [DATE], 2025 (the "Hearing") to consider the Verified Petition, at which the Moran Decl. and MacInnis Decl. were received into evidence; and appropriate and timely notice of the filing of the Verified Petition and the Hearing thereon having been given by the Petitioners pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and no other or further notice being necessary or required; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court finds:[3] (i) it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(a), 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; (ii) venue is properly located in this district pursuant to 28 U.S.C. §§ 1410(1) and 1410(3); (iii) the Verified Petition was properly filed and served; (iv) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); (v) the Debtor is subject to foreign main proceedings within the meaning of section 1502(4) and 1517(b)(1) of the Bankruptcy Code; (vi) the Petitioners are "persons" and the "foreign representatives" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code; (vii) the Debtor's chapter 15 case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code; (viii) the Debtor has its center of main interests in the Cayman Islands; (ix) the Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code and Rule 1007(a)(4) of the Bankruptcy Rules; (x) the Petitioners have demonstrated that the relief requested is necessary and appropriate, in the interests of the public and international comity,

---

[3] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

consistent with the public policy of the United States, and warranted pursuant to sections 105(a), 362, 542, 1507(a), 1509(b)(2)-(3), 1520, 1521 and 1522 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules and will not cause hardship to creditors of the Debtor or other parties-in-interest that is not outweighed by the benefit of granting that relief; (xi) the interest of the public will be served by this Court's granting of the relief requested by the Petitioners; (xii) all of the relief contained in this Order is within the Court's jurisdiction, is essential to the success of the Cayman Proceeding, confers material benefits on, and is in the best interests of, the Debtor, its creditors, interest holders and other parties-in-interest, and critical and integral to the overall objectives of the liquidation and, with respect to injunctive relief, meets the legal and factual requirements for issuing an injunction; and (xiii) all creditors, interest holders and other parties-in-interest, including the Debtor, are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

IT IS HEREBY ORDERED THAT:

1. The Verified Petition is granted and any objections thereto are overruled with prejudice.

2. The Debtor's Cayman Proceeding is granted recognition as a foreign main proceeding pursuant to sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3. All relief afforded to a foreign main proceeding automatically upon recognition pursuant to section 1520 of the Bankruptcy Code is granted including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and its property that is now within or in the future is located within the territorial jurisdiction of the United States.

4. The Petitioners are granted recognition as "foreign representatives" pursuant to section 101(24) of the Bankruptcy Code in respect of the Cayman Proceeding.

5. Pursuant to sections 1521(a)(1), (2) and (3) of the Bankruptcy Code, all persons and entities, other than the Petitioners and their representatives and agents, are hereby enjoined (to the extent they have not been stayed under section 1520(a)), in each case from:

a. executing against the assets of the Debtor;

b. commencing or continuing, including the issuance or employment of process, any judicial, quasi-judicial, administrative, regulatory, arbitral, or other action or proceeding, or to recover a claim, including, without limitation, any and all unpaid judgments, settlements or otherwise against the Debtor;

c. taking or continuing any act to create, perfect or enforce a lien or other security interest, setoff or other claim against the Debtor;

d. transferring, relinquishing or disposing of any property of the Debtor to any person or entity (as that term is defined in section 101(15) of the Bankruptcy Code) other than the Petitioners; and

e. commencing or continuing an individual action or proceeding concerning the assets, rights, obligations or liabilities of the Debtor;

provided, in each case, that such injunctions shall be effective solely within the territorial jurisdiction of the United States.

6. No persons or entities may take any action inconsistent with the Supervision Order, any order entered by the Cayman Court in relation to the Applications, and any orders issued in the Cayman Proceeding identified in the Verified Petition.

7. No action taken by the Petitioners in preparing, disseminating, applying for, implementing, or otherwise in connection with this Order, any order entered in respect of the Verified Petition, this Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, constitutes a waiver of any immunity afforded to the Petitioners as foreign representatives, including without limitation pursuant to section 1510 of the Bankruptcy Code.

8. In accordance with sections 1519(a)(3) and 1521(a)(4) of the Bankruptcy Code, Rule 2004 of the Bankruptcy Rules, and the Federal Rules of Civil Procedure, as incorporated by the Bankruptcy Rules, the Petitioners are authorized to conduct the examination of witnesses, the taking of evidence, or the delivery of information concerning the Debtor's assets, affairs, rights, obligations, or liabilities.

9. In accordance with sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code, subject to any applicable privilege, all persons that hold recorded information, including books, documents, records, and papers, relating to the Debtor's property or financial affairs are required to turnover or disclose such recorded information to the Petitioners.

10. Pursuant to section 1521(a)(5) of the Bankruptcy Code, the administration or realization of all or part of the assets of Debtor within the territorial jurisdiction of the United States is hereby entrusted to the Petitioners and the Petitioners are hereby established as the exclusive representatives of Debtor in the United States.

11. Pursuant to sections 105(a), 1507, and 1521(a)(7) of the Bankruptcy Code, the Injunctive Relief Order is hereby recognized, given full force and effect and is fully enforceable within the territorial jurisdiction of the United States.

12. Notwithstanding any provision in the Bankruptcy Rules to the contrary, including, but not limited to, Bankruptcy Rules 7062 and 1018, (A) this Order shall be effective immediately and enforceable upon its entry; (B) the Petitioners are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order; and (B) the Petitioners and the Debtor are authorized and empowered, and may in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

13. A copy of this Order shall be served in accordance with *Order Scheduling Hearing on Chapter 15 Petitions and Relating Relief and Specifying Form and Manner of Service of Notice* (D.I. •). Such service shall be good and sufficient service and adequate notice for all purposes.

14. This Court shall retain jurisdiction with respect to the effect, enforcement, amendment, or modification of this Order, any request for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

15. This Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

**EXHIBIT K**

**In the Matter Of:**

HIGHLAND CAPITAL MANAGEMENT, LP

19-34054-SGJ11

**SHAWN RAVER**

*June 20, 2025*

ESQUIRE DEPOSITION SOLUTIONS

*800.211.DEPO (3376)*
*EsquireSolutions.com*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) Case No. 19-34054-SGJ11 |
| | ) |
| REORGANIZED DEBTOR. | ) |

************************************************************

ORAL DEPOSITION OF

SHAWN RAVER

JUNE 20, 2025

(Reported Remotely)

************************************************************

ORAL DEPOSITION of SHAWN RAVER, produced at the instance of the Defendant Dugaboy Investment Trust, and duly sworn, was taken in the above-styled and numbered cause on the 20th day of June, 2025, from 11:35 a.m. to 12:19 p.m., Central Time, via Zoom videoconference before Angelica G. Robles, CSR, in and for the State of Texas, reported by oral stenography remotely pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S:

FOR HIGHLAND CAPITAL MANAGEMENT, L.P. AND HIGHLAND CLAIM AND TRUST:

JOHN A. MORRIS
PACHULSKI STANG ZIEHL & JONES, LLP
1700 Broadway, 36th Floor
New York, New York 10019
Phone: (210) 561-7700
Email: jmorris@pszjlaw.com

FOR HIGHLAND LITIGATION TRUSTEE:

ROBERT S. LOIGMAN
QUINN EMANUEL URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone: (212) 849-7000
Email: robertloigman@quinnemanuel.com

FOR DUGABOY INVESTMENT TRUST:

MICHAEL J. LANG
CRAWFORD, WISHNEW & LANG PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Phone: (214) 817-4500
Email: mlang@cwl.law

FOR HUNTER MOUNTAIN INVESTMENT TRUST:

LOUIS M. PHILLIPS
KELLY HART PITRE
400 Poydras Street, Suite 1812
New Orleans, Louisiana 70130
Phone: (504) 522-1812
Email: louis.phillips@kellyhart.com

FOR DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE:

DAVID CURRY
OKIN ADAMS BARTLETT CURRY LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Phone: (713) 228-4100
Email: dcurry@okinadams.com

ALSO PRESENT:

Jeff Pomerantz

Drew York

Amelia Hurt

Dennis C. Sauter

INDEX

Appearances.................................... 2

SHAWN RAVER
Examination by MR. LANG........................ 6
Examination by MR. CURRY....................... 15

Changes and Signature.......................... 35

Reporter's Certification....................... 37

EXHIBITS

DUGABOY INVESTMENT TRUST:

| No. | Description | Page |
|---|---|---|
| 1 | Charitable DAF/CLO HoldCo Structure Chart | 11 |

P-R-O-C-E-E-D-I-N-G-S

THE REPORTER: We are now on the record. Today's date is June 20th, 2025, and the time is 11:35 a.m., Central Time. This is the oral, remote deposition of Shawn Raver who is located in Dallas, Texas.

These proceedings are held in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, case being In Re Highland Capital Management, LP, Case No. 19-34054-SGJ11.

My name is Angelica Robles, Texas CSR No. 11809, administering the oath and reporting the deposition remotely for Esquire Deposition Solutions. The witnesses been identified to me throughout attestation of Counsel.

Would all parties, starting with the Plaintiff's attorney, please state their appearances and locations for the record, and then I will swear in the witness.

MR. MORRIS: John Morris, Pachulski, Stang, Ziehl & Jones, for Highland Capital Management, LP and Highland Claim and Trust, and I'm located in New York.

MR. LANG: Michael Lang for Dugaboy Investment Trust, and I am in Dallas.

MR. PHILLIPS: Louis M. Phillips, Kelly Hart, representing -- sitting in, defending Mr. Raver,

representing Hunter Mountain Investment Trust, and I'm in New Mexico.

MR. LOIGMAN: This is Robert Loigman of Quinn, Emanuel representing the Highland Litigation Trustee. And I am in New York.

MR. CURRY: And this is David Curry from Okin, Adams, Bartlett & Curry, on behalf of the Dallas Foundation and Crown Global Insurance, LTD, and I am in Houston.

THE REPORTER: Mr. Raver, at this time please raise your right hand to be sworn in.

(The witness was sworn)

THE WITNESS: I do.

THE REPORTER: Thank you.

Please proceed, Counsel.

SHAWN RAVER,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. LANG:

Q. Please state your name for the record.

A. Shawn Raver.

Q. Mr. Raver, how are you employed?

A. I'm employed by CDM CFAD, LLC.

Q. Can you give me those letters again?

A. Yes. CDM CFAD, LLC.

Q. And what does that LLC do?

A. It is basically a charitable investment, you know, fund, for a lack of a better word. But, you know, charitable investment structure.

Q. And how is CDM CFAD, LLC related to Hunter Mountain?

MR. MORRIS: Objection to the form of the question.

A. So Hunter Mountain would be an affiliate several layers below, so indirect subsidiary.

Q. (By Mr. Lang) Were you involved in the negotiation of the proposed settlement agreement in the Highland bankruptcy between Highland Capital Management and Hunter Mountain?

A. Yes. In a supporting role.

Q. Okay. What did you do in a supporting role?

A. You know, just took part in, you know, some meetings, reviewed drafts of the settlement agreement, provided comments, if I had any. You know, that was about it.

Q. And are you aware of when the negotiations began?

A. I became involved early April, right at the beginning of April.

Q. When is the first time -- let me ask this: Who initiated the settlement discussions, if you know?

A. I don't know.

Q. Under the proposed settlement agreement, Hunter Mountain received a promissory note from Highland, the Dugaboy Note. Are you familiar with that?

A. I am.

Q. Okay. Has Hunter Mountain performed any valuation on the Dugaboy note?

A. We had engaged a valuation firm, and it is in process, but it's not finished as of today.

Q. Does Hunter Mountain have an estimated value of the Dugaboy note?

A. No.

Q. What about the Kirschner Claims? Does Hunter Mountain have an estimated value of the Kirschner Claims?

A. Not to my knowledge, no.

Q. Are you familiar with the structure of DAF, the DAF CLO HoldCo?

A. Generally, yes.

Q. Let me try and share my screen here. I hope you guys can see the flowchart. Do you see that?

A. I can.

Q. Is this an accurate depiction of the structure of the DAF, which is the Donor Advised Fund, as it exists today?

A. No.

MR. PHILLIPS: Hold on, Shawn. Objection, Mr. Lang, sort of like and even stronger than Mr. Morris's suggestion that we limit the scope of the deposition to your objection. The court has said that the objection is not -- your client is not able to supplement your objection. We're not going to allow it to be supplemented through evidence outside the scope of the objection. And, in fact, the objection doesn't relate to the Hunter Mountain side at all, that we can figure out. So let's not challenge the authority of Mr. Patrick to sign on behalf of Hunter Mountain. So while Mr. Morris was very lenient in allowing you additional -- in allowing you leeway, we're going to be less so because your objection doesn't address, as we read it, the entire Hunter Mountain side of the settlement.

MR. LANG: Okay. You know, my issue is somebody has raised this issue. And if you're trying to buy peace and to risk the whole thing being unwound because of some capacity issue, I was just trying to get an idea of what changed in this work chart.

MR. PHILLIPS: Well, you didn't raise that as a problem. And the party who raises the problem, we know does not have standing to raise anything in connection with this transaction.

MR. CURRY: Well, Louis, do we want to go

ahead and pause and get her on the phone, or do you want to just stop and redo this next week and waste everybody's time?

MR. PHILLIPS: No. I'm telling Mr. Lang that we're going to allow him some leeway but not much because his objection doesn't relate to any claim -- any suggestion or assertion about the Hunter Mountain side of the transaction.

MR. CURRY: Well, I don't want to do his job for him, but don't you think his client has an interest in not having to pay twice?

MR. PHILLIPS: I don't think -- well, his client -- whose client?

MR. CURRY: I said his. We're not being asked to anything. We're trying to make sure the money that's owed to us comes to us, but --

MR. PHILLIPS: I don't know who you are talking about having to pay twice.

MR. LANG: Let's sit through another deposition. That's all.

MR. PHILLIPS: I didn't hear that.

MR. CURRY: We'll just sit through another deposition. You're right.

MR. LANG: We'll sit through another deposition, that's all I was saying.

MR. PHILLIPS: I'm going to give you some leeway, but I'm just telling you, we're not going to allow for supplementation or amendment of the pleadings through evidence.

MR. LANG: Understood.

Q. (By Mr. Lang) So, Mr. Raver, can you tell me what has changed from the flowchart that you see in what I'm going to mark as Exhibit 1? Can you tell me what has changed between the organization chart as it exists here and how it looks today?

(Exhibit No. 1 marked)

A. The ownership of the Charitable DAF Fund, LP has changed.

Q. (By Mr. Lang) Okay. So on this flowchart, Charitable DAF HoldCo, Limited owned 100 percent of Charitable DAF Fund, LP, correct?

A. Yes.

Q. And Charitable DAF HoldCo, Limited no longer owns Charitable DAF Fund, LP?

A. Correct.

Q. Who owns Charitable DAF Fund, LP?

A. CDM CFAD, LLC.

Q. And does Charitable DAF HoldCo, Limited have any ownership interest, direct or indirect, you know, through whatever layers there are? Does it have any ownership

interest in Charitable DAF Fund, LP?

MR. PHILLIPS: Object to the form of the question.

A. No.

Q. (By Mr. Lang) Does Charitable DAF Fund, LP still own 100 percent of CLO HoldCo?

A. Yes.

Q. So, currently, just so I'm clear, the structure below -- does the structure below the Charitable DAF Fund, LP generally look the same?

A. Generally, yes, it looks the same.

Q. And then -- and then CDM CFAD, LLC now sits above Charitable DAF Fund, LP?

A. Yes.

Q. And who owns Hunter Mountain? Where do they fall?

A. They are below -- they are below CLO HoldCo, LTD. The direct owner of Hunter Mountain is Beacon Mountain, LLC.

Q. And who owns Beacon Mountain?

A. CLO HoldCo, LLC.

Q. There was a mention in Mr. Klos's deposition about a Liberty or Liberty HoldCo. Where do they fall?

A. It's another 100 percent subsidiary of CLO HoldCo, LTD.

Q. So they go across the line under CLO HoldCo?

MR. PHILLIPS: Object to the form of the

question.
A. Yeah, I think that's correct. Yeah.
Q. (By Mr. Lang) Which of -- which of the companies on the work chart on Exhibit 1 is in liquidation?
A. Charitable DAF HoldCo, LTD.
Q. And who currently owns, of the Hunter Mountain entities that are defined in the motion, Rand Advisors, LLC?
A. I'm sorry. Could you repeat that?
Q. There's a list of Hunter Mountain entities in the motion. They include Beacon Mountain, LLC, who we talked about, Rand Advisors, LLC, Rand PE Fund1, LLC, Rand PE Fund Management, Atlas IDF, LP, and Atlas IDF GP, LLC. Are you familiar with those entities?
MR. MORRIS: Object to the form of the question.
A. Yes.
Q. (By Mr. Lang) Okay. So who currently owns Rand Advisors, LLC?
A. Charitable DAF Holdings Corp.
Q. And who currently owns Rand PE Fund1, LP?
A. Atlas IDF, LP.
Q. And who currently owns Rand PE Fund Management, LLC?
A. Charitable DAF Holdings Corp.
Q. And Atlas IDF, LP, who owns that LP?

A. I think -- I always look at it as the sole limited partner as Crown Global, the insurance company on behalf of the two segregated annuity contracts.

Q. And then Atlas IDF GP, LLC is just a general partner of Atlas IDF?

A. Yes.

MR. LANG: I'll pass the witness to Mr. Curry.

MR. PHILLIPS: We have the same objection as Mr. Morris raised to Mr. Curry's participation. And in the spirit of cooperation, we will allow 15 minutes.

MR. CURRY: I'm going to take the time I need, Louis. If you instruct your witness to leave, we can either deal with it today, or we'll just re-notice him, so --

MR. PHILLIPS: That's fine. You can do whatever you do. I've told you what we're going to do, and then you can respond.

MR. CURRY: Are you saying you're going to leave in 15 minutes? Because I'll filibuster with you for 15 minutes and then completely have an obstruction issue.

MR. MORRIS: We're going to allow you to ask questions for 15 minutes and abide by the very agreement that your partner just did.

MR. CURRY: Well, that was on that deposition

back then, John. He didn't make that agreement as to this deposition, and we're not agreeing to the limitation. So objection noted. You guys do what you want to do.

EXAMINATION

BY MR. CURRY:

Q. Mr. Raver, my name is David Curry. I'm with the law firm of Okin, Adams. I represent the Dallas Foundation and Crown Global Life Insurance. Are you familiar with those two entities?

A. Generally, yes.

Q. As to Crown Global, I think we were just going through this chart in here. Are you aware of Crown Global's limited partnership interest in this structure?

A. No, not in the structure.

Q. No? How about in the Rand entity structures? So if you go down from Rand to Hunter Mountain.

MR. PHILLIPS: Object to the form of the question.

A. Yeah, can you be a little clearer? I don't know what you mean by Rand.

Q. (By Mr. Curry) Rand Advisors Fund.

A. So Rand Advisors is the investment manager for Atlas IDF, LP.

Q. Atlas IDF, LP, it's a limited partnership?

A. Yes.

Q. And who would be the limited partner?
A. Crown Global.
Q. Thank you. I want to back up just a little bit and just kind of get a little bit of background information, Mr. Raver. You say your current employer is CDM CFAD, LLC?
A. Yes.
Q. Is that correct?
A. Correct.
Q. When did you become employed there?
A. My employment below that -- or for that entity was in March of this year.
Q. March of '25?
A. Correct.
Q. Where were you employed before then?
A. The employment agreement was with Charitable DAF HoldCo, LTD, and it would cover all the DAF entities.
Q. So you were employed by Charitable DAF HoldCo, LTD?
A. Yes.
Q. The entity that's in liquidation in the Caymans?
A. Yes.
Q. Okay. What was your role there?
A. Chief Operating Officer and Associate General Counsel.
Q. Okay. So we talked earlier, and you said -- and

just looking here at Exhibit 1 that's up here, you said that this structure is no longer accurate. When did CDM CFAD acquire any interest in Charitable DAF Fund -- I mean, yeah, in the Charitable DAF Fund, LTD? I'm sorry. Alphabet soup. Sometimes it jumbles.

MR. MORRIS: Objection to the form of the question.

MR. PHILLIPS: Same objection.

MR. CURRY: Yeah. Let me rephrase it.

Q. (By Mr. Curry) I believe your testimony earlier was that Charitable DAF Fund, LP is owned by your employer, CDM CFAD, LLC. When did your employer acquire its interest in Charitable DAF Fund, LP?

A. I believe it was in March of 2025. I don't remember the exact date.

Q. Was it before or after you went to work for CDM CFAD?

A. I don't recall.

Q. You don't recall whether you were working for DAF HoldCo or CDM F -- we're just going to call it -- if we say CDM, can we all agree we know what we're talking about? It's a mouthful. Were you working at DAF HoldCo or at CDM when CDM acquired its interest in DAF Fund, LP?

A. I just don't remember the exact date. I don't know if it was concurrently or shortly thereafter that I

became --

Q. You were the CEO and General Counsel of DAF HoldCo, that was your testimony, correct?

MR. PHILLIPS: Objection; misstating prior testimony.

MR. CURRY: Then I'm giving him the opportunity to correct it.

MR. PHILLIPS: Objection to the form of the question.

Q. (By Mr. Curry) Up until March '25, your testimony earlier was that you were the CEO and General Counsel for DAF HoldCo, correct?

MR. PHILLIPS: Object to the form of the question.

Q. (By Mr. Curry) Correct? Mr. Raver, go ahead and answer out loud.

A. Correct.

Q. Thank you. Correct. And so you're telling me you don't know whether or not you went to work for the purchaser before or after the asset was sold?

A. I just don't remember the specific dates, and I don't know the --

(Speaking simultaneously)

Q. (By Mr. Curry) Did you represent DAF HoldCo as internal counsel? Did you participate in the negotiation of

the transaction transferring ownership of DAF Fund, LP from DAF HoldCo, LTD to CDM?

MR. MORRIS: Objection to the form of the question.

A. I was aware of it but I didn't -- I don't know if I -- I didn't participate, I guess, you know, in the restructuring.

Q. (By Mr. Curry) So as the CEO and General Counsel, your input was not sought into the structure of the transaction or the resulting structure? Is that your testimony, that you had no input?

MR. MORRIS: Objection to the form of the question.

A. I think you said CEO, which I wasn't.

Q. (By Mr. Curry) I'm sorry. COO.

A. Yeah, like I said, I was generally aware of it. I just don't recall, you know, how my input was requested. But, you know, I'm understandably aware of it.

Q. Did you -- as General Counsel, was it your responsibility to engage outside legal services?

MR. MORRIS: Objection to the form of the question.

MR. PHILLIPS: Objection to the form of the question.

Q. (By Mr. Curry) Let me -- all right -- Mr. Raver,

tell us your roles at DAF HoldCo. What were your titles?
MR. PHILLIPS: Objection to the form of the question.
A. Chief Operating Officer and Associate General Counsel.
Q. (By Mr. Curry) Okay. In your role as associate General Counsel at Charitable DAF HoldCo, LTD, were your responsibilities -- did they include engagement of outside counsel?
A. At times, yes.
Q. Yes? Were you asked to engage outside counsel in connection with the transaction between DAF HoldCo and CDM?
A. Not that I recall, no.
Q. Okay. Do you know if outside counsel was engaged?
A. I believe so, yes.
Q. Do you know who that was?
A. I don't recall. I'd have to -- yeah, I don't remember.
Q. Okay. Who was the General Counsel?
MR. MORRIS: Objection to the form of the question.
Q. (By Mr. Curry) Okay. So sitting here today, your testimony is that you did not participate in any of the negotiation or drafting of the documents underlying a transaction that occurred in or around March of '25 -- 2025

whereby Charitable DAF HoldCo, LTD -- well, I'm going to say it this way -- whereby CDM CFAD, LLC acquired the sole partnership or the sole ownership interest in Charitable DAF Fund? So that's the transaction. Mr. Raver, do you understand when I say transaction? Are we in agreement in what I'm talking about?

A. I believe so, yes.

Q. Okay. So your testimony today is that in your capacity as Chief Operating Officer or Associate General Counsel with Charitable DAF HoldCo, LTD, that you did not participate in the drafting or the negotiation of the transaction documents; is that correct?

A. I don't think I said I did not participate. Yeah, I don't know -- I was aware of the transaction. I was aware of the concerns and the reasoning for the transaction, and, you know, I was aware of the documents, but I didn't draft them. So I guess I participated. I just don't know how, you know, how much I participated. I was aware of the transaction and, you know, the reasoning for it.

Q. So you were aware of the transaction, aware of the reasoning for it -- and I'm not trying to misstate this; this is a question -- had some familiarity or engagement with the documents or -- because you said something about the documents. I didn't quite hear you. It was broken up. I'm trying to get that clarified.

A. Right. I was aware of the documentation and may have reviewed it. So I guess I participated to some level. I just -- you know, I didn't draft the documents. I didn't engage outside counsel for that transaction.

Q. At the time of that transaction, who owned CDM CFAD, LLC?

A. Tell me the transaction again. I mean, with the redemption or the change of ownership of Charitable DAF Fund?

Q. Yeah. The change in ownership.

A. At that point, CDM was owned 50 percent by Charitable DAF HoldCo, LTD and 50 percent by CDM -- or DFW Charitable Foundation. Sorry.

Q. Okay. And so it was a 50/50 ownership? How did Charitable DAF HoldCo, LTD inquire its interest in CDM CFAD?

MR. MORRIS: Objection to the form of the question.

A. My recollection is it contributed its interest in Charitable DAF Fund, LP.

Q. (By Mr. Curry) So before it contributed its 50 percent ownership interest to Charitable DAF HoldCo, LTD, was it 100 percent owned by DFW Charitable Foundation?

A. I don't recall.

Q. I'm sorry?

A. I don't recall.

Q. Okay. As we sit here today, who owns CDM CFAD?
A. DFW Charitable Foundation.
Q. Just to make sure -- there's a little bit of choppiness, Mr. Raver, when you first start talking. So I'm losing a lot of your -- the beginning of your answers. So if you can just try to be aware of that and speak a little bit more clearly. Was your answer there that currently, now, CDM CFAD is owned by DFW Charitable Foundation? Is that 100 percent?
A. Right. Yes. 100 percent.
Q. And I think you alluded to this earlier when you were asking me to clarify which transaction I was talking about, you mentioned the redemption. By that, did you mean the transaction in which the 50 percent ownership that Charitable DAF HoldCo had in CDM -- well, wait. Let me back up. When was the CDM CFAD transaction? When did that occur?
A. I believe it was the end of March of 2025.
Q. Okay. So let me back up because I want to make sure we're establishing a timeline correctly here.
So before -- before CDM CFAD contributed 50 percent interest into Charitable DAF HoldCo, right, we all agree that the structure for CLO HoldCo, LTD, would you agree, Mr. Raver, that the chart that's on the screen as Exhibit 1 was what was accurate --

MR. PHILLIPS: Object to the form of the question.
Q. (By Mr. Curry) -- before the CDM transaction?
A. Yes.
Q. Okay.
A. Well, let me correct. I think the GP was different. It was a different GP. It was not Charitable DAF GP, LLC at that time, so I need to correct that.
Q. Was it CDH GP, LTD?
A. Yes.
Q. And who formed that entity?
A. It would've been Cayman counsel. I don't know who specifically would have formed it.
Q. Okay. So noting that discrepancy -- there's another issue there -- so the GP's been replaced by a new entity, and -- but before Charitable DAF HoldCo acquires its 50 percent interest in CDM CFAD, it owned 100 percent Charitable DAF Fund, LP, correct?
A. Can you repeat that? I'm sorry.
Q. CDM CFAD, before it was inserted into the structure, so before it contributed its interest and before the March '25 transaction we were talking about before, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF HoldCo, LTD, right, right here as it says on Exhibit 1?
A. Yes.

Q. That's correct as far as you know, right?
A. Yes.
Q. Do you have any reason to believe that it would have been incorrect at anytime before the transaction with CDM CFAD?
A. Not to my knowledge, no.
Q. No? Okay.
MR. PHILLIPS: David, we're three minutes over. I'm going to give you another two minutes. That will give you 20.
MR. CURRY: Thank you, Louis. I should be able to wrap it up. If you give me 25, we'll definitely be done without a fight.
Q. (By Mr. Curry) So, Mr. Raver, when CDM CFAD contributed its 50 percent interest into Charitable DAF, so at this point, Charitable DAF HoldCo would own CDM CFAD, 50 percent; it's jointly owned with DFW Charitable Foundation, correct?
A. Yes.
Q. And so when CDM CFAD contributed its 50 percent interest in itself, did it own any assets?
MR. PHILLIPS: Objection to the form of the question.
Q. (By Mr. Curry) Did CDM own any assets?
A. I'm not sure I understand the question.

Q. Do you know what assets are?
A. Yes.
Q. Do you know what ownership is?
A. Yes.
Q. Did CDM own any assets when it contributed its 50 percent interest into Charitable DAF HoldCo?
A. I don't know.
Q. Okay. CDM, at some point, acquired 100 percent ownership of Charitable DAF Fund, LP, correct?
A. Yes.
Q. Other than its ownership of Charitable DAF Fund, LP, does CDM own any assets, any other assets?
A. No.
Q. I'm sorry. I didn't hear you.
A. No.
Q. No? Okay. So initially -- and I want to make sure I have the steps correct. So initially, we have this chart up here, Exhibit 1. We have Charitable DAF HoldCo. It holds 100 percent Charitable DAF Fund. Charitable DAF HoldCo acquires a 50 percent interest in CDM CFAD and then transfers its interest of Charitable DAF Fund, LP to CDM. And at the end of that transaction, if we are looking back at Exhibit 1, and I want to make sure -- I think I understand this correctly, but I just want to make sure -- that Charitable DAF HoldCo, LTD, once -- so it now owns CDM

CFAD 50 percent, right, and no longer owns an interest in Charitable DAF Fund, LP; is that correct? That's the change that occurred? Before the redemption -- I understand there's another transaction. But before --

MR. PHILLIPS: Object to the form.

Q. (By Mr. Curry) -- the redemption, the structure would have been Charitable DAF HoldCo, LTD owning CDM CFAD, which then held the rights to Charitable DAF Fund, LP. Is that the resulting structure?

A. Yes.

Q. Yes? Okay. So the transaction through which Charitable DAF HoldCo, LTD transferred its interest, you said you were familiar with. What was the consideration that was received by DAF HoldCo for the transfer of the Charitable DAF Fund, LP interest?

A. It would've been the interest in CDM CFAD, LLC.

Q. Right. So they gave 50 percent of all their assets, what they didn't return?

MR. PHILLIPS: Object to the form of the question.

A. I'm not sure I follow. They contributed --

Q. Well, let me walk you through it. DAF owned -- DAF Fund HoldCo owned Fund, LP 100 percent. When CDM was inserted in between it, it owned 50 percent of CDM. The other 50 percent was owned by DFW. So now, because it only

owns 50 percent of the company that now owns all of the assets, it owns 50 percent of all the assets. Is that not correct?

MR. PHILLIPS: Object to the form of the question.

A. Yeah. I guess I just don't understand your question.

Q. (By Mr. Curry) What was the consideration given by CDM to DAF HoldCo in exchange for DAF HoldCo's 100 percent interest in DAF Fund, LP? What consideration was provided?

MR. PHILLIPS: Objection to the form of the question.

A. Again, my recollection, and I don't -- clearly don't recall all the steps of the restructuring, but they got an LLC interest for -- in consideration for its contribution.

Q. (By Mr. Curry) An LLC interest in -- sir, help me understand --

MR. PHILLIPS: 24-minute mark, David, so one more minute.

MR. CURRY: Well, sorry. We need some follow-up here.

MR. MORRIS: You're going to have one more minute. That's what we agreed to.

MR. PHILLIPS: Yeah. One more minute.

MR. CURRY: Well, we can press pause and call Judge Jernigan, or you guys can leave, and we'll note on the record that you're leaving over --

MR. MORRIS: You can do whatever you want. We gave you 15. Then we gave you 20. You said you only needed 25. We're done. One more minute. Go ahead.

MR. CURRY: Well, your witness is kind of giving me a little bit of issue here. And I notice that as we get to the questions that are important to what you guys are objecting on us, you're being the most obstructionist. So if you want to continue that, John, then I'm going to assume you're waving your argument to our standing.

(Speaking simultaneously)

MR. MORRIS: Don't be ridiculous, number one.

MR. CURRY: It's absurd as you're being, John.

MR. MORRIS: What I'm trying to do, David, is to abide by the very agreement that we just reached when you said 25 minutes would be enough. I'm just looking at the clock.

MR. CURRY: I just assumed that he would answer the questions. I didn't realize he would say he didn't know what assets were or what it meant to own something. We had to walk through a few more things.

MR. MORRIS: You've got 60 seconds. Go ahead.

MR. CURRY: Yeah.

Q. (By Mr. Curry) You -- Mr. Raver, you said that it was your understanding that what DAF HoldCo received in exchange for its 100 percent ownership of DAF Fund, LP, that the only thing it received was the LLC interest in CDM CFAD?

MR. PHILLIPS: Objection to form the question.

Q. (By Mr. Curry) That's it? That's the consideration? Because I'm trying to make sense of what you said.

A. I'm sorry. Can you repeat the question again? I'm not trying to delay. In all honesty --

Q. It's the same question that I've been asking that I'm trying to get answered.

A. In all honesty I didn't --

(Speaking simultaneously)

MR. PHILLIPS: All right. Let him finish. He's trying to answer.

MR. CURRY: Sorry. Sorry.

A. Yeah, in all honesty, I didn't review this restructuring, for purposes of your questioning because Crown Global has never had any ownership in this structure. So I guess I just wasn't expecting the questions.

Q. (By Mr. Curry) Well, my other client does. Let's back this up. So you worked at Charitable DAF HoldCo, LTD, right?

MR. MORRIS: Last question.

A. I did.

Q. (By Mr. Curry) It's a limited partnership, correct?

A. I think it's an exempted limited company.

Q. Limited company? Okay. Are you familiar with the limited company agreement?

MR. MORRIS: John --

Q. (By Mr. Curry) Are you familiar with the limited company agreement?

A. Generally, yes.

Q. Okay. Who -- the limited company economic interest, the participation interest, who --

MR. MORRIS: Louis, I really don't want to do this all day. It's your witness, but this is not --

MR. PHILLIPS: Yeah. I think we're done.

MR. CURRY: Hey, guys, you agreed to make him available for two hours, and it's only been an hour.

MR. PHILLIPS: Not to you.

MR. MORRIS: We didn't reach any agreement with you because you didn't have the courtesy of contacting us all --

MR. PHILLIPS: Right.

MR. CURRY: Yeah, John, because you've been assuming that we were affiliated with people that we're not. And you've been talking to them instead of getting back to us --

(Speaking simultaneously)

MR. MORRIS: They -- they --

MR. CURRY: -- you could have reached out to us.

MR. MORRIS: I sent you an e-mail earlier this week that you failed to respond to, true?

MR. CURRY: You're right. You asked me to file something and I haven't filed it. I'll get it filed.

(Speaking simultaneously)

MR. MORRIS: You don't know how -- you don't know how to serve a subpoena? Is this new to you? You don't know how to serve a subpoena?

(Speaking simultaneously)

MR. CURRY: I'll tell you what --

MR. MORRIS: You don't know how to reach out and say I'd like to take a deposition? You can say, I'd like to take a deposition. You can see --

(Speaking simultaneously)

MR. CURRY: You know what? That's fine, guys. I'll tell you what. Here's what we'll do --

(Speaking simultaneously)
MR. MORRIS: We're done.
MR. PHILLIPS: Yeah. Clearly -- clearly this a --
MR. CURRY: Fine. I didn't notice this deposition. I didn't participate in it. We'll see you guys Monday and Tuesday. We'll see you Monday and Tuesday.
And we're not doing it by Zoom, Louis. You are coming to Dallas.
MR. MORRIS: Right. Good luck.
MR. PHILLIPS: Good luck with that.
MR. CURRY: Hey, Louis, there's full knowledge of all this that's out there, right?
MR. MORRIS: Hey, let's not do this. I'm shutting this down.
MR. CURRY: I would assume -- hey, Louis. Louis, stop. This is a question for you.
(Speaking simultaneously)
MR. MORRIS: We're shutting this down. Madame Court Reporter, let's go off the record, please.
(Speaking simultaneously)
MR. PHILLIPS: Madame Court Reporter, let's go off the record, please.
MR. CURRY: Louis -- yeah, we can go off the record. Absolutely. Go off the record.

THE REPORTER: We are off the record at 12:19.

(Proceedings terminated at 12:19 p.m.)

CHANGES AND SIGNATURE

WITNESS NAME: SHAWN RAVER DATE: JUNE 20, 2025

PAGE LINE CHANGE REASON

Signature: ______________________ Date: __________

I, SHAWN RAVER, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
SHAWN RAVER

THE STATE OF ______________)
COUNTY OF ________________)

Before me, __________________________ on this day personally appeared SHAWN RAVER, known to me (or proved to me under oath or through ______________________, (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this __________ day of _____________________, 2025.

______________________________
Notary Public in and for
The State of ____________________

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-SGJ11 |
| | ) | |
| REORGANIZED DEBTOR. | ) | |

************************************************************

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF SHAWN RAVER
JUNE 20, 2025

I, Angelica G. Robles, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, SHAWN RAVER, was duly sworn by the officer and the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

XXX was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from the date of receipt of the transcript. If returned, the attached Changes and Signature Pages contains any changes and the reasons therefore;

___ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for,

related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 21st day of June, 2025.

ANGELICA G. ROBLES, TEXAS CSR 11809
Expiration Date: 02-28-2027
Esquire Deposition Solutions
1700 Pacific Avenue, Suite 1000
Dallas, Texas 75204
Firm Registration No. 286

**1**

**1** 11:8,11 13:4 17:1 23:25 24:24 26:18,23
**100** 11:15 12:6,22 22:22 23:9,10 24:17,23 26:8,19 27:23 28:10 30:6
**11809** 5:11
**11:35** 5:3
**12:19** 34:2,3
**15** 14:11,20, 21,23 29:6
**19-34054-SGJ11** 5:9

**2**

**20** 25:10 29:6
**2025** 5:3 17:14 20:25 23:18
**20th** 5:3
**24-minute** 28:20
**25** 16:12 18:10 20:25 24:22 25:12 29:7,20

**5**

**50** 22:11,12, 21 23:14, 22 24:17 25:15,17, 20 26:6, 20 27:1, 17,24,25 28:1,2
**50/50** 22:14

**6**

**60** 30:1

**A**

**a.m.** 5:3
**abide** 14:23 29:19
**Absolutely** 33:25
**absurd** 29:16
**accurate** 8:22 17:2 23:25
**acquire** 17:3,12
**acquired** 17:23 21:2 26:8
**acquires** 24:16 26:20
**Adams** 6:7 15:7
**additional** 9:12
**address** 9:13
**administering** 5:11
**Advised** 8:23
**Advisors** 13:7,11, 18 15:21, 22
**affiliate** 7:9
**affiliated** 32:3
**agree** 17:21 23:23,24
**agreed** 28:25 31:20
**agreeing** 15:2
**agreement** 7:12,18 8:2 14:23 15:1 16:15 21:5 29:19 31:10,13, 23
**ahead** 10:1 18:15 29:7 30:2
**allowing** 9:12
**alluded** 23:11
**Alphabet** 17:4
**amendment** 11:3
**Angelica** 5:10
**annuity** 14:3
**answers** 23:5
**anytime** 25:4
**appearances** 5:16
**April** 7:22,23
**argument** 29:13
**assertion** 10:7
**asset** 18:20
**assets** 25:21,24 26:1,5,12 27:18 28:2 29:24
**associate** 16:23 20:4,6 21:9
**assume** 29:13 33:16
**assumed** 29:22
**assuming** 32:3
**Atlas** 13:12,21, 25 14:4,5 15:23,24
**attestation** 5:13
**attorney** 5:16
**authority** 9:10
**aware** 7:21 15:12 19:5,16, 18 21:14, 16,18,20 22:1 23:6

**B**

**back** 15:1 16:3 23:15,19 26:22 31:2 32:4

background 16:4
bankruptcy 5:7 7:13
Bartlett 6:7
basically 7:2
Beacon 12:17,18 13:10
began 7:21
beginning 7:23 23:5
behalf 6:7 9:10 14:2
bit 16:3,4 23:3,7 29:9
broken 21:24
buy 9:17

C

call 17:20 29:2
capacity 9:19 21:9
Capital 5:8,20 7:13
case 5:8,9
Cayman 24:12
Caymans 16:20
CDH 24:9
CDM 6:23,25 7:5 11:22 12:12 16:5 17:2,12, 17,20,21, 22,23 19:2 20:12 21:2 22:6,11, 12,15 23:1,8, 15,16,21 24:3,17, 20 25:5, 14,16,20, 24 26:5, 8,12,20, 21,25 27:7,16, 23,24 28:9 30:7
Central 5:4
CEO 18:2,11 19:8,14
CFAD 6:23,25 7:5 11:22 12:12 16:5 17:2,12, 17 21:2 22:6,15 23:1,8, 16,21 24:17,20 25:5,14, 16,20 26:20 27:1,7,16 30:7
challenge 9:9
change 22:8,10 27:2
changed 9:20 11:7,9,13
charitable 7:2,4 11:12,15, 16,18,19, 21,23 12:1,5,9, 13 13:5, 19,24 16:15,17 17:3,4, 11,13 20:7 21:1,3,10 22:8,12, 13,15,19, 21,22 23:2,8, 15,22 24:7,16, 18,23 25:15,16, 17 26:6, 9,11,18, 19,21,25 27:2,7,8, 12,15 31:2
chart 9:20 11:9
13:4 15:12 23:24 26:18
Chief 16:23 20:4 21:9
choppiness 23:4
claim 5:21 10:6
Claims 8:13,14
clarified 21:25
clarify 23:12
clear 12:8
clearer 15:19
client 9:5 10:10,13 31:1
CLO 8:17 12:6,16, 19,22,24 23:23
clock 29:21
comments 7:19
companies 13:3
company 14:2 28:1 31:8,9, 10,13,15
completely 14:21
concerns 21:15
concurrently 17:25
connection 9:23 20:12
consideration 27:13 28:8,10, 16 30:11
contacting 31:24
continue 29:12
contracts 14:3
contributed 22:18,20 23:21 24:21 25:15,20 26:5 27:21
contribution 28:17
COO 19:15
cooperation 14:11
Corp 13:19,24
correct 11:16,20 13:2 16:7,8,13

18:3,7, 12,15,17, 18 21:12 24:6,8,18 25:1,18 26:9,17 27:2 28:3 31:7

**correctly** 23:20 26:24

**counsel** 5:14 6:15 16:24 18:2,11, 25 19:8, 19 20:5, 7,9,11, 14,19 21:10 22:4 24:12

**court** 5:7 9:4 33:20,22

**courtesy** 31:24

**cover** 16:16

**Crown** 6:8 14:2 15:8,11, 12 16:2 30:24

**CSR** 5:10

**current** 16:5

**Curry** 6:6,7 9:25 10:9,14, 22 14:8, 12,19,25 15:5,6,21 17:9,10 18:6,10, 15,24 19:8,15, 25 20:6, 22 22:20 24:3 25:11,14, 24 27:6 28:8,18, 22 29:2, 8,16,22 30:3,4, 10,21 31:1,6, 12,20 32:2,8, 12,19,24 33:5,12, 16,24

**Curry's** 14:10

**D**

**DAF** 8:16,17, 23 11:12, 15,16,18, 19,21,23 12:1,5,9, 13 13:5, 19,24 16:15,16, 17 17:3, 4,11,13, 19,22,23 18:2,12, 24 19:1,2 20:1,7,12 21:1,3,10 22:8,12, 15,19,21 23:15,22 24:8,16, 18,23,24 25:15,16 26:6,9, 11,18,19, 21,25 27:2,7,8, 12,14,15, 22,23 28:9,10 30:5,6 31:2

**Dallas** 5:5,8,23 6:7 15:7 33:9

**date** 5:3 17:15,24

**dates** 18:21

**David** 6:6 15:6 25:8 28:20 29:18

**day** 31:18

**deal** 14:14

**defending** 5:25

**defined** 13:7

**delay** 30:14

**depiction** 8:22

**deposition** 5:4,12 9:3 10:20,23, 25 12:20 14:25 15:2 32:21,22 33:6

**DFW** 22:13,22 23:2,8 25:17 27:25

**direct** 11:24 12:17

**discrepancy** 24:14

**discussions** 7:25

**District** 5:7

**Division** 5:8

**documentation** 22:1

**documents** 20:24 21:12,16, 23,24 22:3

**Donor** 8:23

**draft** 21:16 22:3

**drafting** 20:24 21:11

**drafts** 7:18

**Dugaboy** 5:22 8:4, 7,11

**duly** 6:17

**E**

**e-mail** 32:10

**earlier** 16:25 17:10 18:11 23:11 32:10

**early** 7:22

**economic** 31:15

**Emanuel** 6:4

**employed** 6:22,23 16:9,14, 17

**employer** 16:5 17:11,12

**employment** 16:10,15

**end** 23:18 26:22

**engage** 19:20 20:11 22:4

**engaged** 8:8 20:14

**engagement**

20:8 21:22
entire 9:14
entities 13:7,9,13 15:9 16:16
entity 15:15 16:10,20 24:11,16
Esquire 5:12
establishing 23:20
estimated 8:10,14
everybody's 10:2
evidence 9:6 11:4
exact 17:15,24
EXAMINATION 6:18 15:4
exchange 28:9 30:6
exempted 31:8
exhibit 11:8,11 13:4 17:1 23:25 24:24 26:18,23
exists 8:23 11:9
expecting 30:25

F

fact 9:7
failed 32:11
fall 12:15,21
familiar 8:4,16 13:13 15:8 27:13 31:9,12
familiarity 21:22
fight 25:13
figure 9:9
file 32:13
filed 32:13
filibuster 14:20
fine 14:16 32:24 33:5
finish 30:19
finished 8:9
firm 8:8 15:7
flowchart 8:20 11:7,14
follow 27:21
follow-up 28:23
form 7:7 12:2,25 13:14 15:17 17:6 18:8,13 19:3,12,21,23 20:2,20 22:16 24:1 25:22 27:5,19 28:4,12 30:8
formed 24:11,13
Foundation 6:8 15:7 22:13,22 23:2,8 25:18
full 33:12
fund 7:3 8:23 11:12,16,19,21 12:1,5,9,13 13:11,22 15:21 17:3,4,11,13,23 19:1 21:4 22:9,19 24:18,23 26:9,11,19,21 27:2,8,15,23 28:10 30:6
Fund1 13:11,20

G

gave 27:17 29:6
general 14:4 16:23 18:2,11 19:8,19 20:4,7,19 21:9
generally 8:18 12:10,11 15:10 19:16 31:14
give 6:24 11:1 25:9,10,12
giving 18:6 29:9
Global 6:8 14:2 15:8,11 16:2 30:24
Global's 15:12
Good 33:10,11
GP 13:12 14:4 24:6,7,8,9
GP's 24:15
guess 19:6 21:17 22:2 28:6 30:25
guys 8:20 15:3 29:3,10 31:20 32:25 33:6

H

hand 6:11
Hart 5:24
hear 10:21 21:24 26:14
held 5:6 27:8
hey 31:20 33:12,14,16
Highland 5:8,20,21 6:4 7:13 8:3
Hold 9:1
Holdco 8:17 11:15,18,

23 12:6, 16,19,21, 22,24 13:5 16:16,17 17:20,22 18:3,12, 24 19:2 20:1,7,12 21:1,10 22:12,15, 21 23:15, 22,23 24:16,24 25:16 26:6,18, 20,25 27:7,12, 14,23 28:9 30:5 31:2

**Holdco's** 28:9

**Holdings** 13:19,24

**holds** 26:19

**honesty** 30:14,17, 22

**hope** 8:19

**hour** 31:21

**hours** 31:21

**Houston** 6:9

**Hunter** 6:1 7:6, 9,14 8:3, 6,10,13 9:8,11,14 10:7 12:15,17 13:6,9 15:16

**I**

**idea** 9:19

**identified** 5:13

**IDF** 13:12,21, 25 14:4,5 15:23,24

**important** 29:10

**include** 13:10 20:8

**incorrect** 25:4

**indirect** 7:10 11:24

**information** 16:4

**initially** 26:16,17

**initiated** 7:25

**input** 19:9,11, 17

**inquire** 22:15

**inserted** 24:20 27:24

**instruct** 14:13

**insurance** 6:8 14:2 15:8

**interest** 10:10 11:24 12:1 15:13 17:3,12, 23 21:3 22:15,18, 21 23:22 24:17,21 25:15,21 26:6,20, 21 27:1, 12,15,16 28:10,16, 18 30:7 31:16

**internal** 18:25

**investment** 5:23 6:1 7:2,4 15:22

**involved** 7:11,22

**issue** 9:16,17, 19 14:21 24:15 29:9

**J**

**Jernigan** 29:3

**job** 10:9

**John** 5:19 15:1 29:12,17 31:11 32:2

**jointly** 25:17

**Jones** 5:20

**Judge** 29:3

**jumbles** 17:5

**June** 5:3

**K**

**Kelly** 5:24

**kind** 16:4 29:8

**Kirschner** 8:13,14

**Klos's** 12:20

**knowledge** 8:15 25:6 33:13

**L**

**lack** 7:3

**Lang** 5:22 6:19 7:11 9:2, 16 10:4, 19,24 11:5,6,14 12:5 13:3,17 14:7

**law** 15:7

**layers** 7:10 11:25

**leave** 14:13,20 29:3

**leaving** 29:4

**leeway** 9:12 10:5 11:2

**legal** 19:20

**lenient** 9:11

**letters** 6:24

**level** 22:2

**Liberty** 12:21

**Life** 15:8

**limit** 9:3

**limitation** 15:2

**limited** 11:15,18, 23 14:1 15:13,24 16:1 31:6,8,9, 10,12,15

**liquidation** 13:4

16:20
**list** 13:9
**Litigation** 6:4
**LLC** 6:23,25 7:1,5 11:22 12:12,17, 19 13:7, 10,11,12, 18,23 14:4 16:5 17:12 21:2 22:6 24:8 27:16 28:16,18 30:7
**located** 5:5,21
**locations** 5:17
**Loigman** 6:3
**longer** 11:18 17:2 27:1
**losing** 23:5
**lot** 23:5
**loud** 18:16
**Louis** 5:24 9:25 14:13 25:11 31:17 33:8,12, 16,17,24
**LP** 5:9,20 11:12,16, 19,21 12:1,5, 10,13 13:12,20, 21,25 15:23,24 17:11,13, 23 19:1 22:19 24:18,23 26:9,12, 21 27:2, 8,15,23 28:10 30:6
**luck** 33:10,11

M

**Madame** 33:20,22
**make** 10:15 15:1 23:3,19 26:16,23, 24 30:11 31:20
**Management** 5:9,20 7:13 13:12,22
**manager** 15:22
**March** 16:11,12 17:14 18:10 20:25 23:18 24:22
**mark** 11:8 28:20
**marked** 11:11
**meant** 29:24
**meetings** 7:18
**mention** 12:20
**mentioned** 23:13
**Mexico** 6:2
**Michael** 5:22
**minute** 28:21,25 29:1,7
**minutes** 14:11,20, 21,23 25:8,9 29:20
**misstate** 21:21
**misstating** 18:4
**Monday** 33:7
**money** 10:15
**Morris** 5:19 7:7 9:11 13:14 14:10,22 17:6 19:3,12, 21 20:20 22:16 28:24 29:5,15, 18 30:1 31:4,11, 17,23 32:7,10, 15,20 33:2,10, 14,19
**Morris's** 9:2
**motion** 13:7,10
**Mountain** 6:1 7:6, 9,14 8:3, 6,10,14 9:8,11,14 10:7 12:15,17, 18 13:6, 9,10 15:16
**mouthful** 17:22

N

**needed** 29:7
**negotiation** 7:12 18:25 20:24 21:11
**negotiations** 7:21
**Northern** 5:7
**note** 8:3,4,7, 11 29:3
**noted** 15:3
**notice** 29:9 33:5
**noting** 24:14
**number** 29:15

O

**oath** 5:11
**Object** 12:2,25 13:14 15:17 18:13 24:1 27:5,19 28:4
**objecting** 29:11
**objection** 7:7 9:1, 4,5,7,8, 13 10:6 14:9 15:3 17:6,8 18:4,8 19:3,12, 21,23 20:2,20 22:16 25:22 28:12 30:8
**obstruction** 14:21

obstructionist 29:11
occur 23:17
occurred 20:25 27:3
Officer 16:23 20:4 21:9
Okin 6:7 15:7
Operating 16:23 20:4 21:9
opportunity 18:7
oral 5:4
organization 11:9
owed 10:16
owned 11:15 17:11 22:5,11, 22 23:8 24:17,23 25:17 27:22,23, 24,25
owner 12:17
ownership 11:12,24, 25 19:1 21:3 22:8,10, 14,21 23:14 26:3,9,11 30:6,24
owning 27:7
owns 11:18,21 12:15,18 13:6,17, 20,22,25 23:1 26:25 27:1 28:1,2

P

P-R-O-C-E-E-D-I-N-G-S 5:1
p.m. 34:3
Pachulski 5:19
part 7:17
participate 18:25 19:6 20:23 21:11,13 33:6
participated 21:17,18 22:2
participation 14:10 31:16
parties 5:15
partner 14:2,5,24 16:1
partnership 15:13,24 21:3 31:6
party 9:22
pass 14:7
Patrick 9:10
pause 10:1 29:2
pay 10:11,18
PE 13:11,20, 22
peace 9:18
people 32:3
percent 11:15 12:6,22 22:11,12, 21,22 23:9,10, 14,22 24:17,23 25:15,17, 20 26:6, 8,19,20 27:1,17, 23,24,25 28:1,2,10 30:6
performed 8:6
Phillips 5:24 9:1, 21 10:4, 12,17,21 11:1 12:2,25 14:9,16 15:17 17:8 18:4,8,13 19:23 20:2 24:1 25:8,22 27:5,19 28:4,12, 20 29:1 30:8,19 31:19,22 32:1 33:3,11, 22
phone 10:1
Plaintiff's 5:16
pleadings 11:3
point 22:11 25:16 26:8
press 29:2
prior 18:4
problem 9:22
proceed 6:15
proceedings 5:6 34:3
process 8:9
promissory 8:3
proposed 7:12 8:2
provided 7:19 28:11
purchaser 18:19
purposes 30:23

Q

question 7:8 12:3 13:1,15 15:18 17:7 18:9,14 19:4,13, 22,24 20:3,21 21:22 22:17 24:2 25:23,25 27:20 28:5,7,13 30:9,13, 15 31:4 33:17
questioning 30:23
questions 14:23 29:10,23 30:25
Quinn 6:4

R

raise 6:11 9:21,23
raised 9:17 14:10
raises 9:22
Rand 13:7,11,17,20,22 15:15,16,20,21,22
Raver 5:5,25 6:10,16,21,22 11:6 15:6 16:5 18:15 19:25 21:4 23:4,24 25:14 30:4
re-notice 14:14
reach 31:23 32:20
reached 29:19 32:8
read 9:14
realize 29:23
reason 25:3
reasoning 21:15,19,21
recall 17:18,19 19:17 20:13,17 22:23,25 28:15
received 8:3 27:14 30:5,7
recollection 22:18 28:14
record 5:2,17 6:20 29:4 33:20,23,25 34:1
redemption 22:8 23:13 27:3,6
redo 10:2
relate 9:8 10:6
related 7:5
remember 17:15,24 18:21 20:18
remote 5:4
remotely 5:12
repeat 13:8 24:19 30:13
rephrase 17:9
replaced 24:15
Reporter 5:2 6:10,14 33:20,22 34:1
reporting 5:11
represent 15:7 18:24
representing 5:25 6:1,4
requested 19:17
respond 14:18 32:11
responsibilities 20:8
responsibility 19:20
restructuring 19:7 28:15 30:23
resulting 19:10 27:9
return 27:18
review 30:22
reviewed 7:18 22:2
ridiculous 29:15
rights 27:8
risk 9:18
Robert 6:3
Robles 5:10
role 7:15,16 16:22 20:6
roles 20:1

S

scope 9:3,7
screen 8:19 23:24
seconds 30:1
segregated 14:3
sense 30:11
serve 32:16,17
services 19:20
settlement 7:12,18,25 8:2 9:15
share 8:19
Shawn 5:5 6:16,21 9:1
shortly 17:25
shutting 33:15,19
side 9:8,14 10:7
sign 9:10
simultaneously 18:23 29:14 30:18 32:6,14,18,23 33:1,18,21
sir 28:18
sit 10:19,22,24 23:1
sits 12:12
sitting 5:25 20:22
sold 18:20
sole 14:1 21:2,3

Solutions 5:12
sort 9:2
sought 19:9
soup 17:4
speak 23:6
speaking 18:23 29:14 30:18 32:6,14, 18,23 33:1,18, 21
specific 18:21
specifically 24:13
spirit 14:11
standing 9:23 29:13
Stang 5:19
start 23:4
starting 5:15
state 5:16 6:20
States 5:7
steps 26:17 28:15
stop 10:2 33:17
stronger 9:2
structure 7:4 8:16, 22 12:8,9 15:13,14 17:2 19:9,10 23:23 24:21 27:6,9 30:24
structures 15:15
subpoena 32:16,17
subsidiary 7:10 12:22
suggestion 9:3 10:6
supplement 9:5
supplementation 11:3
supplemented 9:6
supporting 7:15,16
swear 5:17
sworn 6:11,12, 17

T

talked 13:10 16:25
talking 10:18 17:21 21:6 23:4,12 24:22 32:4
telling 10:4 11:2 18:18
terminated 34:3
testified 6:17
testimony 17:10 18:3,5,10 19:11 20:23 21:8
Texas 5:5,7,10
thing 9:18 30:7
things 29:25
time 5:3,4 6:10 7:24 10:3 14:12 22:5 24:8
timeline 23:20
times 20:10
titles 20:1
today 8:9,24 11:10 14:14 20:22 21:8 23:1
Today's 5:3
told 14:17
transaction 9:24 10:8 19:1,10 20:12,25 21:4,5, 12,14,15, 19,20 22:4,5,7 23:12,14, 16 24:3, 22 25:4 26:22 27:4,11
transfer 27:14
transferred 27:12
transferring 19:1
transfers 26:21
true 32:11
Trust 5:21,23 6:1
Trustee 6:4
Tuesday 33:7

U

underlying 20:24
understand 21:5 25:25 26:24 27:3 28:6,19
understandably 19:18
understanding 30:5
Understood 11:5
United 5:6
unwound 9:18

V

valuation 8:6,8

W

wait 23:15
walk 27:22 29:25
waste

10:2

**waving**
29:13

**week**
10:2
32:11

**witnesses**
5:13

**word**
7:3

**work**
9:20 13:4
17:16
18:19

**worked**
31:2

**working**
17:19,22

**would've**
24:12
27:16

**wrap**
25:12

**Y**

**year**
16:11

**York**
5:21 6:5

**Z**

**Ziehl**
5:20

**Zoom**
33:8

**EXHIBIT L**

HIGHLAND CAPITAL
MANAGEMENT

# Highland Capital Management, L.P.

## Motion Pursuant to Rule 9019 and Code §363 For Approval of HMIT Settlement

(Docket No. 4216)

June 25, 2025

PSZJ PACHULSKI STANG ZIEHL & JONES

## The Evidence Will Show the Settlement Agreement Is the Product of Good Faith, Arms-Length Negotiations

- **The negotiations began in late March and concluded on May 19.** Exs. 2-57
- **The negotiations were conducted by Zoom calls, phone calls, and one in-person meeting.**
- **The structure and terms of the Agreement changed over time:**
  - HMIT/DAF vs. Stand-alone
  - Timing of effectiveness (signing / court approval / final order)
  - Amount / timing / conditions of Distributions
- **Exchange of substantial information under a Confidentiality Agreement**
  - Claims information
  - Trust Agreement and budgets
  - Asset, liability, and valuation Information
  - Forecasted expenses

## The Proposed Settlement Is In the Best Interests of the Highland Entities and Their Stakeholders

- Upon Bankruptcy Court approval, all Pending Litigation (as defined) will be dismissed with prejudice, thereby reducing litigation risk and the attendant costs.
  Ex. 1, Ex. 1 § 1(a)

- HMIT's Class 10 Interest will be allowed in a fixed amount of approximately $337 million. *Id.* § 4(a)[1]

- The Highland Entities are able to dispose of certain illiquid assets, including the Dugaboy Note and the Estate Claims asserted in the Kirschner Litigation.
  *Id.* §§ 5(b), 8(a)

- The Highland Entities obtain broad Litigation Protections that will ensure that there will be no future litigation with the HMIT Entities regardless of who controls them.
  *Id.* §§ 9-12

1. HMIT is barred from transferring the Class 10 Interest or any rights related thereto. *Id.* at § 4(c).

# The Calculation of HMIT's Allowed Class 10 Interest

| | | | |
|---|---|---|---|
| Total partners capital – Petition Date | | $396,613,941.24 | 11.19 Monthly Operating Report spreadsheet – Ex. 117 and all monthly operating reports on file.[1] |
| **Ownership by partner** | **Class** | **Ownership %** | |
| Hunter Mountain Investment Trust ("HMIT") | B/C | 99.5000% | 4th A&R LPA – Ex. 114; 2018/2019 tax returns Ex. 115/116. |
| Strand Advisors, Inc. | A | 0.2508% | |
| The Dugaboy Investment Trust | A | 0.1866% | |
| Mark Okada | A | 0.0487% | |
| "MAP 1" | A | 0.0098% | |
| "MAP 2" | A | 0.0042% | |
| **HMIT Petition Date Capital Account** | | **$394,630,871.53** | Calculation: Total partners' capital (above) x 99.5% [2] |
| **Less: HMIT Petition Date Note Receivable (P&I)** | | **$(59,690,640.95)** | 20191015 HMIT Note Receivable JE – Ex. 118 |
| **Class 10 Interest to be allowed per settlement** | | **$336,940,230.58** | Calculation: Petition Date Capital Account less Petition Date Note Receivable – Ex. 1 |

1. Monthly operating reports can be found at the following Docket #'s: 289, 418, 497, 558, 634, 686, 800, 905, 913, 1014, 1115, 1329, 1493, 1710, 1949, 2030. Each describes Petition Date Partners' Capital, rounded to the nearest $1,000 and presented in thousands (ie presented as $396,614 [in thousands] rather than $396,613,941.24).
2. Although not as of the Petition Date, see also Exhibits 115 and 116 for 2018 and 2019 IRS partnership tax returns of Highland Capital Management, LP, including capital accounts by partner. HMIT's capital account balances as of December 31, 2018 and December 31, 2019 were $370,103,735 and $347,989,195, respectively. The December 31, 2019 capital account reserved the balance of the HMIT note receivable.

## With the Settlement, Transfer of the Kirschner Litigation Is In the Movants' Best Interests

- Upon approval, the Kirschner Litigation will be transferred to HMIT
- When commenced, the Kirschner Litigation was expected to be a potential source of funding indemnification expenses and distributions to creditors
- By 2023 and 2024, with the success of the Highland team, the need to pursue and monetize the Kirschner Claims became less clear, so the case was stayed to conserve resources
- With the settlement, the pursuit of the Kirschner claims in the hands of Highland is no longer justified because (a) all but 10% of the Class 9 Claims will be paid; (b) the Litigation Protections reduce the need to fund indemnity obligations; and (c) HMIT would be the primary beneficiary of the Kirschner Claims

## As the Administrator, Mark Patrick Is Authorized to Enter Into the Settlement on HMIT's Behalf [1]

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

1. Ex. 70

## Classes 9 and 10 May Accept Other Less Favorable Treatment


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

9. *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

7

## The Affected Stakeholders Have Agreed to Accept Less Favorable Treatment

- As permitted by the Plan, Holders of Class 9 Claims consented to (a) the payment in full of Daugherty's Class 9 Claim, and (b) the Class 10 Distributions in accordance with the terms of the HMIT Settlement Agreement, before their Class 9 Claims are paid in full. Ex. 59

- HMIT accepts less favorable treatment by agreeing (a) that it is not a "Claimant Trust Beneficiary," (b) that its rights are limited to those under the Settlement Agreement, (c) the Highland Entities owe HMIT no duties except as arising under the Settlement Agreement, (d) to restrictions on transfers of the Class 10 interest, (e) to condition the First and Second Subsequent Distributions on there being no threats or need to satisfy Indemnity Obligations, and (f) to grant the Litigation Protections. Ex. 1, Ex. 1 §§ 4(b)-(c), 6(c), 9, 11-12, 14-16

- All other stakeholders have been paid in full except for Daugherty's disputed Class 8 Claim, which has been fully reserved at an agreed-upon amount for years. Exs. 60-63

# Hunter Mountain Investment Trust Org Chart




1. Crown Global Insurance Company is sole LP of Atlas IDF, LP. It issued Deferred Variable Annuity Contracts to the Empower Dallas Foundation, Inc. and the Okada Family Foundation in 2015, both of whom selected a 100% allocation to this investment. Both entities are supporting Organizations of The Dallas Foundation.
2. Rand Advisors, LLC is also the sub-adviser to Rand Advisors Series I Insurance Fund ("Insurance Fund"). Total discretionary regulatory AUM a/o 12/31/24 was $154mm (Insurance Fund: $123.9mm, Atlas IDF, LP: $29.9mm; Rand PE Fund I: $0).
3. For presentation purposes, other subsidiaries of CLO Holdco, Ltd. are not depicted. These subsidiaries consist of HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. Neither of these entities is a Party to the Settlement Agreement. Each of these entities and evidence of their ownership by CLO Holdco, Ltd. can be found at Dkt. 2547.

# EXHIBIT M

**CWR Form No 15**

**Liquidator's Certificate (Composition of Liquidation Committee) (O. 9, r. 1)**

THE COMPANIES LAW

<u>OFFICIAL LIQUIDATOR'S CERTIFICATE</u>

<u>COMPOSITION OF LIQUIDATION COMMITTEE</u>

Charitable DAF HoldCo, Ltd. (In Official liquidation)

Grand Court FSD Cause No. 116 of 2025

The Official Liquidator hereby certifies that a liquidation committee has been constituted on the basis that he has determined the Company to be solvent for the purposes of section 110(4) of the Companies Law and CWR Order 9 and that the following contributories have been appointed:

1. Julie Diaz, representing Highland Dallas Foundation, Inc., 3000 Pegasus Park Drive #930, Dallas, TX 75247 (jdiaz@dallasfoundation.org)

2. Deborah Wilkerson, representing Highland Kansas City Foundation, Inc.,1055 Broadway Blvd. #130, Kansas City, MO 64105 (wilkerson@growyourgiving.org)

3. Jacqueline M. Carrera, representing Highland Santa Barbara Foundation, Inc., 1111 Chapala Street, Santa Barbara, CA 93101 (jcarrera@sbfoundation.org)

4. Rose Bradshaw, representing North Texas Community Foundation, 7777 Main Street, Suite 2850, Fort Worth, TX 76102 (rbradshaw@northtexascf.org)

5. Jennier Colegate, representing DFW Charitable Foundation c/o Baker & Partners (Cayman) Limited, P.O. Box, 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 (jennifercolegate@bakerandpartners.com)

Dated this 21st day of July 2025.

[signature]

Margot MacInnis – Joint Official Liquidator of Charitable DAF HoldCo, Ltd. (In Official Liquidation)
Grant Thornton Specialist Services (Cayman) Ltd
2nd floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands KY1-1102
Contact: +1 345 949 7100