**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§

§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§

vs. §

3:26-CV-02315-X

**Highland Capital Management, L.P., et al**-Appellee

§

§

**[4679] Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026.**

**APPELLANT RECORD**

**VOLUME 21**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02315-X<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to the Clerk of Court's correspondence [Docket No. 4700] and Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4685] on June 29, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4513] and a *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4699] now files this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and Hunter Mountain Investment Trust among other entities?

2. Did the Bankruptcy Court err in making evidentiary and trial conduct rulings during the course of evidentiary hearings held on Dugaboy's motion to vacate in May 2026?

3. Did the Bankruptcy Court err in making rulings on the availability of discovery, including the production of documents or depositions, in proceedings leading to its denial of the motion to vacate or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and the Hunter Mountain Investment Trust, among other entities?

4. Did the Bankruptcy Court err in not treating the Hunter Mountain Investment Trust, Mark Patrick, and other entities associated with him as parties in the 9019 settlement approval proceedings or the proceedings considering whether to vacate or reconsider that settlement approval?

5. Did the Bankruptcy Court err by misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(2) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by determining that the evidence presented of Mark Patrick's misconduct was not newly discovered or otherwise cognizable under Rule 60(b)(2)?

6. Did the Bankruptcy Court err in determining that James Dondero's knowledge could be imputed to Dugaboy, regardless of the capacity in which he was acting at the time he gained that knowledge?

7. Did the Bankruptcy Court err in determining that previously known instances of Mr. Patrick's

compliance lapses in other areas needed to have been acted upon in order to preserve the right to remove him from his position at the Hunter Mountain Investment Trust for later discovered and more significant misconduct related to misappropriating much of the asset value of two charitable structures, including the Charitable DAF?

8. Did the Bankruptcy Court err in misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(3) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by, among other things, determining that there is no evidence that Highland withheld or otherwise obscured evidence of Mark Patrick's misconduct and resulting lack of authority to negotiate the 9019 settlement agreement from Dugaboy in the proceedings that led to the Bankruptcy Court's entry of the original Federal Rule of Bankruptcy Procedure 9019 Order on June 30, 2025?

9. Did the Bankruptcy Court err in not considering under Federal Rule of Civil Procedure 60(b)(3) or otherwise the evidence Mark Patrick and/or his associates withheld or otherwise obscured from the Court through omissions and misrepresentations during discovery and before the Court at the hearing on the proposed settlement under Federal Rule of Bankruptcy Procedure 9019?

10. Did the Bankruptcy Court err by misconceiving the applicable legal standard and/or in not considering the fraud and misconduct of Mark Patrick and his associates in misappropriating most or all of the assets of two charitable structures and obscuring or making it more difficult to detect that conduct when determining whether to vacate the settlement approval order under Federal Rule of Evidence 60(b)(3)?

11. Under all aspects of Federal Rule of Civil Procedure 60(b) and the Court's inherent powers to vacate or modify judgments that are against the interest of justice and affected by wrongdoing, did the Bankruptcy Court err in suggesting that the fraud and misconduct of Mark Patrick was not directly pertinent to whether a bankruptcy settlement with entities he purported to control should be approved?

12. Did the Bankruptcy Court misapply the Federal Rule of Civil Procedure 60(b)(6) standard in denying Dugaboy's Motion for Relief from Order and Motion to Vacate in determining that Dugaboy "failed to articulate a 'mutually exclusive' reason for vacating the 9019 Order?"

13. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when he came to the Court having engaged in fraud and/or misconduct, or with unclean hands, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

14. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when that judgment may have assisted Mr. Patrick in furthering his misconduct or in deterring others from contesting it, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

15. Whether the 9019 settlement order, in light of the presented evidence of Patrick's misconduct, was an inappropriate circumvention of the Fifth Circuit's decision to permit suits against certain parties without seeking bankruptcy court permission and constituted a invalid non- consensual release of claims?

16. Did the Bankruptcy Court err in denying relief under Federal Rule of Civil Procedure 60(b) or the Court's other authorities to reconsider, amend, or vacate orders on Dugaboy's independently asserted ground that Chief Judge Stacey G. Jernigan lacked authority to enter the Rule 9019 Settlement Order because she should have recused herself and was disqualified from presiding in this matter earlier in the proceedings?

17. Did the Bankruptcy Court err in denying prior motions to recuse Judge Jernigan based on her manifestations of bias against James Dondero and others associated with him, including through her extrajudicial statements in novels and elsewhere?

18. Did the Bankruptcy Court err in finding that Dugaboy had abandoned its argument regarding whether Judge Jernigan was disqualified or should have been recused for not introducing additional testimonial evidence at the hearing on the matter, despite having fully briefed the issue in its Federal Rule of Civil Procedure 60(b) Motion and Reply thereto and having place the fully published versions of the judge's novels before the Court?

19. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of Mark Patrick's personal benefit in the decision to sell the Hunter Mountain Investment Trust?

20. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of the attendance of Supporting Organizations at the instant proceedings?

21. Did the Bankruptcy Court err when it determined that the deposition transcript of Mark Patrick (Highland hearing exhibit 55) was admissible and not an exception to hearsay?

22. Did the Bankruptcy Court err when it admitted Highland's hearing exhibits 43-45 as relevant?

23. Did the Bankruptcy Court err when it did not permit James Dondero to testify in Dugaboy's case-in-chief, including while permitting Highland to sponsor his testimony for other purposes by admitting his deposition?

24. Did the Bankruptcy Court err when it excluded Dugaboy's exhibits 292-297 as improper rebuttal evidence?

25. Did the Bankruptcy Court err when it granted Highland's request to admit the deposition testimony of James Dondero, despite Highland's decision not to call him as a witness for live testimony in the case, even though he was available in the courtroom throughout the proceedings?

26. Did the Bankruptcy Court err in protecting Highland, Hunter Mountain, Mark Patrick, and others from having to produce documents created earlier than May 19, 2025?

27. Did the Bankruptcy Court err in granting any part of Highland and other participants' requests for a protective order and/or to quash subpoenas?

28. Did the Bankruptcy Court err when it delayed Highland, Mark Patrick, Hunter Mountain, and other entities' obligations to respond to discovery until a couple of weeks before trial, only to require them to produce documents, sit for depositions, and commence trial—all within a 10-day period?

29. Whether a bankruptcy court may deny relief under Federal Rule of Civil Procedure Rule 60(b) or otherwise because vacatur would not itself unwind antecedent transactions or restore a separate pre-settlement structure?

30. Whether Federal Rule of Civil Procedure 60(b)(3) requires proof that concealed or misrepresented information would have changed the outcome, or instead clear and convincing evidence that adverse-party misconduct prevented a full and fair presentation?

31. Whether the District Court should conduct additional hearings and/or review of some or all findings *de novo* given that the decision below was entered by an Article I judge, who may exercise authority only through plenary supervision by a judge contemplated by Article III of the Constitution?

32. Are rulings by Article I bankruptcy judges on matters ancillary to the bankruptcy process due a similar amount of deference as rulings on core bankruptcy matters, or should the District Court act as an Article III backstop to judges not nominated by the President or confirmed by the Senate?

33. Is any amount of deferential review of a Bankruptcy Court's findings consistent with the Supreme Court's recent decisions that principal and inferior officers of the United States must be subject to plenary supervision by the President or some other office expressly listed in the Constitution, such as an Article III judge?

34. Whether the District Court should conduct additional hearings and/or review of some or all of the Bankruptcy Court's findings *de novo* given the Bankruptcy Court found it lacked jurisdiction to rule on the motion under Federal Rule of Civil Procedure 60(b), and the appealed Order denying relief under Rule 60(b) was only to the extent the Court was permitted to issue a ruling concerning the matter?

35. Whether the Bankruptcy Court erred in finding this matter a core proceeding pursuant to 28 U.S.C. § 157(b)(2)?

36. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4685] filed by Appellant;

2. The Bankruptcy Court's June 15, 2026 *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4679];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol. 7 003628 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003641 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003644 & 003645 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003646 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003657 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003661 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003664 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |
| 003703 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol. 7 | | Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 04/03/2026 004727 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| vol 8 04/03/2026 004784 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| vol. 9 04/03/2026 005201 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 04/06/2026 005203 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 04/06/2026 005211 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 9 | | | *Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 005216 | 04/07/2026 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 005219 | 04/07/2026 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 005221 | 04/10/2026 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 005223 | 04/16/2026 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 005227 | 04/17/2026 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly |

| Date Filed | Docket No. | Description/Docket Text |
| --- | --- | --- |
| | | Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| Vol 9<br>04/17/2026<br>005324 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol.10<br>04/21/2026<br>005584 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026<br>005588 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026<br>005609 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026<br>005676 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| Vol. 10 005686 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005698 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005720 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005721 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005723 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005731 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005740 | ~~04/28/2026~~ | ~~4569~~ | ~~(9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)~~ *Discovery Deadlines and Hearing on The Dugaboy Investment* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 10 | | *Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005749 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005761 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005770 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005777 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |
| 04/29/2026 005779 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

vol. 10

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/29/2026 005781 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 05/01/2026 005788 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 05/01/2026 005790 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 05/04/2026 005792 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 05/05/2026 005795 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 05/05/2026 005878 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 05/05/2026 005896 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 05/05/2026 005899 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 05/05/2026 005901 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | |
| 005907 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005914 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005921 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005923 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005930 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005933 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005936 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005939 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol 12 006094 thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| Vol:22 008150 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008166 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008182 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 22 008250 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008287 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008423 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008459 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008466 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008910 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol. 25<br>05/11/2026<br>009548 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26<br>05/11/2026<br>009862 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27<br>05/11/2026<br>010223 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28<br>05/11/2026<br>010532 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 28 | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 010658 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010730 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol. 30 011119 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol. 31 011703 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol. 32 013172 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014857 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| vol. 35 05/11/2026 015318 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015474 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015475 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015507 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015534 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015535 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| vol. 36 05/18/2026 015538 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol. 37 015965 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 015977 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016048 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016051 – 016053 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016054 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016103 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| Vol. 37 016104 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016202 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016459 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016473 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| 016474 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court; and

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J");

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No. 4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: July 31, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in paragraph 1 of the consent order to which these undertakings are appended).

6 From the date of this undertaking to the date of the determination of the JOLs' Summons, the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 5, shall not be disclosed to or shared with Mr James Dondero, the Supporting Organisations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals / entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Court or as otherwise required by law.

7 With respect to the chapter 15 case, *In re Charitable DAF Holdco, Ltd (In Official Liquidation)*, United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), Case No. 25-11376 (BLS) (the "**Chapter 15 Case**"), (i) The First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities consent to the entry of an order, in the form and substance appended hereto at Schedule C, in the Chapter 15 Case, recognising and enforcing the above undertakings in the United States; (ii) the JOLs agree to adjourn the hearing to recognise the Cayman Islands liquidation of Charitable DAF Holdco, Ltd. (the "**Company**") as a foreign main proceeding from 14 August 2025, to a date as soon as practicable, based on the Bankruptcy Court's availability, following the conclusion of inter parties hearing regarding the JOL's Summons (such, date, the "**Adjourned Recognition Hearing Date**"); (iii) the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree that the deadline to object to recognition of the Cayman Islands liquidation of the Company shall be the date that is 21 days before the Adjourned Recognition Hearing Date and the deadline for JOLs to reply to objections, if any, shall be the date that is 7 days before the Adjourned Recognition Hearing Date. For

the avoidance of doubt, (i) the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative and (II) Related Relief Under Chapter 15 of the Bankruptcy Code*, other than with respect to matters expressly addressed in this undertaking; and (ii) the JOLs reserve their right to seek provisional relief against parties as they deem necessary or appropriate in furtherance of their duties as official liquidators, including in furtherance of their ongoing investigation of the business and affairs of the Company from the date hereof through the Adjourned Recognition Hearing Date.

## Schedule B

List of CDM Entities

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

**Schedule C**

Draft form of Chapter 15 order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD (In Official Liquidation),[2]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (BLS) |

**ORDER GRANTING PROVISIONAL RELIEF PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A) AND 1519 TO RECOGNIZE AND ENFORCE AN ORDER ENTERED BY THE CAYMAN COURT IMPLEMENTING AN ASSET PRESERVATION PROTOCOL WITH RESPECT TO THE CDM ENTITIES**

Upon consideration of [a certification of counsel] with respect to the entry by the Cayman Court[3] of an Order Implementing an Asset Preservation Protocol in the Cayman Litigation, dated [July __, 2025] and attached hereto as **Exhibit 1** (the "Asset Preservation Protocol") and it being understood that the JOLs and the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities agree to the terms and form of this order (the "Order") and its entry by the Court; and after due deliberation and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1. The Asset Preservation Protocol is hereby recognized by this Court and all undertakings as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM

[2] The Debtor is incorporated in the Cayman Islands as an exempted company and registered with registration number 263805. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [D.I. 3] (the "Verified Petition").

Entities, set forth therein are fully enforceable in the United States, including, but not limited to, each of the following:

a. the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the related entities listed in and attached hereto as **Exhibit 2** (the "CDM Entities") and their respective agents, servants, employees, and representatives, agree and undertake to:

   i. not transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

   ii. not take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

   iii. not take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

   iv. not take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

   v. not take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities;

vi. not alter, conceal, or destroy any business records concerning the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the First, Third, Fourth, Fifth and Sixth Defendants or CDM Entities;

b. Further, and to the extent not addressed by the foregoing, the First, Third, Fourth, Fifth and Sixth and the CDM Entities undertake and agree that:

i. they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "Fund"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

ii. they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this Order;

c. From the date of the Asset Preservation Protocol to the date of the determination JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

d. From the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation

Protocol), the First Defendant (as defined in the Asset Preservation Protocol) will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) he proposes to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction;

e. If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with the Cayman Litigation, the Cayman Proceeding or this Chapter 15 Case. All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 1(f) of this Order. However, the First, Third, Fourth, Fifth and Sixth Defendants agree that the issue of whether they are permitted to use funds that derive directly or indirectly from the limited partner interest in the Fund to pay their legal fees and other service providers will be determined at the Hearing (as defined in the Asset Preservation Protocol);

f. from the date of the Asset Preservation Protocol to the date of the determination of the JOLs' Summons (as defined in the Asset Preservation Protocol), the CDM Defendants and the CDM Entities will disclose to the JOLs, at the end of each calendar month: (i) a full listing of payments or other transactions undertaken by them below US$50,000 in the calendar month just passed; and (ii) copies of all existing and up to date balance sheets and financial statements or records prepared in relation to the CDM Defendants or the CDM Entities for the period 30 June 2024 onwards. Any information of whatever nature relating to any member of the First, Third, Fourth, Fifth and Sixth Defendants or the CDM Entities which is provided to the JOLs pursuant to this paragraph 1(e), shall not be disclosed to or shared with Mr James Dondero, the Supporting Organizations (being Highland Santa Barbara Foundation, Highland Dallas Foundation, and Highland Kansas City Foundation), or any known affiliates or service providers of these individuals or entities, subject to where the JOLs' are required to disclose any such information in the discharge of their duties to the Cayman Court or as otherwise required by law;

2. Notwithstanding any provision in the Bankruptcy Rules to the contrary (i) this Order shall be effective immediately and enforceable upon entry; (ii) the JOLs are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order; and (iii) the JOLs are authorized and empowered, and may, in their discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

3. Each of the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities reserve their rights regarding any relief sought in the Chapter 15 Case, including the relief sought

in the Verified Petition, other than with respect to matters expressly addressed in paragraph 1 of this Order. For the avoidance of doubt, the First, Third, Fourth, Fifth and Sixth Defendants (as defined in the Asset Preservation Protocol) and the CDM Entities hereby consent to the recognition and enforcement of the Asset Preservation Protocol in the United States through and including the date of determination of the JOLs' Summons (as defined in the Asset Preservation Protocol) and shall not oppose the continuation of such relief at any hearing for recognition of the Cayman Proceeding. By agreeing to the entry of this order, the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities have not consented to jurisdiction in this Court. All parties' rights are reserved with respect to jurisdiction

4. This Order is a Final Order within the meaning of 28 U.S.C. § 158(a) and is effective immediately upon entry.

5. This Order shall be binding on and inure to the benefit of the Debtor, the JOLs, the First, Third, Fourth, Fifth and Sixth Defendants, and the CDM Entities.

6. To the extent there is any inconsistency between the terms of this Order and the Asset Preservation Protocol, the terms of the Asset Preservation Protocol as they relate to the First, Third, Fourth, Fifth and Sixth Defendants and the CDM Entities shall control.

7. This Court shall retain jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order, any request for additional relief or any adversary proceeding brought in and through this Chapter 15 Case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: [July __], 2025
Wilmington, Delaware

______________________________

Honorable Brendan L. Shannon
United States Bankruptcy Judge

**Exhibit 1**

[Asset Preservation Protocol]

FILED BY Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/LRA/858403.02/83824743)

**EXHIBIT 42**

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
9/18/2025

The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | § § § § § § § | |
| v. | § | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | § § § § § | |

## ORDER

Before the court are

1. Defendants' July 14, 2025, Motion to Dismiss and Plea to the Jurisdiction;

2. Plaintiffs' July 21, 2025, Response to Defendants' Motion to Dismiss and Plea to the Jurisdiction;



Copy from re:SearchTX

3. Defendants' July 25, 2025, Reply in Support of their Motion to Dismiss and Plea to the Jurisdiction;

4. Plaintiffs' July 30, 2025, Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

5. Defendants' August 11, 2025, Supplemental Brief and Alternative Motion to Abate;

6. Plaintiffs' August 18, 2025, Response to Defendants' Supplemental Brief and Alternative Motion to Abate;

7. Defendants' August 21, 2025, Reply in Support of their Supplemental Brief and Alternative Motion to Abate; and

8. Plaintiffs' August 25, 2025, Sur-reply to Defendants' Supplemental Brief and Alternative Motion to Abate.

Having considered the pleadings, motions, party submissions, and oral arguments, the court makes the following findings and conclusions:

1. Plaintiffs have constitutional standing to assert their claims because they allege an injury to themselves. Additionally, the court has statutory jurisdiction under Texas Government Code § 25A.004(b). Therefore, Defendants' Motion to Dismiss and Plea to the Jurisdiction based on those premises is denied. These are not rulings on (i) the validity of plaintiffs'



Copy from re:SearchTX

causes of action; (ii) whether plaintiffs are proper parties to assert those causes of action; or (iii) whether all necessary parties are before the court.

2. The court does not at this time decide whether plaintiffs have the legal capacity to assert their causes of action because defendants have not filed a verified denial raising a lack of capacity defense. *See* TEX. R. CIV. P. 93(1).

3. Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are necessary parties under Texas Rule of Civil Procedure 39(a), they are not parties to this case, and the court cannot provide complete relief in their absence. Accordingly, this case should be abated until when the JOLs become parties, voluntarily or involuntarily.

4. Any further filings must be made by leave of court.

So ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: September 18, 2025



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 105799881
Filing Code Description: No Fee Documents
Filing Description: Order
Status as of 9/18/2025 4:53 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 9/18/2025 4:45:45 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 9/18/2025 4:45:45 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 9/18/2025 4:45:45 PM | SENT |


Copy from re:SearchTX

**EXHIBIT 4**

***Execution Version***

# THIRTEENTH AMENDMENT TO SENIOR SECURED TERM LOAN CREDIT AGREEMENT

THIRTEENTH AMENDMENT TO SENIOR SECURED TERM LOAN CREDIT AGREEMENT, dated September 30, 2025 (this "Amendment"), is by and among MIDWAVE WIRELESS, INC. (f/k/a TERRESTAR CORPORATION) (the "Borrower"), MIDWAVE WIRELESS COMMUNICATIONS, LLC (F/K/A MOTIENT COMMUNICATIONS LLC), MIDWAVE WIRELESS HOLDINGS, INC. (F/K/A MOTIENT HOLDINGS INC.), MIDWAVE WIRELESS HOLDINGS I, INC. (F/K/A MVH HOLDINGS I INC.), 2014 AWS SPECTRUM PARTNERSHIP, LP, 2014 AWS SPECTRUM BIDCO CORPORATION, as guarantors (each a "Guarantor" and, collectively, the "Guarantors" and together with the Borrower, the "Loan Parties"), the Lenders party hereto (in such capacity, the "Consenting Lenders"), and NEXBANK, FKA NEXBANK SSB, as agent for the Lenders (in such capacity, the "Administrative Agent").

## WITNESSETH:

WHEREAS, the Loan Parties, Administrative Agent and the Lenders have entered into that certain Senior Secured Term Loan Credit Agreement, dated as of February 27, 2015, as amended and restated pursuant to that certain First Amendment, dated as of October 25, 2017, and as amended and restated pursuant to that certain Second Amendment, dated as of March 19, 2018, and as amended by that certain Third Amendment, dated as of August 1, 2018, that certain Fourth Amendment, dated May 15, 2019, that certain Fifth Amendment, dated as of May 15, 2020, that certain Sixth Amendment, dated as of December 29, 2020, that certain Seventh Amendment, dated as of July 6, 2021, that certain Eighth Amendment, dated as of August 5, 2021, that certain Ninth Amendment, dated as of June 30, 2023, that certain Tenth Amendment, dated as of November 7, 2024, that certain Eleventh Amendment, dated as of January 31, 2025, and that certain Twelfth Amendment, dated as of May 14, 2025 (as further amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement" and as amended by this Amendment, the "Credit Agreement"), pursuant to which the Lenders have made and may make loans and advances and provide other financial accommodations to the Borrower as set forth in the (x) Existing Credit Agreement and (y) other Loan Documents;

WHEREAS, pursuant to the Existing Credit Agreement, the Financing Fee Effective Date is October 1, 2025;

WHEREAS, pursuant to the Existing Credit Agreement, the Borrower agreed to pay to each Tenth Amendment Consenting Lender (other than the Specified Lender) a financing fee equal to 9.0% of the principal amount of the Loans held by such Tenth Amendment Consenting Lender on such Financing Fee Effective Date, which shall be payable in kind, capitalized, compounded and added to the unpaid principal amount of the Tranche J Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date (the "Existing Financing Fee Requirement");

WHEREAS, the Borrower has requested that the Consenting Lenders agree to amend the timing and mechanics of the Existing Financing Fee Requirement with respect to the Loans held by such Consenting Lender on the terms and subject to the conditions set forth herein and in the Credit Agreement;

WHEREAS, the Consenting Lenders are willing to agree to such amendments to the Existing Credit Agreement on the terms and subject to the conditions set forth herein; and

WHEREAS, by this Amendment, the undersigned parties desire and intend to evidence such amendments;

NOW THEREFORE, in consideration of the foregoing and the mutual agreements and covenants contained herein and in the Credit Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Consents; etc. Each of the Consenting Lenders and the Loan Parties consents to and approves this Amendment, the amendments to the Existing Credit Agreement effected hereby, and the Credit Agreement as amended by this Amendment.

2. Amendment to Existing Credit Agreement.

(a) Section 1.1 of the Existing Credit Agreement is hereby amended to add thereto, in alphabetical order, the following definitions which shall read in full as follows:

"*Financing Fee PIK Interest*" means PIK Interest applicable to 9.0% of the principal amount of the Loans held by a Tenth Amendment Consenting Lender for the period beginning on October 1, 2025, and ending on the Financing Fee Effective Date.

(b) Section 1.1 of the Existing Credit Agreement is hereby amended by amending and restating the definition of "Financing Fee Effective Date" in its entirety as follows:

"*Financing Fee Effective Date*" means December 15, 2025.

(c) Section 2.9(c) of the Existing Credit Agreement is hereby amended and restated in its entirety as follows:

"(c) *Financing Fee*. The Borrower agrees to pay to each Tenth Amendment Consenting Lender (other than the Specified Lender) on the Financing Fee Effective Date a financing fee equal to (i) 9.0% of the principal amount of the Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date (after adding Financing Fee PIK Interest to the principal amount of the Loans held by such Tenth Amendment Consenting Lender) *plus* (ii) Financing Fee PIK Interest (collectively, the "*Financing Fee*"), which shall be payable in kind, capitalized, compounded and added to the unpaid principal amount of the Tranche J Loans held by such Tenth Amendment Consenting Lender on the Financing Fee Effective Date; provided, that any assignment of Loans by any Tenth Amendment Consenting Lender effected following the Tenth Amendment Effective Date shall be deemed to include an assignment of the right to receive any Financing Fee on account of such Loans."

3. Interpretation. For purposes of this Amendment, all terms used herein which are not otherwise defined herein, including but not limited to, those terms used in the recitals hereto, shall have the respective meanings assigned thereto in the Existing Credit Agreement as amended

by this Amendment.

4. Representations and Warranties by Loan Parties. The Borrower and the Guarantors, jointly and severally, represent and warrant to the Administrative Agent and the Lenders as follows, which representations and warranties shall survive the execution and delivery hereof:

(a) no Default or Event of Default has occurred and is continuing as of the date hereof before and after giving effect to this Amendment;

(b) the Borrower and each Guarantor has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Amendment, and this Amendment has been duly executed and delivered by the Borrower and each Guarantor, and constitutes a legal, valid and binding obligation of the Borrower and each Guarantor, enforceable against such Borrower or Guarantor in accordance with its terms, except as enforceability may be limited by applicable domestic or foreign bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law);

(c) the execution, delivery and performance of this Amendment by the Borrower or any Guarantor will not violate any Requirement of Law or Contractual Obligation of such Borrower or Guarantor in any respect that has or could reasonably be expected to have a Material Adverse Effect; and

(d) all of the representations and warranties set forth in the Existing Credit Agreement and the other Loan Documents, as amended hereby, are true and correct in all material respects (or, with respect to any representation or warranty that is itself modified or qualified by materiality or "Material Adverse Effect" standard, such representation or warranty shall be true and correct in all respects) on and as of the date hereof, as if made on the date hereof, except to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such date.

5. Conditions Precedent. The amendments contained herein shall only be effective on the date on which each of the following conditions precedent are satisfied or waived (the "Thirteenth Amendment Effective Date"):

(a) the Administrative Agent shall have received counterparts of this Amendment, duly authorized, executed and delivered by each of the Loan Parties;

(b) the Administrative Agent shall have received counterparts of this Amendment, duly authorized, executed and delivered by the Consenting Lenders constituting each of the Lenders;

(c) no Default or Event of Default shall exist or have occurred and be continuing (after giving effect to the provisions of this Amendment); and

(d) the representations and warranties of each of the Loan Parties contained in this Amendment and each other Loan Document shall be true and correct in all material respects

(or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) on and as of the Thirteenth Amendment Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, if such representation or warranty is subject to a materiality or Material Adverse Effect qualification, in all respects) as of such earlier date.

6. Reaffirmation of the Guaranty and Collateral Documents.

(a) Each Loan Party (i) confirms, ratifies and reaffirms its respective obligations under the guaranty described in Article XI of the Credit Agreement (the "Guaranty"), (ii) agrees that the Guaranty remains valid, binding and enforceable in all respects against such Loan Party and that the Guaranty shall continue to be in full force and effect, with the same force, effect and priority in effect immediately prior to the Thirteenth Amendment Effective Date, and (iii) agrees to continue to comply with, and be subject to, all of the terms, provisions, conditions, covenants, agreements and obligations applicable to it as set forth in the Guaranty;

(b) Each Loan Party confirms, ratifies and reaffirms (i) its respective obligations under the Collateral Documents to which it is a party and (ii) the security interest granted in all of its right, title and interest in, to and under the Collateral under each Collateral Document to which it is a party;

(c) Each Loan Party agrees that each Collateral Document to which it is a party remains valid, binding and enforceable in all respects against such Loan Party and the security interests granted by it therein shall continue to be in full force and effect, with the same force, effect and priority in effect immediately prior to the Thirteenth Amendment Effective Date; and

(d) Each Loan Party agrees, acknowledges and reaffirms all the covenants and agreements contained in each Collateral Document to which it is a party.

All of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Credit Agreement and the other Loan Documents, in each case, as amended by this Amendment.

7. Effect of this Amendment; No Novation. Except as expressly set forth herein, no other amendments, changes or modifications to the Loan Documents are intended or implied, and in all other respects the Loan Documents are hereby specifically ratified, reaffirmed and confirmed by each Loan Party as of the Thirteenth Amendment Effective Date and the Loan Parties shall not be entitled to any other or further amendment by virtue of the provisions of this Amendment or with respect to the subject matter of this Amendment. To the extent of conflict between the terms of this Amendment and the other Loan Documents, the terms of this Amendment shall control. The Credit Agreement and this Amendment shall be read and construed as one agreement. On and after the Thirteenth Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import, and each reference in the other Loan Documents to the Credit Agreement, shall mean and be a reference to the Credit Agreement as amended by this Amendment. The parties hereto acknowledge and agree that this Amendment and the other Loan Documents, whether executed and delivered in connection

herewith or otherwise, do not constitute a novation, satisfaction, payment, re-borrowing or termination of the "Obligations" under the Existing Credit Agreement or the other Loan Documents, and that all such "Obligations" under the Existing Credit Agreement or the other Loan Documents are in all respects continued and outstanding as "Obligations" under the Credit Agreement, except to the extent such obligations are modified from and after the Thirteenth Amendment Effective Date as provided in this Amendment or otherwise paid in full on the Thirteenth Amendment Effective Date.

8. Governing Law. This Amendment and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York without giving effect to any provision thereof that would require the application of the law of another jurisdiction.

9. Binding Effect. This Amendment shall be binding upon and inure to the benefit of each of the parties hereto and their respective successors and assigns.

10. Further Assurances. The Borrower and the Guarantors shall execute and deliver such additional documents and take such additional action as may be reasonably requested by the Administrative Agent to effectuate the provisions and purposes of this Amendment.

11. Entire Agreement. This Amendment represents the entire agreement and understanding concerning the subject matter hereof among the parties hereto, and supersedes all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.

12. Headings. The headings listed herein are for convenience only and do not constitute matters to be construed in interpreting this Amendment.

13. Counterparts. This Amendment may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Amendment by facsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Amendment. Any party delivering an executed counterpart of this Amendment by facsimile or other electronic method of transmission shall also deliver an original executed counterpart of this Amendment, but the failure to do so shall not affect the validity, enforceability, and binding effect of this Amendment.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Limited Waiver to be duly executed and delivered by their authorized officers as of the day and year first above written.

**MIDWAVE WIRELESS, INC.,** as the Borrower

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS COMMUNICATIONS LLC,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS HOLDINGS INC.,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

**MIDWAVE WIRELESS HOLDINGS I INC.,** as a Guarantor

By: ______________________
Name: Douglas Brandon
Title: Secretary

**2014 AWS SPECTRUM BIDCO CORPORATION,** as a Guarantor

By: ______________________________
Name: John Dooley
Title: President and Chief Executive Officer

**2014 AWS SPECTRUM PARTNERSHIP, LP,** as a Guarantor

By: Jarvinian AWS3 LLC, its General Partner

By: ______________________________
Name: John Dooley
Title: Manager

**NEXBANK, FKA NEXBANK SSB,** as Administrative Agent

By: ______________________________

Name: Rhett Miller
Title: EVP - Chief Banking Officer

**CONSENTING LENDERS**:

CEDARVIEW OPPORTUNITIES MASTER FUND, LP, as Consenting Lender

By: [signature]
Name: Burton Weinstein
Title: Managing Partner

[*Signature Page to Thirteenth Amendment*]

**CONSENTING LENDERS**:

JAMES PALLOTTA, as Consenting Lender

By: /s/ Pallotta
Name: James J. Pallotta
Title:

**CONSENTING LENDERS**:

L-BAND FUND II, LP, as Consenting Lender

By: ______________________________
Name: Thomas P. Eddy
Title: Member of L-Band Fund II GP LLC, the General Partner of L-Band Fund II, LP

L-BAND TARGET FUND, LP, as Consenting Lender

By: ______________________________
Name: Thomas P. Eddy
Title: Member of L-Band Target Fund GP, LLC, the General Partner of L-Band Target Fund, LP

**CONSENTING LENDERS**:

SIC I LLC FKA SOLUS INVESTMENT CO LLC, as
Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLA LTD, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS ADVISORS LLC, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS LONG-TERM OPPORTUNITIES FUND MASTER
LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 1 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 4 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES FUND 5 LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS OPPORTUNITIES IDF SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, L.P., as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

SOLUS CORE OPPORTUNITIES LP, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

ULTRA MASTER LTD., as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

ULTRA NB LLC, as Consenting Lender

By: ______________________________
Name: Gordon J. Yeager
Title: Authorized Signatory

**CONSENTING LENDERS**:

**CLO HOLDCO, LTD.**, as Consenting Lender

By: ______________________________
Name: Mark Patrick
Title: Director

**CONSENTING LENDERS**:

TRUST UNDER THE KODAK RETIREMENT PLAN TRUST, as Consenting Lender

By: ______________________________
Name: Chris Klapinsky
Title: Partner, NEPC, LLC

**CONSENTING LENDERS**:

THE IBS OPPORTUNITY FUND, LTD., as Consenting Lender

By: ________________________
Name: JAMES S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS INVESTMENT MANAGER

THE IBS TURNAROUND FUND (QP) (A LIMITED PARTNERSHIP), as Consenting Lender

By: ________________________
Name: JAMES S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS GENERAL PARTNER

THE IBS TURNAROUND FUND, L.P., as Consenting Lender

By: ________________________
Name: JAMES. S. HORNE
Title: CFO, IBS CAPITAL LLC, ITS GENERAL PARTNER

**CONSENTING LENDERS**:

**OCM TRSTR Holdings, LLC** as Consenting Lender

By: Oaktree Fund GP, LLC
Its: Manager

By: Oaktree Fund GP I, L.P.
Its: Managing Member

Signed by:
By: Sherman Lau
905F83179F544D7...
Name: Sherman Lau
Title: Authorized Signatory

DocuSigned by:
By: David Nicoll
80EF4EE2BE4F41F...
Name: David Nicoll
Title: Authorized Signatory

**CONSENTING LENDERS**:

WARANA SP USA VI-A LLC, as Consenting Lender

By: ______________________
Grant Gillespie (Sep 26, 2025 10:31:46 EDT)
Name: Grant Gillespie
Title: Authorized Signatory

**EXHIBIT 44**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **LIBERTY CLO HOLDCO, LTD.**<br><br>*Plaintiff*,<br><br>v.<br><br>**NANCY DONDERO, as Trustee of The Dugaboy Investment Trust, GRANT JAMES SCOTT as Trustee of The SLHC Trust, NEXPOINT ADVISORS, L.P., NEXPOINT ADVISORS GP, LLC, NEXPOINT REAL ESTATE ADVISORS IV, L.P. and NEXPOINT REAL ESTATE ADVISORS GP, LLC,**<br><br>***Defendants.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 1:25-cv-00236-JLH** |

**STIPULATION AND [PROPOSED]
ORDER OF DISMISSAL WITH PREJUDICE**

WHEREAS, on February 28, 2025, Plaintiff Liberty CLO HoldCo, Ltd. ("Plaintiff") commenced the above-captioned action and filed its Complaint and supporting documents (D.I. 1); and

WHEREAS, on March 25, 2025, Defendants Nancy Dondero, as Trustee of The Dugaboy Investment Trust, Grant Scott, as Truste of the SLHC Trust, NexPoint Advisors, L.P., NexPoint Advisors GP, LLC, NexPoint Real Estate Advisors IV, L.P., and NexPoint Real Estate Advisors GP, LLC (collectively, "Defendants") filed their Answers (D.I. 19-23);

IT IS HEREBY STIPULATED AND AGREED, by and between the parties hereto, through their undersigned counsel and subject to approval of the Court, that:

1. The Complaint in the above-captioned action is dismissed with prejudice.



4915-0306-1630\1

2. Upon the Court's approval of this Stipulation and [Proposed] Order of Dismissal with Prejudice, the above-captioned action shall hereby be closed.

Dated: December 3, 2025

DORSEY & WHITNEY (DELAWARE) LLP

By: */s/ Eric Lopez Schnabel*
Eric Lopez Schnabel (DE Bar No. 3672)
300 Delaware Avenue, Suite 1010
Wilmington, Delaware 19801
Telephone: (302) 425-7171
Facsimile: (302) 425-7177
E-mail: *schnabel.eric@dorsey.com*

-and-

Brian Shaw (*admitted pro hac vice*)
Texas Bar No. 24053473
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3003
E-mail: bshaw@ccsb.com

Monica Gaudioso (*admitted pro hac vice*)
Texas Bar No. 24084570
Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St., Suite 5500
Dallas, TX 75202
Telephone: (214) 855-3088
E-mail: mgaudioso@ccsb.com

**ATTORNEYS FOR PLAINTIFF LIBERTY CLO HOLDCO, LTD.**

**HOGAN MCDANIEL**

By: */s/ Daniel K. Hogan*
Daniel K. Hogan
DE Bar No. 2814
1311 Delaware Avenue, Ste. 1
Wilmington, Delaware 19806
Telephone: (302) 656-7540
Facsimile: (302) 656-7599
Email: dkhogan@dkhogan.com

**STINSON LLP**

Deborah Deitsch-Perez
Texas Bar No. 24036072
deborah.deitschperez@stinson.com
(*admitted pro hac vice*)

Jeffrey T. Prudhomme
Texas Bar No. 24053696
jeff.prudhomme@stinson.com
(*admitted pro hac vice*)

2200 Ross Ave, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Telecopier: (214) 560-2203

**ATTORNEYS FOR DEFENDANTS**

IT IS SO ORDERED THIS __ day of _______________, 2025

_______________________________________
The Honorable Jennifer L. Hall

**EXHIBIT 4**

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
12/8/2025

| | | |
|---|---|---|
| ATLAS IDF, LP, | § | THE BUSINESS COURT OF TEXAS FIRST DIVISION |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Cause No. 25-BC01B-0004 |
| NEXPOINT REAL ESTATE PARTNERS, LLC f/k/a HCRE PARTNERS, LLC, and NANCY DONDERO, as Trustee of The Dugaboy Investment Trust, | § | |
| Defendants. | § | |

## AGREED FINAL JUDGMENT

The Court considered the Traditional Motion for Summary Judgment (the "Motion")[1] filed by Plaintiff Atlas IDF, LP ("Atlas") on September 29, 2025, the response and reply, the admitted summary-judgment evidence, the pleadings in this case, and the agreement of the parties reflected by this Agreed Final Judgment.

The Court concludes that the Motion should be granted and the parties' agreement honored, such that Atlas is entitled to final judgment against Defendant NexPoint Real Estate Partners, LLC f/k/a HCRE Partners, LLC ("NexPoint") as set forth below.

[1] All defined terms in the Motion are incorporated herein.


Copy from re:SearchTX

Accordingly, the Court therefore RENDERS final judgment in favor of Atlas on its claims for breach (1) of the $2.3M Note, and (2) the $5M Note against NexPoint.

It is ORDERED, Adjudged, and Decreed that Atlas shall recover the following amounts from NexPoint:

1. Damages on the $2.3M Note, calculated as follows: $4,583,477.85 in accrued but unpaid principal and interest due as of October 27, 2025; with pre-judgment interest on that amount at the rate of 8.00% annually, accruing at $967.71 per day beginning on October 27, 2025, until the day before the date of this Agreed Final Judgment;

2. Damages on the $5M Note, calculated as follows: $9,955,549.91 in accrued but unpaid principal and interest due as of October 27, 2025; with pre-judgment interest on that amount at the rate of 8.00% annually, accruing at $2,105.25 per day beginning on October 27, 2025, until the day before the date of this Agreed Final Judgment;

3. Atlas's reasonable and necessary pre-judgment attorneys' fees in the amount of $136,834.50;



Copy from re:SearchTX

4. Conditional post-judgment and appellate fees as follows:

a. $19,791.75 if NexPoint files an unsuccessful motion for new trial;

b. $118,750.50 if NexPoint files an unsuccessful appeal to the Court of Appeals;

c. $59,375.25 if NexPoint files an unsuccessful petition for review to the Supreme Court of Texas if a response to the petition for review is filed;

d. $118,750.50 if NexPoint files an unsuccessful petition for review to the Supreme Court of Texas if a brief on the merits is also filed; and

e. $79,167.00 if NexPoint files an unsuccessful appeal to the Supreme Court of Texas if the petition for review is granted and oral argument is presented;

5. Costs of court; and

6. Post-judgment interest on all amounts due under this Agreed Final Judgment at the contractual rate of 8.00% pursuant to Texas Finance Code § 304.002, beginning on the date this Agreed Final Judgment is rendered.



Copy from re:SearchTX

It is ORDERED, Adjudged, and Decreed that NexPoint shall pay to Atlas the net proceeds due to NexPoint from the sale of any of its assets to satisfy this Agreed Final Judgment until paid in full.

It is ORDERED, Adjudged, and Decreed that Atlas shall have all writs of process and orders necessary to execute on and enforce this Agreed Final Judgment.

This Agreed Final Judgment finally disposes of all claims, all causes of action, and all parties before the Court in this case. To the extent not addressed herein or in a prior order of the Court, all other relief requested by the parties is denied. This final judgment is appealable.

NexPoint waives all rights to appeal this Agreed Final Judgment.

It is SO ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court, First Division

SIGNED: December 8, 2025



Copy from re:SearchTX

**AGREED AS TO FORM, ENTRY, AND AS A CONSENT/AGREED JUDGMENT:**

By: *\/s/ Brian P. Shaw*
Brian P. Shaw, counsel for
Plaintiff Atlas IDF, LP

By: */s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez, counsel
for Defendant NexPoint Real
Estate Partners f/k/a HCRE
Partners, LLC



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108824009
Filing Code Description: No Fee Documents
Filing Description: Agreed Final Judgment
Status as of 12/8/2025 10:48 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Deborah Deitsch-Perez | | deborah.deitschperez@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Deborah Deitsch-Perez | | deborah.deitschperez@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jeff Prudhomme | | jeff.prudhomme@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jeff Prudhomme | | jeff.prudhomme@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Monica E.Gaudioso | | mgaudioso@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Andrea C.Reed | | areed@ccsb.com | 12/8/2025 10:43:10 AM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 12/8/2025 10:43:10 AM | SENT |
| Team Email | | DAL.LSSTeam2@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Jacob Gaslin | | jacob.gaslin@stinson.com | 12/8/2025 10:43:10 AM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 12/8/2025 10:43:10 AM | SENT |



Copy from re:SearchTX

**EXHIBIT 4**

efile Public Visual Render | ObjectId: 202523219349325902 - Submission: 2025-11-17 | TIN: 45-3961755

Form **990**

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

Do not enter social security numbers on this form as it may be made public.

**Go to *www.irs.gov/Form990* for instructions and the latest information.**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2024**

Open to Public Inspection

**A For the 2024 calendar year, or tax year beginning 01-01-2024 , and ending 12-31-2024**

**B** Check if applicable:
☐ Address change
☐ Name change
☐ Initial return
☐ Final return/terminated
☐ Amended return
☐ Application pending

**C** Name of organization
HIGHLAND DALLAS FOUNDATION INC

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) | Room/suite
2101 CEDAR SPRINGS SUITE 1200

City or town, state or province, country, and ZIP or foreign postal code
DALLAS, TX 75201

**D Employer identification number**
45-3961755

E Telephone number
(214) 276-6300

**G** Gross receipts $ 4,709,490

**F** Name and address of principal officer:
JAMES DONDERO
2101 CEDAR SPRINGS SUITE 1200
DALLAS, TX 75201

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No
**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.
**H(c)** Group exemption number

**I** Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) (insert no.) ☐ 4947(a)(1) or ☐ 527

**J Website:** N/A

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

**L** Year of formation: 2011

**M** State of legal domicile: TX

## Part I Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities:
TO SUPPORT AND BENEFIT THE DALLAS FOUNDATION, A TEXAS NONPROFIT CORPORATION.

**2** Check this box ☐

| | | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 3 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 1 |
| 5 | Total number of individuals employed in calendar year 2024 (Part V, line 2a) | 5 | 0 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | 0 |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 | Program service revenue (Part VIII, line 2g) | 0 | 0 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 32,787,503 | 4,709,490 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 32,787,503 | 4,709,490 |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 2,284,137 | 3,839,918 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 103,570 | 677,824 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 2,387,707 | 4,517,742 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 30,399,796 | 191,748 |

| | | | Beginning of Current Year | End of Year |
|---|---|---|---|---|
| Net Assets or Fund Balances | 20 | Total assets (Part X, line 16) | 139,632,832 | 82,073,527 |
| | 21 | Total liabilities (Part X, line 26) | 0 | 405,413 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 139,632,832 | 81,668,114 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| | | | | | | |
|---|---|---|---|---|---|---|
| | which the organization is licensed to issue qualified health plans | 13b | | | | |
| c | Enter the amount of reserves on hand | 13c | | | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? | | | 14a | | No |
| b | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | | 14b | | |
| 15 | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | | 15 | | No |
| 16 | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O. | | | 16 | | No |
| 17 | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? If "Yes," complete Form 6069. | | | 17 | | |

Form **990** (2024)

Page 6

Form 990 (2024) Page **6**

**Part VI Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI ☑

## Section A. Governing Body and Management

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year | 1a | 3 | | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | 1 | | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | | 2 | | No |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | | 3 | | No |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? | | | 5 | | No |
| 6 | Did the organization have members or stockholders? | | | 6 | | No |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | | 7a | | No |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | | | 7b | | No |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? | | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? | | | 8b | Yes | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | | 9 | | No |

## Section B. Policies (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? | 10a | | No |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | Yes | |
| b | Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | | No |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | 12c | | |
| 13 | Did the organization have a written whistleblower policy? | 13 | | No |
| 14 | Did the organization have a written document retention and destruction policy? | 14 | | No |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official | 15a | | No |
| b | Other officers or key employees of the organization | 15b | | No |
| | If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions. | | | |

| | | | |
|---|---|---|---|
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | **16a** | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? | **16b** | |

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
TORREY LITTLETON 3000 PEGASUS PARK STE 930 DALLAS, TX 75247 (214) 741-9898

Form **990** (2024)

Page 7

Form 990 (2024) Page **7**

**Part VII Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position: Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) JAMES DONDERO<br>PRESIDENT, DIRECTOR | 1.00<br>0.00 | X | | X | | | | 0 | 0 | 0 |
| (2) JULIE DIAZ<br>VICE PRESIDENT | 0.50<br>40.00 | X | | X | | | | 518,549 | 0 | 13,576 |
| (3) ANGELA WOODSON<br>SECRETARY | 0.50<br>40.00 | | | X | | | | 182,830 | 0 | 19,002 |
| (4) TORRREY LITTLETON<br>TREASURER | 0.50<br>40.00 | | | X | | | | 260,781 | 0 | 29,957 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

efile Public Visual Render | ObjectId: 202523219349325902 - Submission: 2025-11-17 | TIN: 45-3961755

**SCHEDULE A** (Form 990)

Department of the Treasury Internal Revenue Service

# Public Charity Status and Public Support

**Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.**
▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

**2024**

Open to Public Inspection

**Name of the organization**
HIGHLAND DALLAS FOUNDATION INC

**Employer identification number**
45-3961755

**Part I Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

10 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☑ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☑ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations . . . . . . 1

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| (A) THE DALLAS FOUNDATION | 752890371 | 7 | Yes | | 3,839,918 | 0 |
| | | | | | | |
| **Total** 1 | | | | | 3,839,918 | 0 |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.** Cat. No. 11285F **Schedule A (Form 990) 2024**

Page 2

Schedule A (Form 990) 2024 Page **2**

**Part II Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

| | | | Yes | No |
|---|---|---|---|---|
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* | 4a | | No |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* **Part VI** *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | 4b | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* **Part VI** *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | 4c | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in* **Part VI,** *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | 5a | | No |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | 5b | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | 5c | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* **Part VI.** | 6 | | No |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990) .* | 7 | | No |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* | 8 | | No |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* **Part VI.** | 9a | | No |
| b | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* **Part VI.** | 9b | | No |
| c | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* **Part VI.** | 9c | | No |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* | 10a | | No |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* | 10b | | |

**Schedule A (Form 990) 2024**

Page 5



**Part IV Supporting Organizations** (continued)

| | | | Yes | No |
|---|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| a | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | 11a | | No |
| b | A family member of a person described on 11a above? | 11b | | No |
| c | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in* **Part VI.** | 11c | | No |

**Section B. Type I Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | 1 | Yes | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | 2 | | No |

**Section C. Type II Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of [cut off] | | | |

efile Public Visual Render | ObjectId: 202523219349325902 - Submission: 2025-11-17 | TIN: 45-3961755

**Schedule J** (Form 990) (Rev. January 2025)
Department of the Treasury Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**
**▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**
**▶ Attach to Form 990.**
**▶ Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047
Open to Public Inspection

Name of the organization: HIGHLAND DALLAS FOUNDATION INC
**Employer identification number** 45-3961755

**Part I Questions Regarding Compensation**

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.<br>☐ First-class or charter travel ☐ Housing allowance or residence for personal use<br>☐ Travel for companions ☐ Payments for business use of personal residence<br>☐ Tax idemnification and gross-up payments ☐ Health or social club dues or initiation fees<br>☐ Discretionary spending account ☐ Personal services (e.g., maid, chauffeur, chef) | | | |
| **b** | If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | 1b | | |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? | 2 | | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.<br>☐ Compensation committee ☐ Written employment contract<br>☐ Independent compensation consultant ☐ Compensation survey or study<br>☐ Form 990 of other organizations ☐ Approval by the board or compensation committee | | | |
| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** | Receive a severance payment or change-of-control payment? | 4a | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? | 4b | | No |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement?<br>If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | 4c | | No |
| | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** | The organization? | 5a | | No |
| **b** | Any related organization?<br>If "Yes," on line 5a or 5b, describe in Part III. | 5b | | No |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** | The organization? | 6a | | No |
| **b** | Any related organization?<br>If "Yes," on line 6a or 6b, describe in Part III. | 6b | | No |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III | 7 | | No |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III | 8 | | No |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? | 9 | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50053T **Schedule J (Form 990) (Rev. 1-2025)**

Page 2

Schedule J (Form 990) (Rev. 1-2025) Page **2**

**Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.
**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2, 1099-MISC compensation, and/or 1099-NEC | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| 1 JULIE DIAZ<br>VICE PRESIDENT | (i) | 473,549 | 45,000 | 0 | 13,100 | 476 | 532,125 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 TORRREY LITTLETON<br>TREASURER | (i) | 231,741 | 29,040 | 0 | 10,027 | 19,930 | 290,738 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 ANGELA WOODSON<br>SECRETARY | (i) | 178,504 | 4,326 | 0 | 7,072 | 11,930 | 201,832 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Schedule J (Form 990) (Rev. 1-2025)

Page 3

Schedule J (Form 990) (Rev. 1-2025) Page **3**

**Part III Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 3 | COMPENSATION PROCESS FOR TOP OFFICIAL - A SELECT INDEPENDENT GROUP OF THE BOARD ESTABLISHES THE COMPENSATION PACKAGE FOR THE CEO. COMPENSATION SURVEYS, INDICATING NATIONAL INDUSTRY STANDARDS FOR COMPENSATION OF SIMILAR ORGANIZATIONS, ARE CONSULTED IN SETTING THE COMPENSATION PACKAGE FOR THIS POSITION. COMPENSATION PROCESS FOR OFFICERS - THE BOARD HAS DESIGNATED COMPENSATION DECISIONS FOR OTHER OFFICERS AND KEY EMPLOYEES TO THE ORGANIZATION'S CEO. COMPENSATION SURVEYS, INDICATING NATIONAL INDUSTRY STANDARDS FOR COMPENSATION OF SIMILAR ORGANIZATIONS, ARE CONSULTED IN SETTING COMPENSATION PACKAGES FOR THESE POSITIONS. |

Schedule J (Form 990) (Rev. 1-2025)

**Additional Data** Return to Form

**Software ID:**
**Software Version:**

| efile Public Visual Render | ObjectId: 202523219349325902 - Submission: 2025-11-17 | TIN: 45-3961755 |
|---|---|---|

**SCHEDULE O**
**(Form 990)**
(Rev. January 2025)
Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.**
**Attach to Form 990 or 990-EZ.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
HIGHLAND DALLAS FOUNDATION INC

**Employer identification number**
45-3961755

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 1A | PURSUANT TO SECTION 2.2 OF THE ORGANIZATION'S BYLAWS, THE INSTITUTIONAL MEMBER SHALL BE ENTITLED TO TWO (2) VOTES UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS, AND THE INDIVIDUAL MEMBER SHALL BE ENTITLED TO ONE (1) VOTE UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS. |
| FORM 990, PART VI, SECTION B, LINE 11B | MANAGEMENT, INCLUDING THE DIRECTORS, WORKS DILIGENTLY TO COMPLETE THE FORM 990 AND ATTACHED SCHEDULES IN A THOROUGH MANNER. MANAGEMENT PRESENTS THE FORM TO THE BOARD FOR REVIEW AND COMMENTS. PRIOR TO FILING THE RETURN, ALL BOARD MEMBERS ARE PROVIDED THE FORM 990 AND MANAGEMENT TEAM MEMBERS ARE AVAILABLE TO ANSWER ANY BOARD MEMBERS' QUESTIONS. |
| FORM 990, PART VI, SECTION C, LINE 19 | THE ORGANIZATION'S GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS ARE MADE AVAILABLE UPON REQUEST. |
| FORM 990, PART XI, LINE 9: | LIABILITY PAYABLE -405,413. |



**Additional Data** Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202523219349325902 - Submission: 2025-11-17 | TIN: 45-3961755

**SCHEDULE R (Form 990)** (Rev. January 2025)
Department of the Treasury Internal Revenue Service

# Related Organizations and Unrelated Partnerships

**Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.**
**Attach to Form 990.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047
Open to Public Inspection

Name of the organization
HIGHLAND DALLAS FOUNDATION INC

**Employer identification number**
45-3961755

Part I **Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Part II **Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1)THE DALLAS FOUNDATION<br>3000 PEGUSAS PARK DRIVE SUITE 930<br><br>DALLAS, TX 75247<br>75-2893071 | COMMUNITY FOUNDATION | TX | 501(C)(3) | LINE 7: 170(B)(1)(A) | N/A | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |



Page 2



Part III **Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Part IV **Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |





**Part V Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | Yes | No |
|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule. | | | |
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)**annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | No |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | Yes | |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | No |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | No |
| **e** Loans or loan guarantees by related organization(s) | 1e | | No |
| **f** Dividends from related organization(s) | 1f | | No |
| **g** Sale of assets to related organization(s) | 1g | | No |
| **h** Purchase of assets from related organization(s) | 1h | | No |
| **i** Exchange of assets with related organization(s) | 1i | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | No |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | Yes | |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | No |
| **o** Sharing of paid employees with related organization(s) | 1o | | No |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | No |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | | No |
| **r** Other transfer of cash or property to related organization(s) | 1r | | No |
| **s** Other transfer of cash or property from related organization(s) | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| (1)THE DALLAS FOUNDATION | B | 3,839,918 | CASH |
| (2)THE DALLAS FOUNDATION | M | 500,000 | CASH |
| | | | |
| | | | |
| | | | |
| | | | |





**Part VI Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? Yes | (e) No | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? Yes | (h) No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | (j) No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |







**Part VII Supplemental Information**

Provide additional information for responses to questions on Schedule R. See instructions.

| Return Reference | Explanation |
|---|---|



## Additional Data

Return to Form

**Software ID:**

**Software Version:**

efile Public Visual Render | ObjectId: 202503189349301990 - Submission: 2025-11-14 | TIN: 45-3961865

Form **990**

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

Do not enter social security numbers on this form as it may be made public.

**Go to www.irs.gov/Form990 for instructions and the latest information.**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2024**

Open to Public Inspection

**A For the 2024 calendar year, or tax year beginning 01-01-2024 , and ending 12-31-2024**

B Check if applicable:
☐ Address change
☐ Name change
☐ Initial return
☐ Final return/terminated
☐ Amended return
☐ Application pending

C Name of organization
HIGHLAND KANSAS CITY FOUNDATION INC

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) Room/suite
2101 CEDAR SPRING ROAD 1200

City or town, state or province, country, and ZIP or foreign postal code
DALLAS, TX 75201

**D Employer identification number**
45-3961865

E Telephone number
(214) 276-6300

G Gross receipts $ 1,103,223

F Name and address of principal officer:
JAMES DONDERO
2101 CEDAR SPRING ROAD 1200
DALLAS, TX 75201

H(a) Is this a group return for subordinates? ☐ Yes ☑ No
H(b) Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.
H(c) Group exemption number

I Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) (insert no.) ☐ 4947(a)(1) or ☐ 527

**J Website:** N/A

K Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

L Year of formation: 2011

M State of legal domicile: TX

## Part I Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities:
TO SUPPORT AND BENEFIT THE GREATER KANSAS CITY COMMUNITY FOUNDATION, A MISSOURI NONPROFIT CORPORATION.

2 Check this box ☐

| | | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 3 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 1 |
| 5 | Total number of individuals employed in calendar year 2024 (Part V, line 2a) | 5 | 0 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | 0 |

| Section | Line | Description | Prior Year | Current Year |
|---|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 | Program service revenue (Part VIII, line 2g) | 0 | 0 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 19,810,435 | 1,103,223 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 19,810,435 | 1,103,223 |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 2,000,000 | 500,000 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 9,508 | 9,508 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 2,009,508 | 509,508 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 17,800,927 | 593,715 |
| Net Assets or Fund Balances | | | Beginning of Current Year | End of Year |
| | 20 | Total assets (Part X, line 16) | 91,007,570 | 88,214,035 |
| | 21 | Total liabilities (Part X, line 26) | 0 | 0 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 91,007,570 | 88,214,035 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| | | | | | |
|---|---|---|---|---|---|
| **a** Is the organization licensed to issue qualified health plans in more than one state? **Note.** See the instructions for additional information the organization must report on Schedule O. | | | 13a | | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | 13b | | | | |
| **c** Enter the amount of reserves on hand | 13c | | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? | | | 14a | | No |
| **b** If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | | 14b | | |
| **15** Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | | 15 | | No |
| **16** Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O. | | | 16 | | No |
| **17** **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? If "Yes," complete Form 6069. | | | 17 | | |







Part VI **Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*
Check if Schedule O contains a response or note to any line in this Part VI ☑

**Section A. Governing Body and Management**

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** Enter the number of voting members of the governing body at the end of the tax year | 1a | 3 | | | |
| If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| **b** Enter the number of voting members included in line 1a, above, who are independent | 1b | 1 | | | |
| **2** Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | | 2 | | No |
| **3** Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | | 3 | | No |
| **4** Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | | 4 | | No |
| **5** Did the organization become aware during the year of a significant diversion of the organization's assets? | | | 5 | | No |
| **6** Did the organization have members or stockholders? | | | 6 | Yes | |
| **7a** Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | | 7a | Yes | |
| **b** Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | | | 7b | Yes | |
| **8** Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| **a** The governing body? | | | 8a | Yes | |
| **b** Each committee with authority to act on behalf of the governing body? | | | 8b | Yes | |
| **9** Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | | 9 | | No |

**Section B. Policies** *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | Yes | No |
|---|---|---|---|
| **10a** Did the organization have local chapters, branches, or affiliates? | 10a | | No |
| **b** If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| **11a** Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | Yes | |
| **b** Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| **12a** Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | Yes | |
| **b** Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | | No |
| **c** Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | 12c | Yes | |
| **13** Did the organization have a written whistleblower policy? | 13 | | No |
| **14** Did the organization have a written document retention and destruction policy? | 14 | | No |
| **15** Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** The organization's CEO, Executive Director, or top management official | 15a | | No |

**b** Other officers or key employees of the organization . . . . . **15b** No

If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions.

**16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . . . . . **16a** No

**b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . **16b**

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
DEBORAH WILKERSON 1055 BROADWAY BLVD STE 130 KANSAS, MO 64105 (816) 842-0944







**Part VII Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position: Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) JAMES DONDERO<br>PRESIDENT, DIRECTOR | 1.00<br>0.00 | X | | X | | | | 0 | 0 | 0 |
| (2) BRENDA CHUMLEY<br>DIRECTOR | 0.50<br>40.00 | X | | | | | | 0 | 256,661 | 43,745 |
| (3) DEBORAH L WILKERSON<br>SECRETARY, TREASURER | 2.00<br>40.00 | X | | X | | | | 0 | 490,724 | 59,189 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

**SCHEDULE A**
(Form 990)

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

**Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.**
**▶ Attach to Form 990 or Form 990-EZ.**
**▶ Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047
**2024**
Open to Public Inspection

**Name of the organization**
HIGHLAND KANSAS CITY FOUNDATION INC

**Employer identification number**
45-3961865

**Part I** **Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

10 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☑ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☑ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations . . . . . . 1

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| (A) GREATER KANSAS CITY COMMUNITY FOUNDATION | 431152398 | 8 | Yes | | 500,000 | 0 |
| | | | | | | |
| **Total** 1 | | | | | 500,000 | 0 |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.** Cat. No. 11285F **Schedule A (Form 990) 2024**





**Part II** **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.

| | | | Yes | No |
|---|---|---|---|---|
| | *If "Yes," explain in* ***Part VI*** *what controls the organization put in place to ensure such use.* | 3c | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* | 4a | | No |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* ***Part VI*** *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | 4b | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* ***Part VI*** *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | 4c | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in* ***Part VI,*** *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | 5a | | No |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | 5b | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | 5c | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* ***Part VI.*** | 6 | | No |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990) .* | 7 | | No |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* | 8 | | No |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* ***Part VI.*** | 9a | | No |
| b | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* ***Part VI.*** | 9b | | No |
| c | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* ***Part VI.*** | 9c | | No |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* | 10a | | No |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* | 10b | | |







**Part IV Supporting Organizations** (continued)

| | | | Yes | No |
|---|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| a | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | 11a | | No |
| b | A family member of a person described on 11a above? | 11b | | No |
| c | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in* ***Part VI.*** | 11c | | No |

**Section B. Type I Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* ***Part VI*** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | 1 | Yes | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* ***Part VI*** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | 2 | | No |

**Section C. Type II Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees ... | | | |

| efile Public Visual Render | ObjectId: 202503189349301990 - Submission: 2025-11-14 | TIN: 45-3961865 |
|---|---|---|

**SCHEDULE O**
**(Form 990)**
(Rev. January 2025)
Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.**
**Attach to Form 990 or 990-EZ.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
HIGHLAND KANSAS CITY FOUNDATION INC

**Employer identification number**
45-3961865

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 1A | PURSUANT TO SECTION 2.2 OF THE ORGANIZATION'S BYLAWS, THE INSTITUTIONAL MEMBER SHALL BE ENTITLED TO TWO (2) VOTES UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS, AND THE INDIVIDUAL MEMBER SHALL BE ENTITLED TO ONE (1) VOTE UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS. |
| FORM 990, PART VI, SECTION A, LINE 6 | THE CORPORATION SHALL HAVE TWO CLASSES OF MEMBERS AND ONE MEMBER IN EACH SUCH CLASS: THE INSTITUTIONAL MEMBER, WHICH SHALL BE THE GREATER KANSAS CITY COMMUNITY FOUNDATION, AND THE INDIVIDUAL MEMBER, WHICH SHALL BE JAMES DONDERO OR AN INDIVIDUAL DESIGNATED AS THE INDIVIDUAL MEMBER IN ACCORDANCE WITH THE BYLAWS. |
| FORM 990, PART VI, SECTION A, LINE 7A | TWO (2) DIRECTORS (THE "INSTITUTIONAL DIRECTORS") SHALL BE ELECTED ANNUALLY BY THE INSTITUTIONAL MEMBER AND ONE (1) DIRECTOR (THE "INDIVIDUAL DIRECTOR") SHALL BE ELECTED ANNUALLY BY THE INDIVIDUAL MEMBER. |
| FORM 990, PART VI, SECTION A, LINE 7B | ONLY THE MEMBERS, BY THE AFFIRMATIVE UNANIMOUS VOTE OF THE MEMBERS ENTITLED TO VOTE, MAY ADOPT, AMEND, OR REPEAL THE BYLAWS, AND ALTERATIONS OR AMENDMENTS OF THE BYLAWS MADE BY THE MEMBERS SHALL NOT BE ALTERED OR AMENDED BY THE BOARD OF DIRECTORS TO THE EXTENT SUCH ALTERATION OR AMENDMENT EXPRESSLY STATES THAT IT CAN ONLY BE ALTERED OR AMENDED BY THE MEMBERS. |
| FORM 990, PART VI, SECTION B, LINE 11B | MANAGEMENT, INCLUDING THE DIRECTORS, WORKS DILIGENTLY TO COMPLETE THE FORM 990 AND ATTACHED SCHEDULES IN A THOROUGH MANNER. MANAGEMENT PRESENT THE FORM TO THE BOARD FOR REVIEW AND COMMENTS. PRIOR TO FILING THE RETURN, ALL BOARD MEMBERS ARE PROVIDED THE FORM 990 AND MANAGEMENT TEAM MEMBERS ARE AVAILABLE TO ANSWER ANY BOARD MEMBERS' QUESTIONS. |
| FORM 990, PART VI, SECTION B, LINE 12C | NO CONTRACT OR AGREEMENT MAY BE ENTERED INTO BY AND BETWEEN THE CORPORATION AND ANY OF THE FOLLOWING: (A) A DIRECTOR, OFFICER, OR EMPLOYEE OF THE CORPORATION (HEREINAFTER AN "INSIDER"); OR (B) ANY CORPORATION, PARTNERSHIP, TRUST, SOLE PROPRIETORSHIP OR ANY OTHER ENTITY (HEREINAFTER AN "ENTITY") IN WHICH AN INTEREST IS OWNED OR HELD, DIRECTLY OR INDIRECTLY, BY OR FOR THE BENEFIT OF AN INSIDER, UNLESS (I) THE TRANSACTION IS APPROVED IN ACCORDANCE WITH SECTION 144 OF THE DELAWARE GENERAL CORPORATION LAW TO THE EXTENT SUCH PROVISION IS APPLICABLE TO THE TRANSACTION; AND (II) IF ONE OR MORE OF THE PARTIES TO THE CONTRACT OR TRANSACTION IS A "DISQUALIFIED PERSON" WITH RESPECT TO THE CORPORATION WITHIN THE MEANING OF SECTION 4958 OF THE CODE, EITHER (X) SUCH TRANSACTION IS REVIEWED AND APPROVED IN ACCORDANCE WITH THE "REBUTTABLE PRESUMPTION SAFE HARBOR" PROVISIONS SET FORTH IN THE REGULATIONS PROMULGATED UNDER SECTION 4958 OF THE CODE OR (Y) THE BOARD OF DIRECTORS DETERMINES THAT SUCH PROCEDURES ARE NOT NECESSARY FOR THE TRANSACTION INVOLVED AND RECORDS ITS SPECIFIC FINDINGS FOR MAKING SUCH DETERMINATION; PROVIDED, HOWEVER, THAT THE FOLLOWING CONTRACTS AND AGREEMENTS SHALL NOT BE SUBJECT TO THE FOREGOING PROHIBITION: A GRATUITOUS TRANSFER OF ASSETS OR PROMISE TO TRANSFER ASSETS TO THE CORPORATION OF ANY KIND, INCLUDING BUT NOT LIMITED TO, (I) A GIFT ANNUITY, CHARITABLE REMAINDER TRUST, CHARITABLE LEAD TRUST OR SIMILAR SPLIT-INTEREST ARRANGEMENT WHICH BENEFITS BOTH THE INSIDER AND THE CORPORATION; OR (II) A LOAN, LEASE, AGREEMENT OF SALE OR PURCHASE, PLEDGE, GUARANTEE, ASSUMPTION OF LIABILITY, BAILMENT, OR CONSIGNMENT. ALL INSIDERS SHALL, AS A CONDITION OF QUALIFYING AND CONTINUING TO QUALIFY AS A DIRECTOR, OFFICER, AND/OR EMPLOYEE OF THE CORPORATION, ABIDE BY SUCH CONFLICT OF INTEREST POLICIES AS THE BOARD OF DIRECTORS MAY ADOPT FROM TIME TO TIME. |
| FORM 990, PART VI, SECTION C, LINE 19 | THE ORGANIZATION'S GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS ARE MADE AVAILABLE UPON REQUEST. |



## Additional Data

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202503189349301990 - Submission: 2025-11-14 | TIN: 45-3961865

# SCHEDULE R (Form 990)

(Rev. January 2025)

Department of the Treasury
Internal Revenue Service

## Related Organizations and Unrelated Partnerships

**Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.**
**Attach to Form 990.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
HIGHLAND KANSAS CITY FOUNDATION INC

**Employer identification number**
45-3961865

Part I **Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Part II **Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1)GREATER KANSAS CITY COMMUNITY FOUNDATION<br>1055 BROADWAY<br><br>KANSAS CITY, MO 64105<br>43-1152398 | COMMUNITY FOUNDATION | MO | 501(C)(3) | LINE 7: 170(B)(1)(A) | N/A | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |



Page 2



Part III **Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

Part IV **Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |





**Part V Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | Yes | No |
|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule. | | | |
| **1** During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | No |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | Yes | |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | No |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | No |
| **e** Loans or loan guarantees by related organization(s) | 1e | | No |
| **f** Dividends from related organization(s) | 1f | | No |
| **g** Sale of assets to related organization(s) | 1g | | No |
| **h** Purchase of assets from related organization(s) | 1h | | No |
| **i** Exchange of assets with related organization(s) | 1i | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | No |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | Yes | |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | No |
| **o** Sharing of paid employees with related organization(s) | 1o | | No |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | No |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | | No |
| **r** Other transfer of cash or property to related organization(s) | 1r | | No |
| **s** Other transfer of cash or property from related organization(s) | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |





**Part VI Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

**Part VII Supplemental Information**

Provide additional information for responses to questions on Schedule R. See instructions.

| Return Reference | Explanation |
|---|---|



## Additional Data

Return to Form

**Software ID:**
**Software Version:**

efile Public Visual Render | ObjectId: 202503189349311420 - Submission: 2025-11-14 | TIN: 45-3962008

Form **990**

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

Do not enter social security numbers on this form as it may be made public.

**Go to *www.irs.gov/Form990* for instructions and the latest information.**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**2024**

Open to Public Inspection

**A For the 2024 calendar year, or tax year beginning 01-01-2024 , and ending 12-31-2024**

**B** Check if applicable:
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

**C** Name of organization
HIGHLAND SANTA BARBARA FOUNDATION INC

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) 2101 CEDAR SPRINGS ROAD 1200 | Room/suite

City or town, state or province, country, and ZIP or foreign postal code
DALLAS, TX 75201

**D Employer identification number**
45-3962008

E Telephone number
(214) 276-6300

G Gross receipts $ 1,087,722

**F** Name and address of principal officer:
JAMES DONDERO
2101 CEDAR SPRINGS ROAD 1200
DALLAS, TX 75201

**H(a)** Is this a group return for subordinates? ☐ Yes ☑ No

**H(b)** Are all subordinates included? ☐ Yes ☐ No
If "No," attach a list. See instructions.

**H(c)** Group exemption number

**I** Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) (insert no.) ☐ 4947(a)(1) or ☐ 527

**J Website:** N/A

**K** Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

**L** Year of formation: 2011

**M** State of legal domicile: TX

## Part I Summary

**Activities & Governance**

**1** Briefly describe the organization's mission or most significant activities:
TO SUPPORT AND BENEFIT THE SANTA BARBARA FOUNDATION, A CALIFORNIA NONPROFIT CORPORATION.

**2** Check this box ☐

| | | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 3 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 1 |
| 5 | Total number of individuals employed in calendar year 2024 (Part V, line 2a) | 5 | 0 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 0 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | 0 |

| | | | Prior Year | Current Year |
|---|---|---|---|---|
| **Revenue** | 8 | Contributions and grants (Part VIII, line 1h) | 0 | 0 |
| | 9 | Program service revenue (Part VIII, line 2g) | 0 | 0 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 18,296,113 | 1,087,722 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 18,296,113 | 1,087,722 |
| **Expenses** | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 250,000 | 250,000 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 245,186 | 244,007 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 495,186 | 494,007 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 17,800,927 | 593,715 |
| | | | **Beginning of Current Year** | **End of Year** |
| **Net Assets or Fund Balances** | 20 | Total assets (Part X, line 16) | 91,007,570 | 88,214,035 |
| | 21 | Total liabilities (Part X, line 26) | 0 | 0 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 91,007,570 | 88,214,035 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| | | | | | |
|---|---|---|---|---|---|
| b | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans | 13b | | | |
| c | Enter the amount of reserves on hand | 13c | | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? | | 14a | | No |
| b | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* | | 14b | | |
| 15 | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see the instructions and file Form 4720, Schedule N. | | 15 | | No |
| 16 | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? If "Yes," complete Form 4720, Schedule O. | | 16 | | No |
| 17 | **Section 501(c)(21) organizations.** Did the trust, or any disqualified or other person engage in any activities that would result in the imposition of an excise tax under section 4951, 4952, or 4953? If "Yes," complete Form 6069. | | 17 | | |

Form **990** (2024)

Page 6

Form 990 (2024) Page **6**

**Part VI Governance, Management, and Disclosure.** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI ☑

**Section A. Governing Body and Management**

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year | 1a | 3 | | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | 1 | | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? | | | 2 | | No |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? | | | 3 | | No |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? | | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? | | | 5 | | No |
| 6 | Did the organization have members or stockholders? | | | 6 | Yes | |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? | | | 7a | Yes | |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? | | | 7b | Yes | |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? | | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? | | | 8b | Yes | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* | | | 9 | | No |

**Section B. Policies** (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? | 10a | | No |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? | 11a | Yes | |
| b | Describe on Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| 12a | Did the organization have a written conflict of interest policy? *If "No," go to line 13* | 12a | Yes | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? | 12b | | No |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe on Schedule O how this was done* | 12c | Yes | |
| 13 | Did the organization have a written whistleblower policy? | 13 | | No |
| 14 | Did the organization have a written document retention and destruction policy? | 14 | | No |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official | 15a | | No |
| b | Other officers or key employees of the organization | 15b | | No |

If "Yes" to line 15a or 15b, describe the process on Schedule O. See instructions.

| | | | |
|---|---|---|---|
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? | 16a | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? | 16b | |

**Section C. Disclosure**

**17** List the states with which a copy of this Form 990 is required to be filed

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
JACQUELINE CARRERRA 1111 CHAPALA STREET STE 200 SANTA BARBARA, CA 93101 (805) 963-1873

Form **990** (2024)

Page 7

Form 990 (2024) Page **7**

**Part VII** **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee): Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) JAMES DONDERO<br>DIRECTOR, PRESIDENT | 1.00 | X | | X | | | | 0 | 0 | 0 |
| (2) JACQUELINE CARRERRA<br>DIRECTOR, SECY/TREASURER | 2.00<br>42.00 | X | | X | | | | 0 | 457,442 | 83,862 |
| (3) TODD YUBA<br>DIRECTOR | 1.00<br>42.00 | X | | | | | | 0 | 297,791 | 56,674 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

efile Public Visual Render | ObjectId: 202503189349311420 - Submission: 2025-11-14 | TIN: 45-3962008

**SCHEDULE A**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

**Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.**
**▶ Attach to Form 990 or Form 990-EZ.**
**▶ Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047
**2024**
Open to Public Inspection

**Name of the organization**
HIGHLAND SANTA BARBARA FOUNDATION INC

**Employer identification number**
45-3962008

**Part I Reason for Public Charity Status** (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990).)

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II.)

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

10 ☐ An organization that normally receives: (1) more than 33 1/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 33 1/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

11 ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

12 ☑ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box on lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

a ☑ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

f Enter the number of supported organizations . . . . . . . . . . 1

g Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| (A) SANTA BARBARA FOUNDATION | 951866094 | 7 | Yes | | 250,000 | 0 |
| | | | | | | |
| **Total** 1 | | | | | 250,000 | 0 |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.** Cat. No. 11285F **Schedule A (Form 990) 2024**

Page 2

Schedule A (Form 990) 2024 Page **2**

**Part II Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III. If the organization failed to qualify under the tests listed below, please complete Part III.)

**Section A. Public Support**

| | | | Yes | No |
|---|---|---|---|---|
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked box 12a or 12b in Part I, answer lines 4b and 4c below.* | 4a | | No |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in* **Part VI** *how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* | 4b | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in* **Part VI** *what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* | 4c | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer lines 5b and 5c below (if applicable). Also, provide detail in* **Part VI,** *including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* | 5a | | No |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | 5b | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? | 5c | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in* **Part VI.** | 6 | | No |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990) .* | 7 | | No |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described on line 7? *If "Yes," complete Part I of Schedule L (Form 990).* | 8 | | No |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons, as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in* **Part VI.** | 9a | | No |
| b | Did one or more disqualified persons (as defined on line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in* **Part VI.** | 9b | | No |
| c | Did a disqualified person (as defined on line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in* **Part VI.** | 9c | | No |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* | 10a | | No |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* | 10b | | |

**Schedule A (Form 990) 2024**

Page 5

Schedule A (Form 990) 2024 Page **5**

**Part IV Supporting Organizations** (continued)

| | | | Yes | No |
|---|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| a | A person who directly or indirectly controls, either alone or together with persons described on lines 11b and 11c below, the governing body of a supported organization? | 11a | | No |
| b | A family member of a person described on 11a above? | 11b | | No |
| c | A 35% controlled entity of a person described on line 11a or 11b above? *If "Yes" to 11a, 11b, or 11c, provide detail in* **Part VI.** | 11c | | No |

**Section B. Type I Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the officers, directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in* **Part VI** *how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | 1 | Yes | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in* **Part VI** *how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | 2 | | No |

**Section C. Type II Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of | | | |

efile Public Visual Render | ObjectId: 202503189349311420 - Submission: 2025-11-14 | TIN: 45-3962008

**Schedule J** (Form 990) (Rev. January 2025)
Department of the Treasury Internal Revenue Service

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**
**▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**
**▶ Attach to Form 990.**
**▶ Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047
Open to Public Inspection

Name of the organization
HIGHLAND SANTA BARBARA FOUNDATION INC

**Employer identification number**
45-3962008

## Part I Questions Regarding Compensation

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.<br>☐ First-class or charter travel ☐ Housing allowance or residence for personal use<br>☐ Travel for companions ☐ Payments for business use of personal residence<br>☐ Tax idemnification and gross-up payments ☐ Health or social club dues or initiation fees<br>☐ Discretionary spending account ☐ Personal services (e.g., maid, chauffeur, chef) | | | |
| **b** | If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . . | 1b | | |
| **2** | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . . . . . | 2 | | |
| **3** | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.<br>☐ Compensation committee ☐ Written employment contract<br>☐ Independent compensation consultant ☐ Compensation survey or study<br>☐ Form 990 of other organizations ☐ Approval by the board or compensation committee | | | |
| **4** | During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization: | | | |
| **a** | Receive a severance payment or change-of-control payment? . . . . . | 4a | | No |
| **b** | Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . . . | 4b | | No |
| **c** | Participate in, or receive payment from, an equity-based compensation arrangement? . . . . .<br>If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | 4c | | No |
| | **Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.** | | | |
| **5** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of: | | | |
| **a** | The organization? . . . . . | 5a | | No |
| **b** | Any related organization? . . . . .<br>If "Yes," on line 5a or 5b, describe in Part III. | 5b | | No |
| **6** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of: | | | |
| **a** | The organization? . . . . . | 6a | | No |
| **b** | Any related organization? . . . . .<br>If "Yes," on line 6a or 6b, describe in Part III. | 6b | | No |
| **7** | For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III . . . . . | 7 | | No |
| **8** | Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . | 8 | | No |
| **9** | If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . | 9 | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50053T **Schedule J (Form 990) (Rev. 1-2025)**

Page 2

Schedule J (Form 990) (Rev. 1-2025) Page **2**

## Part II Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees. Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.
**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2, 1099-MISC compensation, and/or 1099-NEC | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| 1 JACQUELINE CARRERRA<br>DIRECTOR, SECY/TREASURER | (i) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 412,296 | 43,856 | 1,290 | 57,500 | 26,362 | 541,304 | 0 |
| 2 TODD YUBA<br>DIRECTOR | (i) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | (ii) | 277,711 | 11,000 | 9,080 | 29,919 | 26,755 | 354,465 | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |



Page 3



**Part III Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 3 | THE COMPENSATION FOR THE RELATED ORGANIZATION WAS ESTABLISHED BY A COMPENSATION STUDY AND APPROVAL OF THE BOARD. ADDITIONALLY, STARTING WITH THE RECOMMENDATIONS OF THE CEO, THE COMPENSATION COMMITTEE ASSESSES, DETERMINES, AND DOCUMENTS THE REASONABLENESS OF THE TOTAL COMPENSATION RANGES, AND THE TERMS OF ANY EMPLOYMENT AGREEMENTS, SEVERANCE AND/OR RETENTION AGREEMENTS, OF THE V.P., FINANCE & ADMINISTRATION AND ALL EMPLOYEES WITH REPORTABLE COMPENSATION (W-2) RANGES AT OR OVER $150,000. WHEN APPROPRIATE, THE COMMITTEE SELECTS AND ENGAGES PROFESSIONALS TO GATHER AND REVIEW IN ADVANCE, APPROPRIATE MARKET COMPARABILITY DATA ON THE AMOUNT AND FORM OF COMPENSATION PAID FOR COMPARABLE POSITIONS BY OTHER COMPARABLE EMPLOYERS. |



**Additional Data**

Return to Form

**Software ID:**
**Software Version:**

| efile Public Visual Render | ObjectId: 202503189349311420 - Submission: 2025-11-14 | TIN: 45-3962008 |
|---|---|---|

**SCHEDULE O** (Form 990) (Rev. January 2025) Department of the Treasury Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information.**
**Attach to Form 990 or 990-EZ.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
HIGHLAND SANTA BARBARA FOUNDATION INC

**Employer identification number**
45-3962008

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 1A | PURSUANT TO SECTION 2.2 OF THE ORGANIZATION'S BYLAWS, THE INSTITUTIONAL MEMBER SHALL BE ENTITLED TO TWO (2) VOTES UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS, AND THE INDIVIDUAL MEMBER SHALL BE ENTITLED TO ONE (1) VOTE UPON EACH MATTER SUBMITTED TO A VOTE OF THE MEMBERS. |
| FORM 990, PART VI, SECTION A, LINE 6 | THE CORPORATION SHALL HAVE TWO CLASSES OF MEMBERS AND ONE MEMBER IN EACH SUCH CLASS: THE INSTITUTIONAL MEMBER, WHICH SHALL BE THE SANTA BARBARA FOUNDATION, AND THE INDIVIDUAL MEMBER, WHICH SHALL BE JAMES DONDERO OR AN INDIVIDUAL DESIGNATED AS THE INDIVIDUAL MEMBER IN ACCORDANCE WITH THE BYLAWS. |
| FORM 990, PART VI, SECTION A, LINE 7A | TWO (2) DIRECTORS (THE "INSTITUTIONAL DIRECTORS") SHALL BE ELECTED ANNUALLY BY THE INSTITUTIONAL MEMBER AND ONE (1) DIRECTOR (THE "INDIVIDUAL DIRECTOR") SHALL BE ELECTED ANNUALLY BY THE INDIVIDUAL MEMBER. |
| FORM 990, PART VI, SECTION A, LINE 7B | ONLY THE MEMBERS, BY THE AFFIRMATIVE UNANIMOUS VOTE OF THE MEMBERS ENTITLED TO VOTE, MAY ADOPT, AMEND, OR REPEAL THE BYLAWS, AND ALTERATIONS OR AMENDMENTS OF THE BYLAWS MADE BY THE MEMBERS SHALL NOT BE ALTERED OR AMENDED BY THE BOARD OF DIRECTORS TO THE EXTENT SUCH ALTERATION OR AMENDMENT EXPRESSLY STATES THAT IT CAN ONLY BE ALTERED OR AMENDED BY THE MEMBERS. |
| FORM 990, PART VI, SECTION B, LINE 11B | MANAGEMENT, INCLUDING THE DIRECTORS, WORKS DILIGENTLY TO COMPLETE THE FORM 990 AND ATTACHED SCHEDULES IN A THOROUGH MANNER. MANAGEMENT PRESENT THE FORM TO THE BOARD FOR REVIEW AND COMMENTS. PRIOR TO FILING THE RETURN, ALL BOARD MEMBERS ARE PROVIDED THE FORM 990 AND MANAGEMENT TEAM MEMBERS ARE AVAILABLE TO ANSWER ANY BOARD MEMBERS' QUESTIONS. |
| FORM 990, PART VI, SECTION B, LINE 12C | NO CONTRACT OR AGREEMENT MAY BE ENTERED INTO BY AND BETWEEN THE CORPORATION AND ANY OF THE FOLLOWING: (A) A DIRECTOR, OFFICER, OR EMPLOYEE OF THE CORPORATION (HEREINAFTER AN "INSIDER"); OR (B) ANY CORPORATION, PARTNERSHIP, TRUST, SOLE PROPRIETORSHIP OR ANY OTHER ENTITY (HEREINAFTER AN "ENTITY") IN WHICH AN INTEREST IS OWNED OR HELD, DIRECTLY OR INDIRECTLY, BY OR FOR THE BENEFIT OF AN INSIDER, UNLESS (I) THE TRANSACTION IS APPROVED IN ACCORDANCE WITH SECTION 144 OF THE DELAWARE GENERAL CORPORATION LAW TO THE EXTENT SUCH PROVISION IS APPLICABLE TO THE TRANSACTION; AND (II) IF ONE OR MORE OF THE PARTIES TO THE CONTRACT OR TRANSACTION IS A "DISQUALIFIED PERSON" WITH RESPECT TO THE CORPORATION WITHIN THE MEANING OF SECTION 4958 OF THE CODE, EITHER (X) SUCH TRANSACTION IS REVIEWED AND APPROVED IN ACCORDANCE WITH THE "REBUTTABLE PRESUMPTION SAFE HARBOR" PROVISIONS SET FORTH IN THE REGULATIONS PROMULGATED UNDER SECTION 4958 OF THE CODE OR (Y) THE BOARD OF DIRECTORS DETERMINES THAT SUCH PROCEDURES ARE NOT NECESSARY FOR THE TRANSACTION INVOLVED AND RECORDS ITS SPECIFIC FINDINGS FOR MAKING SUCH DETERMINATION; PROVIDED, HOWEVER, THAT THE FOLLOWING CONTRACTS AND AGREEMENTS SHALL NOT BE SUBJECT TO THE FOREGOING PROHIBITION: A GRATUITOUS TRANSFER OF ASSETS OR PROMISE TO TRANSFER ASSETS TO THE CORPORATION OF ANY KIND, INCLUDING BUT NOT LIMITED TO, (I) A GIFT ANNUITY, CHARITABLE REMAINDER TRUST, CHARITABLE LEAD TRUST OR SIMILAR SPLIT-INTEREST ARRANGEMENT WHICH BENEFITS BOTH THE INSIDER AND THE CORPORATION; OR (II) A LOAN, LEASE, AGREEMENT OF SALE OR PURCHASE, PLEDGE, GUARANTEE, ASSUMPTION OF LIABILITY, BAILMENT, OR CONSIGNMENT. ALL INSIDERS SHALL, AS A CONDITION OF QUALIFYING AND CONTINUING TO QUALIFY AS A DIRECTOR, OFFICER, AND/OR EMPLOYEE OF THE CORPORATION, ABIDE BY SUCH CONFLICT OF INTEREST POLICIES AS THE BOARD OF DIRECTORS MAY ADOPT FROM TIME TO TIME. |
| FORM 990, PART VI, SECTION C, LINE 19 | THE ORGANIZATION'S GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY, AND FINANCIAL STATEMENTS ARE MADE AVAILABLE UPON REQUEST. |



**Additional Data**

Return to Form

**Software ID:**
**Software Version:**

# SCHEDULE R (Form 990)

(Rev. January 2025)

Department of the Treasury
Internal Revenue Service

## Related Organizations and Unrelated Partnerships

**Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37.**
**Attach to Form 990.**
**Go to *www.irs.gov/Form990* for instructions and the latest information.**

OMB No. 1545-0047

Open to Public Inspection

Name of the organization
HIGHLAND SANTA BARBARA FOUNDATION INC

**Employer identification number**
45-3962008

**Part I** **Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Part II** **Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b)(13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1)SANTA BARBARA FOUNDATION<br>1111 CHAPALA STREET SUITE 200<br><br>SANTA BARBARA, CA 93101<br>95-1866094 | COMMUNITY FOUNDATION | CA | 501(C)(3) | LINE 7: 170(B)(1)(A) | N/A | | No |
| (2)WYATT FAMILY FOUNDATION<br>1111 CHAPALA STREET SUITE 200<br><br>SANTA BARBARA, CA 93101<br>93-1503406 | TO SUPPORT THE CHARITABLE ACTIVITIES OF THE SANTA BARBARA FOUNDATION | CA | 501(C)(3) | LINE 12A, I | SANTA BARBARA FOUNDATION | | No |
| (3)ERIC AND KELLY SCHWARTZ CHARITABLE TRUST<br>1776 PLEASANT PLAIN ROAD<br><br>FAIRFIELD, IA 52556<br>47-4959497 | TO SUPPORT THE CHARITABLE ACTIVITIES OF THE SANTA BARBARA FOUNDATION | IA | 501(C)(3) | LINE 12A, I | SANTA BARBARA FOUNDATION | | No |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50135Y **Schedule R (Form 990) (Rev. 1-2025)**

Page 2

Schedule R (Form 990) (Rev. 1-2025) Page **2**

**Part III** **Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? Yes | No | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? Yes | No | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**Part IV** **Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of | (b) Primary activity | (c) Legal | (d) Direct controlling | (e) Type of entity | (f) Share of total | (g) Share of end | (h) Percentage | (i) Section 512(b)(13) |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | Yes | No |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |





**Part V Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

| | | Yes | No |
|---|---|---|---|
| **Note.** Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule. | | | |
| **1** During the tax year, did the orgranization engage in any of the following transactions with one or more related organizations listed in Parts II-IV? | | | |
| **a** Receipt of **(i)** interest, **(ii)** annuities, **(iii)** royalties, or **(iv)** rent from a controlled entity | 1a | | No |
| **b** Gift, grant, or capital contribution to related organization(s) | 1b | Yes | |
| **c** Gift, grant, or capital contribution from related organization(s) | 1c | | No |
| **d** Loans or loan guarantees to or for related organization(s) | 1d | | No |
| **e** Loans or loan guarantees by related organization(s) | 1e | | No |
| **f** Dividends from related organization(s) | 1f | | No |
| **g** Sale of assets to related organization(s) | 1g | | No |
| **h** Purchase of assets from related organization(s) | 1h | | No |
| **i** Exchange of assets with related organization(s) | 1i | | No |
| **j** Lease of facilities, equipment, or other assets to related organization(s) | 1j | | No |
| **k** Lease of facilities, equipment, or other assets from related organization(s) | 1k | | No |
| **l** Performance of services or membership or fundraising solicitations for related organization(s) | 1l | | No |
| **m** Performance of services or membership or fundraising solicitations by related organization(s) | 1m | Yes | |
| **n** Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) | 1n | | No |
| **o** Sharing of paid employees with related organization(s) | 1o | | No |
| **p** Reimbursement paid to related organization(s) for expenses | 1p | | No |
| **q** Reimbursement paid by related organization(s) for expenses | 1q | | No |
| **r** Other transfer of cash or property to related organization(s) | 1r | | No |
| **s** Other transfer of cash or property from related organization(s) | 1s | | No |

**2** If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| (1) SANTA BARBARA FOUNDATION | B | 250,000 | CASH PAID |
| (2) SANTA BARBARA FOUNDATION | M | 234,499 | CASH PAID |
| | | | |
| | | | |
| | | | |
| | | | |





**Part VI Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a) Name, address, and EIN of entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e) Are all partners section 501(c)(3) organizations? | | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproprtionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

**Part VII Supplemental Information**

Provide additional information for responses to questions on Schedule R. See instructions.

| Return Reference | Explanation |
|---|---|



## Additional Data

Return to Form

**Software ID:**
**Software Version:**

**EXHIBIT 4**

Digitally signed by Advance Performance Exponents Inc.
Reason: Apex Certified

GRAND COURT CAYMAN ISLANDS FINANCIAL SERVICES DIVISION

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

---

**WINDING UP PETITION**

---

**TO: The Grand Court of the Cayman Islands**

**THE HUMBLE PETITION** of the **Supporting Organisations** (as defined below) (the ***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***LP***) (and indirectly by way of separate petition the Charitable DAF Fund, LP (the ***Fund***)) shows that:

## A INTRODUCTION

1. The Petitioners respectfully seek:

   (a) an order pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) that the LP be wound up on the basis that it is just and equitable to do so; and

   (b) the appointment of Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands as joint official liquidators (the ***JOLs***) of the Fund; and/or

   (c) such other orders as the Court considers to be appropriate.

## B THE FUND

2. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

3. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

4. The Fund invests in securities for the purpose of benefiting, directly and indirectly, its Supporting Organisations (as defined below) which support various charitable causes in the U.S., including education, veteran and first responder welfare, medical research, economic and community initiatives, and youth and family programs.

5. The LP is the sole limited partner of the Fund and is a Cayman Islands exempt company incorporated on 27 October 2011 (registration number 263805) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

6. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles***).

7. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

*Ownership and Management*

8. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" (ARLPA, Recitals).

9. The Petitioners understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organisations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities.

10. In this context:

(a) The LP holds ninety-nine percent (99%) of the economic interest in the Fund. The other one per cent (1%) in the Fund is held by the GP or its successor as GP.

(b) The LP issued 305 participation shares (the ***Participation Shares***) that are held by four Delaware corporate entities, namely: The Highland Dallas Foundation, Inc. (***HDF***), The Highland Kansas City Foundation, Inc. (***HKCF***), The Highland Santa Barbara Foundation, Inc. (***HSBF***), and The HCMLP Charitable Fund (***HCMLP***) (together, the ***Supporting Organisations***).

(c) Each Supporting Organisation provides funding to its respective U.S. charitable foundation (together, the ***Charities***) which are the ultimate beneficial owners of the Fund's entire economic interest.

(d) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the holder of the entire issued share capital in the GP (the ***Membership Interest***).

11. The Management Shares and the Membership Interest have at all material times been held by a single individual who, as a result, has sole control of the Fund structure (the ***Control Position***).

## C THE PETITIONERS

12. As stated above, the Petitioners (the Supporting Organisations) are non-profit charitable entities exempt from taxation under section 501(c)(3) of the \ Code and through the LP hold 99% of the economic interest in the Fund.

13. The Supporting Organisations provide funding directly to the Charities as follows:

(a) HDF holds 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1 billion in grants and manages over $500 million in assets.

(b) HKCF holds 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and currently manages over $5 billion in assets.

(c) HSBF holds 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) HCMLP holds 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.

14. Since the Fund's inception in 2011, through profits generated by the Fund the Supporting Organisations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

D **BACKGROUND**

15. The Fund was created in 2011 on the instructions of James Dondero. Mr Dondero is the President of NexPoint Advisors, L.P. (***NexPoint***), an alternative investment firm registered with the U.S. Securities and Exchange Commission (***SEC***), and the former President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which he founded in 1993. Mr Dondero is a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles he utilises to donate such funds to charitable organisations. Mr Dondero holds no ownership or control stake in the Fund or any related entities, although he sits on the boards of the Supporting Organisations.

16. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr Scott: (i) resigned as director of the Fund and the LP, (ii) appointed Mark Patrick as director of the Fund and the LP, and (iii) transferred to Mr Patrick the Management Shares in the LP and Management Interest in the GP. Mr Patrick therefore assumed the Control Position from that date.

17. From 2008 to 2021, Mr Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr Dondero. From March 2021 to October 2024, Mr Patrick was employed as tax counsel by Skyview Group (***Skyview***). In both positions, Mr Patrick acted as an advisor to Mr Dondero and entities owned or affiliated to him.

18. On 22 April 2021, Paul Murphy, a Cayman Islands resident, was appointed as director of the LP.

19. On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of Texas (the ***Highland Bankruptcy***). The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

E **EVENTS FOLLOWING MR PATRICK'S ASSUMPTION OF THE CONTROL POSITION**

20. Since assuming the Control Position, Mr Patrick has used that position to advance his own interests to the detriment of the LP, the Fund, the Supporting Organisations and the Charities.

*Non-disclosure of personal interest in grant*

21. In June 2023, Mr Patrick made a request that the Highland Dallas Foundation (i.e. the Supporting

Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, it was discovered that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

22. The grant payment was authorised on 5 September 2023, but Mr Patrick was informed that further payments were unlikely.

*Attempt to obtain secret profit*

23. In September 2023, Mr Dondero was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***), a firm providing litigation support and investigative services which, at the time, was engaged by the Fund on an unrelated matter.

24. Mr Cronin disclosed to Mr Dondero that Mr Patrick had approached him with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between US$25,000 and US$50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation.

25. Mr Cronin refused Mr Patrick's proposal.

26. Mr Patrick's attempt to obtain a secret, undisclosed personal profit from the Fund would, if successful, have constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. It was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Unauthorised use of MNPI / Insider Trading*

27. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities and other laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (the ***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing each quarter that they will not use MNPI while trading. Mr Patrick completed an annual 2023, Q4 2023, Q1 2024 and Q2 2024 certifications, among others.

28. In late August 2024, Mr Patrick contacted the attorneys to the Dallas Foundation to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to

exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

29. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick. The investigation concluded that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations and that Mr Patrick had attempted a serious breach of U.S. securities laws.

30. Mr Patrick resigned from Skyview immediately before the internal investigation was finalised. At the same time, he terminated the Fund's services agreement with Skyview. That termination was not in the interests of the Fund, was for Mr Patrick's own self-protection and was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Financial Irregularities in the Fund / Unexplained Expenditure*

31. A review of the Fund's financial records conducted by Skyview covering the calendar years ending 2018 to 2023 and the first half of 2024 showed significant increases in expenditures, notably:

(a) **Directors' fees**, which increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, increased further to around US$2.25 million; and

(b) **Expenses overall**, which for the first half of 2024 were around US$18.3 million, with a further US$18.6 million being spent in the calendar year 2023.

32. In October 2024, the Charities requested that Mr Patrick provide financial information about the Fund entities to seek to understand these increases in expenditures. This information was not provided.

33. In November 2024, Holland and Knight (***H&K***), the Charities' US attorneys, delivered a letter to Mr Murphy from the Charities advising that the Charities no longer had confidence in the governance of the Fund and considered that a reorganisation was required (the ***No Confidence Letter***). No response to the No Confidence Letter was received.

34. In January 2025, further correspondence was sent to Mr Patrick and Mr Murphy advising that a better understanding of the Fund's asset position was needed and expressing serious concern that the Charities' requests for information continued to be disregarded, reflecting an ongoing lack of transparency on the part of Mr Patrick and Mr Murphy. Mr Murphy responded via email to this request noting that he and Mr Patrick would "*present directly to the foundations/supporting organisations*" to address some of the concerns in the No Confidence Letter.

35. H&K responded to Mr Murphy's email noting, *inter alia*, that the Supporting Organisations had legitimate concerns and highlighted that "*the last information they received from in July of 2024, before Mr Patrick shut down [communication] showed that legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022*" (a 300% increase, if annualized) and "*director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024*" (a 12,400% increase, if annualized).

36. In February 2025, further correspondence was sent between H&K and Douglas Mancino (***Mr Mancino***) of Seyfarth Shaw LLP (***Seyfarth***), US counsel purporting to act for the Fund, whereby Seyfarth rejected the reported increases in legal and directors' fees and provided a valuation of the Fund from 2020 to support the suggestion that similar information was provided to the Charities when Mr Scott was in the Control Position. It is clear that Mr Patrick and/or Mr Murphy has instructed Seyfarth, purportedly on behalf of the Fund, to take a hostile, indignant and non-neutral stance when faced with reasonable requests on behalf of the Charities, as ultimate beneficiaries of the assets of the Fund. Such conduct is a breach of their duties to the LP and, through the LP, to the Fund.

37. H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund. Seyfarth sent an email to H&K requesting available dates for Mr Murphy to make the promised presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth sent an email to H&K stating that they had just learned that a call was scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the source of confusion. Seyfarth has made no further efforts to schedule the meeting, nor has it otherwise provided any of the requested financial information.

*<u>Replacement of GP without notification</u>*

38. In February 2025, H&K discovered that Mr Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior.

39. On 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

40. Mr Patrick is the sole director of the New GP.

*<u>Sale of assets</u>*

41. Following Mr Patrick's resignation from Skyview and his termination of Skyview's services agreement with the Fund, the Petitioners have become aware that assets of the Fund have been

sold without explanation, at values which appear to be below-market.

*Hunter Mountain*

42. In February 2025, an individual associated with Mr Patrick, Shawn Raver, asked for the in-bound wire instructions for one of Mr Dondero's affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain is an indirect majority owned subsidiary of the Fund and owns the majority of the distribution rights of the equity position in the Highland Bankruptcy. The residual value of the Highland estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy.

43. According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold, at potentially a substantial undervalue, to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. In the absence of a further or better explanation, there is the inference of self-dealing, fair dealing, no profit or conflict rules

*Atlas IDF, L.P.*

44. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policyholder is Empower Dallas Foundation (***EDF***), a charitable foundation for which Mr Dondero serves as President whose purpose is to benefit the Dallas Foundation.

45. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of:

(a) concerns about the long-term availability and viability of back-office support;

(b) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of Mr Donero's affiliates) dated 7 May 2014 in the amount of $2.3M and 27 May 2014 in the amount of $5M, held by the Partnership; and

(c) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up.

46. At the time, the amounts outstanding on the two Notes, including accumulated interest, were in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 and attempted sale of the Notes to

an affiliate.

47. On 27 February 2025, H&K as counsel for EDF (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes.

48. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and further noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP*." The initial zero valuation and proposed $500,000 sale price is commercially unjustifiable.

*Attorney General Investigation*

49. The Petitioners have been informed that on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organisation, conduct and management of Charitable DAF GP, LLC, and its related entities.

50. It is understood that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

51. The Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

## F GROUNDS FOR WINDING UP

52. The Supporting Organizations bring this Petition based on the multiple concerns identified above about the governance of the LP and the Fund, including potential mismanagement of assets and/or use of assets for purposes other than to benefit and support the Charities, as the ultimate beneficial owners of the Fund's interest, in carrying out their charitable purposes, in accordance with the terms of the ARLPA, on the basis of a complete breakdown in confidence in the person in the Control Position.

53. Accordingly, the Petitioners seek a winding up of the LP on a just and equitable basis and in particular, without limitation, on the following grounds (each discussed in detail below):

(a) governance issues and mismanagement; and

(b) the need for an investigation into the recent activities and expenditure of the Fund; and

(c) justifiable loss of faith and confidence in the management of the Fund.

## F APPLICATION

54. Given the above, the Petitioners seek an order that the LP be wound up pursuant to section 92(e) of the Act.

55. The Petitioners also seek an order appointing Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, as the joint official liquidators (***JOLs***) of the LP.

56. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd:

(a) are "qualified insolvency practitioners" as defined in section 89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (***IPR***);

(b) meet the residency requirements contained in Regulation 5 of the IPR;

(c) meet the independence requirements prescribed by Regulation 6 of the IPR;

(d) meet the insurance requirements prescribed by Regulation 7 of the IPR and A&M holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e) consent to their appointment as official liquidators of the LP, if so appointed by the Court.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT –**

1. The LP be wound up by the Court in accordance with section 92(e) of the Act.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands be appointed as the joint official liquidators (the ***JOLs***) of the LP.

3. The JOLs be authorized to act jointly and severally in their capacity as liquidators of the LP.

4. The JOLs shall not be required to give security for their appointment.

5. In addition to their powers prescribed in Part II of the Third Schedule to the Act, which are exercisable without sanction of this Honourable Court, the JOLs may also without further sanction or intervention from this Honourable Court exercise the following powers set out in Part I of the Third Schedule to the Act:

(a) The power to engage staff, agents and/or consultants (whether or not as employees of the LP) in the Cayman Islands and elsewhere to assist the JOLs in the performance of their

functions; and

(b) The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

6. The JOLs be authorised to do any act or thing considered by them to be necessary or desirable in connection with the liquidation of the LP.

7. The JOLs' remuneration and expenses be paid out of the assets of the LP in accordance with section 109 of the Act, Part III of the Regulations, and CWR Order 20.

8. The costs of this Petition shall be paid out of the assets of the LP as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

9. The JOLs shall be at liberty to apply to further directions concerning their functions and the exercise or the proposed exercise of their powers.

10. Such further or other orders and directions be made as the Court shall deem fit.

**AND** your Petitioners will ever pray etc.

Dated 10 April 2025

Johnstone Law

**Johnstone Law Ltd.**

**NOTE:** This Petition is intended to be served on:

**CHARITABLE DAF HOLDCO, LTD** at its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

## NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on at am.

Any correspondence or communication with the Court related to the hearing of this Petition should be addresses to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands.

**EXHIBIT 4**

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex



GRAND COURT CAYMAN ISLANDS FINANCIAL SERVICES DIVISION

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

## AFFIDAVIT OF JAMES DAVID DONDERO

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the ***Petition***) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the ***LP***) and the Charitable DAF Fund, LP (the ***Fund***) pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the ***CWR***).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**BACKGROUND**

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (***Highland Bankruptcy***) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (***Skyview***) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

**THE FUND**

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42. On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**SWORN** by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )

**JAMES DAVID DONDERO**

**BEFORE ME:**

Krystal Hughes
**NOTARY PUBLIC**

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025
NOTARY PUBLIC
STATE OF TEXAS

**THIS AFFIDAVIT** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

**EXHIBIT 4**

Digitally signed by Advance Performance Exponents
Reason: Apex Certified

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

FSD NO. OF 2025 (JAJ)

IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD

---

**PETITION FOR COURT SUPERVISION**
**OF A VOLUNTARY LIQUIDATION**

---

**TO: THE GRAND COURT OF THE CAYMAN ISLANDS**

THE **HUMBLE PETITION** of (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund (the ***Supporting Organisations*** or ***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***Company*** or ***HoldCo***):

1. The purpose of this petition (the ***Supervision Application***) is to seek an order that the voluntary liquidation of the Company continue under the supervision of this Honourable Court pursuant to section 131 of the Companies Act (2025 Revision) (the ***Act***) and Order 15, Rule 3 of the Companies Winding Up Rules (2023 Consolidation) (the ***CWR***). The Company was placed into voluntary liquidation, and Mitchell Mansfield and William Clarke (together, the ***JVLs***) of Kroll (Cayman) Ltd, pursuant to written resolutions of the directors of the Company dated 2 April 2025.

2. The petitioning Supporting Organisations are non-profit charitable entities exempt from taxation under s.501(c)(3) of the US Internal Revenue Code who collectively hold (or in light of recent developments allegedly held) 100% of the Participating Shares in the Company. Holders of Participating Shares are entitled under the Company's Amended and Restated Memorandum and Articles of Association dated 20 February 2025 (the ***Articles***) to participate in the profits or assets of the Company but are not entitled to attend, to speak at, or to vote at general meetings. By contrast, holders of Management Shares are entitled to attend, to speak at and to vote at any general meeting, but have no right to participate in the profits or assets of the Company.

3. HoldCo is a Cayman Islands exempt company formed on 27 October 2011 (registration no. 263805) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. HoldCo is purportedly governed by the Articles.

4. HoldCo is (or at least was) the limited partner of Charitable DAF Fund, LP (the ***Fund***), a Cayman Islands limited partnership formed on 28 October 2011 (registration no. 53083) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is, to the best of the Petitioners' knowledge, governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

5. This Petition refers to the Supporting Organisations' petition seeking the winding up of the Company on just and equitable grounds dated 10 April 2025 (the ***J&E Petition***), and the summons for the appointment of provisional liquidators dated 10 April 2025 (the ***PL Summons***), in Proceedings FSD. No. 99 of 2025, the latter of which is listed for hearing before this Honourable Court on 29 April 2025 (the ***Hearing***) – copies of which are at **Schedules A** and **B**, respectively.

**VOLUNTARY LIQUIDATION OF THE COMPANY**

6. On 23 April 2025 at 1:42pm, Johnstone Law (the Petitioners' attorneys) sent an email to Walkers (Cayman) LLP advising that they acted for the Supporting Organisations and seeking confirmation as to whether Walkers acted for and were instructed to accept service on the Company's behalf.

7. On 24 April 2025 at 11:35am, Walkers responded to Johnstone Law requesting confirmation of the nature of the proceeding to be served – but not addressing whether they acted for or had instructions to accept service on the Company's behalf. Johnstone Law replied that given their failure to respond the day prior, the papers would be served on HoldCo's registered office. That same day, copies of the Petition, the PL Summons and supporting materials were served on the Company's registered office.

8. On 25 April 2025, the Petitioners were preparing for the Hearing of the J&E Petition / PL Summons and in the course of finalising the hearing materials for delivery to the Court. At 3.32pm that day however Johnstone Law received a letter from Walkers (the ***Walkers Letter***) that stated *inter alia*:

(a) On 2 April 2025, nearly four weeks ago: (i) HoldCo was placed into voluntary liquidation, and the JVLs appointed, by way of written resolutions of the directors, and (ii) the directors had executed a declaration of solvency with respect to the Company.

(b) On 14 April 2025, Gazette Issue No. 8/2025 (the ***Gazette***) was published, which included notice that the Company was placed into voluntary liquidation.

(c) Nothing in the Articles entitled the Petitioners to receive notice from the Company of its entry into Voluntary Liquidation, and "*[t]he fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice*".

(d) As the Company was already in voluntary liquidation, the Petition and Summons were "*plainly redundant*" and should be withdrawn. If they were not withdrawn, this letter must be brought to the Court's attention at the Hearing, at which Walkers will appear for the Company and seek costs if appropriate.

9. Enclosed to the Walkers Letter were copies of the following:

(a) director resolutions dated 2 April 2025 (the ***Director Resolutions***);

(b) management shareholder resolution dated 2 April 2025;

(c) the JVLs' consents to act;

(d) declaration of solvency;

(e) the Gazette;

(f) the Articles;

(g) the Company's register of members as at 25 April 2025.

10. Although not stated anywhere in the Walkers Letter, the enclosures revealed the following matters, which were previously unknown to the Petitioners:

(a) On 7 February 2025, HoldCo allotted 318 participating shares to an entity named 'DFW Charitable Foundation' (***DFW***) – the effect being the substantial dilution of the Supporting Organisations' interest in the Company, from a cumulative holding of **100%** of the Participation Shares to **48.9%**. The Petitioners have since discovered that DFW is a Delaware company incorporated on 9 December 2024, registered to Mark Patrick's home address and Mark Patrick being the sole member. Mark Patrick is a director of and holds the Management Shares in HoldCo. DFW was purportedly granted charitable status by the State of Delaware on 7 February 2025, the same day it was allotted 318 participating shares in the Company.

(b) On 20 February 2025, HoldCo amended its Articles by way of special resolution, such special resolution passed solely by Mark Patrick.

(c) The Company's sole investment, being an interest in an entity by the name of CDMCFAD LLC was redeemed on 27 March 2025 and, on 2 April 2025, the proceeds available for distribution from this redemption were distributed in the amount of US$1,612,192 purportedly to HoldCo's participating shareholders;

(d) As at 2 April 2025, the Company has no assets.

11. On 27 April 2025, Johnstone Law responded to the Walkers Letter setting out the Petitioners' serious concerns arising from the matters disclosed therein, and stating *inter alia*:

(a) There can be no honest, reasonable or lawful justification or basis for the Company taking the steps it has, or for doing so without notifying and consulting the Petitioners in advance, and the subsequent failure to provide notice of such actions makes clear the information was deliberately withheld (supported further by the matters being disclosed only 1 clear working day before the Hearing).

(b) The steps were taken while the Supporting Organisations and HoldCo were engaged in correspondence about financial irregularities and lacking transparency on the part of the Company and its underlying interests. The failure of HoldCo (through its current directors or its US attorneys) to disclose this information in the course of that correspondence is proof of the utmost bad faith and deception on the part of HoldCo and its directors.

(c) The fact that the JVLs appointed by the Company have themselves taken no steps to inform the Supporting Organisations of such matters since their appointment causes them to conclude the JVLs lack sufficient independence required to protect the interests of the Supporting Organisations and the Company as a whole.

(d) The Walkers Letter makes it more, not less, essential that independent officer holders operating under the Court's supervision are appointed over the Company without delay. The Supporting Organisations will not withdraw the Petition or the PL Summons, but plan to issue or at least finalise additional proceedings on 28 April 2025, and to invite the Court to appoint Margot MacInnis and Sandipan Bhowmik as official liquidators of the Company at the Hearing – and seeking the Company's agreement by 12pm on 28 April 2025.

(e) The Supporting Organisations were, until 7 February 2025, and in law remain, owners of 99% of the economic interest in HoldCo. They do not approve of the purported share dilution nor the appointment of JVLs and their rights are fully reserved, and in the circumstances, it is inappropriate for assets of the Company, or any related entities, to be used for the purpose of payment of legal fees.

(f) A request for details of DFW, including when it was formed and received charitable status, the identity of its owners/controllers, its registered address and centre of operations.

(g) A request for confirmation by 8pm on 27 April 2025: (i) what has become of the Company's interest in the Fund, and (ii) to whom and in what amounts were the distributions referred to in the Director Resolutions transferred.

12. No response was received from Walkers by 8pm on 27 April 2025. At 9:16pm, Johnstone Law sent an email to Walkers noting the failure to provide the information and requesting that, in the circumstances and, if within their knowledge, the JVLs provide such information.

**NOTICE OF SUPERVISION APPLICATION**

13. In the circumstances, in particular that the Supporting Organisations (and purportedly DFW, although the Petitioners do not accept the validity of the share allotment to DFW) are the Company's only contributories – and given the clear evidence that the Supporting Organisations' interests in the Company have been diluted and the assets of the Company dissipated without notice or justification – the Petitioners respectfully request the Court exercise its discretion to dispense, as it is entitled to do, with the notice requirements in O.15 of the CWR.

**APPLICATION FOR SUPERVISION ORDER**

14. The Petitioners respectfully seek an Order from this Honourable Court that the voluntary liquidation of the Company continue under the supervision of the Court pursuant to section 131 of the Act, and that Margot MacInnis and Sandipan Bhowmik of Grant Thornton be appointed as joint official liquidators (together, the ***JOLs***) of the Company, for the following reasons:

(a) The making of a supervision order will allow the JOLs to conduct a proper investigation of the affairs of the Company and conduct an orderly winding up under the supervision of this Honourable Court for the benefit of all stakeholders.

(b) There is to say the least a large cloud hanging over Mr Patrick and Mr Murphy, as directors of HoldCo, who should not be allowed or entitled, irrespective of the professionalism of the JVLs, to retain the role and functions that directors normally retain attendant upon voluntary liquidations.

(c) The Supporting Organisations, as the owners of 100% of the economic interest in the Company (at least prior to the purported allotment of shares to DFW on 7 February 2025) should be entitled to choose the liquidator, or at least a liquidator not appointed by the directors, the conduct of whom has raised serious concerns even prior to the events disclosed in the Walkers Letter.

(d) Court supervision will result in an indisputably more effective, economic, and expeditious liquidation of the Company in the interests of the Supporting Organisations as contributories. Save in respect of any claim the Supporting Organisations save, there

does not appear to be any creditors.

(e) An investigation into the allegations of misconduct on the part of the management of the Company will be substantially expedited and more effective if conducted by official liquidators, who are not the same persons as the JVLs.

(f) Should an investigation identify transactions that should be set aside, or claims that should be advanced, whether against the directors of the Company or third parties, such actions are most appropriately and effectively undertaken by official liquidators, who are not the same persons as the JVLs.

(g) As the holder of the Management Shares in the Company (Mr Patrick) is resident in the US and as are many of the entities related to and with whom the Fund transacts, it is highly likely, if not certain, that the liquidators will need to instruct attorneys in the US, obtain recognition under chapter 15 of the US Bankruptcy Code, and commence proceedings in the US to recover any assets wrongfully dissipated. Such steps necessitate the liquidation being conducted under the supervision of the Court.

15. Ms MacInnis and Mr Bhowmik of Grant Thornton:

(a) are "qualified insolvency practitioners" as defined in s.89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (***IPR***);

(b) meet the residency requirements contained in Regulation 5, IPR;

(c) meet the independence requirements prescribed by Regulation 6, IPR;

(d) meet the insurance requirements prescribed by Regulation 7, IPR, and Grant Thornton holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e) consent to their appointment as official liquidators of the Company, if so appointed.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT:**

1. The voluntary liquidation of the Company be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the CWR.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, be appointed as joint official liquidators (***JOLs***) of the Company pursuant to s.132 of the Act.

3. The JOLs have the power to act jointly and severally.

4. The JOLs shall not be required to give security for their appointment.

5. The JOLs be authorised pursuant to s.110(2)(a) of the Act, to jointly and severally exercise all of the powers specified in Part II of the Third Schedule to the Act..

6. The JOLs be authorised pursuant to s.110(2)(a) of the Act to exercise the following powers in Part I of the Third Schedule to the Act, without the further sanction or intervention of the Court:

   a. The power to bring or defend any action or other legal proceeding in the name and on behalf of the company;

   b. The power to carry on the business of the company so far as may be necessary for its beneficial winding up;

   c. The power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

   d. The power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

   e. The power to engage staff, agents and/or consultants in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions; and

   f. The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

7. The JOLs be specifically authorised and entitled without the further sanction of the Court to undertake the following:

   a. Presenting a petition for the winding up of the exempted limited partnership, Charitable DAF Fund, LP (the Fund).

   b. Taking control of the Company's subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively referred to as the "Associated Companies") in which the Company holds an interest (or such shares of such Subsidiaries and/or Associated Companies as are owned directly or indirectly by the Company), in each case, wherever located, as the JOLs see fit. Additionally, to call or cause to be called meetings of such Subsidiaries and/or Associated Companies, and to sign resolutions (in accordance with the provisions of any relevant constitutional or related documentation of

such companies) and take such other steps, including applications to and communications with appropriate courts and/or regulators, as the JOLs consider necessary to appoint or remove directors, legal representatives, officers, and/or managers to or from such Subsidiaries and/or Associated Companies. In each case, take the necessary steps to ensure that the registered agents (or other equivalent corporate administrators) of such Subsidiaries or Associated Companies implement the changes to the boards of directors, legal representatives, officers, and/or managers of such companies or entities. This includes (without limitation) effecting changes to the company registers of such Subsidiaries or Associated Companies as may be deemed appropriate by the JOLs. Furthermore, to take such other actions in relation to all such Subsidiaries or Associated Companies as the JOLs see fit for the purpose of protecting the assets of the Company and managing its affairs (which, to avoid any doubt, shall include the assets and affairs of the Subsidiaries and Associated Companies).

c. Issuing and pursuing an application by summons for an order appointing themselves or other fit and proper persons as joint provisional liquidators of the Fund.

d. Locating and taking possession of and preserving all the Company's books, records and other papers (whether hard copy, digital or otherwise).

e. Identifying the nature and location of all property and assets which appear to belong to the Company.

f. Getting in or otherwise securing and protecting all such property and assets.

g. Investigating the costs and expenses incurred by the Company.

h. Identifying any creditors of the Company.

i. Investigating the promotion, business, dealings, and affairs of the Company.

j. Investigating whether the Company or the JOLs may have any claims (either in this jurisdiction or elsewhere) against any officer or employee or former officer or employee of the Company, or against any other person or persons.

k. Commencing and pursuing any such or other claims, if the JOLs are of the view that that is necessary or desirable in order to protect the ability of the Company or any liquidator of the Company to pursue any such claims or otherwise to preserve the value of any such claims.

l. Seeking registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the liquidation.

m. Carrying on the business of the Company so far that may be beneficial for the Company, its

creditors.

n. Being at liberty to complete or terminate any contracts or transactions entered into by the Company.

o. Retaining and operating the existing bank or other accounts of the Company and where necessary opening new accounts.

p. Taking control of or redirecting any email or other digital communication method used for the purposes of the Company's business or affairs.

q. Applying to the Court for directions, including on short notice, including for Orders to vary these powers and functions.

8. The Court dispenses with the requirement for this Supervision Application and the hearing of this Supervision Application to be advertised pursuant to O.15 of the CWR.

9. The JOLs' remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Regulations, and O.20 of the CWR.

10. The costs of this Supervision Application shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

11. The JVLs shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of the supervision order, and deliver such report to the JOLs within 28 days of this Order.

12. Such further or other orders be made as the Court shall deem fit.

**AND** your Petitioner will ever pray etc.

Dated 28th April 2025

**Johnstone Law Ltd.**
Attorneys for the Petitioners

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Plaintiffs, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

## NOTICE OF HEARING

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on at am.

Any correspondence or communication with the Court relating to the hearing of this Petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman KY1-1106, Cayman Islands; Tel: +1(345)949-4296.

**EXHIBIT**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

## SUPERVISION ORDER

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)


Filed: 09-May-2025 15:00 EST
Auth Code: C02067594574
www.verify.gov.ky File#: 263805

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588<br>margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588<br>sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed 6 May 2025

THE HONOURABLE JUSTICE JALIL ASIF KC
JUDGE OF THE GRAND COURT

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS


Filed: 09-May-2025 15:00 EST
Auth Code: C02067594574
www.verify.gov.ky File#: 263805

**EXHIBIT**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4. I am duly authorized to provide this affidavit for and on behalf of DFW to:

   (a) Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

   (b) Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

   (c) Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5. In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7. There is now produced and shown to me a paginated bundle of documents marked "**MP1**". References in this affidavit are to pages in MP1 are in the form [**MP1/page number**]. The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment. As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs. To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8. I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed. I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025. To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9. There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10. In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11. In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

    (a) Objections to the JOLs' Summons

    (b) Professional background and dealings with Holdco / DAF

    (c) Function of Holdco and DAF Structure

    (d) DAF as alter ego of Mr Dondero

    (e) Responses to First Affidavit of Ms Diaz

    (f) Responses to First Affidavit of Mr Dondero

A. **OBJECTION TO JOLS' SUMMONS**

15. In summary, DFW:

(a) Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

(b) Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

(c) Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

    (a) The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

    (b) On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

    (c) On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring.**

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent. As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

*(i)* *<u>Objections to Johnstone Law on the basis of a conflict of interest</u>*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators, Johnstone Law addressed the proposition that *"There is no hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court. In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**). Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation"* *"...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**). Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

(a) Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

(b) After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

(c) I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

(d) Mr Johnstone asserts that he "*no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients*" (**Johnstone 1, paragraph 39**) and that there is no "*suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs*" (**Johnstone 1, paragraph 40**).

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure. Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*. This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations. Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

    (a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1** suggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing. I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys. I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May. It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs. However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton. There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco. In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting. That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**). As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero. DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW. I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction. The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50. I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*. At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW. I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51. I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested. Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52. Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed. Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53. Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54. As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55. Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56. Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57. I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58. Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59. In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

**B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF**

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66. Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67. I was employed by Skyview from March 2021 to October 2024.

68. I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69. Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

### C. FUNCTION OF HOLDCO AND DAF STRUCTURE

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1] In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control". These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure. I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations. If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust). At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81. For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made. Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure. A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82. In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83. My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84. In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation. Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

(a) Did not solicit capital from investors;

(b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

(c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

(d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

(e) Does not have a registered investment advisor;

(f) There are no investment hurdles or reporting requirements;

(g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

(h) The economic substance filing lists business of Holdco; and

(i) There is no wind down date or term within which shareholders are entitled as of right to distributions.

90. Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect. Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91. The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same. In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**). The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**). It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92. Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified. Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93. Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco. As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco. Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94. In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95. The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

(a) it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve. The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

(b) Participating Shares do not confer the right to remove or appoint directors to Holdco. The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

(c) The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]...issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

(d) Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96. At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas. These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97. In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares. Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights. The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98. The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the “woke”, liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

**D. DAF AS ALTER EGO OF JAMES DONDERO**

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that "*The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed*". Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, "*And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee.*" Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b) As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c) When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116. With respect to point (ii) above:

(a) I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests. On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**). It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b) Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation. As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%. Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c) I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities. Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person. As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**). With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**). The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline. Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate. From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF. In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

(a) **The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**). By way of background:

(a) In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b) NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c) TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d) I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e) Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f) However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a) In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b) I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c) The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a) In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full. In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354)**.

**(d) Polo Glen DST**

(a) DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b) As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c) As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120. In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations. The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted. DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero. Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities. Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties. DAF must vigorously defend itself and its assets, which can be costly and time-consuming".* The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support. Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

***Turnover Proceedings - New York County Supreme Court (Index No 650744/23)***

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

***Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)***

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

***Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)***

130. This action was brought by Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

[2] Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

***Derivative Action - Royal Court of Guernsey (Civil Number 2479)***

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank, **National Association.**

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)***

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)***

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (19-34054)***

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

***General Litigation - District Court, Northern District of Texas (24-00498)***

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

***The Business Court of Texas First Division (25-BC01B-0004)***

138. Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

***United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)***

141. I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr**

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals. DAF and I were frequently referred to as:

(a) as an alter ego of Dondero,

(b) part of Dondero's web of entities, and

(c) under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over".*

(c) DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d) We adopted institutional grade investment committee guidelines.

(e) We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f) By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148. I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149. However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150. Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151. It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P.* , (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury""*, with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*". To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above). In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

## E. RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero. In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been. Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses. These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III). DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement. As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose. On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**. DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185. As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024. It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations. I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186. For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187. Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (**DAF 2**)."* . I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188. The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

## F. RESPONSES TO FIRST AFFIDAVIT OF MR DONERO

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1,** I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*
>
> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

*"The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy."*

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

(a) Investment committee

(b) Investment advisors

(c) Investment houses and banks with investment functions

(d) Real estate advisors

(e) Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.

**SWORN** to at Wise Texas )
on this 4th day of June 2025 )
) **MARK ERIC PATRICK**

**BEFORE ME:** 132662714 08/27/2028

**NOTARY PUBLIC**

NOTARY PUBLIC STATE OF TEXAS
Shannara Franzel
ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.

**EXHIBIT 2**

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Okin Adams Bartlett Curry LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
mokin@okinadams.com
dcurry@okinadams.com

ATTORNEYS FOR THE DALLAS FOUNDATION AND
CROWN GLOBAL LIFE INSURANCE, LTD.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**OBJECTION OF THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

[Related Docket No. 4216]

The Dallas Foundation (the "Foundation"), on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation (the "Okada Foundation"), and Crown Global Life Insurance, Ltd. ("Crown."), not individually, but solely in respect of Segregated Accounts 30218 & 30219 (the "Segregated Accounts") hereby file this objection (the "Objection") to the Motion (the "9019 Motion") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") filed on behalf of Highland Capital Management, L.P., the

reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust" and together with Highland and the Claimant Trust, the "Movants"), and respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1. Through the Motion, the Movants seek approval of a settlement agreement (the "Settlement") purportedly entered into by Movants with Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"), which Movants describe as "one of the most significant developments in the long-running Highland Bankruptcy Case." *Motion*, p. 3. As described by Movants, the significance of the settlement rests in the belief that it will bring to an end "protracted and value-destructive litigation that has impeded the Highland Entities' ability to distribute their assets to their constituents and fully implement the Plan." *Id.*

2. Unfortunately, unbeknownst to the Movants, the Settlement is potentially tainted by the actions of Mark Patrick, the apparent sole manager and director of the HMIT Entities. Specifically, upon information and belief, Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities. As set forth herein, given the actions of Mr. Patrick and the pending proceedings related thereto, rather than

provide the peace sought by Movants, approval of and consummation of the Settlement will most likely result in further litigation both before this Court and in jurisdictions outside of the United States.

3. Further, as set forth in more detail herein, the alleged actions of Mr. Patrick, taken in his capacity as the sole manager or officer of various entities within the charitable organization structure supported by the HMIT Entities and their assets, along with the timing of the Settlement, all establish a cloud of suspicion over the HMIT Entities' entry into the Settlement. Upon information and belief, under the structure illicitly put in place by Mr. Patrick, more than half of the proceeds of the Settlement will flow to an entity formed very recently by Mr. Patrick and based out his personal home, rather than to the Charitable Entities (defined below) who should be receiving such proceeds. Approval of the Settlement would, therefore, also be inequitable at this time.

4. For these reasons, as more fully set forth herein, the 9019 Motion should be denied.

## II.
## FACTUAL BACKGROUND

5. The lengthy procedural history of this Bankruptcy Case has been well documented in numerous prior pleadings and orders from this Court and is, therefore, not repeated herein. Moreover, the Beneficial Owners do not at this time have sufficient information to either admit or deny the procedural or background allegations set forth in the Motion but admit that those certain publicly available pleadings and orders referenced were filed or entered, as the case may be, on the dates and in the proceedings set forth in the Motion.

## A. The Foundation is a Beneficial Owner of the HMIT Entities

6. The HMIT Entities, and their assets, are held and managed for distribution to certain charitable organizations through a Donor Advised Fund (a "DAF") established at the direction of James Dondero in 2011.[1] The DAF was structured as a limited partnership and registered under the name The Charitable DAF Fund, L.P. (the "Fund"). The formation documents for the Fund make clear its charitable purposes and further establish that, while certain non-voting limited partnership interests were nominally held by the Supporting Organizations (defined below), the Charitable Entities (defined below) that they supported were the actual indirect, beneficial owners of the Fund.

7. Specifically, the recitals set forth in its partnership agreement provide that:

> the [Fund] was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") and the parties hereto desire for the [Fund] to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein.

*Amended and Restated Exempted Limited Partnership Agreement of The Charitable DAF Fund, LP*, p. 1. Further, the "Purpose and Powers" of the Fund include investment: "in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners." *Id.*, at p. 2, Art. 1.3.

8. Lastly, the partnership agreement specifically provides that the Charitable Entities are: "the indirect equity owners of the Limited Partners, which shall at all times be entities or Organisations exempt from taxation under Section 501(c)(3) of the Code or entities or

[1] As originally structured, the HMIT Entities were wholly owned by their sole member, Charitable DAF Holdings Corp., which is, in turn, indirectly owned by the Fund.

Organisations whose sole beneficiaries are entities or Organisations exempt from taxation under Section 501(c)(3) of the Code." *Id*. at p. 4, Art. 1.12(b).

9. As a beneficial owner of the HMIT Entities, approval of the Settlement will have a direct, pecuniary impact upon the Charitable Entities, including the Foundation. This is because, as a result of actions believed to have illicitly taken by Mr. Patrick, a significant portion of the economic interests derived by the HMIT Entities from the Settlement will flow to Mr. Patrick rather than the Charitable Entities for whose benefit the Fund was established.

**B. The Original Structure and Management of the Fund**

10. To achieve certain desired tax treatments, the Fund, a Cayman Islands exempted limited partnership, was structured with a single limited partner, Charitable DAF Holdco, Ltd ("Holdco"), holding 99% of the economic interests in the Fund. Holdco, in turn, was owned through the issuance of participation shares (the "Participation Shares") to: (i) Highland Dallas Foundation, Inc. ("HDFI") (32.787%) for the benefit of the Foundation; (ii) Highland Kansas City Foundation, Inc. ("HKCF") (32.787%) for the benefit of Greater Kansas City Community Foundation ("GKCC Foundation"); (iii) Highland Santa Barbara Foundation, Inc. ("HSBFI") (32.787%) for the benefit of Santa Barbara Foundation ("SB Foundation"); and (iv) HCMLP Charitable Fund ("HCMLP," and, with HDFI, HKCF, and HSBFI, the "Supporting Organizations") (1.639%) for the benefit of The Community Foundation of North Texas ("CFNT," and, with the Foundation, the GKCC Foundation, and the SB Foundation, the "Charitable Entities").

11. The general partner of the Fund, as originally established, Charitable DAF GP, LLC (the "Original GP"), a Delaware limited liability company, held the remaining de minimis economic interest in the Fund. Additionally, to achieve the desired tax treatment as referenced

above, the Fund issued to the Orignial GP 100 management shares (the "Management Shares") representing the only voting rights for any and all shareholders. In essence, this structure granted complete control of the Fund to the holder of the Management Shares, which shares have at all material times been held by a single individual as the manager of the Original GP. As a result, the manager of the general partner has substantial control over the entire Fund structure (the "Control Position"). From the inception of the Fund until March 25, 2021, the Control Position was held by Grant Scott.

**C. Change of Control in 2021 and Resulting Concerns Regarding Mr. Patrick**

12. In March 2021, Mr. Scott indicated his desire to retire from the Control Position. Mr. Patrick offered himself as a replacement to both Mr. Dondero and Mr. Scott. Mr. Patrick had been employed by the Debtor as tax counsel since 2008.[2] He had also provided personal tax advice to Mr. Dondero. Significantly, Mr. Patrick was intimately involved in the creation of the Fund in 2011, including providing advice as to the Fund's structure and in drafting the Fund's governing documents. He was at the time clearly an individual trusted by both Mr. Dondero and Mr. Scott to oversee the DAF and its charitable purposes. Thus, on March 25, 2021, Mr. Scott transferred the Management Shares, and the shares held in Holdco, to Mr. Patrick.

13. There was, initially, no noticeable change in the Fund's management following the transfer to Mr. Patrick. Over time, however, communications from Mr. Patrick and the Fund became less frequent and less substantive when provided. Further, through the Supporting Organizations, the Foundation and Crown became aware that Mr. Patrick had taken or had attempted to take various actions that appeared to be in conflict with the duties owed to the

[2] In February 2021, as part of this Bankruptcy Case, the employment contracts of many of Highland's employees, including Mr. Patrick, were terminated. Mr. Patrick, along with many other of the former back-office employees of the Debtor thereafter became employees of a newly formed company, Skyview Group ("Skyview"), that provides middle and back-office services to various clients.

Charitable Entities as beneficial owners of the Fund. Finally, an initial investigation into these alleged improper actions highlighted a substantial and sudden increase in the costs and expenses borne by the Fund.

*i.* *Mr. Patrick attempts to direct charitable funds to benefit his own family.*

14. An early example of these concerns occurred in June 2023. On June 28, 2023, Mr. Patrick attempted to have HDFI "*direct $10,000*" to Creative HEARTS TX ("CHTX"), a non-profit entity formed just two weeks earlier. Following due diligence, it was discovered that the directors of the CHTX were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick did not initially disclose either his or his family's involvement with CHTX.

15. When questioned regarding the nature of CHTX and his family's involvement Mr. Patrick represented that the nonprofit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Upon information and belief, Mr. Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. The grant payment to CHTX was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely.

*ii.* *Mr. Patrick resigns amidst insider trading concerns.*

16. In August 2024, additional concerns arose regarding Mr. Patrick when he attempted to provide advice to the Foundation regarding an asset held directly by the Foundation (the asset in question was held separately from the Fund). Upon information and belief, the information provided was obtained by Mr. Patrick through his employment at Skyview and constituted material non-public information ("MNPI"). On the basis of this MNPI, Mr. Patrick advised the Foundation to exercise a put option it held in the subject asset. Uncomfortable with

the nature of the information provided and the "tip" from Mr. Patrick, the Foundation notified Skyview of Mr. Patrick's actions and declined to act upon Mr. Patrick's advice.

17. On October 2, 2024, while his actions were being reviewed by Skyview's internal compliance department, Mr. Patrick abruptly resigned from his position at Skyview. On the same day, Mr. Patrick also terminated Skyview's service agreement with the Fund.

*iii.* *Diversion of assets through the creation of new entities.*

18. Through the Control Position, Mr. Patrick also manages the HMIT Entities, including Atlas IDF and its general partner, Atlas GP, which itself is a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are EDF and the Okada Foundation as the holders of annuity policies issued by Crown.

19. On February 20, 2025, Mr. Patrick in his capacity as the general partner of Atlas GP, sent a letter to Crown advising of the intention to dissolve Atlas IDF in accordance with the partnership agreement dated November 30, 2015, on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell certain defaulted Notes (the "HCRE Notes") issued by HCRE Partners (a Dondero affiliate) dated May 7, 2014, in the amount of $2,300,000.00, and May 27, 2014, in the amount of $5,000,000, which notes were held by Atlas IDF; and (iii) the decision by an affiliate of Atlas GP to purchase the HCRE Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the HCRE Notes, including accumulated interest, was in excess of $13,000,000. The stated intention was to sell the HCRE Notes collectively for $500,000.

20. Crown initially provided consent to the sale and liquidation, but withdrew said consent on February 28, 2025, after being advised of the potential misconduct by Mr. Patrick. That same day, Mr. Patrick sent a further letter to Crown Global responding to the revocation of

consent, and noting that: "*in addition to the purchase of the 'Notes' for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*"

21. At the time that Mr. Patrick attempted to sell the HCRE Notes, upon information and belief, HCRE had proposed to cure its default and repay the HCRE Notes in full pursuant to a revised amortization schedule. As such, the initial zero valuation and proposed $500,000 sale price disclosed to Crown is troubling. More troubling, however, is the fact that the proposed amortization schedule extends beyond 12 months. In other words, Mr. Patrick's proposed "fix" – i.e. sharing upside in the event the HCRE Notes were repaid within one year – was carefully tailored to give the appearance of addressing Crown's concerns even though Mr. Patrick already knew that the repayment would not occur within the 12 month period.

## D. The Cayman Insolvency Proceedings

22. In or around October 2024, the Charitable Entities, acting through counsel and the Supporting Organizations, requested that Mr. Patrick provide financial information explaining certain significant increases in the costs charged to the Fund.[3] In November 2024, having not received any of the requested financial information, the Charitable Entities delivered a letter of no confidence to Mr. Patrick requesting a formal reorganization of the Fund. No response to the no confidence letter was received.

[3] For example, directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023 –and increased even further to around $2.25 million in the first half of 2024 alone. Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

23. In January 2025, the Charitable Entities again reached out to Mr. Patrick and invited him to provide a presentation directly to the Charitable Entities and/or the Supporting Organizations to address the concerns raised in the no confidence letter.

24. In February 2025, the Supporting Organizations and the Charitable Entities learned that, almost a year earlier, Mr. Patrick had secretly redomiciled and replaced the Original GP. Specifically, on February 27, 2024, Mr. Patrick caused the formation of CDH GP, Ltd (the "New GP"), which was incorporated in the Caymen Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. Mark Patrick is the sole director of the New GP.

25. In light of the mounting concerns regarding Mr. Patrick's actions, the Supporting Organizations, as holders of the Participation Shares, filed a petition (the "Cayman Petition") in the Cayman Islands requesting that the Fund be liquidated under the supervision of the Cayman Islands court and the appointment of joint official liquidators.

26. The Cayman Petition was served on the Fund on April 24, 2025. The next day, April 25, 2025, counsel purporting to act on behalf of the Fund responded by correspondence to counsel for the petitioning Supporting Organizations. Through this correspondence, the Supporting Organizations and the Charitable Entities that they serve learned for the first time that Mr. Patrick had engaged Kroll Cayman Ltd ("Kroll") to commence a liquidation of the Fund.

27. The Supporting Organizations and Charitable Entities further learned that Mr. Patrick had caused the issuance of new Participation Interests, representing 51.04% of the resulting total of issued Participation Interests, to an entity named DFW Charitable Foundation (the "MP Charity"). The issuance of these new Participation Interests resulted in substantial

dilution of the interests beneficially held by the Charitable Entities such that, following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05%; and (iv) HCMLP's interest was diluted from 1.639% to 0.80%.

28. Publicly available records indicate that the MP Charity was formed in December 2024 and is based out of Mr. Patrick's home.

29. Additionally, the Supporting Organizations and the Charitable Entities learned that Mr. Patrick had caused the formation of another new entity, CDMCFAD, LLC ("CDMCFAD"), which was secretly inserted into the charitable organization structure. CDMCFAD is nominally a new wholly-owned subsidiary of the Fund, though, like the MP Charity, it is based out of Mr. Patrick's home. Upon information and belief, Mr. Patrick then caused the Fund to transfer its 100% interests in Charitable DAF Fund, LP to CDMCFAD. On March 27, 2025, the Fund's interest in CDMCFAD was purportedly redeemed for proceeds totaling $1,612,192.00 to be distributed to the Fund's participating interest holders.

30. In light of the existing liquidation and with these newly discovered facts, the Supporting Organizations amended their Cayman Petition to request that liquidation of the Fund continue under the supervision of the Cayman courts and that new independent, joint official liquidators be appointed to replace Kroll.

31. Following a hearing to consider the amended Cayman petition, the Cayman court entered its Supervision Order on May 6, 2025, and appointed Margo MacInnis and Sandipan Bhowmik as Joint Official Liquidators.[4]

[4] Mr. Patrick's chosen liquidators, Kroll, withdrew their consent to nomination prior to a May 5, 2025, hearing to consider the amended petition.

## III.
## OBJECTION

32. Against this backdrop, the proposed Settlement is problematic for a number of reasons. First, the Settlement purports to have been entered into on May 19, 2025, less than two weeks after entry of the Supervision Order by the Cayman court. Unfortunately, it does not appear, however, that Joint Official Liquidators are parties to or have authorized the Settlement. As a result, it is unclear whether Mr. Patrick had the requisite corporate authority to cause the HMIT Entities to enter into the Settlement. Indeed, many of Mr. Patrick's actions, including the insertion of newly created entities into the Fund's structure for the apparent purpose of diverting charitable assets will now be subject to the scrutiny of an independent, court appointed fiduciary and may be subject to claw back or other avoidance actions in the Cayman liquidation or such other tribunal as has jurisdiction.

33. In the event that it is ultimately determined that Mr. Patrick has acted against the fiduciary duties owed to the Fund, the Supporting Organizations, and the Charitable Entities, and the transfers of interests to Mr. Patrick's newly created companies are avoided, the validity of the Settlement will be in question. Thus, even if approved by this Court, consummation of the Settlement is not likely to buy the peace the Debtor now seeks.

34. Additionally, while Mr. Patrick may nominally be the sole manager of each of the HMIT Entities at this time, there is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations. Indeed, in light of the above, there is reason to suspect that the HMIT Entities' entry into the Settlement will further a scheme to wrongfully divert charitable funds from their intended beneficiaries. Under such circumstances, approval of the Settlement would be wholly inequitable.

35. For these reasons, the 9019 Motion should be denied.

## IV.
## ALTERNATIVE RELIEF

36. Alternatively, the Foundation and Crown respectfully request a continuance of the hearing to consider the 9019 Motion, which is currently scheduled for June 25, 2025. As noted above, upon becoming aware of the allegations discussed herein, the Supporting Organizations and Charitable Entities acted diligently to bring their concerns before a court of competent jurisdiction in the Cayman Islands. The Cayman court has granted relief in the form of the Supervision Order and the appointment of the JOLs. The JOLs, however, have held their positions for just over one month. Given the significance of the proposed Settlement to this bankruptcy estate, a short continuance to ensure that the Settlement is not being entered into improperly, without authority, and will not result in further, likely avoidable litigation, would benefit all parties in interest.

## V.
## CONCLUSION

37. In sum, the Foundation and Crown have received credible evidence that substantial charitable assets have been and are still being diverted from their benefit. The facts and circumstances set forth herein show that, at a minimum, there is good cause to suspect that entry into the Settlement by the HMIT Entities is but another attempt or the conclusion of an existing attempt to divert said charitable assets from their rightful recipients. Further, under these facts and circumstances, there is good cause to suspect that Mr. Patrick lacked the requisite corporate authority to enter into the Settlement or that any apparent authority he holds results from improper actions subject to avoidance and clawback. Under such circumstances, approval and consummation of the Settlement will not result in a cessation of litigation but will instead

result in more litigation across multiple forums. For these reasons, the Foundation and Crown, each a beneficial owner of the HMIT Entities, respectfully request that the 9019 Motion be denied.

## VI.
## PRAYER

WHEREFORE, for the reasons stated above, The Dallas Foundation and Crown Global Insurance, Ltd., request that this Court enter an order (i) denying the 9019 Motion; or, in the alternative, continuing the hearing set for June 25, 2025; and (ii) granting such other and further relief as the Court may deem just and proper.

Respectfully submitted on this 9th day of June 2025.

**OKIN ADAMS BARTLETT CURRY LLP**

By: */s/ David L. Curry, Jr.*
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
Email: mokin@okinadams.com
Email: dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2025, a true and correct copy of this document, with all exhibits, was served via the Court's CM/ECF system to all parties consenting to service through the same.

By: *<u>/s/ David L. Curry, Jr.</u>*
David L. Curry, Jr.

**EXHIBIT**

Gregory G. Hesse, Esq.
State Bar No. 09549419
HUNTON ANDREWS KURTH, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |
| | § | |

**DUGABOY INVESTMENT TRUST'S DISCOVERY RELATED TO RULE 9019 MOTION**

Dugaboy Investment Trust ("Dugaboy"), by and through undersigned counsel, hereby serves the following First Set of Discovery upon Movants Highland Capital Management, L.P. ("HCMLP" or "Debtor"), Highland Claimant Trust ("Claimant Trust") and the Highland Litigation Sub-Trust ("Litigation Trust," and together with the Claimant Trust, the "Trusts," together with HCMLP, the "Movants"), with respect to the Movants' *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. 4216] ("Motion") and requests that the Movants respond to such discovery requests within the time required by the applicable Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, and that the Movants produce for inspection and copying the documents described below at the offices of counsel identified below.

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").