**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§

§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§

vs. §

3:26-CV-02315-X

**Highland Capital Management, L.P., et al**-Appellee

§

§

**[4679] Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026.**

**APPELLANT RECORD**

**VOLUME 23**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02315-X<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S AMENDED DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to the Clerk of Court's correspondence [Docket No. 4700] and Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4685] on June 29, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4513] and a *Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* [Docket No. 4699] now files this *Amended Statement of Issues to be Presented and Designation of Items to be Included in the Record on Appeal* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and Hunter Mountain Investment Trust among other entities?

2. Did the Bankruptcy Court err in making evidentiary and trial conduct rulings during the course of evidentiary hearings held on Dugaboy's motion to vacate in May 2026?

3. Did the Bankruptcy Court err in making rulings on the availability of discovery, including the production of documents or depositions, in proceedings leading to its denial of the motion to vacate or otherwise reconsider the June 2025 judgment approving a settlement between Highland entities and the Hunter Mountain Investment Trust, among other entities?

4. Did the Bankruptcy Court err in not treating the Hunter Mountain Investment Trust, Mark Patrick, and other entities associated with him as parties in the 9019 settlement approval proceedings or the proceedings considering whether to vacate or reconsider that settlement approval?

5. Did the Bankruptcy Court err by misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(2) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by determining that the evidence presented of Mark Patrick's misconduct was not newly discovered or otherwise cognizable under Rule 60(b)(2)?

6. Did the Bankruptcy Court err in determining that James Dondero's knowledge could be imputed to Dugaboy, regardless of the capacity in which he was acting at the time he gained that knowledge?

7. Did the Bankruptcy Court err in determining that previously known instances of Mr. Patrick's

compliance lapses in other areas needed to have been acted upon in order to preserve the right to remove him from his position at the Hunter Mountain Investment Trust for later discovered and more significant misconduct related to misappropriating much of the asset value of two charitable structures, including the Charitable DAF?

8. Did the Bankruptcy Court err in misconceiving and/or misapplying the Federal Rule of Civil Procedure 60(b)(3) in denying Dugaboy's Motion for Relief from Order and Motion to Vacate by, among other things, determining that there is no evidence that Highland withheld or otherwise obscured evidence of Mark Patrick's misconduct and resulting lack of authority to negotiate the 9019 settlement agreement from Dugaboy in the proceedings that led to the Bankruptcy Court's entry of the original Federal Rule of Bankruptcy Procedure 9019 Order on June 30, 2025?

9. Did the Bankruptcy Court err in not considering under Federal Rule of Civil Procedure 60(b)(3) or otherwise the evidence Mark Patrick and/or his associates withheld or otherwise obscured from the Court through omissions and misrepresentations during discovery and before the Court at the hearing on the proposed settlement under Federal Rule of Bankruptcy Procedure 9019?

10. Did the Bankruptcy Court err by misconceiving the applicable legal standard and/or in not considering the fraud and misconduct of Mark Patrick and his associates in misappropriating most or all of the assets of two charitable structures and obscuring or making it more difficult to detect that conduct when determining whether to vacate the settlement approval order under Federal Rule of Evidence 60(b)(3)?

11. Under all aspects of Federal Rule of Civil Procedure 60(b) and the Court's inherent powers to vacate or modify judgments that are against the interest of justice and affected by wrongdoing, did the Bankruptcy Court err in suggesting that the fraud and misconduct of Mark Patrick was not directly pertinent to whether a bankruptcy settlement with entities he purported to control should be approved?

12. Did the Bankruptcy Court misapply the Federal Rule of Civil Procedure 60(b)(6) standard in denying Dugaboy's Motion for Relief from Order and Motion to Vacate in determining that Dugaboy "failed to articulate a 'mutually exclusive' reason for vacating the 9019 Order?"

13. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when he came to the Court having engaged in fraud and/or misconduct, or with unclean hands, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

14. Did the Bankruptcy Court err in failing to vacate a judgment directly or indirectly sought by Mark Patrick and/or entities associated with him when that judgment may have assisted Mr. Patrick in furthering his misconduct or in deterring others from contesting it, using the Court's authority under Federal Rule of Civil Procedure 60(b)(6), Rule 60(b) more broadly, or other authorities of the Court to vacate, reconsider, or modify judgments that are inconsistent with the interests of justice?

15. Whether the 9019 settlement order, in light of the presented evidence of Patrick's misconduct, was an inappropriate circumvention of the Fifth Circuit's decision to permit suits against certain parties without seeking bankruptcy court permission and constituted a invalid non- consensual release of claims?

16. Did the Bankruptcy Court err in denying relief under Federal Rule of Civil Procedure 60(b) or the Court's other authorities to reconsider, amend, or vacate orders on Dugaboy's independently asserted ground that Chief Judge Stacey G. Jernigan lacked authority to enter the Rule 9019 Settlement Order because she should have recused herself and was disqualified from presiding in this matter earlier in the proceedings?

17. Did the Bankruptcy Court err in denying prior motions to recuse Judge Jernigan based on her manifestations of bias against James Dondero and others associated with him, including through her extrajudicial statements in novels and elsewhere?

18. Did the Bankruptcy Court err in finding that Dugaboy had abandoned its argument regarding whether Judge Jernigan was disqualified or should have been recused for not introducing additional testimonial evidence at the hearing on the matter, despite having fully briefed the issue in its Federal Rule of Civil Procedure 60(b) Motion and Reply thereto and having place the fully published versions of the judge's novels before the Court?

19. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of Mark Patrick's personal benefit in the decision to sell the Hunter Mountain Investment Trust?

20. Did the Bankruptcy Court err when it excluded Lucy Bannon's testimony regarding evidence of the attendance of Supporting Organizations at the instant proceedings?

21. Did the Bankruptcy Court err when it determined that the deposition transcript of Mark Patrick (Highland hearing exhibit 55) was admissible and not an exception to hearsay?

22. Did the Bankruptcy Court err when it admitted Highland's hearing exhibits 43-45 as relevant?

23. Did the Bankruptcy Court err when it did not permit James Dondero to testify in Dugaboy's case-in-chief, including while permitting Highland to sponsor his testimony for other purposes by admitting his deposition?

24. Did the Bankruptcy Court err when it excluded Dugaboy's exhibits 292-297 as improper rebuttal evidence?

25. Did the Bankruptcy Court err when it granted Highland's request to admit the deposition testimony of James Dondero, despite Highland's decision not to call him as a witness for live testimony in the case, even though he was available in the courtroom throughout the proceedings?

26. Did the Bankruptcy Court err in protecting Highland, Hunter Mountain, Mark Patrick, and others from having to produce documents created earlier than May 19, 2025?

27. Did the Bankruptcy Court err in granting any part of Highland and other participants' requests for a protective order and/or to quash subpoenas?

28. Did the Bankruptcy Court err when it delayed Highland, Mark Patrick, Hunter Mountain, and other entities' obligations to respond to discovery until a couple of weeks before trial, only to require them to produce documents, sit for depositions, and commence trial—all within a 10-day period?

29. Whether a bankruptcy court may deny relief under Federal Rule of Civil Procedure Rule 60(b) or otherwise because vacatur would not itself unwind antecedent transactions or restore a separate pre-settlement structure?

30. Whether Federal Rule of Civil Procedure 60(b)(3) requires proof that concealed or misrepresented information would have changed the outcome, or instead clear and convincing evidence that adverse-party misconduct prevented a full and fair presentation?

31. Whether the District Court should conduct additional hearings and/or review of some or all findings *de novo* given that the decision below was entered by an Article I judge, who may exercise authority only through plenary supervision by a judge contemplated by Article III of the Constitution?

32. Are rulings by Article I bankruptcy judges on matters ancillary to the bankruptcy process due a similar amount of deference as rulings on core bankruptcy matters, or should the District Court act as an Article III backstop to judges not nominated by the President or confirmed by the Senate?

33. Is any amount of deferential review of a Bankruptcy Court's findings consistent with the Supreme Court's recent decisions that principal and inferior officers of the United States must be subject to plenary supervision by the President or some other office expressly listed in the Constitution, such as an Article III judge?

34. Whether the District Court should conduct additional hearings and/or review of some or all of the Bankruptcy Court's findings *de novo* given the Bankruptcy Court found it lacked jurisdiction to rule on the motion under Federal Rule of Civil Procedure 60(b), and the appealed Order denying relief under Rule 60(b) was only to the extent the Court was permitted to issue a ruling concerning the matter?

35. Whether the Bankruptcy Court erred in finding this matter a core proceeding pursuant to 28 U.S.C. § 157(b)(2)?

36. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4685] filed by Appellant;

000008 2. The Bankruptcy Court's June 15, 2026 *Order Denying Dugaboy's Motion for Relief from Order and Motion to Vacate* [Docket No. 4679];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000009 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 2 000642 thru Vol. 3 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001837 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| 001839 Thru Vol 6 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol. 7<br>02/27/2026<br>003628 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 03/02/2026<br>003641 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 03/02/2026<br>003644 & 003645 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 03/02/2026<br>003646 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 03/03/2026<br>003657 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 03/04/2026<br>003661 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 04/01/2026<br>003664 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |
| 04/01/2026<br>003703 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 |

| **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|
| Vol. 7 | | Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 04/03/2026 004727 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol 8 04/03/2026 004784 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol. 9 04/03/2026 005201 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 04/06/2026 005203 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 04/06/2026 005211 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 9 | | | *Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 005216 | 04/07/2026 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 005219 | 04/07/2026 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 005221 | 04/10/2026 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 005223 | 04/16/2026 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 005227 | 04/17/2026 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| Vol 9<br>04/17/2026<br>005324 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol. 10<br>04/21/2026<br>005584 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026<br>005588 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026<br>005609 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026<br>005676 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| Vol. 10<br>04/22/2026<br>005686 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026<br>005698 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026<br>005720 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026<br>005721 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026<br>005723 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026<br>005731 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/28/2026<br>005740 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held) *Discovery Deadlines and Hearing on The Dugaboy Investment* |

Vol. 10

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005749 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005761 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005770 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005777 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |
| 04/29/2026 005779 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

vol. 10

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/29/2026 005781 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 05/01/2026 005788 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 05/01/2026 005790 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 05/04/2026 005792 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 05/05/2026 005795 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 05/05/2026 005878 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 05/05/2026 005896 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 05/05/2026 005899 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 05/05/2026 005901 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | |
| 005907 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005914 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005921 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005923 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005930 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005933 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005936 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005939 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol 12 006094 thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| V01:22 008150 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008166 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008182 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 22 008250 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008287 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008423 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008459 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008466 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008910 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| vol. 25 009548 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| vol. 26 009862 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| vol. 27 010223 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| vol. 28 010532 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 28 | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 010658 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010730 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol. 30 011119 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol. 31 011703 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol. 32 013172 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014657 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| vol. 35 05/11/2026 015318 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015474 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015475 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015507 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015534 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015535 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| vol. 36 05/18/2026 015538 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol. 37 015965 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 015977 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016048 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016051 – 016053 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016054 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016103 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| Vol. 37 05/23/2026 016104 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 05/28/2026 016202 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 06/15/2026 016459 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 06/15/2026 016473 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| 07/13/2026 016474 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court; and

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J");

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No. 4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: July 31, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 31, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**<u>EXHIBIT LIST FOR THE MAY 11, 2026 HEARING</u>**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Avery Joseph Welker</u>*
Avery Joseph Welker

# EXHIBIT 1

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

(e) Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i) in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii) in his "good faith" or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f) The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper. The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9. Recordkeeping and Accounting. The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10. Tax Treatment. The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes. The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

11. No Other Interests

(a) The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b) The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12. Compensation; Administrator Liability. The Administrator shall not receive any compensation for his role as Administrator. Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator. The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13. Amendment. The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity. If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14. Duration. The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15. Termination. The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act. Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust. After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16. Removal of Administrator. Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17. Successor Administrator. The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Adminstrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18. Delaware Trustee.

(a) For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b) The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c) By its execution hereof, the Delaware Trustee accepts its appointment hereunder. Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d) The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document. The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement. In particular, but not by way of limitation:

(i) the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii) no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv) the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v) the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi) in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii) except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e) The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f) The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g) The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h) The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19. Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20. Governing Law. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21. Exclusive Jurisdiction. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22. Application to Successors. This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23. Transfer of Beneficial Ownership. Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate. To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: ______________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

______________________
1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:______________________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

______________________________

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: [signature]
Name: Jennifer A. Luce
Title: Vice President

# EXHIBIT 2

EXECUTION VERSION

## SETTLEMENT AGREEMENT & GENERAL RELEASE

THIS SETTLEMENT AGREEMENT & GENERAL RELEASE (this "**Agreement**") is entered into as of May 19, 2025 (the "**Agreement Date**"), by and among Highland Capital Management, L.P., a Delaware limited partnership ("**Highland**"), the Highland Claimant Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Claimant Trust**"), the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Litigation Sub-Trust**"), and the Highland Indemnity Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "**Indemnity Trust**", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "**Highland Entities**"), on the one hand, and Hunter Mountain Investment Trust, a Delaware statutory trust ("**HMIT**"), Beacon Mountain LLC, a Delaware limited liability company ("**Beacon Mountain**"), Rand Advisors, LLC, a Delaware limited liability company ("**Rand Advisors**"), Rand PE Fund I, LP, a Delaware series limited partnership ("**Rand PE Fund**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**"), Atlas IDF, LP, a Delaware limited partnership ("**Atlas IDF**"), Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP and Atlas IDF, the "**HMIT Entities**"), on the other hand. The Highland Entities and the HMIT Entities are collectively referred to as the "**Parties**," and each individually, as a "**Party**".

## DEFINITIONS

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Claimant Trust Agreement or the Plan, as applicable (in each case, as hereinafter defined). For purposes of this Agreement, the following capitalized terms have the following meanings:

"**9019 Motion**" means the motion seeking entry of the Bankruptcy Court Order pursuant to Bankruptcy Rule 9019 and in accordance with Section 18.

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings, including any petition under Rule 202 of the Texas Rules of Civil Procedure.

"**Affiliate**" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made. The term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by contract or otherwise.

"**Amended Complaint**" means the *Amended Complaint and Objection to Claims*, filed as docket number 158 in *Kirschner v. Dondero*, Adv. Pro. No. 21-03076-sgj (Bankr. N.D. Tex. May 19, 2022).

Case 3:26-cv-02324-K Document 19-28 Filed 03/31/25 Page 58 of 460 PageID 9416

"**Bankruptcy Case**" means *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj (Bankr. N.D. Tex.) and its related proceedings.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended).

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division.

"**Bankruptcy Court Approval Date**" means the date on which the Bankruptcy Court Order is issued.

"**Bankruptcy Court Order**" means an order of the Bankruptcy Court approving the allowance of the HMIT's Class 10 Interest as provided in this Agreement pursuant to the 9019 Motion.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Business Day**" means any day other than (i) a Saturday or a Sunday, (ii) a day on which the Federal Reserve Bank of New York or the New York Stock Exchange is closed, or (iii) a day on which banks in the States of Texas are required, or authorized by law, to close.

"**Claimant Trust Agreement**" means that certain Claimant Trust Agreement of the Claimant Trust (as may have been or may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 11, 2021, by and among Highland, as settlor, James P. Seery, Jr., a Claimant Trustee, and Wilmington Trust, National Association, a national banking association, as Delaware trustee.

"**Claims**" means any claims, debts, liabilities, demands, obligations, breaches of contract, breaches of duty or any relationship, misfeasance, malfeasance, promises, acts, omissions, agreements, liens, losses, costs and expenses (including attorney's fees and related costs), damages, injuries, suits, Actions, and causes of action of whatever kind or nature, whenever and however, arising, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise.

"**Class 10**" means the class of Claims or Equity Interests described in Article II. Section H.10. of the Plan.

"**Class 11**" means the class of Claims or Equity Interests described in Article II. Section H.11. of the Plan.

"**Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Case.

"**Confirmation Order**" means that certain *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], as conformed in accordance with the Fifth Circuit's rulings.

"**Dugaboy Note**" means that certain Promissory Note dated May 31, 2017, in the original face amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

"**Final Court Approval Date**" means the date on which the Bankruptcy Court Order becomes a Final Order.

"**Final Order**" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Highland Entities, as applicable, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

"**Gatekeeper**" means the gatekeeping provision contained in Article IX. F of the Plan as of August 11, 2021.

"**Governmental Authority**" means any federal, provincial, state, local or foreign government or political subdivision thereof, court of competent jurisdiction, administrative agency, judicial or arbitral body, or commission or other governmental or regulatory authority or instrumentality.

"**Highland Released Parties**" means collectively (i) the Highland Entities, (ii) any Affiliate of any Highland Entity and any Person directly or indirectly majority-owned by any Highland Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any Highland Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i)-(iii), collectively, the "**Highland Parties**"), (iv) each of the Highland Parties' current and former trustees and administrators (including the trustees of any of the Claimant Trust, the Litigation Sub-Trust, or the Indemnity Trust), officers, executives, agents, directors, advisors, advisory representatives, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, (v) the current and former members of the Oversight Board of the Claimant Trust in any capacity (including Richard Katz) and their Affiliates, (vi) Farallon Capital Management, LLC, Stonehill Capital Management, LLC, Muck Holdings LLC, and Jessup Holdings LLC, in each case, in any capacity, (vii) the Independent Board and its members John Dubel, James P. Seery, Jr., and Russell Nelms, (viii) James P. Seery, Jr., individually and in all capacities for any Highland Released Party, including as Chief Executive Officer of Highland Capital Management, L.P., Claimant Trustee of the Claimant

Trust, and the Indemnity Trust Administrator of the Indemnity Trust, (ix) Marc S. Kirschner, individually and as Trustee of the Litigation Sub-Trust, (x) the Committee and each of its members, (xi) the professionals (and their respective firms) (a) retained by Highland or the Committee during the Bankruptcy Case or which provided services to Highland or the Committee during the Bankruptcy Case or (b) retained by any Highland Released Party on or after August 11, 2021, (xii) any Person indemnified by any Highland Party (the Persons described in clauses (i)-(xii), collectively, the "**Highland Covered Parties**"), and (xii) each Highland Covered Party's current and former officers, executives, agents, attorneys (and their respective firms), directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "Highland Covered Parties;" provided, however, and for the avoidance of doubt, and without in any way limiting the scope of the foregoing, "Highland Covered Parties" shall include Highland CLO Funding, Ltd., Highland HCF Advisor, Ltd., Highland Multi Strategy Credit Fund, L.P., Highland Multi Strategy Credit Fund GP, L.P., Highland Multi Strategy Credit GP, LLC, Highland Multi Strategy Credit Fund, Ltd., Highland Select Equity Master Fund, L.P., Highland Select Equity Fund GP, L.P., Highland Select Equity Fund, L.P., Highland Restoration Capital Partners Master, L.P., Highland Restoration Capital Partners GP, LLC, Highland Restoration Capital Partners, L.P., Highland Restoration Capital Partners Offshore, L.P., Highland Offshore Director, LLC, Acis CLO Management, LLC, Neutra, Ltd., Pollack, Ltd., Acis CLO Management Holdings, L.P., Acis CLO Management Intermediate Holdings I, LLC, Acis CLO Management Intermediate Holdings II, LLC, Acis CLO Assets Holdings Limited, CHG Houston Holdings, LLC, Penant Management, L.P., Penant Management GP, LLC, Gunwale, LLC, HE Capital, LLC, Gleneagles CLO, Ltd., Aberdeen Loan Funding, Ltd. Highland Argentina Regional Opportunity Fund GP, LLC, Highland Argentina Regional Opportunity Fund, L.P., Highland Argentina Regional Opportunity Fund, Ltd., Highland Argentina Regional Opportunity Master Fund, L.P., Highland Latin America Consulting, Ltd., Highland Capital Management Korea Limited, Highland Capital Management Latin America, L.P., Highland Latin America GP, Ltd., Highland Latin America LP, Ltd., Highland Offshore Partners, L.P. (Diversified), Brentwood CLO, Ltd., Eastland CLO, Ltd., Bristol Bay Funding Ltd., Jasper CLO Ltd., Highland Legacy Limited, Grayson CLO, Ltd., Greenbriar CLO, Ltd., Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Liberty CLO, Ltd., Valhalla CLO, Ltd., Stratford CLO Ltd., Southfork CLO, Ltd., Pam Capital Funding, L.P., Stonebridge-Highland Healthcare Private Equity Fund, Pamco Cayman Ltd., Red River CLO, Ltd., Rockwall CDO II Ltd., Rockwall CDO, Ltd., Westchester CLO, Ltd. Longhorn Credit Funding, LLC, PensionDanmark Pensionsforsikringsaktieselskab, Highland Dynamic Income Master Fund L.P., Highland Dynamic Income Fund GP, LLC, Highland Dynamic Income Fund, L.P., Highland Dynamic Income Fund, Ltd., Highland JHT Holdings, LLC, Highland Prometheus Master Fund, L.P., Highland Prometheus Feeder Fund I, L.P., Highland Prometheus Feeder Fund II, L.P., Highland Sunbridge GP, LLC, Trussway Holdings, LLC, Trussway Industries, LLC, TW Company, Inc., T-Way Investments, LLC, SSP Holdings, LLC, Highland Flexible Income UCITS Fund, and Acis CLO 2017-7, Ltd. *Notwithstanding the forgoing or anything herein to the contrary*, none of "Highland Released Parties", "Highland Parties", nor "Highland Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming

through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner and none of such Persons are released from any Claim by any Person in connection with this Agreement.

"**HMIT Class 10 Interest**" means the unvested, contingent Class 10 interest in the Claimant Trust (a) to be allowed on account of HMIT's pre-petition equity interest in Highland, and (b) subject to the terms and conditions, as applicable, of the Plan, the Plan Documents, the Claimant Trust Agreement, and in accordance with this Agreement, and applicable law.

"**HMIT Note**" means that certain Secured Promissory Note dated December 21, 2015, in the original face amount of $63,000,000 from HMIT, as maker, and Highland, as payee.

"**HMIT Note Claims**" means any Claim related to, in connection with or arising out of the HMIT Note.

"**HMIT Released Parties**" means collectively (i) the HMIT Entities, (ii) any Affiliate of any HMIT Entity and any Person directly or indirectly majority owned by any HMIT Entity or any of their respective Affiliates, (iii) any Person directly or indirectly managed by any HMIT Entity or any of their respective Affiliates, whether by contract or otherwise (the entities described in clauses (i) – (iii), collectively, the "**HMIT Parties**"), (iv) each of the HMIT Parties' current and former trustees, administrators, officer, executives, agents, directors, advisors, consultants, manager, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns (v) the professionals (and their respective firms (a) retained by any HMIT Party during the Bankruptcy Case or which provided services to any HMIT Party during the Bankruptcy Case or (b) retained by any HMIT Released Party on or after August 11, 2021, (vi) any Person indemnified by any HMIT Party (the Persons described in clauses (i) – (vi), collectively, the "**HMIT Covered Parties**"), and (vii) each HMIT Covered Party's current and former officers, executives, agents, directors, advisors, consultants, administrators, managers, members, partners (including limited and general partners), employees, beneficiaries, shareholders, other equityholders, participants, direct and indirect subsidiaries and parents, Affiliates, successors, designees, and assigns, if not otherwise included in the defined term "HMIT Covered Parties." *Notwithstanding the forgoing*, none of "HMIT Released Parties", "HMIT Parties", nor "HMIT Covered Parties" shall include James Dondero, Scott Ellington, Isaac Leventon, or any Person directly or indirectly owned as of the date hereof (in whole or in part) by, and/or Affiliated as of the date hereof with, or claiming through, under or on behalf of, any of Mr. Dondero, Mr. Ellington, or Mr. Leventon in any manner, and none of such Persons are released from any Claims by any Person in connection with this Agreement.

"**Indemnity Trust Administrator**" has the meaning given to it in the Indemnity Trust Agreement.

"**Indemnity Trust Agreement**" means that certain *Second Amended and Restated Indemnity Trust Agreement of the Indemnity Trust* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of [April 28], 2025, by and among the Claimant Trust, as grantor, James P. Seery, Jr., as indemnity

trust administrator, and Wilmington Trust, National Association, a national banking association, as indemnity trustee and Delaware trustee.

"**Indemnity Trust Assets**" has the meaning set forth in the Indemnity Trust Agreement, but excluding Highland, the Claimant Trust, and their respective assets.

"**Independent Board**" means the independent board appointed by the Bankruptcy Court on January 9, 2020, pursuant to that certain *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 339].

"**Kirschner Claims**" means all Claims and causes of action that were asserted or could have been asserted by the Litigation Trustee of the Litigation Sub-Trust, in the Amended Complaint.

"**Liability**" means any liability, debt, obligation, loss, damage, claim, cost or expense (including costs of investigation and defense and attorney's fees, costs and expenses), in each case, whether direct or indirect, whether accrued or contingent, whether or not involving a third-party claim, and including incidental and consequential damages and diminution of value.

"**Litigation Protections**" means, individually and collectively, the rights, duties, and obligations set forth in Sections 1 – 2 and Sections 9 - 16.

"**Litigation Sub-Trust**" means the Highland Litigation Sub-Trust, a Delaware statutory trust governed by the Delaware Statutory Trust Act.

"**Litigation Sub-Trust Agreement**" means that certain Litigation Sub-Trust Agreement of the Litigation Sub-Trust (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), effective as of August 16, 2021, by and among James P. Seery, Jr., as Claimant Trustee of the Claimant Trust, Wilmington Trust, National Association, a national banking association, as Delaware Trustee, and the Litigation Trustee.

"**Litigation Trustee**" means Marc S. Kirschner, as Litigation Trustee of the Litigation Sub-Trust.

"**LPA**" means that certain *Sixth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (as may be amended, supplemented or otherwise modified in accordance with the terms thereof from time to time), dated as of October 4, 2021.

"**Operating Expenses**" means, except for the expenses of the Indemnity Trust (including any payments to Trust Indemnified Parties or Indemnified Parties (in each case, as defined, and pursuant to the terms and conditions set forth, in the Indemnity Trust Agreement)), the expenses of operating and administering the Highland Entities, including legal expenses, employee compensation, Claimant Trustee/CEO and other trust and trustee related compensation, incentive compensation, and customary general and administrative expenses.

“**<u>Original Plan</u>**” means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* attached as Exhibit A to the *Order (A) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as modified) and (B) Granting Related Relief*, filed at Docket No. 1943 on the Bankruptcy Court’s docket.

“**<u>Oversight Board</u>**” means the oversight board of the Highland Claimant Trust.

“**<u>Pending Litigation</u>**” means (i) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:23-cv-02071-E (N.D. Tex.), on remand to the Bankruptcy Court (including *Hunter Mountain Investment Trust’s Emergency Motion for Leave to File Adversary Proceeding* filed at Bankruptcy Court Docket No. 3699 and all proceedings, decisions, and orders relating there); (ii) *Dugaboy Investment Trust v. Highland Cap. Mgmt, L.P.*, 3:24-cv-01531-X (N.D. Tex.) (only as to HMIT), and (iii) *Hunter Mountain Investment Trust v. Highland Cap. Mgmt., L.P.*, Case No. 3:24-cv-01786-L (N.D. Tex.).

“**<u>Permitted Investments</u>**” has the meaning set forth in the Indemnity Trust Agreement.

“**<u>Person</u>**” means any natural person, partnership, limited liability partnership, corporation, limited liability company, association, joint stock company, trust, estate, joint venture, unincorporated organization or Governmental Authority.

“**<u>Plan</u>**” means that certain *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* as conformed in accordance with the Fifth Circuit’s rulings.

“**<u>Plan Documents</u>**” has the meaning given to it in the Plan.

“**<u>Plan Protections</u>**” means, collectively, the provisions of the Plan contained in Article IX thereof.

“**<u>Pro Rata</u>**” means the proportion that (a) the allowed amount of a particular Claim or Equity Interest in Class 10 bears to (b) the aggregate allowed amount of all Claims or Equity Interests in Class 10.

“**<u>Threats</u>**” means any written threats of legal action, legal demands, filed complaints, petitions for pre-suit discovery, suits, litigations, arbitrations, actual or threated restraining orders or injunctions made in writing, or similar written actions of any kind, or sworn statements evidencing the same, in any forum against any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), excluding any such action that would otherwise be a Threat except that any applicable statute of limitations that could be applicable to such action has expired.

**“<u>Threats Notice</u>”** means the written notice of any Threats received by the Indemnity Trust with respect to any Trust Indemnified Parties or Indemnified Party (both as defined in the Indemnity Trust Agreement), that is hereby required to be provided by the Indemnity Trust to the HMIT Entities, within five (5) Business Days after receipt of such Threat.

**<u>RECITALS</u>**

**WHEREAS**, as of the Petition Date, HMIT held Class B and Class C Limited Partnerships Interests in Highland;

**WHEREAS**, on December 21, 2015, HMIT entered into the HMIT Note with Highland, which had a total outstanding principal balance of Fifty-Seven Million Six Hundred Ninety Thousand Six Hundred Forty and 95/100 Dollars ($57,690,640.95) as of the Petition Date (the "**HMIT Note Balance**");

**WHEREAS**, HMIT's Class B and Class C Limited Partnership Interests in Highland were extinguished on August 11, 2021, in accordance with the Plan;

**WHEREAS**, pursuant to the LPA, HMIT's capital account balance at Highland on account of its Class B and Class C Limited Partnership Interests on the Petition Date was Three Hundred Ninety-Four Million Six Hundred Thirty Thousand Eight Hundred Seventy-One and 53/100 Dollars ($394,630,871.53) (the "**HMIT Capital Account Balance**");

**WHEREAS**, some or all of the HMIT Entities have asserted certain Claims against certain Highland Entities and certain other Highland Covered Parties, including those asserted in the Pending Litigation;

**WHEREAS**, certain distributions to be made to the holders of allowed Class 10 Claims or Equity Interests pursuant to the terms and subject to the conditions set forth herein are premised on the consent of certain Highland Covered Parties in their capacity as Holders of Class 9 Interests, and such Persons are only willing to provide such consent in exchange for the releases as set forth in this Agreement;

**WHEREAS**, some or all of the Highland Entities have asserted certain Claims against certain HMIT Entities, including the HMIT Note Claims;

**WHEREAS**, the Parties wish to terminate, extinguish, and release any and all rights, duties, obligations and Claims that (a) any of the Highland Released Parties owed or have, or may have owed or have, to or with respect to any of the HMIT Released Parties, and (b) any of the HMIT Released Parties owed or have, or may have owed or have, to or with respect to any of the Highland Released Parties, as provided in this Agreement (collectively, the "**Rights and Obligations**");

**WHEREAS**, the Parties agree that the Litigation Protections are intended to enact a permanent cessation of all litigation concerning or related to the Highland Released Parties through and including the Agreement Date; and

**WHEREAS**, the Parties, individually and collectively, wish to (a) resolve all disputes between and/or among any of the Highland Entities and their respective indemnitees, on the one hand, and any of the HMIT Entities, on the other hand, including those asserted or attempted to be asserted in the Pending Litigation, (b) fix and allow HMIT's Class 10 Interest at the amount and on the terms provided herein; and (c) terminate, extinguish, and release all Rights and Obligations on the terms provided herein.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**AGREEMENT**

1. Stay and Dismissal of Pending Litigation With Prejudice.

(a) Within five (5) Business Days after the Agreement Date, the HMIT Entities shall take all steps necessary (at their own cost) to stay the Pending Litigation.

(b) Within five (5) Business Days after the Bankruptcy Court Approval Date, the HMIT Entities shall take all steps necessary (at their own cost) to dismiss the Pending Litigation with prejudice.

2. Maintenance of Stay and Dismissal of Certain Defendants from the Amended Complaint.

(a) The Litigation Trustee shall continue to maintain the stay of Adv. Proc. No. 21-03076-sgj and all related proceedings arising therefrom through the Bankruptcy Court Approval Date. Within five (5) Business Days after the Bankruptcy Court Approval Date, the Litigation Sub-Trust shall take all steps necessary (at its own cost) to dismiss, with prejudice, HMIT and Rand PE from Counts I, II, III, and XXIV of the Amended Complaint.

3. Cash Payment to HMIT. Within five (5) Business Days following the Bankruptcy Court Approval Date, Highland shall pay HMIT a one-time, lump sum of Five Hundred Thousand Dollars (US$500,000.00) (the "**Payment**") by wire transfer:

Hunter Mountain Investment Trust
C/o CLO Holdco, LLC
Hancock Whitney
Account # - 071173413
Routing # - 113000968
(469) 604-0955

4. HMIT Class 10 Interest.

(a) Subject to entry of the Bankruptcy Court Order, and the terms of this Agreement, the HMIT Class 10 Interest shall be deemed allowed in the amount of Three Hundred Thirty-Six Million Nine Hundred Forty Thousand Two Hundred Thirty and 58/100 Dollars (US$336,940,230.58), which amount represents the HMIT Capital Account Balance, less the HMIT Note Balance.

(b) Notwithstanding anything to the contrary in the Plan or the Claimant Trust Agreement, as an integral part of this Agreement to consent to the allowance of the HMIT Class 10 Interest and the other considerations in this Agreement, HMIT shall not be deemed, and no holder of the HMIT Class 10 Interest shall be, a Claimant Trust Beneficiary or a "Beneficiary" under the Claimant Trust Agreement, and the Highland Released Parties, individually and collectively, shall owe no duty to any HMIT Releasor (whether contractual, fiduciary, equitable,

statutory or otherwise), including with respect to the HMIT Class 10 Interest, in each case, except as expressly set forth in this Agreement. Furthermore, without limiting the foregoing and for the avoidance of doubt, the contractual right of the holder of the HMIT Class 10 Interest to receive or recover any payments or Indemnity Trust Assets from the Indemnity Trust as set forth in this Agreement or the Indemnity Trust Agreement does not make any HMIT Releasor or any other Person a beneficiary of the Indemnity Trust or under the Indemnity Trust Agreement.

(c) Notwithstanding anything to the contrary in the Plan, the Claimant Trust Agreement or the Indemnity Trust Agreement, in no event shall HMIT sell, transfer, assign, pledge, hypothecate, participate or otherwise dispose of or encumber the HMIT Class 10 Interest or any rights (including any right to payment) with respect thereto (collectively, a "**Class 10 Assignment**"), and any attempted Class 10 Assignment shall be null and void.

(d) For the avoidance of doubt, the HMIT Class 10 Interest is and shall remain senior to the not yet allowed, unvested contingent Class 11 Claims of Equity Interests as provided for in the Plan, the Plan Documents, and the Claimant Trust Agreement.

5. Initial Interim Distributions on the Allowed Class 10 Interests.

(a) Within five (5) Business Days after the Bankruptcy Court Approval Date, the Indemnity Trust shall distribute (the date on which such distribution is made, the "**Initial Interim Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Ten Million Dollars (US$10,000,000.00) (the "**Initial Interim Cash Distribution Amount**"), by means of wire transfer with the Pro Rata portion in respect of the HMIT Class 10 Interest sent to the wire instructions contained in Section 3 ("**Wire Transfer**").

(b) Within five (5) Business Days after the Bankruptcy Court Approval Date (the "**Note Assignment Date**"), the Highland Entities shall cause the portion of the Dugaboy Note held by the Highland Entities to be distributed to HMIT in-kind and take all actions necessary for HMIT to become the holder of such portion of the Dugaboy Note, and shall in addition pay to HMIT cash in the aggregate amount of all principal and interest payments actually received on the Dugaboy Note by the Highland Entities, including the Indemnity Trust, from the Agreement Date to the Note Assignment Date. Prior to the Bankruptcy Court Approval Date, HMIT will engage an independent valuation service provider to value the Dugaboy Note for purposes of determining the magnitude of reduction to the outstanding allowed Class 10 Interests on account of such in-kind distribution, which shall not be less than Fifty percent (50%) of the current balance owed under the Dugaboy Note. The HMIT Entities acknowledge and agree that none of the Highland Entities are representing or warranting that the Dugaboy Note can be sold, or the price, if any, that could be received for the Dugaboy Note and further acknowledge and agree that any such purchase price may be de minimis.

6. Subsequent Distribution(s) on the Allowed Class 10 Interests.

(a) On December 1, 2027, the Indemnity Trust shall distribute (such distribution, collectively, the "**First Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**First Subsequent Distribution Date**") Pro Rata to the

Holders of allowed Class 10 Claims or Equity Interests: cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00), by Wire Transfer.

(b) On December 1, 2028, the Indemnity Trust shall distribute (such distribution, collectively, the "**Second Subsequent Distribution**", and the date on which such Subsequent Distribution is made, the "**Second Subsequent Distribution Date**") Pro Rata to the Holders of allowed Class 10 Claims or Equity Interests cash in the aggregate amount of Six Million Five Hundred Thousand Dollars (US$6,500,000.00) by Wire Transfer.

(c) Notwithstanding anything herein to the contrary, the obligations of the Indemnity Trust to make the First Subsequent Distribution or Second Subsequent Distribution is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII, Section 8.1(c) of the Indemnity Trust Agreement that the Indemnity Trust Assets comprising such distributions are not reasonably necessary to satisfy current or potential Indemnification Obligations (as defined in the Indemnity Trust Agreement) to all persons who are or might become Beneficiaries (as defined in the Indemnity Trust Agreement).

7. Final Distribution on the Allowed Class 10 Interests.

(a) On the later of the Final Court Approval Date and April 1, 2029, the Indemnity Trust will distribute all excess remaining Indemnity Trust Assets in accordance with Article VIII of the Indemnity Trust Agreement; provided, however, that the obligation of the Indemnity Trust to make any such distributions and/or dissolve and wind up the affairs of the Indemnity Trust is subject in all respects to (i) there being no Threats and (ii) a determination in accordance with Article VIII of the Indemnity Trust Agreement that (1) a Final Order(s) (as defined in the Indemnity Trust Agreement) has been entered resolving all litigation, claims or proceedings in any forum of any kind which could give rise to Indemnity Obligations (as defined in the Indemnity Trust Agreement) and payment in full of all such Indemnity Obligations and (2) all applicable statutes of limitations and any applicable tolling of such statutes of limitation have expired.

(b) The Indemnity Trust agrees to not use Indemnity Trust Assets to fund Operating Expenses.

(c) Following the Bankruptcy Court Approval Date, at the request of Mark Patrick, solely in his capacity, and to the extent he remains, as administrator of HMIT, but not more often than quarterly, Highland and the Indemnity Trust Administrator agree to review (i) the status of their respective assets, (ii) the balance of cash held, (iii) the status of any claims made for indemnification and any resolutions thereof, (iv) the status of any litigation, and (v) forecasted operating expenses with Mr. Patrick, and will each work in good faith to reduce operating expenses where reasonably practicable; provided, however, that all such reporting shall be subject to Mr. Patrick's agreement to maintain confidentiality with respect to any non-public information.

8. Transfer Kirschner Claims; Dismissal of HMIT Note Claims.

(a) Within five (5) Business Days after the Bankruptcy Court Approval Date, but after the dismissal provided for in Section 2, the Litigation Sub-Trust shall execute a short-

form assignment in in favor of the HMIT Entities transferring all of the Litigation Sub-Trust's right, title, and interest in and to the Kirschner Claims (the "**Kirschner Transfer**"). Such assignment shall be in a form mutually acceptable to the Parties and its substance shall be consistent with the terms, conditions and limitations set forth in this Agreement, including Section 8(b) below. Each HMIT Entity acknowledges and agrees that none of the Highland Entities will have any duty or obligation to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof, except as provided in this Agreement, including the terms of Section 8(c) below.

(b) THE HMIT ENTITIES SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THE LITIGATION SUB-TRUST IS TRANSFERRING THE KIRSCHNER CLAIMS ON AN "AS IS AND WITH ALL FAULTS" BASIS AND THAT THE HMIT ENTITIES ARE NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM THE HIGHLAND ENTITIES OR THEIR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE KIRSCHNER CLAIMS AND AMENDED COMPLAINT, INCLUDING WITH RESPECT TO THE ENFORCEABILITY, TRANSFERABILITY, VIABILITY, STRENGTH, OR VALUE OF ANY OF THE KIRSCHNER CLAIMS OR THE AMENDED COMPLAINT. The HMIT Entities hereby specifically acknowledge that they have carefully reviewed this Section and have had the opportunity to discuss its import with legal counsel and that the provisions of this Section are a material part of this Agreement. Thus, if for any reason HMIT is precluded from or is otherwise unable to prosecute all or any of the Kirschner Claims, (i) the HMIT Releasors shall have no recourse against any Highland Released Parties whatsoever and shall not be entitled to compensation of any kind, it being agreed that the HMIT Entities are otherwise receiving adequate consideration for the duties and obligations they are undertaking pursuant to this Agreement and (ii) there will be no effect whatsoever on the validity and enforceability of this Agreement or any of the other transactions contemplated hereby.

(c) As promptly as reasonably practicable following the Bankruptcy Court Approval Date, the Highland Entities shall provide to the HMIT Entities electronic copies of written discovery requests and responses thereto, and documents produced in discovery in respect of the Kirschner Claims and the Amended Complaint. The Highland Entities will not provide any other documents regarding the Kirschner Claims including any attorney-client communications and any documents subject to the attorney work-product doctrine or similar privileges or immunities concerning the Kirschner Claims (collectively, the "**Kirschner Privileges**"), it being understood and agreed that the Highland Entities are retaining, and not transferring or waiving, the Kirschner Privileges.

(d) Each Party acknowledges and agrees that if (i) the Kirschner Transfer is found or deemed to be impermissible or invalid, for any reason, or (ii) any HMIT Entity materially breaches this Agreement, the Kirschner Claims and Amended Complaint will revert to, and remain an asset of, the Litigation Sub-Trust.

9. General Release By The HMIT Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the HMIT Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its and their respective current and former advisors, consultants,

administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the HMIT Entities, the "**HMIT Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each Highland Released Party from, and waives and relinquishes, any and all Claims, which the HMIT Releasors, or any Person claiming through, under, or on behalf of any of the HMIT Releasors, ever had, now has, or hereafter can, shall, or may have against any of the Highland Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Agreement Date, including any fact, matter, transaction, or occurrence asserted by any HMIT Entity in the Pending Litigation or in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the Highland Released Parties, or the Highland Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**HMIT Entity Released Claims**").

10. General Release By The Highland Entities. On the Bankruptcy Court Approval Date, and to the maximum extent permitted by law, each of the Highland Entities, on behalf of itself and each of its respective Affiliates (including Affiliated and/or managed funds, accounts and other investment vehicles) and its or their respective current and former advisors, consultants, administrators, trustees, directors, officers, managers, executives, members, partners (including limited and general partners), employees, beneficiaries, direct and indirect shareholders and other equity holders, agents, participants, direct and indirect subsidiaries and parents, successors, predecessors, designees, and assigns (whether by operation of law or otherwise) and all Persons claiming through, under or on their behalf (collectively with the Highland Entities, the "**Highland Releasors**") hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, discharges, remises, and exonerates each HMIT Released Party from, and waives and relinquishes, any and all Claims which the Highland Releasors, or any Person claiming through, under, or on behalf of any of the Highland Releasors, ever had, now has, or hereafter can, shall, or may have against any of the HMIT Released Parties by reason of, arising from, relating to, or in connection with, any fact, matter, or transaction that occurred prior to the Bankruptcy Court Approval Date, including any fact, matter, transaction, or occurrence in connection with, relating to, or with respect to the Bankruptcy Case, the management or operation of any of the HMIT Released Parties, or the HMIT Released Parties' property and including any defense, affirmative defenses, and right to setoff arising out of, or otherwise related to, any of the foregoing (collectively, the "**Highland Released Claims**").

11. Further Provisions Concerning The General Releases.

(a) **FOR THE AVOIDANCE OF DOUBT, THE FOREGOING RELEASES ARE INTENDED TO BE GENERAL AND INCLUDE A RELEASE OF ALL RELEASED CLAIMS, WHETHER KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ARISING OR EXISTING FROM THE BEGINNING OF TIME THROUGH AND INCLUDING THE AGREEMENT DATE.**

(b) To the maximum extent permitted by law, each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefit of any statute or other principle of law or equity that limits the applicability of a release with respect to Claims that the releasing party does not know or suspect to exist in his, her or its favor at the time of executing the release.

(c) Without limiting the scope of the foregoing waiver, in connection with the foregoing release, each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, waives the benefits of Section 1542 of the California Civil Code (to the extent, if any, that Section 1542 might apply to the foregoing release), which provides as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees that the provisions of Section 1542 of the Civil Code of the State of California and all similar federal or state law, rights, rules or legal principles, legal or equitable, in each case solely to the extent such provisions apply, **ARE HEREBY KNOWINGLY AND VOLUNTARILY WAIVED AND RELINQUISHED BY EACH OF THE HMIT ENTITIES AND THE HIGHLAND ENTITIES**, **ON THEIR OWN BEHALF AND ON BEHALF OF THE OTHER HMIT RELEASORS AND HIGHLAND RELEASORS, RESPECTIVELY,** in each and every capacity, to the full extent that such rights and benefits pertaining to the matters released herein may be waived, and each of the HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, hereby agrees and acknowledges that this waiver and relinquishment is an essential term of this Agreement, without which the consideration provided would not have been given.

In connection with such waiver and relinquishment, each of the HMIT Entities and Highland Entities acknowledges that it is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which it now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is the intent of each of the HMIT Entities and the Highland Entities, on its own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, in executing this Agreement fully, finally, and forever to settle and release all such matters, and all Claims related thereto, which exist, may exist or might have existed (whether or not previously or currently asserted in any action) which are the subject to the releases granted above.

(d) As an integral component of this Agreement, and notwithstanding the Parties' intent set forth in the preamble hereto and the general nature of the releases in Sections 9 and 10, should:

(i) any HMIT Releasor contend or assert that any Claim of any kind whatsoever held by any HMIT Releasor against any Highland Released Party survives this Agreement and is in any way related to or arising from or in connection with any HMIT Entity Released Claim (such claim or cause of action, a "**HMIT Alleged Claim**"), such HMIT Releasor will be deemed to have irrevocably, fully, and finally assigned such HMIT Alleged Claim to the Highland Entities and the Highland Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such HMIT Alleged Claim.

(ii) any Highland Releasor contend or assert that any Claim of any kind whatsoever held by any Highland Releasor against any HMIT Released Party survives this Agreement and is in any way related to or arising from or in connection with any Highland Entity Released Claim (such claim or cause of action, a "**Highland Alleged Claim**"), such Highland Releasor will be deemed to have irrevocably, fully, and finally assigned such Highland Alleged Claim to the HMIT Entities and the HMIT Entities will be deemed to have forever, finally, full, unconditionally, and irrevocably, and completely released such Highland Alleged Claim.

12. Covenant Not To Sue; Limitation on Standing. Upon the Agreement Date:

(a) Each of the HMIT Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the Highland Released Parties, to recover, enforce, investigate, or collect any HMIT Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(b) Each of the Highland Releasors covenants and agrees that it will not institute or prosecute any Action, in law, in equity or otherwise, against any of the HMIT Released Parties, to recover, enforce, investigate, or collect any Highland Entity Released Claim and will not (i) induce, encourage or direct any other Person to do so or (ii) act in concert with or assist (financially or otherwise) any other Person in doing so.

(c) For the avoidance of doubt, this Agreement shall not operate to give any HMIT Entity standing for any purpose in connection with the Bankruptcy Case (or in connection with any appeal arising from any order entered by the Bankruptcy Court), except for the limited purpose of seeking Court approval of this Agreement (including with respect to any appeal concerning any order entered granting or denying such approval), and except for the limited purpose of enforcing this Agreement, no HMIT Entity shall commence any Action in connection with the HMIT Class 10 Interest.

13. Representations and Warranties.

(a) Each of the HMIT Entities hereby represents and warrants that every HMIT Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any HMIT Releasor.

(b) The HMIT Entities, on their own behalf and on behalf of the other HMIT Releasors, acknowledge and agree that each Plan Provision is lawful, effective, and binding on the HMIT Releasors. The HMIT Entities further agree, on their own behalf and on behalf of the

other HMIT Releasors, that the HMIT Releasors will never, in any way, challenge or seek to modify, nullify, vacate, or revoke, or induce, encourage or direct any other Person to do so or act in concert with or assist (financially or otherwise) any other Person in doing so the Confirmation Order, the Plan, the Plan Protections, or any Plan Document, including the Claimant Trust Agreement, the LPA, the Indemnity Trust Agreement or the Litigation Sub-Trust Agreement, in the Bankruptcy Court, in any other state or federal court, in any other forum or tribunal, or otherwise, including administrative or regulatory tribunals and foreign courts.

(c) Each of the Highland Entities hereby represents and warrants that every Highland Entity Released Claim has not heretofore been assigned or encumbered and is not the subject of a transfer (as such term is defined in 11 U.S.C. § 101(54)), by any Highland Releasor.

(d) Each Party severally represents and warrants as to itself only that: (i) it has taken all necessary action to authorize and approve the execution, delivery and performance of this Agreement; (ii) such Party has full power and authority to execute and deliver this Agreement; and (iii) this Agreement constitutes a valid, legal and binding obligation of such Party, and is enforceable subject to its terms. Each individual signatory hereto individually warrants and represents to all Parties hereto that such individual has full power and authority to act on behalf of and bind the Party for which he or she has executed this Agreement; provided, however that no signatory shall otherwise provide any warranty or representation or otherwise be a party to this Agreement on an individual basis.

14. <u>No Continuing Rights, Duties or Obligations</u>. Except for the rights, duties, and obligations expressly set forth in this Agreement, all Rights and Obligations that existed or may have existed shall be deemed terminated, extinguished, and released upon the Agreement Date. For the avoidance of doubt, from and after the Agreement Date, (a) the Highland Released Parties, individually and collectively, shall owe no duty, past or present, including with respect to the Kirchner Claims, to the HMIT Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement, and (b) the HMIT Released Parties, individually and collectively, shall owe no duty to the Highland Released Parties, individually and collectively, whether contractual, fiduciary, equitable, statutory or otherwise, except as arising out of this Agreement.

15. <u>Gatekeeper Standard</u>.

(a) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that, notwithstanding the United States Court of Appeals for the Fifth Circuit's decision in *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P.*, No. 23-10534 (5th Cir. Mar. 18, 2025), the "Gatekeeper" provisions contained in Highland's Original Plan is forever binding on each of the HMIT Entities and any Persons claiming through, under or on behalf of any of them, and for a claim or cause of action to be "colorable" for purposes of the Gatekeeper, it must be found by final order of the Bankruptcy Court (the "**<u>Gatekeeper Court</u>**"), which order shall be subject to appeal to a court of competent jurisdiction, to have satisfied the "Gatekeeper Colorability Test" as such term is defined in *In re Highland Capital Management, L.P.*, 2023 Bankr. LEXIS 2104 at *124-36 (Bankr. N.D. Tex. Aug. 24, 2023).

(b) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, acknowledge and agree that compliance with the Gatekeeper requires (i) a motion seeking leave to sue an Exculpated Party (as that term is defined in Highland's original Plan) and a finding that the litigant's claims and causes of action are "colorable" attaching a complaint setting forth the basis for such claims or causes of action and (ii), in the Gatekeeper Court's sole discretion, an evidentiary hearing (during which the Gatekeeper Court may, among other things, hear testimony and assess the credibility of any witness(es)) to determine whether a proposed claim or cause of action is "colorable."

(c) The HMIT Entities and the Highland Entities, on their own behalf and on behalf of the other HMIT Releasors and Highland Releasors, respectively, further acknowledge and agree that the moving party under the Gatekeeper has the burden of satisfying the "Gatekeeper Colorability Test," and that the dismissal of the Pending Litigation shall have res judicata effect.

16. Indemnification.

(a) Without in any manner limiting the available remedies for any breach of this Agreement, the HMIT Entities, severally but not jointly, agree to indemnify, defend, and hold the Highland Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any HMIT Entity set forth in Section 13 or (y) any Actions brought or prosecuted by or on behalf of, any HMIT Releasor or that are induced, encouraged, assisted or directed by any HMIT Releasor or brought or prosecuted in concert with any HMIT Releasor against any Highland Released Party with respect to or related to any HMIT Entity Released Claims. Without limiting the scope of the foregoing in any manner, any HMIT Entity that breaches Section 12 shall be liable to the Highland Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such Highland Released Party in defending against or otherwise responding to such Action. Each HMIT Entity acknowledges and agrees that the HMIT Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

(b) Without in any manner limiting the available remedies for any breach of this Agreement, the Highland Entities, severally but not jointly, agree to indemnify, defend, and hold the HMIT Released Parties harmless from and against any and all Liability, that may arise or result from or on account of, or that are otherwise related or attributable to (x) any breach of this Agreement or of any representation or warranty contained in the Agreement, including the representations and warranties of any Highland Entity set forth in Section 13 or (y) any suits, proceedings, or other actions brought or prosecuted by or on behalf of, any Highland Releasor or that are induced, encouraged, assisted or directed by any Highland Releasor or brought or prosecuted in concert with any Highland Releasor against any HMIT Released Party with respect to or related to any Highland Entity Released Claims. Without in any manner limiting the scope of the foregoing, any Highland Entity that breaches Section 12 shall be liable to the HMIT

Released Party against whom the applicable Action has been brought or prosecuted in violation of Section 12 for the reasonable attorneys' fees and costs incurred by such HMIT Released Party in defending against or otherwise responding to such Action. Each Highland Entity acknowledges and agrees that the Highland Entities are and shall be severally but not jointly liable for any Liability arising from or out of any breach of this Agreement or of any representation or warranty set forth in this Agreement.

17. Execution. This Agreement may be executed by the exchange of signatures by facsimile or by PDF attachment to an email transmittal and in counterparts, and if so executed, shall be fully executed when a counterpart has been executed and delivered by all Parties hereto through counsel. All counterparts taken together shall constitute one and the same agreement and shall be fully enforceable as such.

18. Bankruptcy Court Order. The allowance of the allowed HMIT Class 10 Interest pursuant to Section 4 is subject to the entry of the Bankruptcy Court Order. To that end, the Highland Entities shall file the 9019 Motion no later than five (5) Business Days after the Agreement Date. Each Party shall, and shall cause each of their respective Affiliates to, undertake any and all actions in compliance with applicable law to obtain the Bankruptcy Court Order as promptly as practicable, and without limiting the foregoing, if an Action is threatened or instituted by any Person opposing the 9019 Motion or otherwise challenging the validity or legality, or seeking to restrain the consummation, of the transactions contemplated by this Agreement or the Bankruptcy Court Order, each Party shall, and shall cause its respective Affiliates to, use their commercially reasonable best efforts to avoid, resist, resolve or, if necessary, and defend to effectuate this Agreement and consummate the transactions hereby. If the 9019 Motion is not approved by entry of the Bankruptcy Court Order or if the Bankruptcy Court Approval is precluded from becoming a Final Order, (a) there will be no effect on, adjustment to, or impairment of, in any way, the validity and enforceability of the remainder of this Agreement, and the other transactions contemplated hereby, all of which shall remain in full force and effect and (b) each Party shall, and shall cause its respective Affiliates to, use their best efforts to seek the allowance of the HMIT Class 10 Interest in a substantially similar amount and on substantially similar terms as set forth in Section 4 to the fullest extent possible so as to give effect to the original intent of the Parties as closely as possible.

19. Fees and Expenses. Whether or not the transactions contemplated hereby are consummated or the Bankruptcy Court Order is obtained, and except as otherwise expressly provided in this Agreement, each Party will bear its respective fees, costs and expenses (including legal, accounting and other professional fees) incurred in connection with the preparation, negotiation, execution and performance of this Agreement or the transactions contemplated hereby, including with respect to each Party's respective obligations pursuant to Section 18. Notwithstanding the foregoing, if any Party hereto, any Highland Released Party, or any HMIT Released Party brings an Action to enforce or interpret the terms and provisions of this Agreement, the prevailing Person in that Action shall be entitled to have and recover from the non-prevailing Person all such fees, costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing Person may suffer or incur in the pursuit or defense of such action or proceeding.

20. Entire Agreement; No Other Representations. **THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES, AND NO RIGHTS ARE CREATED IN FAVOR OF ANY PERSON OTHER THAN AS SPECIFIED OR EXPRESSLY SET FORTH IN THIS AGREEMENT. THERE ARE NO REPRESENTATIONS, CONDITIONS, WARRANTIES, STATEMENTS, OR UNDERSTANDINGS (COLLECTIVELY, "REPRESENTATIONS"), EITHER ORAL OR WRITTEN, BETWEEN THE PARTIES OTHER THAN THOSE EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT; AND THE PARTIES EXPRESSLY AGREE THAT THEY HAVE NOT RELIED ON ANY REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES EXPRESSLY AGREE THAT THEY ARE ENTERING INTO THIS AGREEMENT RELYING SOLELY ON THEIR OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS BY ANY PARTY, EXCEPT FOR THOSE REPRESENTATIONS EXPRESSLY SET FORTH IN THIS AGREEMENT. THE PARTIES AGREE THAT REPRESENTATIONS NOT EXPRESSLY SET FORTH IN THIS AGREEMENT SHALL NOT BE USED IN THE INTERPRETATION OR CONSTRUCTION OF THIS AGREEMENT, AND NEITHER THE HMIT RELEASED PARTIES NOR THE HIGHLAND RELEASED PARTIES SHALL HAVE ANY LIABILITY FOR ANY CONSEQUENCES ARISING AS A RESULT OF ANY REPRESENTATIONS NOT SET FORTH IN THIS AGREEMENT**.

21. Agreement and Release Knowing and Voluntary. The Parties acknowledge that they have considered this Agreement with their respective attorneys and have carefully read this Agreement, that it has been fully explained by their attorneys, and that they have had a reasonable opportunity to consider this Agreement. The Parties further represent that they know and fully understand the contents of this Agreement, that they intend to be legally bound by this Agreement and the releases and covenants contained herein, and that they are signing this Agreement, including the release provisions herein, voluntarily and of their own free will and without coercion, and with the benefit of advice of counsel.

22. Cooperation. The Parties agree to perform any services or actions reasonably necessary to carry out the terms and conditions of this Agreement or the transactions contemplated hereby, including the execution and delivery of reasonable additional documents, instruments, conveyances and/or assurances, in good faith, and to reasonably communicate and cooperate with one another in this regard. For the avoidance of doubt, nothing in this Section shall obligate the Highland Entities to assist the HMIT Entities in any way with respect to the Kirschner Claims, including the prosecution thereof.

23. Governing Law. This Agreement shall be construed pursuant to and governed by the laws of the State of Delaware (substantive and procedural) without reference to principles of conflicts of law that would result in the application of any other State's laws.

24. Jurisdiction/Venue. The Parties hereby irrevocably submit to the jurisdiction and venue of the Bankruptcy Court with respect to any Action arising out of or related to this Agreement or the subject matter hereof; if (and only if) the Bankruptcy Court lacks personal or

subject matter jurisdiction to adjudicate an Action arising out of or related to this Agreement or the subject matter hereof, then the Parties irrevocably submit to the jurisdiction and venue of the United States District Court for the Northern District of Texas.

25. No Admissions. All Parties acknowledge and agree that the matters set forth in this Agreement constitute the settlement and compromise of disputed Claims and that this Agreement shall not constitute the admission of any fact or liability by any of them regarding any Claim, including the Claims released hereunder, and neither the terms hereof, nor the fact of this Agreement itself, shall be evidence of any kind in any Action, other than an Action to enforce the terms of the Agreement or any instrument executed in connection herewith or any claim for damages or other relief for breach of any representation or warranty contained herein or in any instrument executed in connection herewith.

26. Other Provisions.

(a) No representation, inducement, agreement, promise or understandings altering, modifying, amending, taking from or adding to, the terms and conditions hereof shall have any force or effect unless the same is in writing and validly executed by each of the Parties hereto.

(b) The waiver by any Party of any breach of, or default under, any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or default; provided, however, that for any such waiver to be enforceable, it shall be in writing and executed by the non-breaching Party.

(c) The headings contained in this Agreement are for convenience only and shall in no way restrict or otherwise affect the construction of the provisions hereof.

(d) The Parties shall each execute all documents and perform all acts necessary and proper to effectuate the terms of this Agreement.

27. Notices. All notices required or permitted to be provided hereunder shall be afforded to the respective parties to and through their counsel, and shall be transmitted simultaneously by electronic mail (with PDF attachments, as necessary) and by telefax, addressed as follows:

To the Highland Entities:

**PACHULSKI STANG ZIEHL AND JONES LLP**
Jeffrey N. Pomerantz
John A. Morris
10100 Santa Monica Boulevard
Los Angeles, California 90067-4003
310.277.6910
jpomerantz@pszjlaw.com
jmorris@pszjlaw.com

To the HMIT Entities:

**KELLY HART PITRE**
Louis M. Phillips
Amelia Hurt
301 Main Street, Suite 1600
225.381.9643
Louis.Phillips@Kellyhart.com
Amelia.Hurt@Kellyhart.com

28. Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity and enforceability of any other provision of this Agreement.

29. Interpretive Provisions. Unless the express context otherwise requires: (a) the words “hereof,” “herein” and “hereunder” and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (b) words defined in the singular shall have a comparable meaning when used in the plural, and vice versa; (c) the words “Dollars” and “$” mean U.S. dollars; (d) references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement; (e) wherever the word “include,” “includes” or “including” is used in this Agreement, it shall be deemed to be followed by the words “,without limitation,”; (f) references herein to any gender shall include each other gender; (g) references herein to any Person shall include such Person’s heirs, executors, personal representatives, administrators, successors and assigns; provided, however, that nothing contained in this clause (g) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement; (h) with respect to the determination of any period of time, the word “from” means “from and including” and the words “to” and “until” each means “to but excluding”; (i) the word “or” shall be disjunctive but not exclusive; (j) the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties; and (k) if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

[*Signature page follows*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

**HUNTER MOUNTAIN INVESTMENT TRUST**

By ____/s/ Mark Patrick______________________
Name: Mark Patrick
Title: Administrator
Date: May 19, 2025

**BEACON MOUNTAIN LLC**

By ____/s/ Mark Patrick______________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**RAND ADVISORS, LLC**

By ____/s/ Mark Patrick______________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**RAND PE FUND I, LP**
By: Rand PE Fund Management, LLC, its General Partner

By ____/s/ Mark Patrick______________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**RAND PE FUND MANAGEMENT, LLC**

By ____/s/ Mark Patrick______________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**ATLAS IDF, LP**
By: Atlas IDF GP, LLC, its General Partner

By _____/s/ Mark Patrick_________________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**ATLAS IDF GP, LLC**

By _____/s/ Mark Patrick_________________________
Name: Mark Patrick
Title: President
Date: May 19, 2025

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By ______/s/ James P. Seery, Jr.__________________
Name: James. P. Seery, Jr.
Title: Chief Executive Officer
Date: May 19, 2025

**HIGHLAND CLAIMANT TRUST**

By ____/s/ James P. Seery, Jr._________________
Name: James P. Seery, Jr.
Title: Claimant Trustee
Date: May 19, 2025

**HIGHLAND LITIGATION SUB-TRUST**

By __/s/ Marc S. Kirschner_________________
Name: Marc S. Kirschner
Title: Litigation Trustee
Date: May 19, 2025

**HIGHLAND INDEMNITY TRUST**

By __/s/ James P. Seery, Jr.________________

Name: James P. Seery, Jr.
Title: Indemnity Trust Administrator
Date: May 19, 2025

# EXHIBIT 3

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

# FIRST AFFIDAVIT OF MARK ERIC PATRICK

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

EXHIBIT 47

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4. I am duly authorized to provide this affidavit for and on behalf of DFW to:

   (a) Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

   (b) Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

   (c) Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5. In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7. There is now produced and shown to me a paginated bundle of documents marked **"MP1"**. References in this affidavit are to pages in MP1 are in the form [**MP1/page number**]. The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment. As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs. To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8. I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed. I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025. To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9. There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10. In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11. In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

    (a) Objections to the JOLs' Summons

    (b) Professional background and dealings with Holdco / DAF

    (c) Function of Holdco and DAF Structure

    (d) DAF as alter ego of Mr Dondero

    (e) Responses to First Affidavit of Ms Diaz

    (f) Responses to First Affidavit of Mr Dondero

## A. OBJECTION TO JOLS' SUMMONS

15. In summary, DFW:

(a) Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

(b) Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

(c) Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

    (a) The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

    (b) On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

    (c) On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring**.

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent. As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

*(i)* *Objections to Johnstone Law on the basis of a conflict of interest*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *"fraudulent Scheme"* and that the former directors (myself and Mr Murphy) appeared to be *"implementing a calculated and ultimately fraudulent scheme to dissipate the Company's assets to prevent thorough independent investigation"*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *"victims of the apparent fraud"* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators, Johnstone Law addressed the proposition that *"There is no hard evidence of fraud or defalcation"* by clearly refuting that suggestion as *"not true"* and that *"it will not take the Court long to see that Mr Patrick and Mr Murphy's blocking tactics hide more nefarious conduct"* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court. In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *"cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco"* (**Diaz 2, para 15(b)**). Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *"the owners of 100% of the economic interest in the Company"* and that the need for supervision of the Grand Court is primarily for a *"(a) proper investigation"* *"...(e) into the allegations of misconduct on the part of the management of the company"* (**Diaz 2, para 15.(a), (e)**). Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

(a) Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

(b) After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

(c) I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

(d) Mr Johnstone asserts that he *"no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients"* (**Johnstone 1, paragraph 39**) and that there is no *"suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs"* (**Johnstone 1, paragraph 40**).

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure. Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*. This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations. Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

   (a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1** suggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing. I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys. I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May. It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs. However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton. There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco. In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting. That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**). As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero. DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW. I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction. The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50. I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*. At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW. I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51. I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested. Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52. Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed. Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53. Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54. As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55. Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56. Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57. I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58. Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59. In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

**B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF**

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66. Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67. I was employed by Skyview from March 2021 to October 2024.

68. I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69. Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 (**"Trust #2"**), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

**C. FUNCTION OF HOLDCO AND DAF STRUCTURE**

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

---

[1] In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control". These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure. I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations. If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust). At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81. For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made. Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure. A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82. In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83. My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84. In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation. Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

(a) Did not solicit capital from investors;

(b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

(c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

(d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

(e) Does not have a registered investment advisor;

(f) There are no investment hurdles or reporting requirements;

(g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

(h) The economic substance filing lists business of Holdco; and

(i) There is no wind down date or term within which shareholders are entitled as of right to distributions.

90. Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect. Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91. The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same. In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**). The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**). It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92. Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified. Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93. Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco. As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco. Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94. In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95. The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

(a) it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve. The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

(b) Participating Shares do not confer the right to remove or appoint directors to Holdco. The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

(c) The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]...issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

(d) Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96. At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas. These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97. In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares. Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights. The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98. The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

**D. DAF AS ALTER EGO OF JAMES DONDERO**

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that "*The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed*". Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, "*And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation...and Grant signed it, and Mark Patrick became the trustee.*" Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b) As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c) When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116. With respect to point (ii) above:

(a) I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests. On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**). It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b) Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation. As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%. Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c) I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities. Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person. As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**). With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**). The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline. Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate. From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF. In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

(a) **The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**). By way of background:

(a) In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b) NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c) TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d) I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e) Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f) However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a) In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b) I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c) The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

(c) **Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a) In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full. In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354**).

**(d) Polo Glen DST**

(a) DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b) As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c) As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120. In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations. The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted. DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero. Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities. Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties. DAF must vigorously defend itself and its assets, which can be costly and time-consuming".* The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support. Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

***Turnover Proceedings - New York County Supreme Court (Index No 650744/23)***

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

***Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)***

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

***Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)***

130. This action was brought by Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

---

[2] Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

***Derivative Action - Royal Court of Guernsey (Civil Number 2479)***

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank**, National Association.**

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)***

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)***

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (19-34054)***

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

***General Litigation - District Court, Northern District of Texas (24-00498)***

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

***The Business Court of Texas First Division (25-BC01B-0004)***

138. Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

***United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)***

141. I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr**

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals. DAF and I were frequently referred to as:

(a) as an alter ego of Dondero,

(b) part of Dondero's web of entities, and

(c) under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over".*

(c) DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d) We adopted institutional grade investment committee guidelines.

(e) We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f) By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148. I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149. However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150. Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151. It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury""*, with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*". To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above). In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

## E. RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero. In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645.**

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been. Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses. These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III). DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement. As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose. On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**. DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185. As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024. It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations. I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186. For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187. Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (**DAF 2**)."*. I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188. The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

**F. RESPONSES TO FIRST AFFIDAVIT OF MR DONERO**

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*
>
> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

*"The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy."*

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

(a) Investment committee

(b) Investment advisors

(c) Investment houses and banks with investment functions

(d) Real estate advisors

(e) Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.

**SWORN** to at Wise Texas )
on this 4th day of June 2025 )
) **MARK ERIC PATRICK**

**BEFORE ME:** 132662714
08/27/2028

**NOTARY PUBLIC**

NOTARY PUBLIC STATE OF TEXAS
Shannara Franzel
ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.

# EXHIBIT 4

# Before


The Dallas Foundation (nonprofit)
Greater Kansas City Community Foundation (nonprofit)
Santa Barbara Foundation (nonprofit)
The Community Foundation of North Texas (nonprofit)
DFW Charitable Foundation (nonprofit)
Highland Dallas Foundation, Inc. (nonprofit)
Highland Kansas City Foundation, Inc. (nonprofit)
Highland Santa Barbara Foundation, Inc. (nonprofit)
.80% 5 Participating Shares
51.04% 318 Participating Shares
16.05% 100 Participating Shares
16.05% 100 Participating Shares
16.05% 100 Participating Shares
Mark Patrick
Management Shares
Charitable DAF HoldCo, Ltd. (Cayman Islands)
100% and sole Director
Manager
CDH GP, Ltd. (Cayman Islands)
CDMCFAD, LLC (Delaware)
CDH GP, Ltd. (Cayman Islands)
General Partner
General Partner
Charitable DAF Fund 2, LP (Cayman Islands)
Charitable DAF Fund, LP (Cayman Islands)
CLO HoldCo, Ltd. (Cayman Islands)
Liberty CLO HoldCo, Ltd. (Cayman Islands)
HCT Holdco 2, Ltd. (Cayman Islands)
MGM Studios Holdco, Ltd. (Cayman Islands)
CLO HoldCo, LLC (Delaware)
Liberty CLO HoldCo, LLC (Delaware)
Liberty Sub, Ltd. (Delaware)
Charitable DAF Holdings Corp. (Delaware)
Rand Advisors, LLC (Delaware)
DST Investco, LLC (Delaware)
Allanon Capital Management LLC (Texas)
CDHC Royse City Land, LLC (Texas)
Royse City Land Company, LLC (Texas)
CDHC Assets, LLC (Texas)
CDHC Fort Worth Land, LLC (Texas)
CDHC Stewart Creek, LLC (Texas)
BVP Property, LLC (Delaware with CA Registration)

# EXHIBIT 5

# AMENDED AND RESTATED
# EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
# CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1) Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4) Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 Name. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners.

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) Indirect Charitable Owners. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Withdrawal of Initial Limited Partner. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

**ARTICLE II**
**POWERS**

2.1 Partnership Powers. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **<u>WAIVER OF CONSUMER RIGHTS</u>: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 Termination. The Partnership shall be required to be wound up and dissolved upon:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2 Winding Up. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law. Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b) Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Limited Partnership Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require. The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement. This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________
Name: Grant Scott
Title: Director

Witnessed By: ______________________

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________
Name:
Title:

Witnessed by: ______________________

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ________________________
James D. Dondero
Managing Member

Witnessed By: ____________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ________________________
Name: Grant Scott
Title: Director

Witnessed By: Candi L. Riggs
Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ________________________
Name: ROD PALMER
Title:

Witnessed by: Graeme S Gray

# EXHIBIT 6

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power





GENERAL REGISTRY CAYMAN ISLANDS



www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS
008610
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## TABLE OF CONTENTS

**CLAUSE** **PAGE**

**TABLE A** ..... 1

**INTERPRETATION** ..... 1

**PRELIMINARY** ..... 5

**SHARES** ..... 6

**MANAGEMENT SHARES** ..... 6

**PARTICIPATING SHARES** ..... 7

**MODIFICATION OF RIGHTS** ..... 7

**CERTIFICATES** ..... 7

**FRACTIONAL SHARES** ..... 7

**TRANSFER OF SHARES** ..... 8

**TRANSMISSION OF SHARES** ..... 8

**ALTERATION OF SHARE CAPITAL** ..... 9

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES** ..... 9

**TREASURY SHARES** ..... 10

**GENERAL MEETINGS** ..... 11

**NOTICE OF GENERAL MEETINGS** ..... 11

**PROCEEDINGS AT GENERAL MEETINGS** ..... 11

**VOTES OF SHAREHOLDERS** ..... 13

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS** ..... 14

**DIRECTORS** ..... 14

**POWERS AND DUTIES OF DIRECTORS** ..... 15



*Filed: 21-Feb-2025 09:26 EST*
*www.verify.gov.ky File#: 263805*
*Auth Code: E90228166495*

**BORROWING POWERS OF DIRECTORS** ........ 17

**THE SEAL** ........ 17

**DISQUALIFICATION OF DIRECTORS** ........ 17

**PROCEEDINGS OF DIRECTORS** ........ 18

**DIVIDENDS** ........ 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ........ 21

**CAPITALISATION OF RESERVES** ........ 22

**SHARE PREMIUM ACCOUNT** ........ 23

**NOTICES** ........ 23

**NON-RECOGNITION OF TRUSTS** ........ 24

**WINDING UP** ........ 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** ........ 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ........ 25

**REGISTRATION BYWAY OF CONTINUATION** ........ 26

**MERGERS AND CONSOLIDATION** ........ 26

**DISCLOSURE** ........ 26

**INDEMNITY** ........ 27

**DISPUTE RESOLUTION** ........ 28

**AEOI** ........ 30



GENERAL REGISTRY CAYMAN ISLANDS
008612
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



GENERAL REGISTRY CAYMAN ISLANDS
008613
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

GENERAL REGISTRY CAYMAN ISLANDS



008614 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



008615
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



GENERAL REGISTRY CAYMAN ISLANDS
008616
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



GENERAL REGISTRY CAYMAN ISLANDS
008617 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

## SHARES

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   (b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
008618
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS
008619
Filed: 1-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## TRANSFER OF SHARES

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



008620
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

    (a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

    (b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

    (c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

    (d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

    (a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



GENERAL REGISTRY CAYMAN ISLANDS
008621 Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS
008622
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
008623
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS
008624
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS
008625
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



GENERAL REGISTRY CAYMAN ISLANDS
008626
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
008627
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



GENERAL REGISTRY CAYMAN ISLANDS
008628
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



GENERAL REGISTRY CAYMAN ISLANDS
008629
Filed: 11-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director



GENERAL REGISTRY CAYMAN ISLANDS
008630
Filed: 11-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
008631 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
008632
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



008633
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

## NOTICES

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
008635 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS
008636
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



GENERAL REGISTRY CAYMAN ISLANDS
008637 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BYWAY OF CONTINUATION

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

## DISCLOSURE

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
008638
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## INDEMNITY

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



GENERAL REGISTRY CAYMAN ISLANDS
008639
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
008640
Filed: 11-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS
008641
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



GENERAL REGISTRY CAYMAN ISLANDS
008642
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



008643 Filed 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.






008644
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

# EXHIBIT 7

Plaintiff
M MacInnis
First Affidavit
15 July 2025
Exhibit MM-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MM-1**

---

This is the Exhibit shown to me and marked "**MM-1**" to the First Affidavit of **MARGOT MACINNIS**.

Sworn before me this 15th day of July 2025

Rachel Baxendale
Notary Public - Cayman Islands

Commission expires on 31 January 2026

Notary Public

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address fo[r]
309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: LRA/858403-000001/

**INDEX TO EXHIBIT MM-1**
**TO FIRST AFFIDAVIT OF MARGOT MACINNIS**



| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 1. | Company's Memorandum and Articles | 20 February 2025 | 1-37 |
| 2. | Highland Kansas Foundation – Certificate of Incorporation | 23 November 2021 | 38-40 |
| 3. | Highland Kansas Foundation – By-laws | Undated | 41-59 |
| 4. | Highland Dallas Foundation – Certificate of Incorporation | 23 November 2021 | 60-62 |
| 5. | Highland Dallas Foundation – By-laws | Undated | 63-77 |
| 6. | Highland Santa Barbara Foundation – Certificate of Incorporation | 23 November 2021 | 78-80 |
| 7. | Highland Santa Barbara Foundation – By-laws | Undated | 81-95 |
| 8. | Procedures for Establishment and Operation of Funds and Supporting Organizations | Undated | 96-122 |
| 9. | Highland Dallas Foundation – IRS Determination Letter | 19 January 2013 | 123-124 |
| 10. | Highland Santa Barbara Foundation - IRS Determination Letter | 12 February 2013 | 125-127 |
| 11. | Highland Kansas Foundation - IRS Determination Letter | 21 March 2013 | 128-129 |
| 12. | Highland Kansas City Foundation - Legal Relationship Agreement | 30 November 2011 | 130-132 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 13. | Highland Dallas Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 133-140 |
| 14. | Highland Santa Barbara Foundation - Supporting Organization Operating Agreement | 30 November 2011 | 141-147 |
| 15. | Charitable DAF Fund, LP - LPA | 11 March 2024 | 148-165 |
| 16. | CLO HoldCo - Expense report of as of 30 June 2024 | 30 June 2024 | 166-169 |
| 17. | Letter from Stinson LLP to the JOLs | 8 May 2025 | 170-173 |
| 18. | NexPoint Capital, Inc. – Proxy Statement | 7 May 2025 | 174-196 |
| 19. | NexPoint Real Estate Strategies Fund – Prospectus | 30 April 2025 | 197-333 |
| 20. | Complaint - Liberty CLO HoldCo, Ltd v Nancy Dondero and others (United States District Court for the State of Delaware) | 28 February 2025 | 334-345 |
| 21. | CDHC Royse City Land, LLC – Property Tax Assessments | Various | 346-356 |
| 22. | CDHC Assets, LLC - Property Tax Assessments | May 2025 | 357-368 |
| 23. | CDHC Fort Worth Land, LLC - Property Tax Assessments | Various | 369-378 |
| 24. | CDHC Stewart Creek, LLC – Property Tax Assessment | 29 May 2025 | 379 |
| 25. | Rand Advisors LLC – Form ADV | March 2025 | 380-408 |
| 26. | Rand Advisors LLC – Brochure | March 2025 | 409-434 |
| 27. | DFW Charitable Foundation – Certificate of Incorporation | 9 December 2024 | 435-437 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 28. | Email from Shields Legal to Mr Patrick | 5 February 2024 | 438 |
| 29. | Structure chart showing the JOLs' understanding of the Fund holding structure prior to the Relevant Transactions | Undated | 439 |
| 30. | Structure chart showing the JOLs' understanding of the Fund holding structure after the Relevant Transactions | Undated | 440 |
| 31. | No Confidence Letter | 11 November 2024 | 441-442 |
| 32. | Email from Mr Murphy to Mr Patrick | 26 November 2024 | 443-447 |
| 33. | Email from Walkers to the Directors | 27 November 2024 | 448-453 |
| 34. | 18 December Resolution | 18 December 2024 | 454-460 |
| 35. | CDM Assignment | 18 December 2024 | 461-466 |
| 36. | CDMCFAD, LLC LLC Agreement | 18 December 2024 | 467-494 |
| 37. | Walkers' Draft Advice | February 2025 | 495-499 |
| 38. | Share Issuance Resolution | 7 February 2025 | 500-524 |
| 39. | Carrington Coleman Email | 18 December 2024 | 525-526 |
| 40. | Letter Agreement | 27 March 2025 | 527-531 |
| 41. | Manager Consent (Admission and Redemption Documents exhibited) | 27 March 2025 | 532-688 |
| 42. | Resolution of the Directors (Redemption) | 2 April 2025 | 689-691 |
| 43. | Resolution of the Directors (Assignment) | 2 April 2025 | 692-693 |
| 44. | Expenses Table | Undated | 694 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 45. | Resolution of the Directors (Mr Patrick's Salary) | 13 September 2024 | 695-696 |
| 46. | Resolution of the Directors (Mr Patrick's LTI Payment and Annual Discretionary Bonus) | 1 October 2024 | 697-704 |
| 47. | Employment Agreement | 24 March 2021 | 705-722 |
| 48. | Santa Barbara Foundation - Audited Financial Statements (year ended 31 December 2023) | 5 September 2024 | 723-750 |
| 49. | Valuescope Report | 11 April 2024 | 751-809 |
| 50. | Valuescope Report | 7 January 2025 | 810-864 |
| 51. | Valuescope Report | 26 March 2025 | 865-939 |
| 52. | Carrington Coleman Memo | 25 March 2025 | 940-956 |
| 53. | IRS Complaint | 20 March 2025 | 957-973 |
| 54. | FTI Report | 27 March 2025 | 974-987 |
| 55. | Mercer Report | 26 August 2024 | 988-1007 |
| 56. | H&B Memorandum | 9 July 2021 | 1008-1012 |
| 57. | Opinion (Mr Tony Beswetherick KC) | 5 March 2025 | 1013-1038 |
| 58. | Email from PwC to Walkers | 11 February 2025 | 1039-1057 |
| 59. | Email from Mr Patrick to Walkers | 17 March 2025 | 1058-1074 |
| 60. | Email chain between FTI and Walkers | 26 March 2025 | 1075-1092 |
| 61. | Letter from Campbells to the JOLs | 16 May 2025 | 1093-1095 |
| 62. | Letter from Johnstone Law to Campbells | 30 May 2025 | 1096-1097 |

| NO. | DESCRIPTION | DATE | PAGES |
|---|---|---|---|
| 63. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 30 May 2025 | 1098-1112 |
| 64. | Letter from Johnstone Law to Campbells | 5 June 2025 | 1113-1116 |
| 65. | Letter from Campbells to Johnstone Law (enclosing draft protocol) | 9 June 2025 | 1117-1124 |
| 66. | Letter from Maples to Campbells (enclosing draft protocol) | 19 June 2025 | 1125-1136 |
| 67. | Letter from Campbells to Maples (enclosing Revised Campbells Draft Protocol) | 29 June 2025 | 1137-1170 |
| 68. | Email from Kobre & Kim to Maples | 30 June 2025 | 1171-1173 |
| 69. | Email from Baker & Partners to Maples | 30 June 2025 | 1174-1176 |
| 70. | Texas Petition | 1 July 2025 | 1177-1422 |
| 71. | Texas Petition – Proposed Order | Undated | 1423-1426 |
| 72. | Second Rule 11 Agreement | 11 July 2025 | 1427-1429 |
| 73. | DFW Charitable Foundation – Delaware Division of Corporations Search Results | Undated | 1430 |
| 74. | CDMCFAD, LLC – Delaware Division of Corporations Search Results | Undated | 1431 |
| 75. | Company's Certificate of Incorporation | 27 October 2011 | 1432 |
| 76. | Shields Legal – Memorandum – Work Plan | 9 November 2023 | 1433-1440 |
| 77. | Letter from Seyfarth Shaw LLP to the IRS | 1 May 2025 | 1441-1446 |

# MEMORANDUM – WORK PLAN[1]

RE: Work Plan, Scope of Work, and Deliverables

DATE: November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.




I. **LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]**

a. <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.

[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law?
2. Is consideration a requirement under Cayman law?
3. If so, did each transfer have consideration under Cayman law?
4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.
5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?
6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii. **Priority: high[3].**

iii. **Work product: legal opinion[4] and/or memorandum.**

1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

---

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

c. What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?

i. **Priority: high.**

ii. **Work product: legal opinion and/or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

d. Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?

i. **Priority: high.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

## II. CORPORATE REVIEW.

a. Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 30.**

b. Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

c. Confirm who controls these entities. We have reviewed the corporate documents and understand the Delaware law implications but only the plain language of the Cayman documents. To streamline your review, our short-form analysis is attached on Annex A

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 25.**

d. Who can remove a director?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 0.**

e. Who, or under what circumstances, can change the ownership of the Management Shares in Charitable DAF Holdco, Ltd.?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 0.**

f. What control rights does the donor James Dondero have (note: it appears he appoints the successor to the Management Shares if there is a death or disability event)?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

g. Are there any actions the controlling person/managing member cannot take?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 2.**

h. Given there are two directors of several entities (Mark Patrick and Paul Murphy) and Mark appears to control the ownership/shareholder voting interest, and given certain provisions

seem to say "the directors run the business," how is this share of control divided among what one director can do, what two directors can do, and what the voting interest can do?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

i. Can the controlling person dilute shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

j. Can the controlling person redeem shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

k. Is there any Cayman law requirement that Charitable DAF Holdco, Ltd. distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

l. Could Charitable DAF Holdco, Ltd. liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

III. **CORPORATE PROACTIVE ACTIONS**.

a. What can be done at this point to make these share transfers bulletproof?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 15.**

b. Is it possible to proactively confirm the validity of these transfers with the government?

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 10.**

c. Would Cayman regulators perform a prophylactic checkup?

   i. **Priority: low.**

   ii. **Work product: email answer.**

   iii. **Anticipated attorney hours to completion: 1.**

d. Determine whether any compliance with corporate formalities generally or new rules effective 10/13/23 is required or advisable.

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

e. Given the scope and focus of this review, please feel free to flag any other ideas that supplement these points. Our "issue spotting" is from the standpoint of a U.S. law firm.

   i. **Priority: low.**

   ii. **Work product: email advice/discussion.**

   iii. **Anticipated attorney hours to completion: TBD.**

f. For your context, we are working on an indemnification and affidavit from the former Director of these entities, Grant Scott, who will attest to the validity of the share transfer.

**Annex A**

**Plain Language Control Analysis**[5]

1. Charitable DAF Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick owns 100% of the Management Shares[1], which are the only voting shares[2].
    b. The Directors run the company.[3] The Directors are Mark Patrick and Paul Murphy.[4]
    c. Mark Patrick may remove Paul Murphy as Director.[5]
2. Charitable DAF GP, LLC: Mark Patrick controls this entity.
    a. Mark Patrick is the Managing Member and Sole Member.[6]
    b. The Managing Member runs the company.[7]
3. Charitable DAF Fund, LP: Mark Patrick controls this entity.
    a. Mark Patrick controls Charitable DAF GP, LLC.[8]
    b. Charitable DAF GP, LLC is the GP and controls this entity.[9]
4. CLO Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick controls Charitable DAF Fund, LP.[10]
    b. Charitable DAF Fund, LP is the sole shareholder.[11]
    c. The Directors run the company.[12] The Directors are Mark Patrick[13] and Paul Murphy[14].
    d. Mark Patrick may remove Paul Murphy as Director.[15]
5. Liberty CLO Holdco, Ltd.: Mark Patrick controls this entity.
    a. Mark Patrick controls CLO Holdco, Ltd.
    b. CLO Holdco, Ltd. is the sole shareholder.[16]
    c. The Directors run the company.[17] Mark Patrick and Paul Murphy are Directors.[18][19]

---

[5] This is not intended to be legal advice and is provided in a summary format for reference purposes only.
[1] *See* Tab 24_Share Trans_Scott to Patrick_03.24.21; Tab 25_Assign & Assump of Mem Int Agr_ 03.24.21; and Tab 31_Reg of Mems_10.27.11.
[2] *See* definitions of "Management Shares" and "Participating Shares" and Paragraph 11 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.
[3] *See* Paragraph 80 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.
[4] *See* Tabs 26-27_SH Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[5] *See* Paragraph 93(d) of Tab 22_A&R Memo and Arts of Assoc_01.19.15 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Management Shares).
[6] *See* Tab 25_Assign & Assum of Mem Int Agr_ 03.24.21.
[7] *See* Paragraph 5 of Tab 07_A&R Co Agr_substit Scott for Dondero as Managing Mem (the Managing Member controls the company).
[8] See above.
[9] *See* Section 1.6(a) of Tab 10_A&R LP Agr_11.07.11 (the GP shall have full discretion in management and control).
[10] See above.
[11] *See* Tab 03_Regist of Mems_12.13.10.
[12] *See* Paragraph 85 of Tab 01_Memo and Arts of Assoc_12.13.10 (the business of the Company shall be managed by the Directors).
[13] *See* Tab 30_SH Resol of Sole SH, appt Patrick as Dir_04.02.21.
[14] *See* Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[15] *See* Paragraph 98(d) of Tab 01_Memo and Arts of Assoc_12.13.10 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).
[16] *See* LIBERTYCLO HOLDCO, LTD_ROM.
[17] *See* Paragraph 89 of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12).
[18] *See* Tab 26_Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.
[19] *See* LIBERTY CLO HOLDCO, LTD._ROD (the Intertrust Register of Directors, listing Mark E. Patrick and Paul Murphy).

   d. Mark Patrick may remove Paul Murphy as Director.[20]

6. Charitable DAF Holdings Corp. (f/k/a Rand Advisors Holding Corp.): Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF Fund, LP.[21]
   b. Charitable DAF Fund, LP is the sole shareholder.[22]
   c. Mark Patrick is the sole member of the Board of Directors[23] and runs the company[24].

---

[20] *See* Paragraph 102(d) of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12) (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).
[21] See above.
[22] *See* fourth "Resolved" paragraph in Tab 03_Consent of BOD_01.05.22.
[23] *See* Tab 03_Consent of BOD_01.05.22.
[24] *See* Section 3.01 of Tab 04_Bylaws.

# EXHIBIT 8

# Delaware

The First State



*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "DFW CHARITABLE FOUNDATION", FILED IN THIS OFFICE ON THE NINTH DAY OF DECEMBER, A.D. 2024, AT 4:06 O`CLOCK P.M.*

Jeffrey W. Bullock, Secretary of State

SECRETARY'S OFFICE 1793 DELAWARE 1855

10030937 8100
SR# 20244432762

Authentication: 205075905
Date: 12-09-24

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
# OF
# DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

## I.

The name of the Corporation is DFW Charitable Foundation.

## II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

## III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

## V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

## VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

**VII.**

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

**VIII.**

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

**IX.**

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

# EXHIBIT 9

# Delaware

The First State



***I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "CDMCFAD, LLC", FILED IN THIS OFFICE ON THE TWELFTH DAY OF DECEMBER, A.D. 2024, AT 11:33 O`CLOCK A.M.***

Jeffrey W. Bullock, Secretary of State

10035168 8100
SR# 20244471736

Authentication: 205115849
Date: 12-12-24

You may verify this certificate online at corp.delaware.gov/authver.shtml

# CERTIFICATE OF FORMATION

# OF

# CDMCFAD, LLC

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. Name. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

Name: Mark Patrick
Authorized Person

4930-4296-2948\1

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471[illegible]6 - File Number 10[illegible]5168

# EXHIBIT 10

**CHARITABLE DAF HOLDCO, LTD**
the ("**Company**")

---

**Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company**

---

## 1 Declaration of Interests

**IT IS NOTED THAT** the directors of the Company (each, a "**Director**" and together, the "**Directors**") have declared their respective interests (if any) in the matters contemplated by these resolutions, and any such interest be and is hereby noted, ratified and acknowledged.

## 2 Transfer of interest in the Partnership

2.1 **IT IS NOTED THAT**:

(a) In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "**Transferee**"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "**Partnership**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Transfer**").

(b) In connection with the Transfer, the Company proposes to enter into a deed of assignment and assumption (the "**Deed**"), substantially in the form that was circulated to and carefully considered by the Directors, to be entered into by and among the Company, the Transferee and CDH GP, LTD, solely in its capacity as general partner (the "**GP**") of the Partnership, under the terms of which the Company will transfer, convey, assign or otherwise contribute all of its Transferred Interest (as defined in the Deed) to the Transferee on the terms and conditions set out therein.

(c) Section 1.11(a) of the amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**") provides that a Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner (each term as defined in the Partnership Agreement).

(d) Under the terms of the Deed, it is expected that:

(i) the Transferee will make in favour of the GP and the Company, each representation, as was made by the Company in connection with its admission as a Limited Partner;

(ii) the Transferee will undertake to perform all of the obligations of a Limited Partner and be bound by and receive the benefit of all terms of the Partnership Agreement and replace the Company as a Limited Partner and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, under the Partnership Agreement with respect to the Transferred Interest;

(iii) the GP will: (x) consent to the assignment and assumption contemplated thereby; (y) acknowledge that all requirements and conditions for the Transfer and the admission of the Transferee as a Limited Partner of the Partnership have been satisfied or waived; and (z) certify that the Transferee will, in accordance with Section 1.15 of the Partnership Agreement, be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest;

(iv) the GP will agree to admit the Transferee as a Limited Partner in respect of the Transferred Interest and remove, in accordance with Section 1.15 of the Partnership Agreement, the name of the Company from the register of Limited Partners maintained in respect of the Partnership; and

(v) the Company and Transferee will undertake to jointly and severally indemnify the GP and the Partnership from any expense arising from the transactions contemplated by the Deed or any losses arising from the breach of the Deed or the Partnership Agreement.

(e) All the requirements of the transfer provisions contained in the Partnership Agreement have been or will be either satisfied by the Company and Transferee or waived by the GP.

(f) U.S. tax counsel has advised the Company and its Directors that reorganization of the Company and its subsidiaries pursuant to the Transfer generally would provide the following benefits and protections to the Company, the Partnership, and the Company's subsidiaries (collectively, the "**DAF**"):

(i) The Transfer would help insulate the DAF from exposure to James Dondero and his entities (collectively, "**Dondero**"), who may be at risk of causing the Internal Revenue Service (the "**IRS**") to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF;

(A) Each Internal Revenue Code (the "**IRC**") Section 501(c)(3) organization must be organized and operating primarily for charitable purposes;

(B) Treasury Regulation Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than

an insubstantial part of its activities is not in furtherance of an exempt purpose"; and

(C) An IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity due to the private benefit/private inurement prohibition.

(ii) The Transfer would help reduce the influence of Dondero and, as such, would broaden the charitable scope of DAF for its benefit and the benefit of the public;

(iii) The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and

(iv) Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

(g) Delaware counsel has advised the Company and its Directors that, as a result of the Transfer, the Transferred Interest shall be held by the Transferee, and that certain Limited Liabiltiy Company Agreement of the Transferee (the "**LLC Agreement**"), along with the Transfer generally, shall provide the following benefits and protections to the Company and the Partnership:

(i) Under Delaware law and the Delaware Limited Liability Compay Act (the "**LLC Act**"), there are very few required adminstrative or other requirements for a limited liablity company that cannot be modified or elimintated in a limited liablity company agreement and therefore, the Company and the Partnership will benefit from the contractual freedom and flexbility to provide for its desired terms under the LLC Agreement;

(ii) As a Delaware limited liability company, the Transferee will be governed by the LLC Act, which unlike the statutes in almost every other jurisidction, is updated annually to stay current based on the needs of companies forming in Delaware and the changing markets, as well as any needed changes due to the results of case law;

(iii) Under the LLC Act, the only required filing in Delaware is a certificate of formation that contains only the name of the company and its registered agent and registered office, therefore maintaining the privacy of the members and managers of the company by allowing them to put their business terms into a limited liablity company agreement that is a private document not avialable to the public;

(iv) Under the LLC Act, and the LLC Agreement, the neither the Company nor the Partnership shall be personally liable for the debts, obligations and liabilities of the Transferee, whether such debts, obligations or liabilities arise in contract, tort or otherwise;

(v) As permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee;

(vi) It will be very difficult to dissolve and terminate the Transferee, with any such voluntary decision requiring the consent of the manager of the Transferee;

(vii) The cost to maintain a limited liability company in Delaware is relatively low, with only a $300 annual state franchise tax and minimal expenses to maintain a Delaware registered agent and registered office;

(viii) Any enforcement action with respect to the LLC Agreement will likely occur in the Delaware Chancery Court, which is known as being one of the most respected and sophisticated business courts in the United States.

2.2 **IT IS HEREBY RESOLVED THAT:**

(a) It is in the best interests of the Company to enter into the Transfer and execute and enter into the Deed and consummate the transactions contemplated thereunder.

(b) A draft of the Deed having been provided to the Directors, the form thereof be approved on behalf of the Company, subject to such amendments and additions thereto as any director, officer or attorney of the Company in his absolute discretion and opinion deems appropriate, the signature of any director, officer or attorney of the Company on the Deed being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

(c) The Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgments, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any director, officer or attorney of the Company be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Deed and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any director, officer or attorney of the Company be necessary or desirable for the purposes aforesaid.

(d) The Ancillary Documents be in such form as any director, officer or attorney of the Company should in his absolute discretion and sole opinion approve, the signature of any director, officer or attorney of the Company on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

(e) The Deed and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereon of any director, officer or attorney of the Company and the Company deliver and perform the Deed and Ancillary Documents.

(f) Any director, officer or attorney of the Company be and they are hereby authorised to take such further actions as they may consider necessary or convenient to effect the foregoing resolutions.

(g) All prior acts of any of the directors, officers or attorneys of the Company in connection with the foregoing resolutions be and they hereby are confirmed, ratified and approved.

[*Signature Page follows*]

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

______________________________

Name: **Mark E. Patrick**

Title: Director

______________________________

Name: **Paul Murphy**

Title: Director

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

_______________________________

Name: **Mark E. Patrick**

Title: Director

_______________________________

Name: **Paul Murphy**

Title: Director

# EXHIBIT 11

# VALUATION ANALYSIS OF 100 PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
SEPTEMBER 30, 2024

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

1 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **<u>Applicable Discounts</u>** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW .......... 1**

DESCRIPTION OF THE ASSIGNMENT .......... 1
SCOPE .......... 1
PROCEDURES .......... 1

**DAF OVERVIEW .......... 2**

COMPANY OVERVIEW .......... 2
SUBJECT INTEREST OVERVIEW .......... 2
HISTORICAL FINANCIAL ANALYSIS .......... 2

**ECONOMIC AND INDUSTRY OVERVIEW .......... 4**

OVERVIEW OF THE U.S. ECONOMY .......... 4
OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY .......... 12

**VALUATION METHODOLOGY .......... 15**

VALUATION APPROACHES .......... 15
VALUATION METHODS .......... 16
SUMMARY OF THE VALUATION APPROACHES AND METHODS .......... 16

**VALUATION ANALYSIS .......... 17**

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE .......... 17

**CONCLUSION OF VALUE - SUBJECT INTEREST .......... 19**

DISCOUNT FOR LACK OF CONTROL .......... 19
DISCOUNT FOR LACK OF MARKETABILITY .......... 19
CONCLUSION - SUBJECT INTEREST VALUE .......... 21

**ASSUMPTIONS AND LIMITING CONDITIONS .......... 23**

**APPRAISAL CERTIFICATION .......... 28**

## TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY .......... SUMMARY 1**

**CURRENT VALUATION SUMMARY .......... SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS .......... A**

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET .......... A.1
CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET .......... A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS .......... B**

CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS .......... B.1
CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS .......... B.2
DLOC CONCLUSION .......... B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS .......... C**

DLOM DETERMINATION - PUT OPTION APPROACH .......... C.1
PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY .......... C.2
DLOM DETERMINATION - RESTRICTED STOCK STUDIES .......... C.3
DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS .......... C.4
DLOM CONCLUSION .......... C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[3] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

3 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

# DAF OVERVIEW[4]

## COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

## SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors. According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10). Director consent is also required for shareholders to transfer their interests in DAF (Section 18). Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

## HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's balance sheet as of September 30, 2024. These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other various investments. The net asset value for CLO HoldCo was reported as

---

[4] Based on the Company's memorandum and articles of association and information from management.

$269.1 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter. Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target. After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points. The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown. Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

### Gross Domestic Product[5]

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.




5 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]







6 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

7 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

8 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

9 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].




---

10 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

11 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

12 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* August 9, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13] The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]




The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]




---

13 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

14 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

15 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last October 7, 2024.

16 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.




17 U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

### *Stock Markets*[18]

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024. The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024. The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024. In the graph below, the September 30, 2022, values were set to 100.




### *Construction & Housing Starts*

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19] Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

---

18 CapIQ Database, last accessed October 7, 2024.

19 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

20 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.




### *Consumer Confidence*

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




[21] University of Michigan, *Surveys of Consumers*, September 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[22]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

### *Industry Performance*

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

---

[22] IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

***Industry Outlook***

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

# VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

# VALUATION ANALYSIS

## ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

***CLO HoldCo, Ltd - Summary Balance Sheet***

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

23 Other investments consist of investments in approximately 39 entities.

### ***DAF NAV Conclusion***

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively. Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

### *Put Option Approach*

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%. This DLOM indication is presented in Schedule C.1.

### *Restricted Stock Study Analysis*

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

### *DLOM Conclusion*

The put option approach in Schedule C.1 indicated a DLOM of 2.8%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

24 Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

25 See Schedule C.3

concluded a discount for lack of marketability of 6.3%. This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this

report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS**

No consideration is rendered as to the law of the Cayman Islands. Implications of Cayman Island jurisdiction are not considered.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, Inc.



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, Inc.*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

# SCHEDULES

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: September 30, 2024**

Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

**Summary Schedule 1**
**Valuation Date: September 30, 2024**

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 | 9/30/2023 | 12/31/2023 | 3/31/2024 | 6/30/2024 | 9/30/2024 |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | **$269,052,808** |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| **FMV of Subject Interest (Per 100 Shares)** | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | **$75,961,370** |

**Charitable DAF HoldCo, Ltd** — **Summary Schedule 2**
**Current Valuation Summary** — **Valuation Date: September 30, 2024**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

**Charitable DAF HoldCo, Ltd** — **Schedule A.1**
**DAF Net Asset Value Analysis** — **Valuation Date: September 30, 2024**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd** — **Schedule A.2**
**DAF Net Asset Value Analysis** — **Valuation Date: September 30, 2024**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

**Charitable DAF HoldCo, Ltd** **Schedule B.1**
**Discount for Lack of Control (DLOC) Analysis** **Valuation Date: September 30, 2024**

*Closed-End Fund Data - Investment Grade Bond Funds*

| Closed-End Fund Data - Investment Grade Bond Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

| **Summary Statistics** | |
|---|---|
| **Mean Premium (Discount)** | **(2.9%)** |
| **Median Premium (Discount)** | **(2.5%)** |
| **Standard Deviation** | **2.2%** |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd** **Schedule B.2**
**Discount for Lack of Control (DLOC) Analysis** **Valuation Date: September 30, 2024**

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(12.1%)** |
| **Median Premium (Discount)** | **(13.6%)** |
| **Standard Deviation** | **13.0%** |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd** **Schedule B.3**
**Discount for Lack of Control (DLOC) Analysis** **Valuation Date: September 30, 2024**

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| **Concluded Discount for Lack of Control** | **8.1%** | |

**Charitable DAF HoldCo, Ltd** | **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*DLOM Determination - Put Option Approach*

**Discount for Lack of Marketability - Put Option Approach**

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 12.3% | *Schedule C.2* |
| Risk-free rate | **R** | 4.18% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

| *Intermediate Calculations:* | | *Intermediate Calculations:* | |
|---|---|---|---|
| *d1* | *0.34756838* | *-d1* | *-0.34756838* |
| *d2* | *0.24104726* | *-d2* | *-0.24104726* |
| *N(d1)* | *0.63591782* | *N(d1)* | *0.36408218* |
| *N(d2)* | *0.59524076* | *N(d2)* | *0.40475924* |
| Black-Scholes Call Option Price | $0.06 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | **2.8%** |

** Distributions not expected in the near future*

**Charitable DAF HoldCo, Ltd** | **Schedule C.2**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 8.3% | 9.6% | **11.2%** | 16.0% | 19.4% | 43.0% |
| **1 Year** | 9.9% | 12.0% | **13.3%** | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| Concluded Volatility | 12.3% |
|---|---|

*Source: Yahoo Finance*

**Charitable DAF HoldCo, Ltd** — **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** | **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |

**Charitable DAF HoldCo, Ltd** **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: September 30, 2024**

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

# EXHIBIT 1

# VALUATION ANALYSIS OF CERTAIN PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
MARCH 25, 2025

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

***RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2] The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

- Information regarding the Company's history and current operations
- Historical distributions paid to the holders of the Subject Interest
- The organizational structure chart for Charitable DAF HoldCo, Ltd
- Discussions with the Company's Management
- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024
- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date
- An interview with Management regarding expectations for future distributions
- An application of appropriate valuation techniques and procedures, including the income approach
- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

Mr. Bart F. Higgins
March 26, 2025
Page 4

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | **Value** | **Reference** |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | **Shares** | **Fair Market Value** |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,



ValueScope, LLC

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW ... 1**

DESCRIPTION OF THE ASSIGNMENT ... 1
SCOPE ... 1
PROCEDURES ... 1

**DAF OVERVIEW ... 2**

COMPANY OVERVIEW ... 2
CAPITALIZATION TABLE ... 2
COMPANY STRUCTURE CHART ... 3
FINANCIAL POSITION ... 3
SUBJECT INTEREST OVERVIEW ... 6

**ECONOMIC AND INDUSTRY OVERVIEW ... 8**

OVERVIEW OF THE U.S. ECONOMY ... 8
OVERVIEW OF THE PRIVATE EQUITY… & INVESTMENT VEHICLES INDUSTRY ... 16

**VALUATION METHODOLOGY ... 17**

VALUATION APPROACHES ... 17
VALUATION METHODS ... 18
SUMMARY OF THE VALUATION APPROACHES AND METHODS ... 18

**VALUATION ANALYSIS ... 20**

INCOME APPROACH ANALYSIS ... 20

**CONCLUSION OF VALUE - SUBJECT INTEREST ... 22**

DISCOUNT FOR LACK OF MARKETABILITY ... 22
PRE-IPO STUDIES ... 34
APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ... 35
DISCOUNT ADJUSTMENT DISCUSSION ... 36
SUBJECT INTEREST DISCOUNT CALCULATION ... 37
FAIR MARKET VALUE CONCLUSION ... 38

**ASSUMPTIONS AND LIMITING CONDITIONS ... 39**

**APPRAISAL CERTIFICATION ... 44**

**TABLE OF SCHEDULES**

**VALUATION SUMMARY .................................................. SUMMARY SCHEDULE**

**HISTORICAL FINANCIAL ANALYSIS .................................................. A**

HISTORICAL DISTRIBUTIONS TABLE .................................................. A.1
HISTORICAL DISTRIBUTIONS CHARTS .................................................. A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET .................................................. A.3

**INCOME APPROACH .................................................. B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS .................................................. B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND .................................................. B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS .................................................. C**

RESTRICTED STOCK STUDIES.................................................. C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS .................................................. C.2
DLOM QUALITATIVE SCORING .................................................. C.3
CALCULATION OF MARKETABILITY DISCOUNT .................................................. C.4
DLOM FOOTNOTES AND COMMENTS.................................................. C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

## DAF OVERVIEW

### COMPANY OVERVIEW[4]

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

---

4 Based on the Company's memorandum and articles of association and information from Management.

## COMPANY STRUCTURE CHART




## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024. The Balance Sheet is presented below and in Schedule A.3.

### *CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

[5] Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.




Note: Q4 2024 distributions have not yet been paid.



## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders. The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions. They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents. Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

### *Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine. Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders). Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

***Restrictions on Meetings and Information Access***

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

***Restricted Persons Clause***

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter. Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target. After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December. The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election. Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending. These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.




6 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7] The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]







7 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

8 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

9 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

10 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

### *Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].




---

11 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

12 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

13 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

### *Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14] The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]




The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]




---

14 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

15 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

16 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

17 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.




[18] U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

***Stock Markets***[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024. The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024. The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024. In the graph below, the December 30, 2022, values were set to 100.




***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20] Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

[19] CapIQ Database, last accessed January 10, 2025.

[20] U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[21] U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.




***Consumer Sentiment***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




[22] University of Michigan, *Surveys of Consumers*, November 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23] IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
   1. Discounted Cash Flow Method (multi-period model)
   2. Direct Capitalization Method (single period model)
   3. Excess Earnings Method

B. Market Approach
   1. Guideline Public Company Method
   2. Merger and Acquisition Method

C. Asset-Based Approach
   1. Reproduction Cost Method
   2. Replacement Cost Method
   3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up. Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

24 Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

25 The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions. If no future distributions are expected, the value of the Subject Interest would be nominal. The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits. In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets. The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments. The resulting present value represents the fair market value of the Subject Interest.

#### *Discounted Cash Flow Method*

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date. The DCF method projects the distributions that the Participation Shareholders are expected to receive. Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

#### *Projected Distributions*

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions. Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months. We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000. Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

#### *Cost of Equity*

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions. This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

***Conclusion – Income Approach Analysis***

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

[26] Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

## DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity. A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions. These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010. The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity. The restricted stocks were identical to the traded stock except for marketability. A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

**Summary of Restricted Stock Studies**




## SEC Institutional Investor Study[27]

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

27 U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

discounts than smaller exchanges and over-the-counter stocks. The study found higher discounts for companies with smaller sales and lower earnings.

**Johnson & Racette Study[28]**

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973. The study included 86 observations sent from 75 investment companies that met the selection criteria. Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

**Gelman Study[29]**

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970. The investment companies were formed in 1968 to specialize in restricted securities. A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders. Gelman's analysis found mean and median discounts of approximately 33%. In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

**Trout Study[30]**

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972. Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares. Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

28 Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

29 Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

30 Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

**Moroney Study[31]**

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972. The study was subsequently published in 1973. The analysis focused on 146 transactions in restricted securities by 10 registered investment companies. The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

**Maher Study[32]**

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976. The study observed discounts for 34 restricted stock transactions from 1966 to 1973. The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

**Standard Research Consultants Study[33]**

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982. The discounts varied from 7% to 91% with a median of 45%. The results of the study tend to suggest higher discounts for companies with smaller revenues.

**Wruck Study[34]**

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample. On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%. The median discount indicated was similar at 12.2%.

---

31 Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

32 J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

33 William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

34 Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

**FMV Opinions Study**[35]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

**Barclay, Holderness, Sheehan Study**[36]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

**Hertzel & Smith Study**[37]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[35] Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[36] Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[37] Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

**Management Planning Study**[38]

Management Planning, Inc. published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H. Meyers, ASA, CFA. They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights. A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment. Certain factors were also cited by the authors as the most influential in determining discounts. The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

**Hertzel, Lemmon, Linck, Rees Study**[39]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996. A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million. Of the 619 private

---

38 A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370. Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

39 Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

**Wruck & Wu Study[40]**

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

**Angrist, Curtis, Kerrigan (MPI) Study[41]**

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

**Willamette Management Associates Study[42]**

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

40 Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

41 Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

42 Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

**Silber Study[43]**

William L. Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989. Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%. Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

**Krishnamurthy, et al. Study[44]**

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992. The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined). The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively. The overall mean discount was 19.4%.

**Wu Study[45]**

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004. The study analyzed 301 private placements taking place from 1986 to 1997. Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

**Bajaj Study[46]**

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith. This study analyzed 88 private placements occurring between 1990 and 1995. The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively. The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

43 William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

44 Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

45 Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

46 Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

**Johnson Study (Business Valuation Review)[47]**

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

**Finnerty Study[48]**

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

**Chaplinsky Purchase Discount and Warrant Study[49]**

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

**Brophy PIPE Study[50]**

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

47 Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

48 John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

49 Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

50 David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

### Columbia Financial Advisors Study[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998. The one-year holding period became effective April 29, 1997. A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

| | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

### Meidan Study[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003. The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%. The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample. The weighted average of the mean discounts was calculated as 9.8%.

### Verdasca Study[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions. The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

51 Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

52 Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

53 Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

**Billett & Floros Study[54]**

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

**Stout Risius Ross Study[55]**

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

**Harris-Trugman Study[56]**

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

54 Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

55 Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

56 William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010. Reported mean discounts range from 8.7% to 35.6%. The average of reported mean discounts was 20.8%, while the median was 19.4%. Reported median discounts range from 9.0% to 45.0%. The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed. Prior to April 1997, the SEC-required holding period for restricted stocks was two years. That was decreased to one year on April 29, 1997. Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts. The methodology applied in these studies is based on the initial offering price (the price prior to public trading). This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period. The resulting amount is divided by the initial offering price to arrive at the appropriate discount. The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders. Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

***Emory Studies***

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC. Emory has completed nine studies with the original published in June 1986. The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share. The ninth study deviated from the previous studies as follows:

- Included only companies with “com” in their names
- Review period was increased from 18 months in the previous studies to 35 months
- All transactions were actual sales as opposed to the previous studies that included options
- Most of the companies did not have earnings

The study consisted of 53 transactions. The mean and median discounts by study are presented in the following chart.




### *Willamette Management Associates Pre-IPO Study*

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

### *Valuation Advisors Pre-IPO Study*

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

## APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[57] Excluded highest and lowest deciles of indicated discounts

The latest restricted stock studies indicate mean and median marketability discounts in 14% range. We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis. Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions. Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company. We did not use these studies for our analysis.

***Factors Affecting Marketability***

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase. We also note that various other factors affected discounts observed in the other studies. Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

**DISCOUNT ADJUSTMENT DISCUSSION**

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section. Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison. Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature. Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest. This results in a range of outputs from -4 to +4

(from significantly worse to significantly better). The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature. An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

**SUBJECT INTEREST DISCOUNT CALCULATION**

***Adjustment Analysis – Marketability***

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile. The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock. Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis. Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

## FAIR MARKET VALUE CONCLUSION

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**
**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest. Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated. They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC. Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein. This report may be used alongside other appraisals or studies for comparative or analytical purposes. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, LLC



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

## APPENDIX A
## KEY DAF AGREEMENT PROVISIONS

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

    a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

    b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

    and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]

8. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

**APPENDIX B**
**QUALIFICATIONS OF THE APPRAISER**

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

**EMPLOYMENT HISTORY**

*2006 – Present* *ValueScope, LLC*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

“How to Finance Your Company” – National Med Trade

“Employee Stock Ownership Plans – When They Make Sense” – TAHC

“Documentation Linking Systems” – Oklahoma Healthcare Association

“CORF – What You Need to Know to Run A Successful Business” – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: March 25, 2025**

## Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Valuation Summary and Conclusion** | Summary Schedule |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Valuation Summary and Conclusion**

**Summary Schedule**
**Valuation Date: March 25, 2025**

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | Value | Reference |
|---|---|---|---|
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | Shares | Fair Market Value |
|---|---|---|
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.1**
**Valuation Date: March 25, 2025**

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | | | | | |
|---|---|---|---|---|---|
| **Organization** | **Highland Dallas Foundation, Inc.** | **Highland Kansas City Foundation, Inc.** | **Highland Santa Barbara Foundation, Inc.** | **The Community Foundation of North Texas** | **Total** |
| **Holding** | **100 Participation Shares** | **100 Participation Shares** | **100 Participation Shares** | **5 Participation Shares** | **305 Participation Shares** |
| **31-Mar-19** | 39,750 | - | $51,000 | - | $90,750 |
| **30-Jun-19** | 39,438 | - | 50,688 | - | 90,125 |
| **30-Sep-19** | 36,813 | - | 48,063 | - | 84,875 |
| **31-Dec-19** | 231,738 | - | 53,313 | - | 553,300 |
| **2019 Subtotal** | **$347,738** | **$168,250** | **$203,063** | **$100,000** | **$819,050** |
| **31-Mar-20** | 25,750 | - | 37,000 | - | 62,750 |
| **30-Jun-20** | 27,625 | - | 38,875 | - | 66,500 |
| **30-Sep-20** | 27,125 | - | 38,375 | - | 65,500 |
| **31-Dec-20** | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| **2020 Subtotal** | **$243,238** | **$120,250** | **$155,563** | **$100,000** | **$619,050** |
| **31-Mar-21** | 33,188 | - | 44,438 | - | 77,625 |
| **30-Jun-21** | 40,063 | - | 51,313 | - | 91,375 |
| **30-Sep-21** | 43,063 | - | 54,313 | - | 97,375 |
| **31-Dec-21** | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| **2021 Subtotal** | **$352,825** | **$176,250** | **$205,375** | **$100,000** | **$834,450** |
| **31-Mar-22** | 46,438 | - | 57,688 | - | 104,125 |
| **30-Jun-22** | 52,438 | - | 63,688 | - | 116,125 |
| **30-Sep-22** | 50,750 | - | 62,000 | - | 112,750 |
| **31-Dec-22** | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| **2022 Subtotal** | **$434,638** | **$191,750** | **$242,563** | **$100,000** | **$968,950** |
| **31-Mar-23** | 48,313 | - | 59,563 | - | 107,875 |
| **30-Jun-23** | 45,750 | - | 57,000 | - | 102,750 |
| **30-Sep-23** | 47,688 | - | 58,938 | - | 106,625 |
| **31-Dec-23** | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| **2023 Subtotal** | **$419,491** | **$195,712** | **$235,678** | **$100,000** | **$950,881** |
| **31-Mar-24** | 47,608 | - | 58,858 | - | 106,467 |
| **30-Jun-24** | 46,939 | - | 58,189 | - | 105,127 |
| **30-Sep-24** | 47,476 | - | 58,726 | - | 106,202 |
| **31-Dec-24** | **TBD** | **TBD** | **TBD** | **TBD** | **TBD** |
| **2024 Subtotal** | **$142,023** | **$0** | **$175,773** | **$0** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$1,939,952** | **$852,212** | **$1,218,013** | **$500,000** | **$4,510,177** |

Note: Payments are typically made a few months following the end of each period.

**Charitable DAF HoldCo, Ltd** **Schedule A.2**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*Historical Distributions Charts*







Note: Q4 2024 distributions have not yet been paid.

**Charitable DAF HoldCo, Ltd** **Schedule A.3**
**Historical Financial Analysis** **Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | 9/30/2024 | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd**
**Income Approach**

**Schedule B.1**
**Valuation Date: March 25, 2025**

*Discounted Cash Flow (DCF) Analysis*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | *0.9663* | *0.8484* | *0.7449* | *0.6540* | *0.5742* | *0.5041* | *0.4426* | *0.3886* | *0.3412* | *0.2995* | *0.2630* | *0.2309* | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$5,368** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | *0.2309* |
| PV residual value : | $359,856 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

PM-1/368

**Charitable DAF HoldCo, Ltd**
**Income Approach**

**Schedule B.2**
**Valuation Date: March 25, 2025**

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | *0.9970* | *0.9858* | *0.9746* | *0.9636* | *0.9527* | *0.9420* | *0.9313* | *0.9208* | *0.9104* | *0.9001* | *0.8899* | *0.8799* | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| Less: Discount for Lack of Marketability *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | *0.8799* |
| PV residual value : | $41,969,350 |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

**Charitable DAF HoldCo, Ltd** **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** | **Schedule C.2**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| **Descriptive Statistics for Reported Mean and Median Discounts** | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**Charitable DAF HoldCo, Ltd** **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: March 25, 2025**

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size. Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years. Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up. CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets. The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations. The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

**Charitable DAF HoldCo, Ltd** | **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: March 25, 2025**

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | **A (Schedules B)** | **B = F(A)** | **C** | **D = F(C)** | **E = B x D** | **F = 1+E or 1/(1-E)** | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | **G = Product ($F_i$), i = 1 to n** | | | | | **96%** | **-0.8%** |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | I (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | **J = G x I** | | | | | **20.0%** | |

**Charitable DAF HoldCo, Ltd** **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: March 25, 2025**

*DLOM Footnotes and Comments*

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.
1 = Poor 2 = Weak 3 = Fair 4 = Good 5 = Excellent
We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

| | | | | |
|---|---|---|---|---|
| 0 = Equal | 1 = Slightly Better | 2 = Better | 3 = Much Better | 4 = Significantly Better |
| | -1 = Slightly Worse | -2 = Worse | -3 = Much Worse | -4 = Significantly Worse |

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.
1 = Low 2 = Medium 3 = High

**D)** Weights are allocated as follows:
Low = 25% Medium = 50% High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.

# EXHIBIT 1

# REDEMPTION AND AMENDMENT NO. 2 AGREEMENT

This Redemption and Amendment No. 2 Agreement (this "**Agreement**"), is entered into by the undersigned on March 27, 2025 (the "**Effective Date**"). Capitalized terms used herein and not otherwise defined shall have the meanings for such terms set forth in the LLC Agreement (as defined below).

## RECITALS

WHEREAS, CDMCFAD, LLC, a Delaware limited liability company (the "**Company**") is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of December 18, 2024 (as heretofore amended, the "**LLC Agreement**"); and

WHEREAS, in accordance with the terms of the LLC Agreement, Manager desires to: (i) redeem the entire limited liability company interest in the Company currently held by Charitable DAF HoldCo, Ltd. (the "**Redeemed Member**") effective as of the Effective Date for $1,637,192 (the "**Redemption Price**"), such amount being the Fair Market Value for the Redeemed Member's Interest as determined by the Manager, and (ii) amend Schedule A to the LLC Agreement as set forth in Exhibit A hereto to reflect the foregoing, as of the Effective Date.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## AGREEMENTS

**I. Redemption.** The Manager hereby approves and as of the Effective Date, the Redeemed Member's entire Interest in the Company is hereby redeemed by the Company for the payment of the Redemption Price. As of the redemption contemplated by this Section I, the Redeemed Member shall cease to be a member of the Company and shall thereupon cease to have any rights or obligations as a member of the Company under the LLC Agreement, the Act or otherwise.

**II. Amendments.**

A. Schedule A of the LLC Agreement is hereby amended and restated in its entirety and replaced with Exhibit A attached hereto.

**III. Miscellaneous.**

A. Agreement in Effect. Except as otherwise hereby amended, the LLC Agreement shall remain in full force and effect.

B. Governing Law. This Agreement shall be governed by, and interpreted in accordance with, the laws of the State of Delaware, all rights and remedies being governed by such laws.

C. Successors and Assigns. This Agreement is binding upon and will inure to the benefit of the parties to this Agreement and their successors and assigns.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Manager executed this Agreement as of the day and date first above written.

**MANAGER:**

Name: Mark Patrick

**EXHIBIT A**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised: March 27, 2025**

| Name and Contact Information | Allocation Percentage |
|---|---|
| DFW Charitable Foundation<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

# EXHIBIT 1

HUNTER MOUNTAIN INVESTMENT TRUST

APPOINTMENT OF SUCCESSOR ADMINISTRATOR

August 12, 2022

Reference is made to that certain Trust Agreement of Hunter Mountain Investment Trust dated December 17, 2015 (the “Trust Agreement”). Capitalized terms not otherwise defined shall have the meaning given them in the Trust Agreement. Pursuant to section 16 of the Trust Agreement, upon the occurrence of a Honis Trigger Event, the current Administrator is immediately removed. Pursuant to that certain Membership Interest Purchase Agreement dated August 1, 2022 (“MIPA”), by and among John Honis (as “Seller”), Rand Advisors Holding Corp., a Delaware corporation (as “Buyer”), and CLO Holdco, Ltd., a Cayman limited company (as “Guarantor”), the Buyer acquired all the membership interests in, and therefore voting control of, Rand Advisors, LLC (“Rand”). A Honis Trigger Event under the Trust Agreement includes a change in ownership of Rand, such that John Honis fails to retain majority voting control.

Pursuant to section 17 of the Trust Agreement, upon the occurrence of a Honis Trigger Event and the immediate removal of John Honis as Administrator, Beacon Mountain, LLC (“Beacon”) shall appoint a successor Administrator. Accordingly, Beacon hereby appoints Mark E. Patrick as Administrator of Hunter Mountain Investment Trust, effective as of the date first written above.

BEACON MOUNTAIN, LLC, a Delaware limited liability company
By: Rand PE Fund I, L.P., its sole member
By: Rand PE Fund Management, LLC, its general partner
By: Rand Advisors Holding Corp., its sole member

By:______________________________________
Name: Mark Patrick
Title: President

# EXHIBIT 1

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of February 12, 2025, is entered into between RAND PE FUND I, L.P., a Delaware limited partnership ("**Seller**") and CLO HOLDCO, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

(A) WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"); and

(B) WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein.

(C) NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Membership Interests, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,000,000.00 (the "**Purchase Price**"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.02 hereto.

**Section 1.03 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at noon on the Closing Date.

**Section 1.04 Transfer Taxes.** Buyer shall pay, and shall reimburse Seller for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees, or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

**Section 1.05 Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its

intent to withhold prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. dTo the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

**Section 1.06 Allocation of Company Income and Loss.** Buyer and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this Article II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 2 of the Schedules.

**Section 2.01 Organization and Authority of Seller; Enforceability.** Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware. Seller has full limited partnership power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited partnership action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 2.02 No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of limited partnership, limited partnership agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Seller, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party, except where the conflict, violation, default, termination, cancellation, modification, or acceleration would not, individually or in the aggregate, have a

material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents (the "**Beacon Organizational Documents**"); or (e) result in the creation or imposition of any Encumbrance on the Membership Interests. No consent, approval, waiver, or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 2.03 Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 2.04 Financial Statements.** True, correct, and complete copies of any financial statements requested by the Buyer (collectively, the "**Financial Statements**") have been provided to Buyer. To Seller's Knowledge, the Financial Statements, if any, are true, correct, and complete.

**Section 2.05 Ownership of Membership Interests.**

(a) Seller is the sole legal, beneficial, record, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever.

(b) To Seller's Knowledge, the Membership Interests were issued in compliance with applicable laws. To Seller's Knowledge, the Membership Interests were not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c) Other than the organizational documents of the Company, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 2.06 Beacon Organizational Documents.** The Seller has provided Buyer a true, correct, and complete copy (including all amendments and modifications) of the Beacon Organizational Documents, which agreement is in full force and effect and is the only agreement in effect with respect to the matters described therein.

**Section 2.07 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 2.08 Non-Foreign Status.** Seller is not a foreign person as defined in Treasury Regulations Section 1.1446(f)-1(b)(4) or Section 1.1445-2.

**Section 2.09 No Other Representations or Warranties.** Except for the representations and warranties contained in this ARTICLE II, neither Seller nor any partner, director, officer, employee, or agent of Seller has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE III are true and correct as of the date hereof. For purposes of this ARTICLE III, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 3 hereto.

**Section 3.01 Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 3.02 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, LLC agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Buyer, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby on a timely basis. No consent, approval, waiver, or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Buyer's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 3.03 Investment Purpose.** Buyer is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in

connection with, any distribution thereof. Buyer acknowledges that the Membership Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

**Section 3.04 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 3.05 Legal Proceedings.** There is no Action pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby on a timely basis. To Buyer's knowledge, no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 3.06 Buyer's Assumption of Risk and Liabilities**. Buyer acknowledges and agrees that it is purchasing the Membership Interests in the Company on an "as-is, where-is" basis, with all faults and conditions, whether known or unknown. Buyer further acknowledges that it has conducted its own due diligence and waives any claim against Seller for any matters arising out of or related to the Company's operations, liabilities, or legal compliance, whether arising before or after the Closing Date. Buyer assumes all risks and liabilities associated with the ownership of the Membership Interests, including but not limited to any regulatory, tax, financial, or legal claims or disputes that may arise in the future whether at law or in equity. In the event that any claim, lawsuit, or governmental investigation or action is initiated against Seller related to the Company or the transactions contemplated herein, Buyer shall, at its own cost and expense, take all commercially reasonable actions to resolve such claims and shall be solely responsible for any associated costs, judgments, settlements, or penalties. Seller shall have no obligation to participate in such proceedings and shall be released from any liability related thereto.

## ARTICLE IV
## CLOSING DELIVERIES

**Section 4.01 Seller's Deliveries.** At the Closing, Seller shall deliver to Buyer the following:

(a) an assignment of the Membership Interests to Buyer in substantially the form attached hereto as Exhibit A (the "**Assignment**"), executed by Seller.

(b) A certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to (i) the resolutions of the board of directors (or equivalent managing body) of Seller, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (ii) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder.

**Section 4.02 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The Purchase Price.

(b) The Assignment, executed by Buyer.

(c) A certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying as to (i) the resolutions of the board of directors (or equivalent managing body) of Buyer, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (ii) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder.

## ARTICLE V
## NO INDEMNIFICATION

**Section 5.01 No Indemnification.** The parties acknowledge and agree that there shall be no indemnification obligation on behalf of either party in connection with this Agreement, the representations, warranties, and covenants contained herein, or any of the instruments or documents delivered in connection with this Agreement.

**Section 5.02 Exclusive Remedies.** The parties acknowledge and agree that following the closing, the provisions of this ARTICLE V shall be their exclusive remedy for any and all claims relating to the subject matter of this Agreement or any of the other documents to be delivered hereunder, except for claims arising from intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement.

## ARTICLE VI
## MISCELLANEOUS

**Section 6.01 Expenses.** Except as otherwise provided in Section 1.04, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 6.02 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 6.03 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient

or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.03):

| | |
|---|---|
| If to Seller: | Rand PE Fund Management, LLC<br>6716 Glenhurst Drive<br>Dallas, TX 75254<br>E-mail: MPatrick@randadvisors.com<br>Attention: Mark Patrick |
| If to Buyer: | CLO HoldCo, LLC<br>6716 Glenhurst Drive<br>Dallas, TX 75254<br>E-mail: mpatrick@dafholdco.com<br>Attention: Mark Patrick |

**Section 6.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.05 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify the Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 6.06 Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in documents to be delivered hereunder, the Exhibits and Schedules (other than an exception expressly set forth as such in the Schedules), the statements in the body of this Agreement will control.

**Section 6.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 6.08 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 6.09 Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 6.10 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 6.11 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

**Section 6.12 Submission to Jurisdiction.** Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Texas in each case located in the city of Dallas and county of Dallas, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

**Section 6.13 Waiver of Jury Trial.** Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 6.14 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Each party hereto (i) agrees that it shall not oppose the granting of such specific performance or relief and (ii) hereby irrevocably waives any requirements for the security or posting of any bond in connection with such relief.

**Section 6.15 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

RAND PE FUND I, L.P.,
a Delaware limited partnership

By: Rand PE Fund Management, LLC
Its: General Partner

By ____________________
Name: Mark Patrick
Title: Authorized Signatory

CLO HOLDCO, LLC,
a Delaware limited liability company

By ____________________
Name: Mark Patrick
Title: Director of the Manager, CDH GP, Ltd.

[Signature Page to Membership Interest Purchase Agreement]

Schedule 1.02

[Included]

Schedule 2

1. Mark Patrick
2. Shawn Raver

Schedule 3

1. Mark Patrick
2. Shawn Raver

Exhibit A

Assignment of Membership Interests

[See attached]

# Assignment of Membership Interest

This Assignment of Membership Interest (this "**Assignment**") is entered into as of February 12, 2025, by and between RAND PE FUND I, L.P., a Delaware limited partnership ("**Assignor**"), and CLO HOLDCO, LLC, a Delaware limited liability company ("**Assignee**").

## RECITALS

WHEREAS, Assignor owns, beneficially and of record, 100% of the issued and outstanding membership interests (including all voting, consent, and economic rights associated with such membership interests, the "**Membership Interests**") of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**");

WHEREAS, Assignor and Assignee have entered into that certain Membership Interest Purchase Agreement, dated February 12, 2025 (the "**Purchase Agreement**"), pursuant to which, among other things, Assignor has agreed to sell, assign, and transfer all of its right, title, and interest in and to, and Assignee has agreed to accept, the Membership Interests; and

WHEREAS, in order to effect the sale, transfer, and assignment of the Membership Interests to Assignee, Assignor and Assignee are executing and delivering this Assignment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby sells, assigns, and transfers to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the Membership Interests.

2. Terms of the Purchase Agreement. This Assignment is made in accordance with, and is subject to, the terms and conditions of the Purchase Agreement. Nothing in this Assignment, express or implied, is intended to or shall be construed to modify, expand, or limit any of the terms of the Purchase Agreement. Assignor and Assignee acknowledge and agree that no representations and warranties are made in this Assignment. The representations, warranties, covenants, and agreements contained in the Purchase Agreement shall not be superseded by this Assignment but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3. Definitions. All capitalized terms used in this Assignment but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

4. Further Assurances. Each of Assignee and Assignor shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances, and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment.

5. Successors and Assigns. This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

6. Amendment and Modifications. This Assignment may not be amended or modified in any manner other than by a written agreement signed by the party to be charged.

7. Governing Law. This Assignment shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

8. Counterparts. This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignee and Assignor have executed this Assignment as of the date set out above.

RAND PE FUND I, L.P.,
a Delaware limited partnership

By: Rand PE Fund Management, LLC
Its: General Partner

By: ______________
Name: Mark Patrick
Title: Authorized Signatory

CLO HOLDCO, LLC,
a Delaware limited liability company

By: ______________
Name: Mark Patrick
Title: Director of the Manager, CDH GP, Ltd.

# EXHIBIT 1

MEMBER CONSENT
OF
BEACON MOUNTAIN, LLC

February 12, 2025

THE UNDERSIGNED sole member (the "**Member**") of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"), acting pursuant to the Delaware Limited Liability Company Act, does hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as February 12, 2025 (the "Purchase Agreement"), by and between RAND PE FUND I, L.P. (as "Seller"), and CLO HOLDCO, LLC, the Sole Member purchased from Seller all of the issued and outstanding membership interests in the Company;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person's successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an "**Officer**"):

| **Name** | **Office** |
|---|---|
| Mark Patrick | President, Secretary and Treasurer |

RESOLVED FURTHER, that any individual previously appointed as an officer of the Company but not named above is hereby removed from the office of the Company;

RESOLVED FURTHER, that each Officer is hereby, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that all authorized acts and deeds of the Officers, managers and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the Company; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the undersigned Sole Member has executed this Consent to be effective as of the date first set forth above.

SOLE MEMBER

CLO HOLDCO, LLC, a Delaware limited liability company

By:__________________________________
Mark Patrick, Manager

*Signature Page*

# EXHIBIT 1

# Amended and Restated Limited Partnership Agreement of Atlas IDF, LP

A DELAWARE "SERIES" LIMITED PARTNERSHIP

**As of November 30, 2015**

## Exhibit A

Neither Atlas IDF, LP nor the limited partner interests therein ("**Interests**") have been or will be registered under the Securities Act of 1933, as amended ("**Securities Act**"), the Investment Company Act of 1940, as amended, or the securities laws of any of the States of the United States. The offering of the Interests is being made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering, and analogous exemptions under state securities laws.

These securities are subject to restrictions on transferability and resale, may not be transferred or resold, except: (i) as permitted under the Securities Act and applicable state securities laws pursuant to registration or exemption therefrom, and (ii) in accordance with the requirements and conditions set forth in this Amended and Restated Limited Partnership Agreement.

This Amended and Restated Limited Partnership Agreement of Atlas IDF, LP, a Delaware "series" limited partnership ("**Partnership**"), is entered into as of November 30, 2015 ("**Agreement**") by and among: (i) Atlas IDF GP, LLC, a Delaware limited liability company ("**General Partner**"), with an address at 87 Railroad Place, Suite 403, Saratoga Springs, New York, 12866; (ii) such persons and entities who are or may become limited partners in accordance with the terms hereof ("**Limited Partners**"; and, together with the General Partner, shall collectively be referred to as the "**Partners**"); (iii) John Honis, as the initial Limited Partner ("**Initial Limited Partner**"); and (iv) such other persons who may become parties to this Agreement from time to time.

**WITNESSETH:**

**WHEREAS**, the General Partner and the Initial Limited Partner entered into a Limited Partnership Agreement, dated and effective as of October 29, 2015 ("**Current Agreement**"); and

**WHEREAS**, the General Partner desires to amend and restate the Current Agreement in its entirety pursuant to, and in accordance with the terms of, **Section 28** thereof, including to reflect the conversion of the Partnership into a "series" limited partnership.

**NOW THEREFORE**, in consideration of the mutual promises of the parties hereinafter set forth and of other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned parties agree to amend and restate the Current Agreement in its entirety with the following terms and conditions:

# ARTICLE I
## GENERAL PROVISIONS

**Section 1.01** **Formation of Partnership**. The Partnership was formed as a limited partnership under the Delaware Revised Uniform Limited Partnership Act (as in effect on the date hereof and as amended from time to time, the "**Act**") by the filing of its Certificate of Limited Partnership (the "**Certificate**") with the Secretary of State of the State of Delaware (the "**Delaware Secretary**") on October 29, 2015. On November 19, 2015, an amended Certificate was filed with the Delaware Secretary to convert the Partnership into a "series" limited partnership under Section 17-218 of the Act. The General Partner, for itself and as agent for the Limited Partners, shall accomplish all filing, recording, publishing and other acts necessary or appropriate for compliance with all the requirements for the formation and operation of the Partnership as a limited partnership under this Agreement and the Act and under all other laws of the State of Delaware and such other jurisdictions in which the General Partner determines that the Partnership may conduct business. Each Limited Partner admitted to the Partnership by the General Partner shall promptly execute all relevant certificates and other documents, as the General Partner shall request.

**Section 1.02** **Partnership Name**. The name of the Partnership is Atlas IDF, LP.

**Section 1.03** **Purpose**. The Partnership was organized for the purpose of investing and trading in a wide variety of securities and financial instruments, domestic and foreign, of all kinds and descriptions, whether publicly traded or privately placed, including but not limited to, common and preferred stocks, bonds and other debt securities, convertible securities, limited partner interests, mutual fund shares, options, warrants, commodities, futures, derivatives (including swaps, forward contracts and structured instruments), currencies, monetary instruments, and cash and cash equivalents. In furtherance of the foregoing, the Partnership may engage in any lawful act or activity for which limited partnerships may be formed under the Act, and any and all activities necessary or incidental thereto, including any other business activities described in the Partnership's confidential private placement memorandum (as amended and supplemented from time to time, the "**Memorandum**"). In addition to investing in individual traded assets, the Partnership may invest a significant portion of its assets in other investment vehicles, including, without limitation, hedge funds, managed accounts and other private investment funds (collectively, the "**Portfolio Funds**"), including those managed by, or otherwise affiliated or related to, the Investment Manager (as defined in **Section 3.01**). Portfolio Funds may allocate their assets to Illiquid Investments (as defined in **Section 9.07(a)**).

**Section 1.04** **Place of Business**. The Partnership shall have offices located at 87 Railroad Place, Suite

403, Saratoga Springs, New York, 12866, or elsewhere as the General Partner may from time to time determine. The Partnership may have more than one (1) office as may from time to time be determined by the General Partner.

**Section 1.05** **Fiscal Year**. The fiscal year of the Partnership (the "**Fiscal Year**") shall end on December 31 of each year, except that it may be changed at any time by the General Partner in its sole discretion. In the event that the General Partner changes the Partnership's Fiscal Year, the dates and time periods referred to in this Agreement shall be appropriately adjusted.

**Section 1.06** **Term of Partnership**. The term of the Partnership commenced upon filing of the Partnership's Certificate with the Delaware Secretary and shall continue indefinitely; *provided, however*, that the Partnership shall be dissolved forthwith upon the occurrence of any one of the events set forth in **Section 13.01**.

## ARTICLE II
## COMPOSITION; ADMISSIONS

**Section 2.01** **Names of the Partners**. Atlas IDF GP, LLC, a Delaware limited liability company, is the sole general partner of the Partnership as of the date hereof. The names and addresses of the General Partner and of each of the Limited Partners shall be set forth in the records of the Partnership to be kept on file at all times at the principal place of business of the Partnership.

**Section 2.02** **Admission of Partners**. Additional Limited Partners (as defined in **Section 8.01**) may be admitted to the Partnership at such times as provided in **Article VIII**. In connection with the admission of a Limited Partner to the Partnership, such Limited Partner shall, in advance of such admission and as a condition thereto, sign a copy of this Agreement or an agreement to become bound by the provisions of this Agreement and such other subscription materials as shall be determined by the General Partner. Upon the admission of a Limited Partner, the Initial Limited Partner listed on the signature page hereof shall automatically be deemed to have withdrawn from the Partnership. For the avoidance of doubt, the General Partner shall be permitted to make an investment in the Partnership and be issued Partnership Interests hereunder, and such Interests of the General Partner shall be treated as a Limited Partner's Partnership Interests hereunder. A substitute general partner and additional general partners may be admitted to the Partnership as provided in **Article IV**.

**Section 2.03** **Partnership Interests**.

(a) For purposes of this Agreement, the term "**Partnership Interest**" shall mean the quotient resulting from dividing (i) the amount in a Partner's Capital Account (as defined in **Section 9.01**), including the fair value of such Partner's interests in any Side Pocket Accounts (as defined in **Section 9.07**) or New Issues Accounts (as defined in **Section 9.08(a)**) and other memorandum accounts, by (ii) the aggregate amount in the Capital Accounts of all Partners, including the fair value of any Side Pocket Accounts, New Issues Accounts and other memorandum accounts. "**Partnership Interests**" shall mean the sum of all amounts in the Capital Accounts of all Partners (including all Side Pocket Accounts, New Issues Accounts and other memorandum accounts).

(b) The Partnership is an "insurance-dedicated" fund. The Partnership Interests are being offered only to Limited Partners that are: (x) insurance company investors, on behalf of certain of their segregated separate accounts ("**Separate Accounts**"), that fund certain variable life insurance and variable annuity contracts (collectively, the "**Policies**") to be issued to policy owners (each, a "**Policy Owner**") by the Limited Partners, or (y) state or local government pension plans, qualified tuition plans ("**§529 plans**"), and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). In addition, if an investor is an insurance company, such investor must require its Policy Owners to meet certain suitability standards, as further set forth in the Memorandum. While an insurance company, not a Policy Owner, will become a Limited Partner in the Partnership, it is expected that Policy Owners will be able to allocate a portion of their investment held in the Separate Account to the Partnership as one of the investment options of the Policies.

Each life insurance company Limited Partner will be deemed to hold a Partnership Interest in respect of the account of each Policy Owner and will be treated as a separate Limited Partner with respect to each such Partnership Interest.

**Section 2.04** **Issuance of Interests in Series**.

(a) Pursuant to Section 17-218 of the Act, the Partnership Interests will be offered in separate series ("**Series**"). The Partnership is currently offering one Series of Partnership Interests: "**Series 1 Partnership Interests**". Each Series of Partnership Interests will have separate rights and obligations.

(b) In addition, each Series of Partnership Interests may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series of Partnership Interests in the future, which may have rights and obligations that differ from those of the Series 1 Partnership Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined) and other rights and terms. The terms of such additional Series shall be determined by the General Partner, in its sole discretion.

(c) Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership shall maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series. The Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.

(d) Pursuant to Section 17-218 of the Act, (i) the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular Series shall be enforceable against the assets of such Series only, and not against the assets of any other Series, and (ii) none of the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to the Partnership generally or any other Series shall be enforceable against the assets of such Series.

(e) As of the date hereof, the Investment Manager intends to allocate approximately 45% of the Series 1 investment portfolio to traded investments and approximately (but not more than) 55% of the Series 1 investment portfolio to the first series of limited partnership interests to be issued by the PE Portfolio Fund (as defined in **Section 2.04(f)**). However, the Investment Manager reserves the right to change such allocation in the future, subject to compliance with all applicable laws, including the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(f) As of the date hereof, (i) the Investment Manager acts as the investment manager to Rand PE Fund I, L.P., a Delaware "series" limited partnership ("**PE Portfolio Fund**") that: (x) is expected to initially invest in the Highland Transaction (as defined in the Memorandum), if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal (as defined in the Memorandum) is the managing member and controlling person of Rand PE Fund Management, LLC; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series, as further set forth in the Memorandum.

(g) Unless the context otherwise requires, Series 1 Partnership Interests and any other Series of Partnership Interests shall be collectively referred to throughout this Agreement as the "**Partnership Interests**." As the context may require, the holders of Series 1 Partnership Interests may be referred to herein as "**Series 1 Limited Partners**". Series 1 Limited Partners and, to the extent applicable, all the Limited Partners of other Series shall be collectively referred to throughout this Agreement the "**Limited Partners**".

(h) References herein to the Partnership shall include, where appropriate, each Series of the Partnership. The terms of the other Series may be set forth in an amended version of this Agreement and/or in a separate supplement thereto.

## ARTICLE III
## MANAGEMENT

**Section 3.01** **Management of Partnership**

(a) The business and affairs of the Partnership shall be managed exclusively by the General Partner. The Limited Partners shall take no part in the management or control of the Partnership's business and shall have no authority to act for or bind the Partnership. The General Partner shall have sole discretion and authority to select investments, shall invest the funds of the Partnership from time to time as the General Partner deems appropriate in accordance with the purposes set forth in **Section 1.03**, and shall have (without limitation) the powers set forth in **Section 3.02**. The General Partner may select an investment manager ("**Investment Manager**") to provide all or any portion of the portfolio management services required by the Partnership, including the valuation of assets of the Partnership. The Investment Manager may be changed from time to time by the General Partner in its sole and absolute discretion. The initial Investment Manager shall be Rand Advisors, LLC, a Delaware limited liability company and an affiliate of the General Partner. If at any time there is no Investment Manager, then the General Partner shall provide such portfolio management services, and be subject to the provisions of this Agreement applicable to the Investment Manager.

(b) Each of the General Partner and the Investment Manager shall not be required to devote its full time to the business of the Partnership, but shall devote so much of its time and efforts to the affairs of the Partnership as may in its judgment be necessary to accomplish the purposes of the Partnership. Nothing herein contained shall prevent the General Partner or the Investment Manager from conducting any other business, including any business with respect to securities (and/or other investments), whether or not such business ventures are in direct or indirect competition with the Partnership. Each of the General Partner and the Investment Manager is not prohibited from buying or selling securities for its own account, including the same securities (and/or other investments) as are purchased, sold or held by the Partnership, but none of the General Partner, the Investment Manager or any of their respective affiliates (which shall not include, for purposes of this paragraph, advisory clients or managed funds) shall buy securities (and/or other investments) from or sell securities (and/or other investments) to the Partnership without the written consent of either all Limited Partners or a committee of independent Limited Partners.

**Section 3.02** **Powers of the General Partner**. Without in any way intending to limit the powers of the General Partner, the General Partner shall have the right, power and authority on behalf of the Partnership (or to delegate any portion of such rights, power and authority):

(a) As provided in **Section 3.01**, to allocate all of the assets of the Partnership among securities (and/or other investments) to be selected by the General Partner in its sole and absolute discretion, including, but not limited to the right to:

(i) purchase, hold and sell securities (and/or other investments) and rights therein of any kind or nature;

(ii) allocate any and all of the assets of the Partnership among a number of Portfolio Funds;

(iii) purchase, hold, sell and otherwise deal in put and call options, monetary instruments and any combinations thereof and any other financial instruments or contracts of any nature or kind;

(iv) maintain margin accounts with brokers, pledge securities for loans and, in connection with any such pledge, effect borrowings from brokers or banks in such amounts as may be determined from time to time; and

(v) transact business through brokers and dealers and other persons selected by the General Partner in its sole discretion, and in selecting such brokers, dealers and other persons, and determining the compensation payable to such persons, it shall seek to obtain the best execution for the Partnership taking into account the value of any research and brokerage services or products provided by such persons to the General Partner or the Partnership even though other persons may be able to provide transactional services (without any accompanying research or brokerage services or products) at lower rates of compensation;

(b) To acquire and enter into any contract of insurance that the General Partner deems necessary or appropriate for the protection of the Partnership and the General Partner or for any purpose convenient or beneficial to the Partnership;

(c) To engage in any transaction with affiliates of the General Partner, including entering into and amending and restating an investment management agreement with the Investment Manager (any such agreement, in effect from time to time, "**Investment Management Agreement**"), subject to the restrictions in **Section 3.01(b)**;

(d) To employ persons, whether full-time or part-time, in the operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner shall determine, regardless of whether or not such persons also may be employed by the General Partner or its affiliates;

(e) To file, conduct and defend legal proceedings of any form, including proceedings against Partners, and to compromise and settle any such proceedings or any claims, including claims against Partners, on whatever terms deemed appropriate by the General Partner;

(f) To open brokerage, bank and other accounts and, to the extent that funds are not invested, to deposit and maintain such funds in the name of the Partnership in such accounts and to temporarily invest such funds in short term United States and/or foreign government securities, money market accounts and/or other short term interest-bearing instruments; *provided, however*, that the Partnership's funds shall not be commingled with the funds of any other person or entity;

(g) To cause the Partnership to make or revoke any of the elections referred to in Section 754 of the Internal Revenue Code of 1986, as amended ("**Code**"), or any similar provision enacted in lieu thereof;

(h) To act as the "tax matters partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code;

(i) To select as its accounting year the annual period ending December 31 or any other Fiscal Year as is permitted by the Internal Revenue Service ("**IRS**");

(j) To engage independent accountants, attorneys, investment managers, sub-advisers, broker-dealers, administrators, custodians, consultants and such other persons as the General Partner may deem necessary or advisable;

(k) To establish and maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent or acquire office space, engage personnel, whether part time or full time, and do such other acts and incur such expenses as the General Partner may deem necessary or advisable in connection with the maintenance or administration of such office;

(l) To require a provision in any Partnership contract that the General Partner shall not have any personal liability therefor, but that the person or entity contracting with the

Partnership is to look solely to the Partnership and its assets for satisfaction;

(m) To purchase and sell Partnership assets at such price or amount for cash, securities or other property and upon such terms as are deemed in the General Partner's absolute discretion to be in the best interests of the Partnership;

(n) To prepare (or cause to be prepared), execute, acknowledge and/or deliver any and all instruments to effectuate the business of the Partnership, including, but not limited to, annual and/or interim reports, a copy of which shall be delivered to each Partner, as provided in **Sections 3.06(b) and 13.05**;

(o) To effect on behalf of the Partnership any "agency cross transaction" (as contemplated in Rule 206(3)-2 under the U.S. Investment Advisers Act of 1940, as amended ("**Advisers Act**")) through the General Partner or any of its affiliates that is registered as a broker or dealer; *provided* that the authority granted in this subsection may be revoked at any time by the General Partner or by vote or consent of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners;

(p) To "cross" any transaction for the purchase or sale of securities between two or more advisory clients or managed funds, including the Partnership (as contemplated in Rule 206(3) under the Advisers Act and interpretations thereunder) ("**Cross Trading**"); *provided* that the General Partner receives no additional compensation in connection with such Cross Trading activities, and subject to the restrictions in **Section 3.01(b)**;

(q) To waive or reduce, in whole or in part, any notice period, minimum amount requirement, or other limitation or restriction imposed on Capital Contributions (as defined in **Section 8.01**), withdrawals of capital, any fee, any payment to the General Partner and/or any requirement imposed on a Limited Partner by this Agreement, regardless of whether such notice period, minimum amount, limitation, restriction, withdrawal provision, fee, payment or other requirement of this Agreement, or the waiver or reduction thereof, operates for the benefit of the Partnership, the General Partner or fewer than all the Limited Partners;

(r) To establish such reserves for the Partnership as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with U.S. generally accepted accounting principles ("**GAAP**"));

(s) To value the assets and liabilities of the Partnership;

(t) To create special purpose vehicles to make or pursue investments either alone or as a joint-venture with other persons or entities;

(u) To establish and offer multiple Series of Partnership Interests with such rights and privileges as the General Partner shall determine, and to amend this Agreement in connection therewith to reflect such multi-Series structure;

(v) To convert the Partnership from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, and to amend this Agreement pursuant thereto to reflect such master-feeder structure;

(w) To create a liquidating fund entity (e.g., a liquidating trust or similar vehicle), and to transfer all or a portion of the Partnership's assets to such entity for any reason, including an orderly liquidation of any illiquid Partnership assets; and

(x) To do any act, engage in any activity or execute any agreement of any nature, necessary or incidental to the accomplishment of the purposes of the Partnership in accordance with the provisions of this Agreement, the Memorandum and all applicable federal, state and local laws and regulations.

**Section 3.03** **Actions of General Partner**. The General Partner is authorized, directed and empowered to act individually on behalf of the Partnership, and in accordance therewith, to execute all documents and instruments on behalf of the Partnership. Third parties may rely on the execution of any documents on behalf of the Partnership by the General Partner.

**Section 3.04** **Liability and Indemnification**

(a) None of the General Partner, the Investment Manager or any of the Investment Manager Affiliates (as defined in **Section 6.02(a)**) shall be liable to the Partnership or the Limited Partners for any action or inaction in connection with the business and affairs of the Partnership unless such action or inaction is determined by a final, non-appealable decision of a court of competent jurisdiction to constitute gross negligence or willful misconduct. It shall be conclusively presumed and established that the General Partner, the Investment Manager and such persons acted in good faith if any action is taken, or not taken, by any of them on the advice of legal counsel or other independent outside consultants; *provided* that the General Partner, the Investment Manager and such persons did not act with gross negligence or willful misconduct in the selection of such counsel or consultants. Any exculpation under this **Section 3.04(a)** shall apply only to the extent that such exculpation does not violate applicable federal and state laws.

(b) The Partnership shall indemnify and hold harmless the General Partner, the Investment Manager and the Investment Manager Affiliates (which, for purposes of this **Section 3.04(b)**, shall include fund counsel (except for legal malpractice)) from and against any and all claims, liabilities, obligations, judgments, suits, proceedings, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding (made or threatened) related to any action or inaction by any of them in connection with the business and affairs of the Partnership (including the settlement or appeal of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final, non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 3.04(b)** shall be paid from and to the extent of Partnership assets only, and shall apply only to the extent that such indemnity does not violate applicable federal and state laws. The Partnership shall, in the sole discretion of the General Partner, advance amounts and/or pay expenses as incurred in connection with the indemnification obligation herein. In the event this indemnification obligation shall be deemed unenforceable, whether in whole or in part, such unenforceable portion shall be stricken or modified so as to give effect to this paragraph to the fullest extent permitted by law. For the avoidance of doubt, the foregoing indemnification provisions shall apply on a Series-by-Series basis.

(c) If, to the extent, and at such times as, any assets of the Partnership are deemed to be "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), of any Limited Partner that is an employee benefit plan governed by ERISA, the General Partner shall be, and hereby acknowledges that it shall be considered to be, a fiduciary within the meaning of Section 3(21) of ERISA as to that Limited Partner. In such an event, or if any manager, member, officer, employee, agent or affiliate of the General Partner, is ever held to be a fiduciary of any Limited Partner, then, in accordance with Sections 405(b)(1), 405(c)(2) and 405(d) of ERISA, the fiduciary responsibilities of that person shall be limited to the person's duties in administering the business of the Partnership, and the person shall not be responsible for any other duties to such Limited Partner, specifically including evaluating the initial or continued appropriateness of this investment in the Partnership under Section 404(a)(1) of ERISA.

**Section 3.05** **No Prohibition Against Other Business Ventures**. Each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may engage and hold interests in other business ventures of every kind and description for its own account, including, without limitation, other investment entities similar to the Partnership, whether or not such

business ventures are in direct or indirect competition with the Partnership, and whether or not the Partnership or any of the Partners also has an interest therein, without having to account to the Partnership or any Partner for any profits or other benefits derived therefrom and without incurring any obligation to offer any interest in any such activity to the Partnership or any Partner.

**Section 3.06** **<u>Duty to Keep Books, Financial and Tax Reports</u>**

(a) At all times during the existence of the Partnership, the General Partner shall keep true and complete records and books of account, in which each transaction of the Partnership shall be entered fully and accurately. The General Partner has the power, in its sole and absolute discretion, to delegate some or all of the administrative bookkeeping functions relating to the Partnership to an administrator or other agent, which may be the Partnership's accountants.

(b) The General Partner shall cause to be prepared and distributed to each Partner as soon as practicable following each Fiscal Year the Partnership's annual financial statements prepared in accordance with GAAP (except to the extent that the Memorandum or this Agreement states or contemplates that such statements may be inconsistent with GAAP) and audited by an independent certified public accounting firm. The General Partner shall also have prepared and filed all federal, state and local income, franchise, gross receipts, payroll and other tax returns that the Partnership is obligated to file. Subject to the limitations set forth in **<u>Section 5.04</u>**, copies of all Partnership tax returns, information returns or reports shall be available to all Partners as soon as possible after the close of the Partnership's Fiscal Year at the principal office of the Partnership. Copies of each Partner's Schedule K-1 of the Partnership's Tax Return (Form 1065) shall be distributed to such Partner as soon as practicable after the close of the Partnership's Fiscal Year. The General Partner may agree to provide certain Limited Partners with additional information on the underlying investments of the Partnership, as well as heightened access to the General Partner, the Investment Manager and their respective employees for relevant information. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

(c) The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the International Financial Reporting Standard ("**<u>IFRS</u>**"). In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

## ARTICLE IV
## GENERAL PARTNER RESIGNATION; TRANSFER OF GENERAL PARTNER INTEREST; CONTINUATION OF PARTNERSHIP; SUBSTITUTION OF GENERAL PARTNER

**Section 4.01** **<u>General Partner Resignation and Involuntary Withdrawal; Admission of Additional General Partners and Transfer by General Partner</u>**

(a) The General Partner shall not be permitted to voluntarily withdraw or resign as the general partner of the Partnership, except upon no less than thirty (30) days' prior written notice to all Limited Partners. In the event of dissolution of the General Partner, or if a voluntary or involuntary petition for bankruptcy shall be filed by or against the General Partner, or the General Partner shall make any assignment for the benefit of its creditors (any of the foregoing, an "**<u>Involuntary Withdrawal</u>**"), the General Partner or the General Partner's trustee, receiver or assignee shall have none of the rights and powers of a general partner hereunder, and shall have no authority to act on behalf of the Partnership or have any voice in the management and operation of the Partnership, except as provided in **<u>Section 13.02</u>**.

(b) The General Partner may admit additional general partners to the Partnership at such times as the General Partner shall determine, without the consent of the Limited Partners. Notwithstanding anything herein to the contrary, the General Partner shall have the right to transfer its interest, as the general partner of the Partnership, to any affiliate of the General Partner, including any person or entity controlled by the

General Partner, controlling the General Partner or under common control with the General Partner, without the consent of the Limited Partners. In the event of such transfer by the General Partner to an affiliate, the General Partner shall not be deemed to have resigned or withdrawn from the Partnership for purposes of **Section 13.01(a)**. Any affiliate transferee of the General Partner under this **Section 4.01(b)** shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to such transfer. The General Partner shall not assign, transfer, sell, mortgage or otherwise encumber or transfer its interest as the general partner of the Partnership, except as set forth herein. Any additional general partner or transferee of the General Partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. For the avoidance of doubt, should the General Partner transfer its interest, as the general partner of the Partnership, to any non-affiliate of the General Partner, the Limited Partners shall have the right to revoke such appointment within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners.

**Section 4.02** **Continuation of Partnership; Appointment of Substitute General Partner by Limited Partners**. If an event as set forth in **Section 13.01(a)** occurs, the Limited Partners shall have the right, within ninety (90) days after such event, by affirmative vote of Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, to appoint a substitute general partner, in which event the Partnership shall not dissolve and shall continue its existence.

**Section 4.03** **Substitute General Partner Requirements**. Any substitute general partner shall execute and acknowledge any and all instruments that are necessary or appropriate to effect the admission of any such person or entity as a substitute general partner, including, without limitation, the written acceptance and adoption by such person of the provisions of this Agreement and, if required by the Act, an amendment of the Certificate. Any successor to such office of general partner shall assume the status of and shall have all of the rights, powers and obligations that the General Partner possessed prior to its withdrawal, resignation or Involuntary Withdrawal from the Partnership.

## ARTICLE V
## STATUS, RIGHTS, POWERS AND VOTING RIGHTS OF LIMITED PARTNERS

**Section 5.01** **Limited Liability**. No Limited Partner, Substitute Limited Partner (as defined in **Section 10.02**) or Additional Limited Partner shall be personally liable or bound for the expenses, liabilities or obligations of the Partnership or the relevant Series beyond the amount in such Partner's Capital Account in the relevant Series, from time to time, including any amounts thereof attributable to Capital Contributions, except that such Partner may be obligated to return all or a portion of any distributions (including withdrawal proceeds) received from the Partnership (x) in an amount up to its aggregate Capital Contributions in the relevant Series (including any income or gains thereon) to the Partnership in order to pay such Partner's *pro rata* share of any Partnership liabilities that arose while such Partner held Partnership Interests, and (y) as required under **Section 5.02(b)**.

**Section 5.02** **Capital Contributions**

(a) No Limited Partner shall be entitled to a return of such Limited Partner's Capital Contribution or any portion thereof, except as set forth in **Section 7.01**, and no time has been agreed upon for the return of any Partner's Capital Contribution, except as herein provided.

(b) Each Limited Partner, if such Limited Partner receives a return of all or any part of such Limited Partner's Capital Contribution, may, to the extent provided for in the Act, be liable to the Partnership or the relevant Series for an amount equal to such distribution, if at the time of such distribution, the Limited Partner knew the

Partnership or the relevant Series was prohibited from making such distribution under the Act.

**Section 5.03** **Liability of Limited Partner for Additional Contributions and Loans**. No Limited Partner shall be obligated to provide any contributions to the Partnership, other than the Original Capital Contribution (as defined in **Section 9.02**) of such Limited Partner. No Limited Partner shall be obligated to make any loan to the Partnership.

**Section 5.04** **Rights of Limited Partners to Inspect Books, Records, and Partnership Documents**. Upon reasonable advance written notice and during reasonable business hours, a Limited Partner may inspect and copy, at the Limited Partner's expense and solely for a purpose reasonably related to the Limited Partner's interest as a Partner, the records of the Partnership required to be maintained pursuant to Section 17-305 of the Act and any financial statements maintained by the Partnership. Any such inspection must be in good faith without any intent to damage the Partnership or any of its Partners in any manner. Notwithstanding the foregoing, the General Partner in its discretion may limit the information that a Limited Partner may obtain pursuant to this **Section 5.04** to the extent that such information shall allow a Limited Partner to identify any other Limited Partner. As a result, each Limited Partner agrees and acknowledges that any books and records of the Partnership made available to a Limited Partner for inspection may be redacted to exclude any information concerning the identity of the other Limited Partners, and, to the extent such books and records cannot be so redacted, such books and records may be withheld for inspection to such requesting Limited Partner. Copies of this Agreement and all amendments hereto shall be furnished to each Limited Partner upon request. For the avoidance of doubt, the foregoing reporting provisions shall apply on a Series-by-Series basis.

**Section 5.05** **No Restriction on Other Activities**. Limited Partners may engage and hold interests in business ventures of every kind and description for their own accounts, including, without limitation, business ventures which are, directly or indirectly, in competition with the Partnership and whether or not the Partnership or any of the Partners also has an interest therein. Neither the Partnership nor any of the Partners shall have any rights in such independent business ventures by virtue of this Agreement.

**Section 5.06** **Voting Rights**. In addition to the rights to vote conferred upon the Limited Partners in **Sections 3.01(b), 3.02, 4.02 and 13.02** or otherwise specifically set forth herein, Limited Partners shall have the right to vote on amendments to this Agreement to the extent provided in **Section 14.08**.

**Section 5.07** **Constructive Consent by Limited Partners**. In the event that the General Partner requires the consent of the Limited Partners in order to take action (including approving amendments to this Agreement), and written notice of such action is sent to any such Limited Partners by (i) certified mail, return receipt requested, (ii) electronic mail, or (iii) overnight delivery by a reputable private carrier or by the postal service, those Limited Partners not affirmatively objecting in writing within thirty (30) days after such notice is deemed to have been mailed or sent (under **Section 14.01**) be deemed to have consented to the proposed action set forth in the General Partner's notice.

**Section 5.08** **Rights as to Dissolution**. The Limited Partners shall have no right or power to cause the dissolution and winding up of the Partnership by court decree or otherwise or to withdraw or reduce their Capital Contributions, except as set forth in the Certificate and this Agreement. No Limited Partner shall have the right to bring an action for partition against the Partnership, and each Partner hereby waives any right to partition of the Partnership's property.

**Section 5.09** **Consent by Partners in Lieu of Meeting**. Any action required by this Agreement or the Act to be taken at any regular or special meeting of the Partners, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Partners (or shall be deemed signed by the Partners pursuant to **Section 5.07**) having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Partners entitled to vote thereon were present and voted.

**Section 5.10** **Non-Voting Interests of BHC Limited Partners; Other Non-Voting Interests**

(a) The portion of any Partnership Interest held for its own account by a BHC Limited Partner (as defined in this **Section 5.10(a)**) whose interests in the Partnership are determined, at any time, to be in excess of 4.99% (or such greater or lesser percentage as may be permitted or required from time to time under Section 4(c)(6) of the Bank Holding Company Act of 1956, as amended ("**BHCA**")) of the aggregate outstanding Partnership Interests of all Limited Partners, excluding any other Partnership Interests that are non-voting Partnership Interests pursuant to this **Section 5.10**, shall be deemed to be non-voting Partnership Interests to the extent of such excess above 4.99% (whether or not subsequently transferred, in whole or in part, to any other person or entity) (collectively, "**Non-Voting Interests**"); *provided* that such Non-Voting Interests shall be permitted to participate in any vote by the Limited Partners on (i) any proposal to dissolve or continue the business of the Partnership under this Agreement, (ii) any vote pursuant to **Section 4.02**, and (iii) matters with respect to which voting rights are not considered to be "voting securities" under 12 C.F.R. § 225.2(q)(2), including such matters which may "significantly and adversely" affect a BHC Limited Partner (such as amendments to this Agreement or modifications of the terms of its Partnership Interest). Except as provided in **Section 13.01(a)**, a BHC Limited Partner shall not be permitted to vote on the selection of any successor general partner of the Partnership, and each BHC Limited Partner irrevocably waives its right to vote its Non-Voting Interest on the selection of a successor general partner of the Partnership under Section 17-801 of the Act, which waiver shall be binding upon such BHC Limited Partner or any person or entity that succeeds to its Partnership Interest. A "**BHC Limited Partner**" shall mean any Limited Partner that is, or is an affiliate of, a bank holding company (as defined in Section 2(a) of the BHCA) that is subject to the provisions of Regulation Y issued by the Board of Governors of the Federal Reserve System.

(b) To the extent permitted by the BHCA, and except as otherwise provided in this **Section 5.10**, Non-Voting Interests shall not be counted as Partnership Interests held by any Limited Partner for purposes of determining whether any vote or consent required by this Agreement has been approved or given by the requisite percentage of the Limited Partners.

(c) Notwithstanding the foregoing, any BHC Limited Partner may elect to no longer be treated as a BHC Limited Partner for the purposes of this Agreement by delivering written notice of such election to the General Partner. Any such election made by a BHC Limited Partner may be rescinded at any time by providing written notice thereof to the General Partner.

(d) The General Partner may, for legal, regulatory or other reasons, designate any other Partnership Interests as non-voting, in whole or in part. Except as provided in this **Section 5.10**, a Partnership Interest held by a Limited Partner as a non-voting Partnership Interest shall be identical in all regards to all other Partnership Interests held by Limited Partners.

(e) For the avoidance of doubt, the provisions of this **Section 5.10** shall apply on a Series-by-Series basis.

## ARTICLE VI
## FEES AND EXPENSES; BROKERAGE PRACTICES

**Section 6.01** **Management Fee**.

(a) In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager shall receive a quarterly management fee ("**Management Fee**") equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined in **Section 9.04**), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|

| | |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

For the avoidance of doubt, the Management Fee calculated based on the foregoing schedule will be calculated on a "progressive" basis. For example, if the Partnership's Net Asset Value reaches $150,000,000, the initial $99,999,999 will always be charged a Management Fee of 0.55000% annually. The benefit of the declining Management Fee schedule above is intended to benefit all Limited Partners as each Capital Account will be charged a blended Management Fee based on the above schedule.

The Management Fee shall be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A *pro rata* Management Fee shall be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No part of the Management Fee shall be refunded in the event that a Limited Partner withdraws, whether voluntarily or involuntarily, all or any of the value in such Limited Partner's Capital Account during any calendar quarter. Management Fees shall be payable with respect to the Partnership Interests of a Limited Partner in any Side Pocket Account.

(b) For purposes of calculating the Management Fee with respect to Side Pocket Accounts, Illiquid Investments (each as defined in **Section 9.07**) shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager.

(c) With respect to any Limited Partner who has requested to withdraw all of its Partnership Interests from the Partnership, with the exception of any Partnership Interests maintained in a Side Pocket Account, the Partnership may reserve an amount from the withdrawing Limited Partner's withdrawal proceeds in order to cover the estimated accrued Management Fees and expenses attributable to the Limited Partner's Partnership Interests in the Side Pocket Account based on the Investment Manager's estimate of the time period that the Illiquid Investments held in the Side Pocket Account shall remain in such Side Pocket Account (collectively, the "**Management Fee Reserve**"). The Management Fee Reserve shall be treated as a liability of the Partnership, and the balance of the Management Fee Reserve, if any, shall be paid to the withdrawing Limited Partner, without interest, upon such Limited Partner's complete withdrawal from the Side Pocket Account.

(d) The Partnership will also bear its *pro rata* share of the management fees charged by the managers of the Portfolio Funds. Notwithstanding the foregoing, the Investment Manager intends to waive any management fees due to the Investment Manager with respect to any investment of the Partnership in any Affiliated Funds (as defined in the Memorandum), including the PE Portfolio Fund (as defined in the Memorandum). Accordingly, to the extent that the Partnership invests in any Affiliated Funds, including the PE Portfolio Fund, the Partnership will not be subject to a layering of fees.

**Section 6.02** **Expenses**

(a) **Organizational and Initial Offering Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or their respective managers, members, shareholders, directors, officers, partners, employees, agents and/or affiliates (collectively, "**Investment Manager Affiliates**") for all organizational

and initial offering expenses of the Partnership, including, but not limited to, legal and accounting fees, printing and mailing expenses and government filing fees (including blue sky filing fees). The Partnership's organizational and initial offering expenses may be, for accounting purposes, capitalized and amortized by the Partnership for up to sixty (60) months from the date the Partnership commences operations. Amortization of such expenses is a divergence from GAAP. In certain circumstances, this divergence may result in a qualification of the Partnership's annual audited financial statements. In such instances, the Partnership may elect to: (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP-conforming changes for financial reporting purposes, but capitalize and amortize expenses for purposes of calculating the Partnership's Net Asset Value (resulting in a divergence in Fiscal Year-end Net Asset Values reported in the Partnership's financial statements, and as otherwise applicable under the provisions of this Agreement). If the Partnership capitalizes and amortizes such expenses and is then terminated within sixty (60) months of its commencement, any unamortized expenses shall be recognized. If a Limited Partner makes a withdrawal prior to the end of the period during which the Partnership is capitalizing and amortizing expenses, the Partnership may, but is not required to, accelerate a proportionate share of the unamortized expenses based upon the amount being withdrawn and reduce withdrawal proceeds accordingly.

(b) **Operating Expenses**. The Partnership shall pay or reimburse the General Partner, the Investment Manager and/or the Investment Manager Affiliates for: (i) all expenses incurred in connection with the ongoing offer and sale of Partnership Interests, including, but not limited to, printing of the Memorandum and exhibits, marketing expenses and documentation of performance and the admission of Limited Partners, (ii) all operating expenses of the Partnership, such as tax preparation fees, governmental fees and taxes, fees to the Partnership's administrator ("**Administrator**"), costs of communications with Limited Partners, and ongoing legal, accounting, auditing, bookkeeping, consulting and other professional fees and expenses, (iii) all Partnership research, trading and investment-related costs and expenses (e.g., brokerage commissions, research fees, margin interest, expenses related to short sales, custodial fees, bank service fees, and clearing and settlement charges), (iv) technology-related costs and expenses, including, but not limited to, software licenses, data feeds and colocation expenses, (v) all expenses related to attending any conference or seminar related to alternative investments (e.g., registration, transportation, accommodation or meal expenses), (vi) regulatory and other filing fees and expenses, (vii) travel expenses related to meeting with management teams, or related to any of the other categories of expenses set forth herein, (viii) any costs and expenses incurred by the Partnership in connection with converting from a stand-alone fund into a "feeder fund" as part of a master-feeder structure, (ix) director and officer liability insurance or other insurance premiums for any principal or employee of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates, (x) all fees and other expenses incurred in connection with the investigation, prosecution or defense of any claims, assertion of rights or pursuit of remedies, by or against the Partnership, including, without limitation, professional and other advisory and consulting expenses, and (xi) any and all costs and expenses incurred in connection with the dissolution, winding up, or termination of the Partnership. Each of the General Partner, the Investment Manager or any of the Investment Manager Affiliates, in its sole discretion, may from time to time pay for any of the foregoing Partnership expenses. Any such person may elect to be reimbursed for such expenses, or to waive its right to reimbursement for any such expenses, as well as terminate any such voluntary payment or waiver of reimbursement.

The Partnership will also bear its *pro rata* share of the expenses of each Portfolio Fund.

(c) **Allocation of Expenses Among Series**. The General Partner and/or the Investment Manager will allocate all expenses attributable to the Partnership among the Series on a *pro rata* basis or otherwise in their reasonable discretion.

(d) **General Partner and Investment Manager Expenses**. The General Partner and the Investment Manager shall pay for their own general operating and overhead expenses associated with providing the management and investment management services required under this Agreement and the Investment Management Agreement, respectively. These expenses include all expenses incurred by the General Partner and the Investment Manager in providing for their normal operating overhead, including, but not limited to, the cost of providing relevant support and administrative services (e.g., employee compensation and benefits, rent, office equipment, computer systems, insurance (other than as expressly set forth above), utilities, telephone, secretarial and bookkeeping services, etc.), but not including any Partnership operating expenses described above. The General Partner and the Investment Manager may use "soft dollar" commissions or rebates by brokerage firms of commissions generated by the Partnership's brokerage transactions executed through those firms to pay for certain brokerage and research products and services that fall within the safe harbor under Section 28(e) of the Securities Exchange Act of 1934, as amended, as set forth in the Memorandum.

**Section 6.03** **Marketing Fees and Sales Charges**. The General Partner and/or the Investment Manager may sell Partnership Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the Capital Contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. If a Limited Partner is introduced to the Partnership through a broker-dealer that is not affiliated with the General Partner and/or the Investment Manager, the arrangement, if any, with such broker-dealer shall be disclosed to, and acknowledged by, such Limited Partner.

**Section 6.04** **Directed Brokerage**. The Investment Manager is authorized to direct Partnership brokerage transactions to brokers or other persons who refer prospective Limited Partners to the Partnership. The Investment Manager is authorized to pay finders' fees or other compensation at its own expense to such persons.

**Section 6.05** **Allocation of Investment Opportunities**. The Investment Manager may at times determine that certain investments shall be suitable for acquisition by the Partnership and by other accounts managed by the Investment Manager, the Investment Manager's own accounts or accounts of an affiliate. If that occurs, and the Investment Manager is not able to acquire the desired aggregate amount of such investments on terms and conditions which the Investment Manager deems advisable, the Investment Manager shall endeavor to allocate in good faith the limited amount of such investments acquired among the various accounts for which the Investment Manager considers them to be suitable. The Investment Manager may make such allocations among the accounts in any manner which it considers to be fair under the circumstances, including, but not limited to, allocations based on relative account sizes, the degree of risk involved in the investments acquired, and the extent to which such investments are consistent with the investment policies and strategies of the various accounts involved.

**Section 6.06** **Aggregation of Orders**. The Investment Manager may aggregate purchase and sale orders of investments held by the Partnership with similar orders being made simultaneously for other accounts or entities if, in the Investment Manager's reasonable judgment, such aggregation is reasonably likely to result in an overall economic benefit to the Partnership based on an evaluation that the Partnership shall be benefited by relatively better purchase or sale prices, lower commission expenses or beneficial timing of transactions, or a combination of these and other factors. In some instances, the purchase or sale of investments for the Partnership may be effected simultaneously with the purchase or sale of like investments for other accounts or entities. Such transactions may be made at slightly different prices, due to the volume of investments purchased or sold. In such event, the average price of all investments purchased or sold in such transactions may be determined, at the Investment Manager's sole discretion, and the Partnership may be charged or credited, as the case may be, with the average transaction price.

# ARTICLE VII
## WITHDRAWALS FROM CAPITAL ACCOUNT; DISTRIBUTIONS

**Section 7.01** **Permissible Withdrawals**. A Limited Partner may withdraw all or any of the value in such Limited Partner's Capital Account in any Series in the manner and to the extent provided in **Section 7.02**. Each of the General Partner and its principals and affiliates may withdraw all or any of the value in its respective Capital Account at any time, from time to time, without the consent of the Limited Partners and without notice to any of the Limited Partners.

**Section 7.02** **Withdrawal Procedures**

(a) Subject to certain restrictions described herein, each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion (each such date shall be referred to herein as a "**Withdrawal Date**"), upon at least ninety-one (91) days' prior written notice to the Administrator, with a copy to the General Partner. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's Capital Account balance below $500,000. All withdrawals shall be deemed made prior to the commencement of the following calendar quarter (or other relevant period).

(b) The General Partner believes (but cannot guarantee) that the assets of the Partnership will be invested in a manner which would allow the General Partner to satisfy withdrawal requests. The General Partner may, in its sole discretion: (i) defer withdrawal requests until the Partnership's assets mature or are liquidated in due course, (ii) elect to purchase with its own funds the Partnership Interests of the withdrawing Partner, or (iii) borrow from a third party or draw from a line of credit, subject to availability and other factors, in order to fund any withdrawal. In addition, notwithstanding anything to the contrary herein, the General Partner may limit and/or suspend withdrawals in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds, as further set forth in the Memorandum.

(c) A Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of an Illiquid Investment held in a Side Pocket Account until such time that such Illiquid Investment (or the sales proceeds thereof) is reallocated to such Limited Partner's Capital Account. At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in **Section 9.07**). **For the avoidance of doubt, any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely.**

(d) The following provision shall apply to withdrawals, on a Series-by-Series basis:

(i) A Limited Partner who requests any withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, less than ninety percent (90%) of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts) shall be paid within ninety (90) days after the applicable Withdrawal Date.

(ii) In the event that a Limited Partner requests a withdrawal of capital that constitutes, together with prior withdrawals within any Fiscal Year, ninety percent (90%) or more of the value of such Limited Partner's Capital Account (excluding any amounts held in any Side Pocket Accounts), the General Partner may reduce the amounts paid after any Withdrawal Date so that they constitute, in the aggregate during such Fiscal Year ninety percent (90%) of an amount estimated by the General Partner to be the amount to which the withdrawing Limited Partner is entitled in the aggregate (calculated on the basis of unaudited data); such amount will be paid within ninety (90)

days after the applicable Withdrawal Date. The balance of the amount payable upon such withdrawal shall be paid, without interest, within ninety (90) days after completion of the audited financial statements for the Fiscal Year in which the withdrawal occurs. Notwithstanding the foregoing, the General Partner may, in its sole discretion, agree to pay up to the full Capital Account balance (calculated on the basis of unaudited data) to a withdrawing Limited Partner within ninety (90) days after the applicable Withdrawal Date, subject to adjustment based on audited financial statements. To the extent that the sum previously paid to a withdrawing Limited Partner is calculated to have exceeded the amount to which it is entitled, that Limited Partner shall be required to repay to the Partnership the balance.

(e) The General Partner may, in its sole discretion, require a Limited Partner to withdraw any or all of the value of such Limited Partner's Capital Accounts on at least five (5) days' notice for any reason or no reason; *provided, however*, that the General Partner may require such a withdrawal on less (or no) notice in order to comply with any laws and regulations applicable to the Partnership and/or its affiliates.

(f) The Partnership or the relevant Series has the right to pay cash or in-kind, or a combination of both, to a Limited Partner that makes a withdrawal from such Limited Partner's Capital Account under this **<u>Article VII</u>**.

(g) All withdrawals shall be subject to the General Partner's power to establish such reserves for the Partnership or a Series as the General Partner shall, in its sole but reasonable discretion, deem appropriate to pay current and future, definite, contingent and possible obligations of the Partnership or a Series (even if such reserves are not in accordance with GAAP), including estimated expenses in connection therewith, which could reduce the amount of a distribution upon withdrawal.

(h) All notices of withdrawal must specify the dollar amount or percentage of value of a Limited Partner's Capital Account to be withdrawn. The General Partner, in its sole discretion, may waive or modify any of the terms relating to withdrawals, including, without limitation, minimum amounts and notice periods, for all or any of the Limited Partners in its discretion without notice to the other Limited Partners.

(i) If the General Partner, in its sole discretion, permits a Limited Partner to withdraw capital other than on a regularly scheduled Withdrawal Date, the General Partner may impose an administrative fee to cover the actual legal, accounting, administrative, brokerage, and any other costs and expenses associated with such withdrawal. Such fee shall be payable to the relevant Series of the Partnership and shall be deducted from the withdrawal proceeds of the withdrawing Limited Partner as of such Withdrawal Date.

(j) Upon withdrawal of all of the capital in its Capital Account (excluding for purposes hereof, any remaining investments held in a Side Pocket Account), a Limited Partner shall be deemed to have withdrawn from the Partnership or the relevant Series and, upon notice of such withdrawal, a Limited Partner shall not be entitled to exercise any voting rights afforded to Limited Partners under this Agreement.

(k) In addition to the above limitations on withdrawals, all withdrawals by Limited Partners will be subject to any limitations on withdrawals imposed by the Portfolio Funds, as applicable. For example, the ability of the Partnership to provide withdrawal proceeds to a Limited Partner may be subject to, among other things, various notice period requirements of the Portfolio Funds.

**Section 7.03 <u>Limitations on Withdrawals</u>**

(a) The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from Capital Accounts:

(i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners;

(ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation, including any diversification requirements applicable to insurance-dedicated investment funds;

(iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications;

(iv) a Portfolio Fund suspends the right to, or the payment of proceeds due upon, withdrawal and/or a Portfolio Fund allocates assets to its side pocket account;

(v) a Portfolio Fund satisfies a withdrawal request by making an in-kind distribution; or

(vi) for such other reasons or for such other periods as the General Partner may prudently and in good faith determine.

(b) All Limited Partners shall be notified in writing of any such suspension or postponement and the termination thereof. Following any suspension or postponement of withdrawals, a withdrawal request made by a Limited Partner prior to such suspension or postponement shall be effected as of the first Withdrawal Date following the recommencement of withdrawals.

**Section 7.04** **Distributions**

(a) The Partnership (or any Series) is not required, and generally does not intend, to make any distributions of cash or other property. However, the Partnership (or any Series) may make such distributions at such times and in such amounts as the General Partner shall determine in its sole discretion.

(b) All distributions hereunder (other than those made related to withdrawals from Capital Accounts) shall be made *pro rata* to all Partners in accordance with their relative Capital Accounts (or Side Pocket Accounts, New Issues Accounts or other memorandum accounts, as applicable) at the time of any such distribution. The General Partner may set up such reserves as it shall determine shall be appropriate or necessary to accomplish the purposes of the Partnership (even if such reserves are not in accordance with GAAP). If the Partnership (or a Series) shall distribute property other than cash pursuant to this **Section 7.04**, the Capital Accounts of the Partners shall be adjusted as if such property were sold at the value of such property as determined under **Section 9.04**, and the cash proceeds of such sale were distributed.

(c) Notwithstanding anything to the contrary herein, to the extent that the Partnership makes any distributions, the General Partner may limit such distributions, in its sole discretion, in order to ensure that the Partnership, at all times, meets the diversification requirements applicable to insurance-dedicated investment funds.

## ARTICLE VIII
## ADDITIONAL LIMITED PARTNERS

**Section 8.01** **Future Issuance of Partnership Interests**. The General Partner may admit as of the first day

of each month (each such date, a "**Contribution Date**"), or at any other time that the General Partner determines in its sole and absolute discretion, as additional Limited Partners ("**Additional Limited Partners**"), persons who contribute cash or, in the General Partner's sole discretion, persons who contribute securities (and/or other investments), for Partnership Interests ("**Capital Contributions**"). If the General Partner consents to a Limited Partner's contribution of securities (and/or other investments) to the Partnership, the Partnership may, in the General Partner's discretion, assess a special charge against such Limited Partner equal to the actual costs incurred by the Partnership in connection with accepting such contributed securities (and/or other investments), including, but not limited to, the costs of liquidating, or otherwise adjusting the Partnership's portfolio to accommodate, such securities (and/or other investments), and legal, accounting and administration costs. Such special charge shall be assessed as of such dates deemed appropriate by the General Partner. Any securities (and/or other investments) accepted as a Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

## ARTICLE IX
## CAPITAL ACCOUNTS; CAPITAL CONTRIBUTIONS; NET ASSET VALUE ADJUSTMENTS; TAXABLE INCOME AND LOSS AND DISTRIBUTIONS

**Section 9.01** **Capital Accounts**. A Partner's "**Capital Account**" as of a particular date shall consist of the following:

(a) an amount equal to the Partner's Original Capital Contribution;

(b) the increases, if any, to such account by reason of Additional Capital Contributions (as defined in **Section 9.03(a)**);

(c) the decreases, if any, to such account by reason of withdrawals (and distributions) from such Capital Account; and

(d) the increases or decreases, if any, to such Capital Account in accordance with the provisions of this **Article IX**.

Capital Accounts shall be maintained in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2), or any successor provisions thereto.

**Section 9.02** **Original Capital Contributions**. A Partner's "**Original Capital Contribution**" shall be the amount of the cash, or in the sole discretion of the General Partner, securities (and/or other investments), contributed by such party upon such Partner's admission as a Partner. The General Partner may establish such minimum Original Capital Contribution as the General Partner deems appropriate and that minimum may thereafter be waived or changed by the General Partner. In the event an Original Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that a Partner is admitted, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Original Capital Contribution, and commence a new accounting period on the date of such admission, and upon such admission, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners.

**Section 9.03** **Additional Capital Contributions**

(a) A Partner shall be permitted, with the consent of the General Partner, to make additional Capital Contributions in an amount deemed appropriate by the General Partner in cash or, in the sole discretion of the General Partner, securities (and/or other investments) ("**Additional Capital Contributions**") to the capital of the Partnership as of any Contribution Date, or at any other time that the General Partner determines in its sole and absolute discretion. In the event an Additional Capital Contribution is accepted as of any day other than a Contribution Date, the General Partner shall cause appropriate adjustments to be made for purposes of applying the accounting and allocation provisions of this Agreement. At any time that Additional

Capital Contributions are accepted pursuant to this **Section 9.03**, the General Partner shall end the prior accounting period on the day prior to the date of the acceptance of the Additional Capital Contributions, and commence a new accounting period on the date of such acceptance, and upon such acceptance, the Partnership Interests shall be adjusted and reallocated based upon the Capital Accounts of the respective Partners. Any securities accepted as an Additional Capital Contribution shall be valued by the General Partner, in its sole discretion, using the valuation criteria set forth in **Section 9.04**.

(b) In connection with an Additional Capital Contribution by an existing Limited Partner, the General Partner shall (i) treat such Additional Capital Contribution as a Capital Contribution with respect to one of such Limited Partner's existing Capital Accounts or (ii) establish a new Capital Account to which such Capital Contribution shall be credited and which shall be maintained for the benefit of such Limited Partner separately from any existing Capital Account of such Limited Partner. Such separate Capital Account may be maintained for any purpose, in the discretion of the General Partner. If a Limited Partner has more than one Capital Account, any withdrawals by or distributions to such Limited Partner shall be applied to such Capital Accounts in such manner and proportion as the General Partner shall determine in its sole discretion.

**Section 9.04** **Determination of Net Asset Value**

(a) The net asset value ("**Net Asset Value**") of the Partnership, on a Series-by-Series basis, shall be determined on an accrual basis of accounting, as of the end of each calendar month (or other period, as the case may be), in accordance with GAAP, consistently applied (except that: (x) organizational and initial offering expenses of the Partnership may be capitalized and amortized over a period of up to sixty (60) months from the date the Partnership commences operations and (y) reserves may be taken that are inconsistent with GAAP), the Memorandum and the following:

(1) No value shall be assigned to goodwill;

(2) All accrued debts and liabilities shall be treated as liabilities, including, but not limited to, all compensation payable to the Investment Manager that has been earned but not yet paid (e.g., Management Fees), any allowance for the Partnership's estimated annual audit and legal fees and other operating expenses and any contingencies for which reserves are required;

(3) Securities, commodities and other financial instruments (other than options) that are listed on a national securities, commodities or other exchange, or over-the-counter instruments listed on NASDAQ, shall be valued at their last sales prices on such date or, if no sales occurred on such date, at the midpoint between the last "bid" and "ask" prices for such securities, commodities or financial instruments on such date;

(4) Options that are listed on a securities or commodities exchange shall be valued at their last sales prices on the date of determination on the largest securities or commodities exchange (by trading volume) on which such options shall have traded on such date; provided that, if the last sales prices of such options do not fall between the last "bid" and "ask" prices for such options on such date, then such options shall be valued at the midpoint between the last "bid" and "ask" prices for such options on such date;

(5) Securities, commodities, options and other financial instruments that are not listed on an exchange or quoted on an over-the-counter market, but for which there are available quotations, shall be valued based upon quotations obtained from market makers, dealers or pricing services;

(6) Securities (and/or other investments) contributed to the Partnership as subscription proceeds shall be treated as if purchased by the Partnership at market value on the date of contribution, and securities (and/or other

investments) distributed from the Partnership as withdrawal proceeds shall be treated as if sold by the Partnership at market value on the date of distribution;

(7) Net profits and net losses from New Issues (as defined in **Section 9.08(a)**) shall only be credited or debited to the Net Asset Value of the New Issues Accounts, except to the extent permitted by the applicable rules of the FINRA (as defined in **Section 9.08(a)**), in which case a portion of the net profits and net losses from New Issues may be credited or debited to the Net Asset Value of the Capital Accounts of Limited Partners who are Restricted Persons (as defined in **Section 9.08(a)**) up to an amount permitted by applicable FINRA rules;

(8) Any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, shall be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value; and

(9) In the case of investments in Portfolio Funds, which investments are expected to constitute most of the Partnership's assets, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. None of the General Partner, the Investment Manager or any of their respective affiliates will be responsible for calculating the net asset value of the Portfolio Funds or for verifying the accuracy and completeness of any such values received.

(b) If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument does not fairly represent its market value, the Investment Manager shall value such security, commodity, option or other financial instrument as it reasonably determines.

(c) In connection with the determination of the Net Asset Value of the Partnership, the Investment Manager may consult with and is entitled to rely upon the advice of the Partnership's brokers and any other third parties deemed appropriate by the Investment Manager. In no event and under no circumstances shall the Investment Manager, the Partnership's brokers or such other third parties incur any individual liability or responsibility for any determination made or other action taken or omitted by them in good faith.

(d) Absent bad faith or manifest error, all Net Asset Value determinations pursuant to this Agreement are conclusive and binding as to all Partners.

(e) After the foregoing determinations have been made, a further calculation shall be made to determine the increase or decrease in Net Asset Value of the Partnership during the month (or other time period, as the case may be) just ended. The term "**increase in Net Asset Value**" shall be the excess of Net Asset Value at the end of any month (or other time period, as the case may be) over that of the Net Asset Value of the Partnership as of the end of the preceding period, after adjusting for Capital Contributions, distributions and withdrawals. The term "**decrease in Net Asset Value**" shall be the amount by which the Net Asset Value at the end of the month (or other time period, as the case may be) is less than the Net Asset Value of the Partnership as of the end of the preceding period, after making the adjustments specified above.

**Section 9.05** **Allocation of Increases and Decreases in Net Asset Value**

(a) Any net increase or decrease in Net Asset Value during any month (or such other period, as the case may be) shall be allocated as of the end of such month (or such other period, as the case may be) to the Capital Account of each Partner in the proportion which such Partner's Capital Account bore to the sum of the Capital Accounts of all the Partners as of the beginning of such month (or such other period, as the case may be); *provided* that net increases or decreases in Side Pocket Accounts, New Issues Accounts and other memorandum accounts shall be allocated as provided in **Sections 9.07 and 9.08**, respectively.

(b) Notwithstanding the provisions set forth above, if the Partnership has a material item of income or loss in any fiscal period which relates to a matter or transaction occurring during a prior fiscal period (e.g., if the Partnership wins a cash settlement in a case it began in a prior period) the item of income or loss may, at the sole discretion of the General Partner, be shared among the Partners (including persons who ceased to be Partners) in accordance with each such Partner's Partnership Interest in the Partnership during the prior period.

**Section 9.06** **Allocations for Tax Purposes; General Partner Discretion on Allocations; Withholding**

(a) Ordinary income, gains, losses and deductions of the Partnership for each Fiscal Year shall accrue to, and be borne by, the Partners in proportion to their sharing of net increases or decreases in Net Asset Value, the allocations of various types of taxable income and losses likewise being as nearly as possible proportionate.

(b) All allocations under this **Section 9.06** shall be made pursuant to the principles of Section 704 of the Code and in conformity with Treasury regulations promulgated thereunder ("**Regulations**"), or the successor provisions to such Code Section and Regulations.

(c) All matters concerning the allocation of profits, gains and losses among the parties (including the taxes thereon) and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner in its sole discretion, and the General Partner is expressly permitted to use the aggregate method of apportioning taxable gain and loss under Treasury Regulation Section 704(b). The General Partner is expressly authorized to make special allocations to the Partners of such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Treasury Regulations Section 1.704-1(b)(2)(ii)(d). The General Partner's determination of the foregoing matters shall be final and conclusive as to all parties.

(d) Notwithstanding anything to the contrary contained in this Agreement, in the event a Partner withdraws all of the capital in its Capital Account from the Partnership (excluding any amounts held in Side Pocket Accounts), the General Partner shall have the discretion to specially allocate an amount of the Partnership's taxable gains or losses to the withdrawing Partner to the extent that the Partner's Capital Account exceeds, or is less than, its federal income tax basis in its Partnership Interest.

(e) Any taxes, fees or other charges that the Partnership is required to withhold under applicable law with respect to any Partner shall be withheld by the Partnership (and paid to the appropriate government authority) and shall be deducted from the Capital Account of such Partner as of the last day of the Fiscal Year (or earlier if the Partner withdraws) with respect to which amounts are required to be withheld.

(f) For the avoidance of doubt, the provisions of this **Section 9.06** shall apply on a Series-by-Series basis.

**Section 9.07** **Side Pocket Accounts**

(a) The Investment Manager may designate that certain investments held by a Series of

the Partnership and/or by the Portfolio Fund(s) be carried in one or more separate memorandum accounts (each, a "**Side Pocket Account**") for such period of time as the Investment Manager determines. Such investments may include: (i) privately placed, unregistered securities, commodities, options and other financial instruments, or those investments that, in the opinion of the Investment Manager, do not have a readily ascertainable market value; (ii) other illiquid securities that may be valued but are not freely transferable; (iii) an investment into a Portfolio Fund that invests in illiquid assets; (iv) that portion of an investment in a Portfolio Fund that is attributable to side pocket accounts designated by the manager of such Portfolio Fund (which may be designated with respect to assets that are subject to legal or contractual restrictions on transferability, or that the Investment Manager believes either lack a readily assessable market value (without impairing the value of such investments) or should be held until the resolution of a special event or circumstance; and (v) investments in other asset classes (such as real estate) and other property that are not traded on public exchanges (each, as designated by the Investment Manager, along with follow-on investments, if any, an "**Illiquid Investment**"). **For the avoidance of doubt, (i) there will be no limitation on the percentage of the Partnership's portfolio that may be carried in a Side Pocket Account, and (ii) any investment made by Series 1 into the series of the PE Portfolio Fund that corresponds to the latter fund's investment made in the Highland Transaction (if any) may be held in a Side Pocket Account indefinitely**. Illiquid Investments held in a Side Pocket Account shall be carried at their fair value (which may be at, above or below cost) as determined by the Investment Manager. For the avoidance of doubt, each Policy Owner investing through the relevant Limited Partner will indirectly participate in the economics from a *pro rata* portion of a Side Pocket Account and the corresponding Illiquid Investment.

(b) At the sole discretion of the Investment Manager, an Illiquid Investment may be held in a Side Pocket Account until the occurrence of a Realization Event. Upon a Realization Event, such Illiquid Investment (or the sales proceeds thereof) shall be reallocated, *pro rata*, from the Side Pocket Account to the Capital Accounts of participating Partners in accordance with their respective interests in such Side Pocket Account. Until such reallocation, a Limited Partner may not withdraw any of the amounts in its Capital Account that are attributable to the value of Illiquid Investments held in a Side Pocket Account. Upon such reallocation, a Limited Partner that has withdrawn all of its capital from the Partnership other than the capital attributable to such Side Pocket Account shall receive an amount equal to its interest in such Side Pocket Account (net of any accrued Management Fees and accrued expenses (to the extent not covered by the Partnership's reserves, including the Management Fee Reserve), with respect thereto) within ninety (90) days after such reallocation. A "**Realization Event**" occurs: (1) when an Illiquid Investment becomes liquid, as determined in the reasonable discretion of the Investment Manager; (2) when an Illiquid Investment is sold or otherwise disposed of by the Partnership; (3) when circumstances otherwise exist that, in the reasonable judgment of the Investment Manager, conclusively establish a value for an Illiquid Investment, as determined in the reasonable discretion of the Investment Manager (including, without limitation, when additional securities substantially similar to the Illiquid Investment have been issued by the issuer of the Illiquid Investment); or (4) as otherwise determined in the sole discretion of the Investment Manager.

(c) Newly-admitted Limited Partners may not participate in Illiquid Investments that were placed in a Side Pocket Account prior to their admission. **For the avoidance of doubt, the Partnership shall not accept additional Limited Partners into any existing Series if such Series has existing Side Pocket Accounts at the time of such admission.** Notwithstanding any provisions of this Agreement to the contrary, any expenses relating specifically to a Side Pocket Account shall be charged to the Partners participating in such account in proportion to their respective interests therein, as of the commencement of such Side Pocket Account.

(d) If the Investment Manager in its discretion designates any investment as a follow-on investment to an existing Illiquid Investment (each, a "**Follow-On Investment**"), only the Partners participating in such original investment shall participate in such Follow-

On Investment in proportion to their interest in the related Side Pocket Account; *provided, however*, that if a Partner shall have withdrawn from the Partnership, the General Partner shall equitably adjust the interests of the remaining participating Partners to reflect such withdrawn Partner's non-participation in the Follow-On Investment. In its discretion, the Investment Manager need not designate as a "Follow-On Investment" an additional investment in the same or similar opportunity as the investment for which a Side Pocket Account has been established, but instead may designate such investment as a new investment with a separate Side Pocket Account. Additionally, the Investment Manager, in its sole and absolute discretion, may determine that, for various reasons, an asset that initially was not an Illiquid Investment should be categorized as an Illiquid Investment.

**Section 9.08** **New Issues; Other Memorandum Accounts for Restricted Transactions**.

(a) From time to time, the Partnership may invest in initial public offerings of equity securities ("**New Issues**"). Under rules adopted by the Financial Industry Regulatory Authority ("**FINRA**"), (i) certain persons engaged in the securities, banking or financial services industries (and members of their immediate families) and (ii) certain persons who are affiliated with companies that are current, former or prospective investment banking clients of the Partnership's broker(s) (collectively, "**Restricted Persons**") are restricted from participating in New Issues, each subject to a de minimis exemption ("**De Minimis Limit**"). To the extent necessary to comply with FINRA rules, in addition to the Partnership's regular Capital Accounts and any Side Pocket Accounts, the General Partner may establish one or more memorandum accounts that are authorized to participate in New Issues (each, a "**New Issues Account**"). Participation in New Issues Accounts shall be limited to (i) those Limited Partners who are not Restricted Persons, and (ii) those Limited Partners who are Restricted Persons, but only to the extent that such participation by Restricted Persons does not exceed the De Minimis Limit.

(b) In the event a New Issues Account is established, to effect a transaction in New Issues, the requisite funds shall be transferred from the Partnership to the New Issues Account. Securities held in the New Issues Account shall be held there until they are eventually sold or transferred. Upon the sale or other disposition of New Issues (including any transfer of the underlying securities in the New Issues Account to the Capital Accounts of all of the Partners after such securities no longer constitute New Issues), any profits or losses resulting from securities transactions in the New Issues Account in any fiscal period shall be credited or debited to the Capital Accounts of Limited Partners participating in the New Issues Account in accordance with their interests therein. In the event that the Partnership establishes one or more New Issues Accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that Limited Partners that are not Restricted Persons were receiving profits based in part on the capital of Limited Partners that are Restricted Persons. Such adjustment may, in the sole and absolute discretion of the General Partner, and to the extent not prohibited by rules of FINRA, consist of: (i) assessing an interest charge to the Capital Accounts of Limited Partners that are not Restricted Persons, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by Limited Partners that are not Restricted Persons in connection with New Issue trades; or (ii) such other adjustment as the General Partner considers equitable and is not inconsistent with the rules of FINRA.

(c) In addition to the foregoing provisions with respect to New Issues Accounts and Side Pocket Accounts, to the extent that certain Limited Partners are restricted from participating in any transactions of the Partnership by applicable laws or regulations, or for any other reason determined by the General Partner in good faith, the General Partner may, in its discretion, establish one or more separate memorandum accounts to hold such investments and isolate ownership away from such non-participating Limited Partners. Only those Limited Partners who the General Partner determines are eligible shall participate in such accounts. In the event that the Partnership establishes one or more memorandum accounts, the General Partner shall be authorized to make an equitable adjustment to account for the fact that participating

Limited Partners were receiving profits based in part on the capital of non-participating Limited Partners. Such adjustment may, in the sole and absolute discretion of the General Partner, consist of: (i) assessing an interest charge to the Capital Accounts of participating Limited Partners, in favor of the Partnership, in an amount deemed appropriate to compensate the Partnership for the use of capital by participating Limited Partners in connection with such trades; or (ii) such other adjustment as the General Partner considers equitable.

## ARTICLE X
## RESTRICTIONS ON TRANSFERS OF PARTNERSHIP INTERESTS OF LIMITED PARTNERS; ADMISSION OF SUBSTITUTE LIMITED PARTNERS; OTHER MATTERS AFFECTING PARTNERSHIP INTERESTS

**Section 10.01** **Restrictions on Transfer of Partnership Interests of Limited Partners**

(a) Except for transfers by will or intestate succession or by operation of law, no Limited Partner may offer, sell, transfer, assign, exchange, hypothecate or pledge, or otherwise dispose of or encumber (hereinafter collectively, "**Transfer**" or "**Transferred**"), in whole or in part, such Limited Partner's Partnership Interest without the consent of the General Partner, which may be given or withheld in the sole and absolute discretion of the General Partner.

(b) No Limited Partner may Transfer, in whole or in part, such Limited Partner's Partnership Interest if, in the General Partner's discretion, such Transfer could result in the termination of the Partnership for federal income tax purposes, and any purported Transfer that could result in the termination of the Partnership for federal income tax purposes shall be void *ab initio*. In its sole and absolute discretion, the General Partner may request a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) as to whether any contemplated Transfer could result in the termination of the Partnership for federal income tax purposes, and the General Partner shall be entitled to rely conclusively upon such opinion in determining whether such Transfer could result in the termination of the Partnership and whether consent to such disposition should be given.

(c) The Partnership Interests may not be transferred without documentation acceptable to the General Partner, which may include a written opinion of counsel acceptable to the General Partner (the expenses of which may be allocated to the relevant Limited Partner) that such proposed Transfer may be effected without:

(i) registration of the Partnership Interest being made under the Securities Act of 1933, as amended;

(ii) violating any applicable state securities or "blue sky" law (including investment suitability standards) or the laws of any other jurisdiction;

(iii) the Partnership becoming subject to the Investment Company Act of 1940, as amended ("**1940 Act**"); or

(iv) violating the Act.

(d) In no event shall the Partnership Interest of a Limited Partner or any portion thereof be Transferred to a minor or incompetent, unless by will or intestate succession.

**Section 10.02** **Admission of Substitute Limited Partner**

(a) Subject to the provisions of this **Article X**, an assignee of the Partnership Interest of a Limited Partner (which shall include any purchaser, transferee, donee or other recipient of any disposition of such Partnership Interest) shall be deemed admitted to the Partnership as a Limited Partner (a "**Substitute Limited Partner**") only upon the satisfactory completion of the following:

(i) consent of the General Partner shall have been given, which may be given or withheld in the sole and absolute discretion of the General Partner and which shall be evidenced by a written document executed by the General Partner;

(ii) the assignee shall have accepted and agreed to be bound by the terms and provisions of this Agreement (as it may be amended from time to time) by executing a counterpart hereof and such assignee shall have expressly assumed all of the rights and obligations of the assignor Limited Partner hereunder, and shall have executed such other documents or instruments as the General Partner may require in its sole and absolute discretion in order to effect the admission of such person as a Limited Partner;

(iii) an amendment to the Certificate, if required by the Act (in the opinion of the General Partner), evidencing the admission of such person as a Limited Partner shall have been filed;

(iv) the assignee shall have delivered a letter containing a representation that the assignee's acquisition of the Partnership Interest is made as a principal, for the assignee's own account, for investment purposes only and not with a view to the resale or distribution of such Partnership Interest, and that the assignee will not Transfer such Partnership Interest or any fraction thereof to anyone in violation of this Agreement;

(v) if the assignee is a corporation, partnership, limited liability company, trust or other entity, the assignee shall have provided to the General Partner evidence satisfactory to the General Partner of its authority to become a Limited Partner under the terms and provisions of this Agreement;

(vi) the assignee shall have complied with all applicable governmental rules and regulations, if any;

(vii) the assignee meets the suitability requirements for investing in the Partnership and the assignee completes the subscription documents ("**Subscription Documents**") provided by the General Partner; and

(viii) all costs and expenses incurred by the Partnership and the General Partner in connection with this **Section 10.02** shall be paid by the person or entity seeking to become a Substitute Limited Partner (or the transferor Limited Partner).

**Section 10.03** **Rights of Assignee of Partnership Interest**

(a) Subject to **Section 10.01(b)**, if a Limited Partner Transfers all or a portion of such Limited Partner's Partnership Interest, involuntarily, by operation of law or voluntarily, without the consent required by this **Article X**, the transferee or assignee shall: (i) be entitled only to receive that proportion of profit and loss, and any distribution of Partnership assets, attributable to the Partnership Interest acquired by reason of such disposition from and after the effective date of such disposition, and only upon written notification of same to the General Partner consistent with **Section 10.03(b)**; and (ii) have no other rights as a Limited Partner unless admitted as a Substitute Limited Partner in accordance with the terms of this Agreement.

(b) Subject to the provisions of **Section 10.01**, and except as required by operation of law, the Partnership shall not be obligated for any purposes whatsoever to recognize the assignment by any Limited Partner of such Limited Partner's Partnership Interest until the General Partner has received notice thereof.

(c) Any person or entity who is the assignee of all or any portion of the Partnership Interest of a Limited Partner, but who has not become a Substitute Limited Partner, and desires to make a further disposition of such Partnership Interest, shall be subject to all the provisions of this **Article X** to the same extent and in the same manner as

any Limited Partner desiring to make a disposition of such Limited Partner's Partnership Interest.

**Section 10.04** **Effect of Bankruptcy, Death or Incompetence of a Limited Partner**. The bankruptcy, dissolution or winding up of a Limited Partner, the death of a Limited Partner or an adjudication that a Limited Partner is incompetent (which term shall include, but not be limited to, insanity), shall not cause the termination, wind-down or dissolution of the Partnership and the business of the Partnership shall continue. If a Limited Partner becomes bankrupt, dissolved or wound up, the trustee or receiver of such Limited Partner's estate or, if a Limited Partner dies, such Limited Partner's executor, administrator or trustee, or, if such Limited Partner is adjudicated incompetent, such Limited Partner's committee, guardian or conservator, shall have the rights of such Limited Partner for the purposes of settling or managing such Limited Partner's estate or property and such power as the bankrupt, deceased or incompetent Limited Partner possessed to dispose of all or any part of such Limited Partner's Interest and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a Substitute Limited Partner.

**Section 10.05** **Attachment by Creditors**. If a Partnership Interest is subjected to attachment by a creditor, or is assigned for the benefit of any creditor, the Partnership Interest obtained by such creditor shall be only that of an assignee, and in no event shall such creditor have the rights of a Substitute Limited Partner or an Additional Limited Partner.

## ARTICLE XI
## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 11.01** **Limited Partners**. Each Limited Partner represents, warrants and covenants to the Partnership and to every other Partner as follows:

(a) Such Limited Partner shall provide promptly, upon request by the General Partner, all financial data, documents, reports, certifications or other information necessary or appropriate to enable the Partnership to apply for and obtain an exemption from the registration provisions of applicable law and any other information required by governmental agencies having jurisdiction over the Partnership.

(b) There is no misrepresentation contained in the Subscription Documents and the forms attached thereto completed by such Limited Partner.

(c) If such Limited Partner is a corporation, partnership, limited liability company, trust or other entity, that the officer (or other signatory) signing on its behalf has been duly authorized to execute and deliver this Agreement and, to the extent requested by the General Partner, the Certificate.

(d) Such Limited Partner that is an entity that would be an "investment company" under the 1940 Act, but for an exclusion under either Section 3(c)(1) or Section 3(c)(7) thereof, has advised the General Partner of the number of persons that constitute "beneficial owners of such Limited Partner's outstanding securities (other than short-term paper)" within the meaning of Section 3(c)(1)(A) of the 1940 Act, and shall advise the General Partner promptly upon any change in that number.

## ARTICLE XII
## SPECIAL POWER OF ATTORNEY

**Section 12.01** **Execution and Consent**. Each Limited Partner hereby irrevocably constitutes and appoints the General Partner and its respective successors (hereinafter referred to as "**Special Attorney**") as the attorney-in-fact for such Limited Partner with power and authority to act in the Limited Partner's name and on the Limited Partner's behalf to execute, acknowledge, swear to and file documents and instruments necessary or appropriate to the conduct of the Partnership's business, which shall include, but not be limited to, the following:

(a) the Certificate and this Agreement, as well as amendments thereto as required by the

laws of any state, or any other jurisdiction, or as otherwise permitted under the terms of this Agreement;

(b) any other certificates, instruments and documents, including fictitious name certificates, as may be required by, or may be appropriate under, the laws of any state;

(c) the amendment and/or restatement of this Agreement in accordance with **Section 14.08**; and

(d) any documents that may be required to effect the continuation of the Partnership, the admission of an Additional Limited Partner or a Substitute Limited Partner, the withdrawal of a Limited Partner, or the dissolution and termination of the Partnership, *provided* that such continuation, admission, withdrawal or dissolution and termination are in accordance with the terms of the Certificate and this Agreement.

**Section 12.02** **Procedural Aspects**. The power of attorney granted by each Limited Partner to the Special Attorney:

(a) is a special power of attorney, coupled with an interest, and is accordingly irrevocable;

(b) may be exercised by the Special Attorney for each Limited Partner either by signing separately as attorney-in-fact for each Limited Partner or, by executing any instrument with the single signature of such Special Attorney acting as attorney-in-fact for all of the Limited Partners; and

(c) shall survive the assignment by a Limited Partner of the whole or any portion of such Limited Partner's Partnership Interest; *provided* that where the assignee has been approved in accordance with the provisions of this Agreement for admission to the Partnership as a Substitute Limited Partner, the Power of Attorney shall survive such assignment for the sole purpose of enabling the Special Attorney to execute, acknowledge and file any instrument necessary to effect such substitution.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

**Section 13.01** **Dissolution**. The Partnership shall be dissolved upon the earliest to occur of:

(a) the withdrawal, resignation or Involuntary Withdrawal of the General Partner, or any other event that results in such entity ceasing to be a general partner, unless the remaining Limited Partners agree, within ninety (90) days after such event, to continue the Partnership with a new and qualified substitute general partner pursuant to and in accordance with the terms and conditions set forth in **Article IV**;

(b) an election to dissolve the Partnership made by the General Partner, in its discretion, upon thirty (30) days' prior written notice to the Limited Partners; or

(c) the happening of any other event, including the entry of a decree of judicial dissolution under Section 17-802 of the Act, that under the law of the State of Delaware, mandatorily requires the dissolution of the Partnership.

For the avoidance of doubt, the termination of the Partnership shall constitute the termination of all Series. For the avoidance of doubt, the termination of an individual Series, however, shall not constitute the termination of the Partnership.

**Section 13.02** **Liquidation**. Upon the dissolution of the Partnership, the "**Liquidators**", namely: (i) the General Partner or, if there is no general partner at the time, or if the principal(s) of the General Partner are unable to act on its behalf, (ii) (A) the person or persons previously designated in writing by the General Partner and notified to the Partnership's auditors, or (B) if the General Partner has not made such a designation, the person or persons designated by Limited

Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners, shall cause the cancellation of the Certificate, liquidate (or distribute) the assets of the Partnership, and apply and distribute the balance of the proceeds of such liquidation in accordance with the following order of priority: (1) pay off known liabilities; (2) establish reserves for contingent liabilities and expenses of liquidation (even if such reserves are not in accordance with GAAP); and (3) distribute the remainder to the Partners in proportion to the Capital Account balances maintained in accordance with the provisions of **Section 9.01** and the Act. The Liquidators shall take all other steps necessary to wind up the affairs of the Partnership as promptly as practicable. To the extent reasonable, the business of the Partnership may continue to be conducted until liquidation is complete. For purposes hereof, the term "Liquidators" shall also include the trustees, receivers or other persons required by law to wind up the affairs of the Partnership.

**Section 13.03** **Notice of Dissolution**

(a) Upon the dissolution of the Partnership or the relevant Series, the Liquidators shall promptly notify the Partners of such dissolution as well as known creditors and claimants whose addresses appear on the Partnership's or the relevant Series' records.

(b) The General Partner shall give at least fifteen (15) days' prior written notice to each Limited Partner that is a BHC Limited Partner (as defined in **Section 5.10**) of any proposal to distribute property in-kind to such Limited Partner and the proposed date of such distribution, and shall not make any such distribution in-kind to the extent that such Limited Partner advises the General Partner at least five (5) days prior to the date set forth in such notice for such distribution that such distribution in-kind could reasonably be expected to cause it to violate the BHCA. In the event that a BHC Limited Partner notifies the General Partner to such effect, the General Partner shall be authorized to make such arrangements for the property that it would have otherwise distributed in-kind as the General Partner shall determine in its reasonable discretion.

**Section 13.04** **Deferred Liquidation; Distribution In-Kind of Joint Interests in Property**. For the avoidance of doubt, the following provisions of this **Section 13.04** shall apply on a Series-by-Series basis. Notwithstanding the provisions of **Section 13.02**, if on dissolution of the Partnership the Liquidators shall determine that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners, the Liquidators may, in their absolute discretion, either defer for a reasonable time the liquidation of any assets, except those necessary to satisfy liabilities of the Partnership (other than those to Partners), or distribute to the Partners, in lieu of cash, as tenants in common and in proportion to their respective interests in the Partnership, undivided interests in such Partnership assets as the Liquidators deem not suitable for liquidation. To the extent that the General Partner exercises its right, power and authority under **Section 3.02(w)**, this Section shall be construed by the Liquidators in their reasonable discretion to give effect thereto.

**Section 13.05** **Final Statement**. As soon as practicable after the dissolution of the Partnership or the relevant Series, a final statement of its assets and liabilities shall be prepared by the General Partner and/or the internal accountants for the Partnership or the relevant Series and furnished to the Partners.

## ARTICLE XIV
## GENERAL PROVISIONS

**Section 14.01** **Address and Notices**. The address of each Partner (other than the General Partner) for all purposes shall be the address set forth on the signature page to this Agreement or such other address of which the General Partner has received written notice in accordance with this **Section 14.01**. The address of the General Partner for all purposes shall be the address set forth in **Section 1.04** or such other address of which the General Partner has provided written notice to the Partners in accordance with this **Section 14.01**. Any notice, demand or request required or permitted to be given or made hereunder shall be in writing and shall be deemed given or made (i) when delivered in person, (ii) when sent to such Partner at such address by

registered or certified mail, return receipt requested, or by electronic mail, or (iii) when delivered by overnight delivery by a reputable private carrier or by the postal service.

**Section 14.02** **Titles and Captions**. All Article and Section titles and captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.

**Section 14.03** **Pronouns and Plurals**. Whenever the context may require, any pronoun used herein shall include the corresponding masculine, feminine or neuter forms. The singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**Section 14.04** **Further Action**. The Limited Partners shall execute and deliver all documents, provide all information and take or forbear from taking all such action as may be necessary or appropriate, in the discretion of the General Partner, to achieve the purposes set forth in this Agreement.

**Section 14.05** **Governing Law, Personal Jurisdiction and Venue**. **EACH LIMITED PARTNER ACKNOWLEDGES AND AGREES THAT ANY CLAIM, CONTROVERSY, DISPUTE OR ACTION RELATING IN ANY WAY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP SHALL BE GOVERNED SOLELY AND EXCLUSIVELY BY THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO ANY CONFLICT OF LAWS DOCTRINES. EACH LIMITED PARTNER UNDERSTANDS AND AGREES THAT IT IS WAIVING THE PROTECTION OF STATUTES IN ITS STATE OF RESIDENCE THAT PROVIDE IT WITH CERTAIN RIGHTS, REMEDIES AND PROTECTIONS IN THE CASE OF FRAUD OR MISREPRESENTATION AND AGREES TO RELY SOLELY UPON THE LAWS OF THE STATE OF DELAWARE AND ANY APPLICABLE FEDERAL LAWS. EACH LIMITED PARTNER MAKES THIS WAIVER KNOWINGLY AND REPRESENTS THAT IT HAS CONSULTED INDEPENDENT COUNSEL, OR THAT IT HAS HAD THE OPPORTUNITY TO CONSULT WITH SUCH INDEPENDENT COUNSEL BUT HAS ELECTED NOT TO DO SO, AND AGREES THAT THE ONLY STATE LAWS THAT WILL APPLY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT AND ITS INVESTMENT IN THE PARTNERSHIP ARE THE LAWS OF THE STATE OF DELAWARE.**

**EACH OF THE LIMITED PARTNERS, FUND COUNSEL AND ANY OTHER PARTY TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT OR ANY OTHER AGREEMENT REGARDING SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP (COLLECTIVELY, FOR PURPOSES OF THIS CLAUSE, THE "PARTIES") IRREVOCABLY CONSENTS TO BEING SERVED WITH LEGAL PROCESS ISSUED FROM THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF NEW YORK AND IRREVOCABLY CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION OF THE FEDERAL AND STATE COURTS SITUATED IN THE STATE OF NEW YORK. THE PARTIES IRREVOCABLY WAIVE ANY OBJECTIONS TO THE PERSONAL JURISDICTION OF THESE COURTS. SAID COURTS SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OVER ANY AND ALL CLAIMS, CONTROVERSIES, DISPUTES AND ACTIONS, OF ANY KIND OR MANNER, WHICH IN ANY WAY RELATE TO THIS AGREEMENT, THE SUBSCRIPTION AGREEMENT, OR SUCH LIMITED PARTNER'S INVESTMENT IN THE PARTNERSHIP. THE PARTIES ALSO IRREVOCABLY WAIVE ANY OBJECTIONS THAT THESE COURTS CONSTITUTE AN OPPRESSIVE, UNFAIR, OR INCONVENIENT FORUM AND AGREE NOT TO SEEK TO CHANGE VENUE ON THESE GROUNDS OR ANY OTHER GROUNDS. THE PARTIES FURTHER AGREE THAT THEY WILL NOT FILE SUIT IN A JURISDICTION OTHER THAN NEW YORK AND THAT, SHOULD THEY DO SO, THEY SHALL BE LIABLE FOR ALL DAMAGES AS A RESULT OF MAKING SUCH A FILING AND SHALL PAY ALL ATTORNEYS' FEES INCURRED BY ANY PARTY IN CONNECTION WITH MOVING TO DISMISS THE SUIT FOR FAILURE TO COMPLY WITH THIS PROVISION.**

In the event that (i) any current or prior Limited Partner ("**Claiming Party**") initiates or asserts any litigation, arbitration or similar claim or counterclaim, or joins, offers substantial assistance to or has a direct financial interest in any claim ("**Claim**") against the Partnership, the General Partner, the Investment Manager or any Investment Manager Affiliates, including any Claim purportedly filed on behalf of the Partnership or any Limited Partner, and (ii) the Claiming Party (or the third party that received substantial assistance from the Claiming Party or in whose

Claim the Claiming Party had a direct financial interest) does not obtain a judgment on the merits that substantially achieves, in substance and amount, the full remedy sought, then each Claiming Party shall be obligated jointly and severally to reimburse the Partnership and/or the General Partner, the Investment Manager or any such Investment Manager Affiliate for all fees, costs and expenses of every kind and description (including, but not limited to, all reasonable attorneys' fees and other litigation expenses) that the parties may incur in connection with such Claim.

**Section 14.06** **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties and their heirs, executors, administrators, successors, legal representatives and permitted assigns; *provided*, however, that fund counsel shall be a party to this Agreement solely with respect to **Sections 3.04(b) and 14.05** hereof in order to benefit from and enforce such Sections, and a conformed signature page for fund counsel is included as a counterpart to this Agreement.

**Section 14.07** **Entire Agreement**. This Agreement, together with the related Subscription Documents and any other written agreement between the General Partner, on behalf of the Partnership (acting severally in the name of and for the account of any individual Series), and any Limited Partner of that Series, shall constitute the entire agreement and understanding among all the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter, including, without limitation, the Current Agreement. The parties hereto acknowledge that, notwithstanding any other provision of this Agreement or the Subscription Documents, the General Partner, on its own behalf or on behalf of the Partnership, without any act, consent or approval of any other Partner, may enter into side letters or other writings to or with one or more Limited Partners that have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement or the Subscription Documents ("**Side Letters**"). The parties agree that any rights established, or any terms of this Agreement or the Subscription Documents altered or supplemented, in a Side Letter to or with one or more Limited Partners shall govern with respect to such Limited Partner(s) notwithstanding any other provision of this Agreement or the Subscription Documents. No covenant, representation or condition not expressed in this Agreement or such Subscription Documents (and, if applicable, any Side Letter) shall affect or be deemed to interpret, change or restrict the express provisions hereof and thereof.

**Section 14.08** **Amendment**. This Agreement may be modified or amended only by the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of all of the outstanding Partnership Interests of each Series; *provided* that the General Partner may amend this Agreement from time to time (x) only with the affirmative vote of the General Partner and Limited Partners owning more than fifty percent (50%) of the Partnership Interests held by Limited Partners of a specific Series of Partnership Interests, if such amendment, in the opinion of the General Partner, only has a material effect on such Series of Partnership Interests, and (y) without the consent, approval or other authorization of, or notice to, any of the Limited Partners (including pursuant to **Sections 3.02(u)** and **(v)**) if, in the opinion of the General Partner, the amendment does not have a material adverse effect on any Limited Partner. Notwithstanding the foregoing, no amendment may: (i) convert a Limited Partner's interest to that of a general partner or, modify the limited liability of any Limited Partner, without the consent of each affected Partner or (ii) amend any provision hereof which requires the consent or approval of a specified percentage in interest of the Limited Partners without the consent of such specified percentage in interest of the Limited Partners.

**Section 14.09** **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership or the relevant Series.

**Section 14.10** **Waiver by Partner**

(a) Any Partner by notice to the General Partner may, but shall be under no obligation to, waive any of its rights or any conditions to its obligations hereunder, or any duty, obligation or covenant of any other Partner to such first mentioned Partner.

(b) No such waiver shall affect or alter the remainder of this Agreement, but each and every covenant, agreement, term and condition hereof shall continue in full force and

effect with respect to any other existing or subsequent breach.

**Section 14.11** **Rights and Remedies**

(a) The rights and remedies of any of the Partners hereunder shall not be mutually exclusive, and the implementation of one or more of the provisions of this Agreement shall not preclude the implementation of any other provision.

(b) Each of the Partners confirms that damages at law may be an inadequate remedy for a breach or threatened breach of any provision hereof. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy but nothing herein contained is intended to or shall limit or affect any rights at law or by statute or otherwise of any Partner aggrieved as against the other Partners for a breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear that the respective rights and obligations of the Partners hereunder shall be enforceable in equity as well as at law or otherwise, except as provided in **Section 5.08**.

**Section 14.12** **Counterparts**. This Agreement may be executed in counterparts, all of which taken together shall constitute one agreement binding on all parties, notwithstanding that all the parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing his, her or its signature hereto, independently of the signature of any other party.

**Section 14.13** **Certain Tax Matters**

(a) *Tax Matters Partner*

(i) The Tax Matters Partner (as such term is defined in Section 6231(a)(7) of the Code) of the Partnership shall be the General Partner. The General Partner shall have all powers necessary to perform fully in its capacity as Tax Matters Partner and, in such capacity, the General Partner shall use its reasonable efforts to comply with the responsibilities outlined in Sections 6221 through 6233 of the Code (including the Regulations) and shall have any powers necessary to perform fully in such capacity.

(ii) In furtherance of the foregoing, the General Partner is authorized to represent the Partnership before taxing authorities and courts in tax matters affecting the Partnership and the Partners in their capacity as such and shall keep the Partners informed of any such administrative and judicial proceedings. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any action brought against it in connection with any judgment in or settlement of any such proceeding, except in the case of the General Partner's own fraud, gross negligence, willful misconduct or conduct that is the subject of a criminal proceeding (where the General Partner has a reasonable cause to believe that such conduct was unlawful).

(iii) Any Partner that is in dispute with any tax authority in relation to any Partnership matter shall notify the General Partner within thirty (30) calendar days, and if the General Partner reasonably determines that the matter is of material relevance to the tax position of the Partnership, such Partner shall consult with the General Partner (or any advisor appointed by the General Partner for the purpose) as to how that dispute shall be handled. Any Partner who enters into a settlement agreement with respect to any Partnership item shall notify the Tax Matters Partner of such settlement agreement and its terms within thirty (30) calendar days after the date of settlement.

(iv) The provisions of this **Section 14.13(a)** shall survive any termination of this Agreement.

(b) *Tax Elections*. Each Partner agrees to provide the Partnership with such information which may be necessary or desirable in order for the General Partner to carry out its powers under this **Section 14.13** and **Section 3.02(g)**, including, without limitation, to facilitate compliance with Section 743 of the Code and elections permitted thereunder.

(c) *Classification as a Partnership*. The parties hereto intend that the Partnership be classified as a partnership for federal income tax purposes. The General Partner shall not elect to have the Partnership classified as an association taxable as a corporation for federal income tax purposes pursuant to Regulation Section 301.7701–3. The General Partner shall, for and on behalf of the Partnership, take all steps as it may deem reasonably necessary to maintain the Partnership's classification as a partnership for federal income tax purposes.

(d) *Tax Audits*. Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership or any existing or former investment.

[*remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, this Amended and Restated Limited Partnership Agreement has been duly executed as of the day and year first above written.

**Atlas IDF GP, LLC**, as General Partner
(acting severally in the name of and for the account of each individual Series)

By: ____________________
Name: John Honis
Title: Managing Member

INITIAL LIMITED PARTNER:

/s/ John Honis
John Honis

[SIGNATURES OF ADDITIONAL LIMITED PARTNERS AND OTHER PARTIES ARE SET FORTH ON SEPARATE SIGNATURE PAGES]

# EXHIBIT 1

# RAND PE FUND I, L.P.

(A DELAWARE “SERIES” LIMITED PARTNERSHIP)

## FINANCIAL STATEMENTS

INDEPENDENT AUDITOR’S REPORT

FOR THE YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)

# RAND PE FUND I, L.P.

## TABLE OF CONTENTS

DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24,2025 (LIQUIDATION DATE)


| | Page |
|---|---|
| **Independent Auditor's Report** | 1 |
| **Financial Statements** | |
| Statements of Assets, Liabilities and Partners' Capital | 3 |
| Schedule of Investments | 4 |
| Statements of Operations | 5 |
| Statements of Changes in Partners' Capital | 6 |
| Statements of Cash Flows | 7 |
| Notes to Financial Statements | 8 |

Cohen & Co

# Independent Auditor's Report

To the Partners of
Rand PE Fund I, L.P.

## Opinion

We have audited the accompanying financial statements and financial statements in liquidation of Rand PE Fund I, L.P., which comprise the statement of asset and liabilities, including the schedule of investments, as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the related statements of operations, changes in partners' capital and cash flows for the year and period then ended, and the related notes to the financial statements.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Rand PE Fund I, L.P. as of December 31, 2024 and as of February 24, 2025 (liquidation date), and the results of its operations, changes in its partners' capital and cash flows for the year and period then ended in accordance with accounting principles generally accepted in the United States of America.

## Basis for Opinion

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Rand PE Fund I, L.P. and to meet our other ethical responsibilities in accordance with the relevant ethical requirements relating to our audits. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## Partnership Liquidation

As discussed in Note 1 to the financial statements, in February 2025, in accordance with the Partnership's operating agreement, the Manager approved a plan for the orderly liquidation of the Partnership and notified the partners of their intentions to liquidate the partnership effective February 24, 2025 (liquidation date). Our opinion is not modified with respect to this matter.

## Responsibilities of Management for the Financial Statements

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

## Auditor's Responsibilities for the Audit of the Financial Statements

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with generally accepted auditing standards will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the financial statements.

In performing an audit in accordance with generally accepted auditing standards, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Rand PE Fund I, L.P.'s internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the financial statements.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control related matters that we identified during the audit.

Cohen & Company, Ltd.

Cleveland, Ohio
June 26, 2025

# RAND PE FUND I, L.P.

## STATEMENTS OF ASSETS, LIABILITIES AND PARTNERS' CAPITAL

### YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Assets** | | |
| Investment, at fair value (cost $15,986,892 and $0, respectively) | $ 1,000,000 | $ - |
| Cash and cash equivalents | 19,891 | 1,019,678 |
| Total assets | $ 1,019,891 | $ 1,019,678 |
| | | |
| **Liabilities** | | |
| Accrued expenses | $ 43,900 | $ 69,965 |
| Distributions payable | - | 949,713 |
| Total liabilities | 43,900 | 1,019,678 |
| | | |
| **Partners' capital** | 975,991 | - |
| Total liabilities and partners' capital | $ 1,019,891 | $ 1,019,678 |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.
## SCHEDULE OF INVESTMENTS
YEAR ENDED DECEMBER 31, 2024

| Ownership Percentage | Description | Fair Value | % of Partners' Capital |
|---|---|---|---|
| | **Investment in LLC interests** | | |
| | United States | | |
| | Financial | | |
| 100% | *Beacon Mountain, LLC (cost $15,986,892)* | $ 1,000,000 | 102.46% |
| | **Total Investment (cost $15,986,892)** | $ 1,000,000 | 102.46% |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF OPERATIONS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | Year ended December 31, 2024 | Period ended February 24, 2025 (liquidation date) |
|---|---|---|
| **Investment income and expenses** | | |
| **Income** | | |
| Investment income | $ - | $ - |
| **Expenses** | | |
| Professional fees | 43,900 | 25,000 |
| Custodian fees | 2,650 | 1,278 |
| Other expense | - | - |
| Total expenses | 46,550 | 26,278 |
| Net investment loss | (46,550) | (26,278) |
| **Realized gain** | | |
| Net realized loss from settlement income | (52,242) | - |
| Net realized loss on investments | - | (14,986,892) |
| Net change in unrealized depreciation on investments | 1,000,000 | 14,986,892 |
| | 947,758 | - |
| **Net increase (decrease) in partners' capital resulting from operations** | $ 901,208 | $ (26,278) |

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF CHANGES IN PARTNERS' CAPITAL

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2023** | $ - | $ 74,783 | $ 74,783 |
| **Operating activities** | | | |
| Net investment loss | - | (46,550) | (46,550) |
| Net realized loss from settlement income | - | (52,242) | (52,242) |
| Net change in unrealized depreciation on investments | - | 1,000,000 | 1,000,000 |
| Net increase in partners' capital resulting from operations | - | 901,208 | 901,208 |
| **Partners' capital at December 31, 2024** | **$ -** | **$ 975,991** | **$ 975,991** |

| | General Partner | Series I Limited Partners | Total |
|---|---|---|---|
| **Partners' capital at December 31, 2024** | $ - | $ 975,991 | $ 975,991 |
| **Operating activities** | | | |
| Net investment loss | - | (26,278) | (26,278) |
| Net realized loss on investments | - | (14,986,892) | (14,986,892) |
| Net change in unrealized depreciation on investments | - | 14,986,892 | 14,986,892 |
| Net decrease in partners' capital resulting from operations | - | (26,278) | (26,278) |
| **Capital activities** | | | |
| Capital distributions* | - | (949,713) | (949,713) |
| Net change in partners' capital resulting from capital activities | - | (949,713) | (949,713) |
| **Partners' capital at February 24, 2025 (liquidation date)** | **$ -** | **$ -** | **$ -** |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.

# RAND PE FUND I, L.P.

## STATEMENTS OF CASH FLOWS

YEAR ENDED DECEMBER 31, 2024 AND PERIOD ENDED FEBRUARY 24, 2025 (LIQUIDATION DATE)

| | December 31,2024 | February 24, 2025 (liquidation date) |
|---|---|---|
| **Cash flows from operating activities** | | |
| Net increase (decrease) in partners' capital resulting from operations | $ 901,208 | $ (26,278) |
| Adjustments to reconcile net increase (decrease) in partners' capital resulting from operations to net cash provided by (used in) operating activities: | | |
| Proceeds from the disposition of investments | - | 1,000,000 |
| Net realized loss on investment transactions | - | (14,986,892) |
| Net change in unrealized depreciation on investments | (1,000,000) | 14,986,892 |
| Net changes in operating assets and liabilities | | |
| Increase in other assets | 62,242 | - |
| Increase in accrued expenses | (5,100) | 26,065 |
| Net cash provided by (used in) operating activities | (41,650) | 999,787 |
| **Cash flows from financing activities** | | |
| Capital distributions, net of payable* | - | - |
| Net cash provided by financing activities | - | - |
| Net increase (decrease) in cash | (41,650) | 999,787 |
| Cash and cash equivalents, beginning of year | 61,541 | 19,891 |
| Cash and cash equivalents, end of year | $ 19,891 | $ 1,019,678 |

**Capital distributions have not been paid as of the date of the audit opinion*

The accompanying notes are an integral part of these financial statements.

## 1. Organization

Rand PE Fund I, L.P. (the "Partnership") was organized as a "series" limited partnership under the laws of Delaware Revised Uniform Limited Partnership Act on October 29, 2015, and commenced operations on December 17, 2015. The Partnership offered partner interests in the Partnership ("Interests") in a private placement pursuant to section 4(a)(2) of the Securities Act of 1933, as amended ("Securities Act"), and Regulation D promulgated thereunder.

Rand PE Fund Management, LLC, a Delaware limited liability company (the "General Partner"), is the general partner of the Partnership and is responsible for the management of the Partnership's affairs. Rand Advisors, LLC, a Delaware limited liability company (the "Investment Manager"), is the investment manager of the Partnership and has discretionary investment authority over the Partnership's assets. The Investment Manager is registered as an investment adviser with the U.S. Securities and Exchange Commission ("SEC"). The Investment Manager has a shared services agreement with Skyview Group ("Skyview") to provide certain limited back office services including, but not limited to, bookkeeping, financial reporting, tax preparation, operations, and IT support. Neither the Investment Manager nor Skyview receives any compensation from the Partnership for these services.

The Partnership was formed to pool investment funds of its investors (each, a "Limited Partner" and, collectively, "Limited Partners"; and, together with the General Partner (as defined above), "Partners") for the purpose of investing and trading in a wide variety of securities, financial instruments and other assets and investments, including other investment vehicles, as more fully described herein.

The Partnership is governed by the Agreement of Limited Partnership (the "Partnership Agreement") dated October 29, 2015. Interests in the Partnership will be offered in separate series of interests ("Series"). All current Limited Partners have been enrolled in "Series 1 Interests". Each Series will have separate rights and obligations. In addition, each Series may correspond to a separate portfolio of assets, which may have different investment objectives and strategies. The Partnership may issue additional Series in the future, which may have rights and obligations that differ from those of the Series 1 Interests with respect to any matters, including without limitation, fees, withdrawal rights, participation in Side Pocket Accounts (as defined in the Partnership Agreement) and other rights and terms. The terms of such additional Series will be determined by the General Partner, in its sole discretion.

Each Series shall have separate rights, powers and duties with respect to its investment portfolio and other property and obligations and the profits and losses associated with such portfolio, property and obligations. The Partnership will maintain separate and distinct records for each Series and shall hold and account for the assets and liabilities of such Series separately from other Series.

On June 21, 2022, the Partnership entered into a confidential settlement agreement with certain third-parties who agreed to pay all legal, audit, and custody expenses incurred by Hunter Mountain Investment Trust ("HMIT"), an entity which the Partnership had owned indirectly through its investment in Beacon Mountain, LLC, and the Partnership for the duration of the Highland Capital Management, L.P. ("HCMLP") bankruptcy. As of December 31, 2024 this agreement is not expected to result in any further actual reimbursement to the Partnership and all related income and receivables have been written off.

On August 1, 2022, Rand Advisors, LLC was acquired by Rand Advisors Holding Corp, effecting a change in control of the Investment Manager.

On February 6, 2025, the General Partner redeemed certain limited partners in the Partnership for their Capital Account value of $0. Following the sale of the Partnership's sole investment thereafter, the Partnership caused distributions to be made to such limited partners for their respective share of such sale proceeds pursuant to the "side pocket" status of such investment.

On February 12, 2025, the Partnership's sole investment was sold and thereafter on February 24, 2025, the Investment Manager decided to dissolve the Partnership at which point liquidation became imminent. Under the plan of liquidation, the Partnership plans to settle all outstanding liabilities and pay out distributions to the partners. The adoption of the liquidation basis of accounting did not have a material effect on the carrying value of the Partnership's assets and liabilities and was therefore not adopted.

## 2. Significant Accounting Policies

The following is a summary of the significant accounting policies followed by the Partnership in the preparation of its financial statements.

**Basis of Accounting**
The Partnership's financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP") and are stated in United States dollars. The Partnership is an investment company in conformity with U.S. GAAP and as such follows the accounting and reporting guidance under Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 946, *Financial Services – Investment Companies*.

**Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of increases and decreases in partners' capital from operations during the period. The Partnership's significant estimates include the fair value of its investments and derivative contracts. Actual results could differ from those estimates.

**Investment Transactions**
Investment transactions are recorded on a trade-date basis. Realized gains and losses on investment transactions are determined based on specific identification using the first-in, first-out method.

Investments are valued at market or fair value at the date of the financial statements with the resulting net unrealized appreciation or depreciation reflected in the Statements of operations.

See Note 6 for the Partnership's fair value hierarchy disclosures.

**Cash and Cash Equivalents**
Cash and cash equivalents consist of cash held at U.S. banks or brokers and deposits with original maturities of less than 90 days. Cash equivalents are carried at cost, which approximates fair value. At December 31, 2025, the Partnership held cash balances at certain financial institutions within the federally insured limit of $250,000. At February 24, 2025 the Partnership held cash balances at certain financial institutions which exceeded the federally insured limit of $250,000 by approximately $770,000. The Investment Manager regularly monitors the credit quality of these institutions.

**Income and Expense Recognition**
Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognized when received. Discounts and premiums are accreted or amortized to interest income except for deeply discounted debt where ultimate collection of interest and principal may be in doubt. Such accretion/amortization is calculated on an effective-yield basis. Amendment fees are recognized when received. Operating expenses are recorded on the accrual basis as incurred.

**Allocation of Gains and Losses**
Net capital change as a result of operations is generally allocated to the capital accounts of each limited partner in proportion to their respective ownership percentages as determined at the beginning of each accounting period adjusted for any additional contributions or withdrawals.

**3. Taxes**

The Partnership is treated as a pass-through entity for tax purposes, which means it is not subject to U.S. income taxes under current Internal Revenue Service or state and local guidelines. Each partner is individually liable for income taxes, if any, on its share of the Partnership's net taxable income. Interest, dividends and other income realized by the Partnership from non-U.S. sources and capital gains realized on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Partnership applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions, which requires the General Partner to determine whether a tax position of the Partnership is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognized in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement with the relevant taxing authority. The General Partner has determined that there was no effect on the financial statements from the application of this guidance. The General Partner does not expect a significant change in uncertain tax positions during the twelve months subsequent to December 31, 2024.

The Partnership files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Partnership is subject to examination by federal, state, local and foreign jurisdictions, where applicable. As of December 31, 2024, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from December 31, 2021 forward.

The Partnership recognizes interest and penalties, if any, related to unrecognized tax benefits as income tax expense in the Statements of operations. During the year ended December 31, 2024 and period ended February 24, 2025 (liquidation date), the Partnership did not incur any interest or penalties.

**4. Limited Partnership Agreement**

**Capital Contributions and Withdrawals**
The minimum initial capital contribution that will be accepted from a new Limited Partner is $500,000. The minimum additional capital contribution that will be accepted from an existing Limited Partner is $500,000. In each case, the General Partner has discretion to accept lesser amounts. Generally, new Limited Partners will be admitted on the first day of each month, and withdrawals may be made on the last day of each calendar quarter upon 91 days' prior written notice and subject to certain other restrictions as described herein (unless, in each case, the General Partner, in its sole discretion, permits subscriptions or withdrawals at another time).

There is no public market for the limited partner interests in the Partnership ("Interests") nor is any expected to develop. Even if such a market develops, no distribution, resale or transfer of an Interest will be permitted, except in accordance with the provisions of the Securities Act, the rules and regulations promulgated thereunder, any applicable state securities laws and the terms and conditions of the Partnership Agreement. Any transfer of an Interest by a Limited Partner, public or private, will require the consent of the General Partner.

Each Limited Partner may withdraw a minimum of $100,000 as of the last day of each calendar quarter and at such other times as the General Partner may determine in its sole discretion, upon at least 91 days' prior written notice. Unless the General Partner consents, partial withdrawals may not be made if they would reduce a Limited Partner's capital account balance below $500,000. Generally, not less than 90% of the withdrawal proceeds (excluding any amounts held in any Side Pocket Accounts) will be paid within 90 days after the applicable withdrawal date. The balance of the amount payable upon such withdrawal will be paid without interest, within 90 days after the completion of the audited financial statements for the fiscal year in which the withdrawal occurs.

**Limitations on Withdrawals**
The Partnership or a Series may suspend (or postpone) withdrawals, subscriptions, calculations of Net Asset Value and/or payments upon any withdrawals (in whole or in part) from capital accounts: (i) during the existence of any state of affairs which, in the opinion of the General Partner, makes the disposition of the Partnership's investments impractical or prejudicial to the Partners, or where such state of affairs, in the opinion of the General Partner, makes the determination of the price or value of the Partnership's investments impractical or prejudicial to the Partners; (ii) where any such withdrawals, subscriptions, calculations and/or payments, in the opinion of the General Partner, would result in the violation of any applicable law or regulation; (iii) if the General Partner determines, in its sole discretion, that such suspension or postponement is prudent in order to prevent the Partnership from being subject to adverse tax or regulatory implications; or (iv) for such other reasons or for such other periods as the General Partner may in good faith determine.

**Side Pocket Accounts**
A Limited Partner may not withdraw any of the amounts in its capital account that are attributable to the value of an illiquid investment held in a Side Pocket Account until such time that such illiquid investment (or the sales proceeds thereof) is reallocated to such Limited Partner's capital account. At the sole discretion of the Investment Manager, an illiquid investment may be held in a Side Pocket Account until the occurrence of a Realization Event (as defined in the Partnership Agreement). At December 31, 2024, the Partnership's investment was held in a side pocket account. At February 24, 2025 (liquidation date), the investment had been sold.

**Management Fees**
The Partnership has entered into an investment management agreement (as the same may be amended and/or restated from time to time, the "Investment Management Agreement") by and among the Partnership and the Investment Manager. In consideration for services provided pursuant to the Investment Management Agreement, the Investment Manager will receive a quarterly management fee ("Management Fee"), equal to a percentage of each Limited Partner's share of the Partnership's Net Asset Value (as defined herein), and based on the Partnership's total Net Asset Value, as follows:

| Partnership's Total Net Asset Value | Management Fee (per annum) |
|---|---|
| $0 - $99,999,999 | 0.5500% |
| $100,000,000 - $199,999,999 | 0.5000% |
| $200,000,000 - $249,999,999 | 0.4500% |

| | |
|---|---|
| $250,000,000 - $499,999,999 | 0.3500% |
| > $500,000,000 | 0.3400% |

The Management Fee will be calculated and payable to the Investment Manager quarterly, in advance, as of the first day of each calendar quarter. A pro rata Management Fee will be charged to Limited Partners on any amounts accepted by the General Partner during a calendar quarter. No management fees were paid to the Investment Manager during the year or period presented, as the Investment Manager elected to waive its management fees. The Investment Manager can, at its discretion, waive or reduce the management fee.

**Allocation of Net Increase/(Decrease) in Partners' Capital Resulting from Operations**
The Partnership Agreement specifies the allocation of net income or loss (increases and decreases in net worth, as defined in the Limited Partnership Agreement) to each partner's capital account. Net income or loss includes all gains and losses, whether realized or unrealized, plus all other items of income (such as interest) and less all expenses. Generally, net income and loss for each month (or other period, as the case may be) will be allocated to the partners in proportion to their capital account balances at the start of such month (or such other period). Capital account balances will reflect capital contributions, previous allocations of increases and decreases in net worth and withdrawals.

## 5. Financial Instruments with Concentration of Credit Risk and Other Risks

**Market Risk**
Market risk represents the potential loss that may be incurred by the Partnership due to a change in the market value of its investments. The Partnership's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of securities prices and the liquidity of the Partnership's investments. Volatility or illiquidity could impair the Partnership's performance or result in losses. The Partnership may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

**Liquidity Risk**
The Partnership's limited partner interests have not been registered under the Securities Act or any other applicable securities laws. There is no public market for the interests and neither the Partnership nor the Investment Manager expects such a market to develop.

**Market Concentration**
The Partnership was formed to invest in small to medium-sized companies (i.e., generally with market capitalization of under $1 billion) that are involved in (or are the target of) acquisition attempts or tender offers, and/or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies or similar transactions. All of the assets attributable to Series I have been invested in LLC interests of Beacon Mountain, LLC. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole.

**Litigation Risk**
The Partnership is periodically subject to legal actions arising from the ordinary course of business. The ultimate outcome of these cases is inherently uncertain and could result in material losses to the Partnership.

**Limited Diversification**
The Partnership's portfolio could become significantly concentrated in any one issuer, industry, sector strategy, country or geographic region, and such concentration of risk may increase the losses suffered by the Partnership. In addition, it is possible that the Investment Manager may select investments that

are concentrated in certain classes of financial instruments. This limited diversification could expose the Partnership to losses that are disproportionate to market movements as a whole. As of December 31, 2024, the Partnership's portfolio consisted of one investment in the LLC interests of Beacon Mountain, LLC. At February 24, 2025 (liquidation date), the investment had been sold.

**Custody Risk**
The clearing operations for the Partnership's investments are provided by major financial institutions. In addition, all of the Partnership's cash and investments are held with banks or brokerage firms, which have worldwide custody facilities and are members of major securities exchanges. The Partnership may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Partnership might be unable to recover the full value of its assets or incur losses due to its assets being unavailable for a period of time.

**Concentration of Investor Risk**
One affiliated entity, Atlas IDF, L.P., held approximately 96.5% of the Partnership's capital balance as of December 31, 2024.

## 6. Fair Value Hierarchy of Financial Instruments

In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Partnership discloses the fair value of its investments in a hierarchy that prioritizes the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on unadjusted prices in active markets for identical assets and liabilities that the Partnership has the ability to access as of the measurement date. Valuations utilizing Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorized for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Partnership uses prices and inputs that are current as of the measurement dates. The Partnership also considers the counterparty's nonperformance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Partnership uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available or are determined to be unreliable, the Partnership develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Investment Manager has established policies, as described above, processes and procedures intended to ensure that valuation methodologies for investments and financial instruments that are categorized within all levels of the fair value hierarchy are fair and consistent.

As of December 31, 2024, the Partnership's investment consisted of an LLC interest. As of February 24, 2025 (liquidation date), the investment had been sold.

**LLC interests**
As of December 31, 2024, the Partnership's investment was comprised entirely of a membership interest in a nonpublic limited liability company that was valued using commonly accepted valuation methodologies due to not having a readily determinable fair value. The LLC's sole investment is an indirect non-voting limited partner interest in 99.5% of a private investment management firm. This private investment management firm owns equity in a company that is in bankruptcy. The LLC interest is classified as level 3 as it is priced using inputs that are not readily observable.

The following table provides a summary of the investment recorded at fair value on a recurring basis by level within the hierarchy as of December 31, 2024. As of February 24,2025, no investments were held by the partnership.

| | Level 1 | Level 2 | Level 3 | Total fair value at December 31, 2024 |
|---|---|---|---|---|
| LLC interests | $ - | $ - | $ 1,000,000 | $ 1,000,000 |

The following table provides a roll forward of the amounts for the year ended December 31, 2024 and February 24, 2025 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.



008886
HMIT_Entities_000037

| | LLC interests |
|---|---|
| Fair value as of December 31, 2023 | $ - |
| Purchases | - |
| Sales and maturities | - |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | - |
| Net change in unrealized gains/(losses) | 1,000,000 |
| Fair value as of December 31, 2024 | $ 1,000,000 |

| | LLC interests |
|---|---|
| Fair value as of December 31, 2024 | $ 1,000,000 |
| Purchases | - |
| Sales and maturities | (1,000,000) |
| Transfers in | - |
| Transfers out | - |
| Net realized gains/(losses) | (14,986,892) |
| Net change in unrealized gains/(losses) | 14,986,892 |
| Fair value as of February 24, 2025 (liquidation date) * | $ - |

*The values in the preceding table are equal to zero.

No transfers between levels occurred during the year ended December 31, 2024, or period ended February 24, 2025.

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorized within Level 3 of the fair value hierarchy as of December 31, 2024. As of February 24, 2025 no investments were held by the Partnership.

| Category | Fair Value at December 31, 2024 | Valuation Technique | Unobservable Inputs | Input Value(s) |
|---|---|---|---|---|
| LLC interests | $ 1,000,000 | Transaction Indication of Value | Sales Price | $ 1,000,000 |

## 7. Commitments and Contingencies

In the normal course of business, the Partnership may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Partnership to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant.

## 8. Related Party Transactions

**Management Fees**
For its services to the Partnership, the Investment Manager is entitled to management fees as described in Note 4. For the year ended December 31, 2024 and period ended February 24, 2025 (liquidation

date), the Investment Manager did not earn management fees. The Investment Manager does not charge a management fee on investments in related funds.

**9. Financial Highlights**

Financial highlights for the year ended December 31, 2024 and February 24, 2025 are as follows:

| | Year ended December 31, 2024 | Period ended February 24, 2025 (liquidation date) |
|---|---|---|
| | **Series I** | **Series I** |
| Total return [1] | 1205.10 % | (17.87)% |
| Ratios to average limited partners' capital [2] | | |
| Investment income | 0.0 % | 0.0 % |
| Operating expenses | (37.18)% | (17.87)% |
| Net investment loss | (37.18)% | (17.87)% |

[1] Total return is determined using a time-weighted rate of return methodology in which rates of return are geometrically linked. Total return is reflected after all investment related and operating expenses. An individual investor's return may vary from these returns based on timing of capital transactions.

[2] Expense ratios are determined by dividing the total investment related and operating expenses by the average limited partners' capital. The ratio of net investment income/(loss) is determined by dividing the net investment income/(loss) by the average limited partners' capital.

**10. Subsequent Events**

The General Partner has evaluated subsequent events through June 26, 2025, which is the date the financial statements were available for issuance and has determined no subsequent event disclosure is necessary.

# EXHIBIT 1

**DAF Structure Chart**
*(as of 3/6/2024)*



**DAF Structure Chart**
*(as of 3/27/2025)*



**DAF Structure Chart**
*(as of 3/27/2025)*




008892

# EXHIBIT

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this “Trust Agreement”), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor") and as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee”).

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to “the Agreement” or “this Agreement” are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

“Account” means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in its sole and absolute discretion.

“Delaware Act” means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

“Honis Cause” means conduct by Honis, in any capacity, amounting to (i) Honis’s conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis’s using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

“Honis Trigger Event” means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis’s employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days’ written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in its sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform its duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for its good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

(e) Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i) in its “discretion” or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii) in its “good faith” or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f) The Administrator and any of its affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar it acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper. The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9. Recordkeeping and Accounting. The Administrator shall maintain appropriate records in which it shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10. Tax Treatment. The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes. The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

11. No Other Interests

(a) The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b) The Administrator acknowledges that it has no right, title, or interest in the Trust, the Trust Property, or the Account in its corporate or personal capacity and has no beneficial interest in the Trust.

12. Compensation; Administrator Liability. The Administrator shall not receive any compensation for its role as Administrator. Nothing herein shall be construed to limit Beacon's ability to receive compensation pursuant to other agreements for services it may provide other than in its role as Administrator. The Administrator and the Sponsor shall be indemnified, defended and held harmless by the Trust for any liability incurred by it while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of its fiduciary duties hereunder, its own bad faith, willful misconduct or gross negligence in the performance of its express duties under this Trust Agreement.

13. Amendment. The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by its duly authorized officer or officers; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity. If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14. Duration. The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15. Termination. The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in its sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act. Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust. After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such

releases, indemnities or like documentation as the Administrator may reasonably deem necessary for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16. Removal of Administrator. Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17. Successor Administrator. The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, it shall appoint a successor Administrator unless, prior to the effective date of its resignation, it dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18. Delaware Trustee.

(a) For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b) The Sponsor and the Administrator hereby appoints Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a

successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c) By its execution hereof, the Delaware Trustee accepts its appointment hereunder. Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d) The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document. The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement. In particular, but not by way of limitation:

(i) the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii) no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv) the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v) the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi) in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii) except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e) The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(f) The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g) The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h) The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19. Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20. Governing Law. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21. Exclusive Jurisdiction. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22. Application to Successors. This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23. Transfer of Beneficial Ownership. Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate. To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor and as Administrator

By:________________________
Name: John Honis
Title: President

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:________________________
Name: Jennifer A. Luce
Title: Vice President

# EXHIBIT 1


Rand Structure Chart
(effective as of 12/2015 – 8/2022)
Dallas Foundation
Supported Organization
100% support
100% support
Empower Dallas
Okada Family Trust
70%
30%
Annuity Policy
John Honis
Sole Member
Sole Member
Sole Member
Rand Advisors, LLC
(registered investment advisor)
Rand PE Fund Management, LLC
Atlas IDF GP, LLC
Crown Global
Insurance Company
GP
Atlas IDF, LP
100% LP
GP
IMA
96% LP
Dolomiti / Hakusan
4% LP
Rand PE Fund I, L.P.
Sole Member
Beacon Mountain, LLC
Sole Beneficiary
Hunter Mountain Investment Trust
(Delaware statutory trust)
99.5% LP
Highland Capital Management, L.P.
Key
Control/ Fiduciary
Assets
Economic Benefit

# EXHIBIT 22

**Rand Structure Chart**
*(Feb. 12, 2025)*




DAF/Rand Structure Chart
(May 2025)
Mark Patrick
Director
DFW Charitable Foundation
(Delaware)
(Director: Mark Patrick)
100%
Manager
100%
CDH GP, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
CDMCFAD, LLC
(Delaware)
(Manager: Mark Patrick)
1% GP
99% LP
Charitable DAF Fund, LP
(Cayman Islands)
(General Partner Managed)
100%
CLO HoldCo, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
100%
100%
Liberty CLO Holdco, Ltd.
(Cayman Islands)
(Directors: Mark Patrick, Paul Murphy)
CLO Holdco, LLC
(Delaware)
100%
100%
Charitable DAF Holdings Corp.
(Delaware)
(Director: Mark Patrick)
Beacon Mountain, LLC
(Delaware)
(Managed solely by its single member)
100% Beneficiary
Hunter Mountain Investment Trust
(Delaware statutory trust)
(Administrator: Mark Patrick)
(DE Trustee: Wilmington Trust)