**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§

§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§

vs. §

3:26-CV-02315-X

**Highland Capital Management, L.P., et al**-Appellee

§

§

**[4679] Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026.**

**APPELLANT SUPPLEMENTAL RECORD**

**VOLUME 1**

BTXN 101 (rev. 10/02)

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| In Re:<br>Highland Capital Management, L.P.<br>Debtor(s)<br>The Dugaboy Investment Trust<br>Appellant(s)<br>vs.<br>Highland Capital Management, L.P., et al<br>Appellee(s) | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No.: 19−34054−sgj11<br>Chapter No.: 11 |

# INDEX OF RECORD FOR THE PURPOSE OF APPEAL


| **Page No.** | **Item Description** |
|---|---|
| | Appellant Supplemental Record Vol. 1 |
| 000001 | Transcript of hearing held April 24, 2026, before Judge Brad W. Odell |
| 000085 | Transcript of hearing held April 29, 2026 before Judge Brad W. Odell |
| 000123 | Transcript of hearing held May 12,before Judge Brad W. Odell |
| 000260 | Transcript of hearing held May 11, before Judge Brad W. Odell |
| 000535 | Transcript of hearing held May 21,before Judge Brad W. Odell |


DATED: 10/1/26

FOR THE COURT:
Stephen J Manz, Clerk of Court

by: /s/J. Blanco, Deputy Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Chapter 11 |
| Debtor. | |
| | April 24, 2026<br>9:36 A.M. |

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:
Willkie Farr & Gallagher LLP
BY: MARK STANCIL, ESQUIRE
1875 K Street, NW
Washington, DC 20006
(202) 303-1133

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019
(212) 561-7760

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder:
Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service:
Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Shields Legal Group, P.C., CLO Holdco, Ltd., Kelly Hart & Pitre ("HMIT Entities"):

Kelly Hart & Pitre
BY: LOUIS M. PHILLIPS, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
(225) 381-9643

Kelly Hart & Pitre
BY: AMELIA L. HURT, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
(504) 434-6742

For Dugaboy Investment Trust:

Morgan Lewis
BY: MICHAEL EDNEY, ESQUIRE
1717 Main Street, Suite 3200
Dallas, Texas 75201
(214) 466-4000

For the Dondero Entities:

Stinson LLP
BY: DEBORAH ROSE DEITSCH-PEREZ, ESQUIRE
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
(214) 560-2201

(The proceedings commenced at 9:36 a.m.)

THE COURT: The Court is going to call the case, we're here on a special setting in the Highland Capital Management case, Case Number 19-34054. We're here on a motion for protective order filed by the Debtor Highland Capital Management. And then we have joinder by several parties with a response by Dugaboy Investment Trust.

We're also here on a motion to quash which was filed by Shields Legal Group, CLO Holdco, and Kelly Hart & Pitre. And I believe we have responses to that, as well.

So let me start off by taking appearances. Let me first get appearances for the Debtor.

MR. STANCIL: Thank you, Your Honor.

Mark Stancil from Willkie Farr & Gallagher for the Debtor. And I'm joined as well by my colleagues at my firm plus Mr. Morris and his colleagues from Pachulski Stang Ziehl & Jones. And our client Mr. Seery and his team are also on the line today.

THE COURT: Okay. And then let me get appearances on behalf of what I'm going to refer to as the "HMIT Entities."

MR. PHILLIPS: Good morning, Your Honor.

Louis M. Phillips, Kelly Hart, on behalf of the HMIT Entities. And also, Your Honor, would you like for me to make an appearance in connection with the Shields Law firm, Kelly Hart, and CLO Holdco, or just the HMIT Entities at this point?

THE COURT: No, Mr. Phillips. If you're going to be appearing on behalf of the Shields Law Firm, you're welcome to make an appearance on that, as well.

MR. PHILLIPS: Yes, Your Honor. I'm making an appearance for the HMIT Entities, the Shields Law Firm, Kelly Hart, and also CLO Holdco. And my workmate, Amelia Hurt from Kelly Hart, is on the phone. Also, client representative Mark Patrick is on the call, as well.

THE COURT: Okay. All right. And then appearances on behalf of the Dugaboy Trust?

MR. EDNEY: Good morning, Your Honor.

This is Michael Edney from the Morgan Lewis Law Firm on behalf of the Dugaboy Investment Trust. I am joined by Michael Gattis from the King Spalding Law Firm. Mr. Harper from King Spalding Law Firm was not able to attend today due to protracted trial proceedings, but I'll be handling the argument on behalf of Dugaboy Investment Trust.

THE COURT: Okay. One moment, we're working through some technology while I'm starting here.

(Pause)

THE COURT: All right. Do we have any other parties that are wishing to make an appearance in this matter?

(No audible response)

THE COURT: Okay. Hearing none, that will be great. I'm going to ask you real quick, Mr. Phillips, mainly because

you had mentioned that your client is there, Mr. Mark Patrick. I didn't see any witness and exhibit list filed. I'm assuming nobody, or you are not intending to call any witnesses in this matter?

MR. PHILLIPS: No, Your Honor.

THE COURT: Okay.

MR. PHILLIPS: My client representative for the HMIT Entities and CLO Holdco is Mr. Patrick, and he's just observing.

THE COURT: Okay. All right. I just wanted to make sure --

MR. PHILLIPS: And I -- yeah.

THE COURT: I just wanted to make sure because I think we do have some other parties that have dialed in. And usually if we're going to have an evidentiary hearing, I try to get an understanding of everybody that may be dialed in that's listening in and who they are affiliated with.

So before we get started, let me see first if the parties have reached any agreements on all these matters.

MR. STANCIL: No, Your Honor. I think we have sort of a fundamental disagreement.

THE COURT: Okay. Well, I was --

MR. PHILLIPS: (Indiscernible).

THE COURT: I was optimistic that maybe the parties were able to come to some term or some agreement on this deal.

Mr. Phillips, you were going to say something. I didn't want to cut you off.

MR. PHILLIPS: Your Honor, I'm sorry. Yes, I was going to agree with Mr. Stancil.

THE COURT: Okay. All right. The next thing I have for the parties, and I'm trying to think through all of this, but I've got a real question. And it's not something I think I have to solve today, but I've got a real question about whether or not I have jurisdiction to even consider the underlying motion, the Rule 60(b) motion.

Obviously, Dugaboy Investment Trust has already filed an appeal on that matter. The appeal is pending, as I understand it, and has been fully briefed. And so, I guess my question that I'd like to have some understanding on is, and maybe I'll start with you, Mr. Edney, is how does this Court have jurisdiction over the underlying motion at this time to even consider whether we need to deal with this discovery dispute?

MR. EDNEY: Sure, Your Honor. You're correct. There was a timely filed appeal, and that is pending in front of the district court. And I would tend to agree with Your Honor that that would deprive the Court of jurisdiction to go back and adjust the order based on what happened at the time. But this motion is based on emerging evidence of misconduct and fraud and newly discovered evidence.

And I do believe the Court maintains jurisdiction to correct that. Otherwise, we'd have this protracted logjam where we'd have to wait for that timely filed appeal to resolve itself before a Rule 60 motion could be decided, which it has its own time limits, time limits which aren't stayed by dependency of an appeal.

So, we can research that a bit further for Your Honor. It obviously hasn't been briefed, but I am confident that there will be some authority for a Rule 60(b) motion to proceed when there's an appeal of the underlying order pending based on what happened back then.

THE COURT: Okay.

MR. STANCIL: Your Honor, I think I can solve this.

THE COURT: Hold on one moment, Mr. Stancil. Okay.

MR. STANCIL: Yes.

THE COURT: I'm going to give everybody their opportunity to talk. So, please understand I'm not going to cut anybody off.

Okay, but let me make sure that I understand. And this will somewhat play into the underlying motions we have set for today. The fraud though, Mr. Edney, if I'm understanding correctly, isn't fraud that occurred post-settlement. The allegations are fraud that occurred pre-settlement, correct?

MR. EDNEY: Correct. It is evidence that emerged after the order but about events occurring before the order.

THE COURT: Okay.

MR. EDNEY: Right. So, it would not have been error for the previous bankruptcy judge to approve the settlement order due to this late emerging evidence because this late emergency evidence wasn't apparent at the time. But it is evidence of events that occurred prior to the order approving the settlement.

THE COURT: Okay. Mr. Stancil.

MR. STANCIL: So, thank you, Your Honor. With respect to jurisdiction, I believe the answer is supplied by Rule 62.1, which states that Your Honor has jurisdiction to deny the motion. And I'll walk through it in a second. But would have to ask for jurisdiction back for it to incline to grant the 60(b) motion.

So, Rule 62.1 says if a timely motion is made for relief that the Court lacks authority to grant because of an appeal that has been docketed as pending, the Court may, one, defer considering the motion; two, deny the motion; or, three, state either that it would grant the motion if the Court of Appeals remands for that purpose or that the motion raises a substantial issue.

I think this is often referred to as an indicative ruling under 62.1(a). So, that's how the Rules Committee has solved this 60(b) issue. So, we believe Your Honor will deny the motion and you have clear jurisdiction and authority to do

that under 62.1.

THE COURT: Okay. Well, let me say this. Well, first, Mr. Phillips, did you have anything that you wanted to say in respects to the subject matter jurisdiction issue?

MR. PHILLIPS: No, Your Honor. We agree with Mr. Stancil's perspective. We do not want our silence -- we don't want to create a back and forth, baseball-bat hand-over-hand. We do not agree with the representations made by counsel for Dugaboy that evidence was unavailable, that it was newly discovered, anything like that.

This is all, I think it's been demonstrated by the papers that that's demonstrably false. So, I don't want my silence -- I agree with Mr. Stancil's analysis of the way the Court is directed by Rule 62 to resolve the issues before it, but I don't want to go unresponded to the suggestion that there is any basis for a Rule 60 motion.

THE COURT: Okay. All right. Well, and again, I'm not going to decide that today, but I do bring it up to the parties and as you all prepare for a May 11th trial, that will be something that we'll need to address. So, maybe I'm giving you a little foreshadowing of what the Court's going to want to have some better resolution and understanding on as we come to the actual underlying motion.

The next issue that I've kind of identified as I've looked over you all's pleadings and the various motions and

joinders and supplemental -- or declarations and supplements, as well as responses and replies, is the concern that I have that ultimately depending on how the Court rules, we're looking at delay.

So this, again, I'll start with you, Mr. Edney. I mean, we've got over, some of these requests for discovery are over 90 requests. I mean, this is pretty extensive discovery that you've requested. I mean, should I be anticipating that I'm going to get a motion to continue the May 11th hearing because we're going to have some question of whether or not you can process and get prepared with all the discovery you've requested if I allow it to continue to go forward?

MR. EDNEY: Your Honor, I think that is a possibility. And, you know, let me say this. I think because of the dispute about whether there should be any discovery at all, what has been skipped over here a bit is some of the natural process that would have gone on had there not been that dispute. That is, you know, the other side looking at the particular requests saying, you know, this is feasible, this is too broad. You know, we can do this, but that's too much.

That hasn't occurred, unfortunately. We haven't had that kind of natural meet-and-confer process. We've asked for it, but it hasn't happened. And because of that, because of this underlying question, this claim by my brother counsel on the other side that there should be no discovery at all, you

know, I think the requests do remain broad.

I would anticipate, Your Honor, if that we could clear the threshold objection of there only being unilateral discovery, not bilateral discovery, and that we get to the point where we're talking about what discovery is returned by the other side. Brother counsel and I will go through a process to work that out. We'll go through a process to narrow it. We'll go through a process to talk about feasibility.

But I do imagine that that may take some time once this objection is cleared. And it wouldn't surprise me at all if the parties together, or us individually, ask Your Honor to push the May 11th trial back so that process that should have been going on earlier can work itself out. I guess that's the beginnings of a response to your question, Your Honor.

THE COURT: Okay. Let me ask you this. Have you heard anything from this entity, which I'm going to ask more questions about, but this entity ValueScope with a subpoena requires their responses to be done today by 5 p.m. Has your side heard anything from ValueScope?

MR. PHILLIPS: Your Honor, Louis M. Phillips, I represent ValueScope as well. And ValueScope joined into the motion for protective order in the original joinder that was --

THE COURT: Well, that answers that question, Mr. Phillips.

MR. PHILLIPS: Yeah. At 4546, that was our original

joinder. We did -- ValueScope was served with a subpoena. And we responded for ValueScope by joining the motion for protective order sought by Highland in all respects.

THE COURT: Okay.

MR. EDNEY: And Your Honor, that, you know, the ValueScope issue, I don't want to accelerate the merits into this discovery question, but the ValueScope value, the valuation for ValueScope, that facilitated the restructuring of the issue in the 60(b) motion, that's going to be a very important issue in this case. So I'm glad Your Honor's attention was drawn to it.

MR. PHILLIPS: And Your Honor, in response to that, I would say it's absolutely not important to this case, but --

THE COURT: Okay. Gentlemen, the Court has read the pleadings. I'm aware of the arguments. I'm trying to see if we can cut to the chase and get to what really needs to be discovered and what can, what we can move on from. And so I understand the arguments.

I understand this Court -- or I say this Court, I mean, this judge, I've been on, or my staff and I have been on this case now for maybe five months. We're drinking from a fire hose to try to get an understanding of what Highland was and how all of these entities relate to each other and how, at the end of the day, the actions that are being alleged as the fraudulent actions here have any play with this bankruptcy

estate and with the settlement.

And so I understand you guys want to argue your points. I've read them. So what I want to try to do here for the time that we have is try to get to the bottom of this and try to see where we end up. So I've got some questions that I'm going to be asking and wanting to get some understanding so that I can kind of better address this discovery issue.

So let me start off, and Mr. Stancil, most of these questions may be coming to you mainly because you represent Highland. So to the extent that -- and forgive me, I'm not quite sure, Mr. Stancil, if you're kind of more the litigation counsel, if Mr. Morris, I believe he's on, if he's going to need to address some of these.

But let me understand, first off, kind of the corporate structure of Highland prepetition. And I understand I'm going way back and I'm getting into the basics here, but I got to understand this as a judge. So prepetition, what was the corporate structure of Highland?

MR. STANCIL: I invite Mr. Morris to jump in. I think that question alone, prepetition, would probably take quite a while.

MR. MORRIS: Sure.

MR. STANCIL: Go ahead, John.

MR. MORRIS: Let me try, Your Honor. This is John Morris, Pachulski Stang Ziehl & Jones, for Highland.

Prepetition, Highland was a limited partnership. It had two tiers of limited partners. The senior limited partner was Hunter Mountain Investment Trust. They held 99.5 percent of the limited partnership interests. Subordinated to HMIT was a handful of both individual and other entity-type holders or limited partners who collectively held one-half of one percent of the limited partnership interests.

Within that one half of one percent is Dugaboy. Dugaboy held exactly 0.188 percent of the limited partnership interests. And those limited partnership interests were subordinated to HMIT in terms of distribution. And that structure was adopted into the plan of reorganization so that you have in Class 10 -- in Class 8, you have general unsecured creditors.

Class 9 was another class of general unsecured creditors that was created that was subordinate to the Class 8 claims so that they would not get paid until the Class 8 general unsecured creditors got paid in full. So that's Class 9.

Class 10 is the holder of the former senior prepetition limited partnership interest. And that's HMIT. And that's the subject of the 9019 motion because one aspect of the 9019 motion was to fix the value of the HMIT prepetition interest. That value was established by allocating the capital that existed as of the petition date.

And then you have in Class 11, the former subordinated limited partners of Highland, which includes Dugaboy. And so Dugaboy, under the limited partnership agreement, but most importantly, under the plan, which has never been challenged, gets not a nickel unless and until HMIT gets paid in full. HMIT's claim has now been fixed at an amount of over $300 million on a net basis. And I don't think there's any dispute that HMIT will never get paid in full, which does raise the question of what are we doing here?

But that's the prepetition corporate structure, Your Honor.

THE COURT: Okay. Thank you, Mr. Morris. And so to make sure that I understand it, that structure was actually arranged, as I read it, by Mr. Dondero prepetition and many years before the actual bankruptcy filing?

MR. MORRIS: That's correct, Your Honor. That was in existence for many, many years. In 2015, long before I ever heard of Highland, there was a restructuring into which Mr. Dondero and Mr. Okada's interests were placed into HMIT. There's a note that went back to Highland. Mr. Dondero and Mr. Okada got their own consideration, but that's how long HMIT has been the senior 99-1/2 percent limited partner of Highland. It goes back to 2015, I think a full four years before the petition date. And it was done under Mr. Dondero's exclusive control.

THE COURT: Okay. And then as part of the restructuring plan, as I understand it, essentially old equity was wiped out. Essentially all equity was wiped out of the reorganized Debtor, and we have various trusts that are established. In particular, you have the claimant trust. And old equity got a beneficial interest in the claimant trust and every other creditor likewise. But it was also established to be based on the priorities as the plan provided.

And as you just mentioned, Class 8 and 9 were general unsecured creditors. Class 10 was HMIT. And I believe another company has some claim in Class 10 of $10 million or so. And then Class 11 is the remaining half of one percent of the original owners of Highland.

MR. MORRIS: You have that almost exactly right.

THE COURT: Okay.

MR. MORRIS: I'm going to give you two very, very specific clarifications.

THE COURT: Okay.

MR. MORRIS: The prepetition limited partners placed into Class 10 and Class 11 were given, their interests were extinguished. There was never equity. They were limited partners, which is equity with a small E, I suppose. But their interests were extinguished and they received contingent unvested interests in Class 10 and 11. And that was one of the important things that happened with the settlement with HMIT.

Their interest became fixed and it's no longer contingent. It's in a fixed amount.

So that's one little thing I want to make sure Your Honor understands that until last summer's hearings where we were able to fix the interest, they were contingent and unvested. And the other thing is you're absolutely right. There is another holder of a Class 10 interest, not because it was a prepetition limited partner, but as the result of an agreement that was made in December of 2024 between Highland and an entity called HCLOM.

It's HCLO Management. HCLO Management had a claim against Highland. It's another entity that was controlled by Mr. Dondero. The long and the short of it is the resolution of the dispute over that claim placed HCLOM into Class 10. But just for context, Your Honor, that was kind of the precipitating event from our perspective as to how we wound up negotiating with HMIT because we insisted as a condition of that settlement in December 2014 that HMIT consent to the placement of HCLOM into Class 10 so that there was no misunderstanding because it would impact HMIT's rights.

And in January after that settlement was announced, Mr. Phillips informed me that Mr. Dondero and his counsel had given HMIT's consent without Mr. Patrick's authority. And that is the first time that I learned that Mr. Patrick and Mr. Dondero were no longer seeing eye to eye, and that

Mr. Patrick had alleged that Mr. Dondero acted without authority and purported to bind HMIT.

But that's a long-winded answer to is there another claimant in Class 10? There is, but not as a result of their prepetition limited partnership holdings.

THE COURT: Okay. When you said that the settlement that was approved fixed the contingent claims, does that also mean it fixed the contingent claims that are Class 11 or just fixed the contingent claim of HMIT?

MR. MORRIS: So absolutely perfect question.

And on June 25th, 2025, the Court approved the settlement with HMIT, and it fixed only HMIT's Class 10 claim. We later, we being Highland, later made a separate motion to fix the value of each of the Class 11 interests. That was the subject of a separate motion.

We had a hearing on that in September. And Judge Jernigan entered a separate order that's not directly relevant to this proceeding whereby she fixed not only Dugaboy's, but all of the holders of the Class 11 interests. So that did happen, but it happened subsequently and as part of a separate motion.

THE COURT: Okay. Continuing my questions to better understand Highland, any investment that was being managed by Highland was actually, as I understand it, placed into a separate entity and that I think if I look at the settlement

agreement, there's this gigantic list of entities that are called Highland Parties. And maybe this wasn't for everyone, but like Highland CLO Funding Limited, Highland HCF Advisor Limited, Highland Multi Strategy Credit Fund L.P., Highland Multi Strategy Credit Fund GP LP. All of those entities were formed as part of Highland's operations to hold various different investment vehicles. Is that accurate?

MR. MORRIS: I think it's generally accurate. Prepetition Highland had many, many, many, many, many different entities, some of which did nothing. Some of them just held interests in certain assets. At the end of the day, they all became part of the estate. And under Mr. Seery's leadership, we have done what is necessary to either monetize or otherwise close out virtually all of those entities.

THE COURT: Okay, which now leads me to the next question, which is I'm trying to understand what are the HMIT entities and what are the DAF Entities? And so I don't know if that's a question for Mr. Phillips to address or Mr. Morris.

Well, let me stop. Again, I do want to give all parties. Mr. Edney, did you have anything that you wanted to state on behalf of your client as to whether or not what we've just been talking about is accurate?

MR. EDNEY: Yes, Your Honor. So I think one of the key aspects that's important to keep an eye on is that when we talk about this prepetition restructuring that involved these

Hunter Mountain entities, these HMIT entities that took over a significant limited partnership interest, the purpose of that was for Mr. Dondero, who was the owner of Highland, to provide the value of much of his equity to charitable organizations, right?

And I think one of the issues that we're going to be discussing in the Rule 60(b) is how that has been disrupted and thwarted by some of the restructurings that Mr. Patrick did. But this was an effort for Mr. Dondero to benefit charities in large part, and it's an effort that has been falling apart over the course of the last year and a half.

THE COURT: Okay, but I'm asking about Highland's structure.

MR. EDNEY: Yes.

THE COURT: Do you have anything that is different than what Mr. Morris said about Highland's structure prepetition and then what the plan or the reorganized better looks like?

MR. EDNEY: Yeah, no, I don't really. I will say this, that the fixing of Hunter Mountain's interest, that was part of the settlement order that's being challenged here and being challenged on appeal. But yes, I think Mr. Morris had it largely correct.

THE COURT: Okay, all right. Mr. Morris, did you want to take on the questions on HMIT's structure or

Mr. Phillips?

MR. MORRIS: Sure.

THE COURT: Okay.

MR. MORRIS: Sure. And Mr. Phillips may have more to add. My understanding is that both the creation of the HMIT series of entities as well as the creation of the DAF series of entities was really simply a tax-driven exercise in order to avoid the payment of taxes on the income that was being generated from Highland.

And in order to create the Hunter Mountain Investment Trust, Mr. Dondero had to, from a legal perspective, give up control. And he originally placed, it's literally called the control person. It is the administrator of the Hunter Mountain Investment Trust. He originally gave the keys to the Hunter Mountain Investment Trust to his friend, John Honis and then, I apologize, I forget if it was in 2021 or '22, as the litigation accelerated post-confirmation.

For reasons that I don't know, Mr. Honis gave Mr. Patrick the keys. And so Mr. Patrick became holder of the HMIT enterprise. It was a fairly complicated structure, the sole purpose of which my understanding is, was to avoid the payment of taxes until sometime in 2024.

Based on my reading of the papers and certainly to my knowledge based on what I learned in January of 2025, Mr. Patrick was doing exactly what Mr. Dondero wanted him to

do, vis-a-vis Highland. He was suing Highland at every opportunity. And then, they came to their disassociation. And here we are with HMIT trying to resolve litigation with Highland.

But as a matter of fact, Your Honor, that enterprise, the HMIT enterprise, was done in order to save on taxes, as was the DAF enterprise. This is my understanding. They created this blocker entity. I think in Dugaboy's own papers, if you read carefully, you'll see that very little of the money that's held by the DAF is distributed to charities over time. It's really just a hedge fund in the Cayman Islands by another name that Mr. Dondero has controlled.

But be that as it may, the important point here, Your Honor, is that there is no relationship between HMIT and the DAF enterprise other than Mr. Patrick was given the keys to both. And under the law, under the documents, he has control. He's always had control, at least since he was given the keys.

Mr. Honis gave him the keys to HMIT and a gentleman named Grant Scott, who is Mr. Dondero's longtime friend, also, I think, got uncomfortable with the litigation. And in about March or April 2021, I think, he turned over control of the DAF to Mr. Patrick. And the DAF, too, was engaged in very substantial litigation with Highland up until the spring of 2025 when we reached this agreement.

So there are two different silos of entities, if you

will, both of which were created for the sole purpose, really, of tax avoidance, and both of which are and have been and remain under the exclusive control of Mr. Patrick since 2021-2022.

THE COURT: Okay. I'm looking at these charts. And so, I mean, Mr. Edney, you're welcome to jump in. But I'm looking at the charts from your -- this is from the motion to vacate or overturn the order approving the settlement.

So we've got Beacon Mountain, LLC. We've got Rand PE Fund I, LP. We've got an Atlas IDF, LP. We've got Rand Advisors, Rand PE, Atlas IDF. Those are all the HMIT entities, correct?

MR. EDNEY: Is that a question to me, Your Honor?

THE COURT: Yeah. Well, I'll take an answer from anybody.

MR. EDNEY: Yes, Your Honor. I think they're largely referred to as the HMIT entities.

THE COURT: Okay. And the only way that they have any interest in Highland or the Debtor is through the ownership between Hunter Mountain Investments or HMIT. And it's 99.5 percent ownership interest. Is that right?

MR. PHILLIPS: Your Honor, if I could, Louis M. Phillips. That is correct. I would add to -- I'm not going to adopt Mr. Morris's descriptive phraseology, but I would adopt his suggestion to the Court that we have two different silos.

The DAF is a charitable enterprise. And there is some -- and then let's just call Dugaboy, Mr. Dondero.

Mr. Dondero is a party to -- he's the control person, we say, of certain foundations and support organizations that have been related to the DAF and its affiliates. Mr. Patrick is in charge of the DAF and its affiliates. There's one of those entities that is in liquidation in the Caymans, but those entities historically were not involved in HMIT.

HMIT is the owner of the equity in Highland, the 99.5 percent equity in Highland. And that is its own -- that's one silo. And you're correct, Your Honor, that the HMIT entities were parties to the settlement because Highland, and we understood that, and reciprocally, we wanted releases. So the HMIT entities were parties to the settlement primarily for purposes of the release provisions Highland, as you pointed out, had an extensive list of entities for which it wanted releases. And HMIT had its list of entities to be released, as well.

And because the DAF had been involved through CLO Holdco and various DAF Entities in litigation with Highland, all of those entities wanted releases. And we worked out through the settlement reciprocal releases that involved parties that were related to the settling parties, but did not hold equity in Highland. The HMIT entities did not hold equity in Highland. They are parties so that they could get released

by Highland.

And many of the Highland entities that Your Honor mentioned and Mr. Morris discussed, Highland wanted releases for those entities, as well, from HMIT and the HMIT entities. So the number of parties to the settlement were in effect, they're really two parties to the settlement as far as exchange of interest and value. And that is HMIT, Hunter Mountain Investment Trust, and Highland. The other parties to the settlement are there for their being released. And I wanted to make that clear.

The DAF is a release party in the settlement. And that's because the DAF had been sued by Highland, for example, for fraudulent transfer, disputed for various and sundry claims in the, quote, Kirschner litigation, the litigation sub-trust. And those entities wanted dismissal from that litigation. And Highland wanted releases from those entities because those entities had been involved in litigation.

So all of this, and I think what we said in the papers is correct. But all of this, we dispute the suggestion that HMIT was set up as part of the charitable enterprise. The charitable enterprise is the DAF. And HMIT is the owner, or was the owner of Highland. I agree with Mr. Morris's description of the effect of confirmation of the plan, who granted contingent beneficial interest that would not vest unless and until there was a vesting. And part of our

settlement was that we would not vest, but we would have claims. And the settlement outlines how those claims would be treated.

The one other thing I'd like to point out, and this is, I'm going back a couple of steps, but I did interject myself. With respect to the additional, the HCLOM $10 million that went into Class 10, the reason that that settlement stood was because HMIT made a deal, settled its claims against HCLOM. And now that 10 percent, while it is part of an order that Mr. Morris and Highland are subject to, HCLOM and HMIT made a deal that HMIT gets, I think, 95 percent of any money that HCLOM might be entitled to, because we were going to file a motion to reconsider without a settlement because of the lack of authority in signing HMIT's name to the deal with Highland.

Instead, we made a deal with HCLOM to take, HMIT take 95 percent of any distribution to HCLOM. I wanted to put that -- that's the full picture of the $10 million that was added to the Class 10 claims.

THE COURT: Okay. So, but Mr. Phillips, as I'm understanding it, you're saying that HMIT and DAF are two separate organizational structures, there's no ownership between the two.

MR. PHILLIPS: At this point, there is an ownership. Historically, there was not. But at this point, CLO Holdco is the owner of HMIT.

THE COURT: And that's the entity that is owned by Mr. Patrick?

MR. PHILLIPS: Well, it's owned by the DAF, one of the DAF Entities --

THE COURT: Okay.

MR. PHILLIPS: -- under the entity that's in litigation -- that's in liquidation.

THE COURT: Okay. All right. Mr. Edney, let me hear from you on any of that.

MR. EDNEY: Yes, Your Honor. You know, the structure is no question complicated. Let me point out, I think, something that is fundamental, though. What you're going to hear about in the Rule 60 is a lot about the corporate restructurings. By the time we got to the settlement, Mr. Patrick had engaged in an effort to try to separate the charitable exercises from HMIT.

Prior to the settlement, in 2024, Hunter Mountain was owned by the Atlas Fund. And the Atlas Fund was owned by the Dallas Foundation. So the point of Hunter Mountain was to benefit one of Dallas's oldest charities. Patrick reorganized that, right, and got it out from under the Atlas Fund or in a transaction that I think raises very serious questions that we'll talk about when we get to the substantive hearings. And then he engaged in yet another restructuring when he put it in association with the DAF to put it under his sole control as

opposed to the three variable entities that owned the DAF.

So to say that there's a silo between the Charitable Entities and Hunter Mountain is part of the problem, right? It's part of the restructuring that Mr. Patrick pulled off, we believe for his own personal benefit. And I don't want to accelerate the merits here, but to say that there's the charities on the one hand and Hunter Mountain on the other, we do contest that.

And I think one of the points of the charts in the Rule 60(b) motion is to walk the Court through how that happened or how that was attempted to happen and the inappropriateness of that.

THE COURT: Okay, let me ask you this.

MR. PHILLIPS: I --

THE COURT: Hold on one second, Mr. Phillips.

Let me ask you this, Mr. Edney, because I think this may go to -- and this goes to, I think, what I believe your client's position is. But if I'm understanding you correctly on why you're saying that these structures were originally put into place, this is before any of the alleged fraudulently restructures by Mr. Patrick, was that profits of Highland were to flow up into these charitable organizations, correct?

MR. EDNEY: Exactly.

THE COURT: Okay, hold on one second. Hold on one second.

MR. MORRIS: Yeah, that's not accurate, but --

THE COURT: Hold on one second.

MR. PHILLIPS: That's not accurate, Your Honor.

THE COURT: Okay, hold on, gentlemen. Please hold on, okay? Like I said, I'm going to give everybody their opportunity here.

So my question to you is, if that is the case and Highland is defunct, what is, I'm trying to understand how then the Hunter Management or Hunter Mountain Trust, HMIT, has its settlement, has anything to do with how that affects these charitable trusts or these charities if the funding source for these charities already is defunct?

MR. EDNEY: I see. Yeah, I mean, Your Honor, if there were no money to get up to Class 10, that might be an issue. But the reason there is this settlement is that there may be, right? And so what we're dealing with here, and I think -- I don't want to get too far into the bankruptcy, but I think the creditors have largely been satisfied.

What we're dealing with at this point in these bankruptcy proceedings is what is left over. And our concern is that that Hunter Mountain was organized to be an asset of the Dallas Foundation up until February 2025, where the Dallas Foundation, part of Mr. Dondero's charitable legacy, would be the beneficiary of what's left over in this bankruptcy.

And Mr. Patrick organized it, reorganized it, so the

proceeds of this bankruptcy or what's left over would blow up the entities that are controlled by him. And that is of great concern to Mr. Dondero because that's not what he had in mind when he put together this structure.

THE COURT: Okay. Right, but --

MR. MORRIS: If I may, Your Honor, when you're ready.

THE COURT: Hold on one second, Mr. Morris, because I've got to follow up to that. And then I'm going to let you say what you would like to say.

But the question, though, from what you just stated is an issue between the money going from Hunter -- HMIT to those charities. That's not a bankruptcy issue. The bankruptcy issue is, is Highland paying out to its creditors like it should? And if it pays to Hunter Mountain the money that is supposed to go to Hunter Mountain, then it's done what the bankruptcy has provided, correct?

MR. EDNEY: Well, I guess my answer to that question would be yes and no. The primary purpose of any bankruptcy is to protect creditors. And what we would traditionally understand the creditors have been largely taken care of in this bankruptcy and now we're dealing with what's left over.

The bankruptcy plan, however, converted the equity holders like HMIT, like Dugaboy, like others into a type of creditor assigned to the class status, right? And that's why there was this process over the summer. And Mr. Dondero was

concerned about how that process works out because he wants the destination of those funds to be charitable, not personal, not personal to Mr. Patrick. And --

THE COURT: Okay, but Mr. Edney, I apologize that I'm cutting you off, but --

MR. EDNEY: Of course, Your Honor.

THE COURT: -- the issue is he wants to control, he's asking this Court potentially to control how Hunter Management or Hunter Mountain moves those funds to where he wanted them to go, not how the Debtor gets those funds to where he wants them to go.

MR. EDNEY: Right.

THE COURT: Right? I mean, the Court only has the ability to govern what the Debtor -- where the Debtor is supposed to pay its creditors or as now equity, and it doesn't have the ability to direct where equity sends its money.

MR. EDNEY: Fair enough, Your Honor.

THE COURT: Okay.

MR. EDNEY: But Mr. Patrick, by entering into a settlement with the Debtor, had massive consequences as to what equity, what those equitable entities now turned into Class 10 and 11 creditor-like entities received. And we believe that if Mr. Patrick had not tried to conceal his restructurings and not engaged in misconduct and fraud -- and I do understand that the opposing counsel disagrees with these characterizations, but if

he had not, he would not have had authority to enter into that settlement.

Mr. Patrick is the wrong person to be making decisions on behalf of equity. And it had a massive consequence about what equity would take from this bankruptcy process. That's why we think the settlement should be set aside.

THE COURT: Okay. Mr. Morris?

MR. MORRIS: If I may, Your Honor.

THE COURT: Yeah.

MR. MORRIS: Yeah. First of all, Your Honor, again, your question is exactly the right question. I wrote on my paper as Mr. Edney was talking, that this is an intercreditor dispute. I don't mean that, right? These are former limited partners, so I'm using the phrase creditor colloquially, but this is an intercreditor dispute that has absolutely nothing to do with Highland.

The point that was made just now that somehow the Court shouldn't have been able to approve of the agreement because of some misconduct on the part of Mr. Patrick is exactly wrong. There is no dispute. There has never been a dispute that Mr. Patrick was given the authority to run HMIT.

If you simply look at the claimant trust, not the claimant trust agreement, the Hunter Mountain Investment Trust Agreement, it says very clearly -- and, frankly, until this

moment, I didn't even think this was in dispute -- that Mr. Patrick has sole authority over HMIT, including the authority to settle claims.

He had that authority when he was given the keys back in 2021, 2022. He had the authority when he entered into the settlement agreement. He had the authority on June 25th when the Court approved the settlement agreement, and he has that authority today. In fact, no party has ever sought to remove Mr. Patrick as the administrator of HMIT.

So again, I don't know what we're doing here. I don't know what the basis of this claim is. He had the authority to enter into the settlement agreement. It's in the trust agreement itself. If he engaged in wrongdoing, if Dugaboy or somebody else ever actually proves that and, of course, the Cayman Islands Court has already rejected this factual basis for purposes of assessing whether or not to impose injunctive relief, they'll have a claim against Mr. Patrick. That's not going to undo this settlement.

UNIDENTIFIED SPEAKER: Right.

MR. MORRIS: I've said this many times to my colleagues. Even if the joint official liquidators somehow prevail on a breach of fiduciary duty claim in the Cayman Islands, that's not going to retroactively say, Mark Patrick didn't have authority on June 25th, 2025 to get this settlement approved. And the proof is in the pudding, Your Honor.

I think there was a very inaccurate statement here about HMIT being somehow existing for the benefit of charities. That's exactly wrong. HMIT does not exist for the benefit of charities. And you don't have to take my word for it. Just take the word for it of the representatives of the Dallas Foundation who testified to that in their deposition. And it was after providing that testimony that they withdrew their objection to the 9019 settlement with prejudice, leaving Mark Patrick in place as the administrator of HMIT.

Dugaboy is here with absolutely no connection to DAF, with absolutely no connection to HMIT whatsoever in any way, shape or form. And they claim to be here acting on behalf of the charities. Where are the charities? The charities settled with HMIT, okay? The Dallas Foundation did. The Dondero Foundations, they're still in the Cayman Islands taking their direction from Mr. Dondero and losing, right?

We were told last June, just wait, Judge Jernigan. You should adjourn this hearing. Because the JOLs need to complete their investigation. And Judge Jernigan said, I see no connection between what's happening in the Cayman Islands and what's happening in my courtroom. We're going to proceed. She did. She ruled. She granted the motion.

Several weeks later, Dugaboy comes back with the conclusions of the JOL's investigation in the form of this writ and summons that was filed in the Cayman Islands. And they

made a motion for a stay. And they said, oh, please, now you have to stay it this entity in the Cayman Islands that I have absolutely no connection to has completed their investigation. And they've got these wonderful claims that you should wait for the Cayman Islands Court to rule.

Judge Jernigan said, no, I don't see the connection between the DAF and HMIT. I don't see the connection between the Cayman Islands and anything that's happening in my courtroom. And she denied that motion.

Fast forward to December. They have a two-day hearing in the Cayman Islands on the facts that were adduced by the official liquidators. A ruling comes out in February that I think we've established Mr. Dondero certainly knew about in advance. And they deny the motion for injunctive relief in its entirety.

And so I really -- you may hear a sense of frustration in my voice, Your Honor. If you do, there is a sense of frustration in my body because I don't know what we're doing here. Mr. Patrick had the authority. He still has the authority. He's never been removed. Nobody's even threatening to remove him. What are we doing?

This seems like a great waste of time that at the end of the day, just to finish up, Your Honor pointed out correctly, this is an intercreditor dispute. It's nothing more than that, if it's that at all.

THE COURT: Okay.

MR. PHILLIPS: Your Honor, if I could say something now?

THE COURT: Yeah, Mr. Phillips, please be brief.

MR. PHILLIPS: I will. But I think the most egregious misstatement is to rely on the connection of the Dallas Foundation, which was an objecting party and with whom HMIT settled. And part of that settlement, as Mr. Morris has pointed out, the Dallas Foundation withdrew its objection with prejudice.

THE COURT: Okay.

MR. PHILLIPS: With prejudice.

THE COURT: All right. Thank you.

All right. Here's the next thing I'm trying to understand. And Mr. Morris, this is probably going to go back to you. The Kirschner litigation. What I'm trying to understand there is, is it's my understanding that they were suing or Mr. Kirschner is the trustee of the litigation trust, which was established under the plan. As part of that trust, he was suing multiple parties. In particular, it looked like the majority of the ownership structure and maybe up the chain of the ownership structure related to Highland.

Is that fair? And can give me some more understanding of the Kirschner litigation?

MR. MORRIS: Sure, sure. Sure. So in our disclosure

statement, I've described for you the structure of the interests in the proposed claimant trust, Class 8, Class 9, Class 10, Class 11.

In our disclosure statement that was prepared in the fall of 2020, we projected that Class 8 would recover 70 percent on the dollar and that Class 9 would receive nothing. Class 10 would receive nothing. Class 11 would receive nothing.

And in order to try to maximize recoveries for creditors in negotiations with the Creditors Committee, we wound up agreeing that there would be a litigation sub-trust that was created. Ultimately, Mark Kirschner became the litigation trustee. And they would pursue any additional claims that the estate might have in order to maximize recovery from creditors and to try to get that 70 percent number up.

They filed their complaint in October of 2021. It asserted a host of causes of action for fraudulent transfers and other claims against Hunter Mountain. I think there was a claim for breach of a note. So there was a potpourri of claims, if you will, that was asserted by Mr. Kirschner in the fall of 2021. And the whole purpose of the complaint was to try to make sure that the unsecured creditors in Classes 8 and 9 received as much value as possible.

Fast forward to 2023. Our nation emerged from COVID. Asset values increased. Mr. Seery and his team worked their

tails off to try to maximize value. And so from 2021 to 2023, '24, they were monetizing assets and they ultimately exceeded expectations. And so creditors received considerably more than had been projected in the fall of 2020 in the depths of COVID. And there came a time when we decided to put the Kirschner litigation on ice.

(Echo sound)

MR. MORRIS: And the -- Debra, can you unmute your phone, please? Thank you.

Consensually, all parties agreed to stay the Kirschner litigation, I think it was the spring of 2023. It could have been 2024. And that's where it remained. And ultimately, when Class 8 got paid in full and a substantial distribution had been made to Class 9, the justification for the HMIT litigation, from the claimant trust's perspective, started to evaporate because the point of the exercise was to recover additional monetary -- you know, more money to go to Class 8 and 9, but it looked like they were -- that there was a chance that they could get paid in full.

And as of now, I think Class 8 has been paid in full. Class 9 has been paid about 90 percent. And there, today, depending on what happens with this case, theoretically, subject to the indemnification reserve, which is the highest priority in the structure, there could be enough to pay.

And so when we entered into negotiations with Mr.

Phillips on behalf of HMIT, the question that we have to ask ourselves is who is actually the beneficiary of the Kirschner litigation? And at this point, we decided the beneficiary of that litigation really is HMIT as the Class 10 holder.

The merits of the claim never changed. The only thing that changed was where is the value in these claims? Who would benefit from the value? And since Classes 8 and 9 have largely been paid in full, although not wholly on the Class 9 side, HMIT really was next in line as the beneficiary. So that lawsuit ceased to have meaningful value to the estate, not because there was any question about the merits of the claim.

And I appreciate that Dugaboy and Mr. Dondero and others on the bottom of the V will take a different view. I don't think that's for the Court to decide today. But if the question is, why did we transfer that as part of the settlement? It's because HMIT ultimately became the likely beneficiary of those claims. Whatever value they have, that value inures to the benefit of HMIT. And so it just made sense to give it to them. I hope that answers your question.

THE COURT: It does.

Mr. Edney, did you have anything that you wanted to state as to that?

MR. EDNEY: Yes, Your Honor. Briefly, we have a different perspective than Mr. Morris. If the value of the Kirschner litigation has abated to the estate, they should have

dismissed it. Instead, they gave it to Mr. Patrick to use as a cudgel to get Mr. Dondero of his back for bringing to light his theft of the DAF and of HMIT from the Charitable Entities.

And that is a particularly distasteful aspect of this settlement. And it is one that brings very much to fore the misconduct and fraud that Mr. Patrick was engaged in.

MR. EDNEY: Your Honor?

MR. PHILLIPS: -- that integrated into the settlement.

THE COURT: Okay. Hold on one second, Mr. Phillips. I've got a question for Mr. Edney that I want to ask first.

Okay. Did I just hear you correctly that your client's position is that instead of having assigned the litigation to Hunter Mountain, that they should have just dismissed the litigation?

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. Mr. Phillips? And I don't want to go back and forth and have attacks on parties and --

MR. PHILLIPS: I cannot --

THE COURT: -- who they think are bad guys, not bad guys. I understand that. I just, I'm trying to understand the underlying facts because I'm trying to dictate what is going to govern this discovery. So, Mr. Phillips?

MR. PHILLIPS: Your Honor, number one, Mr. Morris is exactly right in his description of the Kirschner litigation.

Some of the parties that were parties to the Kirschner litigation, defendants in the Kirschner litigation, I represented and they have all been dismissed as part of the releases and subsequent to the settlement, a dismissal of one client that was not encompassed by the release. But the Kirschner litigation was against a number of parties and individuals, including Mr. Dondero.

And Mr. Morris is exactly correct. The beneficiary of the Kirschner litigation would have been HMIT, given the fact that the assets of Highland look like they will pay and will pay the classes of creditors above Class 10, and will generate a distribution to Class 10. But because of that, Highland -- HMIT is the beneficiary of the Kirschner litigation.

Now, that's it in a nutshell. And there's various and sundry things going on. I'm not representing HMIT in the Kirschner litigation, but that has a life of its own out here. And the suggestion in the face of -- there are two lawsuits, two claims and proceedings that have been instituted by Dondero-sponsored entities. One is the Cayman proceeding. One is the Dallas Business Court proceeding.

For counsel for Dugaboy to keep slinging defamatory allegations of crime and fraud when the Cayman proceeding expressly said that the JOL sponsored by Dondero could not meet a motion to dismiss standard on either. And the Texas Business

Court action has been abated because the Dondero-sponsored petitioners would not and could not join necessary parties.

Your Honor, it's very difficult for me -- Mr. Morris mentioned frustration. My client representative with no basis whatsoever, upon no evidence whatsoever, is having his name run through the mud by a lawyer who just filed a notice of appearance in this case today --

THE COURT: Okay.

MR. PHILLIPS: -- in the face of actual proceedings and ruling in one case that dismissed any and all claims that he's suggesting and he's got to use as a basis for reconsideration when in fact the Dallas Foundation and Dugaboy had full access to any and all information prior to the settlement as set forth in the papers and in the reply.

So please, Your Honor, I would request that Your Honor limit the ability of counsel to cast aspersions, allegations of criminal conduct, allegations of fraud, because they are groundless. And I cannot sit by and listen to them without having to respond.

THE COURT: Okay. All right. Yes. Look, I understand that the parties, the principals of the various entities that we're discussing here today have their -- strongly have their disagreements. Let's keep this to what are the issues for this Court and stay off of, as Mr. Phillips put it, mudslinging against both sides.

This goes as to Mr. Dondero and it goes to as Mr. Patrick. Okay. All right.

MS. DEITSCH-PEREZ: Your Honor, would you like to hear from someone who represents defendants in Kirschner or?

MR. PHILLIPS: Your Honor, we object.

THE COURT: Hold on a second, Mr. Phillips. I'm sorry. Could you state your name for the record?

MS. DEITSCH-PEREZ: Yes. This is Deborah Deitsch-Perez from Stinson.

THE COURT: Okay.

MS. DEITSCH-PEREZ: If you recall, I was before you some months ago when we had an initial conference in Kirschner. I represent some of the defendants. The case is now set for a status conference in front of Judge Scholer and I did want to just respond to two things that were said about the Kirschner case by lawyers not involved in it, if I may.

THE COURT: Okay, hold on one second. Do you -- what I'm just trying to understand about the Kirschner litigation is what was the intention of it and then ultimately the assignment of it went to Hunter Mountain.

Okay. It's my understanding and I don't think any party can disagree with this, but it's my understanding that the purpose of the litigation by the trust was to try to recover funds to help pay creditors and then once it determined that creditors were going to get paid in other means, it saw

the litigation as a way to try to settle issues for the estate and that it ultimately became part of a settlement.

MR. PHILLIPS: Correct.

THE COURT: Do you disagree with that, Ms. Deitch-Perez?

MS. DEITSCH-PEREZ: Your Honor, initially --

THE COURT: I don't want to know about what parties are arguing in the Kirschner litigation, whether they agree or disagree. I'm trying to understand what is its role in this settlement, in this bankruptcy. That's what I'm wanting to make sure I understand.

MS. DEITSCH-PEREZ: And that's exactly what I want to address, but initially it was an action by a litigation trustee to marshal assets for the estate. When it became clear the money was not needed to do that, it was voluntarily stayed by the litigation trustee and it was only reactivated when it was assigned to HMIT.

HMIT is not doing this as the estate. HMIT could be Joe Smith off the street. It is simply a party to whom some property has been sold. The property happens to be the Kirschner claims that are being used, however they're being used, but this is not something for the benefit of the estate anymore. This is something that's just been traded to HMIT. That was my point, Your Honor.

THE COURT: Okay. All right.

MS. DEITSCH-PEREZ: And there is a motion, a pending motion to dismiss.

THE COURT: Okay, I appreciate that. Thank you.

MR. MORRIS: Fifteen seconds?

THE COURT: Fifteen seconds, starting now.

MR. MORRIS: I agree with that. It is just more of an intercreditor dispute at this point. I think Your Honor should be aware that whatever umbrage may be taken today of the transfer of the Kirschner litigation was not the subject of an objection as part of the 9019 hearing.

And I would just want to remind the Court and everybody here that the settlement, including the transfer of the Kirschner litigation has been fully consummated. And that's why Highland doesn't appear before Your Honor in these status conferences.

We've given control of the litigation to HMIT. HMIT is doing with it what it will. And it would have been a breach of Highland's fiduciary duties to just walk away from a lawsuit that somebody else had value, that thought had value and was willing to pay us for it.

THE COURT: Okay. Thank you, Mr. Morris. Let me, that actually leads into my next line of questioning, which is I'm trying to understand what has been done under the settlement and where things stand as far as consummating the settlement. And so I've got the settlement in front of me

here.

MR. MORRIS: Great.

THE COURT: So I see --

MR. MORRIS: If I may, Your Honor.

THE COURT: Yeah, go ahead, Mr. Morris.

MR. MORRIS: Sure. The settlement was substantially consummated within days. In fact, there is pending before Judge Kincaid right now -- let me back up for a second. We, I think we use shorthand unfairly here. We refer to the settlement as a 9019 settlement. The motion was actually made pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363. And it was made pursuant to both because there were certain assets that were sold that HMIT had no right to.

HMIT had no right to the Kirschner litigation. HMIT had no right to obtain the Dugaboy note. They never asserted otherwise. But we gave certain assets that were illiquid assets from the Highland Estate's perspective. It was another reason why the settlement was so good for Highland because it allowed us to monetize certain illiquid assets.

But the important point here is that it was consummated within days so that when Dugaboy appealed the granting of the 9019/363 order, we made a motion to dismiss. And we made a motion to dismiss on statutory mootness grounds. That motion to dismiss is available, Your Honor, on the docket as part of the appeal. We told Judge Kincaid that the appeal

should be dismissed because the settlement was substantially consummated.

And with particularity here, Highland transferred cash to Dugaboy -- to HMIT. Highland transferred the Dugaboy note because Dugaboy had a very substantial note in which it was the maker. Highland was the beneficiary. It was a very long-term note. We tendered that to HMIT under the settlement agreement.

And in fact, while Dugaboy today complains that Mr. Patrick somehow lacks authority, last December Dugaboy did what it was supposed to do and it complied with the terms of the note. And it made the payment under the note to Mr. Patrick as required in his capacity as the head of HMIT. So they validated his position then.

But the note was transferred. Payments had been made to HMIT under the note. The Kirschner litigation was transferred. I don't remember off the top of my head what it -- oh, there was a lot of litigation dismissed. There was a whole -- I mean, this was so important for Highland. There's been a whole host of litigation that HMIT had commenced against Highland that's been dismissed with prejudice.

So I think that's the totality of the performance. There's nothing left to do under the settlement except to make future payments which are conditioned on there being no threats as that is defined under the settlement agreement. There

obviously are continuing threats. So we won't be making any payments to HMIT in the near future until those threats dissipate.

But otherwise, Your Honor, the settlement has been fully consummated as we've, I think, proven and are waiting to hear from Judge Kincaid about.

THE COURT: Okay. So in looking through this, I see in Paragraph 1 under the agreement there were stays pending approval of various -- or pending the approval of the -- by the bankruptcy court of the settlement. And then I'm assuming all those stays took place. And then after the Court approved it, as you stated, there was dismissal of litigation as well as the assignment of the Kirschner litigation. There was an initial cash payment of $500,000 as I see it. And that was made?

MR. MORRIS: Yes. And I think there was a subsequent -- yes, that was made. That was made promptly. And I think there was a subsequent payment of $10 million.

MR. PHILLIPS: Yes. Yes.

THE COURT: Okay.

MR. MORRIS: Yeah.

THE COURT: And that was done as well? There's been no --

MR. MORRIS: Everything that has been required to be done has been done.

THE COURT: Okay.

MR. MORRIS: And the only thing that hasn't been paid, the only thing that hasn't been done, I believe, are -- we'd give HMIT all the money today if we got a general release from Mr. Dondero and his affiliates, but we know that that will never happen. So we have to reserve money as part of the indemnification reserve. And as long as there continues to be the specter and threat of litigation, we'll continue to do that.

THE COURT: Okay. So I want to understand, Mr. Morris, the flow of funds here. So is there funds being held by the Debtor, by the Reorganized Debtor?

MR. MORRIS: So, great question. And I'm going to say that I'm highly confident in what I'm about to say. And I really -- my credibility is all I have here. So I want to be really precise here. Right now, there is still a claimant trust. There is still an indemnity trust. There is still Highland, right?

As Your Honor knows from prior hearings, including last Friday's, we need to get to the dissolution process by August. That is the goal. But currently, there is some amount of money, a portion of which is held in the indemnity trust. A portion of the cash, I think, is still held at Highland. But that cash is available to both fund operations and to -- which includes the cost of litigation, defending litigation -- because I think at this point, we're only playing defense here

-- and to fund indemnity reserves going forward.

So, you know, there is still cash. I don't know the number off the top of my head. The number had been disclosed to HMIT as part of the settlement negotiations. And it was shared with Dugaboy as part of the discovery process. But there is still cash out there. And there may be a couple of assets that remain to be monetized. I don't know if that answers your question.

THE COURT: Okay. That's in Highland, the Reorganized Debtor?

MR. MORRIS: Actually, most of the cash is in the Highland indemnity trust.

THE COURT: Okay.

MR. MORRIS: Okay. Which is the vehicle that will live in perpetuity until we either get a release or the threat of litigation ends. But I explained to you earlier, Class 8, Class 9, Class 10, Class 11, those were the former creditors or holders of limited partnership interests under the plan and the claimant trust Agreement.

Higher in priority than any of them are the Debtor and the claimant trust indemnity obligations. And they have very substantial indemnity obligations. And so the claimant trust initially and now really the indemnity trust is holding cash for the purpose of satisfying its indemnification obligations.

This is something that was litigated all the way up to the Fifth Circuit. The Fifth Circuit has validated the indemnity trust. The Fifth Circuit has validated the idea that the indemnity obligations are senior to any creditor or former holder of a limited partnership interest.

So that's really at the top. That's where most of the cash is held right now. That's where it will remain to be held until we can finally end this litigation.

THE COURT: Okay. Here's the question I'm trying to get an understanding of. So funds, there were funds in the claimant trust. There may still be -- there still are funds in the claimant trust because we were fighting over some of them last week.

Those funds, once all claims are resolved, the funds -- the claimant trust is to dissolve and the efforts are to try to get that dissolved by August of this year. I can't remember the date, the exact day. But once that's done, assuming that gets done and there's funds still in the claimant trust, those funds will go to Highland, the Reorganized Debtor, or to the indemnity trust?

MR. MORRIS: No, let me clarify. The dissolution process pertains to Highland Capital Management, L.P. And that process will begin, not end, on August 11th. Once you begin the dissolution process, you have to go through the process of winding up. I don't know how long that will take.

There's modest cash in the Highland Claimant Trust side. Most of the cash that exists today is in the indemnity trust right now. There is the reserve for Mr. Daugherty --

THE COURT: Right.

MR. MORRIS: -- that we talked about last week that certainly exists.

THE COURT: Okay.

MR. MORRIS: So that's kind of sacrosanct. But most of the cash today is in the Highland -- is in the indemnity trust. And it's Highland, not the claimant trust that will be -- whose dissolution will commence on August 11th.

THE COURT: Okay, but, well, but the claimant trust is supposed to terminate on August 11th, correct?

MR. MORRIS: The trust has to dissolve. I know that part. And I --

THE COURT: Okay. And once it dissolves, the funds go from the trust to where?

MR. MORRIS: Everything goes into the indemnity trust.

THE COURT: Okay. And then once the trustee of the indemnity trust determines that any of indemnity obligations are no longer, then where do those funds go?

MR. MORRIS: It will go to HMIT and that little entity that we talked about earlier, HCLOM --

THE COURT: Okay.

MR. MORRIS: -- on a pro-rata basis because they're both in Class 10. So it wouldn't all go to HMIT. I think under the plan and having consensually put HCLOM into Class 10, they would share on a pro-rata basis any remaining assets.

THE COURT: Based on their claim amounts. Okay, this is probably a question for Mr. Phillips because this was really more your client's agreement with the Dallas Foundation. But I'm assuming that your clients, as part of the settlement, as I understood it, the stipulation entered into between HMIT and the Dallas Foundation was made part of the settlement that was approved. Those stipulations are being complied with?

MR. PHILLIPS: Your Honor, we think that the Dallas Foundation immediately after executing the stipulation violated it. We were -- in fact, we had a meet, a structure for meeting to try to resolve issues.

The day of our first meeting, I received a communication from counsel for the Dallas Foundation, who was driving to the meeting. And he said, I just need to tell you that we -- my client sued HMIT, sued to get an injunction today. And I just -- I didn't know about it. But my client -- I said, wait, we're supposed to meet in an hour and a half as part of our negotiation structure in the stipulation so that we can try to resolve our differences and get to a second meeting.

And I thought that was the point. And he said, I thought so, too. But we made the determination, that was July

2nd. We made the -- what was that, a week after the hearing? We set up the meeting and I went to Dallas. And the meeting was at the Dallas Foundation. And I think the purpose of the lawsuit was to cause us to not meet. And I told counsel for the Dallas Foundation that we were going to meet and we would be there at the appointed time.

And we went to the meeting, we provided the documentation and the documents that we were supposed to provide, the financial information that we were supposed to provide. We had a meeting that lasted probably 45 minutes, during which I pointed out that I thought that the stipulation, Dallas Foundation, was in violation of the stipulation. And clearly, there was never any intention of the Dallas Foundation to meet.

We've done -- I will say this, we have done everything that the stipulation required HMIT and any of the DAF Entities to do. But I have not been able to set up a second meeting because I've gotten no response since July 2nd that, in my attempt to set up meetings as set forth in the stipulation, I received no response from the Dallas Foundation or any of the DAF Entities that they would agree to a separate meeting.

And frankly, I saw no reason to call an end to it an impasse, because they -- it was clear to me that they never really intended to comport with the stipulation. But as far as

our side of the stipulation, we've done everything that we were supposed to do.

THE COURT: Is your client still holding the funds as the stipulation required?

MR. PHILLIPS: I think so, yes.

THE COURT: Okay. All right. ValueScope. What is ValueScope and how does it play into all of this?

MR. PHILLIPS: ValueScope does not play --

THE COURT: Mr. Phillips?

MR. PHILLIPS: ValueScope does not play into all of this. But ValueScope provided valuation services that had nothing to do with the settlement. It provided valuation services with respect to the DAF and valuation issues that arose in connection with restructuring of the DAF and also restructuring of certain of the HMIT entities which are not being told, of course, is that every action taken by Mr. Patrick was backed by a valuation from ValueScope and these parties had known about ValueScope since 2021.

And of course, of course, there was no suggestion by Dugaboy, the Dallas Foundation, any of the parties that are now complaining mightily and losing, by the way, that ValueScope was in any way, shape, or form relevant to the 9019 settlement and the 363 sale portion of the settlement.

So ValueScope has nothing to do with the settlement. ValueScope provided valuation in connection with down the line

restructurings of, first of all, in the DAF arena, the DAF that has nothing to do with the settlement. Secondly, prior to the settlement, far prior to the settlement, valuations in connection with restructuring of the HMIT entities. And as we suggested and as the papers show, Dugaboy knew and all the parties knew about ValueScope from 2021 forward.

THE COURT: Okay. All right, Mr. Edney, I'm going to ask you to try to do this as brief as you can, but I want to give you the time to do it. I want to understand how the restructuring of the DAF Entities, as I understand it, in your allegations plays into the settlement issue that was approved by the Court previously.

MR. EDNEY: Yes, Your Honor. I'll try to do this both a concise way and a way that keeps the temperature down. But our contention is that the various restructurings -- and the ValueScope valuations were an important part of this because it allowed assets to be moved around, not for value, but for pennies on the dollar -- took assets away from the Charitable Entities, including the Hunter Mountain asset, which is an asset that is key to the settlement, and put them within Mr. Patrick's personal control and benefit.

We believe if those restructurings had been transparent, if Mr. Patrick hadn't taken steps to make them -- to conceal them, that by the time he arrived on the settlement date, he would not have had the authority to enter into the

settlement in the first place. He would have been removed.

And we further contend, Your Honor, that, and I think if you look back at the record on this, this settlement process initiated about May 19th, in public view, May 19th, 2025. It was concluded by June 25th, 2025. And there was a very hurried process that was trying to get in front of the transparency that was coming. The transparency that Mr. Patrick knew was coming, but the rest of us found out about over the summer, fall, and winter of 2025 leading to this motion.

THE COURT: Okay. Mr. Edney, do you disagree that Mr. Patrick is still, I'm not sure exactly the correct term, but the control party for HMIT? I mean, he hasn't been removed yet, correct?

MR. EDNEY: He has not been removed yet.

THE COURT: Okay.

MR. EDNEY: That's correct.

THE COURT: So he's still there. Now, the DAF restructurings, do you disagree that they were known at the time of the motion and the filing of the motion to approve settlement?

MR. EDNEY: Yes, I disagree with that, Your Honor. The details, the movements, and the justifications for those restructurings and their effect, they became revealed starting with the allegations in the statement of claim in July of 2025.

This is information that the liquidators in the

Cayman Islands got access to only because they were able to step into the shoes of the entity down there and get access to their communications with counsel and otherwise, and came into focus as the underlying evidence for those allegations in the statement of claim became revealed and became available for use in domestic court proceedings.

THE COURT: Okay.

MR. EDNEY: And we're prepared to walk through this on the merits of the 60(b) motion. We understand the timing of when this evidence came to light is an issue and we're prepared to document it.

THE COURT: Okay. And so as concisely as you can, tell me what it is that you believe is discovery that you need from these parties related to that.

MR. EDNEY: Sure, Your Honor. So I would put it in two categories. I think you heard today in strongly worded terms that counsel for Mr. Patrick's entity disagrees with my characterization of the events and, frankly, the characterization of the events by the liquidators in the Cayman Islands.

Part of the purpose of the discovery is to be prepared to rebut those denials more fully. That's why we are asking questions about the restructurings, the valuation with ValueScope, a very important part of this, and the compensation to Mr. Patrick. That's category one.

Category two, in terms of the discovery that's directed at Highland is about the extent to which Highland was made aware of these restructurings, knew about it, and the extent to which it drove the manner in which and the timing on which the settlement was entered

So that's my most concise description, Your Honor.

THE COURT: Okay.

MR. EDNEY: And if our requests are too broad, I will tell you that you have my firm commitment that I'm willing to work with opposing counsel to get them more over the target. But that interim process before we usually appear before a federal judge like yourself, Your Honor, that hasn't happened because of --

THE COURT: I understand that's your position.

MR. EDNEY: Yeah.

THE COURT: There was no typical response and then discussions and motions to compel or now a motion for protective order.

But let me just make sure. So category one is you're seeking discovery on evidence to back up or support or -- yeah, I mean, basically backup, support your allegations that these restructurings of the DAF Entities were fraudulent. Is that correct? That's one. And I guess with the purpose of saying that if they were fraudulent, then Mr. Patrick somehow wouldn't have had authority to sign on behalf of HMIT for this

settlement.

MR. EDNEY: That's correct, Your Honor.

THE COURT: Okay. And then category two, as you put it, is what knowledge did Highland have of all of that? And I guess I'm not quite sure why that matters what Highland's knowledge is, but that's correct. Highland's knowledge of these restructurings and whether or not they knew or should have known that somehow these were all fraudulent.

MR. EDNEY: Yes, Your Honor. I mean, I think one of the things that we're hearing from Highland in the papers, and I will say that their papers are highly factual, which I think probably begs the question for discovery.

But one of the things we're hearing from Highland is that all this stuff we're talking about Mr. Patrick's misconduct, it's adjacent to the settlement or it's adjacent to the bankruptcy process. We want to be prepared to rebut that argument with facts. And so if our requests were too broad, that's what we're really after. And we're willing to work with opposing counsel to get it targeted, Your Honor.

THE COURT: Okay.

MR. MORRIS: Your Honor?

THE COURT: Hold on. I'm going to give everybody a chance to --

MR. MORRIS: Oh, sorry.

THE COURT: I'm going to give everybody a chance to

respond. I've got some more questions for Mr. Edney real quick.

Mr. Edney, I want to walk through and get an understanding of where we would be at if the settlement is basically overturned. And that would be at, I think where we would be at would be the Kirschner litigation would still be controlled by the estate. And they would still be potentially pursuing that.

MR. EDNEY: Yes, Your Honor.

THE COURT: The other part of that would be HMIT would not have a fixed claim. It would still be considered a contingent claim, but still part of Class 10.

MR. EDNEY: Yes, Your Honor.

THE COURT: And presumably Class 11 claimants would still be in a contingent situation. Do you agree with that so far?

MR. EDNEY: Yes, Your Honor. And I think

THE COURT: Okay.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. So if that were the case and the litigation trustee continued to pursue the litigation and let's say ultimately was successful and brought money back in, that money would then, again, go and be paid out according to the plan, which would be paid to Class 10 first. And then if there's anything that remains after paying off Class 10, Class

11.

But importantly, Class 10 is Hunter Mountain or HMIT. And it appears that they're going to get the lion's share of whatever funds that would be generated from this litigation if the estate were controlling it still, and those funds would go to Hunter Mountain first.

Okay. So as I see the settlement agreement, all that's been done is changed who's controlling the Kirschner litigation. And ultimately, the same beneficiary is the party that's now controlling it as it would be the same beneficiary if the Debtor controlled it and ultimately paid out under the plan. Do you disagree with that? Do you see something that I'm not seeing?

MR. EDNEY: Yes, there's one other aspect, Your Honor. I think Mr. Morris covered this. One of the things that happened in the settlement is that Hunter Mountain dropped numerous claims about the administration of the bankruptcy estate that I think -- I know there's a disagreement on this, but would have generated significant value for equity, right?

So it wasn't just the money that would be coming out of the estate as it is now that are at issue, but there's also affirmative claims about how equity has been treated that I guess numerous parties, including the estate that were released through the settlement. And those claims would be not released.

THE COURT: Okay. And so those would still exist that Hunter Mountain would be pursuing as a counter plaintiff?

MR. EDNEY: That's right.

THE COURT: Okay. All right.

MR. EDNEY: And I mean, I think you're hearing it from us, but our view ultimately is that Hunter Mountain needs to be under a responsible steward who's looking after the interests of equity and the charities.

THE COURT: Okay.

MR. EDNEY: Not itself.

THE COURT: All right. I want to -- you said something that now makes me ask the question. Why is that this Court's purview?

MR. EDNEY: Right. Well, I think Your Honor, it is this Court's purview because a person who was not acting by his fiduciary duties has released all sorts of assets that belong to the charities and others. And you may say, well, just take that up with Mr. Patrick but, unfortunately, Mr. Patrick is effectively judgment proof. So by letting the estate off the hook and letting others off the hook, that settlement has created permanent damage to those beneficiaries.

MR. PHILLIPS: Your Honor?

THE COURT: All right. Hold on, Mr. Phillips. Hold on. All right.

MR. EDNEY: I know Mr. Phillips disagrees. And look,

I'm sorry. Some of these words are harsh, but I mean, unfortunately --

MR. PHILLIPS: Well, they're also not relevant to anything and not ever raised --

MR. EDNEY: All right, Mr. Phillips. I don't interrupt you. But also the standard here is -- one of the standards that we're proceeding under is fraud. So I mean, the words are going to be a little harsh, right?

THE COURT: Okay.

MR. EDNEY: It's just part of the Rule 60(b) exercise. And for that, I apologize.

THE COURT: All right. All right. Thank you.

Let me -- I'm going to hear from Mr. Stancil, I believe is now going to -- I want to hear from you, Mr. Stancil I guess your client's position as to these two categories. And --

MR. STANCIL: Sure.

THE COURT: Go ahead.

MR. STANCIL: So Your Honor, we're coming back. I was trying -- I had tried to sketch out a background of this case that I could do in five minutes, which now seems almost laughable. But I don't need to do any of that.

I think what we're here on today is their request for discovery. And those two categories, I think, are not surprising that that's how they describe it. But I think it

skips over what we agree. I think we agree with Dugaboy is the actual standard for getting discovery.

So the baseline is you don't get discovery in aid of a 60(b) motion just because you file a 60(b) motion. That is undisputed. There is Fifth Circuit case file out the wazoo that says as much. And in order to be entitled to any discovery, which it's important to bear in mind, is new -- which is a repeat of discovery we already did in support of the original 9019 discovery. In order to get that, you have to make some prima facie showing. You have to have something new and within a very specific category and time window. Something that is new and could not have been discovered to reasonable diligence within 28 days of the entry of the judgment.

And so let me start with what Mr. Edney said about what did Highland know and when did it know it. Paraphrasing, that's the category two. Well, we already produced to all the parties in the 9019 hearing the first time around the communications between Highland and HMIT leading up to the settlement. That's already been done. That's why you don't get to just reopen discovery and send new discovery requests without making a showing that you have something new that was or couldn't have been discovered in the time. So we've already done that.

The broader category about fraud, sort of that first category, I heard a general description that the details did

not emerge until the summer, fall, winter. That's just not belied -- that's just not consistent with the record and their own record. I have, if Your Honor, if you'll bear with me for, I think I can do this in literally five minutes. I have a little timeline that I could put up, but I think we'll show you kind of what was known.

If that's okay with Your Honor, Mr. Levy, I think has the technical capacity to do it.

THE COURT: Okay, that's fine. I will state this for you, Mr. Stancil. At least on our end, you're kind of coming in a little choppy. Your video's not very clear and you're going in and out. So hopefully -- okay, I do have a slide deck up. So go ahead.

MR. STANCIL: I got rid of the earbuds. Is that better? The audio?

THE COURT: Yes, I can hear you.

MR. PHILLIPS: Yes.

MR. STANCIL: Okay, so all right. So this is the timeline and we start with this. These are the bookend dates that are relevant for a new evidence claim. So we've got the settlement, which was first negotiated starting in March and announced in May of 2025, right? And then there's a bunch of discovery we'll get to.

June 30th, it's approved. July 28th, 2025, that's the deadline for a 59(b) new trial motion. And that matters

because you have to show, if you want to say there's new evidence, you have to show that it's evidence that you didn't have or could not reasonably have discovered within that new trial window. So anything that they knew or reasonably could have discovered by July 28th, 2025 cannot be the basis for their motion and, therefore, cannot be the basis for their claim for discovery.

So I can quickly walk through, Your Honor, and we will supply this deck, these slides to the Court and, of course, to opposing counsel. And you'll see in here, we have docket cite by docket cite that will show you where to find these things. And this has to be just not just new evidence, but evidence that would change the outcome, right?

So April 10, 2025. Will you flip to the next slide, please? There may be a little lag. There we go.

So April 10, 2025, there is a declaration or affidavit filed by Mr. Dondero in the Cayman Islands with respect to this DAF entity. And I would just ask Your Honor to look at this document. It's docket number, it's Exhibit 7 to our motion for protective order. And just to pull out a couple of examples, and I won't do this sort of chapter and verse for each one, but this idea that no one knew what was going on with the restructuring of DAF is absurd.

So if you would look at, if you flip to Paragraph 32 of that exhibit, and I'm not saying that we all need to do it

together right now, Your Honor, but if I remember from my law clerk days, it's always nice to have a specific cite to go to. Paragraph 32, Mr. Patrick is using the control position for his own enrichment rather than to benefit the supporting organizations and the causes they support.

Paragraph 39, while Mr. Patrick, of course -- pardon me. Paragraph 39 describes that or alleges that Mr. Patrick was selling -- had sold the entire Hunter Mountain position to an unidentified party for a million dollars and says that's not a legitimate fiduciary sale.

May 10th -- or pardon me, May 2nd, the supporting organizations file a petition in the Cayman Islands. They say, we would like you to take over and supervise dissolution of the DAF. And in that document, I would recommend to the Court Paragraph 10, Subparagraphs Alpha through Delta, and that lays out this entire restructuring of DAF. So it is on -- it goes through Paragraph A, 7 February 2025, here's what Holdco did, 20 February 2025, it goes through chapter and verse on this purported restructuring.

Okay, so we knew no later than early May, they knew no later than early May that DAF had been restructured. There's nothing new here. There's all sorts of allegations in here with a score of the same allegations that they make against Mr. Patrick here and claim it's new evidence. But it gets -- it goes on.

We have June 9th, in the 9019 itself, the Dallas Foundation makes a submission to the 9019. They litigate that, there's discovery. The discovery's extension -- is extensive, pardon me; 4,000 pages of documents in response to Dugaboy's discovery requests. So there's just simply no plausible basis that people were not aware that DAF had been restructured.

They are alleging in the Caymans at the very same time. They could have asked Mr. Patrick any question they want. They could have asked for documents. They did, in fact, ask Highland for its communications with Hunter Mountain leading up to the settlement, and we gave it to them. Okay, so that's discovery.

Mr. Patrick is deposed, Mr. Seery is deposed. We have multiple witnesses. I think there were 4,000 pages, and then you get to the June 25 hearing. It's an all-day evidentiary hearing. Even though Mr. Dondero's Dugaboy had not joined the Dallas Foundation objection, the judge allowed, when the Dallas Foundation withdrew its objection, the judge allowed Dugaboy to assert the same objection that Dallas had asserted, and so they got that there.

All-day evidentiary hearing, 128 exhibits, live testimony from Mr. Seery, Mr. Patrick, Mr. Dondero, all subject to cross. They could have, could have, could have made all of this stuff. There's nothing new. But let's go just a few weeks beyond that, and I'll start moving at a faster clip here.

July 1st, 2025, so we're well within (audio interference). This is the very day after Judge Jernigan denied the 90 -- or granted the 9019 approval. This is where this Texas lawsuit is filed. It's in the Texas Business Court. It is massive. I think the complaint alone is 80 pages perhaps, and tons of attachment, and it lays out the exact same scheme.

Then, July 15, 2025, the joint official liquidators in the Caymans, who are, you guessed it, they are the Dondero Foundation of which Mr. Dondero is the president. He is also the head of Dugaboy -- and I want to commend this to Your Honor in particular because you will find this July 15, 2025 writ that was filed in the Cayman Islands action. You will find this cited dozens of times in the 60(b) motion, claiming to be new evidence.

But under Rule 60(b)(2), it cannot be new because it was there within this time horizon, so they had all this information. They could have brought all of this before. They didn't. It's over and over again. There's the July 17, Dugaboy motion to stay the 9019 order, which was denied. I believe that even attached the Cayman action, so the idea that these details were not known and couldn't have been known by July 28 are false.

July 21, the joint official liquidators filed a Chapter 15 recognition proceeding in the District of Delaware.

Again, all of this is here. So the short answer to the discovery motion actually in front of the Court today is there's not a whiff, not one whiff of actually new evidence. If Your Honor just compares the 60(b) motion on one hand, and I've done this many times, and this stack of material that I just went through on the other, these allegations are all here.

And so they can take their chances on the 11th as to whether that will entitle them to relief on the 60(b) motion, but they're not as a matter of law entitled to discovery in aid of that motion unless they can actually make a showing to Your Honor. Otherwise, we'd be reopening stuff constantly and all the time.

I have more to say on the Caymans and the fraud, but let me pause if Your Honor has any questions on what is or is not new. There's literally not a single new piece of information here.

THE COURT: Okay, I don't know that I have any questions. Again, Mr. Stancil, I've read the pleadings. We've looked through, I can't say I've looked through all hundreds of pages of the exhibits, but we've certainly got them. Please, if you would file this, if you want to file this deck on the docket so that we can have it as well as the other parties, that's fine.

I understand the legal argument. I'm trying, again, to get to the practical. And so unless you have something else

related to trying to get to a resolution of this, I think I'll let Mr. Phillips make any statement he would like, and then I've got just one more question for all the parties to understand, you know, who we're really talking about deposing here.

MR. STANCIL: Well, Your Honor, let me -- I do have a practical, very practical solution, I think, that is correct under the law, which is the opportunity for offensive discovery is legally wrong. What they are entitled to do on the 11th, they can come in and put on their case, and if they can make the showing to impress Your Honor, they're entitled (audio interference) -- if they want to --

THE COURT: Sorry, Mr. Stancil.

MR. STANCIL: -- call a witness, they can call their own -- yes.

THE COURT: Mr. Stancil, your audio cut out.

THE COURT: Okay, I'm sorry, Your Honor.

THE COURT: May I make a suggestion? Why don't you go ahead and cut off your video, and hopefully that'll solve the audio problem.

MR. STANCIL: This is what I get for coming into my real office for some reason, so I get bad internet.

So, Your Honor, I think the bottom line is that they should come in on the 11th and put on their case. If you want the exceptional remedy of reopening discovery in aid of a 60(d)

motion, you have to make a showing that you have something that is new or prima facie evidence of fraud on the Court. We could get into what they've shown as to whether they have any disagreement between -- with Mr. Patrick, and we can get into the depths of what the Cayman Islands decision that was recently rendered actually says.

But they haven't shown any showing whatsoever that this Court was misled, that there was fraud in the settlement. And Your Honor has, I think, been getting at all those practical issues. So, they should be denied any affirmative discovery, which is essentially because we've already done discovery on the 9019 motion, and they can come in and make their showing, if they can, on the 11th. And we should be able to move on with this hearing -- pardon me, with this case.

And I guess I don't want to steal Mr. Phillips' thunder. I know he probably has some stronger views on some of the things I said.

THE COURT: All right. Thank you, Mr. Stancil.

Mr. Phillips?

MR. PHILLIPS: Yes, Your Honor. Thank you. I'll be brief, as brief as I can be. Now, I would throw up a couple of additional things that might be lost in the flurry. They've been mentioned, and they've been briefed and shown to the Court. But if we start with, just as Mr. Stancil has outlined, the Dallas Foundation objection and compare that to the Dugaboy

objection, the Dugaboy objection did not adopt in any way, shape, or form the Dallas Foundation objection. The Dallas Foundation, rather than proceed with their objection, dismissed their objection with prejudice.

Neither Dugaboy nor the Dallas Foundation ever sought documentary discovery from any of the parties that they now say they have to discover information from. Despite the fact, as outlined by Mr. Stancil, that the entirety of the restructuring was known to Dondero, Dugaboy, the foundations, at the -- far before the hearing.

As we point -- as Highland pointed out in his reply in Footnote 8, there's much to be said now about the compensation paid, and there needs to be discovery about that. Well, if you look at the Dallas Foundation objection, it says that the compensation went up from 40 to 600 to 2.2 million through the first half of 2024. And what Footnote 8 also says is that if they had asked, they would have found out that the compensation of $13 million was paid before the end of 2024, far before the hearing. They never asked for that information, but now they need to discover it.

And the Court asked for a practical approach. And counsel for Dugaboy is, of course, hedging and not being open kimono, because if you look at Mr. Dondero's testimony in the 9019, what you'll find is that one of Mr. Dondero's complaints about the settlement was -- and I don't know how he really has

the complaint, except he says, Highland should have sued Seery for stealing, Mr. Seery and the management group and Pachulski for stealing $700 million from the estate. And he also said in his testimony that he was bringing -- very, very quickly would be bringing a RICO action to establish that the entirety of the bankruptcy process was a RICO criminal enterprise headed up by the evil Mr. Seery and the evil Mr. Morris and his evil law firm.

So if you want to know what the practical considerations of undoing the settlement, which I don't think the Court can do, there's been a sale, there's been an assignment, there's been a transfer of assets. That's one of the things that this lawyer for Dugaboy is seeking to impose upon this Court.

Some type, and this is what they would suggest, Highland -- Hunter Mountain Investment Trust should be doing under its newly constructed control people. We don't know who they would be because they'd never offered any suggestions in any Court, in any pleading, in any even allegation who the new control person would be for Hunter Mountain Investment Trust.

But I guarantee you this, if Mr. Dondero was in charge of Hunter Mountain Investment Trust and this settlement is undone, he's already testified what he wants to do, which is sue Mr. Seery and Mr. Morris for stealing $700 million from the bankruptcy estate and to bring a RICO action that the

bankruptcy process was a criminal enterprise. Now, we reviewed those allegations and we reviewed the litigation through other counsel's eyes, mine.

We decided, and we had some support for our decision. Judge Jernigan had stated in every single case brought before her that either there was no standing or there was no colorable claim asserted. We suggested that getting HMIT the entitlement of receipt of the Dugaboy note, perhaps a $24 million payday at the end of the day or $18 million payday at the end of the day, to receive the Kirschner litigation which had been generated and brought for the benefit of the estate, which includes equity, which includes claims and our claim is not paid.

And finally, for cash that might, if we could get through all the claims and the indemnity trust could get resolved, would generate approximately 75 to 85 to 100 million dollars in cash for HMIT. We traded these claims against the estate by which HMIT in its equity position or Class 10 position was in fact paying Ms. Morris's firm to litigate against it. We said stop that and give us our money.

And so the practical considerations include very dire consequences for the judicial process, this Court, all parties, and HMIT if HMIT was forced to undergo some type of Dondero control.

THE COURT: Okay. I hear what you're saying on what happens if the settlement is reversed. I'm asking practicality

for this discovery dispute.

Okay. So if you have something --

MR. PHILLIPS: We agree with Mr. Stancil that --

THE COURT: -- other than they shouldn't get anything, then feel free to share it.

MR. PHILLIPS: I have nothing other than they shouldn't get anything, Your Honor.

THE COURT: Okay, all right. Mr. Edney, I'm going to ask you this. Who are the parties that you believe you need to depose? Is it just -- is it the same three that have been mentioned in all the pleadings, Mr. Seery, Mr. Murphy and Mr. Patrick?

MR. EDNEY: Yes, Your Honor. So in the negotiations that led to the order before Your Honor, the parties agreed to limit our depositions to one full-length, eight-hour deposition and two four-hour depositions.

We have proposed negotiating -- I'm sorry, we have proposed deposing Mr. Patrick for the long deposition, one of his co-trustees, Mr. Murphy, for the four-hour deposition, and then Mr. Seery for the other four-hour deposition.

For Highland's part, they have proposed the depositions of Mr. Dondero and his sister, Nancy Dondero, and her role as trustee at the Dugaboy Investment Trust.

THE COURT: Okay. Do we have these depositions scheduled and on the books at all? I realize they're trying to

quash all that, but I'm just trying to find out whether this is going to be done before May 1st, which is the Court's deadline to have all discovery. I mean, have the parties at least talked and said --

MR. EDNEY: Your Honor? Your Honor, no --

THE COURT: -- if the judge doesn't grant your motion, then this is the dates we're going to do these depositions?

MR. EDNEY: Your Honor, no. I don't think that that's probably feasible at this point, the May 1st cutoff for --

THE COURT: Okay.

MR. EDNEY: -- at least deposition discovery. I think what's being proposed currently is if Your Honor denies in part or in whole the motion for protective order that the parties will finish their document production by August 28th, I think probably there's going to have to be a discussion, if you deny the motion for protective order, between the parties about the feasibility of some of these document requests and to narrow it and to avoid disputes before the Court.

I think the current intention would be to try to take these depositions during the week of May 4th in advance of the hearing.

THE COURT: Okay.

MR. EDNEY: So with the benefit of whatever documents

that are produced. So that schedule probably would require some adjustment, Your Honor, that May 1st deadline, Your Honor. Just given where we are today on the 24th and if there is document production, the feasibility of getting that done and digested prior to May 1st.

THE COURT: Okay. Let me ask this next question. Earlier, I asked a question about subject matter jurisdiction and Mr. Stancil brought up Rule 62.1, which I think is an appellate rule. But there's also Federal Bankruptcy Rule 8008, which provides extremely similar or basically I think states the same thing at 62.1 states.

One of these potentials is that the Court abates this matter pending the appeal to understand what the appeal is going to be done.

I take it your position, Mr. Edney, one was that the Court has jurisdiction regardless of that rule. Mr. Stancil's position is the Court should look to the other section or the other part of that rule that says I can just deny your motion under Rule 60(b). I guess the question that I have for the parties is, is that if the Court determines that this thing just gets held in abeyance until the district court resolves or rules on the settlement appeal, what effect does that have on the estate in this litigation?

And so I don't know. Maybe Mr. Morris.

MR. STANCIL: Your Honor, I may turn that over to

Mr. Morris.

THE COURT: Yeah, I was going to say maybe Mr. Morris needs to address that question first.

MR. MORRIS: Yeah, I mean, look, Your Honor, we think that the matter is ripe to be denied right now. I think we've laid out the law in our brief. Mr. Stancil has done it again earlier today. We don't think the Court has jurisdiction to grant the motion.

But given the inability of Dugaboy even today to specifically identify not just say there's new stuff out there, but today they still cannot. And this is about their fifth chance. They had the opportunity in the motion in response to our extraordinarily limited discovery in opposition to this motion. Here today at oral argument, they cannot identify a single fact that was not known to them as of July 28th that could not have been discovered with reasonable diligence. They still have not identified a specific fact.

Under Rule 60(b)(2) or (3) newly discovered evidence or fraud, not one fact.

THE COURT: Okay.

MR. MORRIS: And on that basis, Your Honor, I think the Court should adhere to the schedule. If there's any document production to be provided, Your Honor can make that order. I'm prepared to take depositions next week if Your Honor orders it. I don't -- for the reasons Mr. Stancil stated

and I won't go over, we don't think that's appropriate here, but you're the judge and we don't want delay. That's the one thing that we don't want.

We've now adjourned this thing twice. I actually did ask and Your Honor has it in the papers. I asked them for depositions of their witnesses in the event our motion was overturned. We never got a response to that.

THE COURT: Okay.

MR. MORRIS: I want to take -- if Your Honor is going to order depositions, let's do that next week. Let's get this over with. There's no reason for delay.

THE COURT: All right. All right. Thank you.

Mr. Edney, the question is --

MR. EDNEY: Yes, sir.

THE COURT: The question is this. What effect does it have if the Court just stays this, your pending 60(b) motion until the district court rules on the motion or the appeal of the settlement.

MR. EDNEY: Your Honor, so obviously, there are time limits on Rule 60 motions, and we couldn't wait for that appeal to resolve itself to bring the motion itself. We do think Your Honor -- and I want to study this a little bit more on jurisdiction, but we do think Your Honor has -- if Your Honor believes that the motion is appropriate and well taken to ask for the case back, just as contemplated by Federal Rule

Appellate Procedure 62 and indicate that it intends to grant it, therefore, moving the appeal. And I think that that's something that the Court should explore.

As far as -- our position on deferring it until the appeal is over, my client is not with me in this room today, so I don't feel comfortable stating a position on that exactly, but I'd be willing to get back to the Court on the --

THE COURT: Well, you don't need to do that.

Okay, Mr. Phillips, is your position the same as --

MR. PHILLIPS: My position, Your Honor, --

THE COURT: -- counsel for --

MR. PHILLIPS: Yes, thank you. The position of the respondents to the subpoena, I mean, as we -- yes, my position is the same. Let's get this over with. I don't know how we get document discovery when certain of our subpoenas are returnable after the hearing date and one is returnable a week after the hearing date.

So we think there should be -- I'm just repeating myself now, Your Honor, and I embrace and adopt what Mr. Morris argued and put before the Court. But we don't want to leave this hanging. We want to move it along because we know, we know when they get before Your Honor and Your Honor is faced with when they put on their case, there won't be one.

THE COURT: Okay, all right.

All right. I appreciate the parties. I appreciate

the parties indulging the Court with trying to get a better handle and understanding of the case, the settlement, all that has gone on. The Court is going to take this motion under advisement but understands the need for a quick and rapid ruling. And so the Court intends to do so.

The Court will either advise the parties of its oral -- a time for its oral ruling or will enter a written ruling depending on the Court's review. But with that, that will be where the matter stands at this moment. And we will be adjourned.

MR. PHILLIPS: Thank you, Your Honor, very much.

UNIDENTIFIED SPEAKER: Thank you so much. Thank you very much, Your Honor.

(The proceedings were adjourned at 11:55 a.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.



____________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: April 30, 2026

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| IN RE: | ) Case No. 19-34054-sgj11 |
| | ) Chapter 11 |
| HIGHLAND CAPITAL | ) |
| MANAGEMENT, L.P., | ) George Mahon Federal Building |
| | ) 1205 Texas Avenue |
| Debtor. | ) Lubbock, Texas 79401 |
| | ) |
| | ) April 29, 2026 |
| | ) 4:01 p.m. |

TRANSCRIPT OF MOTION TO CONTINUE DISCOVERY DEADLINES AND HEARING FILED BY PARTNER DUGABOY INVESTMENT TRUST (4569); MOTION TO EXTEND TIME TO MODIFY RELEVANT TIME PERIOD FOR DISCOVERY FILED BY PARTNER DUGABOY INVESTMENT TRUST (ROSE, SYDNEY) (4570); RESPONSE OPPOSED FILED BY DEBTOR HIGHLAND CAPITAL MANAGEMENT, L.P. (ANNABLE, ZACHERY) (4572); OBJECTION FILED BY BEACON MOUNTAIN, LLC, HUNTER MOUNTAIN INVESTMENT TRUST, RAND ADVISORS, LLC, RAND PE FUND I, LP, RAND PE FUND MANAGEMENT, LLC, VALUESCOPE, LLC (PHILLIPS, LOUIS) (4575)
BEFORE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES VIA WebEX:

| | |
|---|---|
| For the Debtor: | Pachulski Stang Ziehl & Jones, LLP<br>By: JOHN A. MORRIS, ESQ.<br>780 Third Avenue, 34th Floor<br>New York, New York 10017-2024 |
| COURTROOM DEPUTY: | Shelby Wimberley |
| ECRO: | Nick N. |
| TRANSCRIPTION SERVICE: | TRANSCRIPTS PLUS, INC.<br>435 Riverview Circle<br>New Hope, Pennsylvania 18938<br>Telephone: 215-862-1115<br>e-mail CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES VIA WebEX:
(continued)

| | |
|---|---|
| For the Movant, Dugaboy Investment Trust: | King & Spalding, LLP<br>By: JOHN MICHAEL GADDIS, ESQ.<br>2601 Olive Street, Suite 2300<br>Dallas, TX 75201 |
| | Morgan, Lewis & Bockius LLP<br>By: MICHAEL J. EDNEY, ESQ.<br>1111 Pennsylvania Avenue, NW<br>Washington, D.C. 20004 |
| For HMIT entities and ValueScope: | Kelly Hart & Hallman, LLP<br>By: LOUIS M. PHILLIPS, ESQ.<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801 |
| | Kelly Hart & Hallman, LLP<br>By: AMELIA L. HURT, ESQ.<br>400 Poydras Street, Suite 1812<br>New Orleans, LA 70130 |

\- - -

INDEX


| | PAGE |
|---|---|
| Argument by Mr. Edney | 7 |
| Argument by Mr. Morris | 14 |
| Argument by Mr. Phillips | 21 |
| Response by Mr. Edney | 29 |
| Ruling by the Court | 33 |

THE COURT: All right, good afternoon. This is Judge Odell. We are here for a special setting in the Highland Capital Management case, Case Number 19-34054.

We are here on two motions:

The first is a motion to continue the hearing -- discovery deadlines and hearing on the Dugaboy Investment Trust's motion for relief order and motion to vacate.

And then a motion to extend time to modify the relevant time periods for discovery filed by Dugaboy Investment Trust with responses and objections filed by Highland Capital Management and the entities that I'm going to refer to as the HMIT entities.

So let me go ahead and start off by getting appearances, and I'll start by getting appearances from movant's counsel.

MR. EDNEY: Yes, Your Honor, good afternoon. This is Michael Edney from the Morgan Lewis firm. I'm here with Michael Gaddis from the King & Spalding firm. Both of us on behalf of movant, Dugaboy Investment Trust.

THE COURT: Okay. And counsel for Highland Capital Management?

(Pause/No audible response)

THE COURT: I don't believe --

MR. PHILLIPS: John? John, you're on mute, or something's wrong.

THE COURT: Mr. Phillips, since we can hear you, why don't you go ahead and make your appearance, and then we'll come back to Highland?

MR. PHILLIPS: Thank you, Your Honor. Louis M. Phillips, Kelly Hart, and also Amelia L. Hurt, Kelly Hart, on behalf of the HMIT entities and ValueScope.

THE COURT: All right. I do show that we may be having some difficulty, because I believe Mr. Edney is frozen on my screen.

MR. PHILLIPS: There's John.

THE COURT: Do we have anybody here appearing on behalf of Highland Capital Management?

MR. MORRIS: Good afternoon -- Your Honor, can you hear me?

THE COURT: Yes.

MR. PHILLIPS: Yes, we can.

MR. MORRIS: This is John Morris from Pachulski Stang Ziehl & Jones on behalf of Highland.

THE COURT: All right. And, Mr. Edney, why don't you go ahead? Let me just make sure that I've got you still there, and not any technical problems there. Could you just go ahead and state your name again?

MR. EDNEY: Yes, Your Honor. It's Michael Edney from the Morgan Lewis firm on behalf of the Dugaboy Investment Trust.

THE COURT: Okay. All right.

MR. EDNEY: Did that work, Your Honor?

THE COURT: Yeah. Yeah, that's all coming through better now. We may be having a little bit of difficulty. And if we do continue to have some, we may need to do as we did in the last hearing, and have parties turn off their cameras to allow the audio.

But before we get started, I do just want to reiterate for the parties my judge-specific guidelines. Based on the hearing last week, as well as some of the pleadings that I'm reading, I just want to remind the parties that the Northern District, and in particular most of my colleagues, including myself, require all parties that are appearing before us to abide by the guidelines that are set forth in a case called Dondi Properties Corp. versus Commerce Savings & Loan Association, which can be found at 121 F.R.D. 284. It's a 1988 case in which en banc proceeding was had by the Northern District Court in which they laid forth specific guidelines for counsel to follow as they appear before the Court.

I reiterate this because the judicial process is one in which the parties come to the Court seeking relief, but they do so in a professional manner, and one in which does not and should not include attempts to besmirch other litigants, as well as counsel representing those litigants.

And so I strongly advise all the parties and counsel

to review that case, and to follow its precepts as you continue to appear before this Court in this matter.

I understand these parties are adversaries. And while this is an adversarial process, it doesn't require us to stray from professionalism that our profession requires and deserves.

So with that, Mr. Edney, it's your motions, so you may proceed.

MR. EDNEY: Thank you, Your Honor.

And, Your Honor, we're grateful for Your Honor's prompt order of Monday afternoon.

Let me start with the scheduling issue. We're asking the Court to continue its hearing for two weeks to a time convenient for the Court. The purpose of this request is twofold:

Number one, we're seeking that continuance in order to provide time to digest the documents that Your Honor has contemplated will be produced by the various parties in this matter. I have no indication that that's going to go past May 1st yet. But even if it all came in on May 1st, we are seeking some time to digest whatever documents are returned so we can prepare for, and then take the contemplated depositions.

I note that Your Honor anticipated this, and we talked about this during our hearing on Friday, that this may be a possibility. And I think we're just trying to find a

little bit of a gap between the end of document discovery and the taking of really probably the most important deposition in this matter, that of Mr. Patrick.

The second reason is, is we've talked among counsel for the past day or so, it's become apparent that Mr. Patrick isn't going to be available for an in-person deposition next week. I think of all the depositions from our perspective, that is the one that we would like to take in person, and that's just not going to be feasible next week due to Mr. Patrick's schedule. So that was not in the motion, Your Honor, but it is an additional reason that I wanted to bring to the Court's attention.

So really on the scheduling, Your Honor, it is us. We want the time to take in the fruits of the document production, now that we address the issue of whether there should be any document discovery at all, and to make sure that the depositions that are taken are meaningful and informed ones.

We -- you know, we obviously defer to Your Honor's schedule, but we're hopeful that the two weeks that we're asking for won't be particularly prejudicial to the parties, or hopefully to the Court.

I'm happy to stop there and answer any of the Court's questions regarding the scheduling issue, and then -- or go directly into the time frame of the document discovery.

THE COURT: Okay. Just real quick, one thing that -- in reviewing the docket before I came out here, I do show that you all filed a notice of deposition for Mr. Patrick's deposition for May 6th. Was that not a date that was discussed and agreed to?

MR. EDNEY: Yeah, I mean, it's -- it's something -- it's something that we had been discussing. I think -- did we -- did we put -- Mr. Gaddis, did we put that on this afternoon on the docket?

MR. GADDIS: I think we filed it --

MR. EDNEY: Yeah.

MR. GADDIS: -- this afternoon.

MR. EDNEY: So -- so, I mean, that is the date that we're trying to coalesce around, but Mr. Patrick would be available for, I gather, a remote deposition on that day, but not an in-person one. And he's not available for the balance of next week either.

And that really is -- of all the depositions, that is the most important one from our perspective.

THE COURT: Okay. All right. Those are the questions I have on that.

If you want to proceed with the motion to, I guess, modify the time frames of the discovery.

MR. EDNEY: Yes, Your Honor.

THE COURT: Unless you had more on that motion.

MR. EDNEY: Yes, Your Honor. So, with respect to that, Your Honor put the time frame for the documents to be produced from the date of the motion to approve the 9019 settlement, that was May 19th, 2025, to the date that we filed our Rule 60 motion, that's February 8th, 2026, and we appreciate that.

We wanted to suggest not enlarging the time period of the production, but shifting it backwards to October 1st, 2024 through roughly the date of the order, June 3rd, 2025. And the reason for that is as follows:

As -- you know, we have moved under Rules 60(b)(2) and 60(b)(3). That -- 60(b)(2) is about newly discovered evidence. 60(b)(3) is about evidence of fraud, misrepresentation, or misconduct.

And I think what we're trying to get at through these motions is evidence of fraud, misrepresentation, or misconduct, or relevant evidence leading up to the order. You know, 60(b)(2) is not about newly occurring evidence. It's about newly discovered evidence.

And the gravamen of our motion is that when the liquidators in the Cayman Islands were able to step into the shoes of many of the charitable entities, it was then where we saw new indicia of misconduct. Misconduct that is historical. It's misconduct that preceded the order. And that we think, you know, had it been ventilated in the way that the

liquidators were able to ventilate it, only through their ability to step into the shoes of the charitable entities, there would have been a different outcome.

I'm concerned that if -- about -- I understand the motivation between -- about the time frame, and I'm concerned that we're going to get an argument that says, "Well, yes, this is newly occurring evidence, but it couldn't have affected the order at all because it didn't exist." Right? You know, I think this is a situation where we're focused on newly discovered evidence that, had it been uncovered earlier, it would have led to a different outcome in June of 2025.

So we don't want to enlarge the time period. We're grateful for the discovery that Your Honor has ordered. We're mindful of the burdens of producing documents. But we do think the more relevant time period, if we were to shift that period of time to something a little bit over the target -- more over the target of our motions, would be the -- would mean to move it backwards from October 1st, 2024 to June 30th, 2025, Your Honor.

And that's the motivation behind that request to alter the temporal scope of Your Honor's document production order.

With -- I -- you know, I'm sure coming is going to be a discussion of, well, perhaps we could have gotten that previously occurring evidence earlier. I will say that the --

that the indicia of the issues that we're talking about really came into clear focus when the liquidators were able to step in and reveal, you know, pretty clear-cut evidence of some of the things that we're talking about. I'll use that euphemism lest I offend.

But in addition, you know, the 60(b)(3) grounds regarding fraud, misrepresentation, or misconduct, that -- that doesn't have the newly discovered or moniker behind it in any respect.

So we respectfully suggest to the Court that if we're going to use that -- a rough time period crafted for this order, that moving it backwards to -- from October of '24 to June of '25 would be -- would more relevant to the exercise before the Court, and I'd be happy to answer any questions about that.

But don't -- I don't want the Court to get the impression that we're not grateful for the Court's order. We agree with it very significantly. We're requesting these two modifications:

One, for the logistics of getting a good and informed presentation before the Court when the hearing occurs; and

The second to provide the most relevant evidence for the Court's consideration when the hearing occurs.

And I thank Your Honor for hearing us on such short notice.

THE COURT: Okay. Just one thing that I noticed. I think it was in maybe your motion to kind of change the discovery production time frame. I want to be clear that all the parties are on the same page as far as what the order granting in part and denying in part the protective order, as well as granting the motions to quash provided. And that, in particular, is that there seemed to be some reference that there was going to be document production required by Shields Legal Group or Legal PC and Kelly Hart & Hallman. And then I believe there was another subpoena on -- maybe it was CLL Hold Co.

MR. PHILLIPS: Yes, sir.

THE COURT: Those subpoenas were quashed, and the Court is not ordering any production by those three parties.

Now I believe there was another subpoena issued to ValueScope. And, again, the Court is granting limited discovery as to ValueScope.

But I do want to make sure that the parties are very clear and understand that there is no document production or discovery being ordered of Shields Legal PC — and I may have the name wrong on that entity, but I think everybody knows which entity I'm talking about — Kelly Hart & Hallman or Kelly Hart & Pitre, as well as the CLL Hold Co. So I just want to make sure that that's clear on the record.

So, all right. I --

MR. PHILLIPS: Thank you.

THE COURT: Yes, Mr. Phillips.

Mr. Edney, I don't know that I have any questions for you on this motion, and so I'll go ahead and allow for -- Mr. Morris, did you want to provide your client's response?

MR. MORRIS: Yes, Your Honor.

MR. EDNEY: Thank you.

MR. MORRIS: Can you hear me okay?

THE COURT: Yes, I can hear you just fine, Mr. Morris.

MR. MORRIS: Thank you very much.

I'll address the scheduling issue first, Your Honor. Dugaboy filed this motion the first week of February. Your Honor entered your own order setting it for a hearing in March. The parties then agreed to a new scheduling order for April. The parties then discussed, and the Court entered, a third scheduling order for May.

And the first question that I have rhetorically is how many scheduling orders does it take to complete this motion?

We're here now because Dugaboy waited six weeks to serve voluminous discovery. We were forced to engage in motion practice. They're left with some very, very narrow requests that Your Honor has crafted. We're perfectly fine with those requests.

We are prepared to complete our production timely in accordance with your Court's order on Friday. We do not expect it to be voluminous.

And there is nothing happening in Your Honor's order that doesn't happen every day in Bankruptcy Court. It's why I'm a bankruptcy litigator, Your Honor. This is what I enjoy. You get a motion. You get your document requests out. You get your document production the next week. You take your depositions the next week. And you have a little evidentiary hearing the next week. It happens every day in Bankruptcy Court.

In fact, it happened in this Court in this case involving this motion and these parties last June. And in just a couple of weeks, we produced thousands of documents, and we cooperatively, without fanfare, without anybody even requesting an adjournment, took and defended more than a half a dozen depositions. We had two people from the Dallas Foundation, you had Mr. Seery, you had Mr. Klos, you had Mr. Patrick, you had Mr. Raver. And they all happened within days. And there was not a problem whatsoever. This is what we do for a living, and there's nothing unusual about that today.

So, since we're on our third scheduling order, since there's nothing unusual that's happening here, since we're going to comply with the Court's order and timely produce the documents, I see no reason why the Court should not adhere to

the schedule that it adopted just 48 hours ago.

The fact of the matter is, we have done what we could to address Dugaboy's concerns. They didn't want to take or defend any depositions until document production was complete. We've accommodated that. They didn't want there to be any weekend depositions. We've accommodated that.

We've given flexibility. On a sidebar, Your Honor, we told them earlier today you can move around, Mr. -- if you want to make Mr. Patrick Tuesday, Wednesday, Thursday; Mr. Seery Tuesday, Wednesday, Thursday; you could flip the Donderos. Do whatever you want. It's four depositions in five days, two of which are likely to be very short.

This is not a heavy exercise by any means. And so, you know, for those reasons, Your Honor, I think it should stay exactly as it is.

Now, Mr. Edney raised the question of wanting to take Mr. Patrick's deposition in person. I appreciate that that's what they want to do, but I need to share with the Court, as I've shared with Mr. Edney earlier today, the fact of the matter is, in the Highland case, we've probably had four, five dozen depositions over a six-year period, and I bet all but two or three of them have been remote.

There's nothing -- there's nothing wrong with doing them remotely. It will allow us to stay on schedule. It would be, in fact, a deviation to order in-person depositions at this

point. It would create, not only delay, but it would create substantial financial burdens.

I would have to come down there. Mr. Stancil or Mr. Levy would have to come down there. We'd have to have -- right, I'm in New York. They're in Virginia. Mr. Phillips is in Louisiana. We're going to incur tens of thousands of dollars of unnecessary expenses to do something that rarely, rarely, rarely has ever happened in this case for no particular reason other than they want to do that.

I don't think that that's fair. I don't think that's a good use of our resources. And we would ask the Court to just keep the schedule that Your Honor meticulously crafted. Keep the schedule. Allow Mr. Patrick to be deposed remotely. Everybody else is going to be deposed remotely, I haven't heard any problems with that.

I do want to point out, though, Your Honor, and I need some help here. Because, as you saw in our papers this morning, I informed Dugaboy's counsel three weeks ago about my schedule. I asked them then for deposition dates for Mr. Dondero and his sister, Nancy, the Trustee of the Dugaboy Investment Trust. I have followed up no fewer than five times in writing. And to this day, they've never given me proposed dates for their depositions.

They're pressing for Mr. Patrick. They've got to have Mr. Patrick. They've put a notice on the docket about Mr.

Patrick. They want Mr. Patrick in person. But for three weeks, despite five separate written requests for deposition dates for Mr. and Mrs. Dondero, I've gotten absolutely silence.

And that's why we did what we did, Your Honor. We put in our opposition to the scheduling motion what we believe is a very fair and workable schedule for the taking of depositions because I'm just getting no response. And that's -- that's not right. That's not right.

And as I've said, I told them we could be flexible within it, but even the proposal that we included today, I tried to be very, very respectful of them. And so I put Mr. Patrick on Thursday. I didn't consult with anybody, but the idea was if we're going to produce documents on Friday, that would give them six days to review documents. I mean, I don't want to characterize what other people do, but I know I can get prepared for deposition in six days. I know that I can.

And so I tried to be mindful of kind of their needs. And so I put Mr. Seery before Mr. Patrick, but I don't care what the schedule looks like. As long as we get Mr. Dondero and Ms. Dondero on Monday, Tuesday, or Friday, and they could do whatever they want. I gave a very -- what I thought was a very reasonable proposal that took into account a number of their concerns.

With respect to the request to change the date, Your Honor, I'm -- I'm a bit -- I'm at a bit of a loss here. Okay?

What I think I basically heard was a confession that they don't have any evidence today. Yet again, we're going to have another hearing. And to this day, I don't think you or I have any idea what the new evidence is that they base their motion on.

We don't have any idea today what the evidence of fraud is that they base their motion on.

And what you heard today is they want to go find it. And I understand that Your Honor has ordered document production, and we're not going to quarrel with it. It is what it is, and we will comply with it. But to take what he -- what Mr. Edney is suggesting and flipping it to the period from October, 2024 until basically the hearing date is to do exactly what Rule 60 is not intended to do, and that is give somebody a do-over.

This would be a very, very damaging precedent because it would allow anybody who faces an adverse judgment to come back to court and say, "Newly discovered evidence. I'm not going to tell you what it is. I'm not going to even tell you that I have any. But I'm going to make a motion under Rule 60, and I'm going to get discovery about the discovery that I already took." There's no question, this is not disputable, that the Dallas Foundation filed an objection based on the exact same thing that Dugaboy is pressing today. That Mark Patrick engaged in some type of fraud, that -- for reasons that

still have never been explained -- implicates his ability to serve as the fiduciary for Hunter Mountain. That was their objection.

They took discovery. Dugaboy took discovery. As I just mentioned, between them, they took four depositions. They've already taken Mr. Patrick's deposition. They took Mr. Raver's deposition. They took Mr. Seery's deposition. They took Mr. Klos's deposition.

Remember, the question is could they have, with reasonable diligence, discovered the information? They're now asking for the same information they could have asked then.

The Court should not change the dates, because to do so would give them basically a new trial without having come forth with anything, really with anything.

The notion that there would have been a different outcome, I really have to take issue with because they've yet to identify a single piece of information that would have changed the outcome at all. It's completely speculative.

They mentioned the Joint Official Liquidators and the investigation that they did. The Joint Official Liquidators' investigation was completed on July 25th -- July 15th. How do we know that? Because that's when they filed their complaint. Did Dugaboy know that? Of course, Dugaboy knew that. How do I know Dugaboy knew that? Because they attached that complaint to their motion for a stay of the enforcement of the

settlement. The stay was denied. Nothing has changed since then.

The JOLs had completed their investigation. They knew everything back then. They didn't move for a new trial. Instead, they wanted to wait and see what happened in the Cayman Islands. They lost.

And now, they're back here trying to take discovery in order to help them against Mr. Patrick in other forums. They had their shot at Mr. Patrick. They had their shot to challenge his authority to bind HMIT to the settlement agreements. They had their shot to try to persuade the Bankruptcy Court that Mr. Patrick engaged in wrongdoing. They had their shot to take discovery on all those issues. They failed. You don't -- Rule 60 is not an opportunity to say, "Can I have a second bite at the apple? Can I have a do-over?"

That's what they're asking to do. And that's why the Court should deny their request.

THE COURT: All right. Anything further, Mr. Morris?

MR. MORRIS: Not unless Your Honor has any questions.

THE COURT: I do not; thank you.

MR. MORRIS: Thank you.

THE COURT: All right, Mr. Phillips?

MR. PHILLIPS: Thank you, Your Honor.

We concur and join in Mr. Morris's papers. We filed

our own response to the motion. The motion to -- we didn't oppose expedited hearing. In fact, we suggested one -- the date and time for the hearing. We appreciate Your Honor granting the earliest possible hearing.

Mr. Morris says that things -- that nothing has changed. A couple of things have changed:

Number one, all the supposed evidence of fraud has been tried in the Caymans, and the court in the Caymans, after taking, issued an extensive opinion denying any relief to the Joint Liquidators.

And it's very important to note, Your Honor, that Dugaboy is not in any way, shape, or form related to -- legally related to or a part of the DAF. Dugaboy is not legally related to or a part of the HMIT entities.

Dugaboy is an equity holder of a very minute percentage. And one of the things you haven't heard is that the outcome -- you hear the outcome would have been different, but how? And why? And that -- Dugaboy has lost on its objection to the valuation and fixing of its allowed claim. It -- it did -- and so one thing has changed. There has been a review of all this supposed evidence.

And what you're hearing is that they didn't like that outcome in the Caymans, so what they want to try in the -- under the guise of a Rule 60(b) motion for Highland Investment Management Trust is the Caymans litigation again, when that

doesn't affect Dugaboy. That's number one.

Number two -- and this is a little different from the position of Highland. The Dallas Foundation, which is one of the precipitating parties of the Caymans litigation and the Joint Official Liquidators, is on the member of the Creditors' Committee. As Mr. Morris pointed out, the Dallas Foundation did oppose the settlement based on its allegations that there was something amiss because of Mr. Patrick's misconduct in both -- and they really never articulated it, in -- it was -- they never articulated it, but they mentioned and tried to articulate their concern that because of restructuring of HMIT and the DAF, that Mr. Patrick did something wrong and you shouldn't approve the settlement. There was never a suggestion, even in their objection, that Mr. Patrick didn't have authority.

And when depositions were taken, Mr. Morris took the deposition of the Dallas Foundation people -- and all this is of record, Your Honor, in this proceeding. Under the -- because the depositions established the very real prospect of, well, let's just say, bad testimony by representatives of the Dallas Foundation.

The Dallas Foundation came to us, and we resolved that objection, and they withdrew it with prejudice and supported -- didn't support the settlement, had no further objection to the settlement, and we moved forward.

There is no suggestion in the Rule 60 motion that they're looking at anything involving the HMIT entities. It's all the DAF.

And so the problem that they have is that they're not even questioning the authority of Mr. Patrick on the HMIT side, and that's -- that's a logistical problem. But I'm getting to the point -- and I'm sorry it's taken so long. But even though the Dallas Foundation objected to the very same thing as Mr. Morris points out, that is being sought to uncover now and tried now under the guise of a Rule 60 motion. Neither the Dallas Foundation nor Dugaboy ever sought discovery from any of the HMIT entities, any of the DAF whatsoever. No document requests.

All they wanted was a deposition to Mark Patrick and a deposition to Mr. Shawn Raver, who works with -- is legal counsel for the DAF and the HMIT entities.

And so what we're being asked to do -- and we have filed our response, we've filed a response -- our responses to and objections to the discovery, and have advised that we will produce documents by March -- by May 1st that we consider responsive to the Court's order with full reservation of rights.

But to echo Mr. Morris, there can be no more precise definition of a do-over than we didn't ask for any documents before, and now we need an extensive document request that goes

back to 24 -- months and months before the hearing on the settlement. Months and months before May 19th, the date the settlement was confected and executed.

So we have filed our response. We -- that is -- I would like to move, if I could, for a minute or two. I echo Mr. Morris's version of how discovery has been taken in the Highland case. There's -- there's no requirement by Mr. Morris -- that he wants to take the deposition to Mr. Dondero and Ms. Nancy Dondero, no requirement that they be -- other than remote. No requirement from Dugaboy that Seery be remote.

And the suggestion to the Court is they have to have Mr. Patrick there because his deposition is so important. But if Your Honor notes its own order, the Court's own order, the time frame is probably not going to yield much in the nature of information or evidence that they're going to be able to use on May 11th.

We don't think there's going to be much at all that Mr. Patrick is going to be asked that's within the scope of the Court's order. And there's not going to be much at all that Mr. Patrick is going to have to say about the -- within the confines of discovery under the Court's order.

So to say that all counsel have to come for one deposition because there's some unarticulated suggestion that he is the most important -- well, there have been a lot of important depositions. We took a lot of -- very early on, a

lot of very adversarial depositions that went on for hours and hours. There were hours and hours of deposition taken in connection with the settlement conference. As Mr. Morris said, we did do depositions over the weekend in that case.

There was document discovery propounded to Highland. Highland responded. The documents that were discovered could be utilized easily remotely, and that's the same situation here.

And we would respectfully request, Your Honor, that once we get a date -- and I can try to make the 6th work. We've proposed the 7th; they've not responded, other than to issue a notice of deposition saying it's going to be on the 6th. You know, there's been no suggestion why it couldn't be on the 7th. But I can make the 6th work.

But I respectfully request that the deposition be taken remotely. There's no reason to have all the expense of counsel coming in for one deposition.

And also with respect to the trial, Your Honor, on the 11th, Mr. Patrick is scheduled to be traveling. He will postpone travel. I would request that he be allowed to testify live remotely on the 11th. That is not to say that he can't be there, but it would be at extreme and tremendous cost and disruption. And I think that once the discovery is made, and once we get to the 11th, we think this is liable to be a lot about nothing. But that's our hope, and that's our

perspective.

But this Court has conducted hearings with remote witnesses for years, and we respectfully request that. Although I'm not going to jeopardize the hearing date, I will make Mr. Patrick appear if the Court absolutely orders him to appear live, but it will be at a cost.

He and his wife drove for a family trip, and he would have to fly -- leave his wife fly from Missouri to Lubbock for the hearing, and also for the deposition, which we don't think is in any way, shape, or form reasonable.

I leave it to Your Honor, though. I've pled -- I've pled the case as best I can for remote live appearance on May 11th, and we respectfully request that this Court allow that approach to his testimony if he's called as a witness, and also allow the remote deposition.

One final thing, Your Honor. We did today get an email that says that Dugaboy is starting today a process to obtain a witness deposition through the Hague Convention process. That does -- I'm not a Hague Convention expert, but my suggestion to the Court is that starting today to invoke the Hague Convention process to obtain discovery from -- a deposition from a person who lives outside of the United States does not reflect due diligence in promoting efficient discovery process before the Court.

And I'll -- I can answer any questions, Your Honor.

And thank you for your attention.

THE COURT: Okay. Just real quick, Mr. Phillips. So I take you from your comments, there wasn't an agreement that the deposition of Mr. Patrick would be on the 6th. The date -- I'm just referring to the date.

MR. PHILLIPS: Yes, sir.

THE COURT: There wasn't any agreement that there would be a --

MR. PHILLIPS: Well, we had proposed the 7th, and got no response to that, other than the notice of deposition.

THE COURT: Okay.

MR. PHILLIPS: I have spoken to Mr. Patrick today, and even though he had some things already planned out-of-town on his trip, if necessary, he would cancel those and move those around.

But I will say, we have -- we have suggested the 7th, at least for today. And the response was that we got a notice of deposition for the 6th.

THE COURT: Okay. And then I will just state this, this is the first I'm hearing about any request about remote witnesses. This hearing has always been set as a live hearing or trial on the 11th in Lubbock, as the parties were well aware.

Mr. Phillips, and this goes to you, as well as any counsels that believes they need to seek permission from the

Court to have a witness appear remotely for testimony, please, again, look at my judge-specific guidelines regarding the process to accomplish that. If we need to set that on an expedited basis, we can try to accommodate that, as well. But --

MR. PHILLIPS: Thank you, Your Honor.

THE COURT: Okay? All right, Mr. Edney, I'm going to let you have, obviously, the final word here before the Court determines what it's going to do.

MR. EDNEY: Yes, Your Honor; thank you. And I'll try to be brief.

Obviously, there's a lot of things said about the merits; I'll put those aside for a moment and try to focus on some of the things that -- with respect to scheduling and scope.

Your Honor, again, the principal purpose for our scheduling request is to make sure that there's time to digest what's coming. I know Mr. Morris says he doesn't plan on producing very much; that doesn't surprise me. I do think the production is likely to come from the other entities in Your Honor's order. And we want to make sure that, you know, that is not for -- that is not all for naught, but instead put to good and thoughtful use.

Mr. Morris, you know, is much more experienced in bankruptcy than I am, there's no question. And, you know,

referred to processes where document production occurs one week, and depositions the next.

But, you know, I do want to note that we did put a pin in document production for quite some time here to address the objection that there be no discovery at all. We've now had that addressed. And I think -- I think this two-week adjournment, the continuance that we're asking for, will give an appropriate amount of time for this document work to be sensibly put to good use.

I also note that, you know, we do think that Mr. Patrick is an important part of this. I think it's -- I think it's going to be important to take his deposition in person. Of course, I think it's important that he appear for live testimony before Your Honor, and perhaps the requested extension will facilitate that.

With respect to the -- with respect to the shifting of the temporal scope of the document production, the second topic, I'll just say three quick things:

Number one, almost all judicial proceedings are about what is happening up until the time of the order. They're -- we're in a -- I guess we're -- Your Honor, we're in a backwards-looking business. And in a corollary of that is that Rule 60 talks about newly discovered evidence in 60(b)(2), and 60(b)(3) is fraud, misconduct, and -- it's fraud and misconduct.

But when we talk about newly discovered evidence, I really do think that the focus is, you know, we've discovered something that happened previously, right? And that's why it's not newly occurring evidence. And I think it is appropriate to shift the temporal scope back, because I think that's what Rule 60 is focused on. And I think that's -- I think that's what's relevant to determining whether the order should have been entered in light of the newly discovered evidence.

I also note that -- that it was with respect to the bases for Rule 60(b)(3), fraud and misconduct, and with respect to newly discovered evidence, you know, what the -- what the Cayman -- what liquidators came in with was a significant intervening development. And the parties did ask the Court -- the Texas Attorney General did ask the Court, the Cayman liquidators, by letter, did ask the Court back in the 9019 settlement to wait for the liquidators to come out with that evidence, to pause those proceedings. That request was declined.

But this intervention of that evidence coming out of the liquidation process, I think, is -- I think Rule 60 is the appropriate way to address that. And we think that there's substantial evidence making our case that came out of the liquidation process that's part of our motion. And we hope that this discovery process will be in the manner of rebutting efforts by our opponents to deny that.

So we think the shift is appropriate, and we think that the two-week continuance is the right way to lead to the most productive hearing before Your Honor possible.

And with respect to all the other detailed date issues, you have my firm commitment, Your Honor, to work with brother counsel to make sure that we sort that out without the Court's further intervention.

We come to you today with these two a little bit more macro issues, and we're grateful for Your Honor, both entering the order on Monday, and taking this up so quickly today.

Thank you, Your Honor, for your time this afternoon.

THE COURT: All right. One second, Mr. Edney. I've got a -- I have a few questions for you. One is --

MR. EDNEY: Yes, Your Honor.

THE COURT: One is, do you recall -- I'm sure it's somewhere in the pleadings, but do you recall when you all first served written discovery on your motion -- your Rule 60(b) motion?

MR. EDNEY: I don't, off the top of my head. But my colleague undoubtedly does. Just give me one moment, Your Honor.

(Pause)

MR. EDNEY: Well, maybe my colleague doesn't remember the exact date, Your Honor; we can get that to you. But I believe it -- I believe it was in March, Your Honor.

THE COURT: Okay.

MR. EDNEY: Yeah.

THE COURT: All right. My next question is, has there been any response from you or your colleagues about deposition dates for Mr. and Mrs. Dondero?

MR. EDNEY: Yes, Your Honor. I -- we've been -- Mr. Morris and I had a discussion about that today, and -- and, you know, we'll work with opposing counsel to put them on the right date that works for everybody. Assuming how -- we are under the cover of whatever Your Honor decides today.

THE COURT: Okay. All right. The Court is going to take a ten-minute recess. I want to think through and organize my thoughts before I issue the ruling. So we'll be in a short recess.

MR. EDNEY: Thank you, Your Honor.

(Recess 4:54 p.m./Reconvene 5:04 p.m.)

THE COURT: Okay, this is Judge Odell. We're back on the record in the Highland Capital Management matter.

The Court has listened to the arguments of the parties, as well as reviewed the pleadings, and now is prepared to issue its oral ruling.

The Court has before it, again, the motions filed by Dugaboy Investment Trust. The first motion is a motion to change the discovery deadlines, as well, as the hearing currently set for May 11th on the motion by -- filed by Dugaboy

on its motion for relief from order and motion to vacate the prior settlement order which was entered by this Court.

The second motion is a motion to modify the time periods or time frames which the Court ordered as part of its ruling on the motion for protective order.

The Court has jurisdiction over this matter pursuant to Section 11 U.S.C. Section 1334, and the standing order of the Northern District of Texas has referred all bankruptcy matters to the Bankruptcy Courts.

This is a core proceeding as the underlying motion to vacate relates to a motion to overturn or to vacate an order that was issued under a settlement agreement, and settlement motions are core proceedings within the Bankruptcy Code and within the bankruptcy case. And so this Court considers these motions to be core proceedings for which the Court has authority to enter final orders.

Based on the arguments of the parties and the review of the Court's -- of the pleadings by the Court, the Court finds that the motions -- that Dugaboy has not shown cause for the Court to grant either of the two motions.

As it pertains to the motion to enlarge the discovery period, as well as to move the trial, the Court notes that the Rule 60(b) motion, which was filed by Dugaboy, was filed back on -- in February of this year, I believe February 9th. The Court has reviewed the pleadings and understands that the first

time that discovery was served in this matter wasn't until around March 23rd of this year.

Pursuant to Rule 9014, the parties have the right to seek discovery and the 7000 Rules, including discovery rules, apply to contested matters. There was nothing that was preventing Dugaboy from seeking written discovery as soon as they filed their motion. However, they did not. And it's not until this point in time that now they're seeking extension of time to deal with discovery delays that may have been prevented had they promptly prosecuted or pursued discovery in this matter.

Further, the Court has already set this motion multiple times, and sees no reason why this Court shouldn't hold or continue to hold the hearing on May 11th.

So as it pertains to the motion to continue the hearing and to readjust discovery deadlines, the Court denies the motion.

The Court will look for an order to that effect. Mr. Morris, if you'll prepare that and submit it to the Court? It can be very simple and straightforward, and provide basically that based on the ruling of the Court on the record, the motion is denied.

As it pertains -- let me just state real quick that as it pertains to the depositions that are going to be taken in this matter, the Court is not going to order particular dates,

as requested by Highland in this case.

Again, the Court reiterates what it started off with at the hearing today, which is the Court expects the parties to act in a professional manner and to work together to resolve dates and timing for depositions, the discovery, and the adversarial process in general.

And so the Court is not, at this time, going to enter any order that specifically sets depositions.

The Court -- to allow the parties to know, the Court will be traveling. There's a judicial conference that the Court will be attending the first part of next week. However, the Court will make itself available, should the parties not be able to reach agreement by themselves.

The Court, however, will note and let the parties know that should the Court have to get further involved as to matters of scheduling depositions, the Court will consider whether or not sanctions should be issued against the party that is not cooperative.

The Court does also note -- well, the Court will also now issue its ruling on the motion to modify its prior order regarding the time period for the discovery. The Court denies that motion, as well. Specifically, the Court does not find cause exists to modify the order to modify the dates of when the discovery is allowed to be sought.

Similar to the ruling of the Court as to timing of

discovery, discovery could have been, but does not appear to have been, taken to the full extent during the underlying ruling on the motion for -- to approve the settlement. Dugaboy certainly had its opportunity, and could have sought discovery regarding the issues that have been raised as they were known based on the pleadings and the papers that have been filed, were certainly known to Dugaboy at the time. And, in fact, an objection, while not Dugaboy's objection, an objection was lodged prior to the settlement motion -- or I'm sorry -- the settlement hearing on the issue of authority by Mr. Patrick to sign on behalf of HMIT.

The Court, therefore, denies that motion, as well. And, again, will look to Mr. Morris, if you can prepare an order denying the motion.

The Court notes that while it states that it had jurisdiction to rule on these motions today, the Court is not -- it still is holding the reservation and the question of whether or not the Court has jurisdiction to rule on the Rule 60(b) motion, as previously raised during the last hearing.

So that's the ruling of the Court. I dare ask the question, is there any questions before the Court adjourns?

MR. MORRIS: Not from Highland, Your Honor. We'll have those orders to you. And we'll share them with Dugaboy's counsel, if not tonight, early tomorrow morning.

THE COURT: Okay. All right. I appreciate it --

MR. PHILLIPS: No, Your Honor; thank you.

THE COURT: And with that, the Court will be adjourned.

MR. PHILLIPS: Thank you, Your Honor.

(Whereupon, at 5:12 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ *Karen Hartmann*

Karen Hartmann, AAERT CET Date: May 1, 2026

TRANSCRIPTS PLUS, INC.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| | ) | **Case No. 19-34054-sgj11** |
| In Re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL | ) | Lubbock, Texas |
| MANAGEMENT, L.P., | ) | May 12, 2026 |
| | ) | 9:00 a.m. Docket |
| Reorganized Debtor. | ) | |
| | ) | MOTION TO RECONSIDER (4513) |
| | ) | OBJECTION (4535) |
| | ) | JOINDER TO OBJECTION (4537) |
| ________________________________ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRAD W. ODELL,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtors: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For The Dugaboy Investment Trust: | Michael J. Edney<br>MORGAN LEWIS<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>(202) 739-3000 |
| For Mark Patrick, et al.: | Louis M. Phillips<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For Highland Capital Management, et al.: | Joshua Seth Levy<br>WILLKIE FARR & GALLAGHER, LLP<br>1875 K Street, NW<br>Washington, DC 20006<br>(202) 303-1147 |

Recorded by: Nicholas Noble
UNITED STATES BANKRUPTCY COURT
George Mahon Federal Building
1205 Texas Avenue, Room 306
Lubbock, TX 79401-4002
(806) 472-5007

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

LUBBOCK, TEXAS - MAY 12, 2026 - 9:05 A.M.

(Counsel microphones not recording properly throughout proceedings.)

THE COURT: All right. We'll go ahead and call the matter. We're here on the Highland Capital Management bankruptcy case, Case No. 19-34054. We're, again, here on the Motion to Reconsider and to Vacate the Prior Order of this Court filed by Dugaboy, with objections by various parties.

Mr. Morris?

MR. MORRIS: (faintly) Good morning, Your Honor. John Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital Management.

Before Dugaboy puts on its next witness, I just wanted to address the Court with respect to scheduling matters, where we have to address today. Obviously, Mr. Edney (inaudible) different perspectives. But we have conferred. The parties who are, like, the parties who are relevant in the continued hearing on this matter are all available next Tuesday or Thursday (inaudible). It would be exceedingly helpful if Your Honor could hear us in Dallas (inaudible). But if that's not -- if that's not possible, we are all prepared to go forward either next Tuesday or Thursday. (inaudible)

THE COURT: Okay. Let me pull up my schedule. (Pause.) Okay. It looks to me that either of those dates will work. So we're talking about the 19th. No. Yes, the

19th or the 21st. Is that correct?

MR. MORRIS: Yes.

THE COURT: Okay. It does look like either of those dates will work for the Court, for me.

I can tell you that obviously I control this courtroom. Lubbock is always the easiest one. I don't know, let me see if I can find some way to see about availability of courtrooms in Dallas. But we can certainly check with Judge Jernigan's courtroom deputy about it, but I just was going to look online to see if I can get any idea.

So it looks like on Tuesday she has court. And let's see about -- yes. It's going to be best. And mainly also, I mean, all your exhibits are here. You're welcome, when we finish up for today, you're welcome to leave your stuff here. We lock the courtroom every day. In fact, between now and then I don't believe we're going to have anybody live in the courtroom. We'll have an Amarillo docket. Minus the fact that I've got a large volume of binders here that it would be more difficult to haul to Dallas.

So, to me, I think we just need to set it here. And we're happy to do Thursday if that's the best available date for all the parties.

MR. MORRIS: It is for Highland, Your Honor. And (inaudible).

THE COURT: Yes.

MR. MORRIS: We're happy to come back to Lubbock.

THE COURT: Yes. Why don't we hear from Mr. Edney to make sure that all this plan is good for Dugaboy as well. And I understand at that time I'm anticipating we'll have Ms. McGinnis back.

MR. EDNEY: Yes, Your Honor. That's one of the dates she's available, and that works for us. We'd be happy to come back here (inaudible).

THE COURT: Okay. All right. Well, we'll just plan on that.

So, for today, what are we anticipating as the schedule?

MR. MORRIS: So we have agreed that the sole witness will be Dugaboy's fact witness, Mark Patrick.

THE COURT: Okay.

MR. MORRIS: There's just a slight concern on my part. Mr. Edney tells me that he hopes Mr. Patrick will be completed by 1:00 (inaudible).

THE COURT: Yes.

MR. MORRIS: There is no circumstance where we could (inaudible) day without Mark Patrick concluding his testimony. It would be very unfair. (inaudible) sit for five hours of testimony and then -- and then be subjected to the opportunity to review the transcript (inaudible), et cetera, et cetera.

I offered, as I did yesterday, to put -- to put this on the clock. If he wants five hours, we can split it. Or we

can give him -- we can give him three for every one, to be honest with you. I don't expect -- I don't expect maybe an hour on redirect and (inaudible) at this point. I believe that (inaudible).

And so I just -- I just need to be clear today that we would object (inaudible) at this hearing (inaudible) Mr. Patrick's testimony.

He did sit for a seven-hour deposition. It's not as if they don't know what his testimony (inaudible). And so I am very concerned, given what happened yesterday, it went far beyond anything I could have imagined. I want this to be efficient. There's no reason (inaudible).

THE COURT: Okay. Let me understand. What is the 1:00 o'clock time deadline that we're --

MR. MORRIS: That's Mr. Edney's schedule.

MR. EDNEY: Your Honor, we've agreed -- we've agreed with Mr. Morris to put on Mr. Patrick today and have that be (inaudible) Mr. Patrick today (inaudible), have the other witnesses happen later.

I don't anticipate finishing Mr. Patrick (inaudible) today, unless something very unforeseen happens. Just looking at my questions, I don't anticipate it taking much longer than an hour. I don't know what Mr. Morris is going to do and I don't know what we're going to have to do on redirect, but I think that's very, very (inaudible).

Again, I don't know what I don't know, but I think we're -- I think we're in a good place to get this done today and then move on to the rest of the witnesses going forward.

I will say that we do reserve the right to call Dondero in our case in chief. We have (inaudible) him as a witness. Mr. Morris certainly intends to call him. And that's something under consideration. But for today, we've agreed that Mr. Patrick is the witness and we'll go our separate ways. And that will likely present (inaudible) for our next (inaudible) hearing. (inaudible). So, --

THE COURT: Okay. And let me ask this. Did you all -- and forgive me, I don't have it pulled up -- but did you all not designate Mr. Patrick as a witness?

MR. MORRIS: We did.

THE COURT: Okay. So do we have an agreement on the fact that -- are we going to -- well, let me back up. Forgive me. The question I have is are you going to handle your direct as your case in chief at the same time, or are you going to -- okay. So we're planning on getting through Mr. Patrick completed today, both sides calling -- basically handling their testimony for their case as well as any cross?

MR. MORRIS: That's exactly right, Your Honor.

THE COURT: Okay.

MR. MORRIS: I'm happy to (inaudible).

THE COURT: Okay. Let me ask Mr. Phillips to come up

to the pulpit or stand up at the desk. And are you planning on having direct and cross of Mr. Patrick?

(Inaudible.)

THE COURT: Oh. Sorry.

A VOICE: Mr. Levy will be (inaudible) direct.

MR. LEVY: I'll be handling direct and cross in this matter.

THE COURT: On behalf of HMIT?

MR. LEVY: Yes.

THE COURT: Oh, okay. All right.

MR. PHILLIPS: Well, actually, on behalf of Highland, Your Honor. HMIT -- we could -- Highland will be doing the questioning of Mr. Patrick. We reserve the right, as counsel for HMIT, to object to the testimony that's elicited pursuant to Mr. Edney's questions.

THE COURT: Uh-huh.

MR. PHILLIPS: But if the Court will allow it. I don't -- I don't have any independent questions of Mr. Patrick because we are --

THE COURT: Okay.

MR. PHILLIPS: -- not technically a party to the motion.

MR. LEVY: I apologize. I misspoke. I'm handling the questioning on behalf of Highland.

THE COURT: And that's fine. I mean, HMIT has filed

a joinder --

MR. LEVY: (inaudible)

THE COURT: -- and essentially joined in the objection of Highland.

MR. PHILLIPS: We --

THE COURT: So I just wanted to make sure that I understand who all is going to be questioning, who all is going to putting on evidence by way of Mr. Patrick. And so it sounds to me like we definitely have Dugaboy, we have Highland, and there's some potential for HMIT to do something. Okay.

MR. PHILLIPS: The only thing that we would do, if the Court allows us to, is object to questions by Mr. Edney.

(Inaudible.)

THE COURT: Yes.

MR. PHILLIPS: Highland (inaudible).

THE COURT: That's understandable.

MR. MORRIS: So that's, that's where we are, Your Honor. I just have to respond briefly to the notion that they can call Mr. Dondero in their case in chief, that he's not on their witness list. And we'd like -- that's why we have witness lists. And we'd like to -- call anybody else the other side calls. That just allows them to go beyond the scope of my testimony, exactly what we didn't -- right? So when we call Mr. Dondero, we get to go first. We get to

examine first. And then they'll follow up and can ask him whatever they want as their cross. But that's -- he is not on their witness list. They do not call him in their case in chief.

THE COURT: Well, we can --

MR. MORRIS: We can defer that --

THE COURT: We can -- yes. We're not --

MR. MORRIS: I just wanted to make clear that we would very much disagree.

THE COURT: Okay. We'll address that when the appropriate time arises.

MR. MORRIS: Perfect.

THE COURT: So give me one second. Sorry.

(Pause.)

THE COURT: Technology doesn't always work for you, so I've got to switch over to a different way to take notes. So, with that, I believe we're ready to proceed, then.

MR. MORRIS: Yes.

THE COURT: Okay. Mr. --

MR. MORRIS: (inaudible)

THE COURT: Okay. Mr. Edney, is there anything else that you wanted to bring to the Court's attention at this time?

MR. EDNEY: No, I don't think so. So I guess we're all agreed that we'll get through Mr. Patrick and then we'll

adjourn for the day and then pick it up on Thursday, whatever it is?

One second.

THE COURT: Yes. That is the schedule. Now, I'm leaving it to you all. I can cut things short. I don't like to do that, as I've stated already, putting people on clocks, things of that nature. But you all have said you're going to get through Mr. Patrick today. I leave it to you all to get through Mr. Patrick today. But, yes, that is the schedule. We've got -- we're going to hear the testimony of Mr. Patrick. And once that's done, then we'll conclude for today, and we will pick back up on the 21st here in Lubbock.

MR. EDNEY: All right, Your Honor. Thank you.

MR. PHILLIPS: Your Honor, one more thing I wanted to just --

THE COURT: Mr. Phillips, if you wouldn't mind coming over to the podium. That picks up the best. And so --

MR. PHILLIPS: I've never had any trouble with anybody hearing me before, Your Honor. But I understand. I think, as Mr. Stancil pointed out, I mean, it had slipped my mind, Highland doesn't, you know, assert the attorney-client privilege on behalf of (inaudible). And so when I say that I'm reserving my right to object, it's (inaudible) HMIT (inaudible).

THE COURT: Okay. All right.

Go ahead, Mr. Edney, if you'd like to call your next witness.

MR. EDNEY: Thank you, Your Honor. The Movant calls Mark Patrick to the stand.

THE COURT: All right. Mr. Patrick, when you get to the stand, my law clerk will swear you in before you sit down.

MARK PATRICK, MOVANT'S WITNESS, AFFIRMED

DIRECT EXAMINATION

BY MR. EDNEY:

Q (faintly) One small thing before we get into something, Mr. Patrick, that you did not (inaudible).

THE COURT: He's -- oh, okay. I was going to say, I see he had a bottle of water there, too. He's welcome to have the water there at the stand. That's fine.

MR. EDNEY: Thank you.

THE COURT: I'm not quite sure why in Dallas we provide you all water, but here in Lubbock we just don't want to do that.

A VOICE: Well, there's less water here in Lubbock.

THE COURT: Maybe --

A VOICE: Things go faster if you can't drink.

THE COURT: Maybe that's what it is.

All right. Mr. Edney, you may proceed.

MR. EDNEY: Thank you, Your Honor.

BY MR. EDNEY:

Q Good morning, Mr. Patrick.
A Good morning, Mr. Edney.
Q I think we've met before in your deposition. My name is Michael Edney. I represent The Dugaboy Investment Trust with respect to the motion. Thank you for being here today. Just a handful of preliminary questions. Did you prepare for your testimony today?
A Yes, I did.
Q And did you meet with anybody to prepare for your testimony?
A Yes, I did.
Q And did you -- did you meet with lawyers for Highland Capital Management to prepare for your testimony?
A Yes, I did.
Q And did they review the questions that they may ask you?
A Yes, they did.
Q Now, you're involved in a couple forms of litigation revolving -- involving your management of what I'll call the DAF entity; is that right?
A Yes.
Q And that includes lawsuits brought in the Dallas district court; is that right?
A Yes.
Q And those are brought by organizations like Highland Dallas Foundation Incorporated; is that right?

A Yes.
Q And you're also involved with litigation in the Cayman Islands; is that correct?
A Yes.
Q And the Highland Dallas Foundation is involved in that litigation as well; is that correct?
A Yes.
Q Now, is it your view that -- that Mr. Dondero is responsible for or assisting those various litigations? Is that right?
A It -- it's my view that he is responsible for those litigations.
Q All right. And --
A Yes.
Q And do you know what the Dugaboy Investment Trust is?
A Yes, I do.
Q Does that come from you formerly working in connection with Mr. Dondero?
A Yes.
Q And what do you understand The Dugaboy Investment Trust to be?
A It's his family trust.
Q Do you feel like you're in an adverse position to Mr. Dondero?
A From a litigation and business context, yes.

Q And what about The Dugaboy Investment Trust?
A Yes. I believe we have litigation with The Dugaboy Investment Trust. HMIT does.
MR. EDNEY: Your Honor, on the basis of the foregoing questions, I request the Court's permission to treat Mr. Patrick (inaudible).
THE COURT: Okay. Any objections?
A VOICE: No objection.
THE COURT: No one objects? Okay. You may.
MR. EDNEY: Thank you, Your Honor.
BY MR. EDNEY:
Q Mr. Patrick, what is the DFW Charitable Foundation?
A It is a nonprofit organization organized under -- in the U.S.
Q And did you form the DFW Charitable Foundation?
A Yes.
Q And when did you form it?
A It was formed in late 2024.
Q And you're the sole member of the DFW Charitable foundation; isn't that correct?
A Yes.
Q And you are today one of two directors of the DFW Charitable Foundation; is that right?
A Yes.
Q Who is the other director?

A Shawn Raver.
Q You make decisions on behalf of the DFW Charitable Foundation?
A Together, we do.
Q And the DFW Charitable Foundation's place of business is at your home residence in Dallas; is that right?
A Yes.
Q Since the DFW Charitable Foundation was formed, it has given away less than a million dollars to charity; isn't that right?
A I think it's closer to a million. We did -- and I know in our deposition -- I have done a one off grant to a church in Fort Worth, which was a couple hundred thousand dollars. So close to a million.
Q But less than a million dollars; is that right, Mr. Patrick?
A I think that's fair, yes.
Q And as things are currently structured, DFW Charitable Foundation is the sole economic beneficiary of more than $270 million in assets? Is that right?
MR. LEVY: Object to form.
THE WITNESS: No.
MR. EDNEY: (inaudible), sir.
THE COURT: Yes. Did you want to state your objection more specific?

MR. LEVY: Lack of foundation.

THE COURT: I'll overrule.

THE WITNESS: No.

BY MR. EDNEY:

Q DFW Charitable, it pays you for your work on its behalf; isn't that right?

A No.

Q You don't draw any salary from DFW Charitable?

A That's correct.

Q No other compensation or director fees?

A Nothing.

Q No reimbursement of expenses?

A Nothing.

Q Let's go back to the question of much is under DFW Charitable today. Let's pull up Exhibit 243, please. Go to Slide 18. Bear with me one minute, Mr. Patrick. Slide 18. All right. And perhaps go down slightly. All right. There we are.

Mr. Patrick, between 2024 and 2025, you engaged in the restructuring of the entity that surrounds the Charitable DAF Fund, LP; isn't that right?

A By restructuring, I describe it as I appointed a new discretionary beneficiary of DAF, which I define as Charitable DAF Fund, LP.

Q Okay. And that's that entity in the middle of this chart,

which is Slide 19 of Exhibit 243, correct?
A Yes.
Q And Charitable DAF Fund, LP, is that the entity that holds the assets and the structure of that?
A Yes.
Q And you believe you've appointed another -- a discretionary charitable beneficiary of DAF -- Charitable DAF Fund, LP; is that right?
A Myself and my independent director. Yes.
Q And that -- and that discretionary economic beneficiary is DFW Charitable Foundation?
A Yes.
Q And it is the only discretionary charitable beneficiary of the DFW Charitable Foundation; is that right?
A Yes.
Q I'm sorry. I asked that question incorrectly. DFW Charitable Foundation is the only discretionary economic beneficiary of the Charitable DAF Fund, LP. Is that right?
A Yes.
Q And the Charitable DAF Fund, LP today holds more than $270 million in assets?
A Yes.
Q Now, did there come a time where you also issued participation shares in DFW -- in Charitable DAF Holdco Limited to DFW Charitable Foundation?

A Yes.
Q Let's look at a slide on that. Let's pull up Slide 7. All right. So Charitable DAF Holdco, LP was a -- was an entity that was under the DAF structure at some point. Is that right?
A Again, I define the DAF structure as Charitable DAF Fund, LP. So not -- it was -- it was a blocker pass-through entity, just ultimately to indirect nonprofits.
Q And it -- and it held an indirect stake -- share in Charitable DAF Fund, LP; is that right?
A Yes.
Q And Charitable DAF Holdco, Ltd. had a series of what you call discretionary economic beneficiaries; is that right?
A Yes.
Q And before 2024, there were four of those; isn't that right?
A Yes.
Q And one of them was the Highland Dallas Foundation Incorporated; isn't that right?
A Yes.
Q And another was the Highland Kansas City Foundation, Incorporated, correct?
A Yes.
Q And another was the Highland Santa Barbara Foundation, Incorporated. Correct?

A Yes.
Q And another was the HC NLP General Fund. Right?
A Yes. A donor-advised fund account, the Community Foundation of North Texas.
Q And the -- and each of those entities that held participation shares, they supported 501(c)(3) charities; is that right?
A Yes.
Q And those -- you can see those at the top of the chart that's in front of you. Isn't that right?
A Yes.
Q And those are the Dallas Foundation, right?
A Yes.
Q And the Kansas -- Greater Kansas City Community Foundation?
A Yes.
Q And the Santa Barbara Foundation?
A Yes.
Q And the Community Foundation of North Texas. Correct?
A Correct.
Q Did there come a time where you decided to have Charitable DAF Holdco, Ltd. issue new participation shares to the DFW Charitable Foundation?
A Yes.
Q And did you issue 51 percent of the shares in Charitable

DAF Holdco to DFW Charitable Foundation?

A My director and myself as directors of Charitable DAF Holdco, Ltd. authorized resolutions to do so.

Q And you did that through your capacity as the general partner of various DAF entities; is that correct?

A No.

Q You did it in your capacity as directors of Charitable DAF Holdco, Ltd.?

A Yes.

Q And that issuance of 51 percent shares to DFW Charitable Foundation had the effect of diluting the participation shares of the other four charities. Is that right?

A No.

Q Previous to the decision to issue DFW Charitable Foundation participation shares in Charitable DAF Holdco, Ltd., the four charities that I mentioned owned a hundred percent of the participation shares. Is that right?

A Yes. I can explain.

Q And thereafter, they owned 49 percent. Isn't that right?

A Yes. I can -- I take issue with the word dilution. These are all discretionary charitable beneficiaries, so the concept of dilution is a bit of a misnomer. It's not the same in a corporate ownership sense.

Q All right. But after the decision --

THE COURT: Mr. Edney, I know you -- I understand, I

don't want to take you out of comfortable positions, but we've got to be able to pick you up on the mic, and if you stand like that with your hand covering your mouth, we won't be able to hear you.

MR. EDNEY: No, that's a fair point, Your Honor. Thanks for keeping me on track.

BY MR. EDNEY:

Q All right. After the decision to issue DFW Charitable Foundation 51 percent of the shares in Charitable DAF Holdco, Ltd., the four historical charities held fewer of those participation shares. Isn't that right?

A Yes.

Q But you don't call that a dilution. Correct?

A Correct. They're all discretionary beneficiaries.

Q Okay. And you made the decision to issue those new shares to DFW Charitable Foundation. Correct?

A Myself and Mr. Murphy as directors of Charitable DAF Holdco, Ltd.

Q And that had the effect of reducing the number of participation shares owned by the other four charities. Isn't that right?

A Yes, held by the supporting organizations. I wouldn't describe it as owned.

Q Okay. Bear with me just a second.

(Pause.)

Q Now, Mr. Patrick, when did you issue these new shares to DFW Charitable Foundation?

A I recall in March of 2025.

Q In March of 2025? And -- but you had been considering forming a new charity and issuing new participation shares in Charitable DAF Holdco for quite some time, didn't you?

A Yes.

Q As a matter, you had been considering doing so since at least November of 2023. Isn't that right?

MR. LEVY: Objection; foundation.

THE WITNESS: Yeah.

THE COURT: Overruled.

THE WITNESS: Yeah. No.

BY MR. EDNEY:

Q All right. We'll pull up Movant's Exhibit 7. And move to Page 1433. Mr. Patrick, what is the Shields Law Group?

A It's a law firm that advises the DAF.

Q And by the DAF, you mean what?

A Charitable DAF Fund, LP. And the entities below it.

Q And you turn to the Shields Law Group regularly for advice on corporate structuring matters; is that right?

A Yes.

Q And in 2023, you commissioned the Shields Law Group to take a -- to take a look at how the DAF could be restructured, didn't you?

A No.
Q As a matter of fact, you commissioned a work plan from the Shields Law Group about how the DAF could be restructured; isn't that right?
A No.
Q And they provided you and your entities with such a plan on November 9, 2023?
A No.
Q All right. Mr. Patrick, do you recognize the document in Exhibit 7 entitled Memorandum Work Plan? Work plan, scope of work, and deliverable dated November 9, 2023?
A Yes, I do.
Q What is it?
A Pardon?
Q What is it, Mr. Patrick?
A Oh. Yeah. This is a legal research project that I requested of the lawyer groups that were advising the DAF. And so this memorandum lays out various issues with respect to the DAF structure that, as a group, we had asked to research. And in this lengthy work plan, you can see there are different priorities and different settings on our budgets as far as how much people work.

But I can also explain the context of why this memo was put together, if you are interested.
Q I appreciate that, Mr. Patrick. Thank you. Exhibit 7, is

that a true and correct copy of the work plan as you remember it?

A Yes, it is.

Q And do you see on the first page there is a -- one of these organization charts, kind of like the one we've been showing you. Do you see that?

A Yes.

Q As a matter of fact, it uses some of the same colors I think that were previously put in this column. The color at the top, salmon. (inaudible)

A Yes.

Q Okay. And this chart that you see there, was that an accurate representation of the structure of the DAF as of around November 9th, 2023? Do you want to take a look at it?

A Yes.

Q Is the answer to my question yes, it's an accurate representation?

A Yes, it is an accurate representation, --

Q All right.

A -- is my understanding.

Q I want to turn your attention to Page 1437 of the document. And Paragraph 5, which reads as follows: Can the controlling person redeem shares, *e.g.*, Can the controlling -- I'm sorry. Paragraph 5: Can the controlling person dilute shares, *e.g.*, the participation shares in Charitable DAF

Holdco, Ltd.?

Do you see that?

A Yes.

Q Now, Mr. Patrick, people associated with you or yourself asked Shields Law Group whether you can dilute the shares of Charitable DAF Holdco, Ltd. in November -- on or around November 9th, 2023. Is that right?

A That's how the document reads. Midway down through it, amongst several other legal issues and questions.

Q I'm going to object. Thank you. So the answer to my question is yes?

A Yes.

Q Okay. And you also asked your lawyers: Can the controlling person redeem shares, *e.g.*, the participation shares in Charitable DAF Holdco, Ltd.?

Do you see that?

A Yes, I do.

Q Moving up to -- moving up to Page 1434, the bottom of the page, you asked a series of questions of counsel about how directors of Charitable DAF Holdco could be held accountable for corporate malfeasance. Isn't that right?

A Just let me briefly read this. What section are you pointing me to?

Q Paragraph little (b), please, at the bottom.

(Pause.)

A Okay. Please restate your -- please state your question again, if you don't mind.

Q You asked a question of -- you or your advisors asked a question of the Shields Law Group about the manner in which directors of the Charitable DAF could be held accountable for corporate malfeasance. Isn't that right?

A That's not what the sentence reads.

Q What do you think the sentence reads?

A It's -- it's referring to a transfer of -- of a GP interest, is my understanding, and whether those transfer -- itself could -- could be considered corporate malfeasance or assert a lack of corporate control.

And I believe it's referring to the historic transfer of Grant Scott of the GP interest to myself, and so it's asking whether that -- the person that made that transfer, Grant Scott, could later allege that there was some sort of corporate malfeasance or lack of corporate control related to that transfer.

Q All right. But as of November 2023, you were considering diluting the shares of the existing charities in the Charitable DAF Holdco. Isn't that right?

A No.

Q And you were considering redeeming those shares at some point. Isn't that right?

A No.

Q But you did ask questions about whether you could do it to your lawyers. Isn't that right?
A Yes.
Q And when you were seeking advice on whether you could take these steps, did you inform the charities that either redeeming their shares or diluting them were under consideration?
A They were not under consideration, but I did not inform the charities of this memo.
Q And when you in fact issued new shares to Charitable -- to DFW Charitable Foundation, you didn't inform the charities that those new shares had been issued then, either, did you?
A Correct.
Q And you didn't do that because your lawyers told you you didn't have an obligation to inform them. Is that right?

MR. PHILLIPS: Objection. Asks for privileged information.

THE WITNESS: Yes, I recall asking --

THE COURT: Hold on.

THE WITNESS: Oh, sorry.

THE COURT: I'm sorry. If you'll stand and make the objection.

MR. PHILLIPS: Sorry, Your Honor. Louis M. Phillips. Objection. Asks for privileged information.

THE COURT: Okay. To the extent that you can answer

the question without divulging any privileged communication, you may answer it. Otherwise, it is a sustained objection.

THE WITNESS: My understanding, Walkers was counsel for CLO Holdco.

MR. PHILLIPS: Your Honor, Mr. Patrick, the judge asked you to answer the question without reference --

THE WITNESS: Oh.

MR. PHILLIPS: -- to legal advice.

THE WITNESS: Oh, okay.

MR. PHILLIPS: If you can do that, it would be (inaudible).

THE WITNESS: All right. I can't. Thank you.

BY MR. EDNEY:

Q All right. Mr. Patrick, last Thursday did you sit for a deposition with me asking questions?

A Yes, I did.

Q And during that deposition, did you tell the court reporter that your lawyers told you that you had no obligation to inform the charities of their dilution?

A Yes.

Q All right. And aside from not having an obligation to inform them, you chose not to inform them anyway. Isn't that right?

A Correct.

Q Now, after this transaction issuing new shares to DFW

Charitable Foundation, you transferred Charitable DAF Holdco, Ltd. interests in the Charitable DAF Fund, LP to a new company you created, didn't you?

A My -- my director and myself authorized resolutions to contribute the Charitable DAF, LP interests into a new company.

Q Pull up I believe previously-admitted Exhibit 44.

MR. EDNEY: Your Honor, does your record so show?

THE COURT: Yes, I do show that Dugaboy Exhibit 44 has been admitted into evidence.

BY MR. EDNEY:

Q Mr. Patrick, I am showing you what's been previously admitted as Movant's Exhibit 44. Do you see that?

A Yes.

Q And it's entitled (inaudible) Written Resolution (inaudible) Records of the Company past 18 December 2024, in accordance with the articles of association.

Do you see that?

A Yes.

Q Now, Mr. Patrick, is this the instrument by which you transferred the company's interests in Charitable DAF Fund, LP -- and by the company, I mean Charitable DAF Holdco, Ltd. -- to another company?

A It's the resolutions. I think from a corporate standpoint it doesn't effectuate, you know, effectuate it. So it's not

the document -- it's not the contribution agreement. But it is the resolution authorizing that.

Q And did you effect a transfer around that time?

A Yes.

Q Okay. And did you inform the charities that you had made this transfer around December 2024?

A No.

Q After this -- after this transaction, the interests of Charitable DAF Holdco, Ltd. in Charitable DAF Fund, LP was transferred to a new company called CDM CFAB, LLC. Is that right?

A Yes.

Q And perhaps if we can pull up Exhibit 242 and Slide 19. All right. That, on Slide 19, that company is reflected. It's the topmost blue box. Is that correct?

A Yes.

Q And thereafter, it owned a hundred percent of the interests in Charitable DAF Fund, LP; is that right?

A I wouldn't characterize it as ownership, but it was the holder of that interest. It was the new discretionary beneficiary.

Q There was no other holder or discretionary beneficiary than CDM CFAB, LLC; isn't that right?

A Yes.

Q And Charitable DAF Fund, LP held the -- held the corpus of

the DAF assets, the $270 million that we've been talking about?
A Yes.
Q After the transfer of this interest to CDM CFAB, LLC, you then redeemed the interests of the four historical charities in that new company; isn't that right?
A Yes.
Q And by the four historical charities, I mean the Highland Dallas Foundation, correct?
A Yes.
Q And the Highland Kansas City Foundation. Correct?
A Yes.
Q And the Highland Santa Barbara Foundation. Correct?
A Yes.
Q And the HCMLP Charitable Fund. Correct?
A Yes, but as a point of clarification, the redemption was -- or the redemption of Charitable DAF Holdco, Ltd.'s membership interests in CDM, LLC, and so then indirectly -- indirectly those -- those as well as DFW Foundation were -- had -- no longer had indirect exposure to the DAF.
I'm just clarifying. There was no redemption of the participation shares in the supporting orgs that you just indicated. You know, there's a step below.
Q That's right. So what you're telling me is that Charitable DAF Holdco, Ltd. was the -- was the interest holder

in CDM CFAB, LLC, right?
A Yes.
Q And that's how the four historical charities participated, right?
A Yes.
Q And you redeemed their interests in Charitable DAF Holdco, LP, right?
A The interest redeemed was the membership interest and the CDM entity from Charitable DAF Holdco, Ltd.
Q Right. That had the effect of divorcing or ending any interest that, directly or indirectly, that those four historical charities have had in CDM CFAB, LLC; isn't that right?
A Yes.
Q And it had the effect of ending any interest, direct or indirect, that those four historical charities might have had in the Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q And that was the entity that held more than $270 million in assets at the time; isn't that right?
A Yes.
Q And you redeemed this interest in exchange for a payment of $1,637,192. Isn't that right?
A Yes.
Q And the basis -- and a principal basis for coming up with

that number was the valuation from a company called Evalueserve. Isn't that right?
A Yes.
Q And let's pull up our Movant's Exhibit 12, please. But then you -- I think you previously admitted Movant's Exhibit 12, the valuation analysis of certain participation shares in Charitable DAF Holdco, Ltd. as of March 25th, 2025. Do you see that?
A Yes.
Q Was this the valuation document that formed the basis of the $1,637,192 payment?
A Yes.
Q All right. Now, the assets that were held by Charitable DAF Fund, LP, the more than $270 million, can I ask you some questions about that?
A Yes.
Q Approximately half of those assets were held in cash or Treasury bonds. Isn't that correct?
A I just don't -- I don't recall specifically.
Q Okay. Were some of the assets of the $270 million held in cash or Treasury bonds?
A Yes.
Q Was it more than $50 million?
A What time period?
Q This is at the time of the redemption, sir, in March of

2025.
A Yes.
Q Was it more than $100 million?
A It might have been around $100 million.
Q Was it more than $125 million?
A I don't specifically recall.
Q Okay. And then the other part of the $270 million in assets, those were held in corporate bonds. Isn't that right?
A No.
Q What were they held in?
A A variety of different securities and assets. And private -- private bonds.
Q Can you describe them for me?
A Sure. The predominant asset was a private bond in a company called MidWave. I don't recall exactly what the value of that private debt was, but -- at that time, but probably around $90 to $100 million, I would say. And then the remaining amount was a variety of marketable securities, and then land holdings.
Q The marketable securities, they had the value of whatever the market or the price of them as, as of March 25th. Is that right?
A Yes.
Q And the -- was it MidWave private bond, was that bond performing well?

A That's -- that's hard to say, in that charact... performing well. It was -- it wasn't paying, but it didn't have to pay interest. It was what's called making Payment in Kind interest. But the company had a variety of plans in store to monetize its assets. And it had exposure to that. Whether I can characterize that as performing well or not, I'm not sure.
Q Regard that investment as in any kind of distress?
A I would consider it distressed.
Q But you -- you determined that the value of that investment was around seventy to a hundred million?
A That was its principal face. And, you know, without undertaking a full credit analysis, we would book it at its face.
Q All right. But this managing the DAF assets, that was a full-time job for you, wasn't it, Mr. Patrick?
A It was a part of multiple jobs that I had for the DAF.
Q Yes. But managing the DAF, generally speaking, was a full-time job for you, correct?
A Yes.
Q And this was a significant asset of the DAF, right?
A Yes, it is.
Q So you had a pretty firm view as to that asset's value, didn't you?
A I didn't look at it in terms of value. I looked at it in

terms of trying to get monetization from that asset and efforts related to that.

Q Now, at the time of the redemption, when the -- when the four traditional charities were exited from any association with the assets held by Charitable DAF Fund, LP, you didn't inform those charities of that redemption when it occurred, did you?

A That is correct.

Q And why didn't you tell those charities that they were suddenly a quarter-billion dollars poorer?

A Well, --

Q You can go ahead and answer my question.

A Yeah. I disagree with the, you know, when-was-the-last-time-you-beat-your-wife question premise. But I did not -- I did not notify them of that redemption.

Q And why did you not notify them?

A Because I was under no legal obligation to do so.

Q You really didn't think you had any responsibility with respect to those four charities; isn't that right?

A You've got to help me understand, what do you mean by responsibilities to those charities?

Q Well, just the fact that you just exited them from any association with -- from $270 million in assets. I mean, kind of the bare minimum responsibility would be telling them that it happened.

MR. LEVY: Objection. Argumentative.

THE COURT: He's an adverse witness. I don't -- overruled.

THE WITNESS: Okay. They are discretionary beneficiaries. Akin to a will, they could be changed at -- and written out, or put back in. There was -- there's been no obligation to inform them of the change in their status as a discretionary beneficiary.

BY MR. EDNEY:

Q Why don't we -- why don't we go at discretion from the bottom up, Mr. Patrick. What responsibilities to those four historical charities did you think you had in March 2025?

A To make -- in March of 2025?

Q Yes.

A Like, before the redemption?

Q Yes. Before the redemption, sir.

A Okay. To make discretionary distributions from time to time.

Q And do you think you had any obligation to keep them informed of the status of their relationship with you?

A It was not required under the constituent documents.

Q So, before March of 2025, you thought your responsibility to the four charitable entities consisted of giving them some money when you thought it was appropriate. Is that right?

A They are discretionary beneficiaries that could make --

that they could receive discretionary distributions in the sole discretion of the control person, which is myself.

Q So is the answer to my question yes, Mr. Patrick?

A If your question is consistent with what I've just stated, yes.

Q All right. And you have -- and you had no obligation to keep them informed of changes of their relationship with the DAF or actions that you took under DAF auspices. Is that right?

A What was that? What'd you say, the last part?

Q You had no obligation to keep them informed with respect to decisions that you made on behalf of the DAF or any restructuring decisions that you might make on behalf of the DAF. Is that right?

A Yes. You're asking me the same question twice.

Q Now, at the time of the redemption, your decision to do so also severed these four historical charities from any interest in the Hunter Mountain Investment Trust; is that right?

A Yes.

Q And in doing so, it therefore severed them from any interest in the prior equity stake that Hunter Mountain Investment Trust held in Highland Capital Management. Isn't that right?

A Yes.

Q And that is the former equity stake that's under the

administration of this Court in these bankruptcy proceedings. Isn't that right?

A Yes.

Q And that was because, in February of 2025, you had transferred the Hunter Mountain Investment Trust and its parent company, Beacon Mountain, LLC, to a company called CLO Holdco, LLC. Isn't that right?

A Yes.

Q All right. Let's look at Exhibit 242, Slide 19, please. Here we are. Okay. Mr. Patrick, CLO Holdco, LLC, you see that on this chart. Isn't that right?

A Yes.

Q And it's -- a hundred percent of the interest in that is held by CLO Holdco, Ltd. Is that right?

A Yes.

Q And that, in turn, is held by the Charitable DAF Fund, LP. Correct?

A Correct.

Q So, and you controlled CLO Holdco, LLC, didn't you?

A Yes.

Q Mr. Patrick, just pausing here at Exhibit 19, as of May 2025, after the redemption had happened, is this an accurate depiction of the structure of the Hunter Mountain Investment Trust --

A Yes.

Q -- companies?
A Yes.
Q Do you have any issues with this chart? Is there anything inaccuracies in it?
A No, I don't believe so.

MR. EDNEY: Your Honor, on the basis of that, I'd move the admission of Slide 19 of Exhibit 242.

A VOICE: Hold on, Your Honor.

MR. LEVY: Not the record, the --

THE COURT: Okay.

A VOICE: Your Honor, we object to the --

MR. LEVY: We object to the line Sole Economic Beneficiary in this slide.

THE COURT: Are you referring to up at the top, where --

MR. LEVY: Yes.

THE COURT: -- between the arrows where Mark Patrick to DFW Charitable Foundation?

MR. LEVY: Yes.

THE COURT: Okay. Do you have a response to that objection?

MR. EDNEY: Well, I -- other than the testimony of counsel, I think I've laid a foundation for this. But beyond that, I think you can have a submission with that caveat on the record. I'd be happy to -- I'd be happy to assume that

that line is stricken.

THE COURT: Does that resolve your objection?

MR. LEVY: Yes. Yes, Your Honor.

THE COURT: Okay. Then --

MR. LEVY: Because Mr. Patrick testified precisely the opposite. That resolves our objection.

THE COURT: Okay. All right. So Slide 19 of Exhibit 242 is admitted, with the caveat that the sole known economic beneficiary statement between the box of Mark Patrick and DFW Charitable Foundation is stricken.

(Movant's Exhibit 242, Slide 19, is admitted.)

MR. PHILLIPS: Your Honor, what --

THE COURT: Mr. -- if you'd please --

MR. PHILLIPS: Your Honor, could counsel go down to the bottom? There's a star at the top, and I don't know where there's a reference to that star. I don't think it's on Slide 19. So -- so that reference is just a dangling punctuation mark.

THE COURT: All right. Well, that will be stricken as well.

MR. PHILLIPS: Thank you, Your Honor.

THE COURT: All right.

THE WITNESS: Let me clarify my prior statement, though. I mean, if we're talking nits. I was not the sole director. Obviously, I testified that Mr. Raver was a co-

director. You know, so to the extent of that testimony, this would -- this would be incorrect as well.

BY MR. EDNEY:

Q All right. Well, your testimony is -- accompanies the admission of this exhibit, Mr. Patrick.

All right. So before March 27th of 2025 when the redemption event occurred, the four historical charities had an indirect stake in the Hunter Mountain Investment Trust. Isn't that right?

A Yes.

Q And after, they did not. Isn't that right?

A Yes.

Q And upon the redemption event, you didn't inform the charities that they were being exited from their Hunter Mountain Investment Trust position; is that right?

A I did not inform them. That is right.

Q And one of the historical charities was the Highland Dallas Foundation, Incorporated. Is that right?

A Yes.

Q And that supported the Dallas Foundation; is that right?

A Yes.

Q And even before you sold it in the CLO Holdco, the Dallas Foundation had some economic relationship with Hunter Mountain Investment Trust, didn't it?

A Yes.

Q And when you sold Hunter Mountain into CLO Holdco, you severed that economic relationship with the Dallas Foundation, too. Isn't that right?
A No.
Q After the February 12th, 2025 sale of Hunter Mountain into CLO Holdco, did the Dallas Foundation have its historical economic relationship with that asset?
A No.
Q Okay. I think that's the answer I wanted.
And you didn't inform the Dallas Foundation of that February 12th, 2025 sale, either, did you?
A That is correct.
Q All right. Let's move to Slide 242, or Exhibit 242, Slide 12. We have -- (inaudible) mark these. No. Yes. Thank you.
(Discussion.)
BY MR. EDNEY:
Q So I'm showing you Exhibit 242, Slide 13. Prior to the February 12th, 2025 sale of Hunter Mountain into CLO Holdco, LLC, it was owned indirectly by Rand PE Fund I, LP. Isn't that right?
A Yes.
Q And you controlled Rand PE Fund I, LP, didn't you?
A Yes.
Q And you did so through a relationship between Rand PE Fund I, LP and Rand Advisors, LLC. Isn't that right?

A Yes.
Q And your relationship was one of investment management duties. Isn't that right?
A Yes.
Q And Rand Advisors, LLC, that was a registered investment advisor. Isn't that right?
A Yes.
Q Now, Mr. Patrick, registered investment advisors owe fiduciary duties to the beneficial owners of the assets they manage, don't they?
A They owe fiduciary duties to their investors.
Q Okay. And the investor in Rand PE Fund I, LP was what?
A Atlas IDF, LP was a 99 percent investor. This chart, you know, as I pointed out in my deposition, is inaccurate. And Dolomiti and Hakusan combined had a one percent interest.
Q So did you at least owe fiduciary duties to those three entities that you just mentioned?
A Yes.
Q And you also had an investment management agreement relationship between Rand Advisors, LLC and Atlas IDF, LP. Isn't that right?
A Yes.
Q And so you owed a fiduciary duty to the investors in Atlas IDF, LP; isn't that correct?
A Yes. Only Crown Global.

Q And one of those investors was Crown Global; is that right?
A Yes.
Q Okay. And one of those fiduciary duties is to keep investors informed of your investment decisions, isn't it?
A Pursuant to the constituent documents of the respective fund, I would agree.
Q And to act in the best interest of those investors. Isn't that right?
A Yes.
Q But when you sold Beacon Mountain, LLC, you didn't tell Crown Global that you had sold it, did you?
A They were not an investor in Rand PE Fund.
Q I see. But they were an investor in Atlas; isn't that right?
A Yes, but Atlas did not own Beacon Mountain, LLC.
Q And --
A And so it was not an investment in Atlas IDF Fund.
Q So that's your explanation for not letting Crown Global know?
A It's -- Atlas IDF did not -- was not an investor. It did -- Beacon Mountain, LLC was not an investment of Atlas IDF. And when Beacon Mountain was sold, there was no requirement under the fund documents to notify a non-investor. And the only investor in Rand PE Fund was the Atlas IDF Fund.

Q I see. So Rand Advisors, LLC had an investment management agreement relationship with Atlas IDF Fund, LP, too, didn't it?

A Yes.

Q And you controlled Rand Advisors, LLC; isn't that right?

A Yes.

Q And did you draw compensation from your role at Rand Advisors, LLC?

A Personally?

Q Yes, sir.

A No. Just holistically, my compensation's paid that way. The management fees simply go to that -- that entity, and then its ownership.

Q Okay. Who is the ownership of Rand Advisors, LLC?

A I believe it's Charitable DAF Holdco Corporation, Inc.

Q Okay. And you control that company?

A Yes, I do.

Q And does that company pay you?

A Yes.

Q So let's just talk about your -- your compensation from the DAF structure in 2024. What entity would be providing that compensation? I'm not asking (inaudible), but where is it paid out of?

A Yeah. It's -- generally speaking, it's paid out of Charitable DAF Holdco Corporation, Inc.

Q And that is a company that's part of the DAF structure; is that right?
A Yes.
Q Okay. And that's a company that benefits from the Rand Advisor, LLC management; is that right?
A Yes.
Q Okay. And Rand Advisors, LLC charges management fees to entities with which it has an investment management agreement; is that right?
A Yes.
Q And what -- how -- what are those fees running (inaudible)?
A Oh, it's based upon the value of the asset that it manages.
Q So it's like points or something like that?
A I agree.
Q Okay. Now, you started the creation of new entities in the DAF structure around December 2024, didn't you?
A Yes, generally speaking. That is kind of a non-specific question, but yes.
Q One of the first moves you made to reorganize the structure was you created a new general partner of Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q Prior to the winter of 2024, the general partner of

Charitable DAF Fund, LP was Charitable DAF GP, LLC. Isn't that right?
A Yes.
Q And that was a Delaware company; is that right?
A Yes.
Q And you changed that general partner to a company called CDH GP, Ltd. Isn't that right?
A Yes.
Q Let's go back to the previously-admitted Slide 19 with Exhibit 242. So I -- is that the company reflected in green over at the left on Slide 19 in Exhibit 242?
A Yes.
Q And that company was created in the Cayman Islands; isn't that right?
A Yes.
Q Now, in 2024, Mr. Patrick, when you created this new general partner, you told your lawyer to design it in a way that would conceal its creation from any (inaudible). Isn't that right?
A I wouldn't characterize that email like that as far as the context.
Q Okay. And you told your lawyers to do it in a jurisdiction that would make it harder to hold you accountable for any future restructuring moves you might make. Isn't that right?

A No.

MR. LEVY: Objection; assumes facts not in evidence.

THE COURT: Response, if any?

MR. EDNEY: I think I'm establishing the foundation for the evidence that's about to come in, Your Honor.

MR. LEVY: That's backwards. The (inaudible) question is not in evidence. Your Honor (inaudible).

MR. EDNEY: I'm asking him what happened, Your Honor, and --

THE COURT: Yes. I'm going to overrule the objection.

MR. EDNEY: All right. Thank you, Your Honor.

BY MR. EDNEY:

Q Let's go to Movant's Exhibit 169, please. All right. Who's Brandon Schaller, Mr. Patrick?

A He's an attorney with the Shields Legal Group.

Q And Phil Aubry?

A He's an attorney with Walkers, is my understanding.

Q And Shawn Raver?

A He is my chief operating officer and assistant GC for the DAF.

Q Bart Higgins?

A He's an attorney for the Shields Legal Group.

Q And do you use an email addressed called mpatricktax1040@gmail.com?

A Yes.
Q Email address. Pretty --
A You know. Tax, tax professional, my background.
Q All right. Mr. Patrick, did you send an email to your lawyers on February 5th, 2024, at 12:18 p.m., --
A Yes, I did.
Q -- regarding the --
A Oh. Yes, I did.
Q And did it regard the creation of a new general partner for the DAF entities?
A Yes.
Q And didn't you instruct your lawyers to come up with a name that was hard to find or track or trace or find owners of, et cetera?
A No.
Q Mr. Patrick, on February 5th, 2024, when asked a question about whether you wanted the company to be a new -- you wanted the new Cayman GP to be a Cayman LLC or an exempted company, you were referring to the creation of CDH GP, Ltd., weren't you?
A The future creation, yes, I was.
Q Future creation. And you provided instructions to your lawyer with respect to the future creation of that company, didn't you?
A Yes.

Q And in response to a question where you said, Do you want the company -- the question was, Do you want the new Cayman GP to be a Cayman LLC or an exempted company, you responded, Doesn't matter to me. Whatever from a strategic point of view. Hard to find or track or trace or find owners, et cetera. Generic name. Strong litigation protection.

Is that right?

A I wrote that.

Q All right.

MR. EDNEY: Your Honor, I'd move the admission of Movant's Exhibit 169.

THE WITNESS: But I would -- happy to explain my thought process when I wrote that.

THE COURT: Hold on one moment, Mr. Patrick. There's no question -- okay. Movant Exhibit 169 will be admitted.

(Movant's Exhibit 169 is admitted.)

BY MR. EDNEY:

Q Bear with me for just a moment, Mr. Patrick. (Pause.) Now, Mr. Patrick, we've heard a term a few times today from you. I think it was discretionary charitable beneficiary. Do you remember that?

A Yes.

Q Why don't you tell me what you mean by that term, discretionary charitable beneficiaries.

A I think it distills the overall purpose of this, what many

can see is a complex structure. You know, at its heart, it was formed to have discretionary beneficiaries that would receive distributions from time to time, and those beneficiaries would be nonprofit organizations. And so, despite the complexity of all these legal entities, at its heart that's what it is.

Q And that adjective discretionary, that's meant to convey your view that you could swap these charities out at any time in your discretion. Is that right?

A No, the LPA agreement for Charitable DAF Fund, LP, when you -- when you read through the various provisions, this is exactly what it provides for. And that's what Judge Parker in the Cayman Islands correctly assessed as well.

Q So the entity that owns most of the assets in the DAF is called Charitable DAF Fund, LP. Isn't that right?

A My understanding, under Cayman law, that the entity that is the owner of an exempt Cayman limited partnership is the GP because it has unlimited liability. And so that would be CDH GP, Ltd. as the general partner of Charitable DAF Fund, LP, to be legally correct. And I think that's how Judge Parker analyzed it as well in his opinion in the Cayman Islands.

Q So the general partner of Charitable DAF Fund, LP is CDH GP, Ltd., right?

A Correct.

Q And who owns CDH GP, Ltd.?

A I do.
Q So you own all the assets of the DAF, the $270 million?
A I do not own those assets.
Q The general partner does?
A The general partner does.
Q Which you -- which you own, correct?
A I own the general partner. That is correct.
Q And you control it?
A I control it.
Q All right. Now, back to this term, discretionary charitable beneficiaries. That term that you have articulated, that doesn't appear in any of the foundational documents of the DAF, does it?
A No. Again, it's meant to convey the overall purpose of the structure. And, again, that's what was reflected in Judge Parker's opinion.
Q It's a term you came up with; isn't that right, Mr. Patrick?
A No. I think Judge Parker actually referred to that term, and perhaps in our affidavits that term might have been used. I just can't recall specifically.
Q Let's go to Movant's Exhibit 5, which has been previously admitted. Mr. Patrick, I'm showing you what's been previously admitted as Movant's Exhibit 5. It's the Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund,

LP, dated November 7th, 2011.
Do you see that?
A Yes, but it's not the current version of the LPA agreement.
Q Oh, there's a new (inaudible)?
A As I said in my deposition, there's a Second Amended and Restated Exempt Limited Partnership Agreement. This has the former GP, Charitable DAF GP, LLC, specified. It doesn't have the new GP.
Q Are you aware of any other changes to the Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP?
A I can't recite it chapter and verse, what other changes, but I believe there were other changes.
Q But sitting here today, you don't know what they are?
A Again, I believe we -- there was a mission statement that was put into the second amended version to make it very clear as to the charitable mission of this entity. And I think there might have been some other changes, but, again, I don't recall.
Q And have you produced this Second Amended Partnership Agreement to the Cayman liquidators?
A Yes. I would imagine it's in the extensive affidavits and exhibits to those affidavits. I would be surprised if it was not.

Q Do you know when it was changed?
A I don't -- I don't recall specifically. I'm trying to. But I think I'd be speculating.
Q All right. Was it in 2025?
A Again, I think I would be -- I'd have to refresh my recollection. I'm sorry.
Q Was it within the last two years?
A Again, I'd have to refresh my recollection.
Q Was it after the substitution of the general partner of Charitable DAF Fund, LP moving to CDH GP, LP?
A Again, I cannot -- I just don't recall specifics.
Q All right. Well, let's look at this document for a moment. Let me turn to Page 2 of the document, and Section 1.3.
Isn't it true that Exhibit 5, the Amended and Restated Limited Partnership Agreement of this company as of November 7, 2011, the purpose of the company was to make investments in other types of securities, investment vehicles, and (inaudible), under the sole discretion of the general partner, for the purpose of benefiting, directly or indirectly, the indirect charitable owners?
Do you see that?
A Yes, I do.
Q At least as of 2011, the purpose of Charitable DAF Fund, LP was to make investments for the purpose of benefiting,

directly or indirectly, the indirect charitable owners. Isn't that right?
A Yes.
Q That doesn't say discretionary charitable beneficiaries, does it?
A Not that language. But elsewhere, when you read it, read the entire LPA agreement, there are provisions for removal of the indirect charitable owners and such. And there's provisions with respect to making distributions and in the sole discretion of the GP.
Q And -- but it never uses the term discretionary charitable beneficiaries, does it?
A That is correct.
Q Okay. As a matter of fact, if we turn to Page 4, Section 1.12(b), there's a definition of Indirect Charitable Owners. Isn't that right?
A Yes. 1.12(b) provides for a definition.
Q Okay. And that reads: The term Indirect Charitable Owners shall refer to the indirect equity owners of the limited partners which shall at all times be the entities and organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.
Do you see that?

A Yes.
Q Before we started with the corporate moves that we've been talking about in December 2024. The indirect charitable owners of the Charitable DAF Fund, LP were the Highland Dallas Foundation, correct?
A Correct.
Q And the Highland Kansas City Foundation. Correct?
A Correct.
Q And the Highland Santa Barbara Foundation. Correct?
A Correct.
Q And the HCMLP Charitable Fund. Correct?
A Correct.
Q And, again, in 2024, you had the obligation under these documents to make investments for the purpose of benefiting, directly or indirectly, the indirect charitable owners. Isn't that right?
A Yes.
Q And those four organizations that I mentioned, they support the Dallas Foundation, the Greater Kansas City Community Foundation, Santa Barbara Foundation, and the Community Foundation of Texas, right?
A Yes.
Q Now, the Dallas Foundation, you know about the Dallas Foundation, right?
A Yes.

Q It wasn't started in the last few years, was it?
A No.
Q It's been around for almost a century?
A Yes.
Q Maybe a little more than that. Is that right?
A Yes.
Q Okay. And taking away $270 million in direct or indirect economic value from these charities didn't benefit them directly or indirectly, did it?
A Yeah, I'm sorry, you kind of spoke kind of fast on that last bit. You said it didn't benefit them or it did benefit, taking away?
Q Right.
A Just restate it. A little slower.
Q When you redeemed the interests of the supporting organizations in March of 2025 and you exchanged them for $1.6 million in cash and divorced them from a potential interest in $270 million in assets, that didn't benefit them directly or indirectly, did it?
A They were no longer named a discretionary beneficiary, is how I would characterize the answer to your question.
Q Okay. And it was that no longer naming of that that divorced them from a quarter-million dollars in assets? Remember that?
A They were no longer -- they no longer had the hopeful

expectancy of a potential distribution, to quote Judge Parker in the Cayman Islands.

Q So that was your call, right, Mr. Patrick?

A As the general partner, that is my job.

Q Okay. After the restructuring moves that you made in late 2024 or in early 2025, the indirect charitable owner of Charitable DAF Fund, LP is DFW Charitable Foundation. Am I right?

A Yes.

Q And that's the foundation that's headquartered in your house in Dallas. Isn't that correct?

A Yes.

Q Now -- (pause). Sorry. I've covered a lot of this stuff, so I'm moving along here.

Let's go back to -- I think it's Slide 13. Exhibit 242, please. (Pause.) Now, Mr. Patrick, Slide 13 of Exhibit 242, do you see that?

A Yes.

Q Prior to sale of Hunter Mountain Investment Trust and Beacon Mountain, LLC onto CL Holdco, LLC, is this an accurate representation of how the family of companies in Hunter Mountain Investment Trust was structured?

A No.

Q What's inaccurate about it?

A Well, as I noted under my deposition, that four percent

number of Dolomiti and Hakusan should be one percent.

Q Okay. Any other problems you see with this, Mr. Patrick?

MR. LEVY: Your Honor, it's a little unclear now whether we're talking about Slide 12 or 13. Mr. Edney said Slide 13. At the bottom it says 12. I want to make sure we're all on the right --

A VOICE: And given that these numbers that are at the top, the PDF file, there's small numbers down in --

A VOICE: Slide 12. Yeah, Slide 12.

A VOICE: 12 on the bottom, 13 on the top?

A VOICE: Right. 12 on the bottom, Slide 13 on the top.

A VOICE: Is that true for all of our slides?

A VOICE: We've been right all along. It's just the last one that's Slide 12.

MR. LEVY: Got it. Thanks.

THE COURT: All right. Hold on. You guys got me all confused. Okay. So what I'm looking at is Slide 13? Or Slide 12?

A VOICE: If you look in the bottom right.

THE COURT: Okay. We're going to go off the bottom of the page now.

A VOICE: Right.

THE COURT: So Slide 12.

MR. LEVY: And the previously-admitted one, was that

-- the bottom number was 19?

A VOICE: Yes. That was correct.

MR. LEVY: Okay.

THE COURT: Okay.

MR. EDNEY: And now the bottom number is 12. Correct?

BY MR. EDNEY:

Q Okay. So I'll make a better record here. Let's start again. I'm showing you Movant's Exhibit 242. And the number in the bottom right-hand corner of this slide is 12.

Do you see that, Mr. Patrick?

A Yes.

Q Okay. Now, Mr. Patrick, I was asking you whether this is an accurate representative of the structure of the companies that held the Hunter Mountain Investment Trust prior to December of 2024. And I think you answered my question, but maybe you should --

A Fair enough. I mean, there are a few items that I would change here. First off, the one percent -- the four percent should be a one percent, Dolomiti and Hakusan. You know, Atlas IDF then would go up to 99 percent accordingly.

I would also put Atlas -- you know, this economic benefit, Atlas IDF is the investor in Rand PE Fund, so actually I would have a box for Investors, and I would put Atlas IDF as an investor. Dolomiti and Hakusan as an investor. And then I

would also put Crown as an investor. And then fair enough to leave the top tier, Dallas, Empower, Okada, as economic benefit of an annuity policy. I think that would be, off the cuff, how I would probably mark up this diagram.

Q Anything else (inaudible)?

A This is -- this is -- am I right, this is August of 2022?

Q Yes, sir.

A Prior to the DAF's purchase of Rand Advisors. So Mr. Honis was -- that sounds right. Yes.

Q And you have replaced Mr. Honis, right?

A In those respective positions, yes, I have.

Q So, to make this truly accurate as of, say, December 2024, we would -- we would replace John Honis with Mark Patrick. Is that right?

A Yes.

Q Now, just as a clarification, does Atlas IDF, LP own a limited partnership interest in Rand PE Fund I, LP?

A Yes.

Q Okay. And Dolomiti and Hakusan, they own a limited partnership interest (inaudible) percent?

A Together, as a group, yes.

MR. EDNEY: Your Honor, with the benefit of Mr. Patrick's clarification by his testimony, I'd move to admit the Slide 12 of the exhibits the Court has --

MR. LEVY: We object. I think that -- I think they

(inaudible) mark-up of this document, changing colors, adding boxes, changing numbers, (inaudible) every single line or two. Mr. Patrick has (inaudible). I don't think Mr. Patrick (inaudible).

THE COURT: Well, but I have the benefit of his testimony as to what are the changes or how this would be different. I don't know why -- what is the issue with -- I mean, they did the same thing on a prior slide. So --

MR. LEVY: And I think this is a difference in time (inaudible) offered for the support (inaudible).

THE COURT: Well, I'm going to admit the exhibit and note that testimony of Mr. Patrick as to his belief that it's inaccurate. But I'll go ahead and admit the exhibit. So Slide 12 of Exhibit 242 is admitted, with the Court's note that I've taken the testimony -- or, the Court notes Mr. Patrick's testimony as to the accuracy of the diagram.

(Movant's Exhibit 242, Slide 12, is admitted.)

BY MR. EDNEY:

Q Now, prior to the sale of Hunter Mountain from the structure to a new structure, did the limited partners of Rand PE Fund I, LP have the right to redeem their interests in it?

A Yes.

Q And that includes the right to take possession of the assets and appropriate shares that were held by Rand PE Fund I, LP?

A I don't specifically recall if the constituent documents allow for that.

Q So the investors in Rand PE Fund I, LP, when you sold Beacon Mountain, LLC (inaudible) Hunter Mountain Investment Trust to another entity, lost any authority they might have had to redeem their interest in those companies and take possession of their shares; is that right?

A I don't think that's an accurate characterization of the fund documents with respect to their rights and entitlements.

Q But you're unsure whether they had a right to redeem their interest in Rand PE Fund I, LP? And by that, I (inaudible).

A Generally speaking, when an investor redeems out of a fund, they're only entitled to the value of their net asset, their allocable share of the net asset value. And Rand PE Fund had a zero net asset value since 2020. And, you know, and as we discussed in my deposition, it was running annual losses for the administration of that fund.

Q You didn't inform Crown Global that you had -- you sold Beacon Mountain, LLC?

A I take that to -- your question to mean the date that when it happened, --

Q Yes.

A -- I did not inform Crown Global. However, I did have an earlier conversation with them in November of 2024 with respect to the winding down of the Rand PE Fund because

essentially it had been running with a zero net asset value for in excess of four years.
Q But in February when you sold the asset, you didn't inform Crown Global of it?
A I informed them earlier that I was winding down the fund, whose only asset was Beacon Mountain, LLC. So, by direct inference, they knew that there was going to be a disposition of that asset.
Q But when the sale occurred, you didn't inform Crown Global; isn't that right?
A That is correct.
Q All right. Does Rand PE Fund I, LP have an auditor?
A Yes, it does.
Q And who is that?
A Cohen.
Q How regularly is Rand PE Fund I, LP audited?
A Annually.
Q And do you rely on those audit reports in the normal course of the business?
A Yes, I do.
Q All right. Pull up Exhibit 18, please. (Pause.) I've handed you what I believe is previously-admitted Exhibit 18.
MR. EDNEY: Is that right, Your Honor?
(Pause.)
MR. EDNEY: Okay.

THE COURT: Yes, it has been admitted.

MR. EDNEY: Thank you, Your Honor.

BY MR. EDNEY:

Q This is about Rand PE Fund I, LP, the financial statements and audit reports for the year ended December 31st, 2024 and the period ended February 24th, 2025th [sic]?

A Yes.

Q Do you see that? Now, these audit reports, do you share those with the investors in Rand PE Fund I, LP?

A I -- I don't recall specifically what the process is. Mr. Raver, this is part of his responsibilities. But I would imagine that they are -- they are given a copy, but I could -- I could be mistaken. He's involved in that sort of logistical work.

Q Okay. And February 24th, that was after you sold the Beacon Mountain asset. Is that right?

A Yes.

Q All right. Let's go to Page 3 of the document, please. All right. Do you see that chart there?

A Yes.

Q And that reflects an asset -- assets in the amount of about a million dollars. Isn't that right?

A Yes.

Q And that reflected both the sale that had previously occurred of Beacon Mountain assets?

A I would -- I would -- I would think so.
Q And as of February 24th, 2025, you hadn't distributed any of the proceeds of that sale to the investors. Is that right?
A I can't recall specifically, but I would imagine that's true.
Q Is that why there you have some $900,000 listed as distribution payable?
A Yes.
Q Okay.
A Thank you.
Q And you still haven't distributed the proceeds of the sale to Crown Global, have you?
A It doesn't work that way. They're an investor in an insurance-dedicated fund, and if they want any distributions, they put in what's called a partial redemption request. And then through that is when I honor whatever amount that I can per the fund documents. So we don't -- the way the fund works, it just doesn't distribute it all the way up to -- up the chain.
Q Okay.
A But when I wound the fund -- when I wound Rand PE Fund, every investor received their allocable share, including the Atlas IDF Fund and Hakusan and Dolomiti.
Q And to the best of your knowledge, the proceeds of the Beacon Mountain sale haven't been distributed -- distributed

upward to Crown Global; is that right?
A They haven't asked for it. That is right.
Q You didn't tell them that they were (inaudible)?
A They received the same -- similar financial statements as -- as what you see here with respect to Atlas PDF. But it -- so they haven't made a request.
Q Let's go to Page 15 of the document. All right. So I take it you informed the auditors of Rand PE I Fund that the Beacon Mountain asset had been sold; is that right?
A Yes.
Q And do you see down at -- right above Paragraph 7 where it says LLC interests, fair market value, a million dollars? Do you see that?
A Yes.
Q You sold Beacon Mountain out from Rand PE Fund for a million dollars; isn't that right?
A Yes.
Q Okay.
A Yes.
Q And the auditors then, their ability to value that asset was just based on the transaction price. Isn't that right?
A Yes.
Q And you sold the Beacon Mountain asset to a company that you control, right, CLO Holdco, LLC?
A Yes. It was, for all intents and purposes, a sub-account

of Rand Advisors. I never changed my role --
Q So the --
A -- and control.
Q So the sale from Rand PE Fund I, LP to CLO Holdco was from a company that you controlled, right?
A Yes.
Q To a company that you controlled. Isn't that right?
A Yes.
Q All right. Now, Mr. Patrick, you signed the settlement agreement between Hunter Mountain and various other entities and Highland Capital Management entities; is that right?
A Yes.
Q And you signed that settlement on behalf of Atlas IDF, LP, didn't you?
A Yes.
Q And you signed it on behalf of Rand PE Fund I, LP, didn't you?
A Yes.
Q Let's go to previously-admitted Exhibit 2, please. All right. Now let's just go down to the signature page, please. The last two pages.
(Pause.)
Q Mr. Patrick, those are your I guess what counts for signatures these days, your slash S's there; is that right?
A Yeah. Those are -- those are my signatures.

Q And you signed on behalf of Rand Advisors, LLC; is that right?
A Yes.
Q And Rand PE Fund I, LP. Correct?
A Yes.
Q And Rand PE Fund Management, LLC. Correct?
A Yes.
Q You also, go down a bit, you also signed on behalf of Atlas IDF, LP. Is that right?
A Yes.
Q And Atlas IDF GP, LLC; is that correct?
A Yes.
Q Let's go to -- let's go back to Exhibit 242, Slide 12, Hunter Mountain at the bottom, please. The exhibit right before it. I think you probably have it in front of you (inaudible). Excellent. But those companies I just mentioned, they're reflected here on this chart, aren't they? Rand PE Fund I, LP, that was the owner of Beacon Mountain, correct?
A Yes.
Q And then Atlas IDF, LP, they -- they had a -- they had a limited partnership stake in Rand PE Fund I, LP; is that right?
A Yes.
Q And Rand PE Fund Management, LLC, that was the general

partner of Rand PE Fund I, LP; is that right?
A Yes.
Q And Atlas IDF, LP, that's the -- right up there above Rand PE Fund I, LP. Isn't that right?
A And Atlas IDF GP, LLC, that's the general partner of Atlas IDF, LP. Is that correct?
A Yes.
Q You signed this settlement agreement as of May 19th, 2025. Isn't that right?
A Yes.
Q You sold the Beacon Mountain asset from Rand PE Fund I, LLP to CLO Holdco, LLC on February 12th, 2025, correct?
A Yes.
Q As of May 19th, 2025, Rand PE Fund I, LP had no ownership or economic interest in Beacon Mountain, LLC. Isn't that right?
A Correct.
Q And neither did Atlas IDF, LP?
A Correct.
Q Neither did the various green-shaded general partners on this box -- Rand Advisors, LLC; Rand PE Fund Management, LLC, Atlas IDF GP, LLC?
A Yes.
Q And let's go to -- let's go to previously-admitted Slide 19. Excuse me. Now 18. Is it 19? Bottom of 19, please.

(Pause.)

Q I think we might have even seen this maybe before. It's the bottom -- the top -- I believe it's the prior slide. And (inaudible).

MR. LEVY: Yes, I think that's right. Yes.

MR. EDNEY: And the record should reflect that this slide, 19 on the bottom, is actually -- actually 18 on the bottom. Admitted at (inaudible).

THE COURT: Okay. So, just so that the record is clear, the Court has admitted what was previously designated as Exhibit 242, Slide 19. It is actually Exhibit 242, Slide 18. And that will be admitted with the same caveats that were previously stated about Slide 19.

MR. EDNEY: That's correct. And (inaudible).

MR. LEVY: Yes, Your Honor.

THE COURT: Okay.

(Movant's Exhibit 242, Slide 18, is admitted.)

BY MR. EDNEY:

Q As of May 19th, 2025, the Deacon Mountain asset was owned by CLO Holdco, LLC. Right?

A Yes.

Q And then there was a series of companies on top of that. Correct?

A Yes.

Q And you didn't have those newly-owning companies sign the

settlement agreement, did you?
A They are not signatures. That is correct -- they are not signatories. That is correct.
Q Instead, you had the previous ownership structure before the sale of Deacon Mountain, LLC sign the settlement agreement. Is that right?
A Yes.
Q Now, the sale was for -- of Deacon Mountain, LLC for one million dollars. Isn't that right?
A Yes.
Q And that happened on February 12th, correct?
A Yes.
Q And about three months later, on May 19th, you entered into this settlement agreement; is that correct?
A Yes.
Q And under the settlement agreement so far, Hunter Mountain and its current corporate owners have received $18-1/2 million of cash. Is that right?
A I'm sorry. Did you say 16?
Q 18.
A 18?
Q Eighteen and a half. Does that sound right, Mr. Patrick?
A No, that doesn't sound right. But I could be mistaken. Like, I thought we received about $10 million of proceeds, not $18 million.

Q Okay. So you're not sure?
A I'm not sure.
Q Do you know where that cash is today, Mr. Patrick?
A In the -- in the general accounts of the DAF. But not specifically.
Q When you say the general accounts of the DAF, do you mean Charitable DAF Fund, LP?
A Yeah, and its constituent subsidiary entities. It's in there. Like the Prego commercial.
Q In some bank account somewhere in the current DAF structure. Is that right?
A Yes.
Q Okay. Has any of it been spent?
A Money is fungible. So there's legal bills and -- so you could say it's spent. It's -- or it's -- just, money is fungible. So it's in the same pot with all the other assets, is how I kind of would think of it.
Q Ballpark, Mr. Patrick, how much has the DAF entity spent on lawyers in 2026?
A 2026? (Pause.) I don't know precisely. I would -- I'm speculating, but I'll give you an answer, roughly maybe five, six million.
Q Okay. What about in 2025?
A Yeah. Yeah. I don't -- I don't know specifically.
Q Is it more than $10 million?

A It could be.
Q Is it more than $20 million?
A No. I would be very surprised by that.
Q Okay. 2024? Do you have a sense of how much was spent on lawyers then?
A Yes. I think that was around $12 million.
Q Okay. So about how many law firms has the Charitable DAF entity retained?
A I would -- closer to a dozen than half a dozen.

THE COURT: Mr. Edney, I'm sorry to interrupt you, but we're at 11:00 o'clock. We're going to take a 10-minute recess. If you're wanting to catch a plane at 1:00 p.m., you're trying to get through this witness, we're going to need to move things along.

MR. EDNEY: Yes, Your Honor.

THE COURT: So I just want to make sure that the parties are aware of their own time management. But we're going to take a 10-minute recess.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(A recess ensued from 11:01 a.m. until 11:15 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

A VOICE: Your Honor, (inaudible) Mr. Edney, but there's also (inaudible). (inaudible) to see what it is

before we --

THE COURT: Okay. That's fine.

A VOICE: He's not here anyway.

THE COURT: Yes. Mr. (inaudible), let me tell you this while I have you here. Just, and this is just so you know, the exhibit Volume 1 that I received does not have Exhibit 1 in it and does not have Exhibit 2, which is behind the tab. So I'm happy to hand this back to you all for you all to get that.

A VOICE: Exhibits 1 and 2?

THE COURT: Yes. And then Mr. Edney, I understand that you all just filed a new exhibit on the docket, and so we're going to take another 10-minute recess so everybody can take a look at what this new exhibit is. So we'll be back in recess.

THE CLERK: All rise.

(A recess ensued from 11:16 a.m. until 11:20 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

MR. EDNEY: Your Honor, I just want to apologize for (inaudible).

THE COURT: No worries, Mr. Edney.

MR. EDNEY: Second, I (inaudible). That's why I was (inaudible). This morning, I looked and (inaudible). I informed both counsel of that.

THE COURT: Okay.
MR. EDNEY: All right?
THE COURT: All right. You may proceed then.
MR. EDNEY: Thank you, Your Honor.

DIRECT EXAMINATION, RESUMED

BY MR. EDNEY:
Q Just a few more questions, Mr. Patrick. Thank you for coming back and being with me here this morning. So, coming back to the settlement agreement, did -- when did you start negotiations with Highland Capital Management on the settlement agreement?
A In March, late March of 2025.
Q Nobody on your behalf was engaged in settlement agreement negotiations earlier than that?
A To my understanding, nobody on my behalf was.
Q When you were negotiating the settlement agreement that is the subject of this proceeding, are you aware that the Highland Capital Management estate was holding tens, if not hundreds, of millions of dollars in various indemnity trusts?
A I'm not sure I heard tens of hundreds of millions of dollars. That's not my general understanding of the remaining assets, being in excess of a hundred million.
Q Do you -- you understand the remaining assets being in excess of a hundred million?
MR. LEVY: Objection. Foundation. Asking him to

(inaudible).

THE COURT: I'm going to overrule it.

BY MR. EDNEY:

A Prior to the March discussions, I can tell you I personally had no idea what was left in Highland. I didn't really monitor the docket or the filings or anything. It was only subsequent, during the settlement discussions, that we were provided financial information on the residual amounts.

Q Okay. Did you, in those settle negotiations, inform yourself of what the Highland estate was holding in various trusts?

A Yes.

Q And what was the understanding you came to?

A The number in my mind is $70 million.

Q Okay. And who told you that?

A I'm just going from a general memory of what the residual cash was left in the overall estate.

Q Okay. Did that include the various indemnity trusts that the estate held?

A Yeah. I think -- I mean, I'm just trying to go from my general understanding. I think that just included all remaining assets, you know, wherever located. But, yeah, that's my answer.

Q Did you take steps to accelerate the payment of any assets being held in the bankruptcy estate to either you or your

charitable beneficiaries?
A Could you be more specific in when?
Q Was one of your objectives in negotiating the settlement to push out assets that were still being held in the Highland estate to the equity owners of Highland, like Hunter Mountain, that you manage?
A Yeah, I do apologize. I'm sorry, I'm not following the question.
Q Did you think it was important when negotiating the settlement to make sure that the equity owners of Highland, represented by your Hunter Mountain --
A Okay.
Q -- (inaudible) --
A Okay.
Q -- got as much cash out of the estate as possible as quickly as possible?
A Yes, I would agree with that overall philosophy. Sorry.
Q Okay. All right. And did you take steps to do that?
A In the course of the negotiations, yes.
Q Did you deal away some of that potential cash in order to obtain the Kirschner litigation asset?
A Yeah, I'm sorry, you said peel away--?
Q Deal away, Mr. Patrick. Deal.
A Deal. Deal away?
Q Did you sacrifice the opportunity for getting more cash to

the equity owners more quickly in order to obtain the Kirschner personal litigation asset?
A No, I wouldn't characterize that at all. I disagree with that.
Q But you negotiated to obtain the Kirschner litigation asset, didn't you?
A Yes.
Q All right. Now, in 2024, from entities under the DAF structure, you paid yourself more than $14-1/2 million dollars, didn't you?
A No.
Q You heard you heard Ms. McGinnis' testimony. Is it inaccurate?
A Yes.
Q How much did you get paid in 2024?
A About -- the Compensation Committee, pursuant to a Mercer Executive Compensation Benchmark, paid me, for three years of my service starting in 2021, about $10.5 million. So that covered three years. And that was pursuant to Mercer Executive Compensation Benchmarking that took quite some time to accomplish. And then that, that recommendation was presented to the Compensation Committee, and the Compensation Committee made that award.
And as I discussed in my deposition, it was composed of base salary, an annual discretionary bonus. This is set out

by Mercer. And then an LTIP award that's awarded every three years. And so part of that compensation was an LTIP that is based upon the value of the DAF from 2021 through the increase into the 2024 year, is my general recollection.
Q So the answer to my question about how much the DAF entities paid you in 2024 is $10-1/2 million?
A Yes.
Q Okay. And we did talk about your compensation in the deposition on Thursday, didn't we?
A Yes, we did.
Q And I asked you then whether you got paid more than $13 million in 2024, and you said you weren't sure. Isn't that right?
A That is correct.
Q And why are you so certain of the $10-1/2 million number now?
A Because I made an inquiry to confirm exactly what that number was.
Q Did you review documents to do that?
A No.
Q Who did you ask?
A I just called up Mr. Raver, the CFO of the DAF, and I asked him specifically how much was I paid in that year, and that's the number he gave me.
Q Okay. How much did the DAF entities pay you in 2025?

A In the year 2025, I received a bonus for the 2024 work. Paul Murphy awarded me a multiple of three. On a Mercer bench scale of two to four, he awarded me a 3 off of my base of $850,000. And that was paid in roughly February of 2025. And then for the remainder of 2025, I should -- I received my base compensation of $850,000.
Q Okay. I mean, I appreciate the explanation, but can you give me a total number of compensation for 2025, please?
A For 2025, yeah, it would be $850,000 plus $2,550,000, if I'm correct. So add those two numbers together.
Q So about $3.4 million; is that right?
A I'm -- $850,000 plus $2.5 million, yes.
Q Okay. And how about for 2026, Mr. Patrick?
A It's -- it's -- the award for the 2025 work awarded in 2026 was the same multiple and it's the same base.
Q So you expect to make about $3.4 million in 2026?
A Yes.
Q And since its inception, Mr. Patrick, the DFW Charitable Foundation has given away less than a million dollars; is that correct?
A Correct.
Q All right. Do you remember when we earlier talked about the Amended and Restated Partnership Agreement of Charitable DAF Fund, LP?
A Yes.

MR. EDNEY: Let's pull up Highland Exhibit 85, please.

THE COURT: 8-5?

MR. EDNEY: Yes, please.

(Pause.)

BY MR. EDNEY:

Q And just bear with us for a moment, Mr. Patrick. We seem to have technical difficulties here. Do it the old-fashioned way. All right. I've handed you Highland Exhibit 85. This is the Second Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP. Do you see that?

A Yes, I -- yes, I do.

Q And that's the same entity that we were discussing in the previous amended and restated limited partnership agreement; is that right?

A Correct.

Q Okay. And that's dated March 11th, 2024. Correct?

A I see that, yes.

Q And so if the previous exhibit had been amended, it was amended around March of 2024; is that correct?

A Yes, I would assume so.

Q Okay. Let's turn to Page 1 at the bottom of that document page. 1 at the bottom. All right. In Section 1.3 of the document there, you see a reference to Purposes and Powers.

Do you see that?
A Yes.
Q This is similar to the Section 1.3 of the previous agreement, wasn't it?
A Yes.
Q And it says that the partnership may make investments in other types of security investment vehicles and instruments in the sole discretion of general partner for the purpose of benefiting directly or indirectly the direct charitable owners, right?
A Correct.
Q That doesn't say discretionary charitable beneficiaries, does it?
A No, it does not.
Q All right. Let's turn to Page 3 at the bottom. Definition of Indirect Charitable Owners. Do you see that?
A Yes.
Q And that says: It shall refer to the indirect equity owners of the limited partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code, or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code. Do you see that?
A Yes.

Q All right. And that's very similar to the provision we read previously?

A Agreed.

Q Now, Mr. Patrick, are you aware that a registered investment advisor cannot sell an asset to an entity that's controlled by it without disclosing that ownership status to all investors (inaudible)?

MR. LEVY: Objection; legal conclusion.

THE COURT: Hold on one second. Any response?

MR. EDNEY: Your Honor, I'm asking about his awareness about the --

THE COURT: Yes, I'm going to overrule the objection. He can answer what his awareness is.

BY MR. EDNEY:

Q Do you remember my question, Mr. Patrick?

A Yes. I'm not a securities lawyer, so I rely upon my counsel with respect to questions such as that.

Q Did you take counsel on the -- did you take counsel on your retaining disclosure obligations related to the sale (inaudible)?

A Yes. Yes, I did. I was advised by counsel.

Q And which counsel was that?

A A couple. The law firm of Eversheds, and Seward & Kissel, and Shields Group.

Q All right. So counsel from three law firms on that?

A It was, as I said in my depositions, this is my first time ever winding up a fund, and I wanted to make sure I did it right.
Q In the fall of 2024, you had a meeting with representatives of the Dallas Highland Foundation, Kansas City Foundation -- or Highland Kansas City Foundation, the Highland Santa Barbara Foundation, and the other supported organizations, right?
A No.
Q But did any of your representatives have such a meeting?
A The list was -- is inaccurate.
Q I see. What list would be accurate?
A In the fall of 2024, in October, I met with the Dallas Foundation in person. And on the same day, I recall having a Zoom meeting with the Highland Kansas City Foundation.
Q Okay.
A So, like I heard you say Santa Barbara and the other one, and that's why I said no. Just clarifying.
Q Did you prepare a PowerPoint for that meeting?
A No.
Q Okay. Did you represent in that meeting that the DAF was following best practices of corporate governance?
A I don't recall specifically.
Q Do you recall not saying that?
A I don't -- I just -- I don't recall. I mean, I recall

certain elements of the conversation, such as that it was my overall view in a couple years to have the DAF have audited financials. That's one specific item.

I also did indicate at that meeting that I was -- my intention at that point in time was to operate the DAF in the ordinary course. And even though I was leaving Skyview, that from my perspective there would be no changes within the DAF structure.

Q All right.

A Let me clarify. No changes with the operations of the DAF, is what I tried to emphasize. It would just be business as usual with respect to my relationship with them. And that was a week after I resigned from Skyview.

Q Okay. So you're the administrator of the Hunter Mountain Investment Trust; is that right?

A Yes.

Q And the Hunter Mountain Investment Trust was formed in 2015; is that correct?

A Yes.

Q And its original administrator was John Honis; is that correct?

A Yes.

Q And you acceded to Mr. Honis' position in August of 2022; is that right?

A Yes.

Q Are you aware that the Hunter Mountain Investment Trust has a trust agreement?
A Yes.
Q Do you feel like you're bound by the terms of the trust agreement?
A Yes.
Q Do you feel like you're bound by the terms of the trust agreement that are applicable to Mr. Honis?
A Yes.
Q Let's pull up --
(Pause.)
Q Mr. Patrick, I've handed you what's previously been admitted as Exhibit 1 on the Movant's side. It's the trust agreement dated December 15th, 2015 between Beacon Mountain and the Wilmington Trust Association. Do you see that?
A Yes.
Q Was the purpose of this trust agreement to establish the Hunter Mountain Investment Trust?
A Yes.
Q All right. I want to draw your attention to Page 6, Paragraph 16, please. Do you agree that upon the occurrence of any Honis trigger event, the administrator shall be immediately removed, without any action by the Delaware Trustee or any other party?
A That does not apply to a successor administrator.

Q Okay. Do you agree that whenever the trust agreement refers to the Administrator, such reference shall include any Successor Administrator appointed under this paragraph?
A Yes, but my statement for 16 not applying, it says a Honis Trigger Event. And a Honis Trigger Event, in the definitional section, applies only to the human being John Honis and no others.
Q So you think only some of the terms applicable to Mr. Honis apply to you; is that right?
A By the four squares of this document, it has specific sections that apply only to John Honis the human being, and obviously I'm not John Honis.
Q All right. And do you think that that left you at liberty to breach fiduciary duties and remain in control of the Hunter Mountain Investment Trust?
MR. LEVY: Objection.
THE WITNESS: I --
THE COURT: Hold on one second, Mr. Patrick. Do you want to state your basis for the objection?
MR. LEVY: The form of the question. This is another kind of how-long-have-you-been-beating-your-wife type of question.
MR. EDNEY: When did you stop.
MR. LEVY: Yes.
A VOICE: He's showing how little experience he has

with the topic question.

A VOICE: I've had more.

THE COURT: All right. I'm going to sustain the objection as argumentative.

BY MR. EDNEY:

Q You're aware that, going to the first page of the document, that an Honis Trigger Event, the one referred to in Paragraph 16, requiring the removal of the administrator, refers to any conduct by Honis regarding the Honis Clause. Do you see that in Exhibit 4?

A Yeah. And it begins with respect to Honis or any of his affiliates, referring again to John Honis.

Q All right. And up in the immediately-previous paragraph, Honis Clause means conduct by Honis in any capacity, moving down to Rule 5, amounting to a breach of fiduciary duty. Do you see that?

A Yeah. Yes, I see that.

Q Do you agree that if Mr. Honis were still the administrator of the Hunter Mountain Investment Trust and he had engaged in a breach of fiduciary duties in any capacity, he'd be automatically removed as Administrator?

A It feels like a legal conclusion that I would ask an attorney, but I can look at the flesh language. And the flesh language appears that if Mr. Honis breached a fiduciary duty he would be removed.

Q But that -- you believe that term doesn't apply to you, correct?
A Correct.
Q So asking the hypothetical question, based on your reading of the Hunter Mountain Investment Trust, if you breached a fiduciary duty in any capacity, it's your position that you would not be automatically removed?
A Yeah.
MR. LEVY: Misstates prior testimony.
THE WITNESS: Yeah, yeah.
THE COURT: Overruled. You may answer the question.
THE WITNESS: I --
BY MR. EDNEY:
Q Do remember my question?
A Yes. I would -- I would answer that this clause, the Honis Clause and the Honis Trigger Events, do not apply to me. I would have to ask counsel with respect to if I engaged in some sort of breach of fiduciary duty, what this -- what the remaining provisions within the trust agreement would, you know, would result in.
Q But the application of the Honis Clause would not result in removal; is that right?
A That is correct, because I'm not John Honis.
Q And is your position that you as administrator, not being John Honis, can breach a fiduciary duty in any capacity and

remain as administrator?

MR. LEVY: Same objection.

THE COURT: I'll sustain. It's been asked and answered.

MR. EDNEY: All right.

BY MR. EDNEY:

Q Mr. Patrick, were you in the room for Ms. Martinez's direct testimony yesterday?

A Yes, I was.

Q At the end, she talked about what fiduciary duties under Cayman Islands law of somebody running organizations like the DAF. Did you hear that?

A I think I did. Just keep going and maybe it'll refresh my recollection on her testimony.

Q Do you recall her referring to the duty of loyalty?

A I'm sorry. I wasn't paying that close of attention.

Q Okay. Did you hear her refer to a duty to avoid conflicts?

A No. Again, I -- again, I'm sorry, I don't recall that in her testimony.

Q Do you think in your position that you have avoided conflicts with respect to your administration of the DAF entities?

A With respect to what? I'm sorry. You're kind of soft spoken.

Q Your administration of the DAF entities. Do you feel like you've avoided conflicts?
A Do I feel like I've avoided conflicts in my administration of the DAF entities? That sounds like a vague hypothetical. If you can give me a specific example, I'm happy to answer, that actually happened.
Q Like conflicts of interest. Have you avoided conflicts of interest in your role as administrator of the DAF entities?
A Have I -- I can't recall whether I have or have not.
Q Before the restructuring of the DAF, Mr. Patrick, the indirect charitable owners, as we referred to under the Charitable DAF Partnership Agreement, were the Highland Dallas Foundation, the Highland Santa Barbara Foundation, and others, right?
A Yes.
Q And you controlled the DAF entities, right?
A Yes.
Q But you never sat on the boards or controlled the indirect charitable owners prior to restructuring, correct?
A Correct.
Q But today you sit on the board and control to some degree the indirect charitable owner of the DAF structure today, don't you?
A Yes.
MR. EDNEY: I have no further questions of this time,

subject to the right to recall in rebuttal. Thank you, Your Honor.

THE COURT: All right. Thank you.

CROSS-EXAMINATION

BY MR. LEVY:

Q Good afternoon, Mr. Patrick.

A Good afternoon.

Q Before I get to my questioning, I'd like to start by discussing a few of the things Mr. Edney discussed with you, both today and yesterday. During his opening statement, do you recall that Mr. Edney said that you didn't disclose that you had moved the HMIT entities into the DAF structure?

A Yes.

Q And were you deposed in connection with the 9019 proceeding in June 2025?

A Yes, I was.

Q And during that testimony, did you disclose the structure of the HMIT entities?

A Yes, I did.

Q And do you stand by that testimony today?

A Yes, I do.

MR. LEVY: I would like to move into evidence Exhibit 58, which is the transcript of Mr. Patrick's deposition.

MR. EDNEY: Objection, Your Honor. Hearsay.

MR. LEVY: It's being admitted for the fact that it

was -- the fact that it was said, not the truth of the matter asserted. It's under Rule 60(b)(2). Dugaboy would have to show that it didn't know or with reasonable diligence couldn't know about this information. So it's about the fact that it was disclosed, not the truth of the matter asserted.

THE COURT: I'll admit it. Well, I'll overrule the objection. And Exhibit 58, you said?

MR. LEVY: Yes.

THE COURT: And I'm admitting it only for the fact that there has been a deposition, not for the truth of the matter asserted. So let me, as requested by Counsel, is that the limitation is being admitted as to the fact that it was disclosed and not that it is the truth of the matter asserted.

MR. PHILLIPS: Agreed.

MR. LEVY: To clarify, it's the fact that each question was asked and was answered and then Dugaboy's counsel was aware of it, not simply the fact that the deposition happened.

THE COURT: Okay.

(Highland Capital's Exhibit 58 is admitted.)

BY MR. LEVY:

Q Now, Mr. Patrick, do you recall that Mr. Edney, both during the opening and his questioning, asked you about particular entities that signed the 9019 settlement?

A Yes.

Q Other than HMIT, why were all those other entities added as signature parties?
A Because Highland Capital Management requested it.
Q And just to clarify one point, HMIT itself was not transferred, was it, as part of these agreements?
A That's correct. HMIT was not transferred as part of the settlement agreement with Highland.
Q Or during the restructuring, right?
A Or during the restructuring, correct.
Q It was a sale of interest in Beacon Mountain that was transferred?
A Yes.
Q Are you familiar with Dolomiti and Hakusan?
A Yes.
Q Do you have an understanding of who owns them?
A Yes.
Q Who owns them?
A My understanding is Dolomiti is owned by Dugaboy Investment Trust and Hakusan is -- I don't specifically recall the ownership.
Q Were Dolomiti and -- did Dolomiti and Hakusan together own one percent of Rand PE Fund, LP until sometime in February 2025?
A Yes.
Q Were Dolomiti and Hakusan's limited partnerships in Rand

renewed?
A They were withdrawn.
MR. LEVY: Can you pull up Exhibit 76, please?
BY MR. LEVY:
Q All right. Are these redemption letter?
A The rail-end says Notice of Withdrawal. They're the withdrawal letters.
Q Did Dolomiti or Hakusan ever object to these withdrawal (inaudible)?
A No.
Q Do you recall that Mr. Edney asked you about a charity called DFW?
A Yes.
Q Is DFW a Section 501(c)(3) entity?
A Yes.
Q Do you receive any economic benefit from the DFW?
A No.
MR. LEVY: Could we pull up Dugaboy Exhibit 15?
(Pause.)
BY MR. LEVY:
Q While we're waiting for that, do you recall that Mr. Edney showed you a partnership agreement for Charitable DAF, LP?
A Yes.
A VOICE: Hang on, sir. I'm sorry to interrupt. Who's driving the car here?

MR. LEVY: That's our associate on WebEx.

A VOICE: Oh, I see. All right. So I'll get off the thing and --

A VOICE: That was my question, too. I was even asking if I was supposed to do it. That would have been a bad thing.

MR. LEVY: And Your Honor, our associate is in Washington, and so that's the lag that you're getting. I'm not trusted to use a computer (inaudible).

A VOICE: I believe she's in New York.

MR. LEVY: Oh, New York. I apologize.

THE COURT: That's fine. All I've got is a white screen on mine right now. I'm assuming we're in the right spot.

MR. LEVY: We're still waiting on that exhibit. Oh, there it is.

THE COURT: Okay.

MR. LEVY: It's like a Zoom issue. And apologies for not clarifying that sooner.

THE COURT: This is Dugaboy Exhibit 15, correct?

MR. LEVY: Yes, this is Dugaboy Exhibit 15.

BY MR. LEVY:

Q Mr. Patrick, do you see that document in front of you?

A Yes, I do.

Q And this is the Charitable DAF Limited Partner -- oh, no,

this is not the right -- yeah, this is not the right document. You want pull up the Charitable DAF Limited Partnership Agreement?

(Discussion.)

MR. LEVY: My apologies. It's Dugaboy Exhibit 5, not 15.

BY MR. LEVY:

Q Now, Mr. Patrick, do you see the Amended Limited Partnership Agreement for Charitable DAF Fund, LP?

A Yes.

Q If we can scroll down to Section 1.12(c) of that agreement. And do you recall that Mr. Edney was asking you about some of the provisions in this section?

A Yes.

Q And if we look at the definition of Limited Partner, it states: The term Limited Partner shall refer to Charitable DAF Holdco, Ltd. and each person subsequently admitted as a limited partner by the general partner pursuant to the terms of this agreement.

Do you see that?

A Yes.

Q So this agreement contemplates adding additional or the possibility of adding additional partners to this agreement?

A Yes. Or removing.

Q It doesn't guarantee that any of the existing partners

would stay as partners, right?
A That is correct.
Q In fact, at this time, the agreement didn't include the Community Foundation of North Texas, right?
A That's correct.
Q And this agreement, as you testified earlier, has been superseded, right?
A Yes.
MR. LEVY: Can we pull up -- this is Highland Exhibit 85. This is the Second Amended Limited Partnership Agreement.
BY MR. LEVY:
Q Can you turn also to Section 1.12? And do you see that the language in Section 1.12(b) about limited partners is the same as in the prior agreement?
A Yes.
Q Let's pull up Highland Exhibit 1. This is the HMIT Trust Agreement that Mr. Edney has shown to you earlier. Do you see that document?
A Yes.
Q Do you see the definition of Honis Clause in the middle of the page there?
A Yes, I do.
Q I'll direct your attention to the last sentence of that paragraph, which states: Any determination of whether conduct constitutes Honis Clause pursuant to this agreement shall be

made in the reasonable discretion of the partnership, shall be made in good faith, and shall be binding upon all parties affected thereby.

Do you see that?

A Yes, I do.

Q I'd call your attention to the last paragraph of this page, where it states: Limited Partnership Agreement means the agreement of the limited partnership of Highland Capital Management, LP, as amended from time to time.

Do you see that?

A Yes, I do.

Q Did Highland remove -- did Highland exercise -- make any determination that your conduct constituted Honis Clause?

A No.

Q Has any partnership within the HMIT structure made a determination that your conduct constitutes Honis Clause?

A No.

Q Now let's turn to Page 6, Section 17 of this agreement. And I'll direct your attention to the second paragraph in Section 17, which states: Upon the termination of the -- upon the termination of the administrator in accordance with Paragraph 16 above, Beacon Mountain, LLC shall appoint a successor administrator within a reasonable period of time.

Do you see that?

A Yes.

Q Who is the control person at Beacon Mountain, LLC?
A I am.
Q If you were removed as administrator of HMIT under Section 16 based on a Honis Trigger Event, who would you appoint as successor, as successor administrator at HMIT?
A Myself.
Q Do you believe you did anything wrong that would constitute Honis Clause or a Honis Trigger Event?
A No.
MR. LEVY: Let's pull up Highland Exhibit 87, previously admitted into evidence. Let's turn to Slide 3.
BY MR. LEVY:
Q Mr. Patrick, do you agree that this chart is accurate?
A Yes.
Q Who was originally the control person of the entity circled in red on the chart?
A The original control person was John Honis. And could it be enlarged a little bit, please?`
Q Are you able to see the Exhibit 87?
A A little bit more, please. Okay. There we go.
Q Are Atlas GP, LLC, Rand PE Fund Management, LLC, and Rand Advisors, LLC member-managed limited liabilities companies?
A Yes, they are.
Q Did Mr. Honis transfer the membership interests in those three entities?

A Yes, he did.

Q Who did he transfer them to?

A He transferred them to an entity of -- or, Charitable DAF Holdco. Charitable DAF Holdco Corporation, Inc. Wait, wait, no. To myself. To myself except for Rand Advisors, LLC, I believe, Charitable DAF Holdco Corporation.

MR. LEVY: Are we able to enlarge that portion of the --

(Pause.)

THE WITNESS: Yeah, my recollection was -- my first recollection was correct. The Charitable DAF Holdings Corp. received those -- the Atlas IDF GP, Rand Advisors, LLC, Rand PE Fund Management, LLC from John Honis.

BY MR. LEVY:

Q So after this transfer, Charitable DAF Holdings Corp. was the sole member of these three entries?

A Yes.

Q As sole member, did Charitable DAF Holding Corp. have the power to appoint and remove the managers and officers of each entity?

A Yes.

Q And at the time of the Honis transfer, who was the control person of Charitable DAF Holdings Corp.?

A I was.

Q And at the time of the Honis transfer, who was the control

person of the entities above Charitable DAF Holding Corp. in in this structure?

A I am.

Q To your knowledge, was James Dondero aware of the Honis transfer at the time?

A Yes, he was.

Q On October 13th, 2022, were you appointed as the sole manager, president, secretary, and treasurer of Atlas IDF GP?

A Yes.

Q Is Atlas IDF GP the general partner of Atlas IDF, LP?

A Yes.

Q As general partner, does Atlas IDF GP have full and exclusive authority and control over Atlas IDF, LP?

A Yes.

Q Does this include the right, power, and authority to settle claims?

A Yes.

Q I'm going to refer to Atlas IDF GP and Atlas IDF, LP together as the Atlas entities. Is that okay?

A Yes.

Q On October 13th, 2022, were you appointed as the sole manager, president, secretary, and treasurer of Rand PE Fund Management, LLC?

A Yes, I was.

Q Is Rand PE Fund Management, LLC the general partner of

Rand PE Fund I, LP?

A Yes.

Q And as general partner, does Rand PE Fund Management, LLC have full and exclusive authority and control over Rand PE Fund I, LP?

Q Yes, it does.

Q Does that include the right, power, and authority to settle claims?

A Yes, it does.

Q On October 13th, 2022, were you appointed as the sole manager, president, secretary, and treasurer of Rand Advisors, LLC?

A Yes, I was.

Q I'm going to refer to Rand Advisors, LLC, Rand PE Fund Management, LLC, and Rand PE Fund I, LLC together as the Rand Entities. Is that okay?

A Yes.

Q Going further down the chart, is Beacon Mountain, LLC a member-managed Delaware limited liability company?

A Yes, it is.

Q In 2022, who was the sole member of Beacon Mountain, LLC?

A I was.

Q Was that through Rand PE Fund I, LP?

A Yes.

Q Through that authority, do you have the right, power, and

authority to settle claims?
A Yes, I do.
Q What's the relationship between Beacon Mountain, LLC and Hunter Mountain Investment Trust?
A Beacon Mountain is the sponsor entity and sole beneficiary.
Q I'm going to refer to -- withdrawn. Let's pull Highland Exhibit 1 back up. This is the HMIT Trust Agreement we were looking at earlier. Okay. Let's turn to Section -- Page 2, Section 5, titled Beneficial Owner. Do you see where it states: The beneficial owner of the trust shall be Beacon -- Beacon Mountain, LLC?
A Yes.
Q And let's turn to Page 10, Section 23. This is titled Transfer of Beneficial Ownership. In Section 23, do you see where it states: Beacon Mountain, LLC shall be the sole beneficial owner of the trust to the extent provided herein? Do you see that language?
A Yes.
Q And has Beacon Mountain, LLC ever sold or transferred beneficial ownership of HMIT?
A No.
Q What's your position at HMIT?
A I am the administrator.
Q Who appointed you administrator of HMIT?

A I did.
Q All right. Let's pull up Exhibit 2, which was previously admitted into evidence. Did this document appoint you as successor administrator of HMIT effective August 12th, 2022?
A Yes, it did.
Q Who signed this document?
A I did.
Q On whose behalf?
A On behalf of the entities stated in the document
Q Let's turn back to Exhibit 1. Please turn to Page 3, Section 7, titled Purpose and Powers of the Trust, Administrative Power. And I'd direct your attention to the last sentence of the paragraph, which states: The administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matter in dispute.
Do you see that language?
A Yes, I do.
Q So as administrator of HMIT, did you have full and exclusive authority over HMIT?
A Yes, I did.
Q Did this include the right, power, and authority to settle claims?
A Yes, it does.
Q I'm going to refer to the Rand Entities, Beacon Mountain,

and HMIT together as the HMIT. Is that okay?
A Yes.
Q Let's pull up Exhibit 73, previously admitted into evidence. And this is the 9019 settlement that we were looking at earlier. Do you see that document?
A Yes, I do.
Q And if we turn to the signature pages, who signed on behalf of the HMIT Entities?
A Yes.
Q The question was, who signed?
A Oh, who signed? I'm sorry. I apologize. I thought I heard, did you sign on behalf of those entities? That's what I thought I heard. But, yes, I did sign on behalf of those entities.
Q Other than the HMIT Entities, the Atlas Entities, and the Highland Parties, is any other person or entity a party to this 9019 agreement?
A No.
MR. LEVY: We can take that down.
BY MR. LEVY:
Q Do you recall Mr. Edney asking you a lot of questions about what he called the DAF restructuring?
A Yes.
Q Why did you restructure the DAF?
A And, again, I would just describe it as a simple change of

the discretionary beneficiaries. There were three principle reasons why Mr. Murphy and myself, in conjunction with advice of a variety of counsel, undertook that change of the discretionary beneficiary to DFW.

The three principle reasons, which I can describe in more detail, is it was first the concern that they're -- through the actions of Mr. Dondero with respect to the supporting orgs and the supporting orgs' actions, that they were jeopardizing, potentially jeopardizing their tax-exempt status, which the Charitable DAF Fund, LP, its overall mission is charitable. And so, you know, therefore it causes a concern with respect to that mission.

The second reason was with respect to a variety of aggressive requests to undertake a variety of transactions that -- on behalf of the DAF with NexPoint-type entities where they reached certain thresholds that were considered too much a redline. And then in addition, in addition to that, I received a request to make a wire out of the DAF Entities in November of 2023 that was considered to be inappropriate and illegal.

The third reason related to an overarching concern that Mr. Dondero's creditors would argue and apply an alter ego theory with respect to the assets of the DAF. And so the first -- let me just -- I'll give you a highlight. Obviously, this is subject to an awful lot of evidence and affidavits in

the Cayman Islands. But just for brevity purposes, on the first reason that there was a concern with respect to the loss of exempt status, Mr. Mancino, who actually helped form and organize most of these entities back in 2011, he had sent a letter to the foundation, the Highland Dallas Foundation, expressing a great deal of concerns. And one of the concerns was with respect to a put option that was owed by Dugaboy but for the benefit of the Highland Dallas Foundation.

MR. EDNEY: Objection. Move to strike his reference to Mr. Mancino's statements as hearsay.

THE COURT: Okay. You're wanting to strike -- say that again so that I understand the objection.

MR. EDNEY: Yes, Your Honor. It's -- I object on the grounds of hearsay. He is testifying to the out-of-court statements of Mr. Mancino, a third party who is not here to verify. Hearsay.

THE COURT: All right.

MR. EDNEY: I would like that portion to be stricken.

MR. LEVY: He's testifying to the effect on him, not for the truth of the matter of the statements.

THE COURT: Okay. I'm going to overrule the objection to the extent that he's testifying as to grounds for why he took the actions, not to the truthfulness of the letter or the contents of the letter.

MR. EDNEY: Thank you, Your Honor.

THE WITNESS: So, as one example of the Highland Dallas Foundation putting its exempt status at risk is that there was a donation of a security made to the Highland Dallas Foundation by Mr. Dondero's trust. He received a charitable deduction for that donation.

A part of that donation included a put option that allowed the Highland Dallas Foundation to put for a specified value that stock that was being donated. And the benefit of having a put option with a stock donation is that it allowed for an increased value of charitable deduction.

So when that donation was made, effectively, the U.S. government wrote a check out to Mr. Dondero for the reduction of his taxes at that moment.

Now, that put option has -- obviously has to have legal significance, meaning that it is a real document that would be exercised by the party in favor to it.

Mr. Dondero is classified as a donor through that transaction to the Highland Dallas Foundation. That security subsequently in 2024 period was trading as effectively a penny stock. And the Highland Dallas Foundation has a fiduciary duty to exercise that put option. And in fact, as soon as the put option would go beyond the value, it should have exercised that option. And that option was worth roughly $8 million.

There was a persistent non-exercise of that put by the Highland Dallas Foundation, and this becomes problematic for

two principal reasons. One, under the Internal Revenue Code, a nonprofit cannot loan any money to its donor. It's a prohibition. And by the non-exercise of the put while it was, quote, in the money in favor of the Highland Dallas Foundation, every minute, every hour, every day that goes by through the non-exercise is a deemed loan back to the donor. So it invokes that rule.

And then the greater concern, the concern that I had through the non-exercise of that, is that should the Internal Revenue Service audit this transaction and audit that deduction that was claimed on Mr. Dondero's return, that it would also take a look at the non-action by the Highland Dallas Foundation from exercising this put and determine that that foundation was under the undue influence and control of Mr. Dondero and revoke its exempt status, which then would result in a whole cascade of potential negative events.

But from the standpoint of being the control person on behalf of the DAF, I don't have to wait for the body, you know, to -- I don't have to wait for the explosion to occur, the loss of exempt status. I can see a fact pattern that's becoming problematic with respect to the status of the exempt organization or if they're acting in a certain way that appears not appropriate with respect to their exempt status.

So I offer that as one reason. And that's -- that transaction was disclosed in our resolutions with respect to

the changing of the discretionary beneficiary.

The second bucket, as I described it, is due to Mr. Dondero's special status as a donor, that applies on down the chain into the DAF Entities. And what that generally means, and I'll oversimplify it, but the concept is he cannot have any dominion and control over the assets that are within the DAF. And that is why it was structured the way it was structured, because originally he had claimed a charitable deduction to the charitable remainder trust, which was subsequently the precursor to this structure.

And so under that prohibition of not having dominion and control, in the latter part of 2023, there were two very problematic occurrences that were happening. One, the amount of transactions that the DAF was under -- had exposure to NexPoint entities was over $100 million. Now, these transactions were arm's length and were negotiated by, you know, on behalf of the DAF for independent valuations. But the size of it was extraordinary. And my advisors had told me --

MR. EDNEY: I'm going to object to this continued testimony (inaudible). I guess if the question was give your general thoughts on Jim Dondero, I probably shouldn't object, but I don't remember that, but --

THE COURT: Okay. Okay. I don't want to have speaking objections, either, so I'm going to sustain the

objection to the narrative. Let's get back to asking questions and getting answers.

MR. LEVY: Yes, Your Honor. The question here was why you structured DAF (inaudible) Dondero. I can ask a more specific question.

THE COURT: Let's go that route, please.

MR. LEVY: Understood, Your Honor.

BY MR. LEVY:

Q Mr. Patrick, you had mentioned a particular transaction that you thought prohibited the legal involvement of Mr. Dondero that led you to the restructure. Can you please explain that transaction, both transactions?

A Yes. I received a request to wire for no consideration over $1 million to an offshore entity that my understanding was owned and controlled by Mr. Dondero.

Q Was that request in writing?

A Yes, it was.

Q How was it written?

A It was written on a napkin in what I understood to be Mr. Dondero's handwriting.

Q And did you seek legal advice in response to the problematic requested transaction?

A Yes, I did.

Q Do you recall that Mr. Edney asked you about a work plan from 2023 to legal counsel?

A Yes, I did.
Q What was that work plan?
A That work plan was in reaction to our -- the -- what was viewed by -- as excessive, excessive amounts, over $100 million of transactions that were being requested quite frequently to me to undertake with NexPoint funds. And we reached a point where we determined that I would, with respect to my duties and responsibilities to the DAF, I would have to be denying those requests and that I should lower the overall exposure of those transactions. And so part of that, we anticipated that there could be a reaction to turning down multiple requests for transactions. And so we had the lawyers put together a research plan looking at the structure itself, looking at what sort of attacks that could be made to remove myself from the -- for denying the continuation of these transaction requests.
Q Do you recall Mr. Edney showed you an email between you and counsel regarding setting up some -- some entities?
A Yeah, I'm sorry, say that again.
Q Do you recall that Mr. Edney showed you an email between you and counsel about setting up --
A Oh, yes. Yes, I do.
Q Yeah. And can you explain what you were trying to do in that email?
A Yes. I mean, I rather -- I mentally remember what

happened. This is an email from a Cayman law firm that is organizing the general partner, and they send it to me and they're saying, Mark, do you want an exempt LL -- a Cayman exempt LL -- you know, exempt corporation, or do you want a Cayman LLC? And in my mind, it's kind of like we've all attended those corporate organization seminars where it gives you the pros and cons of organizing. And I was a little flabbergasted at the fact that they were asking me, a U.S. person, what I should do.

And so my reaction was, do whatever. You know. And then I just kind of recited those seminar talking points, like, okay, yeah, you know, is it nondescript? Is it, you know, is it asset protection? You know, just sort of like those are usually the factors. And I essentially punted the name of the entity and the type of the entity back to Walkers, which, you know, they provided a name of CDH GP, Ltd. That was their name, their name of it. And then they selected the Limited.

And so it was really just a reaction to an email that I actually thought they should be telling me what they want, not the other way around, because obviously I don't know those Cayman entities.

Q As a result of these restructuring transactions, did you receive any distributions from any of the DAF entities?

A No.

Q Did you personally receive any tax benefit from the DAF on

behalf of the restructuring transactions?
A No.
Q Did the DAF restructuring transactions change your control position at any HMIT entity or Atlas entity?
A No.
Q Did your title change at any HMIT entity or Atlas entity as a result of the DAF restructuring transaction?
A No.
Q Did you already have full control over HMIT assets, irrespective of the DAF restructuring transaction?
A Yes, I did.
Q So if the DAF restructuring transaction were rescinded, would you still have full control over HMIT assets?
A Yes, I would.
MR. LEVY: Let's pull up Exhibit 38.
BY MR. LEVY:
Q This is the Intercreditor and Participation Agreement with HCLLMP [sic] dated January 10th, 2025, which was previously admitted into evidence. Do you see that document?
A Yes, I do.
Q Can we turn to the signature page on Page 4? Who signed this agreement?
A I did and Mr. Dondero did.
Q On whose behalf did you sign this agreement?
A On behalf of Hunter Mountain Investment Trust.

MR. LEVY: Let's pull up Exhibit 37.

BY MR. LEVY:

Q This is a Remittance Agreement dated January 10th, 2025. It was previously admitted into evidence. Do you see that document?

A Yes, I do.

Q Let's turn to the signature page in the end, Page 5. And who signed this agreement on behalf of the Charitable DAF Holdings Co. and (inaudible) Ltd.?

A I did.

Q Now, did anybody challenge your authority to sign that agreement (inaudible)?

A No.

Q And same with a prior exhibit we looked at. Did anybody ever challenge your authority to enter into that agreement on behalf of HMIT?

A No.

MR. LEVY: Let's pull up Exhibit 39.

BY MR. LEVY:

Q This is a stipulation dated June 27th, 2025. Do you see that document?

A Yes, I do.

Q Can we turn to the signature page on Page 3? And who signed this agreement as counsel for HMIT --

A Louis Phillips.

Q Did you direct Mr. Phillips to sign this agreement?
A Yes, I did.
Q Did anyone question or challenge your authority to do so?
A No, they did not.
MR. LEVY: Let's pull up Exhibit 40.
BY MR. LEVY:
Q And this is a letter. It states: Pursuant to Texas Rule of Civil Procedure 11, dated July 11th, 2025. Do you see that?
A Yes, I do.
Q And if we look at the first paragraph, who are the parties to this agreement?
A Various DAF entities.
Q Um, --
A And the Highland Dallas Foundation.
Q And who controls the various Highland foundations that are party to this agreement?
A Mr. Dondero.
Q Now let's turn to the signature page at the end of Page 3. And who signed on behalf of the DFW Charitable Foundation and other defendants?
A Brian Shaw.
Q Did you direct Mr. Shaw to execute this agreement on behalf of those Defendants?
A Yes, I did.

Q And did Mr. Dondero or anybody else challenge your authority to do so?
A No.
Q Let's actually turn back to Exhibit 38. 37, rather. Looking at the first paragraph, who are the parties to this agreement?
A NexPoint Small Bay entity and Charitable DAF and Liberty COL.
Q Who controls NexPoint Small Bay?
A Mr. Dondero.
Q And did Mr. Dondero or anybody else challenge your authority to enter into this agreement?
A No.
MR. LEVY: Let's turn back to Exhibit 39. Let's scroll down a little bit so we can see all the parties.
BY MR. LEVY:
Q Mr. Patrick, who are the parties to this stipulation?
A A variety. HMIT, Beacon Mountain, Rand parties, Atlas, the Okada Family Foundation, Dallas Foundation, Empower Dallas Foundation.
Q And who controls the Empower Dallas Foundation?
A Mr. Dondero.
Q Okay. And Crown Global Life Insurance is a party to this agreement, right?
A Yes, it is.

MR. LEVY: Okay. Let's turn to -- let's pull up Exhibit 41.

BY MR. LEVY:

Q Actually, staying with Exhibit 40 for a minute, did any of the entities -- did Mr. Dondero question or challenge your authority to enter into that (inaudible) agreement?

A No.

Q Did any of the other entities that were parties to that agreement challenge your authority?

A No.

MR. LEVY: Let's turn to Exhibit 41.

BY MR. LEVY:

Q Let's turn to Exhibit 41. And if you look at the first page, who are the parties to this consent order?

A Myself, Paul Murphy. CDM, DFW, CDH GP, CLO Holdco. And Charitable DAF Holdco, Ltd.

Q And who are the Plaintiffs in this Cayman Island proceeding?

A Charitable DAF Holdco, Ltd.

Q And who's acting on their behalf in this proceeding?

A The Joint Liquidators.

Q Who is funding the Joint Official Liquidators?

A Mr. Dondero.

Q Let's turn to the next page with the -- Page 3 with the signatures. And who signed on behalf of the first, third,

fifth, and sixth Defendants?

A Law firms.

Q And did you direct that law firm to execute this agreement?

A Yes, I did.

Q And did the Joint Official Liquidator challenge your authority to direct them to do so?

A No.

Q Did Mr. Dondero?

A No.

Q Did anyone else?

A No.

Q Let's pull up Exhibit 43. And let's look at the opening paragraph of this agreement. It's the 13th Amendment to the Senior Secured Term Loan Credit Agreement. Do you see that?

A Yes, I do.

Q Who are the parties to this agreement?

A MidWave entities and a variety -- NexBank and borrowing -- I mean lending, lending parties.

Q Who controls NexBank?

A Mr. Dondero.

Q And is MidWave Wireless affiliated with Mr. Dondero?

A Yes. His funds have ownership in the equity and the debt.

Q And the first paragraph refers to a consenting lender. Do you see that?

A Yes, I do.
Q Was CLO Holdco, Ltd. one of the consenting lenders?
A Yes, it was.
Q Let's turn to Page 16 in this agreement. 16 by the date stamp, ECF stamp on top. And who signed this agreement on behalf of CLO Holdco, Ltd.?
A I did.
Q Did Mr. Dondero question or challenge your authority to enter into this agreement on behalf of CLO Holdco?
A No, he did not.
Q Did anyone else?
A No.

MR. LEVY: Highland moves to introduce Exhibit 43 into evidence.

(Pause.)

A VOICE: Is it not already?

MR. LEVY: No, this is not currently in evidence.

A VOICE: We have 3740 --

A VOICE: 40 -- 46 is in.

THE COURT: I have Highland Exhibits 1 through -- I'm going to take a moment, I'm going to go back over all the exhibits that were agreed to be admitted, because other ones have been admitted and I've been noting.

For Dugaboy, Exhibits 1 and 2 were agreed, 5 through 18, 19, 20 through 27, 35, 37 through 46, 48 through 51, 204 to

212, 215, 219 to 221. Again, these are exhibits that were agreed to be admitted, not the ones that have been admitted after the fact.

Then we have Highland's Exhibits 1 through 41, 46 through 54, 59 through 68, 72 through 76, 78 through 89.

And right now I have an offer for admission of Exhibit -- Highland Exhibit 43 into evidence.

MR. EDNEY: I frankly don't think it's relevant, Your Honor.

THE COURT: Okay. I'll overrule the objection. The exhibit is admitted.

(Highland Capital's Exhibit 43 is admitted.)

MR. LEVY: Let's pull up Exhibit 44.

BY MR. LEVY:

Q This is a stipulation dated December 3rd, 2025. Do you see that document, Mr. Patrick?

A Yes, I do.

Q If you take a look at the first page, who are the parties to the stipulation?

A Liberty CLO Holdco and Nancy Dondero on behalf of the Dugaboy Investment Trust, Grant Scott for the SLHC Trust, NexPoint Advisors, NexPoint Advisors, GP, NexPoint Real Estate Advisors, LP, NexPoint Real Estate Advisors, GP.

Q And who controls the NexPoint entities?

A Mr. Dondero does.

Q What is Nancy Dondero's relationship with Mr. Dondero?
A That is his sister.
Q What's the relationship between Dugaboy and Mr. Dondero?
A That's his family trust.
Q What's the relationship between Grant Scott and Mr. Dondero?
A They were prior college roommates, but he's -- Grant Scott is the trustee of his SLHC Trust.
Q Let's turn to the signature block on Page 2. Who signed on behalf of CLO Holdco, Ltd.?
A I did. Or wait, excuse me. You've got to go down more.
Q We have to go up.
A Yeah, we have to go up.
Q All right. Who signed on behalf Liberty, CLO Holdco?
A I'm just trying -- I'm not -- oh, there it is. Attorneys for Plaintiff, Liberty CLO Holdco. Okay. Dorsey & Whitney did.
Q Did you direct them to do so?
A Yes, I did.
Q And did Mr. Dondero challenge your authority to do so?
A No.
Q Did anyone else?
A No.

MR. LEVY: I introduce Exhibit 44 into evidence.

THE COURT: Okay. I have an offer for admission into

evidence Exhibit 44, Highland Exhibit 44.

MR. EDNEY: I'm going to object on ground of relevance. No party has even mentioned company Liberty CLO Holdco, Ltd. (inaudible)

THE COURT: Yes. I'm going to overrule the objection and I'll admit Exhibit 44.

(Highland Capital's Exhibit 44 is admitted.)

MR. LEVY: Let's pull up Exhibit 45.

BY MR. LEVY:

Q This is an Agreed Final Judgment dated December 8th, 2025. Do you see that document?

A Yes, I do.

Q All right. And looking at the first page, who are the parties to this agreed final judgment?

A Atlas IDF, LP, NexPoint Real Estate Partners, and Nancy Dondero, Trustee for the Dugaboy Investment Trust.

Q You testified to this earlier, but who controlled NexPoint?

A Mr. Dondero.

Q What's the relationship between Nancy Dondero and Mr. Dondero?

A Brother-sister.

Q And what's the relationship between Mr. Dondero and Dugaboy?

A It's his family trust.

Q Let's turn to the signature block on Page 5. And who signed on behalf of Plaintiff Atlas IDF, LP?
A Brian Shaw.
Q Did you direct him to do so?
A Yes.
Q Did Mr. Dondero question or challenge your authority to do that?
A No.
Q Did anyone else?
A No.
MR. LEVY: We can take -- I introduce into evidence Exhibit 45.
THE COURT: I have an offer for admission into evidence Highland Exhibit 45. Do I have any objections?
MR. EDNEY: Objection. Ground: relevance.
THE COURT: Okay. Overruled. Exhibit 45 will be admitted.
(Highland Capital's Exhibit 45 is admitted.)
MR. LEVY: We can take that down.
BY MR. LEVY:
Q Mr. Patrick, in connection with the 9019 settlement, Highland transferred to HMIT a note payable by Dugaboy, right?
A Yes.
Q Has Dugaboy made payments to HMIT on that note?
A Yes, it has.

Q Did Dugaboy question or challenge your authority as administrator of HMIT to receive payment on that note?
A No.
Q Did Nancy Dondero?
A No.
Q Did Mr. Dondero?
A No.
MR. LEVY: One moment, Your Honor.
(Pause.)
MR. LEVY: No further questions at this time.
THE COURT: All right. Mr. Edney, do you have redirect?
MR. EDNEY: Just briefly, Your Honor. Thank you.
THE COURT: You may proceed, Mr. Edney.

REDIRECT EXAMINATION

BY MR. EDNEY:
Q Good afternoon, Mr. Patrick. I just have a handful of questions.
MR. EDNEY: Can we pull up Movant's Exhibit 5, please?
BY MR. EDNEY:
Q Bear with me for a moment, Mr. Patrick. (Pause.) Now, Mr. Patrick, I'm pulling up what has been previously admitted as Movant's Exhibit 5. It's the Amended and Restated Exempted

Limited Partnership Agreement of Charitable DAF Fund, LP. Do you see that?
A Yes.
Q And do you remember opposing counsel asking you a series of questions about this?
A Yes.
Q Let's turn our attention to Page 4, please. Do you remember opposing counsel asking you questions about the term, Limited Partner?
A Yes.
Q And the ability to subsequently embed additional limited partners to the relevant partnership; is that right?
A Yes.
MR. EDNEY: Let's go to -- let's go to Movant's Exhibit 242, Slide 2, please. That one.
BY MR. EDNEY:
Q Prior to 2024, the only limited partner in Charitable DAF Fund, LP was Charitable DAF Holdco, Ltd.; isn't that right?
A Yes.
Q Charitable DAF Holdco, Ltd. was not one of the indirect charitable owners, correct?
A Correct.
Q If Charitable DAF Fund, LP had the ability to admit additional limited partners, it would be in addition to Charitable DAF Holdco, LP; isn't that right?

A Wait. Slow that down. State it again.
Q The entities in salmon, Charitable DAF Holdco, do you see those?
A Yes.
Q Highland Dallas Foundation, Incorporated and others?
A Yes.
Q They're not -- they were never limited partners in Charitable DAF Fund, were they?
A No.
Q They were what the document referred to as indirect charitable owners, --
A Correct.
Q -- correct?
A Yes.
Q Do you remember opposing counsel asking you some questions about the reasons why you took some restructuring actions with respect to DAF?
A Yes.
Q And one of those was that you were concerned about the IRS status of the supporting and supported organizations; is that right?
A Yes.
Q And you were afraid that, because of certain actions of Mr. Dondero, their IRS status might be endangered; is that right?

A Yes.
Q And that would be bad for them; is that correct?
A Yes.
Q And your solution to that problem was to deprive them in any economic interest of over $270 million in assets; am I right?
A No.
Q And in fact, during this period of time while you were trying to solve the IRS problems of these charitable foundations, you paid yourself in excess of $10 million; isn't that right?
A No, because of the when-was-the-last-time-you-stopped-beating-your-wife part of it, the premise. But I -- I didn't -- well, no, because I don't pay myself. I've got a process, institutionalized process, on how I am compensated, and I don't make the determination.
Q All right. You took actions to save the IRS status of these supportive organizations, right?
A Do -- uh, --
Q You restructured the DAF to save the IRS charitable status of these supportive organizations; isn't that correct?
A To save them? No, they are still at risk.
Q But that's one of the reasons you took these -- these reorganizations?
A One of the reasons why I changed the discretionary

beneficiary was with respect to what I considered inappropriate influence upon these nonprofits and through their actions that would potentially jeopardize their exempt status.

Q And one of your solutions was to cut them off from a quarter-billion dollars in assets; isn't that right?

A One of my solutions -- my solution was to change the discretionary beneficiary from those entities to the DFW Foundation.

Q Now, you also said that Mr. Dondero ordered you to make a wire to one of his entities out of that; is that right?

A Yes.

Q And for how much was that?

A About $1.3 million.

Q And you said that he wrote his instructions down on a cocktail napkin; is that right?

A Yes.

Q But you don't have that cocktail napkin, do you, Mr. Patrick?

A No, I do not.

MR. EDNEY: Now, let's pull up Movant's Exhibit 1, please.

BY MR. EDNEY:

Q Do you recognize previously-admitted Movant's Exhibit 1 as the Hunter Mountain Investment Trust Agreement?

A Yes, I do.
Q Do you remember being asked a series of questions by opposing counsel about it?
A Yes.
Q And do you remember when opposing counsel asked you what you would do in your capacity as the control person of Beacon Mountain if for some reason you were removed for breach of fiduciary duty from your position as administrator of the Hunter Mountain Investment Trust?
A I think the question they posed to me was what would happen if I was removed, without the qualifier of a breach of fiduciary duty. Yes. But I remember that question.
Q If you were removed for any reason, right?
A Yes.
Q And you said you would reappoint yourself?
A Yes.
Q So if you were removed, Mr. Patrick, for breach of fiduciary duty, your plan would be to reappoint yourself from your -- role?
A Upon advice of counsel. Obviously, in that kind of situation, I would, you know, look at the surrounding circumstances of what happened and I would follow the advice of counsel, which -- but by the four squares of these documents, yes, indeed, I could appoint myself.
Q And in fact, would. Isn't that right?

A I don't want to speculate on a hypothetical.

MR. EDNEY: Subject to recalling him in our rebuttal case, I have no further questions at this time. Thank you, Your Honor.

THE COURT: Okay.

MR. EDNEY: Thank you, Mr. Patrick.

THE WITNESS: Thank you.

THE COURT: Hold on, Mr. Patrick.

No -- okay.

MR. LEVY: No further questions.

THE COURT: Okay. All right. You may now step down, Mr. Patrick. Thank you.

(The witness steps down.)

THE COURT: All right. Based on the agreement of the parties, we'll go ahead and conclude for today. We'll adjourn until the May 21st date at 9:00 a.m. And then as I understand it, that's your case-in-chief, or that's all your witnesses you're going to call, Mr. Edney?

MR. EDNEY: No, Your Honor. We reserve the right to call Mr. Dondero in our case-in-chief. We cross-designated him. I know that -- I know that the -- here he comes, right? I know Mr. Morris doesn't agree with that.

THE COURT: One second. Let me just, and this is to all counsel, so all please listen. Okay? We're professionals. We don't need to take slights at others.

Let's continue to be respectful of each other and we can stop with the sidebars about counsel. I'd appreciate that. That's what's required of all attorneys and all of us.

So, okay. I understand your position. We'll deal with that come May 21st when you call him, if you're going to call him.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay?

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right. Anything further before we finish up today?

MR. EDNEY: Not from the Movant, Your Honor.

THE COURT: Anything from Highland? All right. With that, we will be adjourned.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 12:54 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my ability from the electronic sound recording available of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **05/13/2026**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX


| | | |
|---|---|---|
| PROCEEDINGS | | 3 |
| WITNESSES | | |
| <u>Dugaboy Investment Trust's Witnesses</u> | | |
| Mark Patrick | | |
| - Direct Examination by Mr. Edney | | 12 |
| - Cross-Examination by Mr. Levy | | 95 |
| - Redirect Examination by Mr. Edney | | 129 |
| EXHIBITS | | |
| Movant's Exhibit 242, Slide 19 | Admitted | 42 |
| Movant's Exhibit 169 | Admitted | 52 |
| Movant's Exhibit 242, Slide 12 | Admitted | 64 |
| Movant's Exhibit 242, Slide 18 (corrected) | Admitted | 73 |
| Highland Capital's Exhibit 43 | Admitted | 125 |
| Highland Capital's Exhibit 44 | Admitted | 127 |
| Highland Capital's Exhibit 45 | Admitted | 128 |
| Highland Capital's Exhibit 58 | Admitted | 96 |
| Dugaboy Exhibits 1-2, 5-18, 19-27, 35, 370-46, 48-51, 204 to 212, 215, 219 to 221 | Admitted | 124 |
| Highland Capital's Exhibits 1-41, 46-54, 59-68, 72-76, 78-89 | Admitted | 125 |
| RULINGS - *Continued to 05/21/2026* | | 135 |
| END OF PROCEEDINGS | | 136 |
| INDEX | | 137 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | |
|---|---|
| IN RE: | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | Chapter 11 |
| Debtor. | |
| | Monday, May 11, 2026 9:06 A.M. |

TRANSCRIPT OF HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Pachulski Stang Ziehl & Jones LLP
BY: JEFFREY POMERANTZ, ESQUIRE
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Debtor, Highland Capital Management:

Willkie Farr & Gallagher LLP
BY: MARK STANCIL, ESQUIRE
1875 K Street, NW
Washington, DC 20006

Willkie Farr & Gallagher LLP
BY: JOSHUA LEVY, ESQUIRE
787 Seventh Avenue
New York, New York 10019

For the Movant, Dugaboy Investment Trust:

Morgan, Lewis & Bockius LLP.
BY: MICHAEL EDNEY, ESQUIRE
1717 Main Street, Suite 3200
Dallas, Texas 75201

Morgan, Lewis & Bockius LLP.
BY: MARTHA B. STOLLEY, ESQUIRE
101 Park Avenue
New York, New York 10178

King & Spalding, LLC
BY: SYDNEY ROSE, ESQUIRE
500 West 2nd Street, Suite 1800
Austin, Texas 78701

For Shields Legal Group, P.C., CLO Holdco, Ltd., Kelly Hart & Pitre ("HMIT Entities"):

Kelly Hart & Pitre
BY: LOUIS M. PHILLIPS, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801

INDEX


| WITNESSES | PAGE |
|---|---|
| FOR THE DEBTOR: | |
| (None) | |
| FOR THE MOVANT: | |
| MARGOT MacINNIS | |
| Direct Examination by Mr. Edney | 69 |
| Cross-Examination by Mr. Morris | 134 |
| Redirect Examination by Mr. Edney | 177 |
| Recross-Examination by Mr. Morris | 194 |
| Examination by the Court | 198 |
| LUCY BANNON | |
| Direct Examination by Ms. Stolley | 204 |
| Cross-Examination by Mr. Morris | 257 |
| Redirect Examination by Ms. Stolley | 269 |

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| 1 through 41 | 14 | 16 |
| 46 through 54 | 14 | 16 |
| 59 through 68 | 14 | 16 |
| 72 through 76 | 14 | 16 |
| 78 through 89 | 14 | 16 |
| FOR THE MOVANT: | | |
| 1 | 12 | 13 |
| 2 | 12 | 13 |
| 5 through 18 | 12 | 13 |
| 19 | 12 | 21 |
| 20 through 27 | 12 | 13 |
| 35 | 12 | 13 |
| 37 through 46 | 12 | 13 |
| 48 through 51 | 12 | 13 |
| 179 | 110 | 114 |
| 191 | 118 | 119 |
| 204 through 212 | 12 | 13 |
| 215 | 12 | 13 |
| 219 through 221 | 12 | 13 |

(The proceedings commenced at 9:06 a.m.)

THE COURT: All right. We're here on our special setting in the Highland Capital Management bankruptcy case. This is Case Number 19-34054. We're here on a motion to reconsider and motion to vacate a prior order entered in this case which was Order Number -- Document Number 4297 which was an order on the motion to compromise. We have multiple objections as well as a reply that was filed today.

So let me go ahead and start off by getting appearances. I'll start with Movant's counsel.

MR. EDNEY: Good morning, Your Honor.

My name's Michael Edney from the Morgan Lewis Law Firm. I'm here with my colleague Martha Stolley from Morgan Lewis. And Sydney Rose from the King & Spalding Law Firm on my left, Your Honor.

THE COURT: Thank you. Then, let me get appearances from Highland Capital.

MR. MORRIS: Good morning, Your Honor.

John Morris from Pachulski Stang Ziehl & Jones. I'm joined by my partner Jeff Pomerantz and co-counsel from Willkie Farr, Mark Stancil.

THE COURT: Mr. Stancil, you'll either need to get closer to a mic. That will work, perfect.

MR. STANCIL: All right. Mark Stancil from Willkie Farr & Gallagher for Highland. I'm also joined by my partner

Josh Levy.

THE COURT: And then from what I'm going to refer to as "HMIT."

MR. PHILLIPS: Good morning, Your Honor.

Louis M. Phillips, Kelly Hart, on behalf the HMIT Entitles.

THE COURT: Okay. Do I have any other parties appearing on behalf of entities here? Ms. Liz Ziegler, did you want to make an appearance on behalf of the U.S. Trustee's Office?

MS. YOUNG: I would, Your Honor. Liz Ziegler-Young for the Office of the United States Trustee.

THE COURT: Good afternoon -- or good morning. Good morning, gosh, it's a Monday already. Sorry.

All right. I do show multiple parties on Webex. I'm not going to get any appearances from them, but I do need to confirm that we don't have any parties that should not be appearing today. So I have what it looks like various parties that I believe are all either lawyers that are somehow related to this case or potentially another what I'm going to call a Highland Capital spinoff case.

But I do show a party that shows up with the notation of A-N-O and then ends in U-S. Does anybody -- let me ask first in the courtroom, does anybody recognize that? If not, the party that has name A-N-O and then ends in U-S, could you

please identify yourself?

(No audible response)

THE COURT: Okay, I'm going to ask again. If I don't get a response or if you don't identify yourself, we're going to excuse you from the virtual meeting. So again, I have a party that's appearing it looks like A-N-O, multiple stars, and then U-S. Please identify yourself.

(No audible response)

THE COURT: All right. If you'll go ahead and have that party removed.

Okay. Yes, I have someone standing up. Go ahead.

MR. BUNCHER: Sorry, Your Honor. Doug Buncher, Ferguson Braswell. I'm here for the witness, Margot MacInnis. She's the joint official liquidator of the Cayman Islands entity, Charitable DAF Holdco, Ltd. It's in liquidation in the Cayman Islands. And I'm joined by her Cayman counsel from Maples, Christian La-Roda Thomas who is sitting next to Ms. MacInnis here in the courtroom.

THE COURT: Okay. I apologize. What was your -- can I get your name again?

MR. BUNCHER: Doug Buncher, B-U-N-C-H-E-R, Your Honor.

THE COURT: Well, I can only imagine that Lubbock is a much more beautiful place than the Grand Cayman. So, thank you for coming out to our great part of the country. Okay.

MR. BUNCHER: Thank you, Your Honor.

THE COURT: Any other parties?

(No audible response)

THE COURT: Okay. Mr. Edney, it's your motion. So, did you have an opening or how would you like to proceed?

MR. EDNEY: Yes, Your Honor. I do have an opening. And then our intention is to call three witnesses.

THE COURT: Okay.

MR. EDNEY: First will be Ms. MacInnis who Mr. Buncher just introduced. The second will be Lucy Bannon who is in charge of charitable operations for NexPoint. And the third will be Mr. Mark Patrick.

THE COURT: Okay. That'll be fine. I'm assuming you'll have -- all the parties will have an opening of some sort.

MR. MORRIS: We will, Your Honor. But we both met and conferred over --

THE COURT: Okay.

MR. MORRIS: -- regarding the exhibits, Your Honor. It may seem quite a large number of exhibits were filed.

THE COURT: Okay.

MR. MORRIS: I defer to Mr. Edney and the Court, but my suggestion would be we spend just a few minutes now to see if we can have the Court help us resolve those objections that remain before we get into the openings. I wouldn't want

somebody to rely on a document that ultimately is not going to be admitted into evidence.

THE COURT: Okay. That'll be fine. If we have stipulations as to admissibility of evidence or documents that the parties want to go forward with, and then we can address. I mean if it's relevance objections, I'd rather just take those up at the time of the documents trying to be admitted. If there are other types of objections, then certainly we can try to resolve them now.

But looking at the amount of witnesses that we have today and the idea of trying to get done with it all today, I'm a little concerned that if we spend an hour on evidentiary objections right now, we may run short. But I'm happy to -- why don't we start off with what -- do we have stipulations as to the admission of any documents or exhibits by the parties?

MR. MORRIS: We don't have a stipulation per se, Your Honor. What we have after a meet and confer is an agreement as to which documents there's no objection to.

THE COURT: Okay.

MR. MORRIS: We didn't reduce that to a writing.

THE COURT: That's fine.

MR. MORRIS: When the documents are offered into evidence, we'll hear that there's no objection to certain of them.

THE COURT: Okay.

MR. EDNEY: Yeah, Your Honor. So I guess perhaps as a function of the trial preparation process Friday, I think both parties put in a lot of exhibits so they would be available. I think that's been funneled quite a bit over the weekend. I don't know how fruitful it would be to go through all the exhibits that were listed on the exhibit list on Friday and determine if there are any objections to their admissibility or anything like that right now because I think at the end of the day there's going to be much fewer exhibits that are ultimately at issue.

And I think we'll try to do a good job of keeping track when we present our evidence as to what's been stipulated and what needs to lay a foundation for invisibility and get a ruling from Your Honor.

THE COURT: Okay. I mean, I'm happy to take up what we've got agreements on right now and get that out of the way, which probably, I mean, makes sense. That way we don't have to worry about moving to get those into evidence.

So, Mr. Edney, one of the things I'm going to ask both parties actually do is if you'll move over to the podium, it's just that we have a recorder that records the trial testimony or the record. And so we just want to make sure that we're getting all of you into that.

And then let me just also ask this. Obviously we have the TV. I understand it may be cutting in and out. At

counsel table there's also monitors that show the Webex. Are you all able to -- are those cutting out, as well? Are those creating problems?

UNIDENTIFIED SPEAKER: Ours is --

UNIDENTIFIED SPEAKER: Ours is black.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: There's no signal.

THE COURT: Okay, let's do this. We're going to -- I apologize, I want to be able to have the technology up and available for everybody to the extent you're going to be using any of the technology to show exhibits. We're going to take -- we'll take a five-minute recess to allow for my guy to come in and make sure that this is all up and running. And then we'll be back out. And then we can deal with the evidence, the exhibits, and then we'll move forward. Okay?

THE CLERK: All rise.

(Recess at 9:16 a.m., recommencing at 9:31 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

Okay. We're back on the record in the Highland Capital Management case, Case Number 19-34054. So Mr. Edney, do we have agreement on exhibits that we want to make announcements of?

MR. EDNEY: Yes, Your Honor. My colleague, Mike Gaddis, who had conferred with Mr. Morris, is on his way down

here from the law firm right now. I think he'll be here in just a few minutes. We can talk through that.

THE COURT: Okay.

MR. EDNEY: Do you want to do that now? Do you want to confer --

THE COURT: You mean he's coming here?

MR. EDNEY: Yes, Your Honor.

THE COURT: Because we show him on Webex.

MR. EDNEY: Yeah. He abandoned his Webex position.

THE COURT: Okay.

MR. EDNEY: He's (indiscernible). Yes, Your Honor.

THE COURT: Okay. Well, Mr. Morris, do you want to go ahead and approach and at least tell us what exhibits you have announced -- that you believe you can announce as agreed as far as their exhibits go, and then we'll -- hopefully he'll be here by then and we can deal with your exhibits.

So these will be exhibits that you're agreeable to for Dugaboy. Is that --

MR. MORRIS: Let me restate that.

THE COURT: Okay.

MR. MORRIS: I think what you're asking me to do is to state those Dugaboy exhibits as to which Highland has no objection?

THE COURT: Correct. Your side would be agreeable that those would be admitted into evidence.

MR. MORRIS: Right. Okay, I don't have it in order, just --

THE COURT: That will be fine.

MR. MORRIS: Okay. So Exhibits 1 through 2, Exhibits 5 through 18, Exhibits 20 through 27, Exhibit 35, Exhibits 37 through 46, Exhibits 48 through 51, Exhibits 204 to 212, Exhibit 214.

THE COURT: That was 2014, Mr. Morris?

MR. MORRIS: No, I apologize. 206 to 212, Exhibit 215, Exhibits 219 to 221. And I think that's it. No, I apologize. I believe that we have, Your Honor, objections to 205 and 206 so let me state the back end again.

THE COURT: Okay.

MR. MORRIS: No objection to 204 to 212. No objection to 215. No objection to 219 to 221.

THE COURT: Okay. I'm going to go ahead and repeat these just to make sure I have them correctly. I have Exhibits 1 through 2, Exhibits 5 through 18, Exhibits 20 through 27, Exhibit 35, Exhibits 37 through 46, and Exhibits 48 through 51, Exhibits 204 to 212, Exhibit 215, and Exhibits 219 to 221.

MR. MORRIS: That's exactly correct.

THE COURT: Okay. And I'm assuming, Mr. Phillips, that you're in the same agreement?

MR. PHILLIPS: We are in the same agreement with Mr. Morris.

THE COURT: Okay. So Mr. Edney, then I have I presume on your behalf an offer for admission into evidence those exhibits?

MR. EDNEY: Yeah. Just one question, Your Honor. Based upon your readback, did Mr. Morris say something about 205 to 206?

THE COURT: Yes. They're included --

MR. MORRIS: 206 through 212.

MR. EDNEY: I see. No, okay, got it.

Yes, Your Honor, we move for their admission.

THE COURT: Okay. Those exhibits of Dugaboy will be admitted into evidence.

MR. EDNEY: Thank you, Your Honor.

(Dugaboy Exhibits 1 through 2, Exhibits 5 through 18, Exhibits 20 through 27, Exhibit 35, Exhibits 37 through 46, and Exhibits 48 through 51, Exhibits 204 to 212, Exhibit 215, and Exhibits 219 to 221 admitted into evidence)

THE COURT: All right.

MR. MORRIS: I can make a representation as to my understanding as to what exhibits are -- or I can hand my computer to Mr. Edney and he can see --

MR. EDNEY: I would wager that Mr. Morris is probably correct --

THE COURT: Yeah, why don't we go ahead and have you read off, Mr. Morris, the exhibits that have been agreed to by

Highland and when Mr. Gaddis gets here, we can confirm that.

MR. MORRIS: Okay.

MR. EDNEY: Thank you, Your Honor.

MR. MORRIS: This is subject to a few exhibits that we filed either late last night or early this morning. We just hadn't had a chance to confer and I'm not at all suggesting that any exhibit we put on the docket and agree upon this afternoon that they be considered.

THE COURT: Okay.

MR. MORRIS: So subject to that, there is no objection to Highland exhibits except as follows.

THE COURT: So hold on, you're going to give me the ones that are being objected to?

MR. MORRIS: Correct.

THE COURT: Okay.

MR. MORRIS: 42 to 45, 55 to 58, 69 to 71, and 77.

THE COURT: All right, give me a second because I'm going to have to reverse engineer this now.

MR. MORRIS: If you'd like, I can do it (indiscernible) because I've got the numbers in front of me? Let me try it. There's no objection to 1 through 41. There's no objection to 46 through 54. There's no objection to 59 to 68. There's no objection to 72 to 76. And there's no objection to any of the exhibits beyond 76 that were filed (indiscernible).

THE COURT: Which are what numbers, Mr. Morris?

MR. MORRIS: That goes through Exhibit 89, so no objection to 78 to 89. (Indiscernible) state their position on that in a few minutes.

THE COURT: Okay, all right. Mr. Edney, do we have Mr. Gaddis here?

MR. EDNEY: We do have Mr. Gaddis, Your Honor.

THE COURT: Okay.

MR. EDNEY: Do you want to make your appearance?

MR. GADDIS: I'm Mike Gaddis.

THE COURT: If you'll come to the podium, Mr. Gaddis.

MR. GADDIS: Your Honor, I'm Mike Gaddis. I'm with King & Spalding and (indiscernible).

THE COURT: Okay. So Mr. Gaddis, I've been told that you and Mr. Morris have conferred and these are the exhibits that you have no objections to, okay, of Highland exhibits. Exhibits 1 through 41, Exhibits 46 through 54, Exhibits 59 through 68, Exhibits 72 through 76, and Exhibits 78 through 89.

MR. GADDIS: Are those the ones that have the yellow (indiscernible)? Okay. Yes, everything on the spreadsheet we gave them, yellow marking, is unobjected to and (indiscernible).

THE COURT: Okay. All right. So I have an offer in for admission into evidence exhibits, Highland Exhibits 1 through 41, 46 to 54, 59 through 68, 72 through 76, and 78

through 89.

Being that the parties have agreed to the admission of those exhibits, those exhibits will be admitted into evidence.

(Debtor's Exhibits 1 through 41, 46 to 54, 59 through 68, 72 through 76, and 78 through 89 admitted into evidence)

THE COURT: All right.

MR. EDNEY: And, Your Honor, I guess just to foreshadow what's coming up here, as you see there's a lot of exhibits on our side that are objected to. I believe Mr. Morris has a general objection to evidence that was (indiscernible) before a certain date as being relevant. Is that right, Mr. Morris? Do you want to put that date on the record?

MR. MORRIS: Your Honor, I know there's a little apprehension about doing this now. But we do have a number of objections that would fall into five very distinct categories if I can just present to you. We've gone back and forth. And if you say yes or no, the exhibits will be coming in or not if they're categorical.

THE COURT: Okay.

MR. MORRIS: It's not an item by item objection.

THE COURT: Okay. Go ahead.

MR. MORRIS: So the first category they objected to is anything created after July 14th, 2025 would be inadmissible

as newly-discovered evidence under Rule 60(b)(2). We laid that out in Paragraph 58 of our motion for (indiscernible) motion for protective order (indiscernible) objection to the motion to sale.

But our position, Your Honor, is that as a general matter, if the document is created after the date after the deadline for a new trial, then it couldn't possibly have been considered by the underlying court and this Court should have considered (indiscernible).

THE COURT: Okay.

MR. MORRIS: The second category, and I'll (indiscernible) very briefly. Your Honor may have seen in our papers since the beginning that we interpreted Rule 9024 to set a 28-day time period for a new trial. So we are objecting as being the subject of this motion which I believe was June 30th. I think a strict instruction and plain reading of Rule 9024 I believe (indiscernible) eight days for a new trial because it refers to Rule 59(d). It doesn't refer to Rule 90.3.

Dugaboy relies on Rule 9023, but this is not a motion for a new trial. It's a motion to vacate the (indiscernible). Be that as it may, Your Honor, we are taking a conservative approach here because while we think we're right, we don't think it matters.

THE COURT: Okay.

MR. MORRIS: So I don't want to spend a lot of time

because I don't want there to be a perception that we've conceded to their position. We haven't. We're going to use the (indiscernible) purposes of this.

THE COURT: Okay.

MR. MORRIS: So that's for category number one, and I don't know if you want Mr. Edney to respond or should I go to --

THE COURT: Go through your categories --

MR. MORRIS: Okay. So number two --

THE COURT: -- and then we'll have any response.

MR. MORRIS: Sure. So number two is any documents that came out of Dugaboy's own files should not be considered newly-discovered evidence unless Dugaboy can demonstrate that the documents were obtained from the third party after July 14th and they otherwise meet the requirements of Rule 60 (indiscernible).

So if they had a document that was sitting in their files last May, that shouldn't come into evidence now. It can't possibly be newly-discovered evidence. But if they had a document that was in their files that they got last August from the third party, okay. The burden is going to be on them to start with and say, you know, you're producing this stuff, so how could it be new evidence?

The third category relates to Exhibits 52 to 140. So this is a broad category of documents. The reason that we

don't believe this would be considered newly-discovered evidence is because they are the documents that Highland and HMIT produced in response to this Court's order, resolving our motion for a protective order. And the reason we believe that these documents should be inadmissible is because they go to two issues. Whether Mr. Patrick was authorized to act on behalf of the (indiscernible) and to redact the instruction.

But these documents cannot be considered new discovered evidence because if you go back to last June, which I think I'm the only one here who was there. But if you go back to last June, there was no objection to Mr. Patrick's authority. There was no discovery given by Dugaboy as to Mr. Patrick's authority.

So they have now gotten -- they didn't even serve a discovery request on HMIT. They have now gotten discovery in the case that they didn't even seek. Last June, they mentioned their objection to the settlement. I think just as a general matter, we have taken this position from the beginning. We have taken this position strongly that this is not a do-over. This is not a do-over. They should not be able to retry the case that they lost last year simply -- right? This is not a do-over. And that's what's happening here.

We're letting all of these documents that we produced that they didn't even ask for last time. All we're doing is trying the same case again. And that's exactly what

(indiscernible) not supposed to be doing. So that's number three.

Number four, both parties have identified a slew of declarations and activities. Personally, I have no problem with them coming into evidence. I just want them to be admitted not for the truth of the matter asserted but just the fact that they're existing in the file (indiscernible). And I was hoping we could get a stipulation on that, but I'll let Mr. Edney address the reasons why (indiscernible) do that.

There was -- gosh. You know what? There's a fifth category that they're going to use in one document. I'll withdraw that objection to Exhibit 19.

THE COURT: Okay.

MR. MORRIS: And so we just have these four categories, Your Honor. And just to summarize them very, very briefly, the evidence that was created after July 14th is (indiscernible) by the trial court. Number two, information that came out of Dugaboy's own files, unless they can show that they got it from someplace else after July 14th. Number three, the Highland, HMIT, and I think the ValueScope stuff that just wasn't part of the earlier hearing because we don't want to try the same case twice. And then, finally, just the declaration, the limitation on declarations and exhibits so that they're not on the truth of the matter asserted.

THE COURT: Okay.

MR. MORRIS: Unless you have questions, (indiscernible).

THE COURT: No, I think I understand the categories. So before I hear from you, Mr. Edney, we now have an agreement on 19.

MR. EDNEY: Yes, sir.

THE COURT: And so exhibit -- Dugaboy Exhibit 19 will be admitted into evidence.

(Movant's Exhibit 19 admitted into evidence)

THE COURT: All right. Mr. Edney, did you want a response or do you want to just deal with this when we go through your presentation of evidence?

MR. EDNEY: Yes, Your Honor. I think it probably would be more efficient to deal with it as we go through the presentation of evidence again. There's a fair amount of exhibits on the exhibit list, but they've been now funneled down to (indiscernible).

I would note, Your Honor, that, yes, this case is about what happened prior to June 25th, 2025, but documents and communications about those historical events that came out through the discovery process, I think they're very important to cast a light on what happened during that period and do constitute newly-discovered evidence on those events and how those events should be considered in light of reconsidering the order. But we can deal with these as we go through them.

THE COURT: Okay.

MR. EDNEY: With regard to the affidavits, Your Honor. Oh, yes, Your Honor?

THE COURT: Well, I'm only -- I mean, if you want to do your opening and we can deal with these objections during evidence, we can do that. But if you're going to do your opening, I want you to do it from a pulpit as opposed from counsel's table. So --

MR. EDNEY: Yes, Your Honor.

THE COURT: So if you want to go ahead and start your opening, we'll go ahead and move forward with the hearing.

MR. EDNEY: Thank you, Your Honor.

THE COURT: And let me just say, all those objections obviously are reserved. You can make them whenever he seeks to introduce or the other side seeks to introduce any document that you all have not agreed to being admitted into evidence.

MR. MORRIS: One last thing and I'll be (indiscernible).

THE COURT: Okay. All right. I also have Mr. Phillips standing up. So --

MR. MORRIS: Your Honor, we've already gotten off to a (indiscernible). We very much want to complete this trial today. We oppose Dugaboy's (indiscernible). That's exactly what we did at the 9019 hearing (indiscernible) the time. I believe you've done that before, but it's a mechanism to keep

the parties focused. It's a mechanism to make sure that we complete it today. We ask the Court to consider that as an option so that we do finish today.

THE COURT: Okay. Mr. Phillips?

MR. PHILLIPS: Thank you, Your Honor. Louis M. Phillips for the HMIT Entities. I wanted to put on the record that we fully support the position taken by Mr. Morris.

THE COURT: As far as time goes, I mean, while I'm relatively new on the bench, I'm not one necessarily to try to prevent the parties from presenting their case. If the parties have agreed to time, I can certainly -- we can certainly keep track of it. But, I mean, obviously, you all can either move through your evidence as you believe sufficient or you can try your case and we'll just get it tried and if we have to do another date, we can figure out a date and time or we can move in -- we can spill in until tomorrow.

I mean, the Court's available tomorrow. Timekeeping is just difficult in the sense of cross-examination and direct. And I'm assuming if we've got similar witnesses on each other's witness and exhibit list, then when someone's on their cross, am I keeping track as cross time or am I keeping track as direct time? So I'll allow the parties to proceed. We can go as long as possible today and then, obviously, we can spill until tomorrow, as well.

But I'm sure that there are multiple parties that

have other things and obligations. So let's just move forward with presentation of evidence. Or, well, we'll start with opening statements. So, Mr. Edney.

MR. EDNEY: Thank you, Your Honor. My name is Michael Edney and I'm here on behalf of the Dugaboy Investment Trust. We're asking the Court today to reconsider and vacate the Rule 9019 Settlement that led to the approval of a settlement between Hunter Mountain Investment Trust and the Debtor in this case.

Your Honor, in our view, the evidence adduced today will show that the 9019 Order approving the settlement between Hunter Mountain and Highland should be vacated. It should be vacated because of newly-discovered evidence showing Mr. Patrick lacked authority to make decisions for Hunter Mountain because of his misconduct. It should be vacated because Mr. Patrick concealed the conditions demonstrating his misconduct and lack of authority in the months leading to the settlement in the 9019 and in the 9019 proceedings themselves.

It should be vacated because Mr. Patrick's, what the evidence will show today, now proven contact leading to the settlement was not in good faith when there's a settlement and an inequitable outcome in which this court of equity could not have approved or been involved.

The man who should have been before the Court in June of 2025 was an honest broker acting in the best interest of

four longstanding charities throughout the country. The man who did arrive at the June 2025 settlement was Mr. Patrick, who at that point was acting not on behalf of those charities but solely for himself.

Fortunately, the foundational documents placing an administrator in charge of the Hunter Mountain Investment Trust demanded that a trustworthy steward be in place at all times. For that reason, and if you can pull up the Hunter Mountain Investment Trust here for a moment (indiscernible).

Your Honor, as an aside, I will say that the technology facing us is blank.

THE COURT: Okay. I mean, I can see it over here. It's working on my monitor. I don't know if the TV is still cutting in and out. We did confirm everybody has hard copies, correct, in the courtroom?

MR. MORRIS: Yes, sir.

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. And it sounds like anybody that's on Webex, they can see it. So even though you all might not be able to see it here, I can see it. Webex participants appear to be able to see it. And you all should have hard copies.

I apologize for the technology but, unfortunately, sometimes that's what happens.

MR. EDNEY: I understand, Your Honor. And does the witness television work? (Indiscernible).

THE COURT: I don't know the answer to that.

MR. EDNEY: Okay.

THE COURT: Okay. The witness box does have a monitor that's working.

MR. EDNEY: Thank you, Your Honor. So I think we have it up on the screen now. But the key document in this case is going to be the Hunter Mountain Investment Trust Trust Agreement.

And as you see on the first page there, there's two paragraphs, the last two or three paragraphs that talk about Honis clause. Now, John Honis was the original administrator of the Hunter Mountain Investment Trust, and he was ultimately replaced by Mr. Patrick. As we'll go through today, there are several clauses in this agreement that make all of the terms that are applicable to Mr. Honis applicable to any successor.

And the Honis clause indicates that the administrator should be removed if he's breached his fiduciary duties in any capacity. This removal doesn't require the filing of paperwork, doesn't require an actual report. It's automatic. It's his duty to remove himself upon having breached fiduciary duty. And that made sense because it was important that somebody with such significant responsibility have acted with and continue to act with the utmost integrity.

That's where the restructuring comes in, Your Honor. The evidence will show a restructuring that began in 2024 of

two parallel structures. One is what we'll refer to as the DAF. The DAF, I guess, is an acronym. In legal circles, it's referred to as donor-advised fund. I think there's some dispute about whether it's really actually a donor-advised fund in kind of the strict IRS sense or some other animal. But that's what the entities were called, and we'll walk through that as we go through.

And evidence just come to light late last year through the Cayman Islands proceedings. It has become clear that Mr. Patrick had entities meant for charitable living pay him in excess of $14-1/2 million in 2024 alone. After he did that in late 2024 and then through the winter and early spring of 2025, he sought to exit any charitable entities that would question that significant compensation package. And again, the evidence will show he didn't form the charities with this compensation. It had to be (indiscernible).

The Charitable DAF Fund LP, and if we can pull up the demonstrative chart. I'm not offering this, but it's for demonstration purposes only.

Your Honor, I hope you can see it. The Charitable DAF Fund LP is the third from the bottom entity on this chart in blue. And the Charitable DAF Fund LP had been for the benefit of ultimately four established charities, including all the way up top, the Dallas Foundation, a charity that had been in existence for more than a century with a long track record

of good works.

But Mr. Patrick created new entities to reorganize it under a foundation run by him from his home address and really under his almost entirely sole supervision. He told lawyers in creating these new entities, and this is evidence that came out in late fall of this year, choose those with a generic name in a manner that would be hard to find. And we have this evidence from the work of the Cayman Liquidators who stood in the shoes of his entity in the Cayman Islands and got to work at finding out his interactions with a series of advisors in pulling off this restructuring.

We can move to the next slide I identified. This led to the creation of several new entities with nondescript names. One was CDH GP LTD. This was the entity in green off to the left of this chart. This entity was fully controlled by Mr. Patrick. It had the responsibility for making decisions for several other entities in the DAF structure of companies. Those entities were limited partnerships. The general partnership makes the decisions. The limited partnership has control over the assets.

Another entity that he created was CDMCFAD LLC. This was an entity that he created in Delaware. And most remarkably, at the top of the chart, we have the DFW Charitable Foundation. The evidence is going to show that he transferred assets from the longstanding structure to this new company,

CDMCFAD. He then redeemed the stake of the four established charities in that company for a price of $1.6 million.

The evidence will further show that at the time of this redemption under the stack of companies leading down the Charitable DAF Fund LP, more than $270 million was under those entities. So those four charities that had the stake, the $270 million, the moves made in the winter and spring of 2025 for the 9019 hearing, they got redeemed out for $1.6 million.

Now, I think you see in the papers, Your Honor, Highland asked the question, what does this have to do with Hunter Mountain and ultimately the settlement? The answer, Your Honor, is that it has everything to do with it. Hunter Mountain was under a different structure.

We can move to the next slide regarding that. Oh, I'm sorry.

MR. MORRIS: I apologize.

MR. EDNEY: You don't have it.

MR. MORRIS: But we don't have this on the screen. If you have exhibit numbers, I can look in the binder. I'm happy to do that. But I don't know what he's (indiscernible).

THE COURT: I believe he's referring to the, I think it's Exhibit 242, which is all of the organizational charts that -- of course they can tell you better than I can, but I believe you have the right document now or right exhibit now.

MR. MORRIS: What page are we on?

MR. EDNEY: We're on Slide 13. And I'm sorry about that, Your Honor.

(Pause)

MR. MORRIS: I am reminded by my colleagues that this is subject to admission.

MR. EDNEY: Okay.

THE COURT: Yes, I understand. He's stated he's using it right now for demonstrative purposes.

MR. EDNEY: So, Your Honor, turning to that Slide 13, Hunter Mountain, prior to the actions of the first two quarters of 2025, was held under a separate structure. And that structure ultimately was meant to benefit one of the same charitable organizations as the DAF structure, the Dallas Foundation. It was owned by Rand PE Fund I, LP, up through Atlas IDF, LP, then Crown Global Insurance Company owned a little bit of partnership shares, and they had a contractual relationship with charitable organizations to feed the economic bounty of whatever Hunter Mountain Investment Trust generated up to the Dallas Foundation.

But over a week in February of 2025, Mark Patrick sold Hunter Mountain out from under this structure to his new DAF structure, the one we just looked at previously -- and perhaps we'll go back to that slide -- leaving only $1 million behind. That was the price for which it sold.

At the top of the new DAF structure at the end of

this process, maybe we can turn now to the last slide I identified. I believe that's Slide 23 in Exhibit 242.

UNIDENTIFIED SPEAKER: I'm sorry, Your Honor, I'm on a stop (indiscernible).

THE COURT: Yeah, it's where it stops on this, as well.

UNIDENTIFIED SPEAKER: I believe it's Slide 19.

MR. EDNEY: Slide 19. He moved it to the new DAF structure that he put together. And that new DAF structure had his charity at the top run from his house, DFW Charitable Foundation, building a new DAF, the topic of the Cayman Islands proceedings, and exiting the Dallas Foundation and other charities from it was the mechanism by which he created this move.

And all of this was so that for both assets, both the $270 million originally held in the DAF structure and the Hunter Mountain asset, that he did not owe the Dallas Foundation or any of the other traditional charities anything, that they could not control or be the beneficiary or be the target or purpose of his decisions. When he was deciding to move these assets out from under the four charities, the $270 million, he knew they were worth that. He knew they were not worth $1.6 million.

And we're going to see in the evidence today the valuation that he shopped for and obtained in order to try to

justify this, but it was not a justification at all. And when he moved the Hunter Mountain asset, he knew it was not worth $1 million. As a matter of fact, February of 2025, he had already begun settlement discussions with Highland and had a sense of where this was going.

Your Honor, I want to move now to the points of contention between the parties. I don't want to speak for Highland's counsel, but I really didn't get the sense in the papers that they disputed the mechanisms or the reality of the moves of these entities, the creations of the new ones. And perhaps we'll hear differently. But Highland's response to this case so far has not been so much to deny it, but to claim that Dugaboy Investment Trust and Mr. Dondero should have bought it earlier.

Your Honor, from the standpoint of detecting what Mr. Patrick did, wrongdoers like Mr. Patrick, and I hate to say that, rarely can use the sophistication and mean by which they concealed their misconduct as a defense to it when evidence brings it to light. And the three-week discovery process for the 9019 settlement order, leading to it, would not have uncovered this.

It took a court-appointed receiver, and this is what the Cayman Islands calls a liquidator -- you'll hear from her today, Margot MacInnis -- who stepped into the shoes of one of the charitable -- the DAF Entities, one of the original ones,

Charitable DAF Holdco Ltd. in the Cayman Islands to find it. And you'll hear from that receiver today and the evidence that she uncovered.

We believe that this is among one of the most significant intervening events. It took her getting in there to see exactly what happened and to see what the justifications were for. To see that the economic benefit had been completely (indiscernible). To see that when it came right down to it, there was no lingering economic effect for the original charities or any justification for moving assets of this magnitude for so little money into a structure controlled by Mr. Patrick's home charity, (indiscernible) charitable.

Your Honor, it's our respectful position at the end of the day that that tone of evidence uncovered by the Cayman Liquidators is not enough to trigger of the newly-discovered evidence prong under Rule 60(b)(2), that there's very few things that would be. And notably, my client, the Cayman Liquidators, and the Texas Attorney General, asked Your Honor's predecessor to pause the 9019 proceedings to see what the liquidators would uncover.

And when the liquidators' allegations came out on July 15, 2025, Dugaboy Investment Trust immediately, within 48 hours, asked for a stay of the order so that the evidence behind it could come to light and this could be reconsidered. The predecessor judge declined. Now, perhaps there was a

concern that these -- what the liquidators filed in the Cayman Islands, and they were on the allegations, they were like a complaint. Perhaps there was a concern there'd be no evidence behind them.

But today's presentation will show that the evidence followed. In a series of filings from late July 2025 through December of 2025, many of which only coming into our full possession at the last part of last year. The corpus of evidence was significant and it backed up each one of the Cayman Liquidators' claims and we'll be presenting that to Your Honor today.

I believe at the end of the presentation of evidence that it will show that this new evidence coming out of the Cayman process was serious and real and is the appropriate subject of a reconsideration and a Rule 60(b) process to vacate.

And then, you know, as I prepared for today's hearing, I recall my first encounter with Mr. Morris a couple weeks ago, I guess it was -- I guess we're going on 17 days, at the motion for a protective order hearing. And what he said, and it was an education for me, it's just a word from elsewhere. The discovery process in the bankruptcy system is time-compressed and is imperfect. I think that's the word.

And the 9019 process leading to the settlement approval order was no exception. It was time-compressed, a

little over the course of maybe just a touch over a month if you trace it from the motion to approve the settlement to the hearing and order of approving it. But even in that process, Your Honor, Mr. Patrick made it hard.

When the deposition was taken and Mr. Patrick was the architect of this restructuring, he said he couldn't remember whether Hunter Mountain had been moved over to entities that were ultimately controlled by his new charity DAF Charitable. And, Your Honor, there was probably 14-1/2 million reasons for him not to have a -- for him to have a granular recall of exactly how that happened.

I mean, for him not to remember in his deposition was not credible. And it led to a process two or three days later where all the facts did not come to light. And that is a Rule 60(b)(3) problem.

More on the nose, Your Honor, was the 9019 settlement agreement. Perhaps if we can pull that up and go to the signature pages where we see Mr. Patrick's signature. And Sydney, this is Exhibit Number 2. Exhibit Number 2.

And now I'm turning to Page 22. Your Honor, and if we could --and if we can have in mind Slide 13 of the demonstratives of which we had up two iterations.

Your Honor, Mr. Patrick signed that settlement agreement on behalf of a number of companies. The Hunter Mountain Investment Trust makes sense. They're the ones that

own the limited partnership interest or most of it in the Debtor, Highland Capital Management. Beacon Mountain, LLC, that's the immediate owner of the Hunter Mountain Investment Trust. That makes sense.

But then we go on and he signs on behalf of Rand Advisors, LLC. That's the green entity on Slide 13 that historically had been a controlling part of and an investment management advisor to two upstream companies. Signed on behalf for Rand PE Fund I, LP. That used to be the blue box right above Beacon Mountain in the old structure. He signed on behalf of Rand PE Fund Management, LLC. This was the general partner of Rand PE Fund I, LP.

Those three entities by the time of the settlement had absolutely nothing to do with Hunter Mountain Investment Trust. They had nothing to do with it because Mr. Patrick had sold Beacon Mountain, Hunter Mountain Investment Trust, out from under Rand PE Fund I, LP and sold it into his new DAF.

Now, I understand why they were in here. I mean, everybody thought that these were the upstream companies that owned Beacon Mountain and the Hunter Mountain Investment Trust. But Mr. Patrick knew when he signed this document that they did not, that they were irrelevant entities. And if we were going to put upstream owners in the settlement agreement, he should put the new ones. He should put the new ones that were over in his new DAF, but he did not.

And if he had, he would have alerted everybody (indiscernible). He would have alerted Highland. He would have alerted the Court that there had been a change of ownership. That's a revelation that would have led to appropriate questions about what had happened and whether he standing there today had authority to make this momentous decision for Hunter Mountain Investment Trust and on whose behalf he was acting.

This is a classic 60(b)(3) issue about an order being procured by misconduct and deception. It is a 60(b)(2) issue because we now have the evidence of how it was organized. And it is a hallmark of a settlement that must be made (indiscernible). That's the substance of our case, Your Honor.

Now I just want to speak briefly to the legal mechanic of it, and that is what I expect Highland's presentation to be about. Their position is we should have found this out during the 9019 discovery process. And then we should have brought more and better evidence then, but we certainly should have in the wake of that filed a motion for a new trial. And we didn't. And they say if we had evidence of this reorganization within a 28-day period, then it's out of luck on 60(b)(2) grounds of newly-discovered evidence.

Your Honor, as a legal matter we disagree with that. If we were in front of the district court, I might agree, but as my colleague Mr. Morris has said, things move more quickly

in bankruptcy proceedings. And motions for a new trial are not an exception. Rule 9023 of the Bankruptcy Rules say that those motions have to be filed not in 28 days but 14 and that deadline cannot be extended for any reason.

That difference is important. It's important because I think you're going to hear from Mr. Morris and his colleagues that on the 15th of July 2025, the Cayman Island Liquidators filed a lengthy statement of claim, this is like a complaint in our court system, alleging some pretty significant details about the restructuring that had happened and the reasons for or lack thereof.

Your Honor, our contention is that if we had run into the Court with those allegations -- and we did Your Honor, we did run into the Court with those allegations. We asked for a stay of the order just two days thereafter. But if we had run into this Court with those allegations, I think the response would have been this is a nice document but where is the evidence behind it? Where is the evidence? This is not evidence, not admissible evidence.

I think what we're going to show here is that that evidence came out of the Cayman proceeding later, certainly to our attention because even as it was accumulated in the Cayman proceedings it was treated in a confidential manner, could not be shared with us much less with the Court.

But even if we were to consider that Cayman Island

statement of claim significant, it did come after the 14-day period for moving for a new trial so it's not within that window of disqualifying us from seeking review on 60(b)(2) matters.

I also point out, Your Honor that 60(b)(2) is not the only basis on which we seek Your Honor's intervention. We seek it under 60(b)(3), and you will hear evidence today that this restructuring and the lack of justification for it was swept under the rug by Mr. Patrick in the lead-up to the 9019 proceedings. And then we ask, Your Honor for his equitable intervention because this is an inequitable outcome.

Your Honor, at the end of the day the person deciding whether to settle with the Debtor in this case should have been somebody acting for four established charities that are doing good in this state and across the country. He, Mr. Patrick, had put himself out of that (indiscernible). He was acting as if he were a different person.

I don't know whether somebody exercising independent judgment in the best interest of the charities would settle with the Debtor or on what terms they would settle. But the rules of equity, Rule 60, principles of law require that we find that out, that we vacate this settlement. And when somebody acting truly on the interests of the people who own Hunter Mountain who were acting in a manner consistent with their fiduciary duties who had not been disqualified

automatically by the Hunter Mountain Investment Trust, we'll find out what that person does and the decision that that person makes.

That is the modest relief that we are asking for today. And we are grateful for the Court's attention to this matter and providing us with the time to present it before you in this courtroom. Thank you, Your Honor

THE COURT: Thank you.

(Pause)

THE COURT: You may proceed, Mr. Morris.

MR. MORRIS: Good morning, Your Honor. John Morris of Pachulski Stang Ziehl & Jones for Highland. We put on the docket a demonstrative exhibit, Exhibit 94, which is a PowerPoint presentation that I intend to use to aid my opening. I've got hard copies here if that would be helpful for you or your staff.

THE COURT: No, we're pulling it up right now.

MR. MORRIS: Tell me when you're there.

(Pause)

THE COURT: Okay, we've got it pulled up.

MR. MORRIS: Okay. I'm going to begin with a very short rebuttal before I get into my prepared remarks. And I want to begin with the notion that somehow what Mark Patrick did was hidden from everybody.

I appreciate that it's a challenge for counsel to try

this case having not participated in last June's proceedings. But that doesn't mean that (indiscernible) because if he had participated in those proceedings, he would have known that the entirety of the chart that he just dramatically put before Your Honor was actually put before the Court last June. And it can be found in Exhibit 60.

So in terms of Exhibit 60, the very last page, it has the very chart that we're told shows all of the hidden nature of Mr. Patrick's. It has DFW Foundation (indiscernible) as the results of a transfer of (indiscernible) through the transfer of (indiscernible). This was right in front of them. But they knew it. They knew it and they knew it for a long time because if you go back, I'm just going to do this a little bit before I hit my remarks.

If you just go back to Mr. Dondero's declaration or affidavit that he filed in the Cayman Islands on June 14th which is at Exhibit 48, this is Mr. Dondero's declaration in the Cayman Islands on April 16th, 2025, a month before there's an HMIT Agreement, two months before there's a trial.

In Paragraph 39, he tells the Court in the Cayman Islands that the entire Hunter Mountain position has been sold for a million dollars. He tells the Cayman Islands that that's outrageous because it was worth so much more money. Mr. Dondero knew that Hunter Mountain was sold and yet when we presented our settlement for approval, he acting on behalf of

the Debtor filed an objection that ignored the (indiscernible).

So if you look at their objection that's filed in the case, and I apologize I don't have the document, but Dugaboy filed an objection to the 9019 motion and they articulated exactly three reasons. Dugaboy contended it violated the plan. Dugaboy contended that the releases were improper. And Dugaboy contended that Highland hadn't met its burden. It was nothing about Mark Patrick's authority. It was nothing about DAF structure. It was nothing about what he knew to be the transfer of Beacon Mountain.

You know what happened instead? The Dallas Foundation supposed (indiscernible) is the one who carried the water. The Dallas Foundation filed an extensive objection making the exact same arguments that we're making today. You know what they did, Your Honor? After taking discovery, they withdrew their objection with prejudice, entered into a (indiscernible) with Mr. Patrick that left him in control of HMIT.

What are we doing here? This is not right. Look at what they did in discovery. Mr. Edney wants to chastise me (indiscernible). He said bankruptcy litigations moves quickly. It does. But they could have taken three years and not three weeks and they wouldn't have gotten anything because they (indiscernible).

If you look at their witness, let's start with their

-- they exercised their discovery rights. They served interrogatories. They served documents requests. They took depositions. They didn't ask for a single thing regarding Mark Patrick. They didn't ask for any questions in their interrogatories regarding the restructuring. They let the Dallas Foundation do it and that's why this is a do-over. This is just a new trial by a different party. And that's why this is wrong.

I know that we have -- we don't get to it (indiscernible). I know that we have their discovery requests in the record, and perhaps I'll get to it in a moment. And the last thing I would say that proves everything I'm saying is look at their witness and exhibit list. It's filed at Docket Number 4279. What did Dugaboy do? They put one witness on the exhibit list. Who is that? It's James Seery. They don't even put Mark Patrick on the witness list.

Do you know what their exhibit list is? It's exactly one document. It's a (indiscernible). So counsel gets up in his opening and he begins and he's pointing to the Hunter Mountain Investment Trust Agreement as the holy grail. We put that document into evidence last year to prove that Mark Patrick had authority. They had the document and they used it in discovery. And now, a year later, they point to that document and they say, oh my goodness, he lost all of his rights by some time that I can't identify years ago. How come

they're doing this now? This is exactly what Rule 60 is not designed for.

Getting to my prepared remarks, I'll start at the first slide. It is a very high standard to (indiscernible). That's what they're doing here. They have to come forward with newly-discovered evidence that with reasonable diligence would not have been discovered in time to move for a new trial. Whether you use July 14th or July 28th, it's a marginal difference. I know it's a very, very important difference for them because they desperately want to use the July 15th (indiscernible) as the new evidence.

Mr. Dondero testified to that one day, so you got to get that one day beyond. It doesn't, Your Honor. Dugaboy can't show that the so-called newly-discovered evidence is material and controlling and clearly would have produced a different result if presented before the original judgment. The evidence cannot be cumulative and must be in existence at the time of final judgment and not be discovered after.

We'll go to the next slide. This is really important. It renders the testimony I think you're about to hear completely irrelevant. The bankruptcy court determined that (indiscernible) is irrelevant. In denying Dugaboy's motion for a stay, the Court stated, quote, Whatever the misdeeds may or may not be of Mr. Patrick -- meaning they could be big, they could be small, they could be, whatever they are

-- they are not sufficient to intertwine with the Highland bankruptcy estate and the settlement agreement to justify a stay.

And you know, it's interesting, Your Honor, because there's no allegation that Highland participated in whatever activities Mr. Patrick was engaged in. No allegation that Highland was aware of anything other than what was in Mr. Dondero's declaration. The fact of the matter is, you know how you know that this is an intercreditor dispute that really has nothing to do with Highland?

Last year, they didn't put Mr. Patrick on the witness list. This year, they didn't put Mr. Seery on the witness list. They're not even asking for any testimony from Highland. they don't care about us. And this is another very important point. The bankruptcy's finding, the bankruptcy court's finding that the Cayman proceeding is irrelevant is already subject to a full and complete appeal before Judge Kinkeade.

I've got cited in Footnote 2, Dugaboy's opening brief in the district court. It is the second issue that they're appealing, Judge Jernigan's decision not to stay the proceedings. All of the so-called newly-discovered evidence identified for the first time in this reply concerns the Cayman proceeding and the DAF restructuring, the very issue that Judge Jernigan determined is irrelevant and that Judge Kinkeade is considering as we speak.

It is disappointing, Your Honor, that I had to wait until Friday night to learn what the so-called newly-discovered evidence was. Your Honor knows that I've made this point many times at every single hearing. I don't even know what I'm supposed to challenge. I had to take Mr. Dondero's deposition on Friday without knowing what evidence Dugaboy contended was newly discovered.

Mr. Dondero, to his credit, described five broad categories, but I don't understand why they didn't put in their motion what they put in Friday night about the newly-discovered evidence. I don't understand that at all. All of it was known to them last year. It's just hiding the ball, and that's not right. And here's another, it's just another (indiscernible). I expect the witnesses to tell us all about what they discovered, all about what they discovered, how horrible it all is.

But here's the thing, Your Honor. It was all presented to the Cayman court and it was rejected. On February 10th, after a two-day hearing in the Cayman Islands, the trial court in the Cayman Islands refused to grant any proprietary relief requested. To this day, Mr. Patrick has not been removed. No court anywhere has removed him from anywhere. Nobody in the world has even sought to remove him from the control position of HMIT. Not here, not in the Cayman Islands, not in the Texas Business Court, not in Delaware.

Nobody has ever even said, oh my gosh, maybe we should take some steps to get Mr. Patrick out of HMIT, because that's not what this is about. What this is about is to try to undo the settlement that is going to end Dugaboy's life in the Highland bankruptcy case. Because as part of the settlement, Hunter Mountain's Class 10 senior claim was set, was fixed at over $300 million and everybody (indiscernible). So Dugaboy is out.

That is all that's happening is you have a last gasp from a desperate subordinated holder of a prepetition 0.1866 percent of the limited partnerships of Highland. You look at the courtroom, what we're doing for a holder of a 0.1866 percent limited partner on a subordinated basis. What is this about?

I'll go to the next slide. If we go to the next slide, Your Honor, this is the common law. And this will show you all you need to know that there's absolutely nothing to see. In February 2025, Dugaboy had learned it held -- you know, this is just the way that the Highland team operated prepetition. They would have people with these miniscule interests use various entities so that we (indiscernible) had standing to cause havoc and chaos as they've done for six years.

Dugaboy had some interest in some entity called (indiscernible) which had a fraction of a percent of an

interest in land and that interest was redeemed. Dugaboy, the owner of the lien, knew that Mark Patrick redeemed its interest in land. And why is that important? Because that is the indirect parent of HMIT. You would think, oh, maybe that would trigger something. Nope. They knew it was -- HMIT was sold for a million dollars. That was right in Mr. Dondero's declaration. We've got the winding-up petition from (indiscernible). We've got the supporting organization's petition for supervision which contains all kinds of allegations of fraudulent conduct.

On June 4th, Your Honor, I encourage you to read it. Mark Patrick files a 64-page affidavit in the Cayman Islands. You're told that he hasn't explained why he did what he did. Read that affidavit. That affidavit goes into great detail that Mark Patrick, the sophisticated tax professional, was incredibly concerned that Mr. Dondero's never-ending attempts to control the very charitable foundations that he's not allowed to control was going to jeopardize their tax status.

That is what he did. And he simply placed the assets in a different tax-exempt organization. But that was the concern. But that 64-page declaration, I mean, that's on June 4th. That's before even the deadline for filing objections. That didn't prompt Dugaboy to do anything.

On June 9th, the Dallas Foundation files its objection again based exactly on self-healing allegations,

allegations of breach of fiduciary duty. That objection is withdrawn without prejudice. On July 1st, well within even Dugaboy's 14-day period, the supporting organizations, which are the Highland Dallas Foundation, the Highland Kansas City Foundation, the Highland Santa Barbara Foundation, foundations that Mr. Dondero established, that Mr. Dondero funded, that Mr. Dondero controls, files yet another -- launches yet another front in this war against Mark Patrick, this time in Texas Business Court.

And it's supported by another affidavit or declaration from Mr. Dondero with even more allegations of fraud. Really? New evidence? They didn't know enough?

July 9th, there's a liquidation committee. It's akin, Your Honor, to a creditors' committee that we have here in the United States. There's a liquidation committee that's formed in the Cayman Islands, and the supporting organizations who initiated the whole proceeding with Mr. Dondero's money are now appointed to the liquidation committee. They have advanced knowledge, I'm sure that you'll hear from the witness about this so-called -- not so-called, actual (indiscernible).

Really, they didn't have enough evidence? They didn't know enough? Have they not asked a single question about (indiscernible) when they had the opportunity? Have you not objected on these (indiscernible)?

I'll turn the slide. Skip the 7, that's outside.

July 14th (indiscernible).

If we skip the slide, reasonable diligence. We have a stipulation that we filed earlier today, Your Honor, and it's of vital importance. You can find it at Docket Number 4615. And why is it vitally important? Because in that stipulation, Nancy Dondero, Trustee of the Dugaboy Investment Trust, represents that she delegated to her brother Jim the authority to oversee Dugaboy's interests in all of this litigation, between Highland's litigation, (indiscernible) litigation, the Texas Business Court litigation, and the recognition proceedings (indiscernible).

He had control of everything. It was his job. He was the agent, and I appreciate that on Pages 6 and 7 of their brief, Dugaboy focuses on corporate affiliates and acknowledge that one corporate affiliate can be imputed to another corporate affiliate, but that's not what happened. We have, according to Ms. Dondero, according to Nancy Dondero, you have a principal and an agent, with Dugaboy being the principal and Mr. Dondero being the agent.

And it is black-letter law that the knowledge of an agent acquired in the course of his duties is imputed to the principal. And we've cited a case there for Your Honor (indiscernible). So with Mr. Dondero acting as Dugaboy's agent, Dugaboy objected to the 9019 motion, the Dallas Foundation, Crown Global also objected. The objections created

a contested matter. They had all rights of discovery. They exercised those rights.

Dugaboy received comprehensive responses to the interrogatory. It received over 4,000 pages of documents, including every single communication between Highland, Mr. Patrick and his lawyer, Mr. Phillips, up until the day the agreement was signed. They had the opportunity to ask all the questions they wanted during the depositions. And so you can come up here and say, oh my goodness, three weeks isn't enough to take discovery, but 300 years isn't enough if you don't bother to ask for the information.

Who cares how much time you have or don't have when you're not asking for any information regarding the restructuring? You're not asking for any information about Mark Patrick. We heard some allusions to some questions that Mr. Patrick supposedly evaded. Dugaboy, neither Dugaboy nor the Dallas Foundation rushed into court for their motion to compel. They didn't even complain. I don't even remember any complaints about anything.

And to this day, Your Honor, I don't see any identification of the particular questions that are being referenced. This is just, oh yeah, (indiscernible). But at the time, they didn't care. Nobody took any steps to try to rectify the situation and say, oh my goodness, this stuff is really important to us, we better have Judge -- and here's the

irony of it, Your Honor, because Mr. Patrick went into court on June 25th, and he was evasive. I will concede the point.

In the courtroom, he was not being very direct, and Judge Jernigan admonished him, the very judge that supposedly biased the prejudice against Dondero. She told Mr. Patrick, Mr. Patrick, please answer the questions directly. You know what he did? He answered the questions directly, and it was never a problem. So, the problem arose, the problem rectified. Absolutely no complaint anywhere. Nothing in their appellate papers says, oh my gosh, we were prevented from taking discovery.

The next slide. We move to 60(b)(3). 60(b)(3), made applicable by Bankruptcy Rule 9024. Dugaboy has to prove by clear and convincing evidence, and this is the standard, basically. Let's not lose sight of the legal standard. It's clear and convincing evidence that an adverse party engaged in misconduct and prevented the moving party from (indiscernible) the case.

HMIT wasn't even involved. I mean, let's be real here. This was a motion brought by Highland because Highland required court approval before it could enter into the agreement. This wasn't a motion by HMIT. HMIT may -- they may hate HMIT, they may hate Mark Patrick, but for purposes of Rule 60(b)(3), they're not really relevant. They're not a movant, they're not the party. Highland is.

In any event, really, I don't want to repeat myself here, but the reason that they fail under 60(b)(3) and they do not even come close is because there is no evidence to get that Highland or even Mr. Patrick did anything to prevent Dugaboy from fully (indiscernible) case. And how do we know that? Go back to Dugaboy's objection. Their objection was about the leases. Their objection was about violations of the plan, right? It wasn't about Mr. Patrick.

What happened was, the night before the hearing, the Dallas Foundation reached an agreement with HMIT. They withdrew their objection with prejudice and entered into the binding term sheet that let Mr. Patrick in control. So we show up in court on the 25th, and Judge Jernigan says to Dugaboy's counsel, Michael Lang, Mr. Lang, Dallas Foundation is out. So can you confirm -- we can read this in the transcript. Maybe not (indiscernible).

In substance, she asked Mr. Lang, can you just confirm that we no longer have a challenge to Mr. Patrick's authority? And he says, yes, Your Honor, we confirm that. We have no (indiscernible). And I felt badly for him (indiscernible), but at that point, I admired Mr. Lang because Dugaboy had not objected to Mr. Patrick's authority.

And a couple of minutes later, Mr. Dondero pops up from (indiscernible) and he comes up and taps Mr. Lang on the shoulder, whispers in his ear, and says (indiscernible). No,

Your Honor, we do object. We object on the grounds of lack of authority. And you can read it in the transcript. Just search for the word "abuse" because Judge Jernigan said, I may be abusing my authority here, I may be abusing my discretion, but I'll allow you to do it (indiscernible) because here it is.

So we were in the courtroom at that moment. They were prosecuting a defense they weren't prepared to prosecute. Because they were never pressing that defense. That's why this is a do-over. They're trying a case today that they never tried before. This is completely improper under Rule 60.

Next, Slide 7. It's ironic that we're here today, that Mr. Patrick somehow magically lost his powers at some undefined point when Mr. Dondero contends breach of his fiduciary duty because in 2025 alone, Mr. Patrick saw no fewer than nine separate documents on behalf of either a DAF or an HMIT entity with one Dondero entity or another on (indiscernible). In fact, yeah, I think there were nine.

And yet we hear this theory that's never been articulated before, that wasn't in their motion, that Mr. Patrick somehow magically lost his authority at some point back in 2023. How do you lose your authority in 2023? How do you contend that he lost his authority in 2023 and continue to sign agreement after agreement and take his signature and pay him money? Pay him money? They're doing in December of 2025.

This is like, I don't even know if this is in good

faith at this point. Nobody has ever taken action anywhere to replace Mr. Patrick as the sole representative of the HMIT entities. There has never been a determination by any court that Mr. Patrick has breached any duty of any kind.

Under the governing documents, Highland is actually the party that would determine if the need ever arose to determine whether Mr. Patrick breached his fiduciary duty, and that makes sense. Why? Because at the time these documents were written, Mr. Dondero controlled Highland. And so he was always going to have the final say. But he lost control of Highland. The documents haven't changed. There's a new fiduciary (indiscernible) Highland, and that's the way the process would work. But we're not even there. It's just another Hail Mary. That's (indiscernible).

I'm going to address it even though counsel didn't because it's offensive to me personally. The next slide, this recusal stuff. I think it needs to be addressed. They didn't address it, and maybe I respect them for not doing it. But this is out of hand. At no time did Dugaboy ever contend that Judge Jernigan did anything wrong in the 9019 proceeding. In fact, if anything, she did them a solid by allowing them to make the last-minute objection that they have never asserted because if she had simply exercised her authority that Congress wished she would have and said, no, you can't do this, this is not right, we would not be here today.

She opened the door a crack, and (indiscernible). This is the bias, Judge. And yet they're still trotting this out. It's not fair. They never asked Judge Jernigan to recuse herself. They never gave her an opportunity to defend herself. They never gave her an opportunity to say, what have I done wrong in this proceeding? You made your recusal motion. You got all the way to the Fifth Circuit. They said no. They made a motion for rehearing. They said no. They made a motion for a hearing and back. They said no.

There is no basis to renew -- I mean, I don't think you can. I think the Fifth Circuit's rulings are final orders. So what did they do instead? Secretly, with no notice to anybody, Mr. Dondero and four of his cohorts filed his private complaints in the Fifth Circuit. And Judge Elrod, acting alone, issues and orders, she clearly spoke to Judge Jernigan. I'm willing to say, (indiscernible) their interpretation that Judge Jernigan said I've had enough. This is nonsense. I'm not going to be (indiscernible) anymore.

Because you have to look at Judge Elrod's language. It's not (indiscernible). It is, I put it in bold on purpose. She expressly stated that Judge Jernigan's voluntary recusal, quote, should not be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse, which has been addressed by the Fifth Circuit. You have the Chief Judge of the Fifth Circuit relying on the Fifth Circuit's three

different orders denying recusal, and then you have a litigant here asking you to ignore the Fifth Circuit and the Chief Judge.

Next slide, who was present and who was not? Please consider this under Rule 60(b)(6). Who is present and who is not? What is just and what is not? You have Dugaboy here with virtually no interest, making all of these sordid allegations, which by the way can be addressed. As Judge Jernigan said, go have fun in the Cayman Islands.

The joint official liquidator is here. She should go down the block to the Texas Business Court and litigate there. We've been waiting for her. This is not the forum for the resolution of these intercreditor disputes.

Who was absent? You heard counsel refer several times to the Dallas Foundation, Empower Dallas, the Okada Family Foundation, Crown Global, the supporting organizations. These are all supposedly the beneficiaries of Mr. Dondero's largesse, and they are not here. And they sit on the liquidation committee. They know everything. They know everything, and they're not here.

Let me finish up by saying, Your Honor, Mr. Dondero's goal is very simple. It's to regain control of the HMIT entities so that he can continue his litigation crusade against Highland, its principals, and me. Rule 60 is not an opportunity for a do-over, but that's exactly what Dugaboy is

attempting to do here.

They don't contend that the settlement was not in Highland's best interest. They don't pretend that the settlement is not part of arms-length negotiations. Instead, they rely on evidence developed by joint official liquidators in a foreign country that, as Judge Jernigan found, has nothing to do with Highland or the settlement. Dugaboy was not in control of Highland (indiscernible).

Dugaboy and its agent, Mr. Dondero, knew all they needed to (indiscernible) Mr. Patrick's authority (indiscernible) settlement. This is a dispute between and among affiliates and that should be resolved in the Cayman Islands or the Texas Business Court. If you needed any final, final information to know that everything in the Cayman Islands has nothing to do with Highland, just look at (indiscernible) decision in the trial court.

Other than historical references, Highland is irrelevant to that proceeding, other than maybe historical references, and I don't even know if there are any, HMIT has nothing to do with that decision. They'll appeal it, they've appealed it. If we want to (indiscernible), we need to correct one thing (indiscernible).

So, the JOL is lost. The only thing they walked away with from the trial court was a statement that a breach of fiduciary duty claim basically survived the motion to dismiss.

Okay, you can pursue your claim against Mr. Patrick, I mean, I don't care. Even if they win, that's not going to remove Mr. Patrick as the authorized representative of HMIT. They're not even asking for that relief. It's got nothing to do with anything.

So they appealed it, and that appeal occurred in September. And contrary to what I heard some people say, the appellate court has not reversed the trial court in any respect at all. They haven't undone any aspect of the trial court's decision. That appeal is (indiscernible).

Instead, what happened was the JOLs went to the appellate court and basically asked for interim injunctive leave pending appeal. Common practice, right? Happens all the time. You lose, you want to appeal, you ask for injunctive leave pending appeal. And you know what the court did? The court said, well, you and Mr. Patrick entered into this Rule 11 motion in Texas back in July. Let's just adopt that and make that (indiscernible) the Cayman Islands. Otherwise, the motion was denied. That's what happened.

And the Court should really listen carefully to the representations that are being made to you because if you dig down, they're not always what they appear to be. The reorganization wasn't (indiscernible). Mr. Dondero knew about the transfer of Beacon Mountain.

Let's do the work. Let's do the hard work. At the

end of the day, Your Honor will see that this is a baseless motion attempting to do one of two things, either a do-over or get more information that they can use against Mr. Patrick in some other forum on some other day. (Indiscernible).

THE COURT: Mr. Phillips.

MR. PHILLIPS: Thank you, Your Honor. Louis M. Phillips, Kelly Hart, on behalf of the HMIT entities.

Number one, we fully embrace and endorse Mr. Morris and join in Mr. Morris's opening. Number two, I just have a couple of cleanup additions with respect to the assertions that the HMIT structure was hidden and the reorganizations were hidden, discovered only by the very, very, very (indiscernible) JOLs, and no one could have known because you don't try things when people are hiding facts.

There are a couple of problems with that. On May 8th, and this is in evidence, May 8th, Counsel for Dugaboy amongst others Dondero --

THE COURT: Mr. Phillips, just real quick. We're throwing out dates. I just want to make sure when we're talking about May 8th, we're talking about 2025.

MR. PHILLIPS: I'll put it up. I'm sorry.

On May 8th, 2025, Counsel for Dugaboy, along with multiple other Dondero-related affiliates, sent a letter to the JOLs. They were involved in litigation being brought against the Dugaboy -- against Dondero-related entities. And there was

an attempt by those entities through this May 8th, 2025 letter, trying to get the JOLs to interrupt and intercede on their behalf, but Mr. Patrick was bringing action seeking to enforce obligation owed by the Dondero entities to various entities under his control.

In that May 8th letter, Counsel for Dugaboy, amongst others, provided information to the JOLs about the restructuring of HMIT entities, also about the restructuring of DAF Entities, and said that because of these restructurings, they were very concerned that in the event Mr. Patrick won, they didn't want to pay that entity that was under Mr. Patrick's control because of these restructurings and bad acts. That was on May 8th of 2025, 11 days before the settlement was executed, and weeks before this ending of discovery.

Also, I'd point out that as Mr. Morris told the Court, there was discovery done in connection -- upon HMIT and DAF representatives and employees. One of the -- but to reiterate, there was never a single document request issued to any HMIT entities, HMIT entity, to any DAF entity by either Crown, Empower Dallas, Dallas Foundation operating or advancing the interests of Crown and Empower Dallas in connection with its objection or by Dugaboy in connection with its objection. Not one document request.

You look at Mr. Dondero's transcript at the hearing,

which, as Ms. Morris says, if the judge was prejudiced, he sure didn't act like it. It hadn't raised the issue. They let Mr. Dondero testify. Mr. Dondero's testimony in sum and substance was he had done an investigation, and they had it all wrapped up, and it handed the benefit, the sum and substance of their investigation to the charity back in February of 2025.

And as a result of the investigation, they knew that HMIT had sold, had been -- he says HMIT had been sold -- not correct, Beacon Mountain was sold. But he knew that the DAF had been restructured and the charities were out. He gave that all to the charities in February of 2025. That's his testimony at hearing, as incoherent as it was, that's his testimony at hearing on June 25th, 2025.

My last point is that there's some suggestion, and I appreciate Mr. Morris standing for Mr. Patrick. Mr. Patrick was subjected to a seven-hour deposition Thursday of last week, and we feel he was very forthright. But Mr. Patrick testified at a hearing. He was admonished, and when after he was admonished, he came clear and said everything that -- he answered every question put to him by counsel for Dugaboy and counsel for Crown, Dallas acting for Crown.

Empower Dallas was not a party in interest because they had waived their rights, even though their objection was grounded in the very transaction, and even an additional complaint of misconduct by Mr. Patrick. They withdrew their

objection with prejudice.

The one thing that you'll get from Mr. Dondero's testimony that that hearing is, they didn't tell him. They didn't tell him that they were withdrawing their objection. Why? Because they didn't want to, and they did, and Mr. Dondero's position was, all I need is a little more time, because I raised an objection that didn't say anything that's even relevant to these issues. Crown did, but Crown settled and didn't tell me, so I need to go drum up some other people to object.

And when you say that the JOLs asked for a continuance, the JOLs sent a letter to the Court. (Indiscernible) somebody on Avenue Q sending a letter to the Court? It's not the way you address the Court and seek an extension of a deadline, seek a continuance of a hearing that parties have spent hundreds of thousands of dollars on legal time and (indiscernible) and hours and hours and hours of deposition. By the way, why don't you just continue this, Judge? We would like an opportunity to take a look by a letter sent to the judge. Not the way you do it.

Finally, the suggestion of Counsel that the structure of HMIT was hidden from Highland, not only was Counsel not there, but Counsel can't read. The documents presented to the Court in support of the 9019 included all of the restructured transactions and all of the positions taken to establish

Mr. Patrick's authority at every turn.

Mr. Raver's (phonetic) deposition, which is in the witness and exhibit list, was given, and he was asked questions by counsel for Crown. He supposedly missed badly treated entities, and counsel for Dugaboy, and he laid out the entire structure of HMIT as restructured and provided full, honest, and open testimony.

Nobody called him as a witness at the hearing. Why? They didn't want to. Dugaboy never made the suggestion that there was a problem with authority. It wasn't until Mr. Dondero taps his hand on the shoulder of his lawyer who had just said, we don't have an issue with Mr. Patrick's authority, and said, yes, we do, put me on the stand on the issue of authority. He did. The Court allowed testimony.

But the point is, Judge, May 8th, 2025, letter sent to the JOL about the problems (indiscernible) restructuring, and Dondero entities not willing to pay their just debts. John Raver's complete deposition, never evasive, no complaints by anybody, laid out the entire structure. That was prior to the hearing. That was discovery in connection with the hearing.

Number three, not one document request to any HMIT entity, any DAF entity whatsoever. Thank you.

THE COURT: Thank you.

Ms. Ziegler-Young, you all did file an objection, or I say an objection. You did file a response or comment, I

believe is how it's styled. Do you have any opening in this case?

MS. YOUNG: Thank you, Your Honor. We do just want to make some general comments. As we stated in our comment, although this case has been confirmed and many of our oversight committees have terminated, we are here today because the parties have raised allegations that relate to the integrity of the bankruptcy court system.

The United States Trustee has no knowledge of whether the allegations raised by and against Mr. Patrick that avoid others have merit. We defer to the Court's weighing of this evidence. The fact that the Court may probably examine these allegations does not mean that the confirmed plan or the results of the bankruptcy case must be unwound. Rather, if the Court concludes that some of these allegations have merit and that they are based on newly-discovered evidence that could not have been raised earlier, the Court may wish to revisit its finding of which may be in connection with the settlement order.

In the alternative, as we noted in our comment, the Court may also wish to defer its ruling on this matter until after the resolution of the appeal of the settlement order. The United States Trustee monitored the depositions and the evidence filed in this hearing, as well as all the documents that have been used. We look forward to the presentation of

evidence before this Court, and we thank the Court for its attention to this serious (indiscernible).

THE COURT: Thank you. I believe that's all the parties that I'm going to allow to make any type of opening.

So, Mr. Edney, we're about 11:10. You want to go ahead and call your first witness?

MR. EDNEY: Yes, Your Honor. I might have a suggestion, though. In looking at the technology, I'm no computer guy, but it occurs to me that maybe if we use some of these laptops to log into the Webex feed over the wi-fi, we would have access to the documents that were flashing (indiscernible).

THE COURT: That's fine. If you all want -- I mean, we can take a brief 10-minute -- well, let's just do 10-minute recess. You all can log in, pull up, and that way, you all can see the exhibits electronically, as well. That's fine.

So, we'll take a 10-minute recess.

THE CLERK: All rise.

(Recess at 11:12 a.m., recommencing at 11:27 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

Okay. Mr. Edney, why don't we just say this, we're back on the record in the Highland Capital Management case. Mr. Edney, if you'd like to call your first witness.

MR. EDNEY: Thank you, Your Honor. The Movant calls

Margot MacInnis.

THE COURT: Okay, Ms. MacInnis, we'll have you -- that is the witness box and I'll have you sworn in before you have a seat.

THE CLERK: Please raise your right hand.

MARGOT MACINNIS, MOVANT'S WITNESS, SWORN

THE CLERK: Thank you.

THE COURT: Just real quick before we get started with the witness, I know that you all logged on. I can see exhibits. But Mr. Edney, you all did not file your exhibits as part of your witness and exhibit list, so if you have hard copies, you might want to present those to the Court.

MR. EDNEY: Yes, Your Honor. I'd be happy to do so. Can you give us a moment, Your Honor?

THE COURT: That will be fine.

MR. EDNEY: Thank you.

(Pause)

MR. EDNEY: Sorry, Your Honor.

THE COURT: Okay. Just before you start again, let me make sure. I'm just looking at our list here. I want to make sure we're not -- we haven't had someone join that shouldn't be. I know that everybody has started to join for purposes of seeing exhibits, but I have a CC. Does anybody recognize who that might be? Capital C, capital C?

MR. MORRIS: That might be our associate, Corinne

Cathcart.

THE COURT: Okay.

MR. MORRIS: I don't know that for sure, but.

THE COURT: They just changed their name to Corinne Cathcart.

MR. MORRIS: All right.

THE COURT: So you did well with your guts.

MR. MORRIS: (Indiscernible) very fast.

THE COURT: All right. Observer? Does any party under know who has appeared or is on our Webex with the name -- Paul Murphy maybe? Or maybe they dropped off.

MR. MURPHY: Yes. Apologies, Your Honor. I'm here.

THE COURT: Okay. And Mr. Murphy, is he associated with HMIT.

MR. PHILLIPS: He's associated with the DAF, Your Honor.

THE COURT: Okay, all right.

MR. PHILLIPS: (Indiscernible)

THE COURT: Thank you. All right.

MR. MURPHY: Thank you.

THE COURT: I apologize for all that. Mr. Edney, you may proceed.

MR. EDNEY: Thank you. Did we swear her in? I --

THE COURT: We did swear in, yes.

MR. EDNEY: Okay.

THE COURT: She has been sworn in, yes.

MR. EDNEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EDNEY:

Q Good morning.

A Good morning.

Q Could you please state your full name for the record?

A It's Margo MacInnis.

Q And where do you currently reside?

A I reside in the Cayman Islands.

Q And where are you employed?

A I'm employed with Grant Thornton Specialist Services Cayman Limited in the Cayman Islands.

Q Can you give the Court briefly a sense of your background and experience as a professional?

A I'm a chartered accountant by profession. I've been residing in the Cayman Islands for nearly 30 years. I am a certified fraud examiner and an anti-money laundering specialist. And the majority of my practice is spent on cross-border asset tracing and recovery cases.

Q And what experience and expertise do you have in uncovering and analyzing (indiscernible)?

A Extensive. That's largely been my practice for 30 years being in the Cayman Islands. Our Cayman structures are, you know, used globally so I take court-appointed positions in

insolvent or sometimes solvent cases or appointed as a -- as a receiver or a restructuring officer.

Q And what about any experience or expertise in detecting or analyzing (indiscernible)?

A I'm well versed in that. As a court-appointed officer I have duties and responsibilities to the estate to act in its best interest and for proper purpose and to have no conflict of interest. I'm an independent professional, and I also have extensive experience sitting on boards of directors and the duties that go along with that.

Q And do you have a team that works with you?

A I do.

Q Can you describe that a bit for us?

A The team in Cayman is roughly 24 professionals. I'm part of a global network that has over 66,000 people. There are -- I'm also a partner in the UK firm so we have access to, you know, all the usual service lines that are available in large big accounting firms.

Q Okay. Do you have any awareness of a company called Charitable DAF Holdco, Ltd.?

A Yes. I'm the court-appointed liquidator.

Q What is that company?

A It's a Cayman Islands incorporated company that is -- holds a limited partnership interest in or held in the Charitable DAF, LP.

Q Is that the Charitable DAF Fund, LP?
A Charitable DAF Fund, LP. Yes.
Q Okay. And we mentioned that you're a court-appointed liquidator of that company. Is that right?
A Yes. I was appointed on May 6 pursuant to an order from the Cayman court.
Q So I didn't really know about the court liquidator until I encountered this case. Could you tell me a little bit more about what a court-appointed liquidator in the Cayman Islands is?
A Broadly, it's -- your appointment comes about when a -- in an insolvent case when a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company. In a case like this, broadly my role will be to secure and protect the assets of the company. Often in cases where there's been misappropriation or fraud, that activity is quite involved because you have to trace the assets and look to enforce and recover them.
 Once I have the assets in the estate, I do an exercise to adjudicate the claims that are filed in the estate. And then if there are funds available for distribution, I would distribute those funds. So those are the broad categories. There are a lot of other elements of the liquidation, but those broadly are the are the functions.
Q All right. And I think you mentioned when you were

appointed in this position. Could you restate that again?
A That was on May 6.
Q What were the circumstances that led to your appointment?
A As I understand it, the supporting orgs of the Charitable DAF Holdco petitioned the court for a just and equitable winding up of the Charitable DAF Holdco largely on the basis of concerns of misappropriation of the assets of the structure.
Q You mentioned the term the supporting organizations. Could you tell us what your understanding of what those are?
A So the Limited Charitable DAF Holdco is a hundred percent shareholder in the Charitable DAF Fund, LP. And the supporting organizations, which include the Dallas Foundation, the Kansas City Foundation, and the Santa Barbara Foundation, and the Community Foundation of North Texas, they are the participating shareholders of CDAF Holdco.
Q And what do you think your court-appointed mission is with respect to the Charitable DAF (indiscernible)?
A Well, it is to recover the assets of the estate and administer them for the benefit of the economic stakeholders in the company.
Q As a court-appointed liquidator for the Charitable DAF Holdco, Ltd., do you have the power to bring claims against other parties?
A I do have the power to bring proceedings by Cayman law statute and with the sanction of the Cayman court.

Q And did you bring any proceedings against Mark Patrick?

A Yes. We filed a statement of claim on July 15 in the Cayman court. The process to do that, I had to first seek sanction of the what I'm going to refer to as the liquidation judge, the judge that supervises my position and authority in CDAF Holdco.

I sought permission from him to bring these -- to bring this claim. And then once I had permission to bring it, I then filed it on July 15th. And that proceeding was assigned to Justice Parker, so it's not the liquidation judge that reviews and considers the statement of claim. It's Justice Parker. And the claim is presently I think paused, stayed pending the outcome of the injunction application that we filed off the back of our statement of claim.

Q Okay. What if anything did you have to show the liquidating judge in order to initiate litigation (indiscernible)?

A The liquidation judge would expect that I need to show that I have reasonable prospects of success on that claim. And practically speaking, that usually entails and it did in our case providing an expert opinion from a King's counsel an, independent King's counsel, on the merits of the case.

We're also required, I have a duty to present not only the reasons I feel that there's a reasonable prospect of success but also any material weaknesses or considerations of my claim

so that the judge has that all before him.

Q And did you provide opinions of King's counsel?

A Yes, we did. And we received sanctions so.

Q Now towards the latter half of your answer a couple of questions ago, you started talking about the status of the Cayman proceedings.

A Yes.

Q Could you give us a brief overview of that?

A So we filed the initial claim on July 15th. The judge set down and then we filed our -- I don't recall the date exactly but shortly thereafter an application for injunctive relief that was set down for December 15 and 16 in the Cayman Islands.

We filed an amended statement of claim on October 15. The matter was heard for the injunction on December 15th and 16th. In February, Justice Parker issued his ruling which found that we have a serious issue to be tried. That's the threshold for seeking injunctive relief. He denied our injunction on the basis he didn't consider our proprietary interest went as far as we said it did in the application. And so he found on the balance of convenience that it was in favor of the defendants.

We appealed that decision. We were in front of the Court of Appeal on an interim application for injunctive relief. They also affirmed there is a serious issue to be tried and granted the interim relief. And the main injunction action is pending for September 2nd and 3rd.

Q Okay. And what was the interim relief that you secured from the Court of Appeals?
A In the Court of Appeals, we essentially have -- there is to be no transfer, dissipation, withdrawal, removal apart from the ordinary course of business from any of the defendants. And there is also a limitation on no increases and remuneration can be made in this period and DFW is limited to $200,000 a month in distributions.
Q Just bear with me for a minute.
Okay. So there's a -- you mentioned that there's a limitation on what Charitable DAF Holdco can do with certain assets during the pendency of (indiscernible). Is that right?
A Yes, that's correct.
Q And does that apply to assets that is held directly by Charitable DAF Holdco or (indiscernible)?
A Well, because our injunction is against CLO Holdco, all of -- all of the assets in that structure and anything under CLO Holdco would be caught by the terms of that injunction.
Q And what are the limitations that this injunction places upon those assets?
A In layman's terms, it essentially keeps those assets safe from being dissipated, removed, transferred, diminished, any sort of transaction that would put them further away from this structure except they are allowed to do -- make payments in the ordinary course.

Q So if an asset is held under this structure and Mr. Patrick decided to sell them or trade them away or settle claims, would he need the Cayman court's permission?
A It would be a -- it would be a breach of the injunctive relief if he didn't have the permission to do that and it's outside of the ordinary course of business, yes.
Q And did Mr. Patrick oppose the imposition of this interim relief?
A Well they -- yes, it was -- the interim relief hearing was opposed by the defendants.
Q And his objection was (indiscernible). Is that correct?
A Yes.
Q Now did -- now with respect to the Cayman proceedings, did you take any actions to bring them to the attention of the courts in the United States?
A We were also -- filed our application for recognition Chapter 15, so our statement of claim was exhibited to that application. I believe that was done on July 25th.
Q And where is that application pending?
A It's in Delaware.
Q As a liquidator of the Charitable DAF Holdco, Ltd., do you have a special ability to obtain documents that are related to that company?
A Yes, I have the power to compel the production of documents certainly from service providers in the Cayman

Islands. A Chapter 15 recognition would also give me the subpoena powers in the United States for any third parties who are here who have books and records belonging to Holdco.

Q And does that include documents that with respect to other third parties might be considered confidential or privileged?

A Yes, I can -- if they're the documents of Holdco which we have obtained some, we're still in the process of getting parties to cooperate and provide their documents. But we receive, for example the lawyers acting for Holdco would be compelled to provide us with the information belonging to Holdco.

Q Is that because you're practically in charge of Holdco now?

A Yeah, I step into the shoes of the company. I replace the directors and others who have power.

Q And prior to being appointed a liquidator, would you have been able to have obtained access to some of these otherwise confidential documents?

A No, no it would be private company information.

Q When were you first able to gain access to some of these confidential documents?

A We started getting documents within the early days, the first few days of our appointment. That process is usually fairly involved, you'll appreciate it. Oftentimes the records of Cayman Islands companies aren't held in the Cayman Islands.

But for those parties who were there and we were able to ask them for the books and records and they cooperated. There were a number of parties who did not cooperate.

Q And when did you start making some of these confidential documents publicly accessible?

A We made the documents in connection with the statement of claim public when we filed in Chapter 15. I believe also that -- in the Cayman Islands, documents aren't going to become public unless they do something like file them in the Chapter 15 proceeding, until they're brought up in court or mentioned in court. And then that lifts the sort of privacy rules governing Cayman proceedings.

So some of those documents wouldn't have been capable of being referred to publicly until we held the injunction hearing in December.

Q December of 2025?

A December 15, 16 was the injunction hearing in Cayman.

Q So some of the documents you obtained you were able to make public when you filed them as an attachment to the Chapter 15 recognition proceeding?

A Yes.

Q And you filed that -- do you remember what date that was?

A That was July 25th.

Q July 25th --

A Yes.

Q -- 2025?

A Yes. And we would have filed updates or additional documents as there were some further filings in the Chapter 15. I don't have all of those dates at my fingertips.

Q But there were still other documents that you were able to obtain in the position as liquidator that were not part of the Chapter 15 proceedings?

A Yes.

Q Is that correct?

A Yes.

Q And those documents under Cayman law need to be confidential until you file them in connection with the Cayman proceeding. Is that right?

A Yes.

MR. PHILLIPS: Your Honor? This doesn't change, but we now have a total process of leading the witness.

THE COURT: Please try -- I mean, she's already answered that question. So to the extent for that question, the objection's overruled. But let's please try to not lead the witness.

MR. EDNEY: I understand, Your Honor. Thank you.

BY MR. EDNEY:

Q So let's try and remember where I left off. So aside from what was filed with respect to the Chapter 15 in Delaware, there are some -- are there -- were there some documents that

you obtained that remain confidential?

A Yes. We -- yes, And we -- we share information with our liquidation committee. So there are five members of that committee, the four supporting orgs I mentioned, as well as DFW.

And they all have signed up to a confidentiality agreement. So information that is shared with them is used for discussion in consultation between myself and the committee. And that information is not to be used or shared outside of those discussions.

Q As a part of that confidentiality agreement, do the recipients of that information, may they file in the U.S. court proceedings without your permission?

A Sorry, could you repeat that?

Q Sure. The recipients of that information under that confidential agreement, are they free to file it in the U.S. court proceedings?

A No.

Q Are they free to share it with the parties?

A No.

Q Now, some of these documents that weren't in the Chapter 15 filing, when, if ever, did they become publicly accessible?

A Only if they've been referred to in open court or if we've referred to them in -- produced them in connection with correspondence with other parties.

Q And do you have a recollection of some of the occasions upon which they might have been referred to in open court and became more publicly available?
A Well, that would have been on December 15th and 16th at the injunction hearing when we were raising the points and merits about the serious issue to be tried, because that's the threshold issue for the injunction.
So a number of documents would have been referred to in open court at that point.
Q Among the materials that you obtained in your position as liquidator, were there some attorney-client privileged materials among those?
A Yes.
Q And to the extent that you've made those documents public, have you waived the privilege?
A Yes, I have.
Q And do you have the authority to do that?
A Yes, I do.
Q Now, you referred to some information sharing with the supporting organizations or other members of the liquidation committee. Do you remember that?
A Yes.
Q Did there -- are you aware of any special restrictions that were placed on the use of documents or information by the members of the liquidating committee or the supporting

organizations?

A None other than what is imposed on them as part of the confidentiality agreement. I do recall at the time that they were being appointed to the committee, which I believe I'm correct in saying that was July 7th when that committee was constitutionally formed.

There were objections from DFW to the supporting orgs, A, being able to sit on the committee, and to how they might share information.

Q Do you have any knowledge of any special agreement that was reached with respect to Mr. Dondero?

A No. We made it clear to the supporting organizations that the information that they obtained was pursuant to a confidentiality agreement.

MR. EDNEY: Let's go ahead and I'm going to ask Sydney to pull up the demonstrative exhibit, Slide 2, please.

BY MR. EDNEY:

Q Ms. MacInnis, I'm putting up on your screen, and hopefully the screen of others, a demonstrative exhibit as far -- I'm not offering it for admission. Do you see it?

A Yes, I do.

Q And do you see references there to -- do you see references there to the Charitable DAF Holdco, Ltd.?

A Yes.

Q And Charitable DAF Funds, LP?

A Yes.
Q Do you see that?
A Yes.
Q And CLO Holdco, Ltd.?
A Yes.
Q Could you provide your understanding of the relationship between Charitable DAF Holdco, Ltd. and Charitable DAF Fund, LP?
A Yes. So Charitable DAF Holdco owned a hundred percent interest in Charitable DAF Fund, LP. This structured chart looks to be what our understanding on the day of our appointment in terms of what we understood to be the structure we were being appointed over, that we had the interest in Charitable DAF Fund. And it held, through CLO Holdco, another of investment interests that all kind of aren't shown on this chart -- on this chart, but --
Q And what level of this chart are the assets in LP? Do you know?
A The assets are held by CLO Holdco.
Q Is that the second box from the bottom?
A Yes.
Q Do you have an understanding of what the box in green is?
A The Charitable DAF GP?
Q Charitable DAF GP, LLC?
A That's the general partner to the fund. So the general

partner has the control and management authority for the partnership. And the partnership just has participating interest from the limited partners, which would be the, is that salmon color entities?

Q Yeah, so the salmon, I guess that's salmon color. What I see referenced there right above Charitable DAF Holdco, the Highland Dallas Foundation Incorporated, the Highland Kansas City Foundation Incorporated, the Highland Santa Barbara Foundation Incorporated, and HCMLP Charitable Fund?

A Yes.

Q Do you see that?

A Yes. Those are what we are referring to as the supporting organizations that had the economic interest in Charitable DAF Holdco. And this structure, as I understand it, was the reference to DAF, a donor-advised fund. So this was a structure set up for tax efficiency purposes. And those supporting organizations are what they refer to as Section 501(c)(3) tax-exempt entities.

Q And the salmon-colored boxes above that, I'm seeing the Dallas Foundation, the Greater Kansas City Community Foundation, the Santa Barbara Foundation, the Community Foundation of New York. Could you just briefly tell -- do you see those on the chart?

A Yes, I do.

Q And what is your understanding of the relationship of

those entities with the Charitable DAF Holdco?

A They are the -- they hold the economic benefit of Charitable DAF Holdco from Charitable DAF Holdco's inception. It was these four charities. I think Community Foundation of Texas was added after the first three in that list, but all four of them were for the -- up until the restructuring, were the sole economic interests in the Charitable DAF Holdco.

Q Now you mentioned the restructuring. Was there a restructuring that occurred with this chart of entities?

A Yes. That's what is behind our statement of claim. We've alleged or impugned this restructuring for --

Q Maybe you should stop. Let me ask --

A Okay.

Q -- (indiscernible).

A Okay.

Q Okay. And do you have a sense of what time period during which that restructuring occurred?

A I believe it started around the planning for the late December, late 2023, and the bulk of the transactions and documents supporting it from December 2024 to March 25th or 27th, 2025.

Q Based on your investigation and your work as liquidator, do you believe this chart is an accurate understanding of how the DAF Entities were organized prior to the restructuring (indiscernible)?

A Yes.

Q And why do you believe so?

A Based on the review of documents since our appointment, we were able to confirm how DAF Holdco did hold its interest in Charitable DAF Fund and the general partner arrangements.

Q And do you have an understanding based on your role as liquidator of the amount of assets that was held under this structure prior to the restructuring?

A I'll broadly refer to it as it was roughly $270 million at various points. I think it was somewhat below that and somewhat above that.

MR. EDNEY: All right. Let me put this demonstrative aside for a moment and look at the Slide 4 of the demonstrative, please.

(Pause)

BY MR. EDNEY:

Q So, I'm showing you Slide 4 of our demonstrative chart. Did there come a point where the general partner of the Charitable DAF Fund, LP was changed?

A Yes. Yes, it was.

Q Okay. And what's your -- do you have an understanding of the relationship between the general partner and the limited partnership?

A Yes. The general partner is the one that controls the decisions and the management of the fund.

Q And then I guess the general partner is distinguished from the limited partners. Is that right?

A Yeah. The general partner has the -- would hold the 100 percent of the management share, so it can affect control and voting of the structure. The limited partners, they have the participating shares or interest, so they get the economic benefit, but the general partner is the one that makes all the decisions about how funds are invested and used.

Q Now, the change in the identity of the general partner, from what entity to what entity did it change?

A I think it changed from what was called Charitable DAF General Partner to CDH GP.

Q And where was that new general partner (indiscernible)?

A Here on your chart, it says Cayman Islands.

Q But do you have an independent awareness of that?

A I've seen it on the documents that we obtained.

Q And based on your investigation, who is in charge of this new entity, CDH GP, Ltd.?

A Mark Patrick and Paul Murphy.

Q And tell me a little bit more about that, if you have any knowledge.

A I only understand them to have been in control of and appointed over CDH GP.

Q Okay, all right. I'm going to show you -- let's just see if I can just check my chart here for a second to see if this

exhibit.

Earlier, we talked about some of your efforts to obtain documents from service providers and DAF companies. Is that right?

A Yes.

Q Were you able to obtain documents relating to a law firm called the Shields Law Firm?

A Yes. I believe we've obtained some, but not all.

MR. EDNEY: Okay. Let's pull up Exhibit 169.

BY MR. EDNEY:

Q I'm handing you what's been --

MR. MORRIS: (Indiscernible).

THE COURT: I mean, he hasn't offered it into evidence, so when he --

MR. MORRIS: He's showing it to the witness.

THE COURT: I mean, how else is he going to lay a foundation without showing it to the witness?

MR. MORRIS: I won't make suggestions (indiscernible).

BY MR. EDNEY:

Q I'll show you what's been marked as Movant's Exhibit 169. Do you recognize this document?

A Yes.

Q And do you -- what is it?

A It's an email between Shields and Mark Patrick in relation

to a query from Walkers about how they want the new Cayman GP to be structured, whether a Cayman LLC or an exempted company.

Q Did you obtain this document in the course of your duties as liquidator?

A I've seen it before so, yes, I believe I have.

Q And do you know whether it was included as an exhibit to one of the affidavits that you filed in the Cayman proceeding?

A There were a number of exhibits attached to that, so I can't recall specifically where it was in the statement of claim.

Q How did you obtain this document, Ms. MacInnis?

A Well, we obtained, as I said, some discovery in books and records from Shields, from Walkers themselves, so it could have been from Mr. Patrick as well filed evidence in the Cayman proceedings. So without seeing my own document log and reference, I can't confirm specifically which exhibit or in which production it came through.

Q Okay. Do you recognize the name Brandon Schaller --

A Yes.

Q -- on the top of the email? Who's that?

A An attorney who works for Shields.

Q Okay. And if you scroll down to the second email, this is an email from an address with the name Mark Patz and Patrick Patz (indiscernible). com. Do you see that?

A Yes, I do.

Q Do you recognize that email address?
A That's Mark Patrick's, yes.
Q Is that an address he's used elsewhere in documents --
A Yes.
Q -- in your (indiscernible)?
Okay. Now, Ms. MacInnis, the bottom email reads, a question from Walkers, "Do you want the new Cayman JP to be a Cayman LLC or an exempted company?" Do you see that?
A Yes, I do.
Q Do you have an understanding of about what that question refers?
A Well, as I understand it in the initial work plan that I had sight of, that there was discussion between Mark Patrick and his advisors about how best to affect the new restructuring and what types of entity structures to be used. A limited liability company is different from an exempted company.
Q And do you see Mark Patrick responding?
A To this email? Yes. "It doesn't matter to me, whatever. From a strategic point of view, hard to find or track or trace or find owners, generic names, strong litigation protection."
Q And when did you understand --
THE COURT: We have an objection. Hold on one -- go ahead.
MR. MORRIS: Your Honor, this is full of hearsay. Just to make it clear that if it's not being offered for the

truth of the matter asserted, there's no objection (indiscernible).

THE COURT: Mr. Edney, your response?

MR. EDNEY: It's the admission of a party opponent, Your Honor. It's not hearsay.

MR. EDNEY: If he were in the Cayman Islands or in the Texas Business Court, he might have a point. But -- and Mark Patrick certainly is not a party opponent here at all. The HMIT entities are not parties here at all. (Indiscernible).

MR. EDNEY: Your Honor, if I may. The hearsay rule --

THE COURT: You may respond, yes. Go ahead.

MR. EDNEY: Yes, Your Honor. The hearsay rule refers to the admission of a party opponent. It's not so much talking about a party, but somebody with an adverse interest to the party sponsoring the evidence.

Beyond that, Mr. Patrick certainly is a co-sponsor of this settlement agreement. It's been widely in the 9019 proceedings. We argued vociferously for the adoption of the settlement agreement. He has a significant interest in the settlement agreement going forward. So I do think he's properly regarded as a party opponent for purposes of this proceeding, for purposes of the exceptions to the hearsay rule, Your Honor.

THE COURT: Okay. Well, let me make sure I address a couple of things. One is, you are seeking to have this admitted as evidence for the truth of the matter asserted as opposed to not?

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. And so your argument is that this is a statement against a party -- or a statement by a party opponent?

MR. EDNEY: Yes, Your Honor.

THE COURT: I'm going to sustain the objection. Neither Mr. Patrick nor HMIT are, one, Debtors in this case, and they were not the movants of the motion underlying the settlement. That was a Debtor's motion, and so I'm going to sustain the objection on hearsay grounds.

MR. EDNEY: Your Honor, I mean, I would just say in this proceeding, they are objecting to our motion. They have intervened and they have adopted Highland's objection to the motion to vacate. They filed a brief in this. They've said I'm wrong about all sorts of things. I do think for purposes of this proceeding, they are a party opponent.

THE COURT: Well, actually, let me state it this way. If I'm understanding this email correctly, and maybe we need to have Ms. MacInnis testify to this, but this is an email regarding what I believe to be CDH or one of these other restructured entities of the DAF, correct?

MR. EDNEY: Yes.

THE COURT: Okay. And it's regarding that formation and the formation of those entities, correct?

MR. EDNEY: Yes, Your Honor.

THE COURT: And none of those entities have filed an objection in this Court regarding that, correct?

MR. EDNEY: Well, Your Honor, in a sense they have because now as you'll see later in this presentation of evidence, (indiscernible) HMIT have been tucked under this new structure of the DAF, right? So today, they are -- those entities are controlled by merit of this general partnership about which we are now talking.

Today's status, CDH GP is under the stack of entities that controls and makes decisions for the Hunter Mountain Investment Trust, Beacon Mountain LLC, and the other HMIT entities that have objected to the relief that we're seeking here. We do believe that makes them a party opponent in this proceeding.

THE COURT: Okay. One moment, Mr. Morris.

Mr. Edney, if I'm not mistaken, and I didn't get a chance to read the entire reply brief that was filed this morning, but one of your opening points in this reply brief is that legal entities are separate and apart and that affiliates are not the same legal entity of other related companies.

So aren't you now arguing that I have to allow this

as evidence because these DAF Entities and the restructured DAF Entities are affiliates of HMIT?

MR. EDNEY: No, I am not arguing that. And, yes, we did make an argument regarding the intubation of knowledge between corporate affiliates, generally speaking. But in this particular circumstance, the stack of companies today that leads down to the Hunter Mountain Investment Trust doesn't have a capability of making decisions of their own other than through the general partner that controls it.

So in this particular circumstance, CDH GP, Ltd. is the means by which an objection has been lodged to our relief in this proceeding and we believe is a party opponent to what we are seeking here through this motion.

THE COURT: Okay. Mr. Morris, did you have something to add?

MR. MORRIS: I mean, I don't have (indiscernible) I rose the first time to the point exactly that Your Honor made. Just because it's the general partner, give me a citation that doesn't make sense for this particular -- there are separate corporate entities. I have never -- that's a good point. Why don't I just ask Mr. Patrick the question and we can avoid this (indiscernible).

THE COURT: That's fine. I am going to maintain my ruling. I sustain the objection at this time regarding this evidence by this witness as hearsay.

MR. EDNEY: May I offer an alternative ground, Your Honor?

THE COURT: To sustaining the objection?

MR. EDNEY: No. Yes, alternative to sustaining the objection.

THE COURT: Mr. Edney, you all want to have this trial done. We're already at the lunch hour. You want to have this trial done in one day. We can sit here and go back and forth on what the Court has ruled.

I've ruled that Ms. MacInnis' testimony regarding this matter is hearsay. If you want to get it in another way by calling a different witness that can testify to it because he or she wrote this email, you're welcome to do so. But that's the ruling of the Court. I mean, if we're going to get through this, we got to move.

MR. EDNEY: Yes, Your Honor. Thank you, Your Honor.

BY MR. EDNEY:

Q Ms. MacInnis, are you familiar with an organization called ValueScope?

A Yes, I am.

Q And what is your understanding of that organization?

A They were a third-party valuation services firm used by the Charitable DAF structure to provide valuation services.

I've seen several different valuation reports from ValueScope.

Q You say several. Over what period of time did you see these valuation reports?
A Probably dating back to June, July 2024, I think was the most recent one we had available to us upon appointment. And then I've seen the valuation report evidenced in the Cayman proceedings used in the restructuring.
Q And these valuation reports that you've seen, did you see them in your capacity as liquidator?
A Yes.
Q And how were you able to come into possession of them?
A We obtained them through our collection of books and records, and they were -- well, that's how they came into my possession.
Q Did you ask for the regularly kept books and records of the entities of which you were appointed liquidator?
A Yes.
Q And did you develop an understanding of how the entities of which you were appointed liquidator kept their business records?
A For the most part, yes. We're still in the process. I'm cautious to say we have all of the books and records when we don't, so.
Q And what is the understanding of how the entities of which you were appointed liquidator kept their books and records (indiscernible)?

A Well, they were kept with the -- some with the registered office, some with their legal advisors, some with the third-party advisors who perform services for the company.

Q All right. I'm going to pull up what we've marked as Movant's Exhibit 11.

(Counsel confer briefly)

BY MR. EDNEY:

Q I'm handing you what's been marked as Exhibit 11. It's entitled "Valuation Analysis of 100 Participation Shares of Charitable DAF Holdco, Ltd. Dated September 30th (indiscernible)." Do you see that?

A Yes, I do.

Q Do you recognize this document?

A Yes, I do.

A What do you recognize it to be?

A One of the, I believe, a quarterly valuation report for Charitable DAF Holdco.

Q And did you obtain this document in the course of your liquidation investigation?

A Yes, I did.

Q And was it a part of the books and records of the Charitable DAF Entities that you (indiscernible)?

A Yes.

Q Do you have an understanding of whether this document was kept in the ordinary course of business in Charitable DAF

Entities?

A Yes.

Q And what is that understanding?

A That there were regular valuation reports provided so that the underlying Charitable Holdco and the LPs had an understanding of the value of their interest in the structure.

Q And based on your role as liquidator stepping into the shoes of the Charitable DAF Entities, do you have an opinion as to whether this document was maintained in the ordinary course of those entities' business?

A That's my view.

Q And what is that view?

A That it's maintained, yes, in the ordinary course.

MR. EDNEY: Your Honor, I'm going to move the admission of Exhibit 11 from the Movant.

THE COURT: If I'm not mistaken, according to my notes, this has already been admitted into evidence. It was one of the ones that I show was agreed by the Debtor's counsel.

MR. EDNEY: Okay.

MR. MORRIS: Correct, Your Honor.

MR. EDNEY: Next up, Your Honor. Thank you.

Let's turn to Page 5 of the document.

THE COURT: Mr. Edney, is that Page 5 of the document based on the numbers at the top or Page 5 of the document, the numbers on the bottom?

MR. EDNEY: Numbers on the top, Your Honor.

THE COURT: Okay.

BY MR. EDNEY:

Q Now, Ms. MacInnis, do you see the reference there accompanying that asset value?

A Yes, that $269 million, thereabouts.

Q What do you understand that number to represent?

A To be the value of the underlying assets in the structure.

Q And do you see the box shaded in blue --

A Yes.

Q -- entitled "Fair Market Value of Subject Interest?"

A Yes, I understand that to be the value of 100 shares in the structure for $75.9 million.

MR. EDNEY: All right. Let's move to Exhibit 243.

MS. ROSE: Your Honor, if I could approach?

THE COURT: You may.

(Pause)

BY MR. EDNEY:

Q So I've handed you what we've marked as Exhibit 243 of Movant. Do you recognize this?

A Yes, I do.

Q What is this?

A It's a certificate of formation for CDMCFAD, which was incorporated in Delaware.

Q And did you obtain this in the course of your

investigation?

A I did.

Q And from what source did you obtain it?

A I believe from the registered office books and records.

Q And is there a date on it?

A I didn't catch it when it was up. It was -- it's moving, so.

MR. MORRIS: I apologize. I'm a little confused. I was handed one document, but it's a different one from the screen. (Indiscernible).

MR. EDNEY: The witness is looking at the document you were handed.

Sydney, could you pull down the document on the screen?

MS. ROSE: She doesn't have it on the screen. (Indiscernible).

MR. EDNEY: I'm sorry. You have a document on the screen. Can you pull it down?

(Pause)

BY MR. EDNEY:

Q Was this document maintained in the ordinary course of business of the Charitable DAF Entities?

A I'm not sure which document we're looking -- I don't have anything on my screen.

Q You don't have this physical document?

A No.

MS. ROSE: May I approach the witness, Your Honor.

THE COURT: You may.

MR. EDNEY: All right, we're going to move on from this document. Let's move on to Movant's Exhibit 51.

BY MR. EDNEY:

Q I've handed you what's been marked as Movant's Exhibit 51. This is the written consent of the managing member of Charitable DAF, LLC. Do you see that?

A I do.

Q Do you recognize this document?

A I do.

Q (Indiscernible)?

A It is the consent of Charitable DAF GP -- I'm just reading it -- to transfer the partnership interest from Charitable DAF to CDH GP.

Q So did there come a time where the previous general partner transferred that interest to another entity?

A Yes. The general transferred from Charitable DAF General Partner to CDH GP.

Q And does this document provide you with any information about when that occurred?

A Yeah, March 7th, 2024.

Q All right. Do you have an understanding of who the directors of CDH GP are?

A CDH GP?
Q Yeah.
A I believe it's Mark Patrick. I don't know whether it's also Paul Murphy.
Q And was this document revealed in the litigation proceeding?
A Yes, it was.
Q Do you have an understanding of an entity called CDMCFAD, LLC?
A Yeah, that was the Delaware entity formed as part of the restructuring transaction, which is the subject of our statement of claim. There was an entity inserted in the structure which essentially Charitable DAF Holdco transferred all of its interest in Charitable DAF, LP to CDMCFAD.
Q All right, let's pull up Movant's Exhibit 9.

THE COURT: Mr. Edney, just real quick. We're at 12:30. I'm sure you have more to go with this witness, but is now a good enough time to just take a break for lunch? Okay. Why don't we do that? I'm going to say with the size of this group and finding a place that's going to be able to serve you with sufficient time to eat, we're going to take an hour recess for lunch. We'll be back at 1:30.

THE CLERK: All rise.

(Recess at 12:30 p.m., recommencing at 1:37 p.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

One moment, Mr. Morris.

(Pause)

THE COURT: All right. For the record, we're back on the record in Case Number 19-34054, Highland Capital Management.

Mr. Morris, did you have something you needed to bring to the attention of the Court?

MR. MORRIS: Just really briefly, and I apologize (indiscernible). We've conferred (indiscernible) and in the chance (indiscernible) stay and continue in the morning. Again, I apologize for not confirming. We should have done that. (Indiscernible) joint position, but I do know that Your Honor said you were available tomorrow. And I just want to (indiscernible) we're available tomorrow. And my hope is that if we can't finish today, we can just finish tomorrow.

THE COURT: Okay. Well, we can take that up as the time comes.

So, Mr. Edney, you were examining your witness. So we'll go ahead and allow you to continue.

MR. EDNEY: Thank you, Your Honor.

THE COURT: So, Ms. MacInnis, just as a reminder, you are still under oath.

THE WITNESS: Okay.

BY MR. EDNEY:

Q Good afternoon, Ms. MacInnis. Thank you for coming back. When we left off, we were talking about Exhibit 10 which I'll put on the screen. And this has been previously admitted by agreement. Ms. MacInnis, let's go to the first meaningful page of that exhibit. I'm showing you what's been previously admitted as Exhibit 10 in this case. It's the unanimous resolutions, all the records of the company as of on December 18th, 2024, on behalf of Charitable DAF Holdco, Ltd. Do you recognize this document?

A Yes, I do.

Q Is this a document that you gathered in your investigation as liquidator?

A Yes, I did.

Q Do you understand what -- do you have an understanding of what this document accomplished as a matter of corporate action?

A I believe it was the transfer of the interest, or the establishment of Holdco's interest in CDMCFAD.

Q And tell me a little bit about that transaction. What's your understanding of it?

A My understanding is that this entity was inserted into this structure in between Holdco and its interest in the underlying LP, Charitable DAF, LP.

Q And by this entity, what entity are you referring to?

A CDMCFAD.

Q All right. So after the transfer of the interest in Charitable DAF Holdco to CDMCFAD, what was the relationship between the companies?
A As between Holdco and CDMCFAD?
Q Yes.
A Holdco owned 100 percent interest in CDMCFAD, and no longer held the interest in Charitable DAF, LP.
Q Okay. And my company owned that interest going forward?
A I don't recall. I think it -- I don't recall.
Q Okay. Now, this resolution was signed on December 18th, 2024. Is that correct?
A Yes, that's -- December 18th, yes.
Q Did your investigation show any information about compensation of one of the directors of Charitable DAF Holdco during the period of December 2024?
A I understand that I believe on December 16th, there was a resolution passed to approve an additional $250,000 bonus to Mr. Murphy.
Q Do you know what DFW Charitable Foundation is?
A As I understand it, it's an entity formed I believe in Delaware, and for which Mark Patrick is the director, controller, manager.
Q And do you know who formed it?
A I believe Mr. Patrick formed it.
Q All right. I'm going to show you a previous statement,

Exhibit 8. Ms. MacInnis, I'm showing you what's been previously admitted as Exhibit 8. This is a certificate of incorporation of DFW Charitable Foundation, a nonprofit stock corporation. Do you see that on the first page?

A I do.

Q Is this a document that you gathered in the course of your investigation?

A Yes.

Q Do you know what it is?

A Yes. It's -- it incorporates DFW and confirms that, I was correct, it was formed in the State of Delaware.

Q Do you have an understanding of where DFW Charitable Foundation is headquartered?

A I understand it's at Mark Patrick's residence.

Q And do you have an understanding as to Mr. Patrick's role in DFW Charitable Foundation?

A Nothing more than I understand him to be named as the director and holder of the shares of DFW.

Q Let's move on to Movant's Exhibit 43 which is not in evidence. Ms. MacInnis, just in the manner of some preliminary questions, in the course of your investigation, did you gather the business records of Charitable DAF Holdco and use them?

A Yes.

Q And did that include resolutions of the board of directors of Charitable DAF Holdco?

A Yes.
Q And from what sources were you able to gather these records?
A Corporate records generally come from the registered office, although the law firms enacted for the -- for Holdco did have some of those information. So I can't say precisely which entity provided --
Q Charitable DAF Holdco, Ltd. is a Cayman Islands company.
A Yes.
Q Is that right? Does a Cayman Islands company have a duty to maintain its board of directors resolutions and (indiscernible)?
A Yes, it does.
Q Do you have an understanding of what Exhibit 43 is?
A No, not unless I see it.
MR. EDNEY: If we can pull up the first page, please. Oh, here we are.
(Pause)
BY MR. EDNEY:
Q Let us know if you want us to scroll further.
A If you could scroll down.
Q Perhaps I can direct your attention to Section 5?
A Okay. Yes, I understand.
Q What do you recognize this resolution to be?
A This is the resolution that, at least for one purpose,

admitted, or the issuance of shares to DFW which gave DFW a 51 percent interest in the Holdco structure.

Q And with respect to the issuance of shares that DFW Charitable Foundation that you just referenced, what role, if any, did that play in Mr. Patrick's restructuring of the DAF Entities?

A The effect of that was to dilute the other shareholders. And most corporate resolutions require a two-third majority. But the 51 percent of share issuance that diluted the other limited partners.

MR. EDNEY: Your Honor, I move for the admission of Movant's Exhibit 43 as a document held in the regular course of business OF Charitable DAF Holdco and sponsored by (indiscernible).

THE COURT: There's no need to stand up, Mr. Morris. This document has already been admitted as part of the original stipulations or agreements of the party. That's what I show in my records. Do you have anything that disagrees with that?

MR. MORRIS: No, Your Honor.

THE COURT: Okay. So this document has already been admitted, Mr. Edney. You may proceed.

MR. EDNEY: Okay. I had it off my list. Thank you, Your Honor.

BY MR. EDNEY:

Q All right. I'm going to direct your attention to the

first page of the document, the Section 2, and Section 2.5. Did there come a time where the directors of Charitable DAF Holdco set the issuance of shares to another charitable entity or as necessary for certain reasons?

A Yes. I understand that, their reasons for doing that, yes.

Q And what was your understanding of their reasons?

A My understanding is that they perceived a sort of tax threat, challenge to the structure on the basis of Mr. Dondero having sort of undue influence in the structure, and that it threatened the 501(c)(3) status.

Q And did you, in the course of your investigation, come to a conclusion about the genuineness of that classification?

A We took our own tax advice on that matter and did -- don't agree with the perception of a threat and the rationale for that explanation.

Q Why not?

A Essentially, and I'm not a tax expert, but the advice we received indicated that --

MR. PHILLIPS: Objection. This is hearsay. She's testifying that she doesn't have any idea, but she's relying on advice of some third party that's not here and is not on the witness list.

THE COURT: Mr. Edney, do you have a response?

MR. EDNEY: Yes. My question is trying to draw the

conclusion that she reached, and the basis for that conclusion. I'm not calling for hearsay (indiscernible).

THE COURT: So, Ms. MacInnis, to the extent that you can answer the question based on your understanding without stating what you were told, I'll go ahead and allow the question.

THE WITNESS: I reached the conclusion that there was no perceived tax threat.

BY MR. EDNEY:

Q Ms. MacInnis, I want to direct your attention to Section 2.1 of the document previously admitted. It reads as follows, "It is noted that the directors have received communications from certain participating shareholders requested information (indiscernible) claims regarding the companies and shareholders' subsidiaries' finances." Do you see that, Section 2.1?

A On the resolution?

Q Yes.

A Yes.

Q Do you have a view of whether the complaints of the charities had a role in the decision of Charitable DAF Holdco to issue shares to this new DFW Charitable Foundation entity?

A I don't know. That was before my appointment.

Q Let's move on to Exhibit 179.

Ms. MacInnis, in the course of your investigation, were

you able to collect certain emails between --

THE COURT: I'm sorry. Did you finish the question, Mr. Edney or?

MR. EDNEY: No.

THE COURT: Okay. Did you want to finish the question --

MR. EDNEY: I will.

THE COURT: -- before he lodges his objection?

MR. EDNEY: I would, Your Honor.

BY MR. EDNEY:

Q In the course of your work as liquidator, were you able to gather electronic communications between Charitable DAF Holdco managers and/or advisors?

A Yes.

Q And how were you able to do that?

A I made requests of the providers for their books and records and information belonging to the company.

Q And for what reason did you do that?

A To carry out my review and investigation of the restructuring.

Q And did that investigation include inquiries into the justification for some of the restructuring rules?

A Yes, it did.

Q And were emails between Charitable DAF Holdco managers and/or advisors maintained in the ordinary course of Charitable

DAF Holdco's business?

A Yes.

Q And did they provide you with any insight into the state of mind of the Charitable DAF Holdco managers?

MR. MORRIS: Objection to the form of the question. Its state of mind, he's explicitly asking for the state of mind (indiscernible).

MR. EDNEY: I'm not asking for that. I'm asking whether they provided any insight or not (indiscernible).

MR. MORRIS: You just used the phrase "state of mind."

THE COURT: Can you rephrase? I mean, I'm going to sustain the objection. You're asking her whether she gained an insight into the state of mind of those parties. If you want to ask it a different way, you're welcome to do so.

BY MR. EDNEY:

Q Without telling me what your conclusion was, Ms. MacInnis, did you use these emails to gain access into the perspective or state of mind of the managers of the Charitable DAF Holdco?

A I used the information to form the basis for the statement of claim that we filed against the six defendants, and to support the serious issues and breaches of duty that we alleged in the statement of claim.

Q And do you recognize what I've referred to as Movant's Exhibit 179?

A Sorry. Pardon me?

Q Do you recognize what I've referred to as Movant's Exhibit 179, the document that's on the screen before you?

A Yes, I do.

Q And what do you understand it to be, without going into (indiscernible).

A I understand it was speaking to the purpose of the restructuring, which was to effect a dilution of the current limited partners, the supporting org's interest, and to kind of protect against future litigation that the architects of that restructuring anticipated may come from these various transactions.

Q Now, the email, the from line is a person named Mr. Paul Murphy, right?

A Yes.

Q And you recognize who that is?

A Yes. He was a director of Charitable DAF Holdco.

Q And the to line is Mr. Patrick. Do you recognize him?

A Yes.

Q And who is he?

A He's -- he wears a number of hats. But he's a director of Holdco and really the control person that's set out and defined in my statement of claim.

Q Copied is Brandon Schaller. Do you know who that is?

A He's an attorney at Shields.

Q And the gentleman who is cclark.com address, do you know who that is?
A Doug Mancino.
Q And who is that?
A He was, again, an advisor to Mark Patrick and Paul Murphy.
Q And Shawn Raver?
A He works in a role as an accountant in the structure.
Q And to the best of your understanding, was this an email that was maintained in the ordinary course of business of the Charitable DAF Holdco company?
A Yes.

MR. EDNEY: Your Honor, on the basis of that, I move for the admission of Exhibit 179 on grounds that it's a business record kept in the ordinary course and shed light on the state of mind of the participants of this email.

MR. MORRIS: I have to object to that. I was ready to say no objection, but --

THE COURT: And your objection is?

MR. MORRIS: It's not state of mind. It is what it is. It's an email. It says what it says. No objection. That's --

THE COURT: Okay. I'm going to admit the exhibit. Exhibit 179 is admitted into evidence.

(Movant's Exhibit Number 179 admitted into evidence)

MR. EDNEY: Thank you, Your Honor.

If we could scroll to the second page.

BY MR. EDNEY:

Q The second email there dated November 26, 2024 at 4:11 p.m., if you can just take a moment to read that, and I'll read it into the record, as well.

"If new participating shares are issued to a nonprofit and say (indiscernible) tried to implement an equitable winding down of the company, do the new shareholders object. Will that help? Also, what could possibly be the basis for any equitable liquidation of the articles if the articles don't give such rights?" Do you see that?

A Yes, I do.

Q Are you familiar with this passage?

A Yes.

Q What is your understanding of some of the efforts to issue new shares to DFW Charitable and restructure this company?

A The dilution of the supporting org's interest in the structure would make it very difficult for them to bring a winding-up petition and have the ability to cause the company to be either wound up, or to prevent a winding-up. They wouldn't have enough economic interest to sway that sort of application.

Q All right. Let's move on to Movant's Exhibit 45. I do believe this document has --

THE COURT: I show this on my list of agreed-to

admitted exhibits.

MR. EDNEY: All right. Well that should speed things up a bit. Thank you, Your Honor. This is not great here.

BY MR. EDNEY:

Q So I'm handing you what's been previously admitted as Movant's Exhibit 45. Do you see it?

A Yes.

Q And it's a Charitable DAF Holdco, Ltd. General Resolutions To The Board of Directors dated April 2nd, 2025. Do you see that?

A Yes.

Q Are you familiar with this document?

A Yes.

Q And what do you understand it to be?

A I understand it to be the final step in the restructuring series of transactions that resulted in the limited partners' four original charities being given $1.6 million in relation to their interest in the structure.

Q And this is -- this document is dated April 2nd, 2025? Do you see that?

A Yes.

Q Based on your role as liquidator of DAF, DAF Holdco and your access to communications on behalf of that company, have you seen any evidence of Mr. Patrick inform the charities of the redemption of their shares under the (indiscernible)?

A No.
Q Ms. MacInnis, did DAF Holdco have a valuation to support the action that we see here in Movant's Exhibit 45?
A Yes. I understand there was a valuation provided to support the 1.6.
Q And do you know what firm provided that valuation?
A ValueScope.
Q Did the company seek the valuation opinions of any other companies prior to going with ValueScope?
A Yes. They sought valuations from FTI and PWC.
Q And did -- and were PWC and FTI willing to provide those valuations?
A FTI provided an assessment of the discount rates. But it was a sort of heavily-qualified, I wouldn't even call it an opinion but a heavily-qualified analysis on the basis on which they provided that. And as far as I'm aware, PWC refused to provide a valuation.
Q Now, in your role of liquidator, were you able to gain access to communications between the Charitable DAF Holdco company and PWC and FTI?
A Yes.
Q And would they form the basis of your understanding of what those two firms were willing to do in terms of a valuation?
A Yes, they did.

Q And then how were you able to obtain these communications?
A Through requests to the service providers in Cayman who had copies of them.
Q And if you had not been the liquidator, would have access to the company's potentially confidential information, would you have been able to obtain access to this document?
A No.
Q I want to draw your attention to Movant's Exhibit 191, please. I'm handing you a document that is marked as Movant's Exhibit 191. I don't believe it has been admitted. I'm going to ask you some foundational question about it.
Ms. MacInnis, do you recognize this document? If you want to take a moment to take a look.
A I recognize it.
Q And it's an email dated February 11th, 2025, from Jamie Waller (phonetic), PWC.com. Do you know who Jamie Waller is?
A I don't know him personally, but I understand he works at PWC.
Q And it's addressed to Mr. Geoffrey Sykes. Do you know who that is?
A He's -- I believe he's a partner at Walkers.
Q And what is Walkers?
A Walkers is a law firm that was retained to provide legal services to Holdco.
Q And is Walkers a law firm in the Cayman Islands?

A It's a off-shore law firm, but it's based and headquartered in the Cayman Islands.
Q And was Walkers kind of Charitable DAF Holdco's attorneys?
A Yes.
Q And did Walkers maintain records in the ordinary course of their business with respect to the work for Charitable DAF Holdco?
A Yes, they did.
Q And did you request the business records of Charitable DAF Holdco that Walkers could obtain?
A Yes.
Q And was Exhibit 191 among the communications that had been provided during the response to that request?
A Yes.

MR. EDNEY: Your Honor, I move to admit Movant's Exhibit 191 on the grounds that it is a business record kept in the ordinary course of Charitable DAF Holdco business and properly obtained by Ms. MacInnis in her capacity as liquidating the company.

MR. MORRIS: No objection.

THE COURT: And, all right. Exhibit 191 will be admitted.

(Movant's Exhibit Number 191 admitted into evidence)

BY MR. EDNEY:
Q So you have some familiarity with this document, I take

it?
A Yes.
Q And what do you understand it to be?
A I understand it to be PWC were clarifying the scope of the valuation work that they were being asked, and in particular had concerns about estimating the value based on the fact pattern they were being provided.
Q And what particular concerns about the fact pattern did PWC have based on this document?
A It was trying to reconcile that the SOs either were previously 100 percent participating shareholders in the structure to having -- or being in a sense zero economic interest because of the control features of the DAF. So as I understand it, they were being asked to weigh out, what would this interest be worth if you had control function in the structure, or if you did not.
Q I see. And was the PWC asked to -- this is PricewaterhouseCoopers number 38, were they asked to give a low valuation of the four charities' interest in Charitable DAF Holdco?
A Were they asked -- can you --
Q Were they asked to give a low valuation of those four shared interests in Charitable DAF's record?
A I don't believe that that's what they were being asked, to give a low. I think what they were saying was they couldn't

provide a valuation based on the fact pattern being proposed.
Q And did the PWC ultimately decline to provide a valuation?
A Yes, they did.
Q Let's turn our attention to Movant's Exhibit 197 which has not been admitted into evidence. So I'm going to ask you a handful of questions about it, Ms. MacInnis. Do you see Movant's Exhibit 197 there?
A Yes, I do.
Q And it is a March 27th chain of emails between Alexis Anaman at FTI Consulting and Geoffrey Sykes and three other people. Is that right?
A Yes.
Q And Geoffrey Sykes again worked for whom?
A Walkers.
Q And Walkers --
A Legal advisors.
Q -- acted in what capacity in this --
A They're the legal advisors of Charitable DAF Holdco.
Q And did you obtain Movant's Exhibit 197 in the course of asking for the Charitable DAF Holdco's business records in the hands of Walkers?
A Yes, I did.
Q And was it your understanding that this was one of the records that was held in the ordinary course of business at Walkers and in Charitable DAF Holdco?

A Yes.

MR. EDNEY: Your Honor, I move for the admission of Movant's Exhibit 197.

MR. MORRIS: No objection.

THE COURT: Okay. Exhibit 197 will be admitted.

(Movant's Exhibit Number 197 admitted into evidence)

BY MR. EDNEY:

Q Ms. MacInnis, what do you understand Movant's Exhibit 197 to be?

A FTI were clarifying, again, their understanding of what they were being -- the scope and the assumptions to be made in providing a valuation. And they were struggling to understand the distinction of the valuation on the basis of whether the original charities remained, or DFW was added, why any of that would affect the underlying value of what the economic stakeholders were entitled to receive.

Q And what, if any, concerns did FTI Consulting seem to have about the restructuring?

A They were being very clear, certainly, I think in this email that they -- their opinion could be used to support a fairness opinion of the transaction, that it was not something that it could be used for.

Q I see. So what, if any, limitations on use did -- of your opinion did FTI place on what they were saying about the valuation?

A They were very clear it couldn't be used to support or justify the fairness of the transaction being proposed.
Q And based upon your review of the business records of Charitable DAF Holdco, did that limitation on use ever change?
A Not that I'm aware of.
Q After speaking with PricewaterhouseCoopers and after speaking with FTI Consulting, did Charitable DAF Holdco move on to another valuation company?
A I understand they used ValueScope.
Q Let's go to previously admitted Movant's Exhibit 12. I'm handing you what's been marked as a valuation analysis of certain participation shares of the Charitable DAF Holdco, Ltd., as of March 25th, 2025. Do you see that?
A Yes, I do.
Q Do you recognize this document?
A Yes, I do.
Q What is it?
A It's the valuation used to support -- to put structure in the transaction.
Q And based upon your investigation and review of this document, what conclusions did ValueScope reach about the value of the org charitable institutions that historically had been in charge of Charitable DAF Holdco as of March 25th, 2025?
A They reached the conclusion that they were entitled to $1.6 million in total from the assets of that structure.

Q And in your role as liquidator, were you in a position to review previous valuation efforts by ValueScope?
A Yes. We looked at the September -- even earlier today we looked at the September 2024 -- 2024 valuation.
Q And did you see even others beyond that?
A Yes, I have.
Q Had ValueScope ever valued the stake of the four charities that (indiscernible) 1.61 million before?
A No. They had generally been in the ballpark of 270 million. And the discount provisions sort of ranged between 10 and 30 percent, whereas this one is materially different from the others on the basis that the valuation method changed and the level of discount changed.

MR. EDNEY: Perhaps if we could scroll down to the summary chart of ValueScope's conclusions. Just one up, please.

BY MR. EDNEY:
Q So directing you to what's Page 46 of the electronic document that has a fair market value conclusion, and you see down at the bottom in bold subject interest. Can you read that number for me?
A It's 1.6 -- 17,000, 1.6 million, 17 thousand and --
Q Is that what it is? Maybe we can blow that up a little bit.
A Sorry. If you mean the one per share, it's the per share

valuation was $5,368. But the total interest for the original SOs was 1.6 million.

Q Can you give us the exact number, please?

A 1,637,192.

Q Now, in the course of your investigation, were you -- did you reach a conclusion about whether this March 25th ValueScope valuation was reconcilable with ValueScope's previous valuations of the (indiscernible) shares?

A I did.

Q And what was that conclusion?

A That it isn't.

Q And why not?

A As I said, it changed the valuation approach, the discount assumptions that are the subject matter now of our statement of claim, and a matter to be resolved by the Cayman court.

Q Now, as of March 25th, 2025, the date of this valuation, had the assets under the DAF management changed in any significant magnitude?

A No.

Q And as of that date, what was your understanding of how many assets were underneath the DAF?

A My understanding is the corpus of that structure and the assets was about $270 million.

Q Let's move to -- well, let me ask you this. This ValueScope valuation, did you obtain this in the course of your

work as a liquidator?
A Yes, I did.
Q And was this one of the confidential documents that you were only able to gain access to by stepping into the shoes of the Charitable DAF Holdco?
A Yes.
Q Let's move to Movant's Exhibit 48, which appears to have been previously admitted. So I'm handing you what's been previously admitted as Movant's Exhibit 48. It's the redemption amendment number two dated March 27, 2025. Do you see that?
A Yes.
Q And it's on behalf of CDMCFAD, LLC. Do you see that?
A Yes.
Q Are you familiar with this document?
A Yes.
Q What do you understand it to be?
A I understand it to be the step that redeemed Holdco from its interest in CDMCFAD.
Q And redemption and amendment agreement, it was -- what was the date of it again?
A March 27th, 2025.
Q And how long after the ValueScope evaluation was that?
A ValueScope, was it March 25th?
Q Yes.

A I want to direct your attention to the third paragraph of Page 1, starting with, "Whereas, in accordance with the terms of this LLC agreement." Do you see that?
A Yes.
Q It says a manager desires to redeem the entire limited liability company interest in the company currently held by Charitable DAF Holdco of the effective as of the effective date of $1,647,192. Do you see that?
A Yes.
Q Now, what was the economics of this redemption transaction? Who, if anyone, got paid what through this?
A This resulted in Charitable DAF Holdco being completely divorced from the assets in the estate, and it received $1.6 million and change in that exchange.
Q And Charitable DAF Holdco, who were the economic beneficiaries of that company?
A In Holdco, it was the four supporting orgs and DFW.
Q And when did DFW come to have a stake in Charitable DAF Holdco?
A Off the top of my head, I think that was the resolution looked at in February.
Q Now, after this redemption, where were all the assets held that used to be in the DAF structure?
A They were still in CDMCFAD, and then held, one of your earlier charts shows still all held through CL Holdco.

Q All right. Let's turn to Slide 9 of the demonstrative, please. I'm handing you part of our demonstrative exhibit, Slide 9. It has a series of charts on it, DFW Charitable Foundation at the top. CDMCFAD, LLC below that. Do you see that?

A Yes, I do.

Q After the redemption of the stake of Charitable DAF Holdco, Ltd. and CDMCFAD, what stake did the four original charities have in the $270 million in assets in the DAF structure?

A They're left with nothing.

Q And what organization had the economic interest in those assets after the redemption that we just referenced?

A DFW.

Q And were there any other organizations that had such interest?

A No.

Q Turning back to -- and let's just stay there for a second, on Slide 9. Do you regard Slide 9 as an accurate representation of the current structure of the DAF after the redemption event that we just talked about?

A Yes.

Q Let's turn back to Slide 7. So I'm showing you Slide 7 that refers to Charitable DAF Holdco, Ltd. down at the bottom. And then it has the familiar supporting and other historical

charitable foundations at the top. Do you see that?
A Yes.
Q After the redemption even that we just referenced, what stake did Charitable DAF Holdco, Ltd. have in the $270 million in assets of the DAF structure?
A It didn't have any.
Q And what did it receive for that?
A One-point-six million.
Q And for that 1.6 million in cash, which entities had a stake in that now?
A That would be the four supporting orgs, excluding DFW.
Q And even in that 1.6 million, DFW Charitable Foundation had a stake in 50 percent of that? Is that right?
A No. The 1.6 represents the stake for the SOs.
Q Okay. And then, so after this transaction, what was the Dallas Foundation and the Highland Dallas Foundation left with in terms of assets?
A They don't have any recourse or access to these funds in the Charitable DAF structure.
Q Do they have any portion of the 1.6 million?
A They received the -- that was divided as between them. So I don't have the exact allocations. I think it was on the ValueScope summary.
Q At the end of this process, Ms. MacInnis, what was the sum of effect of the restructuring on these four historical

charities?
A They lost their economic interest and right to distributions from the 270 million in the structure. And as I understand it, you know, they, each of them had multi-year grant obligations and charitable works that they were contributing to using the distributions from the structure. And they'd been left in serious straits, not being able to fund those projects.
Q And the Dallas Foundation, was that a charitable organization that was founded in just the last couple years?
A No. As I understand it, it's been around for a century.
Q And do you have similar views with respect to the other four?
A Yes.
Q All right. Ms. MacInnis, in your role as liquidator, you had access to the communications that were going out of the Charitable DAF Holdco structure?
A Yes.
Q And in your role of liquidator, did you see any evidence that these four charities were informed of the redemption and the shift of their interest from 270 million to 1.61 million when it happened?
A No, I did not.
Q Now, in the course of your investigation, did -- have you inquired into what Mr. Patrick had been paid by various DAF

Entities over the course of the last few years?

A Yes, I have.

Q And what did you do to determine the source and amount of this compensation over that period?

A We received information in connection with the disclosures of our injunction that was in place from the end of July to early January. And from the disclosure of various cash outlays from the structure, we were able to determine what amounts had been paid to Mr. Patrick and Mr. Murphy.

Q And did you develop a view, based on your investigation, of how much Mr. Patrick was paid by the entities in the calendar year of 2024?

A Yes.

Q And what was that view?

A I don't have the exact numbers in front of me, but it's set out in our statement of claim. But it was substantial increases in remuneration were paid out to Mr. Murphy and Mr. Patrick from the end of 2024 through 2/2025.

Q And was that amount in excess of $10 million?

A Yes.

Q Was it in excess of $13 million?

A Yes. I believe the total was 18, 18 million and change. But I don't recall the exact figure.

Q And was there a short period of time in September or October of 2024, where these payments were concentrated?

A Yes.

Q And do you recall how much was paid out during those periods?

A I don't recall exactly. I don't recall exactly.

Q Did you also investigate the compensation of Paul Murphy?

A Yes, we did.

Q And can you remind us who Paul Murphy was?

A He was the other co-director of Charitable DAF Holdco.

Q And did you reach a conclusion as to the level of his compensation in 2024, 2025?

A Yes. It increased substantially in terms of what he was paid for salary and also for bonus, and that they were paid in advance of the -- they were paid in a lump sum.

Q And are you able to appear today to give us a sense of the magnitude of that increase in compensation?

A I believe Paul Murphy's initial director services agreement afforded him a salary of 125,000. And then that was subsequently increased to 250, I believe. And then he was also awarded a bonus of 250 at the end of 2024, and I believe in 2025 paid a sum of 500,000, representing his new salary and bonus in advance of the company being put into liquidation.

Q And did your investigation reach any conclusions about who approved Mr. Murphy's increases in compensation?

A I understand. I believe I recall that it was Mr. Patrick approving Mr. Murphy's compensation.

Q And did your investigation reach any conclusions about who approved Mr. Patrick's increases in compensation?

A I believe they both did, Mr. Patrick and Mr. Murphy, approved his increase in compensation.

Q And did your investigation show whether there was any other approving party with respect to Mr. Murphy's and Mr. Patrick's compensation?

A Not that I'm aware of.

Q Now, your investigation is focused on the restructuring and the compensation during that time period. Isn't that right?

A Yes.

Q Did your investigation show any effort on behalf of Mr. Patrick, Mr. Murphy, or anybody else who formed the four historical charities that we've been discussing, the Dallas Foundation and others, about these increases in compensation?

A No.

Q Ms. MacInnis, have you alleged in your litigation against Mr. Patrick that this breach of his fiduciary duty with respect to the charities?

A Yes, I do. I allege it on six bases.

Q And can you explain those bases?

A There is the duty to act in the best interest. There's a duty to act for proper purpose. There's a duty to act with reasonable care, and there's duties around having no conflict,

no profit, and no self-dealing.

Q And did you reach a conclusion with respect to whether he in fact had breached those duties?

A Well, I brought the statement of claim. It's for the Court to reach the conclusion on whether I'm correct. But I did -- I do believe the basis and support for our claim. And the Court granted me sanction to bring those claims.

MR. EDNEY: All right, Ms. MacInnis.

Your Honor, may I just have one second to check with my co-counsel if I have any further questions?

THE COURT: Yes, that's fine.

(Pause)

MR. EDNEY: All right. Your Honor, I have no further questions on direct examination. Your Honor, thank you. (Indiscernible). I pass the witness, Your Honor.

THE COURT: Okay. All right. Thank you.

Mr. Morris?

MR. MORRIS: (Indiscernible).

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good afternoon. Can you hear me okay?

A Yes, I can.

Q In the February 10th decision by the Cayman Island court on the claims, is it right to say that the only claim that survived is the claim of fiduciary duty (indiscernible)

restructuring?
A No.
Q Are you sure about that?
A Well, the claim is under appeal. So all elements of our claim survive until the Court of Appeals rules differently.
Q Okay. But subject to your appeal, the Financial Services Division, trial court deferred all of your evidence and rejected all of your claims with the exception of the breach of fiduciary duty claim arising under the restructuring. Is that right?
A Our statement of claim is a breach of fiduciary duty claim. And the judge accepted and agreed there are serious issues to be tried. So, yes.
Q But solely with respect to the restructuring. Is that right?
A Yes.
Q Thank you. And so all of the evidence that you just presented concerning the compensation issues are no longer live and, thus, overturned on appeal. Is that correct?
A They are the subject of an appeal.
Q Thank you. So you would agree with me that the trial court heard the exact same evidence that you just presented to this Judge and said no claim on compensation, right?
A I don't -- no, I don't agree. That's not how it works in Cayman. The matter is now live before the Court of Appeal.

MR. MORRIS: So here's the trick, Your Honor. Who controls the screen? Are we supposed to do that or --

THE COURT: Well, no. They've been using Webex to share their documents. So they are the ones controlling and putting documents on the screen. So I guess the answer to your question, Mr. Morris, is yes, you all would do that.

MR. MORRIS: Yeah. That's what I was afraid you were going to say.

THE COURT: Now, you're more than welcome to hand me hard copies.

(Counsel confer)

MR. MORRIS: We're just going to --

THE COURT: And again, if it's not up on the TV, I believe Ms. MacInnis is still being able to see things.

THE WITNESS: I can see.

THE COURT: I can see things. Everybody on Webex with their laptop should be able to see things. But we can also do this by hard copy.

MR. MORRIS: Yeah, let me do that. May I approach the witness?

THE COURT: You may.

(Counsel confer)

THE COURT: Mr. Morris, before you get started, to the extent that those are your Highland's exhibits, I do not have a hard copy up here.

MR. MORRIS: Your Honor, I think it's on the Webex now or is it --

THE COURT: It is. I can see it on Webex.

MR. MORRIS: Oh, good. We don't have it up here anymore or (indiscernible).

THE COURT: We'll have to check during a recess.

MR. MORRIS: We'll have to ask (indiscernible). Okay. So if we can go to Paragraph 210 which is Page 41 of 46.

BY MR. MORRIS:

Q Ma'am, do you understand that this is the Court's decision that was rendered in February?

A Yes.

Q Okay. Can you read out loud Paragraph 220?

A "Having reviewed Mr. Murphy's affidavit, evidence, the levels of remuneration he received, which is not contradicted, do not seem to the Court to be excessive in the circumstances. They are within the margin of appreciation in respect to commercial decisions such as risk and reward relating to remuneration."

Q And have you appealed that?

A Yes, I have.

Q But for the moment, that's the final word that you got from the Cayman Islands. Is that fair?

A Well, apart from the fact that the Cayman Islands Court of Appeal issued -- said at the hearing that they accept and

believe there are serious issues to be tried in this case.

Q Did they say that with respect to anything other than -- the appeal hasn't happened yet, right?

A It's happening on the 2nd and 3rd. Yes, it has happened.

Q It was happening in September, right?

A Yes.

Q So the appellate court didn't review the lower court's decision for any of this. There --

A There was an interim hearing. And the Court of Appeal made observations at the start of that hearing of what they needed to hear from us on. And they were very clear that they did not need to hear from us on the threshold test of whether we had serious issues to be tried because they essentially said we got home on that for their purpose.

Q Can you go to Paragraph 253, please? Can you read that out loud?

A "The Court has been persuaded that the Company and the JOLs have a case which the directors need to answer in relation to the divestiture of the company's limited partner interest in the fund which does withstand a reverse summary judgment application."

Q And the next paragraph, it says that there is a serious issue to be tried as to whether the records accurately (indiscernible) the restructuring. Have I read that correctly?

A Yes.

Q And that's the only issue that the trial court said was going to be tried. Is that correct?
A Yes.
Q And the trial court heard all of your evidence, all of the evidence that you presented today and declined to enter any injunction whatsoever, right?
A The trial court heard argument on the injunction, not on the underlying claim.
Q But my question is whether after hearing all of your evidence that you just presented to us, the trial court declined to enter any injunction of any form. Is that right?
A They declined to grant an injunction.
Q Thank you. After the trial court issued its decision to you as one of the JOLs (indiscernible). Is that right?
A Yes.
Q And in connection with the appeal, you filed an application for interim injunctive relief pending the appeal that would be heard --
A Yes.
Q -- in September. Is that fair?
A Yes.
Q And are you familiar with the Rule 11 agreement that was entered in the --
A Yes.
Q -- Texas Business Court?

A Yes.
Q How did you become familiar with it?
A I was informed of it after it was issued, I can't recall, sometime in July I think.
Q And is it fair to describe that Rule 11 agreement was consensual? Was it your understanding that it was an consensual agreement?
A Yes.
Q So the DAF parties and Mr. Patrick voluntarily entered into a Rule 11 agreement. That's your understanding, correct?
A Yes.
Q And is it your understanding that that Rule 11 agreement permits Mr. Patrick to remain in control of the DAF Entities subject to what's been referred to as ordinary course of business litigations?
A Yes.
Q And after you filed -- when you filed the motion in the appellate court in the Cayman Islands, you asked for injunctive relief that went beyond the Rule 11 motion. Is that fair?
A Yes.
Q And that's when Mr. Patrick and the DAF Entities or the Defendants, they objected because it went beyond the Rule 11 agreement.
A Yes. Yes.
Q And ultimately, what happened in the court in the Cayman

Islands is the Cayman Islands Appellate Division simply adopted what the consensual ruling of the (indiscernible)?

A They adopted it with some modifications, yes.

Q Okay. And the Cayman court otherwise rejected the balance of the injunctive relief (indiscernible). Is that correct?

A The Court of Appeal granted interim relief or hold the ring in the form of the Chapter 11 with some modifications around what DFW was able to obtain with confirming there should be no increase in remuneration and ensuring that all of the parties who were defendants in my claim were captured by this injunctive relief.

Q Okay. Okay. What's the name of the other person who's at JOL?

A Sandipan Bhowmick.

Q Okay. And you are the JOL for the Charitable DAF Holdco, Ltd. entity, right?

A Yes.

Q And you referred to that as Holdco?

A Yes.

Q You don't act for any entities other than the Holdco. Is that correct?

A No, I do not.

Q So for example, you don't act for the Charitable DAF Holdco. Is that right?

A No, I don't.

Q Does Dugaboy have any connection to the -- to Holdco?

A I guess it would under some part of this structure through the Hunter Mountain Entities further down in the chain, but not to Holdco.

Q Not to Holdco?

A Not to Holdco.

Q And not to any entity in the DAF structure, correct?

A Well, the supporting orgs, they're comprised of three directors, one of which will be Jim Dondero.

Q So that's the connection? That's the --

A Yes.

Q Mr. Dondero is the connection to the supporting organizations. (Indiscernible)?

A Yes.

Q But they don't have any ownership interest or economic interest in anything --

A No.

Q Dugaboy doesn't have any interest whatsoever in any of the DAF Entities, right?

A That question's a bit broad because the DAF, within its structure, through its investment CLO Holdco, there are a number of underlying entities of which the Hunter Mountain are. And I can't say because I don't have the visibility of all of the activities underneath CLO Holdco as to what relationships with other entities there may be. So --

Q Okay. So let me ask the question a little better. To the best of your knowledge, Dugaboy has no relationship to any of the DAF Entities. Correct?
A Yes.
Q Holdco is what's referred to as a tax (indiscernible), right?
A Yes.
Q It's never had any employees, to the best --
A No.
Q -- of your knowledge, correct? It's never conducted any operations of any kind, correct?
A No.
Q It's never had a server, for example, which holds electronic data, correct?
A No.
Q I apologize, I may have missed it. When were you appointed as the JOL?
A May 6th, 2025.
Q And how did you come to be appointed as the JOL?
A I was appointed by the Grand Court of the Cayman Islands.
Q I understand that. But how did you become aware of the filing?
A Of the filing? Well, we were approached as on the -- the supporting orgs petitioned for the winding-up. We would have been approached by the counsel acting for the supporting orgs

to consent to act as liquidators. So we would have provided an affidavit to consent to act, to confirm we were independent, and then appointed by the court.

Q I've never sat in the witness box, so I'm not speaking with experience. But I notice that you're speaking in a hypothetical to the fact that they would have. I want to know what actually happened. Do you know who contacted you about the possibility --

A Yeah.

Q -- of serving as a JOL?

MR. EDNEY: Objection to the comment rather than a question.

THE COURT: Okay. I'll sustain the objection. You may ask the question.

BY MR. MORRIS:

Q Can you just tell me the name of the person who contacted you?

A It was Andrew Johnstone from Johnstone Law.

Q What did he tell you about the -- what did he tell you?

A Very little. Just said there was going to be an application to put a structure -- he gave us a name so we had it for conflict check purposes. That they were going to be put into liquidation.

Q Did he explain to you -- had he already put -- had he already filed the winding-up petition?

A By that point, yes.
Q And did he share with you his views as to Mr. Patrick's conduct?
A Not that I recall.
Q Did he share with you that this was a fraud case?
A No.
Q Did you ask him what the case was about?
A Well, it was not unusual that we weren't given much information at the -- this is how these cases work. We're asked whether we have a conflict. We --
Q And who was Mr. Johnstone representing?
A The supporting orgs.
Q And since being appointed, you conducted an investigation into Mr. Patrick's conduct concerning restructuring of the DAF Entities and (indiscernible). Is that correct?
A Yes.
Q And when did the investigation begin?
A On the day of appointment, May 6.
Q I take it that before being engaged, you had never done any work for Holdco. Is that right?
A I had not, no.
Q And you didn't know anything about the DAF structure. Is that right?
A No.
Q And you didn't know anything about Mr. Patrick or his

supporting organizations, correct?

A No.

Q Do you recall what day in May you were appointed?

A May 6.

Q So on the day you were appointed, you began your investigation (indiscernible)?

A Well, we started collecting books and records, and reviewing, you know -- we understood it had 270 million assets and it didn't have any on the day we were appointed. So we started to collect the records and investigation what happened.

Q How did you know what to investigate?

A In terms of? Well, it's a Holdco that we understood, from supporting organizations, had an interest in limited partner that had further held interests in CLO Holdco. So we had some books and records. We got that pretty quickly.

Q But did anybody provide any information to you about the transactions that you were investigating?

A We would have had, by that point of our appointment, a copy of the petition and the supporting affidavits filed in connection with the application for the winding up. So we had the access to all of what were allegations and some information. And then we started by asking the registered office, the lawyers to produce documents so that we could piece together what had happened and what else we might need.

Q Did you send out requests for books and records on May

6th?
A Yes, we did.
Q How did you know who to send it to?
A Well, we can do public searches as to who's the registered office. We knew who the attorneys were; we knew who -- from some of the information provided who some of the service providers might be. We have a general approach to banks that we know that might be banking. So you know, we would issue to, and one we reasonably believed had a relationship or information that we might need.
Q So it's your testimony that the day you were appointed, you launched an investigation based on nothing but (indiscernible)?
A I'm saying we collected -- we started the collection of books and records. But when you say what -- the date from when our investigation commenced, we were in the seat and tasked with the duty to gather in the assets of the estate. So --
Q I don't mean to suggest that you weren't doing your job. I'm just trying to figure out, there's no person in the world who sat you down and described the transactions that you were going to investigate and who the service providers were and where to look for information. Nobody did that? You just did that on your own?
A Generally, yes. That's how it works.
Q Okay. Did you ever hear of an entity called Skyview?

A Yes.
Q Have you worked with anybody at Skyview on this account?
A I've had conversations with people from Skyview.
Q And who at Skyview have you had conversations with?
A With Isaac Leventon.
Q And who's Isaac Leventon?
A I don't know his official title. But he's a member of staff of Skyview.
Q And he's a lawyer?
A Yes.
Q Does he represent the JOLs?
A No.
Q Does he represent Holdco?
A No.
Q Do you have an attorney-client relationship with him?
A No.
Q Did Mr. Leventon give you any information in connection with your investigation?
A I believe Skyview gave us some information. I don't have my record of every document we received. But we --
Q When did you speak with Mr. Leventon first?
A I'd say within the first week or ten days of our appointment.
Q How did you know to contact Mr. Leventon?
A I believe in the papers from the supporting organizations

of who was carrying out the supporting admin services for Holdco. I understood Skyview was doing that. They'd been mentioned in the filings.
Q Do you know if Mr. Dondero had a relationship with Skyview?
A Yes. I understand he does.
Q And what's your understanding of the nature of the relationship between Mr. Dondero and Skyview?
A I don't know what it is. I understand he's connected with Skyview.
Q Okay. Are you aware that Mr. Leventon used to be employed by Highland?
A Yes. I believe I'm aware of that, yes.
Q How did you learn that?
A At some point in conversation.
Q Did Mr. Johnstone provide any information to you?
A Yes.
Q And can you describe for me what information he provided?
A It would have been the clarification or papers that he had in connection with the winding-up. And then we retained him as our counsel.
Q Is one of the things that you reviewed as you were trying to get up to speed Mr. Dondero's April 16 declaration in support of the wind-up petition?
A Yes.

Q And did you learn when reading that, that Mr. Dondero was already aware that Hunter Mountain had been sold for a million dollars?

MR. EDNEY: Objection. Assumes facts not in evidence.

MR. MORRIS: She was aware or she wasn't.

THE COURT: Yeah. I'm going to overrule the objection. You may answer the question.

THE WITNESS: I'm not aware. I wasn't aware at the time. You're asking me when I reviewed that declaration at the time. I understand that to be the case now.

MR. MORRIS: Okay. Can we pull up Exhibit 48, please? And if we can go to Paragraph 38 at the bottom of Page 7.

BY MR. MORRIS:

Q You said you did read Mr. Dondero's declaration on the (indiscernible)?

A It was more than a year ago. Yes.

MR. MORRIS: So if you could just scroll up a little bit so we can see the bottom paragraph?

BY MR. MORRIS:

Q Am I reading this correctly, that it says towards the bottom, "Hunter Mountain owns most of the distribution rights of the equity position in the Highland bankruptcy," meaning most of the residual value at this stage had been distributed

to (indiscernible) Highland bankruptcy. "

And it goes on to say, "According to Hunter Mountain's own filings, the value has been calculated in excess of $100 million gross with approximate $17 million net value."

Have I read that --

A Yes.

Q -- correctly?

A Yes.

Q And then in the very next sentence, Mr. Dondero discloses that according to Mr. Raver, the entire Hunter Mountain position had been sold (indiscernible). Is that correct?

A Yes.

Q So you knew the moment that you were appointed that Hunter Mountain was sold for a million dollars. Is that fair?

A Yes.

Q Do you know who Ms. Moran is?

A Yes, my counsel at --

Q Ms. Moran --

A -- Maples.

Q Pardon me?

A She's my counsel at Maples.

Q She's your counsel. Do you remember there was a hearing in the Cayman Islands on June 24th, 2025?

A June 24th, 2025? Yes.

Q Do you recall what the subject matter of the hearing was?

A If you could remind me, that would be helpful.
Q (Indiscernible).
A Okay.
Q Do you recall that your lawyer publicly disclosed on June 24th, 2025, that over the last six months, Mr. Patrick had engaged in a series of transactions whereby all of the value in the structure had been transferred away to DFW, meaning DFW was a member of the LLC that holds all of the valuable assets (indiscernible)? Do you remember that concept?
A Yes. And that -- that was likely at the sanction hearing for retaining counsel, our Cayman counsel and our U.S. counsel.
Q Right.
A Okay.
Q So in just a few weeks, right, Mr. Dondero knew in April that Hunter Mountain had been sold for a million dollars. You saw that in his declaration, correct?
A Yes.
Q And here, by June 24th, the day before our 9019 hearing, your lawyer publicly discloses that that Hunter Mountain interest is transferred to an entity called DFW, right?
A It wasn't public. That's not a public hearing.
Q This is not a public hearing?
A No.
Q But you did know that at the time, right?
A Yes.

Q And did you know that DFW was controlled by Mr. Patrick?
A Yes.
Q Okay. So you had connected all of the dots with respect to the transfer to DFW by June 24th. Is that fair?
A I understood the broad strokes of the restructuring transactions. What we had to spend time doing was get to the facts of what had happened and what the documents said about what had happened. And that's what we spent our time from appointment to the time we brought the claim.
Q Do you know when the transcript for that hearing became public?
A For the sanction hearing? I don't believe it ever became public, unless it's been attached to events. But I don't recall.
Q Do you know why this hearing wasn't public?
A Because it was in the liquidation proceedings for the estate. So it wouldn't be -- it wouldn't have been a public hearing. It's between the liquidators making a request to the court and the stakeholders with an economic interest can appear and make submissions.
Q Do you know the Terry Olsen firm?
A Yes.
Q Do you know that they represent the Island foundations?
A They represent the supporting organizations, yes.
Q And the supporting organizations are the Highland Kansas

City Foundation, the Highland --
A Yes.
Q -- Santa Barbara Foundation and the Highland Dallas Foundation, right?
A Yes.
Q And is it your understanding that those organizations were founded (indiscernible) Dondero?
A Yes.
Q And is it your understanding today that he's the president and director of those organizations?
A He's one of, yes.
Q He is. Do you recall that they were at the hearing (indiscernible)?
A I don't recall.
Q And those supporting organizations that you just identified, they're the ones who commenced the (indiscernible), right?
A Yes.
Q Did you understand -- I'm just going to go back to Mr. Dondero's declaration for a moment. He also included in his declaration allegations concerning Mr. Patrick's compensation. Do you recall that?
A I'm going to say vaguely. I haven't read his declaration in over a year.
Q Have you ever spoken with Mr. Dondero?

A I spoke to him once, apart from greeting him here today.

MR. MORRIS: May I have just one moment, Your Honor?

(Pause)

BY MR. MORRIS:

Q Were you aware that Mr. Dondero was funding the supporting organizations in your Cayman Island efforts?

A Yes.

Q When did you learn that?

A I can't recall exactly. But I understood that they'd had some funding to get their petition up and running.

Q Does Holdco have a source of funding other than Mr. Dondero?

A Not presently, no.

Q Are you being compensated for your services as one of Holdco's joint official liquidators?

A Well, we're incurring fees, yes.

Q So you're incurring fees, but you have not been paid. Is that correct?

A Yes.

Q How much are your fees?

A Off the top of my head, I think we've incurred close to $3 million U.S. since appointment.

Q That's more than Mr. Murphy, right?

A Yes.

Q And is that between you and your joint official

liquidator, or is that just your own personal --
A That's our firm. Sorry.
Q Your firm.
A That's our firm. Yes. I'm not getting any personal compensation.
Q Are you here volunteering?
A Yes.
Q Nobody forced you to --
A No.
Q Who asked you?
A Michael Edney from Morgan Lewis.
Q Do you know Mr. Edney represents Dugaboy?
A Yes, I do.
Q When did you make the decision to come and testify for Dugaboy? Did you do that voluntarily?
A Late last week.
Q Did Mr. Edney tell you why he wanted you to come?
A He indicated that he wanted me to be a witness of fact.
Q So you're here testifying just because Counsel asked you to do that, right?
A Yes.
Q And do you understand that Dugaboy is Mr. Dondero's family trust?
A Yes.
Q And again, Dugaboy has no relationship with Holdco,

correct?
A Yes.
Q To the best of your knowledge, Dugaboy never had a direct or indirect relationship with (indiscernible), correct?
A I believe so, yes.
Q Who's paying your expenses?
A In terms of my firm?
Q Who paid for your coming here?
A My firm.
Q Okay. And is that going to be billed as an expense to Holdco?
A Not usually.
Q No? Do you know if anybody's going to pay that expense (indiscernible)?
A Presently, no. No.
Q So at this time, you're just voluntarily, the firm's voluntarily going to fund for you to testify on behalf of an entity that has no relationship to the entity in which you're acting as JOL. Is that fair?
A I'm here because it's in the best interest of the estate in terms of the Hunter Mountain transaction. I don't have enough information to know whether or not that settlement is good or bad for my estate. And I have a fiduciary duty to assess and consider that.
Q So that settlement was entered into in June of last year,

is your understanding?
A Yes.
Q And so as we sit here today, you still don't have enough information to assess whether or not it's in the best interest of Holdco (indiscernible)?
A Yes.
Q During your testimony, I don't think I heard you mention Hunter Mountain one time (indiscernible)?
A I didn't. I wasn't asked.
Q And I don't think I heard you mention Beacon Mountain at all (indiscernible).
A No.
Q Have you done any investigation -- you haven't done any investigation at all as to the sale of Beacon Mountain?
A We have a number of parties who have not been cooperative and refusing to give us books and records, largely those out of the United States. So until I have Chapter 15 recognition and I'm able to get on with getting that disclosure, I can't complete my investigations.
Q So as we sit here today, you don't have any -- you haven't reached any conclusions of any kind with respect to the Beacon Mountain --
A No.
Q -- transaction, fair?
A No.

Q Did Holdco have an interest in Beacon Mountain -- withdrawn. Did Holdco have an interest in HMIT before the sale of Beacon Mountain?

A I'm not sure. I know when the sale took place. But if I can give my understanding of the Hunter Mountain, where it sat in the structure. At the time of my appointment, I believed it sat outside of my structure. We've come to find later through the documents and our review and investigation that it sits actually under the CLO Holdco Entities that are now in my structure.

Q So as a result of the structure, you actually benefitted from the transaction?

A I don't know. I don't know whether the transaction was good or bad. I can't say. I don't know.

Q Do you know or would you agree that before land sold, Beacon Mountain, Holdco had no interest in Hunter Mountain (indiscernible)?

A Before that transaction, yes. I understood it sat outside of my structure. So it wasn't my fiduciary responsibility.

Q So ironically, the sale of Beacon Mountain actually resulted in the Holdco getting an interest, an indirect interest in Hunter Mountain, correct?

A All I understand what Holdco gained were that there were some claims that were released and some claims that were kept in the structure. Whether those are good claims or bad claims,

I don't know and can't say. I do know there's a severe level of animosity as between Mr. Patrick and Mr. Dondero.

And it's not -- based on my personal experience, Mr. Patrick has brought significant sort of unfounded applications and litigation. And it would be a concern for me as a liquidator of the DAF structure to have funds of the DAF used in spurious litigation.

Q Speaking of Mr. Patrick's litigation, as a result of litigation in the proceeding, Holdco now owes Mr. Patrick and his charity, DFW Charitable Foundation, over $1.2 million. Isn't that right?

A They have a cost award from the result of the sanction of counsel.

Q And so can you just explain to the Court what a sanction was, what that proceeding was and why at the end of it Mr. Patrick and DFW were awarded over a million dollars?

A The sanction hearing, I'm required to get the Court's sanction permission for the counsel I retain. So we made an application to retain Johnstone Law and Maples and Calder, as well as Reed Smith in the U.S. The Defendants objected to the retention of all three of those counsel. So we had a hearing in front of the judge.

I recall we made the application for sanctions some ten days after our appointment, so sometime around May 16th. The Court initially set down a hearing for the 30th, but then it

was pushed for the Defendants' availability until the 23rd or 24th of June. And in that time period, I believe the Defendants racked up 1.6 million in costs. They filed thousands of pages of evidence in connection with what was a fairly straightforward sanction application for counsel.

And because a stakeholder in liquidations are entitled to be heard on liquidators' applications, they have an economic interest, they're entitled to be heard to put forward their views. And in this case, DFW put forward its views that we shouldn't be able to retain that counsel. Their costs were awarded in that sanction application.

Q And that's because the Court agreed with Mr. Patrick and DFW that Mr. Johnstone shouldn't be retained, right?

A No. It's because we did not withdraw Johnstone Law with sufficient time in advance of the hearing. We had indicated we would, but the court considered that, in all fairness, they didn't have enough time so that their costs should be awarded. But the court didn't, at the time, know how much those costs were going to be.

Q Let's get to the investigation. Mr. Edney went through a whole bunch of documents with you, but I didn't hear anything about when you acquired any of those documents from there. Do you know from all of the documents that he put in front of you, can you go back and look, would you be able to tell me when (indiscernible)?

A I'd have to refer -- I'd have to get access to our books and record log. But we logged every date, every provider of information. So I do have a log. I didn't have it, and I don't have it here.
Q Other than attorney-client communications, can you think of any reason why, including service of the subpoena, anybody could -- anybody would have been prevented from getting the same information (indiscernible)?
A Well, to get them from me? Or from anyone else?
Q I apologize. Maybe I wasn't clear. You got information from a number of different sources. Is that fair?
A Yes.
Q Some of the information that you obtained, all that you could obtain was subject to attorney-client privilege, correct?
A No. Most of the information I obtained was because of my position as a court-appointed liquidator. And I have statutory powers to compel that production.
Q Okay, I appreciate that. I'm asking a different question. Some of the information that you obtained was subject to the attorney-client privilege, right?
A Yes.
Q And the rest of it was not, correct?
A Yes.
Q So if I was -- let's say the ValueScope appraisal, that's not privileged.

A No.

Q Where did you get the ValueScope appraisals?

A I can't recall specifically unless I check the log. But I believe it was probably provided amongst the papers, either that the Defendants filed in support of their transaction because they filed thousands of pages of evidence, as well as Walkers may have had it in connection with the advice they were providing.

Q But if somebody was aware of the ValueScope reports, are you aware of anything that would prevent them from serving a subpoena to get that information?

A No.

Q And as we sit here today, you can't specifically state whether some of the information you received before July 14th, and whether some of the information was received after July 14th. Is that fair, without (indiscernible)?

A Did I get some information before July 14th and some after?

Q Yeah.

A Yes.

Q And but as you sit here today, you can't state, without your log, which information was obtained before and which information was obtained after. Is that correct?

A That's fair.

Q And some of the information you obtained was publicly

available. Is that right?

A Very little of what we have is public. But I'm sure there's some information you can get from publicly available sources. But most of it is not public. And most of the information I would have as a liquidator, whether I had it from the 14th or the 15th is only made public when I make it public.

Q Right. But if you went to the Delaware Secretary of State and you got a certificate of good standing --

A Sure.

Q -- anyway, right?

A Yes. Right. Publicly available information is publicly available information.

Q But if you go to the Secretary of State and you get the certificate of good standing, nobody's allowed to know that until you decide to make it public, right?

A You mean --

Q Let me ask a better question.

A Yeah.

Q Some of the information that you (indiscernible) was publicly available but nobody knew that you had it until you chose to disclose it. Is that correct?

A That's fair.

Q Did Mr. Leventon have an opportunity to review pleadings and declarations before they were filed in the Cayman Islands?

A No.

Q Are you sure?

MR. EDNEY: Objection, Your Honor. Asked and answered.

MR. MORRIS: I'm getting her --

THE COURT: I'm going to sustain.

MR. MORRIS: Would it surprise you --

THE COURT: Sustained.

BY MR. MORRIS:

Q Would it surprise you if we went on the docket of this case, we found the exhibit that was filed in support of this motion and found metadata that would reflect Mr. Leventon's (indiscernible)?

MR. EDNEY: Objection, Your Honor. Lack of foundation.

THE COURT: I think he's questioning the witness based on what she's testified to. I'm going to overrule the objection.

BY MR. MORRIS:

Q Would that surprise you?

A You said did he review applications I made? I don't know what document you're referring to, so.

Q Okay. Do you need a document to refresh your recollection, or can you tell me definitively that Mr. Leventon never had access to any of your pleadings and declarations before they were filed?

A That he did not. We did not share them.

MR. MORRIS: Okay. And I offer the next document to impeach the witness. I guess we can mark it as Highland's Exhibit 300 since I don't know the last one.

THE COURT: You may approach the witness.

MR. MORRIS: Thank you.

BY MR. MORRIS:

Q So I'm going to represent to you that this is from your third affidavit that was filed in November of 2025. And in looking at the document, we found highlighted properties that reflect that Isaac Leventon had modified the document. Do you see that?

A Well, if you're telling me that that's what that means. But I maintain I did not provide my draft affidavit to Isaac Leventon to review or comment.

Q Okay. So you didn't do that. I appreciate that. Do you know JP Sevilla?

A Yes. I've met him.

Q And have you spoken with him about this part of your investigation?

A We had conversations early on.

Q And what do you recall about those conversations?

A Just background to what they understood to have happened in the DAF and how the structure had worked and general history.

Q Okay. So both Mr. Sevilla and Mr. Leventon gave the information --
A Yes, they did.
Q -- (indiscernible). Is that fair?
A Yes, that's fair.
Q Okay. And do you understand Mr. Sevilla also works for Skyview?
A Yes, I understand that.
Q Okay. How about Scott Ellington, do you know Scott Ellington?
A Yes, I know Scott Ellington.
Q When did the first meet Mr. Ellington?
A I met him many, many, many years ago on other cases, but have come across him on this case in connection with Crossvine. He provided the funding to the estate.
Q Okay. So it's Crossvine?
A Crossvine.
Q And how much funding did Crossvine provide?
A They provided $5 million.
Q And does Mr. Ellington have any connection with Holdco?
A Not that I'm aware, apart from through Crossvine.
Q Does Mr. Ellington have any connection, to the best of your knowledge, with any entity in the DAF structure?
A No.
Q Do you know if Mr. Ellington has a relationship with

Mr. Dondero?
A I believe he does.
Q And do you know the nature of that relationship?
A I don't know the nature.
Q Are you aware that Mr. Ellington was the longtime Highland general counsel until he was terminated in December of 2020?
A I wasn't aware of his role. I understood he had involvement with Highland Capital.
Q Do you recall that in the Cayman Islands decision on February 10th, the judge described Crossvine as being basically a Dondero entity?
A I believe there was some. It has been used in connection. Crossvine and Dondero, yes.
Q Okay.
THE COURT: I just want to make sure. Are you saying bine, Crossbine?
THE WITNESS: Crossvine, V-I-N-E.
THE COURT: Crossvine.
THE WITNESS: Crossvine.
THE COURT: Thank you.
BY MR. MORRIS:
Q Are documents in the registered office in the Cayman Islands publicly available?
A No, they are not.
Q No. It has to be the fiduciary?

A Yes.
Q Did you see documents from Skyview?
A I don't recall expressly which ones. But I wouldn't be surprised if we had received documents.
Q You would or wouldn't?
A I wouldn't be.
(Pause)
MR. MORRIS: Can you go to Exhibit 95.
(Counsel confer)
MR. MORRIS: So, in everybody's binder, in the pocket in the back, you should have a copy of (indiscernible).
THE COURT: Mr. Morris, I only have Volumes 1 and 2 of your binders, or your exhibits. Though I will say that my law clerk has pulled it up from the docket, so.
MR. MORRIS: We'll go to 95.
(Pause)
MR. MORRIS: And if we could go to the third page, the (indiscernible) page. Okay. Apologies for the delay.
BY MR. MORRIS:
Q But, ma'am, do you see that on May 6th, you wrote a letter to Skyview --
A Yes.
Q -- addressed to Mr. Sevilla and Mr. Leventon and to request for books and records?
A Yes.

Q So this is one of the letters you sent on the date --
A Appointed.
Q -- that you commenced your investigation, right?
A Yes.
Q And I'll just ask you, how did you know to send that letter to Skyview?
A It would have been referred to in the materials that were filed in the pre-appointment, or parties we would have asked, parties who they were working with, who was associated, who might have books and records. It starts in a fairly broad-brush approach.
Q And before your proceeding in the Cayman Islands is recognized in the United States, do you have the ability to subpoena documents in the United States?
A I do not.
Q And so did Skyview voluntarily comply with your request with a subpoena?
A Some parties did. Again, I'd have to look at the record to see what information was provided. But we did make the request. So if they provided documents, I'd have a record of it.
Q Well, if you look at the first page of the document, you can see that (indiscernible) replied to you. And that's the first page there. And you'll see that notice is given that Skyview intends to comply with the notice and the order. Do

you see that?
A Yes.
Q Okay. So does that refresh your recollection that on the day you were appointed, you knew to seek books and records from Skyview, and three days later Skyview said that they would comply with the liquidators' request?
A Yes.
MR. EDNEY: Objection, Your Honor. I don't want to be a pain here, but I'm just making sure (indiscernible) correctly. This letter appears to be addressed to Mr. Murphy, not to Ms. MacInnis.
MR. MORRIS: And I have no problem with that. I'm looking at what the lawyer wrote. And it says counsel to Skyview. They received notice, the very one that we just looked at, and said we intend to comply with notice.
THE WITNESS: And it's CC'd to Sandipan Bhowmik and to our core email, so.
MR. MORRIS: I'm grateful for that. Thank you.
Thank you to Counsel (indiscernible).
BY MR. MORRIS:
Q But as you sit here today, you can't tell me what information Skyview provided. You just know that you asked for it and they simply complied.
A Yes.
Q The compensation -- were you in touch with lawyers from

Dugaboy at this time?

A Well, Michael Edney.

Q No, no. I apologize. I don't mean now. Going back from the -- around the time of your appointment, do you recall being in communication with other lawyers from there?

A For Dugaboy, I don't know. I don't know who those lawyers would be.

MR. MORRIS: Okay. Is there a way to call up Dugaboy Exhibit 206? It's a very large exhibit.

(Pause)

THE COURT: Mr. Morris, let me ask you real quick while they're pulling this up. How much longer do you anticipate --

MR. MORRIS: About ten minutes.

THE COURT: Okay. All right. Ms. MacInnis, are you good for ten minutes?

THE WITNESS: Yes.

THE COURT: I know you've been on the stand for a while. We could -- so --

(Counsel confer)

MR. MORRIS: Thank you everybody for your patience.

BY MR. MORRIS:

Q Okay. So, again, your investigation begins on May 8th. And you receive, this is a letter dated -- I apologize. Your investigation begins on the 6th.

A The 6th, yes.
Q And this letter's dated on the 8th. Do you see that?
A Yes.
Q And you see that the author of the letter, tells you that she represents the Dugaboy Investment Trust, NexPoint?
A Yes.
Q Again, Dugaboy has no relationship to Holdco, correct?
A No.
Q And to the best of your knowledge, Dugaboy has no relationship to any of the DAF Entities, correct?
A Yes.
Q And that they're writing to you as the official liquidator of Holdco to provide information to you against Mr. Patrick. Is that right?
A Yes.
Q And the supporting organizations sit on Holdco's liquidation, correct?
A Yes, they do.
Q And they sat on the Holdco liquidation committee since, I think you said July 9th?
A July 7th.
Q July 7th.
A 7th.
Q Since early July, right? So the liquidation committee -- was the liquidation committee provided with a copy of the

written report that was filed on July 15?
A Members. Not the full committee. We wouldn't provide it to DFW because they're a defendant.
Q Fair enough. So they were recused?
A They were recused. But we provided a draft of the claim without the supporting documents in advance of seeking sanction from the Court.
Q And the sanction is, again, the --
A Approval to bring the claims.
Q Yes.
A Yes.
Q And that's --
A It means something different in the U.S. Yes, I understand. It means a bad thing in the U.S. But in ours, it means a good thing. Approved.
Q Sanction means approval in --
A Approval, yes.
Q -- the Cayman Islands, right? When you referred earlier to the court having found that there was one serious claim to be made of breach of fiduciary duty in the restructuring, the phrase serious claim is also -- is stated as a term of art --
A Serious issue to be tried is the threshold test.
Q So are you familiar with a motion to dismiss standard in the United States?
A Yes, I am.

Q And is a serious claim, is it your understanding that a serious claim is analogous to a motion to dismiss (indiscernible)? If you stated a serious claim, you've stated a claim upon which (indiscernible)?

A Yes.

Q The only -- are you aware of any restrictions on -- withdrawn.

Mr. Dondero is the president and the director of the supporting organizations, correct?

A Yes.

Q And the supporting organizations are members of the liquidation committee?

A Yes.

Q Is there any restriction on the flow of information from Mr. Dondero personally for any reason, to the best of your knowledge?

A There are restrictions on information we obtained under the injunction disclosures that expressly prevented information from being shared with Mr. Dondero. And we -- the SO, the supporting organizations, Mr. Dondero has never sat on the liquidation committee, or participated. Those are represented by the individuals who are leading those charities. So we made it clear to them and their counsel if we were sharing information, that could not be passed on, that information was being provided under the terms of the confidentiality agreement

with the liquidation committee.

Q But it couldn't be provided outside --

A No, it couldn't.

Q -- the supporting organizations, correct?

A Right. Yes.

Q Mr. Dondero was inside the supporting organizations, correct?

A Well, he's -- I understand he sits on -- but as the liquidation committee members, those are individuals representing the SOs, but the members have the information.

Q And is there a place where that barrier -- is there a law, is there in the bylaws where -- maybe a member who not an individual, it's an entity?

A But its representative sits on the Committee in terms of the person authorized to engage in the activities of the committee.

MR. MORRIS: I have nothing further.

THE COURT: Okay. Mr. Phillips, do you have examination --

MR. PHILLIPS: Your Honor, if we can take a five- or ten-minute break, and then I'll confer with Counsel and see.

THE COURT: Okay. And, Ms. Ziegler-Young?

MS. YOUNG: No comment, Your Honor.

THE COURT: Okay. All right. We'll take a -- let's take a ten-minute recess and we'll be back.

THE CLERK: All rise.

(Recess at 3:35 p.m./recommencing at 3:49 p.m.)

THE COURT: All right. We're back on the record in the Highland Capital Management case.

Mr. Phillips, did you have any questions of --

MR. PHILLIPS: No questions, Your Honor.

THE COURT: Okay. Mr. Edney, any redirect?

MR. EDNEY: Yes, Your Honor. Thank you.

(Pause)

REDIRECT EXAMINATION

BY MR. EDNEY:

Q Good afternoon, Ms. MacInnis. Thank you for coming back. I just have a handful of questions. Do you recall when Mr. Morris asked you a series of questions about the status of the Cayman litigation?

A Yes.

Q And Mr. Morris asked you a series of questions regarding the Cayman court's decision of February 10th, 2026?

A Yes.

Q What is a proprietary injunction?

A It's -- what we're claiming under the injunction is the return of all of the property, that damages isn't sufficient, that it is the return of the corpus, the assets that you have a traceable claim into the underlying assets.

Q And in the proceedings that led to the February 10th, 2026

ruling by the Cayman trial court, what relief were you and the liquidators seeking?

A We were seeking an injunction over the limited partnership interest itself and as well over the underlying assets in the estate.

Q Was that injunction designed to be an interim relief?

A The injunction would -- interim in a sense that it would hold as an injunction until the subject of our statement of claim had been heard by the Cayman court and ruled upon. So it's designed to hold the ring.

Q Was the court familiar with the arrangements and restrictions on moving assets that had been put in place by the Texas Business Court?

A Yes.

Q And what did the court say about that?

A Well, the court -- our argument, and I don't recall specifically what the judge said about it in his ruling, but our argument was that it didn't go far enough. The Rule 11 didn't cover parties that were our Defendants in the Cayman -- it doesn't apply to the Cayman Islands. And it didn't have the disclosure requirements we were seeking, as well as the restrictions on DFW.

Q And did the court take any comfort in the existence of the Texas Business Court arrangement?

MR. MORRIS: Objection, Your Honor. I don't know how

the witness would tell you whether the court took comfort.

THE COURT: I'm going to overrule the -- he's asking what her understanding is.

MR. MORRIS: Okay.

THE WITNESS: My understanding of -- are you referring to the Cayman Islands Court of Appeal, or the first instance?

BY MR. EDNEY:

Q The first instance.

A So can you repeat your question?

Q Yes. Did the court say whether it took any comfort from the Texas Business Court arrangement in making its ruling?

A I don't recall.

Q Okay. What is the status of the main claim in the Cayman proceedings?

A It is essentially stayed pending the outcome of the injunction hearing because once the injunction hearing's been ruled upon, the defendants have 28 days to file their defenses to the statement of claim.

Q And the Cayman Court of Appeals weighed in after the (indiscernible). Is that correct?

A Yeah. They weighed in on this issue at our hearing for the interim relief.

Q And did you as liquidator seek interim relief from the Court of Appeals?

A Yes, we did.
Q Was that request opposed by Mr. Patrick?
A Yes.
Q Backing up a bit, has Mr. Patrick opposed your deference to gather documents in your role as liquidator?
A Yes.
Q How has he done that?
A Lack of cooperation.
MR. MORRIS: Your Honor, this is beyond the scope of my direct. I didn't ask any questions about Mr. Patrick's (indiscernible.
MR. EDNEY: Your cross.
MR. MORRIS: My cross, thank you.
THE COURT: Response?
MR. EDNEY: Your Honor, his cross-examination went into the use of which anybody could go get the documents that Ms. MacInnis got. I'm trying to probe the voracity of those questions.
THE COURT: I'm going to overrule the objection.
BY MR. MORRIS:
Q Do you remember my question?
A Could you repeat it, just so I'm clear?
Q I was afraid you were going to ask that. Now I have to remember my question. So I think at one point I asked you whether Mr. Patrick had resisted your efforts to gather

documents in your role as liquidator?

A Yes.

Q And then perhaps my next question was, how had he done so?

A He's in control of virtually all of that structure. So he has the ability to provide consensually information, which he's chosen not to do so.

Q The interim injunction that was entered by the Court of Appeals, was it more or less severe than what the Texas Business Court (indiscernible)?

A It was more than the Rule 11. It was styled on the Rule 11, but it did -- it went further.

Q And how did it go further?

A It went further by ensuring that the Defendants were all captured and bound by it. It restricted DFW's distributions to 250,000. And it also restricted remuneration from being increased.

MR. EDNEY: Maybe if we can pull up Highland's Exhibit 72. And we'll go to Page 48 on which Mr. Morris questioned. All right.

BY MR. EDNEY:

Q I'm going to direct your attention to Paragraph 213 at the bottom. Can you read that for a moment, and then I'll ask you some questions.

A 213?

Q Yeah.

A "Even if there was a" --
Q No, no, no. Not out loud.
A I'm sorry.
Q Did the Cayman court of first instance have a view about why an injunction should not issue with respect to excessive compensation?
A It was the court's finding that it wasn't -- that it is not a proprietary claim of the company for which damages would be an adequate remedy.
Q And did the court entertain the possibility that damages recovered in that compensation might be an appropriate remedy in the future?
A Well, it's saying that it is a claim for which damages would be an adequate remedy.
Q Do you remember Mr. Morris asking you some questions about Dugaboy's relationship to the DAF Entities?
A Yes.
Q And what is your understanding of what the Dugaboy Investment Trust is?
A That it's a family trust.
Q A family trust associated --
A For Mr. Dondero.
Q Do you have an understanding as to how the DAF Entities received its assets in the first instance?
A I have a very, very broad understanding that the funds

were granted, donated into the structure by Mr. Dondero.

Q And do you know whether any of those funds were granted in the structure through the Dugaboy Investment Trust?

A I don't know.

Q So you don't know either way?

A I don't know.

Q Are liquidation proceedings common in the Cayman Islands?

A Fairly. I've been employed for 30 years doing them, so they're frequent enough.

Q You see a lot of them.

A I see a lot of them.

Q And what are liquidation proceedings for?

A Well, they range from straightforward voluntary corporate simplification to liquidations because assets have been misappropriated or fraudulently removed from companies and to the detriment of the stakeholders and require someone to come in and hold the ring, investigate, bring a fiduciary equitable result to those stakeholders.

Q Are liquidation proceedings freely granted by the courts?

A No. Official liquidations are a serious matter. It requires an application. And the courts are very circumspect about making those appointments.

MR. EDNEY: I want to pull up Highland's Exhibit 48, please.

BY MR. EDNEY:

Q Do you remember Mr. Morris asking you some questions about Mr. Dondero's affidavit from April 2025 in support of the liquidation?

A Yes.

MR. EDNEY: If we could go to Paragraph 39, please.

BY MR. EDNEY:

Q Do you recall Mr. Morris asking you some questions about what Mr. Dondero had said in your proceedings that Hunter Mountain had been sold --

A Yes.

Q -- for some money? Based on your review of Paragraph 39, did Mr. Dondero state anything about the party to which Hunter Mountain had been sold?

A It says an unidentified party.

Q Do you recall any indication from the April 2025 filings of the party to which Hunter Mountain had been sold?

A I don't.

Q And as of April 2025, did you know who had been sold that structure?

A No.

Q Do you recall Mr. Morris asking you some questions regarding the work that you may or may not have done to investigate Hunter Mountain?

A At the outset of our appointment, I recall that we understood Hunter Mountain was outside of our estate. So we

wouldn't have devoted much time to that, although I am aware that in the course of obtaining the information, the disclosures under the injunction, that we became aware that Hunter Mountain happened, transferred into our structure. But that was much later, say September, October time.

Q September, October of what year?

A 2025.

Q And since learning that, have you taken further steps to try to investigate the Hunter Mountain issues?

A I have not.

Q And why haven't you?

A Because we are still trying to get access to books and records held by parties that would help form a complete review and investigation.

Q What role does the pending application to be recognized under Chapter 15 in Delaware play in that liquidation? recognition in order to be able to bring those subpoenas.

Q And do you -- if you were to get recognition, do you expect to continue your investigation on this issue?

A Yes. I believe the hearing is set down for some time late August of this year.

Q Do you remember Mr. Morris asking you questions about a June 24th sanction hearing?

A Yes.

Q Now, are filings in your Cayman proceedings, are they

public when made?
A No.
Q Are some of them public when made?
A What would be public is whether it's something that's being heard in kind of open court. But in proceedings like liquidation proceedings, those are just going to be between the judge and the parties that are of interest in the proceedings.
Q And when was your first hearing in open court in the Cayman proceedings?
A That would have been December 14, 15, 16 for the injunction hearing.
Q So hearings that are -- this may have occurred in your proceeding before that, would they have been in any way public?
A They were not public.
Q What about filings leading to the hearing before December 2025, would they be made public?
A No.
Q What about filings leading to the hearing in December 2025, are they public, or do they only become public when the hearing is closed?
A I'm not entirely sure on the rules for that of when it becomes public. But I believe it has to be once it's read in open court.
Q So does the Cayman Islands have fee shifting that you would use issue or motion?

A Yeah. We're a sort of loser pays. So if you bring a proceeding and you lose, you will be -- you'll have to pay the adverse costs of the other side.

Q And does that depend on how wrong you are, or is it just the fact that you lost?

A No. The judge will consider, usually at the end of a matter, that there is often a separate hearing on what they call the consequentials and the costs. And the Court will determine whether the costs are done on a standard basis or indemnity, and what factors play into. It depends really on the ruling and how much you lost or how much you won.

Q And is that proceeding-by-proceeding or motion-by-motion?

A It's by the proceeding, so often cost, as a proceeding has a number of different stages to it. It will -- the costs are usually reserved until the end of the proceedings.

Q Do you remember Mr. Morris asking you some questions about when you were obtaining documents?

A Yes.

Q Perhaps you've answered this already. But when you obtain documents as a liquidator, did they become public as of that date?

A No.

Q When did they become public?

A They become public if I make them public, if attach them to filings that are public. Or if I disclose them in

proceedings and, in a sense, in the statement of claim talked about whether I'd waive privilege on the documents that I attached to the statement of claim. So those aren't public, but they're certainly more public, or they're disclosable to the other side. The Defendants will see it.

Q When you became liquidator, did you take steps to gather the documents of Charitable DAF Holdco, Ltd.?

A Yes.

Q And here did you find many of those documents?

A A large portion would have been from the corporate service providers, from those cooperating service providers, from Walkers who were -- had a significant number of documents.

Q So what is Walkers again?

A They were the law firm to Charitable DAF Holdco.

Q And in your experience, without the status of being a liquidator, do the law firms in the Cayman Islands easily give up corporate records to the parties?

A No, it does not.

Q What does it do?

A Well, they'll tell you it's -- you have no right or access or permission to see the documents, and they won't share them.

Q Will they claim privilege?

A Well, yes. Privilege and just general no authority to request them.

Q And would you say that the amount of documents that you

got from the Walkers firm is significant?
A It was, yes.
Q When the liquidation committee was formed in July of 2025, did Mr. Patrick object to membership on that committee?
A I understand he did, yes.
Q And was one of the responses to that objection the entry of a confidentiality order?
A Yes.
Q And does that confidentiality order restrict what the individual members of that committee, the people who sit on it, can share with others?
A It does.
MR. EDNEY: I would draw your attention to Highland Exhibit 300. If you don't maybe we can we pull it up. I don't know if you have a copy that's there. This is a one-page sheet. Does Your Honor have a copy of it?
THE COURT: I do.
BY MR. EDNEY:
Q Looking at the Highland Exhibit 300, it says, "Screen clip from Exhibit I, MacInnis Third Affidavit." Do you see that?
A Yes.
Q Do you remember when you filed your third affidavit in the Cayman Island proceedings?
A Not specifically. Sometime between October and November 2025.

Q I mean, I'm not 100 percent sure where this document came from. Perhaps (indiscernible).

A I'm not, either. I'm not, either.

Q -- Opposing Counsel does. But is there --

MR. MORRIS: Your Honor, I object. We copied it right off the Court's docket. I should not be accused of (indiscernible).

MR. EDNEY: Oh, no, no, no. I'm talking about the heading.

THE COURT: All right.

BY MR. EDNEY:

Q I don't know where the heading came from. But is there a date up there in the heading?

A It says November 2025.

Q And does that refresh your recollection about when you created and filed the MacInnis third affidavit?

A I believe it was filed probably in connection to support the amended statement of claim which was October 15th, 2025.

Q 2025?

A Yes.

Q Now, Mr. Morris asked you some questions about I guess what's called some metadata. There's this box over to the right. Do you see that?

A I do.

Q And there's an indication of a subject line that says

highlight. Do you see that?

A Yes.

Q And then there's a handful of passages highlighted. Do you see that?

A Yes.

Q Now, in the documents that you filed, did you highlight the documents when you saw them?

A No. And we file ours in a PDF. We don't file the sort of live version that has the, you know, metadata around the origin of the Word document. We would file a PDF of our final version of the affidavit, which I would swear. So it will print -- I print it and swear the affidavit.

Q All right. And in that little box there, do you see there's a reference to modified, and there's a date after that?

A Yeah. It says 12/8/2025 at 7:38 p.m.

Q Sitting here today, was December 8th, 2025, before or after you filed your third MacInnis affidavit with the Court?

A If it's when I say I thought I filed it, if it's in connection with the amended statement of claim, that was October 2025. So December 8 is well after we filed our evidence in the injunction proceedings.

MR. EDNEY: Perhaps we can get a little bit more granularity on this. I don't know it was one of our exhibits. Can you pull up Margot MacInnis' third affidavit?

I'm sorry, Your Honor. Can you bear with me for a

moment?

THE COURT: That's fine.

(Pause)

MR. EDNEY: Maybe we'll come back to that at the end. Let's move on to another question. Do you have -- can we pull up the Highland Exhibit 95, please?

(Counsel confer)

MR. EDNEY: Okay. If we could scroll down to the next letter from Grant Thornton.

BY MR. EDNEY:

Q Do you see that, Ms. MacInnis?
A Yes, I do.
Q Do you see on the screen there a letter from Grant Thornton, a letter from your team?
A Yes.
Q And are you requesting documents from the Skyview Group?
A Yes.
Q Why did you do that?
A Because we understood they provided services in connection with the DAF structure.
Q And generally speaking, would you expect a company to (indiscernible)?
A Generally.
Q Do most?
A Usually. Usually.

Q And were you surprised when Skyview said they wouldn't comply after providing (indiscernible)?

A No.

Q Okay. Let's go to the (indiscernible). So I'm showing you an exhibit to our reply brief filed on Friday night. This is the third affidavit of Margot MacInnis. Do you see that?

A Yes.

Q And --

(Counsel confer)

BY MR. EDNEY:

Q Going up a bit, do you see a date in the corner there?

A I do.

Q What is that date?

A November 2025.

Q If you can go down to the signature page, please. Almost there. Move it up. Is that your signature?

A That's my signature. I know it's unsworn. So sometimes when I'm traveling, I have to sign the affidavit. And they will file it signed but unsworn.

Q Does this refresh your recollection of when you filed the third MacInnis affidavit with the Court?

A Well, in terms of when the final copy that was sworn was filed, I don't have that date. I note it's not saying it on the top page. But it would be a specific date.

Q Do you believe that this is in the month of November 2025?

A Yes.
Q From time to time, have people associated with Dugaboy asked you for materials from your investigation?
A Not that I recall.
Q MR. EDNEY: All right. I have no further questions, Ms. MacInnis. Thank you.

MR. EDNEY: I reserve the right to recall Ms. MacInnis for (indiscernible). Thank you, Your Honor.

THE COURT: Okay. Mr. Morris?

MR. MORRIS: I just have a few questions.

RECROSS-EXAMINATION

BY MR. MORRIS:
Q I think you said, ma'am, that you did not learn who the buyer of Beacon Mountain was until September of (indiscernible). Is that correct?
A I think it was sometime around September. Whether it was August, end of August or -- it was after we started receiving disclosures pursuant to the indemnity.
Q You didn't --
A I'm sorry, the injunction. Sorry.
Q Sorry. You didn't come to the 9019 hearing on June 25th, 2025?
A No, I did not.

MR. MORRIS: Can you put up Exhibit 60, please?

(Pause)

BY MR. MORRIS:

Q While we're waiting for that, did you ever make any effort to obtain information that was adduced during that hearing?

A No.

MR. MORRIS: Can you go to the last page of this document?

BY MR. MORRIS:

Q So what happened during that hearing is of no interest to you. Is that correct?

MR. EDNEY: Objection, Your Honor. Argumentative.

THE COURT: Overruled. She can answer the question.

THE WITNESS: Can you repeat the question?

BY MR. MORRIS:

Q That hearing was of no interest to you. You made no effort to obtain information that was adduced at that hearing, correct?

A Yes.

Q And if you look at this chart here, I'll represent to you that this was the demonstrative exhibit that I used during the hearing. It was in open court. And we see that Hunter Mountain is shown as being ultimately, indirectly but ultimately owned by DFW?

A Yes.

Q Okay. So even though you didn't learn that DFW had been the ultimate acquirer of Beacon Mountain and Hunter Mountain,

everybody who was in the courtroom on June 25th knew that. Is that correct?

A That's what this chart shows.

Q Okay. You were just asked about the third affidavit that was filed in November.

A Yes.

Q And was that filed in connection with the hearing that occurred in December?

A Yes.

Q And that hearing is on December 14th and 15th. Is that right?

A Around there, yes.

Q And was it only after that hearing that your affidavit was made public?

A Yes.

Q So how do you explain Mr. Leventon's comment on your document on December 8th if your affidavit wasn't made public until after the hearing on December 15th?

A Unless the filing of it was available to other parties, I don't recall how it was published. But --

Q Okay. I'm just going to ask a couple of questions.

If we can pull up Exhibit 72. 72 is the Court's decision I believe (indiscernible). And if we can go to Paragraph 213 when Mr. Edney questioned you. And Mr. Edney pointed out that in Paragraph 213 it said that (indiscernible) arguable case

with amounts excessive, but the Court finds that there was no proprietary claim. Do you remember that?
A Yes.
Q And what he wanted to suggest was that the issue of compensation was rejected because under any circumstances, it wouldn't (indiscernible) proprietary claim. Is that right?
A That would be a claim for damages.
Q So if we can go back up to 205. You'll see in 205, the Court describes the presentation of evidence that they made with respect to Mr. Patrick's receiving the director's (indiscernible) amount that is more than almost $14 million in the first six months of 2025. Do you see that?
A Yes.
Q Can you read Paragraph 206, please, for the Court?
A Read it out loud?
Q Yes.
A "Having reviewed the affidavit evidence on this question, including the detailed report dated 26 August 2024, from Mercer, the Court finds that there is no serious issue to be tried, that this remuneration was excessive and in breach of his duty of the company."
Q So the Court not only found that there was no basis for a proprietary injunction (indiscernible) Mr. Patrick's compensation, the Court also specifically found that there was no serious issue to be tried, that the remuneration was

excessive and a breach of his duty. Isn't that right?

A Yes. And we're appealing that.

Q I appreciate that you're appealing it. But the trial court found that it didn't even survive a motion to dismiss, correct?

A The motion to dismiss isn't a relative term in the Cayman court. The claim survives. It's under appeal.

Q And it doesn't survive unless the appellate court reverses it, correct?

A Well, it's a live issue before the Court of Appeal.

MR. MORRIS: No further questions.

THE COURT: Mr. Edney, do you have anything before I ask a couple questions, or ask several questions?

MR. EDNEY: No, Your Honor.

THE COURT: Okay.

EXAMINATION

BY THE COURT:

Q Ms. MacInnis, first off, thank you. I know you've been on the stand for quite some time now. But some questions for you. When we've been talking about proceedings in the Cayman Islands that are public and not public, the nonpublic proceeding, is that just the actual liquidation proceeding in which you were appointed as the liquidator?

A It would include -- it includes all of that, and as well as proceedings, general litigation proceedings aren't

considered public until it would be determined on whether that proceeding is in open court.

Q Okay. But the liquidation proceeding in which you were appointed as one of the joint liquidators, and the statement of claim that you are bringing on behalf of Holdco against Mr. Patrick and these other entities, and maybe even Mr. Murphy, those are two separate proceedings in the Cayman Islands, correct?

A That's correct.

Q Okay. All right. Do you believe that the proceedings that you have pending where your statement of claim and going after the restructuring, as I'm going to put it, is sufficient to allow for you on behalf of Holdco to recapture if found -- if the Court rules in your favor, do you believe that's sufficient to recapture any of the assets that are being alleged to have been restructured and taken away from Holdco?

A Yes.

Q Okay. Does the settlement that was entered into and approved by this Court change that in any way?

A My position on that is that I don't know whether the settlement before this Court is good or bad for my estate. I haven't had the opportunity to assess that, to evaluate.

Q Okay. Why would it be -- help me understand, what would be a reason why you would find that it was bad for the Holdco estate?

A Because I understand some claims were released and some claims remain as part of that settlement. Those claims, I don't know whether those are good or bad claims, but I understand that they vest and are in the control of Mr. Patrick. And there is a possibility that he has acquired claims that he can bring against Mr. Dondero, whether those claims are good or bad or appropriate or not. And the concern would be, he could use Charitable DAF monies to fund litigation of bad claims.

Q Okay. But those would be claims against either Mr. Dondero or other entities that are not Highland Capital Management.

A Could be. I don't know.

Q Okay. Does it -- and these would be -- well, let me back up. So anything that you might identify as claims or assets that were released by HMIT would be to the detriment of HMIT. And I'm saying HMIT as Hunter Mountain Investment Trust.

Am I accurate in that understanding that you would be looking to determine whether or not any of the claims in the settlement agreement that were released by HMIT were detrimental to HMIT which ultimately potentially flows up to Holdco?

A It could be. Or they could have been -- because those are now brought in under my structure. So it depends on whether the assessment of some claims are -- could be good and benefit

the DAF, and they -- I'd have to assess the overall impact on the Charitable DAF structure.

Q Okay. But that would only be determining the effect on the DAF structure and HMIT. It wouldn't be --

A Yes.

Q -- determining any effect on the Debtor --

A Right.

Q -- Highland Capital Management.

A Right. No, no.

THE COURT: Okay. All right. I believe that was the questions that I have.

Mr. Edney or Mr. Morris, to the extent you have any redirect on those questions, you're welcome to ask.

MR. EDNEY: No, Your Honor. Thank you.

MR. MORRIS: No, Your Honor. Thank you.

THE COURT: All right. Ms. MacInnis, you may step down.

(Witness excused)

THE COURT: I mean, Mr. Edney, I don't know how many more witnesses we have for your presentation of the case. But obviously, we're at 4:30. I don't know what the parties' needs are. They're obviously from the Cayman Islands. And so do you believe you're going to need to call her again or, because I'm happy to excuse them and allow them to return to the Cayman Islands, but.

MR. EDNEY: Yes, Your Honor. I do expect that I will have to --

THE COURT: Okay.

MR. EDNEY: -- recall -- well, expect is a strong word. I worry that I might have to call them again in rebuttal.

THE COURT: Okay.

MR. EDNEY: Now, Ms. MacInnis, we worked hard to get her here. She does have to go back to the Caymans tonight/tomorrow morning for some other professional commitments. But you know, we -- I know we can get her back here. We just need to -- I think we're working on that schedule right now. But I think (indiscernible) tomorrow and rest the next day.

So as far as my witness plans, Your Honor, we only have two witnesses remaining. We have Ms. Bannon and Mr. Patrick.

THE COURT: Okay.

MR. EDNEY: And that is our case-in-chief.

THE COURT: Okay. Well, you can go ahead and call your next witness then.

MR. EDNEY: Okay. Thank you, Your Honor. We call --

THE COURT: Hold on. You have Counsel behind you standing up.

MR. BUNCHER: I was wondering if we --

THE COURT: If you'll come to the podium, please?

MR. BUNCHER: Yes, Your Honor. Can we be excused, Your Honor, along with the witness?

THE COURT: Well, one, I don't believe she's here under a subpoena.

MR. BUNCHER: Correct.

THE COURT: So, you know, I'm not going to -- I certainly am not holding her under any subpoena power. I will also say that I'll leave it to the party -- or to counsel to determine whether or not -- I'm fine if she leaves, let me just put it that way, so.

MR. BUNCHER: I was more alerting the Court for myself, I didn't want to just walk out --

THE COURT: Oh, you're fine. You may be excused.

MR. BUNCHER: All right. Thank you, Your Honor.

MR. EDNEY: All right. We call Lucy Bannon. My colleague, Ms. Stolley, will be taking that. With Your Honor's permission, I'll step out (indiscernible) on the way out for a moment.

THE COURT: That will be fine.

MR. EDNEY: Yeah. While Ms. Stolley begins. Thank you, Your Honor.

THE COURT: Okay. Ms. Bannon, if you'll come over to the witness stand. And before you have a seat, my law clerk will swear you in.

THE CLERK: Please raise your right hand.

LUCY BANNON, MOVANT'S WITNESS, SWORN

THE CLERK: Thank you.

THE COURT: You may proceed.

MS. STOLLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. STOLLEY:

Q Good afternoon, Ms. Bannon. Could you please introduce yourself to the Court and give us some brief information about yourself?

A Yes. Good afternoon. I'm Lucy Bannon. I'm the Chief Communications Officer at NexPoint. I've lived in Dallas for about 15 years; originally from Chicago.

Q Tell us about your educational background.

A I went to Princeton University. I received a Bachelor's of Arts degree. I was a religion major.

Q Now, you said you're Chief Communications Officer at NexPoint, correct?

A Correct.

Q And how long have you been in that title?

A About four years.

Q When did you first join the company?

A I joined NexPoint at that time, but had been employed by other affiliated entities, or entities serving Mr. Dondero since 2015.

Q And when you came in in 2015, what position were you in?

A I was hired in a public relations role at Highland Capital Management.

Q As Chief Communications Officer, can you please describe for us your primary responsibilities?

A I oversee the communications and corporate affairs department. And those responsibilities include receiving internal and external communications, public relations, public affairs and government affairs, investor relations, and philanthropy, among other things.

Q And when you say philanthropy, can you expound upon that?

A So, philanthropy entails charitable giving in a lot of different capacities, and community engagement that accompanies that. And so that includes charitable giving through the supporting organizations that we've talked about extensively today, as well as other direct personal and corporate giving.

Q Can you explain for us, Ms. Bannon, how you came to -- has philanthropy always been a component of your work position of chief communications officer?

A Yes. And it's a significant portion of my job. And it's always been a portion of my role since I joined in, you know, some various entities in 2015. But it's certainly expanded. And again, that's reflected in kind of the day-to-day responsibilities that I have as chief communications officer.

Q And for what reason did it expand?

A Well, as I said, it's always been a part of it. When I first was hired in 2015, there were charitable giving entities that existed. Jim Dondero has always had a passion for and commitment to charitable giving. And my role has been facilitating that.

In the last five years, as I mentioned, it has certainly been a significant portion of my job. Part of that is reflected in just the rise of charitable assets available to distribute for charitable purposes. And you know, as a result, we've expanded resources available to facilitate that.

Q Prior to October 2020, was there a specific charitable giving person at the Dallas Foundation?

A Yes. We -- so, we work closely with the Dallas Foundation and other community foundations as part of my charitable giving responsibilities. There was, in I believe prior to 2020, a dedicated charitable giving manager who worked part-time at the Dallas Foundation, but exclusively focused on the supporting org, the Highland Dallas Foundation. And so I worked closely with that individual.

Q And when she left, did you take over that oversight role?

A When she left, she recommended, yeah, that the position and a lot of the responsibilities that she had as it related to identifying and recommending grants, facilitating grants, stewarding grant relationships, et cetera, would make sense to be under my purview. And as I said, she and I worked closely

together. And so that was a kind of natural absorption of responsibilities.

Q And in addition to, you also have a dedicated person at NexPoint on your team who's dedicated solely to (indiscernible)?

A Yes. In addition to a significant portion of my time personally, I have one team member and then several other supporting team members who work on philanthropy in various capacities.

Q Can you give us -- you don't have to go into any detail, give us some sense of your experience and expertise at this point in the charitable organization's structure?

A So, I had experience prior to joining Highland in 2015. I worked at a strategic communications firm where there were, you know, responsibilities that mirrored what I do today. But I serve several nonprofit clients in addition to, you know, a range of other clients.

And then, you know, since 2015 and then especially in the last five years, I spend a good portion of my time engaging with various stakeholders across the Dallas community, north Texas community primarily, but elsewhere, to understand community needs, to stay close to nonprofit organizations that are meeting those needs, and with a good piece of that to be able to identify and recommend grant opportunities to maximize the charitable assets that exist at our disposal.

Q And would it be fair to say that Mr. Dondero has imbued in you essentially overarching responsibility, monitoring, et cetera, over the charitable organizations?

A Yes. That is the primary responsibility of mine. But I work closely to carry out what is known as donor intent in the charitable giving world. Whenever there's a charitable giving entity established like there were across the supporting organizations, the supported organizations that are facilitating those take great care to ensure that charitable assets are disposed in a way that reflect the original donor intent and, oftentimes, the you know, issue areas and interest of that donor.

And so having worked with Jim Dondero for ten-plus years, I feel like I have a great understanding of kind of his focus areas. And a lot of my role is identifying opportunities and, again, kind of stewarding grant relationship in a way that reflects that.

Jim and I meet regularly about a range of things. And charitable giving and philanthropy takes up a significant portion of that time.

Q Now I want to talk about the DAF and Charitable DAF and Rand PE and your role into those structures.

A Okay.

Q But before we do so, tell us why those structures -- tell us why those two, when those were originally structured in the

way they were. And we'll put up a chart later, but --

A Okay.

Q -- that chart, number two, has been seen ad nauseum --

A I can envision it.

Q -- the last seven hours.

A Right. So both structures, what you're calling the Rand structure and the DAF structure, exist to serve charitable purposes. There are charitable entities at the top of and that are the economic beneficiaries of those structures. And so the underlying investment entities are -- operate and are designed to maximize the value of charitable assets for the purposes of charitable giving.

And so, you know, each structure has a little bit kind of unique dynamic to it. And that's reflected ultimately in how the assets are distributed. So for instance, on the charitable DAF side, obviously the $270 million that's been discussed here ad nauseum, significant portion of assets. That's a significant number in the charitable giving world.

But the supporting organizations, so i.e., the charitable entities at the top have, you know, prolific giving that reflects that significant pool of assets. There's also flexible, pretty nimble giving, i.e., those organizations don't follow really strict grant cycles or have strong grant restrictions. So it enables them to act quickly and tap into that pool of assets to be distributions to carry out this

charitable giving mandate.

On the flip side of the Rand structure, you know, ultimately smaller pool of assets. And the charitable entities at the top of those operate on a kind of more regular, recurring grant cycle.

Q And we'll go through these later with --

A Right.

Q -- the illustrations (indiscernible) --

A I'm sure it will have everybody.

Q -- to break that down. Who is the donor who established those two entities?

A Jim Dondero.

Q And I shouldn't say entities. Those two structures.

A Correct.

Q When was the DAF established, approximately?

A By DAF you mean --

Q The Charitable DAF.

A -- the various -- sometime in 2011, I believe.

Q 2011 you said?

A Yes.

Q And how about the Rand PE?

A I think sometime in 2015.

Q Let's talk about your charitable role in respect to the Charitable DAF and the Rand PE.

A So my role within both of those structures exists

primarily at the charitable entities. I serve -- I have served as a charitable advisor of all of the supporting orgs at the top of the DAF structure, so the Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation.

And in that role, as I mentioned, I am identifying and recommending grant opportunities, facilitating grants, stewarding the grant relationships. I have also, since 2024, served as an officer of those three supporting organizations.

And then on the Rand side, there are two supporting organizations at the top of that structure. One of those is the Empower Dallas Foundation. And I've served as a charitable advisor for that entity too since 2015.

Q Okay. And again, forewarning that we're going to be talking --

A Okay.

Q That's okay. Who did -- you know, we're going to talk -- we're talking now about how these were structured before any sort of corporate restructuring. And then we're also going to talk about the restructuring. Who did that restructuring?

A Mr. Patrick.

Q How do you know Mr. Patrick?

A So, I have known Mr. Patrick since 2015 when I joined Highland Capital Management. He was a colleague of mine. He was a tax lawyer for Highland directly. And then in 2021, I

became an employee of Skyview Group which, you know, to rehash some of that Highland Bankruptcy saga, that's at the time when the Highland Capital Management employees, largely who were providing shared services to various Dondero-related entities, were let go of HCMLP and ultimately joined Skyview. So Mr. Patrick, like me, joined Skyview Group then.

And so throughout that time, I have interacted with him on charitable giving in his capacity as a tax lawyer. And then since his assumption of the role as control person and director of the DAF Entities in 2021, I had interacted with him in facilitating the grant making that I've spoken about.

Q And just very quickly, what is your -- what are your thoughts on the various restructuring mechanics that Mr. Patrick has (indiscernible)?

MR. MORRIS: Objection, Your Honor. Let's lay a foundation. I'm not clear if she understands what the restructuring is. She's (indiscernible). Come in here and just (indiscernible) what she thinks (indiscernible).

MS. STOLLEY: I think I've laid plenty of foundation. She's clearly in a role knowing the structure of the charitable organizations to be able to testify about any changes which we will go into in clear detail momentarily.

THE COURT: Is she going to be testifying as to the changes that have happened, or to the legal effect and her opinion on those? I mean, those are two different things.

MS. STOLLEY: Not the legal effects, no.

THE COURT: I mean, if she's going to testify as to company A bought company B and now it's company C, I'll allow it. But to the extent you're seeking her opinion as to the legal ramifications of what happened, I don't believe Ms. Bannon has been, one, designated as an expert in that area.

MS. STOLLEY: No. No.

THE COURT: And two, even recognized as an expert, so.

MS. STOLLEY: I'm not trying to qualify her as an expert. And it would be more in the context of the impact on the charitable organizations with which she is intimately familiar. But I can ask her later on when I build more of a foundation.

THE COURT: Okay.

BY MS. STOLLEY:

Q So prior to the restructuring that we're going to talk about, how were the Charitable DAF and the Rand Entities functioning/operating? And what I mean is not mechanics but in terms of were they operating smoothly, were they doing well, (indiscernible) investing, et cetera.

A Well, I can certainly speak to the -- their function as it related to maximizing value of assets for the purposes of charitable giving. And I can say that both of them were functioning in that capacity, evident in the prolific grant

making that I mentioned that occurred at the top of those structures where, you know, assets grew at the underlying investment level. That enabled larger and larger grant making for the benefit of the north Texas community and elsewhere.

Q So let's talk about the DAF, Charitable DAF. You're familiar with its structure and its operation, correct?

A Correct.

MS. STOLLEY: Sydney, can you please put up Slide 2 of Exhibit 2? And, Your Honor, we do have a hard copy of this if you want it.

THE COURT: It's fine.

THE WITNESS: I can see it.

BY MS. STOLLEY:

Q Okay. What does this chart show?

A This shows what we've been referring to as the Charitable DAF Entities, and the respective charitable entities that sit at the top of the structure as the economic beneficiaries participation shareholders. And as of, I don't see the exact date, but I believe sometime in 2024, as of March 6, 2024.

And so you see the three supporting organizations I mentioned that are the owners of Charitable DAF Holdco and the various supported organizations at the top of those which are community foundations that operate around the country.

Q Tell us what you're talking about when you say the three supporting organizations. Identify what you're talking about.

A The three supporting organizations there are the Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation.

Q And you had said previously that you worked with the supporting organizations, correct?

A Correct. I -- as I said, I've been a charitable advisor for those organizations since 2015, and an officer of those organizations since 2024.

Q Explain for us what a supporting organization is.

A So a supporting organization is a charitable organization that exists for the benefit of a supported organization. And i.e., that can carry out its mission and, you know, facilitate its operations.

So in this instance, I'll sue the example of the Dallas Foundation which is a community foundation which is one kind of supported org. So the Highland Dallas Foundation is one of several supporting organizations that serves to benefit the Dallas Foundation.

In this instance, this charitable vehicle is a way for a donor, Jim Dondero here, to establish a charitable giving mechanism whereby the Highland Dallas Foundation makes grants, is the one that is issuing funds, donations to nonprofits, and does so within the infrastructure and operations of the Dallas Foundation, and is ultimately controlled by the Dallas Foundation.

Q Who controls a supporting org?
A The supported organization.
Q So here you're saying that Highland Dallas Foundation is controlled by Dallas Foundation, correct?
A Correct. And akin to that, the Greater Kansas City Community Foundation controls the Highland Kansas City Foundation. The Santa Barbara Foundation controls the Highland Santa Barbara Foundation.
Q There are board of directors on each of the supported organizations, correct? The supported organizations being, for instance, Dallas Foundation, correct?
A Correct. Each of the community foundations, the supported organizations has their own board. Each of the supporting organizations also has their own board.
Q With respect to the supported community foundations, what is the composition of their board, typically?
A The community foundation boards, the composition of those vary. We're not involved in those. There's no representative from Dondero entities on those boards. So the board members vary, are pulled up from the community, et cetera.
Q As to the supporting organizations, Highland Dallas Foundation for instance, what is the board composition there?
A So that board composition includes a majority representation from the supported organization. So again, I'll use the example of the Dallas Foundation and Highland Dallas

Foundation. So there are two board members from the Dallas Foundation. Those are designated as institutional members. And then one board member, in this instance Jim Dondero who is designated as an individual board member. That board composition reflects the control, as I mentioned, of the community foundation. The supported organization, they have the voting power and ultimate authority.

And then it also reflects the donor intent that I talked about earlier whereas Jim Dondero serves as a board member there and is able to provide advice on grant making and activities along those lines, again to ensure that the original donor intent in the structure is reflected in its charitable giving. But again, all within the confines of kind of the mission of the ultimate supported organization which is the Dallas Foundation.

Q Sure. And what you just described with Mr. Dondero being the minority and the supported organization being the majority.

A Correct.

Q Is that true of Highland Kansas City Foundation, and also Highland Santa Barbara Foundation?

A Yes.

Q Okay. You have been sitting in the courtroom, correct?

A Yes.

Q So do you recall Mr. Morris, in his opening statement, saying that Mr. Dondero established, funded, and controlled the

supporting organizations?
A I recall that statement, yes.
Q Is that correct?
A No.
Q How so?
A Well, the first two parts of that are generally accurate whereas yes, Mr. Dondero as a donor funded and established the three supporting organizations for the purposes of charitable giving.
However, by definition, in establishing those supporting organizations as supporting organizations, he necessarily ceded all control to the community foundations that are the supported organizations in the structure.
Q Okay. So not to beat a dead horse, but to actually beat a dead horse. What, if any, control, absolute control of Highland does Mr. Dondero have over the supporting organizations?
A None.
Q None? Or the supported organizations, correct?
A None.
Q Given that Mr. Dondero has no control there, what is your role in terms of grant making?
A So again, ultimately all grants are reviewed and approved by the Dallas Foundation via their representation on the Highland Dallas Foundation board. And again, I'm using this as

an example. This is the case across all of the supporting organizations.

So my role is in recommending grants in many instances, and identifying grant opportunities. So you know, I don't always. I spend a lot of time reviewing potential issue areas within the community and nonprofits that are working with them.

Sometimes those nonprofits that I'm spending time with, you know, reflect potential grant opportunities that I will help bring to the Highland Dallas Foundation, and ultimately the Dallas Foundation, with a grant recommendation attached to it. They will review that and, you know, potentially approve it.

Then there's also kind of facilitating the grant. You know, oftentimes, these are large, multi-year grant arrangements. And so it's not just a single donation. It is a donation with significant size made of the course of five, sometimes ten years. So there's an ongoing management of the grant to ensure that the original and intended impact is met.

Oftentimes, there are annual, quarterly, you know, ad-hoc check-ins or reporting required as part of the grant from the nonprofit that I will review and kind of steward the grant/nonprofit relationship and, you know, among several other things. But as I mentioned, a significant part of my job is spending time in the North Texas community and elsewhere to identify and manage these grant opportunities.

Q And by the way, I wanted to go back to the control there for just a second. Does Mr. Dondero's lack of control relate just to grant making, or does it also extend to investments, investment management, legal decisions?

A Mr. Dondero ultimately has no control over any of the operations of the supporting organization.

Q Okay. So this is the chart here from March of 2024, we said. Since December 2024, have there been changes to the Charitable DAF structure?

A Yes.

Q Can you give us some examples of those changes?

A So, several that have been discussed today. Looking at this original chart, the Charitable DAF GP that existed in March of 2024 was ultimately changed from a Delaware entity to a Cayman entity, that I believe, CDH GP. There was an entity inserted between Charitable DAF Holdco and Charitable DAF Fund. That's CDHCMFAD, I believe. There was then a newly-created nonprofit that ultimately had -- was issued participation shares in the structure, among other things.

So, yes. There were several changes to the structure.

MS. STOLLEY: Okay. Let's go through those one-by-one. Can you turn the slide forward please, Sydney? Thank you.

BY MS. STOLLEY:

Q Can you tell us what this reflects, Ms. Bannon?
A This reflects that first change that I mentioned, which is the creation of the GP entity, CDH GP, a Cayman Islands entity. And as you can see, that replaced what had been the Delaware GP entity within the DAF structure.
Q TO your current understanding, during what time period did this change take place?
A I now am aware that this change took place March 7th, 2024.
Q And who was the managing partner at that time?
A Managing member or director of --
Q Managing member.
A Mark Patrick.
Q And that is of?
A Well, of the GP entity to now Mark Patrick and Paul Murphy.
Q And to your understanding, was it Mark Patrick who made that change?
A Yes.
Q To your knowledge -- not to your knowledge. Excuse me. Were you or anyone at Dugaboy aware of this change that was made in February 2024?
A I believe it was March of 2024. But no, we were not aware of the change that was made at the time.
Q Oh, I apologize. No, February 2024 is what we're talking

about.

A Oh, okay. Sorry. Well, no, we were not aware of it then.

Q Okay. And when did you or Dugaboy become aware of that change?

A I first became aware of it I believe sometime in February of 2025.

Q Can you move on to Slide 5, please? Now, you mentioned before the insertion of an entity between Charitable DAF Holdco and Charitable DAF Fund. Looking at Side 5, is that insertion that you spoke about reflected here?

A Yes.

Q Can you explain that change to us, please?

A Yes. So this change ultimately inserted this entity, CDMCFAD, again another entity that is managed by Mark Patrick, between Charitable DAF Holdco in which the supporting organizations own the participation shares, i.e. the economic benefit of the Charitable DAF structure.

And the part of the structure where the actual assets resided, and ultimately the value resided which his under the Charitable DAF Fund, LP.

Q So what was the significance of inserting an entity into the DAF structure in this manner?

MR. MORRIS: Objection, Your Honor.

THE COURT: Basis for your objection?

MR. MORRIS: How could she have any knowledge of the

significance of injecting this. This is exactly what Your Honor cautioned about.

THE COURT: Yeah.

MR. MORRIS: It incorporates --

THE COURT: Okay. Response?

MS. STOLLEY: The response is that I'm asking about the significance to the charitable organizations, which she may not be able to testify about now, but later on I'll ask her again, you know, ask her about the impact on the charitable organizations in the structure.

THE COURT: I mean, again, she's -- I'm not quite -- you're skirting really close to seeking an opinion on the legal effect of what's going on here. So to the extent that she's going to testify as to factual matters, I'll allow it. But to the extent she's going to give her opinion as to the legal significance of this, then I'm going to sustain the objection.

MS. STOLLEY: Thank you, Your Honor.

BY MS. STOLLEY:

Q Who added this organization to the structure again?

A Mark Patrick.

Q What is your current understanding of when Mr. Patrick inserted CDM in to the DAF structure?

A Today, I understand that change would have been made in December of 2024.

Q In December 2024, were you or anyone at Dugaboy aware of this move?

A No.

MR. MORRIS: Your Honor, objection. I don't know why she's testifying on behalf of Dugaboy. We haven't established that she's got any relationship with Dugaboy whatsoever. I don't even know why this witness is relevant (indiscernible). This case is being brought by Dugaboy. It's about what Dugaboy knew or could have known. But just, I don't want to be disrespectful at all, Your Honor. But if she wants to testify about her, testify about her. But she is not Dugaboy.

THE COURT: Response?

MS. STOLLEY: I'll (indiscernible) and then I'll circle back to (indiscernible).

THE COURT: Well, I mean, I'm going to sustain the objection because, as I understand it, Ms. Bannon works for either -- works for NexPoint and is also involved with the supporting organizations. I've not heard any testimony where she would have any knowledge on behalf of Dugaboy.

MS. STOLLEY: Thank you, Your Honor.

BY MS. STOLLEY:

Q To your knowledge, were you aware of this change in December 2024?

A No.

Q Was anyone at NexPoint aware of this change in December

2024?

MR. MORRIS: Objection, Your Honor. How can she speak on behalf of an entity, NexPoint, that has dozens of employees?

THE COURT: I'm going to overrule the objection. And she has been identified as the chief communications officer for NexPoint. So to the extent she would have knowledge, she can testify to it.

THE WITNESS: Nobody at NexPoint had knowledge of this in 2024. And again, given the implications it would have for the charitable entities and my role at NexPoint advising the charitable entities, I would have been aware had anybody else known it.

BY MS. STOLLEY:

Q And when did you or anyone at NexPoint, to your knowledge, become aware of this change?

A Not until significant time period later. I can't recall the specific date.

Q Okay. Let's move on to six, please. Now, you've heard testimony about a transfer of shares. Is that depicted structurally in Slide Number 6?

A Yes.

Q Can you explain this change, from your knowledge?

A Yes. So the slide depicts the creation of DFW Charitable Foundation, which was a brand new tax-exempt charitable entity

created I believe sometime in February 2025. And it here is reflected as the 51 percent holder of the participation shares in Charitable DAF Holdco, which reflects, obviously, a significant and significant, i.e. in change of ultimate control of the ownership in the Charitable DAF Holdco moving significant value away from the three supporting organizations that we've talked about.

Q And who made this change?

A Mark Patrick.

Q And what is Mark Patrick's position with DFW?

A He is the director, control person, founder.

Q To your current understanding, when did this issuance of shares happen?

A My current understanding is this issuance of shares happened sometime in February 2025.

Q Were you or anyone at NexPoint aware of the share issuance when it happened in February of 2025?

A No.

MR. MORRIS: Your Honor, I rise just to make sure that this is a demonstrative exhibit and there's no evidentiary value. We think it's inaccurate in some material way including its depiction of Mr. Patrick as the sole known economic beneficiary. So as long as this is here as a demonstrative, it's not being offered for the truth of the matter asserted, it's just being used during the examination of the witness, I

have no objection to that. But I wanted to make sure.

THE COURT: It's my understanding that this is a demonstrative. It has not been admitted into evidence.

MR. MORRIS: Okay.

MS. STOLLEY: Right. (Indiscernible).

BY MS. STOLLEY:

Q When did you become aware of the issuance of shares here?

A Significantly after this time period. I believe as part of the Cayman proceedings.

Q Lastly, you mentioned a change of assets, I believe. Can you explain that in more detail? Explain a little more what you were referring to.

A Can you elaborate on the question?

Q Let's turn to Slide 7, please.

THE COURT: Just real quick, how much longer are we thinking with this witness? Just so you all know, the A/C has been cut off in the building. That's what happens at 5:00 in federal buildings. And all exits have been locked except for one through a stairwell. So you'll all have to exit down through a stairwell, which is fine.

But I may need to take a quick recess if we're going to continue to go on here much longer so that I can get a charger for my tablet.

MS. STOLLEY: I'm thinking 20 minutes.

THE COURT: Okay. Why don't we take a five-minute

recess for me to get a charger and get this plugged in.

THE CLERK: All rise.

(Recess at 5:08 p.m., recommencing at 5:15 p.m.)

THE CLERK: All rise.

THE COURT: All right, you may be seated.

MS. STOLLEY: Ms. Bannon, I can tell that we're way too (indiscernible).

THE WITNESS: I will try.

BY MS. STOLLEY:

Q I want to back up because we've had some conversations sometimes about Dugaboy, et cetera. Do you know what Dugaboy is?

A Yes.

Q What is it?

A It is Jim Dondero's family trust.

Q And do you work -- and give us an extent to which you work with Mr. Dondero in his capacity as its founder of Dugaboy?

A Well, in my capacity at NexPoint, I work on a variety of different entities and affiliates. And Dugaboy is one of them. For instance, Dugaboy has made charitable contributions which I have worked with him in that capacity of and, you know, been a funding source for other things that I've been aware of.

Q And in your capacity as working with Mr. Dondero about his nonprofit focuses and where he wants to put his money, can you walk us briefly through that process? Like, how does that

work? Do you guys meet, do you talk, how does it work?

A As I said, the charitable entities have intentionally, you know, not tried to follow a strict or rigorous grant cycle or major grant restrictions. You know, for instance, there are certain foundations that will only fund things in certain issue areas, you know, global health or something like that.

At the onset, at Mr. Dondero's donor intent as I've spoken about, these entities were established to have broad charitable mandates in order to be nimble and make donations to a variety of issues in support of community needs.

So the, you know, ongoing activities of that, I meet with Mr. Dondero on regularly and, as I said, after ten years, have developed an understanding of certain issue areas and causes that he cares about, and ways that he believes that grant funds can contribute to those.

Some of those causes include education and access to opportunity, veterans causes, economic and community development, a lot of youth and family issues, among other things.

And so with that understanding, along with an understanding of the underlying investment assets that are at the disposal for the supporting organizations, I go out and spend time with nonprofits, spend time with other community stakeholders, work closely with the staff of, and again I'll use the Dallas Foundation as an example just because we are

based in Dallas, in north Texas, and a good amount of the giving occurs there, to identify as nonprofits that are operating in those and other areas, understand that nonprofit's needs, some of its current activities, programs, funding sources.

And when there's a grant opportunity that I believe is valuable, we'll make a recommendation, speak to Mr. Dondero about it, and then bring it forward to the Highland Dallas Foundation for consideration. And that then, once approved, would then ultimately trigger a distribution request from the underlying charitable entity.

Q So prior to 2024 I think it was, that interaction with Mr. Dondero, you were working together at Focus, did Mr. Patrick play any role in that other than as a tax advisor?

A Not really, no.

Q If you know, Ms. Bannon, can you tell us the figure that the total money contributed towards the Charitable DAF. I'm not using the right words. But the amount of -- well, first, is it fair to say that Dugaboy played a role in starting and seeding the Charitable DAF?

A Yes. I don't know the exact figure that Dugaboy would have contributed to. I am aware of certain contributions over time. You know, you'll remember, these are supporting organizations that are recognized via their relationship to the supported organizations as public charities, meaning they can

accept donations of all sorts at any given time.

So there are instances where Mr. Dondero, via Dugaboy, continued to contribute assets into the supporting organization to further the charitable mission. So I can think of instances of those donations over the years that I've been involved in and aware of.

Q But you don't know the initial seed --

A I don't recall the specific funding there.

Q And prior to the various restructurings, what is your understanding of the total number of assets for the Charitable DAF?

A My understanding is the latest value I was aware of prior to the various restructurings was around $270 million.

Q Two hundred and seven?

A Seventy.

Q Seventy. Okay, I want to go back to this demonstrative, please, and walk through, you know, apart from (indiscernible), can you walk through the change of assets that was discussed before?

A Yes. Specific to this slide in front of me?

Q Yes. And also in general.

A As I mentioned, the creation -- well, sequence of events that started with the change of the GP entity from the Delaware entity to the Cayman entity, and then the insertion of CDMCFAD, that is what essentially created the distance and segregation

between the supporting organizations that were originally created as charitable beneficiaries of this structure and the actual entities that held the underlying assets, which was Charitable DAF Fund.

And so then, along with the creation of the new charitable entity, and the dilution of the original supporting organizations by the issuance of the 51 percent participation shares, it enabled the transaction that's been spoken about prior whereas the original charities were redeemed out for $1.6 million, and the $270 million in value was moved and restructured out of their reach.

Q This, what's depicted on this chart, the $1.61 million of the redemption paid to the charities in March 2025, do you know, to your current understanding, when was the $1.61 million redeemed?

A The -- well, my current understanding today is that that occurred in March of 2025.

Q And to your understanding, who's responsible for that change?

A Mark Patrick.

Q Were you aware, at the time, of this change?

A No.

Q And to your knowledge, was anyone at NexPoint aware of this change?

A No.

Q When did you become aware of this?
A I didn't become aware of it until sometime in July of 2025. There ultimately, you know, retroactively were some activity that gave us some indication later on. But we only had bits and pieces and did not have the full and complete picture.
Q By the way, do you know the basis of the $1.61 million redemption made to the charities in March 2025?
A I believe that figure was derived from a new valuation report issued by ValueScope in -- sometime in 2025.
Q Now, you mentioned valuations. What do you know about the valuations?
A I know that the supporting organizations received, on a quarterly basis, the valuation report created by ValueScope of Charitable DAF Holdco reflecting their ownership in the underlying investment assets, and thereby providing them an indication of their percentage ownership within those assets.
Q And can you tell us what the basis of your knowledge of ValueScope and these valuations.
A I often received those quarterly reports. I know they were sent to the supporting organizations on a quarterly basis. The supporting organization and supported organization representatives have indicated that to me and shared those with me. I have received and been -- via the supported organizations and via Shawn Raver, those quarterly valuation

reports, and have reviewed many of them myself.

Q Can you pull up Exhibit 11, please. Do you see what this is, Ms. Bannon?

A Yes.

Q And what is it?

A This is one of those quarterly valuation reports that I mentioned as of the quarter ending, September 30th, 2024.

Q And on this report -- well, let's go to the next page so you can tell us what the date is of this report.

A The as-of date, as I said, is September 30th, 2024. And the date creation is January 7th, 2025.

Q Okay. Can you scroll down, please, to Page 5. Are you familiar with ValueScope's conclusions regarding the value of the shares at this point in time, in this report?

A Yes.

Q And according to ValueScope, what was the Charitable DAF Holdco's net asset value as of 9/30/24?

A The net asset value was $269,052,808.

Q So was there any sort of discount there?

A It says a combined 13.9 percent discount.

Q Can you scroll back to the first page, please?

MS. STOLLEY: Sydney, can you scroll back to the first page, please? Thank you.

BY MS. STOLLEY:

Q Who is this addressed to? Or prepared for, I should say.

Who was this prepared for?
A Prepared for Mark Patrick as Director of Charitable DAF Holdco.
Q And can you scroll down a little bit? And the letter's addressed to Mr. Patrick as well, correct?
A Correct.
Q And we said that the period, that this was as of September 30th, 2024, right?
A Correct.
Q And the date was January 7, 2025.
A Correct.
Q So three months later?
A Correct. And this was one that I received directly from the supporting organization upon transmission from Shawn Raver.
Q And is this Highland Dallas Foundation?
A Correct.
Q Can you turn to Page 8 of the document? Under description of the assignment, those last two sentences, can you just read those out, please?
A "This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred."
Q All right. Can we move on to Exhibit 13 -- I'm sorry, Exhibit 12, please. Do you recognize what this is?
A This is another valuation analysis of certain

participation shares of Charitable DAF Holdco, the same entity we were just talking about. And this one is dated as of March 25th, 2025. Therefore, did not necessarily align with a quarter end like prior reports.

Q And actually, let me go back to the other one before. That, the formatting, September 30th, and then three months later the report comes out, is that generally how these reports -- the timing of these reports, you said quarterly?

A Yes. These reports were prepared quarterly and then would be provided to the supporting organization sometime after that on a recurring basis, but usually with some lag as of when they were created.

Q And the last report being addressed to Mr. Patrick, is that typically what you saw in these quarterly reports?

A Yes. In all quarterly reports prior to this one, it was directed to Mr. Patrick as Director of Charitable DAF Holdco. And then prior to that, it was directed to Grant Scott who had held the position of Director of Charitable DAF Holdco prior to Mr. Patrick.

Q Who is this -- wait, can you go back down? Now, we said this was as of March 25th, 2025. As you pointed out, that is not the end of a quarter.

A Correct.

Q Right? And who was this prepared for?

A It appears to be prepared for Mr. Bart Higgins who is

listed as an attorney for the Shields Legal Group.

Q And do you know who the Shields Legal Group is or who that attorney is?

A I believe it is an attorney for Charitable DAF Holdco. And it was referenced in the prior testimony.

Q So for Mr. Patrick?

A Yes.

Q Can you scroll down, please? So what is the date of this letter?

A March 26, 2025.

Q So it's the day after the (indiscernible), correct?

A Yes.

Q Have you seen this in any other valuation before?

A No. As I mentioned, there's typically a lag between the reporting period of which the report covers and the cover letter through which it's disseminated. It would be unusual to have this purported 24-hour turnaround.

MS. STOLLEY: Can you scroll please, Sydney, to Page 9?

BY MS. STOLLEY:

Q We're going to look at the description of the assignments. The last report you read out that was internal purposes, do you remember that?

A Yes.

Q Can you read the last paragraph here starting with, "This

valuation?" Is it hard to read?
A Oh, sorry. Yes. "This valuation analysis was conducted for internal reporting transaction support including the issuance and redemption of shares, dispute resolution, regulatory compliance, or any other context where a fair market valuation is required."
Q Had you ever seen that language before in any prior valuation report?
A No.
MS. STOLLEY: Can you scroll -- Sydney, I'm sorry for going back and forth, but can you scroll to Page 6 of the document?
BY MS. STOLLEY:
Q Can you tell us what this valuation shows as to Charitable DAF Holdco assets?
A The -- let's see. Sorry, this is blurry.
Q Right at the top.
A I believe that is $1,637,192.
Q In your time of seeing the valuation reports, had you ever seen this low of a number?
A No.
Q What was the lowest you've ever saw a number?
A Something within the $250 million range. Again, it varied but was largely within that number.
Q And do you remember what time period that was or what

could have been caused by?
A There was a period around COVID where obviously significant valuation changes to a number of underlying investments that would have depressed the ultimate value. But again, nothing nearly as significant as this.
Q By the way, was this valuation, did you have access or were you provided this valuation report?
A Not in real time, no.
Q Do you remember seeing it?
A Yes.
Q And at what point did you see it?
A Sometime after, obviously, it's as-of date. And I believe provided as, again, justification for the redemption out of its supporting organizations.
Q Do you know whether this valuation report was provided to the charities?
A No, I do not.
Q You don't know that?
A I do not believe it was brought into the charities.
Q And what is the basis for you saying that?
A As I said, the charities, especially in most recent quarters to date, would have provided me directly the quarterly valuation reports.
Q But as you said previously, the valuations typically were sent on a quarterly basis to the charities, correct?

A Correct.
Q Do you know why this one wasn't?
A No.
Q And did the charities seek any action with respect to this, if you know?
A What do you mean?
Q I'll withdraw the question. Okay. I'm going to move on to -- we haven't spoken about the Rand structures yet. So let's move on to the Rand structures. Can you explain your relationship between the Charitable DAF and the Rand structures?
A So, the relationship between the Charitable DAF structure that we just talked about and the Rand structure first began in 2022 when Mr. Patrick took over from John Honis who had previously been the manager at the top of the Rand structure. He was replaced via an entity, Charitable DAF Holdings. And that entity was created under ultimately I believe Liberty Holdco, or ultimately CLO Holdco within the Charitable DAF structure.
Q Does the Rand structure include Dugaboy?
A The Rand structure includes a subsidiary of Dugaboy, which is Dolomiti. And so, and that is via an ownership in Hunter Mountain. And the Hunter Mountain entity, the other owner there is the Rand PE Fund, or sorry, Dolomiti has an interest in the Rand PE Fund which holds Hunter Mountain via Beacon

Mountain. And then the Atlas IDF also has an ownership in the Rand PE Fund. And Atlas IDF ultimately rolls up into Empower Dallas and the Okada Family Foundation which are both supporting organizations of the Dallas Foundation via Crown Global insurance policy.

MS. STOLLEY: And can we turn to Slide 13, please? Sydney, can we turn to Slide 13, please? Oh, I'm not seeing it.

THE WITNESS: I'm not seeing it either.

BY MS. STOLLEY:

Q Is this an accurate depiction of the Rand structure with the Charitable DAF Holdco?

A Yes.

Q And within your structure, within this structure, what was your role?

A So, as I mentioned, my role was charitable advisor to the Empower Dallas Foundation. And then obviously, as I mentioned, the relationship to Dugaboy. So it would have some ties to the Dolomiti side of things.

Q And what is Empower Dallas?

A So Empower Dallas is another supporting organization of the Dallas Foundation which is the supported organization here, and one of the supported organizations on the DAF structure.

Q Can you explain the rest of the structure for us?

A Sure. I will stop or start at the --

Q You've gone into some of them.
A -- bottom. So the Hunter Mountain Trust, which I mentioned, is a trust wholly owned by Beacon Mountain. And those are assets, well were assets at this time, of the Rand PE Fund. And the Rand PE Fund is held by Atlas IDF, which again is the entity that then connects it to Empower Dallas.
Q And you mentioned Dolomiti.
A Yes. So Dolomiti, along with Atlas IDF, are limited partners in the Rand PE Fund.
Q Is Dolomiti a subsidiary of Dugaboy?
A Yes.
Q Can you explain briefly Crown Global and how they fit in?
A Crown Global is an insurance company that issued a policy that holds the Atlas IDF interest. And Empower Dallas and the Okada Family Trust are annuity policy holders.
Q What's the role of Empower Dallas in the Okada Family Trust?
A Those are both supporting organizations. And so, similar to the supporting organizations that I mentioned within the Charitable DAF structure, those are entities that make grants to nonprofit organizations and facilitate the mission of the supported organization, which is in this case for both Empower and the Okada Family Trust, the Dallas Foundation.
Q Are you aware of any changes to the Rand PE structure at this time?

A Yes.
Q Can you tell us just a general description of --
A Yes.
Q -- the charities.
A As I mentioned, one change was in 2022 where Charitable DAF Holding Corp. was created. And that was when John Honis was removed, no longer the person, the control person and the manager of those entities. And then subsequent to that, there was a change in the Beacon Mountain sale. And then ultimately, the liquidation of the Rand PE Fund.
Q Okay. So let's start with the Beacon Mountain and the Hunter Mountain. Let's talk about that sale. When was that?
A I believe that was in February of 2025.
Q 2025 or 2024?
A 2025.
Q And what's your current understanding, meaning now, of the value of Hunter/Beacon Mountain?
A My current understanding is there is at least $23.5 million that can be attributed in value to those entities via the settlement agreement with Highland Capital Management.
MS. STOLLEY: Can you pull up Exhibit 2, please?
BY MS. STOLLEY:
Q Now, you mentioned the settlement agreement. You're familiar with that settlement agreement?
A Yes.

Q And how are you familiar with that?

A One, it was a significant event in the Highland Capital Management bankruptcy case. So as someone who had various interactions with that case and actively watched the docket, I was familiar with it when it was filed.

Q Now, Exhibit Number 2, is this the settlement agreement that you're talking about?

A Yes.

Q I want to look at Paragraph 3 which is on Page 9. Actually, Page 8 at the bottom and Page 9 at the top. Now, we're still talking about the 23.5 million. Ms. Bannon.

With respect to Paragraph 3, how much is Highland paying Hunter Mountain in this paragraph? And if you need to go down farther to Paragraph 3. Here we go.

MR. MORRIS: Your Honor, I'm just going to object to this whole line of inquiry. I don't hear anything about any responsibility that this witness has for this. She said she monitored the docket. She wasn't a witness at the hearing. I don't see what connection she has to the settlement or the HMIT or to Highland, And I don't know how she comes here today to just tell her what she thinks was on the docket. I don't know why that's relevant.

MS. STOLLEY: I'm using this document simply for Ms. Bannon to walk through the breakdown of the 23.5 million and how she came up with that figure.

MR. MORRIS: Your Honor, the document's in evidence. (Indiscernible).

THE COURT: Yeah. I mean, I am struggling to see where we're going with this. I mean, we've already had one witness who was on the stand for four-plus hours that talked about all the restructuring. So I'm going to sustain the objection. I mean, the document's in evidence. It tells me what claims were there and released.

MS. STOLLEY: Okay. Thank you, Your Honor.

BY MS. STOLLEY:

Q You mentioned the 23.5 million number. How much was Hunter Mountain sold for?

A My understanding is it was sold for one million dollars prior to that settlement.

Q And how do you know that?

A How do I know that today? Ultimately, that has been disclosed and discussed, and reflected in subsequent financial documents that reflected that sale.

MS. STOLLEY: Your Honor, I was going to go into the audited financial statement, but I'm guessing that I should just move on.

THE COURT: I mean, I don't have an objection yet to rule on, so I'm not going to rule on it.

MS. STOLLEY: Okay.

MR. MORRIS: Let her ask the question so then I can

object.

MS. STOLLEY: Thank you.

BY MS. STOLLEY:

Q Okay. So, you learned about that amount from the automated financial statements?

A We learned about that amount I believe when there was some communication between Rand PE Fund and Dolomiti as it related to the sale of an asset and request for wire instructions for funds related to that sale. But that only indicated the amount.

Q And you didn't know what -- anything else other than that?

A No.

Q Now, in your role as chief communications officer of NexPoint and officer of these various supporting organizations, are you familiar with the Rand Fund financial statements?

A Yes.

Q Exhibit 100 is on the board. Do you recognize that document?

MS. STOLLEY: Can you scroll down, please?

THE WITNESS: Yes.

MS. STOLLEY: I don't know whether this is in evidence. I don't believe it is.

(Counsel confer)

BY MS. STOLLEY:

Q And you said you are familiar with Rand's financial audit,

the independent auditor's report, correct?

A Yes.

Q What do you recognize this document to be?

A This is a document provided to the limited partners of the Rand PE Fund.

MR. MORRIS: Your Honor, I'm going to make the same objection if I might. This witness is qualified. She hasn't connected any role that she has within (indiscernible). The document speaks for itself. It's not even in evidence.

THE COURT: Your response?

MS. STOLLEY: (Indiscernible) as an officer of the supporting organizations, she does have some background and knowledge and understanding of this document, and she can provide a foundation to authenticate.

THE COURT: I'm going to overrule the objection at this moment. But I'm going to need for there to be evidence of how she has anything to do with Rand PE Fund, and she can testify to its documents.

BY MS. STOLLEY:

Q Do you want to explain for the Court your position vis-a-vis Rand?

A Right. As I mentioned, Atlas IDF is one of the limited partners in the Rand PE Fund. Atlas IDF is through which the Empower Dallas Foundation and Okada Family Foundation own value in the structure. And so I have familiarity there.

And then also, Dolomiti, subsidiary of Dugaboy, is also another limited partner in this Rand PE Fund, and I believe was the source of the -- receipt of these financial statements.

Q So with respect to this document, is it a true and correct copy of the automated financial statement for that relevant period that you would --

MR. MORRIS: Objection, Your Honor. We have no foundation. It's not in evidence.

THE COURT: I'm going to sustain the objection.

BY MS. STOLLEY:

Q Did you review this document, Ms. Bannon?

A Yes.

Q And in your capacity of what you just described vis-a-vis Rand PE, was it within that position for you to review the financial statements for Rand PE?

A Not on a regular basis. But in the instance of all these restructurings and the implications they had on the charitable vehicles where I did have responsibility, yes.

Q And this document in front of you, is this the document that you reviewed?

A Yes.

Q And to your knowledge, does this exhibit fairly and accurately reflect the financial condition of the entities discussed as of this date, June 26, 2025?

MR. MORRIS: Objection. Unless she can testify that

she's done the diligence to answer that question.

THE COURT: I'm going to sustain the objection.

MS. STOLLEY: One moment, Your Honor.

(Pause)

MS. STOLLEY: Okay. Just a second, Your Honor.

(Counsel confer)

MS. STOLLEY: And I recognize that people want to get out of here. But I want to spend time and just (indiscernible).

BY MS. STOLLEY:

Q All right. Let's talk about -- were you ever aware, or back when it happened, were you aware of to whom Hunter Mountain was sold?

A No.

Q And that was in February of 2025, correct?

A Correct. As I said, at that time, we were aware there was an asset sold via communication to LPs in the Rand PE Fund. But that was, more or less, the extent of our knowledge.

Q And in your current understanding, what entity purchased Hunter Mountain?

A Well, my current understanding is that the sale was via Beacon Mountain. And ultimately, we came to learn the buyer was CLO Holdco, LLC, which is a subsidiary of CLO Holdco within the Charitable DAF structure.

Q Do you know who at CLO made the decision to purchase

Hunter Mountain?

A Mark Patrick.

Q And how do you know that?

A Because he is the control person and ultimately only one with authority to authorize that purchase.

Q And do you know who sold or made the decision to sell Hunter Mountain?

A Mark Patrick.

Q Can you describe for us, based on everything you told us today, the impact of this transaction, this entire -- all these corporate restructures that we've discussed today, please describe for us in detail the impact on the charitable organizations.

A So, all of the maneuvers that we've talked about today on the Charitable DAF side, the GP change, the insertion of a new entity between the Charitable DAF Holdco and the fund level that held the value, the creation of a new charitable entity that was able to absorb the new issuance and thus dilution and participation shares away from the supporting organizations, the Hunter Mountain sale, the Hunter Mountain settlement, all of those are troubling in and of themselves. And troubling as far as the sequence and timeline is concerned, especially considering Mark Patrick is responsible for all of them and was a fiduciary in every capacity at those entities responsible for protecting the charitable assets for the original charitable

owners.

But what's most problematic is the harm -- well, most problematic is how all of these restructurings enabled change of value to flow towards Mr. Patrick personally. As we talked about DFW Charitable is at now the top of this Charitable DAF structure, and Mr. Patrick is the director, manager, creator of DFW Charitable.

And so on top of that, the original charitable entities that these structures existed and operated for the benefit of are unable to continue to make the grants and do the work in the community that they were created for. And beyond that, the real-world implications is significant harm to the nonprofits that rely on the ongoing funding of these organizations.

I -- you know, so there are two worlds that exist here, the world of the underlying investment entities and the world of the charitable entities. I sit in both worlds. I think that's why I'm here as a witness today. And I can certainly speak personally to the real harm that this has caused to nonprofit organizations.

As I mentioned, there are several significant multi-year grants that the various supporting organizations have committed to, continue to commit to, that very much reflect an expectation that the investment vehicles that exist to support them will have the assets that they own available to them to continue to make grants.

So there are several multi-million dollar, multi-year grant commitments that remain partially funded or unfunded today. And we have zero understanding of when those assets will be recovered and available for the original charitable purpose that they existed. And absent intervention, I don't see an opportunity for us to have clarity.

My job has now turned from stewarding ongoing grant relationships to having hard conversations with nonprofits that the funding that we committed via the supporting organizations may or may not exist. And there are going to be significant issues to their day-to-day operations as a result of that. And it's a shame.

MR. MORRIS: Your Honor, I --

MS. STOLLEY: I have nothing further.

MR. MORRIS: Your Honor, I simply move to strike that very limited portion of evidence that referred to Mark Patrick benefitting personally. I've not heard anything at all. There's absolutely no evidence that he received anything other than compensation that the Cayman Island Court (indiscernible). And I just move to strike that piece.

THE COURT: Response?

MS. STOLLEY: Your Honor, again, I think Ms. Bannon is in an unique position to know that --

THE COURT: All right. I'm going to sustain the objection. I'm going to strike the testimony regarding to

Mr. Patrick's -- any testimony regarding benefit to Mr. Patrick. The question was asked what is the effect on charitable organizations.

MR. MORRIS: Thank you.

MS. STOLLEY: Just a moment, Your Honor.

(Pause)

BY MS. STOLLEY:

Q Ms. Bannon, just a couple more questions. In your capacity as the chief communications officer (indiscernible) with the supporting organizations and officer at these, on the board and the supporting organizations, did they share information with you related to the Cayman proceedings?

A Not on an ongoing basis. There was limited information and limited updates they provided. But again, it was certainly not the full picture, as we later learned when we ultimately reviewed the files when they became public.

MS. STOLLEY: Nothing further, Your Honor. Thank you. Thank you, Ms. Bannon.

THE COURT: Okay. Hold on one second, Mr. Morris. We're at 6:00. Again, I think this seems to be a time to be able to end, but I'm needing to understand from the parties, we'll start up at 9:00 in the morning. But I know I have Mr. Morris' comments that they can be here.

MR. EDNEY: Yes. Your Honor, I think that's going to be difficult for us for a variety of reasons, two. First, I do

expect to need Ms. MacInnis on rebuttal. And you know, she has a hard stop commitment that puts her back in the Cayman Islands presently, right. So she's not available to be here tomorrow.

In addition to that, I have a full day evidentiary hearing in the District of Maryland on Thursday. I have witnesses waiting for me on Wednesday. And I think we're here all day tomorrow. I would spend most of the day Wednesday traveling back to Baltimore.

My suggestion would be, I did consult with Ms. MacInnis, and she can be available widely next week or the week after, at the Court's convenience. I do appreciate the time that Your Honor has provided for us. But I think with all the moving logistical parts, that would probably be the best solution would be if we found a date to come to your court during those two weeks.

THE COURT: How long, Mr. Morris, do you anticipate on cross?

MR. MORRIS: Right now?

THE COURT: Just in general.

MR. MORRIS: Five or ten minutes.

THE COURT: Okay. Mr. Phillips?

MR. PHILLIPS: Probably little or none. I think the real problem is if we stop tonight, we're going to object vehemently to starting Mr. Patrick in this kind of a wait to come back.

MR. MORRIS: Yeah, I --

THE COURT: I'm sorry. I don't know if I'm following what you're saying, Mr. Phillips.

MR. PHILLIPS: Well, the next witness is Mr. Patrick.

THE COURT: Correct.

MR. PHILLIPS: If we're going to finish her tonight, I think we can finish her tonight. But then I think we need to make a decision after she's finished what we do.

THE COURT: Okay. Ms. Ziegler-Young, I'm assuming you're not asking questions of any witnesses?

MS. YOUNG: That is correct, Your Honor.

THE COURT: Okay. All right. What we run up to against tonight is that our Webex cuts off at 6:30.

MR. MORRIS: So let's finish --

THE COURT: So we can finish this witness, and then we will start back up tomorrow morning at 9:00 a.m. Okay. You can go through Mr. Patrick however long Mr. Patrick takes. That's great. And then we can -- we'll figure out a day that we may have to come back if we're going to be calling rebuttal witnesses, or actually I guess we're going to have these parties' witnesses that they're going to call regarding this matter.

So we're not going to finish tomorrow. But I want to keep this moving. We've got -- I was told a day. Four-hour limitations on both sides wouldn't have gotten through the

first witness. So I'm happy to give the parties the time, but we got to move this thing along.

So we're going to go ahead and conclude with our -- I'll allow Mr. Morris to do his cross-examination. Hopefully we'll conclude with Ms. Bannon, but then we'll start back up tomorrow morning. And you can call your next witness tomorrow morning.

MR. EDNEY: As opposed to finding another day --

THE COURT: We're going to have to find another day, Mr. Edney. I don't anticipate we're going to finish tomorrow either.

MR. EDNEY: True.

THE COURT: So there's going to be another day that we're going to have to figure out. So I'm going to give you your time to put on your case, and I'm going to give them their time to put on their case. It's not going to be done, I mean, unless you all move quickly. And right now we're wasting time, too.

But you know, it doesn't seem like we're going to get through all of this tomorrow. But the parties are here. Mr. Patrick is going to be here tomorrow. Let's move forward. And then we'll get other days and you'll have your opportunity to have Ms. MacInnis back and rebut whatever you believe needs to be rebutted whenever they put on their case.

MR. EDNEY: All right, Your Honor. Thank you.

THE COURT: All right, thank you. Mr. Morris?

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good evening. I'm not sure if I understand. Are you an officer of any supporting organization?

A Yes.

Q What supporting organizations are you an officer of?

A Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Dallas Foundation.

Q Okay. And those are the three foundations that commenced the Cayman proceeding, right?

A Correct.

Q And they're the three foundations that are on the liquidation committee in the Cayman Islands, correct?

A They are the three foundations, or three supporting organizations, with representatives on the Cayman Liquidation Committee.

Q Okay. You've never been in charge of investigating any of the issues that you just described. Is that fair?

A In what capacity?

Q In any capacity.

A Whole responsibility, no. But I, you know, via my relationship with Mr. Patrick, via my role as a liaison between the donor and the charitable entities, the supporting organizations, there has been a significant amount of activity

I've been responsible for facilitating in this ongoing investigation of these restructurings and the implications they have on the charitable assets.

Q Okay. Your knowledge is not complete. Is that fair?

A That's accurate.

Q Okay. And so for example, you referred a couple of times to an entity called Dolomiti. Did I hear that correctly?

A Yes.

Q And Dolomiti is owned by Dugaboy, right?

A Yes.

Q And Dolomiti owns a fraction percent of Rand, correct?

A Correct.

Q Do you know that Dolomiti's fractional interest in Rand is within the end of February?

A Yes.

Q And so Dolomiti is on notice that it no longer had an interest in Rand way back in February of 2025?

A Yes. I'm now aware of that.

Q Okay. But Dolomiti was aware of it a year and a half ago, right?

A Dolomiti at that time, my understanding was it was aware that there was an asset sold. And I know that there was a communication with Mr. Raver and a colleague of mine on the accounting side about requesting buyer instructions related to an asset sale.

MR. MORRIS: Can we put up Exhibit 76, please.

UNIDENTIFIED SPEAKER: What did you say?

MR. MORRIS: 76.

(Pause)

BY MR. MORRIS:

Q Do you see this is a letter to Dolomiti dated February 6, 2025?

A Yes, I see that.

Q Have you ever seen this before?

A I'm not sure either way.

Q It's addressed to Dolomiti, isn't it?

A Yes.

Q 300 Crescent Court, that's NexPoint's offices, right?

A Correct.

Q And Mr. Dondero controls NexPoint, correct?

A Correct.

Q And Mr. Dondero is the lifetime beneficiary of Dugaboy, correct?

A Correct.

Q And Dugaboy owns Dolomiti, correct?

A Correct.

Q And pursuant to this letter, Dolomiti was told that its interest in the Rand Fund, in the Rand PE Fund I is being reviewed, correct?

A I see that here, yes.

Q Okay. So you can't dispute that Dolomiti was told by Rand Fund that they were out as of February 6, 2025, right?
A Based on this communication, no.
Q You mentioned earlier that you were unaware that supporting organizations have been redeemed until sometime after (indiscernible). Did I get that correct?
A The supporting organizations had been redeemed from?
Q The DAF.
A Oh, yes.
Q The supporting -- you may not have known what had happened contemporaneously, but are you aware that the supporting organizations had full knowledge of the redemption at or around the time that it happened?
A I am not sure of what communication was sent directly to the supporting organizations around any redemption of their shares.

MR. MORRIS: Can we put up Exhibit 41, please?

BY MR. MORRIS:
Q Are you aware that the supporting organizations filed a petition in the Cayman Islands for court supervision of the liquidation of Holdco?
A Yes.
Q And are you aware that that happened early May of 2025?
A Yes.

MR. MORRIS: Can you go to Page 4, please? Do you

see in the top Section C -- I'm sorry. Let's go to the first page so that the witness has some understanding of what this is. I apologize.

BY MR. MORRIS:

Q Do you see that this is the petition for court supervision of the liquidation?

A Yes.

Q And it's filed by the supporting organizations on whose board you served?

A I do not serve on their board.

Q So you said you were an officer?

A Correct.

Q What's your title?

A Vice president.

Q Okay. So the supporting organizations for which you served as vice president filed this document in Cayman Islands on May 2nd. Do you see that?

A Yes.

Q Okay. Now let's go to Paragraph C. Page 4. And do you see that it states, "The supporting organizations state that the sole investment being interest in an entity by the name of CDMCFAD, LLC." Do you see that reference?

A Yes.

Q That's the very entity that we were talking about earlier that had been inserted into the DAF structure, correct?

A Correct.
Q So the supporting organizations were fully aware as of May 2nd, 2025 that this entity had injected itself (indiscernible). Is that fair?
A Correct.
Q And it goes on to say that that interest was redeemed and the proceeds were available for distribution from this redemption and then distributed to Holdco's participating shareholders. Do you see that?
A Correct.
Q So the supporting organizations were aware of the redemption?
A Correct.
Q And I think you also testified earlier that you didn't have knowledge as to who the buyer was of Beacon Mountain. Do you remember that?
A Correct.
Q And you know that the buyer of Beacon Mountain was disclosed in open court during that settlement hearing on June 25th?
A Yes.
Q Okay. So you would agree that even you knew who the buyer was no later than June 25th, 2025?
A In that disclosure. But I don't believe there was any documentation other than testimony at that time.

Q Okay, fair. But there's no question that (indiscernible) board, that we put it up on the screen. And at that time, everybody knew who the buyer was at the time, if not at an earlier time know (indiscernible)?

A I don't recall exactly what capacity it was visually presented. But, yes.

Q Had you shared with the supporting organizations on which you serve as a vice president all of the information that's the subject of this proceeding?

A That would be a lot of information. I'm not sure if I can represent the full amount of information I've shared with them at any given time.

Q Do they know you're here testifying today?

A Yes.

Q Do they know a motion had been made to offset HMIT settlement agreement?

A I don't think I can represent their knowledge of the status of the settlement agreement.

Q You can only speak to your own knowledge, right?

A Correct.

Q And you know that you haven't told anybody in the supporting organizations this fact.

A Not directly. But they know I'm here testifying related to the settlement agreement.

Q Yet, when you testified earlier that you were certain that

Mr. Dondero was in control of supporting organizations; did I hear that correctly?

A Yes.

Q And so the people who are in control of those organizations are aware what's happening today, and they haven't decided to participate, correct?

MS. STOLLEY: Objection, Your Honor.

THE COURT: On what basis?

MS. STOLLEY: Her ability to address that.

THE COURT: I'm going to overrule the objection.

THE WITNESS: I can't speak to the legal decision making of the supporting organizations.

BY MR. MORRIS:

Q Okay. I'm not asking you for legal decision making. But you would agree with me that they have knowledge of what's happening and they are not participating, correct?

A I would agree they have knowledge of what's happening as it relates to me, an officer of their organization. Sitting in a courtroom today, I do not -- I can't speak to the depth of their knowledge of these specific proceedings, this case, this hearing today.

Q But you testified eloquently in your last answer about the damage being caused to the entities for whom you serve as an officer. Didn't you share that with them?

A Share what?

Q What's happening here and the possibility of fighting back and trying to reverse it so that they aren't harmed in the way that you're describing?
A I would say that they are fighting back in the capacity of Cayman proceedings and various other legal proceedings related to the restructuring of the DAF.
Q I see. So they are fighting back in the Cayman Islands, correct?
A Correct.
Q And they filed another lawsuit in the Texas Business Court. Is that correct?
A Correct.
Q But they are not participating in this process?
A Not today. But you know, I would say that there's some additional context in kind of the global inner workings of their involvement in these various legal proceedings.
Q And I think you mentioned the Dallas Foundation earlier.
A Correct.
Q Do you have any relationship to that entity?
A Via the two supporting organizations that I mentioned that reside under the Dallas Foundation.
Q Okay. And had you shared with either of the two supporting organizations of the Dallas Foundation what's happening in this proceeding?
A Yes. Well, what specifically?

Q That there's a motion here to try to overturn the (indiscernible)?
A I haven't spoken to them in detail about the ongoing status of this specific element of this. But I've spoken to them globally, yes.
Q As an officer of -- I apologize. Were you aware that the Dallas Foundation had filed an objection to the 9019 motion?
A Yes.
Q And you were aware that they filed that objection on behalf of two supporting organizations that you had described?
A The two supporting organizations meaning the Empower Dallas Foundation and Okada Family Foundation?
Q Yes.
A Yes.
Q And you're aware that Crown Global also joined that objection?
A Yes.
Q Crown Global is the only one of those four entities that has a limited partnership interest in Atlas, right?
A Crown Global issued the policy that is owned by Empower Dallas and Okada Family Foundation that has the limited partner interest. Sorry, via Atlas IDF.
Q That's right. Crown Global and only Crown Global is the limited partner of Atlas, correct?
A Crown Global issued policy, correct.

Q And then Crown Global issued the policies for which the supporting organizations were the beneficiaries, correct?
A Correct.
Q So the supporting organizations of the Dallas Foundations never had a limited partnership (indiscernible)?
A They have the economic benefit of it.
Q Through Crown Global, correct?
A Through Crown Global policy.
Q Okay. And are you aware that the Dallas Foundation on behalf of the Okada Family Foundation, Empower Dallas, and Crown Global participated in the 9019 proceeding last year?
A Yes.
Q And are you aware that they took discovery?
A Yes.
Q And are you aware that they wound out withdrawing their objection with prejudice?
A Yes.
Q And are you aware that at the same time the (indiscernible) withdrew their objection with prejudice, that they also entered into a binding term sheet with Mr. Patrick?
A Yes.
Q So the economic beneficiaries and the one limited partner in Atlas went through the process to determine that they were not willing to press with any objection to the HMIT settlement, correct?

A At that time, yes.

Q Okay. And they're not here today, are they?

A Correct. They are not here today.

Q And have you shared information with any of those organizations that you testified that you've learned about Mr. Patrick and his activities?

A Various pieces of it. I can't recall if I've shared it in totality. But yes, I've discussed it with them in the context of, again, several other ongoing legal proceedings related to restructurings driven by Mark Patrick to the detriment of charitable entities.

Q And none of them are here to try to walk away from the settlement agreement that they entered into with Mr. Patrick last June 25th, 2025?

A None of the Dallas Foundation-related entities are here today, no.

THE COURT: Mr. Phillips, did you have --

MR. PHILLIPS: No. No questions, Your Honor.

THE COURT: Okay. Do you have any redirect?

MS. STOLLEY: Just a minute, Your Honor.

(Pause)

MR. EDNEY: Just a moment, Your Honor. Sorry.

THE COURT: It's okay.

MS. STOLLEY: Just a couple questions, Your Honor. Just very briefly, can you put Exhibit 76 back up?

(Pause)

REDIRECT EXAMINATION

BY MS. STOLLEY:

Q Ms. Bannon, you were able to review part of this previously. Can you scroll down, please, so that --

A I was going to say, I can only see the title.

MS. ROSE: Do you want me to (indiscernible) all our exhibits in?

MS. STOLLEY: No, no, no. Sorry. Movant's Exhibit 76 (indiscernible) on cross. I apologize. It's Highland 76.

BY MR. MORRIS:

Q You were asked about this letter addressed to Dolomiti.

A Yes.

Q Do you have a date that was sent -- well, it says February 6th. Have you ever sent this letter to Dolomiti?

A No.

Q Can you point out in here where it references the sale of Hunter Mountain?

A It does not.

Q And does it give any amount for the sale of Hunter Mountain? Is there anything in here about Hunter Mountain?

A No.

MS. STOLLEY: All right. You can take that down. I just have two -- a couple questions.

BY MS. STOLLEY:

Q Mr. Morris talked about the various sponsoring organizations not being involved. Do you know -- well, withdrawn. We talked about the value of the assets being $270 million. Now it's what?

A (No audible response)

Q To your knowledge, what is the value of the charitable assets at this point?

A The charitable assets as they --

MR. MORRIS: Objection, Your Honor. Beyond the scope. I didn't ask anything about this topic.

MS. STOLLEY: I'll bring it around to the reasons that some of the sponsoring organizations (indiscernible).

MR. MORRIS: This witness is not (indiscernible).

THE COURT: Okay. I'm going to overrule the objection. There's been testimony about what were the amounts of through these valuation reports. So --

MR. MORRIS: They're not coming in.

MS. STOLLEY: They're documented, those valuation reports.

MR. MORRIS: That's my objection is that her redirect must be limited to the scope of my cross. I didn't ask her anything about that.

THE COURT: I'm going to give her leeway to explain why or to get to where this comes back to your questions as of why these entities aren't here.

BY MS. STOLLEY:

Q So to your knowledge, what is the value of those assets now?

A To my knowledge, perhaps the value of those assets remains something close to 270 million. It's just no longer accessible to the benefit of the original charities it was intended to benefit.

Q And so you talked about this before in terms of being able to give money to charities, nonprofits, for them to help other people. Where are those funds?

A The charitable funds are no longer accessible, again, to the supporting organizations for the purposes of ongoing donations to charitable causes.

Q To your knowledge, Dallas Foundation or one of the other supporting organizations, do they have any money to be here today?

MR. MORRIS: Objection. (Indiscernible).

THE COURT: I'm going to sustain the objection.

BY MS. STOLLEY:

Q Mr. Morris has said several times the various supporting organizations that are not here. Have you spoken to them about why they're not here?

A I've spoken to them about their involvement in legal proceedings. And I can tell you two things that I've heard directly from representatives of the community foundations and

supporting organizations is one, there is significant uncertainty about the ability to pay for any and all expenses, including travel expenses, including legal expenses. And so yes, there is a hesitancy to commit to anything outside of the singular existing pursuit of the original assets in the DAF structure of which those original supporting organizations serve.

Secondly, these community foundations exist for charitable giving purposes. Yes, they have exposure to underlying investment entities. Yes, just by definition of the overlap, there is places of significant wealth that fund philanthropy. There's often disputes over wealth. And so it's oftentimes community foundations will have to step in to disputes to recover and protect the assets that are -- they're entitled to.

However, any of those types of disputes pale in comparison to this case and these legal matters that these community foundations now find themselves in the throes of. And so active Cayman proceedings, Chapter 15 in Delaware, Texas Business Court, this is all so far outside of the day-to-day responsibilities of the CEO of a community foundation. And the rest of their executives who are serving as the fellow directors of the supporting organizations, their primary job is to donate money to charity and carry out on behalf of donors their charitable giving activities.

So they have complained to me on many occasions about how

much time and resources any and all of the attempt to recover assets has already created and continues to create.

MR. MORRIS: Move to strike her (indiscernible) pertaining to what she was told as hearsay.

THE COURT: Sustained.

MS. STOLLEY: Nothing further, Your Honor.

THE COURT: All right.

MS. STOLLEY: And when you say sustained at the beginning, not the entire thing?

THE COURT: I'm sustaining --

MS. STOLLEY: I just want to be clear on what the objection is.

THE COURT: Go ahead, Mr. Morris.

MR. MORRIS: Yeah. The objection was limited to the portion of the testimony that purported to describe what she was told.

THE COURT: Okay. And I'm sustaining that objection.

MS. STOLLEY: Right. Okay. But the striking is just specifically as to that portion, right?

THE COURT: I'm striking anything that she's testified to that she stated that she was told by the supporting organizations as to why they're not here for those purposes. So to the extent her testimony is as to that, it's stricken as hearsay.

MS. STOLLEY: As her getting an affirmative response

or complaints from the sponsored organizations.

THE COURT: Correct.

MS. STOLLEY: Thank you.

THE COURT: Yes. All right. Okay. With that, Ms. Bannon, you may step down. Thank you.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: All right. Let me do this quickly, especially because those on the Webex need to hear this. But tomorrow when we begin, there will be a new Webex information. You'll need to contact the courtroom deputy in order to get that. We'll provide that to you all in the morning when you all arrive.

But for those that are in other places and just appearing by Webex, they'll need to contact Ms. Shelby Wimberly about that.

All right. With that, we will be adjourned until tomorrow morning at 9:00 a.m.

THE CLERK: All rise.

(The proceedings were adjourned at 6:26 p.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.



___________________________

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 15, 2026

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-SGJ-11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | . | Chapter 11 |
| Debtor. | . | |
| | . | Thursday, May 21, 2026 |
| . . . . . . . . . . . . . . . . . | . | 9:02 A.M. |

TRANSCRIPT OF CONTINUED HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Willkie Farr & Gallagher LLP
BY: JOSHUA LEVY, ESQUIRE
787 Seventh Avenue
New York, New York 10019

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Debtor, Highland Capital Management:

Willkie Farr & Gallagher LLP
BY: MARK STANCIL, ESQUIRE
1875 K Street, NW
Washington, DC 20006

For the Movant, Dugaboy Investment Trust:

Morgan, Lewis & Bockius LLP.
BY: MICHAEL EDNEY, ESQUIRE
1717 Main Street, Suite 3200
Dallas, Texas 75201

Morgan, Lewis & Bockius LLP.
BY: MARTHA B. STOLLEY, ESQUIRE
101 Park Avenue
New York, New York 10178

Morgan, Lewis & Bockius LLP.
BY: TORSTEN KRACHT, ESQUIRE
101 Park Avenue
New York, New York 10178

For Shields Legal Group, P.C., CLO Holdco, Ltd., Kelly Hart & Pitre ("HMIT Entities"):

Kelly Hart & Pitre
BY: LOUIS M. PHILLIPS, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801

For the United States Trustee:

Office of the United States Trustee
BY: ELIZABETH ZIEGLER-YOUNG, ESQUIRE
1100 Commerce Street, Room 976
Dallas, Texas 75242

For Margot MacInnis:

Ferguson Braswell Fraser Kubasta PC
BY: DOUGLAS J. BUNCHER, ESQUIRE
2500 Dallas Parkway, Suite 600
Plano, Texas 75093

INDEX

| | PAGE |
|---|---|
| WITNESSES | |
| FOR THE DEBTOR: | |
| JAMES SEERY | |
| Direct Examination by Mr. Morris | 23 |
| Cross-Examination by Mr. Edney | 37 |
| FOR THE MOVANT (REBUTTAL): | |
| LUCY BANNON | |
| Direct Examination by Ms. Stolley | 104 |
| Cross-Examination by Mr. Morris | 126 |
| JAMES DONDERO | |
| Direct Examination by Mr. Edney | 134 |
| Cross-Examination by Mr. Morris | 148 |
| Redirect Examination by Mr. Edney | 160 |
| Recross-Examination by Mr. Morris | 163 |
| MARGOT MacINNIS | |
| Direct Examination by Ms. Stolley | 166 |
| Cross-Examination by Mr. Morris | 176 |

EXHIBITS

| | ID | EVD |
|---|---|---|
| FOR THE DEBTOR: | | |
| 55 | 81 | 96 |
| 56 | 81 | 96 |
| 57 | 81 | 96 |
| 77 | 91 | 98 |
| 80 through 86 | 63 | 66 |
| 87 | 63 | 66 |
| 88 | 63 | 67 |
| 89 | 63 | -- |
| 90 through 97 | 63 | 67 |
| 94 | 63 | 68 |
| FOR THE MOVANT: | | |
| 300 | 100 | 100 |

(The proceedings commenced at 9:03 a.m.)

THE CLERK: All rise. The United States Bankruptcy Court for the Northern District of Texas is now in session; the Honorable Brad W. Odell presiding.

THE COURT: You may be seated.

(Pause)

THE COURT: All right. We are here on the Highland Capital Management case, Case Number 19-34054. Again, we are here and we continue hearing on the motion to reconsider the order on compromise and to vacate filed by Dugaboy Investment Trust, and both objections filed by Highland Capital Management and joinder by the HMIT Entities.

So why don't I go ahead and start off by getting appearances of counsel. Let's see where things stand, if there's been any developments or anything that needs to be brought to the Court's attention to start. If Movant's counsel wants to go first.

MR. EDNEY: Good morning, Your Honor.

Michael Edney from the Morgan Lewis Law Firm for the Movant, here with my colleagues, Martha Stolley and Torsen Kracht. Perhaps I'll defer some of the opening matters until everybody has appearances. Does that make sense, Your Honor?

THE COURT: That will be fine.

MR. EDNEY: Thank you, Your Honor.

THE COURT: Mr. Morris?

MR. MORRIS: Good morning, Your Honor.

John Morris, Pachulski Stang Ziehl & Jones for Highland Capital Management, L.P.

THE COURT: Okay.

MR. STANCIL: Mark Stancil from Willkie Farr & Gallagher for Highland Capital with my partner, Josh Levy.

THE COURT: Okay. Mr. Phillips, did you want to make an appearance?

MR. PHILLIPS: Good morning, Your Honor.

Louis M. Phillips, Kelly Hart, on behalf of the HMIT Entities.

THE COURT: Okay, thank you. All right.

MS. YOUNG: Good morning, Your Honor.

Liz Ziegler-Young for the U.S. Trustee.

THE COURT: Good morning. Mr. --

MR. BUNCHER: I suppose I'll make an appearance, Your Honor. Doug Buncher here with -- I am here for the witness, Margot MacInnis.

THE COURT: Okay.

MR. BUNCHER: And we sent an email about her situation to the Court.

THE COURT: Yes.

MR. BUNCHER: And I'll address that whenever the Court would like.

THE COURT: Okay. I'm sure we'll get to that in a

few seconds. So --

MR. BUNCHER: Yes, sir.

THE COURT: All right. Mr. Edney, are we going to be standing with various members on this matter?

MR. EDNEY: Yes, Your Honor.

So I guess the one logistical issue is that despite, as forecasted, we do intend to call Ms. MacInnis to rebut the testimony of Mark Patrick, elicited in the case-in-chief of Highland. Ms. MacInnis made a heroic effort to be here this morning, but kind of weather got in the way a bit. The airports got shut down in New York and ultimately her flight was canceled. I think she's still endeavoring to be here, but I think under these circumstances when we come to it, we would like to ask the Court permission that she be able to testify remotely. Otherwise, we'll have to defer that to when she can manage to get here.

I can tell you that it was, I mean short of chartering private jet, right, there was pretty extraordinary efforts taken to get her here for court on time, and the intervention of the weather events got in the way.

THE COURT: Okay.

MR. EDNEY: And I do -- I hate to bring this to the Court's attention so late, but the towel was thrown in pretty late last night itself. I think it was almost midnight by the time final cancellation happened.

THE COURT: Okay. So let me ask you how do you envision what today and going forward looks like?

MR. EDNEY: Yes, Your Honor. So my plan is as follows. We would like to call Mr. Dondero to the stand, and that will include our case-in-chief. I do understand we have a potential issue to deal with with that. And then I would hand the baton over to Mr. Morris for his case-in-chief and for any witnesses that he wishes to call.

And then we would have two rebuttable witnesses, both of whom we've seen before. One is Lucy Bannon, and the second is Margot MacInnis. And their testimony is principally directed at the sponsored testimony of Mr. Patrick.

THE COURT: Okay.

MR. EDNEY: And then that would conclude our presentation of evidence, Your Honor. I do anticipate the rebuttal witnesses to be short. I anticipate my direct examination of Mr. Dondero to be relatively brief as well, Your Honor.

THE COURT: Okay. Mr. Morris?

MR. MORRIS: Good morning, Your Honor.

When the Court deems it appropriate, I'd like to address the issue of Mr. Dondero testifying on Dugaboy's case-in-chief. Other than that, we are going to try very hard and think there is no reason not to complete this hearing today. Depending on what happens with Your Honor's ruling with

respect to Mr. Dondero, we may or may not call Mr. Seery. We may or may not call Mr. Dondero.

I have prepared my closing argument. If we did call Mr. Seery, it would be 30 minutes at most, and I've got I think a four-page cross for Mr. Dondero, depending on what Your Honor rules. But I would like the opportunity to be heard because I think it's improper to have Mr. Dondero testify in Dugaboy's case-in-chief today.

THE COURT: Okay. So let me make sure I'm understanding what your comments are, Mr. Morris. This is not about Mr. Dondero testifying or not. I'm just trying to understand the timeline here of what we're expecting. So if the Court does not allow for Dugaboy to call Mr. Dondero in his case-in-chief --

(Audio interference from speaker from Webex)

THE COURT: Okay. We've got a caller showing with a 213 area code ending in 3-0. Could you please announce who you are?

(No audible response)

THE COURT: Does anyone in the courtroom recognize that number? 213 is the area code and 3-0 is the last two digits.

MR. EDNEY: The Movant doesn't, Your Honor.

THE COURT: Okay. All right, I'm going to ask again, the number, the party showing the number, area code 213 ending

in 3-0, please announce to the Court who you are. If you fail to announce, we're going to exclude you from the hearing.

(No audible response)

THE COURT: Okay. All right. So, Mr. Morris, if I'm understanding what you're saying, and please correct me if I'm wrong, but if the Court does not allow for Mr. Dondero to be called in their case-in-chief, it's not your intention to actually call Mr. Dondero?

MR. MORRIS: That's right, Your Honor.

THE COURT: And then Mr. Seery, you would also not -- potentially --

MR. MORRIS: Mr. Seery would likely testify in that circumstance, and it would be a half an hour. We could be done by 10:00.

THE COURT: Okay.

MR. MORRIS: 10:15.

THE COURT: Well, this is what your, and then they would put on any of their rebuttal witnesses that they would choose to put on.

MR. MORRIS: And they would have the opportunity to cross Mr. Seery --

THE COURT: Cross Mr. Seery.

MR. MORRIS: -- on all aspects because he would therefore be a witness called by Highland.

THE COURT: Okay. I'm assuming, Mr. Morris, you

learned this morning, like the Court did, or maybe you learned it last night about the situation of Ms. MacInnis?

MR. MORRIS: I got in at 12:45 this morning myself. I'm very sympathetic, and we have absolutely no objection to her testifying by Zoom or Webex.

THE COURT: Okay. All right. That will be fine, then. It doesn't look like she's on -- so that's good.

Okay. Well, then I guess let's go ahead and I'll hear argument first from Mr. Edney as to whether or not Mr. Dondero should be called, or if the Court should allow him to call Mr. Dondero and then I'll hear from Mr. Morris.

MR. EDNEY: Yes, Your Honor. Thank you.

THE COURT: Mr. Edney, if you'll --

MR. EDNEY: Yes, Your Honor. Of course.

THE COURT: -- argue at the podium.

MR. EDNEY: Yes, Your Honor. We do think that we should be able to call Mr. Dondero in our case-in-chief.

On our initial witness list, and this was Friday before the commencement of these proceedings, I guess this was May 8th, we listed as our witnesses Ms. MacInnis and Ms. Bannon and Mr. Patrick, and we cross-designated those that would be designated by the other party. Mr. Dondero had just been deposed earlier that day, and we certainly anticipated that he would be called either way.

On Monday evening, I informed Mr. Morris by

electronic communication, this is Monday evening, May 11th, that we did intend to call him directly in our case-in-chief, anticipating that he would, and suggesting that for the sake of efficient presentation of evidence, that we go first, followed by cross-examination, and then redirect and recross because it would make for a tighter presentation.

Mr. Morris pointed out that he wasn't on our witness list by name, and he took the position by cross-designation that he should be able to go first on that if he called him. On Friday, in advance of the resumption of these hearings, we did file an amended witness list that put Mr. Dondero on it.

Your Honor, I do think that we've all had plenty of -- I think it's been clear for a long time that Mr. Dondero is a very important part of these proceedings. I think that the witnesses that we put on on Monday probably would not have been questioning differently if there was a conception in the mind's eye that Mr. Dondero would not take the stand.

In the event that Your Honor rules that we cannot put on Mr. Dondero in the case-in-chief, we do intend to put him on as a rebuttal witness because I do think there's a lot of things regarding the presentation so far, particularly the testimony of Mr. Patrick, on which Mr. Dondero has percipient fact witness testimony to rebut it.

But I think the better course, Your Honor, and there is an absence of prejudice here is to allow us to put him on in

our case-in-chief. We will be efficient. This is a tight direct examination that we anticipate to take less than an hour and to be followed by Mr. Morris's cross-examination.

Again, I do emphasize that our intentions in this regard have been clear since at least the night of Monday, May 11th, and have been further formalized in our amended witness list. And I would ask Your Honor's permission, given the lack of prejudice, to let him go on in the case-in-chief.

Thank you, Your Honor.

THE COURT: So let me just ask this question.

MR. EDNEY: Sure.

THE COURT: If Mr. Dondero was or is important, as you've put it in your argument, why wasn't he listed as a witness? I mean, he's your principal, he's your client principal. It is not a surprise. I'm trying to understand why you didn't list him if as you stated he was very important.

MR. EDNEY: Yeah, I mean, I think he is important in light of the testimony that's coming in.

THE COURT: So far, all the testimony, other than cross-examination, all the testimony has been your witness's testimony.

MR. EDNEY: That's true, although the case-in-chief testimony from Mr. Patrick, sponsored by Highland, is an exception to that and a significant exception. But, Your Honor, again, if you want my -- going back to Friday, May 8th,

we had just come off a deposition of Mr. Dondero from Mr. Morris. Hours later we filed the witness list and we had every expectation that Mr. Morris would call him. That's why we cross-designated in that way.

Should we have put him on our witness list? I wish we had. I wish we had, Your Honor, but I think that was the thinking behind it in a case that was moving very quickly indeed. So I would -- to the extent that that was a lapse, Your Honor, I would suggest that it was a lapse that has not caused substantial prejudice. It was one that was quickly corrected by notice to Opposing Counsel. And we have now had in our collective understanding for 10 days that it was our intention to call Mr. Dondero as our final witness.

And I would ask, to the extent the cross-designation didn't get it accomplished, Your Honor, I would ask Your Honor to excuse his omission from the initial witness list and to allow us to present him in our case-in-chief.

THE COURT: Thank you.

MR. EDNEY: Thank you, Your Honor.

THE COURT: Mr. Morris?

MR. MORRIS: Your Honor, they didn't leave Mr. Dondero off of their witness list by mistake. It wasn't Counsel's negligence. It was a very strategic choice.

There's a suggestion that the questioning of other witnesses would have been different had they known that

Mr. Dondero would not be permitted to testify on their case-in-chief. All of that is false. And how do we know it's false? Because after Ms. MacInnis testified last Monday, you pointedly asked Mr. Edney at Page 201 of the transcript, "I mean Mr. Edney, I don't know how many more witnesses we have for your presentation of the case." That's what you asked him.

And on Page 202, from Lines 15 to 19, Mr. Edney responded, "So as far as my witness plans, Your Honor, we only have two witnesses remaining. We have Ms. Bannon and Mr. Patrick, and that is our case-in-chief." This is the representation that he made to you. Highland relied both on the witness list and on that statement.

Litigation is a chess game. Litigation is full of strategic choices. They made their strategic choice on Friday. They ratified and reaffirmed that strategic choice to you on Monday afternoon. And they should not be permitted now to change their minds, simply because they feel the case is going against them.

Highland will be prejudiced. It will be severely prejudiced. And it will be prejudiced because Mr. Dondero will now be permitted to testify about anything that he wants. And we never had that expectation on Friday. We never had that expectation when the trial started. And we certainly didn't have that expectation on Monday afternoon when Mr. Edney told you that their only two witnesses before they rested would be

Ms. Bannon and Mr. Patrick.

If they are permitted now to call Mr. Dondero in their case-in-chief, I dare say, Your Honor, there is no purpose to having witness lists. People can just call whoever they want, whenever they want, without notice. And I don't think that's the right thing. We abided by the witness list.

And I will also point out the language relied upon in their witness list is clear, and it makes a lot of sense, and we do it all the time. It's probably in my witness list, too. We reserve the right to call anybody who's called by the other side.

We do not intend to call Mr. Dondero. So they do not get to open the door in this manner. This is highly prejudicial, and it's not right. And we strenuously hope that the Court will deny Mr. Dondero the opportunity to testify on Dugaboy's case-in-chief.

THE COURT: Mr. Morris, let me ask him a couple of questions. One, regarding prejudice, if I were to allow for Mr. Dondero to be called, but allow you to be the first to do basically direct examination and limiting examination of Mr. Dondero to cross, does that alleviate the prejudice that you are expressing about Mr. Dondero being able to testify on anything?

MR. MORRIS: We've made the decision not to call him. So I think the short answer is no. I'll just leave it at that.

THE COURT: Okay. You all did depose him. I mean, he has been deposed in regards to this motion.

MR. MORRIS: Correct.

THE COURT: And what we're here about.

MR. MORRIS: Your Honor, can you just give me one brief moment so I can consult with my colleague and look at some of my notes to answer that question? We don't have to take a break. It will take 30 seconds.

THE COURT: No. Let me just, before you consult with them, let me also state the fact that if I don't allow for Mr. Dondero to be called in their case-in-chief and you all choose not to call him, obviously they have a right to call him as a rebuttal witness, and a rebuttal witness doesn't have to be listed, right?

And so, I mean, again, I ask the question of their ability to call him as a rebuttal witness, how does that address the issue of prejudice? So, if you want to before you answer that or however you want to --

MR. MORRIS: I'm going to answer that question, and then I'd like to consult with Mr. Stancil.

By all means, they can call Mr. Dondero as a rebuttal, and that's the strategic point that litigators need to be sensitive to. If he comes on rebuttal, he is limited in what he can testify to. He can only testify to things that we have adduced during our case-in-chief. He doesn't have the

ability, as they're trying to do now, to testify about anything he wants.

So, we're fully aware that he can testify in rebuttal. We're cognizant that any rebuttal testimony would be limited to the issues that we have adduced during our case-in-chief, and that's the way it ought to be. But if you can just give me one moment.

(Pause)

MR. MORRIS: My colleague, I'm grateful that I don't fly solo. As my client knows, I hate to do that. And the reason is because you don't always see everything yourself. And what I failed to see that Mr. Stancil points out is that at the time that we deposed Mr. Dondero, it was Friday during the day, the 8th of May, the last business day before the hearing, we didn't even have the benefit of Dugaboy's reply brief.

And as Your Honor will recall, because I've mentioned this at every single hearing, we did not learn of the identity of the so-called newly-discovered evidence until we got their reply brief on Friday night. It wasn't in their motion papers. It wasn't presented even after I pointed it out. We served document requests that are just a jumble, most of which aren't even on their exhibit list at this point.

Mr. Dondero did testify because I want to be in full candor. When I asked him about newly-discovered evidence during his deposition, he testified about five very broad

categories of information. But I did not have the ability during that deposition to ask him about each of the items that are in the Dugaboy reply brief because that wasn't filed until Friday night, and that was the very first time that we ever learned of what the so-called newly-discovered evidence was. So that's why even the deposition was insufficient to prepare for today's broad examination.

THE COURT: Okay. Anything further, Mr. Morris?

MR. MORRIS: No, Your Honor. I'm sorry.

THE COURT: Okay. That's okay.

Mr. Edney, did you want to respond to anything, or are you good with what you've argued?

MR. EDNEY: Your Honor, just briefly, yes.

Yes. On May 8th, there was a --

THE COURT: Mr. Edney, if you wouldn't mind coming --

MR. EDNEY: Oh, of course, Your Honor.

On May 8th, which is prior to the submission of the initial witness list, there was a relatively lengthy deposition of Mr. Dondero by Mr. Morris. I think to the extent there's a concern about the sequencing of the depositions in the reply brief, I mean, that's the schedule we had. I think there were some suggestions to move it out. I think Mr. Morris was opposed to that. So we've tried to make Mr. Dondero very available for any questions Mr. Morris might have, and he certainly had a lengthy opportunity to ask them.

Again, Your Honor, I thank Your Honor for considering this. I'm sorry that he was not on the initial witness list. I do think that we've provided lots of notice to Opposing Counsel about our intentions with respect to this, and I thank Your Honor for considering the issue.

THE COURT: All right, thank you. I'm going to take a 15-minute recess. I want to look at some of the things here and a little bit of preparation. But I want to take a look at something a little bit closer. So I'm going to take a 15-minute recess and we'll be back out and I'll rule.

THE CLERK: All rise.

(Recess at 9:28 a.m., recommencing at 9:43 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

Okay, the Court has considered the request by Dugaboy Investment Trust to call Mr. James Dondero in their case-in-chief and considered the arguments made by counsel with regard to this request. The Court has also reviewed the witness list that was filed by Dugaboy on May 8th of this year in anticipation of the hearing. In particular, the witnesses that were listed, the witnesses which can be found at Docket Number 4605, specifically list three parties, Lucy Bannon, Margot MacInnis, and Mark Patrick.

As with most witness and exhibit lists, of course, Dugaboy included language regarding reservation. In

particular, this language states, "Dugaboy also reserves the right to call or cross-examine any witness called" -- and I emphasize the word "called" -- "by any other party, to supplement or amend the witnesses and to call additional witnesses as necessary to rebut testimony or evidence."

Leading up to today's hearings, we had multiple hearings on discovery matters in which the Court directed the parties to follow and review this Court's judge-specific guidelines. In particular, my specific guidelines provide as follows. With regard to witnesses, it says, "Except in unusual circumstances, exhibits not exchanged" -- let me back up.

Witness and exhibits, it says, "Exhibits other than rebuttal or impeachment exhibits for trials and contested matters must be marked and exchanged three calendar days in advance of the first date set for the docket call or hearing. List of witnesses and exhibits must be filed and exchanged three calendar days in advance of the first date set for the docket call or hearing. Except in unusual circumstances, exhibits not exchanged in this manner will not be admitted, nor will testimony be allowed from witnesses who are not on the witness list."

Based on our local rules requiring witness and exhibit lists to be filed three days in advance of the hearing, and my judge-specific guidelines, as well as the language in the witness list that was filed by Dugaboy, the Court is going

to deny the request to allow Mr. Dondero to be called in the case-in-chief of Dugaboy. They're all allowed in the event that he is called by Highland to obviously cross-examine him as a separate -- based on the reserved language, if he is called, they are allowed to also call him. He is allowed, of course, to testify to the extent necessary as a rebuttal witness.

So that will be the ruling of the Court. Mr. Dondero will not be allowed to testify in the case-in-chief because he was not properly designated on the witness and exhibit list, which was required to be filed within three days of the hearing or according to the scheduling that we have in place, but in particular with my local judge-specific guidelines. So that is the ruling of the Court with regard to calling Mr. Dondero in the case-in-chief.

Mr. Edney, where does that leave us?

MR. EDNEY: Your Honor, it leaves us with our witnesses will be coming in rebuttal, so our case-in-chief is included.

THE COURT: Okay. All right, Mr. Morris?

MR. EDNEY: Now if I may intervene for just a second. There's one more --

THE COURT: If you'll come to the podium.

MR. EDNEY: Yes, Your Honor. Of course.

I guess there's one more logistical issue today. It's a matter of closing arguments, Your Honor. We are -- if

the presentation of evidence ends today, at some point, we're prepared to close today. We do think perhaps a better course would be to let the presentation of evidence end, get the transcripts in so we can provide a more fluid and complete presentation to Your Honor on closing arguments at a later date. But we, of course, leave that issue to Your Honor's discretion.

THE COURT: Okay. We'll get to closing arguments once we have closed with the presentation of evidence. So we can really address this issue, but if we're done today, I think it would be best to just get everything done.

MR. EDNEY: Okay. Your Honor.

THE COURT: We'll address that, so let's get the evidence done and then we can get deal with closing arguments at that time, okay?

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right, thank you.

Mr. Morris?

MR. MORRIS: Thank you, Your Honor.

Highland Capital Management calls James P. Seery Jr. to the stand.

THE COURT: Okay.

Good morning. Mr. Seery, before you take a seat, I'll have my law clerk swear you in.

JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

THE CLERK: Thank you.

THE COURT: You may proceed, Mr. Morris.

MR. MORRIS: Thank you.

DIRECT EXAMINATION

BY MR. MORRIS:

Q Are you prepared, Mr. Seery, to go ahead?

A Yes, I do.

Q Okay. Good morning, Mr. Seery.

A Good morning.

Q Can you just describe your current role at Highland for the Court?

A I am the CEO of Highland Capital Management, L.P. I was the Claimant Trustee of the Highland Claimant Trust, and I am the administrator of the Highland Indemnity Trust.

Q Can you describe for the Court how you first became involved in Highland?

A In January of 2020, I was appointed as an independent director in the Highland bankruptcy case by the Bankruptcy Court, having had no connection with either Highland or the creditors at that time. Subsequently, I was -- my appointment to CEO was approved by the bankruptcy court in July of 2020, as well.

Q And did there come a time when the Court confirmed a plan of reorganization for Highland?

A Yes.

Q Can you describe generally how the priority scheme is set forth in the plan?

A Sure. The plan, in a quick summary, is a monetization plan. It sets up a class of creditors. There's actually nine classes of creditors and two classes of equity. The plan was essentially to have me and my team manage the assets, monetize the assets, and then distribute the proceeds from the monetization/liquidation to each of the classes in order, so it's a strict waterfall.

The first seven classes were really priority and secured claims, and they were paid on the effective date. Class 8 was the general unsecured creditors. Class 9 was subordinated creditors. And then Class 10 and 11 are the equity. There's senior equity that went to HMIT, which was the 99-1/2 percent holder of the senior partnership interest in Highland. And then there's the junior equity, which is Class 11 which was the remaining, which is a small bit which included 0.18 percent interest of Dugaboy.

Importantly, those two classes, Class 10 and 11, don't vest and don't become a subject or part of the trust unless and until Classes 1 through 9 are paid in full or those classes otherwise agree.

Q Let's talk about the settlement agreement. You're aware that Dugaboy has moved to set aside the order entered last June approving the settlement between the Highland Entities and the

HMIT Entities?

A Yes, I am.

Q Were you involved in the negotiation of the agreement that the Court approved?

A Yes, I was.

Q Do you recall when those negotiations began?

A They began after March I think it's 18th, 2025. We had worked on an NDA at the end of I believe it was end of, beginning of March, end of February, beginning of March. It probably took five days. So the NDA, or the nondisclosure agreement, was signed on, I believe it was March 18th, and then we began negotiations. We certainly didn't have any negotiations nor would we have had any negotiations or exchanged any information unless we had an ironclad nondisclosure agreement.

Q Do you recall when the negotiations concluded?

A They concluded on, I should remember this off the top of my head, but I believe it's May 19th, which is the signing of the agreement, which was the settlement agreement that was approved by the Court in June of 2025.

Q Can you describe generally for the Court how the negotiations progressed over time?

A Sure. We have been very transparent. We'd been sued by HMIT multiple times, so HMIT had brought an action which was deemed non-colorable by the bankruptcy court, and that was on

appeal.

HMIT had also brought -- these were in '23 and '24, frankly, and into the beginning of '25. One was just concluded in '26 -- two other motions. Those motions were jointly with Dugaboy. One was to get a valuation of the trust, which since they're not beneficiaries of the trust until they vest, they weren't entitled to. The second was to remove me as trustee. Again, they're not beneficiaries of the trust, so they weren't entitled to that. Those both were denied.

In fact, the second one after we settled with HMIT was just rejected by the Fifth Circuit in March of this year. So we had those negotiations -- we had those litigations and we wanted to make sure, our principal goal was to make sure that we could settle those negotiations finally, fully, completely, that there was no chance that there would be any other litigation that could attack this estate, and that we could move towards completing the case and closing the case.

HMIT wanted money. They wanted their claim allowed. They wanted assets. They wanted money. I believe they were the next in the waterfall, but it was clear that neither Class 10 nor 11, frankly nor 9, could get paid until all indemnity obligations were paid off. And those are not only actual indemnities, but potential risks and threats of losses. So we weren't going to pay them anything unless we knew we had a complete and total settlement.

And that negotiation was arm's length, back and forth, mostly with me and Mr. Patrick as the leads. But we both had our teams and our counsel in each of these negotiations and discussions.

Q Would you characterize those negotiations as arm's length?

A Yeah, undoubtedly. The --

Q Why was that?

A Because there's a give and take. I previously testified on this in 9019. My goal was to get everything for the estate upfront and give nothing until the very end, perhaps years down the road. Mr. Patrick's goal was to get as much upfront as they could from us, from the estate and allowance, and be able to move on to distrust.

So there was a give and take in two opposite ends of the goals. And we met in a place that I think was a good outcome for the estate.

Q In the end, do you believe that the settlement agreement was in the estate's best interests?

A Completely. We couldn't close the case. We couldn't move forward without a resolution of the HMIT litigations.

My view, which I think has been confirmed, is they're frivolous. The were driven for years in this Court with multiple hearings, and then in courts in other places around the world. So we couldn't close the case.

Our expenses continued to grind. We couldn't pay off the

9s. And we would never pay anything to the 10s until we knew fully, completely done -- that we were fully and completely done with all litigation and all risk.

MR. MORRIS: I'd like to have put up on the screen Highland Exhibit 73, which is the agreement itself. I think that'll just take a moment.

Here we go. And if we can turn to the signature pages on Pages 22 and 23.

BY MR. MORRIS:

Q Mr. Seery, am I correct that the first party listed there, Hunter Mountain Investment Trust, is the only party to this settlement agreement that had an interest under the Highland Claimant Trust?

A That's correct. Well, Highland does as a trust sponsor but yes.

Q Okay. Can you explain to the Court why the other HMIT Entities are party to this agreement?

A As I stated earlier, I've been involved in this case now for, I mean I think in my seventh year. I thought it was going to last six or nine months. This -- what we wanted to make sure is that we could cut off all avenues and all potential avenues for litigation. And so any entity that was a control entity that sat above another in the context of the HMIT structure, we wanted to make sure was a party to this settlement.

In addition, one of the entities, because we were getting full releases, as well as other litigation protections in addition to releases, we wanted to make sure we got all of them. One of the parties, the Rand Fund I, was also a defendant in one of our litigations, the estate's litigations against a number of defendants so we needed then as a party. So Hunter Mountain, Hunter Mountain's sole beneficiary, Beacon. The Rand Fund sat above Beacon.

The Advisors to the Rand Fund and the Atlas Fund, which sat above Rand were all parties to the settlement. I wanted to make sure that I tied off every consent.

Q Prior to executing this agreement, did you take any steps to satisfy yourself that Mark Patrick was authorized to enter into this agreement on behalf of the HMIT Entities?

A Yes, I did.

Q Can you describe for the Court what steps you took to do that?

A Just like every other agreement they enter into, you want to make sure that you have all the right parties. And again, to meet the objectives that we had for settlement of all litigation, closing off all risk, we wanted to make sure we had all those parties. We then needed to make sure that every one of the parties was being executed by the right person. And we went through and checked each of the corporate documents related to each of these entities, so each of the constituent

documents.

Frankly, we knew that Mark Patrick controlled HMIT and Beacon Mountain. How do we know that? Because he had been in Court testifying on behalf of HMIT. He had previously sued us on behalf of HMIT. He had brought motions with Dugaboy in '23 and '24 to remove me. So he knew the control party was there, and we wanted to make sure we tied off every other risk.

Q Were you aware of what was going on in the Cayman Islands at the time?

A We were aware of it, so I would say generally. We knew that there had been a filing in the Caymans, and that was all related to the DAF structure, not to the Highland -- to the HMIT side. And so we knew there had been a filing, we knew there had been a supervision application by this point. And I don't know. We had the supervision application, but we didn't know about the liquidation proceedings in the Caymans.

Q Prior to June 24th, had any of the liquidators reached out to you for any reason at all?

A Prior to June 24th, no, not at all.

Q Prior to June 24th, had anybody from Dugaboy reached out to you in any way to discuss what was going on in the Cayman Islands?

A No, not at all.

Q Prior to June 24th, had anybody from any of what are called the supporting organization reached out to you at all

with respect to what was going on in the Cayman Islands?

A I hesitate only because the objection filed by the Dallas Foundation, I don't know if that included any support. It did not. So no, the answer to that question is no. No one had reached out from any of those Dondero foundations.

Q And did you reach any conclusion prior to entering into this agreement in May of 2019 -- withdrawn.

Did you reach any conclusion prior to entering into this agreement in May of 2025 as to whether or not the Cayman proceedings involved Highland and the settlement agreement at all?

A Yes.

Q What conclusion did you reach?

A They didn't involve Highland at all. They didn't involve Hunter Mountain at all. They didn't involve any of the HMIT Entities at all.

Q Are you aware that Mr. Patrick caused the Rand PE Fund to sell its interest in Beacon Mountain?

A Yes, I was aware of it at the time we executed the agreement.

Q Okay. And can you describe your understanding of the sale of Beacon Mountain?

A Mr. Patrick sold Beacon Mountain, the interest in Beacon Mountain, which is, again, the sole beneficiary of HMIT, which he controlled, from one entity he controlled and I forget the

name of that. I think it was called Charitable DAF something. They're all the same names. CDH is Charitable DAF Holding. They're all -- it's a Highland way, I guess. So he sold it from one entity that he controlled another entity that he controlled. So he sold it from the first entity that had that interest to another entity that he controlled.

Q So in your view, did the sale of Beacon Mountain have any impact on Mr. Patrick's control over the HMIT Entities?

A None whatsoever.

Q And why is that?

A Because he controlled each of the HMIT Entities before the sale of the Beacon Mountain interest, and he controlled each of the HMIT Entities after the sale of the Beacon Mountain interest.

Q Okay. Let's just finish up here on the issue of discovery. Do you recall that after Highland filed its motion seeking court approval of the settlement agreement, that certain parties filed objections?

A Yes.

Q Are you aware that among the objecting parties were Dugaboy and the Dallas Foundation and an entity called Crown Global?

A Yes. And just to be precise, it was the Dallas Foundation, Crown Global Insurance, and then it's a strange objection because it says it's on behalf of separate accounts,

as well.

Q Okay. Do you have any recollection as to the substance of Dugaboy's objection?

A Yes. Dugaboy -- Dugaboy had a very simple objection that they claimed it wasn't -- the settlement wasn't authorized by the plan and then the releases went too far according to Dugaboy.

Q Do you recall that the Dallas Foundation and Crown Global also filed an objection?

A Yes.

Q What do you recall about that?

A The Dallas Foundation and Crown objected, basically arguing that while Patrick had control, Mark Patrick had control of these entities, that somehow he had breached his fiduciary duty or his duties in some opaque respect with respect to the restructuring, I believe it related more to the DAF restructuring, and that somehow there was an interest that they had in this settlement, even though they didn't have any privity with any of the entities that were parties to our settlement.

Q After the objections were filed, did Highland participate in discovery?

A Yes.

Q Can you describe the discovery that Highland provided?

A We received numerous requests for production,

interrogatories. We provided really everything that we had related to the negotiations and the settlement, frankly, knowing there would be an objection from Dondero. We had started preparing those materials even as we filed the -- as we filed the motion.

So, we produced those documents very early. It was a fulsome production of everything, every negotiation that we had with Mr. Patrick up to the -- and his team up to the day of signing. We also gave depositions. I was deposed. David Klos, our CFO, was deposed. Mark Patrick was deposed. Shawn Raver was deposed.

And I believe that we took two depositions. One of Ms. Diaz, who was the President of the Dallas Fund, she's also I think a Vice President of the Dondero Foundation, the Highland Dallas Foundation, and of their CFO, I believe his name is Torrey Littleton.

MR. MORRIS: Okay. Can I ask that Exhibit 54 be put up on the screen? Okay. If we could just scroll down a bit.

BY MR. MORRIS:

Q We can look at as much of this as you need to, Mr. Seery, but do you recall that Highland provided written responses to Dugaboy's document requests and interrogatories?

A I do. For some reason, it looks like the heading's cut off. Yes, there we go. Yes, I do.

Q Okay. And scrolling through this document, is this the

document that you caused the Highland Entities to serve on Dugaboy in response to their document requests and interrogatories?

A That's correct. I'm not sure if this was just to Dugaboy or to both Dugaboy and to -- I don't recall if we had one document request. I know Dugaboy gave us one. In any event, we served the Dallas Foundation with these materials, as well, is my recollection.

MR. MORRIS: Okay. If we could just scroll down a little bit to show the Court the nature and extent of the request for production and the interrogatories that were served by Dugaboy. Thank you.

BY MR. MORRIS:

Q And do you see it's dated June 13th?

A Yes.

Q Okay. Is that the date that Highland produced their documents to Dugaboy and to the Dallas Foundation?

A I don't recall specifically that date. That's the date we obviously produced this response. We may have even started producing documents earlier. I just don't -- I don't recall.

Q Okay. Do you have any recollection as to the volume of documents that were produced?

A It was more than 4,000. It was not a blunderbuss production. It was specific to their request, but we produced everything that we had related to the settlement negotiations

and the settlement agreement.

Q And did that include the documents that the HMIT Entities provided to the Highland Entities as part of the negotiations?

A Yes.

Q Can you describe to the Court the nature of those documents?

A Ours really related to the finances, the structure, what we had left in the estate, what they could get out of. The ones that they produced to us were their organizational documents assuring that they had the proper parties. I'm trying to recall if there was any other specific ones, but I don't recall it. Certainly the organizational documents. We had most of those, frankly, because these entities were formed under Highland. And so we have a Highland system. Highland before the bankruptcy essentially had all of the documents for all of those entities.

Q Do you recall whether the Court or any party placed any limits on the scope of discovery that the objecting parties could seek?

A I do recall that there were no such limitations. And we had, I know my depositions tend to go a little bit.

Q Do you recall whether Dugaboy or any objecting party ever moved to compel the production of any information in connection with discovery?

A I do recall, and they did not.

Q Do you recall whether Dugaboy or any objecting party lodged any objection of any kind to any aspect of discovery that was provided in response to the objections filed against the 9019 motion?

A I do recall, and they did not.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Mr. Edney, before you start, let me just make sure Mr. Phillips, I'm assuming you don't have any --

MR. PHILLIPS: No questions, Your Honor.

THE COURT: Mr. Edney.

CROSS-EXAMINATION

BY MR. EDNEY:

Q Good morning, Ms. Seery. My name is Mike Edney. I represent the Dugaboy Investment Trust in this matter. Thank you for being here today.

A Thank you.

Q Let me start where Mr. Morris left off. Do you remember being asked some questions by Mr. Morris about the scope of discovery in the 9019 proceedings?

A I do.

Q Did you attend the depositions taken of Mr. Patrick and Mr. Raver?

A Not physically. I don't recall if I listened to them. I just don't recall.

Q And do you recall counsel for Mr. Patrick and Mr. Raver

objecting to any questions being asked of them regarding the restructuring in the Cayman Islands?

A I'm sorry. Do I recall whether Mr. Patrick's counsel objected?

A Yes.

Q I assume they did. I've definitely read the transcripts. In like every deposition, they objected to a myriad of things.

Q And they asked for that line of questioning to be cut off as irrelevant. Do you remember that?

A I don't recall that specifically, but I'm sure that there would be relevance objections, just as I read Mr. Dondero's deposition and you lodged the same things.

Q All right. Hunter Mountain's counsel initiated the discussions that led to the settlement agreement in May of 2025. Isn't that right?

A I think they did, but I don't recall. We had had specifically. I think that they initiated it, but we may have because we had discussions with them on other things prior to that.

Q And those discussions started in January or early February of 2025. Isn't that right?

A To settle this? No, that's not right.

Q Okay. Do you recall providing testimony at the 9019 hearing --

A Yes, I do.

Q -- that led to this matter? Let's -- and do you recall being asked questions about the course of negotiations between the parties?
A I do.
Q Okay. Do you recall stating that sometime, I believe, in January or early February, there was contact between HMIT's counsel about potential settlement?
A I don't recall that specific testimony. no. Could you read it to me?
Q Okay. I'd be happy to.

MR. EDNEY: Let's pull up the Exhibit 35, please, the transcript of the hearing, Page 88.

BY MR. EDNEY:
Q Now you see up there at the top, this is a direct examination of a gentleman named Seery. Is that right?
A That's what it says, yes.
Q All right. And do you recall direct examination of you during the 9019 hearing on June 25th, 2025?
A I did testify, yes.
Q Okay. I want to direct your attention to Line 10, which reads as follows, "Shortly after that, sometime, I believe, in January or early February, there was contact between HMIT counsel and our counsel about a potential settlement."

Do you see that?
A I see that, yeah.

Q Was there contact sometime in January, early February between HMIT'S counsel and our counsel about a potential settlement?

A I don't know if exactly what the dates were, because you see above it relates to HCLOF, which was a different thing. That was the first contact we had with -- between counsel. And then I believe that sometime in that February, January time frame, there was a discussion about potentially doing something.

But we didn't have -- you asked me about negotiations, I believe. And I don't think we had -- I know we didn't have any discussions with -- about the specifics of any settlement until after we had a nondisclosure agreement, because we were very concerned that this could be a ruse by Mr. Dondero and that Mr. Patrick and Mr. Dondero were continuing to work together.

Q Okay. So let me ask my question a different way. Did discussions regarding the potential settlement between the Hunter Mountain Entities and Highland begin in January or early February of 2025?

A No.

Q All right. But you did provide the testimony that we've outlined at Line 10. Isn't that correct?

A Where it says contact, yes.

Q Okay. All right. As a part of those discussions, as you just referenced, you -- the parties signed a nondisclosure

agreement. Isn't that right?
A That wasn't a part of the discussions. That's the entry door. You don't have discussions until you have the NDA.
Q So to begin the discussions, there was the conclusion of a nondisclosure agreement between the HMIT Entities and Highland. Isn't that right?
A That's correct.
Q And under that nondisclosure agreement, you were enabled to obtain any document that you might have wanted from the HMIT Entities and hold that in confidence. Isn't that right?
A I don't know if I could have obtained every document. I think that they would have said, well, that's a privilege document or something. We were exchanging information that would lead to a settlement, not examining what other things they might have done.
So anything related to what we needed, I believe we could get. There wasn't a requirement that they turn everything over. It was a business negotiation.
Q I understand. You asked for some documents pursuant to that nondisclosure agreement. Is that right?
A I think in the course of the negotiations, we did. Most of the information was us giving information. They were giving facts about Highland and the potential that we -- what a settlement could be and what they could achieve and knowing what our objectives were up.

Q Okay. But you did ask for some documents under that nondisclosure agreement from the Hunter Mountain Entities. Isn't that right?

A I believe I was -- I don't recall asking. I believe I received the corporate docs that -- if we didn't have them. But as I said earlier, a lot of the stuff was on Highland's system because all these entities were formed when Dondero controlled it all and Highland set these things up.

Q Prior to entering into the settlement agreement, you reviewed the organization documents of the entities in the Hunter Mountain chain of ownership, didn't you?

A Yes.

Q And you did this to assure yourself that Mr. Patrick had authority to enter into the settlement agreement. Is that right?

A I did it to assure myself that Mr. Patrick had full authority over those entities and the entities could enter into those -- into the settlement agreement.

Q Okay. I'll take that answer. So you wanted to find out that when Mr. Patrick signed on behalf of those entities, that he would be acting with authority on behalf of those entities. Is that right?

A Absolutely not. I already knew that.

Q Okay.

A I was confirming the structure, that the entities that

could enter into these agreements and that he continued to have authority to enter into those agreements. Making sure that I didn't have to go get somebody else's approval.

Q Prior to entering into the settlement agreement, you looked at the organizational documents of the entities that were going to enter into that agreement, didn't you?

A Yes.

Q And you did so to satisfy yourself that Mr. Patrick had authority to enter into the settlement agreement on behalf of each of the HMIT Entities, didn't you?

A I think that's what I just said. I wanted to make sure that the entities could do it and that he had the authority to do it. I frankly knew that he had the authority for most of them because, again, with HMIT or Beacon, we knew that he had already brought actions in the bankruptcy court against us.

Q Is the answer to my question yes, Mr. Seery?

A I think I had already given the answer before, and then you asked me the same question again.

Q No, I appreciate your views on my questions. I would like to see if the answer to my question is yes.

A Can you ask the question again?

Q Absolutely. Did you look at the organizational documents of the HMIT Entities to satisfy yourself that Mr. Patrick had the authority to enter into the settlement agreement on behalf of each of the HMIT Entities?

A Again, I did look at them for that reason. I already knew he had authority at least with respect to most of them.

MR. EDNEY: All right. Let's pull up Page 97 of this, Exhibit 35.

BY MR. EDNEY:

Q Your answer is a little bit more complicated than it was back then. So I want to take you to Line 12. You were asked a question, read along with me, "Let's talk for a moment about Mr. Patrick's authority. Before entering into the settlement agreement, did you do anything to satisfy yourself that Mr. Patrick had the authority to enter into the settlement agreement on behalf of the HMIT Entities?" Do you see that?

A I see it.

Q And do you see your answer?

A I said "Yes."

Q And then you were asked, "What did you do to satisfy yourself?" And you said, "Well, as a default rule, I always look at the agreements that I'm going to enter into in the organizational docs." Do you see that?

A Yes.

Q In order to satisfy yourself that Mr. Patrick had the authority to enter into the settlement agreement on behalf of each of the HMIT Entities, did you look at the organizational docs of those entities?

A Yes. As a default rule, I always look at those, those

agreements.

Q All right. The documents that you looked at were identified on Highland's exhibit list for that hearing, weren't they?

A I believe they were. Yes.

Q As a matter of fact, further down in this hearing, you were asked what documents you looked at, correct?

A I'm sure I was. If you could show me it, I'm sure that that's the case.

Q Yeah, if you go down to Lines 23 and 24. Are those the documents that are in the exhibit list from 70 to 104? Do you see that?

A I see that it says that, yes.

Q So --

THE COURT: Hold on one second, Mr. Edney.

MR. MORRIS: Your Honor, I object to this line of questioning. The transcript is in evidence already. It speaks for itself. If he wants to impeach Mr. Seery and look at the transcript, by all means. But otherwise, he should just be asking the questions, not just validating the transcript.

THE COURT: Response, Mr. Edney?

MR. EDNEY: Your Honor, I do think I am trying to hold Mr. Seery's testimony to his previous questions and answers in the May 19, 2025 hearing. I think I am using it for an appropriate impeachment purpose.

THE COURT: I don't know the rule. What I am going to say, if you can move this along. I mean, we do have the transcript, but if you've got specific questions where you believe he's not answering the same way and you want to use this, go ahead.

MR. EDNEY: All right. Thank you, Your Honor.

BY MR. EDNEY:

Q So the documents that you looked at to confirm Mr. Patrick's authority, they were listed on the exhibit list of Highland leading to that hearing, weren't they?

A I believe so. I said I'd have to check the actual numbers. It looks like I'm cut off, but we tried to put everything into evidence at the 9019. And we put on a very robust 9019 case by going through every one of the documents, but it was on direct and we didn't beat the dead horse.

Q Fair enough.

MR. EDNEY: Let's go to the exhibit list for the 9019 hearing filed by Highland on June 24, 2025. If we could pull that up, please.

THE COURT: I'm sorry, which exhibit is this, Mr. Edney?

MR. EDNEY: It's not an exhibit.

THE COURT: Okay.

MR. EDNEY: It's for purposes of cross-examination.

THE COURT: Okay.

MR. EDNEY: It's a filing in the main bankruptcy case, Your Honor.

All right. If we could go to Page 8, please.

BY MR. EDNEY:

Q There's a heading there that says "Patrick Authority." Do you see that?

A Yes. And there's a series of exhibits that follow.

MR. EDNEY: If we could scroll down to the next page, 9. And then 10 and then 11.

BY MR. EDNEY:

Q Then there's a heading break that says "Dugaboy Note." Do you see that?

A Yes.

Q So Exhibits 70 through 104 are under the heading "Patrick Authority." Do you see that?

A I'm looking at the Dugaboy Note, but I saw it before. Yes, 70 to 104 under the -- we broke this out so it would be really easy to understand in each of the categories of things we were covering.

Q And Exhibits 70 through 104 were the exhibits, were the documents that you looked at, the organizational documents you looked at to confirm Mr. Patrick's authority. Isn't that right?

A I believe that's most of them, if not all.

Q Okay. As a matter of fact, you stated on the record back

in that hearing that those were the exhibits, Exhibits 70 through 104.

A I stated those were the exhibits. I don't know if that's every document I looked at, but I looked at all 34 of those documents. Yeah.

MR. EDNEY: Okay. All right. Let's go up to the -- I think we're at the right page here. As we do this, let's pull up side-by-side Exhibit 242, Slide 12, please. Do we have that capability to do two at a time?

Just bear with us for a second. I promise this will speed things up.

(Pause)

MR. EDNEY: All right. That's good.

BY MR. EDNEY:

Q Can you see both?

A I can see both, but I apologize because it's going to be hard for me to read this.

Q Yeah, we'll blow it up a touch.

Okay, all right. So one of the documents you reviewed was Exhibit 70, which was the trust agreement at Hunter Mountain, right?

A Yes.

Q And that's the Hunter Mountain Investment Trust in the second to bottom square on this chart. Isn't that right?

A Yes. But to be clear, your chart's incorrect. But okay

-- but that is in that box, yes.
Q Okay. And then at Exhibit 73, we have the Limited Liability Company Agreement of Atlas IDF GP. Do you see that?
A Yes.
Q And that entity is in green on this chart. Isn't that right?
A Yes.
MR. EDNEY: Let's go to the next page of the exhibit list.
BY MR. EDNEY:
Q Now, Exhibits 75 through 85 are documents regarding HMIT, right? See that?
A That's the appointment of Mark Patrick as the successor administrator, yes.
Q And then several organizational documents for Rand Entities and Atlas Entities. Do you see that?
A Yes. Just let me --
Q If you can take him down to 85, please.
A Some are consents. Some are the constituent docs, yes.
Q Okay. But they all concern the Rand and Atlas Entities, right?
A I believe so looking at each of these headings, yes.
Q And these entities, these --
A Just to be clear, I'm looking at the list, not the document.

Q Correct, right. And these Rand and Atlas Entities, they are on this chart over here, Exhibit 242, Slide 15. Aren't they?

A I'd have to check each one, but you certainly have Rand Entities and you certainly have an Atlas entity. And, again, there's so many mistakes in your chart, it's hard to use it. But you have those names listed, yes.

Q All right. So then if we go to the next page, Exhibit Numbers 86 through 93, those are also organizational documents from the various Rand and Atlas Entities. Isn't that right?

A Some are. Some are other documents related to their organization are not organization or constituent documents, yes.

Q But they all concern the Rand and Atlas Entities. Isn't that right?

A They are documents that concern those entities. You're going up to what number?

Q 94. 93, I'm sorry. 86 through 93.

A Yes.

Q Okay. And then Exhibit 94, that concerns Beacon Mountain, LLC. Isn't that right?

A Yes.

Q As does Exhibit 95?

A That's correct.

Q And then Exhibits 96 through 100 concern the Okada Family

Foundation, the Empower Dallas Foundation, and the Crown Global Company. Do you see that?
A I see that, but those are Crown Global Policies.
Q Uh-huh.
A And a term sheet.
Q But they concern the Crown Global Company, right?
A I believe they concern the policy that the entities Empower and Okada Family Trust purchased. I don't believe they concern the Crown Global Company.
Q Okay. They relate to the Crown Global Company, don't they, Mr. Seery?
A To the extent that a policy they issued relates to it. Everything else you've shown is a constituent document, so if you're trying to tie that to being constituent document, I believe you know what that term means, these are not those.
Q All right, Mr. Seery. And the Crown Global Insurance Company, the Empower Dallas Foundation, the Okada Family Trust, they're listed over on the right of Slide 15 of Exhibit 242. Do you see that in pink?
A I see that you have them on your chart, yes.
Q All right. If we go to the next page, we have Exhibits 101 and 102. Those relate to Crown Global, correct?
A Again, those relate to the policies that Crown Global issued, yes.
Q And then we have two HMIT opinions from 2016. Isn't that

right?

A Those are the opinion letters that were -- there's a rep letter, which is Dondero swearing that he's read the opinion and he abides by all of the representations in the opinion. And the opinion which blessed the Hunter Mountain, you know, tax scheme.

Q Mr. Seery, were you aware that by the time of the June 25th hearing, that Hunter Mountain had been sold out of the stack of companies that the Rand PE Fund was a part of?

A Certainly by the hearing, yes. Hold on a second. Can you repeat the question? I think I misunderstood what you said.

Q Sure. By the time of the June 25th hearing, 2025, you were aware that Beacon Mountain and Hunter Mountain had been sold out of the stack of companies that involved Rand PE Fund I, L.P. Isn't that right?

A No. So the interest in Beacon Mountain was sold from one -- I was aware that the interest in Beacon Mountain was sold from one entity that Patrick controlled to another entity that Patrick controlled called CLO Holdco, LLC. It's on our chart that we used as a demonstrative and then your prior counsel used to cross in the 9019 hearing.

Q Okay. And after reviewing Documents 70 through 104 on this exhibit list, you concluded Mr. Patrick had complete authority to enter into the settlement agreement. Isn't that right?

A Yes.
Q And you concluded that the proceedings in the Cayman Islands had no impact on Mr. Patrick's authority over any of the entities in the chain of entities that owned Hunter Mountain. Is that right?
A That's correct, yes.
Q And you concluded that the relevant entities to Hunter Mountain run up to companies he owns and controls, and it's a structure that was set up a long time ago. Is that right?
A That's a pretty broad brush. But I concluded that he had authority over each of the entities and these were entities that I wanted to have as counterparties to the settlement agreement.
Q You had not concluded that the relevant entities to Hunter Mountain were in a structure that was set up a long time ago?
A The Hunter Mountain structure was set up in 2015 to shelter hundreds of millions of dollars of income from taxes that Dondero and Okada were going to be hit with. So I'm very familiar with the structure.
Q All right.
A It was set up in 2015. Yeah, that's I guess a pretty long time.
MR. EDNEY: Let's go to Exhibit 35. Page 99, please.
BY MR. EDNEY:
Q All right. Going to Line 13. At the June 25, 2025

hearing, were you asked the following question, "So based on the work that you did and the documents you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT Entities?" And your answer was "Yes." Do you see that?
A Yes.
Q And then were you asked the question, "What view did you reach?" And the answer follows, "He has complete authority over each of these entities. They run up to entities that he controls or he owns, and he's had that. It's a structure that was set up a long time ago, and any changes to that structure are consistent with the documents that let him do those things." Did I accurately read that question and answer?
A Yes.
Q Did the Hunter Mountain Entities concern a structure that was set up a long time ago?
A That's exactly what I just testified to in 2015.
Q All right. And you concluded that the Dallas Foundation had no rights with respect to the -- at all with respect to the management of these entities because Crown Global had only issued an annuity policy. Isn't that right?
A It was the entire structure of the Crown policy and the layers that they separated those entities from control of the entity. Yes, they had no voting, no consent. Virtually no rights at all, other than to receive the payments from Crown.

Q But by the time of this testimony, Hunter Mountain and Beacon Mountain had been sold out from under the Crown Global structure. Isn't that right?

A Again, you keep doing this, and it's not fair and it's not correct. Be specific. Hunter Mountain, the interest in Beacon Mountain was sold. Yes.

Q And it was sold away from the Crown Global structure. Isn't that right?

A It was sold away -- I've got to look back at the structure. It was sold by Rand through the multiple layers of the structure. And they didn't have any rights to consent. And it was between two entities that Mr. Patrick controlled.

I'm not trying to be difficult. That's exactly what I testified to. That's what the documents say, and that's what we've done. And as you know, the Dallas Foundation objection and withdrew their objection, so go ahead.

Q Before entering into the settlement agreement, did you ask Mr. Patrick to provide Highland with any of the documents from the Cayman Islands proceedings concerning the Charitable DAF?

A I don't -- I don't know. I know I had some of them. I had the supervision application, for sure. I don't know that I asked him to provide them. I don't know where I got them. I think we may have gotten those elsewhere, but I don't know.

Q All right. Now, Mr. Morris asked you a question about whether the liquidators had been in touch with you regarding

the potential settlement prior to the June 25th hearing, right?
A If he -- no, he asked me if they had been in touch with me prior to June 24th.
Q I see.
A No, that's the question he asked. You can look at the transcript. You can see or not see. You don't have to be snide with me. I'm sorry, Your Honor.

THE COURT: Yeah. Let's make sure both for witness and attorney, let's make sure that we're keeping our comments professional and we don't need snide marks.

BY MR. EDNEY:
Q So did they get in touch with you on June 24th, 2025?
A I received a letter, it's in evidence, that came on June 24th for -- it may have come late and I might have gotten it the morning of the 25th.
Q And what did that letter say?
A That letter said, we're aware of the transactions that were the -- we've seen the CDMCFAD that collapsed on the DAF side, a number of entities, and that removed those DAF structures from the entity that the JOLs were now appointed for. So they were aware of the redemption -- the dilution and redemption transaction, as they've so described, and asked for a 45-day stay of the hearing.
Q So did the Cayman Island Liquidators ask the Court to delay the approval of the settlement agreement for 45 days?

A No, they did not.
Q Did they ask for a stay of the hearing for 45 days?
A No, they did -- they asked myself. They didn't ask the Court anything. They sent a letter to me and asked if I would delay the hearing for 45 days.
Q And what was your response, if any?
A I didn't respond, but the answer would have been no.
MR. EDNEY: All right. Let's go back to Exhibit 242, Slide 12, please.
BY MR. EDNEY:
Q One of the entities that you reviewed documents regarding was Rand Advisors, LLC. Isn't that right?
A Yes.
Q And were you aware from reviewing those documents that Rand Advisors, LLC was a registered investment advisor?
A I don't recall if I was aware of that at the time. I probably was. I just don't recall.
Q But if the documents that we looked at, Exhibits 70 through 104 of the May 19th -- of the June 25th, 2025 hearing, had documents regarding that status, you would have been aware of it. Is that right?
A Yes.
Q Okay. And is it your understanding that any sale that Mr. Patrick effected of any interest in Beacon Mountain was done through his authority as the person in charge of Rand

Advisors, LLC?

A I believe it was either done through the GP -- it was the fund selling. It would have been the Rand PE Fund selling. I don't know if it's the Advisors. I just don't recall if it's the Advisors or the GP that is executing in that sale.

Q Do you have any reason to doubt that Rand Advisors, LLC has an investment advisor relationship with Rand PE Fund I, L.P.?

A I don't recall. I mean you've got it listed here. I don't know if that's correct or not. I'd have to look at the management agreement, but I believe that's how they set it up.

Q Okay. So the Highland bankruptcy estate, it has two trusts now. Is that right?

A No.

Q How many trusts does it have?

A The Highland bankruptcy estate has one trust. That's the Highland Claimant Trust.

Q Okay.

A Outside of the Highland bankruptcy estate sits the Highland Indemnity Trust. That trust was set up specifically to provide identification because we couldn't get D&O insurance because there's something in the D&O insurance markets called the Dondero exclusion. There's testimony on this. That structure was approved by the Fifth Circuit.

MR. EDNEY: All right. I'm going to move to strike

the rest of that answer as nonresponsive.

BY MR. EDNEY:

Q I asked you whether there are one or two trusts. Is the answer to my question two?

A I think you asked me if there was one -- if there were two trusts in the estate --

Q Why don't we let --

A -- and I said no.

Q Why don't we let His Honor rule on my motion to strike first.

THE COURT: Okay. It's overruled.

BY MR. EDNEY:

Q Okay. Are there two trusts? Again, there's one trust in the Highland estate. There's a separate trust outside of the Highland estate. That's the Highland Indemnity Trust.

Q Okay. Are there two trusts related to the Highland bankruptcy estate?

A They're both a product of the Highland bankruptcy estate. Yes.

Q Okay.

A But again, we're post-exit and the effective date, that formed -- an effective date the Claimant Trust was formed and the Indemnity Trust was formed. And the Claimant Trust has the relationship with the classes of creditors and the plan and then there's the Indemnity Trust.

Q What is the value of assets that the Highland Claimant Trust currently holds?
A De minimis.
Q Do you know the number?
A It would be less than a couple million dollars. And it will be all cash.
Q Does the Highland Claimant Trust currently have ongoing expenses?
A The Claimant Trust does have ongoing expenses because there's the Claimant Trust, then there's Highland Capital Management Limited Partnership, which is separate. And then there's the Indemnity Trust.
Q Okay. What are the ongoing expenses of the Highland Claimant Trust?
A Certain operational expenses, depending on the matter. Certain litigation expenses. Compensation provided to -- on the Claimant Trust to me, some of it. Some of it would be from HCMLP.
Q All right. In 2025, do you have a ballpark figure of what the expenses of the Highland Claimant Trust were?
A I don't. Because you have the Claimant Trust with its operations, and then if you want to throw in attorney's fees dealing with all of this, some of which are Indemnity Trust, some are not. I don't have a number for you.
Q So some expenses of ongoing operations are charged to the

Indemnity Trust. Is that right?

A The operations are done out of the HCMLP. The Claimant Trust has a portion of my trustee compensation and some other operating expenses.

Q Highland Capital Management, L.P. has some assets. Is that correct?

A Highland Capital Management has some -- no assets anymore. Really, everything's been reduced to cash. We're going to close this case.

Q Okay. And so what is the total value of assets, including cash, at Highland Capital Management, L.P.?

MR. MORRIS: Your Honor, I object. At this point, I see absolutely, positively, no connection between this line of inquiry and anything that's happening with this motion to vacate. I think this is just discovery, and I respectfully request that Mr. Seery not be required to divulge how much money he still has left for indemnification purposes or for any other reason. It's completely irrelevant.

THE COURT: Mr. Edney, response?

MR. EDNEY: Your Honor, it goes to Mr. Patrick's efforts to fight rigorously on behalf of the charities or whoever owned the entities at the time of the settlement. One of the goals was to liberate cash, and the question is about how much cash was available.

THE COURT: Okay, I'm going to sustain the objection.

We're not here to try a settlement motion. We're here based on your motion and your client's motion to vacate that order. We're not here to try whether or not this was an appropriate settlement. That's already been approved.

MR. EDNEY: All right, Your Honor. In light of that, I have no further questions for this witness.

THE COURT: Okay. Mr. Morris, do you have any redirect?

MR. MORRIS: I do not, Your Honor.

THE COURT: Okay. Let me make sure. I just don't believe there's any other questions by any other counsel, but let me just make sure.

Ms. Ziegler-Young, questions?

MS. YOUNG: No questions, Your Honor.

THE COURT: All right. You can step down, Mr. Seery.

THE WITNESS: Thank you, Your Honor.

(Witness excused)

MR. MORRIS: Before Highland rests, Your Honor, I have a number of exhibits I'd like to move into evidence --

THE COURT: Okay.

MR. MORRIS: -- that I believe, some of which are consensual, some of which are subject to some objections. So I'd like to begin with the consensual ones first.

THE COURT: Okay. Is this -- let me make sure. We did this at the beginning of the hearing, so are we talking

about different exhibits than those?

MR. MORRIS: There are certain exhibits that weren't addressed at the beginning of the hearing. There were certain exhibits that were objected to at that time, and we didn't address those objections. I'm doing it now before I rest because there are certain exhibits I want to come into evidence.

THE COURT: Okay. You may proceed, then.

MR. MORRIS: Thank you. So first, Your Honor, and I apologize, I don't have the docket numbers, but Highland filed -- let me back up. Let me explain to you why we're going through this process, because at the time we appeared in court last Monday morning, we had met and conferred about Exhibits 1 through 79. And later that day, before the trial had started, we filed a couple of amended exhibit lists that the parties never had the opportunity to meet and confer about.

THE COURT: Okay.

MR. MORRIS: So that's what I'm going to address in the first instance. It's Exhibits 80 through 97, and subject to Mr. Edney's confirmation. There is no objection as to any of those exhibits, although I want to point out to the Court that Exhibit 87 is a demonstrative exhibit. It's not being offered into evidence. It's merely included on the docket pursuant to Your Honor's rules.

So if Mr. Edney can just confirm that, then I would

move Exhibits 80 through 97 into evidence but for Exhibit 87.

THE COURT: Okay. Mr. Edney?

MR. EDNEY: Your Honor, Mr. Morris and I talked this morning, and we talked about Exhibits 80 through 89. And with respect to that, I told Mr. Morris that we had no objection to the admission of Exhibits 80 through 86. We understand that Exhibit 87 was his opening demonstrative and, as a demonstrative, we have no objection to that being part of the docket in this case, but not as admission into evidence. I don't think Mr. Morris is intending to do so.

We have no objection to 88. 89 is a lengthy transcript from the Cayman proceedings. We do object to that. As to 90 through 97, we did not discuss that this morning. I would say that Mr. Morris and I have been working well to clear out the easy exhibit issues and pre-admit some of them. But where we haven't done that, we've endeavored to do and perhaps it's adding to the -- perhaps we've taken too long to do it. We've sponsored those exhibits through witnesses.

I've not agreed to or I don't think there's a process to just admit a bunch of exhibits not through a witness and not through pre-agreement. So, but having said that, I didn't want to belabor the time of the Court. So, when he brought 80 through 89 to my attention, I took our position on those, which I've read into the record. 90 through 97 is a different thing.

I suspect, Your Honor, that if you look at 90 through

92, I suspect that Mr. Morris was going to use those in his examination of Mr. Dondero, as he did in Mr. Dondero's deposition. And now we're doing this in the middle of that. I probably do object to that.

MR. MORRIS: Your Honor, if I may, and with apologies to Mr. Edney, he's simply mistaken. I've got email communications on which he's copied. We met and conferred. Mr. Gaddis communicated with me on behalf of Dugaboy. I've got an email dated May 12th, sent to me at 8:25 a.m., copying -- from Mr. Gaddis to me, copying Mr. Edney and others, where he specifically says, we reviewed and have no objection to Exhibits Numbers 91 to 97. And then he responded a few moments later and said, ditto for 90.

So, I understand this is a big process and that Mr. Edney may not have recalled this exchange, but we've already been through this. And so with the agreement that's reflected in this email, and I'll represent to the Court, that's exactly what it says. I would respectfully move for the admission of all of the Exhibits 80 through 97, although I do want to address 89, if the Court will allow.

THE COURT: Okay. Here's what I'm going to do. I'm going to go through these, as I understand them, and we're going to get to all these issues. So, I've got an offer for the admission of 80 through 86, Highland's 80 through 86. It's my understanding there's no objection. Is that correct,

Mr. Edney?

MR. EDNEY: That's correct, Your Honor. Thank you.

THE COURT: Okay, those will be admitted.

(Debtor's Exhibits 80 through 86 admitted into evidence)

THE COURT: I have Exhibit 87. Now, I'm sure you all know better than I do that the Rules of Evidence recently changed, and I believe that there is -- I'm not going to remember the rule, you all may know better. There is a rule regarding document or illustrative exhibits where they may not be admitted necessarily for the truthfulness or the truth of the matter being asserted in them but for purposes of use by the Court. So, I want to make sure, is that what we're offering 87 for?

MR. MORRIS: That's exactly right, Your Honor.

THE COURT: Okay. And there's no objection to it being admitted for that purpose?

MR. EDNEY: For that limited purpose, Your Honor, exactly. Thank you, Your Honor.

THE COURT: Okay. All right, so Exhibit 87, and forgive me, I don't recall the rule off the top of my head, but it will be admitted for illustrative purposes as part of the record, but will not be admitted for the truth of the matter asserted therein.

(Debtor's Exhibit 87 admitted into evidence)

THE COURT: All right, that will be 88. We've got an

offer for admission of that. I believe that one is not objected to. Is that correct, Mr. Edney?

MR. EDNEY: That's correct, Your Honor.

THE COURT: Okay, so Exhibit 88 will be admitted.

(Debtor's Exhibit 88 admitted into evidence)

THE COURT: 89, we've got an objection to. We'll get to that here in a second.

Next we've got Exhibits 90 through 97. And is Mr. Gaddis still in the courtroom?

MR. GADDIS: Yes, Your Honor.

THE COURT: All right, will you come to the podium, please, Mr. Gaddis?

So, Mr. Gaddis, Mr. Morris is representing that there's an email exchange between you and him that states that on behalf of Dugaboy, there are no objections to Exhibits 90 through 97. Is that accurate?

MR. GADDIS: Yes, I remember writing that email.

THE COURT: Okay, all right. Exhibits 90 through 97 will be admitted.

(Debtor's Exhibits 90 through 97 admitted into evidence)

THE COURT: All right, Mr. Morris, if you'd like to state your response to what objection to 89. Let me pull up 89 real quick.

MR. EDNEY: Your Honor, if I may interject for just a moment. I do think the illustrative issue that you identified

with respect to 87 also applies to 94.

MR. MORRIS: That's fine, Your Honor.

MR. EDNEY: It appears to be a duplicate perhaps but --

MR. MORRIS: It's not a duplicate. It may be, but be that as it may, I'm perfectly fine with Mr. Edney's request to treat Exhibit 94 in the same way that we treated 87.

THE COURT: Okay. All right. And for the record, so that it's clear, Exhibit 94 will likewise be admitted for illustrative purposes and not for the truth of the matter asserted.

(Debtor's Exhibit 94 admitted into evidence)

THE COURT: All right, 89, Mr. Morris?

MR. MORRIS: So, very simply, let me just remind the Court of Ms. MacInnis' testimony. If Your Honor will recall that in early February the Cayman Trial Court issued an order with respect to the writ that had been filed the prior summer.

I'm going to try hard to avoid characterizing Ms. MacInnis' testimony and just say that after that order was entered, the Joint Official Liquidators filed what's called a summons in the Appellate Court, which is effectively, in our language, a petition for injunctive relief pending appeal. And that's what Exhibit 88 is. And it was --

THE COURT: 89?

MR. MORRIS: No, that's what 88 is.

THE COURT: Oh, 88. I'm sorry.

MR. MORRIS: So you start with 88.

THE COURT: Okay.

MR. MORRIS: So 88 is the request. The Trial Court had just rejected the JOLs' request for a proprietary injunction. The JOLs filed notice of appeal. And Exhibit 88 is the JOLs' request for interim injunctive relief pending the appeal.

THE COURT: Okay.

MR. MORRIS: Are you with me?

THE COURT: Yes.

MR. MORRIS: So what Exhibit 89 is the transcript from the hearing on that application for interim injunctive relief. And if Your Honor will recall, there was some testimony over whether the relief that was granted by the Appellate Court in the Cayman Islands was consistent with the rule, the consensual Rule 11 agreement that had been entered between Mr. Patrick and the supporting organizations the prior July. And we're offering the transcript to show that the Cayman Appellate Court stated what it stated. Okay?

And, I mean, I could characterize it. I'm not here to make an argument. I'm just saying that it's relevant because it flows exactly from the testimony the other day. It will allow the Court to see exactly what the Cayman Appellate Court said vis-a-vis the consensual Rule 11 consent decree that

was issued as part of the Texas Business proceedings.

I hope I've been clear. Maybe I middled it.

THE COURT: So this is the transcript of that hearing with their ruling.

MR. MORRIS: Yes.

THE COURT: Is the ruling not down in writing? Do you not have an order of the court? It has been --

MR. MORRIS: There is. I believe it's Exhibit 93.

THE COURT: Okay.

MR. MORRIS: But I don't know that Exhibit 93 specifically refers. In fact, I'm quite confident that Exhibit 93 does not specifically refer to the Rule 11 consensual order. And the point that we're trying to make to the Court is that all the Cayman Court did, they may have added a couple of parties, but effectively all the Cayman Court did was say, since you consented to the Rule 11 order in Texas, we're just going to adopt it down here on the Cayman Islands.

And I point out again, because I'm getting help from a friend, that under Rule 201, the Court could take judicial notice of facts. It's generally known within the Trial Court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy can't be reasonably questioned.

So there's no question that this is the transcript. We're offering it in order to show the Court that contrary to

some suggestions that have been made, the Cayman Islands Trial Court was not reversed in any way. All that happened was interim injunctive relief was granted pending appeal that will not be heard until September. And that interim injunctive relief was largely if not wholly consistent with the consensual order that was entered in Texas the prior July.

THE COURT: Sorry, give me one second.

MR. MORRIS: Yeah.

THE COURT: I'm going back over my notes. We don't have testimony or evidence if this by Ms. MacInnis?

MR. MORRIS: Your Honor, I don't want to belabor the point. This should not require extensive argument. We respectfully request that it be admitted into evidence. If Your Honor wants to overrule the objection, just note our objection to that ruling. This is not going to make or break anybody's case.

THE COURT: I'm going to sustain the objection, and I'm not going to admit it because I believe we've already got testimony to the issue. And so the Court notes that it sustains the objection to the admission of Exhibit 89 and so, therefore, Exhibit 89 will not be admitted.

MR. MORRIS: Okay. The next matter I'd like to take up, Your Honor, is Exhibit 300. If you will recall, Exhibit 300 was the document that I used to impeach Ms. MacInnis. It's the one that showed Mr. Leventon's modification of her third

affidavit prior to the date that it became public. And --

THE COURT: Hold on one second, Mr. Morris. I've got your binders up here that go through 97. Did you all file -- oh, hold on one second here. If I'm not mistaken, I think I do know what you're talking about. I don't know -- maybe it may be over there. Give me one second.

MR. MORRIS: I may have an extra copy if Your Honor would like it.

THE COURT: Give me one moment. It might be in one of these binders, too.

MR. MORRIS: I'm sorry, Your Honor.

THE COURT: Okay. Yes, okay. This is the screenshot. I'm going to call it a screenshot, but it's basically the review by -- this has the affidavit. It has a text box that looks to be metadata regarding a possible review by another party. Is that correct? Is that --

MR. MORRIS: That's exactly right.

THE COURT: Okay.

MR. MORRIS: And I want to make clear that the boldface type at the top of the document was prepared by counsel, and all it is really are instructions as to how to find the metadata. We used it to impeach already and so, therefore, we think it should properly -- a document that was used to impeach should properly come into evidence.

THE COURT: All right. I have an offer for

admission, Exhibit -- Highland Exhibit 300. Do we have any objections?

MR. EDNEY: Yes, Your Honor, we do object to it. Mr. Morris did use it for purposes of impeachment, and it was incorporated in his questioning. But that's not grounds to admit it into evidence. It is a document that is created by counsel. There was no testimony sponsored as to how it was created. And I think he has his record on its use, and it's not proper to admit the document into evidence in this case.

MR. MORRIS: Just a brief response, Your Honor. We are not offering the boldface type at the top. Those are instructions, but I don't see how an Appellate Court could properly assess the testimony without having this document before it. And you could follow the instructions right now, I believe, and satisfy yourself that what we're representing is true.

THE COURT: Okay. The Court's going to reserve its ruling on the admission of this exhibit and then I'll issue its rulings when it rules on the -- to the extent necessary, will issue its ruling on the admission of this exhibit at the time that it issues its ruling on the motion.

MR. MORRIS: Okay. Would it be helpful, Your Honor, if we filed it on the docket?

THE COURT: Yes, it would be.

MR. MORRIS: Okay. We'll do that either now or at

the very next break.

THE COURT: Okay. And, again, please file it as Highland Exhibit 300?

MR. MORRIS: Okay. If you'd just give me one second, Your Honor. I just have a few more issues to address that I see.

(Pause)

MR. MORRIS: Okay. Next, I just really just have a couple of more exhibits. I'm going to just make this a little bit cleaner, and I will say that Highland withdraws Exhibits 42, 69, and 71.

THE COURT: 42, 69, and 71?

MR. MORRIS: Yes.

THE COURT: Okay.

MR. MORRIS: So that leaves five remaining exhibits, three of which I'm going to handle at once, and they are Exhibits 55, 56, and 57. And those exhibits are the deposition transcripts of Mr. Raver, Ms. Diaz, and Ms. Littleton that were taken in advance of the June 25th hearing as part of the discovery on the 9019 motion.

We filed those exhibits on the docket because I don't think there's any disagreement, because it's in an email that I have that all three witnesses are more than 100 miles from the courthouse. And there is no evidence that their absence has been procured by Highland in any way. And we believe that they

should all come into evidence under Rule 32(a)(4)(B), which states that a party may use for any purpose the deposition of a witness, whether or not a party, if the Court finds that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition.

So we believe that these transcripts should come in for that purpose. We initially conferred about these particular transcripts last Sunday, and the two principal objections that we received at that time were that they were hearsay and that we hadn't provided deposition designations. We are not offering any of these three transcripts for the purpose of the truth of the matter asserted, so that hearsay does not apply.

And in the intervening days, we provided Dugaboy with very specific page and lines designations of these transcripts so they knew exactly what it is we were offering the transcripts for. We think that these transcripts are vital, and they're vital because it shows, right, there's a Rule 60 motion. Under Rule 60(b)(2), Dugaboy is required to show not only that they have newly-discovered evidence, but that it couldn't have reasonably been discovered prior to the date for a new trial.

And here, Dugaboy has claimed that they were unaware

of certain facts until after the date for a new trial, and yet these transcripts show the testimony, particularly Mr. Raver. I mean, they may have qualms about Mr. Patrick, but Mr. Raver answered everything. And the Dallas Foundation witnesses, the parties who you're told are the economic beneficiaries of HMIT, we disagree with that, but let's say it's true from their perspective.

They're the ones who challenged Mr. Patrick's authority, and they're the ones who withdrew their objection with prejudice and entered into a consensual binding term sheet with Mr. Patrick that left him fully in place. I think Dugaboy needs to be charged with the knowledge of the facts that were induced during those three depositions. And so both because it plainly comes in under Rule 32(a)(4)(B) and because it couldn't be more relevant, we'd move for their admission.

I do want to point out, Your Honor, that if Dugaboy succeeds, and maybe it's a hypothetical question, but I think it's one that illustrates the injustice that's being done here. If Dugaboy contends that there's a fact that they were unaware of, and yet the transcript shows that they were, in fact, aware of that particular fact, and the transcript is excluded, is Dugaboy now allowed to just basically say, because the transcript was excluded, now we get to pretend that we were unaware of that fact?

I don't think that makes any sense at all. I think

these transcripts plainly come in under Rule 32. I think they're highly relevant. And to exclude them would be another opportunity for mischief, which the Court should quash right now.

THE COURT: Okay. Do you want to give the Court the line designations that we're talking about?

MR. MORRIS: Can we email that to the Court the -- because I don't have them handy, but I could do that on a short break. I'm happy to do that.

THE COURT: We'll get back to the line designations. Let me hear from Mr. Edney.

MR. MORRIS: And I actually could do that, if you give me a moment. I just have to find each one in my notes, because I know that I have them right here.

(Pause)

MR. MORRIS: Okay, so Mr. Raver, would you like me to do this orally, or is there a more efficient way to do it?

THE COURT: No, orally is fine. But can you give me the exhibit number that we're talking about?

MR. MORRIS: Yes, so Raver is Exhibit 55.

THE COURT: Okay.

MR. MORRIS: And I believe for Raver we have Page 7, Line 5 through 10; Page 11, Line 6 through Page 14, Line 6.

THE COURT: Okay. Sorry, say that one again. Page 11?

MR. MORRIS: Line 6.

THE COURT: And that's through?

MR. MORRIS: Through Page 14, Line 6.

THE COURT: Okay.

MR. MORRIS: Then we have Page 15, Line 6 -- that's just a coincidence -- through Page 16, Line 2.

THE COURT: Okay.

MR. MORRIS: Page 16, Line 25.

THE COURT: 16?

MR. MORRIS: Yes.

THE COURT: Okay.

MR. MORRIS: Through Page 17, Line 15. Page 30, Line 4 through Line 25.

THE COURT: Okay.

MR. MORRIS: You know what, Your Honor? Respectfully, I request a short break, because I'd like to do this from the transcript.

THE COURT: Okay.

MR. MORRIS: And make sure that I have this right.

THE COURT: That will be fine. We'll take a 10-minute recess?

MR. MORRIS: That would be plenty.

THE COURT: Okay. We'll take a 10-minute recess.

MR. MORRIS: I just want to make sure I'm giving to you what I gave to them.

THE COURT: Okay.

THE CLERK: All rise.

MR. MORRIS: Thank you.

(Recess at 11:16 a.m., recommencing at 11:31 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

Okay, Mr. Morris?

MR. MORRIS: Your Honor, I greatly appreciate the Court's indulgence and allowing me to take a few minutes to get the information that I should have had when I walked in the courtroom.

So let's start with Mr. Raver again.

THE COURT: Okay.

MR. MORRIS: And pursuant to an email that I sent to Mr. Edney and Mr. Gaddis, along with the designations, the proper designations from Highland are as follows: Page 6, Line 22 through Page 7, Line 10. Page 11, Line 6 through Page 14, Line 6. Page 15, Line 6 through Page 16, Line 2. Page 16-25, through Page 17, Line 15. Page 22, Line 5 through Page 28, Line 17. And Page 30, Line 4 through Line 25.

THE COURT: Okay.

MR. MORRIS: That's all for Mr. Raver.

THE COURT: That's Exhibit 55, correct?

MR. MORRIS: Correct.

THE COURT: Okay.

MR. MORRIS: Next, Exhibit 56 is the deposition transcript of Julie Diaz. We've designated the following portions of that transcript: Line 21 -- withdrawn. Line -- withdrawn. Page 9, Line 21 through Page 10, Line 16. Page 11, Line 3 through Page 13, Line 6. Page 14, Line 12 through Page 15, Line 7. Page 17, Line 4 through Page 29, Line 4. Page 29, Line 21 through Page 30, Line 24. Page 5 [sic], Line 1 through Page 36 --

THE COURT: Hold on. Sorry, you said Page 35?

MR. MORRIS: Yes, Your Honor. Page 35, Line 1 through Page 36, Line 12. Page 38, Line 17 through Page 39, Line 3. Page 46, Line 14 through Page 47, Line 25. Page 49, Line 6 through Page 55, Line 22. Page 57, Line 12 through Page 62, Line 6. Page 65, Line 18 through Page 67, Line 13. And Page 74, Line 5 through Page 76, Line 4.

And then finally, we have the deposition designations from the deposition of Torrey Littleton, which was lodged as Exhibit Number 57. We have the following designations: Page 11, Line 4 through Page 11, Line 14. Page 12, Line 4 through Page 13, Line 20. Page 15, Line 24 through Page 16, Line 11. Page 16, Line 24 through Page 19, Line 1. Page 19, Line 16 through Page 23, Line 8. Page 23, Line 17 through Page 27, Line 15. Page 32, Line 2 through Page 40, Line 1. Page 42, Line 5 through Page 57, Line 11. Page 59, Line 8 through Page 61, Line 11. Page 66, Line 19 through Page 67, Line 8. Page

68, Line 21 through Page 70, Line 9. And Page 70, Line 13 through Page 75, Line 14.

So Highland offers the designations of those transcripts subject to any objections that were lodged during the deposition. I think, as Your Honor reviews the transcripts, those are certainly live objections.

I had invited Dugaboy over the weekend to provide any counter-designations or any objections, and they simply lodged a categorical objection to any of the deposition transcripts. So I didn't get any specific counter-designations. I didn't get any specific objections. So Highland is prepared to live with the Court's rulings on those objections that were lodged in the depositions if these deposition designations are admitted into evidence.

THE COURT: All right. I have an offer of Exhibits 55, 56, and -- Highland's 55, 56, and 57. In particular, the page and line designations which have been previously stated into the record. Do I have objection to the admission of these exhibits and those designations.

MR. EDNEY: Yes, Your Honor, the Movant does object. It objects for several reasons that I previously shared with Mr. Morris, but I'll put them on the record here.

First of all, Mr. Raver, Mr. Littleton, and Ms. Diaz were not named on any of Highland's timely filed witness lists. Therefore, their testimony is not allowed under this Court's

local procedures. As the procedures point out, testimony will not be allowed for witnesses who are not on the witness list. This issue has gone up to the Fifth Circuit in a case called Tramonte v. Fibreboard Corp. That's 947 F.2d 762. It's at Page 763. The Fifth Circuit there --

THE COURT: Sorry, can you give me the citation again? 947 F.2d?

MR. EDNEY: Yeah, 762. Then the page cite is 763. I think it's in Footnote 1. This is a 1991 Fifth Circuit case that lays out that for purposes of witness list deadlines, depositions are treated the same as live testimony. Again, just as Mr. Morris was concerned about curating his case to potential witness testimony on the stand, we would have had similar views with respect to curating our presentation of evidence for potential witness testimony presented to deposition.

Our second objection is that under the relevant Rule of Civil Procedure, we don't believe any of these people were unavailable. Yes, they all reside in the Dallas area. But as this Court has graciously permitted, the parties do have the ability to seek the presentation of remote testimony upon application of the parties and the showing of good cause.

If there were an effort to bring these folks to participate here at Lubbock and that effort failed, there was an alternative available to Highland, and it's not one of which

they availed themselves. That would have permitted for any discussion of what potentially was said back then, but also a discussion of issues that are pertinent to this particular case. And there was no request made for any of these folks related to the fact that they weren't on the witness list to begin with.

Third, we don't believe Highland has made a showing that any of these folks or the entities of which they were officers are adverse to Highland for purposes of allowing the designation of deposition testimony under Federal Rule of Civil Procedure 32(a)(3).

I note that Mr. Raver, I think you've heard testimony about this, is an officer of CDMCFAD, LLC, and several other HMIT Entities, which I think are arm-in-arm with Highland on this particular issue. There's been much made of the fact that the Dallas Foundation withdrew their objection to the settlement going forward, and there's a lack of adversity issued there. So I don't think under those circumstances these folks are available -- that Highland is in a position to take the deposition testimony in on unavailability grounds.

And so I think those are our main reasons. Obviously, there were objections made to particular questions therein, and Mr. Morris graciously noted that those objections stand and would have to be ruled upon. But this is a situation where particularly with respect to Mr. Raver, who I think is

aligned with Highland and the HMIT Entities, he could have made his way here to Lubbock. All these people should have been put on the witness list if we were going to sponsor testimony from them, either through deposition designations or live testimony. And for the unavailability analysis, there was absolutely the option to go remote from Dallas and bring in whatever Highland deemed appropriate from these witnesses.

This does not fall within the limited circumstances in which deposition testimony is the substitute for what happens here in the courtroom, whether it's the remote virtual courtroom or the live one that's occurring right here in Lubbock, Texas. Those are the grounds for our objection to the admission of these exhibits, Your Honor.

THE COURT: Okay. And then either or Mr. Morris can answer these questions. Raver, he is with HMIT. Is that correct?

MR. MORRIS: I believe so. So he's got -- I think the evidence shows that he -- we heard from Mr. Patrick that he's on the board of the DFW Charitable Foundation. He -- I think he has other roles with various HMIT Entities. We can go back and look at that. I do know that he has an officer position with respect to this entity that's been important in this case, CDMCFAD, LLC. That's in the Charitable DAF structure.

And as Your Honor knows, Hunter Mountain today and at

the time of the 9019 hearing is controlled under that Charitable DAF stack of companies. It has really no staff other than the control companies telling them what to do.

THE COURT: I'm going to have Mr. Morris -- I appreciate what you've stated, but I want to understand who these people are. Because I think what you're arguing is that 32(a)(3) should apply to either some or all of these potential witness or deponents. And I believe what they're arguing is, is that 32(a)(4) is what applies to all of these because -- and I want to make sure I understand who these people are and whether it's (a)(3) or (a)(4) that the Court should be looking at.

So, Mr. Morris, if you can at least provide the Court with the information of who are these parties and what entities they are associated with.

MR. MORRIS: I appreciate the question, Your Honor.

I'll start with Ms. Diaz. Ms. Diaz is, as I recall, the President of the Dallas Foundation, and she is also at least a director of each of the Highland Kansas City Foundation, the Highland Santa Barbara Foundation, and the Highland Dallas Foundation.

Mr. Littleton, as I recall, is the Chief Financial Officer of the Dallas Foundation. I don't know if he was also an officer or director of the Highland Foundations.

Mr. Raver, and I'm just reading from his answer in

the deposition, says that he is employed by that entity with that awful acronym CDMCFAD, LLC.

So that's just directly responsive to Your Honor's questions, but I do have rebuttal for the arguments.

THE COURT: Can you give me the --

MR. MORRIS: The acronym again?

THE COURT: Yes, the (indiscernible).

MR. MORRIS: CDMCFAD, LLC. And that testimony will be found on Page 6 of his deposition transcript at Lines 22 through 25.

THE COURT: Okay. All right. Ms. Morris, you may take a seat. I want to make sure I'm asking the questions of Mr. Edney here.

(Pause)

THE COURT: Okay. So, Mr. Edney, I want to make sure I'm understanding your argument. But your argument is that all of these witnesses should be considered adverse witnesses of the Debtor, and that's a requirement under the rules? Or is there just a particular witness, Mr. Raver, that you had stated is not considered -- well, should not be considered adverse?

MR. EDNEY: Right. So, under 32(a)(3), Mr. Raver, we believe, has close association with the HMIT Entities.

THE COURT: Okay.

MR. EDNEY: They are, in addition to what Mr. Morris listed, you heard testimony from Mr. Patrick that he serves as

co-director of the DFW Charitable Foundation, which is now at the top of the economic beneficiaries of the Hunter Mountain Entities due to the reorganization. We think that they're sufficiently in league that there's no adversity.

On top of that and these proceedings, as Mr. Morris has pointed out on numerous occasions, the Dallas Foundation and, as a result, Ms. Diaz in her role there is not a party to this motion and is not opposing Mr. Morris's position here. So we don't think that the 32(a)(3) route is available for Mr. Littleton or Ms. Diaz.

32(a)(4), we don't think they're unavailable for -- because they could have been called remotely. But across both prongs of Rule 32(a), Your Honor, if their testimony was going to be sponsored by Highland, either through historical deposition or through live testimony, they should have been on the witness list provided to Your Honor at the beginning of these proceedings.

We've had discussions about the importance of that today. They were not. Had they been and we may have taken steps of our own to provide for their live testimony, at least to ask. I think on all those grounds, putting their deposition testimony in is not the right course.

THE COURT: Okay. Mr. Morris, any response?

MR. MORRIS: The fact of the matter is we're not moving under (a)(3). We're only moving under (a)(4)(B).

(a)(4)(B) is very clear. It's unambiguous, and it's really quite simple. A party may use for any purpose the deposition of a witness. All three of these people cannot possibly be characterized as anything other than witnesses, whether or not they're a party. So even if they were a party, it doesn't matter. But adversity is just not an issue for the Court's consideration under (a)(4)(B).

So a party may use for any purpose the deposition of a witness, whether or not a party. If the Court finds that the witness is more than 100 miles from the place of the hearing or is outside the United States, unless it appears that the witness's absence was procured by a party offering the deposition. It's really quite simple.

And while I think all of us in the bar are grateful for Your Honor's willingness to hear testimony by Zoom or Webex, just as you did this morning, I can't imagine that Your Honor was somehow amending the Federal Rules of Civil Procedure to require people who lived more than 100 miles away to testify by Zoom.

I think Your Honor has graciously created a manner of convenience for parties which they could seek court approval to obtain. And that's what happened this morning. And we appreciate that. But that doesn't amend the Federal Rule of Civil Procedure to enable parties to require the appearance of witnesses who are more than 100 miles away.

Lastly, I mean, I hear him say they weren't on the witness list, but they were certainly -- this is an exhibit. Here's the thing, Your Honor. We have no desire to call any of these people. This is like -- their testimony here is like a certificate of incorporation. It's used to rebut the idea that information wasn't known to them prior to the date for moving for a new trial.

If they were to come here and testify, Your Honor, if I had done that, what a waste of time and money it would have been because the only thing I would have asked any of them were, "Were you asked this question and did you give that answer" to every one of the depositions that I just provided to the Court? Why would we want people to do that? They had notice. They knew the transcripts were being offered into evidence. They objected on hearsay grounds and lack of designations.

We agreed that this wouldn't be offered for the truth of the matter asserted. We've provided the designations. There's no dispute that there's more than 100 miles away. I'm not looking to procure their absence because I have no interest in them being here. I'm simply offering the transcripts to show what Dugaboy knew or should have known. They sat in the depositions before the time for a new trial.

So I think they're properly coming into evidence. I think Rule 32(a)(4)(B) is unambiguous. I'd ask the Court to

admit into evidence the designations that have been offered.

THE COURT: Hold on, Mr. Morris, before you sit down, let me ask this question. So we've got this issue that's outstanding. After this, there's nothing more that you're -- go ahead and --

MR. MORRIS: Do you want the -- actually, it's the last two exhibits.

THE COURT: Yes, let's go ahead. I'm going to stew over this issue.

MR. MORRIS: Okay.

THE COURT: We're at least at the noon hour. We'll take a recess, but I kind of want to understand what we have left as way of evidence from all parties so that we can properly define the time of our recess.

MR. MORRIS: We'll rest as soon as we're done with these last couple of items. But I do want to emphasize again that Dugaboy contends that they were unaware of certain facts until after the time for a new trial. Our position is the deposition designations provided that information. And so if this were excluded, I'm going to raise the question now, is Dugaboy then able to pretend that they weren't aware of the facts because these transcripts were excluded?

I mean, it's a rhetorical question, but that's really the dilemma here because I think ultimately you wind up with a fraud on the Court. You wind up with a position where they

say, oh, I wasn't aware of facts. And the only reason that we don't have that fact in evidence is because they've objected to a transcript. They shouldn't be then allowed to pretend that they weren't aware of the fact.

But let me move on. Exhibit 77 is the deposition transcript of Mr. Dondero. Now we'll get to (a)(3). We get to (a)(1) and (a)(3).

Rule 32(a)(1) says at a hearing or trial, all or part of a deposition may be used against the party under these conditions. The party was represented. It's used to the extent it would otherwise be admissible. And it's allowed under 32(a)(2) through (a)(8). And we believe it's certainly allowed under (a)(3) because pursuant to the stipulation that was filed with the Court on the eve of trial, Mr. Dondero testified as the agent of Dugaboy. I don't have it handy, but I can get quickly the docket entry. But I believe it was filed on Sunday evening.

You'll see there is a stipulation concerning Mr. Dondero's appointment as the agent for Dugaboy. And it specifically says for all purposes relating to this litigation. And in fact, if you read the transcript, there was some back and forth with Mr. Dondero. I don't want to go there. I just want to say that during that transcript, at a certain point, he stated that he was testifying as Dugaboy's agent. It's reflected in the stipulation.

And therefore, under Rule 32(a)(1), it is a deposition that's being used against a party, in this case Dugaboy, because under (a)(3), Mr. Dondero testified as Dugaboy's agent. And I'm informed, again, grateful for the help, that the stipulation could be found at Docket 4615. That's all I have on that one.

THE COURT: All right. Let me go ahead. I have an offer for admission into evidence Exhibit 77. Do we have any objections?

MR. EDNEY: Your Honor, we have a hearing here that's for purposes of live testimony. I guess we could have had a situation where we just took depositions and then read deposition excerpts into the record. They've made the decision not to call Mr. Dondero in this case-in-chief and keep him to whatever he said in his deposition on May 8th.

I don't think that this is an appropriate use of 32(a)(3) in the context of a witness who's here, a witness that was on their witness list, a witness that could have been questioned by Mr. Morris for relevant purposes. He's chosen not to call him and now wants to put the entire deposition transcript in. I don't think that's appropriate.

THE COURT: Okay. Anything further Mr. Edney?

MR. EDNEY: No, Your Honor.

THE COURT: Okay. Mr. Morris, I'm assuming you want the entire deposition of Mr. Dondero admitted and not just

doing line designations?

MR. MORRIS: That's correct. Just as --

THE COURT: Okay.

MR. MORRIS: Just as Highland is entitled to under 32(a)(1) where it talks about all or a part of the deposition may be used.

THE COURT: Okay. I believe there's one more exhibit?

MR. MORRIS: There is the last one, Your Honor. It's Exhibit 70, which is MacInnis' third declaration. I would say that we're offering it solely as it relates to the metadata issue. And so because that's the live document on PACER. I think -- I'm offering it really, I'll put it this way, for the sole purpose of authenticating Exhibit 300.

THE COURT: Okay. I have an offer for admission Exhibit -- Highland Exhibit 70. Do I have any objections?

MR. EDNEY: 70.

THE COURT: That's my understanding. Highland Exhibit 70.

MR. EDNEY: I have Highland Exhibit 70 as the third affidavit of Margot MacInnis. Is that correct?

MR. MORRIS: That's exactly right, Your Honor. That's the one where if you follow the instructions on Exhibit 300, you'll find the metadata. And so we want it admitted into evidence because it's on the Court's docket. We're offering it

into evidence for the singular purpose of authenticating Exhibit 300.

MR. EDNEY: Your Honor, I mean, they could have laid a foundation for that when they were questioning Ms. MacInnis both as to authenticity and relevance and moved its admission then. But again, I don't think that there's this overtime period with respect to the admission of exhibits that were relevant to Mr. Morris' cross-examination. And we would object to the admission of it now.

THE COURT: Thank you. All right. Mr. Edney, while I have you up there, how many rebuttal witnesses are we expecting?

MR. EDNEY: Three, Your Honor.

THE COURT: Okay.

MR. EDNEY: Ms. Bannon, Ms. MacInnis, and Mr. Dondero.

THE COURT: Okay. Mr. Morris, are you -- I'm assuming you will just have cross on those witnesses?

MR. MORRIS: Yes. To be clear, subject to the Court's decision on those last handful of documents, Highland rests. We are very mindful now of what the scope of our case-in-chief is due to Mr. Seery's testimony. And it is the cross-examination by Mr. Reed of Mr. Patrick. And we're going to be keeping an eye to make sure that rebuttal is not reduced to cleanup and (indiscernible). But on that basis, I believe

relatively (indiscernible). I see absolutely no reason why we can't conclude this trial today.

THE COURT: Okay.

MR. EDNEY: Your Honor, if I may, I'm sorry. I'm sorry to do this. I know Your Honor hasn't ruled on it yet, but the Exhibit 77. I do note, this is the deposition transcript of Mr. Dondero, I do note that that particular rule applies to -- this is 31(a)(3), I believe, applies to witnesses that were testified in a 30(b)(6) capacity or a 31(a)(4) capacity.

I do note that Mr. Dondero was not noticed in that capacity. I mean, we know what a 30(b)(6) deposition is where somebody needs to get prepared with all the information of the organization and come ready to testify. And that was not the notice that we received from Opposing Counsel. So I do not believe that 31(a)(3) applies in this particular instance. And we would elaborate our objection to Exhibit 77 on those grounds.

THE COURT: Okay. All right. Here's what we're going to do. We're going to take a recess. I'm going to look at these last exhibits, the issues raised. We'll reconvene at 1:30. That will give plenty of time for lunch, but it will also give time for the Court to take a look at these last exhibit issues. So with that, we'll be in recess until 1:30.

THE CLERK: All rise.

(Recess at 12:05 p.m., recommencing at 1:38 p.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

All right. The Court is back on the record in the Highland Capital Management case, Case Number 19-34054. Prior to the Court's recess, we had the offer for admission into evidence Exhibits 55, 56, and 57 with objections raised by Counsel for the Movant Dugaboy.

Based upon Rule 32(a)(4), the Court finds that these deposition transcripts can be admitted into evidence for limited purposes provided as well as not being for the truth of the matter asserted. So the Court will admit each of those exhibits into evidence based on the page and line designations that were provided to the Court on the record.

(Debtor's Exhibits 55, 56, and 57 admitted into evidence)

THE COURT: All right. I've got some questions I want to follow up with on Exhibit 77 which is the deposition of Mr. Dondero.

So Mr. Edney, if you'll please come to the podium.

MR. EDNEY: Yes, Your Honor.

THE COURT: All right. So as I understand it, Highland had subpoenaed both Mr. Dondero as well as the Dugaboy Investment Trust for a deposition. There was a stipulation between the parties, as I understand it, in which Ms. Dondero stipulated and stated that basically she's ceded, for lack of a

better way to put it, all of the duties that she would have as a trustee to Mr. Dondero for purposes of all this litigation.

So in response to the subpoena to Dugaboy Investment Trust, who was produced to respond or to answer the deposition?

MR. EDNEY: Your Honor, I would -- just to back up a little bit, I would clarify something. I believe that Highland issued subpoenas to Mr. Dondero and --

THE COURT: Correct.

MR. EDNEY: -- to Ms. Dondero. They never issued an organizational subpoena to the Dugaboy Investment Trust.

THE COURT: They issued the subpoena to Ms. Dondero as the Trustee of the Dugaboy Investment Trust.

MR. EDNEY: They issued the subpoena to Ms. Dondero because she was the Trustee of the Dugaboy Investment Trust.

THE COURT: Correct. And that's who has to receive service.

MR. EDNEY: No. Your Honor, I mean I think the key clarification here is they're seeking Ms. Dondero's testimony in her personal capacity as a percipient fact witness because she had a role with the Dugaboy Investment Trust. As I understand it, Highland never issued an organizational subpoena to the Dugaboy Investment Trust. And parties do that, right? We could have done it. we could have issued a 30(b)(6) deposition notice to Highland. They could have issued an organizational deposition to us. They could have issued a

30(a)(4) deposition based on written question to the organizations. That didn't happen.

We all had some witnesses that we thought might have relevant testimony, and Mr. Morris and I reached an agreement to narrow the list of depositions given the time we had to do them down to two. As a part of that, I stipulated that Mr. Dondero was acting, was the agent for the Dugaboy Investment Trust for various --

THE COURT: Okay, thank you.

MR. EDNEY: -- various matters.

THE COURT: All right, thank you. That's what I needed to hear. So the Court has before it the offer for admission of Exhibit 77, which is the deposition of Mr. Dondero. Based on Rule 32(a)(1) and (a)(3), the Court does allow the admission of Exhibit 77 into evidence as the testimony or deposition of a party opponent. Dugaboy Investment Trust is obviously an adverse party to Highland Capital Management.

(Debtor's Exhibit 77 admitted into evidence)

THE COURT: All right. I believe that leaves now Exhibit 70, if I'm correct, which is the exhibit or Ms. MacInnis' third declaration and found at Exhibit 70. I am going to sustain the objection to the admission of that exhibit and not allow the admission of Exhibit 70.

So those are the rulings of the Court regarding those

exhibit issues or evidentiary issues on exhibits.

I believe with that, Mr. Morris, you all have rested your case-in-chief?

MR. MORRIS: That's -- we have rested subject to Your Honor's rulings. I've heard what the Court has to say. I think there's just one more, Exhibit 300.

THE COURT: Correct, and I've reserved that.

MR. MORRIS: Okay.

THE COURT: So --

MR. MORRIS: Fair enough. Then Highland rests, Your Honor.

THE COURT: All right. So Mr. Edney, if you want to call your first rebuttal witness.

MR. EDNEY: Yes, Your Honor. Just two housekeeping matters. In the cross-examination of Mr. Seery, I used the amended exhibit list of Highland in advance of the June 25th, 2025 9019 hearing. I'd like to move the admission of that exhibit list.

THE COURT: Okay. Can you give me the docket number?

MR. EDNEY: Yes, Your Honor.

THE COURT: Because this is one that was not on your witness and exhibit list and I don't have an actual physical exhibit, do I?

MR. EDNEY: Yes, Your Honor. It's Docket Number -- bear with me for just a moment. It's Docket Number 4280, Your

Honor.

THE COURT: Okay. And this was the witness -- Highland's witness and exhibit list for the actual 9019 hearing, correct?

MR. EDNEY: Yes, Your Honor.

THE COURT: Okay. And what are we calling this exhibit? What would this be? What number are we on?

MR. EDNEY: Why don't we make it Dugaboy Exhibit 300, Your Honor.

(Movant's Exhibit Number 300 marked for identification)

THE COURT: Okay. I have an offer for admission into evidence what's being called Dugaboy Exhibit 300, which is found at Docket Number 4280, which is Highland's witness and exhibit list for the 9019 hearing held on June 25th of 2025.

MR. MORRIS: The only question I have, Your Honor, is whether the exhibits are also going to be admitted into evidence or just the witness and exhibit list.

MR. EDNEY: No, Your Honor, we're only seeking admission of the exhibit list.

THE COURT: Okay.

MR. MORRIS: No objection, Your Honor.

THE COURT: All right. Dugaboy Exhibit 300 will be admitted.

(Movant's Exhibit Number 300 admitted into evidence)

MR. EDNEY: Your Honor, finally, in light of the

Court's ruling with respect to the admission of Mr. Dondero's deposition, I do have a question about whether we are now regarding Mr. Dondero as having been called to provide testimony in this proceeding, such that I may question him for any purpose.

THE COURT: Well, I think that you can cover anything in rebuttal that's in his deposition.

MR. EDNEY: Right, Your Honor. In or --

THE COURT: And anything that's been put -- I mean, it's part of their case-in-chief, so you're entitled to do the rebuttal examination on anything that's within the deposition as well as any evidence that was part of their case-in-chief.

MR. EDNEY: Right. I note that on May 8th, we did designate as our own witnesses any witness that has been called by the other side. And previously, when we were arguing about this, Mr. Dondero was not called, but now there's been an offer of his testimony effectively calling him, albeit in a written form.

THE COURT: I'm sorry. Give me one moment. We have a technology issue that I now need to address. Forgive me for that.

(Pause)

THE COURT: Okay. Now the response?

MR. STANCIL: Yes, Your Honor. I think that's incorrect to say that because the deposition was admitted for

the limited purposes that Your Honor identified it, including not for the truth of the matter asserted, that it would be treated as if Mr. Dondero had been called in the case-in-chief as a live percipient witness.

Mr. Edney secured a limiting instruction on its admission. He is not a witness. It's in the same way that every author of every document admitted in our case-in-chief isn't treated as a witness.

THE COURT: Okay. I want to make sure, Mr. Stancil, I'm understanding your objection. What you all are seeking to have the purpose of Mr. Dondero's deposition admitted. I just heard you state that you are only seeking to have the deposition admitted not for the truth of what's asserted in the deposition?

MR. STANCIL: That's how I understood, Your Honor's limiting instruction allowing it to come in for the limited purpose.

THE COURT: Well, I limited that for 55, 56, and 57. Those were specifically stated as those were being sought to be admitted not for the truth of the matter asserted. Is that -- you all are also only wanting Exhibit 77 to be admitted for the purpose of -- or not for the truth of the matter asserted?

MR. STANCIL: Correct. It's to show that questions were asked and answers were given. Whether those answers were correct or not correct is not -- that would be, if we were

trying to say this is a correct statement, that would be for the truth of the matter asserted. If it were this question was asked and this answer was given, historically, that is a -- that's a different matter.

I grant, Your Honor, that it's a nuance, but I think it's an important one.

THE COURT: Okay. All right. Well, let me make sure the record is clear, then. The Court is only admitting Exhibit 77, which is the deposition of Mr. Dondero, not for the truth of the matter asserted and only for the evidence that a deposition was taken and questions were asked and answered.

So, I guess, Mr. Edney, I'll come back to you on this.

MR. EDNEY: Okay, Your Honor. Thank you, Your Honor. If the deposition is admitted for that limited purpose, then I withdraw my request for clarification.

THE COURT: Okay.

MR. EDNEY: Thank you, Your Honor.

THE COURT: All right. It's still your rebuttal witness, Mr. Edney.

MR. EDNEY: Thank you, Your Honor. The Movant calls Lucy Bannon. And my colleague, Ms. Stolley, will be taking questioning.

THE COURT: Okay.

MR. EDNEY: Thank you, Your Honor.

THE COURT: Okay. Ms. Bannon, before you have a seat, my law clerk will swear you in again.

LUCY BANNON, MOVANT'S REBUTTAL WITNESS, SWORN

THE COURT: You may proceed, Ms. Stolley.

MS. STOLLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. STOLLEY:

Q Good afternoon, Ms. Bannon.

A Good afternoon.

Q You testified in this hearing on May 10th. Is that correct?

A Correct.

Q And since then, have you had an opportunity to review Mark Patrick's testimony, which was on May 12th?

A I have.

Q Do you recall in reviewing that testimony, Mr. Patrick referring to discretionary economic beneficiaries and specifically labeling the supporting organizations as discretionary economic beneficiaries?

A I do.

Q Are you familiar with that term?

A I am now, after reviewing the testimony.

Q Is that the first time that you became familiar with that term?

A I may have seen it sometime over the last six months but

was not really aware of it until reviewing it several times in the transcript.

Q Now, just as a brief reminder, can you identify who are the supporting organizations that we're discussing here?

A The supporting organizations are the Highland Kansas City Foundation, the Highland Dallas Foundation, and the Highland Santa Barbara Foundation.

Q And what is your role? We spoke last week about your role as Chief Communications Officer, but do you also have a role in respect of the supporting organizations?

A Yes, I am officer of all three of these supporting organizations.

Q In your experience, does the term "discretionary economic beneficiaries" relate in any way to the supporting organizations?

A No, that's not an accurate description of the supporting organizations or a term that's used in the philanthropic world.

Q And how so? I mean, why is it inaccurate to use in that context?

A So, it wrongly suggests that Mr. Patrick, in his capacity as GP, has discretion over who the economic beneficiaries of the DAF assets are, i.e., what charities the DAF Entities support. And that is not within his discretion.

Q Now, just following on that term "discretionary," is it correct, as Mr. Patrick testified, that the term

"discretionary" meant that he could swap out the supporting organizations at any time at his discretion?

MR. MORRIS: Objection, Your Honor. No foundation.

THE COURT: I'm sorry, state --

MR. MORRIS: She's asking her --

UNIDENTIFIED SPEAKER: Legal conclusion.

MR. MORRIS: Yeah, it's a legal conclusion.

THE COURT: I'll overrule the objection.

BY MS. STOLLEY:

Q Do you need me to repeat the question?

A Yes, please.

Q Is it correct, as Mr. Patrick testified, that the term discretionary meant he could swap out the supporting organizations at any time at his discretion?

A That was his believe and his testimony, but that was not an accurate characterization of his discretion.

Q Why not? I mean, in what way is it not?

A So, the supporting organizations are the indirect charitable owners of the DAF assets via their equity ownership in the -- in Charitable DAF Holdco, which is the LP of the DAF Fund.

Mr. Patrick, in his capacity as general partner of that fund, does not have the discretion to determine who the actual economic beneficiaries of the assets are and does not have the discretion to change those indirect charitable owners. Doing

so would be wholly inconsistent with his fiduciary duties to the supporting organizations.

In his capacity as GP to the DAF Fund, which are the indirect charitable owners, and in his capacity as managing member of the Charitable DAF Holdco, for which the supporting organizations are the participating shareholders.

MR. MORRIS: Your Honor, I move to strike the reference of breach of fiduciary duty. I don't think this witness is qualified to make legal determinations as to whether or not somebody breached their fiduciary duties.

THE COURT: Any response, Ms. Stolley?

MS. STOLLEY: I could rephrase the question. Would it be inconsistent with his role?

THE COURT: Hold on one second. Let me rule on the objection. So, if you have no response, I'm going to strike any part of the testimony that references that that would be a breach of his fiduciary duties. If you'd like to rephrase the question or ask another question, you may.

BY MS. STOLLEY:

Q Ms. Bannon, you're familiar with the agreement that memorializes the fund, is that correct, the Charitable --

A Yes.

Q Okay. What you just described, aside from what you categorized as breach of fiduciary duty, would what you just described be inconsistent with what is written in that

agreement?

A Yes.

Q Now, as indirect charitable owners, did the supporting organizations typically seek distributions from the DAF?

A Yes. The supporting organizations would seek distributions as indirect charitable owners related to grant making activities and distributions would fund those grants as well as other operating expenses.

They also received routine recurring distributions that are often related to known pre-determined fees, and those were not distributions that were proactively sought by the supporting orgs that were just delivered to them on a recurring basis.

Q Now, Mr. Patrick also testified that all of the distributions from the DAF to the supporting organizations were entirely at his own discretion. Is that consistent with your experience and understanding?

A No.

Q Please explain why not.

A So his discretion over distributions related to the process and, again, was within the confines of fiduciary application he had to the supporting organizations.

So he would have been required to balance the cash, the status of the funds, liquidity, other things like that, with the charitable needs of the supporting organizations as

indirect charitable owners, other operating fees and expenses. And that would be the capacity that he would have discretion over distributions.

He would not have discretion over whether the indirect charitable owners, i.e., the supporting organizations, are entitled them.

MR. LEVY: We, again, object and move to strike to the extent that the testimony opines on Mr. Patrick's fiduciary defense as a legal conclusion.

MS. STOLLEY: I disagree that that's a legal conclusion, Your Honor. I think that she's testifying within her ken, based not only on the agreement but her experience within the supporting organizations.

THE COURT: I'm going to overrule the objection or the motion to strike.

BY MS. STOLLEY:

Q Have any of the supporting organizations received any distributions from the DAF Fund since the end of 2024?

A No.

Q Now, Mr. Patrick also testified that the assets of the DAF are owned by the general partner rather than by the supporting organizations that were the participation shareholders. Is that consistent with your understanding of how the DAF was structured?

A No. The supporting organizations are the indirect owners

of the DAF assets, and that refers to Charitable DAF Holdco and the Charitable DAF Fund and the underlying assets there. And that ownership was through their equity ownership in the Charitable DAF Holdco.

Q Are there any documents or is there a particular document that conveys this information?

A The Charitable DAF Fund Limited Partnership Agreement outlines that ownership.

MS. STOLLEY: If you could pull up Exhibit Number 5 in evidence, Dugaboy's Exhibit Number 5.

BY MS. STOLLEY:

Q And is this the amended and restated exempted LPA of Charitable DAF Fund LP that you were just referencing?

A Am I supposed to see it on the screen?

Q Yes.

A Okay.

Q I'll be more patient, sorry.

A Yes.

MS. STOLLEY: Now if we could scroll down to Page 3, top of Page 3 of the document. At the top, it should say 7 of 22. There we go.

BY MS. STOLLEY:

Q Starting with the word "except," can you please read that, Ms. Bannon?

A "Except as otherwise expressly provided in this agreement,

the general partner is hereby granted the right, power, and authority to do on behalf of the partnership all things which, in the general partner's sole discretion, are necessary or appropriate to manage the partnership's affairs and fulfill the purposes of the partnership, provided, however, that the partnership's assets and investments shall be for the benefit of the limited partners and not for the economic benefit of the general partner."

Q Can you define implications of that particular section, specifically the last phrase, "for the supporting organizations?"

A So, for the supporting organizations, the DAF Fund assets and investments must be managed for their benefits, benefit as the intellectual owners, and benefits through their equity ownership in the limited partner referred to here, which is Charitable DAF Holdco.

Q And in connection with that, what are the implications of this section, specifically that phrasing, for Mr. Patrick?

A As the general partner, he must manage the assets and investments for the supporting organizations' benefits.

Q Now, you're aware that there is a second amended LPA, correct?

A Yes.

Q And did you have a chance to review that agreement?

A I did.

Q And are the -- is it the same language in the second amended LPA?

A Yes.

Q And so the implications are the same, correct?

A Correct.

Q Now, beyond the LPAs, is there any other documentation that captures or reflects the ownership interests of the supporting organizations?

A So, there are several documents. The Form 990s that the supporting organizations file annually would reflect ownership, as well as other documents related to supporting organization fees that are calculated based on ownership of assets.

Q Okay, I want to show you what has been marked as Dugaboy's Exhibits 292 through 297. And why don't we start with 292? We might need to scroll down, Ms. Bannon, but do you recognize what this is?

MS. STOLLEY: Can you scroll down to Page -- keep going. There you go.

THE WITNESS: This is --

MR. LEVY: Where are these located The last exhibit list we saw only went through 291, the sixth amended exhibit list.

MS. STOLLEY: These are rebuttal exhibits.

MR. LEVY: So, these are exhibits that have not been provided to us before and have not been disclosed to us before?

MS. STOLLEY: Well, the 20 -- correct, they're rebuttal evidence exhibits.

MR. LEVY: Okay.

MS. STOLLEY: But when we get to the 2024 990s, I believe you marked those in evidence under different exhibit numbers, but we are providing a complete version.

MR. STANCIL: Can we see the whole document?

MS. STOLLEY: It's 410 pages long, so we don't have --

THE COURT: Is this the only way we have them, electronically?

MS. STOLLEY: Yes.

THE COURT: Okay. I mean, they have the right to see the document.

MS. STOLLEY: We're only referring to a couple of sections of it. Given that they admitted the 2020 -- not admitted, but they offered the 2024 990s for all three supporting organizations as exhibits for themselves, albeit they limited just the report itself with none of the exhibits, they're clearly familiar with the documents.

MR. STANCIL: Your Honor, what we don't know is what sections she's not referring to. I mean, this may be nothing, but we just need to know what is and isn't being referred to. And if there are portions that are not being referred to that are probative, we would -- that's why we need the document.

MS. STOLLEY: We can provide electronically the documents. But again, this is a publicly accessible document.

MR. STANCIL: There are a lot of publicly accessible documents, Your Honor, that --

MS. STOLLEY: But we're talking about this document.

MR. STANCIL: -- we're not trying to memorize before court.

THE COURT: So, these are 2023, these are the Form 990s?

MS. STOLLEY: Yes, Your Honor.

THE COURT: Okay.

THE WITNESS: It looks like the extension page is up on the screen. Yeah, that's the cover.

MR. LEVY: Can we make this bigger?

UNIDENTIFIED SPEAKER: Is it possible to --

MR. LEVY: Yeah. It's 15 percent.

THE COURT: And what exhibit in Highland (indiscernible)? It's another one of these.

MS. STOLLEY: Let me ask my team the specific exhibit number.

(Pause)

MS. STOLLEY: So, Exhibit 90 is the excerpted Form 990 for Highland Santa Barbara Foundation and 91 is Highland KC and 92 is Highland Dallas Foundation.

MR. STANCIL: Those are the portions or the

(indiscernible)?

MS. STOLLEY: Those are -- I believe they're just the report. What we could do, Your Honor, is just offer as evidence the three pages that we're discussing. I mean, this is a public record. It's not like we're hiding anything that's in the Form 990. But we're going to be focusing on a total of four pages, I believe, or three pages in each of the 990s.

MR. STANCIL: Your Honor, we'd be happy to just reserve our objection until we find out what questions they're going to ask. I don't want to slow us all down if this is a nothingburger.

THE COURT: Yeah, I mean, right now, you can continue with your questions. Obviously, as best as you can -- I'm sorry, I don't recall your last name.

MS. STOLLEY: Stolley.

THE COURT: But as best as you can -- your last name (indiscernible) whose controlling the exhibits.

MS. STOLLEY: Oh, sorry.

THE COURT: If you can make sure that the party can see all of the exhibit as you scroll through it, that would be greatly appreciated. Okay.

MS. STOLLEY: Thank you, Your Honor.

BY MS. STOLLEY:

Q So let's start with 292, which is on the screen. Can you tell us what this is, Ms. Bannon?

A This is the Form 990 filed by the supporting organization, the Highland Kansas City Foundation, for the calendar year 2023.

Q And would you have seen this document in the ordinary course of your work?

A Yes.

Q And when I say your work, not necessarily as Chief Communications Officer, but rather as an officer of the supporting organizations. Is that right?

A Yes.

Q If you could go to -- oh, sorry about that. Before your testimony today, did you have the opportunity to review not only this, but the other five documents?

A Yes.

Q Specifically the portions that we're going to ask questions about.

A I was going to say not all 400-some pages, but.

Q No. Right.

A Yes.

Q But specifically the pages we will talk about. And to your understanding, are they fair and accurate copies of the Tax Form 990 for each of the supporting organizations for 2023 and 2024?

A Yes.

MS. STOLLEY: At this time, I would like to admit the

exhibits into evidence, or we could just do the specific pages and do that instead.

MR. EDNEY: Do you want to ask some questions (indiscernible). Ask questions about it.

MS. STOLLEY: Okay. I'll ask questions about it.

THE COURT: Yeah. I mean so far, all we've seen is what I believe is 292 and one part of it. So --

MS. STOLLEY: So -- I'm sorry, Your Honor. I cut you off. I apologize.

THE COURT: Go ahead. You can ask the witness questions.

BY MS. STOLLEY:

Q Can you explain for us briefly what a Form 990 is, Ms. Bannon?

A So a Form 990 is a regulatory filing that tax-exempt organizations file with the IRS as part of their reporting requirements. And it also serves as a public disclosure document for public charities to provide transparency into the organization's operations, assets, investments, governance, grant-making, and other activities.

Q And do you play a role in assisting at all the supporting organizations in respect of their Form 990s?

A Yes. Me or my team would participate, often providing records or a compilation of grant-making activities and then other information in coordinating the extensive work that goes

into filing these.

Q And who prepared the Tax Form 990 for Highland Kansas City Foundation?

A It would be provided by a tax and accounting firm in this case, Deloitte.

MR. LEVY: We object as beyond the scope of our model. We didn't put in any testimony about any of these issues. It's not clear what this is rebutting.

MS. STOLLEY: I'm about to get to the point.

THE COURT: I'm going to overrule the objection with no prejudice. Please do get to the point.

MS. STOLLEY: Yep, right now.

BY MS. STOLLEY:

Q Ms. Bannon, where in the 990 is there information about Highland Kansas City Foundation's ownership of assets in the DAF?

A So, ownership would be reflected in several places, but one of the first instances and clearest would probably be on this first page where the total assets are listed probably down on Row 20 or net assets on 22.

Q Okay. And where would you find the disclosure of net assets? That's the total assets line that you're talking about?

A Yeah, net assets Line 22.

Q 22. And what is the number listed there?

A At the end of the year, $91,007,570.

Q And what does that number represent?

A That represents assets held by the Highland Kansas City Foundation and, in this case, directly proportionate to their ownership in the DAF assets.

MR. STANCIL: Objection, Your Honor. I think now she's opining on tax law and on the legal conclusion of who owns what. There's no foundation that she's qualified to make any statement as to what that number represents as a legal matter.

THE COURT: I'm going to overrule the objection.

MS. STOLLEY: Thank you, Your Honor.

BY MS. STOLLEY:

Q And you said the assets were the participation shares of Charitable DAF Holdco?

A Yes. That reflects their assets in the DAF Entities via the participation shares held by Highland Kansas City Foundation in CLO or in Charitable DAF Holdco.

Q Now in this same 990, is there anywhere else where you would find evidence of ownership?

A Probably it would be in several other places, including in investment disclosures as well as interest disclosures and form corporations. So those would be at Form 5471. And it would appear there, given the Charitable DAF assets Cayman Islands location. So that would have a trigger a foreign corporation

disclosure.

Q So can we turn to Page 255 of this exhibit? Is that the Form 5471 that you were referencing?

A Scroll up to the top.

MR. STANCIL: Your Honor, I think we have to renew out objection, please.

THE COURT: Yeah. They haven't had a chance to even see this exhibit. You're going through it. While I see it's 400 and something pages long, the parties are entitled to receive the exhibit that you're going to be using as a rebuttal exhibit. And you haven't done that.

MS. STOLLEY: As I said, we can send it to them electronically. And we're discussing three pages in here, and it goes directly --

THE COURT: You're asking not only them but the Court to sift through 400 pages for you all to talk about three pages? I'm going to sustain the objection, okay.

MS. STOLLEY: What you could do, Your Honor, is just lift out those three pages. I mean, they --

THE COURT: I'm going to sustain the objections of the Exhibits 292 through 297 and not allow them to be admitted in evidence. If you want to ask Ms. Bannon questions regarding what she understands the assets of the DAF to be in 2024, you're welcome to do that. But you haven't provided these exhibits to Opposing Counsel and that's required for them to be

admitted into evidence.

MS. STOLLEY: Understood. I understood it because it was a publicly filed document that is accessible. Got it.

BY MS. STOLLEY:

Q So in your understanding, Ms. Bannon, in assisting the supporting organizations to file these public disclosures each year, is part of the disclosure determining the level of their ownership in the Charitable DAF Holdco assets?

A Yes. One of the most important components of the disclosures and Form 990 is the disclosure of assets by the disclosing organization. So in the instance of Highland Kansas City, one of the supporting organizations, it would disclose its ownership in the Charitable DAF Entities and Charitable DAF Fund. And there are references throughout the 990 to its ownership. As I mentioned, the mere fact that it's filing Form 5471 indicates interest or ownership in Charitable DAF Holdco, which is explicitly referenced in those forms.

Q And is that true of all three of the supporting organizations?

A So the participation shares of Charitable DAF Holdco would appear identically across Highland Kansas City, Highland Santa Barbara, and Highland Dallas Foundations, given they each own 100 percent participation shares. Highland Dallas Foundation, however, owns other assets, unlike the other two supporting organizations where those are the primary assets of the

supporting organization.

So Highland Dallas Foundation's Form 990s would look a little different, just because there would be additional assets reported.

Q But they would still contain something about the Holdco assets?

A Correct.

Q And when we talk about the DAF Holdco assets, are we talking about the $270 million in assets that have been discussed throughout this hearing?

A Yes.

Q Are you aware of whether -- or actually in your understanding, would Mr. Patrick have received those, the 2023 or 2024 990s?

A Yes. And would be a part of the filing, especially in his position as GP of the Charitable DAF Fund.

Q Now you mentioned, in addition to the 990s, you mentioned fees that show ownership interest through the supporting organizations?

A Correct.

Q Can you explain what those fees are?

A So the supporting organizations, in their operating agreements with their supported organizations, which are the community foundations, all include some kind of fees owed to the community foundations in exchange for the services they

provide to the supporting organizations. And in each instance, those fees are based on ownership of assets at the supporting organization level.

Q And what do those fees prove as it relates to that ownership interest?

MR. LEVY: We object, again, based on scope. There was no testimony at all used in the case-in-chief about these fees. This is not proper rebuttal testimony.

THE COURT: Any response?

MS. STOLLEY: Your Honor, we are directly rebutting Mr. Patrick's repeated claim that he had sole ownership of the assets.

MR. LEVY: Mr. Patrick never testified that he had sole ownership, and there was no testimony at all about fees or ownership or control of the assets during our case-in-chief. This is a continuation of their --

THE COURT: Okay.

MR. LEVY: -- Dugaboy's case-in-chief and not proper rebuttal.

THE COURT: All right, thank you. I'm going to overrule the objection. Ms. Stolley, please focus the questions. We seem to be getting afar off from where we need to be going. We're getting close to basically having Ms. Bannon testifying as if this is your case-in-chief. This is a rebuttal. Please keep the questions to rebuttal, please.

MS. STOLLEY: Your Honor, if I could be heard, just about the scope of rebuttal.

THE COURT: Okay. Go ahead. I'm listening.

MS. STOLLEY: It is our position that we're permitted this type of rebuttal as opposing evidence because Mark Patrick was a hostile witness and is a representative of a party opponent.

THE COURT: But you're still really giving a rebuttal to what was presented in their case-in-chief. You had an opportunity to cross-examine Mr. Patrick, as well as call his view in your case-in-chief to put on evidence of these things.

So I understand that you're certainly allowed to ask her a question here on things that Mr. Patrick testified to that you would like to rebut. I don't believe Mr. Patrick testified to this extent as to Form 990s.

If you want to ask her questions about the assets of DAF, what they were, whether or not the DAF, whether or not he had the right to designate other beneficiaries, remove beneficiaries. Okay, but I believe we're getting to the point where we're going beyond what rebuttal is around.

BY MS. STOLLEY:

Q Okay, just a few more questions, Ms. Bannon. We spoke previously --

MS. STOLLEY: Just a minute, Your Honor, I'm sorry. If I could say one final thing, if it's okay, Your Honor.

THE COURT: Go ahead.

MS. STOLLEY: Okay. We talked about Mr. Patrick's testimony, Ms. Bannon.

THE COURT: Okay, hold on, Ms. Stolley. Are you directing this to me or to the witness?

MS. STOLLEY: No, Ms. Bannon. Excuse me.

THE COURT: Okay. Sorry, I thought you were wanting me to say that you had something still to say to me.

MS. STOLLEY: Oh. Well, this does contradict what Mr. Patrick testified about, which is that he is the owner and the controller of the assets and that he has the discretion to essentially issue dividends or not, as was his whim, that he could swap out the charitable organizations at his whim. And we are rebutting that particular testimony that it is clear that the supporting organizations do in fact have an ownership interest in the assets of the Charitable DAF Holdco.

THE COURT: Okay. Have a seat, Mr. (indiscernible).

Okay. I'm going to allow you to question the witness to rebut testimony and evidence. You've already asked Ms. Bannon whether or not she believes, or it's her understanding, if Mr. Patrick had the right, unilaterally, is my term, unilaterally to move the DAF assets, as has been stated, to a different entity. But the target has been announced. I mean, we've already covered this. What I'm getting at is we've got limited time here. We seem to be

beating the same horse.

MS. STOLLEY: Okay.

BY MS. STOLLEY:

Q Okay. Has Mr. Patrick authorized the distribution of the fees that we just discussed to the supporting organizations consistently?

A Yes. Those were part of the proactive recurring fees that were issued to the supporting organizations on an ongoing basis without their request, part of kind of predetermined calculation.

Q And when was the last time any of the fees were distributed to the supporting organizations?

A The third quarter of 2024.

MS. STOLLEY: If I could have just a moment, Your Honor.

THE COURT: That's fine.

(Pause)

MS. STOLLEY: Nothing further, Your Honor.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Hi, Ms. Bannon.

A Hello.

Q When did you become an officer of the supporting organizations?

A In the fall of 2004.

Q Okay. It's your view that Mr. Patrick did not have the right, I think, to use your term to swap out the economic beneficiaries. Do I have that right?

A Correct.

Q When did you learn that he had done that?

A When he had, which part of it? When he had changed the general partner, changed the -- inserted an entity in the structure, issued the diluted participation shares?

Q Whatever you mean when you use the phrase, swap out the economic beneficiaries. When did you say that's what he did?

A We put the pieces together over some time. I can't point to a specific date as to when it was abundantly clear that the supporting organizations that were the rightful, indirect charitable owners had been replaced by DFW Charitable because there have been several other changes in the organizational chart prior to that that facilitated that change.

Q You certainly knew it before the hearing on the 9019 motion, right?

A I can't speak to that exact date.

Q Are you familiar with the petition for court supervision in the Cayman Islands that was filed by the supporting organizations?

A Yes.

Q Is it one of the reasons they sought court supervision,

because Mr. Patrick had allegedly swapped out the economic beneficiaries?

A They sought court supervision for a number of suspicions and reasons, including recognition that that first GP change had been made, among other things.

Q Okay. So you would agree that before the 9019 hearing, the supporting organizations were aware of the swap?

A The supporting organizations were, again, aware of changes that removed a lot of the economic benefits of the structure to them. Again, I can't speak to the specifics of what exactly they were aware of at that time.

Q What do you mean a lot of the economics? Didn't it swap out all of it?

A Well, at one point, there were the diluted participation shares issued to the new charity. At one point, then, there was the liquidation of the partnership. That gave minimal economics to the supporting organizations I think far detached from the actual value. But removed all the economics is not necessarily an accurate characterization.

Q When you talk about the supporting organizations, you're only talking about Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation, correct?

A Correct.

Q And none of those entities ever had a participation

interest in Hunter Mountain or any affiliate of Hunter Mountain, correct?

A Not directly.

Q And not indirectly. Is that right?

A Well, they would have through the Charitable DAF Holdings I believe is the correct entity name, that was a part of the DAF org chart in 2022.

Q They don't have participating shares in the entity that directly or indirectly owned Hunter Mountain, correct?

A The only participating shares they hold is in Charitable DAF Holdings. And then through those participating shares, they have the LP interest in a structure that then ultimately flows down to Hunter Mountain under Charitable DAF Holdings as one of the subsidiaries.

Q How come the supporting organizations didn't object to Highland's settlement?

MS. STOLLEY: Objection.

MR. MORRIS: Okay. Withdrawn.

BY MR. MORRIS:

Q The supporting organizations did not object to the Highland --

MS. STOLLEY: Objection.

THE COURT: Let him finish this question.

BY MR. MORRIS:

Q Ma'am, the supporting organizations did not object to the

settlement agreement that was proposed last June, correct?

MS. STOLLEY: Objection, Your Honor.

THE COURT: Basis?

MS. STOLLEY: This is far outside the scope of my rebuttal.

THE COURT: Response?

MR. MORRIS: She testified that Mark Patrick couldn't swap out the entities, and I'm establishing that the supporting organizations knew full well that that's exactly what he had done prior to the hearing, and yet the supporting organizations were nowhere to be found.

THE COURT: I'm going to overrule the objection.

MS. STOLLEY: May I be heard, Your Honor?

THE COURT: Go ahead.

MS. STOLLEY: One has nothing to do with the other. I mean, the fact that she said that he doesn't have the control or the power to swap out the economic beneficiaries does not then lead to whether the supporting organizations agreed with the settlement.

THE COURT: Okay. I've overruled the objection. You may proceed.

BY MR. MORRIS:

Q The supporting organizations did not object to the settlement between the HMIT Entities and the Highland Entities, correct?

A No, they did not issue any objection at the hearing.
Q Okay. Is it your understanding that Crown Global had a limited partnership interest in the entity that indirectly owned Beacon Mountain?
MS. STOLLEY: Objection, Your Honor. Outside the scope.
MR. MORRIS: This is the exact same theory, Your Honor. What I'm looking to establish is that the testimony we just heard about the supporting organizations is actually completely irrelevant to HMIT and to the settlement.
THE COURT: Okay. I'm going to overrule it but, again, I'm going to give you the same instruction. Let's stick to what we need to accomplish here. I don't want to go far afield.
MR. MORRIS: Fair enough.
THE WITNESS: Could you repeat the question?
MR. MORRIS: No. I'll try.
BY MR. MORRIS:
Q You testified about the DAF agreement, the Limited Partnership Agreement, right?
A Correct.
Q That's an agreement that was known to you and to the supporting organizations before last June, correct?
A Correct.
Q And the Form 990s were known to you and the supporting

organizations before last June, correct?
A Let's see. The 2024 would have been filed in November of 2025.
Q But Form 990s were generally available to you guys, right?
A Which ones specifically?
Q The ones that you just referred to.
A So the 2024 Form 990s would not have been because they did not get filed until November of 2025.
Q You said that you weren't familiar with the phrase "discretionary economic beneficiaries." Is that right?
A Not until testimony last week. Again, I may have read it but didn't necessarily register as a significant or common term.
Q You're not a lawyer. Is that fair?
A No. No.
Q No part of your job responsibilities has to do with giving legal interpretation of documents. Is that fair?
A No.
Q Is that fair?
A Yes, that's fair.
Q Okay. And you know the Cayman Islands Court issued a decision in February relating to the supporting organizations.
A I'm aware of that as well as subsequent decisions on some of the same matters.
Q Are you aware that the Cayman Islands Court actually used

the phrase "discretionary beneficiaries?"
A I am aware that Mr. Patrick referenced that, but did not hear that directly from the Cayman Court.
Q Since his testimony, did you take the time to look at that decision?
A No, I have not, did not reference that in the last week.
Q As an officer of the supporting organizations, have you ever read that decision?
A Yes.
Q And do you recall whether or not it specifically refers to discretionary beneficiaries?
A As I said, I remember reading the term but did not register that at the time as kind of a specific term of art.
MR. MORRIS: I have nothing further, Your Honor.
THE COURT: Ms. Stolley, anything further?
MS. STOLLEY: Nothing further, Your Honor.
THE COURT: Okay. Ms. Bannon, you may step down. Thank you.
THE WITNESS: Thank you.
(Witness excused)
THE COURT: Mr. Edney?
MR. EDNEY: Yes, Your Honor.
THE COURT: Your next witness?
MR. EDNEY: Movant calls James Dondero as a rebuttal witness.

THE COURT: Mr. Dondero, before you take a seat, my law clerk will have you sworn in.

JAMES DONDERO, MOVANT'S REBUTTAL WITNESS, SWORN

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. EDNEY:

Q Good afternoon, Mr. Dondero. I'm going to ask you a handful of questions about some things that Mr. Patrick said on the stand. Before I do that, can you tell the Court what your current position is?

A President of NexPoint.

Q And what is NexPoint?

A It's a registered investment advisor managing 16 to 18 billion dollars in the retail space, in the real estate space, and in insurance and banking.

Q And prior to the initiation of this bankruptcy, did you have a role in Highland Capital Management?

A Yes, I was the president and founder of Highland Capital.

Q And what was Highland Capital Management?

A Highland Capital Management was an alternative manager managing a lot of the same things, maybe a bit more on the corporate side and on the CLO side.

Q Can you give me a sense of its mix of assets?

A Sure. A lot of structure products, CLO, CMBS, a lot of retail products, a lot of REITs, a lot of esoteric products

like life settlements and other distressed-type investments.

Q All right. For that mix of assets, did you have any other competitors in the Texas region?

A Not for the -- the mix we had was fairly unique for Texas.

Q Okay. You were here when Mr. Patrick testified, were you?

A Yes.

Q Okay. And do you remember Mr. Patrick talking about the structure, what's called the Charitable DAF?

A Yes.

MR. EDNEY: Let's pull up Exhibit 242, Slide 2, please.

BY MR. MORRIS:

Q Prior to the restructuring that we've been talking about throughout the hearings over the last few days, do you recognize this as the structure of the Charitable DAF prior to 2024?

A Yes.

Q Okay. And did you have a role in standing this structure up?

A Yes, I was the original grantor in 2011, 2012. We originally seeded it with $32 million of assets for which we received a tax deduction at the time.

Q And why did you do that?

A We were establishing a charitable legacy. We did exemplary performance on the asset side and on the giving side.

From the original $32 million, we gave out $55 million over the years, and we grew the $32 million corpus to $270 million over a 12-year period. We never had a losing investment in the portfolio.

Q The supporting organizations, the ones that are in pink, two from the bottom, do you know what those are?

A Yes.

Q And did you have a role in selecting those?

A Yes.

Q And what was your principal purpose in selecting those?

A When we originally put the structure together in 2011, 2012, we were looking for nationally renowned charities that had similar giving strategies as we did.

Q Okay. And was there any aspect of allowing you to maintain some control over where the charitable assets went in selecting those entities?

A We purposely chose this DAF structure versus a foundation or other vehicle because we wanted to be able to manage the assets, and we wanted to pick where most of the specific charitable giving ultimately went. So we would pay a significant discretionary fee to all the underlying charities that they could use at their own discretion every year, but then we would, Lucy and I would allocate to bigger charities.

Q And through this function, what are some of the charities that you selected?

A We were very active over the years in veteran charities, Reserve Aid, Center For Brain Health, more than a million dollars, multiple millions of dollars in all of those, seven figures in snowball, other military charities. We were $15 million into the -- and original donor into the Bush Center. And then the rest of the focus was generally education-based. We did the gymnasium in the building for the Cristo Rey High School in Dallas and things like that.

Q Okay. Did you understand the Charitable DAF to be structured for the benefit of the supporting organizations?

A Yes. And for the donor, also.

Q And what do you mean by for the donor?

A Well, the structure has the donor and donor-advised. We have a lot of input into where the money is ultimately allocated, and then we have the ability to manage the money. And then the picking of local and charitable things in the region is helpful to our real estate business and our presence in the community.

Q All right. Let me, prior to 2015, who owned the limited partnership interest in Highland Capital Management, LP?

A It was 75 percent myself and 25 percent Mark Okada.

Q And did there come a time when you and Mr. Okada decided to give those interests to a new entity?

A Yes. We gave the ultimate residual interest to the Dallas Foundation and a separate subsidiary below Dallas Foundation.

Q And what was that lower entity called?
A Hunter Mountain.
Q Okay. And did some of those interests come from the Dugaboy Investment Trust?
A Yes. Some of them came from Dugaboy. Some of them came from Okada and myself personally.
MR. EDNEY: Let's go to Exhibit 242, Slide 14, please. I'm sorry. Let's go to 242, Slide 13, please.
BY MR. EDNEY:
Q The structure of entities at Slide 13, do you recognize that?
A Yes.
Q Is that the structure that you set up?
A No.
Q Do you recognize that as the Hunter Mountain structure prior to February 2025?
A I'm sorry. I was focusing on Mark Patrick's -- well, yeah, this is after Mark Patrick took it from -- I'm sorry, purchased it from John Honis.
Q I see, okay. And the ultimate beneficiary of this Hunter Mountain structure, what was that supposed to be?
A The ultimate beneficiary goes back to -- I don't know if it's on this chart.
Q What was the ultimate beneficiary supposed to be charitable, Mr. Dondero?

A Yes, it was supposed to be charitable and to Dallas
Q Dallas? I'm sorry. Dallas the city or?
A No, Dallas the charity. I'm sorry.
Q All right.
A Julie Diaz's group.
Q Do you remember what that's called, Mr. Dondero?
A It wasn't the Empower Dallas. It wasn't Highland Dallas. It was called something else.
Q Okay. Did you form the Hunter Mountain structure for a charitable purpose?
A Yes.
Q All right. Now, prior to 2024, did you have a role in where charitable funds out of both of these structures would be spent?
A Yes. That was Lucy. Lucy and I would meet regularly on that.
Q And were you kept abreast of the asset status and available cash in both of these entities?
A Yes. We always ran them with some cash.
Q And for the Hunter Mountain structure, prior to Mark Patrick, the administrator was who?
A John Honis.
Q And did John Honis have a role in what charitable endeavors were supported by the Hunter Mountain structure?
A No.

Q For the Charitable DAF structure, the person that was running that prior to Mark Patrick, who was that?

MR. LEVY: Your Honor, we again object on scope. This is just direct testimony. It's not rebutting anything that's been adduced in the trial.

THE COURT: Response, Mr. Edney?

MR. EDNEY: Your Honor, a big part of Mr. Patrick's sponsored testimony was that, you know, he got to make the call. He had the discretion to decide who would be the charitable beneficiaries of this. We were trying to establish that the course of conduct for years prior to 2024 was the exact opposite, that it was Mr. Dondero and his colleagues who were making that call in consultation with the charities.

MR. LEVY: We're just walking through org charts. we've walked through at least five times already. This is just direct testimony.

THE COURT: Okay, Mr. Levy.

Mr. Morris, I don't know, are you standing --

MR. MORRIS: No, I'm just getting (indiscernible).

THE COURT: Okay. All right, I'm going to overrule the objection. But again, Mr. Edney, let's make sure that we're not going far afield.

MR. EDNEY: Well, we'll stay right on target, Your Honor. Thank you, Your Honor.

BY MR. EDNEY:

Q Okay. So prior to, I think this is where I was, but prior to Mr. Patrick taking over a role in the Charitable DAF structure, who had that role?

A Overall, it was Grant Scott in the DAF structure.

Q And when Mr. Scott had that position, did he have a role in deciding what charitable endeavors would be supported?

A It was about four hours a month of work. He got paid $60,000 a year. It was just an independence function on the overseeing on the investment side. But all the charitable decisions were made by myself and Lucy, and all the investments percolated up from the investment department.

Q And prior to 2024, did Mark Patrick, in either of these roles, for Hunter Mountain or for the Charitable DAF structure, have a role in deciding what charitable endeavors would be supported?

A He never had input on the charitable side or on the investment side.

Q Prior to 2024, did Mark Patrick ever object to you having a role in deciding what charitable projects would be supported?

A No, that's what donor-advised funds are.

Q Prior to 2024, did Mark Patrick ever deny the charities a requested distribution to fund a charitable project?

A No.

Q Prior to October 2024, did Mark Patrick work for an entity called Skyview?

A Yes.

Q In the wake of Mark Patrick's departure from Skyview in October 2024, did Mark Patrick make any statements to the charities regarding the future of the structure?

A He represented to the charities that nothing would change and that it would be best --

MR. LEVY: Objection, hearsay.

THE COURT: I'm sorry?

MR. LEVY: This is hearsay. He's testifying to what Mark Patrick said to organizations.

THE COURT: Okay. I'm going to sustain the objection, but allow for you to ask questions that may deal with this.

MR. EDNEY: Thank you, Your Honor.

BY MR. EDNEY:

Q Mr. Dondero, after October 2024, without telling me what the statements are, did you become aware of any statements Mr. Patrick made to the charities regarding the future of the Charitable DAF structure?

A Yes.

Q And were those -- were what you heard about those statements important to you in deciding what action or not to take against Mr. Patrick and when?

A Yes.

Q Mr. Dondero, what were those statements?

MR. LEVY: Objection.

THE COURT: You're asking him to state what Mr. Patrick said. I'm going to sustain the objection as hearsay.

MR. EDNEY: Your Honor, I'd like to ask a question with the limiting instructor. I'm not offering it for the proof of the matter asserted, but rather going directly to Mr. Dondero's state of mind and his calculations about whether and how to act against Mr. Patrick.

THE COURT: Okay. With that limitation, you can ask the question. You can lodge the objection, but let's see what the question is.

MR. EDNEY: All right.

BY MR. EDNEY:

Q Mr. Dondero, what was your understanding of what Mr. Patrick told the charities after October 2024?

MR. LEVY: Same objection. That exceeds the scope of effect on the listener.

THE COURT: I'm sorry?

MR. LEVY: That exceeds the scope of effect on the listener.

THE COURT: He's asking for what his understanding of the statements were. He's not asking for direct statements were. I'm going to overrule the objection.

BY MR. EDNEY:

Q I'm sorry, Mr. Dondero, do you remember my question?
A Yes, I think I have a good answer.
Q Okay.
A For four years prior to his departure on this org chart that's in front of us, he was a controlling key person at Rand Advisors, which was a registered investment advisor with duty of care and duty of loyalty and fiduciary responsibility to investors. He also --

MR. LEVY: Objection and move to strike. That's beyond the scope and it's legal conclusion.

THE WITNESS: That's not a legal conclusion.

THE COURT: Okay, Mr. Dondero.

THE WITNESS: Sorry.

THE COURT: I'll handle the ruling on the objections. I'm going to sustain the objection as nonresponsive.

BY MR. EDNEY:

Q All right, Mr. Dondero. I probably should have repeated the question, so I'll do it again. Those statements that Mr. Patrick made after his October 2024 departure to the charities, what was your understanding of what he said?
A He would behave consistent with his fiduciary responsibilities as an RIA and a compliant Cayman entity.
Q And did you have any understanding of any statements he might have made regarding potential changes to the structure?
A He specifically told the charities that there wouldn't be

any changes.

Q Just going back for a second, the Charitable DAF structure, did the Dugaboy Investment Trust contribute any of the assets into that?

A Yes.

Q Are you familiar with a liquidation process in the Cayman Islands?

A Yes.

Q And did you become aware that the charities being supported under the DAF structure sought to participate in it?

A Yes.

Q And did you have any understanding that there was an objection made to those charities participating on the liquidating committee of the Cayman liquidation process?

A Yes.

Q And do you have an understanding as to who made that objection?

A Not only did Mark Patrick object, but I think he sued all the professionals personally in the Caymans.

Q All right. With respect to the charities' participation on the liquidating committee, do you have an understanding as to how that was resolved?

A His objection was that information gleaned in Cayman could be used against him in the U.S. And Grant Thornton and Maples people working the case in the Cayman agreed not to provide any

information to me or my representatives as the case went on.

Q And did the charities agree not to provide you with any information from the Caymans as the case went on?

A Correct.

Q Mr. Dondero, were you here when Mr. Patrick testified regarding some justifications for the restructuring being accomplished?

A I didn't hear any meaningful justifications.

Q Okay. Do you remember Mr. Patrick saying that your involvement with the charities would put their tax-exempt status at risk?

A He never mentioned that before yesterday.

Q All right. Are you aware of Mr. Patrick informing you or the charities that your involvement with them was putting their tax-exempt status at risk?

A Again, he had a limited trustee role. No one's ever seen a trustee try and take a charity before. He could have represented he had concerns verbally. He could have asked to cure in writing.

MR. LEVY: Move to strike as nonresponsive.

THE WITNESS: He could have -- he could have resigned as trustee.

THE COURT: Hold on one second, Mr. Edney.

MR. LEVY: Move to strike as nonresponsive.

THE COURT: Yeah, I'm going to sustain it.

BY MR. EDNEY:

Q All right. Mr. Dondero, I'm sorry. I have to ask questions, and then we have to have answers that are responsive to it. So let me ask the question again, and I'll try to make it a little bit more clear. Are you aware of Mr. Patrick informing you or the charities that your involvement with them was putting their tax-exempt status at risk?

A Not while he was employed.

Q Okay. Are you aware of Mr. Patrick ever identifying any problematic conduct to you or to the charities and asking either you or them to stop it?

A Not while he was employed. Not verbally. Not in writing. Never.

Q Did you ever ask Mr. Patrick to transfer funds from the DAF structure to a noncharitable account controlled by you?

A No.

Q Did you ever provide Mr. Patrick instructions on a cocktail napkin?

A No, and I've never had a cocktail with Mr. Patrick, either.

Q If Mr. Patrick was concerned about the conduct of you or others and its effect on the DAF, what do you think Mr. Patrick should have done?

A He should have resigned. He could have papered it to anybody involved in the structure or any regulatory body he

wanted to. But he wasn't supposed to move all the assets to himself.

Q All right, Mr. Dondero. Thank you for your time this afternoon.

MR. EDNEY: I have no further questions on rebuttal examination.

THE COURT: You may proceed, Mr. Morris.

MR. MORRIS: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Dondero.

A Good afternoon.

Q Mark Patrick had complete control over the DAF Fund. Isn't that right?

A He had a GP control share, I guess is what you're saying.

Q And that meant that he had complete control over the DAF Fund. Isn't that right?

A No, not without -- not without acknowledging the broad fiduciary responsibilities in both the Cayman and as a registered investment advisor.

Q You were aware that back in 2021, he obtained the management chairs of the DAF Fund, correct?

A Yes.

Q And you do understand that as the holder of the management chairs, Mr. Patrick had complete control of the fund, right?

A Not without the caveat and the structural limits and the -- the structural limits and obligation in the GP and LP agreements.

MR. MORRIS: Okay. Can I ask that Exhibit 48 be put up on the screen?

THE COURT: Just to be clear, this is Highland Exhibit 48?

MR. MORRIS: Yes. Thank you for the clarification. Highland Exhibit 48. And if we could go to the first page.

BY MR. MORRIS:

Q Do you see this is an affidavit from you?

A Yes.

Q Do you recall filing an affidavit in the Cayman Islands on behalf of the supporting organizations in April of 2025?

A Yes.

Q Did you review this affidavit before you signed it?

A Yes.

MR. MORRIS: Can we go to Paragraph 12, please?

BY MR. MORRIS:

Q I'm going to read the first two sentences, Paragraph 12, and let me know if I've read them correctly.

Paragraph 12 says, "In addition to the participation shares, the LP issued 100 management chairs, defined as the management chairs, with the only voting rights for any and all shareholders in the LP. In essence, the articles and the ARLPA

therefore grant complete control of the fund structure to the holder of the management chairs in the LP and the entirety of the issued share capital of the GP."

Have I read that correctly?

A Yes.

Q And this was your sworn statement submitted to the Cayman Islands in April of 2025, correct?

A Yes, it's consistent.

Q And the holder of the management chairs was Mark Patrick, correct?

A Yes.

Q Thank you.

MR. MORRIS: Can we take this down, please? And can we put up Dugaboy Exhibit 242, Slide 2?

BY MR. MORRIS:

Q Okay. Can you see that, Mr. Dondero?

A Yes.

Q You were asked about that in your direct testimony. Do you remember that?

A Yes.

Q Can you show me where on this chart the HMIT Entities are?

A They're not on this chart.

Q They're not on this chart, correct?

A Correct.

Q Thank you very much. And this is what's known as the DAF

structure, correct?

A Generally, yes.

MR. MORRIS: Okay. Can we go to Slide 13, please?

BY MR. MORRIS:

Q This is the Hunter Mountain structure, correct?

A Yes.

Q And neither the Dallas Foundation nor Empower Dallas nor the Okada Family Trust had any direct or indirect ownership interest in Hunter Mountain, correct?

A Repeat that question again, please.

Q Sure. The Dallas Foundation received support from Empower Dallas and the Okada Family Trust, correct?

A Correct.

Q And Empower Dallas and the Okada Family Trust received cash flow via an annuity policy that was underwritten by Crown Global, correct?

A Correct.

Q So the Dallas Foundation, Empower Dallas, and the Okada Family Trust had no direct or indirect interest in Hunter Mountain, correct?

A That's not true.

THE WITNESS: The only one that had a direct or indirect interest, at least as of the entities in pink, are Crown Global and Dolomiti and Hakusan, correct?

MR. EDNEY: Objection, Your Honor. Asked and

answered.

THE WITNESS: That's not true as I understand it.

THE COURT: I'm going to overrule the objection.

BY MR. MORRIS:

Q Do you understand that this is a chart that was submitted by Dugaboy, the entity on whose behalf you're acting as the agent?

A Yes.

Q Okay. And Crown Global has a limited partnership interest in Atlas IDF. Do you see that?

A Yes. And Atlas IDF has an indirect interest in Hunter Mountain, correct?

A Yes.

Q Okay. But Empower Dallas and Okada Family Trust and Dallas Foundation do not have limited partnership interests in Atlas IDF or any entity below it, correct?

A That's not how I understand it. I can't speak to this chart, but Hunter Mountain spills into Dallas Foundation somehow.

Q But you don't know how. Is that fair?

A I'm just saying I can't see how it does on this chart.

Q Okay. So you can't see how it does it on this chart and you can't explain how it does it otherwise. Fair?

A It's a subsidiary of Dallas Foundation, the residual interest in Hunter Mountain.

Q You're aware that Crown Global was one of the objecting parties to the 9019 motion, correct?
A Yes.
Q And the Dallas Foundation, on behalf of Empower Dallas and Okada Family Trust, was the other objecting party together with Crown Global, correct?
A Yes.
Q And you understand that the Dallas Foundation and Crown Global objected to the settlement on the ground that Mr. Patrick purportedly did not have authority to enter into the settlement on behalf of the HMIT Entities, correct?
MR. EDNEY: I'm going to object to this question as beyond the scope of my direct examination.
MR. MORRIS: Your Honor, the witness was asked about this chart and he was asked about Mr. Patrick's authority. I'm putting the two of them together in one question.
THE COURT: I'm going to overrule the objection.
THE WITNESS: Can you restate the question, please?
BY MR. MORRIS:
Q Sure. The Dallas Foundation, on behalf of Empower Dallas and the Okada Family Trust, together with Crown Global, objected to the Highland proposed settlement with the HMIT Entities on the ground that Mr. Patrick purportedly did not have authority to bind the HMIT Entities. Do you recall that?
A Yes.

Q And do you recall that the Dallas Foundation, on behalf of Empower Dallas and the Okada Family Trust, together with Crown Global, after taking discovery, after participating in discovery, withdrew their objection with prejudice?

MR. EDNEY: I'm going to renew my objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: That isn't how I understand it.

BY MR. MORRIS:

Q No, you don't understand that they withdrew their objection with prejudice?

A I understand Julie Diaz got notice for a deposition on a Saturday for a Sunday deposition and she got badgered and she panicked. That's what I understand.

Q Are you aware that the Dallas Foundation was represented by counsel?

A Yes.

Q And are you aware, and this is the question, are you aware that the Dallas Foundation and Crown Global, with the advice of counsel, withdrew its objection to the Highland proposed settlement with prejudice?

A Yes.

Q Thank you. And are you aware that the Dallas Foundation and Crown Global also entered into a binding term sheet with Mr. Patrick that left him in control of the HMIT Entities?

A I don't have as much awareness of that.

Q As you sit here right now, you don't know that the Dallas Foundation and Crown Global entered into a binding term sheet that left Mr. Patrick in control of the HMIT Entities?

A No, I don't.

Q Okay. In 19 -- wow, I'm dating myself. In 2025, you or entities acting on behalf of entities you owned or controlled entered into a series of agreements with Mr. Patrick or entities that Mr. Patrick purportedly controlled. Is that fair?

MR. EDNEY: I'm going to object to this question beyond the scope of my direct examination which --

THE COURT: I will sustain.

BY MR. MORRIS:

Q Okay. You testified that there was some agreement in place that prevented you from getting information from the Cayman Islands proceeding. Is that right?

A Yes.

MR. MORRIS: Can we put up Exhibit 41, please?

THE COURT: This is Highland (indiscernible)?

MR. MORRIS: Yes, thank you again, Your Honor.

BY MR. MORRIS:

Q Do you see this as a consent order?

A Yes.

Q And do you see that it's dated July 31st, 2025?

A Yes.

Q Have you ever seen this document before?

A Not yet. Is it only one page?

Q No, I'll take you there in a moment. I just want to know if you're familiar with it at all.

A Not yet.

MR. MORRIS: Okay. If we could go to the third page, 3 of 16. And you understand -- stop there.

BY MR. MORRIS:

Q You understand that Maples and Calder represents the Joint Official Liquidators?

A Yes.

Q And the other law firms that are depicted on this page represent the defendants in the Cayman proceeding, correct?

A Mark Patrick has 30 law firms. I don't know which ones are which.

Q You either know or you don't know?

A I don't know.

Q Okay. Thank you.

A I don't know all 30 of them.

Q Thank you. Nobody asked you that.

MR. MORRIS: Can we go to Schedule A, Paragraph 6?

BY MR. MORRIS:

Q This is a consent order as we saw, correct?

A (No audible response)

Q Correct?
A Yes.
Q Okay. And in the middle of Paragraph 6, it says, Any information of whatever nature, relating to any member of the defendants or the CDM entities, which is provided to the JOLs pursuant to this Paragraph 5, shall not be disclosed to or shared with Mr. Dondero, the supporting organizations, or any known affiliates or service providers of these individual or entities.
I've summarized that just a bit, but is that a fair characterization of those words?
A Yes.
Q Okay. So, really, the only restriction that was placed on the flow of information to you was that which related to any member of the defendants or the CDM Entities, which was provided to the JOLs. Is that fair?
A (No audible response).
Q Let me try this. Let me try this. That wasn't a good question. Let me try this better. Withdrawn.
Looking at this provision, would you agree with me that this is a restriction on the flow of information to you and the supporting organizations?
A I thought the supporting organizations were relatively informed, but I know for sure I wasn't informed.
Q Okay. And that's because you thought that there were

agreements in place that prevented you from being informed. Correct?

A That's what I was told.

Q And this --

A That's what our organization was told.

Q And this is an agreement that prevents certain information from flowing to you. Correct?

A If you say so. Like I said, I never saw the agreement that limited it. The supporting organizations were on the creditors' committee. The creditors' committee, I think, was posted by the Grant Thornton and whatever, but I was not posted.

Q Did you ever see an agreement of any kind that prevented any of the supporting organizations from providing information to you with respect to the Cayman proceeding?

A Like I said, there's three other lawsuits in the Cayman against the professionals personally. So I know there was an apprehension, and I know -- I don't know what document it covered, but I know there was a blackout to myself and my organization.

Q What organization are you referring to?

A NexPoint or Dugaboy or just anything in my purview.

Q Can you describe that document for me? Because I haven't seen it.

A No. Doesn't this cover some of it or most of it or?

Q That's a great question. That's what I'd like to ask you. Is this the provision that you had in mind in terms of the restriction of the information flow to you out of the Cayman Islands?

A I don't know. I don't know what document governed it.

THE COURT: Mr. Morris, if you have a minute where we can take a short recess.

MR. MORRIS: You know, I may be done. Can I just consult with my colleague?

THE COURT: That will be fine.

MR. MORRIS: I may be done, Your Honor.

THE COURT: Okay.

MR. MORRIS: I've got nothing further, so if Your Honor would like to take a short recess.

THE COURT: We're going to take a short recess, and of course, Mr. Edney, you'll have your chance to redirect. So we'll take a 10-minute recess.

THE CLERK: All rise.

UNIDENTIFIED SPEAKER: Do you want this in the box?

MR. MORRIS: Your Honor, may I have an instruction not to consult with counsel?

MR. EDNEY: I won't. How about that?

THE COURT: Okay, yes. Mr. Dondero, you are instructed not to consult with counsel. I will also remind you when we come back that you will be under oath still.

THE WITNESS: Yes.

MR. MORRIS: Thank you, Your Honor.

(Recess at 3:18 p.m., recommencing at 3:30 p.m.)

THE CLERK: All rise.

THE COURT: You may proceed, Mr. Edney.

MR. EDNEY: Thank you, Your Honor.

THE COURT: Oh. Let me just again, Mr. Dondero, you are still under oath.

REDIRECT EXAMINATION

BY MR. EDNEY:

Q Mr. Dondero, I want to take you to Highland Exhibit 41, please.

MR. EDNEY: And that will be the first page of the exhibit. All right, let's stop there.

BY MR. EDNEY:

Q Mr. Dondero, do you see there on the -- this is the order of the Caymans Court that you were questioned about by Mr. Morris. Do you remember that?

A Yes.

Q Do you see on the front page there, there's a listing of defendants?

A Yes.

Q Could you read those for us?

A Mark Patrick, Paul Murphy, CDMCFAD, LLC, DFW Charitable Foundation, CDH GP Limited as general partner for and on behalf

of the Charitable DAF Fund in its capacity as general partner, and CLO Holdco.

Q All right. Mr. Dondero, did the charities wall you off from information regarding what was going on in the Cayman Islands?

A Yes.

MR. EDNEY: Let's pull up Exhibit 242, Slide 12, please.

THE WITNESS: Yes.

BY MR. EDNEY:

Q Mr. Dondero, did you transfer your ownership interest in Highland Capital Management to the Hunter Mountain Investment Trust for a charitable purpose?

A Yes.

Q And what charity was that meant to benefit?

A It was meant to flow through to Dallas Foundation.

Q Now, Mr. Dondero, do you understand that subsequently in 2025, Mr. Patrick sold the equity interests in the Highland Capital Management Company and his interest in Hunter Mountain Investment Trust to another structure of entities?

A I'm sorry, what was the date? What was the -- I'm sorry.

Q Yeah, okay. Fair enough.

Mr. Dondero, do you understand that in 2025, Mr. Patrick effected the sale of the Hunter Mountain Entities to another corporate structure?

MR. MORRIS: Objection, Your Honor. That is completely inaccurate. And it's outside the scope.

THE COURT: Can you rephrase the question?

BY MR. EDNEY:

Q Do you know if Mr. Patrick sold Hunter Mountain to another corporate structure?

A I believe he did.

Q And do you know if today under that restructuring, the Dallas Foundation, does it have an interest in Hunter Mountain anymore?

A It does not.

Q Does that bother you, Mr. Dondero?

A Yes.

MR. MORRIS: Objection, Your Honor. Beyond the scope.

THE COURT: All right. Mr. Morris, can you please stand when making objections. And I'll overrule the objection.

THE WITNESS: Yes.

BY MR. EDNEY:

Q Why?

A It had a charitable purpose. I expected the residual to be -- I think in the books of Hunter Mountain, it was carried at over $100 million. I thought ultimately it would be worth several hundreds of millions of dollars.

Mark Patrick, when he stepped in Honis' shoes was a

registered investment advisor. That is a prohibited cross-trade, no matter how you look at it.

MR. EDNEY: All right. I have no further questions. Thank you, Mr. Dondero.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q How many hundreds of millions of dollars did you think Hunter Mountain was worth?

A There's $700 million missing from the Highland estate.

MR. MORRIS: Can we please call back up Exhibit 48?

BY MR. MORRIS:

Q And again, this is your affidavit, right?

A Yes.

Q And you swore it was true at the time that you signed it, right?

A Yes.

Q And you read it before you signed it, right?

A Yes.

Q And you submitted it to a court of law, correct?

A Yes.

MR. MORRIS: Can we go to Paragraph 38, please?

BY MR. MORRIS:

Q And in Paragraph 38, the last sentence, it says, "According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross with

approximately $17 million net value."

Have I read that correctly?

A Yes.

Q So you swore to the Cayman Court last April that Hunter Mountain was worth $17 million on a net value basis, correct?

A No, read what it says. It just said in their own filings. We were just -- I was just repeating that. I think Hunter Mountain is worth hundreds of millions of dollars.

Q Does it own any asset other than its interest in the Class 10 of the Highland Claimant Trust?

A That's its primary asset.

Q Okay. And you're aware that as the holder of a Class 10 interest, Hunter Mountain's interest is subordinated to indemnification obligations under the Highland Capital Management Plan, correct?

A Not if it's unwound.

Q I'm not asking you if it's unwound. I'm asking you to state the facts as you know them today. As of today, and for every single day since the plan has been confirmed, Hunter Mountain's Class 10 interest has been subordinated to, among other things, the indemnification obligations under the Highland Capital Management Plan, correct?

A I don't know specifically.

Q You don't know that?

A I don't know the amounts in the indemnification. We

haven't gotten financials on this estate in five years. I don't know what you're asking.

Q Did you look at the information that was provided in discovery in connection with the 9019 motion?

A No.

Q Well, maybe --

MR. MORRIS: I don't want to make commentary, Your Honor. No further questions.

THE COURT: Anything further, Mr. Edney?

MR. EDNEY: No, Your Honor. Thank you.

THE COURT: All right. Mr. Dondero, you may step down.

(Witness excused)

THE COURT: All right. Mr. Edney, any further rebuttal witnesses?

MR. EDNEY: Your Honor, the Movant calls us its final rebuttal witness, Margot MacInnis, by remote means.

Ms. Stolley will be handling the examination.

THE COURT: Okay. Ms. MacInnis, can you please unmute yourself and turn on your video and state your name?

MS. MacINNIS: Margot MacInnis.

THE COURT: Okay. Ms. MacInnis, my law clerk will swear in your name.

THE CLERK: Please raise your hand.

MARGOT MacINNIS, MOVANT'S REBUTTAL WITNESS, SWORN

THE CLERK: Thank you.

THE COURT: You may proceed, Ms. Stolley.

MS. STOLLEY: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. STOLLEY:

Q Ms. MacInnis, thank you for joining us after your travails yesterday and last night. You testified earlier in this proceeding, correct?

A Yes.

Q Have you had the opportunity to review Mark Patrick's testimony from this hearing?

A Yes, I have.

Q Now, at various points during his testimony, Mr. Patrick referenced the Mercer Report. Do you recall seeing those portions of his testimony?

A Yes, I do.

Q And did you review the Mercer Report as part of your investigation in your role as JOL?

A Yes, I did.

MR. LEVY: Objection to scope. Highland did not use any evidence whatsoever about the Mercer Report or Mr. Patrick's compensation. This is just a continuation of the direct examination.

(Pause)

THE COURT: I'm going to allow you to respond,

Ms. Stolley. se to that. I'm reviewing my notes. I don't have a copy of the transcript in front of me, nor would I have the ability to read it that quickly. But based on my notes, I do not see where there was any examination by Highland about Mr. Patrick's compensation. I do show that you all, on direct examination, questioned Mr. Patrick on his compensation. I do show that. So, do you have a response, Ms. Stolley?

MS. STOLLEY: Your Honor, we -- Your Honor, it is proper rebuttal testimony to impeach his testimony on the facts.

MR. LEVY: No.

MS. STOLLEY: And he was deemed an adverse witness?

MR. LEVY: Impeachment is properly done by cross-examination and redirect. They had ample opportunity to do that. Your Honor's notes are entirely correct that we didn't ask any questions at all about Mercer compensation. These are all questions that could have been posed to Mr. Patrick last week. And it is not proper testimony on rebuttal.

THE COURT: Hold on. But she's rebutting Mr. Patrick's testimony regarding his compensation with Ms. MacInnis. My notes do show that they asked questions. And he testified as to those things.

MR. LEVY: In their own case-in-chief, they presented evidence about Mr. Patrick's compensation. And to quote from, this is Cates v. Sears, Roebuck & Co., 928 F.2d 679 (5th Cir.

1991), "Rebuttal must be kept in perspective. It is not to be used as a continuation of the case-in-chief."

Dugaboy presented evidence about Mr. Patrick's compensation in their case-in-chief. They had ample opportunity to do this last week. This is just a continuation and not proper rebuttal.

THE COURT: I'm going to overrule the objection. We have a situation where we had a witness that was called for both the case-in-chief as well as yours. So go ahead.

MS. STOLLEY: Thank you, Your Honor.

BY MS. STOLLEY:

Q Ms. MacInnis, I believe I asked if you had reviewed the Mercer Report as part of your investigation in your role as JOL.

A Yes, I did.

Q Can you briefly describe for us what is the Mercer Report?

A It was a report that Mark Patrick had contracted to be prepared to support his compensation and his compensation for back pay and bonus.

Q And his compensation in respect of the Charitable DAF Fund structure?

A DAF structure, yes.

Q And you gave us the context in which Mr. Patrick raised the Mercer Report, correct?

A Yes, he -- it was raised in the context of supporting,

defending the position of the compensation paid to him from that structure.

Q And you said that you've reviewed the Mercer Report. So in your view, did the report validate the level of compensation that Mr. Patrick has been paid for his work relating to the DAF Entities?

A No.

Q Can you explain for us how so?

A The report didn't take account of the skills and qualifications of Mr. Patrick and the fact that he didn't have investment management experience and that his sole qualification around investment management was his previous experience in relation to the control figure for the DAF structure.

It also sought to compare the Charitable DAF structure to a private equity fund that managed assets between $400 million and $1 billion. The Charitable DAF structure really only held cash, cash equivalents and some other kind of real estate investments. It wasn't a private equity fund managing multi-portfolio investments.

And the report also cited six interviews it had with people who were supporting the level of compensation or the work that Mr. Patrick was doing. Those individuals, at least five of the six, were service providers or paid, either worked for Mr. Patrick in the structure or were paid to provide

reports or services to the structure.

Q Are you able to name any of those individuals?

A I recall there was Steven Hastings from ValueScope. So that was the entity that provided the valuation to the structure. Shawn Raver, who was a control officer within the corporate structure. I know he's in the DFW structure as well as has roles in the DAF structure. Paul Murphy, who was a co-director of Charitable DAF Holdco. Jim Shields for Shields Law provided the work plan that was used to carry out the restructuring.

Q You mentioned Steve Hastings and the ValueScope and evaluation. Which evaluation was that? The date?

A Well, they provided -- ValueScope provided more than one, I recall, but it was the March, March 30, 2025. If I got that date right.

MR. LEVY: We object again based on scope. Highland did not adduce any evidence about evaluation.

THE COURT: Ms. Stolley, response?

MS. STOLLEY: This is not about the valuation. This is about the individuals, the five or six individuals who are related in some way to Mr. Patrick, who provided summary interviews as part of this Mercer Report, that Mr. Patrick held up as the basis for his compensation levels.

THE COURT: Okay. I'm going to again overrule the objection. But I'm going to direct the parties to keep this

moving in the right direction. Let's not got afield, please.

MS. STOLLEY: Sure.

BY MS. STOLLEY:

Q Ms. MacInnis, what was the -- the report was dated when? You said that he commissioned it in this context. But what was the time period covered?

A Well, I think it looked -- it looked back. I think there was some debate about the report. But I seem to recall it was looking back as to the period from when he was appointed the control figure from 2021 through to, I think the report was around the last quarter of 2024. October, I seem to recall.

Q And as part of your review of the Mercer Report, did you do any sort of comparison about his compensation versus his immediate predecessor?

A Yes, we looked, we looked into previously that before, before Mark was appointed, the person in that role was earning $60,000 a year. And Mark's compensation following, I think within two weeks of receiving that report, was increased substantially. In 2024, he was paid $10.5 million.

Q Now --

MR. LEVY: Your Honor, we object again based on scope, particularly in respect that there's now an extended amount of testimony regarding a document that's not in evidence.

THE COURT: Okay.

MS. STOLLEY: I'm moving on, Your Honor, if that makes a difference.

THE COURT: Yeah, I'm trying -- you all are objecting to the or are seeking for this Court to reconsider the order approving the settlement. What does Mr. Patrick's compensation have to do with any of that? So let's move on.

MS. STOLLEY: Sure.

BY MS. STOLLEY:

Q Ms. MacInnis, Mr. Patrick testified about how many law firms he engaged for the DAF Entities. And he testified, quote, closer to a dozen than half a dozen. Do you remember that testimony?

A Yes.

Q And is that accurate?

A No.

Q How do you know?

A We received, from the books and records, we received, I understand, in 2025, based on our review, there were more, there were 31 law firms retained in connection with the DAF structure.

Q Mr. Patrick testified that he, as general partner, owns and controls all of the DAF assets, meaning the $270 million of assets. Do you --

MR. LEVY: Objection, misstates prior testimony.

MS. STOLLEY: Do you agree with Mr. --

THE COURT: Let's let her finish the question and then you can stand up and --

BY MS. STOLLEY:

Q Do you agree with Mr. Patrick's characterization?

THE COURT: Okay.

MR. LEVY: And we object that it misstates Mr. Patrick's testimony.

THE COURT: Response?

MS. STOLLEY: I'm sorry, Your Honor?

THE COURT: Do you have a response?

MS. STOLLEY: I can cite the transcript. It's Page 54. Actually, it starts probably at Page 53, Line 25, and goes through 54, Line 9, where he states, "So you own all the assets of the DAF, the $270 million?"

"I do not own those assets, the general partner does." Question --

THE COURT: Okay, I'm going to sustain the objection.

MR. LEVY: Thank you, Your Honor.

BY MS. STOLLEY:

Q Ms. MacInnis, is it correct to say that the general partner owns the assets or the benefits of the assets for itself?

A No.

MR. LEVY: Objection again to scope. The portion of the transcript we're referring to is Mr. Patrick's direct

testimony.

THE COURT: Okay. Mr. Levy, I hear your objection. I understand you both, we agreed that the parties would basically do cross and direct at the same time because you both designated Mr. Patrick as witnesses. Okay, so you've put the Court in a situation where we're now asking you to parse out whether it's cross or direct. And it's just because they went first, they got to ask that question first.

I don't know how -- let me just put it this way. Objection's overruled.

MR. LEVY: Understood.

THE COURT: I believe she answered, but.

MS. STOLLEY: I believe she did, too.

BY MS. STOLLEY:

Q By control, does the GP have the authority to manage and direct the partnership's assets?

A Yes.

Q When the general partner exercises control over the partnership's assets, does it do so for its own benefit?

A No.

Q Why not?

A It is controlling the assets in the structure in the company for the benefit of the economic stakeholders and the limited partners, in this case, in the partnership.

Q So how would you accurately describe the general partner's

role with respect to the assets, here the $270 million?

A The general partner is the steward. They hold the voting shares and the management control of assets, which is -- and it's held in a fiduciary capacity to act in the best interest of the economic stakeholders, which are the limited partners in the partnership.

Q And who owns those assets?

A The economic interest in the assets belongs to the limited partners.

Q Now, Mr. Patrick testified that the supporting organizations are "discretionary economic beneficiaries." Do you agree with that characterization?

A No.

Q Why not?

A Placing discretionary in front of economic beneficiary seems to suggest there's some flexibility. The economic interest in the structure is clear. It sits with the limited partners. The discretionary piece, I believe he's probably referring to distributions. And certainly, as a general partner, you would have some discretion over the quantum and timing of distributions or dividends being paid out of the structure.

Q But would there be discretion as to who received those dividends?

A No. The discretion doesn't -- the discretion, again,

would be largely over timing and amounts of what's going to be paid. It's not -- the to whom is the economic interest and stakeholders in the structure.

So, Charitable DAF Holdco is the limited partner in Charitable DAF LP, and Charitable DAF Holdco is entitled to the economic benefit out of Charitable DAF LP. And the discretion would come from how Holdco would take that economic interest and distribute it or dividend it to its economic stakeholders, the four Highland Foundation supporting organizations.

MS. STOLLEY: Okay. Just a moment, Your Honor, please.

THE COURT: Okay.

(Pause)

MS. STOLLEY: Nothing further. Thank you very much, Ms. MacInnis.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good afternoon, ma'am. Can you hear me okay?

A Good afternoon. I can.

MR. MORRIS: Can I ask my colleague to please put up on the screen Exhibit 72?

BY MR. MORRIS:

Q And while she does that, I just want to confirm that you answered a number of questions just now pertaining to something called the Mercer Report. Do I have that right?

A Yes.
Q And the Mercer Report was a report that was commissioned by Mr. Patrick to address certain compensation issues, correct?
A Yes.
Q And you believe the Mercer Report did not support Mr. Patrick's compensation. Is that right?
A Yes.
Q Okay. Do you recall in February the Cayman Court issued a decision?
A Are you referring to the ruling on the injunction?
Q Yes.
A Yes.
MR. MORRIS: Can we go to Paragraph 206, please?
BY MR. MORRIS:
Q Can you read? Do you see Paragraph 206, ma'am?
A Someone will have to make it bigger because it's very small on my screen.
Q Sure.
Perfect. Is that better?
A Yeah. I think I can manage.
Q Can you read Paragraph 206 into the record, please?
A 206?
Q Yep.
A "Having reviewed the affidavit evidence on this question, including the detailed report dated 26 August 2024 from Mercer,

the Court finds that there is no serious issue to be tried, that this remuneration was excessive and in breach of the duty to the company."

Q So you have your view and the Cayman Court came to its own conclusion, fair?

A The court at first instance came to its own conclusion and we've appealed that decision and the Court of Appeal has indicated that there is a serious issue to be tried on our statement of claim. This was the injunction hearing, not the merits of the statement of claim.

Q Okay. Can you go to Paragraph 193, please? Is it fair to say that the Cayman Trial Court also concluded that Holdco had only the right to be considered for discretionary distributions by the general partner?

A Can you repeat your question? Sorry, because I was reading. I was the paragraph.

Q Sure. You mentioned on questioning a few moments ago, you talked about the nature of discretionary interests. Do I have that right?

A She asked about discretionary economic beneficiary and I'm saying that discretionary isn't in relation to the economic beneficiary. The discretion is in relation to distributions.

Q Okay. So you agree and you don't dispute that that's what the Cayman Court found, correct?

A This is what the court at first instance found. Again,

I'm going to repeat that our statement of claim and all of the issues are live in Cayman and have not been determined.

Q Well, they were determined by the Trial Court, correct?

A No, the Trial Court determined an injunction, which isn't the same as the statement of claim and all of the issues underpinning the statement of claim. It was just whether or not assets should be injuncted from being used until we get to the point of arguing about the statement of claim in front of the Court.

Q And that's because the Cayman Court found that Holdco has no proprietary interest in any of the fund's assets, correct?

A That's what the court at first instance found. The Court of Appeal said very directly that that issue of proprietary interest is a seriously arguable issue because -- and it cited a Privy Counsel case called Ackpoint (phonetic) that says the opposite of what Justice Parker said.

Q Did you make Justice Parker aware of that case before he rendered his ruling?

MS. STOLLEY: Objection.

THE WITNESS: I believe it was cited in the --

THE COURT: Hold on one second.

THE WITNESS: -- at the injunction hearing.

THE COURT: Ms. MacInnis, hold on one second. We have an objection here. I understand you may not be able to hear it because of the microphones.

Basis for the objection?

MS. STOLLEY: I'm waiting to stand up. This is going farther and farther and farther (indiscernible).

THE COURT: You've asked her about the Mercer Report and his compensation. He's doing redirect. You asked her about discretionary distributions and I believe that's what this testimony is. So I'm going to overrule the objection.

BY MR. MORRIS:

Q And just the last couple of questions. Ma'am, you're not a lawyer, are you?

A No, I'm not a lawyer.

Q And you're not rendering any legal conclusions in your testimony today, correct?

A No, I'm not.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Okay. Any --

MS. STOLLEY: Nothing further, Your Honor.

THE COURT: Okay. Thank you very much, Ms. MacInnis.

THE WITNESS: Thank you.

(Witness excused)

THE COURT: Any further witnesses, Mr. Edney?

MR. EDNEY: No, Your Honor. That concludes our rebuttal case.

THE COURT: Okay. Mr. Morris, do you have anything in the way of surrebuttal?

MR. MORRIS: No, Your Honor.

THE COURT: Okay. All right. So, that goes to closing arguments. We're at 4:05. I understand what you would like to do. Are the parties in agreement to that? If you wouldn't mind either sharing the podium or getting closer to a microphone.

MR. MORRIS: Your Honor, it's 4:00. This is the third day of what was expected to be a one-day hearing. We are prepared to close. We would urge the Court to allow us to do that.

While I don't know that you have any control of it, we did mention, and I think the Court is aware, that there is a fully briefed appeal on the merits of the 9019 order. It would be our hope that if there's a decision rendered quickly here, the non-prevailing party -- I'd like to see if we can get it merged with the appeal so that you don't have two different judges overseeing many of the same facts. I don't know if Judge Kinkeade, before whom this appeal is pending, is even aware of what's happening here. I don't remember.

But we very much want to finish this already. We very much want this to be heard jointly with the pending appeal if that becomes necessary. And therefore, we're prepared to go forward.

THE COURT: Mr. Edney, are you not prepared to do a closing?

MR. EDNEY: Your Honor, we are. And we can.

THE COURT: Okay.

MR. EDNEY: If --

THE COURT: How long of a closing does each side mean? Because we can take a short recess for you all to have a moment to gather yourselves for the closing. But I'm going to actually put you on a time on these ones, okay, because we need to get this done. I mean, we start to shut down everything at this building at 5:00 p.m. And so, how long on the closing do you believe we need, Mr. Edney?

MR. EDNEY: Your Honor, I can finish within an hour.

THE COURT: Okay.

MR. EDNEY: But I understand we're up against it. I mean, I can work with the Court's schedule. I am expecting to be --

THE COURT: We can go longer --

MR. EDNEY: -- somewhere else tomorrow.

THE COURT: We can go longer than 5, like we did the first day. What I'm getting at is how long do you believe you're going to need?

MR. EDNEY: One hour, Your Honor.

THE COURT: Okay. Mr. Morris?

MR. MORRIS: Your Honor, respectfully, I would like an hour, too. But I am prepared to do this in 45 minutes if we could take a break until 4:30. Each side has 45 minutes.

We're out of here at 6:00.

THE COURT: Okay. I'm going to give each side an hour but I'm going to only give you an hour. That's an hour for everything. So, any reply you have to their closing, you've got an hour. So, we'll take a recess. We'll be in recess until 4:30. We'll come back out at 4:30, and we'll commence closing arguments.

MR. MORRIS: Thank you very much, Your Honor.

THE CLERK: All rise.

(Recess at 4:08 p.m., recommencing at 4:31 p.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

All right, Mr. Edney, if you would like to proceed.

MR. EDNEY: Thank you, Your Honor.

Your Honor, this case in our 60(b) motion is about the misconduct, and I'm sad to say theft, of Mark Patrick. We believe that is now plain, and it has become plain from the documentation and evidence from the Cayman Islands liquidation proceedings. From that new intervening evidence, it is clear that and how Mr. Patrick took both Hunter Mountain and $270 million in other assets from their charitable owners, long established in doing good in the community.

Your Honor, and this is one of the reasons we're here, he also took from Mr. Dondero his longstanding say in where those charitable funds would be used. And for a long

time, Your Honor, they were used for a great good. They were used to help veterans coming off through the war on terror, injured, need of help. They were used for the Bush Center in Dallas. They were used for Cristo Rey High School. But that ability to do good that Mr. Dondero gave his life work to has been taken away by Mr. Patrick.

This theft and misconduct, Your Honor, is not adjacent to this bankruptcy or to the 9019 settlement that was previously approved by Your Honor's predecessor. It has everything to do with it. The Hunter Mountain Investment Trust Agreement automatically disqualifies those who have so gravely breached fiduciary duties, and not just in that role, though they were breached there, but in any capacity.

Also, had the misconduct not been concealed, courts would have enjoined Patrick from acting as he did through the settlement. They would have enjoined him from alienating such a significant asset. And we'll see that in the injunctions and orders that follow the months after the evidence in the Cayman proceedings started coming to light.

And most importantly, Mr. Patrick moved Hunter Mountain on February 12, 2025, from one entity that he was dealing with to another. But most importantly, he moved it into the new Charitable DAF structure he created. The restructuring, the restructuring that we've been complaining about, the restructuring that we allege is misconduct, was the

destination for the Hunter Mountain asset, and it was the location of it. At the time, Mr. Patrick entered into the 9019 settlement.

And, Your Honor, when he took from the Charitable DAF assets, he took the Charitable DAF assets from the Dallas Foundation and others on March 27th, he took Hunter Mountain from the Dallas Foundation for a second time. On February 12th, when he sold it away from the structure it had previously been in and with Dallas Foundation at the top, that was the first time. The second time was when he redeemed the interest of both the Dallas Foundation and all the other three historic charitable organizations from the DAF assets -- $270 million in assets plus Hunter Mountain -- for $1.6 million. We don't think that was with justification.

Your Honor, prior to the 9019 settlement, there were indications that there had been some movement, that new entities had been created. But the full details of this restructuring were not clear until the Cayman Liquidators were able to step into the shoes of the DAF Entities and obtain the documents of exactly how and where it happened. They also saw, the liquidators did, that there was no justification for it.

That it was the product of a series of opinion shopping from accounting organizations to accomplish this move of $270 million for just $1.6 million. They saw that the traditional charitable organizations had been completely

divorced from both the Hunter Mountain asset and the traditional $270 million Charitable DAF asset. That wasn't apparent at all prior to the 9019 hearing. It was apparent when the Cayman Liquidators laid it out.

They saw the reason why this was happening. The reason why it was happening was to avoid scrutiny into a gigantic pay package that resulted in pay to Mr. Patrick of $10-1/2 million in 2024 alone, $18 million over a course of two years between him and his co-director. We saw from that new evidence that the new economic beneficiary of this structure was not a legitimate organization, but it was a charity that was started just months earlier and run from the basement of Mr. Patrick.

And we saw that that charity has given away in its existence less than $1 million, while nearly 20 times that much has been given out to the people who run this new structure. None of that was available. It took the liquidators to come in after the 9019 settlement and to find it, and they did.

So in our view, Your Honor, this Court has multiple tools to address this issue. The misconduct of Mr. Patrick made his lack of authority opaque coming into the 9019 hearing, and that is a classic application of Rule 60(b)(3). The mechanisms, the details, the lack of justification for the improper reorganization was only worn out through the Cayman Liquidation, and it is the epitome of newly-discovered evidence

triggering an appropriate vacatur under Rule 60(b)(2).

And, Your Honor, this Court has its own equitable powers to reverse what appears to have been the result of inequitable conduct. Bankruptcy courts are a court of equity, and Mr. Patrick coming to this Court did not come in the spirit of equity.

Your Honor, I was surprised by some things that happened during our three days here, but I was particularly struck that the Highland lawyers were the ones standing up and defending Mr. Patrick's conduct, that were eliciting testimony from him saying that what happened here wasn't so bad. I mean, I expected Highland's counsel to stand up and say, look, folks should have learned about this earlier, maybe they should have done this or done that, okay. But we got a lot of defense from the Highland folks about maybe this restructuring was appropriate.

I don't think that that's a terribly colorable argument, but I'm also disturbed that it's coming from an entity, from a group of individuals who have been appointed by the bankruptcy court to properly administer the bankruptcy process, to step in the shoes of equity and run this entity while it's under bankruptcy. And it raises questions that we should consider going forward.

So I have a slide deck to guide this discussion, Your Honor, and I want to begin it now with Slide 4 of that. With

Your Honor's permission, we'll file this as a memorialization of some of the things that I've said as a demonstrative. And we can address that at the end.

MR. EDNEY: All right, so we're at Slide 4, and I just want to -- it took me some time to figure out how exactly this reorganization was accomplished, and I understand that Your Honor has had a fraction of the time I have had to figure it out. And I wanted to walk the Court through our view of it.

Slide 4 --

THE COURT: Ms. Young, you're still -- you're unmuted.

MS. YOUNG: Is it now?

THE COURT: Okay, thank you.

Go ahead, Mr. Edney.

MR. EDNEY: I mean, the stuff I say is not particularly good the first time, but the echo is even worse.

So on Slide 4, we have the DAF structure as it was. And through Mr. Dondero's management of the assets, and he did for a long time, this charitable corpus grew from a $35 million donation to $270 million in assets and had accomplished, even with that, distributions of more than $55 million to charity. At the top were the economic beneficiaries, the charitable organizations, the Dallas Foundation, the Greater Kansas City Foundation, the Santa Barbara Foundation, the Community Foundation of North Texas. In the case of the Dallas

Foundation, it had been an entity that was around for more than 100 years.

If we go to Slide 5, we see that the plan to reorganize these entities begins early. And this is Exhibit 7, the Shield Group Work Plan from November 2023. It lays out essentially the questions that led to what happened, an effort to dilute the existing charities and to potentially bring in new ones. This was a work plan that would not have been available to anybody but for the liquidators being able to step into the shoes of the entities in the Cayman Islands.

It continued, as we see in Slide 6, with the creation of a new general partner. And Slide 7 is Exhibit 169. In Exhibit 169, we have the beginning of the implementation of the plan in February 2024. I think this is an important document. Again, this was one only that the Cayman Liquidators were able to obtain standing in the shoes of the Cayman entities.

But this was not a process that Mr. Patrick wanted to be transparent to the outside world, easy to figure out by just sorting through a couple of corporate documents down at the Secretary of State's office. He was looking, when he was creating these new entities, for ones that were hard to find or track or trace, for generic names, something that wouldn't set off a flag.

And I want the Court to keep this email in mind when we hear from Opposing Counsel and when he argues that maybe

this should have been snuffed out earlier. The trail of breadcrumbs here, Your Honor, was intentionally small. And what we saw from the Caymans reveals that. Exhibit 169 is important.

And it resulted in the creation of a new general partner. And we see this at Slide 8. The entity that was hard to track or trace, the entity with the generic name, was CDH GP Ltd. And it was inserted into the existing structure, subbed out for the previous one, which was very easy to find. It was the Charitable DAF general partner. This was not.

Moving on to Slide 9, we have the next step. It was the creation of the DFW Charitable Foundation. This would eventually be the substitute for the $270 million-plus in assets held by the traditional charities. And it's not a traditional charity by any stretch. It doesn't have a track record. It was invented in 2024. It was run out of Mr. Patrick's house. It has almost no known activities. And we heard evidence in this case that it has given away less than a million dollars, well, many multiples of that, to the people that now run the DAF complex.

The next step was at Slide 10. Patrick formed an alphabet soup entity. This is the one that we've all been stumbling over during the course of this case, CDMCFAD, LLC. And he inserted it into the DAF structure. He then added his home-operated charity, as we see in Slide 11, as a member of

multiple of these organizations, including the Charitable DAF Holdco Limited. This is where the traditional charities held their interest. They had all of it. Now they had less than half of it. They were diluted. All the while, Mr. Patrick didn't inform the charities of any of this.

He then engages in the process of exiting Charitable DAF Holdco entirely from the process. He assigns their interest. He assigns their interest in the main corpus of the assets to this new entity, CDMCFAD, LLC. And then he takes actions to redeem those interests for $1.6 million. This is an interest in more than $270 million in assets.

Your Honor, this was not an obvious conclusion, to say the least. He knew he needed some support for it. And what we learned from the liquidators is that that support was not particularly easy to find. He had to go opinion shopping. And if you ask the former Assistant U.S. Attorneys, if you ask the FBI who investigates fraud, this is a common occurrence. You need to find somebody who provides you with the right answer.

So we saw in Exhibit 191, and this was put on by Ms. MacInnis, that he went looking to the PricewaterhouseCoopers accounting firm. And then in Exhibit 197, he went looking to FTI Consulting. Both said that they couldn't support what he's trying to do. He then came back to the vendor that had been working for the DAF structure in the

past, and that was ValueScope.

The ValueScope documentation, not available before the Cayman Islands liquidators came into place. And they, in March 25, 2025, came up with a theory, a theory that these four organizations that had been carrying on their books, as we saw earlier today, $270 million worth of assets, what they really had was something worth $1,637,000 and some change. And as a result of that, he redeemed their interest for that amount.

Of course, as we saw in Exhibit 11, and this is at Slide 15, that was ValueScope's opinion all along. Just a few months earlier, in September 2024, they carried this interest at nearly $270 million. That's what was being taken away.

So by the time it was all over with, we were left with Slide 16. Charitable DAF Holdco, which had been redeemed out of this Alphabet Soup entity, CDM and its Alphabet Brothers, had nothing but $1.61 million in cash. And CDMCFAD, LLC now had the exclusive interest in the Charitable DAF Fund. We see that at Slide 17. And its sole economic beneficiary were not the ones that Mr. Dondero selected, were not the ones that allowed them to have a say where the charitable assets went, but they were instead the DFW Charitable Foundation solely, solely run out of Mr. Patrick's house and not one particularly inclined towards giving away assets to charity, now less than a million dollars.

All of this, Your Honor, all of this was without

notifying the charities that were affected, the four traditional ones who had been counting on this $270 million availability at some point, who had been counting on Mr. Dondero working with them to select the most noble causes without ever notifying them. They had been given notice of the prior value scope valuations back in 2024, but not this one on March 25th, 2025. They were given no notice of the creation of this new general partner. And that was intentional because it was created in a way that was hard to track or trace.

The dilution of their interest with the DFW Charitable creation, they were not notified of that. They were not notified of CDMCFAD having that interest transferred to them. They were not notified of the redemption of their interest for $1.6 million and $270 million in assets.

And we asked Mr. Patrick about this, and he said his lawyers told him not to do it. But he conceded on cross-examination that he chose not to tell them. And that was a process that continued through the 9019 hearing.

Your Honor, his deposition transcript was in the record. Mr. Patrick was the architect of this restructuring, and when he was asked questions to where Hunter Mountain had been moved, whether it had been moved into this emerging new DAF structure, he couldn't remember. That deposition happened three days before the hearing, and nobody made finding this out easy. It took the Cayman Liquidators coming in to figure this

out.

If we go to the next slide. Again, all of this had a purpose, and we talked a bit earlier about the compensation. And I found the compensation to be eye-popping. I think Nick Saban would find the compensation to be eye-popping. Division I college football coach would find the compensation to be eye-popping. But we know that it's not the way this has generally been compensated.

The compensation for running the DAF in the past had been measured in the tens of thousands. Compensation for running the DAF upon striking out on this reconstruction on this reorganization was measured in the eight figures. And again, that was nearly 20 times what the new charitable entity gave away.

Again, I said this is about Hunter Mountain, right? We have to lay the foundation for this to get to what happened for Hunter Mountain, and that takes us to Slide 20.

All right. So as we see in Slide 20, Hunter Mountain was civilly organized to fund charitable work. Mr. Dondero and his partner, Mr. Okada, transferred their ownership in Highland Capital Management to Hunter Mountain for a charitable purpose. They wanted to have that Dallas Foundation that they trusted, that they were working with, to do good in the community at the top. They knew, and they had some confidence, this was only back in 2015, that Highland Capital Management would do well.

And Mr. Dondero wanted a legacy that would out-survive him, that would do well in the community. And that's the structure that he created.

Now, we see that in the slide that's referenced there. This is Exhibit 242 at Slide 12. There's been a lot of discussion today, well, geez, does the Dallas Foundation really own it? There's no question that the structure is complicated, Your Honor, but the undisputed facts are that this was for the benefit of the Dallas Foundation. They put this insurance company in the middle of it, and there are complicated reasons for that.

But at the end of the day, if Hunter Mountain did well, if Highland Capital Management did well, that equity stake, Mr. Dondero could have kept it, but he made sure that the Dallas Foundation would be the one that would benefit from it. Well, that's not the way it went after Mr. Patrick's restructuring activities. And if we can go to the next slide.

Now, Mr. Patrick used his position at Rand Advisors to have Atlas IDF sell -- I'm sorry, to have Rand PE Fund I, LP sell its position in Hunter Mountain on February 12th for a million dollars, and we see that documentation at Dugaboy Exhibit 15, which is reflected on Slide 22. He, in those documents, he affirmed that he received all the consents that he needed to pull off the sale, but it ended up being, as we see on Slide 24, to an entity that he also said he controlled,

from one entity he controlled to another entity that he controlled.

And I think you're going to hear in terms of authority, well, that's great, because by the time he sold it off, he was sending it to another entity he controlled, and he had authority to settle this case there, and he had the authority to settle this case before, and we should not worry about it any further. But he did it, Your Honor, as a registered investment advisor. That's the evidence that came out under cross-examination of Mr. Patrick.

And, you know, that's not a role where you just get to make any decision that you want. What the law says there, and this is in Title 15, is that you cannot transfer an interest in any asset to a commonly controlled entity unless you notify all the investors and you get their consent. This isn't optional. You can't work around it in the fund documents. It's a part of the securities laws, and that didn't happen here.

Mr. Patrick, if we can go back, please, to Slide 20. Mr. Patrick didn't seek the consent of anybody, much less the investors in the Rand PE Fund, when he made this sale. He just didn't. And that's not appropriate. If you want to trade an asset to a commonly controlled entity, the securities laws say you need to be completely above board, cards up with consents and fully informed information to the advisors.

Let's go to Slide 26. The argument that, well, I told myself, right? That's already been dealt with. That's been dealt with in the SEC decision, the Paradigm case that is cited in these papers. At the end of the day, we see at Slide 27 that this consent was needed. It was needed at the Dolomiti level, which is an entity associated with Dugaboy. It wasn't obtained. It was needed from Crown Global. You heard on cross-examination that he didn't obtain that either, other than telling them that he was going to liquidate the entity.

Let's go on to Slide 28. So I think a lot of what we heard during this presentation is, you know, Mr. Edney, you keep talking about the DAF. What does that have to do with Hunter Mountain? Mr. Patrick made the DAF very relevant to Hunter Mountain because before he settled this case in May of 2025, he sold Hunter Mountain and the Highland Capital interest into his new DAF structure, the one he created, the one that we believe he fraudulently and improperly created.

And you can see that in Slide 28. Where this ends up is at that company's CLO Holdco. And underneath that today is the Hunter Mountain Investment Trust. This is the same DAF structure that he moved the charities out of. And keep in mind, Your Honor, this transfer happened on February 12th, this purported sale for a million dollars. On February 12th, it was beginning to change, but the Dallas Foundation, the Kansas City Foundation, the Santa Barbara Foundation, they still had a

stake. They still had a stake in this DAF structure. That ended on March 27th.

So again, he took Hunter Mountain from the Dallas Foundation twice and ultimately left it with the charity run from his home that gives away less than a million dollars to charitable causes. Your Honor, in this way, bringing Hunter Mountain and the DAF structure connects Mr. Patrick's misconduct with respect to the DAF to the 9019 settlement. By the time he arrived at the Court in May of 2025, he was coming to the Court with a series of unclean hands.

So, then we have Mr. Patrick's justifications for what happened here. And we heard this term, "discretionary charitable beneficiaries." I can swap them out at any time. That's not a term that we see in the foundational documents of the DAF. That we saw in Exhibit 5. It was supposed to be run for the benefit of the indirect charitable owners.

And you saw testimony from Mr. Patrick. You saw testimony from others that the indirect charitable owners were those four entities. This restructuring was not to their benefit. He says that Mr. Dondero's involvement with those charities was creating a risk to their tax-exempt status. Taking a quarter billion dollars away from those charities is an awfully severe way to deal with some incremental tax consequences.

And in Slide 34, it ignores, that argument ignores

the long course of activity for Mr. Dondero and Ms. Bannon in determining the ultimate destination for charitable gifts. Up until 2025, they decided where this went. They consulted with the traditional charities, but they worked together to find a meritorious home for these assets. And that was never a problem. Mr. Patrick never said anything about it, but now he uses it as a justification to work this out.

We heard about the cocktail napkin. The cocktail napkin Mr. Patrick says that he doesn't have, that Mr. Dondero says never happened, that isn't accompanied by any detail. And then the question is, let's just say Mr. Patrick had some grievances and thought things should change. What should he have done? Should he have taken it to the charities and said, look, things have got to change here or else we're going to have to do something pretty drastic? If he thought what was going on was inconsistent with his view of the world, should he have resigned and handed it over to Wilmington Trust or somebody to take the mantle from there?

He had all of those options, but instead what he did was to restructure it away from those charities and to pay himself many multiples of what he was giving away. That is not appropriate. That is not justifiable.

You also heard a series of evidence that Mr. Patrick owns the general partner and he can do what he wants. But the foundational documents, and you can see this in Exhibit 6,

separates the management shares to the general partner from the economic interests of the company.

So we come back to the question of why does this misconduct matter here in this bankruptcy? And one of the reasons it matters is because of the Hunter Mountain Investment Trust Agreement. That investment trust agreement has sensible, automatic provisions to remove an administrator who is engaged in misconduct or breaches of fiduciary duties. It's like Monopoly. It's do not pass go, do not collect $200. You start breaching your fiduciary duties, you're out. And it's not just with respect to the Hunter Mountain Investment Trust capacity. It's in any capacity.

This makes complete sense. The old phrase is, "To whom much is given, from whom much is expected." And the foundational documents of the Hunter Mountain Investment Trust said, if you're going to have this kind of authority over these assets, you have to keep your nose clean. Not just with regard to these assets, but with regard to anywhere else.

So, Your Honor, the misconduct that happened to the DAF, even if it weren't related to Hunter Mountain, it would be disqualifying with respect to his authority over Hunter Mountain. And we respectfully submit that the evidence that came out of the Cayman Islands proceedings showed that those disqualifying actions, those transgressions happened before Mr. Patrick came to the Court in May of 2025 to go through

this. And those terms are laid out at Slide 42, the Honis trigger event, the effect of transgressing one of those being the removal of the administrator.

So, we see these terms at Slides 42 and 43. And we heard some explanations from Mr. Patrick. He says, well, that clause doesn't apply to a successor administrator. And he says, my name's not John Honis, so it doesn't apply to me. I think that's going to be hard to square with Paragraph 17 of Exhibit 1. This is the Hunter Mountain trust agreement that makes clear that all the terms that applied to the original one would bind a successor.

We also heard from Mr. Patrick that it doesn't really matter because there would be this unvirtuous cycle where he would use his position at Beacon Mountain to reappoint himself if he were removed for misconduct. I mean that can't possibly be the case. That's not equity, and that's not what this document was designed to accomplish.

It is a real question about once he has committed breaches of fiduciary duty anywhere, whether he could walk into court in May of 2025 and say that he properly represented the Hunter Mountain Investment Trust. Your Honor, not only that, but we saw the evidence. We saw Exhibit 116. We saw the efforts to make this restructuring harder to find that gave him time without all of it being found out.

And we respectfully submit that had the details of

his restructuring been known earlier, had they been done in a transparent way, had they not been covered up after, the owners of Hunter Mountain and the owners of the DAF that was over Hunter Mountain by the time it got to the Court would have had the ability to go into various courts of jurisdiction and find a way to stop it. This is not speculation because we know that that is what happened in the Texas Business Court, and you can see that at Slide 49.

The Texas Business Court put a ground stop on major transactions as represented by the settlement agreement. Had that arrangement been put in place just a month or two earlier, this settlement agreement would not have gone off the ground. And at Slides 49, 50, and 51, we excerpt the portions of that arrangement that make it very clear that it would cover this settlement. It affects the relevant entities.

The same thing happened in the Cayman Islands. The Cayman Islands placed a stop on numerous entities that by the time this injunction had been put in place, by the time Mr. Patrick had come to the Court, they were the entities effectively making the decision about whether there should be a disposition of any serious assets. And you can see at Slides 53 and 54 that that injunction would have stopped at two.

So we have it on two grounds at least, right? His conduct is disqualifying of the Hunter Mountain Investment Trust Agreement. His conduct, had it not been concealed, had

it not been obfuscated, would have led to more rapid injunctions that would have stopped this, and he would have had to seek permission from a steward of this, a court supervising these entities, to enter into the settlement agreement.

And, Your Honor, again, I do want the Court to focus on Mr. Patrick's testimony about his decision not to inform people of each of these successive steps, which were monumental for charities. That was a decision to keep this quiet. His decision to structure the entities in the nondescript way that he did was a decision to keep it quiet. And we now know through the Cayman Islands proceedings that that was not an accident or not unintentional.

Your Honor, turning to Slide 60, you know, this matters here, right? Somebody seeking approval in the 9019 settlement has to come to the Court in good faith. It cannot, it has to be the product of arm's-length bargaining, and it cannot be the product of fraud and collusion. And that's not just between the parties of the settlement. We have to know that somebody is coming to the Court, dealing in good faith, on behalf of the entities to whom they're responsible.

And for that reason, Mr. Seery on the stand told you that he was eager to find out the authority of Mr. Patrick to act on behalf of these entities. We think his examination did not go far enough. We think it had a consequence for the settlement, and I will say this. That's laid out in Slide 62

and 63. I need to give you a sense, Your Honor, of what we're looking for here.

I think Your Honor was right earlier in ruling on an evidentiary objection. I think Your Honor is always right, but in particular, something sunk in with me. This is not about rethinking the terms of the settlement, and I don't think it is. I think our argument here is that we, that Mr. Dondero as donor, that the charities as beneficiaries, that those are trying to do good, and that includes Mr. Dondero. I mean, he has an interest in making sure that his life's work doesn't go to waste or to an improper destination.

We are looking for assurance that somebody that was acting in a manner consistent with his fiduciary duties to the charities, in a manner consistent with his fiduciary duties to the charitable mission, was making the decision to enter into the settlement. And perhaps when that person arrives, you know, Mr. Morris and the Highland team will reach a settlement with them, and perhaps it will have some of the terms that are in this settlement, and perhaps it will have different ones.

But I think the key is the person that was supposed to show up in court in May of 2025 was somebody acting with fidelity to the economic beneficiaries, and the person who did was acting for his own interests and had already breached those duties in a way that removed him from this responsibility. And, Your Honor, it wasn't manifest or easy to find.

If you just look at the 9019 proceedings, and you see this at Paragraph 63, the signatories to the settlement were that same stack of entities. And you can see that at Slide 65, that same stack of entities that used to own Hunter Mountain, but after February 12th, didn't anymore. It was in the DAF, and we didn't see those DAF Entities. That would have been quite the red flag indeed.

It might have been curious when I was questioning Mr. Seery about what he said at that 9019 hearing. He said he wanted to assure himself of Mr. Patrick's authority, and one of the things he did was to review the organizational documents of the entities that owned Hunter Mountain. And I went through all those, and they were the Rand Entities, the Atlas Entities, Beacon Mountain, Crown Global.

Your Honor, you see on -- and I would encourage the Court to look at that list. It's Exhibits 70 through 104 of what has now become Exhibit 300. This is the amended exhibit list of Highland Capital Management. Those entities are the ones in the historical structure. I mean, even Mr. Seery didn't go out and see what had changed. Maybe he didn't know it. We certainly didn't know the full aspects of it.

But intentional or not, that was an indication that this was all kind of business as usual, that there hadn't been this dramatic reorganization, that if you wanted to look at who was in the ownership stack, look at Exhibits 70 through 104.

That was on the record in the 9019 hearing. But that stack of entities was irrelevant by the time we got to that point.

And Mr. Seery said, what has everybody worked up about? This is a structure that had been in place for a long time. As it turns out, it really hadn't. This was the new DAF 2.0, the new structure that was for Mr. Patrick's benefit that he had stood up.

Your Honor, I am going to reserve a bit of time for rebuttal. But I have a sense of what's coming, and I want to say something about it. There is a timeline here. And there were indications that Hunter Mountain had been sold to an undisclosed buyer. There were dribs and drabs of new corporate entities being stood up.

But the full details of this restructuring was really only laid out for the first time in the Joint Liquidators' statement of claim. That was on July 15, 2025. We think that's outside the relevant window. But even if it weren't, that goes for the Texas Business Court, too. As far as we were concerned at Dugaboy, those were just allegations. Those were just allegations. And they weren't evidence. They never are. And I think that's what we would have heard if we came running to Court with that.

What we did do when those allegations came out on July 15 is that we did come to the Court. And we asked the Court to stay these proceedings, to stay the approval order so,

if evidence came out from that process, it could be considered. The Court declined that.

And turning to Slide 71, I think this is the natural outgrowth of that process. I mean, those documents were just allegations. And perhaps there was no evidence behind them. But as the summer wore on, the documentation underneath that became bare. It was revealed to the public in some form. And then the internal documents, the ones that showed the deception and the lack of justification, the opinion shopping, and the compensation motive, those came out in successive affidavits of Ms. MacInnis filed in the Cayman Courts.

You heard from her that they were confidential and not able to be accessed for most mere mortals, even when they came out. But as they were filed, it was in the fall and the winter of 2025. The full picture, the evidentiary pictures that the Cayman Liquidators were able to pull together was only privy to us by December of 2025. And we acted promptly thereafter.

So Judge Jernigan denied the stay. And at Slide 71, she denied the stay, we're at the bottom of the box. And if evidence of Mr. Patrick's misconduct backing up those allegations that were in the statement of claim were revealed, we think the Rule 60(b) motion is the natural outgrowth of that. If the allegations in the statement of claim were just a giant dud, you know, there wouldn't be any filing, right? We

wouldn't have the evidence.

Rule 60 calls for evidence. It doesn't call for suspicion. It doesn't call for allegations. It calls for things that we can prove. And today, with the benefit of the joint liquidator asset -- the joint liquidator documentation, it is something that we can prove.

Your Honor, with that, I'm going to reserve the remainder of my time to rebut Opposing Counsel. But I appreciate it --

THE COURT: Before you sit down, I have a couple questions for you.

MR. EDNEY: Of course, Your Honor.

THE COURT: My first question is, if the Court grants the motion and reconsiders or vacates the order, how does that change the restructuring of the DAF Entities? What effect does that have on the restructuring of the DAF Entities?

MR. EDNEY: It does not.

THE COURT: Okay. So my understanding of what happens if the Court vacates the order approving the settlement is that potentially the settlement is not approved. HMIT remains a party that holds litigation potentially against multiple Highland Entities or I'll call them players. They no longer have a claim that's fixed and in a class, as I understand it, to get paid. And we're basically back at that. But am I incorrect on that?

MR. EDNEY: No, I think you're absolutely correct, Your Honor.

THE COURT: Okay. So then here's my final question to you, and it will be to Mr. Morris, as well. But is this Court required to consider whether the settlement is good on behalf of the party that's not the Debtor? In other words, does this Court have to consider whether or not HMIT is a good settlement, or does it only have to consider whether or not the Debtor made a settlement that's in the best interest of the estate?

MR. EDNEY: Your Honor, it has to do the former to an extent. So by the former, I mean it does need to consider whether the settlement was in the best interest of the other settling party within a range, right? It has to do that because if Mr. Patrick was acting inequitably, he was coming to this Court not in good faith to engage in the settlement, but for his own interest, and this court of equity should not participate in that.

And now that the evidence has been laid bare of that, should vacate it. Beyond that, his conduct disqualifies him as having authority, right? This is conduct that occurred --

THE COURT: I understand the argument there that if the Court determines that or looks at the evidence and believes that the Honis provisions applied to Mr. Patrick and there's some sort of automatic trigger of him having authority, that's

one thing.

I'm asking the question of if this ends up being a bad settlement for HMIT, does the Court have to consider that in your analysis?

MR. EDNEY: Yeah, I think it does, Your Honor. I mean, look, I don't -- if I were coming here to Your Honor and saying, you know, this little part of the settlement over here, that's not great, that should come out differently, no, not at that level of granularity.

But when you have a person who's not acting at all in the interests of the entities that brought him here, the donor and the charities, when he's acting for his own interest in giving away their assets to the Debtor estate, so that's what the settlement does. We think it gave away too much, or at least we think that nobody was deciding what's in the best interest of the charities in terms of giving away too much. That's not something we can go recover from Mr. Patrick later, right?

And this is a court of equity. We need to make sure that, if by the time he got here, he was not acting in the best interest of the beneficiaries of the corporations that were before the Court, we need to unwind that so that somebody can make a decision in the best interest of those beneficiaries. And that's not something that can just be recovered by us taking it up with Mr. Patrick later, because he doesn't have

that money anymore.

What he has is the money he's been compensated. That's not particularly the issue here. He gave that money away to the Debtor estate, and this Court is administering the Debtor estate in an equitable manner. The right outcome is to bring that back and have an individual who's exercising his fiduciary duties make a decision with Highland if there's a potential settlement to be had or pursue rights otherwise.

THE COURT: Okay, but let me make sure I get your answer, because I think you've gone back on what I previously questioned you, which is if the settlement is -- if the settlement order approving settlement is vacated, that doesn't change, it doesn't affect the restructuring, it doesn't affect -- it doesn't somehow bring back the compensation issue that you've raised.

This Court is never going to decide whether or not what Mr. Patrick did as part of the restructuring was appropriate or not. Do you agree with that?

The ultimate decision of whether or not the restructuring was proper and whether or not those $270 million worth of assets should be put back into, and I'm going to get the entity wrong, but I believe it's Charitable DAF Holdco, Ltd., as opposed to the current DAF structure. This Court is never going to rule on that, because that's not Mr. Patrick, the DAF, Hunter Mountain, Beacon Mountain, all those entities,

none of those are in bankruptcy except for Highland.

MR. EDNEY: That's correct.

THE COURT: Okay.

MR. EDNEY: Your Honor is never going to unscramble the egg in terms of the restructuring. You're not going to bring those assets back to Charitable DAF Holdco. You're not going to get Mr. Patrick's compensation back. So I use those as issues that we would take up with Mr. Patrick directly.

What we can't take up with Mr. Patrick directly is the assets that he gave away to the Debtor estate that is administered by this Court. Those assets are here, and we think he gave them away improperly and without authority, and that the right result is to bring them back to the status quo ex ante before the settlement was undertaken and make sure that somebody who's properly exercising his fiduciary duties with respect to those assets is making the decision.

THE COURT: And those assets, just to be clear, are primarily litigation rights of HMIT against Highland Entities or Highland Debtor as well as potentially other related entities.

MR. EDNEY: Yes, and the rights to the timing and distribution of cash that is in the Debtor estate.

THE COURT: Okay, but that was fixed by the settlement in favor of HMIT, right?

MR. EDNEY: Well, that's right, Your Honor, but a key

part of the settlement was to bring a portion of that forward. And we think that somebody that really cared about the charitable beneficiaries would have pushed for more.

Instead, Mr. Patrick gave a lot of that leverage away in order to gain his rights to the Kirchner litigation. And the reason he wanted those was to brush Mr. Dondero off the plate, brush him off the plate from asking the hard questions about what happened in this course of misconduct and the gains that he had gotten from it. He wanted a weapon in that fight. I understand why he wants it, but I don't think it's something that should have been facilitated, given what we know now about the condition in which he came to the Court.

THE COURT: Okay. Those are the questions I have. Thank you.

MR. MORRIS: Thank you, Your Honor.

THE COURT: And I have, even though I've asked you a question and taken up time, I'm still going to give you the 11 minutes that I show that was still existing from your time.

MR. EDNEY: Well, I was aiming for 15, so I'm glad I was somewhat close, Your Honor. Thank you.

MR. MORRIS: My vote was 8, so I guess you're the (indiscernible).

THE COURT: As Mr. Edney said, I am never wrong until, of course, an Appellate Court tells me I am.

MR. MORRIS: We finally come to one thing we can

agree upon.

THE COURT: Give me one moment, Mr. Morris. I just --

MR. MORRIS: Yeah, I'd like to take a moment, too, myself.

(Pause)

MR. MORRIS: While we're waiting, I'm hoping that our slide deck for the closing, which we filed this afternoon at Docket Number 4665, can be put on the screen. And we've got hard copies in case anybody's interested. It will be up on the screen.

THE COURT: Okay, Mr. Morris, you're welcome to proceed.

MR. MORRIS: Okay. Thank you, Your Honor.

I actually want to begin by thanking the Court and your staff for your patience, for your diligence in hearing us over a much longer period of time than was expected and permitting us to stay after hours on two of the three days here. I'm very grateful for that.

The two things that are clear to me after hearing Counsel's closing argument is that this is a two-party dispute that can and should be litigated in the Cayman Islands and/or the Texas Business Court because it has absolutely nothing to do with Highland. The second thing that I take away is that everything that's been argued today, the examinations that we

heard over the course of three days, could have been done last year, really could have been done last year, and it wasn't for reasons I'll discuss.

I want to just do a couple of quick bullet points before I get to my prepared remarks. I regret to say I did not appreciate the shot at me and my colleagues about how we are somehow not acting appropriately in defending this case and the suggestion that people will be looking at what we did here in the future. I don't think that's appropriate, and I don't appreciate it.

There's a mention of Dolomiti and somehow some consent was required of Dolomiti. I think Your Honor has heard at least three times and seen the evidence multiple times. Dolomiti had a micro-percentage interest in the limited partner. It was withdrawn before anything happened. Nobody needed Dolomiti's consent to do anything.

They put up a slide about the signatories and suggested Mark Patrick was doing something improper about putting all of those signatories into the settlement agreement. It's the exact opposite, Your Honor. You heard Mr. Seery testify today unambiguously that that was his idea because he has a whole lot of experience in the Highland case and with Highland-related litigation, and he did everything he could to protect himself, to protect the estate, and to protect the legitimate stakeholders.

There was a slide there at the end that said Judge Jernigan may have reasoned that a 60(b) motion would be appropriate. I wish the Court would take the time to read Judge Jernigan's order denying the stay. You don't have to speculate as to what she was thinking because she said it. She denied the stay because she found what was happening in the Cayman Islands, regardless of what Mark Patrick did, to be irrelevant to Highland, the settlement agreement, and HMIT.

I do want to highlight several things that I did not hear anything about. There was nothing about the standard under Rule 60, not a word. There was no mention of the discovery that Dugaboy took and could have taken during the 9019 proceeding. There was no mention at all about the nine different agreements that Mr. Dondero and entities he controlled entered into with Mark Patrick throughout 2025 when all was known to them. And there was, of course, no mention about recusal, and at this point, Your Honor, I hope the Court will find that Dugaboy has completely abandoned that argument.

Now to get to my prepared remarks, if we can go to the first substantive slide, I do want to talk about the law because the law matters. This may be a court of equity, but not at the expense of the law. And too many people come in and rely on some equity because they're hoping that some sense of fairness will overrule the law. That's not the way it works. This is a court of law.

Under Rule 60(b)(2), Dugaboy must come forward with newly-discovered evidence. There's multiple pieces here. It's not just newly-discovered evidence. It's newly-discovered evidence that with reasonable diligence couldn't have been discovered in time to move for a new trial. We have a debate over whether the appropriate date is July 14th or July 28th. We think the plain text of the language of the bankruptcy rule makes it clear that Rule 28 applies, but we believe we win either way. Dugaboy cannot show that there's any newly-discovered evidence that with reasonable diligence couldn't have been discovered that wasn't either cumulative or that would have otherwise produced a different result here.

The law is stated in Paragraphs 58 and 68 of our brief in opposition to the motion to vacate. And it's clear that evidence that didn't exist at the time of the judgment must be ignored for purposes of Rule 60(b)(2). Under 60(b)(3), and this is really important because I think Dugaboy completely misconstrues what 60(b)(3) is all about.

Under Rule 60(b)(3), Dugaboy must prove by clear and convincing evidence, think about that standard, clear and convincing evidence that an adverse party, meaning Highland, engaged in misconduct and prevented the moving party, prevented Dugaboy from fully and fairly presenting its case. It's not about whether Mark Patrick committed fraud. And this is why it's so critical and so stunning that they have completely

ignored the issue of discovery.

I have a case here called In the Matter of Hope 7 Monroe Street Limited Partnership. It was issued by the United States Court of Appeals in the District of Columbia. The citation is 743 F.3d 867. And there the court makes the exact same distinction that I'm trying probably less articulately to make.

It says, "Courts have distinguished between fraud or misstatements that are committed during the course of a commercial transaction, such as a false statement about the quality of goods being sold, and fraud or misstatements perpetrated in the course of litigation such as perjury of a witness or the introduction of a false document into evidence."

What Rule 60(b)(3) is about is the process that led to the entry of the order that's being challenged. It is not about what Mark Patrick did and what transfers he made and whether he breached his fiduciary duty. That is irrelevant under Rule 60(b)(3).

Let's go to the next slide. I have got a litany of undisputed facts, Your Honor. They are cited to very specific evidence in the record. I believe they are undisputed, and these facts mandate denial of the motion. I'm going to go through them quickly.

And let's begin with the fact that Dugaboy has now designated Mr. Dondero as its agent for all purposes relating

to the relevant litigation and Dugaboy's motion to vacate. The relevant litigation is defined in the stipulation to include everything that's been under discussion here. The Cayman proceeding, the 9019 proceeding, the motion for a stay, the Texas Business proceeding, the motion to vacate, and under really basic principles of principle and agency law.

The knowledge acquired by an agent in the course of his duties is imputed to the principle. So everything that was done by, for, and on behalf of Dugaboy in connection with the relevant litigation, or by or on behalf of Mr. Dondero, regardless of what hat he happened to wear, is imputed to Dugaboy because they have stipulated that he is their agent.

We also filed on the docket, Your Honor, if you recall, in Dugaboy's reply brief we saw for the first time the evidence that they contended was newly-discovered. The second document that we filed on the docket, and I'm not going to go through it today because it is really, it is a piece of work, as they say.

We took the charts that are in Dugaboy's reply brief and we replied to it. And you'll see when you read it and you check the citations to the evidence that we have cited in that document that many of the allegations are false. I again appreciate the fact that Mr. Edney is new to this case. Some of the things that they say they learned for the first time in the JOLs' writ were actually filed in the docket by supporting

organizations four years ago, ironically enough.

There's other evidence that they just missed. And we've lived it, so it's easier for us to have recall here. I understand that it's harder when you've just been on the case for a few weeks, but there is so much evidence that they claim is new that is not new at all.

THE COURT: Mr. Morris, real quick. I'm just looking at your slide here. And I believe point two there is what you're referring to and there's no docket name listed.

MR. MORRIS: That's right. So that is also -- I appreciate that -- that was filed, that is at Docket 4665, and I believe that it's been marked as Exhibit 99. So all we did in that docket is take their chart and add a column to the right, and it's our rebuttal to their rebuttal.

There's no dispute, I'm at the third bullet point now on Slide 3, that Mr. Patrick had authority to act on behalf of HMIT at the time of the 9019 hearing.

THE COURT: Mr. Morris, I apologize for interrupting you again. But the last thing I'm showing on the docket is 4664, but hold on, maybe I'm getting old. Give me one second.

MR. MORRIS: Yeah, maybe refresh.

(Pause)

THE COURT: Okay. I had to refresh.

MR. MORRIS: Okay, so it's there?

THE COURT: Yes, it's there, 4665.

MR. MORRIS: Okay. So that, I guess, Exhibit 99 that was lodged on that amended exhibit is what should be filled in in that blank.

THE COURT: Okay.

MR. MORRIS: So Mr. Patrick had authority to act on behalf of HMIT at the time of the 9019 hearing. Your Honor only need look at Paragraph 7 of the HMIT Trust. No evidence was presented showing that anyone anywhere has ever sought Mr. Patrick's removal as the control person of the HMIT Entities, let alone that he was removed. Mr. Patrick remains the control person of the HMIT Entities today, and nobody has ever tried to remove him, notwithstanding all we hear today.

As reflected in Highland's Exhibits 45 to 72 and 55 to 62, these are all of the documents that were filed in the Cayman Islands in the Texas Business Court. It includes Mr. Patrick's very lengthy declaration that was lodged in the Cayman Islands on June 4th. It includes the Dallas Foundation's objection to the Highland settlement.

There is an enormous amount of information in there that shows that Mr. Patrick's allegedly, right -- that Dugaboy knew or should have known by July 14th, take their date, that Mr. Patrick's allegedly wrongful conduct concerning the sale of Beacon Mountain, the restructuring of the DAF Entities, and the compensation and expense issues complained of as far back as April 2025. And that's a reference to the winding-up petition

and Mr. Dondero's first declaration.

But you have to read all of those documents. And I think when you read those documents, you can only come away with, what are we doing here? Like, you learned that he got paid a few dollars more, or you learned -- as I sit here today, I can't even identify what it is they think that they didn't know.

Dugaboy availed itself, and this is a really important point, no dispute that Dugaboy availed itself of all of the rights in discovery under Bankruptcy Rule 9014. They served document requests. They served interrogatories. They took four agreed-upon depositions, including Mr. Raver and Mr. Patrick. Highland produced over 4,000 documents. As you heard Mr. Seery testify today, it included all of the settlement communications, all of the backup, all of the information we received from the HMIT Entities.

The Dallas Foundation pressed its objection that Mr. Patrick lacked authority and then withdrew it. And I just -- I don't know what we're doing here. All we hear about is the charities, the charities, the charities, the charities, and yet the charities aren't here. And it's not as if they're done litigating. They're still litigating in the Cayman Islands. They're still waiting for the JOLs to get their recognition a year later. I'm not quite sure what's taking so long, but I've never heard of that before.

But they still have two lawsuits, right? And the Dallas Foundation, they actually entered into -- not only withdrew their objection with prejudice, but entered into an agreement with Mr. Patrick. Nobody's here except Mr. Dondero. That's a real tell.

If we can go to the next slide. More undisputed facts from my perspective. And this is -- this just destroys, absolutely destroys any Rule 60(b)(2) argument. Neither Dugaboy nor the Dallas Foundation served any document requests on Hunter Mountain. So you have counsel standing here saying, oh gee, they hid it. We couldn't find it. It was so hard. You'll never find something if you don't look for it. We can all agree on that.

If you don't serve a document request that says, what happened? If you don't say, how come you sold Beacon Mountain for a million dollars? Because they knew that's what happened way back in April. They didn't ask. They didn't ask. If you don't ask, why is anybody going to tell you? That's, that's the point of discovery. And when you fail to exercise your rights in discovery, it's not as if they didn't know they had rights to discovery. They did. Both parties knew they had rights to discovery because they took discovery.

For reasons I don't know, for reasons that have not been explained, both Dugaboy and the Dallas Foundation never asked HMIT for a single piece of paper. No evidence was

presented demonstrating that Dugaboy or any other party objected to any aspect of the discovery that was provided, including Mr. Patrick's responses to questions during deposition.

There is zero evidence because it never happened. Right? So we hear today, oh, gee, Mr. Patrick was evasive. Nobody said that at the time. This is exactly what Rule 60 is not intended to do. A do-over. If you didn't like what was happening in discovery when you were actively participating, you should have said something. You didn't.

Again, not to beat a horse, but the only parties to formally object to the proposed settlement on the ground that Mr. Patrick lacked authority, the Dallas Foundation and Crown Global withdrew their objection with prejudice. And this is really -- this is important. It's such an important document for the Court to consider is the Texas Business Court petition by the supporting organizations. That document is important because it actually goes through in extensive detail all of the transactions that they complained about.

It's a document that was filed less than a week after the 9019 proceeding, and it is a document that was indisputably filed a couple of weeks before, even under their view, the shortened period for seeking a new trial.

Dugaboy relies heavily on the writ that was filed on July 15th, and that's why they argue so strenuously for this

July 14th date. But the facts laid out in that document were either previously known, and that's where we rely on that demonstrative exhibit I just referred to, or were cumulative facts known, or it provides details that we're never going to persuade the Court to change its view.

For reasons I'll talk about more in a moment, the evidence adduced in Dugaboy's case-in-chief actually validated this Court's prior finding that the Cayman Islands proceeding is irrelevant to the Highland bankruptcy case in consideration of the settlement agreement under 9019. In 2025, and this is, you know, again, one of those things that they have completely ignored. How do you ignore the fact that in 2025, Mr. Dondero and entities he controlled entered into nine different agreements with Mr. Patrick and either DAF Entities or HMIT entities? Those agreements were -- you can see them. You'll see one that has Mr. Dondero and Mr. Patrick's signature right next to each other. I think there was one as late as just December of last year -- December of last year -- between Atlas and Dugaboy of all entities in which Dugaboy agreed to pay millions of dollars to Atlas. Okay?

We're here saying that Mark Patrick had no authority and yet Dugaboy, the Movant here, just six months ago, is entering into -- long after the writ was filed, right? Long after they had all that evidence. Long after the recognition petition was filed, they're still entering agreements with

Mr. Patrick and paying him millions of dollars. How do you reconcile that? You can't.

Next slide, please. I just want to talk briefly about Ms. MacInnis and Ms. Bannon. mean them no ill will, but I don't think that they added much at all to the body of evidence in the case. I do think that there's good reason for the Court to question Ms. MacInnis' credibility.

I don't know why, but she voluntarily traveled to Texas on her firm's expense, despite being more than $3 million in arrears, not including a $1.2 million judgment in Mr. Patrick's favor that remains unpaid, to testify on behalf of an entity, Dugaboy, that has absolutely no connection to Holdco, the only entity Ms. MacInnis said she oversees, in a matter that seeks to set aside a settlement agreement that Ms. MacInnis has not even determined a year later is good or bad for her entity. Like, what? Why would anybody do that unless they're trying to curry favor with Mr. Dondero?

Ms. Bannon, I think there's reason to question her credibility. Her primary responsibilities at NexPoint concern communications and charitable giving, but all she testified to today, or most of what she testified on the stand, had to do with corporate charts and corporate organization and restructurings and how the transfer of this entity impacted the other entity. That's not what she does for a living.

She was not responsible for investigating the

allegations lodged against Mr. Patrick. Despite being an officer of the Dondero Foundation, she didn't even keep those entities informed about the allegations presented in this motion to vacate. Really? How do you do that as an officer? You didn't even tell them what was happening here.

While she claimed to learn certain facts, I don't know if Your Honor recalls, very short for us examination the first time she took the stand, I pointed out several times how, while she may have learned facts late in the chronology, her supporting organizations learned of them long before her and before the date for seeking a new trial.

For reasons I'll talk a bit more about in a moment, Dugaboy's last second Hail Mary that Mr. Patrick somehow magically or automatically lost his authority to act on behalf of HMIT the moment he allegedly breached his fiduciary duty in matters unrelated to HMIT is rejected as a matter of fact and on the grounds that they've waived that argument. I mean, I don't know that there's ever been a stronger case of waiver.

They had the HMIT Trust Agreement forever. Mr. Dondero alleges in his April declaration that Mr. Patrick began breaching his fiduciary duties as early as June 2023. And yet, as Mr. Seery testified today, Mr. Dondero was perfectly happy joining forces with Mr. Patrick in 2003 and 2024 when Mr. Patrick was prosecuting cases against Highland, but he didn't like it so much when Mr. Patrick decided not to

stand by his side any longer.

The fact is that this argument has been there forever. Had they chosen to make it? They did not. They did not make it at all in connection with the 9019 hearing. They didn't even make it in their motion to vacate. I heard about it for the very first time the Friday before the Monday trial during the deposition of Mr. Dondero. I'd never heard it before.

So not only did they not ever make this argument before, but again, I'll go back to the nine separate agreements that Mr. Dondero or entities acting -- entities that he owned or controlled, including Dugaboy, entered into with Mr. Patrick acting on behalf of HMIT and DAF Entities. You can't reconcile -- I don't know how you come to court today and say he magically lost his powers in 2023 when you've never made the argument before and you enter into agreement after agreement and pay him millions of dollars. I don't know how you do that in good faith.

Next slide. This is just a summary, and I've clipped a bit, right, because I want to -- because I feel like this is so strong. In my opening, I think I used July 28th. Now I've gone back to July 14th. These are the documents, I think, that I cited to earlier that contain all of the information that Dugaboy needed to pursue an objection to the 9019 or to file a motion for a new trial to the extent that they learned things

in the July 1st petition last year.

If we go to the next slide. This is really important. Again, the suggestion that somehow Judge Jernigan thought, oh, gee, maybe I'll just let those guys do a Rule 60 motion. It's just completely contradicted by the words of her order denying the stay. She found that regardless or whatever Mr. Patrick's misdeeds may or may not have been, it wasn't important to her. She said the Cayman Islands proceeding was irrelevant.

And all that's happened over the course of the three days of this hearing is that her determination has been completely validated. How so? Neither HMIT Highland nor the settlement agreement are mentioned in any substantive way in the JOLs' writ, in the JOLs' Chapter 15 recognition petition, in the Cayman Islands Court decision, or I would add in the July 1st Texas Business Court decision that was filed by the supporting organizations.

You have four documents making all kinds of allegations against Mr. Patrick, not one of which mentions in any substantive way Highland or the HMIT settlement. On cross-examination, Ms. MacInnis, I think, candidly admitted that she didn't mention HMIT or Highland or the settlement agreement at any point during her direct testimony. And she actually added, if you look at the citation, "I didn't mention it because I wasn't asked." Dugaboy did not even ask the JOL, who came up

here on her own nickel, one single question about Highland or the settlement agreement.

Ms. MacInnis candidly admitted she didn't even bother to attend the June 25th 9019 hearing, which was available by Zoom, I guess Webex, I'm sorry. She has made no effort a year later, no effort, to obtain the record in that case. And the JOLs' irrelevant? Why? I don't understand it. A year after the motion is filed in response to Your Honor's question, she was forced to admit that she hadn't formed any view as to whether or not the settlement was good or bad for Holdco.

There's no evidence of any kind, and I think Counsel kind of blurred a bunch of lines in his closing argument, because he suggested at one point that they had to wait for the JOLs and the writ in order to find out about the sale of Beacon Mountain. There's nothing in the writ about the sale of Beacon Mountain.

In fact, there's no evidence at all that Ms. MacInnis or the other JOL has done any investigation of any kind into the Beacon Mountain sale. A sale that, ironically, she's here challenging -- she's here supporting Dugaboy in its effort to overturn a settlement agreement that she hasn't determined if it's good or bad and that, ironically, is only even on her radar because of the sale of Beacon Mountain.

If Mr. Patrick didn't sell Beacon Mountain, Hunter Mountain never winds up on the Holdco side of the ledger. So

she actually benefited, she and the JOLs and Holdco. I hope this point is not lost. Holdco benefited from the sale of Beacon Mountain. Holdco benefited from the sale of Beacon Mountain, and yet Ms. MacInnis comes up on her own dime to try to undo a settlement that she doesn't even know is good or bad for her client.

I think Your Honor put your finger right on the pulse of where we are here. You asked the question, if I set aside the settlement agreement, will it have any impact on the restructurings? And I appreciate Counsel's answer. It was blunt no. And I think that is just so insightful. It's an insightful question among a blizzard of information because it does cut to the heart of the matter.

And I would answer that question in the inverse. Regardless of what happens in the Cayman Islands, it's not going to impact the HMIT settlement. And that's why, ultimately, the Cayman Islands proceeding is completely irrelevant, even if they win. So what? They'll get a breach of fiduciary duty claim against Mark Patrick. That has nothing to do with the HMIT settlement.

If we can go to the next slide. Again, I just want to emphasize, I say no evidence was discovered after July 14th that could not have been discovered with reasonable diligence. And I'm going to be honest with the Court and say that's just a bit of an overstatement. And the reason why it's a bit of an

overstatement is because I do understand that the JOLs were able to obtain privileged communications that Dugaboy would not have been able to obtain.

And I think I always want to maintain my credibility with the Court. And so I do think there's that small island over there. But I don't think that island matters a whit when it comes to whether or not the Court would have overturned its decision. It's not a deciding factor in light of the overwhelming evidence that they either knew about or could have obtained with reasonable diligence.

I am going to, I just want to, I guess, focus on that last point there because it's something that Mr. Seery testified about today. And I want to make sure that the Court is clear that discovery in bankruptcy cases does happen quickly. Often happens quickly. Not always, but it often happens quickly. And people act in good faith for the most part.

And one of the things that was important in the 9019 case is that there were no limits placed on the scope of discovery. Nobody said you can't ask about this. You can't ask about that. That's off limits. I heard there was a suggestion that somehow somebody during a deposition suggested that or said that. I don't recall. But I know that if you look at the designations of Mr. Raver and Mr. Patrick and the various -- you're going to see a whole host of information that

Dugaboy now contends it didn't know until after the date for a motion for a new trial. That's another source of information that just can't be ignored here.

And let's remember, they could have asked anything they wanted, right? They could have asked about the compensation. They could have asked about the -- it's not as if they didn't know Beacon Mountain was sold for a million dollars, right? That's right in Mr. Dondero's April affidavit. Why didn't they ask? Well, they actually knew by that point, but they could have learned if they really thought they didn't know who was the buyer. How did you get to a million dollars? I don't know why they didn't ask any of these questions, but they didn't.

We can go to the next chart. This is just a little bit more on this idea that Mr. Patrick has somehow magically lost his powers. Again, no dispute. Mr. Dondero alleges that Mr. Patrick lost his -- breached his fiduciary duty back in 2023. Dugaboy failed to make this argument until just the Friday before last during a deposition. It wasn't made in the 9019 proceeding, even though they had the HMIT Trust Agreement, and it's not even mentioned in Dugaboy's motion to vacate.

And again, the waiver argument, I think, is strong. Whatever the Court might think of that argument, and I don't think if you looked at the plain text of the agreement that the Court would conclude what they say, and that is somehow -- I

mean, I don't think that's the proper reading of it, but I don't think the Court needs to get there, because when a party fails to raise that issue in the proceeding that is the subject of the Rule 60 motion, I think by itself it can't be new evidence, it can't be evidence of fraud, it's called a waiver. And when you compound that with nine separate agreements validating Mr. Patrick's authority, I don't see how you come here today and say he lacked it.

The next slide. Context is everything. Mr. Dondero's goal, clearly, and it's why he's the only one here fighting, is to regain control of the HMIT Entities so he can restart litigation. I mean, you heard him testify. Take him at his word today, Your Honor. If nothing else, take him at his word today when he testified that somehow $700 million vanished, and he's going to undo all the transactions. This is what he's trying to do here, okay? That's what he's trying to do here.

This isn't about charities. This is about vindication, not vindication. It's about -- yeah, going on the offense and just continuing with this litigation assault that so many people have been the victim of for so many decades. It's happened to so many people.

And that's why this is so important to Highland. We're not here to defend or to denigrate Mr. Patrick. We're here to defend our settlement agreement, because this

settlement agreement was, as Mr. Seery testified, very much in the best interests of Highland and its stakeholders, its legitimate stakeholders. It is the path towards finally concluding this case, and that's why we're here fighting. It's not because, right, Mr. Patrick and Mr. Dondero can go to the Cayman Islands. They can go to Texas Business Court.

But in response to your question, so we don't have to ask it later, I'm not aware of any law that says this Court can or should even consider whether or not the settlement was in the best interest of the non-Debtor party. The fact of the matter is I think it was an outstanding settlement for HMIT. They got a couple of assets they otherwise had no right to, including the Dugaboy note and the Kirschner litigation.

But this is a point that has been made so many times over the year. I'm getting paid today, Your Honor, and I'm getting paid today with money that if there had been this -- right? I'm getting paid with money that would be going to Class 10 if we reached a settlement. But, I mean, we reached a settlement with them, so we agreed to give HMIT a little bit of money, but we're husbanding our resources because we know, right, we just know, just take Mr. Dondero at his word today, there's going to be more litigation tomorrow.

And that's really a shame because it didn't have to be this way. You know, you litigate, you litigate hard. Sometimes you win, sometimes you lose, but there has to be an

end to it. There just isn't in this case. And that's why this settlement is so vitally important to Highland and its stakeholders and why, at the end of the day, I want to follow up on that question again.

You asked, oh, does the Court have to consider whether or not the settlement is in the best interest of the non-Debtor? The answer is categorically no, but I need to also point out that there is not a scintilla of evidence in the record on this case that the settlement is not in HMIT's best interest. None of the litigation has been described, the merits of the litigation, right?

Actually, the only evidence we have in the record is Mr. Seery's testimony, which is beyond dispute, that Judge Jernigan heard the evidence in one of these cases and wouldn't let the case go through the gate, under the gatekeeper. The gatekeeper has since been invalidated. But it gives you a sense that she didn't even think it stated a cause of action. Okay? These are the claims that they're fighting for because that's what they do. That's what they do.

Rule 60 is not an opportunity for a do-over, but that's exactly what they're doing here. Dugaboy doesn't contend that the settlement agreement was not in Highland's best interest or that the settlement agreement wasn't the product of arm's-length negotiations. They don't contend that it wasn't a free exchange of information.

Instead, they're relying on evidence developed by the JOLs in a foreign proceeding that Judge Jernigan found has nothing to do with this case. Indeed, and I pointed this out in my opening, Dugaboy didn't even bother calling a Highland witness in its case-in-chief. They didn't put Mr. Dondero on their witness list. They didn't put Mr. Seery on the witness list. I don't know.

Dugaboy and its agent, Mr. Dondero, knew all they needed to know by July to object to Patrick's authority, yet failed to do so. Again, this dispute should be resolved elsewhere.

I want to finish with some legal conclusions because I think the Court has to only not make factual findings, but conclusions of law. I think the Court should conclude as a matter of law that as of June 25th, 2025, the date of the 9019 hearing, Mark Patrick was authorized to enter into the settlement agreement on behalf of the HMIT Entities as the sole control person of each entity.

And again, you can just find that in Paragraph 7 of Exhibit 1. Highland Exhibit 1, it's the HMIT Trust Agreement. And if the Court should find as a matter of law that Dugaboy failed to prove by clear and convincing evidence that it learned of facts for the first time after July 14th, 2025 that were not cumulative of facts known to it prior to that time.

Even if Dugaboy had identified such evidence, which

we don't believe it did, we believe that Dugaboy failed as a matter of law to prove that any such evidence could not have been obtained with reasonable diligence with the one exception I described earlier, particularly since Dugaboy had all rights of discovery under Bankruptcy Rule 9016, but failed to seek anything pertaining to Mr. Patrick's authority to enter into the settlement agreement.

Even if Dugaboy had identified evidence for the first time after July 14th, and even if it could meet its burden of proving that the evidence could not have been identified with reasonable diligence, and there you have the privileged communications, it failed to meet its burden of proving that such evidence would have changed the outcome of the 9019 proceeding.

Dugaboy failed to prove by clear and convincing evidence that the Highland entity is the only opposing party for purposes of Rule 60(b)(3), since they were the only movants in the 9019 motion, engaged in fraud, misrepresentation, or misconduct in connection with the 9019 proceeding.

While we believe that only Highland is relevant to that analysis, if the Court concludes that the HMIT Entities are also relevant to the analysis, because even though they were not a movant, they were still an opposing party, we think Dugaboy has still failed to meet, by clear and convincing evidence, its burden of establishing that the HMIT Entities

engaged in fraud, misrepresentation, or misconduct in connection with the 9019 proceeding.

I want to address briefly 60(b)(6), the interests of justice. We've heard nothing about it, but I feel pretty strongly that I don't want to leave that stone unturned here. We think that Dugaboy failed to meet its burden under that prong. Again, I think the argument of recusal has been abandoned, but there was zero evidence adduced showing the Court's bias or prejudice with any aspect of the 9019 proceeding. The Fifth Circuit previously rejected three times Dugaboy's recusal motion.

Highland's stakeholders, and this is where the interests of justice come in, Highland's stakeholders, like all litigants, justifiably expect finality in Court rulings, and an end to frivolous litigation. Dugaboy's motives in pursuing this motion are highly questionable, given that following the withdrawal of Dugaboy's indirect interest through Dolomiti and Rand, Dugaboy has no direct or indirect interest in the HMIT or DAF Entities. Dugaboy has no connection to HMIT or Rand -- I mean HMIT or the DAF. No connection. Indisputable fact.

Mr. Dondero is clearly -- right, he's Dugaboy's agent, he's Dugaboy's lifetime beneficiary -- is clearly the driving force behind all of the litigation, all of what we defined as the relevant litigation, through his funding, his services, Dugaboy's agent, the supporting organizations'

principal, officer, funder, president, through the submission of multiple affidavits. This is all driven by one man.

At the heart of all of this is apparently a very bitter and personal dispute between Mr. Dondero and Mr. Patrick that does not concern the Highland Entities, the Highland bankruptcy case, or the settlement agreement. And I'll just emphasize one more time, this idea that Mr. Patrick automatically or magically lost his powers at some point in the past is a last second Hail Mary that has been waived and that lacks merit.

I think there is no basis under Rule 60(b)(2), (3), or (6) to vacate this order. I think Dugaboy should be sent packing. And to the extent the supporting organizations and Mr. Patrick want to continue to do battle, they should just do that elsewhere.

Unless the Court has any questions, I'm done.

THE COURT: Mr. Morris, you've addressed this issue of the argument that the HMIT Trust Agreement provides, or as argued by Dondero, provides an automatic removal of the administrator in the event of one of these triggering events. Your response to that is, is that they've waived the argument.

Here's my question to you, though. If the Court finds that the document does stand for that proposition, then does waiver of the argument even matter? That's a legal effect by the document. In other words, if the document provides that

the removal happens upon one of these triggering events, why does them not raising that create a situation where the removal event didn't happen?

MR. MORRIS: Let's be clear what's happening here, Your Honor, because Hunter Mountain doesn't exist in a vacuum. It has owners, none of whom are Dugaboy. That's number one.

Number two, if you read the trust agreement carefully on this point, you will find that Highland is actually the party who's supposed to make the determination as to whether or not Mr. Patrick breaches his fiduciary duty, not the Court. This is not the Court's job. If you look at the agreement itself, Highland is supposed to do that. Highland's never been asked to do that. Highland -- nobody's ever raised the issue. This is a nonstarter as far as we're concerned because Highland and Highland alone.

And it makes sense that it's drafted this way because at the time Mr. Dondero was in control of Highland, and he wanted to control the process. And he decided he would be the one who determined whether or not the control person breached their fiduciary duty. But you know what? He lost control of Highland, and the agreement was never amended, and the agreement says exactly what it's always said, and that is if there's going to be a determination, that determination should be made by Highland.

And so Your Honor can review it, but I think at the

end of the day, I don't see how under a Rule 60 motion, because this is a Rule 60 motion, so you're coming forth with new evidence, or you're coming forth with allegations of fraud in the process. How can you defraud somebody in the process when they're not making arguments that are right in front of their face, that they're making now, that they didn't even make when they made this motion under Rule 60?

THE COURT: Okay. You've already addressed the other question I had, so.

MR. MORRIS: Thank you.

THE COURT: I think that's all.

MR. MORRIS: Thank you very much, Your Honor.

THE COURT: All right. Before, Mr. Edney, you get up, let me just make sure. Ms. Ziegler-Young, do you have anything on behalf of the U.S. Trustee's Office? And if you can give me just a brief idea of how long it might take.

MS. YOUNG: Under two minutes.

THE COURT: Okay. That will work.

MS. YOUNG: Thank you, Your Honor. And thank you for giving me the opportunity to speak with the Court and the parties here today.

The parties have developed a fulsome record of documentary evidence and testimony, and we thank the Court for its time, and we look forward to its ruling. If the Court is not inclined and ready to rule today, we suggest that the

parties and the U.S. Trustee be afforded a short opportunity to review the evidence presented and submit any post-trial briefs if those parties are so inclined. And I have no additional comments, Your Honor.

THE COURT: Hold on one second. What would you be submitting your post-trial briefs about?

MS. YOUNG: The conclusion of the evidence and any additional arguments that would need to be made.

THE COURT: Okay. All right, thank you.

MS. YOUNG: Thank you. All right.

Mr. Edney, part of the Court family has a graduation tonight, okay, so I'm going to excuse Ms. Balcom (phonetic) so she can attend her son's graduation before you get started.

COUNSEL: Congratulations. Congratulations.

MS. BALCOM: He's only four.

THE COURT: These are the best graduations (indiscernible).

Congratulations.

MR. EDNEY: All right. Well, if I weren't on the clock, Your Honor, the air conditioning would cut me short, so I'll get to it.

THE COURT: All right.

MR. EDNEY: First of all, very briefly on one topic, we do not abandon the recusal argument. That's fully briefed in our papers, along with excerpts of the relevant books. That

case is not about actual bias. It's about out-of-court statements relating to Mr. Dondero, we believe, that create an appearance of partiality.

We do think that the Fifth Circuit advanced the ball on this in saying there was a strong argument that the previous judge should have recused, and it is appropriate if we have to get to this point, right, if the strong evidence on misconduct by Mr. Patrick doesn't afford for vacatur that we did not have a judge that lacked the appearance of impartiality to decide it. So we do maintain that argument, Your Honor.

THE COURT: Okay. Let me ask you this real quick question. What evidence do I have of anything regarding the recusal issue? I have your motion. I have what you submit as part of your motion, but that's not evidence.

MR. EDNEY: Your Honor, we lodged the books with the Court in connection with our motion. They're a published document. We think the record is clear that Mr. Dondero is the person that or is close enough to the person that the comments therein and the character of Kate Graham creates an appearance of partiality. So --

THE COURT: Okay. Let me see if I can rephrase the question. Of the exhibits that were admitted by Dugaboy, which exhibits are the books?

MR. EDNEY: We did not admit the exhibits in this evidentiary hearing, Your Honor.

THE COURT: All right, thank you.

MR. EDNEY: They are with the Court, and they're a publication of a matter of public record.

THE COURT: Okay. Thank you.

MR. EDNEY: And I think we did actually send the actual books back to chambers, yeah.

THE COURT: Yes, I have in chambers two books. Yes.

MR. EDNEY: Thank, Your Honor.

THE COURT: So go ahead.

MR. EDNEY: All right. Mr. Dondero was here today to defend his charitable legacy. The Dugaboy Investment Trust was part of seeding both the Hunter Mountain stack, the historical Hunter Mountain stack that led up to a charity, and the Charitable DAF. And what Mr. Dondero is doing here today is portrayed as selfish, but actually is quite selfless.

What Mr. Dondero wants to accomplish is to make sure that when a settlement is entered into, a steward of those charitable interests, both from the donor standpoint and the charity standpoint, is making that decision to enter into a settlement with what has become Highland.

Mr. Morris said that Mr. Patrick's authority to enter into a settlement agreement on behalf of the Hunter Mountain Entities is not disputed. It very much is, for the reasons that we have stated. The argument with respect to the Hunter Mountain Investment Trust agreement and its automatic

displacement of its administrator, that is fully briefed in our reply, and it's a reply to a response.

We laid out this evidence of fraud that was coming in this evidentiary hearing in our opening motion. Mr. Morris came back and said, what does this have to do with the bankruptcy? We shouldn't care about it. And we explained how it does. And the mechanics of that are laid out in our reply brief, and they've been laid out in the evidence adduced here.

With respect to the Cayman proceedings and why we're talking about them and the DAF and why we're talking about those, if we could just pull up Exhibit 242 for a moment, please. Slide 19, please.

This is the result of the sale, Your Honor. And again, Hunter Mountain-Highland Capital Management, the equity interest, was sold into the new DAF structure. This is the DAF 2.0. This is the improperly restructured entity. And Mr. Patrick says nobody is taking action to remove -- well, Mr. Patrick didn't say it -- Highland says that nobody is taking action to remove Mr. Patrick from his authority over Highland Capital Management, over the equity stake, over Hunter Mountain.

That is happening in the Cayman proceedings. Why? Because the folks that control that today, all the way up, these are these Cayman entities. These are the ones that are under the injunction today in the Cayman Islands. And they are

part and parcel of the misconduct with regard to the DAF. So why do we keep talking about the DAF? Why do we keep talking about the Cayman proceedings? Because on February 12th, 2025, before the 9019 settlement proceedings, Mr. Patrick made Hunter Mountain, made Highland Capital Management a part of the DAF story. That's why we're talking about it.

There was a discussion about Dolomiti and whether they should have consented to the sale outward. And Mr. Morris pointed out, well, they were exited from Rand before that sale happened. That was bang, bang. Day one, there was this attempted exit. Day two, the sale happened. And the effort of it was to try to come up with some shell of an argument to avoid informing the investors to reveal the restructuring that was going on.

The Texas Business Court and the Cayman statement of claim, the Texas Business Court complaint, those were very concerning. They had all sorts of details, but they were allegations. The evidence underlying them came out later in July and throughout the fall and winter.

Your Honor, we hear from Highland that this should have been caught earlier. And Highland is not the entity that engaged in the main misconduct here. It's Mr. Patrick. But today they're speaking on his behalf with respect to this motion. And the argument from those who have engaged in wrongdoing that you should have caught me earlier is not an

argument frequently successful in our court system, in our system of justice and equity.

And it shouldn't be successful here, in particular, because this misconduct was concealed. It was designed in a way, we now see that from the Cayman Islands, to be less traceable and detectable. Mr. Patrick had a duty to inform the charities and other stakeholders of this restructuring. He had a duty to inform them.

It was one of his key duties to inform them as to what was going on. And he chose time and time and time again not to do so. He said he chose not to do it. We believe he had a duty to do so. And when you have a duty to inform and you don't follow through with it, that's concealment. That's Rule 60(b)(3). It extended in to the 9019 proceedings.

And I would direct Your Honor to Mr. Patrick's deposition. You know, he had an opportunity to lay bare how Hunter Mountain was restructured into the DAF. He had an opportunity to do it. And when he was asked questions about that by counsel from the parties that were opposing the settlement, he said he didn't know. He said he didn't know. The architect of all this said he didn't know.

If there were breadcrumbs here, they were very, very, very, very tiny. And they were made tiny through what itself was misconduct, through concealment. And this is a 60(b)(3) issue. And it permeated its way into the settlement itself,

into the settlement proceedings.

Your Honor, again, they say what does it matter if Mr. Patrick concealed all this? What does it matter if he had this reconstruction? That's an issue with us. But that's not what was said in that hearing, right? If you go to Mr. Seery's testimony in that hearing, we cross-examined him on, he said that he took steps to confirm Hunter Mountain's authority to enter into this settlement agreement, Mr. Patrick's authority to enter into this settlement agreement on Hunter Mountain's behalf.

And he said to do that, he had to look at the organizing documents, the stack of ownership. That's those Exhibits 70 through 104. That's the old structure. I mean, even that was meant -- even that had the effect of throwing those onlooking off the scent.

And this is a situation where there was an asteroid strike after the hearing in question. What the liquidators found out, the detail, the mechanics, the lack of justification, the opinion-shopping, the motivation with the compensation, all of which was previously unknown. That is the epitome of newly-discovered evidence, and it should foment a vacatur here.

Finally, Your Honor, it didn't make me happy to raise a concern about Highland defending Mr. Patrick's conduct. I expected to come into this hearing from Mr. Patrick's counsel,

Hunter Mountain's, minimizing this restructuring. Instead, I heard from Highland's counsel. And if we were just two commercial entities out there in the world fighting with each other, if we were Exxon versus Chevron in some case, well, maybe that's what we should expect.

But the folks at Highland right now who are running it, they don't own Highland. They didn't own it. They've been authorized by this Court to run it during bankruptcy. And that comes with a higher standard. It comes with a higher standard, and that includes not getting bound up with the type of misconduct that we've seen here.

So it gave no pleasure to point that out, but we were entitled to two faithful stewards. We were entitled to a faithful steward of the Hunter Mountain interest, somebody that wasn't engaged in breaches of fiduciary duty. But we're also entitled to a faithful steward that has interests beyond itself in running the Highland estate. And having a lawyer come up here and direct Mr. Patrick in a series of questions trying to minimize what he did, I think, is a canary in a coal mine that we should remember as we go forward in this case.

Your Honor, I am very grateful for the amount of time that you have given us to present what has happened here. I'd be happy to answer the Court's further questions, but I don't want to leave without thanking it for listening to us over these past few days. Thank you, Your Honor.

THE COURT: Thank you. All right. The Court's going to go ahead and take this matter under advisement. The Court recognizes that there is some urgency or is urgency in the ruling on the motion, so the Court does anticipate doing so in a relatively quickly manner. I anticipate it be written. To the extent it's not, the Court will contact the parties to identify a date in which all parties will be available in order to issue an oral ruling.

Let me just state for the record, the Court is not going to authorize any post-trial briefing. I believe the parties have argued the evidence today, and the Court is not in need of any post-trial briefing on the matter before the Court.

So with that, the Court will be adjourned. I do want to let you all know, we do have what we refer to as a CSO downstairs. Those are the gentlemen that had you all kind of walk through the security. They are downstairs. You all are all welcome to go and check to see if they have a cart.

I understand that maybe one or more of you needed a cart to help bring in everything that you have. They may still have that cart available, but they are there so that the doors can be opened and you don't have to go out the stairwell that leads directly to the outside of the building. So you may take the elevators down, and there may be a cart available to help you move your boxes and other things that you'll be taking back.

So I don't know that for sure, but you can check with the CSO outside or downstairs.

MR. MORRIS: Your Honor, on that very specific topic, is your courtroom going to be open at all tomorrow? Would it be possible for us to leave our boxes and retrieve them tomorrow?

THE COURT: We certainly can.

MR. MORRIS: Yeah, I think that would be our preference.

THE COURT: That's fine. Yeah.

MR. MORRIS: What time do you anticipate the courtroom be opened?

THE COURT: We're usually here by 8:30. We can get it opened at 8:30 probably.

MR. MORRIS: Is that (indiscernible)?

Yeah, we would greatly appreciate that.

THE COURT: Mr. Noble has to take the job back to the house. That's fine. I would (indiscernible) you all have the same possible arrangement. But yes, we can open up the courtroom. The courtroom will be locked this evening once we know everybody is out. It's not taking any further, but we'll lock the courtroom and we can open it back up in the morning. We don't have court tomorrow, but we can certainly open it back up tomorrow.

MR. MORRIS: Thank you very much.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right. With that, we will be adjourned. Thank you all.

(The proceedings were adjourned at 6:33 p.m.)

* * * * *

CERTIFICATE

I, DIPTI PATEL, court approved transcriber, do hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and transcribed to the best of my ability.

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts Date: May 26, 2026